IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CITY OF CHICAGO,<br><br> Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY and KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security,<br><br> Defendants. | Case No. |

**COMPLAINT**

 Plaintiff City of Chicago files this Complaint to enjoin Defendants from freezing funding under the Securing the Cities counterterrorism program ("Securing the Cities" or "STC") as well as to require that Defendants process pending and future reimbursement requests pursuant to law. In support of this Complaint, Chicago alleges as follows:

 1. Congress passed, and President Trump signed, a law establishing Securing the Cities. Congress explained that Securing the Cities seeks to prevent nuclear and other terrorist attacks in high-risk urban areas. To accomplish this purpose, Congress mandated that DHS implement Securing the Cities by providing resources to local governments.

 2. Pursuant to this mandate, DHS has for years entered into cooperative agreements that award funds to Chicago and 12 other regions that DHS deems to be at an elevated risk of sustaining terrorist attacks. The cooperative agreements expressly identify ways in which local governments may spend Securing the Cities funds and require DHS's pre-approval before

1

incurring other costs.

3. For example, the Chicago Fire Department has used Securing the Cities funds to buy equipment designed to detect nuclear and other radiological materials—equipment that is critical to protecting public safety. After incurring these and other costs, Chicago periodically seeks reimbursement from DHS. Until recently, DHS typically reimbursed Chicago within 72 hours of receiving the City's request.

4. All that changed in recent months. Since February 21, 2025, Chicago has submitted five requests to reimburse the City for pre-approved expenditures totaling more than $1 million. DHS has effectively ignored Chicago's requests.

5. On information and belief, DHS's inaction is part of a programmatic freeze of funding under Securing the Cities. In response to Chicago's many inquiries about its reimbursement requests, a federal employee explained that Chicago's requests were "approved," but that "[a]ll DHS-OPO [Office of Procurement Operations] payments are on pause." Confirming this, other regions that receive Securing the Cities funding have told Chicago that DHS has ignored their reimbursement requests too. And just two days ago, DHS told Securing the Cities regions that they "must pause … all radiological and nuclear detection equipment purchases" due to supposed "funding constraints." Indeed, it is unclear whether the DHS office responsible for Securing the Cities will even continue to exist: press reports indicate that the so-called Department of Government Efficiency intends to dismantle that office.

6. DHS's funding freeze is unconstitutional. The United States Constitution assigns Congress the responsibility to enact laws and appropriate funds, while requiring the executive branch to execute those laws. Congress enacted Securing the Cities and required DHS to provide resources to local governments to implement the program. DHS cannot override Congress's

2

judgment by freezing congressionally appropriated funding.

7. DHS's funding freeze also violates the Administrative Procedure Act. Governing regulations require federal agencies to reimburse funding recipients "within 30 calendar days after receipt of the payment request unless the Federal agency [] reasonably believes the request to be improper." 2 C.F.R. § 200.305(b)(3). DHS has not so much as suggested that there is anything "improper" about Chicago's requests. On the contrary, the federal government told Chicago that its reimbursement requests were "approved," but that "[a]ll" such requests are "paused."

8. Accordingly, Chicago seeks an order enjoining Defendants from freezing funding under Securing the Cities and requiring that Defendants process pending and future reimbursement requests pursuant to law.

## PARTIES

9. Plaintiff City of Chicago is a municipal corporation and home rule unit organized and existing under the constitution and laws of the State of Illinois.

10. Defendant United States Department of Homeland Security is a cabinet agency within the executive branch of the United States government. 6 U.S.C. § 111.

11. Defendant Kristi Noem is the Secretary of DHS and is that agency's highest-ranking official. Noem is charged with supervising and managing all DHS decisions and actions. 6 U.S.C. § 112. Chicago sues Noem in her official capacity.

## JURISDICTION AND VENUE

12. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1346. Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 702, 705, 706.

13. Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(e)(1)

because substantial events giving rise to this action occurred in the district, Chicago resides in the district, and no real property is involved in this action.

## FACTUAL BACKGROUND

### I. Congress Established, and Directed DHS to Implement, Securing the Cities.

14. In the wake of the September 11th attacks, Congress created DHS and tasked the agency with reducing the United States' vulnerability to terrorism.

15. In 2005, President George W. Bush directed DHS to "establish a national level Domestic Nuclear Detection Office." According to the President, the Domestic Nuclear Detection Office would "[s]erve as the primary entity in the United States Government to further develop, acquire, and support the deployment of an enhanced domestic system to detect and report on attempts to import, possess, store, transport, develop, or use an unauthorized nuclear explosive device, fissile material, or radiological material in the United States, and improve that system over time."[1] Congress later established the Domestic Nuclear Detection Office in statute. *See* 6 U.S.C. §§ 591-596A.

16. In 2007, the Domestic Nuclear Detection Office created a pilot initiative called "Securing the Cities" to help the highest-risk U.S. cities detect nuclear and radiological materials as well as respond to terrorist attacks. The Domestic Nuclear Detection Office selected the New York City/Jersey City/Newark region as the first pilot region for Securing the Cities.[2]

17. Between 2012 and 2017, the Domestic Nuclear Detection Office added the Chicago, Houston, Los Angeles, and Washington, DC regions to Securing the Cities because the

---

[1] National Security Presidential Directive Nspd-43 (Apr. 15, 2005), https://irp.fas.org/offdocs/nspd/nspd-43.html.
[2] United States Department of Homeland Security, *Securing the Cities Implementation Plan for Fiscal Year 2022* at 2 (Nov. 4, 2022) ("2022 STC Plan"), www.dhs.gov/sites/default/files/2022-12/CWMD%20-%20Securing%20the%20Cities%20implementation%20Plan.pdf.

Office deemed them to be "high-risk" areas. The Atlanta, Boston, Denver, Maricopa County, Miami, New Orleans, San Francisco, and Seattle regions were later added to Securing the Cities.[3]

18. In 2018, Congress passed—and President Trump signed—the Countering Weapons of Mass Destruction Act. That Act required DHS to "establish" Securing the Cities "to enhance the ability of the United States to detect and prevent terrorist attacks and other high-consequence events utilizing nuclear or other radiological materials that pose a high risk to homeland security in high-risk urban areas." 6 U.S.C. § 596b. Through Securing the Cities, DHS "shall—provide resources to enhance detection, analysis, communication, and coordination to better integrate State, local, Tribal, and territorial assets into Federal operations … [and] provide augmenting resources, as appropriate, to enable State, local, Tribal, and territorial governments to sustain and refresh their capabilities developed under the STC program." *Id.* § 596b(b)(3) & (6).

19. The Countering Weapons of Mass Destruction Act renamed the Domestic Nuclear Detection Office as the Countering Weapons of Mass Destruction Office, which is "responsible for coordinating Federal efforts and developing a strategy and policy for the Department to plan for, detect, and protect against the importation, possession, storage, transportation, development, or use of unauthorized chemical, biological, radiological, or nuclear materials, devices, or agents in the United States and to protect against an attack using such materials, devices, or agents against the people, territory, or interests of the United States." *Id.* § 591g.

20. Congress has annually appropriated funds "[f]or necessary expenses of the Countering Weapons of Mass Destruction Office for Federal assistance through grants, contracts, cooperative agreements, and other activities." Consolidated Appropriations Act, 2021, Pub. L.

---

[3] *Id.*; United States Government Accountability Office, *Nuclear Terrorism Prevention: DHS Has Strengthened the Securing the Cities Program, but Actions Are Needed to Address Key Remaining Challenges* at 1-2 (Mar. 2024) ("GAO Report"), www.gao.gov/assets/870/867470.pdf.

116-260, 134 Stat. 1182; *accord, e.g.*, Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 613.

21. Congress has consistently supported Securing the Cities on a bipartisan basis. As recently as March 2025, the U.S. House of Representatives passed on a voice vote the Securing the Cities Improvement Act, which seeks to strengthen the program in response to the New Orleans Bourbon Street attack in January 2025. *See* H.R. 1374, 119th Cong. (2025); *see also* 171 Cong. Rec. H1056-57 (Mar. 10, 2025) (statements of Reps. Correa and Green).

22. There is good reason for this bipartisan consensus. As the U.S. Government Accountability Office explained in a report about Securing the Cities, "[t]he U.S. faces an enduring threat that terrorists could steal or smuggle nuclear or radiological materials to use in a terrorist attack, and efforts to counter such threats are considered a top national priority." The goal of Securing the Cities "is to enhance the ability of the U.S. to detect and prevent the malevolent use of nuclear and radioactive materials that pose risks to high-risk urban areas."[4]

23. DHS, now acting though the Countering Weapons of Mass Destruction Office, has implemented Congress's directives by entering into "cooperative agreements" with local governments in each Securing the Cities region. Unlike grants, cooperative agreements are used when the federal agency will be "substantial[ly] involve[d]" in "carrying out the activity contemplated in the agreement." 31 U.S.C. § 6305. *Compare id.* § 6304 (grants).

24. Under these cooperative agreements, a local governmental agency in each Securing the Cities region is responsible for managing the regional program, coordinating with other local governmental agencies, and reporting that region's progress to DHS.[5]

25. Cooperative agreements under Securing the Cities provide funding on a

---

[4] GAO Report, *supra*, at 1-2.
[5] 2022 STC Plan, *supra*, at 2.

reimbursement basis. In other words, funding recipients (a) incur costs that are either expressly permitted in cooperative agreements or that DHS pre-approves on an individualized basis and then (b) request reimbursement for those costs.

26. Since 2020, DHS has entered into Securing the Cities cooperative agreements that provide for a ten-year period of performance. According to the U.S. Government Accountability Office, Securing the Cities regions may be unable to "maintain and sustain capabilities over time without a dedicated source of [long-term] federal funding," instead forced to "delay[]" critical work to focus on "short-term efforts."[6]

## II. Chicago Entered into Cooperative Agreements with DHS.

27. In 2015, DHS selected Chicago as a Securing the Cities region based on DHS's determination that Chicago is at a "high risk" of sustaining a terrorist attack. Indeed, DHS has consistently ranked the Chicago region in the top 5 metropolitan statistical areas in terms of terrorism risk. DHS continues to assess Chicago as a "Threat Level I"—the highest threat level—which DHS defines as having credible and specific international and domestic terrorist threats based on Intelligence Community reports.

28. In 2016, DHS entered into a cooperative agreement with Chicago, acting through the City's Fire Department.

29. The 2016 award letter obligated DHS to pay $3.5 million in Securing the Cities funds to Chicago, for a project period of 2016 to 2021.

30. DHS stated that the 2016 award "will enable the City of Chicago, Fire Department to provide regional partners radiological and nuclear detection capabilities to reduce risk along roadway, light and heavy rail, and maritime pathways." DHS also stated that the award "will

---

[6] GAO Report, *supra*, at 15-16.

provide assistance that will allow regional partners to acquire equipment, training, and support to further the radiological and nuclear detection mission in the Chicago Region."

31. DHS celebrated the 2016 award, issuing a press release stating that the agency was "building on [its] ongoing efforts to increase the Nation's capabilities to detect and protect against radiological and nuclear threats."

32. From 2017 through 2020, DHS sent several "please apply" letters asking the Chicago Fire Department to apply "[t]o facilitate continuation funding" under the 2016 award. Chicago applied for and received an additional $16,575,000 for the same project period of 2016 to 2021.

33. In or about 2021, DHS sent a Notice of Funding Opportunity to the Chicago Fire Department, proposing to continue providing Securing the Cities funding to Chicago for a project period of 2021 to 2030.

34. The Notice of Funding Opportunity explained that Securing the Cities seeks to "further the nuclear detection mission in the region" and "[a]chieve better integration of Federal, State, and local capabilities allowing regional support to national operations."

35. The Notice of Funding Opportunity (a) listed equipment that recipients could buy and training that recipients could provide using Securing the Cities funds and (b) required recipients to obtain "prior approval of DHS" to procure other equipment or provide other services.

36. The Chicago Fire Department later applied for the 2021 Securing the Cities funding, providing proposed budgets, project plans, financials, and other information required by DHS.

37. In July 2021, DHS entered into a new cooperative agreement with Chicago, awarding $650,000 in Securing the Cities funds.

38. From 2022 through 2024, DHS sent annual "please apply" letters to the Chicago Fire Department. After the Fire Department submitted the requested applications, DHS awarded an additional $2,525,000 to Chicago for the same project period of 2021 to 2030.

39. The Chicago Fire Department has implemented Securing the Cities by, among other actions:

    a. entering into memoranda of understanding with its principal partners in the Chicago region: the Chicago Police Department, Chicago's Office of Emergency Management and Communications, the Cook County Sherriff's Office, the Illinois State Police, and the Illinois Emergency Management Agency;

    b. developing an STC-Chicago Regional Operation Plan, Strategic Plan, and Implementation Plan—plans for Chicago-region partners to prepare for, and respond to, nuclear and/or radiological threats in the region;

    c. buying equipment to detect nuclear and radiological materials, including to enhance detection systems across transportation routes leading to Chicago;

    d. creating and implementing a program that trains employees to use this equipment and respond to terrorist attacks;

    e. conducting drills on preventing and responding to terrorist attacks using nuclear and radiological materials;

    f. conducting sweeps and providing other services at pre-planned special events, including the 2024 Democratic and Republican National Conventions;

    g. strengthening partnerships with local agencies while expanding collaboration with Indiana and Wisconsin; and

    h. paying the salaries of Fire Department employees responsible for managing

the program.

40. Since Chicago's inclusion in Securing the Cities, Chicago has periodically submitted reimbursement requests for these and other pre-approved expenditures. Until recently, DHS typically reimbursed Chicago within 72 hours of receiving the City's request.

### III. DHS Froze Securing the Cities Funding.

41. Since February 21, 2025, Chicago has submitted five requests for reimbursement under Securing the Cities for a total of $1,191,321.18:

    a. On February 21, 2025, Chicago requested $43,013.83;

    b. Also on February 21, 2025, Chicago separately requested $428,669.98;

    c. On March 13, 2025, Chicago requested $26,035.05;

    d. On April 3, 2025, Chicago requested $30,632.53; and

    e. On April 18, 2025, Chicago requested $662,969.79.

42. Through these requests, Chicago seeks reimbursement for money that the City has spent on equipment designed to detect nuclear materials, payroll, and other products or services that are either expressly authorized by the cooperative agreements or that DHS pre-approved.

43. DHS has not acted on any of these five requests.

44. On March 3, 2025, Chicago requested a status update on the City's February 21 reimbursement requests from U.S. Department of Health and Human Services employee Vivian Hughes, who assists Chicago with drawdown requests made through the federal government's Payment Management Services system. Hughes responded: "All DHS-OPO payments are on pause. The payment has been approved but not yet release[d] for payment. We must await guidance from DHS …." Hughes instructed Chicago to "contact your grant officer directly."

45. On March 4 and March 11, 2025, Chicago emailed its DHS grant officer about the

City's pending reimbursement requests. The grant officer did not respond.

46. On March 19, 2025, Chicago emailed Vivian Hughes again to inquire when DHS anticipated reimbursing Chicago. Hughes responded: "The payment has been approved but not yet release[d] for payment. We must await guidance from DHS … . If you have any questions, contact your grants officer directly."

47. The same day, Chicago emailed another DHS grant officer to request an update about the City's pending reimbursement requests. The grant officer responded: "I am sorry to say, I have no further information on your question. We are awaiting guidance on this issue. As soon as we have information to provide, we will do so."

48. On April 10, 2025, Chicago wrote a letter to DHS demanding that the agency reimburse the City for its Securing the Cities expenditures within 10 days. DHS neither responded to Chicago's letter nor resolved Chicago's pending reimbursement requests.

49. Neither Defendants nor any other federal agency or employee have told Chicago the legal basis for freezing Securing the Cities funding.

50. On May 14, 2025, DHS notified all Securing the Cities regions that "the STC program must pause … all radiological nuclear detection equipment and supplies purchases," citing supposed "Federal funding constraints." This notification is part of DHS's funding freeze.

51. DHS's freeze on Securing the Cities funding and equipment purchases may be explained by press reports indicating that the Department of Government Efficiency has marked the Countering Weapons of Mass Destruction Office for termination.[7] A former head of the Countering Weapons of Mass Destruction Office stated that dismantling the Office "would

---

[7] Josh Marshall, *DOGE Poised to Nix WMD Office at DHS*, TALKING POINTS MEMO, Apr. 8, 2025, talkingpointsmemo.com/edblog/doge-poised-to-nix-wmd-office-at-dhs; *see also* Justin Ling, *Pentagon Cuts Threaten Programs That Secure Losse Nukes and Weapons of Mass Destruction*, WIRED, Mar. 6, 2025, www.wired.com/story/pentagon-cuts-nukes-chemical-weapons-wmd.

increase the likelihood of a successful attack" and leave cities hosting events like the World Cup and Summer Olympics "scrambling to find the tools, expertise and personnel needed to guard against weapons of mass destruction threats."[8]

52. It is unclear who is even leading the Countering Weapons of Mass Destruction Office now. The Trump Administration recently fired Acting FEMA Administrator Cameron Hamilton and replaced him with David Richardson—who had been, and perhaps still is, the head of the Countering Weapons of Mass Destruction Office.[9]

53. In any case, Chicago's work with DHS on Securing the Cities is ongoing. In late March 2025, the then-head of DHS's Countering Weapons of Mass Destruction Office visited Chicago to meet with Chicago's Securing the Cities leadership "to discuss detection equipment needs, the program's status, and to see if there are any areas [the Countering Weapons of Mass Destruction Office] can improve upon in supporting the state and local team."[10]

54. Moreover, Chicago continues to incur costs implementing Securing the Cities and intends to seek reimbursement for those costs in the future. Even if DHS satisfies Chicago's pending reimbursement requests, Chicago will have more than $4 million remaining in Securing the Cities funding that the City may use through 2030, in addition to any additional funding that Congress appropriates in the future.

---

[8] Mary Ellen Callahan, *The Consequences of eliminating the DHS WMD office could be catastrophic*, THE HILL, Apr. 11, 2025, thehill.com/opinion/national-security/5242861-threats-homeland-security-weapons-mass-destruction.
[9] Nicole Sganga, *FEMA leader fired after breaking with Trump administration on eliminating agency*, CBS NEWS, May 9, 2025, www.cbsnews.com/news/fema-leader-fired-trump-administration-cameron-hamilton.
[10] United States Department of Homeland Security, Press Release, *CWMD Meets with Chicago Area BioWatch and STC Partners*, https://www.dhs.gov/news/2025/04/04/cwmd-meets-chicago-area-biowatch-and-stc-partners.

## CLAIMS FOR RELIEF

### COUNT I
### Separation of Powers

55. Chicago repeats and realleges all paragraphs above as if fully set forth herein.

56. The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1. "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of N.Y.*, 524 U.S. 417, 438 (1998).

57. Instead, the President must "take Care that the Laws be faithfully executed." U.S. Const. Art. II, Sec. 3; *see Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("Congress makes the laws and the President, sometimes acting through agencies … 'faithfully execute[s]' them"). The Executive Branch violates the Take Care Clause when it declines to execute or otherwise undermines statutes enacted by Congress or regulations implementing statutes. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("the President is without authority to set aside congressional legislation by executive order"); *Kendall v. United States*, 37 U.S. 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution").

58. Moreover, the Constitution "grants the power of the purse to Congress, not the President." *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018); *see* U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause).

59. The Constitution's delegation of authority to Congress "provides institutional protection" from the "abuse" of power that could occur "should such power be concentrated in the executive branch, where one individual … determined to impose his or her policy preferences regardless of the will of Congress, could proceed unimpeded by the types of institutional checks

present in the legislative body." *City of Chi. v. Barr*, 961 F.3d 882, 887 (7th Cir. 2020). "Such a concentration of power would allow tyranny to flourish, and our system of government is wisely set up by the Founders to foreclose such a danger." *Id*. "The executive branch has significant powers of its own—particularly in matters such as immigration—but the power to wield the purse to alter behavior rests squarely with the legislative branch." *Id*.

60. Congress enacted Securing the Cities and mandated that DHS provide resources to local governments, 6 U.S.C. § 596b, repeatedly appropriating funds for that purpose.

61. By enacting the Impoundment Control Act, Congress provided a procedure by which the Executive may propose that Congress rescind or defer funding. *See* 2 U.S.C. §§ 682 *et seq*. Rescissions require Congress's approval, *id*. § 683(b), while deferrals are permissible in three narrow circumstances and may not be made for policy reasons, *id*. § 684(b). President Trump has not sought or obtained Congress's approval to rescind funding under Securing the Cities, and Defendants have not identified any basis to defer funding under the Impoundment Control Act.

62. Defendants therefore unconstitutionally usurped Congress's authority and violated the Constitution's separation of powers by freezing funding under Securing the Cities.

### COUNT II
### Ultra Vires
### (Against All Defendants)

63. Chicago repeats and realleges all paragraphs above as if fully set forth herein.

64. Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. at 320, 326-27 (2015). The Supreme Court has repeatedly invoked this power in awarding equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

65. Defendants acted beyond their legal authority by freezing funding under Securing the Cities and violating 2 C.F.R. § 200.305(b)(3).

## COUNT III
### Administrative Procedure Act—5 U.S.C. § 706(1)

66. Chicago repeats and realleges all paragraphs above as if fully set forth herein.

67. Defendants include agencies as that term is defined in the APA. 5 U.S.C. § 551(1).

68. The APA requires that a court "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

69. An agency can create a non-discretionary duty by binding itself through a regulation carrying the force of law. *Elec. Privacy Info. Ctr. v. Internal Revenue Serv.*, 910 F.3d 1232, 1244 (D.C. Cir. 2018). *See also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (Section 706(1) claims apply to regulations that have the force of law).

70. Regulations governing DHS provide: "When the reimbursement method is used, the Federal agency or pass-through entity must make payment within 30 calendar days after receipt of the payment request unless the Federal agency or pass-through entity reasonably believes the request to be improper." 2 C.F.R. § 200.305(b)(3); *see also id.* § 200.305(b)(6) ("Payments for allowable costs must not be withheld at any time during the period of performance unless required by Federal statute [or] regulations," the recipient "failed to comply with the terms and conditions of the Federal award," or the recipient "is delinquent in a debt to the United States.").

71. DHS has neither paid Chicago within 30 calendar days after receiving reimbursement requests nor identified—much less have—a reasonable belief that Chicago's requests are improper.

72. DHS's conduct constitutes inaction subject to review under the APA because DHS failed to take a discrete agency action required by 2 C.F.R. § 200.305(b)(3).

## COUNT IV
### Administrative Procedure Act—5 U.S.C. § 706(2)(A)

73. Chicago repeats and realleges all paragraphs above as if fully set forth herein.

74. The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

75. Defendants' freeze of Securing the Cities funding is final agency action. *See, e.g.*, *Me. v. United States Dep't of Agric.*, 2025 WL 1088946, at *20 (D. Me. Apr. 11, 2025); *N.Y. v. Trump*, 2025 WL 715621, at *9 (D.R.I. Mar. 6, 2025); *Nat'l Council of Nonprofits v. Office of Mgmt. & Budget*, 2025 WL 597959, at *13 (D.D.C. Feb. 25, 2025).

76. An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). The "reasoned explanation requirement of administrative law … is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. N.Y.*, 588 U.S. 752, 785 (2019).

77. Defendants have offered no explanation for freezing Securing the Cities funding, much less a reasonable explanation.

78. Defendants have failed to identify, let alone explain, any "reasonabl[e] belie[f]" that they may have for failing to reimburse Chicago within 30 days of receiving payment requests. 2 C.F.R. § 200.305(b)(3).

79. Defendants asserted that they "pause[d]" the use of Securing the Cities funds to buy

"radiological nuclear detection equipment and supplies" based on "Federal funding constraints." Defendants cited no authority permitting this action, which violates congressional appropriations laws and 2 C.F.R. § 200.305.

80. An action is also arbitrary and capricious if the agency "'failed to consider … important aspects of the problem'" before it. *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 25 (2020). Where "an agency changes course ... it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *Id.* Defendants exhibited no consideration of Chicago's reliance interests in refusing to reimburse the City for expenditures that Defendants approved.

## COUNT V
### Administrative Procedure Act—5 U.S.C. § 706(2)(B)-(C)

81. Chicago repeats and realleges all paragraphs above as if fully set forth herein.

82. Courts must "hold unlawful and set aside agency action, findings, and conclusions found to be … contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B)-(C).

83. Federal agencies must "manage and administer the Federal award in a manner so as to ensure that Federal funding is expended and associated programs are implemented in full accordance with the U.S. Constitution, applicable Federal statutes and regulations ... and the requirements of this part." 2 C.F.R. § 200.300(a).

84. For the reasons described above, Defendants violated "the U.S. Constitution, applicable Federal statutes and regulations" by freezing Securing the Cities funding and failing to comply with 2 C.F.R. § 200.305(b)(3).

## COUNT VI
### Administrative Procedure Act—5 U.S.C. § 706(2)(D)

85. Chicago repeats and realleges all paragraphs above as if fully set forth herein.

86. Courts must "hold unlawful and set aside agency action, findings and conclusions found to be … without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

87. DHS's inaction on Chicago's reimbursement requests violates procedures set forth in 2 C.F.R. § 200.305(b)(3).

## PRAYER FOR RELIEF

The City requests that the Court:

i. Pursuant to 28 U.S.C. § 2201, issue a declaration that Defendants violated the Constitution, the APA, and acted *ultra vires* by freezing Securing the Cities funding and failing to resolve reimbursement requests within 30 days;

ii. Preliminarily and permanently enjoin Defendants from freezing Securing the Cities funding and failing to resolve pending and future reimbursement requests in accordance with 2 C.F.R. § 200.305(b)(3);

iii. Award attorney's fees and costs to Chicago; and

iv. Grant any other relief that the Court deems proper.


Dated: May 16, 2025

Respectfully submitted,

Mary B. Richardson-Lowry
Corporation Counsel of the City of Chicago

By: /s/ Chelsey Metcalf
Chelsey Metcalf (IL Bar No. 6337233)
Rebecca Hirsch (IL Bar No. 6279592)
Stephen Kane (IL Bar No. 6272490)
Lucy Prather (IL Bar No. 6337780)
City of Chicago Department of Law
121 North LaSalle Street, Room 600

        Chicago, Illinois 60602
        Tel: (313) 744-9484
        chelsey.metcalf@cityofchicago.org
        rebecca.hirsch2@cityofchicago.org
        stephen.kane@cityofchicago.org
        lucy.prather@cityofchicago.org