**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| City of Chicago; City of Boston; City and County of Denver; City and County of San Francisco; and City of Seattle,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>United States Department of Homeland Security and Kristi Noem, in her official capacity as Secretary of the Department of Homeland Security,<br><br>　　　　Defendants. | Case No. 1:25-cv-05462<br><br>Hon. John J. Tharp, Jr. |

**AMENDED COMPLAINT**

Plaintiffs City of Chicago, City of Boston, City and County of Denver, City and County of San Francisco, and City of Seattle file this Amended Complaint to enjoin Defendants from freezing funding under the Securing the Cities counterterrorism program ("Securing the Cities" or "STC"). In support of this Amended Complaint, Plaintiffs allege as follows:

1.　　Congress passed, and President Donald Trump signed, a law establishing Securing the Cities. Congress explained that Securing the Cities seeks to prevent nuclear and other terrorist attacks in high-risk urban areas. To accomplish this purpose, Congress mandated that DHS implement Securing the Cities by providing resources to local governments.

2.　　Pursuant to this mandate, DHS has for years entered into cooperative agreements that award funds to 13 local governments—including Plaintiffs—in urban regions that DHS deems to be at an elevated risk of sustaining terrorist attacks. The cooperative agreements expressly identify ways in which local governments may spend Securing the Cities funds and require DHS's

1

pre-approval before incurring other costs.

3.     For example, Plaintiffs have used Securing the Cities funds to buy, and train employees to use, equipment designed to detect nuclear and other radiological materials that could be used to commit terrorist attacks. Plaintiffs employ the equipment and personnel funded by Securing the Cities to conduct security sweeps at athletic events, concerts, parades, political rallies, and the like. For instance, Plaintiffs used Securing the Cities funds to protect public safety during a visit by then-President Joe Biden, a rally held by then-Presidential candidate Donald Trump, and at the 2024 Democratic and Republican National Conventions. Plaintiffs similarly intend to use Securing the Cities funds to protect upcoming events such as the 2026 Super Bowl in San Francisco and the FIFA World Cup 26 in Boston, San Francisco, and Seattle.

4.     After incurring these and other costs, Plaintiffs periodically seek reimbursement from DHS. Until recently, DHS typically reimbursed Plaintiffs within 72 hours of receiving the request.

5.     All that changed in recent months. Since February 21, 2025, Plaintiffs have submitted 11 requests to reimburse Plaintiffs for expenditures that DHS had already approved. DHS has effectively ignored Plaintiffs' requests while holding open the possibility that DHS may someday reimburse Plaintiffs. For example, on May 28, 2025, DHS stated that it would reimburse Chicago that day, but only if Chicago resubmitted previously provided information about its five reimbursement requests within ***ten minutes***. Although Chicago provided the requested information that same day, DHS has not reimbursed Chicago as of the date of this filing.

6.     On information and belief, DHS's inaction is part of a programmatic freeze of Securing the Cities funding. In response to Chicago's many inquiries about its reimbursement requests, a federal employee explained that Chicago's requests were "approved," but that "[a]ll

2

DHS-OPO [Office of Procurement Operations] payments are on pause." A DHS employee similarly told San Francisco that "there is a 'pause' on disbursements," and that "I have no information on when you can expect the payment."

7.      On May 14, 2025, DHS notified Securing the Cities regions that they "must pause … all radiological and nuclear detection equipment purchases" due to supposed "funding constraints." That notice, in conjunction with DHS's failure to reimburse Plaintiffs for approved expenditures, has already impaired public safety. Plaintiffs have told vendors to stop work on vital equipment and have canceled training designed to protect against terrorist attacks.

8.      To make matters worse, DHS has not provided new awards to Plaintiffs in 2025, as the agency did each year since entering into cooperative agreements with Plaintiffs. On information and belief, absent new awards or extensions of the budget periods governing Plaintiffs' current awards, DHS will not reimburse Plaintiffs for costs incurred after their budget periods expire. Because Plaintiffs' budget periods expire as early as June 30, 2025, DHS's inaction may soon force Plaintiffs to abandon their Securing the Cities programs altogether.

9.      DHS's funding freeze is unconstitutional. The United States Constitution assigns Congress the responsibility to enact laws and appropriate funds, while requiring the executive branch to execute those laws. Congress enacted Securing the Cities and required DHS to provide resources to local governments to implement the program. DHS cannot override Congress's judgment by freezing congressionally appropriated funding.

10.      DHS's funding freeze also violates the Administrative Procedure Act. Governing regulations require federal agencies to reimburse funding recipients "within 30 calendar days after receipt of the payment request unless the Federal agency [] reasonably believes the request to be improper." 2 C.F.R. § 200.305(b)(3). DHS has neither reimbursed Plaintiffs within 30 days of

receiving reimbursement requests nor so much as suggested that there is anything "improper" about Plaintiffs' requests. On the contrary, the federal government told Chicago that its reimbursement requests were "approved," but that "[a]ll" such requests are "paused."

11.     Accordingly, Plaintiffs seek an order enjoining Defendants from freezing Securing the Cities funding and requiring that Defendants process pending and future reimbursement requests pursuant to law.

<h3 style="text-align:center">PARTIES</h3>

12.     Plaintiff City of Chicago is a municipal corporation and home rule unit organized and existing under the constitution and laws of the State of Illinois.

13.     Plaintiff City of Boston is a municipal corporation organized under the laws of the Commonwealth of Massachusetts.

14.     Plaintiff City and County of Denver is a home rule municipality organized and existing under the laws of the State of Colorado.

15.     Plaintiff City and County of San Francisco is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city and county.

16.     Plaintiff City of Seattle is a municipal corporation and first-class charter city organized and existing under the laws of the State of Washington.

17.     Defendant United States Department of Homeland Security is a cabinet agency within the executive branch of the United States government. 6 U.S.C. § 111.

18.     Defendant Kristi Noem is the Secretary of DHS and is that agency's highest-ranking official. Noem is charged with supervising and managing all DHS decisions and actions. 6 U.S.C. § 112. Plaintiffs sue Noem in her official capacity.

## JURISDICTION AND VENUE

19.     The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1346. Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 702, 705, 706.

20.     Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(e)(1) because substantial events giving rise to this action occurred in the district; Chicago resides in the district; and no real property is involved in this action.

## FACTUAL BACKGROUND

**I.      Congress Established, and Directed DHS to Implement, Securing the Cities.**

21.     In the wake of the September 11th attacks, Congress created DHS and tasked the agency with reducing the United States' vulnerability to terrorism.

22.     In 2005, President George W. Bush directed DHS to "establish a national level Domestic Nuclear Detection Office." According to the President, the Domestic Nuclear Detection Office would "[s]erve as the primary entity in the United States Government to further develop, acquire, and support the deployment of an enhanced domestic system to detect and report on attempts to import, possess, store, transport, develop, or use an unauthorized nuclear explosive device, fissile material, or radiological material in the United States, and improve that system over time."[1] Congress later established the Domestic Nuclear Detection Office in statute. *See* 6 U.S.C. §§ 591-596A.

23.     In 2007, the Domestic Nuclear Detection Office created a pilot initiative called "Securing the Cities" to help the highest-risk U.S. cities detect nuclear and radiological materials as well as respond to terrorist attacks. The Domestic Nuclear Detection Office selected the New

_____

[1] National Security Presidential Directive Nspd-43 (Apr. 15, 2005), https://irp.fas.org/offdocs/nspd/nspd-43.html.

York City/Jersey City/Newark region as the first pilot region for Securing the Cities.[2]

24.   Between 2012 and 2017, the Domestic Nuclear Detection Office added the Chicago, Houston, Los Angeles, and Washington, DC regions to Securing the Cities because the Office deemed them to be "high-risk" areas. The Atlanta, Boston, Denver, Maricopa County, Miami, New Orleans, San Francisco, and Seattle regions were later added to Securing the Cities.[3]

25.   In 2018, Congress passed—and President Trump signed—the Countering Weapons of Mass Destruction Act. That Act required DHS to "establish" Securing the Cities "to enhance the ability of the United States to detect and prevent terrorist attacks and other high-consequence events utilizing nuclear or other radiological materials that pose a high risk to homeland security in high-risk urban areas." 6 U.S.C. § 596b. Through Securing the Cities, DHS "shall—provide resources to enhance detection, analysis, communication, and coordination to better integrate State, local, Tribal, and territorial assets into Federal operations … [and] provide augmenting resources, as appropriate, to enable State, local, Tribal, and territorial governments to sustain and refresh their capabilities developed under the STC program." *Id.* § 596b(b)(3) & (6).

26.   The Countering Weapons of Mass Destruction Act renamed the Domestic Nuclear Detection Office as the Countering Weapons of Mass Destruction Office, which is "responsible for coordinating Federal efforts and developing a strategy and policy for the Department to plan for, detect, and protect against the importation, possession, storage, transportation, development, or use of unauthorized chemical, biological, radiological, or nuclear materials, devices, or agents in the United States and to protect against an attack using such materials, devices, or agents against

---

[2] United States Department of Homeland Security, *Securing the Cities Implementation Plan for Fiscal Year 2022* at 2 (Nov. 4, 2022) ("2022 STC Plan"), www.dhs.gov/sites/default/files/2022-12/CWMD%20-%20Securing%20the%20Cities%20implementation%20Plan.pdf.
[3] *Id.*; United States Government Accountability Office, *Nuclear Terrorism Prevention: DHS Has Strengthened the Securing the Cities Program, but Actions Are Needed to Address Key Remaining Challenges* at 1-2 (Mar. 2024) ("GAO Report"), www.gao.gov/assets/870/867470.pdf.

6

the people, territory, or interests of the United States." *Id.* § 591g.

27.    Congress has annually appropriated funds "[f]or necessary expenses of the Countering Weapons of Mass Destruction Office for Federal assistance through grants, contracts, cooperative agreements, and other activities." Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182; *accord, e.g.*, Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 613.

28.    Congress has consistently supported Securing the Cities on a bipartisan basis. As recently as March 2025, the U.S. House of Representatives passed on a voice vote the Securing the Cities Improvement Act, which seeks to strengthen the program in response to the New Orleans Bourbon Street attack in January 2025. *See* H.R. 1374, 119th Cong. (2025); *see also* 171 Cong. Rec. H1056-57 (Mar. 10, 2025) (statements of Reps. Correa and Green).

29.    There is good reason for this bipartisan consensus. As the U.S. Government Accountability Office explained in a report about Securing the Cities, "[t]he U.S. faces an enduring threat that terrorists could steal or smuggle nuclear or radiological materials to use in a terrorist attack, and efforts to counter such threats are considered a top national priority." The goal of Securing the Cities "is to enhance the ability of the U.S. to detect and prevent the malevolent use of nuclear and radioactive materials that pose risks to high-risk urban areas."[4]

30.    DHS, now acting though the Countering Weapons of Mass Destruction Office, has implemented Congress's directives by entering into "cooperative agreements" with local governments in each Securing the Cities region. Unlike grants, cooperative agreements are used when the federal agency will be "substantial[ly] involve[d]" in "carrying out the activity contemplated in the agreement." 31 U.S.C. § 6305. *Compare id.* § 6304 (grants).

---

[4] GAO Report, *supra*, at 1-2.

7

31.     Under these cooperative agreements, a local governmental agency in each Securing the Cities region is responsible for managing the regional program, coordinating with other state and local governmental agencies, and reporting that region's progress to DHS.[5]

32.     Cooperative agreements under Securing the Cities provide funding on a reimbursement basis. In other words, funding recipients (a) incur costs that are either expressly permitted in cooperative agreements or that DHS pre-approves on an individualized basis and then (b) request reimbursement for those costs.

33.     Since approximately 2020, DHS has entered into Securing the Cities cooperative agreements that provide for a ten-year period of performance (i.e., the period during which the local government may expend approved funds to complete the work). According to the U.S. Government Accountability Office, Securing the Cities regions may be unable to "maintain and sustain capabilities over time without a dedicated source of [long-term] federal funding," instead forced to "delay[]" critical work to focus on "short-term efforts."[6]

II.     **Plaintiffs Entered into Cooperatives Agreements with DHS.**

34.     In 2015, DHS selected Chicago as a Securing the Cities region based on DHS's determination that Chicago is at a "high risk" of sustaining a terrorist attack.

35.     In 2016, DHS entered into a cooperative agreement with Chicago, acting through the City's Fire Department.

36.     The 2016 award letter obligated DHS to pay $3.5 million in Securing the Cities funds to Chicago, with a period of performance from 2016 to 2021.

37.     DHS stated that the 2016 award "will enable the City of Chicago, Fire Department to provide regional partners radiological and nuclear detection capabilities to reduce risk along

---

[5] 2022 STC Plan, *supra*, at 2.
[6] GAO Report, *supra*, at 15-16.

roadway, light and heavy rail, and maritime pathways." DHS also stated that the award "will provide assistance that will allow regional partners to acquire equipment, training, and support to further the radiological and nuclear detection mission in the Chicago Region."

38.     DHS celebrated the 2016 award, issuing a press release stating that the agency was "building on [its] ongoing efforts to increase the Nation's capabilities to detect and protect against radiological and nuclear threats."

39.     From 2017 through 2020, DHS sent several "please apply" letters asking the Chicago Fire Department to apply "[t]o facilitate continuation funding" under the 2016 award. Chicago applied for and received an additional $16,575,000 for the same period of performance from 2016 to 2021.

40.     In 2019 and 2020, DHS added the Boston, Denver, San Francisco, and Seattle regions to Securing the Cities based on DHS's determination that those regions are at a "high risk" of sustaining terrorist attacks. DHS sent Notices of Funding Opportunity inviting Boston, Denver, San Francisco, and Seattle to apply for Securing the Cities funding.

41.     DHS also sent a Notice of Funding Opportunity to the Chicago Fire Department in 2020, proposing to continue providing Securing the Cities funding to Chicago under a new cooperative agreement.

42.     The Notices of Funding Opportunity explained that Securing the Cities seeks to "further the nuclear detection mission in the region" and "[a]chieve better integration of Federal, State, and local capabilities allowing regional support to national operations."

43.     The Notices of Funding Opportunity (a) listed equipment that recipients could buy and training that recipients could provide using Securing the Cities funds and (b) required recipients to obtain "prior approval of DHS" to procure other equipment or provide other services.

9

44.     Plaintiffs each applied for Securing the Cities funding by providing proposed budgets, project plans, financials, and other information required by DHS.

45.     In 2020 and 2021, DHS entered into cooperative agreements with Plaintiffs under which DHS awarded Securing the Cities funds. The cooperative agreements provide for periods of performance from 2020 or 2021 through 2029 or 2030.

46.     Plaintiffs in turn have entered into memoranda of understanding with regional partners to implement Securing the Cities. For example, San Francisco has entered memoranda of understanding with fourteen California counties, one Nevada county, and two other Bay Area cities (San José and Oakland). The Chicago Fire Department has similarly entered into memoranda of understanding with its principal partners in the Chicago region, including the Cook County Sherriff's Office, the Illinois State Police, and the Illinois Emergency Management Agency.

47.     Following execution of the 2020/2021 cooperative agreements, DHS annually sent "please apply" letters inviting Plaintiffs to apply for additional funding. After Plaintiffs submitted the requested applications, DHS awarded additional money to Plaintiffs for the same periods of performance.

48.     All told, DHS has awarded nearly $25 million in congressionally appropriated funds to Plaintiffs under the 2020/2021 cooperative agreements.

49.     Plaintiffs have implemented Securing the Cities by, among other actions:

        a.      buying equipment to detect nuclear and radiological materials, including to enhance detection systems across transportation routes leading to urban areas;

        b.      creating and implementing programs that train employees to use this equipment and respond to terrorist attacks;

        c.      paying the salaries of employees responsible for managing the program; and

      d.     developing plans for regional partners to prepare for, and respond to, nuclear and/or radiological threats in the region.

50.    Plaintiffs use equipment and personnel funded by Securing the Cities to conduct security sweeps and otherwise monitor critical infrastructure as well as special events such as concerts, dignitary visits, elections, festivals, parades, political rallies, and professional sporting events. For example, Plaintiffs have used Securing the Cities funds in connection with:

      a.     the 2024 Democratic National Convention in Chicago and the 2024 Republican National Convention in Milwaukee;

      b.     then-President Biden's visit to Denver in November 2023;

      c.     a rally held in October 2024 by then-candidate Trump in Aurora, Colorado;

      d.     the 2024 Presidential election;

      e.     a conference held by the Jewish National Fund in December 2023;

      f.     the Boston Marathon—including on the ten-year anniversary of the 2013 bombing;

      g.     Major League Baseball, National Basketball Association, National Football League, and National Hockey League games as well as parades celebrating NBA and NHL champions;

      h.     Gay Pride parades; and

      i.     concerts held at Red Rocks as well as by the Boston Pops as part of July 4th celebrations.

51.    Since their inclusion in Securing the Cities, Plaintiffs have periodically submitted reimbursement requests for these and other pre-approved expenditures. Until recently, DHS typically reimbursed Plaintiffs within 72 hours of receiving the request.

**III.     DHS Froze Securing the Cities Funding.**

52.     Since February 21, 2025, Plaintiffs have submitted 11 requests for reimbursement under Securing the Cities for a total of nearly $3 million.

53.     Through these 11 requests, Plaintiffs seek reimbursement for money that they have spent on detection equipment, payroll, and other products or services that are either expressly authorized by the cooperative agreements or that DHS pre-approved.

54.     DHS has not acted on any of these 11 reimbursement requests.

55.     Federal regulations provide that where, as here, "the reimbursement method is used, the Federal agency or pass-through entity must make payment within 30 calendar days after receipt of the payment request unless the Federal agency or pass-through entity reasonably believes the request to be improper." 2 C.F.R. § 200.305(b)(3); *see also id.* § 200.305(b)(6) ("Payments for allowable costs must not be withheld at any time during the period of performance unless required by Federal statute [or] regulations," the recipient "failed to comply with the terms and conditions of the Federal award," or the recipient "is delinquent in a debt to the United States.").

56.     Ten of the eleven reimbursement requests submitted by Plaintiffs since February 21 have been pending for more than 30 days, with some pending for nearly four months. The eleventh request will become 30 days old on June 18, 2025.

57.     On March 3, 2025, Chicago requested a status update on the City's February 21 reimbursement requests from U.S. Department of Health and Human Services employee Vivian Hughes, who assists Chicago with drawdown requests made through the federal government's Payment Management Services system. Hughes responded: "All DHS-OPO payments are on pause. The payment has been approved but not yet release[d] for payment. We must await guidance from DHS …." Hughes instructed Chicago to "contact your grant officer directly."

58.     On March 4 and March 11, 2025, Chicago emailed its DHS grant officer about the City's pending reimbursement requests. The grant officer did not respond.

59.     On March 19, 2025, Chicago emailed Vivian Hughes again to inquire when DHS anticipated reimbursing Chicago. Hughes responded: "The payment has been approved but not yet release[d] for payment. We must await guidance from DHS … If you have any questions, contact your grants officer directly."

60.     The same day, Chicago emailed another DHS grant officer to request an update about the City's pending reimbursement requests. The grant officer responded: "I am sorry to say, I have no further information on your question. We are awaiting guidance on this issue. As soon as we have information to provide, we will do so."

61.     On April 10, 2025, Chicago wrote a letter to DHS demanding that the agency reimburse the City for its Securing the Cities expenditures within 10 days. DHS neither responded to Chicago's letter nor resolved Chicago's pending reimbursement requests.

62.     On April 29, 2025, DHS emailed San Francisco: "Due to current events, there is a 'pause' on disbursements from the federal government's Payment Management Service. All of our grants are subject to this 'pause,' and there is no additional information you need to provide at this time.  I have no information on when you can expect the payment to be approved as we are awaiting guidance. Once we have information to share, we will do so."

63.     Neither Defendants nor any other federal agency or employee have told Plaintiffs the legal basis for freezing Securing the Cities funding.

64.     On May 14, 2025, DHS notified all Securing the Cities regions that "the STC program must pause … all radiological nuclear detection equipment and supplies purchases," citing supposed "Federal funding constraints." This notification is part of DHS's funding freeze.

65. On May 28, 2025—tellingly, after Chicago filed the original complaint initiating this lawsuit—DHS informed Chicago that it would reimburse Chicago that day. But DHS agreed to do so only if Chicago provided a breakdown of the costs for which Chicago sought reimbursement in its five outstanding requests—the oldest of which has been pending for four months—within *ten minutes*. Chicago had previously given DHS the information that the agency requested. Chicago nevertheless gave DHS the information again on May 28, albeit not within ten minutes. DHS has not reimbursed Chicago as of the date of this filing.

66. DHS's freeze on Securing the Cities funding and equipment purchases may be explained by uncertainty about the Office's future. Press reports indicate that the Department of Government Efficiency has marked the Countering Weapons of Mass Destruction Office for termination.[7] DHS's proposed 2026 budget seeks to eliminate the Countering Weapons of Mass Destruction Office and divide its functions among various DHS entities.[8]

67. Adding to the uncertainty surrounding Securing the Cities' future, DHS has not sent "please apply" letters to Plaintiffs in 2025—letters that DHS has distributed to Plaintiffs each year since the 2020/2021 cooperative agreements, for some Plaintiffs typically in April or May. "Please apply" letters are a precursor to DHS allocating new funding appropriated by Congress to Plaintiffs and, for reasons explained below, may be required for Plaintiffs to retain access to unspent funds.

68. A former head of the Countering Weapons of Mass Destruction Office stated that dismantling the Office "would increase the likelihood of a successful attack" and leave cities hosting events like the World Cup and Summer Olympics "scrambling to find the tools, expertise

---

[7] Josh Marshall, *DOGE Poised to Nix WMD Office at DHS*, TALKING POINTS MEMO, Apr. 8, 2025, talkingpointsmemo.com/edblog/doge-poised-to-nix-wmd-office-at-dhs; *see also* Justin Ling, *Pentagon Cuts Threaten Programs That Secure Losse Nukes and Weapons of Mass Destruction*, WIRED, Mar. 6, 2025, www.wired.com/story/pentagon-cuts-nukes-chemical-weapons-wmd.
[8] Justin Doubleday, *DHS budget request would split up CWMD office*, FEDERAL NEWS NETWORK, June 2, 2025, federalnewsnetwork.com/budget/2025/06/dhs-budget-request-would-split-up-cwmd-office.

and personnel needed to guard against weapons of mass destruction threats."[9]

69.     It is unclear who is even leading the Countering Weapons of Mass Destruction Office now. The Trump Administration recently fired Acting FEMA Administrator Cameron Hamilton and replaced him with David Richardson—who had been, and perhaps still is, the head of the Countering Weapons of Mass Destruction Office.[10]

## IV.     DHS's Funding Freeze Is Harming Public Safety.

70.     Even if DHS satisfies Plaintiffs' pending reimbursement requests, Plaintiffs have more than $15 million in Securing the Cities funding that Plaintiffs may use through 2029 or 2030, in addition to funding that Congress appropriates in the future.

71.     Plaintiffs thus continue to incur costs implementing Securing the Cities and intend to seek reimbursement for those costs in the future.

72.     For example, Seattle is hosting the FIFA Club World Cup in 2025 and the FIFA World Cup in 2026, games that will be attended by hundreds of thousands of people from around the world. In preparation, the Seattle Fire and Police Departments are currently engaged in training aimed at detecting radioactive threats and preventing terrorist attacks. The equipment and personnel for this training are funded through Securing the Cities.

73.     DHS's funding freeze is, however, already impairing Plaintiffs' ability to protect public safety.

74.     Boston halted several projects because of DHS's funding freeze and May 14 email:

    a.     Boston told a vendor to continue construction on a Massachusetts State

---

[9] Mary Ellen Callahan, *The Consequences of eliminating the DHS WMD office could be catastrophic*, THE HILL, Apr. 11, 2025, thehill.com/opinion/national-security/5242861-threats-homeland-security-weapons-mass-destruction.

[10] Nicole Sganga, *FEMA leader fired after breaking with Trump administration on eliminating agency*, CBS NEWS, May 9, 2025, www.cbsnews.com/news/fema-leader-fired-trump-administration-cameron-hamilton.

Police vessel for maritime operations without installing radiation detection equipment because Boston otherwise lacks funding to buy the radiation detection equipment needed for the vessel;

b. Boston delayed aerial training designed to help the Massachusetts State Police Air Wing and Bomb Squad prevent terrorist attacks; and

c. Boston delayed buying crucial nuclear and radiological detection equipment for its Fire Department.

75. As a result of DHS's funding freeze and May 14 email, Chicago deferred renewing a license for software used to operate radiation detection devices and instructed a vendor to stop work on a camera system used to detect radiation sources. Chicago also instructed a vendor to stop work on an April 2025 request for built-to-order personal radiation detectors, but the vendor responded that Chicago's customized order was too far along to cancel.

76. As a result of DHS's funding freeze and the May 14 email, Denver has paused all Securing the Cities expenditures except staff time. Consequently, Denver:

a. canceled scheduled training to prevent and respond to terrorist attacks and is rejecting requests from regional partners to schedule new training events;

b. cannot repair broken equipment designed to detect nuclear and radiological materials;

c. cannot install a $263,000 mobile-security unit designed to monitor events for risks to public safety, leaving the unit in storage when it needs to be in the field; and

d. cannot pay the vendor that provides software for a system that Denver uses to manage and track nuclear and radiological detection equipment, forcing Denver to manually maintain records in Excel spreadsheets.

77.     As a result of DHS's funding freeze and the May 14 email, San Francisco has:

        a.      paused the procurement process for mobile radiation detectors designed to identify unauthorized radiological material that could severely harm the public;

        b.      canceled and rescheduled training on the use of specialized detection equipment; and

        c.      rejected requests by partner agencies to expand the region's Securing the Cities program.

78.     In March 2025, DHS approved the Seattle Police Department's request to use Securing the Cities funds to buy 1,000 state-of-the-art personal radiation detectors at a cost exceeding $1.1 million. The Seattle Police Department then initiated procurement procedures to buy the detectors, which the Department intended to use to prevent terrorist attacks at the World Cup events described above as well as other large events. As a result of DHS's funding freeze and May 14 email, however, the Seattle Police Department was forced to pause the purchases.

79.     To make matters worse, the current budget periods for Plaintiffs' cooperative agreements are approaching their end dates, with some expiring as soon as June 30, 2025. Although Plaintiffs' cooperative agreements provide for a period of performance through 2029 or 2030, DHS has taken the position that recipients of Securing the Cities funding must obtain DHS's permission to carry over unspent funds allocated in prior years. Thus, to comply with DHS's position and retain access to unspent funds allocated in prior years, Plaintiffs must either obtain an extension of the current budget period or a new annual award under the cooperative agreements.

80.     In May 2025, Seattle asked DHS whether it intended to send the city a "please apply" letter, which is a precursor to obtaining a new annual award. DHS responded that it was not offering new awards at that time. DHS stated, however, that it would extend Seattle's current

budget period beyond June 30 if requested. Seattle then requested an extension, only for DHS to say that it needed more clarity about the agency's budget before responding. On June 3, Seattle again asked DHS to extend the current budget period past June 30. DHS responded that it could not resolve Seattle's request and did not know when it could do so.

81.     Finally, on June 12, 2025, DHS sent "please apply" letters to three Securing the Cities regions, including San Francisco and Seattle. The letters state: "**For FY'25, your award authorization will consist of carryover funding ONLY.**" (Emphasis in original) The letters also state that the May 14 email "remains in effect for the upcoming budget period and no R/N [radiological/nuclear] Detection Equipment maybe [sic] purchased after that date and until the pause is lifted, therefore no funds should be budgeted in the Equipment Category." The letters demand that recipients apply by June 20, 2025, a highly compressed timeframe relative to prior years.

82.     San Francisco and Seattle plan to apply for the limited carryover funding, but Plaintiffs do not agree to the limitations arbitrarily and unlawfully placed on the funding or any unlawful terms and conditions attached to it. Nor do Plaintiffs agree that the limited funding made available through this award application is sufficient to fulfill Securing the Cities program requirements and goals.

83.     On information and belief, absent an extension or a new annual award, DHS will not reimburse Plaintiffs for costs incurred after their current budget periods expire. DHS's inaction thus may force Plaintiffs to abandon their participation in Securing the Cities.

84.     On June 12, 2025, DHS also emailed all Securing the Cities regions to request "the date when you will run out of funds for PMO [Project Management Office] salaries with your current funding. When calculating the date please keep in mind the pause on equipment purchases

and the funding should carry the PMO until the FY26 award cycle." This confirms that DHS intends to maintain the May 14 email's "pause" on equipment purchases into 2026.

## CLAIMS FOR RELIEF

### COUNT I
### Separation of Powers

85.    Plaintiffs repeat and reallege all paragraphs above as if fully set forth herein.

86.    The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. CONST. art. I, § 1. "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of N.Y.*, 524 U.S. 417, 438 (1998).

87.    Instead, the President must "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3; *see Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("Congress makes the laws and the President, sometimes acting through agencies … 'faithfully execute[s]' them"). The Executive Branch violates the Take Care Clause when it declines to execute or otherwise undermines statutes enacted by Congress or regulations implementing statutes. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("the President is without authority to set aside congressional legislation by executive order"); *Kendall v. United States*, 37 U.S. 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution").

88.    Moreover, the Constitution "grants the power of the purse to Congress, not the President." *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018); *see* U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. CONST. art. I, § 8, cl. 1 (Spending Clause).

89.    The Constitution's delegation of authority to Congress "provides institutional protection" from the "abuse" of power that could occur "should such power be concentrated in the

executive branch, where one individual … determined to impose his or her policy preferences regardless of the will of Congress, could proceed unimpeded by the types of institutional checks present in the legislative body." *City of Chi. v. Barr*, 961 F.3d 882, 887 (7th Cir. 2020). "Such a concentration of power would allow tyranny to flourish, and our system of government is wisely set up by the Founders to foreclose such a danger." *Id.* "The executive branch has significant powers of its own—particularly in matters such as immigration—but the power to wield the purse to alter behavior rests squarely with the legislative branch." *Id.*

90.     Congress enacted Securing the Cities and mandated that DHS provide resources to local governments, 6 U.S.C. § 596b, repeatedly appropriating funds for that purpose.

91.     By enacting the Impoundment Control Act, Congress provided a procedure by which the Executive may propose that Congress rescind or defer funding. *See* 2 U.S.C. §§ 682 *et seq.* Rescissions require Congress's approval, *id.* § 683(b), while deferrals are permissible in three narrow circumstances and may not be made for policy reasons, *id.* § 684(b). President Trump has not sought or obtained Congress's approval to rescind funding under Securing the Cities, and Defendants have not identified any basis to defer funding under the Impoundment Control Act.

92.     Defendants therefore unconstitutionally usurped Congress's authority and violated the Constitution's separation of powers by freezing funding under Securing the Cities.

## COUNT II
### Ultra Vires
### (Against All Defendants)

93.     Plaintiffs repeat and reallege all paragraphs above as if fully set forth herein.

94.     Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. at 320, 326-27 (2015). The Supreme Court has repeatedly invoked this power in awarding

equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

95.     Defendants acted beyond their legal authority by freezing funding under Securing the Cities and violating 2 C.F.R. § 200.305(b)(3).

## COUNT III
## Administrative Procedure Act—5 U.S.C. § 706(1)

96.     Plaintiffs repeat and reallege all paragraphs above as if fully set forth herein.

97.     Defendants include agencies as that term is defined in the Administrative Procedure Act. 5 U.S.C. § 551(1).

98.     The Administrative Procedure Act requires that a court "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

99.     An agency can create a non-discretionary duty by binding itself through a regulation carrying the force of law. *Elec. Privacy Info. Ctr. v. Internal Revenue Serv.*, 910 F.3d 1232, 1244 (D.C. Cir. 2018); *see also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (Section 706(1) claims apply to regulations that have the force of law).

100.     DHS has violated 2 C.F.R. § 200.305(b)(3) by neither paying Plaintiffs within 30 calendar days after receiving reimbursement requests nor identifying—much less having—a reasonable belief that Plaintiffs' requests are improper.

101.     DHS's conduct constitutes inaction subject to review under the Administrative Procedure Act because DHS failed to take a discrete agency action required by 2 C.F.R. § 200.305(b)(3).

## COUNT IV
## Administrative Procedure Act—5 U.S.C. § 706(2)(A)

102.     Plaintiffs repeat and reallege all paragraphs above as if fully set forth herein.

103.     The Administrative Procedure Act requires that a court "hold unlawful and set aside

agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

104.    Defendants' freeze of Securing the Cities funding is final agency action. *See, e.g.*, *Me. v. United States Dep't of Agric.*, 2025 WL 1088946, at *20 (D. Me. Apr. 11, 2025); *N.Y. v. Trump*, 2025 WL 715621, at *9 (D.R.I. Mar. 6, 2025); *Nat'l Council of Nonprofits v. Office of Mgmt. & Budget*, 2025 WL 597959, at *13 (D.D.C. Feb. 25, 2025).

105.    An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). The "reasoned explanation requirement of administrative law … is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. N.Y.*, 588 U.S. 752, 785 (2019).

106.    Defendants have offered no explanation for freezing Securing the Cities funding, much less a reasonable explanation.

107.    Defendants have failed to identify, let alone explain, any "reasonabl[e] belie[f]" that they may have for failing to reimburse Plaintiffs within 30 days of receiving requests. 2 C.F.R. § 200.305(b)(3).

108.    Defendants asserted that they "pause[d]" the use of Securing the Cities funds to buy "radiological nuclear detection equipment and supplies" based on "Federal funding constraints." Defendants cited no authority permitting this action, which violates congressional appropriations laws and 2 C.F.R. § 200.305.

109.    An action is also arbitrary and capricious if the agency "'failed to consider …
important aspects of the problem'" before it. *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
591 U.S. 1, 25 (2020). Where "an agency changes course ... it must 'be cognizant that longstanding
policies may have engendered serious reliance interests that must be taken into account.'" *Id.*
Defendants exhibited no consideration of Plaintiffs' reliance interests in refusing to reimburse
Plaintiffs for expenditures that Defendants approved.

## COUNT V
### Administrative Procedure Act—5 U.S.C. § 706(2)(B)-(C)

110.    Plaintiffs repeat and reallege all paragraphs above as if fully set forth herein.

111.    Courts must "hold unlawful and set aside agency action, findings, and conclusions
found to be … contrary to constitutional right, power, privilege, or immunity," or "in excess of
statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B)-
(C).

112.    Federal agencies must "manage and administer the Federal award in a manner so
as to ensure that Federal funding is expended and associated programs are implemented in full
accordance with the U.S. Constitution, applicable Federal statutes and regulations ... and the
requirements of this part." 2 C.F.R. § 200.300(a).

113.    For the reasons described above, Defendants violated "the U.S. Constitution,
applicable Federal statutes and regulations" by freezing Securing the Cities funding.

## COUNT VI
### Administrative Procedure Act—5 U.S.C. § 706(2)(D)

114.    Plaintiffs repeat and reallege all paragraphs above as if fully set forth herein.

115.    Courts must "hold unlawful and set aside agency action, findings and conclusions
found to be … without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

116.    DHS's inaction on Plaintiffs' reimbursement requests violates procedures set forth

23

in 2 C.F.R. § 200.305(b)(3).

## PRAYER FOR RELIEF

Plaintiffs request that the Court:

i. Pursuant to 28 U.S.C. § 2201, issue a declaration that Defendants violated the Constitution, the Administrative Procedure Act, and acted *ultra vires* by freezing Securing the Cities funding and failing to resolve reimbursement requests within 30 days;

ii. Preliminarily and permanently enjoin Defendants from freezing Securing the Cities funding and failing to resolve pending and future reimbursement requests in accordance with 2 C.F.R. § 200.305(b)(3);

iii. Award attorney's fees and costs to Plaintiffs; and

iv. Grant any other relief that the Court deems proper.


Dated: June 16, 2025                    Respectfully submitted,

                                        Mary B. Richardson-Lowry
                                        Corporation Counsel of the City of Chicago

                                        By: /s/ Chelsey Metcalf
                                        Chelsey Metcalf (chelsey.metcalf@cityofchicago.org)
                                        Rebecca Hirsch (rebecca.hirsch2@cityofchicago.org)
                                        Stephen Kane (stephen.kane@cityofchicago.org)
                                        Lucy Prather (lucy.prather@cityofchicago.org)
                                        City of Chicago Department of Law
                                        121 North LaSalle Street, Room 600
                                        Chicago, Illinois 60602
                                        Tel: (312) 744-9484

                                        Adam Cederbaum
                                        Corporation Counsel, City of Boston

                                        /s/ Samuel B. Dinning
                                        Samuel B. Dinning* (samuel.dinning@boston.gov)
                                        Teresa K. Anderson* (teresa.anderson@pd.boston.gov)
                                        City of Boston Law Department
                                        One City Hall Square, Room 615

Boston, MA 02201
Tel: (617) 635-4034

*Attorneys for Plaintiff City of Boston*

Katie McLoughlin
Acting City Attorney, City and County of Denver

By: /s/ Matthew J. Mulbarger
Matthew J. Mulbarger*
(matthew.mulbarger@denvergov.org)
Denver City Attorney's Office
201 W. Colfax Avenue
Denver, CO 80202
Tel: (720) 913-8050

*Attorneys for Plaintiff City and County of Denver*

David Chiu
City Attorney

/s/ David Chiu
David Chiu*
Yvonne R. Mere* (Yvonne.Mere@sfcityatty.org)
Mollie M. Lee* (Mollie.Lee@sfcityatty.org)
Sara J. Eisenberg* (Sara.Eisenberg@sfcityatty.org)
Nancy E. Harris* (Nancy.Harris@sfcityatty.org)
San Francisco City Attorney's Office
1390 Market Street, 7th Floor
San Francisco, CA 94102-5408
Telephone: (415) 355-3308

*Attorneys for Plaintiff City and County of San Francisco*

Ann Davison
Seattle City Attorney

By: /s/ Rebecca Widen
Rebecca Widen* (Rebecca.Widen@seattle.gov)
Seattle City Attorney's Office
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
Tel: (206) 684-8200

*Attorneys for Plaintiff City of Seattle*

25

* Applications for *pro hac vice* admission forthcoming