**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

CITY OF CHICAGO, CITY OF BOSTON, CITY AND COUNTY OF DENVER, CITY AND COUNTY OF SAN FRANCISCO, and CITY OF SEATTLE,

        Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY and MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security,

        Defendants.

Case No. 1:25-cv-05462

Hon. John J. Tharp, Jr.


**MEMORANDUM IN SUPPORT OF
<u>PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 2

I.      DHS Implemented Securing the Cities by Promptly Reimbursing Local Governments
        for Costs Incurred Buying Counterterrorism Equipment...................................... 2

II.     DHS Froze Securing the Cities Funding and Prohibited Local Governments from
        Using Program Funds to Buy Counterterrorism Equipment. ............................... 5

III.    Plaintiffs' Rely on Securing the Cities Funds and Are Harmed by the Freezes................. 8

ARGUMENT ................................................................................................................ 9

I.      This Court Has Jurisdiction. ............................................................................... 10

        A.      The Tucker Act Does Not Divest the Court of Jurisdiction. ................................ 10

                1.      Plaintiffs' Claims Are Not Based in Contract. ..........................................11

                2.      Plaintiffs Seek Only Equitable and Declaratory Relief that the Court of
                        Federal Claims Lacks Authority to Grant. ................................................ 12

        B.      Plaintiffs' Challenge to the Reimbursement Freeze Is Not Moot. ........................ 13

II.     Plaintiffs Are Entitled to Summary Judgment as to the Equipment Freeze..................... 15

        A.      DHS Failed to Provide a Satisfactory Explanation for the Equipment Freeze. ..... 16

        B.      DHS Changed Its Policy Without Considering Plaintiffs' Reliance Interests. ..... 18

        C.      DHS Ignored the Equipment Freeze's Impact on Public Safety. .......................... 21

III.    Plaintiffs Are Entitled to Summary Judgment as to the Reimbursement Freeze. ............. 22

        A.      The Reimbursement Freeze Is Arbitrary and Capricious.................................... 23

        B.      The Reimbursement Freeze Is Contrary to Law and Procedure. .......................... 27

IV.     The Court Should Award Declaratory Relief, Vacate the Unlawful Freezes, and Grant
        Injunctive Relief................................................................................................ 28

CONCLUSION............................................................................................................ 30

ii

**TABLE OF CASES**

*Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*,
 703 F. Supp. 3d 126 (D.D.C. 2023) ...................................................................................11

*Bennett v. Spear*,
 520 U.S. 154 (1997).......................................................................................................... 15

*Biden v. Texas*,
 597 U.S. 785 (2022)........................................................................................................... 23

*Bowen v. Massachusetts*,
 487 U.S. 879 (1988)........................................................................................................... 12

*California v. U.S. Dep't of Transp.*,
 808 F. Supp. 3d 291 (D.R.I. 2025)..................................................................................... 29

*Castanon-Nava v. DHS*,
 161 F.4th 1048 (7th Cir. 2025)........................................................................................... 30

*Cayuga Nation v. United States*,
 594 F. Supp. 3d 64 (D.D.C. 2022) ..................................................................................... 24

*Chi. Transit Auth. v. U.S. Dep't of Transp.*,
 2026 WL 810912 (N.D. Ill. Mar. 24, 2026) ................................................................ 20, 28

*Chi. Women in Trades v. Trump*,
 778 F. Supp. 3d 959 (N.D. Ill. 2025) ................................................................................. 12

*City & County of San Francisco v. Trump*,
 783 F. Supp. 3d 1148 (N.D. Cal. 2025)............................................................................. 23

*City of Chicago v. Barr*,
 961 F.3d 882 (7th Cir. 2020)............................................................................................. 26

*City of Chicago v. DHS*,
 2025 WL 3171302 (N.D. Ill. Nov. 13, 2025)................................................................ 14, 29

*City of Chicago v. DHS*,
 2026 WL 1265428 (N.D. Ill. May 8, 2026) .............................................................. 14, 15, 28

*City of Chicago v. DHS*,
 2026 WL 353581 (N.D. Ill. Feb. 9, 2026)........................................................................... 14

*City of Chicago v. DHS*,
 815 F. Supp. 3d 727 (N.D. Ill. 2025) ................................................................. 14, 15, 17, 23

*City of Chicago v. DOJ*,
 822 F. Supp. 3d 873 (N.D. Ill. 2026) ............................................................................ 26, 27

*City of Chicago v. Noem*,
  2025 WL 3251222 (N.D. Ill. Nov. 21, 2025) .................................................... 20, 23, 24, 27, 29

*City of Mesquite v. Aladdin's Castle, Inc.*,
  455 U.S. 283 (1982) .......................................................................................................... 13

*Colorado v. HHS*,
  788 F. Supp. 3d 277 (D.R.I. 2025) ................................................................................... 29

*Cook County v. Wolf*,
  498 F. Supp. 3d 999 (N.D. Ill. 2020) ............................................................................... 29

*Cook County v. Wolf*,
  962 F.3d 208 (7th Cir. 2020) ............................................................................... 15, 21, 22

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
  698 F.3d 1101 (9th Cir. 2012) .......................................................................................... 10

*DHS v. Regents of Univ. of Cal.*,
  591 U.S. 1 (2020) ................................................................................................... 18, 20, 21

*Doe v. Noem*,
  822 F. Supp. 3d 893 (N.D. Ill. 2026) ............................................................ 17, 19, 21, 25, 30

*Drs. for Am. v. Off. of Pers. Mgmt.*,
  793 F. Supp. 3d 112 (D.D.C. 2025) ............................................................................ 20, 24

*Duncan v. Bonta*,
  83 F.4th 803 (9th Cir. 2023) ............................................................................................. 29

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) .......................................................................................................... 29

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) ............................................................................................... 18, 24, 25

*Env't Def. Fund, Inc. v. Gorsuch*,
  713 F.2d 802 (D.C. Cir. 1983) .......................................................................................... 28

*Evers v. Astrue*,
  536 F.3d 651 (7th Cir. 2008) .............................................................................................. 11

*Freedom Network USA v. Trump*,
  2026 WL 800392 (N.D. Ill. Mar. 23, 2026) ...................................................... 19, 20, 25, 27

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) .......................................................................................................... 13

iv

*Hisp. Affs. Project v. Acosta*,
  901 F.3d 378 (D.C. Cir. 2018)............................................................................ 10

*Hunger v. Leininger*,
  15 F.3d 664 (7th Cir. 1994) ................................................................................. 9

*Illinois v. FEMA*,
  801 F. Supp. 3d 75, 94 (D.R.I. 2025).............................................. 20, 21, 22, 24, 29

*Illinois v. Noem*,
  813 F. Supp. 3d 282 (D.R.I. 2025) ............................................................ 16, 24, 27

*Illinois v. Vought*,
  2026 WL 962287 (N.D. Ill. Mar. 12, 2026) ........................................................ 18

*Immigrant Defs. L. Ctr. v. DHS*,
  2025 WL 1191572 (C.D. Cal. Mar. 14, 2025) ..................................................... 10

*In re Blunt*,
  358 F. Supp. 2d 882 (D.N.D. 2005) .................................................................... 10

*Johnson v. U.S. Off. of Pers. Mgmt.*,
  783 F.3d 655 (7th Cir. 2015).............................................................................. 29

*Knox v. Serv. Emps. Int'l Union, Local 1000*,
  567 U.S. 298 (2012).......................................................................................... 15

*Life Spine, Inc. v. Aegis Spine, Inc.*,
  8 F.4th 531 (7th Cir. 2021)................................................................................ 29

*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982).......................................................................11, 12

*Michigan v. Noem*,
  819 F. Supp. 3d 1163 (D. Or. 2025) ................................................................... 30

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)....................................................................................... 18, 26

*Nat'l Council of Nonprofits v. OMB*,
  763 F. Supp. 3d 36 (D.D.C. 2025) ..................................................................... 25

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*,
  145 S. Ct. 2658 (2025)...................................................................................... 13

*New York v. Trump*,
  764 F. Supp. 3d 46 (D.R.I. 2025)....................................................................... 25

*New York v. Trump*,
769 F. Supp. 3d 119 (D.R.I. 2025) ...................................................................... 14

*New York v. Trump*,
811 F. Supp. 3d 215 (D. Mass. 2025) ................................................................... 16

*Nken v. Holder*,
556 U.S. 418 (2009) ............................................................................................ 29

*Ohio v. EPA*,
603 U.S. 279 (2024) ................................................................................. 16, 17, 24

*Pacito v. Trump*,
169 F.4th 895 (9th Cir. 2026) ............................................................................. 11

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015) .............................................................................................. 28

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*,
174 F.4th 81 (D.C. Cir. 2026) ............................................................................. 29

*Richardson v. Morris*,
409 U.S. 464 (1973) ............................................................................................ 11

*San Luis & Delta-Mendota Water Auth. v. Locke*,
776 F.3d 971 (9th Cir. 2014) ............................................................................. 10

*St. Bernard Par. Gov't v. United States*,
134 Fed. Cl. 730 (2017) ..................................................................................... 11

*Terry v. Astrue*,
580 F.3d 471 (7th Cir. 2009) .............................................................................. 27

*U.S. Dep't of Com. v. New York*,
588 U.S. 752 (2019) ...................................................................................... 16, 18

*U.S. Dep't of Educ. v. California*,
604 U.S. 650 (2025) ...................................................................................... 12, 13

*United Aeronautical Corp. v. U.S. Air Force*,
80 F.4th 1017 (9th Cir. 2023) ............................................................................. 12

*Washington v. U.S. Dep't of Educ.*,
813 F. Supp. 3d 1222 (W.D. Wash. 2025) ........................................................... 10

*Washington v. U.S. Dep't of Transp.*,
2026 WL 183584 (W.D. Wash. Jan. 23, 2026) ............................................... 15, 23

vi

**INTRODUCTION**

Officially enacted into law by President Trump in 2018, the "Securing the Cities" program's uncontroversial purpose is to prevent radiological or nuclear attacks in high-risk urban areas by enhancing localities' ability to detect and stop illicit radioactive materials. For years, DHS worked cooperatively with Plaintiffs—five Securing the Cities regions—to strengthen their counterterrorism abilities. In particular, DHS helped Plaintiffs make approved counterterrorism equipment purchases, for which DHS reimbursed Plaintiffs, typically within 72 hours.

This all changed in 2025. DHS froze reimbursements to Plaintiffs for millions of dollars in Securing the Cities expenditures (the "Reimbursement Freeze"). DHS later informed Plaintiffs— *regions DHS had designated as being at high risk for terrorism threats*— that they could no longer purchase new radiological and nuclear detection equipment (the "Equipment Freeze").

DHS's abrupt change of course violates the Administrative Procedure Act in at least two ways. *First*, the Reimbursement Freeze and Equipment Freeze are arbitrary and capricious. DHS failed to provide a satisfactory explanation for either freeze. Indeed, DHS gave no explanation at all for the Reimbursement Freeze. For the Equipment Freeze, DHS simply cited nonexistent "Federal funding restraints." DHS also failed to consider Plaintiffs' longstanding reliance interests on Securing the Cities funds and ignored the impact the Freezes would have on public safety. What's more, the record suggests DHS may have relied on improper factors, like whether Plaintiffs are "sanctuary jurisdictions." *Second*, the Reimbursement Freeze is contrary to law and procedure because DHS failed to follow its own regulation requiring it to process Plaintiffs' reimbursement requests within 30 days.

Plaintiffs accordingly request the Court enter summary judgment in their favor on Counts IV and VI and declare both Freezes were unlawful; vacate both Freezes under 5 U.S.C. § 706(2); and permanently enjoin Defendants from implementing the Equipment Freeze.

1

## BACKGROUND

**I.     DHS Implemented Securing the Cities by Promptly Reimbursing Local Governments for Costs Incurred Buying Counterterrorism Equipment.**

In 2007, the Department of Homeland Security ("DHS") established a pilot program called Securing the Cities. *See* Metcalf Dec., Ex. A. The program sought "to prevent a Radiological/Nuclear (RN) attack on high-risk urban areas by enhancing regional capabilities to detect and interdict illicit radioactive materials in and around urban areas." *Id.*, Ex. A at 7.[1] DHS initially awarded Securing the Cities funds to the New York City region based on DHS's determination that the region faced a high risk of sustaining terrorist attacks. *Id.*, Ex. B at 48. DHS later awarded Securing the Cities funds to other high-risk urban areas, including Chicago. *Id.*

For example, in 2016, DHS entered into a cooperative agreement with Chicago, awarding Chicago $3.5 million in Securing the Cities funds for a project period of 2016 to 2021. Bethany Hand Dec. ("Chicago Dec. 1"), Ex. B at 54, 57. DHS stated that the award would "provide assistance that will allow regional partners to acquire equipment, training, and support to further the radiological and nuclear detection mission in the Chicago Region," "reduc[ing] risk along roadway, light and heavy rail, and maritime pathways." *Id.*, Ex. B at 54. Chicago then worked closely with DHS to implement the program. *Id.* ¶ 9. Chicago fronted expenditures that were either authorized by its cooperative agreement or pre-approved by DHS. *Id.* ¶¶ 20–21. Chicago then submitted reimbursement requests, which DHS typically paid within 72 hours. *Id.*

In 2018, Congress codified Securing the Cities by enacting the Countering Weapons of Mass Destruction Act, Pub. L. No. 115-387, § 1928, 132 Stat. 5162, 5164–66. The Act created the Countering Weapons of Mass Destruction Office (the "Office") within DHS, 6 U.S.C. § 591g, and required the Office to "establish" Securing the Cities, *id.* § 596b(a). Congress explained that the

---

[1]     All exhibit pin cites refer to the file-stamped CM/ECF page numbers at the top-right of the documents.

program sought "to enhance the ability of the United States to detect and prevent terrorist attacks and other high-consequence events utilizing nuclear or other radiological materials that pose a high risk to homeland security in high-risk urban areas." *Id.* § 596b(a). The ability of high-risk urban areas to procure radiological and nuclear detection equipment was central to Congress's purpose. The Act mandated that DHS "provide resources to enhance detection, analysis, communication, and coordination to better integrate State [and] local … assets into Federal operations," *id.* § 596b(b)(3), and "provide augmenting resources … to enable State [and] local … governments to sustain and refresh their capabilities," *id*. § 596b(b)(6).

Since codifying Securing the Cities, Congress has annually appropriated funds to the Office "for Federal assistance through grants, contracts, cooperative agreements, and other activities." *E.g.*, Consolidated Appropriations Act of 2021, Pub. L. No. 116-260, 134 Stat. 1182, 1467. DHS in turn entered into cooperative agreements awarding Securing the Cities funds to 13 urban regions—including Plaintiffs—that DHS deems to be at "high risk" of sustaining terrorist attacks. 6 U.S.C. § 596b(c)(1); *see, e.g.*, Anthony Rizzo Dec. ("Boston Dec."), Ex. C at 51; Chicago Dec. 1, Ex. D at 115; Mary Ellen Carroll Dec. ("S.F. Dec."), Ex. B at 51; Melissa Cordeiro Dec. ("Seattle Dec."), Ex. A at 15. Under these cooperative agreements, a local governmental agency in each Securing the Cities region is responsible for managing the regional program, coordinating with other state and local governmental agencies, and reporting that region's progress to DHS. *E.g.*, Chicago Dec. 1, Ex. C at 6–7, 15, 32. DHS provides funding on a reimbursement basis. *E.g.*, *id.* ¶ 20. In other words, funding recipients (a) incur costs that are either expressly permitted in cooperative agreements or that DHS pre-approves on an individualized basis and then (b) request reimbursement for those costs. *Id.* Until approximately February 2025, DHS typically paid the reimbursement requests within 72 hours. *See, e.g.*, Chicago Dec. 1 ¶¶ 21–22; Caroline Buhse Dec.

3

("Denver Dec.") ¶¶ 8, 10.

Local governments' ability to use Securing the Cities funds to buy radiological and nuclear detection equipment has long been a core component of the program. For example, DHS issued Notices of Funding Opportunity for Securing the Cities explaining that "DHS provides assistance to regional partners to … [d]evelop a robust mobile architecture and equipment set for both land and maritime pathways focused on steady-state operations," and that "[s]upport includes … providing radiological/nuclear (R/N) detection equipment." *See, e.g.*, S.F. Dec., Ex. A at 15, 17. Moreover, cooperative agreements between DHS and Securing the Cities regions have, for years, included specific budget lines listing dollar amounts for radiological and nuclear detection equipment purchases. *See, e.g.*, Boston Dec., Ex. F at 84; Chicago Dec. 1, Ex. E at 147; Denver Dec., Ex. C at 17; S.F. Dec., Ex. C at 71. Many cooperative agreements also highlighted Plaintiffs' ownership of this equipment: "[t]itle to equipment acquired by the Recipient [city] with Federal funds provided under this Award shall vest in the Recipient, subject to [specified] conditions …." *See, e.g.*, Chicago Dec. 1, Ex. D at 116.

DHS's implementation of Securing the Cities has likewise centered around funding local governments to buy radiological and nuclear detection equipment. For instance, DHS created a "phased" approach that required Securing the Cities regions to first procure and later refresh radiological and nuclear detection equipment. Chicago Dec. 1, Ex. F at 169 (DHS template for Chicago's FY26 "program management review," identifying "STC Implementation Phases"). DHS required Securing the Cities regions to procure 68% of their radiological and nuclear detection equipment to advance to the penultimate phase of program and then 90% of their equipment to advance to the final phase. *See id.* at 168 (same, citing "STC Implementation Plan").

In total, DHS has awarded more than $50 million in Securing the Cities funds to Plaintiffs.

4

Boston Dec. ¶ 18; Chicago Dec. 1 ¶ 29; Denver Dec. ¶ 22; S.F. Dec. ¶ 32; Seattle Dec. ¶ 5. Plaintiffs have used these funds to buy radiological and nuclear detection equipment as well as to train and pay employees who use that equipment to prevent terrorist attacks. For example, Plaintiffs have used Securing the Cities funds in connection with the 2024 Democratic and Republican National Conventions in Chicago and Milwaukee; campaign rallies and visits from Presidents Biden and Trump and Vice-Presidents Harris and Vance; marquis sporting events including the Boston Marathon, the Indy 500, and the Super Bowl; and major concerts held at Red Rocks Amphitheater in Colorado; as well as for Boston's Fourth of July celebrations with the Boston Pops. Boston Dec. ¶ 17(f); Chicago Dec. 1 ¶ 38; Denver Dec. ¶¶ 14(g), 28; S.F. Dec. ¶ 39.

## II.    DHS Froze Securing the Cities Funding and Prohibited Local Governments from Using Program Funds to Buy Counterterrorism Equipment.

*The Reimbursement Freeze*. Beginning in February 2025, Plaintiffs submitted numerous requests for reimbursement under Securing the Cities. Boston Dec. ¶ 22; Rick Girven Dec. ("Chicago Dec. 2") ¶ 10; Denver Dec. ¶ 15; S.F. Dec. ¶ 24; Seattle Dec. ¶ 16. Receiving no response to its requests, Chicago sought clarification from a federal employee responsible for processing payments to grantees. Chicago Dec. 2 ¶ 13. That employee explained: "All DHS-OPO payments are on pause. The payment has been approved but not yet release[d] for payment." *Id.*, Ex. B at 10. The employee further stated that "[w]e must await guidance from DHS" and instructed Chicago to "contact your grant officer directly." *Id.* Chicago repeatedly contacted DHS grant officers and other DHS officials, who either ignored Chicago or responded, "I have no further information." *Id.*, Ex. B at 9; *id.*, Ex. C at 15. In April 2025, DHS reiterated to San Francisco: "Due to current events, there is a 'pause' on disbursements from PMS [Payment Management Service]. All of our grants are subject to this 'pause' …. I have no information on when you can expect the payment to be approved as we are awaiting guidance." S.F. Dec. Ex. D at 95.

5

Chicago filed this lawsuit in May 2025. ECF No. 1. Less than two weeks later, DHS told Chicago that the agency would reimburse Chicago that day but failed to do so. Chicago Dec. 1 ¶ 24. So, Chicago—joined by Boston, Denver, San Francisco, and Seattle—filed an amended complaint in June 2025. ECF No. 10. At that point, Plaintiffs had 11 outstanding requests for reimbursement—10 pending for more than 30 days—for a total of nearly $3 million. Through these requests, Plaintiffs sought reimbursement for costs incurred on radiological or nuclear detection equipment purchases, payroll, and other products or services that were either expressly authorized by Plaintiffs' cooperative agreements or pre-approved by DHS. In late June 2025, after Plaintiffs filed the amended complaint, DHS began processing Plaintiffs' requests. Boston Dec. ¶ 25; Chicago Dec. 2 ¶ 17; Denver Dec. ¶ 17; S.F. Dec. ¶ 28; Seattle Dec. ¶ 16.

*The Equipment Freeze*. In May 2025, DHS issued a memorandum to all Securing the Cities regions titled "Pause on STC Purchases of Radiological and Nuclear Detection Equipment." Certified Administrative Record, ECF No. 54-3 ("AR") at 0027. The memorandum ("Equipment Freeze Memo") stated, in full:

> Due to current Federal funding constraints, the STC Program must pause on all radiological and nuclear detection equipment purchases. Equipment under this stop order includes all personal radiation detectors, radiological isotope identification devices, radiological/nuclear detection backpacks, and radiological/nuclear mobile detection systems. Purchases underway that have not been accepted need to be paused until further notice. This memorandum applies to currently awarded cooperative agreement funds and carryover funding.

*Id.* at 0027. This "Equipment Freeze" remains in place. *See, e.g.*, Chicago Dec. 1 ¶ 23.

*The Administrative Record*. The 28-page administrative record purportedly contains all non-privileged documents that Defendants considered in implementing the Equipment and Reimbursement Freezes. ECF Nos. 54, 54-1. Five of the ten documents in the administrative record do not mention Securing the Cities:

6

- A January 2025 memo from the Acting Director of the Office of Management and Budget directed federal agencies to "complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders." AR at 0001–0002. During this analysis, agencies were directed that they "*must temporarily pause* all activities related to obligation or disbursement of all Federal financial assistance … that may be implicated by the executive orders, including … financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal." *Id.* at 0002.

- A February 2025 memo from then-DHS Secretary Kristi Noem instructed DHS components "to review all federal financial assistance awards to determine if [DHS] funds, directly or indirectly, are going to sanctuary jurisdictions." AR at 0003–0004. If so, each component was told, "[t]o the extent consistent with relevant legal authorities and the applicable terms and conditions of each award," that it "must cease providing federal funding to sanctuary jurisdictions." *Id.* at 0004.

- A February 2025 executive order, "Implementing the President's 'Department of Government Efficiency' Cost Efficiency Initiative," directed agencies to "build a centralized technological system" to record payments issued pursuant to "covered contracts and grants." AR at 0006–0011.

- A March 2025 memo from a DHS official instructed agency employees to "pause payments to all covered contracts and grants" until DHS built the "centralized technological system" required by the President's executive order. AR at 0012–0014.

- Another March 2025 memo from a DHS official mandated elevated review and approval of certain grant awards and terminations. AR at 0018.

The remaining documents in the record include two copies of the Equipment Freeze Memo quoted above; and three documents that reference the Securing the Cities program but do not mention the Equipment or Reimbursement Freezes:

- A February/March 2025 email chain between DHS and Seattle regarding Seattle's request to use Securing the Cities funds for trainings in connection with the World Cup. AR at 0015–0017.

- A February 2025 memo directing staff to "update the STC Program Management Plan." AR at 0005.

- An April 2025 document titled "Securing the Cities Program Improvements Action Plan" laying out changes to implement a "Concept Paper for STC Program Improvements," AR at 0019–0024, such as moving federal Mobile Detection Deployment Program "assets" to fall under the Securing the Cities program and having each Securing the Cities region host a "Mobile Detection Deployment Unit." *Id.* at 0021. The Action Plan does not include

7

discussion regarding "pausing" either reimbursements or equipment purchases.

**III.    Plaintiffs' Rely on Securing the Cities Funds and Are Harmed by the Freezes.**

The Reimbursement Freeze and the Equipment Freeze have harmed and will continue to harm Plaintiffs and impact their abilities to detect and prevent radiological and nuclear attacks.

As to the Reimbursement Freeze, DHS's abrupt failure to reimburse Plaintiffs from February 2025 to June 2025 destabilized expectations regarding the future of Securing the Cities, which has continued to harm Plaintiffs by creating confusion and uncertainty in Plaintiffs' budget-planning processes. Plaintiffs are currently preparing their Fiscal Year 2026 budgets, and Plaintiffs' public safety departments are now determining whether grant-supported programs and services that Plaintiffs have long relied on to keep their communities safe can remain funded. *See* Chicago Dec. 1 ¶ 35. Not knowing whether certain federal funds will continue to be available has created significant uncertainty about the continued viability of these crucial programs and services. *See* Boston Dec. ¶ 30; Chicago Dec. 1 ¶ 35; S.F. Dec. ¶ 38.

Any future failures to reimburse Plaintiffs in a timely manner could foretell the end of STC funding, which could lead to employees losing their jobs; local law enforcement not monitoring the thousands of existing detection devices on the street that detect radiological or nuclear material; old detection equipment not being serviced or replaced; Plaintiffs not being able to submit valuable data to the federal government about the presence of radiological or nuclear material; and Plaintiffs not being able to conduct counterterrorism exercises and trainings with regional partners. Because Plaintiffs annually host National Security Special Events and events with a Level 1 Special Event Assessment Rating, such as Lollapalooza and the Boston Marathon, the loss of counterterrorism exercises and training could have a devastating impact on the safety of these events. *See* Boston Dec. ¶ 4, 17(f), 32; Chicago Dec. 1 ¶ 38; Denver Dec. ¶ 28; S.F. Dec. ¶ 39; Seattle Dec. ¶¶ 20–26.

The Equipment Freeze has likewise harmed, and if not vacated will continue to harm,

Plaintiffs. For instance, a Massachusetts State Police vessel for maritime operations is being constructed without radiation detection equipment. Boston Dec. ¶ 31(a). Although this vessel should be built with radiation detection equipment, Boston cannot purchase it pursuant to the Equipment Freeze and otherwise lacks funds to buy the necessary equipment. *Id*. Chicago has not been able to renew a license for software used to map its radiation detection devices and communicate expediently with law enforcement personnel on the ground about radiation alerts; nor has Chicago been able to provide equipment to its regional partners, including Chicago Metra. Chicago Dec. 1 ¶ 31. San Francisco had to stop working on a purchase order for four to five vehicle-based mobile radiation detectors that would have been distributed across the region and remained permanently available as deployable regional assets. S.F. Dec. ¶ 34. San Francisco had planned to deploy these detectors to major events across the Bay Area (such as the World Cup, America 250 celebrations, parades, various professional sports events, and large music festivals) to detect and prevent potential harm, such as terrorism, resulting from radiological or nuclear threats. *Id.* Seattle intended to deploy and utilize Thermo RadEye PRD4 personal radiation detectors, which had been approved for purchase by DHS in March 2025, for purposes of public safety preparation for the 2025 and 2026 World Cup events.

## ARGUMENT

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In resolving APA claims, courts generally consider only whether "the administrative record supports the agency's findings." *Hunger v. Leininger*, 15 F.3d 664, 669 (7th Cir. 1994). The Court may, however, consider evidence outside the administrative record to determine whether the agency "considered all the relevant factors," *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1123 n.14 (9th Cir. 2012); whether "[an agency] has a practice or policy" that is unlawful, *Hisp.*

*Affs. Project v. Acosta*, 901 F.3d 378, 386 n.4 (D.C. Cir. 2018); "whether a party will suffer irreparable harm," *Washington v. U.S. Dep't of Educ.*, 813 F. Supp. 3d 1222, 1233 (W.D. Wash. 2025); and "the appropriate scope of relief," *Immigrant Defs. L. Ctr. v. DHS*, 2025 WL 1191572, at *2 (C.D. Cal. Mar. 14, 2025). The Court may also "consider extra-record evidence to develop a background against which it can evaluate the integrity of the agency's analysis." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 993 (9th Cir. 2014); *see also In re Blunt*, 358 F. Supp. 2d 882, 893 (D.N.D. 2005) (similar). The Court therefore may consider evidence submitted by Plaintiffs in addressing these issues.

This Court has jurisdiction to review the unlawful Equipment and Reimbursement Freezes. *See infra*, Part I. The Court should grant summary judgment as to the Equipment Freeze because it is arbitrary and capricious. 5 U.S.C. § 706(2)(A); *see infra*, Part II. The Court should further grant summary judgment as to the Reimbursement Freeze because is arbitrary and capricious and not in accordance with law, 5 U.S.C. § 706(2)(A), and was adopted without observance of procedure required by law, 5 U.S.C. § 706(2)(D); *see infra*, Part III.

## I.      This Court Has Jurisdiction.

Defendants have suggested that (a) the Court lacks subject-matter jurisdiction and (b) Plaintiffs' challenge to the Reimbursement Freeze is moot. ECF No. 30. Neither point has merit.

### A.      The Tucker Act Does Not Divest the Court of Jurisdiction.

The Tucker Act does not bar Plaintiffs' claims because (1) Plaintiffs' claims are based in statute, not a contract, and (2) the U.S. Court of Federal Claims lacks the authority to provide the equitable and declaratory relief Plaintiffs seek.

The Tucker Act grants the Court of Federal Claims exclusive jurisdiction over civil claims against the government "founded … upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The defining feature of a Tucker Act claim is that it seeks retrospective

money damages; the Court of Federal Claims "has no power to grant equitable relief." *Richardson v. Morris*, 409 U.S. 464, 465 (1973). Courts often apply the "*Megapulse* test" to determine whether a particular action is contractual for Tucker Act purposes; the test looks to both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *See Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982); *see also Evers v. Astrue*, 536 F.3d 651, 657–58 (7th Cir. 2008) (adopting *Megapulse*-like analysis to determine whether claim was contractual in nature).

### 1. Plaintiffs' Claims Are Not Based in Contract.

The source of Plaintiffs' rights is in statute, not any contract with DHS. Courts, including the Court of Federal Claims, have long held that cooperative agreements, like the ones used to administer the Securing the Cities program here, do not constitute "contracts with the United States" within the meaning of the Tucker Act. *See St. Bernard Par. Gov't v. United States*, 134 Fed. Cl. 730, 735–36 (2017), *aff'd* 916 F.3d 987 (Fed. Cir. 2019) (Tucker Act did not apply to cooperative agreement for hurricane relief because it provided no direct or tangible benefit to the government); *Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*, 703 F. Supp. 3d 126, 134 (D.D.C. 2023) ("Because the Cooperative Agreement did not confer a direct benefit on [the agency], the consideration leg of the chair is missing, and [the agency]'s argument that the Claims Court has jurisdiction topples over."). Courts regularly distinguish between cooperative agreements and contracts for Tucker Act purposes, *see, e.g.*, *Pacito v. Trump*, 169 F.4th 895, 925–27 (9th Cir. 2026), and the Court of Federal Claims has stated that cooperative agreements, unlike contracts, are presumed not to provide a substantive right to recover money damages, *see St. Bernard Par. Gov't*, 134 Fed. Cl. at 735.

Even if the Securing the Cities cooperative agreements between DHS and Plaintiffs were construed as "contracts" for Tucker Act purposes, Plaintiffs do not rely on them to support their

11

claims. "[A]n action invokes the Tucker Act's jurisdictional hook only when the claim is 'at its essence' a contract claim." *Chi. Women in Trades v. Trump*, 778 F. Supp. 3d 959, 981 (N.D. Ill. 2025) (quoting *Megapulse*, 672 F.2d at 967). Here, Plaintiffs' action is entirely based on DHS violating the APA (including, in turn, by acting contrary to federal regulations)—not a breach of contract. And to the extent DHS argues that Plaintiffs' action implicates any contract-like issues, "the mere existence of such contract-related issues" does not "convert this [equitable] action to one based on contract." *Megapulse*, 672 F.2d at 969.

### 2. Plaintiffs Seek Only Equitable and Declaratory Relief that the Court of Federal Claims Lacks Authority to Grant.

Plaintiffs' claims also fall outside the Tucker Act because they arise under the APA and seek only equitable and declaratory relief. An APA action seeking specific relief, such as setting aside an agency decision that unlawfully withholds or terminates funds, is distinct from a Tucker Act claim for money damages. *See Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988) (district court had jurisdiction over APA claims seeking to "undo" an agency's "refusal to reimburse the State" because the claims were for "specific relief … rather than for money damages"). The mere fact that "an order setting aside an agency's action may result in the disbursement of funds" does not automatically convert an equitable action into one for money damages. *U.S. Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (per curiam) (citing *Bowen*, 487 U.S. at 910).

Consistent with *Bowen*, courts have repeatedly held that the Tucker Act only "'impliedly forbid[s]' an APA action seeking injunctive and declaratory relief" if the action is really a breach of contract claim in disguise. *See, e.g.*, *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (quoting *Megapulse*, 672 F.2d at 968). While the Supreme Court recently invoked the Tucker Act in an emergency docket ruling concerning federal funding awards, *see California*, 604 U.S. at 651, Justice Barrett's controlling opinion in a subsequent emergency ruling

12

reaffirmed that APA challenges to internal agency guidance underlying funding determinations are properly reviewable by district courts, *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2661 (2025) (Barrett, J., concurring). Plaintiffs here ask this Court to set aside unlawful agency action related to administration of the Securing the Cities program, specifically (1) DHS' refusal to process Plaintiffs' reimbursement requests in accordance with federal regulations, and (2) DHS' decision to freeze the purchase of equipment central to the program's purpose. Plaintiffs do not allege a breach of contract, nor do they seek compensatory damages; rather, their claims are equitable in nature and turn entirely on statutory and regulatory compliance.

## B. Plaintiffs' Challenge to the Reimbursement Freeze Is Not Moot.

DHS has suggested that Plaintiffs' challenge to the Reimbursement Freeze—which alleges in part that Defendants violated 2 C.F.R. § 200.305(b)(3) by failing to resolve reimbursement requests within 30 days—is moot because DHS ended the Freeze. *See* ECF No. 30 at 4. "It is well settled," however, that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). "[I]f it did, the courts would be compelled to leave '[t]he defendant … free to return to his old ways.'" *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 n.10 (1982). Instead, Defendants "bear[] the formidable burden of showing that it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 190. DHS cannot meet this burden. When Plaintiffs filed their amended complaint, Plaintiffs had 11 unresolved reimbursement requests— 10 of which had been pending for more than 30 days and some for nearly four months. *See supra* at 6; Chicago Dec. 2 ¶ 18. Defendants ended the Reimbursement Freeze only after Plaintiffs filed their amended complaint, *see supra* at 6, and the administrative record lacks any non-litigation reason why Defendants did so. *See New York v. Trump*, 769 F. Supp. 3d 119, 133–34 (D.R.I. 2025)

13

(holding that challenge to funding freeze that government ended after litigation was initiated was not moot), *aff'd in relevant part*, 171 F.4th 1 (1st Cir. 2026). Moreover, Plaintiffs have millions of additional dollars in Securing the Cities funds that they may use through 2029 or 2030, in addition to funding that Congress may appropriate in the future. *See, e.g.*, Chicago Dec. 1 ¶ 29; S.F. Dec. ¶ 32. Plaintiffs thus continue to incur costs under the program and intend to seek reimbursement for those costs. *See, e.g.*, Chicago Dec. 1 ¶ 29; S.F. Dec. ¶¶ 29-32. Defendants have offered no assurances that they will resolve future requests in accordance with section 200.305(b)(3).

Far from being "absolutely clear" that Defendants will not again freeze Securing the Cities funding, DHS's conduct in other litigation suggests that it will do just that absent judicial relief. In *City of Chicago v. DHS*, 815 F. Supp. 3d 727 (N.D. Ill. 2025), Judge Kennelly granted Chicago's motion to preliminarily enjoin DHS from freezing funding under a grant program. Rather than comply with that order by resolving grantees' reimbursement requests, DHS "ignored the preliminary injunction." *City of Chicago v. DHS*, 2026 WL 1265428, at *2 (N.D. Ill. May 8, 2026). Judge Kennelly then granted Chicago's motion to enforce, holding that DHS violated the preliminary injunction and section 200.305(b)(3) by failing to resolve grantees' reimbursement requests. *City of Chicago v. DHS*, 2026 WL 353581, at *3 (N.D. Ill. Feb. 9, 2026). Even after that order and another order applying the preliminary injunction to non-parties, *City of Chicago v. DHS*, 2025 WL 3171302 (N.D. Ill. Nov. 13, 2025), DHS ignored non-parties' reimbursement requests. Judge Kennelly thus granted Chicago's second motion to enforce the preliminary injunction, stating DHS's "decision to do nothing with respect to non-party … grantee reimbursement claims amounts to disregard, if not defiance, of the Court's orders." *City of Chicago v. DHS*, 2026 WL 1265428, at *3. Given DHS's violations of court orders requiring compliance with section 200.305(b)(3), there is no reason to believe that DHS would adhere to its voluntary cessation.

14

Finally, DHS's voluntary cessation does not prevent the Court from awarding Plaintiffs their requested relief. A case is moot "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012). Among other remedies, the Court may declare that DHS violated section 200.305(b)(3) by failing to resolve reimbursement requests within 30 days—meaningful relief that would bind DHS going forward and provide Plaintiffs assurance that they will be timely reimbursed.

## II. Plaintiffs Are Entitled to Summary Judgment as to the Equipment Freeze.

Count IV alleges that the Equipment Freeze is "arbitrary and capricious," in violation of the APA. *See* ECF No. 10 ¶¶ 102–09 (citing 5 U.S.C. § 706(2)(A)); *see also id.* ¶ 64. The Court should grant summary judgment, as the record establishes DHS (a) failed to articulate a "satisfactory explanation" for the Equipment Freeze; (b) implemented its new policy, barring equipment purchases, without offering "good reasons" or considering Plaintiffs' reliance interests; and (c) ignored an "important aspect" of the problem, namely, the impact of the freeze on homeland security. *Cook County v. Wolf*, 962 F.3d 208, 229–30 (7th Cir. 2020).

As a preliminary matter, the Equipment Freeze is a "final agency action" and is therefore subject to APA review. 5 U.S.C. § 704. Agency action is "final" if it "mark[s] the consummation of the agency's decisionmaking process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). "Courts have routinely found funding freezes to be final agency actions." *Washington v. U.S. Dep't of Transp.*, 2026 WL 183584, at *10 (W.D. Wash. Jan. 23, 2026) (citing cases); *accord, e.g.*, *Chicago v. DHS*, 815 F. Supp. 3d at 761. The result should be the same here. The Equipment Freeze Memo "pause[d]" the use of Securing the Cities funds for "all radiological and nuclear detection equipment purchases," AR at 0027, a freeze that remains in effect today, *see, e.g.*, Chicago Dec. 1 ¶ 23. Even if that "moratorium may eventually be lifted," the Equipment

15

Freeze Memo ended DHS's decision-making process by "'alter[ing] the legal status quo'" under which Plaintiffs could use STC funds to buy radiological and nuclear detection equipment. *See New York v. Trump*, 811 F. Supp. 3d 215, 233 (D. Mass. 2025). The Memo determined Plaintiffs' rights too by "'prevent[ing] Plaintiffs from moving forward'" with equipment purchases. *See id.*

### A. DHS Failed to Provide a Satisfactory Explanation for the Equipment Freeze.

Agency action is arbitrary and capricious if it is not "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024). An agency therefore must offer "a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Id*. The "reasoned explanation requirement … is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts." *U.S. Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

The only explicit justification for the Equipment Freeze in the administrative record comes from the Equipment Freeze Memo, which cited "funding constraints" as the basis for the Freeze. AR at 0027. But the Memo cited no facts identifying any funding constraints. If an agency could satisfy the "satisfactory explanation" requirement simply by citing unspecified funding constraints, then agency funding freezes would be immune from APA review. Nor does the remainder of the administrative record supply the missing explanation. On the contrary, no other document in the record even mentions the Equipment Freeze, much less attempts to justify it. The absence of any "substantive, contemporaneous justification" for the Equipment Freeze renders it arbitrary and capricious. *Illinois v. Noem*, 813 F. Supp. 3d 282, 305–06 (D.R.I. 2025) (granting summary judgment where administrative record "contain[ed] no details regarding how [DHS] came to [its] decision"); *see also City of Chicago v. DHS*, 815 F. Supp. 3d at 762 (DHS's action was likely arbitrary and capricious where DHS "provided no reasoned explanation or factual findings to support [its] decision to freeze [grant] funding").

16

Moreover, there is no "rational connection" between the alleged "funding constraints" and the Equipment Freeze. *Ohio v. EPA*, 603 U.S. at 292. DHS had already awarded funds for Plaintiffs to buy radiological and nuclear detection equipment at the time of the Freeze, so DHS did not need "new" funds. *See, e.g.*, Boston Dec., Ex. H at 118; Chicago Dec. 1, Ex. E at 147; S.F. Dec. Ex. C at 1. And nothing in the administrative record indicates that the funds DHS had awarded to Plaintiffs were somehow unavailable. In the same way, the record does not explain why the asserted "funding constraints" precluded Plaintiffs from using Securing the Cities funds they had already been awarded to buy equipment while allowing Plaintiffs to use those same funds for purposes such as payroll and employee training. For this reason too, the Equipment Freeze is arbitrary and capricious. *See Doe v. Noem*, 822 F. Supp. 3d 893, 922 (N.D. Ill. 2026) (holding that DHS likely acted arbitrarily and capriciously where there was "no logical connection" between DHS's reasoning and its action); *City of Chicago v. DHS*, 815 F. Supp. 3d at 762–63 (same, where DHS awarded "significant … grant funds" to Plaintiffs yet "provided no reasoned explanation for why the[] funds were no longer needed to fulfill the goals of [the grant program]").

While the record includes some other documents that discuss the Securing the Cities program, none references freezing funds for equipment purchases and therefore none can provide the required "satisfactory explanation" for the freeze. *See supra* at 6–8. To the contrary, one document—the "Securing the Cities Program Improvements Action Plan"—suggests that equipment purchases should continue; it states that "[t]he STC Program will continue administering the cooperative agreements [with participating cities] to cover federally procured primary screening equipment distribution," among other functions. AR at 0021. The document does not list an equipment freeze among the "four areas for improvement" addressed by the Action Plan, the "[m]ilestones" for implementing the Action Plan, or the "[t]asks to [s]upport the Action

17

Plan." *See id.* at 0021–0024.

Finally, an agency may not rely on an explanation that is "incongruent with what the record reveals about the agency's priorities and decisionmaking process," *Dep't of Com.*, 588 U.S. at 785, or "on factors which Congress has not intended it to consider," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The administrative record suggests that DHS may have relied on factors other than "funding constraints" in issuing the Equipment Freeze, such as DHS's antipathy for so-called "sanctuary jurisdictions." AR at 0003–0004. But Congress did not authorize DHS to restrict Securing the Cities funding based on cities' immigration policies. On the contrary, Congress codified Securing the Cities after DHS had added so-called "sanctuary jurisdictions," like Chicago, to the program. *See supra* at 2. The "disconnect between the government's expressed hostility to the plaintiffs as [cities] with certain immigration-related policies" and DHS's "later … explanation[]" for the Equipment Freeze is yet more evidence that the Freeze is arbitrary and capricious. *Illinois v. Vought*, 2026 WL 962287, at *4 (N.D. Ill. Mar. 12, 2026).

### B. DHS Changed Its Policy Without Considering Plaintiffs' Reliance Interests.

When an agency changes existing policy, it must "provide a reasoned explanation for the change" and "show that there are good reasons for the new policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). An agency that "changes course" also "must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account," as "[i]t would be arbitrary and capricious to ignore such matters." *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020).

DHS had a longstanding policy of allowing participating cities to use Securing the Cities funds to buy radiological and nuclear detection equipment. *See supra* at 4–5. Indeed, the entire program rests on providing funding to cities for equipment purchases. *Id.* DHS repeatedly

18

represented to Congress in its annual budget justifications that Securing the Cities "provides funding for equipment" and that congressional appropriations were used to "procure[] detection equipment." Metcalf Dec., Ex. D at 68, 73; *id.*, Ex. E at 81, 89. DHS has continued to make these representations to Congress even after instituting the Equipment Freeze. *Id.*, Ex. F at 96. DHS has made similar claims to the general public; just a month before instituting the Equipment Freeze, DHS issued a press release proclaiming that it "provides radiological and nuclear detection equipment … to the STC regions." *Id.*, Ex. C at 63. DHS likewise baked equipment purchases into the phased approach that it created for participating cities. Advancing from one phase of the program to another requires cities to meet specified thresholds for equipment procurement. *See* Chicago Dec. 1, Ex. F at 168 (DHS template for Chicago's FY26 "program management review," citing "STC Implementation Plan").

Despite this, DHS changed its policy to bar participating cities from buying equipment with Securing the Cities funds. This change was arbitrary and capricious for two main reasons.

*First*, as discussed above, DHS's perfunctory justification for the Equipment Freeze—alleged "funding constraints"—is not a "reasoned explanation for the change" in policy, which the law requires. *Encino*, 579 U.S. at 221; *see Doe v. Noem*, 822 F. Supp. 3d at 927 (DHS's action was likely arbitrary and capricious where agency "failed to offer good reasons for the new policy"); *Freedom Network USA v. Trump*, 2026 WL 800392, at *20 (N.D. Ill. Mar. 23, 2026).

*Second*, the administrative record reflects no DHS effort "to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *DHS v. Regents*, 591 U.S. at 33. Had it looked, DHS would have found significant reliance interests. Plaintiffs have long relied on Securing the Cities funding to buy radiological and nuclear detection equipment. Boston Dec. ¶ 29; Chicago Dec. 1 ¶ 34; Denver

19

Dec. ¶ 25; S.F. Dec. ¶ 20; Seattle Dec. ¶ 18. *See City of Chicago v. Noem*, 2025 WL 3251222, at *7 (N.D. Ill. Nov. 21, 2025) (plaintiffs "relied on receiving these grants for years"). As a result, Plaintiffs' budget planning relies on Securing the Cities funds being available for radiological and nuclear detection equipment purchases, with program funding providing significant portions of, and in some cases the entirety of, Plaintiffs' budgets for such purchases. Boston Dec. ¶ 29 (90% of funding for such equipment comes from STC funds); Chicago Dec. 1 ¶ 35 (100%); Denver Dec. ¶ 25 (100%); S.F. Dec. ¶¶ 20–21 (100%); Seattle Dec. ¶ 19 (25%). *See Chicago v. Noem*, 2025 WL 3251222, at *7 (plaintiffs' "[b]udget planning relies on these grants"); *Illinois v. FEMA*, 801 F. Supp. 3d 75 (D.R.I. 2025) (plaintiffs "structured their budgets … around consistent federal support"); *Freedom Network*, 2026 WL 800392, at *20 ("substantial portion of [plaintiff's] budget" came from grant funds). And the freeze forced Plaintiffs to suspend plans to use Securing the Cities funds to buy particular pieces of equipment. Boston Dec. ¶ 31; Chicago Dec. 1 ¶ 31; Denver Dec. ¶ 24; S.F. Dec. ¶¶ 34–36; Seattle Dec. ¶¶ 20–21. *See Chi. Transit Auth. v. U.S. Dep't of Transp.*, 2026 WL 810912, at *4 (N.D. Ill. Mar. 24, 2026) (agency "failed to consider the impact of its [funding] decision on ongoing projects").

DHS itself engendered these reliance interests, including through its various public statements touting the central role that equipment purchases play in Securing the Cities. *See supra* at 19; *Drs. for Am. v. Off. of Pers. Mgmt.*, 793 F. Supp. 3d 112, 147 (D.D.C. 2025) (agency engendered reliance through its public statements, only later to reverse agency policy). Yet the administrative record does not even mention Plaintiffs' reliance interests, much less assess them. *See Doe v. Noem*, 822 F. Supp. 3d at 927 (DHS failed to provide a "reasoned explanation" even though agency referenced "reliance interests" because it did so "without elaboration"). Deciding whether "other interests and policy concerns outweigh[ed] any reliance interests … was [DHS's]

20

job, but the agency failed to do it." *DHS v. Regents*, 591 U.S. at 32. Summary judgment is therefore proper. *See Illinois v. FEMA*, 801 F. Supp. 3d at 94 (granting summary judgment where "DHS did not meaningfully evaluate [plaintiffs'] reliance interests"); *Wolf*, 962 F.3d at 233 (affirming preliminary injunction where DHS "did not adequately consider … reliance interests").

### C. DHS Ignored the Equipment Freeze's Impact on Public Safety.

The Equipment Freeze is also arbitrary and capricious because DHS "failed to consider" an "important aspect of the problem": the Freeze's impact on public safety. *DHS v. Regents*, 591 U.S. at 30. Congress codified Securing the Cities to "enhance the ability of the United States to detect and prevent terrorist attacks and other high-consequence events utilizing nuclear or other radiological materials that pose a high risk to homeland security in high-risk urban areas." 6 U.S.C. § 596b(a); *see also* Metcalf Dec., Ex. E at 81 (DHS stating that the program "provides financial … assistance to … local … organizations in high-risk major metropolitan areas to be better prepared against radiological and nuclear threats to help protect U.S. citizens"). Congress charged DHS with carrying out Securing the Cities by "provid[ing] resources to enhance detection" and "to enable … local … governments to sustain and refresh their capabilities." 6 U.S.C. § 596b(b)(3), (6). DHS itself has linked the provision of equipment to public safety, stating that STC "provides … equipment … to ensure that radiological detection is integrated into day-to-day operations" and "is a critical component of [DHS]'s defense-in-depth strategy to maximize detection opportunities." Metcalf Dec., Ex. E at 89; *see also id.* at 87 (Securing the Cities' work "results in an extensive cadre of well trained and equipped personnel within the [participating] regions who have the capability to support R[adiological]/N[uclear] detection search/locate operations (i.e. increase probab[ility] of detection of threat material)").

The Equipment Freeze has undermined Plaintiffs' ability to "be better prepared against radiological and nuclear threats." Metcalf Dec., Ex. E at 81. Plaintiffs are at the center of regions

that DHS itself designated as being at a "high-risk" of sustaining terrorist attacks and host some of the world's busiest airports, numerous major sports arenas, and countless events that attract massive crowds. Yet the Equipment Freeze requires Plaintiffs to suspend purchases of equipment that would have been deployed to detect radiological and nuclear threats. *See, e.g.*, Denver Dec. ¶ 28; S.F. Dec. ¶¶ 34–36; Seattle Dec. ¶¶ 20–21.

The administrative record reflects no consideration of the Equipment Freeze's impact on public safety. Again, the Equipment Freeze Memo is the only document in the record that even mentions the Freeze, and it does not reference public safety at all. *See* AR at 0027–0028. DHS's failure to consider public safety renders its decision arbitrary and capricious. *See Illinois v. FEMA*, 801 F. Supp. 3d at 94 (granting summary judgment where DHS did not "consider the public safety consequences" of its funding changes, which "threatened [plaintiffs'] capacity to protect public safety"); *Wolf*, 962 F.3d at 233 (DHS "did not acknowledge or address the significant, predictable collateral consequences" of its action).

### III.     Plaintiffs Are Entitled to Summary Judgment as to the Reimbursement Freeze.

Count IV alleges that the Equipment Freeze is both "arbitrary and capricious" and "not in accordance with law," in violation of the APA. *See* ECF No. 10 ¶¶ 102–09 (citing 5 U.S.C. § 706(2)(A)). Count VI alleges that the Freeze was adopted "without observance of procedure required by law." *See id.* ¶¶ 114–16 (citing 5 U.S.C. § 706(2)(D)). The Court should grant summary judgment on both counts.

Like the Equipment Freeze, the Reimbursement Freeze was a final agency action. "Courts have routinely found funding freezes to be final agency actions," *Washington v. DOT*, 2026 WL 183584, at *10 (citing cases), including those the government characterized as temporary "pauses," *see City & County of San Francisco v. Trump*, 783 F. Supp. 3d 1148, 1198–99 (N.D. Cal. 2025). DHS staff and other federal employees used that exact framing here: "All DHS-OPO payments

22

are on pause …. We must await guidance from DHS ….” Chicago Dec. 2, Ex. B at 10; *id*., Ex. C at 15, 17 (similar); S.F. Dec., Ex. D at 95 (similar). DHS's subsequent conduct confirms that the Reimbursement Freeze was a final agency action. In late June 2025, the DHS Assistant Secretary for the Countering Weapons of Mass Destruction Office emailed Plaintiffs that “[then] Secretary Noem ha[d] approved the release of awarded grant funds to [the Office's] awardees in the Securing the Cities (STC) program.” S.F. Dec., Ex. E at 98. The awarded funds could only have been “released” if they had been frozen by a final action in the first place. *See Chicago v. DHS*, 815 F. Supp. 3d at 761 (subsequent agency communication “confirmed” that agency previously froze funding); *see also Biden v. Texas*, 597 U.S. 785, 808–09 (2022) (memoranda that “bound DHS staff by forbidding them to continue [an agency] program in any way from that moment on” was a final agency action).

### A. The Reimbursement Freeze Is Arbitrary and Capricious.

The Reimbursement Freeze is arbitrary and capricious for three reasons.

*First*, DHS offered no explanation, let alone a satisfactory explanation, for the Reimbursement Freeze. This “failure to provide *any* explanation for a final agency action is arbitrary and capricious under even the most lenient standard.” *Chicago v. Noem*, 2025 WL 3251222, at *7 (emphasis in original); *see also supra* at 16–17 (collecting case law).

To be sure, the administrative record includes several directives to freeze funding, whether generally or for “sanctuary jurisdictions” specifically. *See supra* at 7 (discussing AR at 0001–0014). But the record provides no indication that DHS froze Plaintiffs' reimbursement requests because of one (or more) of these directives and, if so, which one(s). *See* AR at 0001–0014. And it is not the Court's responsibility to generate an explanation on DHS's behalf by “speculat[ing] on reasons that might have supported [DHS's] decision.” *Encino*, 579 U.S. at 224. While a “perfectly clear decision” is not required, an agency must “provide a discernable path” showing

23

how it reached its decision. *Cayuga Nation v. United States*, 594 F. Supp. 3d 64, 75 (D.D.C. 2022). DHS's failure to provide such a path renders the Reimbursement Freeze arbitrary and capricious. *See Illinois v. Noem*, 813 F. Supp. 3d at 306 (granting summary judgment where "administrative record contain[ed] no details regarding how Defendants came to their decision"); *Drs. for Am.*, 793 F. Supp. 3d at 147 (granting summary judgment where "administrative record [wa]s devoid of reasoning generally, save a handful of references to [an executive order and a memorandum]"); *see also Chicago v. Noem*, 2025 WL 3251222, at *7 ("express explanation was required" for grant terms that were "apparently implemented to conform with Executive Orders").

In addition, even if the record indicated that DHS implemented the Reimbursement Freeze in response to one or more of those directives (and it does not), the Freeze would still be arbitrary and capricious. The mere fact that the record includes an executive order that "implement[ed] the President's Department of Government Efficiency cost efficiency initiative" as well as a DHS memorandum implementing that executive order, *see* AR at 0006–0013, does not establish that the Freeze is "reasonable and reasonably explained," *Ohio v. EPA*, 603 U.S. at 292; *see Drs. for Am.*, 793 F. Supp. 3d at 145 ("[T]he existence of an executive order does not automatically render an agency's implementing actions adequately reasoned …. Even when 'implement[ing] an executive order,' agencies are bound by their APA obligations ….") (brackets in original)); *Illinois v. FEMA*, 801 F. Supp. 3d at 93 ("DHS cannot avoid the arbitrary and capricious analysis simply by claiming it was acting at the instruction of the President."). The "pause" in federal funding called for in the Office of Management and Budget memorandum, also contained in the record, was itself found arbitrary and capricious and enjoined within days of it being issued in January 2025. AR at 0001–0002; *see Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 36 (D.D.C. 2025); *New York v. Trump*, 764 F. Supp. 3d 46 (D.R.I. 2025). It would not be "reasonable" to implement a funding

24

freeze in reliance on a directive that had previously been found unlawful. Nor would it be "reasonable" for DHS to rely on directives freezing payment of reimbursements when binding DHS regulations require reimbursements to be processed within 30 days. *See infra*, Part III.B. The various directives in the record provide no cover for DHS's unexplained action.

*Second*, the Reimbursement Freeze is arbitrary and capricious because DHS did not identify "'good reasons for [its] new policy.'" *Encino*, 579 U.S. at 221. Before the Reimbursement Freeze, DHS had an official policy (based on binding regulations) to process reimbursement requests within 30 days, *see* 2 C.F.R. § 200.305(b)(3), and a standard practice of sending reimbursements within 72 hours, *see, e.g.*, Chicago Dec. 2 ¶ 8; Boston Dec. ¶ 20. The Reimbursement Freeze changed DHS's policy by withholding reimbursements past 30 days. *Cf. Doe v. Noem*, 822 F. Supp. 3d at 921 (finding a "deviat[ion] from past agency policy" where DHS "pointed to no prior" agency actions like the challenged action).

Just as DHS failed to offer a "satisfactory explanation"—indeed, any explanation—for the Reimbursement Freeze, DHS failed to show "good reasons" for adopting the new policy. This renders DHS's decision arbitrary and capricious. *See Encino*, 579 U.S. at 222 (at minimum, a "summary discussion" of why agency changed its position is required); *Freedom Network*, 2026 WL 800392, at *20 (granting preliminary injunction where agency "provided no explanation for why its position … ha[d] changed"); *Doe v. Noem*, 822 F. Supp. 3d at 927 (similar).

*Third*, the Reimbursement Freeze is arbitrary and capricious to the extent that DHS "relied on factors which Congress ha[d] not intended it to consider." *State Farm*, 463 U.S. at 43. As described above, the administrative record does not indicate the basis for DHS's decision. The presence of various directives in the record suggests, however, that DHS may have considered improper factors in making its decision. In particular, directives in the record refer to freezing

25

funding based on: whether the funded activities were "implicated by [President Trump's] executive orders, including … financial assistance for … DEI, woke gender ideology, and the green new deal" or did not "advance the policies of [President Trump's] Administration," *see* AR at 0002, 0008; whether the recipient was a so-called "sanctuary jurisdiction," *see id.* at 0004; and whether DHS had put an "information system … in place to manage payment approvals," *see id.* at 0013.

None is a proper factor. Congress codified the Securing the Cities program to enhance the country's ability to detect and prevent nuclear attacks in high-risk urban areas, 6 U.S.C. § 596b(a), and identified the purposes for which STC funds may be used, *id.* § 596b(b). When "'Congress limits the purpose'" for which funds may be used, "'it can be presumed that it intends that the dispersing agency makes its allocations based on factors solely related to the goal of implementing the stated statutory purposes in a reasonable fashion, rather than taking irrelevant or impermissible factors into account.'" *City of Chicago v. DOJ*, 822 F. Supp. 3d 873, 886 (N.D. Ill. 2026) (quoting *Robbins v. Reagan*, 780 F.2d 37, 48 (D.C. Cir. 1985)); *see City of Chicago v. Barr*, 961 F.3d 882, 891–909 (7th Cir. 2020) (statute authorizing police grants did not permit agency to condition funding on executive's immigration policy). Securing the Cities' enabling statute does not so much as mention DEI, immigration policy, or the other factors described in the directives in the record.

Thus, these factors "[we]re surely not among the factors that Congress considered when … it authorized [DHS] to provide counterterrorism funding to state and local governments." *Illinois v. Noem*, 813 F. Supp. 3d at 305. Indeed, courts have rejected as arbitrary and capricious DHS's attempts to condition Securing the Cities funding on recipients' compliance with executive orders as well as the executive's immigration and anti-DEI policies. *See id.* at 302–06; *Chicago v. Noem*, 2025 WL 3251222, at *6–7. To the extent that DHS relied on the directives in the administrative record in instituting the Reimbursement Freeze, the result should be the same here. *See Chicago v.*

26

*DOJ*, 822 F. Supp. 3d at 886 (statute authorizing police grants did not permit agency to condition funding on executive's "immigration, anti-DEI, gender ideology, [or] environmental justice" policies); *Freedom Network*, 2026 WL 800392, at *14 ("If Congress meant to incorporate compliance with all federal immigration and anti-discrimination law as a condition for funding under [the relevant statute], Congress would have said something to that effect.").

### B.      The Reimbursement Freeze Is Contrary to Law and Procedure.

The APA prohibits agency action that is "not in accordance with law," 5 U.S.C. § 706(2)(A), or "without observance of procedure required by law," *id.* § 706(2)(D).

DHS adopted the uniform federal regulations from the Office of Budget Management providing that where, as here, "the reimbursement method is used, the Federal agency … must make payment within 30 calendar days after receipt of the billing, unless the Federal agency … reasonably believes the request to be improper." 2 C.F.R. § 200.305(b)(3); *see* 2 C.F.R. § 3002.10 (specifying that 2 C.F.R. part 200, which includes section 200.305, applies to DHS). DHS "is bound by its own regulations." *Terry v. Astrue*, 580 F.3d 471, 476 (7th Cir. 2009).

DHS's action is "not in accordance with law" as DHS repeatedly failed to either reimburse Plaintiffs within 30 days or articulate a reasonable belief that Plaintiffs' requests were improper. Nor could DHS have articulated such a belief: all 11 of the reimbursement requests at issue here were either pre-approved by DHS or explicitly authorized by Plaintiffs' cooperative agreements. *See* Boston Dec. ¶ 23; Chicago Dec.1 ¶ 22; Denver Dec. ¶ 16; S.F. Dec. ¶ 24; Seattle Dec. ¶ 16. DHS therefore violated section 200.305. *See Chicago v. DHS*, 2026 WL 1265428, at *2 (section 200.305 required DHS to resolve reimbursement requests within 30 days); *Chi. Transit Auth.*, 2026 WL 810912, at *5 (plaintiffs likely to show agency violated section 200.305(b)(3) by failing to resolve reimbursement requests within 30 days).

Separately, DHS's conduct is unlawful because an agency may not evade binding

regulatory constraints through ad hoc noncompliance. Regulations "issued through the notice-and-comment process … have the 'force and effect of law,'" *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015), and "an agency action which has the effect of suspending a duly promulgated regulation is normally subject to APA rulemaking requirements," *Env't Def. Fund, Inc. v. Gorsuch*, 713 F.2d 802, 816 (D.C. Cir. 1983). Section 200.305 carries the force of law because it was promulgated through procedures required by the APA, including notice-and-comment rulemaking and publication in the Federal Register. *See* 89 Fed. Reg. 30,046 (Apr. 22, 2024); *see also* 79 Fed. Reg. 75,871 (Dec. 19, 2014) (same, for section 3002). DHS therefore remained bound by section 200.305 absent amendment or repeal through the same rulemaking procedures. DHS's implementation of the Reimbursement Freeze effectively suspended or nullified the regulations while bypassing the procedural safeguards necessary to lawfully change their requirements. This circumvention of required rulemaking procedures provides an additional basis for relief, pursuant to 5 U.S.C. § 706(2)(D).

**IV.     The Court Should Award Declaratory Relief, Vacate the Unlawful Freezes, and Grant Injunctive Relief.**

Plaintiffs seek three remedies. First, the Court should declare that the Equipment and Reimbursement Freezes are unlawful for the reasons described above. *See* 28 U.S.C. § 2201(a).

Second, the Court should vacate the Equipment and Reimbursement Freezes under the APA. Vacatur is the "logical consequence" of a declaration that the Freezes are unlawful, *Illinois v. FEMA*, 801 F. Supp. 3d at 96–97, because the APA directs that a "reviewing court shall … set aside [unlawful] agency action," 5 U.S.C. § 706(2). Indeed, "vacatur is the presumptive remedy." *Johnson v. U.S. Off. of Pers. Mgmt.*, 783 F.3d 655, 663 (7th Cir. 2015); *see Chicago v. DHS*, 2025 WL 3171302, at *2; *Cook County v. Wolf*, 498 F. Supp. 3d 999, 1005–07 (N.D. Ill. 2020). There is no reason to deviate from that "ordinary result" here. *Refugee & Immigrant Ctr. for Educ. & Legal*

*Servs. v. Mullin*, 174 F.4th 81, 119–20 (D.C. Cir. 2026); *see California v. U.S. Dep't of Transp.*, 808 F. Supp. 3d 291, 312 (D.R.I. 2025) (vacating agency action under APA); *Illinois v. FEMA*, 801 F. Supp. 3d at 97 (same).

Third, the Court should enjoin Defendants from implementing the Equipment Freeze. To obtain a permanent injunction, "[a] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). The first and second factors are intertwined because an injury is irreparable when "legal remedies are inadequate to cure it." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021). And the third and fourth factors merge where, as here, the government is the opposing party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

Courts have repeatedly held that "'[t]hreats to public health and safety constitute irreparable harm that will support an injunction.'" *Colorado v. HHS*, 788 F. Supp. 3d 277, 311 (D.R.I. 2025); *accord, e.g.*, *Duncan v. Bonta*, 83 F.4th 803, 806 (9th Cir. 2023); *Chicago v. Noem*, 2025 WL 3251222, at *9. Plaintiffs have suffered, and will continue to suffer, irreparable injury absent injunctive relief because Plaintiffs' inability to use Securing the Cities funds to purchase radiological and nuclear detection equipment jeopardizes public safety. As explained, Plaintiffs rely on such funding to purchase and maintain specialized equipment that allows them to detect and respond to serious safety threats, including terrorism, at large-scale public events. Without the ability to purchase and use their own equipment, local governments will have diminished capacity to prevent public safety threats and respond to emergencies. *See* Boston Dec. ¶¶ 28–31; Chicago

29

Dec. 1 ¶ 39; Denver Dec. ¶ 28; S.F. Dec. ¶ 39; Seattle Dec. ¶¶ 20–21, 24–26. A money judgment at the end of this case would be woefully deficient when compared to the risks that the Equipment Freeze poses to public safety.

The balance of hardships weighs in favor of injunctive relief too. Whereas Plaintiffs cannot buy the necessary radiological and nuclear detection equipment without Securing the Cities funds, an injunction would simply require DHS to do what it has long done: reimburse Plaintiffs for equipment purchases it has approved and thereby carry out the program's statutory mission. Nor would an injunction necessarily cost DHS any money. Plaintiffs have access to the same funds with or without an injunction, but cannot spend those funds on equipment absent judicial relief. Moreover, "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *Doe v. Noem*, 822 F. Supp. 3d at 929; *see Castanon-Nava v. DHS*, 161 F.4th 1048, 1064 (7th Cir. 2025). Finally, Securing the Cities funds "are critical to ensure that [local governments] can prepare for and respond to emergencies and threats of terrorism," and "[t]he public interest weighs against 'jeopardizing national security.'" *Michigan v. Noem*, 819 F. Supp. 3d 1163, 1184 (D. Or. 2025) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 33 (2008)).

## CONCLUSION

The Court should grant Plaintiffs' motion for partial summary judgment as to Counts IV and VI and grant the following relief: (1) a declaratory judgment stating that both the Reimbursement Freeze and Equipment Freeze are unlawful; (2) an order vacating both Freezes; and (3) an order permanently enjoining Defendants from implementing the Equipment Freeze.

Dated: June 15, 2026

Respectfully submitted,

**Mary B. Richardson-Lowry**
Corporation Counsel of the City of Chicago

By: /s/ *Stephen Kane*
Stephen Kane (IL Bar No. 6272490)
Chelsey Metcalf (IL Bar No. 6447233)
Raphael J. Ginsburg (IL Bar No. 6332724)
John Kauffman (IL Bar No. 6353229)
City of Chicago Department of Law
121 North LaSalle Street, Room 600
Chicago, Illinois 60602
(312) 744-0458
Stephen.Kane@cityofchicago.org
Chelsey.Metcalf@cityofchicago.org
Raphael.Ginsburg@cityofchicago.org
John.Kauffman@cityofchicago.org

*Counsel for Plaintiff City of Chicago*

**Michael Firestone**
Corporation Counsel, City of Boston

By: /s/ *Samuel B. Dinning*
Samuel B. Dinning (MA BBO 704304)
Teresa K. Anderson (MA BBO 669985)
City of Boston Law Department
One City Hall Square, Room 615
Boston, MA 02201
(617) 635-4034
samuel.dinning@boston.gov
teresa.anderson@pd.boston.gov

*Counsel for Plaintiff City of Boston*

**Michiko (Miko) Ando Brown**
City Attorney, City and County of Denver

By: /s/ *Matthew J. Mulbarger*
Matthew J. Mulbarger (CO Bar No. 51918)
Denver City Attorney's Office
201 W. Colfax Avenue
Denver, CO 80202
(720) 913-8050
matthew.mulbarger@denvergov.org

*Counsel for Plaintiff City and County of Denver*

31

**David Chiu**
City Attorney

By: /s/ *Nancy E. Harris*
Nancy E. Harris
Sara J. Eisenberg
San Francisco City Attorney's Office
1390 Market Street, 7th Floor
San Francisco, CA 94102-5408
(415) 355-3308
Nancy.Harris@sfcityatty.org
Sara.Eisenberg@sfcityatty.org

*Counsel for Plaintiff City and County of
San Francisco*

**Erika Evans**
Seattle City Attorney

By: /s/ *Rebecca Widen*
Rebecca Widen
Seattle City Attorney's Office
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200
Rebecca.Widen@seattle.gov

*Counsel for Plaintiff City of Seattle*