UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CITY OF CHICAGO, CITY OF BOSTON, CITY AND COUNTY OF DENVER, CITY AND COUNTY OF SAN FRANCISCO, and CITY OF SEATTLE, Plaintiffs, | ) | |
| v. | ) | No. 25 C 5462 |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY and MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security, Defendants. | ) | Judge Tharp |

**DEFENDANTS' COMBINED MEMORANDUM OF LAW IN SUPPORT OF CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

## Table of Contents


Table of Authorities ........ iii

Introduction ........ 1

Background ........ 2

I. The Securing the Cities Program Background ........ 2

II. The STC Program Works with STC Regions via Cooperative Agreements ........ 3

III. The CWMD Office Was Set to Terminate in 2023, and It Faced Continual Funding Uncertainty ........ 3

IV. The Reimbursement Pause ........ 4

V. The Equipment Pause ........ 5

Argument ........ 6

I. The Court Can Consider the Kuleski Declaration ........ 6

II. This Court Lacks Jurisdiction to Hear Plaintiffs' APA Claims ........ 7

a. Tucker Act Principles Deprive the Court of Jurisdiction ........ 7

i. *California* and *NIH* Control ........ 8

ii. Plaintiff's Rights Stem from their Contractual Cooperative Agreements ........ 11

iii. Plaintiffs' Requested Remedies Are Contractual ........ 15

b. Plaintiff's Reimbursement Claim Is Moot ........ 16

III. Plaintiffs' APA Claims Are Not Justiciable ........ 17

a. The Reimbursement Pause Is Not Justiciable ........ 17

b. The Equipment Pause Is Not Justiciable Because the STC Program's Administration Is Left to Agency Discretion ....................................................19

IV. The Equipment Pause Was Not Arbitrary or Capricious ........................................21

Conclusion ..........................................................................................................................25

## Table of Authorities

Cases

*Afterschool for Child. & Teens (ACT) Now v. United States Dep't of Educ.*, No. 25 C 15704, 2026 WL 1847100 (N.D. Ill. June 26, 2026) .......... 11, 13, 15, 16

*Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461 (2004) .......... 22, 23

*Am. Near E. Refugee Aid v. United States Agency for Int'l Dev.*, 703 F. Supp. 3d 126 (D.D.C. 2023) .......... 14

*Am. Pub. Health Ass'n v. NIH*, 145 F.4th 39 (1st Cir. 2025) .......... 10

*Bennet v. Spear*, 520 U.S. 154 .......... 18

*Blue & Gold Fleet, LP v. United States*, 70 Fed.Cl. 487 (2006) .......... 7

*Bowman Transp., Inc. v. Arkansas—Best Freight System, Inc.*, 419 U.S. 281 (1974) .......... 22

*California v. U.S. Dep't of Educ.*, 769 F. Supp. 3d 72 (D. Mass. 2025) .......... 9

*Clifford v. Pena*, 77 F.3d 1414 (D.C. Cir. 1996) .......... 7

*Climate United Fund v. Citibank, N.A.*, 154 F.4th 809 (D.C. Cir. 2025) .......... 13

*Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330 (Fed. Cir. 2021) .......... 14

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099 (D.C. Cir. 2022) .......... 15

*Dep't of Com. v. New York*, 588 U.S. 752 (2019) .......... 22, 23

*Dep't of Educ. v. California*, 604 U.S. 650 (2025) .......... 8, 9, 10

*Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1 (2020) .......... 24

*Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255 (1999) .......... 7

*Dhakal v. Session*, 895 F.3d 532 (7th Cir. 2018) .......... 18

*Evers v. Astrue*, 536 F.3d 651 (7th Cir. 2008) .......... 15

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021) .......... 22

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167 (2000) .......... 17

*Glob. Computer Enters., Inc. v. United States*, 88 Fed. Cl. 52 (2009) .......... 6

*Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002) .................................. 9, 16

*Heckler v. Chaney,* 470 U.S. 821 (1985) ..................................................................... 19, 20

*Ingersoll-Rand Co. v. United States*, 780 F.2d 74 (D.C. Cir. 1985) ............................................ 8

*Lane v. Pena*, 518 U.S. 187 (1996) ........................................................................................ 7

*Lincoln v. Vigil*, 508 U.S. 182 (1993) ..................................................................................... 21

*Maine v. Nat'l Oceanic & Atmospheric Admin.*, No. 25 C, 324, 2026 WL 1005094 (D. Me. Apr. 14, 2026) ....................................................................................................... 14

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012) ...... 8

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) ........................................... 8, 11, 13, 15

*Metzger, Shadyac & Schwarz v. United States*, 12 Cl. Ct. 602 (1987) ........................................ 14

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29 (1983) ........................................................................................... 22, 23

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025) ............................ 8, 9, 10

*Perry Capital LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017) .................................................... 8

*Portfolio Disposition Mgmt. Grp. LLC v. United States*, 64 Fed. Cl. 1 (2005) ........................ 6, 24

*Spectrum Leasing Corp. v. United States*, 764 F.2d 891 (D.C. Cir. 1985) .................................. 11

*St. Bernard Par. Gov't v. United States*, 134 Fed. Cl. 730 (2017) ......................................... 13, 14

*State v. U.S. Dep't of Transporation*, No. 25 C 848, 2026 WL 183584 (W.D. Wash. Jan. 23, 2026) ................................................................................................................ 18, 19

*Sustainability Inst. v. Trump*, 165 F.4th 817 (4th Cir. 2026) ................................................. 13, 16

*Thakur v. Trump*, 163 F.4th 1198 (9th Cir. 2025) ........................................................................ 10

*Transohio Sav. Bank v. Director, Office of Thrift Supervision*, 967 F.2d 598 (D.C. Cir. 1992) .... 8

*Trump v. Boyle*, 145 S. Ct. 2653 (2025) ............................................................................... 8, 9

*Worldwide St. Preachers' Fellowship v. Peterson*, 388 F.3d 555 (7th Cir. 2004) ................ 16, 17

Statutes

5 U.S.C. § 701(a)(2) ..... 19

5 U.S.C. § 702 ..... 7

5 U.S.C. § 704 ..... 18, 22

6 U.S.C. § 591(e) ..... 3

6 U.S.C. § 596b ..... 2

6 U.S.C. § 596b(a) ..... 12, 15

6 U.S.C. § 596b(b) ..... 20

6 U.S.C. § 596b(c)(1) ..... 2

6 U.S.C. §§ 596b(b)(1)-(8) ..... 2, 12

6 U.S.C. §§ 596b(b)(7) ..... 20

28 U.S.C. 1491(a)(1) ..... 9

28 U.S.C. § 1491 ..... 7

PL 119-86 ..... 4

Regulations

2 C.F.R. § 200.305(b)(3) ..... 15

Other Authorities

Executive Order 14,222 ..... 4, 5

## Introduction

The Securing the Cities Program (the STC program) is designed to partner the Department of Homeland Security with local governments for the critical mission of preventing and detecting radiological and nuclear terrorist attacks in the United States. Despite this uncontroversial goal, the program has been beset by funding constraints since at least 2023. And prior administrators of the program encouraged the program's local partners, the STC regions, to expand their footprint and their costs, all while the program's funding remained flat.

In February 2025, DHS temporarily paused reimbursements to STC regions (the "reimbursement pause"). But reimbursements resumed a few months later, and plaintiffs acknowledge they have since been paid all the reimbursement they are owed. In May 2025, the new STC program administrator, Brian Kuleski, paused certain new equipment purchases to mitigate risks from the STC program's well-documented budgetary constraints (the "equipment pause"). Plaintiffs challenge both pauses under the Administrative Procedure Act, arguing they were arbitrary and capricious. Plaintiffs' claims fail, and Defendants are entitled to summary judgment for several reasons:

*First*, both claims are based on plaintiffs' contractual agreements with DHS and seek contractual remedies. Under Tucker Act principles, this court lacks jurisdiction to hear contractual claims against the federal government.

*Second*, because it is undisputed that defendants have reimbursed plaintiffs for all amounts owed, plaintiffs' reimbursement pause claim is moot.

*Third*, neither of plaintiffs' claims are justiciable. Plaintiffs' reimbursement pause challenge is not justiciable because the reimbursement pause was not a final agency action, and

the equipment pause claim is not justiciable because DHS's administration of the STC program is left to agency discretion.

*Fourth*, the equipment pause claim fails on the merits because the pause was neither arbitrary nor capricious.

## Background

### I. The Securing the Cities Program Background

On December 21, 2018, Congress enacted the Countering Weapons of Mass Destruction Act of 2018 (the CWMD Act), which directed DHS to establish the "Securing the Cities" or "STC" program. 6 U.S.C. § 596b. Through the STC program, DHS was required, among other things, to assist local governments in designing, implementing, and enhancing their ability to detect, interdict, and report nuclear or radiological (R/N) material that could be used in terrorist attacks. 6 U.S.C. §§ 596b(b)(1)-(8). The STC program also directed DHS to provide augmenting resources as appropriate to local governments, to monitor expenditures under the program, and to "provide any other assistance [DHS] determines appropriate." *Id*. §§ 596b(b)(6)-(8). The STC program uses cooperative agreements to partner with a small number of high-risk urban areas; those areas are known as STC regions. 6 U.S.C. § 596b(c)(1).

From 2018 through 2026, the STC program was managed by the CWMD Office. Kuleski Dec. ¶¶ 3-4. The CWMD office coordinated with and supported STC regions in numerous ways, including through recurring program support activities, monthly webinars on programmatic and technical topics, semiannual meetings, information sessions, and site visits, as needed. Kuleski Dec. ¶ 7. Additionally, the CWMD Office approved funding and equipment requests pursuant to the Office's cooperative agreements with each STC region. Dkt. 56-2, Ex. A, at 14.

## II. The STC Program Works with STC Regions via Cooperative Agreements.

In fiscal year 2020, DHS sent plaintiffs a "Notice of Funding Opportunity" (NOFO), which provided an opportunity to apply for STC program funds. *E.g.*, Dkt. 56-2, Ex. A. The NOFO stated that the funds would be provided through a cooperative agreement with DHS. Dkt. 56-2, Ex. A, at 4. The NOFO further provided that CMWD would "work with [funding] recipients to identify the appropriate equipment for their operations and procure that equipment for them. At its discretion, CWMD may instead provide monetary assistance for the procurement of equipment . . . ." Dkt. 56-2, Ex. A, at 16. The NOFO also stated that the STC program's goal was " focused on steady-state operations." Dkt. 56-2, Ex. A, at 3.

In 2020 and 2021, DHS entered into cooperative agreements with plaintiffs to facilitate plaintiffs' regional STC operations. Amended Complaint, Dkt. 10 ("Am. Compl.") ¶ 45. Like the NOFOs, the cooperative agreements reflect that DHS would work with STC regions "to identify the appropriate equipment for specific regional operations," and would replace equipment "if doing so is in the Government's best interest, based on the recipient's need, funds availability, and operational/logistical resources." Dkt. 56-2, Ex. C at 404.

## III. The CWMD Office Was Set to Terminate in 2023, and It Faced Continual Funding Uncertainty.

The CWMD Act included a termination clause, which provided that the CWMD Office would terminate on December 21, 2023. 6 U.S.C. § 591(e). After that date passed, Congress continued to authorize its operations through a series of appropriations acts, while at the same indicating its intent to terminate the Office. *See* Kuleski Dec. ¶ 16. In 2026, Congress declined to fund the CWMD Office in The Homeland Security and Further Additional Continuing Appropriations Act, and the Office subsequently terminated. *See* Kuleski Dec. ¶ 3.

That same legislation transferred some of the former CWMD Office's functions, including

the STC program, to the Federal Emergency Management Agency (FEMA). Kuleski Dec. ¶ 27. Congress appropriated $34 million for the STC program after it was transferred to FEMA.[1] Since 2019, the program's funding has remained flat: Congress appropriated $30 million to the program in 2019, and $34 million each year since 2023. During that same timeframe, the program's scope expanded significantly, both by adding new STC regions to the program and encouraging existing STC regions to expand their geographic footprint. Kuleski Dec. ¶¶ 10-14.

## IV. The Reimbursement Pause

In response to a January 2025 memo from the Office of Management and Budget and a February 2025 memo from then-Secretary Noem regarding sanctuary cities, DHS conducted a department-wide review of assistance programs. *See* Administrative Record, Dkt. 54-3 ("AR"), at 1-5. Around the same time, and pursuant to Executive Order 14,222, DHS began working with the Department of Government Efficiency to establish centralized technology systems to track payments to recipients of government contracts and grants, including cooperative agreements for federal assistance programs such as STC. *Id*. at 6-14. DHS also instituted a department-wide review and approval process for all contract and grant awards over $25 million, including STC cooperative agreement awards. *Id*. at 18. As a result of these actions, DHS temporarily paused STC reimbursements between February and June 2025. *See* Dkt. 56-6, Ex. E, at 98. As of June 24, 2025, DHS completed its review and restored all previously paused funding. *See id*. ("Secretary Noem has approved the release of awarded grant funds to CWMD's awardees in the Securing the Cities (STC) program to ensure that CWMD's public safety programs remain operational."). Plaintiffs do not contend that any reimbursements have been improperly withheld

[1] *See* Homeland Security and Further Additional Continuing Appropriations Act, 2026, PL 119-86, April 30, 2026, 140 Stat 773, 790.

since June 2025.

## V. The Equipment Pause

Separate from the reimbursement pause, the CWMD Office announced on May 14, 2025, that all radiological and nuclear detection *equipment* purchases were paused due to "funding constraints." AR at 27. This pause was implemented by Brian Kuleski, who at the time held the position of Securing the Cities Program Manager. *Id.* As Kuleski explains in the attached declaration, he implemented this pause while he conducted a review of the program. Kuleski Dec. ¶¶ 9, 17. More specifically, Kuleski wanted to pause new equipment purchases because (1) he was concerned the program's costs were growing while its funding remained flat, (2) STC regions had sought to purchase equipment despite not having personnel trained to use that equipment, and (3) STC regions were seeking to purchase equipment for specialized events rather than for steady-state operations. *Id.* ¶¶ 10-15.

Kuleski's concerns stemmed in part from a March 2024 Government Accountability Office (GAO) report of the STC program. *Id.* ¶¶ 12. The GAO found that STC regions had been asked to expand their programs without a framework or clear expectations from the CWMD Office. *Id.* In response, the Office reviewed data from prior years and established baseline targets regarding the amount and types of detection equipment and resources each region needed. *See id.*

Even as the equipment pause was in put in place, the CWMD Office ensured the radiological and nuclear detection capabilities would be sustained at all 13 STC regions. Kuleski Dec. ¶ 19. In 2025, the CWMD Office deployed mobile detection deployment units at the request of the regions; those units are designed to augment the regions' detection and reporting efforts. *Id.* Additionally, the Office has continued to approve certain new equipment purchases, including personal radiation detectors for Seattle and new detectors for Chicago and Boston. Kuleski Dec.

¶ 18. The STC program has also continued to fund regions' program administration costs, including salaries for local offices, backfill and overtime for personnel to attend training exercises, equipment repairs, equipment warranties, and other supplies. *Id*.

In June 2026, the STC program (now under FEMA) completed the review that Kuleski began in May 2025. Kuleski Dec. ¶ 28. The STC program management plans to ensure that radiological and nuclear detection equipment is used for steady-state activities, and that any future program expansion is based on threat and risk assessments. *Id*.

**Argument**

## I. The Court Can Consider the Kuleski Declaration.

Contemporaneous with this memorandum, defendants have filed a declaration from Brian Kuleski, the Division Director of the STC and Mobile Detection Deployment Programs (the "Kuleski Declaration"). In his declaration, Kuleski provides additional information regarding the history of STC Program, the budgetary constraints it faces, and his decision to implement the equipment pause.

Plaintiffs argue at length that the administrative record in this case is meager. Plaintiffs' Memorandum, Dkt. 55-1 ("Mem.") at 6-8. Defendants do not contest that characterization. While the administrative record makes clear why Kuleski implemented the equipment pause—because of funding constraints—it contains little else that would allow the court to review what funding constraints Kuleski was considering at the time and why the STC Program's prior practices were unsustainable. Courts regularly allow parties to supplement the administrative record "where the record is insufficient for the Court to render a decision." *Portfolio Disposition Mgmt. Grp. LLC v. United States*, 64 Fed. Cl. 1, 12 (2005); *Glob. Computer Enters., Inc. v. United States*, 88 Fed. Cl. 52, 61 (2009) ("Supplementation, therefore, is justified when required for meaningful judicial

review[.]" (internal quotations and citation removed); *Blue & Gold Fleet, LP v. United States*, 70 Fed.Cl. 487, 494 (2006) (supplementation is justified "when it is necessary for a full and complete understanding of the issues."); *Clifford v. Pena*, 77 F.3d 1414, 1418 (D.C. Cir. 1996) (agency declarations may be admitted where they "merely illuminate reasons obscured but implicit in the administrative record"). Those circumstances apply here. The administrative record, standing on its own, does not provide a full and complete understanding of the issues. Accordingly, this court can and should consider the Kuleski Declaration.

## II. This Court Lacks Jurisdiction to Hear Plaintiffs' APA Claims.

### a. Tucker Act Principles Deprive the Court of Jurisdiction.

This court lacks jurisdiction over plaintiff's claims because those claims are fundamentally contractual. The federal government enjoys sovereign immunity and may be subject to suit only when it has explicitly waived that immunity. *Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999). Waivers of sovereign immunity must be strictly construed to protect the prerogatives of the government and to ensure the courts stay within the jurisdiction provided by Congress. *Lane v. Pena*, 518 U.S. 187, 192 (1996). In the APA, Congress provided a limited waiver of sovereign immunity for claims against the United States by persons "adversely affected . . . by agency action" if they "seek[ ] relief other than money damages." 5 U.S.C. § 702. However, the APA's waiver of sovereign immunity does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Id*. That is the case here.

For contract claims against the government, the Tucker Act establishes jurisdiction in the Court of Federal Claims. 28 U.S.C. § 1491. When it applies, Tucker Act jurisdiction is exclusive and precludes jurisdiction in district court under the APA's waiver of sovereign immunity. The Court of Federal Claims is the "single, uniquely qualified forum for the resolution of contractual

disputes." *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985).

Because Congress has limited the forum and the remedies for contract claims against the government, a litigant whose claim is essentially contractual cannot "avoid the jurisdictional . . . restrictions of the Tucker Act" by simply asking for injunctive relief in district court. *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982); *see also Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (explaining that Section 702 of the APA "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes"); *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (regardless of how a claim is styled, a district court lacks jurisdiction if the claim "is in 'its essence' contractual."); *Transohio Sav. Bank v. Director, Office of Thrift Supervision*, 967 F.2d 598, 613 (D.C. Cir. 1992) ("[T]he APA does *not* waive sovereign immunity for contract claims seeking specific relief.") (emphasis in original). In other words, the Tucker Act impliedly forbids an APA action seeking injunctive and declaratory relief if that action is a disguised breach-of-contract claim. *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025) ("*NIH*"); *Dep't of Educ. v. California*, 604 U.S. 650 (2025) (per curiam) ("*California*").

**i. *California* and *NIH* Control.**

The Supreme Court's recent orders in *California* and *NIH* foreclose plaintiffs' attempt to bring APA challenges. *See NIH,* 145 S. Ct. at 2664 (Gorsuch, J., concurring part and dissenting in part) (emphasizing that the "reasoning" of Supreme Court decisions regarding interim relief "binds lower courts as a matter of vertical *stare decisis*"); *see also Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025) (explaining that the Supreme Court's "interim orders . . . inform how a court should exercise its equitable discretion in like cases").

In *California*, the plaintiffs raised an APA challenge to the Department of Education's termination of various education related grants under certain federal grant programs. 604 U.S. at 650. They alleged that the grant terminations were arbitrary and capricious and sought a temporary restraining order from a district court "enjoining the Government from terminating various education-related grants" and "requir[ing] the Government to pay out past-due grant obligations and continue paying obligations as they accrue." *Id*. The district court found that plaintiffs were likely to succeed on the merits of their APA claim, which alleged that the Department had terminated grants *en masse* without individualized analyses or reasoned explanation. *California v. U.S. Dep't of Educ.*, 769 F. Supp. 3d 72, 76-78 (D. Mass. 2025). As a remedy, the district court ordered the government to pay out past due grant obligations and continue to pay its grant obligations, holding that the Tucker Act did not preclude jurisdiction because the plaintiffs invoked federal statutes and regulations and did not style their action as one for money damages. *Id*. at 76, 80.

The Supreme Court stayed the district court's order. *See California*, 604 U.S. 650. As the Court explained, the lower court likely lacked jurisdiction because the APA's waiver of sovereign immunity "does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered." *Id.* at 651 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). Instead, such suits must be brought in the Court of Federal Claims, in which Congress vested "jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. 1491(a)(1)).

The Supreme Court reiterated this approach in *NIH*. There, the government changed its funding to align with changed policy priorities mandated by several executive orders. *NIH*, 145 S. Ct. at 2660 (Barrett, J., concurring in part). In doing so, the government issued internal guidance

documents describing those priorities and terminating numerous grants. *Id*. at 2661 (Barrett, J., concurring in part). The district court concluded that the government's grant termination decision was arbitrary and capricious under the APA. *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 791 F. Supp. 3d 119, 179 (D. Mass. 2025). In upholding the district court's finding that it had subject matter jurisdiction over the grant terminations, the First Circuit reasoned the case could proceed because the district court provided "declaratory relief that is unavailable in the Court of Federal Claims" and the case does not "depend on the terms or conditions of any contract." *Am. Pub. Health Ass'n v. NIH*, 145 F.4th 39, 43–44, 47, 50 (1st Cir. 2025). The First Circuit distinguished *California* on the grounds that *California* was limited to an order "to pay out past-due grant obligations." *Id.* at 50–51 (quoting *California*, 604 U.S. at 650).

The Supreme Court disagreed and stayed the district court's judgment vacating the government's termination of the individual grants. *NIH*, 145 S. Ct. at 2660. The Supreme Court held that the APA's "limited waiver of sovereign immunity does not provide the District Court with jurisdiction to adjudicate claims based on the research-related grants or to order relief designed to enforce any obligation to pay money pursuant to those grants." *Id.* at 2660 (cleaned up).

In light of the Supreme Court's orders in *California* and *NIH*, various courts have found that APA claims, brought by beneficiaries of government grants, are barred by the Tucker Act. *See Thakur v. Trump*, 163 F.4th 1198, 1204 (9th Cir. 2025) (court likely lacked jurisdiction over APA claim that the government's termination of research grants was arbitrary and capricious because it was designed to enforce an obligation to pay money pursuant to the grants).

Plaintiffs correctly note that the question implicated by *California* and *NIH*—whether their APA claims are contractual in nature and can thus only be heard by the Court of Federal Claims—

is best answered by the *Megapulse* test. *See Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). Under *Megapulse*, courts ask if: (1) the source of the rights asserted is contractual, and (2) the remedies plaintiffs seek (or which are appropriate) are contractual. *Afterschool for Child. & Teens (ACT) Now v. United States Dep't of Educ.*, No. 25 C 15704, 2026 WL 1847100, at *7 (N.D. Ill. June 26, 2026) ("*ACT Now*") (citing *Megapulse*, 672 F.2d at 968). If, as here, the answer to both questions is yes, the Tucker Act requires that the claims can be heard only in the Court of Federal Claims.

### ii. Plaintiff's Rights Stem from their Contractual Cooperative Agreements.

Under *Megapulse*, a claim lies outside of contract where the rights claimed "existed prior to and apart from rights created under the contract." *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985); *see also Megapulse*, 672 F.2d at 969-70 (distinguishing between actions "sounding genuinely in contract" and those "based on truly independent legal grounds."). The corollary of this rule is that "where the rights a litigant is claiming are *dependent* on the contract between two parties, the claim is contractual in nature for purposes of the Tucker Act." *ACT Now*, 2026 WL 1847100, at *7 (N.D. Ill. June 26, 2026) (emphasis in original).

Although disguised as APA claims, Counts IV and VI of the amended complaint plainly depend on plaintiffs' cooperative agreements with DHS. Plaintiffs allege that DHS entered into cooperative agreements with them in 2020 and 2021. ECF No. 10 ¶¶ 45. Pursuant to these agreements, DHS sent each plaintiff annual "please apply" letters inviting plaintiffs to apply for additional funding. *Id*. ¶ 47. Historically, after DHS approved plaintiffs' applications, they requested and received equipment, funding for equipment purchases, training programs, and salaries covered by the STC program as contemplated by the parties' cooperative agreements. *See id*. ¶¶ 47-51.

Today, plaintiffs continue to receive funding for training programs, replacements of R/N detection equipment, R/N material monitoring services, support supplies for R/N detection equipment, and maintenance and sustainment of existing R/N detection equipment. Kuleski Dec. ¶ 17. The difference now—and the impetus behind plaintiffs' equipment pause claim—is that certain purchases of new R/N detection equipment, which plaintiffs previously could obtain pursuant to their agreements with DHS, have been paused. *See* Kuleski Dec. ¶ 18. The rights that plaintiffs seek to vindicate in the equipment pause claim stem solely from those agreements. Likewise, any reimbursement that plaintiffs were owed was pursuant only to their agreements with DHS.

Recognizing the jurisdictional problem this creates, plaintiffs argue their rights are based in statute, rather than their agreement with DHS. Mem. at 11. A review of the statutory scheme belies that assertion. Congress established the STC Program to "enhance the ability of the United States to detect and prevent terrorist attacks and other high-consequence events utilizing nuclear or other radiological materials that pose a high risk to homeland security in high-risk urban areas." 6 U.S.C. § 596b(a). To that end, the DHS Secretary is required to, among other things, support local governments in designing and implementing detection systems, provide resources to enhance detection capabilities, and monitor program expenditures and track performance. *See* 6 U.S.C. § 596b(b)(1)-(8). But the statute says nothing about *how* DHS is to accomplish those goals, nor does it provide that any STC region is entitled to any of plaintiffs' claimed benefits. In fact, the words "reimbursement" and "equipment" do not appear in the statute at all. To the extent plaintiffs have rights to either, those rights come from their cooperative agreements. *See, e.g.*, Dkt. 56-2 at 51 (cooperative agreement with Boston describing the terms and conditions under which DHS would procure equipment for the region).

Indeed, plaintiffs' own allegations make clear that it is the "*[c]ooperative agreements* under [the program] that provide funding on a reimbursement basis," *not* any statute. Am. Compl. ¶ 32 (emphasis added). Their claims thus stem from DHS's alleged noncompliance with the cooperative agreements. *Compare ACT Now*, 2026 WL 1847100, at *8 (holding that the plaintiffs' APA claims were contractual where "[i]f plaintiffs ultimately ha[d] any right to continued grant funding, it would stem from their grant contract"), *with Megapulse*, 672 F.2d at 961-62 (holding the district court had jurisdiction where the government violated the plaintiff's substantive and independent rights under the Trade Secrets Act during the course of a contractual relationship with the government); *see also Climate United Fund v. Citibank, N.A.*, 154 F.4th 809 (D.C. Cir. 2025), *reh'g en banc granted, opinion vacated*, No. 25-5122, 2025 WL 3663661 (D.C. Cir. Dec. 17, 2025) (Tucker Act deprived the district court of jurisdiction to hear APA claims over terminated grants where those claims "expressly refer[red] to and incorporate[d] the grant agreements[.]"; *Sustainability Inst. v. Trump*, 165 F.4th 817, 827 (4th Cir. 2026) (Tucker Act deprived district court of jurisdiction where plaintiffs identified "no source of law, besides their grant agreements, guaranteeing them the relief they seek . . . .").

Plaintiffs also argue that even if their rights do come from the cooperative agreements, those agreements are not contractual. Mem. at 11-12. Plaintiffs rely largely on *St. Bernard Par. Gov't v. United States*, 134 Fed. Cl. 730, 736 (2017), *aff'd on other grounds*, 916 F.3d 987 (Fed. Cir. 2019), where the Court of Federal Claims held that a cooperative agreement between the Natural Resources Conservation Service ("NRCS") and a Louisiana parish designed to clear debris after Hurricane Katrina lacked consideration (and was thus non-contractual) because the NRCS did not directly benefit from the agreement. The only benefit the federal government could realize as a result of the *St. Bernard* agreement was "the restoration of a natural resource and a reduction

in the amount of emergency funds that the Government would spend" in the future. *Id*. at 735-36. The court held this benefit to the government was too indirect to constitute consideration. *Id*. at 736. Relying on *St. Bernard*, various other courts have found that cooperative agreements lack consideration. *E.g.*, *Maine v. Nat'l Oceanic & Atmospheric Admin.*, No. 25 C 324, 2026 WL 1005094, at *1, *7 (D. Me. Apr. 14, 2026) (no consideration where cooperative agreement's purpose was to restore tidal salt marsh habitat and protect coastal infrastructure from flooding); *Am. Near E. Refugee Aid v. United States Agency for Int'l Dev.*, 703 F. Supp. 3d 126, 133 (D.D.C. 2023) (no consideration where cooperative agreement's purpose was to "increase Palestinian access to water, sanitation and . . . infrastructure").

But the "mere fact that an Award is labeled a 'cooperative agreement' does not resolve whether it constitutes a government contract for purposes of the Tucker Act." *Maine*, 2026 WL 1005094, at *6. Rather than focusing on labels, the Federal Circuit "recognizes the existence of a government contract when four elements are present: '(1) mutuality of intent to contract; (2) offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States.'" *Id*. (quoting *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1339 (Fed. Cir. 2021)).

Plaintiffs here dispute only consideration. In "the context of government contracts," the Federal Claims Court has explained "consideration must render a benefit to the government, and not merely a detriment to the contractor." *Metzger, Shadyac & Schwarz v. United States*, 12 Cl. Ct. 602, 605 (1987). The benefit to the government derived from the cooperative agreements here is far more direct than that in *St. Bernard*, *Maine*, or *American Near East Refugee Aid*. Defendants—the Department of Homeland Security and DHS Secretary—have a plain and compelling interest in protecting the nation, including the STC regions, from terrorist attacks. The

CWMD Act itself makes clear that its purpose is to "enhance the *ability of the United States* to detect and prevent terrorist attacks." 6 U.S.C. § 596b(a) (emphasis added). That DHS formed cooperative agreements with the STC Cities to further *its own* purpose is evidence of the agreements' contractual nature. And because plaintiffs' claims arise from those contractual agreements, the first prong of the *Megapulse* test is satisfied.

**iii. Plaintiffs' Requested Remedies Are Contractual.**

*Megapulse*'s next prong asks whether "the type of relief sought (or appropriate)" is contractual. 672 F.2d at 968. Plaintiffs insist that they seek only the non-contractual remedies of equitable and declaratory relief, and that this court thus retains jurisdiction. There are two problems with this argument.

*First*, that plaintiffs seek equitable relief does not remove their claims from the gambit of contract law. Courts have found that requests for specific performance under a contract are contractual remedies for purposes of satisfying *Megapulse*. *ACT NOW*, 2026 WL 1847100, at *10 (citing *Evers v. Astrue*, 536 F.3d 651, 660 (7th Cir. 2008)); *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1111 (D.C. Cir. 2022) (A claim "sound[s] in contract" where it seeks "the classic contractual remedy of specific performance.") (quotations omitted). Plaintiffs characterize the relief they seek as requests for the court "to set aside" DHS's (1) "refusal to process [their] reimbursement requests in accordance with federal regulations," (2) and DHS's "decision to freeze the purchase of equipment central to the program's purpose." Mem. at 13.

As to the first, plaintiffs are correct that federal regulations govern the timeliness of reimbursements. *See* 2 C.F.R. § 200.305(b)(3). But the fact remains that plaintiffs' right to any reimbursement stems from their contractual agreements with DHS. And as to the second, plaintiffs identify no regulation or law that DHS purportedly violated when it implemented the equipment

pause. To "set aside" DHS's "decision to freeze" certain equipment purchases would be to order DHS to specifically perform according to plaintiffs' interpretation of the contract. The relief plaintiffs seek is thus contractual. *See ACT NOW*, 2026 WL 1847100, at *10-11 (holding that requests for the court vacate grant non-continuations were contractual under *Megapulse*); *but see Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002) (distinguishing "specific performance of a contractual obligation to pay past due sums" from "an injunction to correct the method of calculating payments going forward").

*Second*, even if plaintiffs are correct that the Court of Federal Claims cannot award them the relief they seek, that does mean that jurisdiction automatically vests in this court. Instead, "it shows that Congress made the dispositive choice" that the remedies "for contract claims against the United States" are "limited." *Sustainability Institute*, 165 F.4th at 828 n.7. Accordingly, to the extent plaintiffs' APA claims can be heard at all, they must be heard by the Court of Federal Claims.

**b. Plaintiff's Reimbursement Claim Is Moot.**

This court also lacks jurisdiction to hear plaintiffs' reimbursement pause claim because it is moot. Article III of the Constitution extends only to "cases" and "controversies." U.S. Const. art. III, § 2. Federal courts thus cannot "give opinions upon moot questions or abstract propositions." *Worldwide St. Preachers' Fellowship v. Peterson*, 388 F.3d 555, 558 (7th Cir. 2004) (citation and internal quotations omitted).

Plaintiffs' reimbursement pause claim is straightforwardly moot. The substance of the claim is that DHS improperly denied plaintiffs reimbursement that they were owed under their cooperative agreements in the spring and early summer of 2025. As plaintiffs now acknowledge, those funds have since been reimbursed, and DHS has not denied reimbursement of any funds for

over a year. *See* Mem. at 13. There is thus no live "case" or "controversy" with respect to the reimbursement pause, and to adjudicate the legality of a nearly 18-month-old temporary pause would be to "give [an] opinion[] upon moot questions or abstract propositions." *Peterson*, 388 F.3d at 558.

Plaintiffs nonetheless maintain that their claim is not moot because DHS may return to its prior practice of pausing reimbursements. Mem. at 13-14. Plaintiffs are correct that courts are reluctant to dismiss a claim on mootness grounds where the defendant voluntarily changes its behavior after litigation begins. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) ("a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."). The reimbursement pause remains a live issue, plaintiffs say, because DHS only reimbursed plaintiffs after they filed this lawsuit, and because the administrative record does not reveal any non-litigation reason why DHS did so.

But plaintiffs' own declarations discredit this purported fear. DHS Assistant Secretary Richardson informed the STC regions that their funds would be released in June of 2025 "to ensure that CWMD's public safety programs remain operational," not because of the litigation. Dkt. 56-6, Ex. E, at 1. Even if the court were disinclined to take Assistant Secretary Richardson at his word, the fact remains that it has now been fourteen months since the reimbursement pause ended, and there is no evidence anywhere in the record or in plaintiffs' multiple declarations even suggesting that DHS continues to threaten any pause in reimbursements. Accordingly, plaintiffs' reimbursement pause claim is moot.

## III. Plaintiffs' APA Claims Are Not Justiciable.

### a. The Reimbursement Pause Is Not Justiciable.

The reimbursement pause is not justiciable because it was not a final agency action. A plaintiff who brings a claim under the APA may only (with limited exceptions not relevant here) challenge a "final agency action." 5 U.S.C. § 704. To be final, an agency action must satisfy two conditions: "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Dhakal v. Session*, 895 F.3d 532, 539 (7th Cir. 2018) (quoting *Bennet v. Spear*, 520 U.S. 154, 17-78 (1997). The reimbursement pause satisfies neither.

The only "actions" that plaintiffs identify in their memorandum are a handful of emails explaining that payments were "approved but not yet release[d] for payment" while cities' grant officers "await[ed] guidance." *E.g.*, Dkt. 56-4, Ex. B at 2; Dkt. 56-6 ¶ 25 (describing a "pause" while "await[ing] guidance"). There is no indicia from any communication that the reimbursement pause reflected the consummation of a decisionmaking process. Rather, the pause was exactly how it was described: a pause. This conclusion is buttressed by the fact that, as plaintiffs acknowledge, all the charges for which they believe they were entitled to reimbursement have now been reimbursed. Mem. at 6. The agency's process culminated in an award of funds; the temporary, intervening pause thus was not "final." For the same reason, the pause did not result in a determination of rights or obligations, nor did any legal consequences flow from it. The cities received all the funding to which they had a right. That they received that funding after a few-month delay does not make the delay "final" for APA purposes.

Plaintiffs rely on *State v. U.S. Dep't of Transportation* ("*DOT*") to argue that the pause was a final agency action. No. 25 C 848, 2026 WL 183584, at *10 (W.D. Wash. Jan. 23, 2026) (collecting cases). There, the plaintiffs challenged the agency's decision to "definitive[ly] revoke"

disbursement of funds while the agency issued updated guidance regarding how funds would be disbursed in the future. *Id*. The agency argued that the revocation was only a temporary pause, and that the issuance of future guidance was the only final agency action. *Id*. The *DOT* court rejected that argument, explaining that the revocation was a final, non-temporary agency action, and that issuance of new guidance was "*an entirely new series of agency actions*." *Id*. (emphasis in original). But the court also explained that if "the new guidance" had "undone" the earlier revocation, that would suggest the pause "truly had been temporary." *Id.*

That is what occurred here—DHS temporarily paused reimbursements, and within a few months, those reimbursements resumed. The temporary pause was not a culmination of any process, and no legal consequences flowed from it. Plaintiff's challenge to the reimbursement pause is thus not judicially reviewable.

**b. The Equipment Pause Is Not Justiciable Because the STC Program's Administration Is Left to Agency Discretion.**

The APA's sovereign immunity waiver does not apply to challenges against an agency action that "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Although narrow, this exception precludes judicial review of the equipment pause.

The Supreme Court set forth the scope of § 701(a)(2) in *Heckler v. Chaney,* 470 U.S. 821 (1985). There, the Court was asked to determine whether the Food and Drug Administration's decision not to bring an enforcement proceeding was subject to judicial review. The Court explained that "review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id*. at 830. The Court further cautioned that courts generally cannot review agency decisions about whether to bring an enforcement action because those decisions involve "a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," including resource constraints and

policy priorities. *Id*. at 831. Because (1) the statute conferring power on the FDA to bring enforcement actions provided no substantive standards on which a court could base its review, and (2) the FDA's decisions required balancing factors within its expertise, the Court held that the FDA's non-enforcement decision was left to agency discretion, and as such, unreviewable. *Id*. at 831-32 ("The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities.").

Although the STC Program does not involve enforcement decisions, the same considerations preclude review here. The statute obligates DHS to, among other things, "assist" local governments in designing nuclear detection and prevention tools, to "provide resources to enhance detection, analysis, communication, and coordination," and to provide "augmenting resources, as appropriate, to enable" local governments to "sustain and refresh their capabilities under the STC program." 6 U.S.C. § 596b(b). It also obligates DHS to "monitor expenditures under the STC program and track performance in meeting the goals of the program," and to establish an implementation plan with "measures for achieving and sustaining capabilities under the program." 6 U.S.C. §§ 596b(b)(7), d(1)(A)(iii). But the statute says nothing about equipment, let alone criteria under which equipment purchases should be funded.

As Kuleski explains in his declaration, he implemented the equipment pause because (1) STC regions were spending money at an unsustainable rate, and (2) STC regions were regularly purchasing equipment that they (a) did not need, (b) did not have the requisite staff to use, (c) did not intend to use for steady-state operations, or (d) would not help the STC region achieve its baseline requirements under the program.[2] *See* Kuleski Dec. ¶¶ 10-15. But the pause did not freeze

[2] And this should be no surprise to the STC regions. The NOFOs that the CWMD Office sent out explicitly provide that "[a]t its discretion, CWMD may provide monetary assistance for the procurement of equipment by the [regions] if CWMD determines that monetary assistance in

the purchases of all equipment, as plaintiffs describe. Plaintiffs continue to receive funding for replacements of R/N detection equipment, R/N detection equipment monitoring services, support supplies for R/N detection equipment, and maintenance and sustainment of existing R/N detection equipment. Kuleski Dec. ¶ 17. And certain purchases of new equipment continue to be funded. For example, in May 2026, the CWMD Office approved Seattle's purchase of 50 new personal radiation detection devices. Kuleski Dec. ¶ 18.

The thrust of plaintiffs' equipment pause claim is the CWMD Office began arbitrarily and capriciously denying certain requests for equipment purchases. To adjudicate that claim, then, the court would have to weigh the statutory factors that the Office itself has to weigh: whether the sought equipment would support the development of the cities' operating capability, whether such resources are appropriate to augment the cities' existing resources, whether the program's monthly expenditures warrant the narrow pause that has been implemented, and whether that pause is necessary to achieve and sustain the program's capabilities. But the court would find "no meaningful standard" to evaluate those factors, because none exists. The equipment pause challenge in effect asks the court to micromanage the STC program, scrutinizing discrete funding choices based on factors that the court is ill-equipped to evaluate. This is the exact kind of discretionary agency function that Section 702 precludes from judicial review. *See Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) (allocation of lump sum appropriations was committed to agency discretion by law because it required a complicated balancing of a number of factors which were particularly within agency's expertise, including the proper ordering of its priorities.). Plaintiffs' equipment pause claim is thus not reviewable under the APA.

## IV. The Equipment Pause Was Not Arbitrary or Capricious.

---

the Government's best interest to meet the needs of a [region] in a particulate instance." *E.g.*, Dkt. 56-6 at 35.

The APA allows courts to "set aside agency action, finds, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. §§ 704, 706(2)(A), which is not the case here. Under the APA, the arbitrary and capricious standard requires "that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). A court's review of discretionary agency action is "narrow," and courts "determine only whether the [agency] examined 'the relevant data' and articulated a satisfactory explanation' for [its] decision." *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983). And "[e]ven when an agency explains its decision with 'less than ideal clarity,' a reviewing court will not upset the decision on that account 'if the agency's path may reasonably be discerned.'" *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 497 (2004) (quoting *Bowman Transp., Inc. v. Arkansas—Best Freight System, Inc.*, 419 U.S. 281, 286 (1974)).

The stated reason for the equipment pause was funding constraints. AR at 27. Plaintiffs do not dispute that the STC program has been beset by funding constraints for years; in fact, plaintiffs identify those constraints in their own complaint. *See* Am. Compl. ¶ 66 (alleging that proposed budget cuts in 2026 threatened to eliminate the CWMD Office). Plaintiffs are correct. As described more comprehensively above, the CWMD Office was on life support starting in 2023, when it was originally set to terminate. The House Committee on Appropriations regularly indicated its intent to terminate the Office by declining to fund it, and the Office—which administered the STC program—officially terminated in May 2026. While some of the functions of the CWMD Office now continue under FEMA, there can be little doubt that funding constraints plagued the STC program before, during, and after the equipment pause's implementation.

Not only was the program's funding in doubt, but the CWMD Office was not responsibly spending the money it had. The Office had under prior leadership committed funds to equipment purchases without first determining whether that equipment was necessary for steady-state operations, or whether the region seeking the equipment had the trained staff necessary to use that equipment, among other problems. The CWMD Office's prior leadership had encouraged STC regions to expand their programs despite the fact that funding had remained flat for several years. Kuleski Dec. ¶ 10. Unsurprisingly, the GAO reported that STC regions lacked guidance from CWMD regarding how and when they should expand their local programs. Kuleski Dec. ¶ 12.

Recognizing this two-pronged problem—a lack of funding from Congress and unaccountable spending practices enabled by a previous lack of guidance from CWMD—the Office implemented the equipment pause, which limited the circumstances under which STC program funds could be used to purchase new equipment.

Plaintiffs may argue that the decision to implement the equipment pause was wrong, or imprudent, or sub-optimal. But the APA does not allow courts to substitute their own judgment in place of an agency's. *Dep't of Com. v. New York*, 588 U.S. 752, 779 (2019). The only question the APA is concerned with is whether there is a "rational connection between the facts found and the choice made." *Motor Vehicle*, 463 U.S. at 43. The CWMD Office recognized that monetary constraints threatened its existence, and through the equipment pause, it sought to rein in unaccountable spending practices. While it admittedly explained the pause with "less than ideal clarity," the reasoning behind the pause is plainly discernible. *EPA*, 540 U.S. at 497.

Plaintiffs also argue that the equipment pause is arbitrary and capricious because DHS failed to assess plaintiffs' reliance interest. Mem. at 19-20. They argue that "DHS itself engendered [plaintiffs'] reliance interests . . . through its various public statements touting the

central role that equipment purchases play in" the STC program. *Id*. at 20. But plaintiffs identify no public statement suggesting that STC regions had the near-unfettered rights to purchase equipment through the program that plaintiffs now assert. Instead, each plaintiffs' cooperative agreement makes clear that at "its discretion, CWMD may provide monetary assistance for the procurement of equipment by the [regions] if CWMD determines that monetary assistance in the Government's best interest to meet the needs of a [region] in a particulate instance." *E.g.*, Dkt. 56-6 at 35. Plaintiffs can have no legitimate reliance interest in funding for equipment when their agreements with DHS makes clear the funding is only available at CWMD's discretion and only if CWMD determines that funding is in the *federal government*'s interests, rather than the STC region's interests. *But see Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 31 (2020) (suggesting that even if a plaintiff has no legitimate reliance interest in prior agency policy, that does not obviate the need for the agency to assess those interests).

Finally, plaintiffs argue that the equipment pause is arbitrary and capricious because DHS failed to consider its impact on public safety. Mem. at 21 (citing *DHS v. Regents*, 591 U.S. at 30 (finding agency action arbitrary and capricious where the agency "failed to consider . . . important aspects of the problem."). The STC program faced significant funding pressures, and those pressures were made worse by its prior practice of approving equipment purchases with little to no scrutiny. The program receives a finite amount of funding (funding that has not increased since 2023) even now that it is under FEMA, and it cannot spend money that it does not have. And even after the pause went into effect, the STC program remained focused on its mission to protect public safety by ensuring sustained R/N detection capabilities at all 13 STC regions. In 2025, the CWMD Office deployed mobile detection deployment units to support over 100 operations designed to

keep the public safe. Kuleski Dec. ¶ 20. That this may not reflect plaintiffs preferred allocation of resources does not make the allocation arbitrary or capricious for APA purposes.

**Conclusion**

For these reasons, this court should deny plaintiffs' partial motion for a preliminary injunction and grant defendants' partial motion for summary judgment.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: s/ Michael T. Morrell
MICHAEL T. MORRELL
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 469-6206
michael.morrell@usdoj.gov