# Exhibit A-1

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 2 of 714 PageID #:1052



Public Law 119–86
119th Congress

# An Act

Making further consolidated appropriations for the fiscal year ending September 30, 2026, and for other purposes.

Apr. 30, 2026
[H.R. 7147]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Homeland Security and Further Additional Continuing Appropriations Act, 2026.

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Homeland Security and Further Additional Continuing Appropriations Act, 2026.".

**SEC. 2. TABLE OF CONTENTS.**

Sec. 1. Short title.
Sec. 2. Table of contents.
Sec. 3. References.
Sec. 4. Explanatory statement.
Sec. 5. Statement of appropriations.

DIVISION A—DEPARTMENT OF HOMELAND SECURITY APPROPRIATIONS ACT, 2026

Title I—Departmental Management, Intelligence, Situational Awareness, and Oversight
Title II—Security, Enforcement, and Investigations
Title III—Protection, Preparedness, Response, and Recovery
Title IV—Research, Development, Training, and Services
Title V—General Provisions

DIVISION B—FURTHER ADDITIONAL CONTINUING APPROPRIATIONS ACT, 2026

**SEC. 3. REFERENCES.**

1 USC 1 note.

Except as expressly provided otherwise, any reference to "this Act" contained in any division of this Act shall be treated as referring only to the provisions of that division.

**SEC. 4. EXPLANATORY STATEMENT.**

The explanatory statement regarding this Act, printed in the House section of the Congressional Record on or about January 22, 2026, and submitted by the chair of the Committee on Appropriations of the House, shall have the same effect with respect to the allocation of funds and implementation of this Act as if it were a joint explanatory statement of a committee of conference, except that the contents printed under the headings "U.S. Immigration and Customs Enforcement" and "Border Security Operations" under the heading "U.S. Customs and Border Protection" shall have no force or effect for purposes of this Act, and amounts specified in the "Final Bill" column under the sub-heading "Border Security Operations" under the heading "U.S. Customs and Border Protection" and under the heading "U.S. Immigration and Customs

Enforcement" in the "Department of Homeland Security Act, 2026" table shall all be $0.

**SEC. 5. STATEMENT OF APPROPRIATIONS.**

The following sums in this Act are appropriated, out of any money in the Treasury not otherwise appropriated, for the fiscal year ending September 30, 2026.

Department of Homeland Security Appropriations Act, 2026.

# DIVISION A—DEPARTMENT OF HOMELAND SECURITY APPROPRIATIONS ACT, 2026

## TITLE I

## DEPARTMENTAL MANAGEMENT, INTELLIGENCE, SITUATIONAL AWARENESS, AND OVERSIGHT

### Office of the Secretary and Executive Management

#### operations and support

For necessary expenses of the Office of the Secretary and for executive management for operations and support, $316,295,000, which shall be for the purposes and in the amounts specified in the "Final Bill" column for Office of the Secretary and Executive Management, Operations and Support, in the "Department of Homeland Security Appropriations Act, 2026" table in the explanatory statement described in section 4 (in the matter preceding division A of this consolidated Act), of which $22,050,000 of amounts made available for Management and Oversight, Office of Health Security shall remain available until September 30, 2027: *Provided,* That $5,000,000 shall be withheld from obligation until the Secretary submits to the Committees on Appropriations of the House of Representatives and the Senate responses to all questions for the record for each hearing on the fiscal year 2027 budget submission for the Department of Homeland Security held by such Committees prior to July 1: *Provided further*, That not to exceed $15,000 shall be for official reception and representation expenses.

Submission.

#### procurement, construction, and improvements

For necessary expenses of the Office of the Secretary and for executive management for procurement, construction, and improvements, $8,911,000, to remain available until September 30, 2028.

### Management Directorate

#### operations and support

For necessary expenses of the Management Directorate for operations and support, including vehicle fleet modernization, $1,690,380,000, which shall be for the purposes and in the amounts specified in the "Final Bill" column for Management Directorate, Operations and Support, in the "Department of Homeland Security Appropriations Act, 2026" table in the explanatory statement described in section 4 (in the matter preceding division A of this consolidated Act): *Provided*, That not to exceed $2,000 shall be for official reception and representation expenses.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

For necessary expenses of the Management Directorate for procurement, construction, and improvements, $58,106,000, to remain available until September 30, 2028.

FEDERAL PROTECTIVE SERVICE

The revenues and collections of security fees credited to this account shall be available until expended for necessary expenses related to the protection of federally owned and leased buildings and for the operations of the Federal Protective Service.

INTELLIGENCE, ANALYSIS, AND SITUATIONAL AWARENESS

OPERATIONS AND SUPPORT

For necessary expenses of the Office of Intelligence and Analysis and the Office of Homeland Security Situational Awareness for operations and support, $340,819,000, of which $121,274,000 shall remain available until September 30, 2027: *Provided,* That not to exceed $3,825 shall for be official reception and representation expenses and not to exceed $2,000,000 is available for facility needs associated with secure space at fusion centers, including improvements to buildings.

OFFICE OF INSPECTOR GENERAL

OPERATIONS AND SUPPORT

For necessary expenses of the Office of Inspector General for operations and support, $257,599,000, of which $20,000,000 shall be for additional inspections and oversight of detention facilities and shall remain available until September 30, 2027, and of which $12,814,000 shall be for oversight of the execution of funds provided in Public Law 119–21: *Provided,* That not to exceed $300,000 may be used for certain confidential operational expenses, including the payment of informants, to be expended at the direction of the Inspector General.

ADMINISTRATIVE PROVISIONS

SEC. 101. (a) The Secretary of Homeland Security shall submit a report not later than October 15, 2026, to the Inspector General of the Department of Homeland Security listing all grants and contracts awarded by any means other than full and open competition during fiscal years 2025 or 2026. Reports.

(b) The Inspector General shall review the report required by subsection (a) to assess departmental compliance with applicable laws and regulations and report the results of that review to the Committees on Appropriations of the House of Representatives and the Senate not later than February 15, 2027. Review. Assessment. Compliance. Deadline.

SEC. 102. (a) Not later than 30 days after the last day of each month, the Chief Financial Officer of the Department of Homeland Security shall submit to the Committees on Appropriations of the House of Representatives and the Senate a monthly budget and staffing report that includes total obligations of the Department for that month and for the fiscal year at the appropriation and Budget. Reports.

program, project, and activity levels, by the source year of the appropriation.

(b) The initial staffing report submitted pursuant to subsection (a) shall be the baseline for which the Department of Homeland Security may increase or decrease staffing levels for any program, project, or activity pursuant to section 503(a)(4) of this Act.

Notifications.

SEC. 103. (a) The Secretary of Homeland Security, in consultation with the Secretary of the Treasury, shall notify the Committees on Appropriations of the House of Representatives and the Senate of any proposed transfers of funds available under section 9705(g)(4)(B) of title 31, United States Code, from the Department of the Treasury Forfeiture Fund to any agency within the Department of Homeland Security.

(b) None of the funds identified for such a transfer may be obligated until the Committees on Appropriations of the House of Representatives and the Senate are notified of the proposed transfer.

SEC. 104. All official costs associated with the use of Government aircraft by Department of Homeland Security personnel to support official travel of the Secretary and the Deputy Secretary shall be paid from amounts made available for the Office of the Secretary.

Briefing.
Deadline.
Time period.

SEC. 105. (a) The Under Secretary for Management shall brief the Committees on Appropriations of the House of Representatives and the Senate not later than 45 days after the end of each fiscal quarter on all Level 1 and Level 2 acquisition programs on the Master Acquisition Oversight List between Acquisition Decision Event and Full Operational Capability, including programs that have been removed from such list during the preceding quarter.

(b) For each such program, the briefing described in subsection (a) shall include—

(1) a description of the purpose of the program, including the capabilities being acquired and the component(s) sponsoring the acquisition;

(2) the total number of units, as appropriate, to be acquired annually until procurement is complete under the current acquisition program baseline;

(3) the Acquisition Review Board status, including—

(A) the current acquisition phase by increment, as applicable;

(B) the date of the most recent review; and

(C) whether the program has been paused or is in breach status;

(4) a comparison between the initial Department-approved acquisition program baseline cost, schedule, and performance thresholds and objectives and the program's current such thresholds and objectives, if applicable;

(5) the lifecycle cost estimate, adjusted for comparison to the Future Years Homeland Security Program, including—

(A) the confidence level for the estimate;

(B) the fiscal years included in the estimate;

(C) a breakout of the estimate for the prior five years, the current year, and the budget year;

(D) a breakout of the estimate by appropriation account or other funding source; and

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 6 of 714 PageID #:1056



(E) a description of and rationale for any changes to the estimate as compared to the previously approved baseline, as applicable, and during the prior fiscal year;

(6) a summary of the findings of any independent verification and validation of the items to be acquired or an explanation for why no such verification and validation has been performed;

(7) a table displaying the obligation of all program funds by prior fiscal year, the estimated obligation of funds for the current fiscal year, and an estimate for the planned carryover of funds into the subsequent fiscal year;

(8) a listing of prime contractors and major subcontractors; and

(9) narrative descriptions of risks to cost, schedule, or performance that could result in a program breach if not successfully mitigated.

(c) The Under Secretary for Management shall submit each approved Acquisition Decision Memorandum for programs described in this section to the Committees on Appropriations of the House of Representatives and the Senate not later than five business days after the date of approval of such memorandum by the Under Secretary for Management or the designee of the Under Secretary for Management. Memorandums. Deadline.

SEC. 106. (a) None of the funds made available to the Department of Homeland Security in this Act or prior appropriations Acts may be obligated for any new pilot or demonstration unless the component or office carrying out such pilot or demonstration has documented the information described in subsection (c).

(b) Prior to the obligation of any such funds made available for "Operations and Support" for a new pilot or demonstration, the Under Secretary for Management shall provide a report to the Committees on Appropriations of the House of Representatives and the Senate on the information described in subsection (c). Reports.

(c) The information required under subsections (a) and (b) for a pilot or demonstration shall include the following—

(1) documented objectives that are well-defined and measurable;

(2) an assessment methodology that details—

(A) the type and source of assessment data;

(B) the methods for, and frequency of, collecting such data; and

(C) how such data will be analyzed; and

(3) an implementation plan, including milestones, cost estimates, and implementation schedules, including a projected end date.

(d) Not later than 90 days after the date of completion of a pilot or demonstration described in subsection (e), the Under Secretary for Management shall provide a report to the Committees on Appropriations of the House of Representatives and the Senate detailing lessons learned, actual costs, any planned expansion or continuation of the pilot or demonstration, and any planned transition of such pilot or demonstration into an enduring program or operation. Reports.

(e) For the purposes of this section, a pilot or demonstration program is a study, demonstration, experimental program, or trial that—

(1) is a small-scale, short-term experiment conducted in order to evaluate feasibility, duration, costs, or adverse events, and improve upon the design of an effort prior to implementation of a larger scale effort; and

(2) uses more than 10 full-time equivalents or obligates, or proposes to obligate, $5,000,000 or more, but does not include congressionally directed programs or enhancements and does not include programs that were in operation as of the date of the enactment of this Act.

(f) For the purposes of this section, a pilot or demonstration does not include any testing, evaluation, or initial deployment phase executed under a procurement contract for the acquisition of information technology services or systems, or any pilot or demonstration carried out by a non-Federal recipient under any financial assistance agreement funded by the Department.

SEC. 107. (a) None of the funds appropriated or otherwise made available by this Act may be used by the Office of Intelligence and Analysis of the Department of Homeland Security to conduct a covered activity (as defined by section 6303 of the Intelligence Authorization Act for Fiscal Year 2025 (division F of Public Law 118–159)).

(b) Nothing in this section shall be construed as limiting or superseding the authority of any official within the Department of Homeland Security to conduct legal, privacy, civil rights, or civil liberties oversight of the intelligence activities of the Office of Intelligence and Analysis.

(c) Nothing in this section shall be construed to prohibit, or to limit the authority of, personnel of the Office of Intelligence and Analysis of the Department of Homeland Security from sharing intelligence information with, or receiving information from—

(1) foreign, State, local, tribal, or territorial governments (or any agency or subdivision thereof);

(2) the private sector; or

(3) other elements of the Federal Government, including the components of the Department of Homeland Security.

Reports.
Time periods.

SEC. 108. (a) The Inspector General shall report to the Committees on Appropriations of the House of Representatives and the Senate on a quarterly basis on oversight of the funding provided to the Department in Public Law 119–21.

(b) The quarterly report required in subsection (a) shall include—

(1) a review of the spend plans for every program, project, or activity funded by the Department under Public Law 119–21, including the current status of obligated funds compared to spend plan projections; and

(2) a summary of the audits being conducted on the Department's contracting, procurement, and acquisition activities resulting from Public Law 119–21.

Effective date.
Recommendations.

(c) Beginning one year after the date of enactment of this Act, and annually thereafter, the Inspector General shall submit a comprehensive report to the Committees on Appropriations of the House of Representatives and the Senate on the audits, inspections, and evaluations conducted on funds provided and activities undertaken in Public Law 119–21 and shall also provide recommendations in such report on ways to improve effectiveness and efficiency and prevent waste, fraud, and abuse of such programs and funds.

SEC. 109. (a) For an additional amount for "Office of the Secretary and Executive Management—Operations and Support—Office of the Secretary", $20,000,000, for the procurement, deployment, and operations of body-worn cameras for agents and officers performing enforcement activities under 8 U.S.C. 1101 et seq.

(b) Within 30 days of the date of enactment of this Act, the Secretary shall provide the Committees on Appropriations of the House of Representatives and the Senate a spend plan for the execution of funding provided in subsection (a). Deadline. Spend plan.

TITLE II

SECURITY, ENFORCEMENT, AND INVESTIGATIONS

U.S. CUSTOMS AND BORDER PROTECTION

OPERATIONS AND SUPPORT

(INCLUDING TRANSFER OF FUNDS)

For necessary expenses of U.S. Customs and Border Protection for operations and support, including the transportation of unaccompanied alien minors; the provision of air and marine support to Federal, State, local, and international agencies in the enforcement or administration of laws enforced by the Department of Homeland Security; at the discretion of the Secretary of Homeland Security, the provision of such support to Federal, State, and local agencies in other law enforcement and emergency humanitarian efforts; the purchase and lease of up to 7,500 (6,500 for replacement only) police-type vehicles; the purchase, maintenance, or operation of marine vessels, aircraft, and unmanned aerial systems; and contracting with individuals for personal services abroad; $11,083,012,000; of which $3,274,000 shall be derived from the Harbor Maintenance Trust Fund for administrative expenses related to the collection of the Harbor Maintenance Fee pursuant to section 9505(c)(3) of the Internal Revenue Code of 1986 (26 U.S.C. 9505(c)(3)) and notwithstanding section 1511(e)(1) of the Homeland Security Act of 2002 (6 U.S.C. 551(e)(1)); of which $550,000,000 shall be available until September 30, 2027; and of which such sums as become available in the Customs User Fee Account, except sums subject to section 13031(f)(3) of the Consolidated Omnibus Budget Reconciliation Act of 1985 (19 U.S.C. 58c(f)(3)), shall be derived from that account: *Provided,* That not to exceed $34,425 shall be for official reception and representation expenses: *Provided further,* That not to exceed $150,000 shall be available for payment for rental space in connection with preclearance operations: *Provided further,* That not to exceed $2,000,000 shall be for awards of compensation to informants, to be accounted for solely under the certificate of the Secretary of Homeland Security.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

For necessary expenses of U.S. Customs and Border Protection for procurement, construction, and improvements, including procurement of marine vessels, aircraft, and unmanned aerial systems, $222,886,000, which shall be for the purposes and in the amounts specified in the "Final Bill" column for U.S. Customs

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 9 of 714 PageID #:1059



and Border Protection, Procurement, Construction, and Improvements, in the "Department of Homeland Security Appropriations Act, 2026" table in the explanatory statement described in section 4 (in the matter preceding division A of this consolidated Act), of which—

(1) amounts made available for Border Security Assets and Infrastructure, Trade and Travel Assets and Infrastructure, Integrated Operations Assets and Infrastructure, Mission Support Assets and Infrastructure, and Radiological Detection Systems shall remain available until September 30, 2028; and

(2) amounts made available for Construction and Facility Improvements shall remain available until September 30, 2030.

### TRANSPORTATION SECURITY ADMINISTRATION

#### OPERATIONS AND SUPPORT

For necessary expenses of the Transportation Security Administration for operations and support, $10,635,434,000, of which $300,000,000 shall remain available until September 30, 2027: *Provided*, That not to exceed $7,650 shall be for official reception and representation expenses: *Provided further*, That security service fees authorized under section 44940 of title 49, United States Code, shall be credited to this appropriation as offsetting collections and shall be available only for aviation security: *Provided further,* That the sum appropriated under this heading from the general fund shall be reduced on a dollar-for-dollar basis as such offsetting collections are received during fiscal year 2026 so as to result in a final fiscal year appropriation from the general fund estimated at not more than $7,605,434,000.

#### PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

For necessary expenses of the Transportation Security Administration for procurement, construction, and improvements, $330,230,000, to remain available until September 30, 2028.

#### RESEARCH AND DEVELOPMENT

For necessary expenses of the Transportation Security Administration for research and development, $24,000,000, to remain available until September 30, 2027.

### COAST GUARD

#### OPERATIONS AND SUPPORT

For necessary expenses of the Coast Guard for operations and support including the Coast Guard Reserve; purchase or lease of not to exceed 30 passenger motor vehicles, which shall be for replacement only; purchase or lease of small boats for contingent and emergent requirements (at a unit cost of not more than $700,000) and repairs and service-life replacements, not to exceed a total of $31,000,000; purchase, lease, or improvements of boats necessary for overseas deployments and activities; payments pursuant to section 156 of Public Law 97–377 (42 U.S.C. 402 note; 96 Stat. 1920); and recreation and welfare; $11,272,401,000, of which $530,000,000 shall be for defense-related activities; of which

$24,500,000 shall be derived from the Oil Spill Liability Trust Fund to carry out the purposes of section 1012(a)(5) of the Oil Pollution Act of 1990 (33 U.S.C. 2712(a)(5)); of which $20,000,000 shall remain available until September 30, 2028; of which $25,335,000 shall remain available until September 30, 2030, for environmental compliance and restoration; and of which $400,000,000 shall remain available until September 30, 2027, which shall only be available for depot level maintenance: *Provided*, That not to exceed $23,000 shall be for official reception and representation expenses.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

For necessary expenses of the Coast Guard for procurement, construction, and improvements, including aids to navigation, shore facilities (including facilities at Department of Defense installations used by the Coast Guard), and vessels and aircraft, including equipment related thereto, $991,872,000, to remain available until September 30, 2030; of which $20,000,000 shall be derived from the Oil Spill Liability Trust Fund to carry out the purposes of section 1012(a)(5) of the Oil Pollution Act of 1990 (33 U.S.C. 2712(a)(5)).

RESEARCH AND DEVELOPMENT

For necessary expenses of the Coast Guard for research and development; and for maintenance, rehabilitation, lease, and operation of facilities and equipment; $6,763,000, to remain available until September 30, 2028, of which $500,000 shall be derived from the Oil Spill Liability Trust Fund to carry out the purposes of section 1012(a)(5) of the Oil Pollution Act of 1990 (33 U.S.C. 2712(a)(5)): *Provided,* That there may be credited to and used for the purposes of this appropriation funds received from State and local governments, other public authorities, private sources, and foreign countries for expenses incurred for research, development, testing, and evaluation.

RETIRED PAY

For retired pay, including the payment of obligations otherwise chargeable to lapsed appropriations for this purpose, payments under the Retired Serviceman's Family Protection and Survivor Benefits Plans, payment for career status bonuses, payment of continuation pay under section 356 of title 37, United States Code, concurrent receipts, combat-related special compensation, and payments for medical care of retired personnel and their dependents under chapter 55 of title 10, United States Code, $1,249,000,000, to remain available until expended.

UNITED STATES SECRET SERVICE

OPERATIONS AND SUPPORT

For necessary expenses of the United States Secret Service for operations and support, including purchase of not to exceed 652 vehicles for police-type use; hire of passenger motor vehicles; purchase of motorcycles made in the United States; hire of aircraft; rental of buildings in the District of Columbia; fencing, lighting, guard booths, and other facilities on private or other property

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 11 of 714 PageID #:1061



not in Government ownership or control, as may be necessary to perform protective functions; conduct of and participation in firearms matches; presentation of awards; conduct of behavioral research in support of protective intelligence and operations; payment in advance for commercial accommodations as may be necessary to perform protective functions; and payment, without regard to section 5702 of title 5, United States Code, of subsistence expenses of employees who are on protective missions, whether at or away from their duty stations; $3,128,304,000, of which $96,299,000 shall remain available until September 30, 2027, and of which $20,000,000 shall remain available until September 30, 2028; and of which $6,000,000 shall be for a grant for activities related to investigations of missing and exploited children; and of which up to $33,000,000 may be for calendar year 2025 premium pay in excess of the annual equivalent of the limitation on the rate of pay contained in section 5547(a) of title 5, United States Code, pursuant to section 2 of the Overtime Pay for Protective Services Act of 2016 (5 U.S.C. 5547 note), as last amended by Public Law 118–38: *Provided*, That not to exceed $19,125 shall be for official reception and representation expenses: *Provided further*, That not to exceed $100,000 shall be to provide technical assistance and equipment to foreign law enforcement organizations in criminal investigations within the jurisdiction of the United States Secret Service.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

For necessary expenses of the United States Secret Service for procurement, construction, and improvements, $118,517,000, of which $96,167,000 shall remain available until September 30, 2028, and of which $22,350,000 shall remain available until September 30, 2030.

RESEARCH AND DEVELOPMENT

For necessary expenses of the United States Secret Service for research and development, $3,250,000, to remain available until September 30, 2027.

ADMINISTRATIVE PROVISIONS

Applicability.

SEC. 201. Section 201 of the Department of Homeland Security Appropriations Act, 2018 (division F of Public Law 115–141), related to overtime compensation limitations, shall apply with respect to funds made available in this Act in the same manner as such section applied to funds made available in that Act, except that “fiscal year 2026” shall be substituted for “fiscal year 2018”.

Fees.

SEC. 202. As authorized by section 601(b) of the United States-Colombia Trade Promotion Agreement Implementation Act (Public Law 112–42), fees collected from passengers arriving from Canada, Mexico, or an adjacent island pursuant to section 13031(a)(5) of the Consolidated Omnibus Budget Reconciliation Act of 1985 (19 U.S.C. 58c(a)(5)) shall be available until expended.

Consultation.

SEC. 203. (a) Notwithstanding any other provision of law, none of the funds provided in this or any other Act shall be used to approve a waiver of the navigation and vessel-inspection laws pursuant to section 501(b) of title 46, United States Code, for the transportation of crude oil distributed from and to the Strategic

Petroleum Reserve until the Secretary of Homeland Security, after consultation with the Secretaries of the Departments of Energy and Transportation and representatives from the United States flag maritime industry, takes adequate measures to ensure the use of United States flag vessels.

(b) The Secretary shall notify the Committees on Appropriations of the House of Representatives and the Senate, the Committee on Transportation and Infrastructure of the House of Representatives, and the Committee on Commerce, Science, and Transportation of the Senate within two business days of any request for waivers of navigation and vessel-inspection laws pursuant to section 501(b) of title 46, United States Code, with respect to such transportation, and the disposition of such requests.

Notification. Deadline. Waivers.

SEC. 204. (a) Beginning on the date of enactment of this Act, the Secretary of Homeland Security shall not—

Effective date.

(1) establish, collect, or otherwise impose any new border crossing fee on individuals crossing the Southern border or the Northern border at a land port of entry; or

(2) conduct any study relating to the imposition of a border crossing fee.

(b) In this section, the term "border crossing fee" means a fee that every pedestrian, cyclist, and driver and passenger of a private motor vehicle is required to pay for the privilege of crossing the Southern border or the Northern border at a land port of entry.

Definition.

SEC. 205. (a) Not later than 90 days after the date of enactment of this Act, the Commissioner of U.S. Customs and Border Protection shall submit an expenditure plan for any amounts made available for "U.S. Customs and Border Protection—Procurement, Construction, and Improvements" in this Act and prior Acts to the Committees on Appropriations of the House of Representatives and the Senate.

Deadline. Expenditure plan.

(b) No such amounts provided in this Act may be obligated prior to the submission of such plan.

SEC. 206. (a) Funds made available in this Act may be used to alter operations within the National Targeting Center of U.S. Customs and Border Protection.

(b) None of the funds provided by this Act, provided by previous appropriations Acts that remain available for obligation or expenditure in fiscal year 2026, or provided from any accounts in the Treasury of the United States derived by the collection of fees available to the components funded by this Act, may be used to reduce anticipated or planned vetting operations at existing locations unless specifically authorized by a statute enacted after the date of enactment of this Act.

SEC. 207. None of the funds made available for Border Security Assets and Infrastructure under the heading "U.S. Customs and Border Protection—Procurement, Construction, and Improvements" in this Act or prior appropriations Acts shall be used for the procurement or deployment of surveillance systems that are not autonomous, as such term is defined in section 90004 of Public Law 119–21.

Surveillance systems.

SEC. 208. The Secretary shall ensure that the November 30, 2021, policy statement from U.S. Customs and Border Protection titled "Policy Statement and Required Actions Regarding Pregnant, Postpartum, Nursing Individuals, and Infants in Custody," or substantively similar standards of treatment developed in consultation

Pregnant women.

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 13 of 714 PageID #:1063



with maternal and pediatric health providers and experts, are in effect and are fully implemented to safeguard the health, safety, and rights of pregnant women in U.S. Customs and Border Protection custody.

Passenger and baggage screening.

SEC. 209. (a) Members of the United States House of Representatives and the United States Senate, including the leadership; the heads of Federal agencies and commissions, including the Secretary, Deputy Secretary, Under Secretaries, and Assistant Secretaries of the Department of Homeland Security; the United States Attorney General, Deputy Attorney General, Assistant Attorneys General, and the United States Attorneys; and senior members of the Executive Office of the President, including the Director of the Office of Management and Budget, shall not be exempt from Federal passenger and baggage screening.

(b) None of the funds made available in this or any other Act, including prior Acts, or provided from any accounts in the Treasury of the United States derived by the collection of fees available to the components funded by this Act may be used to carry out legislation altering the applicability of the screening requirements outlined in subsection (a).

Contracts. Explosives detection systems.

SEC. 210. Notwithstanding section 44923 of title 49, United States Code, for fiscal year 2026, any funds in the Aviation Security Capital Fund established by section 44923(h) of title 49, United States Code, may be used for the procurement and installation of explosives detection systems or for the issuance of other transaction agreements for the purpose of funding projects described in section 44923(a) of such title.

Reports.

SEC. 211. Not later than 45 days after the submission of the President's budget proposal, the Administrator of the Transportation Security Administration shall submit to the Committees on Appropriations and Homeland Security of the House of Representatives and the Committees on Appropriations and Commerce, Science, and Transportation of the Senate a single report that fulfills the following requirements:

(1) a Capital Investment Plan, both constrained and unconstrained, that includes a plan for continuous and sustained capital investment in new, and the replacement of aged, transportation security equipment;

(2) the 5-year technology investment plan as required by section 1611 of title XVI of the Homeland Security Act of 2002, as amended by section 3 of the Transportation Security Acquisition Reform Act (Public Law 113–245); and

(3) the Advanced Integrated Passenger Screening Technologies report as required by the Senate Report accompanying the Department of Homeland Security Appropriations Act, 2019 (Senate Report 115–283).

SEC. 212. Section 515(b) of Public Law 108–334 (49 U.S.C. 44945 note) is amended by striking "report" each place it appears (including in the subsection heading) and inserting "briefing" and by striking "transmit to" and inserting "provide".

Fees.

SEC. 213. (a) None of the funds made available by this Act under the heading "Coast Guard—Operations and Support" shall be for expenses incurred for recreational vessels under section 12114 of title 46, United States Code, except to the extent fees are collected from owners of yachts and credited to the appropriation made available by this Act under the heading "Coast Guard—Operations and Support".

(b) To the extent such fees are insufficient to pay expenses of recreational vessel documentation under such section 12114, and there is a backlog of recreational vessel applications, personnel performing non-recreational vessel documentation functions under subchapter II of chapter 121 of title 46, United States Code, may perform documentation under section 12114.

SEC. 214. Notwithstanding any other provision of law, the Commandant of the Coast Guard shall submit to the Committees on Appropriations of the House of Representatives and the Senate a future-years capital investment plan as described in the second proviso under the heading "Coast Guard—Acquisition, Construction, and Improvements" in the Department of Homeland Security Appropriations Act, 2015 (Public Law 114–4), which shall be subject to the requirements in the third and fourth provisos under such heading. Investment plan.

SEC. 215. None of the funds in this Act shall be used to reduce the Coast Guard's legacy Operations Systems Center mission or its government-employed or contract staff levels.

SEC. 216. None of the funds appropriated by this Act may be used to conduct, or to implement the results of, a competition under Office of Management and Budget Circular A–76 for activities performed with respect to the Coast Guard National Vessel Documentation Center.

SEC. 217. Funds made available in this Act may be used to alter operations within the Civil Engineering Program of the Coast Guard nationwide, including civil engineering units, facilities design and construction centers, maintenance and logistics commands, and the Coast Guard Academy, except that none of the funds provided in this Act may be used to reduce operations within any civil engineering unit unless specifically authorized by a statute enacted after the date of enactment of this Act.

SEC. 218. Amounts deposited into the Coast Guard Housing Fund in fiscal year 2026 shall be available until expended to carry out the purposes of section 2946 of title 14, United States Code, and shall be in addition to funds otherwise available for such purposes.

SEC. 219. (a) For an additional amount for "Coast Guard—Procurement, Construction, and Improvements", $98,000,000, to remain available until September 30, 2030, for the procurement and acquisition of MQ–9 aircraft and associated base stations, equipment related to such aircraft and associated base stations, and program management for such aircraft and base stations.

(b) None of the funds made available for the Department of Homeland Security in this or any prior Act may be used to procure or acquire long-range unmanned aircraft with kinetic capabilities or to equip any long-range unmanned aircraft with kinetic capabilities.

SEC. 220. None of the funds made available to the United States Coast Guard by this Act may be available for implementation of Force Design 2028 until the Coast Guard provides the Committees on Appropriations of the House of Representatives and the Senate detailed briefings on the initiatives of organization, people, technology, and contracting and acquisitions. Briefings.

SEC. 221. The United States Secret Service is authorized to obligate funds in anticipation of reimbursements from executive agencies, as defined in section 105 of title 5, United States Code, for personnel receiving training sponsored by the James J. Rowley

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 15 of 714 PageID #:1065



Training Center, except that total obligations at the end of the fiscal year shall not exceed total budgetary resources available under the heading "United States Secret Service—Operations and Support" at the end of the fiscal year.

SEC. 222. (a) None of the funds made available to the United States Secret Service by this Act or by previous appropriations Acts may be made available for the protection of the head of a Federal agency other than the Secretary of Homeland Security.

Contracts. Reimbursements.

(b) The Director of the United States Secret Service may enter into agreements to provide such protection on a fully reimbursable basis.

SEC. 223. For purposes of section 503(a)(3) of this Act, up to $15,000,000 may be reprogrammed within "United States Secret Service—Operations and Support".

Notification. Time period.

SEC. 224. Funding made available in this Act for "United States Secret Service—Operations and Support" is available for travel of United States Secret Service employees on protective missions without regard to the limitations on such expenditures in this or any other Act if the Director of the United States Secret Service or a designee notifies the Committees on Appropriations of the House of Representatives and the Senate 10 or more days in advance, or as early as practicable, prior to such expenditures.

SEC. 225. Of the amounts made available by this Act under the heading "United States Secret Service—Operations and Support", $2,000,000, to remain available until expended, shall be distributed as a grant or cooperative agreement for existing National Computer Forensics Institute facilities currently used by the United States Secret Service to carry out activities under section 383 of title 6, United States Code.

SEC. 226. (a) Section 118 of the Treasury and General Government Appropriations Act, 2001 (5 U.S.C. 5547 note) is amended, in the first sentence, by inserting "(or, for 2024, to the extent that such aggregate amount would exceed the per annum rate of salary payable under section 104 of title 3, United States Code)" before the period at the end.

Effective date. 5 USC 5547 note.

(b) Subsection (a) shall take effect as if enacted on December 31, 2023.

Reports. Time period.

(c) Not later than 180 days after the date of enactment of this Act, and annually thereafter through 2028, the Director shall submit to the Committee on Appropriations of the House of Representatives and the Senate; the Committee on Homeland Security, the Committee on Oversight and Accountability, and the Committee on the Judiciary of the House of Representatives; and the Committee on Homeland Security and Governmental Affairs, and the Committee on the Judiciary of the Senate of Congress a report describing the steps that the United States Secret Service is taking to address the increased protective service demands placed upon United States Secret Service personnel.

(d) Each report required under subparagraph (c) shall include the following:

(1) An analysis of the current (as of the date on which the report is submitted) operational demands and staffing levels with respect to the United States Secret Service.

(2) Recommended strategies for reducing overtime requirements for United States Secret Service personnel, including—

(A) the appointment of additional personnel;

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 16 of 714 PageID #:1066



(B) solutions such that sufficient resources are available throughout each year without the need for exceptions to, or waivers of, premium pay limitations;

(C) the redistribution of workload among United States Secret Service personnel; and

(D) other improvements in operational efficiency with respect to the United States Secret Service.

(e) Within the reports required under paragraphs (3) and (4) of section 2(c) of the Overtime Pay for Protective Services Act of 2023 (Public Law 118–38; 138 Stat. 13) that are submitted after the date of enactment of this Act, the Director shall include information about—

(1) the average number of overtime hours and range of number of overtime hours completed by United States Secret Service personnel receiving premium pay above the pay limitation in subsection (a) of section 5547 of title 5, United States Code; and

(2) the average number of overtime hours and range of number of overtime hours completed by United States Secret Service personnel who are not fully compensated for their overtime because their premium pay would be above the pay limitation in section 2 of the Overtime Pay Protection Act of 2016 (5 U.S.C. 5547 note).

(f) The matter preceding the first proviso under the heading "United States Secret Service—Operations and Support" in division C of Public Law 118–47 shall be applied to funds appropriated by this Act by substituting "$40,000,000" for "$24,000,000" and substituting "2024" for "2023". Applicability.

SEC. 227. None of the funds made available in this Act for U.S. Customs and Border Protection may be used to prevent an individual not in the business of importing a prescription drug (within the meaning of section 801(g) of the Federal Food, Drug, and Cosmetic Act) from importing a prescription drug from Canada that complies with the Federal Food, Drug, and Cosmetic Act: *Provided,* That this section shall apply only to individuals transporting on their person a personal-use quantity of the prescription drug, not to exceed a 90-day supply: *Provided further,* That the prescription drug may not be— Exports and imports. Drugs and drug abuse. Canada. Compliance. Applicability. Time period.

(1) a controlled substance, as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802); or

(2) a biological product, as defined in section 351 of the Public Health Service Act (42 U.S.C. 262).

SEC. 228. Funding made available under the headings "U.S. Customs and Border Protection—Operations and Support" and "U.S. Customs and Border Protection—Procurement, Construction, and Improvements" shall be available for customs expenses when necessary to maintain operations and prevent adverse personnel actions in Puerto Rico and the U.S. Virgin Islands, in addition to funding provided by sections 740 and 1406i of title 48, United States Code. Puerto Rico. Virgin Islands.

SEC. 229. (a) For an additional amount for "U.S. Customs and Border Protection—Operations and Support", $31,000,000, to remain available until expended, to be reduced by amounts collected and credited to this appropriation in fiscal year 2026 from amounts authorized to be collected by section 286(i) of the Immigration and Nationality Act (8 U.S.C. 1356(i)), section 10412 of the Farm Security and Rural Investment Act of 2002 (7 U.S.C. 8311), and

section 817 of the Trade Facilitation and Trade Enforcement Act of 2015 (Public Law 114–125), or other such authorizing language.

(b) To the extent that amounts realized from such collections exceed $31,000,000, those amounts in excess of $31,000,000 shall be credited to this appropriation, to remain available until expended.

## TITLE III

## PROTECTION, PREPAREDNESS, RESPONSE, AND RECOVERY

### Cybersecurity and Infrastructure Security Agency

#### operations and support

For necessary expenses of the Cybersecurity and Infrastructure Security Agency for operations and support, $2,218,634,000, which shall be for the purposes and in the amounts specified in the "Final Bill" column for Cybersecurity and Infrastructure Security Agency, Operations and Support in the "Department of Homeland Security Appropriations Act, 2026" table in the explanatory statement described in section 4 (in the matter preceding division A of this consolidated Act), of which amounts made available for Risk Management Operations, National Infrastructure Simulation Analysis Center shall remain available until September 30, 2027: *Provided*, That not to exceed $3,825 shall be for official reception and representation expenses.

#### procurement, construction, and improvements

For necessary expenses of the Cybersecurity and Infrastructure Security Agency for procurement, construction, and improvements, $386,464,000, to remain available until September 30, 2028.

### Federal Emergency Management Agency

#### operations and support

For necessary expenses of the Federal Emergency Management Agency for operations and support, $1,667,038,000: *Provided,* That not less than $3,000,000 shall be for the Emergency Management Assistance Compact: *Provided further*, That not to exceed $2,250 shall be for official reception and representation expenses.

#### procurement, construction, and improvements

For necessary expenses of the Federal Emergency Management Agency for procurement, construction, and improvements, $156,419,000, of which $92,794,000 shall remain available until September 30, 2028, and of which $63,625,000 shall remain available until September 30, 2030.

#### federal assistance

For activities of the Federal Emergency Management Agency for Federal assistance through grants, contracts, cooperative agreements, and other activities, $3,836,748,513, which shall be allocated as follows:

(1) $494,000,000 for the State Homeland Security Grant Program under section 2004 of the Homeland Security Act of 2002 (6 U.S.C. 605), of which $85,500,000 shall be for Operation Stonegarden and $14,250,000 shall be for Tribal Homeland Security Grants under section 2005 of the Homeland Security Act of 2002 (6 U.S.C. 606): *Provided*, That notwithstanding subsection (c)(4) of such section 2004, for fiscal year 2026, the Commonwealth of Puerto Rico shall make available to local and tribal governments amounts provided to the Commonwealth of Puerto Rico under this paragraph in accordance with subsection (c)(1) of such section 2004. Puerto Rico.

(2) $584,250,000 for the Urban Area Security Initiative under section 2003 of the Homeland Security Act of 2002 (6 U.S.C. 604).

(3) $300,000,000 for the Nonprofit Security Grant Program under section 2009 of the Homeland Security Act of 2002 (6 U.S.C. 609a), of which $150,000,000 is for eligible recipients located in high-risk urban areas that receive funding under section 2003 of such Act and $150,000,000 is for eligible recipients that are located outside such areas: *Provided*, That eligible recipients are those described in section 2009(b) of such Act (6 U.S.C. 609a(b)) or are an otherwise eligible recipient at risk of a terrorist or other extremist attack. Terrorism.

(4) $99,750,000 for Public Transportation Security Assistance, Railroad Security Assistance, and Over-the-Road Bus Security Assistance under sections 1406, 1513, and 1532 of the Implementing Recommendations of the 9/11 Commission Act of 2007 (6 U.S.C. 1135, 1163, and 1182), of which $9,500,000 shall be for Amtrak security and $1,900,000 shall be for Over-the-Road Bus Security: *Provided*, That such public transportation security assistance shall be provided directly to public transportation agencies. Security assistance.

(5) $95,000,000 for Port Security Grants in accordance with section 70107 of title 46, United States Code.

(6) $684,000,000, to remain available until September 30, 2027, of which $342,000,000 shall be for Assistance to Firefighter Grants and $342,000,000 shall be for Staffing for Adequate Fire and Emergency Response Grants under sections 33 and 34 respectively of the Federal Fire Prevention and Control Act of 1974 (15 U.S.C. 2229 and 2229a).

(7) $337,250,000 for emergency management performance grants under the National Flood Insurance Act of 1968 (42 U.S.C. 4001 et seq.), the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121), the Earthquake Hazards Reduction Act of 1977 (42 U.S.C. 7701), section 762 of title 6, United States Code, and Reorganization Plan No. 3 of 1978 (5 U.S.C. App.).

(8) $297,113,000 for necessary expenses for Flood Hazard Mapping and Risk Analysis, in addition to and to supplement any other sums appropriated under the National Flood Insurance Fund, and such additional sums as may be provided by States or other political subdivisions for cost-shared mapping activities under section 1360(f)(2) of the National Flood Insurance Act of 1968 (42 U.S.C. 4101(f)(2)), to remain available until expended.

(9) $11,400,000 for Regional Catastrophic Preparedness Grants.

(10) $11,400,000 for Rehabilitation of High Hazard Potential Dams under section 8A of the National Dam Safety Program Act (33 U.S.C. 467f–2).

(11) $123,500,000 for the emergency food and shelter program under title III of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11331), to remain available until September 30, 2027: *Provided*, That not to exceed 3.5 percent shall be for total administrative costs.

(12) $48,000,000 for the Next Generation Warning System.

(13) $272,671,513 for Community Project Funding and Congressionally Directed Spending grants, which shall be for the purposes, and the amounts, specified in the table entitled "Homeland Security—Community Project Funding/Congressionally Directed Spending" under the "Disclosure of Earmarks and Congressionally Directed Spending Items" heading in the explanatory statement described in section 4 (in the matter preceding division A of this consolidated Act), of which—

(A) $82,957,854, in addition to amounts otherwise made available for such purpose, is for emergency operations center grants under section 614 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5196c); and

(B) $189,713,659, in addition to amounts otherwise made available for such purpose, is for pre-disaster mitigation grants under section 203 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5133(e)), notwithstanding subsections (f), (g), and (l) of that section (42 U.S.C. 5133(f), (g), (l)).

(14) $478,414,000 to sustain current operations for training, exercises, technical assistance, and other programs, of which—

(A) $85,711,000 is for the Center for Domestic Preparedness;

(B) $17,100,000 is for the Center for Homeland Defense and Security;

(C) $33,366,000 is for the Emergency Management Institute;

(D) $72,140,000 is for the United States Fire Administration;

(E) $95,950,000 is for the National Domestic Preparedness Consortium;

(F) $15,200,000 is for Continuing Training Grants;

(G) $21,266,000 is for the National Exercise Program;

(H) $83,657,000 is for the Biological Support Program;

(I) $34,465,000 is for the Securing the Cities Program; and

(J) $19,559,000 is for Countering Weapons of Mass Destruction Training, Exercises, and Readiness.

DISASTER RELIEF FUND

For necessary expenses in carrying out the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.), $26,367,000,000, to remain available until expended: *Provided,* That such amount shall be for major disasters declared pursuant to the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.) and is designated by the

Congress as being for disaster relief pursuant to a concurrent resolution on the budget.

NATIONAL FLOOD INSURANCE FUND

For activities under the National Flood Insurance Act of 1968 (42 U.S.C. 4001 et seq.), the Flood Disaster Protection Act of 1973 (42 U.S.C. 4001 et seq.), the Biggert-Waters Flood Insurance Reform Act of 2012 (Public Law 112–141, 126 Stat. 916), and the Homeowner Flood Insurance Affordability Act of 2014 (Public Law 113–89; 128 Stat. 1020), $226,000,000, to remain available until September 30, 2027, which shall be derived from offsetting amounts collected under section 1308(d) of the National Flood Insurance Act of 1968 (42 U.S.C. 4015(d)); of which $16,302,000 shall be available for mission support associated with flood management; and of which $209,698,000 shall be available for flood plain management and flood mapping: *Provided,* That any additional fees collected pursuant to section 1308(d) of the National Flood Insurance Act of 1968 (42 U.S.C. 4015(d)) shall be credited as offsetting collections to this account, to be available for flood plain management and flood mapping: *Provided further,* That in fiscal year 2026, no funds shall be available from the National Flood Insurance Fund under section 1310 of the National Flood Insurance Act of 1968 (42 U.S.C. 4017) in excess of—

(1) $230,669,000 for operating expenses and salaries and expenses associated with flood insurance operations;

(2) $1,505,000,000 for commissions and taxes of agents;

(3) such sums as are necessary for interest on Treasury borrowings; and

(4) $175,000,000, which shall remain available until expended, for flood mitigation actions and for flood mitigation assistance under section 1366 of the National Flood Insurance Act of 1968 (42 U.S.C. 4104c), notwithstanding sections 1366(e) and 1310(a)(7) of such Act (42 U.S.C. 4104c(e), 4017):

*Provided further,* That the amounts collected under section 102 of the Flood Disaster Protection Act of 1973 (42 U.S.C. 4012a) and section 1366(e) of the National Flood Insurance Act of 1968 (42 U.S.C. 4104c(e)), shall be deposited in the National Flood Insurance Fund to supplement other amounts specified as available for section 1366 of the National Flood Insurance Act of 1968, notwithstanding section 102(f)(8), section 1366(e) of the National Flood Insurance Act of 1968, and paragraphs (1) through (3) of section 1367(b) of such Act (42 U.S.C. 4012a(f)(8), 4104c(e), 4104d(b)(1)–(3)): *Provided further,* That total administrative costs shall not exceed 4 percent of the total appropriation: *Provided further,* That up to $4,000,000 is available to carry out section 24 of the Homeowner Flood Insurance Affordability Act of 2014 (42 U.S.C. 4033).

ADMINISTRATIVE PROVISIONS

(INCLUDING TRANSFERS OF FUNDS)

SEC. 301. Funds made available under the heading "Cybersecurity and Infrastructure Security Agency—Operations and Support" may be made available for the necessary expenses of procuring or providing access to cybersecurity threat feeds for branches, agencies, independent agencies, corporations, establishments, and

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 21 of 714 PageID #:1071



instrumentalities of the Federal Government of the United States, State, local, tribal, and territorial entities, fusion centers as described in section 210A of the Homeland Security Act (6 U.S.C. 124h), and Information Sharing and Analysis Organizations.

Grants.

SEC. 302. (a) Notwithstanding section 2008(a)(12) of the Homeland Security Act of 2002 (6 U.S.C. 609(a)(12)) or any other provision of law, not more than 5 percent of the amount of a grant made available in paragraphs (1) through (5) under "Federal Emergency Management Agency—Federal Assistance", may be used by the recipient for expenses directly related to administration of the grant.

Applicability.

(b) The authority provided in subsection (a) shall also apply to a state recipient for the administration of a grant under such paragraph (3).

Grants. Deadlines.

SEC. 303. (a) Applications for grants under the heading "Federal Emergency Management Agency—Federal Assistance", for paragraphs (1) through (5), shall be made available to eligible applicants not later than 60 days after the date of enactment of this Act, eligible applicants shall submit applications not later than 80 days after the grant announcement, and the Administrator of the Federal Emergency Management Agency shall act within 65 days after the receipt of an application.

Reductions. Time period.

(b) Amounts appropriated by this Act for "Federal Emergency Management Agency—Operations and Support" shall be reduced by $100,000 for each day past the 60-day requirement that applications are not made available to eligible applicants as required in subsection (a), and the amount made available under such heading and specified in the "Department of Homeland Security Appropriations Act, 2026" table in the explanatory statement described in section 4 (in the matter preceding division A of this Consolidated Act) for Mission Support shall be correspondingly reduced by an equivalent amount.

Grants. Briefing. Time period. Public information.

SEC. 304. (a) Under the heading "Federal Emergency Management Agency—Federal Assistance", for grants under paragraphs (1) through (5), (9), and (10) the Administrator of the Federal Emergency Management Agency shall brief the Committees on Appropriations of the House of Representatives and the Senate five full business days in advance of announcing publicly the intention of making an award.

Rescission. Reduction.

(b) If any such public announcement is made before five full business days have elapsed following such briefing, $1,000,000 of amounts appropriated by this Act for "Federal Emergency Management Agency—Operations and Support" shall be rescinded, and the amount made available under such heading and specified in the "Department of Homeland Security Appropriations Act, 2026" table in the explanatory statement described in section 4 (in the matter preceding division A of this Consolidated Act) for Mission Support shall be correspondingly reduced by an equivalent amount.

SEC. 305. Under the heading "Federal Emergency Management Agency—Federal Assistance", for grants under paragraphs (1) and (2), the installation of communications towers is not considered construction of a building or other physical facility.

Applicability.

SEC. 306. The reporting requirements in paragraphs (1) and (2) under the heading "Federal Emergency Management Agency—Disaster Relief Fund" in the Department of Homeland Security Appropriations Act, 2015 (Public Law 114–4), related to reporting on the Disaster Relief Fund, shall be applied in fiscal year 2026

with respect to budget year 2027 and current fiscal year 2026, respectively—

(1) in paragraph (1) by substituting "fiscal year 2027" for "fiscal year 2016"; and

(2) in paragraph (2) by inserting "business" after "fifth".

SEC. 307. In making grants under the heading "Federal Emergency Management Agency—Federal Assistance", for Staffing for Adequate Fire and Emergency Response grants, the Administrator of the Federal Emergency Management Agency may grant waivers from the requirements in subsections (a)(1)(A), (a)(1)(B), (a)(1)(E), (c)(1), (c)(2), and (c)(4) of section 34 of the Federal Fire Prevention and Control Act of 1974 (15 U.S.C. 2229a). Waiver authority.

SEC. 308. (a) The aggregate charges assessed during fiscal year 2026, as authorized in title III of the Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1999 (42 U.S.C. 5196e), shall not be less than 100 percent of the amounts anticipated by the Department of Homeland Security to be necessary for its Radiological Emergency Preparedness Program for the next fiscal year. Fees.

(b) The methodology for assessment and collection of fees shall be fair and equitable and shall reflect costs of providing such services, including administrative costs of collecting such fees.

(c) Such fees shall be deposited in a Radiological Emergency Preparedness Program account as offsetting collections and will become available for authorized purposes on October 1, 2026, and remain available until expended. Effective date.

SEC. 309. In making grants under the heading "Federal Emergency Management Agency—Federal Assistance", for Assistance to Firefighter Grants, the Administrator of the Federal Emergency Management Agency may waive subsection (k) of section 33 of the Federal Fire Prevention and Control Act of 1974 (15 U.S.C. 2229). Waiver authority.

SEC. 310. Any unobligated balances of funds appropriated in any prior Act for activities funded by the National Predisaster Mitigation Fund under section 203 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5133), as in effect on the day before the date of enactment of section 1234 of division D of Public Law 115–254, shall be transferred to and merged with funds set aside pursuant to subsection (i)(1) of section 203 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5133), as in effect on the date of the enactment of this section.

SEC. 311. Any unobligated balances of funds appropriated under the heading "Federal Emergency Management Agency—Flood Hazard Mapping and Risk Analysis Program" in any prior Act shall be transferred to and merged with funds appropriated under the heading "Federal Emergency Management Agency—Federal Assistance" for necessary expenses for Flood Hazard Mapping and Risk Analysis: *Provided,* That funds transferred pursuant to this section shall be in addition to and supplement any other sums appropriated for such purposes under the National Flood Insurance Fund and such additional sums as may be provided by States or other political subdivisions for cost-shared mapping activities under section 1360(f)(2) of the National Flood Insurance Act of 1968 (42 U.S.C. 4101(f)(2)), to remain available until expended.

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 23 of 714 PageID #:1073



Grants. Time period.

SEC. 312. Each award for grants under the heading "Federal Emergency Management Agency—Federal Assistance" for paragraphs (1) through (10) and (12), shall have a period of performance, as defined by 2 CFR 200.1, that shall be of not less than three years and not more than five years.

Web posting. Public information. Deadlines.

SEC. 313. (a) The Administrator of the Federal Emergency Management Agency shall post an interactive dashboard on the public-facing website of the Federal Emergency Management Agency with any request for reimbursement for a covered expense, delineated by state and any amount for individual assistance or public assistance related to emergency (42 U.S.C. 5122(1)) or major disaster (42 U.S.C. 5122(2)) declarations under the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.)—

(1) not more than 90 days after such information has been received by the Federal Emergency Management Agency; and

(2) not more than 60 days after such information is under final review by the Department of Homeland Security.

(b) The information in the interactive dashboard referenced in subsection (a) shall include at a minimum the information listed in subparagraphs (1) through (7) under the heading in the paragraph titled "Public and Individual Assistance" in the explanatory statement described in section 4 (in the matter preceding division A of this consolidated Act).

SEC. 314. (a) None of the funds appropriated in this Act may be used to pause a training or grant funded under the heading "Federal Emergency Management Agency—Federal Assistance".

Notification. Time period.

(b) Subsection (a) shall not apply if the Secretary of Homeland Security notifies the Committees on Appropriations of the House of Representatives and the Senate not less than 10 business days in advance of the pause.

Plans.

(c) The notification required by subsection (b) shall include an explanation for the pause, plans to make up any missed classes resulting from the pause, and the budgetary impact of any paused training.

Waiver authority.

(d) The Secretary may waive the requirement in subsection (b) in the event of extraordinary circumstances that imminently threaten the safety of human life or the protection of property.

## TITLE IV

## RESEARCH, DEVELOPMENT, TRAINING, AND SERVICES

### U.S. CITIZENSHIP AND IMMIGRATION SERVICES

#### OPERATIONS AND SUPPORT

For necessary expenses of U.S. Citizenship and Immigration Services for operations and support, including for the E-Verify Program, $122,941,000: *Provided,* That such amounts shall be in addition to any other amounts made available for such purposes, and shall not be construed to require any reduction of any fee described in section 286(m) of the Immigration and Nationality Act (8 U.S.C. 1356(m)): *Provided further*, That not to exceed $5,000 shall be for official reception and representation expenses.

## Federal Law Enforcement Training Centers

### operations and support

For necessary expenses of the Federal Law Enforcement Training Centers for operations and support, including the purchase of not to exceed 117 vehicles for police-type use and hire of passenger motor vehicles, and services as authorized by section 3109 of title 5, United States Code, $379,837,000, of which $75,551,000 shall remain available until September 30, 2027: *Provided*, That not to exceed $7,180 shall be for official reception and representation expenses.

### procurement, construction, and improvements

For necessary expenses of the Federal Law Enforcement Training Centers for procurement, construction, and improvements, $18,300,000, to remain available until September 30, 2030, for acquisition of necessary additional real property and facilities, construction and ongoing maintenance, facility improvements, and related expenses of the Federal Law Enforcement Training Centers.

## Science and Technology Directorate

### operations and support

For necessary expenses of the Science and Technology Directorate for operations and support, including the purchase or lease of not to exceed 5 vehicles, $352,802,000, of which $201,183,000 shall remain available until September 30, 2027: *Provided*, That not to exceed $10,000 shall be for official reception and representation expenses.

### procurement, construction, and improvements

For necessary expenses of the Science and Technology Directorate for procurement, construction, and improvements, $51,500,000, to remain available until September 30, 2030.

### research and development

For necessary expenses of the Science and Technology Directorate for research and development, $426,904,000, to remain available until September 30, 2028.

## Administrative Provisions

Sec. 401. (a) Notwithstanding any other provision of law, funds otherwise made available to U.S. Citizenship and Immigration Services may be used to acquire, operate, equip, and dispose of up to 5 vehicles, for replacement only, for areas where the Administrator of General Services does not provide vehicles for lease.

(b) The Director of U.S. Citizenship and Immigration Services may authorize employees who are assigned to those areas to use such vehicles to travel between the employees' residences and places of employment.

Sec. 402. None of the funds appropriated by this Act may be used to process or approve a competition under Office of Management and Budget Circular A–76 for services provided by employees

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 25 of 714 PageID #:1075



(including employees serving on a temporary or term basis) of U.S. Citizenship and Immigration Services of the Department of Homeland Security who are known as Immigration Information Officers, Immigration Service Analysts, Contact Representatives, Investigative Assistants, or Immigration Services Officers.

SEC. 403. Notwithstanding any other provision of law, any Federal funds made available to U.S. Citizenship and Immigration Services may be used for the collection and use of biometrics taken at a U.S. Citizenship and Immigration Services Application Support Center that is overseen virtually by U.S. Citizenship and Immigration Services personnel using appropriate technology.

SEC. 404. The Director of the Federal Law Enforcement Training Centers is authorized to distribute funds to Federal law enforcement agencies for expenses incurred participating in training accreditation.

SEC. 405. The Federal Law Enforcement Training Accreditation Board, including representatives from the Federal law enforcement community and non-Federal accreditation experts involved in law enforcement training, shall lead the Federal law enforcement training accreditation process to continue the implementation of measuring and assessing the quality and effectiveness of Federal law enforcement training programs, facilities, and instructors.

SEC. 406. (a) The Director of the Federal Law Enforcement Training Centers may accept transfers to its "Procurement, Construction, and Improvements" account from Government agencies requesting the construction of special use facilities, as authorized by the Economy Act (31 U.S.C. 1535(b)).

(b) The Federal Law Enforcement Training Centers shall maintain administrative control and ownership upon completion of such facilities.

SEC. 407. The functions of the Federal Law Enforcement Training Centers instructor staff shall be classified as inherently governmental for purposes of the Federal Activities Inventory Reform Act of 1998 (31 U.S.C. 501 note).

## TITLE V

## GENERAL PROVISIONS

(INCLUDING TRANSFERS AND RESCISSIONS OF FUNDS)

SEC. 501. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

SEC. 502. Subject to the requirements of section 503 of this Act, the unexpended balances of prior appropriations provided for activities in this Act may be transferred to appropriation accounts for such activities established pursuant to this Act, may be merged with funds in the applicable established accounts, and thereafter may be accounted for as one fund for the same time period as originally enacted.

Notifications. Time periods.

SEC. 503. (a) None of the funds provided by this Act, provided by previous appropriations Acts to the components in or transferred to the Department of Homeland Security that remain available for obligation or expenditure in fiscal year 2026, or provided from any accounts in the Treasury of the United States derived by the collection of fees available to the components funded by this

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 26 of 714 PageID #:1076



Act, shall be available for obligation or expenditure through a reprogramming of funds that—

(1) creates or eliminates a program, project, or activity, or increases funds for any program, project, or activity for which funds have been denied or restricted by the Congress;

(2) contracts out any function or activity presently performed by Federal employees or any new function or activity proposed to be performed by Federal employees in the President's budget proposal for fiscal year 2026 for the Department of Homeland Security; Contracts.

(3) augments funding for existing programs, projects, or activities in excess of $5,000,000 or 10 percent, whichever is less;

(4) reduces funding for any program, project, or activity, or numbers of personnel, by 10 percent or more; or

(5) results from any general savings from a reduction in personnel that would result in a change in funding levels for programs, projects, or activities as approved by the Congress.

(b) Subsection (a) shall not apply if the Committees on Appropriations of the House of Representatives and the Senate are notified at least 30 days in advance of such reprogramming.

(c) Up to 5 percent of any appropriation made available for the current fiscal year for the Department of Homeland Security by this Act or provided by previous appropriations Acts may be transferred between such appropriations if the Committees on Appropriations of the House of Representatives and the Senate are notified at least 30 days in advance of such transfer, but no such appropriation, except as otherwise specifically provided, shall be increased by more than 10 percent by such transfer.

(d) Notwithstanding subsections (a), (b), and (c), no funds shall be reprogrammed within or transferred between appropriations—

(1) based upon an initial notification provided after June 15, except in extraordinary circumstances that imminently threaten the safety of human life or the protection of property; Deadline.

(2) to increase or decrease funding for grant programs; or

(3) to create a program, project, or activity pursuant to subsection (a)(1), including any new function or requirement within any program, project, or activity, not approved by Congress in the consideration of the enactment of this Act.

(e) The notification thresholds and procedures set forth in subsections (a), (b), (c), and (d) shall apply to any use of deobligated balances of funds provided in previous Department of Homeland Security Appropriations Acts that remain available for obligation in the current year. Applicability.

(f) Notwithstanding subsection (c), the Secretary of Homeland Security may transfer to the fund established by 8 U.S.C. 1101 note, up to $20,000,000 from appropriations available to the Department of Homeland Security: *Provided*, That the Secretary shall notify the Committees on Appropriations of the House of Representatives and the Senate at least 5 days in advance of such transfer.

SEC. 504. (a) Section 504 of the Department of Homeland Security Appropriations Act, 2017 (division F of Public Law 115–31), related to the operations of a working capital fund, shall apply with respect to funds made available in this Act in the same manner as such section applied to funds made available in that Act. Applicability. 31 USC 501 note.

(b) Funds from such working capital fund may be obligated and expended in anticipation of reimbursements from components of the Department of Homeland Security.

Deadline.

SEC. 505. (a) Except as otherwise specifically provided by law, not to exceed 50 percent of unobligated balances remaining available at the end of fiscal year 2026, as recorded in the financial records at the time of a reprogramming notification, but not later than June 15, 2027, from appropriations for "Operations and Support" for fiscal year 2026 in this Act shall remain available through September 30, 2027, in the account and for the purposes for which the appropriations were provided.

Notification.

(b) Prior to the obligation of such funds, a notification shall be submitted to the Committees on Appropriations of the House of Representatives and the Senate in accordance with section 503 of this Act.

SEC. 506. (a) Funds made available by this Act for intelligence activities are deemed to be specifically authorized by the Congress for purposes of section 504 of the National Security Act of 1947 (50 U.S.C. 414) during fiscal year 2026 until the enactment of an Act authorizing intelligence activities for fiscal year 2026.

(b) Amounts described in subsection (a) made available for "Intelligence, Analysis, and Situational Awareness—Operations and Support" that exceed the amounts in such authorization for such account shall be transferred to and merged with amounts made available under the heading "Management Directorate—Operations and Support".

Briefing. Plan.

(c) Prior to the obligation of any funds transferred under subsection (b), the Undersecretary for Management shall brief the Committees on Appropriations of the House of Representatives and the Senate on a plan for the use of such funds.

Notifications. Time period. Grants. Contracts. Public information.

SEC. 507. (a) The Secretary of Homeland Security, or the designee of the Secretary, shall notify the Committees on Appropriations of the House of Representatives and the Senate at least three full business days in advance of—

(1) making or awarding a grant allocation or grant in excess of $1,000,000 or a grant made from the Disaster Relief Fund in excess of $100,000;

(2) making or awarding a contract, other transaction agreement, or task or delivery order on a multiple award contract, or to issue a letter of intent totaling in excess of $2,000,000;

(3) awarding a task or delivery order requiring an obligation of funds in an amount greater than $5,000,000 from multi-year Department of Homeland Security funds;

(4) making a sole-source grant award; or

(5) announcing publicly the intention to make or award items under paragraph (1), (2), (3), or (4) including a contract covered by the Federal Acquisition Regulation.

Determination. Deadline.

(b) If the Secretary of Homeland Security determines that compliance with this section would pose a substantial risk to human life, health, or safety, an award may be made without notification, and the Secretary shall notify the Committees on Appropriations of the House of Representatives and the Senate not later than three full business days after such an award is made or letter issued.

(c) A notification under this section—

(1) may not involve funds that are not available for obligation; and

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 28 of 714 PageID #:1078



(2) shall include the amount of the award; the fiscal year for which the funds for the award were appropriated; the type of contract; and the account from which the funds are being drawn.

SEC. 508. Notwithstanding any other provision of law, no agency shall purchase, construct, or lease any additional facilities, except within or contiguous to existing locations, to be used for the purpose of conducting Federal law enforcement training without advance notification to the Committees on Appropriations of the House of Representatives and the Senate, except that the Federal Law Enforcement Training Centers is authorized to obtain the temporary use of additional facilities by lease, contract, or other agreement for training that cannot be accommodated in existing Centers' facilities.

Notification.
Contracts.

SEC. 509. None of the funds appropriated or otherwise made available by this Act may be used for expenses for any construction, repair, alteration, or acquisition project for which a prospectus otherwise required under chapter 33 of title 40, United States Code, has not been approved, except that necessary funds may be expended for each project for required expenses for the development of a proposed prospectus.

SEC. 510. Sections 522 and 530 of the Department of Homeland Security Appropriations Act, 2008 (division E of Public Law 110–161; 121 Stat. 2073 and 2074) shall apply with respect to funds made available in this Act in the same manner as such sections applied to funds made available in that Act.

Applicability.

SEC. 511. (a) None of the funds made available in this Act may be used in contravention of the applicable provisions of the Buy American Act.

(b) For purposes of subsection (a), the term "Buy American Act" means chapter 83 of title 41, United States Code.

SEC. 512. None of the funds made available in this Act may be used to amend the oath of allegiance required by section 337 of the Immigration and Nationality Act (8 U.S.C. 1448).

SEC. 513. (a) None of the funds provided or otherwise made available by this Act may be made available to carry out section 872 of the Homeland Security Act of 2002 (6 U.S.C. 452) unless explicitly authorized by the Congress after the date of enactment of this Act.

(b) Subsection (a) shall not apply to the use of the authorities provided by such section 872—

(1) to allocate or reallocate the functions of the Assistant Secretary for the Countering Weapons of Mass Destruction Office to other offices and organizational units within the Department consistent with the "Countering Weapons of Mass Destruction" table in the explanatory statement described in section 4 (in the matter preceding division A of this consolidated Act); or

(2) to allocate or reallocate any other functions of the Countering Weapons of Mass Destruction Office to other offices and organizational units within the Department consistent with the "Countering Weapons of Mass Destruction" table in the explanatory statement described in section 4 (in the matter preceding division A of this consolidated Act).

(c) Notwithstanding subsection (a), the Secretary may transfer funds made available in prior appropriations Acts to the Countering Weapons of Mass Destruction Office between any appropriations

available to the Department as necessary to carry out the purposes described in subsection (b).

National identification card.

SEC. 514. None of the funds made available in this Act may be used for planning, testing, piloting, or developing a national identification card.

Delegation authority.

SEC. 515. Any official that is required by this Act to report or to certify to the Committees on Appropriations of the House of Representatives and the Senate may not delegate such authority to perform that act unless specifically authorized herein.

SEC. 516. None of the funds made available in this Act may be used for first-class travel by the employees of agencies funded by this Act in contravention of sections 301–10.122 through 301–10.124 of title 41, Code of Federal Regulations.

SEC. 517. None of the funds made available in this Act may be used to employ workers described in section 274A(h)(3) of the Immigration and Nationality Act (8 U.S.C. 1324a(h)(3)).

Contracts.

SEC. 518. Notwithstanding any other provision of this Act, none of the funds appropriated or otherwise made available by this Act may be used to pay award or incentive fees for contractor performance that has been judged to be below satisfactory performance or performance that does not meet the basic requirements of a contract.

Pornography.

SEC. 519. (a) None of the funds made available in this Act may be used to maintain or establish a computer network unless such network blocks the viewing, downloading, and exchanging of pornography.

(b) Nothing in subsection (a) shall limit the use of funds necessary for any Federal, State, tribal, territorial, or local law enforcement agency or any other entity carrying out criminal investigations, prosecution, or adjudication activities.

Firearms.

SEC. 520. None of the funds made available in this Act may be used by a Federal law enforcement officer to facilitate the transfer of an operable firearm to an individual if the Federal law enforcement officer knows or suspects that the individual is an agent of a drug cartel unless law enforcement personnel of the United States continuously monitor or control the firearm at all times.

Conference attendees. Determination. Notification. Deadline.

SEC. 521. (a) None of the funds made available in this Act may be used to pay for the travel to or attendance of more than 50 employees of a single component of the Department of Homeland Security, who are stationed in the United States, at a single international conference unless the Secretary of Homeland Security, or a designee, determines that such attendance is in the national interest and notifies the Committees on Appropriations of the House of Representatives and the Senate within at least 10 days of that determination and the basis for that determination.

Definition.

(b) For purposes of this section the term "international conference" shall mean a conference occurring outside of the United States attended by representatives of the United States Government and of foreign governments, international organizations, or nongovernmental organizations.

(c) The total cost to the Department of Homeland Security of any such conference shall not exceed $500,000.

(d) Employees who attend a conference virtually without travel away from their permanent duty station within the United States shall not be counted for purposes of this section, and the prohibition

contained in this section shall not apply to payments for the costs of attendance for such employees.

SEC. 522. None of the funds made available in this Act may be used to reimburse any Federal department or agency for its participation in a National Special Security Event.

SEC. 523. (a) None of the funds made available to the Department of Homeland Security by this or any other Act may be obligated for the implementation of any structural pay reform or the introduction of any new position classification that will affect more than 100 full-time positions or costs more than $5,000,000 in a single year before the end of the 30-day period beginning on the date on which the Secretary of Homeland Security submits to Congress a notification that includes— Pay reform. Employment positions. Time period. Notification.

(1) the number of full-time positions affected by such change;

(2) funding required for such change for the current fiscal year and through the Future Years Homeland Security Program;

(3) justification for such change; and

(4) for a structural pay reform, an analysis of compensation alternatives to such change that were considered by the Department. Analysis.

(b) Subsection (a) shall not apply to such change if—

(1) it was proposed in the President's budget proposal for the fiscal year funded by this Act; and

(2) funds for such change have not been explicitly denied or restricted in this Act.

SEC. 524. (a) Any agency receiving funds made available in this Act shall, subject to subsections (b) and (c), post on the public website of that agency any report required to be submitted by the Committees on Appropriations of the House of Representatives and the Senate in this Act, upon the determination by the head of the agency that it shall serve the national interest. Web posting. Public information. Reports. Determination.

(b) Subsection (a) shall not apply to a report if—

(1) the public posting of the report compromises homeland or national security; or

(2) the report contains proprietary information.

(c) The head of the agency posting such report shall do so only after such report has been made available to the Committees on Appropriations of the House of Representatives and the Senate for not less than 45 days except as otherwise specified in law. Time period.

(d) If the requirements of this section are not met, the reprogramming and transfer authority provided in section 503 of this Act shall be suspended until the requirements of subsection (a) are met. Suspension.

SEC. 525. (a) Funding provided in this Act for "Operations and Support" may be used for minor procurement, construction, and improvements.

(b) For purposes of subsection (a), "minor" refers to end items with a unit cost of $250,000 or less for personal property, and $4,000,000 or less for real property.

SEC. 526. The authority provided by section 532 of the Department of Homeland Security Appropriations Act, 2018 (Public Law 115–141) regarding primary and secondary schooling of dependents shall continue in effect during fiscal year 2026. Extension.

SEC. 527. (a) Except as provided in subsection (b), none of the funds made available in this Act may be used to place restraints Pregnant women. Determinations.

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 31 of 714 PageID #:1081



on a woman in the custody of the Department of Homeland Security (including during transport, in a detention facility, or at an outside medical facility) who is pregnant or in post-delivery recuperation.

(b) Subsection (a) shall not apply with respect to a pregnant woman if—

(1) an appropriate official of the Department of Homeland Security makes an individualized determination that the woman—

(A) is a serious flight risk, and such risk cannot be prevented by other means; or

(B) poses an immediate and serious threat to harm herself or others that cannot be prevented by other means; or

(2) a medical professional responsible for the care of the pregnant woman determines that the use of therapeutic restraints is appropriate for the medical safety of the woman.

(c) If a pregnant woman is restrained pursuant to subsection (b), only the safest and least restrictive restraints, as determined by the appropriate medical professional treating the woman, may be used. In no case may restraints be used on a woman who is in active labor or delivery, and in no case may a pregnant woman be restrained in a face-down position with four-point restraints, on her back, or in a restraint belt that constricts the area of the pregnancy. A pregnant woman who is immobilized by restraints shall be positioned, to the maximum extent feasible, on her left side.

Records.

SEC. 528. (a) None of the funds made available by this Act may be used to destroy any document, recording, or other record pertaining to any—

(1) death of;

Sexual assault.

(2) potential sexual assault or abuse perpetrated against; or

Law enforcement and crime.

(3) allegation of abuse, criminal activity, or disruption committed by an individual held in the custody of the Department of Homeland Security.

(b) The records referred to in subsection (a) shall be made available, in accordance with applicable laws and regulations, and Federal rules governing disclosure in litigation, to an individual who has been charged with a crime, been placed into segregation, or otherwise punished as a result of an allegation described in paragraph (3), upon the request of such individual.

Applicability.

SEC. 529. Section 519 of division F of Public Law 114–113, regarding a prohibition on funding for any position designated as a Principal Federal Official, shall apply with respect to any Federal funds in the same manner as such section applied to funds made available in that Act.

Reports.

SEC. 530. (a) Not later than 10 days after the date on which the budget of the President for a fiscal year is submitted to Congress pursuant to section 1105(a) of title 31, United States Code, the Under Secretary for Management of Homeland Security shall submit to the Committees on Appropriations of the House of Representatives and the Senate a report on the unfunded priorities, for the Department of Homeland Security and separately for each departmental component, for which discretionary funding would be classified as budget function 050.

(b) Each report under this section shall specify, for each such unfunded priority—

(1) a summary description, including the objectives to be achieved if such priority is funded (whether in whole or in part);

(2) the description, including the objectives to be achieved if such priority is funded (whether in whole or in part);

(3) account information, including the following (as applicable):

(A) appropriation account; and

(B) program, project, or activity name; and

(4) the additional number of full-time or part-time positions to be funded as part of such priority.

Definition.

(c) In this section, the term "unfunded priority", in the case of a fiscal year, means a requirement that—

(1) is not funded in the budget referred to in subsection (a);

(2) is necessary to fulfill a requirement associated with an operational or contingency plan for the Department; and

(3) would have been recommended for funding through the budget referred to in subsection (a) if—

(A) additional resources had been available for the budget to fund the requirement;

(B) the requirement has emerged since the budget was formulated; or

(C) the requirement is necessary to sustain prior-year investments.

Deadlines. Determination. President. Evaluation. Notifications.

SEC. 531. (a) Not later than 10 days after a determination is made by the President to evaluate and initiate protection under any authority for a former or retired Government official or employee, or for an individual who, during the duration of the directed protection, will become a former or retired Government official or employee (referred to in this section as a "covered individual"), the Secretary of Homeland Security shall submit a notification to congressional leadership and the Committees on Appropriations of the House of Representatives and the Senate, the Committees on the Judiciary of the House of Representatives and the Senate, the Committee on Homeland Security of the House of Representatives, the Committee on Homeland Security and Governmental Affairs of the Senate, and the Committee on Oversight and Reform of the House of Representatives (referred to in this section as the "appropriate congressional committees").

Threat assessment.

(b) Such notification may be submitted in classified form, if necessary, and in consultation with the Director of National Intelligence or the Director of the Federal Bureau of Investigation, as appropriate, and shall include the threat assessment, scope of the protection, and the anticipated cost and duration of such protection.

(c) Not later than 15 days before extending, or 30 days before terminating, protection for a covered individual, the Secretary of Homeland Security shall submit a notification regarding the extension or termination and any change to the threat assessment to the congressional leadership and the appropriate congressional committees.

Time period. Reports.

(d) Not later than 45 days after the date of enactment of this Act, and quarterly thereafter, the Secretary shall submit a report to the congressional leadership and the appropriate congressional committees, which may be submitted in classified form, if

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 33 of 714 PageID #:1083



necessary, detailing each covered individual, and the scope and associated cost of protection.

Project proposal.

SEC. 532. (a) None of the funds provided to the Department of Homeland Security in this or any prior Act may be used by an agency to submit an initial project proposal to the Technology Modernization Fund (as authorized by section 1078 of subtitle G of title X of the National Defense Authorization Act for Fiscal Year 2018 (Public Law 115–91)) unless, concurrent with the submission of an initial project proposal to the Technology Modernization Board, the head of the agency—

Notifications.

(1) notifies the Committees on Appropriations of the House of Representatives and the Senate of the proposed submission of the project proposal;

Records.

(2) submits to the Committees on Appropriations a copy of the project proposal; and

Analysis.

(3) provides a detailed analysis of how the proposed project funding would supplement or supplant funding requested as part of the Department's most recent budget submission.

Time period. Reports.

(b) None of the funds provided to the Department of Homeland Security by the Technology Modernization Fund shall be available for obligation until 15 days after a report on such funds has been transmitted to the Committees on Appropriations of the House of Representatives and the Senate.

(c) The report described in subsection (b) shall include—

(1) the full project proposal submitted to and approved by the Fund's Technology Modernization Board;

(2) the finalized interagency agreement between the Department and the Fund including the project's deliverables and repayment terms, as applicable;

(3) a detailed analysis of how the project will supplement or supplant existing funding available to the Department for similar activities;

(4) a plan for how the Department will repay the Fund, including specific planned funding sources, as applicable; and

(5) other information as determined by the Secretary.

Deadline. Reductions.

SEC. 533. Within 60 days of any budget submission for the Department of Homeland Security for fiscal year 2027 that assumes revenues or proposes a reduction from the previous year based on user fees proposals that have not been enacted into law prior to the submission of the budget, the Secretary of Homeland Security shall provide the Committees on Appropriations of the House of Representatives and the Senate specific reductions in proposed discretionary budget authority commensurate with the revenues assumed in such proposals in the event that they are not enacted prior to October 1, 2026.

SEC. 534. None of the funds made available by this Act may be obligated or expended to implement the Arms Trade Treaty until the Senate approves a resolution of ratification for the Treaty.

Contracts. Memorandums. Grants. Loans.

SEC. 535. No Federal funds made available to the Department of Homeland Security may be used to enter into a procurement contract, memorandum of understanding, or cooperative agreement with, or make a grant to, or provide a loan or guarantee to, any entity identified under section 1260H of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116–283) or any subsidiary of such entity.

Khalid Sheikh Mohammed. Detainees. Cuba.

SEC. 536. None of the funds appropriated or otherwise made available in this or any other Act may be used to transfer, release,

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 34 of 714 PageID #:1084



or assist in the transfer or release to or within the United States, its territories, or possessions Khalid Sheikh Mohammed or any other detainee who—

(1) is not a United States citizen or a member of the Armed Forces of the United States; and

(2) is or was held on or after June 24, 2009, at the United States Naval Station, Guantanamo Bay, Cuba, by the Department of Defense.

SEC. 537. (a) The Secretary of Homeland Security shall, on a monthly basis beginning immediately after the date of enactment of this Act, develop estimates of the number of migrants anticipated to arrive at the southwest border of the United States.

Time period. Effective date. Border estimates.

(b) The Secretary shall ensure that, at a minimum, the estimates developed pursuant to subsection (a)—

(1) cover the current fiscal year and the following fiscal year;

(2) include a breakout by demographic, to include single adults, family units, and unaccompanied children;

(3) undergo an independent validation and verification review;

Review.

(4) are used to inform policy planning and budgeting processes within the Department of Homeland Security; and

(5) are included in the budget materials submitted to Congress for each fiscal year beginning after the date of enactment of this Act and in support of—

Effective date.

(A) the President's annual budget request pursuant to section 1105 of title 31, United States Code;

(B) any supplemental funding request submitted to Congress;

(C) any reprogramming and transfer notification pursuant to section 503 of this Act; and

(D) such budget materials shall include—

(i) the most recent monthly estimates developed pursuant to subsection (a);

(ii) a description and quantification of the estimates used to justify funding requests for Department programs related to border security, immigration enforcement, and immigration services;

(iii) a description and quantification of the anticipated workload and requirements resulting from such estimates; and

(iv) a confirmation as to whether the budget requests for impacted agencies were developed using the same estimates.

(c) The Secretary shall share the monthly estimates developed pursuant to subsection (a) with the Secretary of Health and Human Services, the Attorney General, the Secretary of State, and the Committees on Appropriations of the House of Representatives and the Senate.

(d) If the monthly estimates described in subsection (b) are not provided for the purposes described, the reprogramming and transfer authority provided in section 503 of this Act shall be suspended until such time as the required estimates are provided to the Committees on Appropriations of the House of Representatives and the Senate.

Suspension.

SEC. 538. (a) The Secretary of Homeland Security shall, on a monthly basis beginning immediately after the date of enactment

Time period. Effective date. Detention and removal estimates.

of this Act, develop estimates of the number of individuals anticipated to be detained in and removed from the United States.

(b) The Secretary shall ensure that, at a minimum, the estimates developed pursuant to subsection (a)—

(1) cover the current fiscal year and the following fiscal year;

(2) include a breakout by demographics, to include single adults and family units;

Review.

(3) undergo an independent validation and verification review;

(4) are used to inform policy planning and budgeting processes within the Department of Homeland Security; and

(5) are included in the budget materials submitted to Congress for each fiscal year beginning after the date of enactment of this Act and in support of—

(A) the President's annual budget request pursuant to section 1105 of title 31, United States Code;

(B) any supplemental funding request submitted to Congress;

(C) any reprogramming and transfer notification pursuant to section 503 of this Act; and

(D) such budget materials shall include—

(i) the most recent monthly estimates developed pursuant to subsection (a);

(ii) a description and quantification of the estimates used to justify funding requests for Department programs related to border security, immigration enforcement, and immigration services;

(iii) a description and quantification of the anticipated workload and requirements resulting from such estimates; and

(iv) a confirmation as to whether the budget requests for impacted agencies were developed using the same estimates.

(c) The Secretary shall share the monthly estimates developed pursuant to subsection (a) with the Attorney General, the Secretary of State, and the Committees on Appropriations of the House of Representatives and the Senate.

Suspension.

(d) If the monthly estimates described in subsection (b) are not provided for the purposes described, the reprogramming and transfer authority provided in section 503 of this Act shall be suspended until such time as the required estimates are provided to the Committees on Appropriations of the House of Representatives and the Senate.

Analyses.
Examination.
Reports.

SEC. 539. (a) Prior to the Secretary of Homeland Security requesting assistance from the Department of Defense for border security operations, the Secretary shall ensure that an alternatives analysis and cost-benefit analysis is conducted before such request is made, which shall include an examination of obtaining such support through other means.

(b) Not later than 30 days after the date on which a request for assistance is made, the Secretary of Homeland Security shall submit to the Committees on Appropriations of the House of Representatives and the Senate a report detailing the types of support requested, the alternatives analysis and cost-benefit analysis

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 36 of 714 PageID #:1086



described in subsection (a), and the operational impact to Department of Homeland Security operations of any Department of Defense border security support requested by the Secretary.

Time period.

(c) Not later than 30 days after the date on which a request made for assistance is granted and quarterly thereafter through the duration of such assistance, the Secretary of Homeland Security shall submit to the Committees on Appropriations of the House of Representatives and the Senate, a report detailing the assistance provided and the operational impacts to border security operations.

SEC. 540. Funds made available in this Act or any other Act for Operations and Support may be used for the necessary expenses of providing an employee emergency back-up care program.

Deadline.
Reductions.

SEC. 541. (a) If the reporting requirement set forth in paragraph (2) under the heading "Federal Emergency Management Agency—Disaster Relief Fund" in the Department of Homeland Security Appropriations Act, 2015 (Public Law 114–4), as applied in this fiscal year by section 306 of this Act, is not submitted to the Committees on Appropriations of the House of Representatives and the Senate and published on the Agency's website not later than the fifth business day of the applicable month, the amount made available for "Office of the Secretary and Executive Management—Operations and Support—Management and Oversight" shall be reduced by $100,000 for each day such report is not submitted and published on the Agency's website.

Time period.
Reimbursement.

(b) During any period in which the total number of requests for reimbursement for a covered expense for individual assistance or public assistance related to emergency (42 U.S.C. 5122(1)) or major disaster (42 U.S.C. 5122(2)) declarations under the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.) that the Department of Homeland Security has been considering under final review for greater than 60 days exceeds 500, the amount made available for "Office of the Secretary and Executive Management—Operations and Support—Management and Oversight" shall be reduced by $100,000 for each day during such period on which the cumulative total of requests over 60 days in final review exceeds 500.

(c) Subsection (b) shall not apply if the balance of funding for the Disaster Relief Fund is sufficient only for the purpose of obligating funds for activities determined to be lifesaving or life-sustaining.

Applicability.
6 USC 320 note.

SEC. 542. Section 16005(c) of title VI of division B of the Coronavirus Aid, Relief, and Economic Security Act (Public Law 116–136) shall be applied as if the language read as follows: "Subsection (a) shall apply until September 30, 2026.".

SEC. 543. The levels for appropriations accounts specified for classified programs in this Act shall conform to the direction included in the classified annex accompanying this Act and shall be implemented in a manner consistent with section 545.

Determination.
Approval.

SEC. 544. Upon a determination by the Director of National Intelligence that such action is necessary and in the national interest, the Director may, with the approval of the Secretary of Homeland Security and the Director of the Office of Management and Budget, transfer amounts for the National Intelligence Program consistent with the percentage caps specified in section 503(c): *Provided,* That such authority to transfer may not be used unless for higher priority items, based on unforeseen intelligence requirements, than those for which originally appropriated and in no

case where the item for which funds are requested has been denied by the Congress: *Provided further,* That a request for any transfer of funds using authority provided in this section shall be made consistent with the requirements of section 503(d)(1).

Deadline. Time period. Obligation plans.

SEC. 545. Within seven days of the date of enactment of this Act, and quarterly thereafter, the Department shall submit to the Committees on Appropriation of the House of Representatives and the Senate—

(1) an obligation plan by program, project, or activity for each component receiving funds from Public Law 119–21;

Fee estimates.

(2) estimated fee collections for each component collecting new or enhanced fees authorized by Public Law 119–21, delineated by collections that a component will retain and collections that a component will remit to other agencies or the Treasury; and

(3) an obligation plan by program, project, or activity for fee collections identified in paragraph (2) as being retained by a component within the Department.

Facility oversight.

SEC. 546. (a) None of the funds appropriated or otherwise made available to the Department of Homeland Security by this Act may be used to prevent any of the following persons from entering, for the purpose of conducting oversight, any facility operated by or for the Department of Homeland Security used to detain or otherwise house aliens, or to make any temporary modification at any such facility that in any way alters what is observed by a visiting Member of Congress or such designated employee, compared to what would be observed in the absence of such modification:

(1) A Member of Congress.

(2) An employee of the United States House of Representatives or the United States Senate designated by such a Member for the purposes of this section.

(b) Nothing in this section may be construed to require a Member of Congress to provide prior notice of the intent to enter a facility described in subsection (a) for the purpose of conducting oversight.

Time period.

(c) With respect to individuals described in subsection (a)(2), the Department of Homeland Security may require that a request be made at least 24 hours in advance of an intent to enter a facility described in subsection (a).

SEC. 547. In addition to amounts otherwise made available for such purposes, there is appropriated $30,000,000, for an additional amount for “The Judiciary—Supreme Court of the United States—Salaries and Expenses”, to remain available until September 30, 2028: *Provided*, That amounts made available pursuant to this section shall be subject to the same authorities and conditions as if such amounts were provided under the heading “The Judiciary—Supreme Court of the United States—Salaries and Expenses” in the Financial Services and General Government Appropriations Act, 2026.

SEC. 548. There is appropriated $140,000,000 for an additional amount for “Department of Transportation—Federal Aviation Administration—Operations” for air traffic organization activities, to remain available until September 30, 2027: *Provided,* That the Administrator of the Federal Aviation Administration shall only use such amounts to provide a rate of pay increase for calendar year 2026 of 3.8 percent, for air traffic controllers, as defined

Pay increase. Air traffic controllers.

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 38 of 714 PageID #:1088



by section 2109(1)(A) of title 5, United States Code, and air traffic controller supervisors or managers who are not covered under such section, but who manage air traffic: *Provided further,* That such adjustment shall be implemented for all such employees only to the extent the Administrator determines, in his sole discretion, that improvements in workforce scheduling, staffing utilization, or other operational efficiencies are achieved that contribute to addressing workforce shortfalls and enhancing aviation safety: *Provided further,* That if the Administrator makes such determination, then such adjustment shall be effective the first pay period beginning after January 1, 2026: *Provided further,* That amounts provided by this section shall be subject to the same authorities and conditions as if such amounts were provided by the Department of Transportation Appropriations Act, 2026.

Determination.

Effective date.

SEC. 549. Notwithstanding section 503(c) of this Act, no amounts may be transferred to "U.S. Customs and Border Protection—Operations and Support" for Border Security Operations in the "Department of Homeland Security Appropriations Act, 2026" table of the explanatory statement regarding this Act, as defined in section 4 (in the matter preceding division A of this consolidated Act).

This division may be cited as the "Department of Homeland Security Appropriations Act, 2026".

## DIVISION B—FURTHER ADDITIONAL CONTINUING APPROPRIATIONS ACT, 2026

Further Additional Continuing Appropriations Act, 2026.
*Ante*, p. 628.

SEC. 101. The Continuing Appropriations Act, 2026 (division A of Public Law 119–37) is further amended by substituting the date of enactment of this Act for the date specified in section 106(3).

SEC. 102. For the purposes of the Continuing Appropriations Act, 2026 (division A of Public Law 119–37), the time covered by such Act shall be considered to include the period which began on or about February 14, 2026, during which there occurred a lapse in appropriations.

Pay and benefit payments.

SEC. 103. Amounts made available in division A of the Homeland Security and Further Additional Continuing Appropriations Act, 2026, the Continuing Appropriations Act, 2026 (division A of Public Law 119–37), and Public Law 119–21 for personnel pay, allowances, and benefits in each department and agency shall be available for payments pursuant to subsection (c) of section 1341 of title 31, United States Code, and such payments shall be made.

SEC. 104. All obligations incurred and in anticipation of the appropriations made and authority granted by division A of the Homeland Security and Further Additional Continuing Appropriations Act, 2026 and the Continuing Appropriations Act, 2026 (division A of Public Law 119–37) for the purposes of maintaining the essential level of activity to protect life and property and bringing about orderly termination of Government function, and for purposes as otherwise authorized by law, are hereby ratified and approved if otherwise in accord with the provisions of such Acts.

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 39 of 714 PageID #:1089



This division may be cited as the "Further Additional Continuing Appropriations Act, 2026".

Approved April 30, 2026.

---

LEGISLATIVE HISTORY—H.R. 7147:

CONGRESSIONAL RECORD, Vol. 172 (2026):
- Jan. 22, considered and passed House.
- Mar. 26, considered and passed Senate, amended.
- Mar. 27, House concurred in Senate amendment with an amendment pursuant to H. Res. 1142.
- Apr. 2, Senate disagreed to House amendment.
- Apr. 30, House receded from its amendment and concurred in Senate amendment.

○

# Exhibit A-2

Xerox

# DIVISION C—DEPARTMENT OF HOMELAND SECURITY APPROPRIATIONS ACT, 2026

The following is an explanation of Division C, which makes appropriations for the Department of Homeland Security (the Department or DHS) for fiscal year 2026. Funding provided in this agreement supports existing programs that protect the Nation from all manner of threats and ensures the Department's ability to improve preparedness at the Federal, state, local, tribal, and territorial levels; prevent and respond to terrorist attacks; and hire, train, and equip DHS frontline personnel protecting the country.

The explanatory statement accompanying this division is approved and indicates congressional intent. Unless otherwise noted, the language set forth in House Report 119–173 carries the same weight as language included in this explanatory statement and should be complied with unless specifically addressed to the contrary in this explanatory statement. While some language is repeated for emphasis, it is not intended to negate the language referred to above unless expressly provided herein.

References in the explanatory statement to "the Committees" or "the Committees on Appropriations" should be interpreted as both the House Appropriations Subcommittee on Homeland Security and the Senate Appropriations Subcommittee on Homeland Security.

This explanatory statement refers to certain entities, persons, funds, and documents as follows: the Department of Homeland Security is referenced as DHS or the Department; the Government Accountability Office is referenced as GAO; and the Office of Inspector General of the Department of Homeland Security is referenced as OIG. In addition, "full-time equivalents" are referred to as FTE; "full-time positions" are referenced as FTP; "Information Technology" is referred to as IT; "program, project, or activity" is referred to as PPA; any reference to "the Secretary" should be interpreted to mean the Secretary of Homeland Security; "component" should be interpreted to mean an agency, administration, or directorate within DHS; any reference to SLTT should be interpreted to mean state, local, tribal, and territorial governments; any reference to "the House report" should be interpreted to mean House Report 119–173; and "budget request" or "the request" should be interpreted to mean the budget of the U.S. Government for fiscal year 2026 that was submitted to Congress on May 2, 2025.

# TITLE I—DEPARTMENTAL MANAGEMENT, INTELLIGENCE, SITUATIONAL AWARENESS, AND OVERSIGHT

## OFFICE OF THE SECRETARY AND EXECUTIVE MANAGEMENT

### OPERATIONS AND SUPPORT

The agreement includes $316,295,000. Within the total amount provided, $22,050,000 is made available for two fiscal years, including $14,050,000 for the Office of Health Security and $8,000,000 for Office of Strategy, Policy, and Plans.

#### Management and Oversight

*2026 FIFA World Cup Planning.*—Not later than 90 days after the date of enactment of this Act, the Secretary is directed to brief the Committees on the security planning processes, expected budgetary needs, including from Public Law 119–21, to the Department, coordination efforts with Federal and SLTT entities, and additional resource requirements necessary for host cities to adequately prepare for the 2026 FIFA World Cup.

*2028 Olympic and Paralympic Games.*—The Secretary shall submit a report to the Committees, in coordination with the U.S. Secret Service (USSS), not later than 90 days after the date of enactment of this Act that details the full scope of the Department's obligations for this National Special Security Event (NSSE). The report shall include the nature of the Department's coordination with the organizing committee involved in the 2028 Games, other Federal agencies and departments, and representatives of the relevant state and local government entities, including Olympic events not hosted in the Los Angeles area. The report shall also include the Department's projected resource needs, by component, for this NSSE for fiscal year 2026 through fiscal year 2029, including specific account details for each fiscal year and how the Department is using the funds provided for this purpose in Public Law 119–21. The Department shall also include any projected budgetary shortfalls, delineated by each fiscal year, when applicable.

*287(g) Programs.*—The Department shall evaluate its interactions and relationships with local law enforcement agencies, including but not limited to the 287(g) program. This evaluation should result in specific recommendations for ensuring that the Department considers the costs and benefits of the 287(g) program, including for local law enforcement agencies, particularly as it relates to the workload and community relationships. The Office of Strategy, Policy, and Plans, in consultation with the Office of Partnership and Engagement, is directed to brief the Committees on the results of its evaluation not later than 180 days after the date of enactment of this Act. Additionally, the agreement continues the directive under the Office of the Secretary and Executive Management heading "287(g) Agreements" in Senate Report 118-85.

*Access to High-Quality Affordable Childcare for Federal Employees.*—Within 90 days of the date of enactment of this Act, and semiannually thereafter, the Department is directed to provide a report on access to high-quality, affordable childcare for children of Department employees. The report shall detail all current programs or efforts that assist Departmental employees with childcare, identify additional programs, including recruitment and retention programs, that would assist with childcare, and detail all associated costs with those programs and efforts, even if such costs are projections. Additionally, 180 days after the date of enactment of this Act, the Department shall survey employees to capture interest in such programs or efforts and provide to the Committees the level of interest and the number of employees using such programs. Where possible, the Department shall identify whether access to childcare hinders recruitment or retention efforts, provide the geographical locations where such hindrance occurs, and identify targeted programs for such cases.

*Administrative Data Research Facility (ADRF).*—The agreement directs the DHS Statistical Official, in consultation with the DHS Chief Data Officer, the Chief Information Officer, and the Senior Agency Official for Privacy, to coordinate secure access to administrative data across the relevant DHS components and to ensure compliance with all applicable laws and DHS policies, including the Privacy Act of 1974 (P.L. 93–579). The agreement provides $2,000,000 to expand the ADRF's capabilities, including enhanced data-sharing partnerships, expanded security measures, the development of advanced analytical tools to support DHS and other agencies' homeland security research needs, and the enhancement of DHS's ability to securely transmit timely data to the ADRF. The agreement directs the DHS Statistical Official to submit a report within 180 days of the date of enactment of this Act detailing progress on the

integration of administrative data for homeland security research, including an assessment of how ADRF is being leveraged to enhance interagency collaboration and threat analysis.

*Artificial Intelligence (AI) Implementation.*—The agreement directs the Department, within 90 days of the date of enactment of this Act, to brief the Committees on the Department's AI activities, including progress on the Department's implementation of its AI strategy and new use cases of AI.

*Asylum Processing at Ports of Entry (POEs)*.—The agreement directs the Department, within 180 days of the date of enactment of this Act, to provide to the Committees an analysis of current capacity to process asylum seekers and any constraints based on Department projections of the number of anticipated asylum applicants at the southwest border over the next five fiscal years at POEs.

*Body Armor.*—The agreement directs DHS to procure ballistic body armor and related protective equipment that is specifically designed to fully protect the body shapes of agents and officers and is made to conform to the individual wearer and provides the best possible fit and coverage to allow for either a flat or shaped front panel. The body armor procured must meet or exceed the most current ballistic resistance standards developed by the National Institute of Justice (NIJ). Within 180 days of the date of enactment of this Act, the Secretary shall submit a report to the Committees detailing:

(1) an assessment of the current ballistic protection inventory across DHS components;

(2) a plan to ensure all newly procured body armor conforms to the latest NIJ standards;

(3) an inventory management strategy, including equipment lifecycle replacement schedules; and

(4) steps to maximize the health, safety, and operational effectiveness of DHS law enforcement personnel through improved protective technologies.

*Body-Worn Cameras.*—The agreement provides $20,000,000 for the procurement, deployment, and operations of body-worn cameras for agents and officers performing enforcement activities under 8 U.S.C. 1101 et seq. INSERT 4a

*Border and Immigration Related Data and Transparency.*—Within 30 days of the date of enactment of this Act, and quarterly thereafter, the Secretary, in consultation with other appropriate Federal officials, shall submit to the Committees a report that details the situational awareness of the southwest border that includes data related to the number of "turn backs," "got

Insert 4a

The agreement notes ICE's body worn camera directive (ICE Directive 19101.3), which is effective as of February 19, 2025, and directs ICE to inform the Committees within 14 days of any changes made to the directive, to include the reason for the change.

aways," and monthly apprehension rate data by sector. For the purposes of this reporting requirement, the Department shall use the definitions provided in section 223 of title 6, United States Code. U.S. Customs and Border Protection (CBP) is also directed to ensure a review by third-party statistical experts on the current process, assumptions, and formulas used to derive the "got aways" estimates and any proposed changes to improve such estimates, including proposed changes to statutory definitions, if any. The Committees also continue the requirement for the Department to submit quarterly Border Security Status reports and data on the deportation, or removal, of the parents of U.S. citizen children semiannually. Additionally, the Department shall provide to the Committees and shall post on a publicly accessible website by the 15th of each month the following, delineating requests received and granted by entity, including CBP, U.S. Immigration and Customs Enforcement (ICE), and U.S. Citizenship and Immigration Services (USCIS):

(1) DHS's total detention capacity, as well as usage rate during the previous month;

(2) the total monthly number of "applicants for admission" under section 1225 of Title 8, United States Code, who are paroled into the United States during the previous month;

(3) the total monthly number of "applicants for admission" under section 1225 of Title 8, United States Code, who are released into the United States, paroled or otherwise, during the previous month;

(4) the total number of individuals paroled into the United States during the previous month;

(5) of the total number of individuals paroled, the rationale for each grant, and its duration; and

(6) the total number of referrals for prosecution made to the Department of Justice (DOJ) for illegal entry or illegal reentry during the previous month.

*Border-Related Executive Orders.*—The agreement directs ICE, CBP, USCIS, and the Office of Strategy, Policy, and Plans to jointly brief the Committees not later than seven days after the execution of any border-related executive actions on preliminary budgetary impacts, operational changes, new training that may be required, revised or new international agreements, and any additional FTE that have been deployed to implement the executive action.

*Combatting Antisemitism.*—The agreement directs the Secretary to release a public report, not later than 90 days after the date of enactment of this Act, detailing how the

Department plans to implement Executive Order 14188 of January 29, 2025, and the U.S. National Strategy to Counter Antisemitism to combat the rising threat of antisemitism.

*Continuous Vetting.*—Not later than 90 days after the enactment of this Act, the Department shall submit a proposal for the centralization of domestic vetting of foreign nationals within one component. The agreement directs the Department to brief the Committees on such proposal prior to implementation.

*Data Aggregation.*—The Department is directed to provide a briefing to the Committees not later than 90 days after the date of enactment of this Act on current or planned systems that draw on data from more than two sources and include information on U.S. citizens. The briefing should describe the purpose and use of such systems, the sources and types of data involved, any applicable oversight or privacy safeguards, and how the Department ensures that such systems are not used for systemic, indiscriminate, or wide-scale surveillance.

*Department of Defense (DoD) Border and Immigration Enforcement Support.*—Within 90 days of the date of enactment of this Act, and monthly thereafter, the Department, including representatives from CBP and ICE, is directed to brief the Committees on the continued support from DoD to augment DHS border and immigration enforcement operations. The briefing shall include:

(1) the support DHS requested to DoD during the reporting period, including a copy of the written request;

(2) the support approved by DoD for the reporting period, including a copy of the written approval;

(3) the duties, functions, and duty stations of the DoD assets providing support to DHS during the reporting period;

(4) a list of each DoD installation or facility that is being used to support DHS or any of its components; and

(5) DHS plans for border and immigration enforcement operations on the southern border and requirement for continued DoD support.

*Department's Mission in Rural Areas and with Tribes.*—The Office of Partnership and Engagement is directed to provide a briefing to the Committees not later than 90 days after the date of enactment of this Act on its outreach efforts to rural communities and tribes in their efforts to support the homeland security mission.

*Deputization of Law Enforcement.*—Within 90 days of the date of enactment of this Act, the Department shall submit to the Committees the memorandums of understanding for the deputization of law enforcement officers that have been signed with departments and agencies across the Federal Government, including but not limited to, DoD, DOJ, the Internal Revenue Service, the Department of State, and components within DHS. In addition, the Department is directed to provide a report on the authorities utilized for each agency agreement and the training provided to the deputized law enforcement officers, including the costs and which agency incurs the cost for training. For those officers deputized from other DHS components, the report shall include an analysis of the operational impacts of such actions, including a breakdown of number of officers deputized by component and any impacts on the original mission of such agency across the Department.

*DHS Law Enforcement Officer Assault Reporting.*—Within 90 days of the date of enactment of this Act and monthly thereafter, the Department is directed to brief the Committees on the number of assaults on DHS law enforcement officers. The data provided in the initial brief shall include statistics for the last five fiscal years.

*DHS Uniform Policy.*—The agreement encourages DHS to develop and implement a standardized uniform policy for domestic law enforcement operations to ensure that law enforcement officers are clearly identifiable as Federal law enforcement. The policy may make exceptions for unique situations, such as those involving undercover operations, or for life and safety considerations in areas of increased threat as covered under title 8, United States Code, for enforcement activities. The Department is directed to brief the Committees within 60 days of the date of enactment of this Act on the policy that has been developed, the implementation plan, how the Department intends to track compliance, and any associated resource costs.

*Duplicative Activities.*—The GAO's 2025 Annual Report entitled "Additional Opportunities to Reduce Fragmentation, Overlap, and Duplication and Achieve Billions of Dollars in Financial Benefits" notes that the Department has at least 20 open and unaddressed recommendations with another eight recommendations only partially addressed. The Department shall provide a report, not later than 180 days after the date of enactment of this Act, on the status of the Department's efforts to address the GAO's recommendations and any legal, resource, or other barriers preventing the Department from addressing the recommendations.

*Ending Online Child Exploitation.*—The agreement directs the Department to brief the Committees semiannually on all of the required data pertaining to Department-wide efforts to combat human trafficking and child exploitation and provide the appropriate committees of jurisdiction with an updated comprehensive study on human trafficking as required in the Trafficking Victims Protection Reauthorization Act of 2008 (Public Law 110–457). The briefing shall include steps the Department has taken to respond to the recent media reports concerning the safety and well-being of vulnerable unaccompanied children. Insert 8a

*Future Goods and Services for Homeland Security Feasibility Report.*—The Secretary, in conjunction with Federal Emergency Management Agency (FEMA) and Cybersecurity and Infrastructure Security Agency (CISA), as well as relevant departmental components and other Federal agencies and departments, shall provide a report to the Committees not later than 90 days after the date of enactment of this Act on the feasibility of producing an annual projection of needs for goods and services regarding response to and recovery from nationwide events. The feasibility report shall detail the ways in which sourcing domestic and foreign supplies affects response and recovery preparedness and shall include the potential impact of the development of a program that communicates anticipated national needs on the reliability of the supply chain.

*Fiscal Year (FY) 2025 FEMA Preparedness Grants.*—The agreement notes the apparent disregard for the 200-day statutory award mandate and concludes this lapse illustrates obfuscation beyond bureaucracy and breaches trust that puts American lives at risk and requires immediate attention. The withhold of these funds until the final week of FY 2025, and the continued stall of access to such funds nearly four months into FY 2026, has left states and localities, from the largest urban centers to the smallest rural towns, in a state of indefinite limbo ahead of near-term and high-security events such as the 2026 FIFA World Cup, America250 celebrations, and the 2028 Olympic games. Within five days of the date of enactment of this Act, FEMA shall provide the Committees with updated allocations for all FY 2025 preparedness grants and is directed to provide states full access to these funds within ten business days of the date of enactment of this Act.

*Icebreaker Collaboration Effort (ICE) Pact Implementation.*—The agreement directs DHS and the Coast Guard to provide a joint briefing within 90 days of the date of enactment of this Act, detailing the progress in ICE Pact implementation, future implementation timelines, and

INSERT 89

*Enforcement and Public Safety.*—The Department is directed to brief the Committees no later than 30 days after the date of enactment of this Act, and monthly thereafter, concerning any domestic law enforcement or immigration enforcement operation involving more than 35 Department of Homeland Security or other deputized law enforcement officers not assigned to the area of responsibility. The brief should include the total number of personnel deployed to the operation by the Department, component, or entity represented and the cumulative costs of the operation by funding source by TAFS. The report shall be transmitted in a classified format as necessary. The agreement directs the Department's Use-of-Force Policy (Policy Statement 044-05), implementing guidance, including investigative and documentation practices, as well as component-specific use of force policies, procedures, and training in effect as of the date of enactment of this Act, to be provided to the Committees within five days of enactment of this Act and any changes to that policy shall be made available to the Committees within 24 hours of such a change.

estimated resource or other needs, including statutory and regulatory changes, for full implementation.

*Limited English Proficient Communities.*—Not later than 90 days after the date of enactment of this Act, and annually thereafter, the Department is directed to provide a detailed report to the Committees covering the Department's annual advertising expenditures by component. The report shall identify expenditures that relate to limited English proficient communities and shall delineate between forms of advertising such as television, radio, or internet.

*Ms. L Settlement.*—Within 90 days of the date of enactment of this Act, the Secretary shall brief the Committees on the settlement agreement that was approved by the U.S. District Court for the Southern District of California on December 11, 2023, in *Ms. L., et al. v. U.S. Immigration and Customs Enforcement, et al.*

*Non-Leaded Ammunition.*—Within 90 days of the date of enactment of this Act, the Department is directed to provide a report to the Committees that examines whether current brass and lead can be recycled and the environmental implications of such recycling. Within 180 days of the date of enactment of this Act, the Department is directed to report to the Committees on examining alternatives to traditional bullet backstops and berms in indoor and outdoor firing ranges that would mitigate or preserve their integrity for the reduction of lead dust and the ability to recycle and the availability of Reduced Training Hazard Ammunition to meet the current training requirements across DHS components. Additionally, the report shall include a summary of any amounts of lead or brass that were recycled by DHS and the cost of that recycling for the past five fiscal years.

*Office of Homeland Security Statistics (OHSS).*—Within 30 days of the date of enactment of this Act, the agreement directs OHSS to provide the monthly reports required in the explanatory statement accompanying Public Law 117–328 for fiscal year 2025 and provide monthly reports for fiscal year 2026. The agreement also directs OHSS to include in its report the arrest location and the number of repatriations by arresting agency, as well as detentions, removals, and ICE arrests of U.S. citizens, Lawful Permanent Residents, and former members of the Armed Services. The report shall include monthly data on self-deportations through the CBP Home App and include detailed summary-level data on prosecution types of charges broken down by sector, country of origin, asylum claim, and sentencing outcome.

*Parole Report.*—The Department is reminded of the requirement in the explanatory statement accompanying Public Law 117–103 to produce a report on its use of parole authority, including the number of parole requests received and granted, and for those granted, the rationale for each grant and its duration. The report shall be required monthly and shall be released at the same time as CBP releases its monthly operation statistics update.

*Parole Requests for Servicemembers and Veterans.*—The Department is directed to make available, on a publicly accessible website, an interactive dashboard detailing the number of such parole requests made, processed, approved, denied, and pending by month, along with the average processing time. For each parole request denial, the Department is directed to report the country of nationality or last habitual residence of the individual, whether the individual was discharged or released from service under honorable conditions, whether the individual was deployed overseas, their branch of service, and whether the individual has a spouse, child or other immediate family member residing in the United States.

*Public Recording of DHS Law Enforcement Operations.*—It is well established that American citizens can record law enforcement officers and agents carrying out their duties in public under the First Amendment of the U.S. Constitution, so long as those recording do not obstruct or interfere with law enforcement operations. Therefore, the Department is directed to ensure that all agents and officers are appropriately trained on the rights of individuals to record public operations. Not later than 90 days after the date of enactment of this Act, the Secretary shall brief the Committees on updated training provided to all officers and agents within the Department, both in the field and at Federal Law Enforcement Training Centers, and provide a semi-annual report to the Committees on any allegations or complaints of violations of First Amendment rights under investigation by any entity funded by this Act.

*Recalcitrant Countries.*—Not later than 90 days after the date of enactment of this Act, the Department shall, in consultation with the Department of State and other relevant agencies, brief the Committees on efforts to remove aliens encountered from countries who currently refuse to accept returns. This brief shall include the list of countries the Department considers recalcitrant, as well as the number of aliens from each of these countries subject to final orders of removal, including their detention status. The brief shall be submitted in unclassified form but may contain a classified annex.

*Records Management.*—The agreement directs the Department to maintain records and respond to records requests, consistent with the requirements of section 552 of title 5, United States Code, for information related to all detainees in the custody of the Department, regardless of whether such detainees are housed in a Federal or non-Federal detention facility. The Department should not withhold records from disclosure unless the Department reasonably foresees that disclosure would harm an interest protected by an exemption described in section 552(b) of title 5, United States Code or is otherwise prohibited by law.

*Reporting Requirements.*—The agreement continues the directives under the headings "Policy on Legal Orientation and Access Within all Department Facilities," "Family Separation from Parents and Legal Guardians," "Separation of Family Units," and "Family Reunification" in Senate Report 118-85.

*Short-Term Holding Facilities.*—The agreement reminds DHS of the outstanding recommendation from GAO–16–514 to develop and issue guidance on how and which complaint mechanisms should be communicated to individuals in custody at holding facilities. DHS shall provide monthly updates to the Committees on its progress towards compliance in addition to the completed field guidance once applicable.

*State Police and Crime Labs.*—Within 90 days of the date of enactment of this Act, the Department shall report on its use of and partnerships with state crime labs, including funds associated with such partnerships, and should fully reimburse state crime labs for the service they provide to the Department.

*Surge Operations Reporting.*—The agreement directs the Department to report to the Committees on the number of daily arrests by field office on a biweekly basis in support of surge immigration enforcement operations conducted by the Department in fiscal years 2025 and 2026. The arrest data should include the arresting agency as well as the number of individuals who were arrested tied to targeted, intelligence-driven operations versus ancillary arrests, as well as arrest data for those with known criminal convictions in the United States. The biweekly report should also include by operation:

(1) the number of personnel assigned to each operation;

(2) the home agency and location of the personnel;

(3) length of detail assignments; and

(4) the cumulative costs of the operation.

*Terrorism Watch List.*—The Department shall notify the Committees within seven days if an individual on the Federal Bureau of Investigation's (FBI) Terrorist Screening Dataset is encountered by the Department, or another Federal agency supporting the Department's law enforcement mission at or between a port of entry, or while conducting immigration enforcement activities.

*Transnational Repression.*—Within 120 days of the date of enactment of this Act, the Department shall brief the Committees on the issue of transnational repression to include awareness of reported incidents, interagency coordination with the DOJ and other domestic Federal departments and agencies, and in coordination with the Department of State, and any related activities the Department has taken within the United States.

*Tribal Consultation.*—Department personnel interact with tribes and thousands of tribal members every day. Some Department personnel do not have training on tribal issues, which may lead to misunderstandings that negatively impact tribes, tribal members, and ultimately, the Department. The Department is required under Executive Order 13175 to consult and coordinate with tribal governments. The Department shall continue to consult and work with tribes to improve the mandatory, base-level training course for Department personnel, including but not limited to FTE, part-time employees, and contractors, who have regular interactions with tribal members or are likely to encounter tribal members at their duty station. This training should include education on recognizing tribal identification documents as valid forms of identification. Within 180 days of the date of enactment of this Act, the Department is directed to brief the Committees on the status of such training improvements.

*Unaccompanied Minor Reporting.*—Within 90 days of the date of enactment of this Act, and monthly thereafter, the Secretary shall provide the Committees with and make publicly available online a report which shall:

(1) include the number of individuals currently in ICE's custody who were transferred to ICE by the Office of Refugee Resettlement (ORR) and a breakdown, delineated by ICE area of responsibility, of the type of placement and accompanying justification for such placement;
(2) the number of unaccompanied children transferred by DHS (including DHS contractors) into ORR custody over the prior year, disaggregated by month, transferring agency, justification for such transfers, and each minor's age, gender, and country of nationality; and
(3) the number of unaccompanied minors removed or otherwise returned from the United

States by DHS (including DHS contractors) over the prior year, disaggregated by month, returning agency, and each minor's age, gender, country of nationality, and country of return.

*Women in Law Enforcement.*—Within 90 days of the date of enactment of this Act, the Department shall brief the Committees on current Department-wide efforts to recruit and retain women in law enforcement. At a minimum, the briefing shall include information of all law enforcement components detailing: an overview of current recruitment and retention efforts of women by component with base funding for such efforts; success of current efforts including identification of the metrics of success by fiscal year; and the current percentage, broken down by seniority, of women in law enforcement per component. The briefing shall also identify planned recruitment and retention efforts by component for the next fiscal year, any funding requirements to improve the recruitment and retention of women in law enforcement fields by component with comparisons of similar efforts by other Federal law enforcement agencies, including the DOJ, and provide recommendations by component for new programs or efforts that would further support the recruitment and retention of women in law enforcement.

Office of Strategy, Policy, and Plans

*Countering Weapons of Mass Destruction (CWMD) Policy Coordinator.*—The agreement includes the transfer of the Chemical, Biological, Radiological, Nuclear and Explosives (CBRNE) risk assessment functions and detection architecture within the Office of Strategy, Policy, and Plans. To ensure proper coordination within the Department, the Secretary is directed to appoint a Department-wide lead CBRNE coordinator, at the Senior Executive Service level, out of the funds transferred for this function. Within 90 days of the date of enactment of this Act, the Secretary shall brief the Committees on plans to ensure no degradation of the functions previously performed by the CWMD office.

*Countering Weapons of Mass Destruction Transfers.*—The agreement transfers the functions of the Countering Weapons of Mass Destruction office as described in the table below.

COUNTERING WEAPONS OF MASS DESTRUCTION
(in thousands of dollars)

| Appropriation | Final Bill |
|---|---|
| OSEM—Operations and Support | |
| CBRN Risk/Detection Architecture | 33,182 |
| National Biosurveillance Integration Center | 24,036 |
| CBP—Operations and Support | |
| Radiation Portal Monitor Mission Support | 4,356 |
| CBP—Procurement, Construction, and Improvements | |
| Radiation Portal Monitor Program | 20,478 |
| Radiation Portal Monitor Replacement Program | 13,900 |
| International Rail (IRAIL) | 1,300 |
| Handheld Radioisotope Identification Devices | 750 |
| Portable Detection End Items | 1,290 |
| TSA—Procurement, Construction, and Improvements | |
| Portable Detection End Items | 1,290 |
| USCG—Procurement, Construction, and Improvements | |
| Handheld Radioisotope Identification Devices | 750 |
| Portable Detection End Items | 1,290 |
| USSS—Procurement, Construction, and Improvements | |
| Portable Detection End Items | 1,290 |
| FEMA—Operations and Support | |
| Mission, Capability, and Operational Support | 78,995 |
| FEMA—Federal Assistance | |
| CWMD Training, Exercises, and Readiness | 19,559 |
| Securing the Cities Program | 34,465 |
| Biological Support Program | 83,657 |
| S&T—Operations and Support | |
| Mission Support for Research and Development | 4,353 |
| S&T—Research and Development | |
| Transformational Research and Development | 26,540 |
| Technical Forensics | 2,000 |
| Detection Capability Development | 21,460 |

*Report on Crew-Served Weapons.*—Within 90 days of the date of enactment of this Act, the Department shall make publicly available the total number of ammunition and weapons that are considered crew-served weapons that are in the possession of a component, other than the Coast Guard or CBP's Air and Marine Operations.

Office for Civil Rights and Civil Liberties

*Investigations Backlog.*—Within 60 days of the date of enactment of this Act, the Office for Civil Rights and Civil Liberties (CRCL) shall report to the Committees on the current status

of its complaint investigations backlog and the processes CRCL is implementing to reduce the backlog.

*Language Access Programs.*—Within 180 days of the date of enactment of this Act, CRCL shall conduct an analysis of existing language access plans for the Department. The report shall include but not be limited to:

(1) an assessment of current language access plans;

(2) whether existing language access plans meet applicable requirements; and

(3) whether any legal rights orientations are provided in the appropriate language for migrants participating in agency programs. Any recommendations developed after review of the existing plans shall utilize the four-factor analysis identified in section 4 of the Department's Master Language Access plan.

*Statutory Requirements.*—Within 90 days of the date of enactment of this Act, CRCL shall report to the Committees, and publicly post on its website, how it is fulfilling the statutory requirements of the CRCL Office. CRCL shall provide detailed reports on these requirements, including the current staffing levels that support these statutory functions. The report shall also include data for the current fiscal year and the previous two fiscal years, broken out by month, on the number of complaints received by CRCL and how they were handled as well as the number of civil rights and civil liberties investigations open and closed during that time period. The report shall also include a description of any previous CRCL responsibility that is no longer being performed and steps CRCL is taking to comply with statutory requirements.

## Office of Health Security

*Child Well-Being Specialists.*—The recommendation provides $18,050,000 for the Child Well-Being Specialists program. The agreement continues the reporting directive under the heading, "Child Well-Being Professionals" in the explanatory statement accompanying Public Law 118–47. Additionally, within 180 days of the date of enactment of this Act, the Office of Health Security (OHS) is directed to brief the Committees on the status of implementing the Child Well-Being Program.

*Telemental Health and Employee Assistance Pilot.*—The agreement provides $1,500,000 to continue the pilot efforts, as described in House Report 118–123 accompanying Public Law 118–47.

*Workforce Wellness and Suicide Prevention.*—The agreement provides $2,000,000 to expand Department-wide workforce wellness and suicide prevention efforts. Not later than 60 days after the date of enactment of this Act, OHS shall provide an update to the Committees on the status of these efforts and its plans for this funding.

## Privacy Office

*Collected Personal Information.*—Within 180 days of the date of enactment of this Act, the Secretary shall submit to the Committees a report detailing the collection and use of personal information by all components of the Department. The report shall include information about the collection of personally identifiable data of U.S. and non-U.S. persons by all components of the Department, including data reflecting expressive or associational activities, and including but not limited to collection from social media platforms, data brokers, electronic devices, applications for services and accreditations provided by components, encounters at POEs, and other travel information. It shall also include: how the data is stored, shared, and accessed; which internal components it is shared with; which partners inside and outside the Federal Government it is shared with, including but not limited to SLTT law enforcement, foreign governments, and private businesses; the legal basis for its collection; and all civil rights, civil liberties and privacy mechanisms that are used to protect the rights of individuals whose data is accessed, stored, or shared. Finally, the report shall address any mechanisms that allow individuals to seek redress if they believe that they are erroneously included in any of the lists maintained by the Department or erroneously subjected to additional screening, scrutiny, or surveillance as a result of a Department risk assessment process. The report shall be provided in an unclassified manner that can be shared with the public to the greatest extent possible and with a classified annex as necessary.

*Freedom of Information Act (FOIA) Backlog.*—The agreement provides $10,000,000 to address the FOIA backlog. Within 90 days of the date of enactment of this Act, the Department shall submit to the Committees a report on the status of the FOIA backlog, its efforts to ensure

that FOIA reading room and information requests continue, and how the Privacy Office is using generative artificial intelligence and automation technologies to streamline the process and reduce the backlog.

Office of the Citizenship and Immigration Services Ombudsman

*Federal Employment Separation Data.*—DHS is directed to brief the Committees, not later than 60 days after the date of enactment of this Act, providing the full number of Federal civilian employees in service at the Office of the Citizenship and Immigration Services Ombudsman (CISOMB) on January 20, 2025, including those in full and part-time status, along with the full number of employees separated from service since January 20, 2025, through enactment. The brief will further provide metrics for measuring performance of statutorily required functions at a PPA level and the number of:

(1) terminated probationary employees categorized as new to government or recently promoted;

(2) employees placed on administrative leave;

(3) employees who participated in the Deferred Resignation Program;

(4) employees voluntarily separated and received separation incentives or early retirement payments;

(5) employees separated through formal Reduction in Force plans; and

(6) employees utilizing optional immediate retirement, categorized by department, pay plan, grade, occupational classification and duty-station location beginning January 20, 2025.

*Citizenship and Immigration Services Ombudsman Reporting Requirements.*—Not later than 90 days after the date of enactment of this Act, and quarterly thereafter, the Department is directed to brief the Committees on its hiring process including a breakdown of how the office intends to allocate fiscal year 2026 funds to each of the following divisions Executive, Casework, Policy, Public Engagement, Strategy, and Operations. CISOMB is directed to include information about progress made in appointing regional representatives. The briefing shall also include the staffing levels for each of the divisions and regions mentioned above. The briefing shall also include the following information on case requests from the date of enactment up until the briefing:

(1) the total number of requests received;

(2) the number of requests received or sent to USCIS within 30 days of receipt;

(3) the number of public stakeholder engagement events conducted;

(4) the total number of requests outstanding by CISOMB; and

(5) a detailed plan for replying to requests for case assistance within a timely manner.

### PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

The agreement provides $8,911,000 for the Office of Health Security for the Medical Information Exchange.

## MANAGEMENT DIRECTORATE

### OPERATIONS AND SUPPORT

The agreement provides $1,690,380,000 for Operations and Support.

*Congressional Requests for Information Tracking Software.*—The agreement provides $1,000,000 for the procurement of a consolidated system to better equip the Chief Financial Officer (CFO) to track and provide oversight of outstanding briefing or information requests that the Committees have made to the Department or a component. Not later than 60 days after the date of enactment of this Act and monthly thereafter, the Department is directed to brief the Committees on the status of all outstanding responses to requests for information, briefings, and overdue reports and briefings stemming from statutory or report requirements. This briefing shall include representatives from each DHS component with outstanding responses due to the Committees. Each representative shall provide detailed information on the current status of each overdue requirement and the expected date of delivery.

*Fiscal Year 2027 Budget Justification.*—The CFO is directed to ensure that fiscal year 2027 classified and unclassified budget justification materials for all components are submitted concurrent with the President's budget submission to Congress. The agreement continues the requirements under "Fiscal Year 2025 Budget Justification" as detailed in Senate Report 118–85 for fiscal year 2027.

*Hiring in Rural Communities*.—Not later than 90 days after the date of enactment of this Act, the Department shall provide a report to the Committees on the challenges of recruiting and retaining Federal employees in non-contiguous and rural states, and including discussion of Native American, Alaska Native, and Native Hawaiian populations. The report shall also provide an assessment of the effect these vacancies have on the ability of components to accomplish their statutory and administrative responsibilities and shall specifically describe steps the Department has taken to address the identified challenges.

*Homeland Advanced Recognition Technology (HART) System.*— In addition to the requirements in the House Report under this heading, the Department shall provide the Committees with similar updates regarding the Automated Biometric Identity System (IDENT). The Department shall also continue the disclosure of technologies, data collection mechanisms, and sharing agreements among Department agencies, other Federal, state, local, and foreign law enforcement agencies, and fusion centers as it relates to the development of the HART biometric database. In cases where the Department relies on information obtained through the HART database or through Department of State foreign intelligence sharing to separate a minor child from a parent, primary caregiver, or close relative who is caring for or traveling with that child, the Department shall report this incident to the OIG and CRCL within 24 hours of the separation, unless the separation was a result of an adult posing a danger to a minor, the adult has serious criminal history, or if the parental or custodial relationship cannot be verified.

*Hiring Plans*.—Within 60 days of the date of enactment of this Act, the Chief Human Capital Officer, in consultation with the CFO, is directed to brief the Committees on projections, by component, for hiring goals associated with funding from Public Law 119–21, to include how new positions will be tracked and transferred between appropriations provided by this Act and appropriations provided by Public Law 119–21.

*Office of Biometric Identity Management (OBIM)*.—The agreement includes $271,000,000 for OBIM. OBIM is directed to continue briefing the Committees on a semiannual basis on its workload, service levels, staffing, modernization efforts, and other operations. Any proposal to transfer the functions of OBIM shall include a detailed plan accompanied by a briefing that demonstrates how the Department will disburse OBIM functions and provide a seamless transfer of biometric identity functions in service of the Department and its mission partners.

*Office of Program Accountability and Risk Management (PARM) Dissolution.*—The agreement maintains funding for PARM and does not include the proposed transfer of the Office to the Immediate Office of the Undersecretary for Management. If the Department proposes dissolution of PARM in fiscal year 2027, the agreement directs the Department to provide a plan that details the transfer of the responsibilities performed by PARM to other entities, including the oversight of contracting activities. The written plan shall be accompanied by a brief that confirms what entities will provide oversight for each Major Acquisition Oversight List Level One or Level Two program.

*Public Reporting on Final Spend Plans.*—Within 60 days of the date of enactment of this Act and quarterly thereafter, the Department shall publicly post spend plans. At a minimum, the report shall include the purposes and amounts at the PPA level, identify the sources of funds, and reflect final decisions from all reprogramming and transfer actions executed under the authorities provided by section 503 of this Act.

*Science, Technology, Engineering, and Mathematics (STEM) Hiring.*—The agreement directs the Department to provide a briefing not later than 120 days after the date of enactment of this Act on actions taken to streamline pathways for qualified STEM graduates, including any updates to guidance, training, or public-facing materials.

*Small Unmanned Aircraft Systems (sUAS) Procurement.*—For any acquisition using funds provided in this Act, the Department is directed to require certification of review of the industry alert and completion of a risk assessment that considers the proposed use of ~~the~~ foreign-made UAS.

*Technology Modernization Fund (TMF) Reporting.*—The agreement directs the Department to provide notice to the Committees when the Department or a component submits an initial project proposal to the Technology Modernization Board. If a proposal from the Department or component is accepted, the Department shall provide the Committees a briefing on the project and the plan for reimbursing the TMF, including identifying the projected cost savings, within 20 business days of acceptance.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

The agreement provides $58,106,000 for Procurement, Construction, and Improvements. This includes $25,000,000 to support development efforts in OBIM, $16,000,000 for Financial Systems Modernization, $8,434,000 for One Net, $3,400,000 for Counter Unmanned Aerial Systems operations at National Special Security Events, $3,272,000 for the DHS Data Framework, and $2,000,000 for Human Resources Information Technology.

## INTELLIGENCE, ANALYSIS, AND SITUATIONAL AWARENESS

### OPERATIONS AND SUPPORT

The agreement provides $340,819,000 for Operations and Support, of which $121,274,000 is made available until September 30, 2027. The agreement includes $6,000,000 for 2026 FIFA World Cup and America250 activities and $8,417,000 for counter fentanyl activities.

*Continuation of Reporting Requirements.*—For the next five years, the Department, in coordination with the FBI, shall continue to produce reports first required under section 5602 of Public Law 116–92. Each report shall be provided to the Committees in addition to any other committees receiving the report.

*Cyber Harassment Threat Assessment.*—Within 180 days of the date of enactment of this Act, the Department shall develop and publicly disseminate a threat assessment on the use of cyber harassment by terrorists and foreign malign actors.

*Intelligence Expenditure Plan.*— The agreement continues the requirement under this heading in Senate Report 118–85, to include through fiscal year 2026.

*State Judicial Security.*—The agreement directs the Office of Intelligence and Analysis (I&A) to work with fusion centers to draft and implement a plan to increase outreach to stakeholders, as appropriate, to ensure that intelligence and threat information impacting Federal and state employees is shared to the extent possible, and to brief the Committees on such plan within 180 days of the date of enactment of this Act.

## OFFICE OF INSPECTOR GENERAL

OPERATIONS AND SUPPORT

The agreement provides $257,599,000 for Operations and Support, including: $5,430,000 for Zero Trust Network Architecture, $20,000,000 for additional inspections and oversight of detention facilities, and $12,814,000 for oversight of the execution of funds provided in Public Law 119–21.

*Deputization of Federal Law Enforcement for Immigration.*—The Inspector General shall report to the Committees within 60 days of the date of enactment of this Act on collaboration with other Inspectors General on oversight of immigration enforcement including with, but not limited to, DoD and DOJ. The report shall include the number of law enforcement officers from each agency that have been deputized, the immigration enforcement authorities they are operating under, and the length of their details.

*Supplemental Reconciliation and Detention Funding.*—The Inspector General shall brief the Committees not later than 90 days after the date of enactment of this Act on oversight plans for detention and for funding provided in Public Law 119–21, including how the resources provided in this Act will be executed in support of those oversight activities. The agreement further directs the Inspector General to provide to the Committees not later than 60 days after the date of enactment of this Act all unfunded requirements to conduct oversight of the funding provided in Public Law 119–21.

TITLE I—ADMINISTRATIVE PROVISIONS

Section 101. The agreement continues a provision requiring the Inspector General to review grants and contracts awarded by means other than full and open competition and report the results to the Committees.

Section 102. The agreement continues and modifies a provision requiring the CFO to submit monthly budget execution and staffing reports within 30 days after the close of each month.

Section 103. The agreement continues a provision requiring the Secretary, in conjunction with the Secretary of the Treasury, to notify the Committees of any proposed transfers from the

Department of Treasury Forfeiture Fund to any agency at DHS. No funds may be obligated prior to such notification.

Section 104. The agreement continues a provision related to official travel costs of the Secretary and Deputy Secretary.

Section 105. The agreement continues and modifies a provision requiring the Under Secretary for Management to provide quarterly briefings on acquisition information to the Committees.

Section 106. The agreement continues a provision restricting the use of funding for certain pilot programs unless the Secretary submits specified information to the Committees related to the program's goals, metrics, and implementation plan.

Section 107. The agreement includes a new provision related to the collection of intelligence.

Section 108. The agreement includes a new provision related to Inspector General oversight.

Section 109. The agreement includes a new provision related to the procurement, deployment, and operations of body-worn cameras.

# TITLE II—SECURITY, ENFORCEMENT, AND INVESTIGATIONS

## U.S. CUSTOMS AND BORDER PROTECTION

### OPERATIONS AND SUPPORT

### (INCLUDING TRANSFER OF FUNDS)

The agreement includes $17,727,974,000 and within the total amount provided, the bill makes $550,000,000 available until September 30, 2027, to provide limited flexibility for certain activities.

*Compliance With National Standards on Transport, Escort, Detention, and Search (TEDS).*—The agreement reaffirms and directs CBP to comply with the agency's National Standards on TEDS policy when encountering an alien, including in the field and prior to their processing at a holding station or facility. The agreement further reaffirms and directs that aliens encountered at the southwest border should be expeditiously processed and not forced to wait outside for extended periods of time. CBP shall provide notice to CRCL within 24 hours if the agency holds aliens outside for more than 12 hours. CBP shall provide adequate shelter, water, food, sanitation, medical care, and other necessities and prioritize expeditious processing; the agency should take special care to comply with this requirement when aliens face severe weather or experience medical emergencies in the field.

*Developing and Using Predictive Analytics.*—The agreement directs CBP to provide, within 45 days of the date of enactment of this Act, a list of all analytic and modeling capabilities at the agency, a description of the data provided by those capabilities, how CBP currently uses that data, and any plans to expand that use. Further, CBP shall provide a briefing within the same timeframe to the Committees with a plan to incorporate the data output from analytic and modeling investments into reporting requirements in fiscal year 2026 and budget justifications for fiscal year 2027.

*Digital Forensics.*—The agreement provides $5,000,000 for enhanced digital forensics capabilities including on-site data extraction, data recovery, decryption, and analysis. Not later than 90 days after the date of enactment of this Act, CBP is directed to brief the Committees on the status of this effort.

*Electronic Device Searches.*—The agreement continues to require CBP to publish annually and make publicly available on its website data pertaining to searches of electronic devices the number of instances, delineated by the nationality (to include U.S. persons) and initial country of departure, in which CBP personnel:

(1) accessed the digital contents of any electronic equipment belonging to or in the possession of an individual;

(2) accessed the digital contents of an online account, including social media handles and cloud-based accounts;

(3) requested consent to access the digital contents of any electronic equipment belonging to or in the possession of a U.S. person, delineated by whether permission was granted;

(4) requested a U.S. person to consensually disclose a credential that would enable access to the digital contents of electronic equipment of such person, delineated by whether the credential was disclosed;

(5) detained an individual for refusing to disclose or provide consent to access the digital contents of any electronic equipment belonging to them or in their possession, delineated by whether the individual was a U.S. person and including the length of time the individual was detained, and aggregate data regarding the race and ethnicity of individuals; and

(6) searched an electronic device at the request of a Federal, SLTT, or foreign governmental entity, including another component of the Department, or disclosed to such entity information from any searched device.

*Emergency Driving and Vehicular Pursuits.*—The agreement directs CBP to provide a report within 180 days of the date of enactment of this Act, on the following:

(1) the number of vehicular pursuits over the last three fiscal years, disaggregated by component, reason for pursuit initiation, reason for pursuit termination, pursuit disposition, location, duration, distance, maximum speed, use of force, involvement of other agency/organization, injuries, and fatalities;

(2) a detailed description of all training curriculum and materials relating to CBP Directive No. 4510–026B, any updates or modifications thereto, and statistics on the training of personnel to date;

(3) a detailed description of the Vehicular Pursuits Review Committee(s) including membership, frequency of meetings, number of incident reports reviewed to date disaggregated by fiscal year, and outcomes of the reviews;

(4) a detailed description of review and compliance assessments by the National Use of Force Review Board and Local Use of Force Review Boards regarding vehicular pursuit incident reports, including the number of incident reports reviewed in the previous fiscal year and outcomes of the reviews; and

(5) all final reports of investigations by the CBP Office of Professional Responsibility relating to emergency driving or vehicular pursuits. Each of these records shall be made available to the public with appropriate redactions not later than 90 days after the date of submission to the Committees.

*Independent Verification & Validation (IV&V).*—Not later than 90 days after the date of enactment of this Act, the Commissioner shall submit a plan to utilize IV&V resources for each level 1, 2 and 3 major acquisition program. Not later than 30 days after each quarter, the Commissioner shall provide a briefing to the Committees that includes the following:

(1) a listing of each level 1, level 2, and level 3 major acquisition program;

(2) acquisition programs that have IV&V resources assigned; and

(3) a summary of the findings of any IV&V activities or an explanation for why no such verification and validation has been performed.

*Integrating Budget Requests.*—The agreement continues its direction to CBP to include with any requests for new funds a description of other programs the investment is expected to impact and a description of the anticipated impact. This should apply to both internal CBP impacts and impacts across other DHS components. The agreement directs CBP to provide a plan and a briefing within 60 days of the date of enactment of this Act on how the agency will comply with this requirement.

*International Training and Assistance Programs.*—CBP is directed to provide a briefing to the Committees not later than 180 days after the date of enactment of this Act, on technical training and assistance to build the border security and customs capacity of foreign law enforcement agencies, including which countries and law enforcement agencies CBP provided such training to and the type of training provided.

*Northern Border Strategy and Resources.*—Not later than 90 days after the date of enactment of this Act, and quarterly thereafter, Border Patrol and the Office of Field Operations (OFO) are directed to brief the Committees on efforts to address northern border staffing issues, alien encounters, drug seizures, and northern border operations. At a minimum, the brief shall include information on staffing levels at each sector, a review of both Border Patrol and OFO's table of organization in light of changing levels of activity along the northern border, and actual staffing levels compared to projected requirements. For Border Patrol, the brief shall include border security technology requirements and investments made and planned to include increased reliance on autonomous systems. Additionally, the brief shall address challenges for telecommunications and signal transmission posed by mountainous areas. Further, the agreement directs CBP to assess the technological needs across the northern border and provide a report within 180 days after the date of enactment of this Act on its plan to address these needs. For OFO, the brief shall include data on any changes in hours of ports of entry, to include an explanation for why those hours were changed and how OFO assesses future changes. Finally, the agreement continues the requirement for CBP to notify the Committees should CBP determine that it is necessary to divert more than 10 percent of staffing in any sector or field office along the northern border to other assignments along the southwest border or other ports of entry. The notification shall occur within 15 days of deployment and include the number and location of the personnel diverted, any operational impacts on the sector, the duration of the diversion, and when the personnel shall return to their posts.

*Polygraph Flexibility and Law Enforcement Suitability Analysis.*—Not later than 180 days after the date of enactment of this Act, CBP shall brief the Committees on the number of CBP Law Enforcement applicants eligible for a polygraph waiver, the number of waivers granted, and the impact on hiring. The agreement also directs CBP to submit a report on the effectiveness of Law Enforcement Pre-Employment Test polygraph examinations within 90 days of the date of enactment of this Act. The report shall again include data comparing CBP's failure rates to those of other Federal law enforcement agencies; a list of admissions elicited during polygraph tests since CBP implemented a mandatory polygraph test requirement; details regarding the total and annualized number of such admissions and types of admissions; and an assessment of this test compared to the Law Enforcement Pre-Employment Test certified by the

National Center for Credibility Assessment. This assessment shall include a detailed analysis of the effectiveness of both tests.

*Prison Rape Elimination Act (PREA).*—The agreement directs CBP to post on its website within 60 days of the date of enactment of this Act a schedule for achieving 100 percent compliance with PREA requirements. In addition, the agreement urges CBP to examine options to provide PREA training to relevant agency staff and personnel during their onboarding process and to maintain annual training.

*Recruitment, Hiring, and Retention.*—Within 90 days of the date of enactment of this Act, CBP shall brief the Committees on its efforts to improve hiring and retention at all of its law enforcement components, including existing and planned strategies and initiatives to accomplish this goal. CBP shall prioritize and continue efforts to use available incentives to recruit and retain employees in rural and remote areas and explore other strategies, such as innovative pilot programs that include successful strategies from the private sector, career path enhancements, alternative schedules, and workforce support programs for employees who are willing to choose such locations. CBP shall ensure that staff are trained on recognizing signs of trauma exposure, understanding common behaviors of people exposed to trauma, and trauma-informed practices. The agreement directs CBP to review existing Federal assessment programs, such as USA Hire, for use within the agency. Additionally, the agreement directs the Commissioner to submit a report within 120 days of the date of enactment of this Act detailing the impact that mental health hours, alternative work schedules, on-duty physical fitness, and other related incentives have on personnel morale, recruitment, and retention. The report should also include such policies' impact on CBP's ability to achieve its national and economic security mission at 24-hour ports of entry.

*Reporting Requirements for Deaths in Custody.*—CBP shall continue to provide the data required in House Report 116–180 regarding deaths of individuals in custody.

*Tracking the Use of Warrants in Arrests.*—The agreement directs CBP to report within 45 days of the date of enactment of this Act, and quarterly thereafter, on the number of warrantless arrests it conducts and in how many of those arrests CBP had established probable cause that the arrested individual was in fact undocumented and determined they pose a flight risk.

*Transportation Checks and Roving Enforcement.*—The agreement directs CBP to continue to collect and semiannually report to the Committees data pertaining to Border Patrol transportation and immigration checkpoints. The report shall exclude law enforcement sensitive information and include necessary redactions of all personal and identifying information about specific individuals. The report shall include, at a minimum, the total number of patrol stops made by CBP personnel during transportation checks and a description of the boarding of public conveyances by CBP personnel at air, maritime, and land environments, including ports and terminals. Additionally, the report shall include the following information when an arrest is made: the total number of arrests by location; the total number of use-of-force incidents during an arrest by location; the citizenship status of any individual arrested; and the total amount of drugs, currency, and firearms seized as a result of transportation checks. The report shall also include the following information pertaining to immigration checkpoints: the location of all tactical and permanent checkpoints that were in operation for any period of time; the total number of arrests by location; the total number of use-of-force incidents during an arrest by location; the citizenship status of subjects stopped or arrested following secondary inspection at checkpoints; and the total amount of drugs, currency, and firearms seized at checkpoints.

## Border Security Operations

*Border Barrier Updates.*—Not later than 60 days after the date of enactment of this Act, and quarterly thereafter, the Commissioner is directed to brief the Committees on the status and plans for border barrier construction to include wall system attributes, other tactical infrastructure including, but not limited to, roads, lighting, and technology associated with barrier construction. The report shall include:

(1) total funds obligated since January 2021 by project and Border Patrol sector;

(2) total funds planned for obligation by project, including number of miles and type of barrier, and Border Patrol sector;

(3) a description of the type of project, to include, at a minimum, the amounts obligated and outcomes for each of the following:

(a) construction of new barriers, replacement of existing barriers, or closure of gaps;

(b) installation of gates;

(c) linear ground detection capabilities; and

(d) activities necessary to address life, safety, environmental, or other remediation requirements; and

(4) data that describes the operational impact resulting from the border barrier and related investments and how it impacts other programs at CBP, e.g., border surveillance technology, air and marine capabilities, and personnel.

*Border Patrol Hiring.*—The agreement sustains 22,000 Border Patrol Agents. Not later than 90 days after the date of enactment of this Act, CBP shall brief the Committees on its plans to address hiring and retention challenges, including academy attrition, ~~and its plans to use any projected surplus personnel funding for recruitment and retention incentives.~~ Additionally, the brief should also address a timeframe for bringing onboard the additional agents, how additional agents hired will impact the total number of agents on the northern border, and how CBP is changing policies to ensure appropriate oversight of Border Patrol activities.

*Border Patrol Supervisor Staffing.*—The agreement directs CBP to report quarterly on:

(1) the number of supervisory agents assigned at headquarters, each sector, and each station;

(2) the number of agents assigned to administrative and non-enforcement positions;

(3) the number of agents assigned to intelligence positions; and

(4) the number of agents assigned to task forces.

*Counter-UAS (cUAS) Operations.*—CBP, in coordination with I&A, shall provide a briefing to the Committees not later than 120 days after the date of enactment of this Act outlining the current threats posed by the use of drones by transnational criminal organizations along the border, the resources necessary to deter this threat, and any authorities or resources that would allow for CBP to better interdict and deter narco-drones, including consolidation of the existing concepts of operations (CONOPS) in southwest border sectors into a single CONOPS overlaying the entire southwest land border.

*Multiple-Use Public Lands on the Southwest Border.*—Within 120 days of the date of enactment of this Act, CBP shall provide a briefing to the Committees, in coordination with DoD, on the multiple-use public lands along the southern border that have been transferred to DoD. The briefing shall include:

(1) the level of collaboration between CBP employees with law enforcement and

immigration enforcement authorities and DoD;

(2) the division of responsibilities for patrolling the National Defense Area between CBP and DoD personnel; and

(3) summaries of any encounters between CBP employees in the National Defense Area and U.S. citizens or any other individuals lawfully present in the United States.

*Non-Mission Duties*.—Not later than 30 days after the date of enactment of this Act, CBP shall submit to the Committees a detailed report which shall include:

(1) the total number of CBP agents or officers carrying out non-mission duties;

(2) identification of the funding source associated with non-mission duties;

(3) the rationale for CBP personnel to perform non-mission duties and the duration they are expected to perform those duties;

(4) a detailed description of all training required for CBP agents and officers to carry out the non-mission duties; and

(5) identification of any impacts to CBP's mission due to agents and officers carrying out non-mission duties. The report does not need to include CBP personnel on temporary duty (TDY) assignment within CBP but shall include TDY assignments to other DHS components and executive branch departments.

*Reporting on Prosecutions for Improper Entry and Reentry*.—Within 60 days of the date of enactment of this Act, CBP in coordination with ICE and USCIS, shall make publicly available the following records and data on improper entry and reentry prosecutions redacted only to the extent required by FOIA:

(1) policy guidance currently in use regarding referrals for prosecutions;

(2) numbers of individuals referred for prosecution, broken down by sector; and

(3) numbers of individuals referred for prosecutions who are charged and sentenced.

Data shall also include whether the individual has claimed asylum, country of origin, race, and justification for referring each individual for prosecution for improper entry and or reentry offenses. In addition, the Department shall provide the Committees with CBP's latest Consequence Delivery System guidance, in both unredacted and redacted (consistent with FOIA) versions, and promptly update with any changes made.

*Short Term Detention*.—CBP shall continue to follow the directives in the explanatory statement accompanying Public Law 116–260 related to Holding Facility Length of Stay and

Short-Term Detention, as well as the directives in House Report 116–458 on Initial Health Screenings, High-Priority Populations, Medical Equipment and Personnel, Access to Water and Food, Holding Facility Standards, Consumables, Child Welfare Professionals, Families in Custody, Personnel Training, Migrant Property, and Migrants-Safety. Additionally, within 90 days of the date of enactment of this Act, the Commissioner shall provide a report to the Committees on infrastructure changes, training protocols, and other investments to ensure the safe, humane, and orderly processing of single adults, families, and unaccompanied children in CBP custody, in compliance with the TEDS as well as the Flores Settlement.

*Workload Staffing Model for Between the Ports.*—Within 30 days of the date of enactment of this Act, CBP shall provide a briefing to the Committees on the status of their work that demonstrates the impact, with data, that existing and potential resources are expected to have on personnel needs. Further, the agreement directs CBP to prioritize completion of the staffing model within fiscal year 2026. CBP shall brief the Committees within 60 days of the date of enactment of this Act on plans to meet this deadline to develop and use such a model. Within 90 days of the date of enactment of this Act, CBP shall provide a report to the Committees detailing the model and the process that CBP used to create and validate the model. The report shall include descriptions of:

(1) steps and associated timelines taken to create the model and resources used to develop it;
(2) data sources and methodology used to generate the model;
(3) actions taken to independently verify the model, including on the following dimensions: data source analysis and findings; variables and assumptions; processes, information, distribution, and reporting; advanced analytics; and probability and risk analysis;
(4) an inventory of Border Patrol technology assets and how those assets and their capabilities inform workload staffing requirements; and
(5) a plan for periodically updating and improving upon the model, including a plan for incorporating planned technology investments and associated, including changes in programs and processes, air and marine assets, and deployment of additional surveillance technologies.

Trade and Travel Operations

*Access to Counsel at Ports of Entry.*—Within 90 days of the date of enactment of this

Act, the agreement directs CBP to provide a briefing on the requirements to ensure that individuals with lawful travel documents are given a meaningful opportunity to consult with counsel and/or an interested party within one hour after entering CBP's secondary or deferred inspection. In identifying the requirements, CBP should assume that the counsel and interested party shall be allowed to advocate on behalf of the individual and, to the greatest extent practicable, be allowed to appear in person at the secondary or deferred inspection site. Individuals for the purpose of this section shall include a national of the U.S.; an immigrant lawfully admitted for permanent residence who is returning from a temporary visit abroad; an individual seeking admission as an immigrant in possession of a valid unexpired immigrant visa; an individual seeking admission as a nonimmigrant in possession of a valid unexpired nonimmigrant visa; a refugee; a returning asylee; or an individual who has been approved for parole.

*Advanced Electronic Data (AED)*.—Within 180 days of the date of enactment of this Act, CBP shall provide a report to the Committees on the implementation of the AED initiative. This report must include:

(1) total volume received by United States Postal Service (USPS) and volume containing AED;

(2) the volume received by country containing AED;

(3) number of packages CBP requests to screen and the number actually tendered by USPS;

(4) reports on the number of goods seized during blitzes on Mail Facilities; and

(5) volume received from countries exempted from AED by CBP.

*Agricultural Inspections*.—CBP shall continue working with the U.S. Department of Agriculture (USDA) to better leverage existing staff in addressing the agricultural inspection workload, such as through the authorization of additional work hours or dual certification.

*Assessing Options for Fishing Vessels Crew*.—To mitigate the impacts from restricting crewmen entry associated with the federally managed longline fishing fleet based out of Hawaii, as well as countering illegal, under-reported, and unregulated fishing by foreign fleets including China, the agreement directs CBP to assess options for a limited or temporary use of authority to allow for the entry of designated crewman via air travel and transfer to their place of employment onboard longline fishing vessels and provide a list of options to the Committees within 90 days of the date of enactment of this Act.

*Border Security Deployment Program (BSDP).*—The agreement includes not less than $33,600,000 to maintain and modernize the BSDP system infrastructure. The agreement directs CBP to provide a briefing within 90 days of the date of enactment of this Act on efforts to modernize and expand this system at land ports of entry (LPOEs).

*Cannabis Seizures.*—Within 120 days of the date of enactment of this Act, CBP shall provide to the Committees a briefing on cannabis seizures to include products containing cannabis or related paraphernalia that are possessed, sold, or transferred by a cannabis distributor in compliance with applicable state or tribal law and regulations.

*CBP Home Mobile Application.*—Within 120 days of the date of enactment of this Act, the agreement directs CBP to provide the following information on the use of the CBP Home mobile application:

(1) current uses of the application to include purpose, users, and data collected and/or shared through the application;

(2) a list of the agencies and programs that have access to the data (including sharing of data) and the reason the data is shared with that agency; and

(3) plans for any changes to the use of the application. Any such changes shall be reported to the Committees prior to execution of such change.

*Combatting Forced Labor.*—The agreement directs CBP to allocate not less than fiscal year 2025 levels to forced labor enforcement capabilities and to continue to support implementation of the Uyghur Forced Labor Prevention Act (UFLPA) (Public Law 117–78) and support additional personnel, technological capability, training, and other activities to faithfully implement the law and protect U.S. consumers from products tainted by forced labor and reduce unintended impacts on supply chains. Within 60 days of the date of enactment of this Act, CBP shall provide a briefing to the Committees on implementation of the UFLPA, including an update on addressing the challenge of transshipment of Xinjiang Uyghur Autonomous Region-related goods, the tools and technology CBP deploys to enhance enforcement of the law, steps to coordinate international engagement to prevent bifurcated supply chains or dumping grounds for the products of forced labor, the obstacles to enforcing UFLPA in cases of rail, road, and air transportation, and CBP engagement with shippers to ensure timely but full review of shipments flagged for review.

*Data on Asylum Seekers.*—The agreement directs OFO to continue to produce a monthly report detailing for each preceding month: the POEs along the southwest border at which queue management or metering practices have been employed; the number of asylum seekers processed at each such POE; and the number of asylum seekers turned away. The report shall include whether CBP is engaging in queue management and if so, are capacity and resource constraints leading to or requiring the implementation of queue; recommendations for alleviating such capacity and resource constraints at POEs; and any agreements or arrangements between CBP, or the Federal Government, and Government of Mexico authorities involving efforts to restrict the number of potential asylum seekers that can access a POE prior to entering the United States. Further, the agreement directs CBP to include within its monthly southwest migration reports data detailing the number of individuals claiming fear or attempting to claim a fear of return to their home country, in addition to, and separate from, its monthly apprehension and inadmissible statistics. The data should include individuals presenting at both POEs and between POEs claiming credible fear as a separate, distinct category from either the monthly "apprehensions" or "inadmissibles" statistics.

e

management

*E–Cigarettes.*—The agreement directs CBP to allocate not less than $5,000,000 to improve coordination between OFO and the Food and Drug Administration (FDA) with respect to the multi-agency work on illegal e-cigarettes. Specifically, the agreement directs CBP to:

(1) improve its coordination with the FDA, as part of the multi-agency task force on illegal e-cigarettes;

(2) increase the number of random joint inspections at POEs and targeted inspections of entries by known manufacturers, brokers, and importers of illicit e-cigarettes;

(3) increase the number of field examinations at POEs with high import volumes to target manufacturers, importers, and brokers known to engage in illicit activity; and

(4) improve screening systems, including risk-based analytics tools, including through additional training for field staff, to detect mis-declared e-cigarette imports.

*Environmental Crimes Enforcement.*—Within 120 days of the date of enactment of this Act, CBP shall provide a briefing to the Committees on the activities and resources applied towards the enforcement of the Lacey Act amendments of 2008, which help address international deforestation and combat the trade of illegal wildlife and timber products. The briefing shall include efforts by CBP to assist USDA's Animal and Plant Health Inspection Service with the

electronic collection of data as well as continued consultations with trading partners, importers, exporters, and other interested groups as the provisions of the Act are fully implemented. Additionally, CBP shall provide the Committees a briefing within 90 days of the date of enactment of this Act on actions and funding to combat illegal, unreported and unregulated fishing-related activities relating to the illegal timber trade.

*Foreign Trade Zones (FTZ)*.—The agreement provides $1,000,000 for FTZ-dedicated regional staffing. Within 120 days of the date of enactment of this Act, CBP shall provide a briefing on the current state of FTZs, the number and type of CBP personnel supporting FTZ work, and their subsequent time allocations spent on FTZ operations, including activation and ongoing compliance checks, the performance measures used to evaluate the impact of FTZs, the level of support provided by CBP, and plans for expanding FTZs. Additionally, CBP shall include with the briefing a plan for incorporating requirements relating to FTZs in the OFO Workforce Staffing Model.

*Identifying Fentanyl Analogues and Related Substances at the Southwest Border*.—CBP shall identify the specific types of fentanyl analogues and fentanyl-related substances, as defined by Public Law 116–114, it encounters at POEs. The Commissioner shall include the totals of fentanyl analogues and fentanyl-related substances, in addition to the other controlled substances for which it reports data in its drug seizure statistics, and make such information publicly available not less than monthly. The agreement directs CBP to continue to pursue and rapidly deploy innovative and proven border technology to detect, interdict, and deter the flow of illicit drugs, including fentanyl, carfentanil, and heroin. Within 120 days of the date of enactment of this Act, CBP shall provide a briefing to the Committees on how the agency tracks fentanyl data with the Drug Enforcement Administration and whether current capabilities allow for a comprehensive fentanyl tracking system, which includes documentation of seizure location, chemical composition, probable or known manufacturing location, and probable or known point of entry into the United States, if applicable.

*Imported Wood Products*.—The agreement directs CBP to provide a report to the Committees not later than 180 days after the date of enactment of this Act detailing CBP's current role in the wood importation declaration process, how it interacts with other agencies, and concrete steps the agencies can take to expedite shipments that are delayed.

*International Mail and Express Consignment Facilities.*—Previously provided funds and funds provided in this Act shall be made available to reduce the entry of scheduled narcotics and other illicit and restricted drugs (and their precursor materials) for facility improvements, detection and testing equipment upgrades, increased capacity for testing and storing illegal and regulated substances, interoperability improvements with FDA detection equipment, and innovative technologies that apply advanced analytics and machine learning capabilities.

*International Tourism.*—Within 90 days of the date of enactment of this Act, CBP shall provide a briefing to the Committees on travel data to the United States that covers fiscal years 2023 to 2025 and includes total number of visitors, mode of entry (air, land, sea POE) and total amount of immigration and customs fees collected. The Committees direct GAO, within 120 days of the date of enactment of this Act, to issue a report studying changes in travel to the United States and impacts on national, regional, and local economies and the tourism industry.

*Locality Payscale Flexibility.*—The explanatory statement accompanying Public Law 117–328 directed CBP to provide a report, in coordination with the Office of Personnel Management, on:

(1) an analysis of local pay scales and how those pay brackets impact recruitment and retention;

(2) an overview of agency authorities for adjusting pay; and

(3) recommendations to better align local pay with the costs of living to improve recruitment and retention. The agreement directs CBP to complete the aforementioned report not later than 30 days after the date of enactment of this Act.

*Port Baseline Service Level.*—Not later than 30 days after the date of enactment of this Act, the agreement directs CBP to provide each air, land, and sea port operator, including cruise terminals, with information on baseline service levels and take those service levels into consideration when acting on requests for facility and security improvements. CBP shall provide all future reports on a semi-annual basis. CBP shall brief the Committees not later than 90 days after the date of enactment of this Act on staffing shortages, requirements for facility and security upgrades, plans for technology recapitalization, and how CBP will negotiate with port operators and incorporate their feedback into the development of plans to address future facility and security needs. CBP shall work in partnership with seaports and refrain from imposing requirements on seaports in a unilateral fashion. Within the funds provided for Operations and

Support, CBP shall ensure adequate staffing at new and expanded maritime POEs in order to meet peak passenger wait time goals.

*Port Hours of Operation.*—Within 90 days of the date of enactment of this Act, CBP shall brief the Committees on all POEs operating under reduced hours due to COVID–19 restrictions, impacts on border security efforts, cross-border economic activity, and public safety, as a result of the reduced hours, actions taken to return to pre-COVID–19 levels of operation, and an assessment the feasibility of returning to pre-COVID–19 levels of operation. The briefing shall also include operating hours at all northern border LPOEs, and describe how CBP plans to improve the recruitment and retention of CBP personnel at remote northern border LPOEs to sustain those operating hours and to consider restoring them to pre-COVID hours. Additionally, to assist with the challenges relating to operating hours, the Committees direct CBP to establish a pilot program for the co-location of CBP and Canada Border Services Agency border agents at remote LPOEs to maintain border security and reduce costs. Finally, the agreement directs CBP to consult with elected officials at all levels, community members, and industry prior to making changes to hours of operation. CBP shall refrain from reducing the hours of operation at any LPOE unless CBP can demonstrate, after consultations with local elected officials, that the reduction in hours will not impede local or regional commerce or unduly impede local resident traffic.

*Port Runners.*—The recommendation provides $3,000,000 to continue demonstrations of less-than-lethal, energy-absorbing active vehicle barrier systems designed to deter, safely stop, and contain "port runner" vehicles at CBP POEs that have a history of port running to determine the scalability of the technology. Within 90 days of the date of enactment of this Act, CBP shall brief the Committees on plans to expand this effort.

*Preclearance.*—The agreement directs CBP to report to the Committees within 120 days of the date of enactment of this Act on the ongoing efforts to establish a customs and immigration pre-clearance facility at Montreal's Central Station to facilitate passenger rail service along Amtrak's Vermonter route, including by directly engaging State Departments of Transportation and providing biannual progress reports to relevant stakeholders and interested parties. The agreement expects CBP to re-engage in negotiations with international airports on expansions to the existing preclearance program by prioritizing airports that were previously identified for possible preclearance locations in 2015 and 2016 and that have the highest number

of travelers arriving in the U.S. each year as an opportunity for increased traveler volume, increased revenue, and new flight routes are dependent on the success of the program.

*Prevent Abduction Program.*—The International Child Prevention and Abduction Prevention and Return Act (P. L. 113–150) required CBP, in coordination with other Federal agencies, to establish a program to ensure children were not unlawfully removed from the United States in violation of a valid state court order. Within 180 days of the date of enactment of this Act, CBP is directed to report to the Committees on the status of the Prevent Abduction Program, created in support of Federal law that prohibits any one parent from removing a child from the United States with intent to obstruct another parent's custodial rights. The report shall include:

(1) the total hours of training CBP officers receive on the issue of international parental child abduction;

(2) the accumulative number of children enrolled in the program and the number of children enrolled in the preceding fiscal year;

(3) the number of children enrolled in the program who, despite their enrollment in the program, were removed at an air POE, if any; and

(4) identification of resources CBP might need to ensure children are not removed from the United States in violation of a valid state court order.

*Resource Allocation and OFO Workload Staffing Models.*—Any modifications to the Resource Allocation Model (RAM) shall be described at the field and office level in future budget submissions. Additionally, not later than 60 days after the date of enactment of this Act, CBP shall brief the Committees on resource and staffing shortfalls on the northern and southern borders compared to levels prescribed by the RAM for rail crossings and air, land, and sea POEs, including cruise ship terminals. Within 90 days of the date of enactment of this Act, the agreement directs CBP to report on an OFO workload staffing model to mitigate the impacts, including loss of economic output and jobs, and vehicular wait times at the busiest LPOEs. The agreement directs CBP to coordinate with the Department of Transportation to improve forecasting for staffing at U.S. ports and to consider both cargo and passenger screening requirements at maritime POE. CBP shall provide a briefing to the Committees within 120 days of the date of enactment of this Act on the projected "retirement cliff," steps the agency is taking to manage the risks associated with this loss in the workforce, and consequences to the agency's

operational capabilities, including data on impacts to trade, travel, and economic and security impacts.

*Sugar Inspection.*—The agreement directs CBP to coordinate with USDA's Agricultural Marketing Service as it implements directives contained in Senate Report 118–193. Within 60 days of the date of enactment of this Act, and quarterly thereafter, CBP shall brief the Committees on this effort, including any enforcement actions taken as a result of the aforementioned directives.

*Tariff Evasion.*—The agreement provides $5,000,000 to conduct operational demonstrations to further leverage private sector driven solutions that may aid with improving supply chain tracing, the classification of goods, trade revenue collection, and segmentation of shipments with high-risk for fraudulent customs declarations, tariff evasion, tariff fraud, or other violations of U.S. trade and customs laws. This may include supply chain traceability solutions that increase visibility into production supply chains explored under the Global Business Identifier (GBI) Test as well as other solutions that streamline operations, promote cargo security and compliance, and secure revenue owed. Not later than 180 days after the date of enactment of this Act, CBP shall brief the Committees on the results of this operational demonstration to expand the use of data analytics in tandem with GBI and other tests or pilots that CBP is conducting to counter trade-related violations.

Integrated Operations

*Air and Marine Operations Flight Hours.*—Not later than 90 days after the date of the enactment of this Act, CBP Air and Marine Operations (AMO) shall provide the Committees updated flight hour targets, by fiscal year, that account for the increased fixed and rotary-wing assets investments made by Public Law 119-21.

*Center for Air and Marine Drone Exploitation.*—The agreement provides $5,000,000 to sustain and expand a drone exploitation program within CBP AMO to counter threats posed by hostile Small Unmanned Aerial Systems (sUAS). The funds shall be used for data analysis, cybersecurity vulnerability assessments, and appropriate countermeasures. Within 180 days of the date of enactment of this Act, CBP, in coordination with the Science and Technology Directorate, shall brief the Committees on the program's progress.

*DHC–8 Multi-Mission, Fixed-Wing Aircraft.*—The agreement provides $42,000,000 to accelerate the upgrade of DHC–8 aircraft to replace obsolete equipment with new digital avionics, mission radios, an integrated communication system, and an enhanced software package.

*Long-Endurance Unmanned Aircraft Systems (UAS).*—The agreement provides $5,000,000 for technical and operational demonstrations of additional unmanned aircraft with capabilities equivalent to Group 4 and 5, including multi-mode radar surveillance payloads and the necessary support equipment for integration into the national airspace system for CBP operations to enhance interdiction efforts, reduce operational costs, and increase continuous aerial surveillance of high-risk areas. CBP AMO is directed to provide a briefing not later than 180 days after the date of enactment of this Act on the deployment plan, cost-benefit analysis, and performance metrics associated with the operational demonstration.

*Northern Border Mission Center.*—The agreement provides $6,000,000 for the Northern Border Mission Center to improve northern border air and maritime domain awareness and coordinate with key partners across DHS and other Federal agencies.

*Persistent Maritime Domain Awareness (MDA).*—The agreement directs AMO to continue to work with the CBP Innovation Team (INVNT) and with industry partners to conduct a persistent, long-duration MDA demonstration in an area where illicit maritime activity is known to be concentrated.

## Enterprise Services

*Artificial Intelligence (AI).*—Not later than 120 days after the date of enactment of this Act, CBP is directed to brief the Committees on the potential use of commercially available purpose-built cybersecurity for AI. The brief shall address the use of generative AI or large language models and what, if any, new challenges to cybersecurity these new capabilities introduce into CBP operations. Within 180 days of enactment of this Act and semi-annually thereafter, the CIO and Chief Artificial Intelligence Officer of CBP shall brief on the current AI inventory and its resource requirements, costs associated with operating and maintaining AI technology, and the operational impacts those technologies have helped realize across all of CBP. Not later than 270 days after the date of enactment of this Act, CBP shall brief the

Committees on the potential to use AI while processing data at the edge to enhance border security operations, including enhancements for small object detection and motion detection to improve situational awareness.

*Encryption.*—The agreement provides $3,500,000 to expand the use of Post-Quantum Cryptography (PQC) for operational use, to include testing one-time pad-based encryption system utilizing true random entropy generation and changing symmetric keys to defend against quantum computer-driven hacking and intrusion threats.

*Workforce Care.*—The agreement provides a total of $84,293,000 for the sustainment of existing program operations and personnel, on-site clinicians, family support programs, CBP support networks, the expansion of employee holistic health support centers, and the deployment of Field Resilience teams consisting of Operational Psychologists and Field Resilience Specialists. Not later than 60 days after the date of enactment of this Act, CBP, in coordination with OHS, shall brief the Committees on an obligation plan for this funding. The report shall also provide an update on wellness and suicide prevention efforts, including existing and planned strategies and initiatives, and the accessibility of the Department's telemental health and employee ~~assistant~~ assistance pilot.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

The agreement recommends $222,886,000 for Procurement, Construction, and Improvements (PC&I), as included in the table below.

U.S. CUSTOMS AND BORDER PROTECTION
PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS
(in thousands of dollars)

| | Final Bill |
|---|---|
| Border Security Assets and Infrastructure | |
| Innovative Technology | 20,000 |
| Border Enforcement Coordination Network-ES | 12,014 |
| Small Unmanned Aircraft System (sUAS) | 10,000 |
| Counter Unmanned Aircraft Systems (C-UAS) | 10,000 |
| Trade and Travel Assets and Infrastructure | |
| Non-Intrusive Inspection Fentanyl Initiative - Outbound | 30,000 |
| Electronic Export Manifest Capability - Outbound | 10,000 |
| Integrated Operations Assets and Infrastructure | |
| Aircraft Sensor Upgrades | 6,500 |
| U.S. Border Patrol V-Hull | 2,400 |

| | |
|---|---|
| All-Weather Interceptor | 6,000 |
| Construction and Facility Improvements | |
| Office of Field Operations Facilities | 65,281 |
| Mission Support Assets and Infrastructure | |
| Revenue Modernization | 4,973 |
| Financial Systems Enhancements | 5,000 |
| Employee Lifecycle Program | 3,000 |
| Radiological Detection Systems | |
| International Rail | 1,300 |
| Radiation Portal Monitor Replacement Program | 13,900 |
| Radiation Portal Monitor Programs | 20,478 |
| Basic Handheld Radioisotope Identification Devices | 750 |
| Portable Detection Systems End Items/Equipment | 1,290 |

*Advanced Training Center (ATC)*.—Within 90 days of the date of enactment of this Act, CBP shall brief the Committees on progress made on construction of ATC's Instructional Design Center/Distance Learning Center with the use of previously appropriated funds.

*Border Security Technology*.—The agreement directs CBP to: (1) re-allocate funding as appropriate to ensure technology is deployed at the locations where it will have the greatest impact on CBP's ability to identify and interdict illicit activity; (2) ensure that the appropriate amount of technology is piloted, tested, and deployed along the northern border, in addition to the southern border; and (3) notify the Committees quarterly on the operational availability of all fixed, relocatable, and mobile surveillance systems deployed by CBP throughout the United States, including maintenance needs of such systems and the agency's maintenance plan for keeping the systems operational, including recapitalization or replacement of systems. Additionally, the Commissioner is directed to prioritize procurement of the most cost-effective technologies based on lifecycle costs, system availability, reduced requirements for personnel, and input from sector leadership. Within 180 days of the date of enactment of this Act, CBP shall brief the Committees on its efforts to improve border security technology development and acquisition.

*Construction and Facility Improvements*.—~~Additionally, not~~ Not later than 90 days after the date of enactment of this Act, CBP shall submit a report to the Committees that includes:

(1) the details of the design and construction process for new or renovated Border Patrol facilities, including stations, processing centers, and checkpoints;

(2) detailed requirements for each facility currently funded or proposed for funding, including buildings, parking facilities, sally ports, vehicle maintenance facilities, fueling stations, temporary detainee holding facilities, and kennels;

(3) for each currently funded facility:

(a) the total amount funded, obligated, and expended, by fiscal year; and

(b) if funds were obligated to an outside agency (e.g., General Services Administration (GSA) and U.S. Army Corps of Engineers), the obligation and expenditure status of those funds;

(4) for each currently funded facility and for proposed facilities, a construction schedule and associated expenditure plan broken out by quarter (to include funds appropriated through other agencies);

(5) For each requirement described in (2):

(a) the severability of each requirement that is specific to the location;

(b) confirmation that each requirement is an independently awardable option for all contracts currently funded;

(c) the requirements for facilities that are unfunded; and

(d) the requirements for facilities described in (2) that are unfunded; and

(6) the number of personnel to be assigned at each location, with confirmation the design is scoped to address current and anticipated future staffing needs.

The report shall also include a detailed plan to improve CBP's cost estimating capability for these facilities.

*Counter Unmanned Aerial Systems.*—The agreement provides $10,000,000 to detect and mitigate the persistent drone threat along the northern and southern borders. Not later than 120 days after the date of enactment of this Act, CBP shall brief the Committees on its efforts to counter sUAS.

*Expanding Outbound Operations at Ports of Entry.*—The agreement provides $30,000,000 to expand the number of locations equipped for outbound operations at LPOEs. Within 60 days of the date of enactment of this Act, CBP shall provide the Committees a spend plan with timeframes for the execution of these funds and projected performance impacts to operational capabilities as a result of these funds. CBP shall update the Committees monthly on the use of these funds and provide actual performance impacts against projections, including

measures to assess disruption to cartel activities. Furthermore, not later than 180 days after the date of enactment of this Act, CBP shall submit a report that analyzes the necessary requirements that would ensure 100 percent outbound inspection for all LPOE passenger vehicles.

*Identifying Impact of Border Security Investments.*—As part of CBP's briefing for the fiscal year 2027 budget request, CBP shall provide the Committees sufficient data that is informed by robust, cost-benefit analysis that incorporates all types of border security assets and is tied to identified capability gaps.

*Land Port of Entry Infrastructure Capital Plan.*—Not later than 30 days after the submission of the budget request for fiscal year 2027, the Commissioner shall submit a report that details its prioritization of LPOE infrastructure capital investment projects, the methods and models used to determine prioritization, and an overview of public-private partnership agreements. The agreement directs CBP to take appropriate steps to ensure submission of the report in a timely manner. CBP shall work with the (GSA) and the Office of Management and Budget on the annual five-year LPOEs modernization plan, which is based on CBP's operational priorities. Specific attention should be paid to the health, safety, and welfare needs of CBP Officers. Special consideration shall also be made for facilities where reconfiguration or upgrades will improve the flow of local traffic and allow local residents to move freely in their communities. Additionally, within 90 days of the date of enactment of this Act, CBP shall provide a detailed report and timeline outlining completion of the Blue Water Bridge Plaza expansion project and any steps taken in the last fiscal year toward project completion. The report shall align with the annual LPOE priority list, outline projected CBP costs, explain how CBP will engage with state and local entities, and detail the specific milestones and timeline for the project completion. Within 120 days of the date of enactment of this Act, CBP, working with GSA, shall provide the Committees with a briefing on plans to execute the funds provided in the Infrastructure Investment and Jobs Act (Public Law 117–58) and whether there are any significant changes involving the 26 LPOE projects supported in that Act. The agreement expects CBP to work expeditiously with GSA to prioritize modernization and expansion on its five-year Capital Investment Plan while adhering to the proposals in the completed feasibility study. As part of this briefing, CBP shall also provide the Committees an update on steps to "rebuild" the annual five-year LPOE plan.

*Maritime Patrol Aircraft (MPA) Support.*—Within 120 days of the date of enactment of this Act, CBP shall brief the Committees on existing capabilities to test complex hardware, software configurations, and inter-component/international partner tactical data communications systems essential to the CBP MPA mission. The briefing shall identify existing requirements for such capabilities and options, including accessing other DHS component facilities, to meet requirements.

*Non-Intrusive Inspection (NII) Technology.*—CBP is directed to brief the Committees not later than 60 days after the date of enactment of this Act on the status and results of their NII–Integration program. Not later than 180 days after the date of enactment of this Act, CBP shall provide a report on the current status of mobile NII technology and proposals for enhancing it.

*Non-Intrusive Inspection at Ports of Entry.*—CBP shall continue to provide monthly updates to the Committees on the obligation of all funds for NII equipment along with actual and projected performance gains as a result of deployments for NII funded in this or prior appropriations, including funding provided through Public Law 119–21. Those updates shall include progress on incorporating AI/Machine Learning capabilities to aid in faster detection of anomalies. Within 90 days of the date of enactment of this Act, CBP shall provide a briefing to the Committees on the status of NII coverage in pre-primary lanes along the southwest border and report on whether the increase in pre-primary screening will create additional alarms at POEs, impacting current secondary inspection capacity and possibly the workflow of other Federal agencies that may not have sufficient opportunity to plan for additional resource needs.

*Small Unmanned Aerial Systems.*—The agreement provides $10,000,000 for the acquisition of small unmanned aerial systems to support border security operations.

*Transitioning Innovative Technologies and Equipment Into CBP Operations.*—The agreement directs CBP to provide a briefing within 90 days of the date of enactment of this Act and quarterly thereafter on: the current rate of pilots that have transitioned to operations; the performance impact to operations as a result of the transition; a plan to evaluate whether there are common indicators for unsuccessful pilots; and recommendations to incentivize CBP programs to participate and ultimately execute promising capabilities. Further, the agreement directs CBP to provide a briefing within 30 days of the date of enactment of this Act on the outreach to frontline personnel that informs decisions on piloting innovative capabilities.

## U.S. Immigration and Customs Enforcement

### OPERATIONS AND SUPPORT

The agreement provides $10,036,362,000 for Operations and Support. Within the total amount, the agreement makes $46,696,000 available until September 30, 2027.

*Contract Notifications.*—The agreement modifies existing reporting requirements under this heading in the explanatory statement accompanying Public Law 118–47. ICE shall notify the Committees not less than five days prior to substantively changing any contract with a total value greater than $5,000,000. This requirement shall apply to all PPAs and includes, but is not limited to, modifications, renegotiations, recompetes, extensions, and terminations. The agreement directs that any notification provided to the Committees that does not comply with the five day requirement must include a robust justification that includes: the number of days the contract was in any review or approval processes within the component or at the Department level, delineated by reviewing office; the number of days the Office of Acquisition Management awaited funds from the program office; and the immediate needs rationale justifying the urgency of the contract, including any national security or operational implications. The notifications should be transmitted to the Committees in a downloadable, sortable format and consolidated into one daily delivery.

*Previous Requirements.*—The agreement continues the requirements found within Senate Report 118–85 under the following headings:

(1) Annual ICE Report;
(2) Detention Standards and Inspections;
(3) Full Title 21 Authority for HSI;
(4) Hunger Strikes;
(5) Language Access;
(6) Parental Interests Directive;
(7) Pregnant, Postpartum, and Lactating Women;
(8) Protecting Vulnerable Children;
(9) Reporting Requirements;

(10) Sensitive Locations and Protected Areas, to include locations that have been identified as sensitive in any of the prior three fiscal years; and

(11) Sex Offender Release Notifications.

Homeland Security Investigations

*Advanced Analytics.*—The agreement includes an increase of $1,000,000 to expand the advanced analytics work of the Homeland Security Investigations' (HSI) Counterproliferation Mission Center.

*Center for Countering Human Trafficking (CCHT).*—The agreement provides an additional $2,500,000 for activities within the CCHT.

*Child Exploitation and Forced Labor.*—The agreement includes an increase of $8,000,000 to provide additional forensic and analytical support for child exploitation and forced labor investigations.

*Counterfeit Semiconductors.*—The ~~recommendation~~ agreement includes $1,000,000 for the creation of a task force to investigate counterfeit semiconductor materials in the marketplace and in global supply chains. The task force shall include other Federal, SLTT, and industry stakeholders to establish policies and procedures for combating counterfeit semiconductors. Within 270 days of the date of enactment of this Act, HSI shall brief the Committees on the creation of such task force and any relevant challenges; additional resource requirements needed for further implementation; and best practices for validating approved counterfeit semiconductor mitigation services.

*Counter-Fentanyl Initiatives.*—The agreement includes an additional $5,000,000 to increase staffing for Border Enforcement Security Task Force teams to enhance investigations related to fentanyl smuggling operations, other illicit opioids, and counterfeit pharmaceutical ingredients, including synthetic semaglutide; $5,000,000 for the procurement of technologies, including those that leverage artificial intelligence, to enhance traditional methods of investigations; and $3,000,000 to enhance HSI's analytical ability to identify and compile all nomenclature associated with fentanyl precursor chemicals, interrupt online operations, map distribution networks, and obtain express consignment shipment data to interdict these chemicals. Not later than 90 days after the date of enactment of this Act, HSI shall provide to the

Committees a briefing on an execution plan for the personnel and technologies funded under this heading, including procurement and implementation progress where applicable. The briefing shall also include the Office of the Chief Information Officer and the Chief Artificial Intelligence Officer and address projected impacts of these investments.

*Cross-Border Financial Crime Center.*—The agreement includes an additional $4,000,000 for the Cross-Border Financial Crime Center. HSI is directed to provide a briefing within 90 days of the date of enactment of this Act detailing the current scope of operations, any major achievements, and any significant resource gaps that are hindering investigations. The agreement allows for up to $2,000,000 of this funding to be used for the establishment of an Organized Retail and Supply Chain Crime section within the Cross-Border Financial Crime Center to ensure a coordinated, prosecutor-led, multi-agency approach to identifying, disrupting, and dismantling transnational criminal organizations (TCO) engaging in such activities. This section should collect and analyze data from various stakeholders to identify regions in the United States, modes of transportation, and specific distribution and retail networks that are experiencing high volumes of organized crime. The agreement directs HSI to brief the Committees within 90 days of the date of enactment of this Act on the status of the implementation of this section, any challenges in its establishment, and an overview of the unmet resource needs and future resource requirements.

*International Forensic Science Research.*—Within 120 days of the date of enactment of this Act, HSI shall provide to the Committees a briefing on collaboration with external academic partners aiming to grow existing efforts on international forensic science research. The briefing shall include any efforts to build holistic approaches to combating TCOs.

*International Operations.*—Within 90 days of the date of enactment of this Act, HSI is directed to provide to the Committees a strategic plan for HSI's expansion of its international presence over the next five fiscal years. The plan shall incorporate the details required under this heading in the explanatory statement accompanying Public Law 117–328.

*International Trade.*—The agreement includes $5,000,000 for additional investigative capacity related to international trade crimes. HSI shall provide quarterly updates to the Committees detailing the number of referrals made to the Department of Justice Trade Fraud Task Force as a result of this additional capacity.

*Missing and Murdered Indigenous People.*—The agreement provides an additional $1,000,000 for human trafficking investigative capacity for indigenous people, including for the Shadow Wolves program. Within 90 days of the date of enactment of this Act, HSI shall provide a briefing to the Committees on coordination efforts with the Bureau of Indian Affairs' Office of Justice Services to enhance investigative capacity.

*Name, Image, Likeness.*—The Department shall brief the Committees within 120 days of the date of enactment of this Act on potential administrative, policy, regulatory, and statutory changes to further international athletes' abilities to continue their schooling and sports careers in the United States, including potential changes to 8 CFR 214.1(e).

*National Academy for Advanced Training and Leadership (NAATL).*—ICE, in collaboration with the General Services Administration, is directed to provide a briefing on progress made at the NAATL facility within 90 days of the date of enactment of this Act and quarterly thereafter. The first briefing shall include a summary and timeline of efforts made to complete work at this facility, as well as lessons learned from any process issues that have caused a delay.

*National Intellectual Property Rights Coordination Center (IPR Center).*—HSI is directed to appropriately staff the IPR Center to facilitate continued enforcement actions against theft of U.S. intellectual property, particularly online. Additionally, the agreement includes $5,000,000 for increased criminal investigative capacity within the IPR Center with respect to misdeclarations of illicit e-vapor products and illegal e-cigarette importation.

*National Special Security Events (NSSEs) Support.*—The agreement provides an additional $25,000,000 for travel and overtime expenses related to NSSEs occurring throughout the fiscal year.

*Non-Intrusive and Outbound Inspections.*—The agreement provides an additional $8,626,000 for 60 new HSI Criminal Investigators to be used exclusively for investigations stemming from inbound or outbound CBP seizures or interdictions. HSI is directed to brief the Committees within 60 days of the date of enactment of this Act on the planned deployment of these Criminal Investigators, by location, as well as the measures of effectiveness that HSI will use to assess the impact of this investment.

*Office of Intelligence.*—Within 60 days of the date of enactment of this Act, the Office of Intelligence shall provide to the Committees an assessment of: TCO activity and current trends,

particularly related to fentanyl smuggling; how intelligence informs ICE operations; and any capability gaps and associated resource requirements within the Office.

*Repository for Analytics in a Virtualized Environment (RAVEn).*—The agreement reiterates the direction found in the House Report under this heading and reminds HSI of the outstanding briefing requirements and requests related to RAVEn development and deployment that are overdue by more than one year.

*Trade-Based Money Laundering (TBML) Schemes.*—HSI shall provide a briefing on endeavors to combat TBML schemes and resources that may be required to enhance these efforts within 90 days of the date of enactment of this Act.

Enforcement and Removal Operations

*287(g) Agreements.*—In addition to the direction provided in the House Report under the heading "287(g) Training", ICE shall provide a report to the Committees within 60 days of the date of enactment of this Act, and monthly thereafter, with the following data for the 287(g) program: all sources of funding; funding obligations of the 287(g) program, delineated by pay and non-pay requirements and funding source; number of law enforcement entities with 287(g) agreements that were provided training in the prior month; model for each 287(g) agreement and associated jurisdiction; number of arrests effectuated per 287(g) agreement; and personnel dedicated to training activities for new or existing 287(g) agreements.

Additionally, ICE shall continue publishing on its website applications for new or renewed 287(g) agreements. ICE shall also continue thoroughly vetting 287(g) applicants and ensure that detention conditions within 287(g) agreement jurisdictions fully comply with current standards, including with Prison Rape Elimination Act (P.L. 108–79). Within 60 days of the enactment of this Act, ICE is directed to provide an evaluation for every existing 287(g) agreement analyzing the operational capacity realized through such agreement, the costs associated with executing the agreement, and the operational impacts if such agreement were not in existence. ICE shall perform the same evaluation for every new 287(g) agreement and provide the analysis to the Committees not later than 15 days after entering into each new agreement.

*Alternatives to Detention (ATD) Metrics.*—In addition to the direction found in the House Report and the direction under the heading "ATD Metrics Reporting" found within Senate

Report 118–85 regarding briefings and data requirements for ATD, the agreement directs ICE to provide a briefing to the Committees on consequence options for noncompliance currently available within the ATD program. The briefing shall include data on each time such consequences were utilized in the prior fiscal year, whether de-escalation or escalation was in accordance with existing policy, and whether any such individuals who are determined to be noncompliant are escalated to a higher level of supervision, including the basis for such escalation and the noncompliant act.

*ATD Technology.*—ICE is directed to explore the feasibility of utilizing wearable, cost-effective technologies for ATD that achieve law enforcement objectives and shall provide a briefing to the Committees within 90 days of the date of enactment of this Act on potential external vendors, cost estimates, and the number of individuals on the non-detained docket for whom such technologies could be used. ICE is directed to confer with the Committees prior to the briefing.

*Contract Competition.*—ICE is directed to ensure a fair and competitive procurement and contracting process for all awards in fiscal year 2026. ICE shall provide responses to the Committees' inquiries regarding contracts within five business days of receipt of such inquiries.

*Detained Population Statistics.*—ICE shall continue to submit the report required under section 216 of the Department of Homeland Security Appropriations Act, 2021 (division F of P.L. 116–260) with respect to the period beginning 15 days after the date of the enactment of this Act, and semimonthly thereafter, and include the following additional requirements:

(1) the number of detainees by race, ethnicity, age, and nationality over the previous three fiscal years;

(2) the number of detainees who are minors, including whether they are unaccompanied;

(3) the number of detainees by number of criminal convictions and by number of pending criminal charges over multiple fiscal years, broken out by whether those convictions and charges are for violent crimes or felonies;

(4) the number of individuals enrolled in the Alternatives to Detention program and the criteria for escalation and de-escalation and application of such criteria;

(5) categories of detention-related complaints and grievances submitted to ICE by those in custody;

(6) categories of detention-related complaints and grievances submitted to ICE by members of the public; and

(7) detention by country of citizenship and criminal history.

*Detainee Transfers*.—Within 90 days of the date of enactment of this Act, ICE shall submit to the Committees a report detailing compliance with all sections of Policy 11022.1 or any successor policy. The report shall also include barriers to achieving full compliance with the policy.

*Detention and Solitary Confinement of Special Populations*.—The agreement continues the reporting requirements as directed under this heading in Senate Report 118–85.

*Detention of Stateless Aliens*.—ICE shall identify individuals in its custody who are stateless and shall, in conjunction with the Department of State, work to secure a travel document for the individual's removal to a third country, including one where the individual has family ties, had previously held residence, or has some other connection. Within 60 days of the date of enactment of this Act, and quarterly thereafter, ICE is directed to report to the Committees on the number of stateless individuals in detention, the number of stateless individuals removed, and the number of stateless individuals released from detention. For those stateless individuals in detention for whom there is no significant likelihood of removal in the foreseeable future, the report shall identify ICE's criteria and other considerations weighed when making prospective custody determinations.

*Detention Oversight*.—ICE is directed to ensure that individuals in custody have the opportunity to confidentially contact oversight entities without retaliation, at no cost to the individual in custody. Within 60 days of the date of enactment of this Act, ICE shall brief the Committees at the facility-specific level on the existing methods of outreach to oversight entities and whether such outreach is monitored by ICE or contracted personnel. Additionally, ICE shall provide a summary of efforts in place to deter retaliation should outreach occur.

*Detention Partnerships*.—Not later than 15 days after the date of enactment of this Act and monthly thereafter, ICE shall brief the Committees on executed partnership agreements for federally-funded, state-operated immigration detention facilities, such as the facilities located at the Dade-Collier Training and Transition Airport or the Miami Correctional Center. The briefing should include information on the following, by facility: the funding source(s); out-year plans and projected costs; current and future capacity estimations; and associated operational impacts

and costs of maintaining partnerships with such facilities. The briefing should also include information on intragovernmental agreements including with the Departments of Defense and Justice. The agreement directs ICE to coordinate with all partners effectuating immigration detention to ensure facilities' personnel are aware of legislative requirements related to custody operations and are in compliance with section 547 of this Act.

*Detention Segregation.*—Within 90 days of the date of enactment of this Act and quarterly thereafter, ICE shall report to the Committees on the use of segregation in ICE facilities and in facilities that contract with ICE for detention purposes during the preceding fiscal year. The report shall include an overview of all placements in segregation by facility, the duration of such placements, and the rationale for such placements.

*Enforcement Surrounding Emergency Shelters.*—Not later than 90 days after the date of enactment of this Act, ICE shall brief the Committees on enforcement operations surrounding emergency shelters and other evacuation-related facilities during and following a disaster.

*Facilities Maintenance and Repair.*—Not later than 60 days after the date of enactment of this Act, ICE shall provide a report to the Committees identifying local or state leased facilities with known minor construction or minor leasehold improvement needs to ensure appropriate conditions and required detention and care standards for all ICE detainees, including a facilities investment plan to address such needs. Within all funding available to ICE for detention capacity, pursuant to the limitations in section 525 of this Act, ICE shall prioritize effectuating such minor construction or leasehold improvements of leased facilities to ensure appropriate conditions and required detention and care standards.

*Family Expedited Removal Management (FERM) Reporting.*—In addition to the reporting requirements found under this heading in House Report 118–553, the report shall include the preferred language of each enrolled family unit and the number of families in FERM subject to final orders of removal.

*Health and Safety in Immigration Detention.*—The agreement directs ICE to ensure medical access for ICE detention beds operated in Bureau of Prisons or Department of Defense facilities, state and local jails, and any other detention facility. Within 90 days of the date of enactment of this Act, ICE shall submit a report to the Committees on plans to improve the provision of medical services for all detained aliens in ICE custody. Additionally, ICE shall

ensure that individuals in any form of segregation, including medical segregation, are provided required recreation time.

*Intensive Supervision Appearance Program.*—The agreement directs ICE to provide a report to the Committees on a monthly basis with a description of the steps taken to close the recommendations made in ''Alternatives to Detention: ICE Needs to Better Assess Program Performance and Improve Oversight'' (GAO–22–104529) until such recommendations have been closed.

*Law Enforcement Support Center (LESC).*—ICE shall ensure that the LESC has the resources and approvals necessary to fully utilize its recruitment incentives program. The agreement further directs ICE to ensure that current operations performed by the LESC remain centralized at the LESC facility in Williston, Vermont, and that these operations are not unnecessarily duplicated elsewhere.

*Public Reporting.*—ICE shall update its public website monthly with the following information:

(1) arrests by country of citizenship and criminal history;

(2) arrests disaggregated by single adults and members of family units; the agency conducting the initial arrest delineated by type of immigration violation; whether the arrest was made on tribal land; and the number of arrests disaggregated by fugitive arrest or custodial arrest; and

(3) arrests by Area of Responsibility.

*Removal Decisions.*—Within 60 days of the date of enactment of this Act, ICE is directed to brief the Committees on its policies and procedures related to individuals determined to be wrongfully removed from the United States, including procedures for expeditiously implementing court-directed returns of individuals to the United States. The briefing shall also include the procedures in place for individuals seeking to return to the United States to submit applications for such purposes, the review and processing of such applications, reviews of final orders of removal, final decisions regarding such applications, and effectuating the return of such individuals to the United States pursuant to such decisions. ICE shall also brief the Committees within 120 days of the date of enactment of this Act and quarterly thereafter on the number of applications received and reviewed, the number granted, the number of individuals returned to the United States, and the timelines in which such returns were effectuated. Within 180 days of

the date of enactment of this Act, ICE shall brief the Committees on the steps it has taken to eliminate future wrongful removals.

*Removal Flight Reporting.*—Within 60 days of the date of enactment of this Act and quarterly thereafter, ICE shall provide a report to the Committees that includes:

(1) the monthly number of removal flights conducted during the reporting period;

(2) the number of individuals removed on each flight;

(3) the citizenship of the individuals removed;

(4) the statutory authority for each removal;

(5) the number of removals within each criminality category, as defined in the integrated decision support system, disaggregated by gender;

(6) the number of migrants removed with removal orders, including the agency that issued the removal order; and

(7) the average cost per removal flight.

Within 60 days of the date of enactment of this Act and monthly thereafter, ICE shall make available on a publicly accessible website the number of flights to transfer aliens to Naval Station Guantanamo Bay; the cost of each flight, delineated by funding agency; the number of aliens on each flight; and the cost to ICE and each other Federal agency and Department to detain an alien on Naval Station Guantanamo Bay. The website must also list from which congressionally appropriated account the money is being drawn. The first report shall also include such information for fiscal year 2025, delineated by month.

*Removal Orders Reporting.*—The agreement continues the direction found under this heading in the explanatory statement accompanying Public Law 118–47. Additionally, the briefing shall include the total number of non-executable final orders of removal.

*Veterans Subject to Removal.*—In addition to the direction found under this heading in the House Report, ICE is further directed to report the number of individuals removed from the United States who are service members or veterans, their length of service in the Armed Forces, their branch of service, any receipt of medals or military decorations, any criminal convictions, whether the individual appealed the removal order to the Board of Immigration Appeals, and their removal destination. This report shall be made available on a publicly accessible website.

*Virtual Attorney Visitation (VAV).*—In addition to the requirements found under the heading "Access to Legal Counsel" in Senate Report 118–85, the agreement directs that existing

VAV booths be utilized for legal access purposes. Further, ICE is directed to improve existing law libraries by updating legal materials and providing online legal access. Additionally, Legal Orientation Programs shall continue without interruption to the maximum extent possible. ICE shall establish consistent policies across all facilities for scheduling access for VAV meetings. ICE shall provide a briefing to the Committees on these efforts within 90 days of the date of enactment of this Act and quarterly thereafter. The briefing shall include resource requirements for ensuring legal access, any ongoing challenges brought forth by field offices regarding certain facilities, the number of Legal Orientation Programs taking place at each facility, and the VAV utilization rate.

Mission Support

*Personnel Well-Being.*—The agreement provides an additional $5,000,000 to support workforce readiness efforts. Within 60 days of the date of enactment of this Act, ICE shall brief the Committees on their plans to execute this funding, other investment opportunities, and the feasibility of establishing an office modeled after the Workforce Care Division of U.S. Customs and Border Protection.

*Staffing Augmentation.*—The agreement provides an additional $425,000 to augment the Appropriations Liaison team within the Office of the Chief Financial Officer. ICE is directed to ensure that these new positions are filled through an open, competitive interview process. Within 15 days of the date of enactment of this Act and monthly thereafter, the Appropriations Liaison team is directed to brief the Committees on the status of all outstanding items owed to the Committees, including outstanding requests for information, briefings that are overdue or due within the next 20 business days, and reports that are overdue or due within the next 20 business days.

*Tactical Communications (TACCOM).*—Within 90 days of the date of enactment of this Act, ICE shall submit a detailed plan for initiating and completing additional TACCOM equipment and infrastructure upgrades and expansion projects. The plan shall specify regional modernization priorities, including any geographic areas that may require upgrades, budget projections, and a timeline for initiating and completing these site expansion priorities. The agreement provides an additional $10,000,000 for TACCOM equipment modernization for personnel funded by this Act.

Office of the Principal Legal Advisor

*Office of the Principal Legal Advisor (OPLA) Hiring.*—Within 60 days of the date of enactment of this Act, ICE shall submit a report to the Committees on a strategy for OPLA hiring over the next five years, ongoing retention efforts, recruitment goals, and litigation team augmentation requirements to match the operational tempo and capacity of the Executive Office for Immigration Review.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

The agreement provides $5,000,000 for the Consolidated ICE Financial Solution.

## TRANSPORTATION SECURITY ADMINISTRATION

OPERATIONS AND SUPPORT

The agreement provides $10,635,434,000 for Operations and Support and includes $98,523,000 for exit lane staffing; $45,868,000 for law enforcement reimbursement; $34,088,000 for canine reimbursements; $27,392,000 for the Federal Flight Deck Officer (FFDO) program; $20,000,000 for interconnected airports; and $3,000,000 for artificial intelligence (AI) multi-modal language translation technology.

*Category-X Interconnection Program.*—The Administrator shall provide a briefing to the Committees not later than 180 days after the date of enactment of this Act on the status of this program and an expansion plan for all Transportation Security Administration (TSA)-serviced airports.

*Explosive Detection System Optimization and Maintenance.*—The agreement provides $4,000,000 for TSA to continue providing cost-effective ways to improve the reliability of explosive detection systems.

*Federal Flight Deck Officer Program.*—Within 90 days of the date of enactment of this Act, TSA shall brief the Committees on the FFDO Program. The briefing shall include, at a minimum, current backlogs of candidates awaiting initial training, utilization rates for FFDO

recurrent training, FFDO firearms recertification training, plans to address the training backlog, and the status of the full-time Atlanta FFDO Recurrent Training Program facility.

*UAS Beyond Visual Line of Sight Operations*.—During promulgation of the final rule for the rulemaking entitled "Normalizing Unmanned Aircraft Systems Beyond Visual Line of Sight Operations" in 90 Fed. Reg. 38212, TSA shall ensure that any security requirements are commensurate with the risk of the proposed activity.

*Screening Locations*.—The Committees emphasize that TSA may continue screening at Reimbursable Screening Services Program (RSSP) locations in the event of a future lapse of authorization.

*Throughput and Wait Times at TSA Checkpoints*.—Not later than 90 days after the date of enactment of this Act and quarterly thereafter, TSA shall provide a briefing to the Committees on how staffing levels, including any anticipated or proposed reductions, and investments in screening equipment and technology are projected to affect passenger throughput and wait times. The briefing shall include analysis of current staffing models, deployment timelines for new technologies such as computed tomography (CT) machines, and the anticipated effects of these changes on operational efficiency and passenger wait times at checkpoints.

*Visible Intermodal Prevention and Response (VIPR) Teams*.—The agreement does not provide funding for VIPR teams or for any of the functions typically performed by VIPR teams.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

The agreement provides $330,230,000 for Procurement, Construction, and Improvement, (5, including $300,000,000 for Checkpoint Property Security Screening (CPSS) and $15,000,000 for Credential Authentication Technology.

*Checkpoint Property Security Screening*.—The agreement provides funding to allow TSA to accelerate the modernization of CPSS equipment and directs TSA to brief the Committees semiannually on its progress.

*Identity Risk and Security Management*.—The agreement directs TSA to continue support of the pilot deployment of biometric identity validation tools at key airports to further advance the necessary infrastructure and investment to support these operations. TSA shall ensure such systems protect the biometric information of passengers and shall ensure that such

systems adhere to all applicable statutes, regulations and guidelines relating to civil liberties and privacy. TSA is further directed to report to the Committees not later than 180 days after the date of enactment of this Act on the pilot deployments initiated and the ways in which TSA's pilot deployments are safeguarding the privacy rights of the traveling public.

RESEARCH AND DEVELOPMENT

The agreement provides $24,000,000 Research and Development. for

*On Person Detection/Next Gen Advanced Imaging Technology.*—The agreement provides $12,000,000 to further develop and certify AI-enhanced screening equipment.

## COAST GUARD

OPERATIONS AND SUPPORT

The agreement provides $11,272,401,000 for Operations and Support.

The agreement includes funding increases for the following: $116,405,000 for IndoPacific expansion; $97,922,000 for the 2026 military pay raise; $40,000,000 for autonomous uncrewed surface vessels; $40,000,000 for shore maintenance; $30,000,000 for surface maintenance; $23,000,000 for sexual assault and sexual harassment prevention and response; $26,000,000 for large unmanned aerial systems operations; $14,000,000 for medium unmanned aerial systems; $13,000,000 for the Technology Optimization and Modernization Fund; $10,000,000 for additional childcare subsidies; $10,000,000 for uncrewed acoustic monitoring system pilot; $6,000,000 for fishing safety grants; $4,500,000 for unmanned air intercept; $3,000,000 for the maritime Transportation System Sector Risk Management Agency; $2,500,000 for marine inspections and standards for innovative vessels; $2,000,000 to study the impact of seismic activity on Coast Guard facilities; $1,750,000 for visit, board, search, and seizure equipment; $1,000,000 for environmental compliance and remediation; $250,000 for a

study on illegal, unreported, and unregulated fishing; $150,000 to continue a cetacean desk; and $100,000 for a contracting officer for Training Center Cape May.

For the fiscal year 2027 budget justification, the request shall contain the same sub-PPA level of detail as provided in fiscal year 2026.

*Aerial Maritime Domain Awareness.*—The agreement directs the Coast Guard to test, train, and deploy unmanned aerial systems to support its statutory missions and to expand domain awareness. Within 180 days of the date of enactment of this Act, the Coast Guard shall brief the Committees on its efforts.

*Child Care Subsidy.*—Within 90 days of the date of enactment of this Act, the Coast Guard shall provide a briefing on the implementation of this program.

*Coast Guard Command Centers.*—The Coast Guard shall provide a report and briefing to the Committees on the state of Coast Guard command centers, including technology gaps, top challenges, and options for improvements within 120 days of the date of enactment of this Act.

*Coast Guard Missions.*—The agreement directs the Coast Guard to continue conducting its missions as described in 6 U.S.C. 468. The Committees remind the Coast Guard and the Department of the prohibition to the significant or substantial reduction to Coast Guard missions or its capability to perform such missions for more than 90 days without a waiver and directs the Department to fulfill the requirements of 6 U.S.C. 468(e) within 30 days of the date of enactment of this Act.

*Coast Guard Oversight.*—The agreement directs the Coast Guard to fully comply with all oversight inquiries, including into its Operation Fouled Anchor investigation. Within 30 days of the date of enactment of this Act, the Coast Guard shall provide the Committees with a specific list of impediments to responsiveness, as well as potential mitigation opportunities.

*Combatting Illegal, Unreported, and Unregulated (IUU) Fishing.*—The Coast Guard shall collaborate with state and academic partners that will quantify the impact and explore the factors influencing increased IUU fishing activity.

*Counternarcotics Efforts.*—Within 60 days of the date of enactment of this Act and monthly thereafter, the Coast Guard shall report to the Committees the amounts and types of narcotics intercepted across each of its Districts. Within 180 days of the date of enactment of this Act, the Coast Guard shall brief the Committees on options for heightening drug interdiction efforts, particularly in the Pacific, including collaboration with foreign partners. The briefing

shall detail the additional resources, intelligence, and other support the Coast Guard requires to more fully meet the demands of countering the drug smuggling across the Pacific.

*Fishing Safety Grants*.—The Coast Guard is directed to provide a briefing to the Committees within 90 days of the date of enactment of this Act on the execution of the Fishing Safety Training and Fishing Safety Research Grant Programs. If the Administration believes funding for this activity should be provided directly to NIOSH in fiscal year 2027, the briefing shall provide that justification and such a change shall be articulated in the next budget request.

*Funding Efforts to End Sexual Assault and Harassment*.—Of the increased funding provided for the Coast Guard's prevention of and response to sexual assault and harassment, $1,000,000 shall be to hire 10 new staff to implement the best and most current sexual assault and harassment prevention practices; $12,000,000 shall be to fund the directed actions of the former Commandant related to the Accountability Transparency Review (ATR) to address workforce support through a new recruit preparatory course, increased leadership courses, Integrated Primary Prevention, a victim mentor program, and core values updates and communication; and $10,000,000 shall be for legal support and oversight, including travel and expert witness support for courts martial, training and coordination, recruiting, reserve support, licensure requirements, technology modernization, and advice related to prevention and prosecution of sexual assault and sexual harassment in the maritime industry.

*Impacts on the U.S. Coast Guard Academy*.—The Coast Guard is directed to provide a report and briefing to the Committees within 120 days of the date of enactment of this Act, detailing the full extent of changes to Academy curricula, policies, and organization, as well as impacts, if any, on campus culture, cadets' morale, and the Academy's overall mission.

*Indo-Pacific Expansion*.—Within 90 days of the date of enactment of this Act, the Coast Guard shall provide to the Committees a spend plan for the additional funds provided, including costs for personnel and operations, timelines for implementation, and planned activities and operations.

*Increased Initial Entry Training*.—The Committees provide $3,000,000 for the Coast Guard to evaluate and plan for the acquisition of an additional initial entry training facility.

*Implementation of Efforts to End Sexual Assault and Harassment*.—The agreement directs the Department to provide the overdue independent review of the Coast Guard's efforts to reduce and respond to sexual assault and sexual harassment, as required in the Further

Consolidated Appropriations Act, 2024 (P.L. 118–47). The agreement directs the Coast Guard to provide a briefing within 30 days of the date of enactment of this Act on what has been done to implement the former Commandant's directives following the ATR Team Report, detailing its efforts to reduce and respond to sexual assault and specific resources the Service is dedicating to each line of effort. The briefing shall also detail the steps taken to enhance survivor advocacy and support and efforts of the Sexual Assault, Prevention, Response, and Recovery (SAPRR) Office. Beginning in fiscal year 2027, future Coast Guard budget requests shall provide a full accounting of all personnel, funding, training, curriculum, and other efforts to end sexual assault and sexual harassment within the Service; measurable outcomes of such efforts; lessons learned; and descriptions of efforts proposed within each budget request to eliminate sexual assault and sexual harassment.

*Long Range Command and Control Aircraft.*—Not later than 15 days after the last day of each month, the Coast Guard shall submit to the Committees, in a searchable and sortable format, for the previous month:

(1) the flight manifests and itinerary for all Long-Range Command and Control Aircraft flights, including the airframe used for each flight;

(2) any alcoholic beverages consumed on the flight and the source of such beverages;

(3) for official travel, the nexus to a statutory Department of Homeland Security mission and justification for trip; and

(4) the total cost of each flight.

*Maritime Industry Cybersecurity Sector Risk Management.*—Within 90 days of the date of enactment of this Act, the Coast Guard shall provide a briefing to the Committees on the integration of additional cybersecurity risk mitigation activities funded by the funding increase.

*Merchant Mariner Credential Program.*—The Coast Guard shall provide a briefing to the Committees within 60 days of the date of enactment of this Act on progress to date of implementing the new program, including an overview of the features that are intended to improve the efficiency of the credentialing process.

*Recruitment and Retention.*—Within 60 days of the date of enactment of this Act, the Coast Guard shall provide a briefing on efforts to recruit and retain sufficient personnel and any resulting plans, with timelines, to return stations to their previous operational status.

*Restoration of Capabilities.*—The Coast Guard shall brief the Committees within 90 days of the date of enactment of this Act on plans to restore operational capabilities at locations with degraded capabilities as a result of damages resulting from major storms and other disasters.

*Seismic Problem Study.*—The agreement provides $2,000,000 for the Coast Guard to conduct a comprehensive study of seismic risks to its facilities, including but not limited to operational centers, housing units, and mission-critical assets located in regions prone to seismic activity. This study should identify infrastructure most at risk, assess potential operational impacts of seismic events, and propose mitigation strategies to improve resilience. The Coast Guard shall submit a report to the Committees not later than three years after the date of enactment of this Act, detailing findings and recommendations for mitigation measures. Within 180 days of the date of enactment of this Act and semiannually thereafter, Coast Guard shall brief the Committees on the progress of the study.

*Short-Range Reconnaissance Program.*—The agreement directs the Coast Guard to brief the Committees within 180 days of the date of enactment of this Act on its plan to replenish its small unmanned aircraft fleet.

*Small Arms Simulation and Cognitive Training Capability Improvements.*—Within 180 days of the date of enactment of this Act, the Coast Guard shall provide a briefing on its current capabilities and practices to improve cognitive skills, operator situational awareness, judgment, and proficiency in high-risk operations that involve the carry and use of small arms.

*State Boating Fees.*—The agreement directs the Coast Guard to provide a briefing within 90 days of the date of enactment of this Act detailing any statutes, regulations, and policies which govern the ability of states to collect fees related to boating safety, search and rescue operations, and management of aquatic invasive species as part of a process for numbering undocumented vessels under chapter 123 of title 46, United States Code.

*Surface and Shore Maintenance.*—Within 120 days of the date of enactment of this Act, the Coast Guard shall provide a briefing to the Committees on Appropriations of the House of Representatives and the Senate; the Committee on Transportation and Infrastructure of the House of Representatives; and the Committee on Commerce, Science, and Transportation of the Senate on the status of infrastructure repairs, dredging, and long-term operability plans for Coast Guard Station Cape Disappointment and the National Motor Lifeboat School in Ilwaco, WA.

*Tracking Missions*.—In lieu of the direction provided under this heading in the House report, the agreement directs the Coast Guard to report on actions taken since the beginning of fiscal year 2025 to reallocate assets, resources, and personnel to border security and immigration enforcement activities, including plans for future reallocations. The report shall detail, delineated by month, specific assets, units, and other resources diverted, as well as impacts on other Coast Guard mission statistics, metrics, and measures. The Coast Guard shall provide this report, as well as a briefing on said report, to the Committees within 90 days of the date of enactment of this Act.

*Uncrewed Acoustic Monitoring System Pilot*.—The agreement includes funding for a pilot of autonomous, wave and solar powered, persistent, passive acoustic large-aperture towed sonar arrays. The pilot shall prioritize functions including monitoring transit routes, enhancing port and maritime security, and detecting narcotic trafficking vessels, particularly semi-submersibles in the Eastern Pacific and Caribbean Sea.

*Unfunded Priorities List (UPL)*.—The agreement directs the Coast Guard to provide to the Committees a list of approved but unfunded Coast Guard priorities and the funding needs for each priority not later than 30 days after submission of the fiscal year 2027 budget request.

## PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

The agreement provides $991,872,000 for Procurement, Construction, and Improvements. This includes $152,000,000 for In-Service Vessel Sustainment; $54,900,000 for Cutter Boats; $98,000,000 for Waterways Commerce Cutter, $43,500,000 for Polar Security Cutter III; $25,000,000 for a Great Lakes Icebreaker; $12,000,000 for HC-144 Conversion/Sustainment; $151,600,000 for MH-60T Sustainment; $99,340,000 for Other Acquisition Programs; $75,000,000 for the Coast Guard Academy; $15,000,000 for a National Security Cutter and Ocean Going Buoy Tender Homeport; $15,000,000 for Station Lake Tahoe; $6,000,000 for Mobile Medical Teams; $30,000,000 for a Hanger at St. Paul, Alaska; $30,732,000 for Alaska Housing; and $160,000,000 for Seattle Polar Security Cutter Homeport.

*Fleet Mix Analysis*.—Within 30 days of the date of enactment of this Act, the Coast Guard shall submit the Fleet Mix Analysis required in the explanatory statement accompanying Public Law 117–103. The agreement reiterates that the analysis be comprehensive and include

all classes of vessels, even those whose mission might not have a direct bearing on the workload of other vessel classes.

*Full-Funding Policy*.—The agreement again directs the Coast Guard to provide an exception to the current acquisition policy that requires the Coast Guard to attain the total acquisition cost for a vessel, including long lead time materials (LLTM), production costs, and post-production costs, before a production contract can be awarded. The Coast Guard should position itself to acquire vessels in the most efficient manner within the guidelines of strict governance measures.

*Funded Projects*.—Projects funded by the agreement shall be executed expeditiously and responsibly. Within 90 days of the date of enactment of this Act and quarterly thereafter, the Coast Guard shall brief the Committees on any projects experiencing significant cost increases, executability concerns, or any other issues that increase the risk profile of a project. Coast Guard shall provide the Committees sufficient time to consider such increased risk profiles and respond in an appropriate manner.

Vessels

*Commercially Available Polar Icebreaker (USCGC Storis)*.—The agreement directs Coast Guard to provide a description of the actions required to fully missionize the *Storis* and to provide a detailed cost estimate of such actions delineated by year for the next five years in its fiscal year 2027 budget request.

*Cutter Boats*.—The amount for Cutter Boats includes $24,000,000 to support the procurement of two Heavy Weather Boat (SPC–HWX) replacements and program costs related to the acquisition program.

*Great Lakes Icebreaker*.—The Coast Guard shall provide a briefing on the Great Lakes Icebreaker Program within 180 days of the date of enactment of this Act.

*Polar Security Cutter (PSC)*.—Within 90 days of the date of enactment of this Act, the Coast Guard shall brief the Committees on the program's progress and shall provide a timeline and spend plan for the completion and delivery of each fully or partially funded PSC. The Coast Guard is directed to continue keeping the Committees fully informed of the PSC program's

progress both with regular quarterly updates and, in the case of emergency or time-sensitive issues, notifications as soon as possible.

## Aircraft

*Long-Range Unmanned Aircraft (LR-UAS).*—The agreement directs the Coast Guard to acquire aircraft for the LR-UAS program consistent with the spend plan briefed to the Committees on September 2, 2025. If the Coast Guard deviates from the briefed spend plan, not later than 15 days after any deviation, the Coast Guard shall brief the Committees on the justification for the change and certify in writing that the changes were in the best interest of the Coast Guard and the American taxpayer. Additionally, the agreement provides $98,000,000 for the purchase of MQ-9 long-range unmanned aircraft and associated base stations, equipment related to such aircraft and base stations, and associated program management.

*Review of MH–60 Acquisition and Missionization.*—Within 60 days of the date of enactment of this Act, the Coast Guard shall brief the Committees on options for streamlining the acquisition and missionization of MH–60 rotary wing aircraft, including potential utilization of similar design specifications and production lines used for the Navy's MH–60R or establishing a commercial production line of the MH-60T. The Coast Guard shall brief the Committees on the program's progress and shall provide a timeline and spend plan for the completion of fleet expansion. The Coast Guard is directed to continue to keep the Committees fully informed of the program's progress both with regular quarterly updates and, in the case of emergency or time-sensitive issues, as soon as possible.

## Shore and Aids to Navigation Facilities

*Coast Guard Academy Infrastructure.*—Within 120 days of the date of enactment of this Act, the Coast Guard shall brief the Committees on an initial plan for Academy improvements using funds appropriated in this Act.

*Coast Guard Cutter Homeports.*—Within 90 days of the date of enactment of this Act, the agreement directs the Coast Guard to provide a report for each homeport where an asset is in active status, but its designated permanent homeport is not complete. The report shall include the

detailed timeline for and projected costs associated with land acquisition, permitting, planning, engineering, design, and construction.

*Engineering and Design.*—The Coast Guard must improve its approach to informing Congress of its priorities for major shore construction projects, housing, aids to navigation, and Major Acquisition Systems Infrastructure (MASI). Accordingly, beginning with the fiscal year 2028 budget submission, the Coast Guard shall provide in its justification a specific list of construction projects to be implemented if the budget request for each project in the Shore Facilities and Aids to Navigation PPA were to be funded at the request level and the total projected future years' costs of each such project, delineated by year.
For fiscal year 2027, Coast Guard shall provide this information in a briefing to the Committees not later than 90 days after submission of the budget request. Additionally, within 180 days of the date of enactment of this Act, Coast Guard shall provide a report on past construction projects that received appropriated funding within the past 10 years that did not proceed to construction for failure to properly factor in preconstruction and engineering and design needs.

*Facilities Plans.*—Within 180 days of the date of enactment of this Act, the Coast Guard shall provide to the Committees long-term master facilities plans for the modernization and upgrading of the Training Center Cape May and the Coast Guard Academy campuses, which are necessary to facilitate additional personnel accessions to accommodate the growing mission demands on the Coast Guard. Each plan shall include a Capital Improvement Plan (CIP) that includes capital project budgets, an inventory of deferred maintenance items necessary to sustain campus operations through completion of the CIP, and schedule and sequencing estimates based upon funding assumptions.

*Polar Security Cutter (PSC) Homeport Base Seattle.*—The agreement provides $160,000,000 to prepare for PSC Homeport Base Seattle, as identified in the fiscal year 2026 UPL. Within 90 days of the date of enactment of this Act and quarterly thereafter, the Coast Guard shall provide a brief updating the progress, timelines, and funding execution of the project to date, as well as updates on future planning and deliverables to facilitate Base Seattle's expansion. Coast Guard shall also brief the Committees within 180 days of the date of enactment of this Act on the total cost estimate for Base Seattle modernization to allow homeport completion and support for the three PSCs, the CGC Healy, and up to four additional major cutters.

RESEARCH AND DEVELOPMENT

The agreement provides $6,763,000 for Research and Development.

## UNITED STATES SECRET SERVICE

OPERATIONS AND SUPPORT

The agreement provides $3,128,304,000 for Operations and Support, including increases of $46,116,000 for hiring of certain positions; $36,701,000 for expanded protection of protectees; $20,000,000 to support the use of autonomous robotic targets in firearm and tactical training; $5,400,000 for modernizing situational awareness, communications, and sensor automation across protective and law enforcement operations through edge processing; and $1,226,000 for enhancing protective intelligence operations.

Within the total amount provided, $96,299,000 is available until September 30, 2027 and $20,000,000 is available until September 30, 2028, as a one-time allowance to support advanced preparation for the 2028 Summer Olympic and Paralympic Games.

*2026 FIFA World Cup and America250.*—The agreement provides $24,623,000 for activities related to 2026 FIFA World Cup and America250 events. USSS is directed to provide a briefing to the Committees on a quarterly basis outlining their planning and coordination efforts with SLTT ahead of these events.

*Employee Resiliency Programs.*—USSS shall brief the Committees on efforts to improve employee resiliency programming and initiatives, including the impact of current employee resiliency programs on retention, not later than 90 days after the date of enactment of this Act. The briefing shall also include ongoing retention efforts for senior agents to reduce reliance on and the utilization of supermax pay.

*Geospatial Technology.*—The agreement provides $2,000,000 for the procurement of geospatial technology that enhances the Service's ability to access, utilize, and analyze commercial space-based data and imagery products for the protective mission.

*National Special Security Events (NSSEs).*—The agreement includes $44,623,000 for USSS to prepare for and execute future NSSEs, including the 2026 FIFA World Cup. Not later

than 90 days after the enactment of this Act, USSS shall provide a quarterly briefing to the Committees detailing obligation and execution of funds, planning and coordination efforts with SLTT law enforcement, and projected resource requirements for NSSEs in fiscal year 2027 and outyears.

*Previous Requirements.*—The agreement continues the directives found within Senate Report 118-85 under the headings "Secret Service Overtime" and "Strategic Human Capital Plan".

*Protective Mission.*—Within 60 days of the date of enactment of this Act, USSS shall submit a report to the Committees that examines the efforts to identify and communicate threats with law enforcement partners during protective events and includes an evaluation of the lessons learned in light of the events of July 13, 2024.

*Secret Service Hiring.*—Within 180 days of the date of enactment of this Act, USSS shall brief the Committees on updated hiring projections for all law enforcement positions from fiscal year 2026 to fiscal year 2030 and detail resource requirements to meet such projections. The briefing shall also include ongoing efforts to decrease the time to hire and increase yield rates from applicants to hires, as well as the impact that these hiring efforts will have on overtime costs.

*Support for Computer Forensics Training.*—The agreement provides $64,777,000 to continue training in computer forensics, to enhance academic certification efforts, and to expand subject matter expert contracts to fulfill unmet training needs. The agreement includes an additional $5,000,000 for expansion of the curriculum at the National Computer Forensics Institute to include forensic analysis of small unmanned aerial systems.

*Recruitment and Retention Initiatives.*—USSS is directed to brief the Committees not later than 30 days after the date of enactment of this Act on plans to appropriately resource recruitment and retention initiatives in fiscal years 2026 through 2029.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

The agreement provides $118,517,000 for Procurement, Construction, and Improvements.

*Long Term Acquisition and Refresh Cycles.*—USSS is directed to brief the Committees within 120 days on all ongoing and anticipated projects that operate on a sliding refresh cycle. The briefing should include current and anticipated costs, including outyear projections through fiscal year 2030.

TITLE II—ADMINISTRATIVE PROVISIONS

Section 201. The agreement continues a provision regarding overtime compensation.

Section 202. The agreement continues a provision allowing CBP to sustain or increase operations in Puerto Rico and the U.S. Virgin Islands with appropriated funds.

Section 203. The agreement continues a provision regarding the availability of passenger fees collected from certain countries.

Section 204. The agreement continues a provision allowing CBP access to certain reimbursements for preclearance activities.

Section 205. The agreement continues a provision regarding the importation of prescription drugs from Canada.

Section 206. The agreement continues and modifies a provision regarding the waiver of certain navigation and vessel-inspection laws.

Section 207. The agreement continues a provision preventing the establishment of new border crossing fees at LPOEs.

Section 208. The agreement continues a provision requiring the Commissioner of CBP to submit an expenditure plan for funds made available under the heading, "U.S. Customs and Border Protection—Procurement, Construction, and Improvements".

Section 209. The agreement continues a provision on vetting operations at existing locations.

Section 210. The agreement includes a new provision regarding a requirement for surveillance technology to be autonomous, consistent with the definition found in P.L. 119–21.

Section 211. The agreement includes a new provision regarding the standard of treatment for certain individuals in CBP custody.

Section 212. The agreement continues a provision prohibiting the use of funds provided under the heading, "U.S. Immigration and Customs Enforcement—Operations and Support" to

continue a delegation of authority under the 287(g) program if the terms of an agreement governing such delegation have been materially violated.

Section 213. The agreement continues a provision prohibiting the use of funds provided under the heading "U.S. Immigration and Customs Enforcement—Operations and Support" to contract for detention services if the facility receives less than "adequate" ratings in two consecutive performance evaluations and requires that such evaluations be conducted by the ICE OPR.

Section 214. The agreement continues a provision allowing the Secretary to reprogram funds within and transfer funds to "U.S. Immigration and Customs Enforcement—Operations and Support" to ensure the detention of noncitizens prioritized for removal.

Section 215. The agreement continues a provision that requires ICE to provide statistics about its detention population.

Section 216. The agreement continues a provision related to reporting on 287(g) agreements.

Section 217. The agreement includes a new provision requiring ICE to submit a monthly obligation plan.

Section 218. The agreement includes a new provision requiring an execution plan for detention facilities funded by P.L. 119-21.

Section 219. The agreement includes a new provision related to ICE international attachés and liaisons.

Section 220. The agreement continues a provision clarifying that certain elected and appointed officials are not exempt from Federal passenger and baggage screening.

Section 221. The agreement continues a provision authorizing TSA to use funds from the Aviation Security Capital Fund for the procurement and installation of explosive detection systems or for other purposes authorized by law.

Section 222. The agreement continues a provision requiring TSA to provide a report that includes the Capital Investment Plan, the five-year technology investment plan, and information on Advanced Integrated Passenger Screening Technologies.

Section 223. The agreement includes a new provision requiring briefings on unclaimed money at TSA checkpoints.

Section 224. The agreement continues a provision prohibiting funds made available by this Act under the heading "Coast Guard—Operations and Support" for recreational vessel expenses, except to the extent fees are collected from owners of yachts and credited to this appropriation.

Section 225. The agreement continues a provision requiring the Commandant of the Coast Guard to submit a future-years capital investment plan.

Section 226. The agreement continues a provision prohibiting funds to reduce the staff or mission at the Coast Guard's legacy Operations System Center.

Section 227. The agreement continues a provision prohibiting funds to conduct a competition for activities related to the Coast Guard National Vessel Documentation Center.

Section 228. The agreement continues a provision allowing the use of funds to alter, but not reduce, operations within the Civil Engineering program of the Coast Guard.

Section 229. The agreement continues a provision allowing for use of the Coast Guard Housing Fund.

Section 230. The agreement includes a new provision appropriating an additional amount for the USCG to purchase MQ-9 systems.

Section 231. The agreement includes a new provision regarding Force Design 2028.

Section 232. The agreement continues a provision allowing the Secret Service to obligate funds in anticipation of reimbursement for personnel receiving training.

Section 233. The agreement continues a provision prohibiting funds made available to the Secret Service from being used for the protection of the head of a Federal agency other than the Secretary of Homeland Security, except when the Director has entered into a reimbursable agreement for such protection services.

Section 234. The agreement continues a provision allowing the reprogramming of funds within "United States Secret Service—Operations and Support".

Section 235. The agreement continues a provision allowing funds provided under the heading "United States Secret Service—Operations and Support" to be available for travel of employees on protective missions without regard to the limitations on such expenditures.

Section 236. The agreement includes a provision for the National Computer Forensics Institute. new

Section 237. The agreement includes a new provision providing for additional overtime payments for certain United States Secret Service personnel.

Section 238. The agreement continues a provision prohibiting the construction of border security barriers in specified areas.

# TITLE III—PROTECTION, PREPAREDNESS, RESPONSE, AND RECOVERY

## CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY

### OPERATIONS AND SUPPORT

The agreement provides $2,218,634,000 for Operations and Support. The agreement does not adopt the consolidation of PPAs within Cybersecurity, as proposed in the budget request.

*Cybersecurity and Infrastructure Security Agency (CISA) Hiring.*—The Committees provide $20,000,000 to hire additional Federal staff to critical positions, of which $4,000,000 is provided to each of the following PPAs for these purposes: Threat Hunting; Vulnerability Management; Continuous Diagnostics and Mitigation; Security Programs; and Security Advisors. Within 60 days of the date of enactment of this Act, CISA shall brief the Committees on a hiring plan for these positions.

*CISA Workforce.*—CISA shall maintain a workforce consistent with the personnel and FTE funded by the pay and non-pay amounts provided in this Act. CISA shall not reduce staffing in such a way that it lacks sufficient staff to effectively carry out its statutory missions, including cybersecurity and infrastructure security for the Federal Civilian Executive Branch agencies, SLTT partners, Sector Risk Management Agencies, international partners, and other stakeholders. Further, CISA is directed to maintain no fewer than 10 regional field offices around the country and is directed to ensure that CISA employs no fewer than one expert "Cyber Security Advisor" per state or territory devoted exclusively to assisting such state or territory.

*Election Security.*—The agreement provides $39,610,000 to continue Election Security Program activities funded in fiscal year 2024, including Election Security Advisors in each CISA Region and the continuation of the Elections Infrastructure Information Sharing and Analysis Center (EI–ISAC).

*Triannual Classified Briefings.*—In addition to the briefings required under this heading in the House Report, CISA shall provide timely classified briefings on emergent issues.

Cybersecurity

*Attack Surface Management (ASM) Program.*— In addition to the requirements found in the House Report under this heading, the briefing must also include the cost estimate of administering ASM as a shared service. CISA is further directed to continue enhancing its ability to centrally verify and manage asset and vulnerability data on internet-facing cyber terrain for Federal, critical infrastructure, and SLTT partner networks. CISA shall sustain efforts funded in fiscal years 2022-2024 for ASM. Within 180 days of the date of enactment of this Act, CISA shall brief the Committees on progress made deploying its ASM capabilities. The briefing shall include a detailed description of fiscal year 2022-2025 funds execution and deliverables provided; a plan and milestones for execution of fiscal year 2026 funds; a demonstration of asset and vulnerability identification capability currently deployed; and a discussion of how CISA uses this capability to verify and manage Federal, critical infrastructure, and SLTT asset and vulnerability data, as well as helps these partners prioritize and remediate critical vulnerabilities.

*Cyber Workforce Development Activities.*—Within 180 days of the date of enactment of this Act, CISA shall brief the Committees on the TryCyber, Threat Sandbox Challenges, and other cyber workforce development programs. The briefing shall include a discussion of such programs' integration of artificial intelligence tools and other emerging technologies.

*Cybersecurity Grant Program.*—Within 60 days of the date of enactment of this Act, CISA shall report to and brief the Committees on any request in the budget to establish a cybersecurity grant program aimed at private and public water, transportation, and energy providers to implement risk reduction strategies.

*Data Security Vulnerability Improvements.*—Within 180 days of the date of enactment of this Act, CISA shall submit a report to the Committees that examines existing security vulnerabilities of Federal civilian executive branch (FCEB) agencies' IT systems. The report shall include an examination of emerging technologies that could improve the FCEB's data security and protection, such as immutable logging of suspect activity by default, intrusion detection and prevention of mechanisms, automation of asset management, and behavioral indicators.

*Federal Cyber Skilling Academy.*—Within 90 days of the date of enactment of this Act, CISA is directed to provide a briefing on the steps taken to grow the pipeline of the Federal

cybersecurity workforce and the progress made, including the number of personnel who have been trained and been placed into a cybersecurity-related position since the inception of the Academy.

*Federal Network Security Reporting.*—Within 180 days of the date of enactment of this Act, CISA shall provide to the Committees a progress report on the success of each Federal agency and department to implement the established program goals. The report shall also include an accounting of non-CISA resources used for implementation. Finally, the report shall include a description of implementation plans through fiscal year 2028, including desired target completion goals, methods for updating lifecycle costs, acquisition program schedules, and details on how innovation and evolving technology, such as end point detection, could improve Federal network and data security. If necessary, this report may be submitted in a classified format with an unclassified summary.

*Post-Quantum Cryptography (PQC) Initiative.*—The Committees direct CISA to continue its PQC Initiative to prepare for cybersecurity challenges stemming from the capability of quantum computing algorithms to break traditional encryption methods.

*Space Systems.*—Within 90 days of the date of enactment of this Act, CISA shall brief the Committees on its cybersecurity efforts related to commercial space systems. The briefing shall include the feasibility and costs of implementing a pilot program in coordination with the Office of the National Cyber Director (ONCD), National Space Council, and heads of other agencies as appropriate to develop an online, publicly available clearinghouse of information specifically aimed at assisting small business concerns with the secure development, operation, and maintenance of commercial satellite systems.

*State Court Electronic Data.*—The Committees direct CISA to maintain and expand upon prior year outreach to the state courts through national level associations to drive participation and understanding of services available to prevent, protect against, and respond to cyberattacks on state court electronic data systems.

Infrastructure Security

*Artificial Intelligence (AI) Emergency Preparedness and Continuity Planning.*—Within 90 days of the date of enactment of this Act, CISA shall brief the Committees on its efforts to

strengthen AI emergency preparedness and continuity planning activities across critical infrastructure sectors that implement AI in their operations. This includes enhanced regional coordination, technical assistance to state and local governments, risk assessments, and pre-incident operational planning. The briefing shall include initiatives to prioritize support to high-risk communities and sectors vulnerable to natural disasters, cyber incidents, and complex emergencies.

*Bomb Disposal Technician Training and Technology Events (TTEs).*—CISA shall utilize the Office of Bombing Prevention resources to hold a minimum of four technician TTEs across the Nation bringing together Federal and SLTT agencies and industry partners. Within 120 days of the date of enactment of this Act, CISA shall brief the Committees on efforts to conduct these annual TTEs across the Nation. This briefing shall include schedules to conduct a minimum of four TTEs per fiscal year and the total program cost.

*Bombing Prevention.*—Within 90 days of the date of enactment of this Act, CISA is directed to brief the Committees on its fiscal year 2026 plans to support the bomb technician community to include continuing education, post graduate proficiency, and advanced training.

*School Safety.*—The agreement provides $3,341,000 to maintain the fiscal year 2024 level for Federal school safety programs.

Risk Management Operations

*National Risk Management Center (NRMC) Strategic Engagement.*—Within 180 days of the date of enactment of this Act, CISA shall provide a briefing on the NRMC's strategic engagement with election stakeholders, including engagement progress to date, future engagement plans and priorities, and information regarding any identified election security risks and shortfalls that should be mitigated in the near-, mid-, and long-terms.

Stakeholder Engagement and Requirements

*International Cybersecurity Engagement.*—CISA shall coordinate with the Department of State and other entities as appropriate to assess ongoing and recently-completed cybersecurity engagement activities with international partners, including requests for cybersecurity support,

technical assistance, or expertise provided to foreign governments and foreign owners and operators of critical infrastructure. The assessment shall include details on the processes for, barriers to providing, and the average time and cost of providing such support or assistance. Within 270 days of the date of enactment of this Act, CISA shall submit a report to the Committees on the assessment and how it will inform new engagement strategies, including a classified annex if appropriate.

*Tribal Engagement*.—CISA shall brief the Committees within 180 days of the date of enactment of this Act on its engagement with federally recognized tribes. The briefing shall identify how CISA promotes the effective delivery of agency programs, resources, and services to Alaska Native, American Indian, and Native Hawaiian communities within the United States.

Mission Support

*Open-Source Software*.—Within 90 days of the date of enactment of this Act, CISA shall brief the Committees on the feasibility, benefits, and costs of establishing an Open-Source Software Management function modeled after open-source program offices, such as those in the private sector, the nonprofit sector, academia, and other non-Federal entities. The analysis shall consider the secure usage of open-source software at CISA, policies and process for contributions to and releases of open-source software at the agency, interfaces with the open-source software community, and manages and reduces risks of using open-source software at the agency.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

The agreement provides $386,464,000 for Procurement, Construction, and Improvements (PC&I). Of the total, $367,821,000 is provided for Cybersecurity Assets and Infrastructure, including $302,649,000 for Continuous Diagnostics and Mitigation; $60,172,000 for the Cyber Analytics Data System; and $5,000,000 for Threat Hunting for cyber defense operations with CyberSentry. Additionally, $18,643,000 is provided for Emergency Communications Assets and Infrastructure, which includes Next Generation Networks Priority Services Phase 2.

### Cybersecurity

*Continuous Diagnostics and Mitigation (CDM).*—Within 120 days of the date of enactment of this Act, CISA shall brief the Committees on its implementation of the CDM program, including agencies' CDM activities previously or currently supported with CISA funding, the duration of such funding support for each agency—including durations for those that are no longer supported with CISA funds—and when such agencies will begin fully funding their CDM activities.

*Spend Plan.*—Within 60 days of the date of enactment of this Act, CISA shall provide the Committees with a spend plan for the funds provided under PC&I.

*Threat Hunting.*—As a part of the quarterly budget and staffing briefing requirements, CISA shall brief the Committees on the progress made under the CyberSentry program.

## FEDERAL EMERGENCY MANAGEMENT AGENCY

### OPERATIONS AND SUPPORT

The agreement provides $1,667,038,000 for Operations and Support, including increases of: $47,000,000 for activities within the Mt. Weather Emergency Operations Center; $35,765,000 for restoration of positions eliminated in fiscal year 2025; $14,208,000 for Grants Management Modernization; $15,168,000 to support enhanced equipment for Urban Search and Rescue Task Forces; $5,137,000 for continuity of communications; $3,000,000 to support FIFA World Cup and America250 events; $3,000,000 for the expansion of innovative technologies in coordinated disaster response; $1,796,000 for Region II facilities; and $1,000,000 for the administration of the Next Generation Warning System.

*Community Disaster Resilience Zones (CDRZ).*—Within 180 days of the date of enactment of this Act, FEMA shall brief the Committees on best practices from the development and rollout of CDRZ and how such practices will be incorporated into future zone selection criteria. FEMA is directed to engage SLTT stakeholders prior to briefing the Committees.

*Community Project Funding/Congressionally Directed Spending (CPF/CDS) Grants Administration.*—The agreement provides $3,200,000 for the administration of CPF/CDS grants.

Not later than 60 days after the release of a Notice of Funding Opportunity (NOFO) for CPF/CDS projects and monthly thereafter, FEMA shall provide a list of projects deemed ineligible—including ineligibility related to Hazard Mitigation Plans—or at risk of being deemed as such, to include amounts for each project. The report shall cover fiscal years 2022-2026.

*Countering Weapons of Mass Destruction (CWMD) Activities.*—In conjunction with the fiscal year 2027 budget request submission, FEMA is directed to provide a proposed distribution of funds provided in Mission Support to oversee activities and programs transferred from CWMD. FEMA may also submit any recommendations for efficiencies or reductions to these programs.

*Disaster-Impacted Renters and Rental Markets.*—Within 30 days of the date of enactment of this Act, FEMA, in coordination with the Department of Housing and Urban Development, shall support a National Academy of Public Administration study examining how renters and rental markets have recovered from recent major disasters, with a focus on disasters involving long displacement times for significant numbers of renter households.

*Emergency Management Assistance Compact (EMAC).*—The agreement directs FEMA to ensure that the level of funding for EMAC is specified in the budget request for fiscal year 2027.

*FEMA Advisory Committee.*—Within 30 days of the date of enactment of this Act, FEMA shall report to the Committees on the status of the National Advisory Council, the National Dam Safety Review Board, and the Technical Mapping Advisory Council and provide a timeline for appointing members to unfilled positions.

*FEMA Workforce.*— FEMA shall maintain staffing levels, including a reservist workforce and its Cadre of Response/Recovery Employees, necessary to fulfill the missions required under the Homeland Security Act of 2002 (Public Law 107–296; 115 Stat. 2135; 6 U.S.C. 101 et seq.); the Robert T. Stafford Disaster Relief and Emergency Assistance Act (Public Law 100–707; 102 Stat. 4689; 42 U.S.C. 5121 et seq.); the Disaster Mitigation Act of 2000 (P.L. 106–390, 114 Stat. 1552); the Post-Katrina Emergency Management Reform Act of 2006 (title VI of Public Law 109–295; 120 Stat. 1394); the Sandy Recovery Improvement Act of 2013 (division B of Public Law 113–2; 127 Stat. 39); the Disaster Recovery Reform Act of 2018 (division D of Public Law 115–254; 132 Stat. 3438); and other FEMA authorities. For example, FEMA's activities related to its federal assistance mission shall include issuing guidance,

reviewing disaster and non-disaster grant applications, obligating and outlaying awards, and providing technical assistance and operational support to grantees in a timely manner; reviewing and approving plans for obligating and expending Federal funds; reviewing expenditures and reports for waste, fraud, and abuse; and performing all other necessary duties to allow recipients to proceed without unnecessary interruption. Within 30 days of the date of enactment of this Act, and monthly thereafter, FEMA shall provide a briefing to the Committees on staffing levels and workload requirements, as detailed above, delineated by PPA and program office. Such briefings shall also include projected staffing levels for the remainder of the fiscal year in light of the agreement's rejection of the position reductions implemented in fiscal year 2025.

*FEMA and U.S. Fish and Wildlife Service (FWS) Dam Removal.*—Within 180 days of the date of enactment of this Act, FEMA and FWS shall provide a joint briefing to the Committees on plans to increase interagency coordination around dam removal and flood map updates and provide a timeline for the updating of flood maps for states where dam removals have taken place within the past 10 years.

*FEMA Regional Offices.*—FEMA shall not close, eliminate, or consolidate its regional offices in a manner that violates current statute.

*FEMA Review Council.*—FEMA shall not implement an elimination or reorganization plan for the Agency or any proposal to inhibit the performance of the Agency's functions and activities funded by this Act without an act of Congress permitting such measures.

*Flood Early Warning Systems.*—Within 90 days of the date of enactment of this Act, FEMA shall brief the Committees on its assessment of the operational reliability of flood early warning systems.

*Hail.*— FEMA shall report to the Committees within 180 days of the date of enactment of this Act on identification of cost-effective and widely-deployable solutions to reduce damage caused by severe weather events involving hail.

*Hazard Mitigation Grant Program.*—Within 30 days of the date of enactment of this Act, FEMA shall brief the Committees on execution of the Hazard Mitigation Grant Program.

*Nation-State Actor Threats.*—FEMA, in conjunction with CISA and other relevant DHS stakeholders, is directed to develop an outreach plan amongst emergency management leadership to provide regular updates on potential nation-state actor threats, identify ways in which existing programs can be updated and utilized to enhance preparedness, and communicate strategies to

increase public awareness. FEMA shall brief the Committees on such a plan within 270 days of the date of enactment of this Act.

*Next Generation Warning System (NGWS) Administration.*—FEMA is directed to provide a briefing to the Committees within 30 days of the date of enactment of this Act on plans for administration of the NGWS grant program for fiscal year 2026, as well as details of the administration of fiscal year 2025 funds.

*Safeguarding Tomorrow through Ongoing Risk Mitigation (STORM) Act.*—The agreement continues $1,000,000 and associated personnel to continue the fiscal year 2024 service level to manage and administer such grants.

*Synthetic Aperture Radar (SAR) Satellite-Driven Hazard Monitoring.*—The agreement provides an additional $4,000,000 to support continuous SAR satellite-driven hazard monitoring technology. Not later than 120 days after the date of enactment of this Act, FEMA shall provide a spend plan to the Committees for these enhanced funds. Additionally, within 180 days of the date of enactment of this Act, FEMA is directed to brief the Committees on efforts to integrate this technology into current disaster response efforts.

*Unmanned Aerial System (UAS) Training.*—The agreement provides an additional $5,000,000 for UAS training efforts and directs FEMA to collaborate with the Federal Aviation Administration's (FAA) Center of Excellence for UAS and other subject matter experts to build a federated ecosystem to teach, train, educate, certify, and credential first responders to employ UAS skills during emergency management events.

*Urban Flood Mapping Pilot Program.*—Within 60 days of the date of enactment of this Act, FEMA shall brief the Committees on progress in developing the previously-enacted Urban Flood Mapping pilot program, which received $1,200,000 through Public Law 116–93.

*Wildland Fire Mitigation and Management Commission Recommendations.*—FEMA is directed to brief the Committees within 180 days of the date of enactment of this Act, and semi-annually thereafter, on efforts to implement relevant Wildland Fire Mitigation and Management Commission recommendations. Such briefings shall include efforts to conduct stakeholder engagement, identification of recommendations that are regulatory in nature or require congressional action, and resources to aid in implementation.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

The agreement provides $156,419,000 for Procurement, Construction, and Improvements. Of this amount, $63,625,000 is for improvements at Mt. Weather Emergency Operations Center; $52,375,000 is for national continuity programs; and $12,000,000 is for the Integrated Public Alert and Warning System.

FEDERAL ASSISTANCE

The agreement includes $3,836,748,513 for Federal Assistance.

*Continuing Training Grants.*—Within the total amount provided for Continuing Training Grants, $1,900,000 shall be for FEMA to partner with the FAA Center of Excellence for UAS to conduct a regional training program on utilizing UAS for disaster preparedness and response for SLTT responders; $7,600,000 shall be for activities of the National Cybersecurity Preparedness Consortium (NCPC); and not less than $2,850,000 shall be competitively awarded for FEMA-certified rural and tribal training.

*Flood Hazard Mapping and Risk Analysis Program (RiskMAP).*—Within 180 days of the date of enactment of this Act, FEMA shall brief the Committees on progress in implementing RiskMAP.

*Grant Award Considerations.*—When awarding grants, the Administrator shall consider the needs of cybersecurity preparedness and planning, state court cybersecurity, 911 call capability, alert and warning capabilities, and implementation of the REAL ID Act (P. L. 109-13).

*Grants Reporting.*—Within 30 days of the date of enactment of this Act and not later than the fifth business day of each month thereafter, FEMA shall provide to the Committees a report identifying the current expected NOFO release dates for each Federal assistance program for which funding is provided or was otherwise made available in fiscal year 2025 and fiscal year 2026 by this or any other Act. The report shall identify the current expected application, review, and award schedules. Following the awarding of Federal assistance for each program, each report shall include the amounts expended under such program's awards. The report shall include

the status of all prior year Federal assistance funding, including whether and for what amounts any such funds have been reprogrammed, transferred, obligated, expended, or lapsed. Additionally, within 90 days of the date of enactment of this Act, FEMA shall provide a report to the Committees detailing the rationale for each individual award termination and the amount terminated.

*Improving Rural Access to Assistance to Firefighters Grants (AFG) and Staffing for Adequate Fire and Emergency Response (SAFER).*—FEMA is directed to review the AFG and SAFER grant programs and identify potential improvements. Within 270 days of the date of enactment of this Act, FEMA shall brief the Committees on recommendations to improve access and distribution of AFG and SAFER grants to rural fire departments.

*Law Enforcement Terrorism Prevention Activities (LETPA) Set-Aside for State Homeland Security Program (SHSP) and Urban Area Security Initiative (UASI).*—Prior to establishing the LETPA set-aside for the SHSP and UASI grant programs, FEMA is directed to brief the Committees on the threat environment. FEMA shall include a discussion of any stakeholder engagement conducted to date in such briefing.

*National Domestic Preparedness Consortium (NDPC).*—Within the funds provided for NDPC, $3,000,000 shall be used to improve domestic preparedness and provide training to emergency responders and event personnel involved in large spectator sports or special events, and $5,000,000 shall be used to provide training for rural county emergency response officials.

*Next Generation Warning System (NGWS).*—FEMA shall use funds provided for the NGWS for technical assistance, infrastructure replacement, infrastructure hardening, cybersecurity, technology infrastructure, improving access to alerts, and operational continuity support.

*Operation Stonegarden.*—Within 180 days of the date of enactment of this Act, FEMA is directed to submit to the Committees data from the last three fiscal years detailing Operation Stonegarden awards by state and recipient and the process used to determine such awards and recipients. Additionally, FEMA shall brief the Committees on the data and justifications for Operation Stonegarden awards 15 days before such awards are publicly announced.

*Reporting on Lithium-ion Battery Related Fires.*—The U.S. Fire Administration (USFA) shall form a cadre of Fire Data Leaders nationwide to provide technical expertise and assistance to local fire departments in need, and the agreement provides an additional $500,000 for the

development of a National Fire Data Corps to support fire and emergency services in their adoption and use of National Emergency Response Information System (NERIS). Additionally, the agreement provides an increase of $5,000,000 in support of USFA's user training on NERIS, including training on reporting lithium-ion battery-related fires.

*Temporary Housing and Non-Congregate Sheltering.*—The agreement directs GAO to conduct an assessment of current temporary housing and non-congregate sheltering options, including non-congregate structures, that are available on the market and whether FEMA utilized the most cost-effective, viable solutions following major disaster declarations in fiscal years 2022-2025. GAO shall brief the Committees within 270 days of the date of enactment of this Act on the costs, benefits, disadvantages, feasibility, and utility of the creation of a national stockpile of rapid response, cost-effective temporary shelter solutions.

*U.S. Fire Administration.*—The agreement provides an additional $5,000,000 for NERIS modernization. FEMA is directed to continue its traditional funding for the congressionally-mandated National Fallen Firefighters Memorial. Additionally, FEMA shall provide a briefing to the Committees within 180 days of the date of enactment of this Act regarding any plans to revise Emergency Support Function #4 – Firefighting to clarify or change USFA's role in responding to structural fires and wildland fires that burn into the wildland urban interface.

*Urban Area Security Initiative.*—Within 90 days of the date of enactment of this Act, FEMA shall provide a briefing to the Committees detailing the current risk and threat assessment methodology used for UASI, any geographic-related factors used to assess the risk of urban areas applying for funding, and how such geographic-related factors are used in developing urban areas' risk and threats. Further, FEMA shall provide to the Committees a report on fiscal year 2022-2025 UASI funding awards, the number of grant applicants in those years, and any quantitative or qualitative results or other outcomes related to such awards within 180 days of the date of enactment of this Act. Additionally, FEMA is directed to examine the enhanced use of the FBI's Threat Review and Prioritization program in the development of Metropolitan Statistical Area Risk Profiles.

DISASTER RELIEF FUND

The agreement provides $26,367,000,000 for the Disaster Relief Fund (DRF).

*Building Resilient Infrastructure and Communities (BRIC).*—Within 30 days of the date of enactment of this Act and monthly thereafter, FEMA shall brief the Committees on the status of BRIC, including projected funding levels. Within 90 days of the date of enactment of this Act, FEMA shall brief the Committees on the abilities of states and local jurisdictions to qualify for access to BRIC. The briefing shall include, but not be limited to, an analysis of the applicants' abilities to meet the program's building code requirements, their options outside of the program to assist communities with needed predisaster mitigation, and other challenges in addressing predisaster mitigation. The briefing shall also include a discussion of the feasibility of modifying the existing technical scoring criteria in the NOFO to provide local jurisdictions with full application points for the building codes implemented by municipalities within the boundary of a county, as well as for other mechanisms to protect property such as advanced floodplain regulations and drainage criteria carried out by a county. Additionally, within 180 days of the date of enactment of this Act, FEMA is directed to brief the Committees on the steps taken to address applicants' concerns regarding building codes.

*BRIC Termination Reporting.*—Within 180 days of the date of enactment of this Act, FEMA is directed to brief the Committees on the specific BRIC grants terminated by FEMA. At a minimum, the briefing shall include a table for each terminated BRIC grant detailing: the previous grant award amount; the percentage of the award disbursed prior to termination; the amount of the award that the grantee returned as a result of the BRIC award termination; a description of work completed under the BRIC award prior to termination; and a description of work unable to be completed due to BRIC award termination. Additionally, within 60 days of the date of enactment of this Act, the Department shall brief the Committees on its rationale for terminating the BRIC program, including justifying forgoing long-term savings associated with investing in predisaster mitigation. The briefing shall include comprehensive empirical data related to claims of waste, fraud, and abuse, to the extent that any exists.

*Debris Removal.*—Within 90 days of the date of enactment of this Act, FEMA is directed to submit to the Committees a report clarifying debris removal and public safety policies across all types of communities with established community associations. Additionally, within 180 days of the date of enactment of this Act, FEMA shall brief the Committees on the number and type of discrimination incidents related to debris removal reported to FEMA since October 1, 2022, as

well as a summary of related public comments received during the drafting of the most recent version of FEMA's Public Assistance Program and Policy Guide (PAPPG).

*Declaration of a Disaster.*—Within 30 days of the date of enactment of this Act, FEMA shall provide a briefing and submit to the Committees current or updated written evaluation factors, thresholds, and any other written or unwritten criteria used to determine eligibility requirements when making final recommendations related to emergency or major disaster declarations. The briefing shall include how each declaration request received by the Executive Branch in the previous fiscal quarter measures against the specific factors, thresholds, and criteria identified. The briefing shall also include the specific reason(s) for any delays in findings of eligibility or ineligibility of more than 20 days from the receipt of each outstanding emergency declaration request or 30 days from the receipt of each outstanding major disaster declaration request. Additionally, updated factors, thresholds, and criteria shall be provided to the Committees not later than the day on which any such update takes effect.

*DRF Monthly Report.*—In addition to the information required in the monthly report, FEMA is directed to provide a projection of obligations from the DRF for the twelve-month period following the date of submission of the current month's report to the Committees.

*Housing Assistance Delivery.*—GAO shall provide a report and briefing to the Committees within 270 days of the date of enactment of this Act analyzing the economic impacts of FEMA's financial housing assistance on communities that have housing shortages.

*Immediate Needs Funding (INF).*—Within 30 days of the date of enactment of this Act, FEMA shall brief the Committees on current policies and procedures for INF implementation, including the analysis of DRF balances and obligation projections used to inform implementation decisions, and the categories of work for which FEMA would likely delay reimbursements of otherwise eligible costs during implementation. Additionally, the briefing shall include an analysis of the benefits and costs of utilizing a strategic approach to the deployment of INF as opposed to an overall cessation of reimbursements. Further, FEMA shall brief the Committees monthly regarding any ongoing utilization of INF, including the analysis and metrics used to make an implementation decision, and the projected date by which INF implementation will end. Finally, during any implementation of INF, FEMA shall provide to the Committees a weekly report of delayed eligible reimbursements delineated by declared disaster, state, and categories of work.

*Indirect Costs Reimbursement.*—Until FEMA establishes management cost rates for the Disaster Case Management (DCM) program, FEMA shall provide an annual report to Congress on the effect of failing to establish management cost rates on DCM capacity, particularly with respect to nonprofit DCM providers.

*Natural Infrastructure Activities.*—Within 180 days of the date of enactment of this Act, FEMA shall provide a report to the Committees on the number, total requested funding, and percentage of fiscal years 2023 and 2024 BRIC applications for natural infrastructure projects, as well as a comparison of such data points to each of the fiscal years 2020 through 2022 grant cycles. The report shall be disaggregated by successful and unsuccessful applications and detail the types of natural infrastructure activities funded.

*Preservation of Surveyors Marks.*—Within 180 days of the date of enactment of this Act, FEMA shall provide a briefing to the Committees on the potential benefits of including surveying mark preservation performed by land surveyors as a core activity for disaster planning, emergency response, disaster cleanup, and disaster recovery efforts.

*Public and Individual Assistance.*—Section 313 of this Act includes language requiring FEMA to produce an interactive dashboard on its publicly accessible website showing the status of certain requests for reimbursement. The dashboard shall include the following information:

(1) the damage category code;

(2) for each proposed grant award, information on each cost estimate, applicant ID, the date of each submission, the descriptions for each project, and the cost of each project delineated by the Federal and non-Federal cost-share;

(3) the status of FEMA's review and approval of each cost estimate submitted, including the date on which a project is approved and the date on which the grant is issued;

(4) an explanation for any cost estimate that is not approved, or if the grant is not provided in the timeline as required, and any corrective action taken by FEMA;

(5) project-level progress updates;

(6) requests for assistance submitted, including dates and amounts of each request, timelines for submissions of required information, and dates of approval and disbursement of awards; and

(7) any other information the Administrator determines to be appropriate to ensure transparency and accountability in the administration of public assistance.

*Reimbursements.*—FEMA is directed to complete a review of outstanding reimbursements expeditiously and to provide a report to the Committees within 60 days of the date of enactment of this Act, and monthly thereafter, outlining any previous or ongoing challenges to reviewing reimbursement claims in a timely manner. Each report shall include the current number of disaster reimbursement requests currently pending FEMA review, delineated by state and funding amount, and a plan and timeline for reducing the number of open requests.

*Reimbursement for Interest.*—Within 180 days of the date of enactment of this Act, FEMA shall provide a report to the Committees detailing reimbursement for interest accumulated on qualifying disaster relief loans pursuant to the most recent version of the PAPPG. The report shall include details on the process through which entities can apply for interest reimbursement and information or examples about how interest reimbursement has been provided.

*Snowstorms.*—The agreement reaffirms Congress' intent, pursuant to 42 U.S.C. 5122(2), that snowstorms shall be eligible for Federal relief under major disaster declarations and notes that a major disaster declaration shall not be withheld simply due to that disaster's classification as a snowstorm.

*Temporary Shelters and Emergency Housing.*—FEMA is directed to brief the Committees within 270 days of the date of enactment of this Act on the current utilization restrictions and categorical eligibility regarding temporary transportable housing units and alternative temporary transportable housing units, the reasons such restrictions are in place, and potential future adjustments.

NATIONAL FLOOD INSURANCE FUND

The agreement includes $226,000,000 for the National Flood Insurance Fund (NFIF). FEMA is directed to conduct quarterly reporting on the NFIF in a public and transparent manner while complying with other reporting requirements in statute. Should FEMA fail to meet the quarterly reporting requirement, the Administrator is required to provide a documented reason for the delay and a status update every 30 days to the Committees until the report is issued. If the Administrator fails to produce a quarterly report, the Administrator or their designee is required

to provide a briefing to the Committees within five business days on the National Flood Insurance Programs debt repayment plan.

*Habitat Restoration Permitting.*—Within 60 days of the date of enactment of this Act, FEMA shall brief the Committees on the steps taken to streamline habitat restoration permitting and a timeline for future related actions.

*Swift Current Program.*—The Committees direct FEMA to provide additional time for eligible states, territories, and tribes to apply for Swift Current Program funding through a process determined by the Administrator. Within 180 days of the date of enactment of this Act and not less than 15 days prior to implementation of such process, FEMA shall brief the Committees on the planned implementation of such process.

## TITLE III—ADMINISTRATIVE PROVISIONS

(INCLUDING TRANSFERS OF FUNDS)

Section 301. The agreement continues and modifies a provision making "Cybersecurity and Infrastructure Security Agency—Operations and Support" funding available for procuring and providing cybersecurity threat feeds to CISA stakeholders and partners.

Section 302. The agreement continues a provision limiting expenses for administration of grants.

Section 303. The agreement continues and modifies a provision specifying timeframes for information on certain grant awards.

Section 304. The agreement continues and modifies a provision requiring a five-day advance notification for certain grant awards under "Federal Emergency Management Agency—Federal Assistance".

Section 305. The agreement continues a provision that addresses the availability of certain grant funds for the installation of communications towers.

Section 306. The agreement continues a provision requiring a report on the expenditures of the DRF.

Section 307. The agreement continues a provision permitting waivers to certain SAFER grant program requirements.

Section 308. The agreement continues a provision providing for the receipt and expenditure of fees collected for the Radiological Emergency Preparedness Program, as authorized by Public Law 105–276.

Section 309. The agreement continues a provision permitting waivers to certain Assistance to Firefighter Grants program requirements.

Section 310. The agreement continues and modifies a provision regarding the transfer of unobligated balances under the National Predisaster Mitigation Fund.

Section 311. The agreement continues and modifies a provision regarding the transfer of unobligated balances under the Flood Hazard Mapping and Risk Analysis Program.

Section 312. The agreement includes a new provision that provides a minimum and maximum for grant periods of performance.

Section 313. The agreement includes a new provision requiring a dashboard for reimbursements made pursuant to a major disaster declaration under the Stafford Act.

Section 314. The agreement includes a new provision prohibiting the pausing of training or grants funded under FEMA Federal Assistance.

# TITLE IV—RESEARCH, DEVELOPMENT, TRAINING, AND SERVICES

## UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES

### OPERATIONS AND SUPPORT

The agreement provides $122,941,000 for Operations and Support, including $10,375,000 for backlog reduction.

*Administrative Holds.*—Within 90 days of the date of enactment of this Act and quarterly thereafter, USCIS shall provide information related to USCIS' administrative holds or suspension of processing on the adjudication of several benefits requests as a result of Executive Orders 14161 or 14157. The report shall include: the number of applicants or beneficiaries whose form processing is on administrative hold or otherwise suspended, including the form type and filing category; the number of days each form has been pending from the time of filing; the number of applications subject to administrative holds or suspensions, disaggregated by form type and filing category for which a fee was paid and processed or a fee waiver was granted; and the number of days each form has been pending from the date the administrative hold or suspension on processing was placed.

*Affirmative Asylum Backlog and Asylum Officer Staffing.*—The agreement continues the reporting requirements in the explanatory statement accompanying Public Law 118–47 and further directs USCIS to submit a report to the Committees within 90 days of the date of enactment of this Act regarding the status of the affirmative asylum backlog, including how funds in fiscal year 2025 were used to reduce the backlog, the number of affirmative asylum cases still pending by year of application date, whether the cases have received an interview, the number of personnel dedicated to reducing the backlog, and any additional financial resources necessary to reduce the backlog. Additionally, USCIS is directed to publish publicly the number of asylum officers, the offices each asylum officer is assigned to, the number of asylum officers dedicated to backlog cases, and the number of asylum officers deployed to the southwest border within 120 days of the date of enactment of this Act.

*Application Processing.*—USCIS is directed to make available on a publicly accessible website an interactive dashboard detailing for all USCIS forms, the number of forms received, processed, approved, denied, and pending by month, along with the average processing time and

the number of forms pending for more than six months. USCIS shall update the Committees on the status of this requirement during the quarterly budget and productivity briefings required by House Report 118–123. The dashboard shall be updated monthly but not later than the tenth business day following the end of each month and permit the downloading of the underlying data in a searchable and sortable spreadsheet format. Additionally, not later than 45 days after the date of the close of the fiscal year, USCIS shall publicly post data related to a fear of intimate partner violence in the applicants' home country reflecting: the number of people claiming to have a credible or reasonable fear under Section 235 of the Immigration and Nationality Act (INA); the number of principal asylum applications filed affirmatively with USCIS under Section 208 of the INA based in whole or in part of such fear, delineated by whether such applications were based in whole or in part; the number of principal asylum applications USCIS granted wholly or in part on account of the applicant's fear of intimate partner violence in their home country, delineated by whether such applications were granted based in whole or in part; and the country of origin for each applicant, whether they were represented by an attorney, accredited representative, or other individual, and whether there was an interpreter present for the credible fear and asylum interviews.

*Audio and Video Interviews.*—Within 90 days of the date of enactment of this Act, USCIS shall provide a report on the number of interviews conducted remotely or by video, what infrastructure was created to do so while preserving a fair and impartial process, and what USCIS needs to efficiently use remote interview capabilities. The report should also include challenges and best practices in conducting remote interviews and factors that informed the Department's decisions around which applicants were eligible for a remote interview, as well as statistics outlining the rates of outcomes between an in-person and remote interview modality for each of the last three fiscal years.

*Biometrics Collection.*—USCIS, in consultation with CBP, is directed to provide a report within 180 days of the date of enactment of this Act on the feasibility and associated resource cost of biometrics collection, for use by USCIS, at CBP locations where there is no USCIS office and where the closest USCIS office is only accessible by airplane, vessel, or is more than 500 miles away from the CBP location.

*Central American Minors (CAM) Program.*—Within 90 days of the date of enactment of this Act, USCIS, in coordination with partner agencies, shall publicly publish data including the

number of CAM applications; approval and denial rates; interviews conducted and whether legal representation was provided; CAM arrivals, disaggregated by refugee and parole arrivals; and average processing times, disaggregated by country and by refugee and parole arrivals.

*Child Applicant Interviews.*—Within 90 days of the date of enactment of this Act, USCIS shall brief the Committees on the current policies and procedures in place concerning interviews that occur when children are the applicant/beneficiary or when children are present in the interview. At a minimum, the briefing shall cover when any child well-being professionals were consulted in the formulation of the policies and procedures, how frequently adjudicators are trained on such policies, and any best practices for conducting interviews when there are children present.

*Coordination with the Office of Refugee Resettlement (ORR).*—Within 180 days of the date of enactment of this Act, USCIS is directed to provide a report to the Committees on the coordination efforts with ORR, including any areas that require improvement regarding the referral process for newly granted asylees.

*Cost Recovery.*—In lieu of the House language under this heading, the agreement directs USCIS to continue to provide fee waiver data in the quarterly budget and staffing briefings required by House Report 117–396 and to provide the briefing required under the heading "Fee Waivers and Application Deadlines" included in the explanatory statement accompanying Public Law 118–47.

*Employment Authorization Backlog Reporting.*—The agreement continues to direct USCIS to make employment authorization backlog statistics available on a publicly accessible website on a quarterly basis with the following modifications: the total number of filed employment authorization applications pending; the total number of such applications that have been pending for: 30 or fewer days; 31–60 days; 61–90 days; 91–120 days; 121–179 days; 180–540 days; 541 or more days; and a summary, on an annual basis, of all existing processing time goals, the source of the time goal, and whether the agency met the time goal for the prior fiscal year. The agreement further directs USCIS to brief the Committees within 120 days of the date of enactment of this Act on the number of reported mistakes on employment authorization documents issued by the agency, timelines associated with remedying such mistakes, and the resources required to issue corrected employment authorization documents within 90 days of receipts.

*Fee Collection Transparency.*—Within 30 days of the date of enactment of this Act, and every 30 days thereafter, USCIS shall publicly report whether any fees collected by USCIS have been utilized for immigration enforcement purposes and the statutory authority for such utilization. Such report shall include the purpose and amount of such uses and shall indicate the original source of fees based on form type of such collected fee.

*Fee Waivers Under Federal Poverty Guidelines.*—USCIS is directed to continue its current policy regarding fee waivers, both full and partial, for certain eligible applicants and shall continue accepting current eligible items as proof, aligned with prevailing policy.

*H–2A Visas.*—In consultation with the Department of Labor (DOL) and within 120 days of the date of enactment of this Act, USCIS is directed to provide to the Committees a report on the impacts of exempting dairy industry activities from the temporary or seasonal requirements of the H–2A program. Additionally, the agreement continues the direction in the explanatory statement accompanying Public Law 118–47 under the "Prevention of Abuses in the H-2A Program" heading.

*H–2B Visas.*—The agreement directs USCIS, in consultation with DOL and other relevant departments:

(1) to examine the impacts of the current H–2B visa semiannual distribution on employers, employees, and agency operations and to provide the Committees with a briefing on the conclusions within 180 days of the date of enactment of this Act;

(2) to provide a report to the Committees within 180 days of the date of enactment of this Act on the following: data on the economic impact of the H–2B visa program on a state-by-state and national level; the estimated number of H–2B visas that would have been required to meet demand in fiscal year 2025 on a state-by-state and national level, absent any restrictions on the number of H-2B visas issued; and any economic impact that resulted from the inability to issue visas that would meet the estimated demand; and

(3) to provide a report within 120 days of the date of enactment of this Act making recommendations to ensure that the integrity of the program is safeguarded and that the limited number of H–2B visas are reserved for law-abiding employers. The report shall include the effects on prohibitions on implementation of DOL regulations relating to corresponding employment, the three-quarter guarantee, and prevailing wages and working conditions for individuals and U.S. workers; and the number of H–2B visas, including the

number of supplemental visas issued in each of the past three years to entities and individuals who in the past five years were found to have committed H–2A or H–2B violations, which include the number of visas allocated to violators who at any point have committed egregious H–2A or H–2B violations such as visa fraud and wage theft, and indicating the dates of the violations and visa issuance.

*Implementation of Grant Funding.*—USCIS is reminded of its statutory requirement to execute funds that Congress has previously appropriated. USCIS is directed to brief the Committees within 45 days on execution of prior years' Federal Assistance funding. USCIS shall provide the Committees with its legal justification for terminating any grant program and associated funding within 45 days of the date of enactment of this Act.

*Naturalization at Basic Training.*—Not later than 90 days after the date of enactment of this Act, USCIS shall brief the Committees on plans to expand Naturalization at Basic Training and ensure eligible military recruits and servicemembers have necessary assistance to complete the process, including attending interviews and appointments.

*P-3 Refugee Processing.*— The agreement continues the requirements found under this heading in Senate Report 118-85.

*Policy Changes.*—USCIS is directed to brief the Committees three business days before implementation of significant changes to any current policy. Additionally, USCIS shall continue to make all policy memos publicly available immediately upon implementation of significant change to any current policy.

*Special Immigration Juvenile (SIJ) Visas Backlog.*—The agreement continues the directive found under this heading in Senate Report 118–85, including the directive to publish copies of SIJ Visa backlog reports publicly within five days of submission to the Committees.

*Status for Certain Individuals.*—The agreement reiterates the directives found in the House Report regarding the required consideration, analysis, and evaluation of the status designation of individuals from certain countries, as well as the required briefing to the Committees.

*USCIS Backlog and Frontlog Reporting.*—The agreement continues the directives found under this heading in Senate Report 118–85.

*USCIS Field Offices.*—Not later than 60 days after the date of enactment of this Act, USCIS is directed to brief the Committees on the current budgetary impact of field offices in

major metropolitan areas, whether these offices have personnel assigned to backlog reduction efforts, and the impact on staffing should these offices move locations to a less populated area. If USCIS has moved a field office location from an area with a population of 500,000 people or greater to an area of less than 100,000 people in the past two years, USCIS shall ensure the availability of services in the prior major metropolitan location.

*United States Refugee Admissions Program.*—Within 90 days of the date of enactment of this Act, and quarterly thereafter, USCIS shall submit a report to the Committees and make available to the public on its website the information described on the United States Refugee Admissions Program (USRAP) with the following information:

(1) for each fiscal year 2020 through 2025, the average duration of each step of the refugee screening process; the number of interviews, approvals, and denials of refugee applications; the number of cases placed on hold or that are pending; and the use of waivers or other flexibilities to expedite the process;

(2) for the current fiscal year, the number of refugees in the USRAP pipeline, disaggregated by status;

(3) the total number of Afghan nationals referred to the USRAP, disaggregated by P-1, P-2, P-3, P-4, and I–730; the total number of Afghan SIV applicants; and the number of Afghan nationals with pending Humanitarian Parole applications; and

(4) the number of Iraqi P-2 Direct Access Program adjudications since the resumption of the program on March 1, 2022. Such report shall also include information on the suitability of extending Priority 2 status to Uyghurs and Hong Kong residents.

*Visa Application Processing.*—USCIS is directed to provide a briefing to the Committees within 180 days of the date of enactment of this Act on possible visa application processing efficiencies that can be implemented, including an assessment of the feasibility of executing processes at both USCIS and DOL's Office of Foreign Labor Certification processes concurrently to reduce wait times.

## FEDERAL LAW ENFORCEMENT TRAINING CENTERS

### OPERATIONS AND SUPPORT

The agreement provides $379,837,000 for Operations and Support.

The agreement directs Federal Law Enforcement Training Centers (FLETC) to provide a cost analysis detailing, at minimum, each training center's maximum instructional capacity by course and measured against its annual student occupancy not later than 90 days after the date of enactment of this Act.

*Human Trafficking Awareness Training.*—The agreement provides $1,000,000 for Human Trafficking Awareness Training.

*Law Enforcement Training.*—FLETC is directed to ensure training of CBP and ICE law enforcement personnel includes de-escalation tactics. The agreement provides $2,000,000 to FLETC to ensure training of DHS law enforcement personnel includes de-escalation tactics. Not less than 30 days after the date of enactment of this Act, FLETC shall brief the Committees on the training curriculum regarding de-escalation and community engagement standards provided to DHS law enforcement personnel. The Department shall provide a quarterly report to the Committees on the number of law enforcement personnel, by component, trained in de-escalation tactics.

### PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

The agreement provides $18,300,000 to address the most critical of FLETC's major deferred maintenance projects that would improve delivery of training or the health and welfare of students.

## SCIENCE AND TECHNOLOGY DIRECTORATE

### OPERATIONS AND SUPPORT

The agreement provides $352,802,000 for Operations and Support. Of the total amount provided for this account, $201,183,000 is available until September 30, 2027 for Laboratory Facilities and Acquisition and Operations Analysis.

*Partnership Intermediary Agreements.*—The agreement sustains base funding for Partnership Intermediary Agreements to enable components across the Department to engage immediately on technology transfer and transition activities.

*SAFETY Act.*—The agreement directs S&T to eliminate the backlog of renewal certifications of qualified anti-terrorism technologies to complete all future renewal certifications within 90 days of the date of application.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

The agreement provides $51,500,000 for Procurement, Construction, and Improvements, including $41,500,000 for Plum Island Closure and Support and $10,000,000 for Critical Repair/Replacement Requirement.

*Plum Island Closure and Support (PICS) Program.*—Not later than 90 days after the date of enactment of this Act, DHS and USDA shall provide a joint briefing to the Committees. The briefing shall identify the root causes that delayed the transition from PIADC to NBAF, the remaining barriers to the transition, and the joint plan to overcome those barriers. The briefing shall include a revised timeline and detailed budget requirements to finalize the transition. Further, S&T is directed to continue providing semi-annual briefings on the progress of these activities.

RESEARCH AND DEVELOPMENT

The agreement provides $426,904,000 for Research and Development.

Research, Development, and Innovation

The agreement provides $379,904,000 for Research, Development, and Innovation. Within 60 days of the date of enactment of this Act, S&T shall provide a spend plan for Research and Development.

*Bi-National Cooperative Program.*—Within the funds provided, the agreement directs S&T to continue its engagement in the Binational Research and Development program and work with partners to develop innovative technology solutions for homeland security needs.

*Next-Generation Biosurveillance Systems.*—Within 90 days, S&T, in consultation with academia, industry, and SLTT partners, is directed to provide a funding plan by fiscal year and transition plans for the development of the next generation Biosurveillance System, including how MALDI–TOF MS will be employed.

*Opioid and Fentanyl Detection.*—The agreement directs S&T to provide a briefing within 90 days of the date of enactment of this Act on any research or development to incorporate rapid scanning into screening methods for drug interdiction.

University Programs

*Centers of Excellence (COE) Program.*—In lieu of the House language under this heading, the agreement provides $47,000,000 for COEs and directs S&T to restore and fund, within 30 days of enactment of this Act, partnerships with all COEs that had option years remaining at the time of termination. The Committees further direct S&T to brief the Committees within 60 days of the date of enactment of this Act on its plan for restoring partnerships with all affected institutions. The agreement also directs DHS to include funding for nine Centers of Excellence in its Fiscal Year 2027 budget submission.

TITLE IV—ADMINISTRATIVE PROVISIONS

Section 401. The agreement continues a provision allowing USCIS to acquire, operate, equip, and dispose of up to five vehicles under certain scenarios.

Section 402. The agreement continues a provision limiting the use of A-76 competitions by USCIS.

Section 403. The agreement continues a provision related to the collection and use of biometrics.

Section 404. The agreement continues a provision authorizing the Director of FLETC to distribute funds for expenses incurred in training accreditation.

Section 405. The agreement continues a provision directing the FLETC Accreditation Board to lead the Federal law enforcement training accreditation process to measure and assess Federal law enforcement training programs, facilities, and instructors.

Section 406. The agreement continues a provision allowing the acceptance of transfers from government agencies into "Federal Law Enforcement Training Centers—Procurement, Construction, and Improvements".

Section 407. The agreement continues a provision classifying FLETC instructor staff as inherently governmental for certain considerations.

## TITLE V—GENERAL PROVISIONS
## (INCLUDING TRANSFERS AND RESCISSIONS OF FUNDS)

Section 501. The agreement continues a provision directing that no part of any appropriation shall remain available for obligation beyond the current year unless expressly provided.

Section 502. The agreement continues a provision providing authority to merge unexpended balances of prior appropriations with new appropriation accounts, to be used for the same purpose, subject to reprogramming guidelines.

Section 503. The agreement continues a provision related to reprogramming limitations and transfer authority.

The Department must notify the Committees on Appropriations at least 30 days in advance of each reprogramming of funds that would: (1) reduce programs, projects, and activities, or personnel, by 10 percent or more; or (2) increase a program, project, or activity by more than $5,000,000 or 10 percent, whichever is less.

The term "program, project, and activity" (PPA) is defined as each functional category listed under an account heading in the funding table at the back of this explanatory statement, along with each funding amount designated for a particular purpose within the statement narrative, exclusive of simple references to increases or reductions below the budget request. Funding for each PPA should not be used for the purposes of any other PPA.

For purposes of reprogramming notifications, the creation of a new program, project, or activity is defined as any significant new activity that has not been explicitly justified to the Congress in budget justification material and for which funds have not been appropriated by the Congress.

Limited transfer authority is provided to give the Department flexibility in responding to emerging requirements and significant changes in circumstances, but is not intended to facilitate the implementation of new programs, projects, or activities that were not proposed in a formal budget submission. Transfers may not reduce accounts by more than five percent or augment appropriations by more than 10 percent. The Department must notify the Committees on Appropriations not fewer than 30 days in advance of any transfer.

To avoid violations of the Anti-Deficiency Act, the Secretary shall ensure that any transfer of funds is carried out in compliance with the limitations and requirements of section 503(c). In particular, the Secretary should ensure that any such transfers adhere to the opinion of the Comptroller General's decision in *the Matter of: John D. Webster, Director, Financial Services, Library of Congress, dated November 7, 1997*, with regard to the definition of an appropriation subject to transfer limitations.

Notifications should provide complete explanations of proposed funding reallocations, including detailed justifications for increases and offsets; any specific impact the proposed changes are expected to have on future-year appropriations requirements; a table showing the proposed revisions to funding and FTE—at the account and PPA levels—for the current fiscal year; and any expected funding and FTE impacts during the budget year.

The Department shall manage its PPAs within the levels appropriated and should only submit reprogramming or transfer notifications in cases of unforeseeable and compelling circumstances that could not have been predicted when formulating the budget request for the current fiscal year. When the Department becomes aware of an emerging requirement after the President's budget has been submitted to Congress but prior to the enactment of a full-year funding Act for the budget year, it is incumbent on the Office of the Chief Financial Officer to timely notify the Committees. When the Department submits a reprogramming or transfer notification and does not receive identical responses from the House and Senate Committees, it is expected to work with the Committees to reconcile the differences before proceeding.

Section 504. The agreement continues a provision prohibiting funds appropriated or otherwise made available to the Department to make payment to the Working Capital Fund, except for activities and amounts allowed in the President's fiscal year 2025 budget request. 6

Section 505. The agreement continues a provision providing that not to exceed 50 percent of unobligated balances from prior-year appropriations for each Operations and Support appropriation shall remain available through fiscal year 2026, subject to section 503 reprogramming requirements.

Section 506. The agreement continues and modifies a provision that deems intelligence activities to be specifically authorized during fiscal year 2026 until the enactment of an Act authorizing intelligence activities for fiscal year 2026.

Section 507. The agreement continues and modifies a provision requiring notification to the Committees at least three days before DHS executes or announces grant allocations or grant awards totaling $1,000,000 or more; an award or contract, other transaction agreement; a grant from the Disaster Relief Fund greater than $100,000; or task order on a multiple award agreement, or to issue a letter of intent of greater than $2,000,000; task or delivery orders greater than $5,000,000 from DHS multi-year funds; or sole-source grant awards. Notifications shall include a description of the projects or activities to be funded and the location, including city, county, and state.

Section 508. The agreement continues a provision prohibiting all agencies from purchasing, constructing, or leasing additional facilities for Federal law enforcement training without advance notification to the Committees.

Section 509. The agreement continues a provision prohibiting the use of funds for any construction, repair, alteration, or acquisition project for which a prospectus, if required under chapter 33 of title 40, United States Code, has not been approved.

Section 510. The agreement continues ~~and modifies~~ a provision that includes and consolidates by reference prior-year statutory provisions related to sensitive security information and the use of funds in conformance with section 303 of the Energy Policy Act of 1992.

Section 511. The agreement continues a provision prohibiting the use of funds in contravention of the Buy American Act.

Section 512. The agreement continues a provision regarding the oath of allegiance required by section 337 of the Immigration and Nationality Act.

Section 513. The agreement continues and modifies a provision that precludes DHS from using funds in this Act to use reorganization authority, with the exception of the Countering Weapons of Mass Destruction Office consistent with the table in this explanatory statement.

Section 514. The agreement continues a provision prohibiting funds for planning, testing, piloting, or developing a national identification card.

Section 515. The agreement continues a provision directing that any official required by this Act to report or certify to the Committees on Appropriations may not delegate such authority unless expressly authorized to do so in this Act.

Section 516. The agreement continues a provision prohibiting funds in this Act to be used for first-class travel.

Section 517. The agreement continues a provision prohibiting the use of funds to employ illegal workers as described in Section 274A(h)(3) of the Immigration and Nationality Act.

Section 518. The agreement continues a provision prohibiting funds appropriated or otherwise made available by this Act to pay for award or incentive fees for contractors with below satisfactory performance or performance that fails to meet the basic requirements of the contract.

Section 519. The agreement continues a provision requiring DHS computer systems to block electronic access to pornography, except for law enforcement purposes.

Section 520. The agreement continues a provision regarding the transfer of firearms by Federal law enforcement personnel.

Section 521. The agreement continues a provision regarding funding restrictions and reporting requirements related to conferences occurring outside of the United States.

Section 522. The agreement continues a provision prohibiting funds to reimburse any Federal department or agency for its participation in a National Special Security Event.

Section 523. The agreement continues a provision requiring a notification, including justification materials, prior to implementing any structural pay reform or instituting a new position classification that affects more than 100 FTP or costs more than $5,000,000.

Section 524. The agreement continues and modifies a provision directing the Department to post, on a public website, reports required by the Committees unless public posting compromises homeland or national security or contains proprietary information.

Section 525. The agreement continues and modifies a provision authorizing minor procurement, construction, and improvements under "Operations and Support" appropriations, as specified.

Section 526. The agreement continues, by reference, a provision authorizing DHS to use discretionary appropriations for the primary and secondary schooling of eligible dependents of DHS personnel stationed in areas of U.S. territories that meet certain criteria.

Section 527. The agreement continues a provision prohibiting the use of restraints on pregnant detainees in DHS custody, except in certain circumstances.

Section 528. The agreement continues and modifies a provision prohibiting the use of funds for the destruction of records related to detainees in custody.

Section 529. The agreement continues a provision prohibiting funds for a Principal Federal Official during a declared disaster or emergency under the Stafford Act, with certain exceptions.

Section 530. The agreement continues a provision requiring the Under Secretary for Management to submit a component-level report on unfunded priorities classified as budget function 050.

Section 531. The agreement continues a provision requiring notifications when the President designates a former or retired Federal official or employee for protection and reporting regarding the costs of such protection.

Section 532. The agreement continues a provision requiring notifications and reporting on DHS submissions of proposals to the Technology Modernization Fund.

Section 533. The agreement continues a provision requiring the identification of discretionary offsets when fee increase proposals to support current activities assume the enactment of such proposals prior to the beginning of the budget year.

Section 534. The agreement continues a provision related to the Arms Trade Treaty.

Section 535. The agreement continues a provision prohibiting the use of funds related to certain entities identified under section 1260H of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021.

Section 536. The agreement continues a provision prohibiting the use of funds for the transfer or release of individuals detained at United States Naval Station, Guantanamo Bay, Cuba into or within the United States.

Section 537. The agreement continues and modifies a provision directing the Secretary of Homeland Security to develop, use, and share estimates of arrivals of individuals at the southwest border.

Section 538. The agreement includes a new provision directing the Secretary of Homeland Security to develop, use, and share estimates of ~~arrivals of~~ individuals anticipated to be detained in and removed from the United States.

Section 539. The agreement continues a provision that requires the Secretary of Homeland Security to conduct alternatives and cost-benefit analysis prior to requesting assistance from the Department of Defense.

Section 540. The agreement continues a provision allowing the use of funds provided by this Act for Emergency Backup Care.

Section 541. The agreement continues a provision providing DHS the ability to transfer funds throughout the Department into ICE to support the Blue Campaign.

Section 542. The agreement includes a new provision that reduces funds from the Office of the Secretary if the monthly DRF report is not delivered consistent with Section 306, or reviews for DRF reimbursements exceed 60 days and exceed 500 projects under review.

Section 543. The agreement includes a new provision that extends medical licensure across state lines for Department medical professionals.

Section 544. The agreement includes a new provision related to classified programs and a classified annex.

Section 545. The agreement includes a new provision subjecting transfers of National Intelligence Program funding to section 503 requirements.

Section 546. The agreement includes a new provision requiring obligation plans for funding provided in P.L. 119-21 from all sources, including fee collections.

Section 547. The agreement continues a provision regarding access to detention facilities by members of Congress or their designated staff.

Section 548. The agreement includes a new provision that provides additional funding for Supreme Court Justice security.

Section 549. The agreement includes a new provision that provides a rate of pay increase for those employees who participate in air traffic control activities as defined within the "Department of Transportation-Federal Aviation Administration-Operations-Air Traffic Organization".

Section 550. The agreement includes a new provision deriving by transfer unobligated balances from a specified source.

Section 551. The agreement includes a new provision rescinding unobligated balances from various sources.

Section 552. The agreement continues and modifies a provision rescinding unobligated balances pursuant to section 505.

Section 553. The agreement continues a provision rescinding unobligated balances from the DHS Nonrecurring Expenses Fund.

DISCLOSURE OF EARMARKS AND CONGRESSIONALLY DIRECTED SPENDING ITEMS

Following is a list of congressional earmarks and congressionally directed spending items (as defined in clause 9 of rule XXI of the Rules of the House of Representatives and rule XLIV of the Standing Rules of the Senate, respectively) included in the bill or this explanatory statement, along with the name of each House Member, Senator, Delegate, or Resident Commissioner who submitted a request to the Committee of jurisdiction for each item so identified. For each item, a Member is required to provide a certification that neither the Member nor the Member's immediate family has a financial interest, and each Senator is required to provide a certification that neither the Senator nor the Senator's immediate family has a pecuniary interest in such congressionally directed spending item. Neither the bill nor the explanatory statement contains any limited tax benefits or limited tariff benefits as defined in the applicable House and Senate rules.

Homeland Security
[Community Project Funding/Congressionally Directed Spending]

~~[INSERT DISCLOSURE AND TABLE]~~

GPO: Insert File 109A - 109F

GPO: Scan do not set 109G - 109AW

HOMELAND SECURITY

[Community Project Funding/Congressionally Directed Spending]

| Agency | Account | Project | Recipient | State | Amount | Requestor(s) | | Origination |
|---|---|---|---|---|---|---|---|---|
| | | | | | | House | Senate | |
| FEMA | Federal Assistance–EOC | Acushnet Office of Emergency Management | Acushnet Office of Emergency Management | MA | $2,140,000 | | Markey, Warren | S |
| FEMA | Federal Assistance–PDM | Hazard Monitoring and Wildfire Detection System | Agribusiness Development Corporation | HI | 1,125,000 | | Hirono, Schatz | S |
| FEMA | Federal Assistance–PDM | Historic Whitehall Shoreline | Anne Arundel County | MD | 226,000 | | Alsobrooks, Van Hollen | S |
| FEMA | Federal Assistance–PDM | Columbia Beach Resilience Project | Anne Arundel County | MD | 1,175,000 | | Alsobrooks, Van Hollen | S |
| FEMA | Federal Assistance–PDM | Gunners Brook Floodplain Restoration and Debris Catcher Reconfiguration | Barre City | VT | 591,000 | | Sanders, Welch | S |
| FEMA | Federal Assistance–PDM | Beckley-Raleigh County EOC HVAC Upgrades | Beckley-Raleigh County Convention Center | WV | 3,206,000 | | Capito, Justice | S |
| FEMA | Federal Assistance–EOC | Town of Berkley Emergency Operations Center | Berkley Police Department | MA | 105,000 | | Markey, Warren | S |
| FEMA | Federal Assistance–EOC | Boone County Emergency Operations Center | Boone County Illinois Emergency Management Agency | IL | 800,000 | Foster | | H |
| FEMA | Federal Assistance–PDM | Portable Generator for Critical Infrastructure | Borough of Hamburg | NJ | 220,000 | | Kim | S |
| FEMA | Federal Assistance–EOC | Metuchen Borough Emergency Services Center Building Project | Borough of Metuchen | NJ | 1,034,487 | Pallone | Booker, Kim | H |
| FEMA | Federal Assistance–EOC | Mountainside Emergency Operations Center | Borough of Mountainside | NJ | 365,000 | Kean | | H |
| FEMA | Federal Assistance–PDM | Boynton Beach Harbor Marina Seawall Replacement | Boynton Beach Community Redevelopment Agency | FL | 1,145,144 | Frankel | | H |
| FEMA | Federal Assistance–EOC | Callaway County Emergency Operations Center Relocation | Callaway County | MO | 2,606,000 | Onder | | H |
| FEMA | Federal Assistance–EOC | CORE3 ECC/Admin Building | Central Oregon Intergovernmental Council | OR | 1,034,487 | Bynum | | H |
| FEMA | Federal Assistance–PDM | Klukwan Landslide Protection Project | Chilkat Indian Village | AK | 1,234,000 | | Murkowski | S |
| FEMA | Federal Assistance–PDM | Glacial Lake Outburst Flood Disaster Mitigation—Flood Resilience on the Mendenhall River | City and Borough of Juneau | AK | 3,253,000 | Begich | Murkowski | H/S |
| FEMA | Federal Assistance–EOC | Artesia Emergency Operations Center | City of Artesia | CA | 925,000 | Tran | | H |
| FEMA | Federal Assistance–EOC | City of Atascadero Emergency Operations Center Technology Project | City of Atascadero | CA | 1,000,000 | | Padilla, Schiff | S |
| FEMA | Federal Assistance–PDM | City of Atmore Storm Drainage Improvements | City of Atmore | AL | 1,250,000 | | Britt | S |
| FEMA | Federal Assistance–PDM | Emergency Disaster Energy Hubs | City of Austin | TX | 1,145,144 | Doggett | | H |
| FEMA | Federal Assistance–PDM | City of Beaumont Underpass Flooding Early Warning System Improvements | City of Beaumont | TX | 827,000 | Babin | | H |
| FEMA | Federal Assistance–PDM | Cypress Ditch Improvement Project | City of Bellaire | TX | 1,145,144 | Fletcher | | H |
| FEMA | Federal Assistance–PDM | Village Creek Stormwater Park Floodplain Restoration | City of Birmingham | AL | 2,645,000 | | Britt | S |
| FEMA | Federal Assistance–PDM | Boyd Lining Project | City of Bloomfield | NM | 750,000 | | Heinrich | S |
| FEMA | Federal Assistance–EOC | City of Brighton Emergency Operations Center Software | City of Brighton/Brighton Fire | CO | 15,000 | | Bennet, Hickenlooper | S |
| FEMA | Federal Assistance–PDM | Brisbane Glen Park Pump Station Replacement | City of Brisbane | CA | 1,145,144 | Mullin | | H |
| FEMA | Federal Assistance–PDM | City of Camarillo Hybrid Microgrid Standby Power Resiliency Project | City of Camarillo | CA | 1,145,144 | Brownley | | H |
| FEMA | Federal Assistance–PDM | 3rd Avenue SE Downtown Pump Station Backup Generator | City of Cedar Rapids | IA | 1,407,000 | Hinson | | H |
| FEMA | Federal Assistance–PDM | Chino Hills Fire Risk Reduction Project | City of Chino Hills | CA | 1,628,000 | Kim (CA) | | H |
| FEMA | Federal Assistance–PDM | Otay Valley Regional Park (OVRP) Wildfire Hazardous Fuels Reduction | City of Chula Vista | CA | 837,000 | | Padilla, Schiff | S |
| FEMA | Federal Assistance–EOC | Bradley County Emergency Operations Center | City of Cleveland | TN | 1,328,000 | Fleischmann | | H |
| FEMA | Federal Assistance–EOC | Emergency Operations Center Upgrades Project | City of Concord | CA | 1,034,487 | DeSaulnier | | H |
| FEMA | Federal Assistance–EOC | Emergency Operations Center Technology and Equipment | City of Concord | NC | 326,000 | McDowell | | H |
| FEMA | Federal Assistance–PDM | City of Davenport Water Pollution Control Plant Flood Mitigation Project | City of Davenport | IA | 2,996,000 | Miller-Meeks | | H |
| FEMA | Federal Assistance–PDM | San Francisquito Creek Floodway Study | City of East Palo Alto | CA | 600,000 | Mullin | | H |
| FEMA | Federal Assistance–PDM | Hillside Natural Area Hazardous Fuels Management | City of El Cerrito | CA | 1,145,144 | Garamendi | | H |

109A

HOMELAND SECURITY—Continued

[Community Project Funding/Congressionally Directed Spending]

| Agency | Account | Project | Recipient | State | Amount | Requestor(s) | | Origination |
|---|---|---|---|---|---|---|---|---|
| | | | | | | House | Senate | |
| FEMA | Federal Assistance–PDM | Pump Station Upgrade Project | City of El Segundo | CA | 1,145,144 | Lieu | | H |
| FEMA | Federal Assistance–PDM | Back-Up Generator Procurement | City of Englewood | KS | 44,000 | | Moran | S |
| FEMA | Federal Assistance–EOC | City of Erie Emergency Operations Command Center | City of Erie | PA | 2,606,000 | Kelly (PA) | Fetterman | H |
| FEMA | Federal Assistance–PDM | Locks Creek and Sessoms Drainage Improvements | City of Fayetteville | NC | 4,212,000 | Rouzer | | H |
| FEMA | Federal Assistance–PDM | City of Flagstaff—Fanning Wash Flood Mitigations | City of Flagstaff | AZ | 1,500,000 | | Gallego, Kelly | S |
| FEMA | Federal Assistance–PDM | Strategic Placement of City of Foley Utilities Underground | City of Foley | AL | 2,063,000 | | Britt | S |
| FEMA | Federal Assistance–PDM | Frankfort Riverbank Stabilization | City of Frankfort | KY | 5,800,000 | Comer | | H |
| FEMA | Federal Assistance–PDM | West Patrick Street at Maryvale Ditch Flood Mitigation Project | City of Frederick, Maryland | MD | 1,145,144 | McClain Delaney | Alsobrooks, Van Hollen | H |
| FEMA | Federal Assistance–PDM | Gladewater High Hazard Dam | City of Gladewater | TX | 1,563,000 | Moran | | H |
| FEMA | Federal Assistance–PDM | Flood Control Levee Improvements | City of Glasgow | MT | 2,487,000 | | Sheehy | S |
| FEMA | Federal Assistance–PDM | City of Greeley—Cold Hill Pipeline | City of Greeley | CO | 8,685,000 | Evans (CO) | | H |
| FEMA | Federal Assistance–EOC | City of Greenacres Emergency Operations Center | City of Greenacres | FL | 1,034,487 | Frankel | | H |
| FEMA | Federal Assistance–PDM | Hampton NH Coastal Resiliency Storm Water Inflow/Infiltration Reduction Project | City of Hampton Department of Emergency Management | NH | 1,250,000 | | Shaheen | S |
| FEMA | Federal Assistance–PDM | City of Harrisonburg Suter Street Drainage Improvement Project | City of Harrisonburg | VA | 1,750,000 | | Kaine, Warner | S |
| FEMA | Federal Assistance–PDM | Holladay City Hall Seismic Retrofit Project | City of Holladay, Utah | UT | 1,759,000 | Kennedy (UT) | Curtis | H/S |
| FEMA | Federal Assistance–PDM | Huntsville Hospital for Women and Children Generator Project | City of Huntsville | AL | 2,597,000 | Strong | | H |
| FEMA | Federal Assistance–PDM | City of Indianapolis Howland Ditch Greenway Flood Control Improvement Project Design | City of Indianapolis | IN | 1,145,144 | Carson | | H |
| FEMA | Federal Assistance–PDM | City of Irvine/COAST Wildfire Prevention SR–133 Restoration Project | City of Irvine | CA | 1,125,000 | Min | | H |
| FEMA | Federal Assistance–PDM | City of Jackson Midtown Area Stormwater Infrastructure Improvements | City of Jackson Public Works Department | MS | 1,125,000 | | Wicker | S |
| FEMA | Federal Assistance–PDM | City of Jackson Queens Area Stormwater Infrastructure Improvements | City of Jackson Public Works Department | MS | 1,125,000 | | Wicker | S |
| FEMA | Federal Assistance–PDM | City of Jasper Flood Mitigation Infrastructure | City of Jasper | AL | 893,000 | | Britt | S |
| FEMA | Federal Assistance–PDM | City of Kingman—Bull Mountain Channel Improvements | City of Kingman | AZ | 493,000 | | Gallego, Kelly | S |
| FEMA | Federal Assistance–EOC | Lake Worth Beach Emergency Operations Center | City of Lake Worth Beach | FL | 1,034,487 | Frankel | | H |
| FEMA | Federal Assistance–EOC | City of Las Vegas—Emergency Operations Upgrades | City of Las Vegas | NV | 150,000 | | Cortez Masto, Rosen | S |
| FEMA | Federal Assistance–PDM | Sumter County Storm Drainage Improvements | City of Livingston | AL | 3,093,000 | | Britt | S |
| FEMA | Federal Assistance–EOC | City of Lompoc—EOC Emergency Generator Project | City of Lompoc | CA | 375,000 | | Schiff | S |
| FEMA | Federal Assistance–PDM | Long Beach Harbor Mitigation Project | City of Long Beach | MS | 2,558,000 | | Hyde-Smith, Wicker | S |
| FEMA | Federal Assistance–EOC | Los Alamitos Emergency Operations Center | City of Los Alamitos | CA | 382,880 | Tran | | H |
| FEMA | Federal Assistance–EOC | City of Louisville Emergency Operations Center | City of Louisville | CO | 100,000 | | Bennet, Hickenlooper | S |
| FEMA | Federal Assistance–PDM | Madelia Wastewater Lift Station Accredited Levee | City of Madelia | MN | 1,980,000 | | Klobuchar, Smith | S |
| FEMA | Federal Assistance–EOC | City of Meriden for Combined Emergency Operations Center/Emergency Communications Center Public Safety Communications Upgrades | City of Meriden | CT | 1,003,003 | Hayes | Blumenthal, Murphy | H |
| FEMA | Federal Assistance–PDM | Elm Street Housing Elevation | City of Montpelier | VT | 1,458,000 | | Sanders, Welch | S |
| FEMA | Federal Assistance–PDM | Charleston Slough Tide Gates Improvement Project | City of Mountain View | CA | 1,145,144 | Liccardo | | H |
| FEMA | Federal Assistance–EOC | City of Mt. Juliet Emergency Operations Center | City of Mt. Juliet | TN | 1,000,000 | Rose | | H |
| FEMA | Federal Assistance–PDM | Walter Mary Burke Park Shoreline Restoration Project | City of New Baltimore | MI | 1,000,000 | | Peters, Slotkin | S |
| FEMA | Federal Assistance–PDM | New Rochelle City Park Drainage Improvements | City of New Rochelle | NY | 1,145,144 | Latimer | | H |

1098

HOMELAND SECURITY—Continued
[Community Project Funding/Congressionally Directed Spending]

| Agency | Account | Project | Recipient | State | Amount | Requestor(s) | | Origination |
|---|---|---|---|---|---|---|---|---|
| | | | | | | House | Senate | |
| FEMA | Federal Assistance–EOC | City of North Myrtle Beach Emergency Operations Center | City of North Myrtle Beach | SC | 2,606,000 | Fry | | H |
| FEMA | Federal Assistance–PDM | Southern End Erosion Project | City of Ocean Shores | WA | 1,145,144 | Randall | | H |
| FEMA | Federal Assistance–PDM | City of Palm Desert Emergency Resiliency Plan | City of Palm Desert | CA | 296,000 | | Padilla | S |
| FEMA | Federal Assistance–EOC | City of Peachtree City Emergency Operations Center | City of Peachtree City | GA | 1,172,000 | Jack | | H |
| FEMA | Federal Assistance–PDM | Pines Point Hurricane Mitigation | City of Pembroke Pines | FL | 428,619 | Wasserman Schultz | | H |
| FEMA | Federal Assistance–PDM | Gust Lane Flood Mitigation Improvements | City of Portsmouth | VA | 1,145,144 | Scott (VA) | | H |
| FEMA | Federal Assistance–PDM | West River Flood Response Initiative | City of Providence | RI | 825,000 | Amo | Reed, Whitehouse | H |
| FEMA | Federal Assistance–EOC | Emergency Operations Center (EOC) Relocation | City of Rancho Cucamonga | CA | 1,034,487 | Aguilar | | H |
| FEMA | Federal Assistance–PDM | Abalone Cove Landslide Stabilization Project | City of Rancho Palos Verdes | CA | 1,145,144 | Lieu | | H |
| FEMA | Federal Assistance–PDM | Klondike Canyon Landslide Emergency Mitigation Project | City of Rancho Palos Verdes | CA | 1,145,144 | Lieu | Schiff | H |
| FEMA | Federal Assistance–PDM | Citywide Flood Mitigation | City of Ridgeland | MS | 4,000,000 | | Hyde-Smith, Wicker | S |
| FEMA | Federal Assistance–PDM | Keith Creek Greenway Improvements | City of Rockford | IL | 2,000,000 | | Duckworth, Durbin | S |
| FEMA | Federal Assistance–EOC | Sacramento Fire Department EMS Division Integration EOC | City of Sacramento | CA | 1,034,487 | Matsui | | H |
| FEMA | Federal Assistance–PDM | Planning & Design of Salt Lagoon & Community Pond Flood Mitigation | City of Saint Paul | AK | 375,000 | | Murkowski | S |
| FEMA | Federal Assistance–PDM | Hazard Mitigation Infrastructure Resiliency Project | City of San Bernardino | CA | 1,145,144 | Aguilar | | H |
| FEMA | Federal Assistance–PDM | Seattle Waterfront Elliott Bay Seawall Project, Phase 2 | City of Seattle | WA | 1,145,144 | Jayapal | Cantwell | H |
| FEMA | Federal Assistance–PDM | Seattle Public Library Columbia Branch Seismic Structural Upgrade | City of Seattle | WA | 1,145,144 | Smith (WA) | | H |
| FEMA | Federal Assistance–PDM | MLK Street South Flooding Alleviation | City of St. Petersburg | FL | 1,145,144 | Castor | | H |
| FEMA | Federal Assistance–PDM | 88th Avenue North Storm Drainage Improvements | City of St. Petersburg | FL | 1,145,144 | Castor | | H |
| FEMA | Federal Assistance–EOC | Taunton Emergency Operations Center | City of Taunton | MA | 1,034,487 | Auchincloss | | H |
| FEMA | Federal Assistance–PDM | City of Thousand Oaks Community Resilience Center Project | City of Thousand Oaks | CA | 1,145,144 | Brownley | Schiff | H |
| FEMA | Federal Assistance–PDM | N. Summit St. Restoration | City of Toledo | OH | 1,145,144 | Kaptur | | H |
| FEMA | Federal Assistance–EOC | Toledo Public Safety Building Outfit | City of Toledo | OR | 1,000,000 | | Merkley, Wyden | S |
| FEMA | Federal Assistance–PDM | Savin Rock Beach Reinforcement | City of West Haven | CT | 2,479,000 | | Blumenthal, Murphy | S |
| FEMA | Federal Assistance–EOC | West Haven EOC | City of West Haven | CT | 1,034,487 | DeLauro | Blumenthal, Murphy | H |
| FEMA | Federal Assistance–EOC | City of Westlake Village Emergency Operations Center Resilience Project | City of Westlake Village | CA | 336,000 | Brownley | | H |
| FEMA | Federal Assistance–PDM | Lower Brandywine Flood Mitigation Project | City of Wilmington, Delaware | DE | 1,509,000 | | Blunt Rochester, Coons | S |
| FEMA | Federal Assistance–EOC | City of Wrightsville Emergency Operations Center Improvements | City of Wrightsville | GA | 450,000 | | Warnock | S |
| FEMA | Federal Assistance–PDM | Yonkers Warburton Avenue Slope Stabilization Project | City of Yonkers | NY | 1,145,144 | Latimer | Schumer | H |
| FEMA | Federal Assistance–EOC | Technology for South Site Emergency Operations Center | Clark County | NV | 1,034,487 | Lee (NV) | Cortez Masto, Rosen | H |
| FEMA | Federal Assistance–PDM | Flamingo Water Resources Center Emergency Power Project | Clark County Water Reclamation District | NV | 1,145,144 | Titus | Cortez Masto | H |
| FEMA | Federal Assistance–EOC | Cleveland County Emergency Operations Center | Cleveland County | NC | 1,954,000 | Moore (NC) | | H |
| FEMA | Federal Assistance–EOC | Coffee County Emergency Operation Center | Coffee County, Alabama | AL | 977,000 | Moore (AL) | | H |
| FEMA | Federal Assistance–EOC | State Emergency Operations Center Technology Update | Colorado Department of Public Safety—Division of Homeland Security and Emergency Management | CO | 585,000 | | Bennet, Hickenlooper | S |
| FEMA | Federal Assistance–EOC | Coosa County Emergency Management Utilities Preservation | Coosa County Emergency Management Agency | AL | 126,000 | | Britt | S |
| FEMA | Federal Assistance–EOC | Emergency Operations Center Technology Refresh | County of Butte | CA | 130,000 | LaMalfa | | H |

109C

HOMELAND SECURITY—Continued
[Community Project Funding/Congressionally Directed Spending]

| Agency | Account | Project | Recipient | State | Amount | Requestor(s) | | Origination |
|---|---|---|---|---|---|---|---|---|
| | | | | | | House | Senate | |
| FEMA | Federal Assistance–EOC | Mercer County for Emergency Operations Center Improvements | County of Mercer | NJ | 1,875,000 | | Booker, Kim | S |
| FEMA | Federal Assistance–PDM | Monroe County Goose Pond Dam Rehabilitation Project | County of Monroe | PA | 2,432,000 | Bresnahan | Fetterman | H |
| FEMA | Federal Assistance–EOC | County of Orange Emergency Operations Center | County of Orange | CA | 1,034,487 | Correa | | H |
| FEMA | Federal Assistance–EOC | Orange County Emergency Operations Center | County of Orange | NY | 1,034,487 | Ryan | | H |
| FEMA | Federal Assistance–EOC | Pontotoc County Emergency Management Operations Center Construction Project | County of Pontotoc, Mississippi | MS | 2,031,000 | Kelly (MS) | | H |
| FEMA | Federal Assistance–EOC | Sacramento County Emergency Operations Center Project | County of Sacramento | CA | 990,000 | Bera | | H |
| FEMA | Federal Assistance–EOC | Ulster County Emergency Operations Center | County of Ulster | NY | 1,034,487 | Ryan | Schumer | H |
| FEMA | Federal Assistance–EOC | Washington County Emergency Operations Center | County of Washington Emergency Management Agency | IL | 2,009,000 | Bost | | H |
| FEMA | Federal Assistance–EOC | Covington County Emergency Operations Center | Covington County Emergency Management Agency | MS | 1,303,000 | Guest | | H |
| FEMA | Federal Assistance–PDM | Northwest Service Area Grid Resiliency | Cowlitz County Public Utility District No. 1 | WA | 1,145,144 | Perez | Cantwell | H |
| FEMA | Federal Assistance–PDM | Seismic Resiliency Reservoir and Transmission Line Improvement Project | Diablo Water District | CA | 1,145,144 | DeSaulnier | | H |
| FEMA | Federal Assistance–PDM | Flood Reduction Project | DuPage County Stormwater Management | IL | 225,000 | | Durbin | S |
| FEMA | Federal Assistance–PDM | Alberta Avenue Storm and Domestic Water Improvements | El Paso County Hospital District | TX | 1,145,144 | Escobar | | H |
| FEMA | Federal Assistance–EOC | Frio County EOC | Frio County | TX | 1,954,000 | Gonzales | | H |
| FEMA | Federal Assistance–PDM | Gibson County Emergency Generator | Gibson County, Tennessee | TN | 117,000 | Kustoff | | H |
| FEMA | Federal Assistance–EOC | Emergency Operations Center | Habersham County | GA | 2,500,000 | | Ossoff | S |
| FEMA | Federal Assistance–EOC | Harford County Department of Emergency Services Emergency Operations Center Equipment Upgrade | Harford County Department of Emergency Services | MD | 525,000 | | Alsobrooks, Van Hollen | S |
| FEMA | Federal Assistance–PDM | Tributary C116–00–00 Conveyance and Drainage Improvements | Harris County Flood Control District | TX | 1,145,144 | Green (TX) | | H |
| FEMA | Federal Assistance–EOC | Emergency Operations Center IT Modernization | Hawaii Emergency Management Agency | HI | 1,034,487 | Case | | H |
| FEMA | Federal Assistance–EOC | Emergency Operations Center Display and Control Systems Equipment | Henry County | GA | 1,149,000 | | Ossoff | S |
| FEMA | Federal Assistance–PDM | Mobile Generators for the Honolulu Fire Department | Honolulu Fire Department | HI | 315,000 | | Schatz | S |
| FEMA | Federal Assistance–EOC | Humboldt County—Emergency Operations Center | Humboldt County | NV | 500,000 | | Cortez Masto, Rosen | S |
| FEMA | Federal Assistance–PDM | Freeport Nuisance Flooding Mitigation | Incorporated Village of Freeport | NY | 1,145,144 | Gillen | | H |
| FEMA | Federal Assistance–PDM | Iron County Forestry Department—Saxon Harbor Lake Superior Shoreline Restoration Project | Iron County Forestry Department | WI | 375,000 | | Baldwin | S |
| FEMA | Federal Assistance–PDM | Roadway Wildfire Hazard Mitigation in Jefferson County | Jefferson County Parks & Conservation | CO | 1,000,000 | Pettersen | | H |
| FEMA | Federal Assistance–PDM | Kentucky Emergency Management Flood Monitoring System | Kentucky Emergency Management | KY | 869,000 | Rogers | | H |
| FEMA | Federal Assistance–EOC | Lawrence County EOC | Lawrence County Office of Emergency Management | TN | 2,606,000 | DesJarlais | | H |
| FEMA | Federal Assistance–EOC | Livingston Parish Emergency Operations Center | Livingston Parish | LA | 2,606,000 | Letlow | | H |
| FEMA | Federal Assistance–PDM | Lower Makefield Township Flood Mitigation and Stormwater Management | Lower Makefield Township | PA | 5,211,000 | Fitzpatrick | | H |
| FEMA | Federal Assistance–EOC | Lyon County—Emergency Backup Generators | Lyon County | NV | 375,000 | | Cortez Masto, Rosen | S |
| FEMA | Federal Assistance–PDM | Holly Beach Farm Resiliency | Maryland Department of Natural Resources | MD | 1,145,144 | Elfreth | Alsobrooks, Van Hollen | H |
| FEMA | Federal Assistance–PDM | Jorstad Substation Grid Resilience Project | Mason County PUD 1 | WA | 1,145,144 | Randall | | H |
| FEMA | Federal Assistance–PDM | Mat-Su Revetment and Road Upgrades | Matanuska-Susitna Borough | AK | 2,000,000 | | Murkowski | S |
| FEMA | Federal Assistance–PDM | Mesa County Douglas Wash Detention Basin Project | Mesa County Public Works Division | CO | 869,000 | Hurd | | H |
| FEMA | Federal Assistance–PDM | Germantown, Englewood, Taylorsville Upstream Dam Walls Rehabilitation | Miami Conservancy District | OH | 8,685,000 | Turner | | H |

1090

HOMELAND SECURITY—Continued

[Community Project Funding/Congressionally Directed Spending]

| Agency | Account | Project | Recipient | State | Amount | Requestor(s) | | Origination |
|---|---|---|---|---|---|---|---|---|
| | | | | | | House | Senate | |
| FEMA | Federal Assistance–EOC | Middle Peninsula Emergency Operations Center Improvements | Middle Peninsula Planning District Commission | VA | 506,000 | | Kaine, Warner | S |
| FEMA | Federal Assistance–EOC | Montezuma County Emergency Operations Center | Montezuma County | CO | 186,000 | | Bennet, Hickenlooper | S |
| FEMA | Federal Assistance–PDM | Washington Ferry Road Restoration | Montgomery Area Chamber of Commerce | AL | 4,000,000 | | Britt | S |
| FEMA | Federal Assistance–PDM | Wheaton Branch Flood Mitigation | Montgomery County Department of Environmental Protection | MD | 1,145,144 | Raskin | Alsobrooks, Van Hollen | H |
| FEMA | Federal Assistance–PDM | MATB Wastewater Treatment Plant Flood Mitigation Project | Municipal Authority of the Town of Bloomsburg | PA | 1,205,000 | | Fetterman, McCormick | S |
| FEMA | Federal Assistance–PDM | Little Mill Creek Upper Reach Flood Control Project Major Maintenance | New Castle County, Delaware (Public Works Department) | DE | 758,000 | | Blunt Rochester, Coons | S |
| FEMA | Federal Assistance–EOC | New Hampshire State Emergency Operations Center Modernization Project | New Hampshire Division of Homeland Security and Emergency Management | NH | 250,000 | | Shaheen | S |
| FEMA | Federal Assistance–PDM | DHSEM Portable Backup Generators and Water Support | NM Department of Homeland Security and Emergency Management | NM | 1,500,000 | | Heinrich, Luján | S |
| FEMA | Federal Assistance–PDM | Wanchese Marine Industrial Park Authority Living Shoreline Resiliency Project | North Carolina Department of Commerce | NC | 2,605,000 | | Tillis | S |
| FEMA | Federal Assistance–PDM | Nye County—Gamebird Road Improvements Planning and Design Project | Nye County | NV | 323,000 | | Cortez Masto, Rosen | S |
| FEMA | Federal Assistance–PDM | Nye County—Area Master Drainage Plan (AMDP) Update | Nye County | NV | 338,000 | | Rosen | S |
| FEMA | Federal Assistance–EOC | Statewide Emergency Coordination Center | Oregon Department of Emergency Management | OR | 1,500,000 | | Merkley, Wyden | S |
| FEMA | Federal Assistance–PDM | Ouachita Parish I-20 South Frontage Road Drainage Improvements | Ouachita Parish Police Jury | LA | 6,000,000 | | Cassidy, Kennedy | S |
| FEMA | Federal Assistance–PDM | Lealman Community Hurricane Shelter Hardening | Pinellas County Board of County Commissioners | FL | 2,606,000 | Luna | | H |
| FEMA | Federal Assistance–EOC | Emergency Operations Center Communications Enhancements | Prince George's County Government | MD | 469,000 | | Alsobrooks, Van Hollen | S |
| FEMA | Federal Assistance–EOC | Pulaski County Emergency Operations Center Radio System Modernization | Pulaski County | GA | 570,000 | | Warnock | S |
| FEMA | Federal Assistance–PDM | Southwestern WI Regional Planning Commission—Resilient Southwest Wisconsin | Resilient Southwest Wisconsin | WI | 150,000 | | Baldwin | S |
| FEMA | Federal Assistance–EOC | Rio Vista—Emergency Operations Center | Rio Vista Fire Department | CA | 1,034,487 | Thompson (CA) | | H |
| FEMA | Federal Assistance–PDM | Emergency Siren Warning System Upgrades | Roosevelt County | NM | 262,000 | | Heinrich, Luján | S |
| FEMA | Federal Assistance–PDM | Well 9 Seismic Resiliency Water Transmission Main Design | Sammamish Plateau Water and Sewer District | WA | 1,125,000 | | Cantwell | S |
| FEMA | Federal Assistance–EOC | San Miguel Community Services District Emergency Operations Center | San Miguel Community Services District | CA | 1,034,487 | Panetta | | H |
| FEMA | Federal Assistance–PDM | City of Westminster Emergency Standby Generator and Control Center for Drinking Water Plant | SC Emergency Management Division | SC | 1,314,000 | | Graham | S |
| FEMA | Federal Assistance–EOC | Sedgwick County Emergency Operations Center | Sedgwick County | KS | 2,000,000 | | Moran | S |
| FEMA | Federal Assistance–EOC | Shelby County Emergency Operations Center | Shelby County Emergency Management and Homeland Security Agency | TN | 1,034,487 | Cohen | | H |
| FEMA | Federal Assistance–PDM | Catfish Canal Stormwater Improvements Mitigation Project | South Carolina Office of Resilience | SC | 1,359,000 | | Graham | S |
| FEMA | Federal Assistance–EOC | Emergency Operations Centers Complex | Southern University and A&M College | LA | 1,034,487 | Fields | | H |
| FEMA | Federal Assistance–EOC | Suffolk County Emergency Operations Center Project | Suffolk County Fire, Rescue and Emergency Services | NY | 1,954,000 | Garbarino | | H |
| FEMA | Federal Assistance–EOC | Taylor County Emergency Operations and Public Safety Complex | Taylor County Board of County Commissioners | FL | 2,606,000 | Dunn | | H |
| FEMA | Federal Assistance–EOC | Terrebonne Parish Emergency Operations Center | Terrebonne Parish Consolidated Government | LA | 1,129,000 | Higgins | | H |
| FEMA | Federal Assistance–PDM | Wildwood Crest Flood Mitigation | The Borough of Wildwood Crest | NJ | 3,572,000 | Van Drew | | H |
| FEMA | Federal Assistance–PDM | City of Sunbury Flood Mitigation Project | The Municipal Authority of the City of Sunbury | PA | 1,000,000 | | Fetterman | S |
| FEMA | Federal Assistance–PDM | Longboat Key Storm Resiliency Project | The Town of Longboat Key | FL | 1,954,000 | Buchanan | | H |
| FEMA | Federal Assistance–PDM | Barrington Police Cove Park Seawall Repair | Town of Barrington | RI | 475,000 | | Reed, Whitehouse | S |
| FEMA | Federal Assistance–PDM | Bristol Independence Park Seawall Restoration | Town of Bristol | RI | 900,000 | | Reed, Whitehouse | S |

109E

HOMELAND SECURITY—Continued
[Community Project Funding/Congressionally Directed Spending]

| Agency | Account | Project | Recipient | State | Amount | Requestor(s) | | Origination |
|---|---|---|---|---|---|---|---|---|
| | | | | | | House | Senate | |
| FEMA | Federal Assistance–PDM | Bristol Seawall Repair | Town of Bristol | RI | 660,000 | | Whitehouse | S |
| FEMA | Federal Assistance–PDM | Town of Burnsville Landslide Remediation Project | Town of Burnsville | WV | 488,000 | | Capito, Justice | S |
| FEMA | Federal Assistance–PDM | Wallum Lake Dam Spillway Improvements | Town of Burrillville | RI | 345,000 | | Reed | S |
| FEMA | Federal Assistance–EOC | East Lyme EOC | Town of East Lyme CT Emergency Management | CT | 395,000 | | Blumenthal, Murphy | S |
| FEMA | Federal Assistance–EOC | Joint Emergency Operations Center | Town of Fairfield | CT | 562,500 | Himes | | H |
| FEMA | Federal Assistance–EOC | Town of Hamden Emergency Operations Center | Town of Hamden | CT | 1,034,487 | DeLauro | | H |
| FEMA | Federal Assistance–PDM | Hardwick Flood Recovery & Resilience Plan | Town of Hardwick | VT | 70,000 | | Welch | S |
| FEMA | Federal Assistance–PDM | Town of Hempstead—Bulkheads | Town of Hempstead | NY | 1,780,000 | | Gillibrand, Schumer | S |
| FEMA | Federal Assistance–PDM | Hull Harborview Road Coastal Resiliency and Shoreline Protection | Town of Hull | MA | 1,145,144 | Lynch | | H |
| FEMA | Federal Assistance–PDM | Town of Lake Arthur Pump Station | Town of Lake Arthur | LA | 900,000 | | Kennedy | S |
| FEMA | Federal Assistance–EOC | Lynnfield Emergency Operations Center Project | Town of Lynnfield | MA | 1,034,487 | Moulton | | H |
| FEMA | Federal Assistance–EOC | New Town Hall Emergency Operations Center | Town of Norton | MA | 22,000 | | Markey, Warren | S |
| FEMA | Federal Assistance–PDM | Town of Ossining—Town-Wide Drainage Study | Town of Ossining | NY | 99,000 | | Gillibrand, Schumer | S |
| FEMA | Federal Assistance–PDM | Scituate Cedar Point Seawall | Town of Scituate | MA | 1,145,144 | Keating | | H |
| FEMA | Federal Assistance–PDM | Plantsville Center Flooding Study | Town of Southington | CT | 300,000 | | Blumenthal, Murphy | S |
| FEMA | Federal Assistance–PDM | Hendricks Head Infrastructure Improvements | Town of Southport | ME | 1,165,000 | | Collins, King | S |
| FEMA | Federal Assistance–PDM | Newbury Neck Peninsula Storm Evacuation | Town of Surry | ME | 2,928,000 | | Collins, King | S |
| FEMA | Federal Assistance–EOC | Westhampton Public Safety Complex Emergency Operations Center | Town of Westhampton | MA | 885,757 | McGovern | | H |
| FEMA | Federal Assistance–EOC | Town of Woodbridge Emergency Operations Center | Town of Woodbridge | CT | 1,034,487 | DeLauro | | H |
| FEMA | Federal Assistance–EOC | UW-Whitewater Emergency Operations Center | UW-Whitewater Police Department | WI | 225,000 | | Baldwin | S |
| FEMA | Federal Assistance–PDM | Village of La Farge Storm Sewer Improvements | Village of La Farge | WI | 250,000 | | Baldwin | S |
| FEMA | Federal Assistance–PDM | Highbrook Avenue Drainage Improvement Project | Village of Pelham | NY | 1,145,144 | Latimer | Schumer | H |
| FEMA | Federal Assistance–EOC | Village of Wellington Emergency Operations Center | Village of Wellington | FL | 1,034,487 | Frankel | | H |
| FEMA | Federal Assistance–PDM | Winston County Road and Bridge Restoration | Winston County Commission | AL | 900,000 | | Britt | S |
| FEMA | Federal Assistance–EOC | Yakima Valley Emergency Operation Center | Yakima Valley Emergency Management | WA | 1,953,000 | Newhouse | Cantwell | H |
| FEMA | Federal Assistance–PDM | York County Flood Protection | York County Emergency Management Agency | ME | 1,762,000 | | Collins | S |

109F

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| DEPARTMENT OF HOMELAND SECURITY | | | |
| TITLE I - DEPARTMENTAL MANAGEMENT, INTELLIGENCE, SITUATIONAL AWARENESS, AND OVERSIGHT | | | |
| Office of the Secretary and Executive Management | | | |
| Operations and Support: | | | |
| Management and Oversight: | | | |
| Office of the Secretary | 54,381 | 18,711 | -35,670 |
| Office of Public Affairs | 11,125 | 10,475 | -650 |
| Office of Legislative Affairs | 7,132 | 4,421 | -2,711 |
| Office of General Counsel | 30,667 | 28,855 | -1,812 |
| Office of Health Security | 62,647 | 95,414 | +32,767 |
| Privacy Office | 18,854 | 27,234 | +8,380 |
| Subtotal, Management and Oversight | 184,806 | 185,110 | +304 |
| Office of Strategy, Policy, and Plans | 85,735 | 106,996 | +21,261 |
| Operations and Engagement: | | | |
| Office for Civil Rights and Civil Liberties | 42,964 | 10,000 | -32,964 |
| Office of the Citizenship and Immigration Services Ombudsman | 11,597 | 5,000 | -6,597 |
| Office of the Immigration Detention Ombudsman | 28,641 | --- | -28,641 |
| Office of Partnership and Engagement | 9,839 | 9,189 | -650 |
| Subtotal, Operations and Engagement | 93,041 | 24,189 | -68,852 |
| Subtotal, Operations and Support | 363,582 | 316,295 | -47,287 |

1096

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| Procurement, Construction, and Improvements: | | | |
| Medical Information Exchange | 8,113 | 8,911 | +798 |
| Federal Assistance: | | | |
| Office of Strategy, Policy, and Plans: | | | |
| Targeted Violence and Terrorism Prevention Grants. | 18,000 | --- | -18,000 |
| Office for Civil Rights and Civil Liberties: | | | |
| ATD Case Management Grant Program | 15,000 | --- | -15,000 |
| Subtotal, Federal Assistance | 33,000 | --- | -33,000 |
| FEMA Assistance Grants (transfer out) | (-33,000) | --- | (+33,000) |
| Administrative Provisions: | | | |
| Additional Appropriations | --- | 20,000 | +20,000 |
| Total, Office of the Secretary and Executive Management | 404,695 | 345,206 | -59,489 |
| (transfer out) | -33,000 | --- | +33,000 |
| Total, Office of the Secretary and Executive Management (including transfer) | 371,695 | 345,206 | -26,489 |

109H

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 160 of 714 PageID #:1210

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| **Management Directorate** | | | |
| Operations and Support: | | | |
| Immediate Office of the Under Secretary for Management | 6,785 | 6,969 | +184 |
| Office of the Chief Readiness Support Officer | 231,526 | 228,750 | -2,776 |
| Office of the Chief Human Capital Officer | 150,490 | 138,750 | -11,740 |
| Office of the Chief Security Officer | 202,880 | 202,089 | -791 |
| Office of the Chief Procurement Officer | 95,953 | 98,063 | +2,110 |
| Office of the Chief Financial Officer | 118,018 | 124,519 | +6,501 |
| Office of the Chief Information Officer | 627,854 | 603,745 | -24,109 |
| Office of Program Accountability and Risk Management | 18,245 | 16,495 | -1,750 |
| Office of Biometric Identity Management: | | | |
| Identity and Screening Program Operations | 270,453 | 271,000 | +547 |
| Subtotal, Operations and Support | 1,722,204 | 1,690,380 | -31,824 |
| Procurement, Construction, and Improvements: | | | |
| Construction and Facility Improvements | 172,763 | --- | -172,763 |
| Mission Support Assets and Infrastructure | 77,670 | 33,106 | -44,564 |
| IDENT/Homeland Advanced Recognition Technology | 10,000 | 25,000 | +15,000 |
| Subtotal, Procurement, Construction, and Improvements | 260,433 | 58,106 | -202,327 |

109I

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 161 of 714 PageID #:1211

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| Federal Protective Service: | | | |
| FPS Operations: | | | |
| Operating Expenses | 473,820 | 481,689 | +7,869 |
| Countermeasures: | | | |
| Protective Security Officers | 1,528,205 | 1,507,201 | -21,004 |
| Technical Countermeasures | 26,778 | 37,565 | +10,787 |
| Subtotal, Federal Protective Service (Gross) | 2,028,803 | 2,026,455 | -2,348 |
| Offsetting Collections | -2,028,803 | -2,026,455 | +2,348 |
| Total, Management Directorate | 1,982,637 | 1,748,486 | -234,151 |
| (Appropriations) | (4,011,440) | (3,774,941) | (-236,499) |
| (Offsetting Collections) | (-2,028,803) | (-2,026,455) | (+2,348) |
| Intelligence, Analysis, and Situational Awareness | | | |
| Operations and Support | 345,410 | 340,819 | -4,591 |

109J

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| **Office of Inspector General** | | | |
| Operations and Support | 220,127 | 257,599 | +37,472 |
| Total, Title I, Departmental Management, Intelligence, Situational Awareness, and Oversight | 2,952,869 | 2,692,110 | -260,759 |
| (Appropriations) | (4,981,672) | (4,718,565) | (-263,107) |
| (Offsetting Collections) | (-2,028,803) | (-2,026,455) | (+2,348) |
| (Transfer out) | (-33,000) | --- | (+33,000) |

109K

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| TITLE II - SECURITY, ENFORCEMENT, AND INVESTIGATIONS | | | |
| U.S. Customs and Border Protection | | | |
| Operations and Support: | | | |
| Border Security Operations: | | | |
| U.S. Border Patrol: | | | |
| Operations | 7,316,574 | 5,413,988 | -1,902,586 |
| Assets and Support | 992,273 | 1,054,700 | +62,427 |
| Office of Training and Development | 160,862 | 176,224 | +15,362 |
| Subtotal, Border Security Operations | 8,469,709 | 6,644,912 | -1,824,797 |
| Trade and Travel Operations: | | | |
| Office of Field Operations: | | | |
| Domestic Operations | 3,933,253 | 4,405,147 | +471,894 |
| International Operations | 157,797 | 199,725 | +41,928 |
| Targeting Operations | 276,875 | 315,112 | +38,237 |
| Assets and Support | 1,029,533 | 1,097,346 | +67,813 |
| Office of Trade | 423,587 | 499,696 | +76,109 |
| Office of Training and Development | 77,156 | 93,775 | +16,619 |
| Subtotal, Trade and Travel Operations | 5,898,201 | 6,610,801 | +712,600 |

109L

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| Integrated Operations: | | | |
| Air and Marine Operations: | | | |
| Operations | 388,926 | 419,289 | +30,363 |
| Assets and Support | 624,612 | 716,886 | +92,274 |
| Air and Marine Operations Center | 50,861 | 51,992 | +1,131 |
| Office of International Affairs | 52,892 | 61,059 | +8,167 |
| Office of Intelligence | 88,197 | 91,886 | +3,689 |
| Office of Training and Development | 13,539 | 15,720 | +2,181 |
| Operations Support | 436,330 | 373,719 | -62,611 |
| Subtotal, Integrated Operations | 1,655,357 | 1,730,551 | +75,194 |
| Mission Support: | | | |
| Enterprise Services | 1,796,988 | 2,095,564 | +298,576 |
| (Harbor Maintenance Trust Fund) | (3,274) | (3,274) | --- |
| Office of Professional Responsibility | 354,870 | 356,078 | +1,208 |
| Executive Leadership and Oversight | 251,745 | 290,068 | +38,323 |
| Subtotal, Mission Support | 2,403,603 | 2,741,710 | +338,107 |
| Subtotal, Operations and Support | 18,426,870 | 17,727,974 | -698,896 |
| (Transfer out to FEMA Federal Assistance) | (-650,000) | --- | (+650,000) |

109M

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 165 of 714 PageID #:1215

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| Procurement, Construction, and Improvements: | | | |
| Border Security Assets and Infrastructure | 283,500 | --- | -283,500 |
| Innovative Technology | --- | 20,000 | +20,000 |
| Border Enforcement Coordination Network | --- | 12,014 | +12,014 |
| Small Unmanned Aircraft System | --- | 10,000 | +10,000 |
| Counter Unmanned Aircraft System | --- | 10,000 | +10,000 |
| Trade and Travel Assets and Infrastructure | 380,900 | --- | -380,900 |
| Non-Intrusive Inspection Fentanyl Initiative - Outbound | --- | 30,000 | +30,000 |
| Electronic Export Manifest Capability - Outbound | --- | 10,000 | +10,000 |
| Integrated Operations Assets and Infrastructure Airframes and Sensors | 71,583 | --- | -71,583 |
| Aircraft Sensor Upgrades | --- | 6,500 | +6,500 |
| Watercraft | 4,400 | --- | -4,400 |
| U.S. Border Patrol V-Hull | --- | 2,400 | +2,400 |
| All-Weather Interceptor | --- | 6,000 | +6,000 |
| Construction and Facility Improvements | 92,114 | --- | -92,114 |
| Office of Field Operations Facilities | --- | 65,281 | +65,281 |
| Mission Support Assets and Infrastructure | 17,673 | --- | -17,673 |
| Revenue Modernization | --- | 4,973 | +4,973 |
| Financial Systems Enhancements | --- | 5,000 | +5,000 |
| Employee Lifecycle Program | --- | 3,000 | +3,000 |

109N

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| Radiological Detection Systems | | | |
| International Rail | --- | 1,300 | +1,300 |
| Radiation Portal Monitor Replacement Program | --- | 13,900 | +13,900 |
| Radiation Portal Monitor Programs | --- | 20,478 | +20,478 |
| Basic Handheld Radioisotope Identification Devices | --- | 750 | +750 |
| Portable Detection Systems End Items/Equipment | --- | 1,290 | +1,290 |
| Subtotal, Procurement, Construction, and Improvements | 850,170 | 222,886 | -627,284 |
| CBP Services at User Fee Facilities (Small Airport) (Permanent Indefinite Discretionary) | 24,000 | 25,000 | +1,000 |
| Global Entry Program (International Registered Traveler) (Permanent Indefinite Discretionary) | 457,000 | 444,000 | -13,000 |
| Offsetting Collections | -457,000 | -444,000 | +13,000 |

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| Fee Funded Programs: | | | |
| Immigration Inspection User Fee | (854,365) | (1,010,937) | (+156,572) |
| Immigration Enforcement Fines | (254) | (1,283) | (+1,029) |
| Electronic System for Travel Authorization (ESTA) Fee | (61,659) | (60,544) | (-1,115) |
| Land Border Inspection Fee | (80,165) | (92,556) | (+12,391) |
| COBRA Passenger Inspection Fee | (821,059) | (1,003,486) | (+182,427) |
| Agricultural Quarantine Inspection Fee | (591,360) | (791,121) | (+199,761) |
| Puerto Rico Trust Fund | (304,133) | (283,871) | (-20,262) |
| Virgin Islands Deposit Fund | (14,994) | (14,818) | (-176) |
| Customs Unclaimed Goods | (3,880) | (1,828) | (-2,052) |
| 9-11 Response and Biometric Exit Account | (21,350) | (15,942) | (-5,408) |
| Subtotal, Fee Funded Programs | 2,753,219 | 3,276,386 | +523,167 |

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| Administrative Provisions | | | |
| Colombia Free Trade Act Collections (Sec. 203)........ | 281,000 | 321,000 | +40,000 |
| Reimbursable Preclearance (Sec. 204).................. | 39,000 | 39,000 | --- |
| Subtotal, Administrative Provisions............ | 320,000 | 360,000 | +40,000 |
| Reimbursable Preclearance (Offsetting Collections).... | -39,000 | -39,000 | --- |
| Total, Administrative Provisions............... | 281,000 | 321,000 | +40,000 |
| Total, U.S. Customs and Border Protection....... | 19,582,040 | 18,296,860 | -1,285,180 |
| (Appropriations)............................. | (20,078,040) | (18,779,860) | (-1,298,180) |
| (Offsetting Collections)..................... | (-496,000) | (-483,000) | (+13,000) |
| Fee Funded Programs............................ | 2,753,219 | 3,276,386 | +523,167 |
| (Transfer out)................................. | (-650,000) | --- | (+650,000) |

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 169 of 714 PageID #:1219

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| U.S. Immigration and Customs Enforcement | | | |
| Operations and Support: | | | |
| Homeland Security Investigations: | | | |
| Domestic Investigations | 2,138,131 | 2,258,714 | +120,583 |
| International Investigations | 214,323 | 225,982 | +11,659 |
| Intelligence | 106,651 | 106,555 | -96 |
| Subtotal, Homeland Security Investigations | 2,459,105 | 2,591,251 | +132,146 |
| Enforcement and Removal Operations: | | | |
| Custody Operations | 3,434,952 | 3,838,340 | +403,388 |
| Fugitive Operations | 159,134 | 165,016 | +5,882 |
| Criminal Alien Program | 296,525 | 312,835 | +16,310 |
| Alternatives to Detention | 470,190 | 393,647 | -76,543 |
| Transportation and Removal Operations | 721,417 | 743,868 | +22,451 |
| Subtotal, Enforcement and Removal Operations | 5,082,218 | 5,453,706 | +371,488 |

109R

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| Mission Support: | | | |
| Enterprise Services | 1,199,009 | 1,225,011 | +26,002 |
| Office of Professional Responsibility | 197,600 | 206,572 | +8,972 |
| Executive Leadership and Oversight | 122,095 | 112,128 | -9,967 |
| Subtotal, Mission Support | 1,518,704 | 1,543,711 | +25,007 |
| Office of the Principal Legal Advisor | 441,515 | 447,694 | +6,179 |
| Additional funding (P.L. 119-4) | 485,000 | --- | -485,000 |
| Subtotal, Operations and Support | 9,986,542 | 10,036,362 | +49,820 |

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 171 of 714 PageID #:1221

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| Procurement, Construction, and Improvements: | | | |
| Operational Communications/Information Technology... | 35,420 | --- | -35,420 |
| Construction and Facility Improvements.............. | 20,100 | --- | -20,100 |
| Mission Support Assets and Infrastructure........... | --- | 5,000 | +5,000 |
| Subtotal, Procurement, Construction, and Improvements.................................. | 55,520 | 5,000 | -50,520 |
| Fee Funded Programs: | | | |
| Immigration Inspection User Fee................... | (135,000) | (135,000) | --- |
| Breached Bond/Detention Fund...................... | (55,000) | (55,000) | --- |
| Student and Exchange Visitor Program Fee.......... | (186,610) | (216,500) | (+29,890) |
| Detention and Removal Office Fee.................. | (3,000) | (3,000) | --- |
| Subtotal, Fee Funded Programs................. | 379,610 | 409,500 | +29,890 |
| Administrative Provisions | | | |
| Executive Leadership and Oversight.................... | --- | 700 | +700 |
| Total, U.S. Immigration and Customs Enforcement. | 10,042,062 | 10,042,062 | --- |
| Fee Funded Programs............................ | 379,610 | 409,500 | +29,890 |

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| Transportation Security Administration | | | |
| Operations and Support: | | | |
| Aviation Screening Operations: | | | |
| Screening Workforce: | | | |
| Screening Partnership Program.................. | 253,759 | 287,033 | +33,274 |
| Screener Personnel, Compensation, and Benefits.. | 5,302,075 | 5,532,816 | +230,741 |
| Screener Training and Other.................... | 272,357 | 278,869 | +6,512 |
| Airport Management................................ | 871,626 | 922,722 | +51,096 |
| Canines........................................... | 159,818 | 197,927 | +38,109 |
| Screening Technology Maintenance.................. | 561,848 | 626,031 | +64,183 |
| Secure Flight..................................... | 137,888 | 142,694 | +4,806 |
| Subtotal, Aviation Screening Operations....... | 7,559,371 | 7,988,092 | +428,721 |

1094

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| Other Operations and Enforcement: | | | |
| Inflight Security: | | | |
| Federal Air Marshals | 808,852 | 815,605 | +6,753 |
| Federal Flight Deck Officer and Crew Training | 26,681 | 27,392 | +711 |
| Aviation Regulation | 243,766 | 297,143 | +53,377 |
| Air Cargo | 135,640 | 138,754 | +3,114 |
| Intelligence and TSOC | 98,793 | 102,755 | +3,962 |
| Surface Programs | 173,142 | 125,100 | -48,042 |
| Vetting Programs | 49,525 | 48,324 | -1,201 |
| Subtotal, Other Operations and Enforcement | 1,536,399 | 1,555,073 | +18,674 |
| Mission Support | 1,069,198 | 1,092,269 | +23,071 |
| Aviation Passenger Security Fees (offsetting collections) | -2,860,000 | -3,030,000 | -170,000 |
| Additional funding (P.L. 119-4) | 450,000 | --- | -450,000 |
| Subtotal, Operations and Support | 7,754,968 | 7,605,434 | -149,534 |
| (Appropriations) | (10,614,968) | (10,635,434) | (+20,466) |
| (Offsetting Collections) | (-2,860,000) | (-3,030,000) | (-170,000) |

109V

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 174 of 714 PageID #:1224



(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| Vetting Fee Programs: | | | |
| Transportation Worker Identification Card........... | 65,000 | 72,700 | +7,700 |
| Hazardous Materials Endorsement Fee................ | 20,000 | 16,400 | -3,600 |
| General Aviation at DCA Fee........................ | 600 | 600 | --- |
| Commercial Aviation and Airports Fee............... | 11,000 | 11,000 | --- |
| Other Security Threat Assessments Fee.............. | 50 | 50 | --- |
| Air Cargo/Certified Cargo Screening Program Fee..... | 4,000 | 4,000 | --- |
| TSA PreCheck Fee................................... | 452,000 | 427,900 | -24,100 |
| Adjustment based on CBO estimate of receipts........ | -93,650 | -10,650 | +83,000 |
| Subtotal, Vetting Fee Programs................. | 459,000 | 522,000 | +63,000 |
| Vetting Fees (Offsetting Collections)........... | -459,000 | -522,000 | -63,000 |
| Procurement, Construction, and Improvements: | | | |
| Aviation Screening Infrastructure: | | | |
| Checkpoint Support................................ | 40,678 | 316,290 | +275,612 |
| Checked Baggage.................................. | --- | 13,940 | +13,940 |
| Subtotal, Procurement, Construction, and Improvements............................... | 40,678 | 330,230 | +289,552 |
| Research and Development............................. | 14,641 | 24,000 | +9,359 |

109W

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| Fee Funded Programs: | | | |
| Alien Flight School Fee (mandatory) | (6,000) | (6,000) | --- |
| Aviation Security Capital Fund (mandatory) | (250,000) | (250,000) | --- |
| Subtotal, Fee Funded Programs | 256,000 | 256,000 | --- |
| Total, Transportation Security Administration | 7,810,287 | 7,959,664 | +149,377 |
| (Appropriations) | (11,129,287) | (11,511,664) | (+382,377) |
| (Offsetting Collections) | (-3,319,000) | (-3,552,000) | (-233,000) |
| Fee Funded Programs | 256,000 | 256,000 | --- |
| Coast Guard | | | |
| Operations and Support: | | | |
| Military Personnel | 5,247,722 | 5,872,665 | +624,943 |
| Mission Support | 420,206 | 537,593 | +117,387 |
| Field Operations: | | | |
| Surface, Air, and Shore Operations | 3,125,281 | 3,536,469 | +411,188 |
| Command, Control, and Communications | 1,261,562 | 1,325,674 | +64,112 |
| Additional funding (P.L. 119-4) | 360,500 | --- | -360,500 |
| Subtotal, Operations and Support | 10,415,271 | 11,272,401 | +857,130 |
| (Non-defense) | (9,885,271) | (10,742,401) | (+857,130) |
| (Defense) | (530,000) | (530,000) | --- |

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| Procurement, Construction, and Improvements: | | | |
| Vessels: | | | |
| In-Service Vessel Sustainment | 120,000 | 152,000 | +32,000 |
| National Security Cutter | 17,100 | --- | -17,100 |
| Offshore Patrol Cutter | 579,000 | --- | -579,000 |
| Fast Response Cutter | 220,000 | --- | -220,000 |
| Cutter Boats | 6,500 | 54,900 | +48,400 |
| Polar Security Cutter | --- | 43,500 | +43,500 |
| Commercially Available Polar Icebreaker | 125,000 | --- | -125,000 |
| Great Lakes Icebreaker | 20,000 | 25,000 | +5,000 |
| Waterways Commerce Cutter | 1,000 | 98,000 | +97,000 |
| Subtotal, Vessels | 1,088,600 | 373,400 | -715,200 |
| Aircraft: | | | |
| HC-144 Conversion/Sustainment | --- | 12,000 | +12,000 |
| HC-130J Acquisition/Conversion/Sustainment | 4,000 | --- | -4,000 |
| MH-65 Conversion/Sustainment Projects | 6,000 | --- | -6,000 |
| MH-60T Sustainment | 58,250 | 151,600 | +93,350 |
| Small Unmanned Aircraft Systems | 500 | --- | -500 |
| Subtotal, Aircraft | 68,750 | 163,600 | +94,850 |

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| Other Acquisition Programs: | | | |
| Survey and Design - Vessels, Boats, and Aircraft.. | 5,000 | 4,500 | -500 |
| Other Equipment and Systems...................... | 5,600 | 7,040 | +1,440 |
| Program Oversight and Management................. | 21,000 | 22,000 | +1,000 |
| C4ISR............................................ | 16,000 | 10,000 | -6,000 |
| Cyber and Enterprise Mission Platform............ | 21,500 | 25,800 | +4,300 |
| In-Service Systems Sustainment................... | --- | 30,000 | +30,000 |
| Subtotal, Other Acquisition Programs......... | 69,100 | 99,340 | +30,240 |
| Shore Facilities and Aids to Navigation: | | | |
| Major Construction; Housing; ATON; and Survey and Design.......................................... | 52,500 | 180,532 | +128,032 |
| Major Acquisition Systems Infrastructure......... | 130,000 | 167,500 | +37,500 |
| Minor Shore...................................... | 5,000 | 7,500 | +2,500 |
| Subtotal, Shore Facilities and Aids to Navigation................................ | 187,500 | 355,532 | +168,032 |
| Subtotal, Procurement, Construction, and Improvements................................. | 1,413,950 | 991,872 | -422,078 |
| Research and Development.............................. | 7,476 | 6,763 | -713 |
| Health Care Fund Contribution (Permanent Indefinite Discretionary)..................................... | 281,851 | 297,731 | +15,880 |
| Mandatory Funding: | | | |
| Retired Pay........................................ | 1,210,840 | 1,249,000 | +38,160 |

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 178 of 714 PageID #:1228

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| Administrative Provisions | | | |
| Coast Guard Housing Fund | 4,000 | 4,000 | --- |
| Coast Guard Housing Fund (Offsetting Collections) | -4,000 | -4,000 | --- |
| Coast Guard PC&I | --- | 98,000 | +98,000 |
| Total, Coast Guard | 13,329,388 | 13,915,767 | +586,379 |
| (Appropriations) | (13,333,388) | (13,919,767) | (+586,379) |
| (Defense) | (530,000) | (530,000) | --- |
| (Non-Defense) | (11,592,548) | (12,140,767) | (+548,219) |
| (Offsetting Collections) | (-4,000) | (-4,000) | --- |
| (Mandatory Funding) | (1,210,840) | (1,249,000) | (+38,160) |
| United States Secret Service | | | |
| Operations and Support: | | | |
| Protective Operations: | | | |
| Protection of Persons and Facilities | 1,031,766 | 1,146,668 | +114,902 |
| Protective Countermeasures | 72,374 | 98,072 | +25,698 |
| Protective Intelligence | 84,973 | 89,628 | +4,655 |
| Presidential Campaigns and National Special Security Events | 243,699 | 33,880 | -209,819 |
| Subtotal, Protective Operations | 1,432,812 | 1,368,248 | -64,564 |

109AA

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| Field Operations: | | | |
| Domestic and International Field Operations....... | 794,184 | 855,140 | +60,956 |
| Support for Missing and Exploited Children Investigations.................................. | 6,000 | 6,000 | --- |
| Support for Computer Forensics Training........... | 48,612 | 64,777 | +16,165 |
| Subtotal, Field Operations................... | 848,796 | 925,917 | +77,121 |
| Basic and In-Service Training and Professional Development...................................... | 115,836 | 174,225 | +58,389 |
| Mission Support.................................... | 610,538 | 659,914 | +49,376 |
| Additional funding (Sec. 136) (P.L. 118-83)......... | (231,000) | --- | (-231,000) |
| Operations and Support (Sec. 136) (P.L. 118-83)....... | 231,000 | --- | -231,000 |
| Subtotal, Operations and Support............... | 3,238,982 | 3,128,304 | -110,678 |
| Procurement, Construction, and Improvements: | | | |
| Protection Assets and Infrastructure................ | 59,198 | 96,167 | +36,969 |
| Construction and Facility Improvements............. | 16,400 | 22,350 | +5,950 |
| Subtotal, Procurement, Construction, and Improvements.................................. | 75,598 | 118,517 | +42,919 |
| Research and Development.............................. | 4,217 | 3,250 | -967 |
| Total, United States Secret Service............ | 3,318,797 | 3,250,071 | -68,726 |

109AB

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 180 of 714 PageID #:1230

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| Total, Title II, Security, Enforcement, and Investigations | 54,082,574 | 53,464,424 | -618,150 |
| (Appropriations) | (56,690,734) | (56,254,424) | (-436,310) |
| (Non-Defense) | (56,160,734) | (55,724,424) | (-436,310) |
| (Defense) | (530,000) | (530,000) | --- |
| (Offsetting Collections) | (-3,819,000) | (-4,039,000) | (-220,000) |
| (Mandatory Funding) | (1,210,840) | (1,249,000) | (+38,160) |
| Aviation Security Capital Fund (Mandatory) | 250,000 | 250,000 | --- |
| Fee Funded Programs | 3,388,829 | 3,941,886 | +553,057 |
| (Transfer out) | (-650,000) | --- | (+650,000) |

T09AC

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| TITLE III - PROTECTION, PREPAREDNESS, RESPONSE, AND RECOVERY | | | |
| Cybersecurity and Infrastructure Security Agency | | | |
| Operations and Support: | | | |
| Cybersecurity: | | | |
| Cyber Operations: | | | |
| Strategy and Performance | 21,383 | 25,304 | +3,921 |
| Threat Hunting | 260,139 | 242,627 | -17,512 |
| Vulnerability Management | 208,652 | 186,495 | -22,157 |
| Capacity Building | 206,661 | 194,359 | -12,302 |
| Operational Planning and Coordination | 122,496 | 113,906 | -8,590 |
| Subtotal, Cyber Operations | 819,331 | 762,691 | -56,640 |
| Technology and Services: | | | |
| Cybersecurity Services | 7,417 | 10,641 | +3,224 |
| Continuous Diagnostics and Mitigation | 82,396 | 84,311 | +1,915 |
| Joint Collaborative Environment | 272,504 | 249,176 | -23,328 |
| Subtotal, Technology and Services | 362,317 | 344,128 | -18,189 |
| Subtotal, Cybersecurity | 1,181,648 | 1,106,819 | -74,829 |

109AD

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| Infrastructure Security: | | | |
| Infrastructure Assessments and Security: | | | |
| Strategy and Performance | 15,547 | 4,436 | -11,111 |
| Security Programs | 22,096 | 21,926 | -170 |
| CISA Exercises | 26,914 | 22,796 | -4,118 |
| Assessments and Infrastructure Information | 38,397 | 26,723 | -11,674 |
| Bombing Prevention | 30,309 | 26,246 | -4,063 |
| Subtotal, Infrastructure Assessments and Security | 133,263 | 102,127 | -31,136 |
| Chemical Security | 25,866 | 13,727 | -12,139 |
| Subtotal, Infrastructure Security | 159,129 | 115,854 | -43,275 |
| Emergency Communications: | | | |
| Emergency Communications Preparedness | 46,971 | 34,436 | -12,535 |
| Priority Telecommunications Service: | | | |
| GETS/WPS/SRAS/TSP | 50,375 | 48,517 | -1,858 |
| Next Generation Networks Priority Services | 4,219 | 3,469 | -750 |
| Subtotal, Priority Telecommunications Services | 54,594 | 51,986 | -2,608 |
| Subtotal, Emergency Communications | 101,565 | 86,422 | -15,143 |

109AE

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 183 of 714 PageID #:1233

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| Integrated Operations: | | | |
| Regional Operations: | | | |
| Coordination and Service Delivery............... | 27,724 | 25,723 | -2,001 |
| Security Advisors............................... | 82,375 | 80,401 | -1,974 |
| Chemical Inspectors............................. | 24,700 | --- | -24,700 |
| Subtotal, Regional Operations............... | 134,799 | 106,124 | -28,675 |
| Operations Coordination and Planning: | | | |
| Intelligence.................................... | 5,060 | 2,807 | -2,253 |
| Operations Center............................... | 78,376 | 56,699 | -21,677 |
| Planning and Readiness.......................... | 6,684 | 5,492 | -1,192 |
| Business Continuity and Emergency Preparedness.. | 3,459 | 1,966 | -1,493 |
| Subtotal, Operations Coordination and Planning.................................. | 93,579 | 66,964 | -26,615 |
| Subtotal, Integrated Operations............... | 228,378 | 173,088 | -55,290 |
| Risk Management Operations: | | | |
| National Infrastructure Simulation Analysis Center | 24,424 | 21,561 | -2,863 |
| Infrastructure Analysis........................... | 109,446 | 42,759 | -66,687 |
| Subtotal, Risk Management Operations.......... | 133,870 | 64,320 | -69,550 |

109AF

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| Stakeholder Engagement and Requirements: | | | |
| Sector Risk Management Agency | 28,982 | 23,752 | -5,230 |
| Council Management | 16,895 | 7,450 | -9,445 |
| Stakeholder Engagement | 43,242 | 32,579 | -10,663 |
| International Affairs | 10,599 | 4,635 | -5,964 |
| (Defense) | (6,995) | (3,059) | (-3,936) |
| Subtotal, Stakeholder Engagement and Requirements | 99,718 | 68,416 | -31,302 |
| Mission Support: | | | |
| Executive Leadership and Oversight | 62,943 | 41,058 | -21,885 |
| (Defense) | (29,835) | (19,461) | (-10,374) |
| Enterprise Services | 415,563 | 562,657 | +147,094 |
| (Defense) | (196,977) | (266,699) | (+69,722) |
| Subtotal, Mission Support | 478,506 | 603,715 | +125,209 |
| Subtotal, Operations and Support | 2,382,814 | 2,218,634 | -164,180 |

109AG

DEPARTMENT OF HOMELAND SECURITY APPROPRIATIONS ACT, 2026

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| Procurement, Construction, and Improvements: | | | |
| Cybersecurity: | | | |
| Continuous Diagnostics and Mitigation............ | 265,279 | 302,649 | +37,370 |
| Threat Hunting.................................... | 20,000 | 5,000 | -15,000 |
| National Cybersecurity Protection System.......... | 30,000 | --- | -30,000 |
| Cyber Analytics and Data System.................. | 145,499 | 60,172 | -85,327 |
| Subtotal, Cybersecurity......................... | 460,778 | 367,821 | -92,957 |
| Emergency Communications: | | | |
| Next Generation Networks Priority Services........ | 28,623 | 18,643 | -9,980 |
| Subtotal, Procurement, Construction, and Improvements............................... | 489,401 | 386,464 | -102,937 |
| Research and Development: | | | |
| Infrastructure Security............................ | 793 | --- | -793 |
| Subtotal, Research and Development............. | 793 | --- | -793 |
| Total, Cybersecurity and Infrastructure Security Agency....................................... | 2,873,008 | 2,605,098 | -267,910 |
| (Defense).................................... | (2,614,251) | (2,284,001) | (-330,250) |
| (Non-defense).............................. | (258,757) | (321,097) | (+62,340) |

109A-H

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 186 of 714 PageID #:1236



(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| Federal Emergency Management Agency | | | |
| Operations and Support: | | | |
| Regional Operations | 210,095 | 225,386 | +15,291 |
| Mitigation | 75,594 | 57,503 | -18,091 |
| Preparedness and Protection | 278,940 | 353,969 | +75,029 |
| Response and Recovery: | | | |
| Response | 236,868 | 273,810 | +36,942 |
| (Urban Search and Rescue) | (40,832) | (56,000) | (+15,168) |
| Recovery | 57,531 | 59,284 | +1,753 |
| Mission Support | 624,962 | 697,086 | +72,124 |
| Subtotal, Operations and Support | 1,483,990 | 1,667,038 | +183,048 |
| (Defense) | (98,089) | (156,534) | (+58,445) |
| (Non-defense) | (1,385,901) | (1,510,504) | (+124,603) |
| Procurement, Construction, and Improvements: | | | |
| Operational Communications/Information Technology | 21,900 | 64,375 | +42,475 |
| Construction and Facility Improvements | 36,250 | 63,625 | +27,375 |
| Mission Support Assets and Infrastructure | 41,378 | 28,419 | -12,959 |
| Subtotal, Procurement, Construction, and Improvements | 99,528 | 156,419 | +56,891 |
| (Appropriations) | (99,528) | (156,419) | (+56,891) |
| (Defense) | (46,900) | (128,000) | (+81,100) |
| (Non-defense) | (52,628) | (28,419) | (-24,209) |

109 AI

DEPARTMENT OF HOMELAND SECURITY APPROPRIATIONS ACT, 2026

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| Federal Assistance: | | | |
| Grants: | | | |
| State Homeland Security Grant Program............ | 468,000 | 494,000 | +26,000 |
| (Base Program)................................. | (373,500) | (394,250) | (+20,750) |
| (Operation Stonegarden)........................ | (81,000) | (85,500) | (+4,500) |
| (Tribal Security).............................. | (13,500) | (14,250) | (+750) |
| Urban Area Security Initiative................... | 553,500 | 584,250 | +30,750 |
| Nonprofit Security Grant Program................. | 274,500 | 300,000 | +25,500 |
| Public Transportation Security Assistance......... | 94,500 | 99,750 | +5,250 |
| (Amtrak Security).............................. | (9,000) | (9,500) | (+500) |
| (Over-the-Road Bus Security)................... | (1,800) | (1,900) | (+100) |
| Port Security Grants............................. | 90,000 | 95,000 | +5,000 |
| Assistance to Firefighter Grants................. | 324,000 | 342,000 | +18,000 |
| Staffing for Adequate Fire and Emergency Response (SAFER) Grants................................. | 324,000 | 342,000 | +18,000 |
| Emergency Management Performance Grants.......... | 319,500 | 337,250 | +17,750 |

109AJ

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 188 of 714 PageID #:1238

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| Flood Hazard Mapping and Risk Analysis Program (RiskMAP) | 281,475 | 297,113 | +15,638 |
| Regional Catastrophic Preparedness Grants | 10,800 | 11,400 | +600 |
| High Hazard Potential Dams/High Risk Dam Safety | --- | 11,400 | +11,400 |
| Emergency Food and Shelter | 117,000 | 123,500 | +6,500 |
| Next Generation Warning System | 40,000 | 48,000 | +8,000 |
| Community Project Funding/Congressionally Directed Spending | --- | 272,672 | +272,672 |
| Subtotal, Grants | 2,897,275 | 3,358,335 | +461,060 |
| Targeted Violence and Terrorism Prevention Grants (by transfer) | (18,000) | --- | (-18,000) |
| Alternatives to Detention Case Management Grants (by transfer) | (15,000) | --- | (-15,000) |
| Shelter and Services Program (by transfer) | (650,000) | --- | (-650,000) |
| Subtotal, Grants (with transfers) | 3,580,275 | 3,358,335 | -221,940 |

109AK

DEPARTMENT OF HOMELAND SECURITY APPROPRIATIONS ACT 2026

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| Education, Training, and Exercises: | | | |
| Center for Domestic Preparedness | 71,352 | 85,711 | +14,359 |
| Center for Homeland Defense and Security | 16,200 | 17,100 | +900 |
| Emergency Management Institute | 32,240 | 33,366 | +1,126 |
| U.S. Fire Administration | 59,975 | 72,140 | +12,165 |
| National Domestic Preparedness Consortium | 90,900 | 95,950 | +5,050 |
| Continuing Training Grants | 14,400 | 15,200 | +800 |
| National Exercise Program | 20,920 | 21,266 | +346 |
| Biological Support Program | --- | 83,657 | +83,657 |
| Securing the Cities Program | --- | 34,465 | +34,465 |
| Countering Weapons of Mass Destruction Training, Exercises, and Readiness | --- | 19,559 | +19,559 |
| Subtotal, Education, Training, and Exercises | 305,987 | 478,414 | +172,427 |
| Subtotal, Federal Assistance | 3,203,262 | 3,836,749 | +633,487 |
| (Defense) | (40,000) | (48,000) | (+8,000) |
| (Non-defense) | 3,163,262 | 3,788,749 | +625,487 |
| (by transfer) | (683,000) | --- | (-683,000) |
| Subtotal, Federal Assistance (including transfer) | 3,886,262 | 3,836,749 | -49,513 |
| Disaster Relief Fund: | | | |
| Disaster Relief Category | 22,510,000 | 26,367,000 | +3,857,000 |
| Subtotal, Disaster Relief Fund | 22,510,000 | 26,367,000 | +3,857,000 |

109AL

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| National Flood Insurance Fund: | | | |
| Floodplain Management and Mapping................ | 225,207 | 209,698 | -15,509 |
| Mission Support.................................. | 14,578 | 16,302 | +1,724 |
| Subtotal, National Flood Insurance Fund....... | 239,785 | 226,000 | -13,785 |
| Offsetting Collections........................... | -239,785 | -226,000 | +13,785 |
| Administrative Provisions | | | |
| Radiological Emergency Preparedness Program (Sec. 308): | | | |
| Operating Expenses............................... | 34,000 | 34,000 | --- |
| Offsetting Collections........................... | -34,000 | -34,000 | --- |
| Total, Federal Emergency Management Agency...... | 27,296,780 | 32,027,206 | +4,730,426 |
| (Appropriations)............................. | (27,570,565) | (32,287,206) | (+4,716,641) |
| (Defense).................................. | (184,989) | (332,534) | (+147,545) |
| (Non-defense).............................. | (27,385,576) | (31,954,672) | (+4,569,096) |
| (Disaster Relief Category)............... | (22,510,000) | (26,367,000) | (+3,857,000) |
| (Regular appropriations, not Disaster Relief)................................ | (4,875,576) | (5,587,672) | (+712,096) |
| (Offsetting Collections)..................... | (-273,785) | (-260,000) | (+13,785) |
| (by transfer).................................. | (683,000) | --- | (-683,000) |

109AM

DEPARTMENT OF HOMELAND SECURITY APPROPRIATIONS ACT, 2026

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| Total, Title III, Protection, Preparedness, Response, and Recovery | 30,169,788 | 34,632,304 | +4,462,516 |
| (Appropriations) | (30,443,573) | (34,892,304) | (+4,448,731) |
| (Defense) | (2,799,240) | (2,616,535) | (-182,705) |
| (Non-Defense) | (27,644,333) | (32,275,769) | (+4,631,436) |
| (Disaster Relief Category) | (22,510,000) | (26,367,000) | (+3,857,000) |
| (Regular Appropriations) | (5,134,333) | (5,908,769) | (+774,436) |
| (Offsetting Collections) | (-273,785) | (-260,000) | (+13,785) |
| (by transfer) | (683,000) | --- | (-683,000) |

109AN

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| TITLE IV - RESEARCH, DEVELOPMENT, TRAINING, AND SERVICES | | | |
| U.S. Citizenship and Immigration Services | | | |
| Operations and Support: | | | |
| Employment Status Verification | 111,085 | 112,566 | +1,481 |
| Application Processing | 160,055 | 10,375 | -149,680 |
| Subtotal, Operations and Support | 271,140 | 122,941 | -148,199 |
| Federal Assistance | 10,000 | --- | -10,000 |
| Fee Funded Programs: | | | |
| Immigration Examinations Fee Account: | | | |
| Adjudication Operations: | | | |
| Adjudication Operations | --- | (6,742,583) | (+6,742,583) |
| Field Operations Directorate | (1,177,268) | --- | (-1,177,268) |
| Fraud Detection and National Security Directorate | (299,506) | --- | (-299,506) |
| Service Center Operations Directorate | (664,569) | --- | (-664,569) |
| Support Services | (195,626) | --- | (-195,626) |
| Subtotal, Adjudication Operations | 2,336,969 | 6,742,583 | +4,405,614 |

109A0

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| Immigration Policy and Support | (1,526,859) | --- | (-1,526,859) |
| Refugee and Asylum Operations | (546,219) | --- | (-546,219) |
| Immigration Records and Applicant Services | (675,328) | --- | (-675,328) |
| Premium Processing (Including Transformation) | (1,523,963) | --- | (-1,523,963) |
| Subtotal, Immigration Examinations Fee Account | (6,609,338) | (6,742,583) | (+133,245) |
| H1-B Non-Immigrant Petitioner Account: | | | |
| Adjudication Services: | | | |
| Service Center Operations | (20,000) | (18,808) | (-1,192) |
| Fraud Prevention and Detection Account: | | | |
| Adjudication Services: | | | |
| Adjudication Services: | --- | (46,066) | (+46,066) |
| District Operations | (29,151) | --- | (-29,151) |
| Service Center Operations | (27,430) | --- | (-27,430) |
| Asylum and Refugee Operating Expenses | (348) | --- | (-348) |
| Subtotal, Fraud Prevention and Detection Account | 56,929 | 46,066 | -10,863 |
| EB-5 Integrity Fund | (8,918) | (10,800) | (+1,882) |
| Subtotal, Fee Funded Programs | 6,695,185 | 6,818,257 | +123,072 |
| Total, U.S. Citizenship and Immigration Services | 281,140 | 122,941 | -158,199 |

109AP

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| Fee Funded Programs | 6,695,185 | 6,818,257 | +123,072 |
| Federal Law Enforcement Training Centers | | | |
| Operations and Support: | | | |
| Law Enforcement Training | 324,087 | 346,209 | +22,122 |
| Mission Support | 33,013 | 33,628 | +615 |
| Subtotal, Operations and Support | 357,100 | 379,837 | +22,737 |
| Procurement, Construction, and Improvements: | | | |
| Construction and Facility Improvements | 20,100 | 18,300 | -1,800 |
| Total, Federal Law Enforcement Training Centers | 377,200 | 398,137 | +20,937 |

109AQ

DEPARTMENT OF HOMELAND SECURITY APPROPRIATIONS ACT, 2026

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| **Science and Technology** | | | |
| Operations and Support: | | | |
| Laboratory Facilities | 128,373 | 127,850 | -523 |
| Acquisition and Operations Analysis | 77,720 | 73,333 | -4,387 |
| Mission Support | 163,718 | 151,619 | -12,099 |
| Subtotal, Operations and Support | 369,811 | 352,802 | -17,009 |
| Procurement, Construction, and Improvements: | | | |
| Laboratory Facilities: | | | |
| Plum Island Closure and Support | 1,000 | 41,500 | +40,500 |
| Critical Repair/Replacement Requirement | 5,000 | 10,000 | +5,000 |
| Detection Sciences Testing and Applied Research Center | 55,000 | --- | -55,000 |
| Subtotal, Procurement, Construction, and Improvements | 61,000 | 51,500 | -9,500 |
| Research and Development: | | | |
| Research, Development, and Innovation | 259,786 | 379,904 | +120,118 |
| University Programs | 51,037 | 47,000 | -4,037 |
| Subtotal, Research and Development | 310,823 | 426,904 | +116,081 |
| Total, Science and Technology | 741,634 | 831,206 | +89,572 |

109AR

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| Countering Weapons of Mass Destruction Office | | | |
| Operations and Support: | | | |
| Mission Support | 93,916 | --- | -93,916 |
| Capability and Operations Support | 69,364 | --- | -69,364 |
| Subtotal, Operations and Support | 163,280 | --- | -163,280 |
| Procurement, Construction, and Improvements: | | | |
| Large Scale Detection Systems | 35,678 | --- | -35,678 |
| Portable Detection Systems | 6,660 | --- | -6,660 |
| Subtotal, Procurement, Construction, and Improvements | 42,338 | --- | -42,338 |
| Research and Development: | | | |
| Transformational R&D/Technical Forensics: | | | |
| Transformational R&D | 39,460 | --- | -39,460 |
| Technical Forensics | 6,530 | --- | -6,530 |
| Detection Capability Development and Rapid Capabilities: | | | |

109AS

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| Detection Capability Development | 14,948 | --- | -14,948 |
| Subtotal, Detection Capability Development and Rapid Capabilities | 14,948 | --- | -14,948 |
| Subtotal, Research and Development | 60,938 | --- | -60,938 |
| Federal Assistance: | | | |
| Capability Building: | | | |
| Training, Exercises, and Readiness | 21,268 | --- | -21,268 |
| Securing the Cities | 34,465 | --- | -34,465 |
| Biological Support | 87,152 | --- | -87,152 |
| Subtotal, Federal Assistance | 142,885 | --- | -142,885 |
| Total, Countering Weapons of Mass Destruction | 409,441 | --- | -409,441 |
| (Appropriations) | (409,441) | --- | (-409,441) |
| Total, Title IV, Research, Development, Training, and Services | 1,809,415 | 1,352,284 | -457,131 |
| (Appropriations) | (1,809,415) | (1,352,284) | (-457,131) |
| Fee Funded Programs | 6,695,185 | 6,818,257 | +123,072 |

109AT

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| TITLE V - GENERAL PROVISIONS | | | |
| Appropriation for the Supreme Court of the United States | --- | 30,000 | +30,000 |
| Appropriation for the Federal Aviation Administration | --- | 140,000 | +140,000 |
| MGMT PC&I (70 22/26 0406) (rescission) | --- | -73,327 | -73,327 |
| CBP O&S (70 x 0530) (rescission) | --- | -6,713 | -6,713 |
| CBP Automation Modernization (70 x 0531) (rescission) | --- | -387 | -387 |
| CBP PC&I (70 x 0532) (rescission) | --- | -917 | -917 |
| CBP BSFIT (70 x 0533) (rescission) | --- | -6,336 | -6,336 |
| CBP Air and Marine Interdiction (70 x 0544) (rescission) | --- | -1,413 | -1,413 |
| CISA Infrastructure Protection and Infrastructure Security (70 x 0565) (rescission) (defense) | --- | -172 | -172 |
| DHS Lapsed Balances (non-defense) (rescission) | -27,030 | -65,132 | -38,102 |
| DHS Lapsed Balances (defense) (rescission) | -2,545 | -46,613 | -44,068 |
| DHS Nonrecurring Expenses Fund (70 x 1914) (rescission) | -133,000 | -2,362 | +130,638 |
| Derived by transfer from P.L. 117-58 | -115,000 | --- | +115,000 |
| Derived by transfer from P.L. 117-58 (defense) | --- | -99,750 | -99,750 |
| Total, Title V, General Provisions | -277,575 | -133,122 | +144,453 |
| (Defense) | (-2,545) | (-146,535) | (-143,990) |
| (Non-Defense) | (-275,030) | (13,413) | (+288,443) |

109AV

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 199 of 714 PageID #:1249

(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| OTHER APPROPRIATIONS | | | |
| DISASTER RELIEF SUPPLEMENTAL APPROPRIATIONS ACT, 2025 (P.L. 118-158 DIVISION B) | | | |
| DEPARTMENT OF HOMELAND SECURITY | | | |
| United States Coast Guard | | | |
| Procurement, Construction, and Improvements (emergency) | 210,200 | --- | -210,200 |
| Operations and Support (emergency) | 102,500 | --- | -102,500 |
| Total, USCG | 312,700 | --- | -312,700 |
| Federal Emergency Management Agency | | | |
| Disaster Relief Fund (DRF) (emergency) | 29,000,000 | --- | -29,000,000 |
| Hermit's Peak (emergency) | 1,500,000 | --- | -1,500,000 |
| Total, FEMA | 30,500,000 | --- | -30,500,000 |
| Federal Law Enforcement Training Centers - Procurement, Construction, and Improvements (emergency) | 14,020 | --- | -14,020 |
| Total, Disaster Relief Supplemental Appropriations Act, 2025 | 30,826,720 | --- | -30,826,720 |
| Total, Other Appropriations | 30,826,720 | --- | -30,826,720 |

109 AV

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 200 of 714 PageID #:1250



(Amounts in thousands)

| | FY 2025 Enacted | Final Bill | Final Bill vs Enacted |
|---|---|---|---|
| Grand Total | 119,563,791 | 92,008,000 | -27,555,791 |
| (Discretionary Appropriations) | (93,925,394) | (97,380,152) | (+3,454,758) |
| (Defense) | (3,329,240) | (3,146,363) | (-182,877) |
| (Non-Defense) | (90,596,154) | (94,233,789) | (+3,637,635) |
| (Disaster Relief Category) | (22,510,000) | (26,367,000) | (+3,857,000) |
| (Other Non-Defense) | (68,086,154) | (67,866,789) | (-219,365) |
| (Rescissions) (Defense) | (-2,545) | (-46,613) | (-44,068) |
| (Rescissions) (Non-defense) | (-160,030) | (-149,334) | (+10,696) |
| (Offsetting Collections) | (-6,236,588) | (-6,425,205) | (-188,617) |
| (Emergency Appropriations) | (30,826,720) | --- | (-30,826,720) |
| (Mandatory Funding) | (1,210,840) | (1,249,000) | (+38,160) |
| | | | |
| (By transfer) | 683,000 | --- | -683,000 |
| (Transfer out) | -683,000 | --- | +683,000 |
| Aviation Security Capital Fund | 250,000 | 250,000 | --- |
| Fee Funded Programs | 9,834,014 | 10,510,143 | +676,129 |
| | | | |
| (Grand Total without Other Appropriations) | (88,737,071) | (92,008,000) | (+3,270,929) |

109AW

# Exhibit B-1

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO


IB

Union Calendar No. 139

119TH CONGRESS
1ST SESSION

# H. R. 4213

**[Report No. 119–173]**

Making appropriations for the Department of Homeland Security for the fiscal year ending September 30, 2026, and for other purposes.

---

IN THE HOUSE OF REPRESENTATIVES

JUNE 26, 2025

Mr. AMODEI of Nevada, from the Committee on Appropriations, reported the following bill; which was committed to the Committee of the Whole House on the State of the Union and ordered to be printed

---

# A BILL

Making appropriations for the Department of Homeland Security for the fiscal year ending September 30, 2026, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the following sums are appropriated, out of any money in the Treasury not otherwise appropriated, for the Department of Homeland Security for the fiscal year ending September 30, 2026, and for other purposes, namely:

# TITLE I

## DEPARTMENTAL MANAGEMENT, INTELLIGENCE, SITUATIONAL AWARENESS, AND OVERSIGHT

### Office of the Secretary and Executive Management

#### OPERATIONS AND SUPPORT

For necessary expenses of the Office of the Secretary and for executive management for operations and support, $246,230,000, of which $26,050,000 shall remain available until September 30, 2027: *Provided,* That $5,000,000 shall be withheld from obligation until the Secretary submits, to the Committees on Appropriations of the House of Representatives and the Senate, responses to all questions for the record for each hearing on the fiscal year 2027 budget submission for the Department of Homeland Security held by such Committees prior to July 1: *Provided further,* That not to exceed $30,000 shall be for official reception and representation expenses.

#### PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

For necessary expenses of the Office of the Secretary and for executive management for procurement, construction, and improvements, $8,113,000, to remain available until September 30, 2028.

MANAGEMENT DIRECTORATE

OPERATIONS AND SUPPORT

For necessary expenses of the Management Directorate for operations and support, $1,648,509,000: *Provided,* That not to exceed $2,000 shall be for official reception and representation expenses.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

For necessary expenses of the Management Directorate for procurement, construction, and improvements, $96,306,000, of which $66,306,00 shall remain available until September 30, 2028, and of which $30,000,000 shall remain available until September 30, 2030.

FEDERAL PROTECTIVE SERVICE

The revenues and collections of security fees credited to this account shall be available until expended for necessary expenses related to the protection of federally owned and leased buildings and for the operations of the Federal Protective Service.

INTELLIGENCE, ANALYSIS, AND SITUATIONAL AWARENESS

OPERATIONS AND SUPPORT

For necessary expenses of the Office of Intelligence and Analysis and the Office of Homeland Security Situational Awareness for operations and support, $360,788,000, of which $114,118,000 shall remain avail-

able until September 30, 2027: *Provided,* That not to exceed $2,000,000 is available for facility needs associated with secure space at fusion centers, including improvements to buildings: *Provided further*, That not to exceed $3,825 shall be for official reception and representation expenses.

## OFFICE OF INSPECTOR GENERAL

### OPERATIONS AND SUPPORT

For necessary expenses of the Office of Inspector General for operations and support, $223,063,000: *Provided,* That not to exceed $300,000 may be used for certain confidential operational expenses, including the payment of informants, to be expended at the direction of the Inspector General.

## ADMINISTRATIVE PROVISIONS

SEC. 101. (a) The Secretary of Homeland Security shall submit a report not later than October 15, 2026, to the Inspector General of the Department of Homeland Security listing all grants and contracts awarded by any means other than full and open competition during fiscal years 2025 or 2026.

(b) The Inspector General shall review the report required by subsection (a) to assess departmental compliance with applicable laws and regulations and report the results of that review to the Committees on Appropriations

of the House of Representatives and the Senate not later than February 15, 2027.

SEC. 102. Not later than 30 days after the last day of each month, the Chief Financial Officer of the Department of Homeland Security shall submit to the Committees on Appropriations of the House of Representatives and the Senate a monthly budget and staffing report that includes total obligations of the Department for that month and for the fiscal year at the appropriation and program, project, and activity levels, by the source year of the appropriation.

SEC. 103. (a) The Secretary of Homeland Security, in consultation with the Secretary of the Treasury, shall notify the Committees on Appropriations of the House of Representatives and the Senate of any proposed transfer of funds available under section 9705(g)(4)(B) of title 31, United States Code, from the Department of the Treasury Forfeiture Fund to any agency within the Department of Homeland Security.

(b) None of the funds identified for such a transfer may be obligated until the Committees on Appropriations of the House of Representatives and the Senate are notified of the proposed transfer.

SEC. 104. All official costs associated with the use of Government aircraft by Department of Homeland Secu-

rity personnel to support official travel of the Secretary and the Deputy Secretary shall be paid from amounts made available for the Office of the Secretary.

SEC. 105. (a) The Under Secretary for Management shall brief the Committees on Appropriations of the House of Representatives and the Senate not later than 45 days after the end of each fiscal quarter on all Level 1 and Level 2 acquisition programs on the Master Acquisition Oversight List between Acquisition Decision Event and Full Operational Capability, including programs that have been removed from such list during the preceding quarter.

(b) For each such program, the briefing described in subsection (a) shall include—

(1) a description of the purpose of the program, including the capabilities being acquired and the component(s) sponsoring the acquisition;

(2) the total number of units, as appropriate, to be acquired annually until procurement is complete under the current acquisition program baseline;

(3) the Acquisition Review Board status, including—

(A) the current acquisition phase by increment, as applicable;

(B) the date of the most recent review; and

(C) whether the program has been paused or is in breach status;

(4) a comparison between the initial Department-approved acquisition program baseline cost, schedule, and performance thresholds and objectives and the program's current such thresholds and objectives, if applicable;

(5) the lifecycle cost estimate, adjusted for comparison to the Future Years Homeland Security Program, including—

(A) the confidence level for the estimate;

(B) the fiscal years included in the estimate;

(C) a breakout of the estimate for the prior five years, the current year, and the budget year;

(D) a breakout of the estimate by appropriation account or other funding source; and

(E) a description of and rationale for any changes to the estimate as compared to the previously approved baseline, as applicable, and during the prior fiscal year;

(6) a summary of the findings of any independent verification and validation of the items to be

acquired or an explanation for why no such verification and validation has been performed;

(7) a table displaying the obligation of all program funds by prior fiscal year, the estimated obligation of funds for the current fiscal year, and an estimate for the planned carryover of funds into the subsequent fiscal year;

(8) a listing of prime contractors and major subcontractors; and

(9) narrative descriptions of risks to cost, schedule, or performance that could result in a program breach if not successfully mitigated.

(c) The Under Secretary for Management shall submit each approved Acquisition Decision Memorandum for programs described in this section to the Committees on Appropriations of the House of Representatives and the Senate not later than five business days after the date of approval of such memorandum by the Under Secretary for Management or the designee of the Under Secretary for Management.

SEC. 106. (a) None of the funds made available to the Department of Homeland Security in this Act or prior appropriations Acts may be obligated for any new pilot or demonstration unless the component or office carrying

out such pilot or demonstration has documented the information described in subsection (c).

(b) Prior to the obligation of any such funds made available for "Operations and Support" for a new pilot or demonstration, the Under Secretary for Management shall provide a report to the Committees on Appropriations of the House of Representatives and the Senate on the information described in subsection (c).

(c) The information required under subsections (a) and (b) for a pilot or demonstration shall include the following—

(1) documented objectives that are well-defined and measurable;

(2) an assessment methodology that details—

(A) the type and source of assessment data;

(B) the methods for, and frequency of, collecting such data; and

(C) how such data will be analyzed; and

(3) an implementation plan, including milestones, cost estimates, and implementation schedules, including a projected end date.

(d) Not later than 90 days after the date of completion of a pilot or demonstration described in subsection (e), the Under Secretary for Management shall provide a

report to the Committees on Appropriations of the House of Representatives and the Senate detailing lessons learned, actual costs, any planned expansion or continuation of the pilot or demonstration, and any planned transition of such pilot or demonstration into an enduring program or operation.

(e) For the purposes of this section, a pilot or demonstration program is a study, demonstration, experimental program, or trial that—

(1) is a small-scale, short-term experiment conducted in order to evaluate feasibility, duration, costs, or adverse events, and improve upon the design of an effort prior to implementation of a larger scale effort; and

(2) uses more than 10 full-time equivalents or obligates, or proposes to obligate, $5,000,000 or more, but does not include congressionally directed programs or enhancements and does not include programs that were in operation as of the date of the enactment of this Act.

(f) For the purposes of this section, a pilot or demonstration does not include any testing, evaluation, or initial deployment phase executed under a procurement contract for the acquisition of information technology services or systems, or any pilot or demonstration carried out by

a non-Federal recipient under any financial assistance agreement funded by the Department.

SEC. 107. None of the funds appropriated or otherwise made available by this Act may be used by the Office of Intelligence and Analysis of the Department of Homeland Security to conduct a covered activity (as defined by section 6303 of the Intelligence Authorization Act for Fiscal Year 2025 (division F of Public Law 118–159)).

## TITLE II

## SECURITY, ENFORCEMENT, AND INVESTIGATIONS

### U.S. CUSTOMS AND BORDER PROTECTION

#### OPERATIONS AND SUPPORT

(INCLUDING TRANSFER OF FUNDS)

For necessary expenses of U.S. Customs and Border Protection for operations and support, including the transportation of unaccompanied alien minors; the provision of air and marine support to Federal, State, local, and international agencies in the enforcement or administration of laws enforced by the Department of Homeland Security; at the discretion of the Secretary of Homeland Security, the provision of such support to Federal, State, and local agencies in other law enforcement and emergency humanitarian efforts; the purchase and lease of up to 7,500 (6,500 for replacement only) police-type vehicles; the pur-

chase, maintenance, or operation of marine vessels, aircraft, and unmanned aerial systems; and contracting with individuals for personal services abroad; $18,088,596,000; of which $3,274,000 shall be derived from the Harbor Maintenance Trust Fund for administrative expenses related to the collection of the Harbor Maintenance Fee pursuant to section 9505(c)(3) of the Internal Revenue Code of 1986 (26 U.S.C. 9505(c)(3)) and notwithstanding section 1511(e)(1) of the Homeland Security Act of 2002 (6 U.S.C. 551(e)(1)); of which $550,000,000 shall be available until September 30, 2027; and of which such sums as become available in the Customs User Fee Account, except sums subject to section 13031(f)(3) of the Consolidated Omnibus Budget Reconciliation Act of 1985 (19 U.S.C. 58c(f)(3)), shall be derived from that account: *Provided,* That not to exceed $34,425 shall be for official reception and representation expenses: *Provided further,* That not to exceed $150,000 shall be available for payment for rental space in connection with preclearance operations: *Provided further,* That not to exceed $2,000,000 shall be for awards of compensation to informants, to be accounted for solely under the certificate of the Secretary of Homeland Security: *Provided further,* That not to exceed $2,500,000 may be transferred to the Bureau of Indian Affairs for the maintenance and repair of roads on

Native American reservations used by the U.S. Border Patrol.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

For necessary expenses of U.S. Customs and Border Protection for procurement, construction, and improvements, including procurement of marine vessels, aircraft, and unmanned aerial systems, $898,118,000, to remain available until September 30, 2028.

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

OPERATIONS AND SUPPORT

For necessary expenses of U.S. Immigration and Customs Enforcement for operations and support, including the purchase and lease of up to 3,790 (2,350 for replacement only) police-type vehicles; overseas vetted units; and maintenance, minor construction, and minor leasehold improvements at owned and leased facilities; $10,967,045,000, of which not less than $6,000,000 shall remain available until expended for efforts to enforce laws against forced child labor; of which $46,696,000 shall remain available until September 30, 2027; of which not less than $2,000,000 is for paid apprenticeships for participants in the Human Exploitation Rescue Operative Child-Rescue Corps; of which not less than $15,000,000 shall be available for investigation of intellectual property rights violations, including operation of the National Intellectual

Property Rights Coordination Center; and of which $6,402,677,000 shall be for enforcement, detention, and removal operations, including transportation of unaccompanied alien minors: *Provided,* That not to exceed $11,475 shall be for official reception and representation expenses: *Provided further,* That not to exceed $15,000,000 shall be available until expended for conducting special operations under section 3131 of the Customs Enforcement Act of 1986 (19 U.S.C. 2081): *Provided further,* That not to exceed $4,000,000 shall be for awards of compensation to informants, to be accounted for solely under the certificate of the Secretary of Homeland Security: *Provided further,* That not to exceed $11,216,000 shall be available to fund or reimburse other Federal agencies for the costs associated with the care, maintenance, and repatriation of smuggled aliens unlawfully present in the United States.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

For necessary expenses of U.S. Immigration and Customs Enforcement for procurement, construction, and improvements, $35,000,000, of which $20,000,000 shall remain available until September 30, 2028, and of which $15,000,000 shall remain available until September 30, 2030.

TRANSPORTATION SECURITY ADMINISTRATION

OPERATIONS AND SUPPORT

For necessary expenses of the Transportation Security Administration for operations and support, $10,378,063,000, of which $300,000,000 shall remain available until September 30, 2027: *Provided,* That not to exceed $7,650 shall be for official reception and representation expenses: *Provided further,* That security service fees authorized under section 44940 of title 49, United States Code, shall be credited to this appropriation as offsetting collections and shall be available only for aviation security: *Provided further,* That the sum appropriated under this heading from the general fund shall be reduced on a dollar-for-dollar basis as such offsetting collections are received during fiscal year 2026 so as to result in a final fiscal year appropriation from the general fund estimated at not more than $7,348,063,000.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

For necessary expenses of the Transportation Security Administration for procurement, construction, and improvements, $258,230,000, to remain available until September 30, 2028.

RESEARCH AND DEVELOPMENT

For necessary expenses of the Transportation Security Administration for research and development,

$14,641,000, to remain available until September 30, 2027.

## Coast Guard

### OPERATIONS AND SUPPORT

For necessary expenses of the Coast Guard for operations and support including the Coast Guard Reserve; purchase or lease of not to exceed 25 passenger motor vehicles, which shall be for replacement only; purchase or lease of small boats for contingent and emergent requirements (at a unit cost of not more than $700,000) and repairs and service-life replacements, not to exceed a total of $31,000,000; purchase, lease, or improvements of boats necessary for overseas deployments and activities; payments pursuant to section 156 of Public Law 97–377 (42 U.S.C. 402 note; 96 Stat. 1920); and recreation and welfare; $10,802,656,000, of which $530,000,000 shall be for defense-related activities; of which $24,500,000 shall be derived from the Oil Spill Liability Trust Fund to carry out the purposes of section 1012(a)(5) of the Oil Pollution Act of 1990 (33 U.S.C. 2712(a)(5)); of which $20,000,000 shall remain available until September 30, 2028; of which $24,359,000 shall remain available until September 30, 2030, for environmental compliance and restoration; and of which $400,000,000 shall remain available until September 30, 2027, which shall only be avail-

able for depot level maintenance: *Provided,* That not to exceed $23,000 shall be for official reception and representation expenses.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

For necessary expenses of the Coast Guard for procurement, construction, and improvements, including aids to navigation, shore facilities (including facilities at Department of Defense installations used by the Coast Guard), and vessels and aircraft, including equipment related thereto, $2,026,790,000, to remain available until September 30, 2030; of which $20,000,000 shall be derived from the Oil Spill Liability Trust Fund to carry out the purposes of section 1012(a)(5) of the Oil Pollution Act of 1990 (33 U.S.C. 2712(a)(5)).

RESEARCH AND DEVELOPMENT

For necessary expenses of the Coast Guard for research and development; and for maintenance, rehabilitation, lease, and operation of facilities and equipment; $7,476,000, to remain available until September 30, 2028, of which $500,000 shall be derived from the Oil Spill Liability Trust Fund to carry out the purposes of section 1012(a)(5) of the Oil Pollution Act of 1990 (33 U.S.C. 2712(a)(5)): *Provided,* That there may be credited to and used for the purposes of this appropriation funds received from State and local governments, other public authori-

ties, private sources, and foreign countries for expenses incurred for research, development, testing, and evaluation.

RETIRED PAY

For retired pay, including the payment of obligations otherwise chargeable to lapsed appropriations for this purpose, payments under the Retired Serviceman's Family Protection and Survivor Benefits Plans, payment for career status bonuses, payment of continuation pay under section 356 of title 37, United States Code, concurrent receipts, combat-related special compensation, and payments for medical care of retired personnel and their dependents under chapter 55 of title 10, United States Code, $1,249,000,000, to remain available until expended.

UNITED STATES SECRET SERVICE

OPERATIONS AND SUPPORT

For necessary expenses of the United States Secret Service for operations and support, including purchase of not to exceed 652 vehicles for police-type use; hire of passenger motor vehicles; purchase of motorcycles made in the United States; hire of aircraft; rental of buildings in the District of Columbia; fencing, lighting, guard booths, and other facilities on private or other property not in Government ownership or control, as may be necessary to perform protective functions; conduct of and participation

in firearms matches; presentation of awards; conduct of behavioral research in support of protective intelligence and operations; payment in advance for commercial accommodations as may be necessary to perform protective functions; and payment, without regard to section 5702 of title 5, United States Code, of subsistence expenses of employees who are on protective missions, whether at or away from their duty stations; $3,103,191,000; of which $111,299,000 shall remain available until September 30, 2027, and of which $6,000,000 shall be for a grant for activities related to investigations of missing and exploited children; and of which up to $35,000,000 may be for calendar year 2025 premium pay in excess of the annual equivalent of the limitation on the rate of pay contained in section 5547(a) of title 5, United States Code, pursuant to section 2 of the Overtime Pay for Protective Services Act of 2016 (5 U.S.C. 5547 note), as last amended by Public Law 118–38: *Provided,* That not to exceed $19,125 shall be for official reception and representation expenses: *Provided further,* That not to exceed $100,000 shall be to provide technical assistance and equipment to foreign law enforcement organizations in criminal investigations within the jurisdiction of the United States Secret Service.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

For necessary expenses of the United States Secret Service for procurement, construction, and improvements, $126,290,000, of which $51,290,000 shall remain available until September 30, 2028, and of which $75,000,000 shall remain available until September 30, 2030.

RESEARCH AND DEVELOPMENT

For necessary expenses of the United States Secret Service for research and development, $3,250,000, to remain available until September 30, 2027.

ADMINISTRATIVE PROVISIONS

SEC. 201. Section 201 of the Department of Homeland Security Appropriations Act, 2018 (division F of Public Law 115–141), related to overtime compensation limitations, shall apply with respect to funds made available in this Act in the same manner as such section applied to funds made available in that Act, except that ''fiscal year 2026'' shall be substituted for ''fiscal year 2018''.

SEC. 202. Funding made available under the headings ''U.S. Customs and Border Protection—Operations and Support'' and ''U.S. Customs and Border Protection—Procurement, Construction, and Improvements'' shall be available for customs expenses when necessary to maintain operations and prevent adverse personnel actions in Puerto Rico and the U.S. Virgin Islands, in addition

to funding provided by sections 740 and 1406i of title 48, United States Code.

SEC. 203. As authorized by section 601(b) of the United States-Colombia Trade Promotion Agreement Implementation Act (Public Law 112–42), fees collected from passengers arriving from Canada, Mexico, or an adjacent island pursuant to section 13031(a)(5) of the Consolidated Omnibus Budget Reconciliation Act of 1985 (19 U.S.C. 58c(a)(5)) shall be available until expended.

SEC. 204. (a) For an additional amount for ''U.S. Customs and Border Protection—Operations and Support'', $31,000,000, to remain available until expended, to be reduced by amounts collected and credited to this appropriation in fiscal year 2026 from amounts authorized to be collected by section 286(i) of the Immigration and Nationality Act (8 U.S.C. 1356(i)), section 10412 of the Farm Security and Rural Investment Act of 2002 (7 U.S.C. 8311), and section 817 of the Trade Facilitation and Trade Enforcement Act of 2015 (Public Law 114–125), or other such authorizing language.

(b) To the extent that amounts realized from such collections exceed $31,000,000, those amounts in excess of $31,000,000 shall be credited to this appropriation, to remain available until expended.

SEC. 205. None of the funds made available in this Act for U.S. Customs and Border Protection may be used to prevent an individual not in the business of importing a prescription drug (within the meaning of section 801(g) of the Federal Food, Drug, and Cosmetic Act) from importing a prescription drug from Canada that complies with the Federal Food, Drug, and Cosmetic Act: *Provided,* That this section shall apply only to individuals transporting on their person a personal-use quantity of the prescription drug, not to exceed a 90-day supply: *Provided further,* That the prescription drug may not be—

(1) a controlled substance, as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802); or

(2) a biological product, as defined in section 351 of the Public Health Service Act (42 U.S.C. 262).

SEC. 206. (a) Notwithstanding any other provision of law, none of the funds provided in this or any other Act shall be used to approve a waiver of the navigation and vessel-inspection laws pursuant to section 501(b) of title 46, United States Code, for the transportation of crude oil distributed from and to the Strategic Petroleum Reserve until the Secretary of Homeland Security, after consultation with the Secretaries of the Departments of

Energy and Transportation and representatives from the United States flag maritime industry, takes adequate measures to ensure the use of United States flag vessels.

(b) The Secretary shall notify the Committees on Appropriations of the House of Representatives and the Senate, the Committee on Transportation and Infrastructure of the House of Representatives, and the Committee on Commerce, Science, and Transportation of the Senate within 2 business days of any request for waivers of navigation and vessel-inspection laws pursuant to section 501(b) of title 46, United States Code, with respect to such transportation, and the disposition of such requests.

SEC. 207. (a) Beginning on the date of enactment of this Act, the Secretary of Homeland Security shall not—

(1) establish, collect, or otherwise impose any new border crossing fee on individuals crossing the Southern border or the Northern border at a land port of entry; or

(2) conduct any study relating to the imposition of a border crossing fee.

(b) In this section, the term "border crossing fee" means a fee that every pedestrian, cyclist, and driver and passenger of a private motor vehicle is required to pay

for the privilege of crossing the Southern border or the Northern border at a land port of entry.

SEC. 208. (a) Not later than 90 days after the date of enactment of this Act, the Commissioner of U.S. Customs and Border Protection shall submit an expenditure plan for any amounts made available for "U.S. Customs and Border Protection—Procurement, Construction, and Improvements" in this Act and prior Acts to the Committees on Appropriations of the House of Representatives and the Senate.

(b) No such amounts provided in this Act may be obligated prior to the submission of such plan.

SEC. 209. Section 211 of the Department of Homeland Security Appropriations Act, 2021 (division F of Public Law 116–260), prohibiting the use of funds for the construction of fencing in certain areas, shall apply with respect to funds made available in this Act in the same manner as such section applied to funds made available in that Act.

SEC. 210. (a) Funds made available in this Act may be used to alter operations within the National Targeting Center of U.S. Customs and Border Protection.

(b) None of the funds provided by this Act, provided by previous appropriations Acts that remain available for obligation or expenditure in fiscal year 2026, or provided

from any accounts in the Treasury of the United States derived by the collection of fees available to the components funded by this Act, may be used to reduce anticipated or planned vetting operations at existing locations unless specifically authorized by a statute enacted after the date of enactment of this Act.

SEC. 211. Of the total amount made available under "U.S. Customs and Border Protection—Procurement, Construction, and Improvements", $898,118,000 shall be available only as follows:

(1) $346,000,000 for the acquisition and deployment of border security technologies;

(2) $300,000,000 for trade and travel assets and infrastructure;

(3) $182,400,000 for integrated operations assets and infrastructure;

(4) $32,000,000 for mission support and infrastructure; and

(5) $37,718,000 for radiological detection systems.

SEC. 212. None of the funds appropriated or otherwise made available by this Act may be made available to admit an alien into the United States at a port of entry on an F or M visa if the college, university, or other institution of higher learning that the student will attend is

not accredited by a nationally recognized accrediting agency or association recognized by the Secretary of Education pursuant to part H of title IV of the Higher Education Act of 1965 (20 U.S.C. 1099a et seq.).

SEC. 213. None of the funds appropriated or otherwise made available by this Act may be made available to parole into the Commonwealth of the Northern Mariana Islands, for the purpose of temporary visit for business or pleasure without a visa, an alien who is a national of the People's Republic of China.

SEC. 214. (a) None of the funds appropriated or otherwise made available by this Act may be used by U.S. Customs and Border Protection to admit into the United States any aerosol-dispensing unmanned aircraft system produced or manufactured in a foreign adversary country.

(b) The term ''foreign adversary country'' means a country specified in section 4872(d)(2) of title 10, United States Code.

SEC. 215. None of the funds appropriated or otherwise made available by this Act may be made available to reduce participation in or substantively diminish the delegation of law enforcement authority authorized under section 287(g) of the Immigration and Nationality Act (8 U.S.C. 1357(g)), except as provided in section 216 of this Act.

SEC. 216. None of the funds provided under the heading ''U.S. Immigration and Customs Enforcement—Operations and Support'' may be used to continue a delegation of law enforcement authority authorized under section 287(g) of the Immigration and Nationality Act (8 U.S.C. 1357(g)) if the Department of Homeland Security Inspector General determines that the terms of the agreement governing the delegation of authority have been materially violated.

SEC. 217. (a) None of the funds provided under the heading ''U.S. Immigration and Customs Enforcement—Operations and Support'' may be used to continue any contract for the provision of detention services if the two most recent overall performance evaluations received by the contracted facility are less than ''adequate'' or the equivalent median score in any subsequent performance evaluation system.

(b) The performance evaluations referenced in subsection (a) shall be conducted by the U.S. Immigration and Customs Enforcement Office of Professional Responsibility.

SEC. 218. Without regard to the limitation as to time and condition of section 503(d) of this Act, the Secretary may reprogram within and transfer funds to ''U.S. Immigration and Customs Enforcement—Operations and Sup-

port'' as necessary to ensure the detention of aliens prioritized for removal.

SEC. 219. The reports required to be submitted under section 216 of the Department of Homeland Security Appropriations Act, 2021 (division F of Public Law 116–260) shall continue to be submitted semimonthly and each matter required to be included in such reports by such section 216 shall apply in the same manner and to the same extent during the period described in such section 216.

SEC. 220. The terms and conditions of section 217 of the Department of Homeland Security Appropriations Act, 2020 (division D of Public Law 116–93) shall apply to this Act.

SEC. 221. (a) None of the funds appropriated or otherwise made available by this Act may be made available to transport aliens unlawfully present in, paroled into, or inadmissible to the United States into the interior of the United States for purposes other than enforcement of the immigration laws (as such term is defined in section 101 of the Immigration and Nationality Act (8 U.S.C. 1101)).

(b) The limitation under subsection (a) shall not apply with respect to amounts made available to transport unaccompanied alien children (as such term is defined in

section 462 of the Homeland Security Act of 2002 (6 U.S.C. 279)).

SEC. 222. (a) None of the funds appropriated or otherwise made available by this Act for "U.S. Immigration and Customs Enforcement" may be used to pay for or facilitate an abortion, except where the life of the mother would be endangered if the fetus would be carried to term, or in the case of rape or incest.

(b) None of the funds appropriated or otherwise made available by this Act for "U.S. Immigration and Customs Enforcement" may be used to require any person to perform, or facilitate in any way the performance of, any abortion.

SEC. 223. None of the funds appropriated or otherwise made available by this Act may be made available to administer hormone therapy medication or perform or facilitate any surgery for any person in custody of U.S. Immigration and Customs Enforcement for the purpose of gender-affirming care.

SEC. 224. The Secretary of Homeland Security shall allocate amounts appropriated or otherwise made available under the heading "U.S. Immigration and Customs Enforcement—Operations and Support" by this Act in order to—

(1) prioritize resources to apprehend, detain, and remove aliens who—

(a) are linked to terrorist organizations or terrorist-related activities, or otherwise pose a danger to national security;

(b) possess a criminal history, with a particular emphasis on violent criminals, felons, and repeat offenders;

(c) have ties to organized criminal organizations; or

(d) otherwise constitute a threat to public safety;

(2) prioritize detention by using such amounts to ensure that the average daily population of detainees is maintained at the full capacity at all detention facilities funded by this Act throughout the fiscal year; and

(3) ensure that every alien on the non-detained docket is enrolled into the Alternatives to Detention Program with mandatory GPS monitoring throughout the duration of all applicable immigration proceedings (including any appeals) and until removal, if ordered removed.

SEC. 225. Not later than 45 days after the date of enactment of this Act, the Chief Financial Officer of U.S.

Immigration and Customs Enforcement shall submit to the Committees on Appropriations of the House of Representatives and the Senate an obligation plan for amounts made available in this Act for ''U.S. Immigration and Customs Enforcement'', delineated by level II program, project, and activity.

SEC. 226. None of the funds provided under the heading ''U.S. Immigration and Customs Enforcement—Operations and Support'' may be made available to develop or administer a physical identification card for purposes of alien identification, verification of immigration status, or immigration portal access.

SEC. 227. No law of any State or political subdivision thereof pertaining to a minimum rate of compensation or any other condition of employment shall apply in the case of any person held in Federal custody pursuant to the immigration laws (as such term is defined in section 101 of the Immigration and Nationality Act (8 U.S.C. 1101)).

SEC. 228. (a) None of the funds appropriated or otherwise made available by this Act or any other Act shall be used to execute an inspection of a detention facility that is in a contractual agreement with U.S. Immigration and Customs Enforcement for the provision of detention services and that is subject to the terms, conditions, and standards found within the National Detention Standards

for Non-Dedicated Facilities, as revised in 2019 for U.S. Immigration and Customs Enforcement, except solely for compliance with the terms, conditions, and standards found within the National Detention Standards for Non-Dedicated Facilities, as revised in 2019.

(b) Executions of inspections described in subsection (a) shall not occur within six months of a previous inspection of such facility, except with respect to inspections executed by the Office of Inspector General.

SEC. 229. (a) None of the funds made available by this Act or any other Act may be used to reduce the presence of U.S. Immigration and Customs Enforcement attaches or liaisons at international U.S. embassies or consulates for the purposes of international investigations or partnerships with foreign law enforcement.

(b) Subsection (a) shall not apply to a reduction of presence in a specific country if—

(1) the Secretary of Homeland Security, in collaboration with the Secretary of State, provides a written explanation of how maintaining a collaborative investigatory presence in a specific country undermines U.S. foreign policy interests in that country to the Committees on Appropriations of the House of Representatives and the Senate; or

(2) a country requests the cessation of collaborative law enforcement activities performed by the attache or liaison stationed at the embassy or consulate to their country.

SEC. 230. (a) Members of the United States House of Representatives and the United States Senate, including the leadership; the heads of Federal agencies and commissions, including the Secretary, Deputy Secretary, Under Secretaries, and Assistant Secretaries of the Department of Homeland Security; the United States Attorney General, Deputy Attorney General, Assistant Attorneys General, and the United States Attorneys; and senior members of the Executive Office of the President, including the Director of the Office of Management and Budget, shall not be exempt from Federal passenger and baggage screening.

(b) None of the funds made available in this or any other Act, including prior Acts, or provided from any accounts in the Treasury of the United States derived by the collection of fees available to the components funded by this Act may be used to carry out legislation altering the applicability of the screening requirements outlined in subsection (a).

SEC. 231. Notwithstanding section 44923 of title 49, United States Code, for fiscal year 2026, any funds in

the Aviation Security Capital Fund established by section 44923(h) of title 49, United States Code, may be used for the procurement and installation of explosives detection systems or for the issuance of other transaction agreements for the purpose of funding projects described in section 44923(a) of such title.

SEC. 232. Not later than 45 days after the submission of the President's budget proposal, the Administrator of the Transportation Security Administration shall submit to the Committees on Appropriations and Homeland Security of the House of Representatives and the Committees on Appropriations and Commerce, Science, and Transportation of the Senate a single report that fulfills the following requirements:

(1) a Capital Investment Plan, both constrained and unconstrained, that includes a plan for continuous and sustained capital investment in new, and the replacement of aged, transportation security equipment;

(2) the 5-year technology investment plan as required by section 1611 of title XVI of the Homeland Security Act of 2002, as amended by section 3 of the Transportation Security Acquisition Reform Act (Public Law 113–245); and

(3) the Advanced Integrated Passenger Screening Technologies report as required by the Senate Report accompanying the Department of Homeland Security Appropriations Act, 2019 (Senate Report 115–283).

SEC. 233. Section 515(b) of Public Law 108–334 (49 U.S.C. 44945 note) is amended by striking ''report'' each place it appears (including in the subsection heading) and inserting ''briefing''.

SEC. 234. (a) None of the funds made available by this Act under the heading ''Coast Guard—Operations and Support'' shall be for expenses incurred for recreational vessels under section 12114 of title 46, United States Code, except to the extent fees are collected from owners of yachts and credited to the appropriation made available by this Act under the heading ''Coast Guard—Operations and Support''.

(b) To the extent such fees are insufficient to pay expenses of recreational vessel documentation under such section 12114, and there is a backlog of recreational vessel applications, personnel performing non-recreational vessel documentation functions under subchapter II of chapter 121 of title 46, United States Code, may perform documentation under section 12114.

SEC. 235. Notwithstanding any other provision of law, the Commandant of the Coast Guard shall submit to the Committees on Appropriations of the House of Representatives and the Senate a future-years capital investment plan as described in the second proviso under the heading "Coast Guard—Acquisition, Construction, and Improvements" in the Department of Homeland Security Appropriations Act, 2015 (Public Law 114–4), which shall be subject to the requirements in the third and fourth provisos under such heading.

SEC. 236. Amounts deposited into the Coast Guard Housing Fund in fiscal year 2026 shall be available until expended to carry out the purposes of section 2946 of title 14, United States Code, and shall be in addition to funds otherwise available for such purposes.

SEC. 237. None of the funds made available by this Act may be used by the United States Coast Guard to enforce vessel speed restrictions with respect to the North Atlantic right whale or the Rice's whale that was not in place prior to January 20, 2021.

SEC. 238. The United States Secret Service is authorized to obligate funds in anticipation of reimbursements from executive agencies, as defined in section 105 of title 5, United States Code, for personnel receiving training sponsored by the James J. Rowley Training Cen-

ter, except that total obligations at the end of the fiscal year shall not exceed total budgetary resources available under the heading "United States Secret Service—Operations and Support" at the end of the fiscal year.

SEC. 239. (a) None of the funds made available to the United States Secret Service by this Act or by previous appropriations Acts may be made available for the protection of the head of a Federal agency other than the Secretary of Homeland Security.

(b) The Director of the United States Secret Service may enter into agreements to provide such protection on a fully reimbursable basis.

SEC. 240. For purposes of section 503(a)(3) of this Act, up to $15,000,000 may be reprogrammed within "United States Secret Service—Operations and Support".

SEC. 241. Funding made available in this Act for "United States Secret Service—Operations and Support" is available for travel of United States Secret Service employees on protective missions without regard to the limitations on such expenditures in this or any other Act if the Director of the United States Secret Service or a designee notifies the Committees on Appropriations of the House of Representatives and the Senate 10 or more days in advance, or as early as practicable, prior to such expenditures.

SEC. 242. The Secretary shall ensure that the November 30, 2021, policy statement from U.S. Customs and Border Protection titled "Policy Statement and Required Actions Regarding Pregnant, Postpartum, Nursing Individuals, and Infants in Custody," or substantively similar standards of treatment developed in consultation with maternal and pediatric health providers and experts, are in effect and are fully implemented to safeguard the health, safety, and rights of pregnant individuals in U.S. Customs and Border Protection custody.

SEC. 243. None of the funds appropriated or otherwise made available by this Act to U.S. Immigration and Customs Enforcement may be used, in carrying out any civil immigration enforcement activities under the immigration laws (as such term is defined in section 101 of the Immigration and Nationality Act (8 U.S.C. 1101)), to—

(1) detain a citizen of the United States; or

(2) deport a citizen of the United States from the United States.

# TITLE III

# PROTECTION, PREPAREDNESS, RESPONSE, AND RECOVERY

## Cybersecurity and Infrastructure Security Agency

### operations and support

For necessary expenses of the Cybersecurity and Infrastructure Security Agency for operations and support, $2,237,159,000, of which $24,424,000 shall remain available until September 30, 2027: *Provided,* That not to exceed $3,825 shall be for official reception and representation expenses.

### procurement, construction, and improvements

For necessary expenses of the Cybersecurity and Infrastructure Security Agency for procurement, construction, and improvements, $501,047,000, to remain available until September 30, 2028.

## Federal Emergency Management Agency

### operations and support

For necessary expenses of the Federal Emergency Management Agency for operations and support, $1,474,420,000: *Provided,* That not to exceed $2,250 shall be for official reception and representation expenses.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

For necessary expenses of the Federal Emergency Management Agency for procurement, construction, and improvements, $158,419,000, of which $94,794,000 shall remain available until September 30, 2028, and of which $63,625,000 shall remain available until September 30, 2030.

FEDERAL ASSISTANCE

For activities of the Federal Emergency Management Agency for Federal assistance through grants, contracts, cooperative agreements, and other activities, $3,756,676,000, which shall be allocated as follows:

(1) $520,000,000 for the State Homeland Security Grant Program under section 2004 of the Homeland Security Act of 2002 (6 U.S.C. 605), of which $90,000,000 shall be for Operation Stonegarden and $15,000,000 shall be for Tribal Homeland Security Grants under section 2005 of the Homeland Security Act of 2002 (6 U.S.C. 606): *Provided*, That notwithstanding subsection (c)(4) of such section 2004, for fiscal year 2026, the Commonwealth of Puerto Rico shall make available to local and Tribal governments amounts provided to the Commonwealth of Puerto Rico under this para-

graph in accordance with subsection (c)(1) of such section 2004.

(2) $615,000,000 for the Urban Area Security Initiative under section 2003 of the Homeland Security Act of 2002 (6 U.S.C. 604).

(3) $335,000,000 for the Nonprofit Security Grant Program under section 2009 of the Homeland Security Act of 2002 (6 U.S.C. 609a), of which $167,500,000 is for eligible recipients located in high-risk urban areas that receive funding under section 2003 of such Act and $167,500,000 is for eligible recipients that are located outside such areas: *Provided*, That eligible recipients are those described in section 2009(b) of such Act (6 U.S.C. 609a(b)) or are an otherwise eligible recipient at risk of a terrorist or other extremist attack.

(4) $94,500,000 for Public Transportation Security Assistance, Railroad Security Assistance, and Over-the-Road Bus Security Assistance under sections 1406, 1513, and 1532 of the Implementing Recommendations of the 9/11 Commission Act of 2007 (6 U.S.C. 1135, 1163, and 1182), of which $9,000,000 shall be for Amtrak security and $1,000,000 shall be for Over-the-Road Bus Security: *Provided*, That such public transportation security

assistance shall be provided directly to public transportation agencies.

(5) $100,000,000 for Port Security Grants in accordance with section 70107 of title 46, United States Code.

(6) $720,000,000, to remain available until September 30, 2027, of which $360,000,000 shall be for Assistance to Firefighter Grants and $360,000,000 shall be for Staffing for Adequate Fire and Emergency Response Grants under sections 33 and 34 respectively of the Federal Fire Prevention and Control Act of 1974 (15 U.S.C. 2229 and 2229a).

(7) $355,000,000 for emergency management performance grants under the National Flood Insurance Act of 1968 (42 U.S.C. 4001 et seq.), the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121), the Earthquake Hazards Reduction Act of 1977 (42 U.S.C. 7701), section 762 of title 6, United States Code, and Reorganization Plan No. 3 of 1978 (5 U.S.C. App.).

(8) $312,750,000 for necessary expenses for Flood Hazard Mapping and Risk Analysis, in addition to and to supplement any other sums appropriated under the National Flood Insurance Fund,

and such additional sums as may be provided by States or other political subdivisions for cost-shared mapping activities under section 1360(f)(2) of the National Flood Insurance Act of 1968 (42 U.S.C. 4101(f)(2)), to remain available until expended.

(9) $9,720,000 for Regional Catastrophic Preparedness Grants.

(10) $105,300,000 for the emergency food and shelter program under title III of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11331), to remain available until September 30, 2027: *Provided*, That not to exceed 3.5 percent shall be for total administrative costs.

(11) $40,000,000 for the Next Generation Warning System.

(12) $170,000,000 for Community Project Funding grants, which shall be for the purposes, and the amounts, specified in the table entitled ''Homeland Security—Community Project Funding'' in the report accompanying this Act, of which—

(A) $64,899,341, in addition to amounts otherwise made available for such purpose, is for emergency operations center grants under section 614 of the Robert T. Stafford Disaster

Relief and Emergency Assistance Act (42 U.S.C. 5196c); and

(B) $105,100,659, in addition to amounts otherwise made available for such purpose, is for pre-disaster mitigation grants under section 203 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5133(e), notwithstanding subsections (f), (g), and (l) of that section (42 U.S.C. 5133(f), (g), (l)).

(13) $379,406,000 to sustain current operations for training, exercises, technical assistance, and other programs.

DISASTER RELIEF FUND

For necessary expenses in carrying out the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.), $26,474,000,000, to remain available until expended: *Provided,* That such amount shall be for major disasters declared pursuant to the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.) and is designated by the Congress as being for disaster relief pursuant to section 251(b)(2)(D) of the Balanced Budget and Emergency Deficit Control Act of 1985.

NATIONAL FLOOD INSURANCE FUND

For activities under the National Flood Insurance Act of 1968 (42 U.S.C. 4001 et seq.), the Flood Disaster Protection Act of 1973 (42 U.S.C. 4001 et seq.), the Biggert-Waters Flood Insurance Reform Act of 2012 (Public Law 112–141, 126 Stat. 916), and the Homeowner Flood Insurance Affordability Act of 2014 (Public Law 113–89; 128 Stat. 1020), $202,100,000, to remain available until September 30, 2027, which shall be derived from offsetting amounts collected under section 1308(d) of the National Flood Insurance Act of 1968 (42 U.S.C. 4015(d)); of which $14,578,000 shall be available for mission support associated with flood management; and of which $187,522,000 shall be available for flood plain management and flood mapping: *Provided,* That any additional fees collected pursuant to section 1308(d) of the National Flood Insurance Act of 1968 (42 U.S.C. 4015(d)) shall be credited as offsetting collections to this account, to be available for flood plain management and flood mapping: *Provided further,* That in fiscal year 2026, no funds shall be available from the National Flood Insurance Fund under section 1310 of the National Flood Insurance Act of 1968 (42 U.S.C. 4017) in excess of—

(1) $230,669,000 for operating expenses and salaries and expenses associated with flood insurance operations;

(2) $1,505,000,000 for commissions and taxes of agents;

(3) such sums as are necessary for interest on Treasury borrowings; and

(4) $175,000,000, which shall remain available until expended, for flood mitigation actions and for flood mitigation assistance under section 1366 of the National Flood Insurance Act of 1968 (42 U.S.C. 4104c), notwithstanding sections 1366(e) and 1310(a)(7) of such Act (42 U.S.C. 4104c(e), 4017):

*Provided further,* That the amounts collected under section 102 of the Flood Disaster Protection Act of 1973 (42 U.S.C. 4012a) and section 1366(e) of the National Flood Insurance Act of 1968 (42 U.S.C. 4104c(e)), shall be deposited in the National Flood Insurance Fund to supplement other amounts specified as available for section 1366 of the National Flood Insurance Act of 1968, notwithstanding section 102(f)(8), section 1366(e) of the National Flood Insurance Act of 1968, and paragraphs (1) through (3) of section 1367(b) of such Act (42 U.S.C. 4012a(f)(8), 4104c(e), 4104d(b)(1)–(3)): *Provided further,* That total administrative costs shall not exceed 4 percent of the total

appropriation: *Provided further,* That up to $4,000,000 is available to carry out section 24 of the Homeowner Flood Insurance Affordability Act of 2014 (42 U.S.C. 4033).

ADMINISTRATIVE PROVISIONS

(INCLUDING TRANSFERS OF FUNDS)

SEC. 301. Funds made available under the heading ''Cybersecurity and Infrastructure Security Agency—Operations and Support'' may be made available for the necessary expenses of procuring or providing access to cybersecurity threat feeds for branches, agencies, independent agencies, corporations, establishments, and instrumentalities of the Federal Government of the United States, State, local, Tribal, and territorial entities, fusion centers as described in section 210A of the Homeland Security Act (6 U.S.C. 124h), and Information Sharing and Analysis Organizations.

SEC. 302. (a) Notwithstanding section 2008(a)(12) of the Homeland Security Act of 2002 (6 U.S.C. 609(a)(12)) or any other provision of law, not more than 5 percent of the amount of a grant made available in paragraphs (1) through (5) under ''Federal Emergency Management Agency—Federal Assistance'', may be used by the recipient for expenses directly related to administration of the grant.

(b) The authority provided in subsection (a) shall also apply to a state recipient for the administration of a grant under such paragraph (3).

SEC. 303. Applications for grants under the heading "Federal Emergency Management Agency—Federal Assistance", for paragraphs (1) through (5), shall be made available to eligible applicants not later than 60 days after the date of enactment of this Act, eligible applicants shall submit applications not later than 80 days after the grant announcement, and the Administrator of the Federal Emergency Management Agency shall act within 65 days after the receipt of an application.

SEC. 304. (a) Under the heading "Federal Emergency Management Agency—Federal Assistance", for grants under paragraphs (1) through (5) and (9), the Administrator of the Federal Emergency Management Agency shall brief the Committees on Appropriations of the House of Representatives and the Senate 5 full business days in advance of announcing publicly the intention of making an award.

(b) If any such public announcement is made before 5 full business days have elapsed following such briefing, $1,000,000 of amounts appropriated by this Act for "Federal Emergency Management Agency—Operations and Support" shall be rescinded.

SEC. 305. Under the heading ''Federal Emergency Management Agency—Federal Assistance'', for grants under paragraphs (1) and (2), the installation of communications towers is not considered construction of a building or other physical facility.

SEC. 306. The reporting requirements in paragraphs (1) and (2) under the heading ''Federal Emergency Management Agency—Disaster Relief Fund'' in the Department of Homeland Security Appropriations Act, 2015 (Public Law 114–4), related to reporting on the Disaster Relief Fund, shall be applied in fiscal year 2026 with respect to budget year 2027 and current fiscal year 2026, respectively—

(1) in paragraph (1) by substituting ''fiscal year 2027'' for ''fiscal year 2016''; and

(2) in paragraph (2) by inserting ''business'' after ''fifth''.

SEC. 307. In making grants under the heading ''Federal Emergency Management Agency—Federal Assistance'', for Staffing for Adequate Fire and Emergency Response grants, the Administrator of the Federal Emergency Management Agency may grant waivers from the requirements in subsections (a)(1)(A), (a)(1)(B), (a)(1)(E), (c)(1), (c)(2), and (c)(4) of section 34 of the

Federal Fire Prevention and Control Act of 1974 (15 U.S.C. 2229a).

SEC. 308. (a) The aggregate charges assessed during fiscal year 2026, as authorized in title III of the Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1999 (42 U.S.C. 5196e), shall not be less than 100 percent of the amounts anticipated by the Department of Homeland Security to be necessary for its Radiological Emergency Preparedness Program for the next fiscal year.

(b) The methodology for assessment and collection of fees shall be fair and equitable and shall reflect costs of providing such services, including administrative costs of collecting such fees.

(c) Such fees shall be deposited in a Radiological Emergency Preparedness Program account as offsetting collections and will become available for authorized purposes on October 1, 2026, and remain available until expended.

SEC. 309. In making grants under the heading ''Federal Emergency Management Agency—Federal Assistance'', for Assistance to Firefighter Grants, the Administrator of the Federal Emergency Management Agency may waive subsection (k) of section 33 of the Federal Fire Prevention and Control Act of 1974 (15 U.S.C. 2229).

SEC. 310. Any unobligated balances of funds appropriated in any prior Act for activities funded by the National Predisaster Mitigation Fund under section 203 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5133), as in effect on the day before the date of enactment of section 1234 of division D of Public Law 115–254, may be transferred to and merged with funds set aside pursuant to subsection (i)(1) of section 203 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5133), as in effect on the date of the enactment of this section.

SEC. 311. Any unobligated balances of funds appropriated under the heading ''Federal Emergency Management Agency—Flood Hazard Mapping and Risk Analysis Program'' in any prior Act may be transferred to and merged with funds appropriated under the heading ''Federal Emergency Management Agency—Federal Assistance'' for necessary expenses for Flood Hazard Mapping and Risk Analysis: *Provided,* That funds transferred pursuant to this section shall be in addition to and supplement any other sums appropriated for such purposes under the National Flood Insurance Fund and such additional sums as may be provided by States or other political subdivisions for cost-shared mapping activities under section 1360(f)(2) of the National Flood Insurance Act of

1968 (42 U.S.C. 4101(f)(2)), to remain available until expended.

SEC. 312. Section 203 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. section 5133) is amended as follows:

(1) In subsection (b)—

(A) by striking ‘‘may'' and inserting ‘‘shall''; and

(B) by inserting ‘‘related to a major disaster declaration in the previous 4 years and'' after ‘‘measures that are''.

(2) In subsection (c) by striking ‘‘may'' and inserting ‘‘shall''.

(3) In subsection (g)—

(A) in the matter preceding paragraph (1), by striking ‘‘7 years'' and inserting ‘‘4 years'';

(B) by striking the semicolon at the end of paragraph (10) and inserting ‘‘; and'';

(C) by striking ‘‘; and'' at the end of paragraph (11) and inserting a period; and

(D) by striking paragraph (12).

(4) In subsection (i)(1)—

(A) by striking ‘‘may'' and inserting ‘‘shall''; and

(B) by striking "equal to" and inserting "that is not less than 3 percent and not more than".

# TITLE IV

# RESEARCH, DEVELOPMENT, TRAINING, AND SERVICES

## U.S. CITIZENSHIP AND IMMIGRATION SERVICES

### OPERATIONS AND SUPPORT

For necessary expenses of U.S. Citizenship and Immigration Services for operations and support of the E-Verify Program, $112,551,000: *Provided,* That such amounts shall be in addition to any other amounts made available for such purposes, and shall not be construed to require any reduction of any fee described in section 286(m) of the Immigration and Nationality Act (8 U.S.C. 1356(m)).

## FEDERAL LAW ENFORCEMENT TRAINING CENTERS

### OPERATIONS AND SUPPORT

For necessary expenses of the Federal Law Enforcement Training Centers for operations and support, including the purchase of not to exceed 117 vehicles for police-type use and hire of passenger motor vehicles, and services as authorized by section 3109 of title 5, United States Code, $385,644,000, of which $75,551,000 shall remain available until September 30, 2027: *Provided,* That not to exceed $7,180 shall be for official reception and representation expenses.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

For necessary expenses of the Federal Law Enforcement Training Centers for procurement, construction, and improvements, $18,300,000, to remain available until September 30, 2030, for acquisition of necessary additional real property and facilities, construction and ongoing maintenance, facility improvements, and related expenses of the Federal Law Enforcement Training Centers.

SCIENCE AND TECHNOLOGY DIRECTORATE

OPERATIONS AND SUPPORT

For necessary expenses of the Science and Technology Directorate for operations and support, including the purchase or lease of not to exceed 5 vehicles, $368,624,000, of which $206,093,000 shall remain available until September 30, 2027: *Provided,* That not to exceed $10,000 shall be for official reception and representation expenses.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

For necessary expenses of the Science and Technology Directorate for procurement, construction, and improvements, $40,000,000, to remain available until September 30, 2030.

RESEARCH AND DEVELOPMENT

For necessary expenses of the Science and Technology Directorate for research and development,

$350,074,000, to remain available until September 30, 2028.

ADMINISTRATIVE PROVISIONS

SEC. 401. (a) Notwithstanding any other provision of law, funds otherwise made available to U.S. Citizenship and Immigration Services may be used to acquire, operate, equip, and dispose of up to 5 vehicles, for replacement only, for areas where the Administrator of General Services does not provide vehicles for lease.

(b) The Director of U.S. Citizenship and Immigration Services may authorize employees who are assigned to those areas to use such vehicles to travel between the employees' residences and places of employment.

SEC. 402. None of the funds appropriated by this Act may be used to process or approve a competition under Office of Management and Budget Circular A–76 for services provided by employees (including employees serving on a temporary or term basis) of U.S. Citizenship and Immigration Services of the Department of Homeland Security who are known as Immigration Information Officers, Immigration Service Analysts, Contact Representatives, Investigative Assistants, or Immigration Services Officers.

SEC. 403. None of the funds appropriated or otherwise made available by this Act may be made available to issue any employment authorization document or simi-

lar document to any alien whose application for asylum in the United States has been denied, or who is convicted of a Federal or State crime while his or her application for asylum in the United States is pending.

SEC. 404. Notwithstanding section 286(n) of the Immigration and Nationality Act (8 U.S.C. 1356(n)), the Director of U.S. Citizenship and Immigration Services may use not more than $2,500 of the amounts deposited in the Immigration Examinations Fee Account for official reception and representation expenses in fiscal year 2026.

SEC. 405. No Federal funds made available to the Department of Homeland Security may be used for the consideration of a petition for a nonimmigrant visa under section 101(a)(15)(H)(i)(b) of the Immigration and Nationality Act, if the petitioner is any entity identified under section 1260H of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116–283) or any subsidiary of such entity.

SEC. 406. The Director of the Federal Law Enforcement Training Centers is authorized to distribute funds to Federal law enforcement agencies for expenses incurred participating in training accreditation.

SEC. 407. The Federal Law Enforcement Training Accreditation Board, including representatives from the Federal law enforcement community and non-Federal ac-

creditation experts involved in law enforcement training, shall lead the Federal law enforcement training accreditation process to continue the implementation of measuring and assessing the quality and effectiveness of Federal law enforcement training programs, facilities, and instructors.

SEC. 408. (a) The Director of the Federal Law Enforcement Training Centers may accept transfers to its ''Procurement, Construction, and Improvements'' account from Government agencies requesting the construction of special use facilities, as authorized by the Economy Act (31 U.S.C. 1535(b)).

(b) The Federal Law Enforcement Training Centers shall maintain administrative control and ownership upon completion of such facilities.

SEC. 409. The functions of the Federal Law Enforcement Training Centers instructor staff shall be classified as inherently governmental for purposes of the Federal Activities Inventory Reform Act of 1998 (31 U.S.C. 501 note).

SEC. 410. None of the funds made available in this Act may be made available to implement, administer, or enforce the ''Asylum Program Fee'' from the Final Rule entitled ''U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements'' (88 Fed. Reg. 6194).

SEC. 411. None of the funds made available by this Act may be obligated, expended, or used in any manner to determine that any alien has a credible fear of persecution under section 235(b)(1)(B)(v) of the Immigration and Nationality Act (8 U.S.C. 1225(b)(1)(B)(v)) unless taking into account the credibility of the statements made by the alien in support of the alien's claim, as determined pursuant to section 208(b)(1)(B)(iii), and such other facts as are known to the officer, the alien more likely than not could establish eligibility for asylum under section 208, and it is more likely than not that the statements made by, and on behalf of, the alien in support of the alien's claim are true.

SEC. 412. None of the funds made available by this Act may be obligated, expended, or used in any manner to determine that any alien has a credible fear of persecution under section 235(b)(1)(B)(v) of the Immigration and Nationality Act (8 U.S.C. 1225(b)(1)(B)(v)) or to grant asylum to any alien pursuant to section 208 of the Immigration and Nationality Act (8 U.S.C. 1158) if such alien entered, attempted to enter, or arrived in the United States after transiting through at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence en route to the United States unless—

(a) the alien demonstrates that he or she applied for protection from persecution or torture in each country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which the alien transited en route to the United States, and the alien received a final judgment denying the alien protection in each country;

(b) the alien demonstrates that he or she was a victim of a severe form of trafficking in which a commercial sex act was induced by force, fraud, or coercion, or in which the person induced to perform such act was under the age of 18 years; or in which the trafficking included the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery, and was unable to apply for protection from persecution in each country through which the alien transited en route to the United States as a result of such severe form of trafficking; or

(c) the only countries through which the alien transited en route to the United States were, at the time of the transit, not parties to the 1951 United Nations Convention relating to the Status of Refugees, the 1967 Protocol Relating to the Status of Refugees, or the United

Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

SEC. 413. An employer that received a labor certification from the Department of Labor under section 214(c)(1) of the Immigration and Nationality Act with regard to a petition to import an alien under section 101(a)(15)(H)(ii)(b) of such Act in fiscal year 2025, 2024, 2023, 2022 and 2021 shall, upon issuance of the labor certification and approval of the petition, obtain positions exempt from the numerical limitation under section 214(g)(1)(B) of such Act in an amount that does not exceed the highest number of positions for all labor certifications received by such employer in any 1 of the prior 5 fiscal years in fiscal year 2026.

SEC. 414. In fiscal year 2026, for the purpose of admission under section 101(a)(15)(H)(ii)(a) of the Immigration and Nationality Act and an application pursuant to section 218 of such Act, work performed by workers on agricultural operations (as such term is defined in section 1619 of the Food, Conservation, and Energy Act of 2008 (7 U.S.C. 8791) shall be considered agricultural labor or services of a temporary or seasonal nature described in section 101(a)(15)(H)(ii)(a) of such Act, and such workers shall be eligible for admission under such section for a period not to exceed one year.

SEC. 415. None of the funds appropriated or otherwise made available by this Act may be made available to implement, administer, or enforce the Final Rule entitled "Modernizing H-2 Program Requirements, Oversight, and Worker Protections" (89 Fed. Reg. 103202).

SEC. 416. (a) Subparagraph (P) of section 101(a)(15) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(15)(P)) is amended—

(1) in clause (iii)(II), by striking "or" at the end;

(2) by redesignating clause (iv) as clause (v);

(3) in clause (v), as redesignated by subparagraph (B), by striking "clause (i), (ii), or (iii)" and inserting "clause (i), (ii), (iii), or (iv)"; and

(4) by inserting after clause (iii) the following:

"(iv) seeks to enter the United States temporarily and solely for the purpose of performing functions that are integral and essential to the operation of a mobile entertainment provider (as set forth in section 214(c)(4)(I)(ii)); or".

(b) Paragraph (4) of section 214(c) of the Immigration and Nationality Act (8 U.S.C. 1184(c)(4)) is amended by adding at the end the following:

"(I) The following shall apply to the admission of any alien under section 101(a)(15)(P)(iv):

"(i) The mobile entertainment provider shall be subject to the same program requirements that govern the admission of non-immigrants pursuant to section 101(a)(15)(H)(ii)(b) of the Immigration and Nationality Act (8 U.S.C. 1101(a) (15)(H)(ii)(b)) as promulgated by the Department of Labor in section 655 of title 20 of the Code of Federal Regulations.

"(ii) For purposes of section 101(a)(15)(P)(iv), functions that are integral and essential to the operation of a mobile entertainment provider include transporting, assembly, operation, disassembly, and maintenance of mobile entertainment attractions, structures, and equipment, including rides, games, novelties, and food or beverage concessions, as well as other functions that are common in the mobile entertainment industry and are necessary for the safe and efficient operation of the mobile entertainment provider.

"(iii) For purposes of this subparagraph, the term 'mobile entertainment provider' means—

"(I) a carnival or circus that travels around the United States on a temporary or seasonal basis; or

"(II) a provider of services normally affiliated with a carnival or circus, such as food and

game concessions, that travels around the United States on a seasonal or temporary basis to provide services to State, county, and local fairs and festivals, or support events sponsored by not-for-profit organizations for fund-raising.''.

(c) Not later than 180 days after the date of the enactment of this Act, the Secretary of Homeland Security and the Secretary of Labor shall separately publish in the Federal Register proposed rules implementing the provisions of this section and the amendments made by this section, and shall finalize such rules not later than 1 year after the date of the enactment of this Act.

## TITLE V

## GENERAL PROVISIONS

(INCLUDING TRANSFERS OF FUNDS)

SEC. 501. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

SEC. 502. Subject to the requirements of section 503 of this Act, the unexpended balances of prior appropriations provided for activities in this Act may be transferred to appropriation accounts for such activities established pursuant to this Act, may be merged with funds in the applicable established accounts, and thereafter may be ac-

counted for as one fund for the same time period as originally enacted.

SEC. 503. (a) None of the funds provided by this Act, provided by previous appropriations Acts to the components in or transferred to the Department of Homeland Security that remain available for obligation or expenditure in fiscal year 2026, or provided from any accounts in the Treasury of the United States derived by the collection of fees available to the components funded by this Act, shall be available for obligation or expenditure through a reprogramming of funds that—

(1) creates or eliminates a program, project, or activity, or increases funds for any program, project, or activity for which funds have been denied or restricted by the Congress;

(2) contracts out any function or activity presently performed by Federal employees or any new function or activity proposed to be performed by Federal employees in the President's budget proposal for fiscal year 2026 for the Department of Homeland Security;

(3) augments funding for existing programs, projects, or activities in excess of $5,000,000 or 10 percent, whichever is less;

(4) reduces funding for any program, project, or activity, or numbers of personnel, by 10 percent or more; or

(5) results from any general savings from a reduction in personnel that would result in a change in funding levels for programs, projects, or activities as approved by the Congress.

(b) Subsection (a) shall not apply if the Committees on Appropriations of the House of Representatives and the Senate are notified at least 30 days in advance of such reprogramming.

(c) Up to 2.5 percent of any appropriation made available for the current fiscal year for the Department of Homeland Security by this Act or provided by previous appropriations Acts may be transferred between such appropriations if the Committees on Appropriations of the House of Representatives and the Senate are notified at least 30 days in advance of such transfer, but no such appropriation, except as otherwise specifically provided, shall be increased by more than 5 percent by such transfer.

(d) Notwithstanding subsections (a), (b), and (c), no funds shall be reprogrammed within or transferred between appropriations—

(1) based upon an initial notification provided after June 15, except in extraordinary circumstances that imminently threaten the safety of human life or the protection of property;

(2) to increase or decrease funding for grant programs; or

(3) to create a program, project, or activity pursuant to subsection (a)(1), including any new function or requirement within any program, project, or activity, not approved by Congress in the consideration of the enactment of this Act.

(e) The notification thresholds and procedures set forth in subsections (a), (b), (c), and (d) shall apply to any use of deobligated balances of funds provided in previous Department of Homeland Security Appropriations Acts that remain available for obligation in the current year.

(f) Notwithstanding subsection (c), the Secretary of Homeland Security may transfer to the fund established by 8 U.S.C. 1101 note, up to $20,000,000 from appropriations available to the Department of Homeland Security: *Provided*, That the Secretary shall notify the Committees on Appropriations of the House of Representatives and the Senate at least 5 days in advance of such transfer.

SEC. 504. (a) Section 504 of the Department of Homeland Security Appropriations Act, 2017 (division F of Public Law 115–31), related to the operations of a working capital fund, shall apply with respect to funds made available in this Act in the same manner as such section applied to funds made available in that Act.

(b) Funds from such working capital fund may be obligated and expended in anticipation of reimbursements from components of the Department of Homeland Security.

SEC. 505. (a) Except as otherwise specifically provided by law, not to exceed 50 percent of unobligated balances remaining available at the end of fiscal year 2026, as recorded in the financial records at the time of a reprogramming notification, but not later than June 15, 2027, from appropriations for ''Operations and Support'' for fiscal year 2026 in this Act shall remain available through September 30, 2027, in the account and for the purposes for which the appropriations were provided.

(b) Prior to the obligation of such funds, a notification shall be submitted to the Committees on Appropriations of the House of Representatives and the Senate in accordance with section 503 of this Act.

SEC. 506. (a) Funds made available by this Act for intelligence activities are deemed to be specifically author-

ized by the Congress for purposes of section 504 of the National Security Act of 1947 (50 U.S.C. 414) during fiscal year 2026 until the enactment of an Act authorizing intelligence activities for fiscal year 2026.

(b) Amounts described in subsection (a) made available for ''Intelligence, Analysis, and Situational Awareness—Operations and Support'' that exceed the amounts in such authorization for such account shall be transferred to and merged with amounts made available under the heading ''Management Directorate—Operations and Support''.

(c) Prior to the obligation of any funds transferred under subsection (b), the Undersecretary for Management shall brief the Committees on Appropriations of the House of Representatives and the Senate on a plan for the use of such funds.

SEC. 507. (a) The Secretary of Homeland Security, or the designee of the Secretary, shall notify the Committees on Appropriations of the House of Representatives and the Senate at least 3 full business days in advance of—

(1) making or awarding a grant allocation or grant in excess of $1,000,000;

(2) making or awarding a contract, other transaction agreement, or task or delivery order on a

multiple award contract, or to issue a letter of intent totaling in excess of $4,000,000;

(3) awarding a task or delivery order requiring an obligation of funds in an amount greater than $10,000,000 from multi-year Department of Homeland Security funds;

(4) making a sole-source grant award; or

(5) announcing publicly the intention to make or award items under paragraph (1), (2), (3), or (4), including a contract covered by the Federal Acquisition Regulation.

(b) If the Secretary of Homeland Security determines that compliance with this section would pose a substantial risk to human life, health, or safety, an award may be made without notification, and the Secretary shall notify the Committees on Appropriations of the House of Representatives and the Senate not later than 5 full business days after such an award is made or letter issued.

(c) A notification under this section—

(1) may not involve funds that are not available for obligation; and

(2) shall include the amount of the award; the fiscal year for which the funds for the award were appropriated; the type of contract; and the account from which the funds are being drawn.

SEC. 508. Notwithstanding any other provision of law, no agency shall purchase, construct, or lease any additional facilities, except within or contiguous to existing locations, to be used for the purpose of conducting Federal law enforcement training without advance notification to the Committees on Appropriations of the House of Representatives and the Senate, except that the Federal Law Enforcement Training Centers is authorized to obtain the temporary use of additional facilities by lease, contract, or other agreement for training that cannot be accommodated in existing Centers' facilities.

SEC. 509. None of the funds appropriated or otherwise made available by this Act may be used for expenses for any construction, repair, alteration, or acquisition project for which a prospectus otherwise required under chapter 33 of title 40, United States Code, has not been approved, except that necessary funds may be expended for each project for required expenses for the development of a proposed prospectus.

SEC. 510. Sections 522 and 530 of the Department of Homeland Security Appropriations Act, 2008 (division E of Public Law 110–161; 121 Stat. 2073 and 2074) shall apply with respect to funds made available in this Act in the same manner as such sections applied to funds made available in that Act.

SEC. 511. (a) None of the funds made available in this Act may be used in contravention of the applicable provisions of the Buy American Act.

(b) For purposes of subsection (a), the term "Buy American Act" means chapter 83 of title 41, United States Code.

SEC. 512. None of the funds made available in this Act may be used to amend the oath of allegiance required by section 337 of the Immigration and Nationality Act (8 U.S.C. 1448).

SEC. 513. (a) None of the funds provided or otherwise made available in this Act shall be available to carry out section 872 of the Homeland Security Act of 2002 (6 U.S.C. 452) unless explicitly authorized by the Congress.

(b) Subsection (a) shall not apply to the use of such section 872—

(1) to allocate or reallocate the functions of the Assistant Secretary for the Countering Weapons of Mass Destruction Office to other officers and organizational units within the Department; or

(2) to allocate or reallocate any other functions of the Countering Weapons of Mass Destruction Office to other offices and organizational units within the Department.

(c) The Secretary of Homeland Security may transfer funds made available in prior appropriations Acts to the Countering Weapons of Mass Destruction Office between any appropriations available to the Department of Homeland Security as necessary to carry out the purposes described in subsection (b).

SEC. 514. None of the funds made available in this Act may be used for planning, testing, piloting, or developing a national identification card.

SEC. 515. Any official that is required by this Act to report or to certify to the Committees on Appropriations of the House of Representatives and the Senate may not delegate such authority to perform that act unless specifically authorized herein.

SEC. 516. None of the funds made available in this Act may be used for first-class travel by the employees of agencies funded by this Act in contravention of sections 301–10.122 through 301–10.124 of title 41, Code of Federal Regulations.

SEC. 517. None of the funds made available in this Act may be used to employ workers described in section 274A(h)(3) of the Immigration and Nationality Act (8 U.S.C. 1324a(h)(3)).

SEC. 518. Notwithstanding any other provision of this Act, none of the funds appropriated or otherwise

made available by this Act may be used to pay award or incentive fees for contractor performance that has been judged to be below satisfactory performance or performance that does not meet the basic requirements of a contract.

SEC. 519. (a) None of the funds made available in this Act may be used to maintain or establish a computer network unless such network blocks the viewing, downloading, and exchanging of pornography.

(b) Nothing in subsection (a) shall limit the use of funds necessary for any Federal, State, Tribal, territorial, or local law enforcement agency or any other entity carrying out criminal investigations, prosecution, or adjudication activities.

SEC. 520. None of the funds made available in this Act may be used by a Federal law enforcement officer to facilitate the transfer of an operable firearm to an individual if the Federal law enforcement officer knows or suspects that the individual is an agent of a drug cartel unless law enforcement personnel of the United States continuously monitor or control the firearm at all times.

SEC. 521. (a) None of the funds made available in this Act may be used to pay for the travel to or attendance of more than 50 employees of a single component of the Department of Homeland Security, who are stationed in

the United States, at a single international conference unless the Secretary of Homeland Security, or a designee, determines that such attendance is in the national interest and notifies the Committees on Appropriations of the House of Representatives and the Senate within at least 10 days of that determination and the basis for that determination.

(b) For purposes of this section the term ''international conference'' shall mean a conference occurring outside of the United States attended by representatives of the United States Government and of foreign governments, international organizations, or nongovernmental organizations.

(c) The total cost to the Department of Homeland Security of any such conference shall not exceed $500,000.

(d) Employees who attend a conference virtually without travel away from their permanent duty station within the United States shall not be counted for purposes of this section, and the prohibition contained in this section shall not apply to payments for the costs of attendance for such employees.

SEC. 522. None of the funds made available in this Act may be used to reimburse any Federal department or agency for its participation in a National Special Security Event.

SEC. 523. (a) None of the funds made available to the Department of Homeland Security by this or any other Act may be obligated for the implementation of any structural pay reform or the introduction of any new position classification that will affect more than 100 full-time positions or costs more than $5,000,000 in a single year before the end of the 30-day period beginning on the date on which the Secretary of Homeland Security submits to Congress a notification that includes—

(1) the number of full-time positions affected by such change;

(2) funding required for such change for the current fiscal year and through the Future Years Homeland Security Program;

(3) justification for such change; and

(4) for a structural pay reform, an analysis of compensation alternatives to such change that were considered by the Department.

(b) Subsection (a) shall not apply to such change if—

(1) it was proposed in the President's budget proposal for the fiscal year funded by this Act; and

(2) funds for such change have not been explicitly denied or restricted in this Act.

SEC. 524. (a) Any agency receiving funds made available in this Act shall, subject to subsections (b) and (c),

post on the public website of that agency any report required to be submitted by the Committees on Appropriations of the House of Representatives and the Senate in this Act, upon the determination by the head of the agency that it shall serve the national interest.

(b) Subsection (a) shall not apply to a report if—

(1) the public posting of the report compromises homeland or national security; or

(2) the report contains proprietary information.

(c) The head of the agency posting such report shall do so only after such report has been made available to the Committees on Appropriations of the House of Representatives and the Senate for not less than 45 days except as otherwise specified in law.

SEC. 525. (a) Funding provided in this Act for ''Operations and Support'' may be used for minor procurement, construction, and improvements.

(b) For purposes of subsection (a), ''minor'' refers to end items with a unit cost of $250,000 or less for personal property, and $4,000,000 or less for real property.

SEC. 526. The authority provided by section 532 of the Department of Homeland Security Appropriations Act, 2018 (Public Law 115–141) regarding primary and secondary schooling of dependents shall continue in effect during fiscal year 2026.

SEC. 527. (a) None of the funds appropriated or otherwise made available to the Department of Homeland Security by this Act may be used to prevent any of the following persons from entering, for the purpose of conducting oversight, any facility used to hold, detain, or otherwise house aliens, or to make any temporary modification at any such facility that in any way alters what is observed by a visiting Member of Congress or such designated employee, compared to what would be observed in the absence of such modification:

(1) a Member of Congress; and

(2) an employee of the United States House of Representatives or the United States Senate designated by such a Member for the purposes of this section.

(b) Nothing in this section may be construed to require a Member of Congress to provide prior notice of the intent to enter a facility described in subsection (a) for the purpose of conducting oversight.

(c) With respect to individuals described in subsection (a)(2), the Department of Homeland Security may require that a request be made at least 24 hours in advance of an intent to enter a facility described in subsection (a).

SEC. 528. (a) Except as provided in subsection (b), none of the funds made available in this Act may be used

to place restraints on a woman in the custody of the Department of Homeland Security (including during transport, in a detention facility, or at an outside medical facility) who is pregnant or in post-delivery recuperation.

(b) Subsection (a) shall not apply with respect to a pregnant woman if—

(1) an appropriate official of the Department of Homeland Security makes an individualized determination that the woman—

(A) is a serious flight risk, and such risk cannot be prevented by other means; or

(B) poses an immediate and serious threat to harm herself or others that cannot be prevented by other means; or

(2) a medical professional responsible for the care of the pregnant woman determines that the use of therapeutic restraints is appropriate for the medical safety of the woman.

(c) If a pregnant woman is restrained pursuant to subsection (b), only the safest and least restrictive restraints, as determined by the appropriate medical professional treating the woman, may be used. In no case may restraints be used on a woman who is in active labor or delivery, and in no case may a pregnant woman be restrained in a face-down position with four-point restraints,

on her back, or in a restraint belt that constricts the area of the pregnancy. A pregnant woman who is immobilized by restraints shall be positioned, to the maximum extent feasible, on her left side.

SEC. 529. (a) None of the funds made available by this Act may be used to destroy any document, recording, or other record pertaining to any—

(1) death of;

(2) potential sexual assault or abuse perpetrated against; or

(3) allegation of abuse, criminal activity, or disruption committed by an individual held in the custody of the Department of Homeland Security.

(b) The records referred to in subsection (a) shall be made available, in accordance with applicable laws and regulations, and Federal rules governing disclosure in litigation, to an individual who has been charged with a crime, been placed into segregation, or otherwise punished as a result of an allegation described in paragraph (3), upon the request of such individual.

SEC. 530. Section 519 of division F of Public Law 114–113, regarding a prohibition on funding for any position designated as a Principal Federal Official, shall apply with respect to any Federal funds in the same manner

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 282 of 714 PageID #:1332



as such section applied to funds made available in that Act.

SEC. 531. (a) Not later than 10 days after the date on which the budget of the President for a fiscal year is submitted to Congress pursuant to section 1105(a) of title 31, United States Code, the Under Secretary for Management of Homeland Security shall submit to the Committees on Appropriations of the House of Representatives and the Senate a report on the unfunded priorities, for the Department of Homeland Security and separately for each departmental component, for which discretionary funding would be classified as budget function 050.

(b) Each report under this section shall specify, for each such unfunded priority—

(1) a summary description, including the objectives to be achieved if such priority is funded (whether in whole or in part);

(2) the description, including the objectives to be achieved if such priority is funded (whether in whole or in part);

(3) account information, including the following (as applicable):

(A) appropriation account; and

(B) program, project, or activity name; and

(4) the additional number of full-time or part-time positions to be funded as part of such priority.

(c) In this section, the term ''unfunded priority'', in the case of a fiscal year, means a requirement that—

(1) is not funded in the budget referred to in subsection (a);

(2) is necessary to fulfill a requirement associated with an operational or contingency plan for the Department; and

(3) would have been recommended for funding through the budget referred to in subsection (a) if—

(A) additional resources had been available for the budget to fund the requirement;

(B) the requirement has emerged since the budget was formulated; or

(C) the requirement is necessary to sustain prior-year investments.

SEC. 532. (a) Not later than 10 days after a determination is made by the President to evaluate and initiate protection under any authority for a former or retired Government official or employee, or for an individual who, during the duration of the directed protection, will become a former or retired Government official or employee (referred to in this section as a ''covered individual''), the Secretary of Homeland Security shall submit a notifica-

tion to congressional leadership and the Committees on Appropriations of the House of Representatives and the Senate, the Committees on the Judiciary of the House of Representatives and the Senate, the Committee on Homeland Security of the House of Representatives, the Committee on Homeland Security and Governmental Affairs of the Senate, and the Committee on Oversight and Reform of the House of Representatives (referred to in this section as the "appropriate congressional committees").

(b) Such notification may be submitted in classified form, if necessary, and in consultation with the Director of National Intelligence or the Director of the Federal Bureau of Investigation, as appropriate, and shall include the threat assessment, scope of the protection, and the anticipated cost and duration of such protection.

(c) Not later than 15 days before extending, or 30 days before terminating, protection for a covered individual, the Secretary of Homeland Security shall submit a notification regarding the extension or termination and any change to the threat assessment to the congressional leadership and the appropriate congressional committees.

(d) Not later than 45 days after the date of enactment of this Act, and quarterly thereafter, the Secretary shall submit a report to the congressional leadership and the appropriate congressional committees, which may be

submitted in classified form, if necessary, detailing each covered individual, and the scope and associated cost of protection.

SEC. 533. (a) None of the funds provided to the Department of Homeland Security in this or any prior Act may be used by an agency to submit an initial project proposal to the Technology Modernization Fund (as authorized by section 1078 of subtitle G of title X of the National Defense Authorization Act for Fiscal Year 2018 (Public Law 115–91)) unless, concurrent with the submission of an initial project proposal to the Technology Modernization Board, the head of the agency—

(1) notifies the Committees on Appropriations of the House of Representatives and the Senate of the proposed submission of the project proposal;

(2) submits to the Committees on Appropriations a copy of the project proposal; and

(3) provides a detailed analysis of how the proposed project funding would supplement or supplant funding requested as part of the Department's most recent budget submission.

(b) None of the funds provided to the Department of Homeland Security by the Technology Modernization Fund shall be available for obligation until 15 days after a report on such funds has been transmitted to the Com-

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 286 of 714 PageID #:1336



mittees on Appropriations of the House of Representatives and the Senate.

(c) The report described in subsection (b) shall include—

(1) the full project proposal submitted to and approved by the Fund's Technology Modernization Board;

(2) the finalized interagency agreement between the Department and the Fund including the project's deliverables and repayment terms, as applicable;

(3) a detailed analysis of how the project will supplement or supplant existing funding available to the Department for similar activities;

(4) a plan for how the Department will repay the Fund, including specific planned funding sources, as applicable; and

(5) other information as determined by the Secretary.

SEC. 534. Within 60 days of any budget submission for the Department of Homeland Security for fiscal year 2027 that assumes revenues or proposes a reduction from the previous year based on user fees proposals that have not been enacted into law prior to the submission of the budget, the Secretary of Homeland Security shall provide

the Committees on Appropriations of the House of Representatives and the Senate specific reductions in proposed discretionary budget authority commensurate with the revenues assumed in such proposals in the event that they are not enacted prior to October 1, 2026.

SEC. 535. None of the funds made available by this Act may be obligated or expended to implement the Arms Trade Treaty until the Senate approves a resolution of ratification for the Treaty.

SEC. 536. No Federal funds made available to the Department of Homeland Security may be used to enter into a procurement contract, memorandum of understanding, or cooperative agreement with, or make a grant to, or provide a loan or guarantee to, any entity identified under section 1260H of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116–283) or any subsidiary of such entity.

SEC. 537. None of the funds appropriated or otherwise made available in this or any other Act may be used to transfer, release, or assist in the transfer or release to or within the United States, its territories, or possessions Khalid Sheikh Mohammed or any other detainee who—

(1) is not a United States citizen or a member of the Armed Forces of the United States; and

(2) is or was held on or after June 24, 2009, at the United States Naval Station, Guantanamo Bay, Cuba, by the Department of Defense.

SEC. 538. (a) The Secretary of Homeland Security shall, on a monthly basis beginning immediately after the date of enactment of this Act, develop estimates of the number of aliens anticipated to arrive at the southern border of the United States.

(b) The Secretary shall ensure that, at a minimum, the estimates developed pursuant to subsection (a)—

(1) cover the current fiscal year and the following fiscal year;

(2) include a breakout by demographics, to include single adults, family units, and unaccompanied children;

(3) undergo an independent validation and verification review;

(4) are used to inform policy planning and budgeting processes within the Department of Homeland Security; and

(5) are included in all budget materials submitted to Congress for each fiscal year beginning after the date of enactment of this Act including—

(A) the President's annual budget request pursuant to section 1105 of title 31, United States Code;

(B) any supplemental funding request submitted to Congress;

(C) any reprogramming and transfer notification pursuant to section 503 of this Act; and

(D) all budget materials shall include—

(i) the most recent monthly estimates developed pursuant to subsection (a);

(ii) a description and quantification of the estimates used to justify funding requests for Department programs related to border security, immigration enforcement, and immigration services;

(iii) a description and quantification of the anticipated workload and requirements resulting from such estimates; and

(iv) a confirmation as to whether the budget requests for impacted agencies were developed using the same estimates.

(c) The Secretary shall share the monthly estimates developed pursuant to subsection (a) with the Secretary of Health and Human Services, the Attorney General, the

Secretary of State, and the Committees on Appropriations of the House of Representatives and the Senate.

(d) If the monthly estimates described in subsection (b) are not provided for the purposes described, the reprogramming and transfer authority provided in section 503 of this Act shall be suspended until such time as the required estimates are provided to the Committees on Appropriations of the House of Representatives and the Senate.

SEC. 539. (a) Prior to the Secretary of Homeland Security requesting assistance from the Department of Defense for border security operations, the Secretary shall ensure that an alternatives analysis and cost-benefit analysis is conducted before such request is made, which shall include an examination of obtaining such support through other means.

(b) Not later than 30 days after the date on which a request for assistance is made, the Secretary of Homeland Security shall submit to the Committees on Appropriations of the House of Representatives and the Senate a report detailing the types of support requested, the alternatives analysis and cost-benefit analysis described in subsection (a), and the operational impact to Department of Homeland Security operations of any Department of Defense border security support requested by the Secretary.

(c) Not later than 30 days after the date on which a request made for assistance is granted and quarterly thereafter through the duration of such assistance, the Secretary of Homeland Security shall submit to the Committees on Appropriations of the House of Representatives and the Senate, a report detailing the assistance provided and the operational impacts to border security operations.

SEC. 540. Funds made available in this Act or any other Act for Operations and Support may be used for the necessary expenses of providing an employee emergency back-up care program.

SEC. 541. (a) Not less than $5,000,000 made available in this Act shall be transferred to ''U.S. Immigration and Customs Enforcement—Operations and Support'' to support and conduct necessary operations of the Blue Campaign for fiscal year 2026.

(b) Prior to the obligation of funds made available by subsection (a), notification shall be submitted to the Committees on Appropriations of the House of Representatives and the Senate.

SEC. 542. None of the funds appropriated or otherwise made available by this Act may be made available to establish or support the activities of a Disinformation Governance Board at the Department of Homeland Security, or any other similar entity carrying out activities re-

lating to disinformation in a similar manner or to a similar extent to such a Board.

SEC. 543. None of the funds appropriated or otherwise made available by this Act may be made available to:

(a) classify or facilitate the classification of any communications by a United States person as mis-, dis-, or mal-information; or

(b) partner with or fund nonprofit or other organizations that pressure or recommend private companies to censor lawful and constitutionally protected speech of United States persons, including recommending the censoring or removal of content on social media platforms.

(c) Any officer or employee of the Federal Government whose salary is funded by this Act and who conducts any activity described in (a) or (b) shall be removed from the Federal service.

SEC. 544. (a) In general.—Notwithstanding section 7 of title 1, United States Code, section 1738C of title 28, United States Code, or any other provision of law, none of the funds provided by this Act, or previous appropriations Acts, shall be used in whole or in part to take any discriminatory action against a person, wholly or partially, on the basis that such person speaks, or acts, in accordance with a sincerely held religious belief, or moral

conviction, that marriage is, or should be recognized as, a union of one man and one woman.

(b) Discriminatory action defined.—As used in subsection (a), a discriminatory action means any action taken by the Federal Government to—

(1) alter in any way the Federal tax treatment of, or cause any tax, penalty, or payment to be assessed against, or deny, delay, or revoke an exemption from taxation under section 501(a) of the Internal Revenue Code of 1986 of, any person referred to in subsection (a);

(2) disallow a deduction for Federal tax purposes of any charitable contribution made to or by such person;

(3) withhold, reduce the amount or funding for, exclude, terminate, or otherwise make unavailable or deny, any Federal grant, contract, subcontract, cooperative agreement, guarantee, loan, scholarship, license, certification, accreditation, employment, or other similar position or status from or to such person;

(4) withhold, reduce, exclude, terminate, or otherwise make unavailable or deny, any entitlement or benefit under a Federal benefit program, including admission to, equal treatment in, or eligibility for a

degree from an educational program, from or to such person; or

(5) withhold, reduce, exclude, terminate, or otherwise make unavailable or deny access or an entitlement to Federal property, facilities, educational institutions, speech fora (including traditional, limited, and nonpublic fora), or charitable fundraising campaigns from or to such person.

(c) Accreditation; Licensure; Certification.—The Federal Government shall consider accredited, licensed, or certified for purposes of Federal law any person that would be accredited, licensed, or certified, respectively, for such purposes but for a determination against such person wholly or partially on the basis that the person speaks, or acts, in accordance with a sincerely held religious belief or moral conviction described in subsection (a).

Sec. 545. None of the funds made available by this Act may be used to obligate or award funds to a political subdivision of a State that—

(a) has in effect any law, policy, or procedure, whether written or communicated orally, in contravention of, or which substantially limits compliance with, subsection (a) or (b) of section 642 of the Illegal Immigration Reform and Immigration Responsibility Act of 1996 (8 U.S.C. 1373); or

(b) has in effect any law, policy, or procedure, whether written or communicated orally, the result of which hinders the federal government from enforcing the immigration laws as defined by 8 U.S.C. 101(a)(17).

SEC. 546. None of the funds appropriated or otherwise made available by this Act may be made available for diversity, equity, and inclusion initiatives, training, programs, offices, officers, policies, or any program, project, or activity that promotes or advances Critical Race Theory, or any concept associated with Critical Race Theory.

SEC. 547. None of the funds appropriated or otherwise made available by this Act may be made available to procure, whether directly or by contract with a third party, computers, printers, or videoconferencing services in which the manufacturer, bidder, or offeror, or any subsidiary or parent entity of the manufacturer, bidder, or offeror, of the equipment is an entity, or parent company of an entity in which the People's Republic of China has any ownership stake.

SEC. 548. (a) For an additional amount for "Federal Emergency Management Agency—Federal Assistance", $3,000,000, to remain available until September 30, 2026, exclusively for providing reimbursement of extraordinary law enforcement personnel costs for protection activities

directly and demonstrably associated with any non-governmental property of the President that is to be secured by the United States Secret Service pursuant to section 3 or section 4 of the Presidential Protection Assistance Act of 1976 (Public Law 94–524); 18 U.S.C. 3056 note).

(b) Funds under subsection (a) shall be available only for costs that a State or local agency—

(1) incurs on or after October 1, 2024;

(2) can demonstrate to the Administrator as being—

(A) in excess of the costs of normal and typical law enforcement operations;

(B) directly attributable to the provision of protection described in this section; and

(C) associated with a non-governmental property to be secured by the United States Secret Service pursuant to such Act; and

(3) certifies to the Administrator as being for protection activities requested by the Director of the United States Secret Service.

(c) For purposes of subsection (a), a non-governmental property to be secured under subsection (b)(2)(C) made after incurring otherwise eligible costs shall apply retroactively to October 1, 2024.

SEC. 549. None of the funds appropriated or otherwise made available by this Act may be obligated or expended in contravention of the First, Fourth, Fifth, and Sixth Amendments to the Constitution.

SEC. 550. None of the funds appropriated or otherwise made available by this Act may be used to interfere with or restrict the ability of an individual to record or document immigration enforcement actions, consistent with existing laws, by U.S. Immigration and Customs Enforcement or any other Federal law enforcement occurring in public areas, provided that such documentation does not obstruct or physically interfere with law enforcement operations.

SPENDING REDUCTION ACCOUNT

SEC. 551. $0.

This Act may be cited as the ''Department of Homeland Security Appropriations Act, 2026''.

**Union Calendar No. 139**

119TH CONGRESS
1ST SESSION

# H. R. 4213

**[Report No. 119–173]**

# A BILL

Making appropriations for the Department of Homeland Security for the fiscal year ending September 30, 2026, and for other purposes.

JUNE 26, 2025

Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

# Exhibit B-2

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO



119TH CONGRESS
*1st Session*

HOUSE OF REPRESENTATIVES

REPORT
119–173

# DEPARTMENT OF HOMELAND SECURITY APPROPRIATIONS BILL, 2026

JUNE 26, 2025.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. AMODEI of Nevada, from the Committee on Appropriations, submitted the following

# REPORT

together with

## MINORITY VIEWS

[To accompany H.R. 4213]

The Committee on Appropriations submits the following report in explanation of the accompanying bill making appropriations for the Department of Homeland Security for the fiscal year ending September 30, 2026.

INDEX TO BILL AND REPORT


| | Page number Bill | Report |
|---|---|---|
| TITLE I—DEPARTMENTAL MANAGEMENT, INTELLIGENCE, SITUATIONAL AWARENESS, AND OVERSIGHT | | |
| Office of the Secretary and Executive Management | 2 | 5 |
| Operations and Support | 2 | 5 |
| Procurement, Construction, and Improvements | 2 | 12 |
| Federal Assistance | ........ | 12 |
| Management Directorate | 3 | 12 |
| Operations and Support | 3 | 12 |
| Procurement, Construction, and Improvements | 3 | 14 |
| Federal Protective Service | 3 | 16 |
| Intelligence, Analysis, and Situational Awareness | 3 | 16 |
| Operations and Support | 3 | 16 |
| Office of Inspector General | 4 | 17 |
| Operations and Support | 4 | 17 |
| Administrative Provisions | 4 | 18 |
| TITLE II—SECURITY, ENFORCEMENT, AND INVESTIGATIONS | | |
| U.S. Customs and Border Protection | 11 | 19 |


60–808

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 302 of 714 PageID #:1352




| | Page number Bill | Report |
|---|---|---|
| Operations and Support | 11 | 19 |
| Procurement, Construction, and Improvements | 13 | 30 |
| U.S. Immigration and Customs Enforcement | 13 | 34 |
| Operations and Support | 13 | 35 |
| Procurement, Construction, and Improvements | 14 | 46 |
| Transportation Security Administration | 15 | 47 |
| Operations and Support | 15 | 47 |
| Procurement, Construction, and Improvements | 15 | 50 |
| Research and Development | 15 | 50 |
| Coast Guard | 16 | 52 |
| Operations and Support | 16 | 52 |
| Procurement, Construction, and Improvements | 17 | 59 |
| Research and Development | 17 | 62 |
| Health Care Fund Contribution | ........ | 62 |
| Retired Pay | 18 | 62 |
| United States Secret Service | 18 | 63 |
| Operations and Support | 18 | 63 |
| Procurement, Construction, and Improvements | 20 | 65 |
| Research and Development | 20 | 65 |
| Administrative Provisions | 20 | 65 |
| TITLE III—PROTECTION, PREPAREDNESS, RESPONSE, AND RECOVERY | | |
| Cybersecurity and Infrastructure Security Agency | 39 | 68 |
| Operations and Support | 39 | 68 |
| Procurement, Construction, and Improvements | 39 | 76 |
| Research and Development | ........ | 79 |
| Federal Emergency Management Agency | 39 | 79 |
| Operations and Support | 39 | 79 |
| Procurement, Construction, and Improvements | 39 | 82 |
| Federal Assistance | 40 | 82 |
| Disaster Relief Fund | 44 | 85 |
| National Flood Insurance Fund | 45 | 88 |
| Administrative Provisions | 47 | 88 |
| TITLE IV—RESEARCH, DEVELOPMENT, TRAINING, AND SERVICES | | |
| U.S. Citizenship and Immigration Services | 54 | 89 |
| Operations and Support | 54 | 89 |
| Federal Assistance | ........ | 91 |
| Federal Law Enforcement Training Centers | 54 | 91 |
| Operations and Support | 54 | 92 |
| Procurement, Construction, and Improvements | 55 | 92 |
| Science and Technology Directorate | 55 | 92 |
| Operations and Support | 55 | 93 |
| Procurement, Construction, and Improvements | 55 | 93 |
| Research and Development | 55 | 94 |
| Administrative Provisions | 56 | 97 |
| TITLE V—GENERAL PROVISIONS | | |
| This Act | 64 | 98 |
| House of Representatives Reporting Requirements | ........ | 103 |


## Overview

The Department of Homeland Security (DHS) is responsible for vital homeland and national defense missions across eight operational components. From providing border security to keeping the flying public safe, to protecting our Nation's key leadership, guarding against cybersecurity threats to the country's critical infrastructure, and to responding to both natural and man-made disas-

ters, the Department ensures the Nation is well-equipped to address challenges facing the Homeland. The Committee recommendation includes $99,136,555,000 in total discretionary appropriations for DHS, including $66,361,000,000 within the bill's 302(b) budget allocation, $6,301,555,000 in discretionary appropriations offset by fee collections, and $26,474,000,000 as an allocation adjustment for major disaster response and recovery activities. The total within the allocation is $1,331,769,000 above the fiscal year 2025 level.

### Homeland Security Investments

Investments in this bill are intended to balance competing priorities across the Department's important missions, all of which are critical to the security of the Nation, including providing funding for: border security technology; Border Patrol Agents; the deployment of additional Non-Intrusive Inspection machines at ports of entry (POEs) to increase the detection of fentanyl; artificial intelligence and machine learning capabilities to reduce manual review of cargo and vehicle images; immigration detention capacity; transportation and removal operations for additional deportation of criminal aliens; continuing recapitalization of the Coast Guard's surface and aviation fleets, including continued support for the Fast Response Cutter, Waterways Commerce Cutter, and Offshore Patrol Cutter programs; and cybersecurity defense tools and technology to protect government networks and critical infrastructure.

### Border Security

Under the previous administration, alien encounters skyrocketed, growing as high as nearly 15,000 per day. U.S. Customs and Border Protection (CBP) agents and officers were pulled away from their primary law enforcement duties to "manage" this policy-driven crisis. However, this administration made key policy changes to enforce long-standing immigration laws already on the books. On average, these policy changes have reduced border crossings by more than 90 percent year-over-year, allowing CBP to close costly soft-sided facilities due to the reduced alien flow along the southern border. This bill supplements the policy direction of this administration by making long-term border security investments that will enable our front-line agents to sustain the recent reductions in illicit border activity. The bill sustains funding for a Border Patrol end strength of 22,000 agents and includes the following: $84,022,000 for workforce care; $20,000,000 for innovative technology; $24,000,000 for tactical aerostats; $10,440,000 for cross-border tunnel threat detection; and $4,000,000 for carrizo cane control.

Within CBP's Procurement, Construction, and Improvements account, the recommendation includes: $346,000,000 for border technology; $300,000,000 for Non-Intrusive Inspection equipment; $66,500,000 for Light Enforcement Helicopters; $29,700,000 for UH 60 Medium Lift Helicopters; and $13,000,000 for sensor upgrades.

### Immigration Enforcement

As the number of aliens who have final orders of removal exceeds 1,300,000, it is the responsibility of this Committee to provide appropriate funding to deter, detain, and deport those who do not

have a legal basis to remain in this country or those who harm our citizens and communities. To further this administration's priorities, the Committee provides resources for U.S. Immigration and Customs Enforcement (ICE) to fund significant increases for the critical components of a robust enforcement and removal apparatus, such as 50,000 detention beds. The recommendation also includes additional funding for transportation and removal operations to ensure that ICE can execute its statutory authority to perform necessary interior enforcement actions.

### Transportation Security

The Transportation Security Administration's (TSA) implementation of changes to its pay structure has caused dramatic increases to the agency's budget, which have continued to come at the expense of other priorities. This bill provides $213,000,000 for checkpoint screening infrastructure to restore some of the cuts that were necessary to fund the agency's pay structure changes.

### Cybersecurity and Infrastructure Security

The bill provides $2,738,206,000 for the Cybersecurity and Infrastructure Security Agency (CISA) to sustain investments in securing Federal civilian executive branch networks and helping state, local, Tribal, and territorial governments and critical infrastructure companies secure both cyber and physical infrastructure, while making strategic cuts to programs and positions that are not aligned with CISA's statutory mission.

### Citizenship and Immigration Processing

With few exceptions, U.S. Citizenship and Immigration Services (has historically operated as a fee-funded agency, with its operating expenses originating primarily from fees charged to applicants and petitioners seeking immigration benefits. The bill returns to this traditional funding structure and includes appropriations only for the E-Verify program.

### Countering Weapons of Mass Destruction

The authorization for the Countering Weapons of Mass Destruction office, which was extended beyond its statutory end date through fiscal year 2024 continuing resolutions, ended on March 22, 2024. Unlike some authorizations that simply lapse, the statutory construction of section 591(e) of title 6, United States Code, terminated the office. As a result, authority for the office continued solely on the basis of the fiscal year 2024 appropriation. The Committee declines to continue, via appropriation, a terminated office and instead chooses to move the critical functions of this office into other components.

### Fiscal Year 2026 Budget Submission

Due to the substantial delay of the fiscal year 2026 budget submission, most of the changes to DHS proposed by the administration have not been considered in this bill. The Committee notes that the request includes a number of important reforms and proposals to reorganize the Department. The Committee applauds the

long overdue efforts to restrain the growth of DHS outside of its key statutorily authorized missions. The Committee looks forward to working with the Department to consider these reforms as this bill moves through the legislative process.

### References in the Report

This report refers to certain entities, persons, funds, and documents as follows: the "Department of Homeland Security" is referenced as DHS or the Department; "full-time equivalents" are referred to as FTE; "Government Accountability Office" is referenced as GAO; "Information Technology" is referred to as IT; "Office of Inspector General" is referenced as OIG; "program, project, and activity" is referred to as PPA; any reference to "the Secretary" should be interpreted to mean the Secretary of Homeland Security; "component" should be interpreted to mean an agency, administration, or directorate within DHS; any reference to "SLTT" should be interpreted to mean state, local, Tribal, and territorial; and "budget request" or "the request" should be interpreted to mean the budget of the U.S. Government for fiscal year 2026 that was submitted to Congress on May 30, 2025.

## TITLE I—DEPARTMENTAL MANAGEMENT, INTELLIGENCE, SITUATIONAL AWARENESS, AND OVERSIGHT

### Mission

The mission of Departmental Management, Intelligence, Situational Awareness, and Oversight is to provide leadership and services to DHS components; formulate policy guidance and directives; disseminate intelligence; identify and track performance measurements relating to DHS missions; and provide oversight for all DHS operations.

### Office of the Secretary and Executive Management

| | |
|---|---|
| Appropriation, fiscal year 2025 | $404,695,000 |
| Budget request, fiscal year 2026 | 325,367,000 |
| Recommended in the bill | 254,343,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | −150,352,000 |
| Budget request, fiscal year 2026 | −71,024,000 |

The Office of the Secretary and Executive Management (OSEM) plans and executes departmental strategies to accomplish agency objectives and provides policy guidance to departmental components.

#### OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriation, fiscal year 2025 | $363,582,000 |
| Budget request, fiscal year 2026 | 325,367,000 |
| Recommended in the bill | 246,230,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | −117,352,000 |
| Budget request, fiscal year 2026 | −79,137,000 |

*2026 FIFA World Cup Planning*.—The Committee recognizes that cities hosting events associated with the 2026 FIFA World Cup face critical public safety needs that require adequate preparation. These include ensuring secure communications for first re-

sponders; working with federal and SLTT jurisdictions to provide emergency services; and ensuring a safe environment for all attendees, residents, and visitors to the United States. However, the Committee is concerned with the lack of departmental budget planning for the 2026 FIFA World Cup. Not later than 90 days after the date of enactment of this Act, the Secretary is directed to brief the Committee on the security planning processes, expected budgetary impacts to the Department, coordination efforts with Federal and SLTT entities, and additional resource requirements necessary for host cities to adequately prepare for the 2026 FIFA World Cup.

*2028 Olympic and Paralympic Games*.—The 2028 Olympic and Paralympic Games in Los Angeles, California, have been designated as a National Special Security Event (NSSE), which commits the Department to develop event security and incident management plans to ensure the safety of all participants. Because significant resources will need to be dedicated to this effort over the next four years, the Secretary shall submit a report to the Committee not later than 90 days after the date of enactment of this Act that details the full scope of the Department's obligations for this NSSE. The report shall include the nature of the Department's coordination with the organizing committee involved in the 2028 Games and with other federal agencies and departments, as well as representatives of the relevant state and local government entities, including Olympic events not hosted in the Los Angeles area. The report shall also include the Department's projected resource needs for this NSSE for fiscal year 2026 through fiscal year 2029, including specific account details for each fiscal year.

*Administrative Data Research Facility (ADRF)*.—The Committee recognizes the critical need for secure, centralized infrastructure to integrate federal and state administrative data for research and policymaking. The Committee strongly encourages the Department to expand secure access to administrative data on cyber threats, border security, human trafficking, and emergency response through the utilization of the ADRF, a Federal Risk and Authorization Management Program authorized research platform designed to securely link sensitive research and administrative data with states and other federal agencies' datasets. The Committee directs the DHS Statistical Official, in consultation with the DHS Chief Data Officer, the Chief Information Officer, and the Senior Agency Official for Privacy, to coordinate these efforts across the relevant DHS components and to ensure compliance with all applicable laws and DHS policies, including the Privacy Act of 1974 (P.L. 93–579). The recommendation provides $2,000,000 to expand the ADRF's capabilities, including enhanced data-sharing partnerships, expanded security measures, and the development of advanced analytical tools to support DHS and other agencies' homeland security research needs, and to enhance DHS's ability to securely transmit timely data to the ADRF. The Committee directs the DHS Statistical Official to submit a report within 180 days of the date of enactment of this Act detailing progress on the integration of administrative data for homeland security research, including an assessment of how ADRF is being leveraged to enhance interagency collaboration and threat analysis.

*Army's 250th Birthday.*—Not later than 30 days after the date of enactment of this Act, the Secretary shall submit a report to the Committee that details the total obligations associated with the parade commemorating the Army's 250th birthday held in Washington, D.C., on June 14, 2025. The report shall include the total cost to each departmental component, broken out by PPA, including the costs for pre-parade preparation, security, travel, and other activities related to this event.

*Biometric Exit and Visa Overstay.*—The Department is directed to provide a spend plan for H–1B and L–1 fee revenues and any other resources being applied to biometric exit implementation not later than 30 days after the date of enactment of this Act. The Committee further directs the Department to brief the Committee within 180 days of the date of enactment of this Act to detail ongoing efforts to address entry and exit data collection and exchange in the land border environment. Further, pursuant to section 1376 of title 8, United States Code, the Department is required to collect data on nonimmigrants who have overstayed their visas and to report annual estimates to Congress. The Department shall provide the report on an annual basis. As previously required, the Department shall submit an updated report outlining its comprehensive strategy for overstay enforcement and deterrence not later than 180 days after the date of enactment of this Act. The report shall detail the ongoing actions to identify individuals who have overstayed their visas, including those actions necessary to improve the capabilities to report such information; notify individuals of their required departure dates in advance; track such overstays for enforcement action; refuse or revoke current and future visas and travel authorizations; and otherwise deter violations or take enforcement action.

*Border and Immigration Related Data and Transparency.*—Within 30 days of the date of enactment of this Act, and quarterly thereafter, the Secretary, in consultation with other appropriate federal officials, shall submit to the Committee a report that details the situational awareness of the southern border that includes data related to the number of "turn backs," "got aways," and monthly apprehension rate data by sector. For the purposes of this reporting requirement, the Department shall use the definitions provided in section 223 of title 6, United States Code. CBP is also directed to ensure a review by third-party statistical experts on the current process, assumptions, and formulas used to derive the "got aways" estimates and any proposed changes to improve such estimates, including proposed changes to statutory definitions, if any. Additionally, the Department shall provide to the Committee and shall post on a publicly accessible website by the 15th of each month the following, delineating requests received and granted by entity, including CBP, U.S. Immigration and Customs Enforcement (ICE), and U.S. Citizenship and Immigration Services:

(1) DHS's total detention capacity, as well as usage rate during the previous month;

(2) the total monthly number of "applicants for admission" under section 1225 of Title 8, United States Code, who are paroled into the United States during the previous month;

(3) the total monthly number of "applicants for admission" under section 1225 of Title 8, United States Code, who are re-

leased into the United States, paroled or otherwise, during the previous month;

(4) the total number of individuals paroled into the United States during the previous month;

(5) of the total number of individuals paroled, the rationale for each grant, and its duration; and

(6) the total number of referrals for prosecution made to the Department of Justice (DOJ) for illegal entry or illegal reentry during the previous month.

*Child Well-Being Specialists.*—The recommendation provides $18,050,000 for the Child Well-Being Specialists program. The Committee continues the reporting directive under the heading, "Child Well-Being Professionals" in the explanatory statement accompanying Public Law 118–47.

*Combatting Antisemitism.*—The Committee directs the Secretary to release a public report, not later than 90 days after the date of enactment of this Act, detailing how the Department plans to implement Executive Order 14188, of January 29, 2025, relating to additional measures to combat antisemitism.

*Customer Experience.*—The Committee directs the Secretary to develop standards to improve customer experience and to incorporate those standards into the performance plans required under section 1115 of title 31, United States Code. Not later than 90 days after the date of enactment of this Act, the Department shall provide the Committee an update on plans for implementing this requirement.

*Detention Space Report.*—Not later than 60 days after the date of enactment of this Act, and semiannually thereafter, consistent with the requirements found in section 1368 of title 8, United States Code, the Office of Homeland Security Statistics (OHSS), in coordination with ICE, shall submit the required report to the Committee.

*GAO Review on Unified Immigration Portal (UIP) Efficacy.*—The Committee recognizes that enabling agencies to efficiently share data and information, in particular information relating to law enforcement activities, is critically vital to our domestic security. While the intent of the UIP is to connect relevant data from across agencies involved in the immigration lifecycle, the Committee is concerned that the system's efficacy remains unverified. Therefore, the Committee directs the Comptroller General of the United States to brief the Committee within 180 days of the date of enactment of this Act with the results of a review on the UIP system's current performance metrics, operational efficiency, and modernization requirements. The review shall include an assessment of:

(1) cloud-based solutions to enhance system performance and reduce operational costs;

(2) any plans for modernizing legacy components;

(3) technical and operational challenges affecting system effectiveness; and

(4) any recommendations for improving cross-agency data sharing and integration to save taxpayer resources.

*Law Enforcement Support.*—The Department is directed to continue quarterly reporting, on a publicly accessible website, on requests to DHS law enforcement components for support in the form of personnel, aircraft, or other assets, consistent with the require-

ment under this heading in the explanatory statement accompanying Public Law 117–328. Support to a non-federal entity in a location where First Amendment protected activity is occurring should only be provided if approved in advance by the Secretary, the Deputy Secretary, or the Under Secretary for Management. The Department shall notify the Committee not more than 48 hours after the approval of such support.

*Law Enforcement Support and Counter Transnational Repression.*—The Committee is concerned about the increased use of transnational repression tactics by foreign governments, Foreign Terrorist Organizations (FTOs), and transnational crime organizations against individuals on U.S. soil. The Committee encourages the Department to evaluate the implementation of a public service announcement campaign educating the public and international allies on the issue of transnational repression, terrorism threats related to transnational repression, and the resources available to victims. Within 180 days of the date of enactment of this Act, DHS is directed to brief the Committee on policy considerations related to the implementation of such a public service campaign.

*National Biosurveillance Integration Center (NBIC).*—The recommendation transfers the personnel and the functions of the NBIC in the Countering Weapons of Mass Destruction Office to the Office of Health Security (OHS). The Committee encourages OHS to ensure that NBIC analytics and products are operationally focused to support frontline operations and not duplicative of other Federal government biosurveillance reporting.

*Northern Border.*—The Committee recognizes the continued work of DHS, in partnership with our Canadian allies, to ensure adequate resources are assigned to secure the Nation's northern border. Not later than 180 days after the date of enactment of this Act, the Committee directs the Secretary to provide a briefing detailing a breakdown of the financial, staffing, and equipment resources allocated to northern border protection; statistics on border crossings, seizures, and arrests; an analysis of the cost-effectiveness of operations conducted on the northern border compared to those on the southern border; and an assessment of joint U.S.-Canada border security operations.

*Office of Homeland Security Statistics (OHSS).*—The Committee is concerned that monthly reports have not been updated since January 2025, despite the requirements in the explanatory statement accompanying Public Law 117–328. The Committee directs the OHSS to continue to provide monthly reports for fiscal year 2026. The Committee also directs OHSS to include in its report the arrest location and the number of repatriations by arresting agency, as well as detentions, removals, and ICE arrests of U.S. citizens, Lawful Permanent Residents, and former members of the Armed Services. The report shall include monthly data on self-deportations through the CBP Home App.

*Office of the Immigration Detention Ombudsman (OIDO).*—The recommendation does not include funds for OIDO.

*Official Reception and Representation Expenses.*—DHS shall continue to submit quarterly obligation reports for official reception and representation expenses, as in prior years. Prior to the obligation of any funds for reception and representation expenses to purchase collectibles or memorabilia, the Department shall provide the

Committee no fewer than 14 days advance written notification describing the purpose of such purchases and the projected costs.

*Performance Measures.*—The Committee directs all agencies funded by this Act to comply with title 31 of United States Code, including by developing organizational priority goals and outcomes such as performance outcome measures, output measures, efficiency measures, and customer service measures.

*Simulation-Based Emergency Preparedness Network.*—The Committee encourages DHS to support the development and implementation of simulation-based emergency preparedness network programs. These programs ensure that the first responder and first receiver health workforce receive high-quality, pertinent, evidence-based training required to care for people injured before, during, and after emergencies and disasters, particularly those in rural and remote areas. This effort may include increasing live and virtual content delivery capacity at accredited healthcare simulation centers and establishing partnerships with academic health institutions and systems in developing training to the first responder and first receiver health workforce. It should also include expanding relevant content and access at DHS training facilities, developing appropriate governance on data management, and outfitting Health Professional Shortage Areas, Medically Underserved Areas, or Tribal entities with necessary health security simulation hardware and software assets.

*Telemental Health and Employee Assistance Pilot.*—The recommendation provides $1,500,000 to continue the pilot efforts, as described in House Report 118–123 accompanying Public Law 118–47.

*Temporary Additional Duty in Support of Enforcement Operations.*—The Committee directs DHS to brief the Committee no later than 30 days after the date of enactment of this Act and quarterly thereafter, on the number of departmental employees who have been temporarily assigned to ICE for the purposes of immigration enforcement since January 20, 2025. The report should include a breakout by agency on the average costs per detail assignment, the average length of detail assignments, and the roles and responsibilities carried out during the detail, including the number of arrests made in support of ICE enforcement and removal operations.

*Terrorism Watch List.*—The Department shall notify the Committee within seven days if an individual on the Federal Bureau of Investigation's (FBI) Terrorist Screening Dataset (TSDS) is encountered by the Department at or between a Port of Entry (POE).

*Transnational Criminal Organizations (TCO) Recruiting.*—The Committee notes the dangers posed by TCOs and their illegal smuggling and trafficking activities along the U.S.-Mexico border. The Committee is also aware that TCOs have increasingly sought to recruit minors in U.S. border communities to assist with illegal smuggling and trafficking activities. To better understand the prevalence of TCO engagement with minors in the United States, the Secretary is directed to report to the Committee within 180 days of the date of enactment of this Act on the influence of TCOs in border communities, including:

(1) the number of encounters Federal law enforcement has had with U.S. citizens or otherwise lawfully present aliens

under 18 years of age working with or on behalf of known TCOs for illegal smuggling or trafficking purposes within 100 miles of the U.S.-Mexico border in fiscal year 2026; and

(2) strategies for DHS to work with any necessary federal and SLTT entities to combat TCO's recruiting individuals under 18 years of age in the U.S. for illegal smuggling and trafficking activities.

*Tribal Training.*—The Committee recognizes the importance of reducing immigration enforcement encounters with lawful U.S. citizens. Given the unique nature of the government-to-government relationship between Tribal Nations and the Federal government, immigration enforcement agents and officers should have an understanding of this relationship and the cultural intricacies of interacting with Tribal members. This should include but not be limited to recognizing names of Tribes in areas where officers and agents are operating and recognizing and accepting Tribal identification and Certificates of Degree of Indian Blood. The Committee encourages the Department to consider training programs for agents and officers to better inform encounters with Native Americans.

*TSDS Encounters.*—Individuals on the FBI TSDS encountered at or between POEs may include family members or associates of a known or suspected terrorist or individuals incorrectly identified as TSDS matches who the Department determines, after evaluation in coordination with the FBI, do not pose a homeland security threat. Within 90 days of the date of enactment of this Act, and quarterly thereafter, the Department shall provide a report to the Committee detailing what actions, if any, the Department has taken or plans to take to determine whether each individual on the TSDS encountered at or between POEs poses a homeland security threat that needs to be mitigated and the total number of individuals determined to pose such a threat. This report shall also include the location of each encounter, the individual's nationality, the individual's post-apprehension outcome, and any other available information. This report shall be submitted in unclassified form but may contain a classified annex.

*Women, Peace, and Security (WPS).*—Not later than 90 days after the date of enactment of this Act, DHS shall submit a report and provide a briefing to the Committee and to the co-chairs of the bipartisan Women, Peace, and Security Caucus detailing plans to implement the Women, Peace, and Security Act of 2017 (P.L. 115–68), the U.S. Strategy on Women, Peace, and Security, and the Department's WPS implementation plan. The briefing shall include details on plans to hire and train qualified and dedicated advisors to ensure programming is accessible and that women's equality is addressed. The briefing shall also include plans to bolster WPS efforts in the Department, plans to provide department-wide training to ensure officials understand how the inclusion of women increases the effectiveness of security-related policies and programs, and new WPS programming being developed.

*Workforce Wellness and Suicide Prevention.*—The recommendation provides $2,000,000 to expand department-wide workforce wellness and suicide prevention efforts. Not later than 60 days after the date of enactment of this Act, OHS shall provide an update to the Committee on the status of these efforts and its plans for this funding. Additionally, the Committee encourages OHS to

consider using these funds to address stressors known to impact law enforcement officers, including but not limited to depression, anxiety, financial hardship, domestic violence, and alcohol abuse.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

| | |
|---|---|
| Appropriation, fiscal year 2025 | $8,113,000 |
| Budget request, fiscal year 2026 | – – – |
| Recommended in the bill | 8,113,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | – – – |
| Budget request, fiscal year 2026 | +8,113,000 |

*Electronic Health Records.*—OHS, in coordination with DHS components, shall develop requirements for medical services and measurable performance standards for current healthcare record systems and the Medical Information Exchange. Not later than 60 days after the date of enactment of this Act, DHS shall provide a briefing to the Committee on the plan for consolidating the Department's non-military healthcare records systems and programs into OHS. Further, the briefing shall include an estimate of any funding, personnel, and procurement impacts, related oversight considerations, and a discussion of any necessary changes in authorities.

FEDERAL ASSISTANCE

| | |
|---|---|
| Appropriation, fiscal year 2025 | $33,000,000 |
| Budget request, fiscal year 2026 | – – – |
| Recommended in the bill | – – – |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | −33,000,000 |
| Budget request, fiscal year 2026 | – – – |

## MANAGEMENT DIRECTORATE

| | |
|---|---|
| Appropriation, fiscal year 2025[1] | $4,011,440,000 |
| Budget request, fiscal year 2026 | 3,990,565,000 |
| Recommended in the bill | 3,771,270,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | −240,170,000 |
| Budget request, fiscal year 2026 | −219,295,000 |

[1] The amounts for each fiscal year include appropriations for the Federal Protective Service that are entirely offset by fee collections from other federal agencies, which for fiscal year 2026 are estimated at $2,026,455,000.

### Mission

The mission of the Management Directorate is to provide enterprise leadership and management and business administration services for the Department, as well as biometric and identity management services.

OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriation, fiscal year 2025 | $1,722,204,000 |
| Budget request, fiscal year 2026 | 1,801,928,000 |
| Recommended in the bill | 1,648,509,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | −73,695,000 |
| Budget request, fiscal year 2026 | −153,419,000 |

*Artificial Intelligence Corps (AI Corps).*—The Committee acknowledges the ongoing work of the DHS AI Corps, which supports AI experts within DHS to bolster AI talent, further national security objectives, modernize DHS's technology infrastructure, and re-

duce costs. The Committee directs the DHS AI Corps to continue its efforts to achieve these objectives and to notify the Committee regarding any planned cuts to programs or personnel.

*Budget Justifications.*—The Department is expected to provide complete justification materials for the fiscal year 2027 budget request, including details for each office and program, and to clearly describe and account for current services, transfers, adjustments to base, and program changes. In addition to the detail provided in current reporting, the justifications shall incorporate output from predictive models used by DHS component agencies. For each relevant program area, justifications shall clearly describe and quantify the projections used to inform resource requests, indicate the offices and components impacted by the projections, and confirm whether the budget requests for those offices and components were developed using the same assumptions. In addition, the Chief Financial Officer (CFO) is directed to ensure that fiscal year 2027 budget justification materials for classified and unclassified budgets of all components are submitted concurrently with the President's budget submission to Congress and that the structure, terminology, and format of such budget materials are standardized to the greatest extent possible.

*Component Staffing Plans.*—The Department shall submit staffing plans to the Committee on a quarterly basis and shall ensure such plans are aligned to the budget justification materials at the PPA level.

*Counter-Unmanned Aerial Systems (cUAS).*—The Department is reminded of the requirement found under this heading in the explanatory statement accompanying Public Law 117–328.

*Enterprise-Wide IT License Agreements.*—The Committee is aware that the Department is improving its IT service, operations, and asset management, low-code application development, and human resources management systems to create improvements in IT auditability, security, and efficiency at several operational components. The Committee supports these efforts and strongly encourages the Department to evaluate opportunities to achieve improved economies of scale through the consolidation of disparate contracts into enterprise-wide agreements. Accordingly, the Committee directs the Chief Information Officer (CIO) to provide a briefing to the Committee, within 180 days of the date of enactment of this Act, on the Department's efforts to consolidate IT license agreements across components to reduce cost and improve performance.

*Enterprise-Wide Maritime Domain Platform.*—The recommendation includes a reduction of $6,000,000 to the Office of the Chief Information Officer (OCIO) that was added as directed in the explanatory statement accompanying Public Law 118–47. The Department is reminded of Congress' oversight functions and the Department's duty to respond to lawful and constitutionally authorized requests for information. For instances in which the Department has a legitimate reason to execute funding in a manner inconsistent with congressional intent, notification should be provided as soon as possible before funds are obligated or would lapse.

*Federal Protective Service (FPS) NSSEs Support.*—The recommendation includes $3,800,000 allocated to the Office of the Chief Security Office. The Department shall direct this funding to

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 314 of 714 PageID #:1364



FPS in support of FPS's work at NSSEs and deployment of cUAS capabilities.

*Federal Risk and Authorization Management Program (FedRAMP).*—The Committee recognizes the importance of the DHS OCIO's responsibility as a member of the FedRAMP Joint Authorization Board and the value of modern cloud products and services. Accordingly, the Committee directs the OCIO to brief the Committee, within 180 days of the date of enactment of this Act, on the resources necessary to enable increased FedRAMP continuous monitoring workload and the facilitation of cloud services.

*Homeland Advanced Recognition Technology (HART) System.*—The Committee is very interested in HART's ability to achieve initial operating capability in fiscal year 2026 and its ability to progress to full operational capability (FOC). During the transition from the Automated Biometric Identification System (IDENT), the Committee directs the Department to ensure full system redundancy until HART can be operationally certified. The Department is directed to continue to brief the Committee monthly on system development, associated costs, and schedule until FOC of HART is achieved.

*Joint Requirements Council (JRC).*—The recommendation rejects the transfer of the JRC to the Office of Program Accountability and Risk Management as proposed in the fiscal year 2026 budget request. The explanatory statement accompanying Public Law 118–47 required both a wind down plan and an identification of alternative methods to improve the management and resourcing of joint requirements in lieu of funding the JRC. The Committee strongly encourages the Department to provide a robust plan that presents a wholesale change in the Department's management of joint requirements to comply with congressional intent.

*Obligation Plans.*—The Department shall continue to submit obligation plans on a quarterly basis consistent with direction provided in the explanatory statement accompanying Public Law 114–113. Additionally, the CFO shall require the use of a uniform obligation plan template aligned with the budget justification materials to ensure consistency across components, which shall include quarterly spending targets for each account and PPA. The CFO shall be responsible for ensuring that components with major acquisition programs include the breakout of these programs within their quarterly plans and provide additional context to describe and justify any changes from the prior submission.

*Office of Biometric Identity Management (OBIM).*—OBIM is directed to continue briefing the Committee on a semiannual basis on its workload, service levels, staffing, modernization efforts, and other operations. The recommendation includes $271,742,000 for OBIM.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

| | |
|---|---|
| Appropriation, fiscal year 2025 | $260,433,000 |
| Budget request, fiscal year 2026 | 162,182,000 |
| Recommended in the bill | 96,306,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | −164,127,000 |
| Budget request, fiscal year 2026 | −65,876,000 |

The recommendation includes $11,200,000 for HART and $8,434,000 for One Net—Homeland Security Enterprise Network.

The recommendation provides no funding for the National Capitol Region (NCR) headquarters consolidation.

*Counter Unmanned Aerial Systems.*—The Committee recognizes the growing threat that unmanned aerial systems present during NSSEs and the role that the FPS plays during these events. Not later than 120 days after the date of enactment of this Act, the Department shall brief the Committee on its cUAS acquisitions and capabilities within the Office of the Chief Security Officer and FPS. The recommendation provides $3,400,000 to detect and mitigate persistent drone threats at NSSEs.

*DHS Procurement Policies.*—The Committee is concerned that existing procurement policies and procedures interfere with delivering mission critical support to government agencies and the constituents they serve. As technology develops at an increasingly rapid pace, traditional methods of procurement are hampering the government's ability to respond to changing needs. Large scale, all-encompassing procurements that seek to solve every problem with a single procurement are unwieldy, often result in the need for subcontractors, and fail to take advantage of technology specialization in the contractor community. Further, they are often delayed due to protests, are difficult to modify afterwards, and result in wasteful government spending. Awardees then sometimes leverage their legacy status as federal contractors to stifle competition and avoid accountability. The Committee encourages DHS to make use of smaller, targeted procurements that make use of alternative contracting approaches to increase competition, foster innovation, and reduce risk of contract non-performance. Further, the Committee encourages DHS to focus on holding contractors accountable to measurable results and, where appropriate, utilize pilot projects and open competition to identify contractors that can most readily meet the needs of DHS.

*Facilities Transformation/Lease Efficiencies.*—The recommendation includes $30,000,000 for facilities transformation and lease efficiencies to increase the occupancy footprint of existing facilities. The Department is directed to brief the Committee within 120 days of the date of enactment of this Act. The briefing shall include an overview of the implementation of the funding provided as well as an updated cost-benefit analysis for existing and future projects.

*Financial Systems Modernization (FSM) Acquisition.*—The recommendation includes $40,000,000 for FSM. The Department shall brief the Committee not later than 120 days after the date of enactment of this Act on progress of the Department-wide financial systems modernization, plans for the project in future fiscal years, and lessons learned from components that have transitioned from legacy financial systems.

*NCR Headquarters Consolidation.*—The Department is directed to provide a briefing to the Committee within 120 days of the date of enactment of this Act on all current and future projects in the NCR DHS Lease Consolidation Plan. The briefing shall include information on any projects that have been paused or cancelled with an updated cost-benefit analysis for current and future projects that incorporates present-day market rental rates for commercial real estate. The Department is encouraged to continuously evaluate if future construction is cost advantageous in lieu of long-term leases.

FEDERAL PROTECTIVE SERVICE

| | |
|---|---|
| Appropriation, fiscal year 2025 | $2,028,803,000 |
| Budget request, fiscal year 2026 | 2,026,455,000 |
| Recommended in the bill | 2,026,455,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | −2,348,000 |
| Budget request, fiscal year 2026 | – – – |

Mission

The Federal Protective Service (FPS) delivers law enforcement and protective security services to Federally owned, leased, or operated facilities.

The Committee recommends $2,026,455,000 for the FPS, as requested, which is fully offset by fees collected from FPS customer agencies.

INTELLIGENCE, ANALYSIS, AND SITUATIONAL AWARENESS

Mission

The missions supported through Intelligence, Analysis, and Situational Awareness (I&A) are twofold: to equip the Homeland Security Enterprise with timely intelligence and information to keep the homeland safe, secure, and resilient and to provide operations coordination, information sharing, situational awareness, a common operating picture, and departmental continuity.

OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriation, fiscal year 2025 | $345,410,000 |
| Budget request, fiscal year 2026 | 387,637,000 |
| Recommended in the bill | 360,788,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | +15,378,000 |
| Budget request, fiscal year 2026 | −26,849,000 |

The recommendation includes $360,788,000 for I&A, including $6,000,000 for 2026 FIFA World Cup activities and $8,417,000 for counter fentanyl activities.

*Annual Budget Justification Materials.*—The fiscal year 2027 budget justification materials for the classified budget shall include the same level of detail required for other PPAs.

*Continuation of Fiscal Year 2022 Requirements.*—The Department is directed to continue providing in fiscal year 2026 any briefing and report as outlined in the classified annex in the explanatory statement accompanying Public Law 117–103.

*Intelligence Expenditure Plan.*—The Department's CIO is directed to brief the Committee on the fiscal year 2026 expenditure plan for I&A within 60 days of the date of enactment of this Act. The plan shall include the following:

(1) fiscal year 2026 expenditures and staffing allotted for each program as compared to fiscal years 2021 through 2025;

(2) all funded versus on-board positions, including FTE, contractors, and reimbursable and non-reimbursable detailees;

(3) a plan for all programs and investments, including dates or timeframes for achieving key milestones;

(4) allocations of funding within each PPA for individual programs and a description of the desired outcomes for fiscal year 2026; and

(5) items outlined in the classified annex in the explanatory statement accompanying Public Law 117–103, updated for fiscal year 2026.

*Intelligence Sharing on Border Security.*—The Committee recognizes the importance of a unity of effort between federal, SLTT, and foreign law enforcement partners as it relates to border security. Not later than 120 days after the date of enactment of this Act, I&A shall develop and brief the Committee on a strategy to better leverage fusion centers to share actionable information with partners to improve border security along the land and maritime borders of the United States.

*National Vetting Center (NVC) Integration.*—The Committee recognizes the positive impact the integration of specific I&A vetting programs will have on the NVC's ability to comprehensively and effectively carry out its mission to protect the homeland. Not later than 180 days after the date of enactment of this Act, I&A shall report to the Committee on the status of the integration of specific I&A programs into the NVC environment, including priorities for expanding the existing vetting methodology to other categories of counterterrorism and counterintelligence concerns. The brief shall include resourcing requirements to scale such integration with the NVC inclusive of network infrastructure needs.

*Semiannual Intelligence Threat Briefings.*—The Committee recognizes I&A's unique role in the Intelligence Community (IC) by aggregating holdings from the Department to enrich those within the IC and disseminating intelligence to SLTT and private sector partners in order to identify and mitigate threats to the homeland. I&A shall provide semiannual intelligence briefings to the Committee beginning not later than 90 days after the date of enactment of this Act. The briefings shall include a high-level summary of I&A produced collections and analysis products, summary statistics of intelligence sharing to SLTT and private sector partners, and an analysis of growing threat trends including examples of I&A assisted outcomes. The briefings shall also include metrics used to measure the success of products and programs.

## Office of Inspector General

### Mission

The DHS Office of Inspector General (OIG) conducts and supervises independent audits, investigations, and inspections of DHS PPAs; identifies fraud, abuse, mismanagement, and inefficiencies in the use of funds; and makes recommendations for improving the execution of DHS missions.

#### OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriation, fiscal year 2025 | $220,127,000 |
| Budget request, fiscal year 2026 | 234,058,000 |
| Recommended in the bill | 223,063,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | +2,936,000 |
| Budget request, fiscal year 2026 | −10,995,000 |

*Denial of OIG Access to Records and Information.*—The Committee directs the OIG, in coordination with the DHS Audit Liaison and relevant component liaisons, to provide quarterly briefings concerning any component efforts to prevent or impede OIG access to records, documents, or other materials. In addition, the Committee directs the OIG to submit a report on a quarterly basis detailing instances of access denials. The report shall include, at a minimum, a summary of the OIG request, a description of the component response to the request, and any other information the OIG determines appropriate. The OIG is urged to ensure the timeliness of such reports.

*Quarterly Budget and Staffing Briefings.*—The OIG shall provide the Committee quarterly budget and staffing briefings which shall include all available funding sources, contracts, and contract staffing. The briefings shall reflect budget and staffing profiles by the types of audits, investigations, and inspections planned and executed. The briefings shall also include a spend plan and strategy to hire to enacted staffing levels.

## TITLE I—ADMINISTRATIVE PROVISIONS

Section 101. The Committee continues a provision requiring the Department to submit a report to the Inspector General regarding grants or contracts awarded by means other than full and open competition and requires the Inspector General to review such grants or contracts and report the results to the Committees.

Section 102. The Committee continues a provision requiring the CFO of the Department to provide a monthly budget and staffing report to the Committees.

Section 103. The Committee continues and modifies a provision requiring the Secretary to notify the Committees of any proposed transfer of funds from the Department of Treasury Forfeiture Fund to any DHS component.

Section 104. The Committee continues a provision related to costs associated with the use of government aircraft by DHS personnel in support of official travel of the Secretary and Deputy Secretary.

Section 105. The Committee continues and modifies a provision requiring the Under Secretary for Management to provide quarterly acquisition information to the Committees.

Section 106. The Committee continues a provision requiring specified documentation for pilot and demonstration programs and restricting the use of Operations and Support funding for any pilot or demonstration program involving more than ten FTEs or costing in excess of $5,000,000 unless the Secretary provides information to the Committees related to the program's goals, metrics, and implementation plan.

Section 107. The Committee includes a new provision that prohibits certain collection of intelligence on U.S. persons.

# TITLE II—SECURITY, ENFORCEMENT, AND INVESTIGATIONS

## U.S. Customs and Border Protection

| | |
|---|---|
| Appropriation, fiscal year 2025 | $19,582,040,000 |
| Budget request, fiscal year 2026 | 19,270,350,000 |
| Recommended in the bill | 19,332,714,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | −249,326,000 |
| Budget request, fiscal year 2026 | +62,364,000 |

### Mission

The mission of U.S. Customs and Border Protection (CBP) is to enforce laws regarding the admission of aliens into the United States and facilitate the flow of legitimate trade and travel.

### OPERATIONS AND SUPPORT

(INCLUDING TRANSFER OF FUNDS)

| | |
|---|---|
| Appropriation, fiscal year 2025 | $18,426,870,000 |
| Budget request, fiscal year 2026 | 18,158,588,000 |
| Recommended in the bill | 18,088,596,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | −338,274,000 |
| Budget request, fiscal year 2026 | −69,992,000 |

Within the total amount provided, the recommendation includes: $84,022,000 for workforce care; $40,000,000 to expand the Border Security Deployment Program at POEs; $24,000,000 for tactical aerostats; $10,440,000 for cross-border tunnel threat detection; and $4,000,000 for carrizo cane control.

Within the total amount provided, the recommendation makes $550,000,000 available until September 30, 2027.

*Border Barrier Updates.*—Not later than 90 days after the date of enactment of this Act and quarterly thereafter, the Commissioner is directed to brief the Committee on the status of border barrier construction to include wall system attributes, other tactical infrastructure, and technology associated with barrier construction.

*Border Technology Operational Availability.*—The Committee continues to be concerned with the low operational availability of border technology deployed along the southern border. Not later than 60 days after the date of enactment of this Act and quarterly thereafter, CBP shall provide a briefing to the Committee that details the operational availability of all fixed, relocatable, and mobile surveillance systems deployed by CBP.

*Digital Forensics.*—The recommendation provides $5,000,000 for enhanced digital forensics capabilities including on-site data extraction, data recovery, decryption, and analysis. Not later than 90 days after the date of enactment of this Act, CBP is directed to brief the Committee on the status of this effort.

*Electronic Device Searches.*—The Committee directs CBP to publish data on a public website detailing the number of instances during secondary inspections in which CBP personnel:

(1) accessed the digital contents of any electronic equipment, delineated by the nationality and initial country of departure for the arriving individual in possession of such equipment;

(2) accessed the digital contents of an online account, including social media handles and cloud-based accounts;

(3) requested consent to access the digital contents of any electronic equipment belonging to or in the possession of a U.S. person, delineated by whether permission was granted;

(4) requested a U.S. person to consensually disclose a credential that would enable access to the digital contents of electronic equipment of such person, delineated by whether the credential was disclosed;

(5) detained an individual for refusing to disclose or provide consent to access the digital contents of any electronic equipment belonging to them or in their possession, delineated by whether the individual was a U.S. person and including the length of time the individual was detained; and

(6) searched an electronic device at the request of a Federal, SLTT, or foreign governmental entity, including another component of the Department, or disclosed to such entity information from any searched device.

*Failure to Yield*.—Within 120 days of the date of enactment of this Act, CBP shall report to the Committee on the number of 'failures to yield' that CBP encountered in southern border states and how many of those incidents were coordinated with SLTT enforcement partners.

*Fentanyl Risk to Law Enforcement*.—The Committee recognizes the clear danger to all CBP officers, agents, other personnel, and canines from secondary exposure to illicit substances like fentanyl and other opioids. The Committee also notes that section 7135 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (P.L. 117–263) requires the Commissioner of CBP to ensure the availability of containment devices for all CBP personnel and canines at risk of accidental exposure to synthetic opioids. The Committee directs the Commissioner to submit a report within 180 days of the date of enactment of this Act that details all actions taken to comply with that directive, including any ongoing or planned procurement processes. In addition, within 180 days of the date of enactment of this Act, CBP in consultation with Homeland Security Investigations (HSI), shall brief the Committee on the Department's current understanding of how transnational criminal organizations (TCOs) are distributing fentanyl and other illicit narcotics throughout the United States after first smuggling it across the southern border.

*Gunshot Detection Technology*.—The Committee recognizes the escalating threats faced by CBP agents and officers along the U.S.-Mexico border, particularly from TCOs employing firearms to disrupt border security operations. To enhance the safety and effectiveness of federal personnel operating in these high-risk regions, the Committee supports the deployment of the best available gunshot detection technology to provide real-time alerts and precise geolocation of gunfire, which could increase situational awareness and response capabilities. Not later than 90 days after the date of enactment of this Act, CBP shall provide a briefing to the Committee on the potential use of this technology along the southern border.

*Health of Detained Women in CBP Facilities*.—Not later than 90 days after the date of enactment of this Act, CBP shall provide a

briefing to the Committee outlining medical treatment and attention provided to detained women who are pregnant, nursing, or postpartum.

*Independent Verification & Validation (IV&V).*—Not later than 90 days after the date of enactment of this Act, the Commissioner shall submit a plan to utilize IV&V resources for each level 1 and 2 acquisition program. Not later than 30 days after each quarter, the Commissioner shall provide a briefing to the Committee that includes the following:

(1) a listing of each level 1 and level 2 acquisition program;

(2) acquisition programs that have IV&V resources assigned; and

(3) a summary of the findings of any IV&V activities or an explanation for why no such verification and validation has been performed.

*Innovative Technology.*—The Committee recommends a total of $40,000,000 for innovative technologies, to include $20,000,000 within Operations and Support and $20,000,000 within Procurement, Construction, and Improvements. CBP is encouraged to consider the following technologies: offshore maritime detection technologies; voice analytics; autonomous systems; remote sensing; artificial intelligence (AI); edge computing; advanced analytics; process automation; quantum sensing technologies; small scale or rapid narcotics detection technologies; DNA point of origin analysis; realtime passive sonar AI models; and supply chain awareness. CBP is directed to update the Committee on the planned obligation of these funds not fewer than 15 days prior to any obligation of funds. Funding shall not exceed $5,000,000 for any individual project.

*Maintenance Apprenticeships.*—CBP is encouraged to consider the feasibility of apprenticeships, internships, or other avenues of engagement with local educational institutions to cultivate the maintenance skills needed by CBP.

*Polygraph Flexibility.*—The Committee is concerned that the polygraph requirement for CBP law enforcement applicants continues to delay hiring and exacerbate hiring shortfalls. To improve workforce readiness while maintaining personnel integrity, the Committee urges CBP to use its full authority under section 221 of title 6, United States Code, to waive polygraph examinations for anyone who holds a current, active Top Secret clearance and is able to access sensitive compartmented information; has a current single scope background investigation; was not granted a waiver to obtain the clearance; or is a veteran of the U.S. Armed Forces. Not later than 180 days after the date of enactment of this Act, CBP shall brief the Committee on the number of applicants eligible for a waiver, the number of waivers granted, and the impact on hiring.

*Quarterly Budget and Staffing Briefings.*—CBP shall continue the reporting directives described under this heading in House Report 118–123 accompanying Public Law 118–47.

*Secure Corridor Strategy.*—CBP, the Federal Railroad Administration (FRA), Servicio de Adminstración Tributaria (SAT), and freight railroads have collaborated on the implementation of a Secure Corridor Strategy that has improved the safety, security, and efficiency of cross-border trade and freight movement. The Committee continues to encourage CBP to work with FRA, SAT, and freight railroads to further implement this strategy.

*Therapy Dog Adoptions.*—CBP launched an initiative to bring real, on-the-ground support to its workforce through the creation of the Support Canine Program. This program aims to have therapy dogs on-site to assist in improving staff morale, assist in grief, and mitigate trauma from critical incidents. The Committee strongly encourages CBP to establish a pilot program to adopt dogs from local animal shelters to be trained as therapy dogs.

*Video Monitoring.*—CBP shall continue the reporting directives as described under this heading found in the explanatory statement accompanying Public Law 118–47.

*Workforce Care.*—The recommendation provides a total of $84,022,000 for the sustainment of existing program operations and personnel, on-site clinicians, the sustainment of family support programs, CBP support networks, the expansion of employee holistic health support centers, and the deployment of Field Resilience teams consisting of Operational Psychologists and Field Resilience Specialists. Not later than 60 days after the date of enactment of this Act, CBP, in coordination with the Office of Health Security, shall brief the Committee on an obligation plan for this funding.

Border Security Operations

*Border Patrol Checkpoints.*—The Committee recognizes the importance of facilitating security through the use of U.S. Border Patrol (USBP) checkpoints throughout the country. The Committee encourages CBP to prioritize the modernization of USBP checkpoints. They are outdated and unable to safely and efficiently accommodate increasing traffic volume, particularly along routes with high rates of traffic, such as the Eagle Pass and San Clemente checkpoints. The Committee also encourages CBP to prioritize the modernization of checkpoints including acceleration and deceleration lanes, lane expansions, vehicle bollards, new signage, primary inspection booths, canine facilities, canopy, lighting, technology, and facility updates to increase public and agent safety. Not later than 120 days after the date of enactment of this Act, CBP shall provide a briefing to the Committee identifying the locations where checkpoint modernization would be the most beneficial, the associated cost estimates, and project risk considerations. Additionally, the briefing shall include an assessment of deploying and implementing technology and cargo inspection processes that maximize the effectiveness and efficiency of processing commercial vehicles. The briefing should also include the feasbility of new Border Patrol checkpoints, especially across the southwest border, aimed at increasing narcotics interdiction.

*Border Patrol Hiring.*—The recommendation provides $613,462,000 to sustain 22,000 Border Patrol Agents. CBP has struggled to hire agents despite continued investment by the Committee. CBP's top priorities should be growing the pipeline of qualified applicants, further reducing attrition at the Border Patrol Academy, and retaining the existing workforce. The Committee directs CBP to use the funds provided that are above onboard personnel levels for recruitment and retention incentives. Not later than 90 days after the date of enactment of this Act, CBP shall brief the Committee on its plans to address hiring and retention challenges, including academy attrition, and its plans to use any

projected surplus personnel funding for recruitment and retention incentives.

*Carrizo Cane.*—The recommendation provides $4,000,000 for efforts to control the growth of carrizo cane along the Rio Grande River in Texas. CBP shall continue to provide quarterly updates on the performance of this program related to improved visibility, biomass reduction, and miles of river treated.

*Geospatial Data.*—The Committee is aware of the challenges associated with CBP's ability to access and utilize space-based geospatial data and imagery to inform operational decision-making at and near the northern and southern borders and surrounding POEs. Critical gaps remain in the CBP's ability to procure commercially available geospatial data and related services in a way that will provide the historical and real-time intelligence needed to secure the borders and optimize resources and decision making. CBP shall brief the Committee not later than 90 days after the date of enactment of this Act on its current process for the evaluation, procurement, integration, and distribution of space-based commercial data, imagery products, and services.

*Northern Border Resources and Encounters.*—The Committee recognizes the number of encounters between POEs along the northern border and the importance of having resources to adequately staff and secure this border. The Committee urges the Department to prioritize deployment of agents and other resources to sectors along the northern border where encounters between POEs are increasing the most and to reduce future deployments of agents from sectors to the southern border. Not later than 90 days after the date of enactment of this Act, CBP is directed to brief the Committee on efforts to address staffing issues, alien encounters, and drug seizures on the northern border.

## Trade and Travel Operations

*Agriculture Quarantine Inspection.*—The Committee supports robust funding for CBP's Agriculture Specialists, Technicians, and Canine Teams. These personnel are critical to protecting U.S. agriculture and the national food supply by conducting inspections at the POEs to detect and prevent the entry of harmful foreign animal diseases and plant pests, including African Swine Fever. The Committee recognizes that an outbreak of such diseases would have catastrophic consequences for American livestock producers, rural economies, and national food security. The Committee urges CBP to prioritize staffing and training for these specialized teams and to ensure sufficient resources are allocated to sustain and expand their operations.

*Automated Commercial Environment.*—Not later than 30 days after the date of enactment of this Act, CBP shall update the Automated Commercial Environment system to enable export carriers to close out customs bonds opened on their behalf by the importing carriers and customs brokers.

*Border Security Deployment Program (BSDP).*—The Committee recognizes the importance of a comprehensive, integrated, and continuous surveillance and intrusion detection system provided at CBP locations to improve the safety and security of CBP officers and the traveling public. The recommendation includes not less than $40,000,000 to maintain and modernize the BSDP system in-

frastructure. The Committee directs CBP to provide a briefing within 90 days of the date of enactment of this Act on efforts to modernize this system.

*Closed-Loop Cruise Ship Travel.*—U.S. citizens who board a cruise ship at a port or place within the United States, travel entirely within the Western Hemisphere, and return on the voyage on the same cruise ship to the same U.S. port or place from which they departed, may present, rather than a passport, a government-issued photo-identification document in combination with other forms of identifying information. The Committee believes that the adoption of this policy has measurably contributed to the facilitation of secure travel for a significant number of U.S. citizens and strongly encourages CBP to continue to allow U.S. citizens to use documents other than passports when on closed-loop travel.

*Counterfeit Pharmaceuticals.*—The Committee recognizes the critical role of CBP in keeping the U.S. borders secure, including through the seizure of counterfeit pharmaceutical GLP–1 products that threaten patient safety. The Committee is concerned about the importation of counterfeit GLP–1s from manufacturers in foreign countries, such as China and India, for use in manufacturing compounded anti-obesity medications, putting American patients at risk. The Committee urges CBP to strengthen enforcement against counterfeit GLP–1s entering through POEs. The Committee strongly encourages CBP to dedicate additional enforcement resources to the inspection and seizure of illegal foreign pharmaceutical ingredients used to make counterfeit GLP–1 medications.

*Country-of-Origin Labeling for Canned Goods.*—The Committee is concerned that current labeling requirements on imported canned food fail to adequately inform American consumers of the country of origin of their food. The Committee directs CBP to provide a report within 120 days of the enactment of this Act on what is needed to implement country-of-origin labels on the front or top of the imported agricultural products as defined in section 207 of the Agricultural Marketing Act of 1946 (P.L. 79–733), as amended, that are packaged in a can.

*DNA Verification.*—The Committee understands that DNA verification technology is currently deployed along the southern border for basic relationship testing of family members. Advancements in genomics may allow for additional applications. CBP is encouraged to consult with relevant stakeholders to determine whether there are additional use cases for DNA verification for enhancing border security. Not later than 120 days after the date of enactment of this Act, CBP shall provide a briefing to the Committee on the potential application of DNA verification technology at the southern border.

*Electronic Cigarettes (e-cigarettes).*—The Committee is deeply concerned about the vast quantities of e-cigarettes being illegally imported into the United States. The Committee directs CBP to coordinate with the Food and Drug Administration (FDA), as part of the multi-agency task force on illegal e-cigarettes; increase the number of random joint inspections at POEs and targeted inspections of entries by known manufacturers, brokers, and importers of illicit e-cigarettes; increase the number of field examinations at POEs with high import volumes to target manufacturers, importers, and brokers known to engage in illicit activity; and improve

screening systems, by using risk-based analytics tools and through additional training for field staff, to detect mis-declared e-cigarette imports. Not later than 90 days after the date of enactment of this Act, CBP shall provide a briefing to the Committee detailing its efforts to combat illegal e-cigarette importation.

*Foreign Trade Zones (FTZ).*—Not later than 120 days after the date of enactment of this Act, CBP shall provide a briefing detailing the assignment of CBP personnel, and their subsequent time allocations spent on FTZ operations, including activation and ongoing compliance checks, the current level of support provided by CBP to FTZs, and plans for supporting the expanding number of FTZs. Additionally, CBP shall include with the briefing a plan for incorporating requirements relating to FTZs in the Office of Field Operations (OFO) Workforce Staffing Model.

*High Throughput Screening.*—The Committee recognizes the value in exploring new and innovative high-speed, high-throughput screening technology capable of rapid inspection of small parcels, mail, and goods at the speed of modern automated packaging handling. Within 90 days of the date of enactment of this Act, the Committee directs CBP to provide a briefing on its efforts to research and develop innovative security screening technologies that could be deployed at international mail facilities in the United States.

*Low-Risk Air Travelers.*—The Committee strongly encourages CBP to utilize technology and innovation to facilitate and expedite the processing of low-risk travelers at U.S. airports, while enhancing security and enforcement, otherwise known as Enhanced Passenger Processing. The Committee urges CBP to consider new processes that meet its operational needs, including for frequent travelers that have not enrolled in a Trusted Traveler Program. Within 90 days of the date of enactment of this Act, CBP shall submit a report to the Committee on its efforts to utilize technology and innovation to facilitate and expedite the processing of low-risk travelers at U.S. airports. The report shall include steps CBP has taken to meet or exceed the current level of security for processing low-risk travelers, the efficiencies in CBP staffing, impacts on the customer experience, and partnerships with the commercial aviation stakeholder community.

*New Land Ports of Entry.*—The Committee recognizes the importance of strategically located new land POEs in enhancing cross-border trade, strengthening security, and reducing pressure on existing ports' resources. Within 120 days of the date of enactment of this Act, the Committee directs CBP to provide a report detailing the agency's staffing plans for all new land POEs currently under development and nearing completion, including but not limited to the Gordie Howe International Bridge, the Otay Mesa East, and the Douglas Land Ports of Entry. This report shall include the anticipated hiring timelines; projected numbers of officers and support personnel; recruitment and retention strategies; plans for personnel allocation within each respective Field Office's area of responsibility; and any other relevant information necessary to ensure the timely and efficient opening and sustained operation of each new facility. The report shall also include an estimate of the total costs associated with staffing, recruitment, training, and operational readiness for each new land POE.

*Office of Field Operations Hiring.*—The recommendation provides $122,870,000 to hire an additional 450 OFO officers.

*Passive Muon Tomography.*—The Committee is aware of the capability to effectively scan dense and/or shielded cargo entering U.S. sea and land ports using a passive muon tomography scanning system. The Committee encourages CBP to deploy such technology to improve CBP's imaging capability of dense cargo and determine additional uses for the technology in CBP's layered enforcement system.

*Port Baseline Service Level.*—The Committee directs CBP to provide each air, land, and sea port operator, including cruise terminals, with information on baseline service levels and take those service levels into consideration when acting on requests for facility and security improvements. CBP should share information on each POE's service levels with the port operator and shall brief the Committee on current levels of service not later than 90 days after the date of enactment of this Act. The brief shall address staffing shortages; requirements for facility and security upgrades; plans for technology recapitalization; and how CBP will coordinate with port operators and incorporate their feedback into the development of plans to address future facility and security needs.

*Port Hours of Operation.*—The Committee recognizes that ongoing reduced hours of operation at certain land POEs, initially due to public safety concerns over COVID–19, compromise the safety of travelers and border security enforcement efforts. The Committee strongly encourages CBP to prioritize restoring hours of operation at land POEs on both the southern and northern border to those in effect prior to the start of the COVID–19 public health emergency to enhance border security efforts, cross-border economic activity, and improve public safety. Within 90 days of the date of enactment of this Act, CBP shall brief the Committee detailing all POEs operating under reduced hours due to COVID–19 restrictions, actions taken to return to pre-COVID–19 levels of operation, and an assessment the feasibility of returning to pre-COVID–19 levels of operation.

*Port Retrofit.*—The Committee is concerned about CBP progress to retrofit certain southwest POEs to reflect Land Port of Entry Design Standards as published in December 2023, under Chapter 7, Commercial Vehicle Inspection; 7.6.2 Dock Components; Special Spaces. Not later than 90 days after the date of enactment of this Act, CBP is directed to brief the Committee on its plans to accommodate commercial shipments of refrigerated and frozen goods at POEs including: Pharr, Texas; Laredo, Texas; Nogales, Arizona; and Otay Mesa, California.

*Port Runners.*—The recommendation provides $3,000,000 to continue demonstrations of less-than-lethal, energy-absorbing active vehicle barrier systems designed to deter, safely stop, and contain "port runner" vehicles at CBP POEs that have a history of port running to determine the scalability of the technology. Within 90 days of the date of enactment of this Act, CBP shall brief the Committee on plans to expand this effort.

*Port Staffing.*—The Committee notes that although OFO has been successful in hiring to its allocated level of CBP officers, some land POEs have consistently faced staff recruitment and retention challenges primarily due to the remoteness of the location. The

Committee encourages OFO to strategically allocate sufficient staffing at remote land POEs with an international rail bridge to adequately conduct rail inspections and operations to bolster cross-border trade and further secure the transportation of goods.

*Port Technology Upgrades.*—The Committee encourages CBP to prioritize funding for License Plate Reader technology, Radio-Frequency Identification technology, and booth installations for land POEs that require technology upgrades or expansion to accommodate current levels of high cross-border traffic, including where existing inspection lanes are readily available for operation.

*Resource Allocation Model (RAM).*—Any modifications to the RAM shall be described at the field and office level in future budget submissions. Additionally, not later than 60 days after the date of enactment of this Act, CBP shall brief the Committee on resource and staffing shortfalls on the northern and southern borders compared to levels prescribed by the RAM for rail crossings and POEs in the land, air, and sea environments, including cruise ship terminals. CBP is encouraged to continue to improve the model by seeking external review.

*Solar Panel Stockpiling.*—The Committee is aware that Chinese solar companies have been found to be shipping products through Southeast Asian countries for minor processing in an attempt to avoid paying China antidumping and countervailing duties. The Committee encourages CBP to dedicate adequate resources to enforcing the anti-stockpiling utilization requirement detailed in the notice concerning the Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells and Modules Imported from Cambodia, Malaysia, Thailand, and Vietnam (88 Fed. Reg. 57419). The Committee encourages CBP to enforce, to the extent possible, the anti-stockpiling utilization requirement by assessing civil penalties and seizure of merchandise. Not later than 90 days after the date of enactment of this Act, CBP shall submit a report detailing enforcement efforts including any questionnaires that were sent to importers, documents that were requested from importers, on-site efforts to verify anti-stockpiling requirements were met, the number of enforcement actions taken, and the cumulative amount duties collected by such enforcement efforts.

*Staffing at Largest Airports.*—The Committee strongly encourages CBP to ensure adequate hiring, training, and staffing levels to support operations at the top 10 U.S. air POEs, as determined by passenger enplanements measured by the Federal Aviation Administration.

*Tariff Evasion.*—The recommendation provides $5,000,000 to conduct operational demonstrations to further leverage private sector-driven solutions that may aid with improving supply chain tracing, the classification of goods, trade revenue collection, and segmentation of shipments at high-risk for tariff evasion or other violations of U.S. trade and customs laws. This may include supply chain traceability solutions explored under the Global Business Identifier (GBI) Test that increase visibility into production supply chains as well as other solutions that streamline operations, promote cargo security and compliance, and secure revenue owed. The Committee is aware that the Office of Trade has worked with data providers to evaluate unique identifiers for supply chain parties involved in the production of goods and other technology solutions

which are intended to increase overall supply chain visibility, reduce the potential for tariff evasion, and drive enhanced data analytics with which to manage trade threats. Not later than 180 days after the date of enactment of this Act, CBP shall brief the Committee on the results of this operational demonstration to expand the use of data analytics in tandem with GBI and other tests or pilots that CBP is conducting to counter trade-related violations.

*Trusted Traveler Program Transparency*.—The Committee directs CBP to brief the Committee not later than 120 days after the date of enactment of this Act and semiannually thereafter on recommendations to increase its transparency and agency communications with Trusted Traveler Program enrollees in the event of a revoked, suspended, or terminated Trusted Traveler Program status.

*User Fee Airports*.—The Committee strongly encourages CBP to give priority staffing consideration, on an overtime basis, to existing User Fee Airports to support scheduled international airline service starting no earlier than January 1, 2026. Further, not later than 90 days after the date of enactment of this Act, CBP shall brief the Committee on any requests by airports for increased CBP support, such as the request from the San Bernardino International Airport. The briefing shall detail the anticipated passenger and/or cargo volumes of the applicant and the reason for CBP accommodating or denying such requests.

## Integrated Operations

*Air and Marine Operations Flight Hours.*—Not later than 120 days after the date of the enactment of this Act, CBP Air and Marine Operations (AMO) shall provide a plan to achieve not fewer than 110,000 flight hours.

*Center for Air and Marine Drone Exploitation (CAMDEx).*—The recommendation provides $5,000,000 to sustain and expand a drone exploitation program within CBP AMO to counter threats posed by hostile Small Unmanned Aerial Systems (sUAS). The funds shall be used for data analysis, cybersecurity vulnerability assessments, and appropriate countermeasures. Within 180 days of the date of enactment of this Act, CBP, in coordination with the Science and Technology Directorate (S&T), shall brief the Committee on the program's progress.

*DHC–8 Multi-Mission, Fixed-Wing Aircraft.*—The recommendation provides $42,000,000 to accelerate the upgrade of DHC–8 aircraft to replace obsolete equipment with new digital avionics, mission radios, an integrated communication system, and an enhanced software package.

*Long-Endurance Unmanned Aircraft Systems (UAS).*—The recommendation provides $10,000,000 for technical and operational demonstrations of additional Group 4 or Group 5 unmanned aircraft with multi-mode radar surveillance payloads and the necessary support equipment for integration into the national airspace system for CBP operations to enhance interdiction efforts, reduce operational costs, and increase continuous aerial surveillance of high-risk areas. The Committee directs CBP AMO to provide a briefing not later than 180 days after the date of enactment of this Act on the deployment plan, cost-benefit analysis, and performance metrics associated with the operational demonstration.

*Maritime Threat Reporting.*—The Committee supports CBP AMO's ability to effectively respond to maritime threats and situations, specifically suspect vessels involved in human trafficking or drug smuggling. Within 180 days of the date of enactment of this Act, CBP, in coordination with the Coast Guard, shall report to the Committee on maritime threats intercepted during fiscal year 2025, including:

(1) the number of suspect vessels intercepted;

(2) the aggregate number of aliens interdicted and trafficking victims identified;

(3) drugs or other illicit substances interdicted on suspect vessels, if any; and

(4) additional technology or personnel that would improve response to maritime threats.

*Minotaur.*—The government-owned Minotaur software currently in use by CBP fixed-wing air assets links sensors, camera, radar, and other communications equipment into a single system to allow for situational awareness and tactical action across multiple DHS components. The Committee encourages CBP to upgrade cybersecurity, cyber resiliency, authority to operate compliance requirements, and increase training for Minotaur operators.

## Enterprise Services

*Artificial Intelligence.*—The Committee is encouraged by CBP's continued use of AI, particularly at the southern border for surveillance towers and to visually screen passenger vehicles and cargo conveyance. However, the Committee is concerned that AI models used to protect our national security can be subverted, allowing criminals and terrorists to freely enter the country, drugs and weapons to pass screening, and other malicious activities to go undetected. The Committee is also concerned with new threats that may arise from the increased use of generative AI or large language models and what, if any, new challenges to cybersecurity these new capabilities introduce into CBP operations. Not later than 120 days after the date of enactment of this Act, CBP is directed to brief the Committee on the potential use of commercially available purpose-built cybersecurity for AI.

*Artificial Intelligence for Front Line Border Security/Enterprise and Edge Computing.*—The Committee is encouraged by commercial advancements in AI and edge computing to address border security operations. Integrating Internet of Things (IoT) sensors, capturing real-time data from multiple border domains, and leveraging intelligence data enhances situational awareness by providing a strategic and operational picture on movement, environmental conditions, and potential threats. Processing data at the edge allows for faster decision-making, reducing latency and reliance on systems that may be vulnerable to disruption. Not later than 270 days after the date of enactment of this Act, CBP shall brief the Committee on the potential to use these capabilities to enhance border security operations, including enhancements for small object detection and motion detection to improve situational awareness.

*Cybersecurity.*—The technologies and communication systems that underpin U.S. border security are increasingly targeted by cyberattacks and cyber espionage, posing a direct threat to national security. The Committee encourages CBP to implement a proactive

strategy to support real-time threat intelligence, risk-based prioritization, and continuous monitoring of critical border security technologies. Not later than 90 days after the date of enactment of this Act, CBP is directed to brief the Committee on efforts to assess, prioritize, and mitigate cybersecurity vulnerabilities and misconfigurations across all IT, Operational Technology, and IoT assets within the border security technology ecosystem.

*Encryption.*—The recommendation provides $3,500,000 to expand the use of Post-Quantum Cryptography for operational use, to include testing one-time pad-based encryption system utilizing true random entropy generation and changing symmetric keys to defend against quantum computer-driven hacking and intrusion threats. CBP is strongly encouraged to test this encryption to secure border security technology at the edge and communications devices connecting these systems together while also expanding their operational use of Post-Quantum Cryptography.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

| | |
|---|---|
| Appropriation, fiscal year 2025 | $850,170,000 |
| Budget request, fiscal year 2026 | 765,762,000 |
| Recommended in the bill | 898,118,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | +47,948,000 |
| Budget request, fiscal year 2026 | +132,356,000 |

Within the total amount provided, the recommendation includes: $346,000,000 for border technology procurement, of which $105,000,000 is for the Integrated Surveillance Tower Program; $60,000,000 is for autonomous surveillance towers; $66,500,000 is for Light Enforcement Helicopters; $66,000,000 is for Multi-Role Enforcement Aircraft; and $29,700,000 is for UH–60 Medium Lift Helicopters.

Border Security Assets & Infrastructure

*Autonomous Surveillance Towers (AST).*—The Committee recognizes the AST program provides the ability to quickly identify illicit border crossings and notes the support of Border Patrol Sector Chiefs and agents for this force-multiplying capability. The recommendation provides $60,000,000 to continue to modernize surveillance capabilities with autonomous technologies to include the procurement of standard, maritime, cold weather, and long-range AST variants to reduce reliance on Border Patrol agents to manually operate equipment.

*Border Technology Innovation.*—The Committee continues to direct CBP to make innovation a central element of all requests for proposals and require vendors to describe in detail how such proposals will provide an innovative solution to improve mission effectiveness beyond that of currently deployed systems. Not later than 90 days after the date of enactment of this Act, CBP, including the CBP Chief Acquisition Executive, shall brief the Committee on a plan to include innovation as scored evaluation criteria for every border security procurement.

*Consolidated Tower and Surveillance Equipment (CTSE).*—The Committee understands the recent technological advances within the CTSE program and encourages CBP to quickly test and implement autonomous capability to modernize and deploy surveillance

towers. The Committee strongly encourages the rapid integration of AI to allow CBP personnel to spend more time in the field. Not later than 60 days after the date of enactment of this Act, CBP is directed to brief the Committee on the status of the CTSE program, test results for additional autonomous capability, and any impediments to the deployment of CTSE program towers.

*Counter Unmanned Aerial Systems.*—The Committee recognizes the growing threat that unmanned aerial systems present to our border, critical infrastructure, and other critical governmental operations. The Committee encourages CBP to explore a portable detection and identification system for countering sUAS. Not later than 120 days after the date of enactment of this Act, CBP shall brief the Committee on its efforts to counter sUAS. The recommendation provides $25,000,000 to detect and mitigate the persistent drone threat along the southern and northern border.

*Cross-Border Tunnel Threat Detection.*—The Committee is concerned about the threat posed by TCOs' use of subterranean tunnels and underground municipal infrastructure at the southern border to smuggle drugs like fentanyl, weapons, and other illicit materials into the country. The Committee remains alarmed over the Department's failure to integrate this threat into wider strategic planning efforts and resource allocation decisions. The recommendation provides $35,000,000 for subterranean detection technology investments. The Committee directs CBP to provide a briefing on the plans to deploy, operate, and maintain cross-border tunnel detection technology not later than 90 days after the date of enactment of this Act.

*Dark Drones.*—The Committee appreciates that drones have become a predominant means of TCOs to exploit U.S. borders, smuggle contraband, perform reconnaissance on smuggling routes, and conduct counter surveillance on border security law enforcement officers and equipment. Cartels have begun using "dark drones," which do not emit a radio frequency (RF) signal and therefore evade traditional RF detection methods. Not later than 120 days after the enactment of this Act, CBP shall brief the Committee on its efforts to counter "dark drones."

*Enhanced Communications Capabilities.*—The recommendation provides $36,000,000 for land mobile radios, Team Awareness Kits, and satellite communications to extend connectivity for agents where commercial cellular service is not present, of which $6,000,000 shall be for communications upgrades to include edge AI and machine learning across high and low bandwidth systems.

*Integrated Surveillance Tower Program.*—The recommendation provides $105,000,000 for the Integrated Surveillance Tower Program. Over the past four fiscal years, the Committee has strongly encouraged adoption of autonomous technology and will discontinue investments to procure non-autonomous tower-based technology in fiscal year 2027. Not later than 90 days after the date of enactment of this Act, CBP shall brief the Committee on the status of autonomy in the tower program, current testing and validation methodology, and any impediments to procuring fully autonomous systems.

*INVNT Program.*—The recommendation provides $20,000,000 for CBP's INVNT Program, of which not more than $5,000,000 shall be available for each specific technology project.

*Mesh Network.*—The recommendation includes $20,000,000 for the continued deployment of interoperable mesh communications equipment and devices that enable communication connectivity in denied and degraded locations enhancing officers' and agents' safety.

*Mobile Surveillance Platforms.*—The recommendation provides $30,000,000 for mobile surveillance platforms, including the Mobile Video Surveillance System, and Mobile Surveillance Capability. The Committee strongly encourages investments in remote and autonomous operations using advanced AI and encourages CBP to consider upgrading current systems with additional capabilities such as radar and other enabling technologies to increase situational awareness. Additionally, the Committee encourages CBP to consider re-using components of the existing mobile surveillance systems where practical to reduce procurement costs.

*Obligation Plan.*—The Commissioner is directed to prioritize procurement of the most cost-effective technologies based on lifecycle costs, system availability, reduced requirements for personnel, and input from sector leadership. CBP shall provide a briefing to the Committee on a plan for the obligation of the funds provided within the "Border Security Assets and Infrastructure" PPA at least 15 days prior to any obligation. The plan shall require the direct approval of the Commissioner and include:

(1) details about the process for prioritizing the use of funds;

(2) a summary of planned obligations for fiscal year 2026, delineated by technology type;

(3) metrics that will be used to assess the cost effectiveness of each type of technology for which funds will be obligated and a plan for collecting the data required for such metrics; and

(4) operational effectiveness data to support continued procurement investments, including evidence of support from sector leadership based on actual use of the technology.

CBP shall notify the Committee at least 15 days prior to the obligation of any funds based on a change to the initial obligation plan.

*Small Unmanned Aerial Systems.*—The Committee continues to recognize the growing threat of sUAS, both homemade and commercial, along the southern border. To protect against this rapidly growing and evolving threat, the Committee encourages CBP to consider expanding radio frequency (RF) sensing to detect, track, and identify all RF-based drones including spoofed or encrypted drones, regardless of manufacturer. Further, the Committee strongly encourages CBP to enhance current detect, track, and identify capabilities to detect sUAS at greater distances through both long-range radar and long-range camera for visual confirmation, and develop and deploy advanced jammer-based mitigation and RF-cyber takeover mitigation, deemed safe and effective for use in the National Airspace System, that are effective against multiple sUAS as the threat evolves. The recommendation provides $15,000,000 for the acquisition of small unmanned systems to support border security operations.

Trade & Travel Assets & Infrastructure

*Land Port of Entry (LPOE) Infrastructure Capital Plan.*—Not later than 30 days after the submission of the budget request for fiscal year 2027, the Commissioner shall submit a report that de-

tails its prioritization of LPOE infrastructure capital investment projects, the methods and models used to determine prioritization, and an overview of public-private partnership agreements. CBP shall work with the General Services Administration and the Office of Management and Budget (OMB) on the annual 5-year LPOEs modernization plan, which is based on CBP's operational priorities. Specific attention should be paid to the health, safety, and welfare needs of CBP Officers. Special consideration shall also be made for facilities where reconfiguration or upgrades will improve the flow of local traffic and allow local residents to move freely in their communities. The report shall align with the annual LPOE priority list, outline projected CBP costs, explain how CBP will engage with State and local entities, and the specific milestones and timeline for the project completion.

*Mobile Vehicle Scanning Systems.*—The Committee remains concerned over CBP's exceedingly slow pace of deployment of Non-Intrusive Inspection (NII) commercial and passenger vehicle screening units, including the inability to appropriately plan and cost for civil works construction. The Committee directs CBP to acquire and deploy mobile scanning systems that allow for quick setup for both passenger and commercial vehicle scanning as a supplement to the Multi-Energy Portal and Low-Energy Portal, especially in locations not suitable for those systems. The Committee encourages CBP to consider systems equipped with backscatter and transmission imaging capabilities, along with advanced image-processing techniques, AI tools, and radiation detection equipment with the ability to detect a comprehensive range of vehicle-based threats, including fentanyl and other narcotics, stowaways, metals used in weaponry, and nuclear materials. CBP shall brief the Committee not later than 60 days after the date of enactment of this Act on its acquisition and deployment plans for mobile scanning systems.

*Non-Intrusive Inspection Technology.*—The Committee recommends $300,000,000 for NII technology at land- and sea-POEs. CBP shall execute these funds as follows: $220,000,000 to procure and deploy new non-intrusive detection devices, of which $25,000,000 shall be for mobile vehicle scanning systems; $29,000,000 for IT infrastructure; $25,000,000 for AI and machine learning capabilities; $20,000,000 for system integration; and $6,000,000 for command center construction. CBP shall provide a briefing to the Committee on a plan for the obligation of these funds at least 15 days prior to any obligation. The Committee is aware that CBP has successfully piloted a commercial-off-the-shelf integration platform as part of the Non-Intrusive Inspection Technology Integration (NII–I) program at select POEs on the southern border, which significantly increased daily cargo inspections and improved contraband detection resulting in increased seizures along the border. The Committee encourages CBP to continue working expeditiously with industry on their successful NII–I program, which enhances CBP's ability to collect and curate data to support operational objectives and the development of AI capabilities. CBP is directed to brief the Committee not later than 60 days after the date of enactment of this Act on the status and results of their NII–I program.

Integrated Operations Assets & Infrastructure

*Air and Marine Helicopter Modernization.*—The recommendation provides $29,700,000 to convert at least two helicopters to the CBP UH–60L configuration. Not later than 120 days after the date of enactment of this Act, CBP shall brief the Committee on its efforts to develop alternative approaches, including a partnership with the U.S. Army, that may reduce the cost to field and sustain future medium lift helicopters.

*Health and Usage Monitoring System (HUMS).*—CBP is strongly encouraged to conduct a feasibility study on HUMS for the Light Enforcement Helicopter used by CBP's AMO and the potential to increase aircraft availability, reduce operations and maintenance costs, and increase safety.

*Light Enforcement Platform (LEP).*—The recommendation provides $66,500,000 to purchase not less than seven LEP helicopters that will allow CBP to continue to transition to one light helicopter platform, improve operational efficiency, and enhance the safety of CBP AMO pilots.

*Medium Unmanned Aircraft System (mUAS).*—The Committee understands that CBP AMO intends to establish a program of record for mUAS to augment existing aerial surveillance capabilities in both land and maritime environments. To enhance the operational effectiveness of mUAS in detecting, tracking, and reporting illicit activity, the Committee encourages CBP to incorporate lightweight multi-mode radar surveillance payloads as part of its program requirements. The Committee notes that such sensor capabilities are consistent with other CBP AMO platforms, including the Multi-role Enforcement Aircraft (MEA), MEA–Land Interdiction, and the CBP's MQ–9 Big Wing UAS.

*Multi-Role Enforcement Aircraft.*—The recommendation provides $66,000,000 for two MEAs to expand CBP's ability to conduct maritime, air, and land surveillance at our Nation's borders.

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

| | |
|---|---|
| Appropriation, fiscal year 2025 | $10,042,062,000 |
| Budget request, fiscal year 2026 | 10,881,035,000 |
| Recommended in the bill | 11,002,045,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | +959,983,000 |
| Budget request, fiscal year 2026 | +121,010,000 |

Mission

U.S. Immigration and Customs Enforcement (ICE) enforces Federal laws governing border control, customs, trade, and immigration to promote homeland security and public safety.

Homeland Security Investigations (HSI) conducts criminal investigations into the illegal movement of people, goods, money, contraband, weapons, and sensitive technology into, out of, and through the United States. HSI special agents also investigate overseas transnational criminal activity impacting the Nation, working to disrupt and dismantle organizations responsible for exploitation of the most vulnerable populations.

Enforcement and Removal Operations (ERO) enforces the Nation's immigration laws by identifying and apprehending removable aliens, detaining apprehended individuals when necessary, and re-

moving them from the United States in a manner consistent with legal processes and procedures.

The Office of the Principal Legal Advisor (OPLA) serves as the representative for the U.S. Government in immigration removal proceedings before the U.S. Department of Justice Executive Office for Immigration Review (EOIR) and provides legal counsel to ICE personnel on their law enforcement and immigration authorities.

OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriation, fiscal year 2025 | $9,986,542,000 |
| Budget request, fiscal year 2026 | 10,840,635,000 |
| Recommended in the bill | 10,967,045,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | +980,503,000 |
| Budget request, fiscal year 2026 | +126,410,000 |

The bill continues language requiring ICE to provide an initial obligation plan to the Committee within 45 days of the date of enactment of this Act. ICE shall also continue the monthly reporting requirements outlined in the explanatory statement accompanying Public Law 118–47 and incorporate data-driven projections into such requirements to fully account for ICE's mission impacts throughout the fiscal year.

ICE is expected to continue briefing the Committee on its financial and reporting system, as directed in the explanatory statement accompanying Public Law 117–328. Additionally, ICE is directed to continue the requirement found under the heading "Contract Notifications" in the explanatory statement accompanying Public Law 118–47 for contracts that exceed $10,000,000 related to the following:

(1) detention operations, including medical and mental health services and other personnel services at detention facilities;

(2) alternatives to detention programs;

(3) transportation and removal operations; and

(4) data services.

The Committee remains concerned with ICE's financial management practices, detailed in GAO–24–106550, "Additional Steps Needed to Improve ICE's Budget Projections and Execution," which have led to an inappropriate and disproportionate reliance on reprogramming and transfer authority to ensure solvency at the end of any given fiscal year over the past decade. Actions already taken in fiscal year 2025 are especially egregious—ICE began spending more than its appropriated level shortly after the fiscal year commenced and operations now far exceed available resources. In order to sustain this heightened operational tempo, ICE has and will likely continue to use the bill's transfer and reprogramming authority to the maximum extent, once again taking from other components' operational priorities.

While the Committee recognizes the dynamic environment in which ICE must function, neither ICE nor the Department should rely on other components to fund the deficits that ICE itself often creates. Not only does that presuppose that other missions within DHS are less important, but it also sets the precedent that the Department can shift funding away from congressional priorities within other components to compensate for ICE's budgetary mismanagement. This is unacceptable and should no longer be the

standard by which OMB, the Department, and ICE conduct their fiscal management. As such, ICE shall expeditiously implement the recommendations from GAO–24–106550 and update the Committee on a monthly cadence to ensure appropriate congressional oversight.

In House Report 118–123 accompanying Public Law 118–47, ICE was directed to better utilize Department-wide, data-driven projections for encounter levels, interior enforcement actions, and policy considerations to better inform the agency of funding requirements throughout the fiscal year. Therefore, ICE's Program Analysis and Evaluation division shall perform an assessment of ICE's budgetary models on a quarterly basis and incorporate the data outlined above and in House Report 118–123 to robustly project ICE's resource needs. ICE is directed to inform the Committee of findings not later than five business days after each assessment.

ICE was provided an additional $485,000,000 within Public Law 119–4 to support considerable increases in detention, transportation, and removal operations beginning in the second quarter of fiscal year 2025. The Committee was assured that such funding would be sufficient for the remainder of the fiscal year. After receiving the spend plan required by Public Law 119–4, the Committee was informed that such funds would be inadequate to sustain ICE's operational tempo given ICE's current and anticipated detention and removal levels.

While the Committee supports enhancements to ICE's enforcement and removal apparatus, allowing operations to significantly exceed available resources is wholly irresponsible and perpetuates fiscal mismanagement within the agency for which Congress is forced to account. Such decisions also create an environment in which the Department may be compelled to release tens of thousands of aliens from detention and halt certain removal operations if the necessary resources are not provided. As ICE works with the Committee to refine its deficit projections for the remainder of the fiscal year, ICE is directed to incorporate monthly estimates of operational requirements and their impact on resources into the required monthly staffing and execution briefings found under the heading "Monthly Reporting Requirements" in the explanatory statement accompanying Public Law 118–47.

### Homeland Security Investigations

The recommendation provides a total of $2,545,487,000 for HSI, including $2,218,106,000 for Domestic Investigations, $220,289,000 for International Investigations, and $107,092,000 for Intelligence.

*Additional Criminal Investigators and Support Staff.*—The recommendation includes an increase of $15,000,000 to hire additional criminal investigators and associated support staff for both domestic and international operations. As HSI's broad, cross-border authorities allow the agency to initiate and participate in a wide array of investigations, staffing levels must be commensurate with the increased workload. HSI shall provide an obligation plan for these funds within 30 days of the date of enactment of this Act, detailing the enhancements by investigative mission area.

*Advanced Analytics for Counter-Proliferation Investigations.*—The Committee urges HSI to implement software within the Counter-Proliferation Investigations Program that utilizes ad-

vanced analytics to correlate open source, commercial, and native agency data.

*Blue Campaign.*—The bill continues a provision that allows for the transfer of not less than $5,000,000 from other departmental components to HSI for necessary operations of the Blue Campaign. HSI shall provide a detailed accounting of fiscal year 2026 base funding requirements and an overview of the effort within 180 days of the date of enactment of this Act.

*Border Enforcement Security Task Forces (BESTs).*—The Committee provides $5,000,000 to support BESTs in their efforts to combat illicit activities of transnational criminal organizations (TCOs), with an emphasis on countering fentanyl initiatives. The Committee is also concerned about the increased importation of counterfeit and illicit active pharmaceutical ingredients, including synthetic semaglutide. Within the additional funds provided, BESTs shall enhance detection, seizure, and investigation of these counterfeit ingredients.

*Center for Countering Human Trafficking (CCHT).*—The recommendation includes an increase of $5,000,000 for activities within the CCHT. HSI shall provide quarterly briefings on CCHT activities and future resource requirements beginning not later than 90 days after the date of enactment of this Act. The Committee urges HSI and the CCHT to coordinate with the Federal Law Enforcement Training Centers to ensure human trafficking awareness trainings conducted for Federal and SLTT law enforcement are appropriately standardized.

*Child Exploitation Investigations.*—The recommendation provides an increase of $5,000,000 for the Child Exploitation Investigations Unit within HSI's Cyber Crimes Center to provide additional investigative, forensic, and analytical support for these efforts. HSI is urged to continue collaborating with partner nations and international stakeholders on victim identification techniques.

*Combatting Transnational Crime Overseas.*—The recommendation includes $6,000,000 for combatting transnational crime overseas, including $1,000,000 for new transnational criminal investigative units.

*Coordination and Notifications.*—The Committee notes that unaccompanied alien minors continue to be vulnerable to labor and sexual exploitation and urges HSI to consider proactive measures to protect this population from such illicit activity. HSI shall continue to provide quarterly updates on the number of referrals of potential instances of human trafficking from the Office of Refugee Resettlement within the Department of Health and Human Services, consistent with the requirements identified in the explanatory statement accompanying Public Law 118–47 under this heading.

*Counterfeit Semiconductors.*—The Committee is concerned that foreign adversaries have attempted to flood the U.S. marketplace with counterfeit semiconductor parts and materials, particularly those that are found within the high-reliability semiconductor ecosystem, posing a significant national security risk. The Committee is further concerned that some commercial providers of semiconductor part authentication services neglect to follow proper processes and procedures, which can then lead to the introduction of counterfeit parts into the supply chain. The recommendation includes $1,000,000 for HSI to create a task force to target counter-

feit semiconductor materials in the marketplace and global supply chains. The task force shall include other federal, SLTT, and industry stakeholders to establish policies and procedures for combating these counterfeit materials. The task force shall also determine best practices for validating approved counterfeit semiconductor mitigation services. HSI is instructed to brief the Committee within 90 days of the date of enactment of this Act on efforts to create the task force, challenges that arise in the establishment of such task force, and additional resource requirements necessary for further implementation.

*Digital Forensic Tools and Analytics.*—Within funds provided, HSI is encouraged to procure technologies that analyze collected digital forensics intelligence to enhance HSI's investigative capabilities. Such tools may include data mining and predictive analytics, secure digital evidence storage and sharing, and specialized training for HSI criminal investigators.

*Fentanyl Detection.*—The Committee remains concerned about the significant threat posed by the smuggling of narcotics, including synthetic opioid fentanyl, through POEs and transportation hubs and recognizes the challenges of using conventional detection methods to address such threat. As such, the recommendation includes an increase of $5,000,000 to support procurement of technologies that utilize artificial intelligence and machine learning to enhance traditional detection methods. Not later than 90 days after the date of enactment of this Act, HSI shall provide a briefing on the procurement and implementation progress of such technologies and future resources needed to further augment detection capabilities.

*Fentanyl Precursors.*—While the majority of the fentanyl that continues to devastate American communities is smuggled across our borders as a finished product, domestic manufacturing of fentanyl is steadily increasing. Often under derivative names to mask their true purpose, precursor chemicals available online are a critical component to fentanyl manufacturing. The recommendation includes an increase of $3,000,000 above the fiscal year 2025 enacted level to enhance HSI's analytical ability to identify and compile all nomenclature associated with precursor chemicals, interrupt online operations, map distribution networks, and obtain express consignment shipment data to interdict these chemicals.

*Forced Labor.*—HSI shall continue to provide the briefing required under this heading found in House Report 118–123 accompanying Public Law 118–47. The recommendation includes an additional $2,000,000 for forced child labor investigations.

*Fraudulent International Driving Documentation.*—The Committee is concerned by the proliferation of fraudulent international driving documentation by operators of commercial motor vehicles and directs HSI to assess the scope and impact of such fraudulent documentation. Not later than 180 days after the date of enactment of this Act, HSI shall coordinate with appropriate federal and SLTT agencies for such assessment and submit a report detailing findings and recommendations for a coordinated enforcement strategy to detect, deter, and prevent continued used of fraudulent documentation within the transportation supply chain.

*Human Exploitation Rescue Operation (HERO) Child-Rescue Corps Program.*—The Committee supports the HERO Child-Rescue

Corps program and provides an additional $1,000,000 for HERO training. HSI shall provide an update within 180 days of the date of enactment of this Act on the number of HERO graduates hired and retained within HSI, as well as further resource requirements to expand the program.

*Human Rights Violators.*—The Committee continues the requirements found under this heading in House Report 118–123 accompanying Public Law 118–47.

*Illegal E-Cigarette Importation.*—The Committee provides $2,500,000 to increase criminal investigations of illegal e-cigarette importation and misdeclarations of illicit e-vapor products.

*Illegal Grow Operations.*—In satisfying the requirement found under this heading in the explanatory statement accompanying Public Law 118–47, HSI detailed investigative methods used to combat illegal grow operations in the United States controlled by TCOs based in the People's Republic of China and elsewhere. HSI is encouraged to continue these methods and shall update the Committee on a quarterly basis on resource and authorization needs to further advance these efforts.

*Image Recognition Technology.*—The Committee recognizes the importance of open-source intelligence and facial recognition technology capabilities in investigating the illicit activities of large TCOs and provides $5,000,000 to expand and enhance such capabilities. Not later than 120 days after the date of enactment of this Act, HSI is directed to provide a spend plan for these funds and brief the Committee on the interoperability of facial recognition with current investigative technologies. The briefing shall also include an assessment of initiatives to reduce HSI's reliance on facial recognition and open-source intelligence tools that are provided by foreign owned-and-operated contractors.

*Intellectual Property Rights (IPR) Center.*—The Committee directs ICE to provide quarterly briefings on its enforcement priorities within the IPR Center, beginning not later than 90 days after the date of enactment of this Act.

*International Operations.*—HSI shall continue providing the Committee with a strategic plan for international operations, as directed in the explanatory statement accompanying Public Law 117–328. The recommendation includes an increase of $5,500,000 for HSI to expand its presence overseas and increase the number of transnational criminal investigative units. HSI is instructed to provide an execution plan for these funds and include details of additional resource needs to support the international mission.

*International Trade.*—The recommendation includes $5,000,000 for additional investigative capacity related to international trade crime. HSI shall provide quarterly updates to the Committee on the number of referrals made to the Department of Justice Trade Fraud Task Force as a result of this additional capacity.

*Investigative Workload.*—Within 90 days of the date of enactment of this Act, HSI shall submit a report on the following with regard to investigative hours in fiscal year 2025 related to:

(1) violations of the Immigration and Nationality Act;

(2) the Student and Exchange Visitor Program and results of such investigations;

(3) worksite enforcement and results of such investigations; and

(4) counter-proliferation and national security and results of such investigations.

*Missing and Murdered Indigenous Women.*—The Committee is concerned with human trafficking and other illicit activities on Tribal nation land and directs HSI to partner with the Missing and Murdered Unit within the Bureau of Indian Affairs' Office of Justice Services to aid in human trafficking investigations that cross Tribal lands. Not later than 180 days after the date of enactment of this Act, HSI shall submit a report on coordination efforts, jurisdictional or other challenges, and resources needed to enhance the partnership between the two agencies. The recommendation includes an increase of $1,000,000 to support such partnership and expand the Shadow Wolves unit.

*Organized Retail and Supply Chain Crime.*—The Committee provides $2,000,000 to establish a multi-agency, intelligence-based, and prosecutor-led Organized Retail and Supply Chain Crime Coordination Center to identify, disrupt, and dismantle TCOs that put the Nation's supply chain at risk. The Center shall coordinate with appropriate federal agencies, including but not limited to the Federal Bureau of Investigation; Drug Enforcement Administration; and relevant agencies within the Department of Justice, to collect and analyze data from relevant stakeholders to identify regions, modes of transportation, and specific distribution and retail networks that are experiencing high volumes of organized crime to better inform HSI's response to such criminal activity. The Committee directs HSI to brief the Committee within 90 days of the date of enactment of this Act on the status of the implementation of the Center and any challenges in its establishment. The briefing should also include an overview of the unmet resource needs and future resource requirements.

*Personnel Well-Being*.—The Committee is concerned about the mental and emotional well-being of HSI agents who primarily focus their efforts on child sexual exploitation and abuse (CSEA) investigations, especially given the disturbing nature and rapid growth of CSEA over the past decade. HSI is directed to provide a briefing within 90 days of the date of enactment of this Act on mental health resources available to HSI personnel, current policies and procedures to determine personnel resiliency, and any additional funding requirements to enhance currently available resources.

*Repository for Analytics in a Virtualized Environment (RAVEn).*—The Committee continues the requirement found under this heading as described in the explanatory statement accompanying Public Law 118–47.

*Special Response Teams (SRTs).*—The recommendation includes an increase of $5,000,000 for equipment and other general expenses associated with additional SRTs. These specialized teams provide critical tactical support in high-risk situations and are uniquely positioned to deploy at a moment's notice.

*Targeting Online Drug Trafficking Operations.*—The Committee continues the directive found under this heading in House Report 118–123 accompanying Public Law 118–47.

### Enforcement and Removal Operations

The recommendation includes a total of $6,402,677,000 for ERO. Of this amount, $4,451,603,000 is for Custody Operations,

$178,703,000 is for Fugitive Operations, $349,807,000 is for the Criminal Apprehension Program, $391,784,000 is for the Alternatives to Detention Program, and $1,030,780,000 is for the Transportation and Removal Program.

*287(g) Program.*—The Committee recognizes the importance of the 287(g) program, particularly since state and local law enforcement who participate act as a force multiplier for the ERO workforce, which has been understaffed for years. The program also provides safety benefits to officers and detainees as detainees are transferred into ICE custody in a controlled environment. ICE is directed to report quarterly on local law enforcement agencies that express interest in joining the program and the number of new agreements that are signed. Additionally, within 90 days of the date of enactment of this Act, ICE shall provide a report to the Committee regarding the growth of the program, progress of training partner agencies, and technologies or other resources needed to seamlessly expand the program. The recommendation includes $10,000,000 for these efforts, of which, funding for training shall be prioritized.

*287(g) Training*.—The Committee acknowledges the significant increase in new 287(g) agreements in fiscal year 2025. To ensure proper oversight of the program and obtain maximum efficacy in regard to program outcomes, ICE, in coordination with the Office of Professional Responsibility, shall conduct an evaluation of both the quality and the proper administration of the trainings required with any new agreement within 30 days of the date of enactment of this Act. ICE shall provide a briefing to the Committee within 60 days of the date of enactment of this Act of the findings of such evaluation, as well as recommendations of enhancements to the required trainings and any improvements to oversight within the 287(g) program. Additionally, not later than 30 days after the date of enactment of this Act and monthly thereafter, ICE shall provide a report to the Committee detailing funding obligations of the 287(g) program, delineated by pay and non-pay requirements, and the number of law enforcement entities with 287(g) agreements that were provided training for the prior month.

*Alternatives to Detention (ATD).*—The recommendation provides $391,784,000 for the ATD program. As the non-detained docket level remains vast, it is the opinion of the Committee that all ATD programs should incorporate elements of electronic monitoring for compliance and enforcement purposes. The Committee instructs ICE to prioritize detention and removal operations prior to considering alternatives to detention.

*ATD Contracts.*—ICE shall continue providing a monthly briefing on the number of aliens participating in the ATD program, delineated by technology type and associated daily cost, as well as the number of participants who attend their immigration court hearings. In addition, ICE shall continue to publish annually the following policies and data relating to ATD:

(1) guidance for referral, placement, escalation, and de-escalation decisions;

(2) enrollments and disenrollments by field office;

(3) information on the length of enrollment, delineated by type of ATD; and

(4) enrollments and disenrollments by type and point of apprehension.

*ATD Intensive Supervision Appearance Program (ISAP) Utilization.*—To ensure the Committee maintains appropriate oversight of the ISAP program, ICE shall provide a report to the Committee not later than 30 days after the date of enactment of this Act detailing its escalation and de-escalation policies for ISAP. Additionally, ICE shall provide a report to the Committee on a monthly basis on the following:

(1) the total number of participants in the ISAP program and their length of time in the program;

(2) the total number of participants who are followed throughout their immigration hearing process until immigration hearing adjudication and, in circumstances of removal orders, are removed; and

(3) the total number of participants who have been escalated or de-escalated within the program, including the number of participants who have been disenrolled from the program prior to the completion of their immigration hearing adjudication.

The Committee directs ICE to employ the ISAP program in a manner that includes enforcement mechanisms to be conducted by appropriate law enforcement personnel for noncompliance. Additionally, ICE shall ensure a fair and open competitive bidding process for future iterations of the ISAP contract.

*ATD Monitoring Pilot Program.*—Within funds provided for ATD, ICE shall pilot innovative, wearable technologies that incorporate tokenized identity capabilities that verify location and biometric information to monitor those on the non-detained docket who do not meet the escalation qualifications for enrollment into the ISAP program. ICE is directed to confer with the Committee prior to any external engagement for the pilot program.

*ATD Program Violation Reporting.*—Within 30 days of the date of enactment of this Act and monthly thereafter, ICE shall provide to the Committee data on the number of ATD program violations for enrolled participants in each program that occurred in the prior month, disaggregating the data by area of responsibility (AOR), type of program violation, whether such program violation was committed by the same individual, and whether that individual was subject to an enforcement action following such program violation.

*ATD Wraparound Stabilization Services (WSS).*—The recommendation does not include funding for WSS or any other case management service as a pass-through within the ISAP contract. ICE's limited resources to monitor the non-detained docket must be directed towards evidence-based approaches that lead to favorable compliance and enforcement outcomes. Within 90 days of the date of enactment of this Act, ICE shall provide a report regarding the increase of participants served with ISAP technologies by utilizing the funds previously available for WSS activities.

*Contract Competition.*—ICE is directed to ensure a fair and competitive procurement and contracting process for awards made within the Custody Operations, Transportation and Removal Operations, and Alternatives to Detention level II PPAs.

*Courthouse Enforcement*.—The Committee acknowledges the importance of aliens participating in the immigration hearing adju-

dication process and urges ICE to restrain immigration enforcement activities at courthouses or other locations where such process takes place.

*Criminal Aliens.*—Not later than 180 days after the date of enactment of this Act, ICE shall provide a report to the Committee comprehensively listing every alien who has been convicted of a violent crime in the United States and ICE's compliance with mandatory detention under the Laken Riley Act (P.L. 119–1) for fiscal years 2020–2025, to include a list of aliens that have committed such criminal acts upon release from SLTT or federal custody.

*Criminal Aliens Prioritization.*—The Committee remains concerned by the number of aliens who remain in the United States, despite having convictions of violent acts. ICE shall prioritize available resources to effectuate enforcement and removal actions for such aliens. Additionally, ICE shall provide a briefing to the Committee within 30 days of the date of enactment of this Act and monthly thereafter detailing such prioritization, the number of effectuated removals of such aliens, and the funding obligations for such actions in the prior month.

*Custody Operations.*—The recommendation includes $4,451,603,000 for Custody Operations, which includes $3,543,836,000 for 50,000 detention beds. In light of the unprecedented non-detained docket level, increased detention capacity is critical to support necessary interior enforcement actions, effectuate removal orders, and ensure that aliens who pose a national security or public safety threat are appropriately detained.

*Custody Reporting.*—Beginning not later than 90 days after the date of enactment of this Act and quarterly thereafter, ICE is directed to provide a report to the Committee with data regarding the number of individuals in its physical custody who were subject to solitary confinement during the preceding quarter. ICE shall confer with the Committee prior to the first report to determine additional relevant data points.

*Deportation Officers (DOs).*—The recommendation provides an increase of $50,000,000 to support hiring additional DOs to address law enforcement personnel shortages.

*Detention Capacity in Rural Areas.*—Within 180 days of the date of enactment of this Act, ICE shall provide a report to the Committee detailing options to increase detention capacity in rural areas and states that do not currently have any facilities that contract with ICE. Options shall include, but are not limited to: engaging with county and local facilities; consideration of joint facilities with the U.S. Marshals Service; and building ICE-owned facilities to serve as hubs for interior enforcement actions.

*Detention Capacity and Utilization.*—The Committee is encouraged by ICE's willingness to better utilize its guaranteed minimum detention capacity in fiscal year 2025, particularly since such capacity is fully funded regardless of use. ICE is instructed to inform the Committee whenever the utilization rate for guaranteed minimum detention capacity declines to below 87 percent for more than 14 consecutive days. ICE shall include plans to maximize future utilization when updating the Committee.

*Detention Partnerships.*—The Committee is of the opinion that partnerships with local and county facilities are critical for a robust detention and enforcement apparatus and instructs ICE to continue

engaging with relevant stakeholders to increase detention capacity wherever practical.

*Foreign-Based Gangs.*—The Committee is alarmed about recent intelligence reports that certain foreign-based gangs have established headquarters in the United States or are carrying out criminal activity within the Nation's interior. The Committee directs ICE to provide a report to the Committee within 90 days of the date of enactment of this Act detailing the foreign-based gang presence in the United States, the number of aliens who have foreign-based gang affiliations, and barriers to effectuating arrests and/or removals of known or suspected alien gang members, including state and local policies that restrict law enforcement from coordinating with ICE for detention and removal purposes.

*Fugitive Operations.*—The recommendation includes an increase of $5,000,000 for additional Mobile Criminal Alien Teams and Special Response Teams within Fugitive Operations. These teams continue to prove crucial for high-stakes interior enforcement actions.

*ICE Detainers.*—The Committee is concerned by the rising number of aliens apprehended for crimes committed after being released into the community due to a state or local jurisdiction's refusal to honor ICE detainer requests. Within 90 days of the date of enactment of this Act and quarterly thereafter, ICE shall provide a briefing to the Committee identifying all state and local jurisdictions that do not honor ICE detainers and the agency's efforts to increase and improve cooperation and information sharing with these entities. The briefing shall also include an assessment of congressional action that could aid such cooperation and information sharing, including the consideration of prohibiting the obligation of certain departmental funds to such entities until ICE detainer requests are honored.

*Medical Staffing.*—Not later than 30 days after the close of the fiscal year, ICE shall provide a report to the Committee detailing the level of medical and mental health staffing, delineated by position and qualification, at each detention facility with an active contract in the fiscal year, along with the average daily population of each facility. The report should indicate the hours of availability of in-person, specialized medical service typically available during the week; whether any positions were unfilled for more than one month of the previous fiscal year; and the average detainee wait time to see a medical professional. ICE also shall include in the report the number of individuals taken into ICE custody with a serious medical or mental health condition, including the number of pregnant women.

*National Criminal Analysis and Targeting Center (NCATC).*—The Committee supports efforts to enhance the NCATC and encourages the deployment of novel data sets to improve lead generation for identifying, locating, and apprehending criminal aliens, fugitives, visa overstays, and other removable individuals. The Committee further encourages integration of these tools to support enforcement actions related to non-compliance within the ATD program.

*Notice to Appear Wait Times.*—ICE shall continue providing the Committee with Notice to Appear wait times and backlogs on a monthly basis, delineated by AOR.

*Pregnant, Postpartum, and Lactating Women.*—ICE is reminded of the directive to provide semiannual reports on the total number of pregnant, postpartum, and lactating women in ICE custody. These anonymized reports shall be made publicly available on the ICE website.

*Removal of Certain Migrants.*—The Committee continues the previous requirement that ICE submit data on the removal of parents of U.S. citizen children semiannually.

*Requests for Information (RFI).*—ICE is directed to inform the Committee at least 15 business days before publishing either a RFI or a Request for Proposal that has the potential to substantively impact requirements within the Alternatives to Detention, Custody Operations, or Transportation and Removal Operations level II PPAs.

*Removal Orders Reporting.*—The Committee remains concerned about the more than 1,300,000 aliens on the non-detained docket who have final orders of removal, thus eliminating the legal basis for such individuals to remain in the country. ICE is directed to provide quarterly reports to the Committee on the number of aliens with final orders of removal on ICE's non-detained docket, the AOR in which such aliens reside, the reason for the order of removal not being effectuated, and the steps that ICE will take during the next quarter to effectuate the order.

*Third-Party Medical Care.*—ICE is directed to delineate costs associated with third-party medical care in the monthly reporting requirements and whenever providing information to the Committee regarding custody operations resources.

*Transportation and Removal Program.*—The recommendation provides an increase of $200,000,000 to facilitate additional transportation and removal operations. The Committee directs ICE to prioritize funding for repatriation flights and other removal operations. ICE shall brief the Committee within 60 days of the date of enactment of this Act on cost considerations and analysis of transporting aliens to guaranteed minimum detention facilities as opposed to non-guaranteed minimum facilities that are in closer proximity to the respective field office.

*Veterans Subject to Removal*.—The Committee supports ICE Directive 10039.2, regarding consideration of U.S. military service in making discretionary determinations regarding enforcement actions. Not later than 90 days after the date of the enactment of this Act, ICE is directed to provide a briefing to the Committee on implementation and training with regard to this directive, including an evaluation of the sufficiency of current methods of identifying aliens veterans of the Armed Forces who are placed in removal proceedings and ensuring consideration of veteran status prior to initiation of removal proceedings against such individuals.

*Voluntary Work Program.*—The bill includes language establishing the minimum rate of allowance paid to detainee participants under ICE's Voluntary Work Program.

*Young Adult Case Management Program (YACMP).*—The recommendation does not include funding for the YACMP.

### Mission Support

The recommendation includes a total of $1,536,127,000 for Mission Support. Within the total, the Committee provides

$1,210,328,000 for Enterprise Services, $198,146,000 for the Office of Professional Responsibility, and $127,653,000 for Executive Leadership and Oversight.

*Enterprise Services Technology.*—In an effort to increase ICE's hiring and budgetary efficiency, the Committee recommends $5,000,000 for technologies within the Offices of Human Capital and Chief Financial Officer.

*Motor Vehicle Fleet.*—The recommendation provides an increase of $5,000,000 for the replacement of additional law enforcement vehicles that have exceeded their useful service life.

*Office of Firearms and Tactical Programs (OFTP).*—The recommendation includes an increase of $5,000,000 for the OFTP to purchase necessary equipment for ICE personnel.

### Office of the Principal Legal Advisor

The Committee provides $482,754,000 for OPLA, including an increase of $20,000,000 to hire additional OPLA attorneys and support staff to enhance the current ratio of OPLA attorneys to EOIR Immigration Judges (IJs). The Committee urges ICE to coordinate with EOIR to ensure future year budget requests include commensurate levels of OPLA attorneys to EOIR IJs to address the evergrowing backlog of immigration cases.

*Failure to Prosecute.*—OPLA shall provide a report to the Committee not later than 90 days after the date of enactment of this Act, and monthly thereafter, detailing the number of cases EOIR dismissed due to the Department's failure to prosecute; the number of such cases for which the Department subsequently filed a Notice to Appear; and all associated departmental reports on such cases from January 20, 2021 through the end of fiscal year 2025. Additionally, OPLA shall provide the Committee with a monthly report detailing the aforementioned data by the previous month beginning in fiscal year 2026.

*Technology.*—The recommendation includes $10,000,000 for technological enhancements to OPLA's case management system and principal legal advisor's network database.

### PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

| | |
|---|---|
| Appropriation, fiscal year 2025 | $55,520,000 |
| Budget request, fiscal year 2026 | 40,400,000 |
| Recommended in the bill | 35,000,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | −20,520,000 |
| Budget request, fiscal year 2026 | −5,400,000 |

Of the total recommended for Procurement, Construction, and Improvements, $15,000,000 is included for critical repair requirements. ICE is reminded of the directive found under the heading "Monthly Reporting Requirements"' in the explanatory statement accompanying Public Law 118–47 requiring cost details for current and future construction or facility refurbishment activities.

*Facilities Backlog and Use.*—ICE is directed to continue the requirement found in the explanatory statement accompanying Public Law 117–328 under the same heading.

*Repository for Analytics in a Virtualized Environment (RAVEn).*—The recommendation includes $10,000,000 for further RAVEn development. Within 90 days of the date of enactment of

this Act, HSI shall provide a briefing to the Committee on intended use of funds and additional resources needed for future enhancements to the platform.

*Tactical Communications (TACCOM).*—The Committee provides $10,000,000 for a refresh of necessary TACCOM equipment, including hardware and portable radios.

## TRANSPORTATION SECURITY ADMINISTRATION

| | |
|---|---|
| Appropriation, fiscal year 2025 | $11,129,287,000 |
| Budget request, fiscal year 2026 | 11,342,659,000 |
| Recommended in the bill | 11,172,934,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | +43,647,000 |
| Budget request, fiscal year 2026 | −169,725,000 |

### Mission

The Transportation Security Administration (TSA) is charged with protecting U.S. transportation systems while facilitating the flow of travel and commerce.

### OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriation, fiscal year 2025 | $10,614,968,000 |
| Budget request, fiscal year 2026 | 10,569,369,000 |
| Recommended in the bill | 10,378,063,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | −236,905,000 |
| Budget request, fiscal year 2026 | −191,306,000 |

The recommendation includes the following: $100,000,000 to continue staffing at certain exit lanes; $45,059,000 for the Law Enforcement Officer (LEO) Reimbursement Program; and $20,000,000 for connecting airports.

Within the total amount provided, the bill makes $300,000,000 available until September 30, 2027. TSA's entire Operations and Support appropriation has historically been made available for two fiscal years, which runs counter to the one-year period of availability that is the baseline for Operations and Support appropriations provided for other DHS components and the standard across the Federal government for appropriations that fund salaries and operating expenses. TSA is directed to continue to work with the DHS CFO and the Committee to develop a proposal for the TSA Operations and Support appropriation, including potential modifications to the current PPA structure, that would limit the two-year period of availability to only the necessary activities that may require such flexibility, consistent with the other DHS components. TSA shall incorporate such proposal in its fiscal year 2027 budget request.

*Airport Interconnection Program.*—The Committee supports efforts to interconnect airports and use the TSA cloud environment to facilitate remote screening technologies. The Committee provides $20,000,000 for TSA to interconnect its airports and leverage the cloud environment.

*Airport Wait Times.*—TSA must ensure the security of airline passengers without creating undue burdens on the traveling public. An important component of this is keeping wait times at airports reasonable. The fiscal year 2025 enacted funding level ensured that TSA could staff airport checkpoint with an adequate number of

Transportation Security Officers (TSOs). The Committee encourages TSA to maintain TSO staffing at a level that does not create delays for air travelers.

*Aviation Worker Screening.*—TSA recently issued an Airport Security Program (ASP) amendment that requires airports to significantly increase airport-performed physical screening of employees and procure explosive detection screening (EDS) equipment for the first time. The Committee is concerned that these new mandates, which require the establishment of screening operations at airports, impose an undue burden on airport operators and are being implemented without conducting a thorough cost-benefit analysis or risk assessment to justify the change. The Committee strongly encourages TSA to rescind the current ASP amendment and solicit a formal round of notice and comment to understand the full financial and operational impacts of this proposal.

*Equipment Transfer to Local Law Enforcement.*—As it modernizes its screening and detection equipment, TSA is urged to improve the manner in which older equipment can be transferred to local law enforcement. A major barrier to transfer is that the equipment is still tied to service contracts. TSA should consider only entering into service contracts that expire when TSA no longer owns the equipment and examine ways to expedite the transfer of such equipment.

*Federal Flight Deck Officer (FFDO) and Crew Training.*—The Committee strongly supports the additional aviation security provided by FFDOs. The recommendation provides $32,307,000 for the FFDO and Crew Training program.

*Identity Management Capability (IDM).*—The Committee supports TSA's IDM capability. Through this program TSA, in concert with other government agencies and the private sector, builds secure and privacy-preserving digital identity solutions for all Americans. The recommendation includes $11,300,000 for this activity.

*Mishandled Firearms.*—The Committee recognizes the threat of misplaced, mishandled, or lost firearms in checked luggage. The Committee directs the Administrator, in coordination with the Secretary of the Department of Transportation (DOT) and any other relevant federal agencies, to conduct an assessment that includes the following:

(1) the number of firearms misplaced, mishandled, or lost annually by commercial airlines on domestic flights within the United States;

(2) the number of firearms misplaced, mishandled, or lost annually by commercial airlines on flights originating in the United States to international destinations;

(3) the number of firearms misplaced, mishandled, or lost annually by commercial airlines on flights originating in international destinations bound for a destination within the United States;

(4) any actions currently being taken by commercial airlines to ensure firearms in checked luggage are not misplaced, mishandled, or lost;

(5) any additional training currently being provided by TSA or commercial airlines to individuals handling checked firearms;

(6) the procedures by which commercial airlines notify TSA, DOT, or any other federal agencies when a checked firearm has been mishandled, misplaced, or lost; and

(7) any actions that are taken by TSA, DOT, or other relevant federal agencies to track mishandled, misplaced, or lost firearms in checked luggage.

*Multimodal Generative AI Language Technology.*—The Committee encourages TSA to consider the use of multimodal generative AI foreign language translation technology at TSA to carry out the requirements set forth by section 7131 of Public Law 117–263.

*Passenger Security Fee.*—The Committee notes that the Passenger Security Fee, collected from passengers of commercial air travel, is intended to fund vital security measures to ensure the safety and protection of travelers within the United States. The Committee further believes that the diversion of funds collected through the Passenger Security Fee to purposes unrelated to aviation security could undermine the integrity and effectiveness of aviation security programs. Under current law, the diversion of funds ends in 2027, and the Committee believes that the diversion should not be extended and that all collected fees should instead be appropriated as part of the annual appropriations process to strengthen aviation security.

*PreCheck Enrollment.*—The Committee notes TSA's goal of 70 percent of American fliers enrolled in TSA PreCheck. PreCheck reduces screening costs and increases security. However, to date, enrollment sits at an estimated 30 percent across the traveling public. The Committee directs the Administrator to work with private sector TSA enrollment providers to increase the number of travelers in the PreCheck program. Not later than 60 days after the date of enactment of this Act, the Administrator shall brief the Committee on PreCheck enrollment numbers in fiscal year 2025.

*Screening Workforce.*—Many rural airports have difficulties hiring and retaining qualified TSOs. At the same time, however, TSA is reducing retention incentives for many rural airports, making it even more difficult to retain qualified TSOs. Not later than 90 days after the date of enactment of this Act, the Department shall provide a briefing to the Committee on the challenges of recruiting and retaining TSOs in non-contiguous and rural states. The briefing shall include a clear description of the obstacles related to using small businesses; information about rates of attrition; the numbers of unfilled positions; and the duration of time for which those positions have remained vacant. The briefing shall also provide an assessment of the effect these vacancies have on the ability of TSA to accomplish its mission.

*Security Scanning Equipment.*—The Committee notes the challenges faced by TSA in maintaining its equipment in open-air airports where exposure to the elements is unavoidable. The Administrator is urged to address the potential degradation of major security equipment exposed to the elements at such airports.

*Surface Transportation Cybersecurity Toolkit.*—As cybersecurity threats to surface transportation infrastructure become more advanced, TSA must equip itself and industry partners with tools that support real-time risk mitigation across operational and information technologies. TSA is encouraged to modernize and scale the toolkit to allow TSA to automate cyber assurance functions, iden-

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 350 of 714 PageID #:1400



tify adversarial attack paths, and share timely intelligence with industry.

*TSA Cares.*—The Committee recognizes the importance of the TSA Cares helpline to provide assistance for travelers with disabilities, medical conditions, and other special circumstances during the security screening process. The Committee directs the Administrator to expand public awareness of this service. Further, the Committee directs the Administrator to prioritize staffing of the helpline for additional hours and to ensure that requests received through the hotline are accommodated by Passenger Support Specialists.

*TSA Reimbursable Services.*—The Committee understands that there may be underutilized space and equipment in security screening areas which may limit TSA's ability to handle expected volume increases. The Committee encourages TSA to consider the success of the CBP's Reimbursable Services Program as a model for generating private sector support and resources to improve security and efficiency at the security checkpoint while alleviating the strain on aviation from increases in traveler volume.

*Visible Intermodal Prevention and Response (VIPR) Teams.*—VIPR teams are duplicative and can face jurisdictional, and in some cases constitutional, challenges. TSA has acknowledged it is working to move towards a new concept of surface transportation protection. Consistent with the fiscal year 2025 budget request, the recommendation does not include funding for VIPR teams. Further, the Committee does not support simply transferring VIPR personnel and activities to the Air Marshal Service. A simple rebranding of VIPR teams is not the Committee's intent. Rather the Committee believes that TSA should no longer perform the functions previously executed by VIPR teams.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

| | |
|---|---|
| Appropriation, fiscal year 2025 | $40,678,000 |
| Budget request, fiscal year 2026 | 216,290,000 |
| Recommended in the bill | 258,230,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | +217,552,000 |
| Budget request, fiscal year 2026 | +41,940,000 |

The recommendation includes $224,290,000 for checkpoint support, including $213,000,000 for the purchase and installation of computed tomography machines at passenger checkpoints at U.S. airports, $10,000,000 for credential authentication technology, and $1,290,000 for portable detection equipment previously provided by the Countering Weapons of Mass Destruction Office.

The recommendation also includes $13,940,000 to complete the process of reimbursing airports for the cost of in-line baggage screening systems installed prior to December 31, 2007.

RESEARCH AND DEVELOPMENT

| | |
|---|---|
| Appropriation, fiscal year 2025 | $14,641,000 |
| Budget request, fiscal year 2026 | 35,000,000 |
| Recommended in the bill | 14,641,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | – – – |
| Budget request, fiscal year 2026 | −20,359,000 |

*Explosive Detection System (EDS) Outages.*—TSA is responsible for the security screening of airline passengers' checked baggage as well as the purchase, maintenance, and installation of EDS equipment. With TSA responsible for approximately 1.4 million checked bags a day, the Committee appreciates the scale of TSA's efforts to keep the flying public safe. However, the Committee is concerned with the recent pattern of EDS outages at airports across the Nation. When these safety critical machines fail, they can cause significant delays and disruptions for the flying public. According to the fiscal year 2024 TSA Capital Investment Plan (CIP), TSA's Checked Baggage fleet consists of 1,626 EDS, of which 200 are at their end-of-life. The recent pattern of outages suggests that many of these machines lack long-term reliability and need to be replaced. The CIP, however, fails to identify a realistic path to replacing these end-of-life and/or unreliable EDS. Additionally, when repairs are needed, the current service maintenance agreements often lead to unacceptable delays, particularly at smaller airports. Further, the slowness of TSA in establishing a Qualified Product List reduces the agency's ability to replace unreliable EDS with equipment that meets a higher security standard.

The Committee directs TSA to prioritize the purchase and installation of EDS at airports with chronic outages with amounts available in the Aviation Security Capital Fund. Further, within 90 days of the date of enactment of this Act, TSA shall develop a realistic plan for recapitalizing checked baggage equipment and brief the Committee quarterly on:

(1) the status of the EDS portfolio throughout the Nation, including EDS outages; and

(2) the progress being made on replacing end-of-life and unreliable EDS.

Further, the Committee encourages TSA to consider structuring future maintenance contracts in a manner that requires set levels of reliability at each airport versus a nationwide level.

*Improved Security Screening Technology.*—The Committee recognizes the value in expanding beyond current security screening technologies. TSA should consider whether the development, testing, evaluation, and deployment of innovative high-speed, high-throughput screening capabilities, including transmission line tomography, could improve security.

*Innovation Task Force.*—The Committee recognizes the importance of the Innovation Task Force's research and development efforts on next-generation baggage and passenger screening within TSA. Given the increase in passenger travel through airports, the need to reduce congestion in screening lines, and the evolution of security threats, funding to improve baggage and passenger screening must be prioritized to ensure TSA is able to meet current and future needs. The Committee recommends $8,146,000 for the Innovation Task Force.

## COAST GUARD [1]

| | |
|---|---|
| Appropriation, fiscal year 2025 | $13,329,388,000 |
| Budget request, fiscal year 2026 | 14,424,695,000 |
| Recommended in the bill | 14,383,653,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | +1,054,265,000 |
| Budget request, fiscal year 2026 | −41,042,000 |

### Mission

The Coast Guard is the principal Federal agency charged with maritime safety, security, and stewardship. It is a military, multi-mission, maritime service within DHS and is one of the Nation's six armed services.

#### OPERATIONS & SUPPORT

| | |
|---|---|
| Appropriation, fiscal year 2025 | $10,415,271,000 |
| Budget request, fiscal year 2026 | 11,066,223,000 |
| Recommended in the bill | 10,802,656,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | +387,385,000 |
| Budget request, fiscal year 2026 | −263,567,000 |

The recommendation includes an additional $60,000,000 for Indo-Pacific expansion, $50,000,000 for shore maintenance, $40,000,000 for technology agnostic unmanned maritime systems, $30,000,000 for surface maintenance, $20,000,000 to establish the Technology Optimization and Modernization Fund, $5,000,000 to bolster efforts to reduce and respond to sexual assault and harassment, $5,000,000 for modernizing the National Capital Region Air Defense Mission, $2,500,000 for marine inspections and standards for innovative vessels, and $100,000 for Training Center contracting support.

*47-Foot Motor Lifeboat Service Life Extension Program.*—The Committee supports the Coast Guard's ongoing service life extension program for its 47-foot motor lifeboats. The Committee notes that the condition of many of the 47-foot motor lifeboats is significantly worse than expected at program inception and urges the Coast Guard to continue providing the resources necessary to sufficiently upgrade and extend the service life of the entire fleet.

*Ballast Water Management.*—The Committee encourages the Coast Guard to expand partnerships with state and local governments in its efforts to test ballast water to prevent the spread of aquatic invasive species and diseases, such as stony coral tissue disease.

*Blue Technoloy Center of Expertise.*—The Committee urges the Coast Guard to leverage the expertise at its Blue Technology Center of Expertise to accelerate the adoption of new technologies that enhance Coast Guard capabilities and mission sets.

*Closure of Coast Guard Stations.*—The Committee is concerned about the operational adjustments made in 2024 to Coast Guard stations. Within 90 days of the date of enactment of this Act, the Coast Guard shall submit a report to the Committee on the efforts to restore capability to impacted regions, particularly given improved recruiting numbers. The report shall also detail efforts the

[1] Totals include permanent indefinite discretionary and mandatory appropriations.

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 353 of 714 PageID #:1403



U.S. Coast Guard is making to increase enlistment so that the closed stations can be reopened.

*Coordination With the Navy on the Shipyard Infrastructure Optimization Program.*—The Committee supports Coast Guard efforts to coordinate with the Department of the Navy on shipyard capacity issues and to create the Government Shipbuilders Council to address common and singular challenges in shipbuilding; identify opportunities to leverage each organization's resources to maximize savings in costs and time; share best practices and lessons learned; and support strategic decision making to strengthen the shipbuilding industrial base.

*Diesel Outboard Testing and Evaluation.*—The Committee is aware that, in response to Department of Defense Directive No. 4140.43, the United States Navy tested and evaluated several diesel-fueled outboard marine motors and has subsequently procured more than 100 of these motors for vessel deployment. The Coast Guard is encouraged to consider whether diesel-fueled outboard marine motors are appropriate for Coast Guard assets.

*Employee Assistance Program (EAP).*—The Committee strongly supports the work of the EAP in support of members of the Coast Guard. Within funds provided for Operations and Support, not less than fiscal year 2024 funding levels are provided for EAP. Additionally, the Coast Guard is directed to ensure that employees at all Coast Guard facilities are aware of and can access EAP tools. The Coast Guard is further directed to brief the Committee within 90 days of the date of enactment of this Act on how the Service will meet this requirement.

*Engagement in the Indo-Pacific.*—The Committee supports the Coast Guard's efforts to help develop the maritime capabilities of partners and allies in Southeast Asia and encourages the Coast Guard to continue its work in the Indo-Pacific, including by considering opportunities for expansion and options for improving coordination and leveraging capabilities with the DoD, especially U.S. Indo-Pacific Command (USINDOPACOM).

*First District Coastal Buoy Modernization Initiative.*—The Committee is dismayed with the Coast Guard's First District Coastal Buoy Modernization Initiative Proposal. While the Coast Guard investigates modernizing buoy constellations, the Committee urges the Service to consider the complicated coastline along the Northeastern Seaboard and stresses the importance of visual navigation markers to maritime economies, as fishermen routinely use these buoys as a reliable safety measure to maneuver through inclement weather and when there is sporadic access to technology.

*Force Design 2028.*—The Committee is aware of several deadlines in the Coast Guard's Force Design 2028, including requirements to deliver an execution plan aligned around strategic imperatives, the Force Posture and Operational Concepts Campaign, and semiannual updates on the implementation of Force Design 2028. The Committee is disappointed that the Coast Guard did not brief the Committee in advance of the release of Force Design 2028. The Coast Guard shall brief the Committee on the details of these plans and activities in a timely manner and prior to public release.

*Icebreaking Collaboration.*—The Coast Guard, in collaboration with relevant agencies, including the Department of the Navy, the State Department, and the National Security Council, shall develop

a multi-fiscal year implementation plan for the collaboration effort between the United States, Canada, and Finland designed to enhance icebreaker shipbuilding capacity. The plan shall be submitted to the Committee not later than 180 days after the date of enactment of this Act and shall include the following:

(1) development of systematic industry engagement strategies to involve relevant shipbuilding partners, ensuring alignment with mission goals and operational needs;

(2) an analysis of how such cooperation will positively impact budgets, schedules, and milestones to meet the Coast Guard's requirements for medium and heavy polar icebreakers;

(3) evaluation of acquisition alternatives, including options for the accelerated build and lease of icebreakers, including "commercial-off-the-shelf" designs as a bridging strategy during the ongoing construction of the new U.S. icebreaker fleet;

(4) recommendations for statutory and regulatory changes to reduce procurement timelines and costs;

(5) commitments to ensure that expedited bridging solutions, if any, are linked to a fundamental long-term commitment to expand the American shipbuilding industrial base;

(6) a schedule for expediting and optimizing the sharing of information, technology, and expertise among shipbuilding partners; and

(7) an assessment of economies of scale achievable through multi-nation order books and other collaborative opportunities, emphasizing coordinated production and mutual investments to strengthen industrial bases across shipbuilding partners.

*Indo-Pacific Operations.*—The Committee recognizes the importance of the Coast Guard in maintaining the U.S.'s posture in the Indo-Pacific. The Committee supports the Coast Guard's efforts to expand its presence in the Indo-Pacific, especially through the Ship Rider Program, and encourages the Coast Guard to continue its coordination with USINDOPACOM and partner and allied Nations. This includes further cooperation with Taiwan by expanding joint and integrated training opportunities between the United States Coast Guard and the Taiwan Coast Guard Administration. The Committee also supports the Coast Guard's efforts to help develop the maritime capabilities of partners and allies in Southeast Asia and encourages the Coast Guard to continue its work in the Indo-Pacific by considering opportunities for expansion and options for improving coordination and leveraging capabilities with the DoD, especially USINDOPACOM. To better evaluate these efforts, the Committee directs the Coast Guard to provide a report to the Committee not later than 180 days after the date of enactment of this Act assessing the Coast Guard's capabilities and operations in the Indo-Pacific. This report shall include a list of current assets in the region, assets and capabilities needed to address unfulfilled requirements, areas where logistical support is needed, and any changes that must be taken to effectively implement the U.S. Indo-Pacific Strategy. Additionally, the Committee directs the GAO to conduct an assessment of the Coast Guard's role in advancing U.S. interests in the Indo-Pacific, particularly in light of the People's Republic of China's (PRC) activities throughout this critical region. Such report shall consider IUU fishing, law enforcement and secu-

rity assistance, national security, and any other relevant aspects of Coast Guard operations in the region.

To support the Coast Guard's Indo-Pacific operations, the recommendation provides $60,000,000 for additional activities in the Indo-Pacific, which may include increased operations to combat Illegal, Unreported, and Unregulated (IUU) fishing; presence of regional Coast Guard Maritime Advisors; Liaison Officers, Attachés, other foreign engagement positions throughout the Indo-Pacific; and workforce support including for housing, medical, and childcare access for Coast Guard personnel.

*IUU Fishing.*—The Committee recognizes the role of the Coast Guard and supports the Service in combatting IUU fishing both domestically and globally. Within 180 days of the date of enactment of this Act, the Coast Guard shall provide a briefing to the Committee detailing the activities of the Coast Guard in fisheries enforcement, any gaps in enforcement capacity, and any resources needed to address those gaps or expand enforcement activities combatting IUU fishing.

IUU fishing in the Gulf of America harms small businesses, ocean ecosystems, and sustainable fisheries and is a threat to our national security. The Committee recognizes the need to characterize and quantify IUU fishing in the Gulf of America. The Committee encourages the Coast Guard to collaborate with state and academic partners to better understand the impact and factors influencing increased IUU fishing activity in the Gulf of America.

*Land Acquisition.*—As the Coast Guard expands its role in the Indo-Pacific, the Committee is aware that Coast Guard Base Honolulu is in critical need of additional pier and related space, and that the State of Hawai'i owns pier space immediately adjacent to Coast Guard Base Honolulu which it may be willing to convey. The Committee directs the Coast Guard to continue to explore all opportunities to acquire the adjacent pier space and provide a report to the Committee within 180 days of the date of enactment of this Act on the status of the potential acquisition. Additionally, the Coast Guard should include any actions requested or required of Congress to facilitate the acquisition of the adjacent Honolulu Harbor pier and related space.

*Long-Range Command and Control Aircraft (LRCCA).*—The Coast Guard is directed to provide a report within 45 days of enactment of this Act, for fiscal years 2024 and 2025, detailing the number of days each LRCCA was fully mission capable, partially-mission capable, and not mission capable. Further, the Coast Guard shall report for such time period the number of flight hours for each aircraft by month and the number of flight hours in which a LRCCA was transporting the Secretary or Deputy Secretary of DHS. Additionally, the Coast Guard shall brief the Committee within 45 days of enactment of this Act on any expected duration of 45 or more days on which one or both aircraft are expected to be non-mission capable due to planned maintenance.

*Long-Range Unmanned Aircraft.*—The Committee provides initial operating costs for long-range unmanned aircraft and encourages the Coast Guard to quickly incorporate these assets into its operations.

*Management of Shore Infrastructure.*—The Committee directs the Coast Guard to fully implement the remaining open recommendations in GAO–19–82 as appropriate.

*Marine Inspection and Standards for Innovative Vessels.*—Advances in vessel design, fuel, and use require the Coast Guard to develop new standards and inspection regimes. Budget constraints often do not allow the Coast Guard to dedicate personnel to this activity, which can stifle technological advances. The recommendation provides the Coast Guard $2,500,000 to develop standards and inspections regimes for innovative vessels.

*Maritime Transportation Security Activities.*—The Committee encourages the Coast Guard to allocate necessary funding to carry out its conveyance authorities required in Public Law 107–295.

*Museum Operations Staffing and Funding.*—The Committee does not continue funding for Coast Guard Museum staffing and operations. Museum staffing and operations should be the sole responsibility of the National Coast Guard Museum Association and not a detriment to Coast Guard missions. With the Museum opening delayed until late 2026, the National Coast Guard Museum Association should have sufficient time to conduct the necessary fundraising, grant requests, and/or internal realignments to become self-sufficient. The Coast Guard cannot be further burdened with the operations of a museum it does not own, particularly in a time in which the Service's aged facilities routinely forgo critical maintenance, cutters and aircraft lack adequate spare parts to maintain readiness, and Coast Guard personnel routinely go without the supplies necessary to perform their duties.

*National Capital Region Air Defense Mission.*—Since 2006 the Coast Guard, under the operational control of the North American Aerospace Defense Command (NORAD), has been responsible for intercepting low-flying aircraft in the National Capital Region. The Coast Guard has admirably performed the Rotary Wing Intercept mission since assuming responsibility from CBP, protecting all those in the National Capital Region. However, the aging of the MH–65 aircraft and the Coast Guard's transition to an all MH–60 fleet has created uncertainty about how the Coast Guard will perform this mission in the future. Additionally, with the lack of armament on Coast Guard aircraft, the only way for a Coast Guard rotary wing aircraft to stop a noncompliant aircraft would be to sacrifice the Coast Guard helicopter and crew. Further, new technologies, such as AI-enabled cameras with laser signaling have been successfully deployed as part of NORAD's multi-layered air defense mission. It is time for the Coast Guard to leverage new innovative technology to perform this mission. The recommendation provides $5,000,000 in operations and support funding so that the Coast Guard can begin using unmanned aircraft systems to replace the capabilities of the MH–65s for the National Capital Region Air Defense mission by fiscal year 2027.

*Oversight.*—The Coast Guard is reminded to promptly, thoroughly, and accurately respond to congressional inquiries.

*Program Changes.*—The Committee does not continue funding for the Cetacean Desk or the body worn camera initiative.

*Physician Training Program.*—The Committee applauds efforts by the Coast Guard to institute a physician training program by sponsoring Coast Guard members through the Uniformed Services

University of Health Services School of Medicine. The Committee directs the Coast Guard to brief the Committee within 90 days of the date of enactment of this Act on its plans to build and sustain this promising initiative.

*Reducing and Responding to Sexual Assault and Sexual Harassment.*—The recommendation includes $5,000,000 for additional activities to support actions to expand the Coast Guard's legal support and oversight related to sexual assault and sexual harassment. The Committee supports the Coast Guard's efforts to strengthen the Service's culture and provides these funds with the expectation the Coast Guard will expand sexual assault and harassment prevention, response, recovery, victims' services, and investigatory capacity.

*Reducing Moves.*—While most personnel moves are necessary for the needs of the Coast Guard, they can be disruptive for members and their families. The Committee believes the overall number of geographic moves a member must make could likely be reduced with no or minimal impact to the Service, while reducing costs and significantly increasing the quality of life for members and their families. Regrettably, the Service does not have clear metrics for tracking geographic moves since a Permanent Change of Station does not always require a servicemember to relocate. The Service shall develop appropriate metrics to track physical moves and brief the Committee not later than 180 days after the date of enactment of this Act on the metrics it has developed.

*Special Victim Counsel Program.*—The Committee directs the Coast Guard to provide a report within 90 days of the date of enactment of this Act on the number of expedited requests for transfer made by victims of sexual assault during the prior fiscal year, including the number of applications denied and a description of the rationale for each denied request. The report shall also include the number of service members served by the Special Victim Counsel program during the same period.

*STARBASE Programs.*—The Committee acknowledges the Coast Guard's authority to establish Coast Guard-sponsored STARBASE programs and encourages the Commandant of the Coast Guard to establish the necessary policies and procedures, in consultation with the DoD, to facilitate the timely establishment of Coast Guard sponsored STARBASE programs that are determined to be consistent with the needs of the Service.

*Technology Optimization and Modernization.*—Innovative, commercial off-the-shelf technology can provide cost-effective ways for the Coast Guard to modernize its equipment and address its operational needs. The recommendation provides $20,000,000 for the Coast Guard to establish an innovative technology program. The Committee urges the Coast Guard to use this program to test, evaluate, and integrate commercially available technologies such as unmanned maritime systems, including those with autonomous control and computer vision, and tactical small unmanned aircraft systems (sUAS). The Coast Guard is encouraged to use its other transaction authority under section 11205 of Public Law 117—263 in executing these funds. The Coast Guard is directed to brief the Committee at least 15 days prior to obligating funds for this purpose.

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 358 of 714 PageID #:1408



*Tracking Missions.*—Beginning 90 days after the date of enactment of this Act and continuing quarterly thereafter, the Coast Guard shall provide a summary of the approximate hours, dollars, personnel, and assets dedicated to each of Coast Guard's statutory missions. Beginning with the second briefing, Coast Guard shall also include a retrospective analysis of the hours, dollars, personnel, and assets dedicated to each statutory mission in the previous quarter.

*Unmanned Maritime Systems.*—Maintaining adequate maritime domain awareness is a perennial challenge. The rapid proliferation and advancement of unmanned maritime systems, both in unmanned surface vessels and unmanned underwater vehicles, available for maritime domain awareness has, at times, led the Coast Guard to take a scattershot approach to their use. The Committee directs the Coast Guard to develop a comprehensive strategy identifying priority locations for improving maritime domain awareness, determining which data streams are most needed in each area, and the optimal fleet mix of unmanned maritime systems and other technologies. Further, the Coast Guard is directed to periodically survey industry to assess emerging technologies that may offer more cost-effective solutions to improving maritime domain awareness. The recommendation includes $40,000,000 for unmanned maritime systems.

*U.S. Virgin Islands and the Caribbean.*—The Committee supports the work of the Coast Guard in this region but remains concerned about insufficient maritime resources based on the U.S. Island of St. Croix. Within 90 days of the date of enactment of this Act, the Coast Guard shall brief the Committee on its efforts to respond to drug trafficking, weapons trafficking, human trafficking, and smuggling operations in this area. The Coast Guard is directed to address each with respect to necessary ship deployments, force posture, and force projection in the Caribbean region and to incorporate reaction time to San Juan, St. Thomas, and St. Croix.

*Visit, Board, Search, and Seizure Training Apparatus.*—Within the funds provided, the Committee urges the Coast Guard to purchase two additional Visit, Board, Search, and Seizure (VBSS) Training Apparatus based on the successful deployment of the VBSS Training Apparatus at Tactical Law Enforcement South. The VBSS Training Apparatus has been shown to be a cost-effective and efficient training solution to bolster maritime border security.

*Wing-in-Ground Craft Inspections.*—The Committee is encouraged by new transportation solutions in the maritime industry including the development of electric wing-in-ground coastal passenger vessels. Wing-in-ground craft have the potential to increase the efficiency and speed of coastal and inter-island transportation and reduce passenger costs. Within the funds provided, including funds provided for marine inspection and standards for innovative vessels, the Coast Guard is directed to develop the capacity to provide wing-in-ground craft certification and inspections.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

| | |
|---|---|
| Appropriation, fiscal year 2025 | $1,413,950,000 |
| Budget request, fiscal year 2026 | 1,744,040,000 |
| Recommended in the bill | 2,026,790,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | +612,840,000 |
| Budget request, fiscal year 2026 | +282,750,000 |

The Coast Guard is directed to continue briefing the Committee quarterly on all major acquisitions. The briefings shall identify major challenges to the programs and obligations and expenditures for the last five years. Further, the briefings shall include a discussion of terminated programs and the follow on, if any, to those programs. The Committee is frustrated by the delay in quarterly updates during fiscal year 2025. The Committee looks forward to resuming a quarterly cadence for these briefings.

The Committee also directs the Coast Guard to include an estimate of the receipts to be deposited in the Housing Fund for the budget year and a plan for the expenditure of those funds in its annual budget justifications. Any deviations from the plan shall be reported to the Committee not fewer than 15 days before the obligation of funds.

Vessels

The recommendation includes $530,000,000 for Offshore Patrol Cutter (OPC), $300,000,000 for Fast Response Cutter (FRC), $135,000,000 for Waterways Commerce Cutter, $160,000,000 for In-Service Vessel Sustainment (ISVS), $100,000,000 for Polar Security Cutter (PSC), $20,000,000 for a Great Lakes Icebreaker, and $10,000,000 for Cutter Boats.

*Arctic Security Cutters*.—The Committee notes that a 2023 Coast Guard fleet mix analysis concluded that the Service requires a total of eight to nine polar icebreakers, including four to five heavy polar icebreakers and four to five medium polar icebreakers, to perform its polar (i.e., Arctic and Antarctic) missions in coming years. Consistent with the authority and direction provided in section 11218 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (P.L. 117–347), the Committee encourages the Coast Guard to establish a program office for the acquisition of Arctic Security Cutters. Not later than 90 days after the date of enactment of this Act, the Coast Guard shall submit a multi-year investment plan to achieve the total number of icebreakers required in the 2023 fleet mix analysis.

*Domestic Icebreaking Capability*.—The Committee notes the importance of the Coast Guard's domestic icebreaking mission to the economy of the Great Lakes region. Inadequate icebreaking capacity can have devastating economic impacts, including significant job losses. The Committee recommends $20,000,000 for the Service to continue work on procuring a second heavy Great Lakes Icebreaker. The Committee also encourages the Service to begin examining how to replace its aging fleet of 140-foot bay-class tugboats. The Committee directs the Coast Guard to brief the Committee not later than 180 days after the date of enactment of this Act on the status of these important domestic priorities.

*Fast Response Cutter*.—The recommendation provides $300,000,000 for the purchase of three additional FRCs, economic

price adjustments related to the rise in material and labor costs, and post-delivery missionization costs.

*In-Service Vessel Sustainment.*—The Committee notes the importance of the ISVS program for maintaining and extending the service life of Coast Guard's vessels. The recommendation provides $160,000,000 for this program, which includes $60,000,000 for a service life extension for a 270-foot Medium Endurance Cutter to be used in the Indo-Pacific.

*National Security Cutter (NSC).*—The Committee is frustrated that the actions of the NSC contractor led the Coast Guard to forgo NSC 11. The contractor's use of pitted steel plates resulted in a no-win situation for the Coast Guard. Either the Service had to accept a vessel that does not meet its standards, or it had to forgo a critical national security asset. The Committee encourages the Coast Guard to work with the General Services Administration to determine whether any lessons learned from NSC 11 should be incorporated in the Federal Acquisition Regulations to disincentivize contractors from refusing to do the work they have been paid to do.

*Offshore Patrol Cutter.*—The recommendation provides $530,000,000 to continue the program of record for these critical assets. The Committee is frustrated by the delays in OPC Stage 1 and supports the efforts the Coast Guard has taken to de-risk the program.

*Polar Security Cutter.*—The recommendation includes $100,000,000 for PSC. The Committee remains supportive of the construction of the first PSC and recognizes the urgency of the capability.

*Special Purpose Craft—Heavy Weather (SPC HWX).*—The Committee remains concerned with the proposed replacement of the 52-foot SPC HWX in the Pacific Northwest. The Committee has safety concerns with the proposed requirement that a replacement for the 52-foot SPC HWX should be able to tow large vessels over the hazardous river bars along the Washington and Oregon coasts. An increased towing capacity creates a moral hazard, and the Committee is concerned the Coast Guard is prioritizing saving property over the safety of its members. The Committee does not provide funds for this program.

*Waterways Commerce Cutter.*—The recommendation includes $135,000,000 to begin recapitalization of the Coast Guard's inland river tenders.The Committee recognizes the urgency in replacing the Service's existing fleet of inland waterways and western river cutters and fully supports the program.

### Aircraft

The recommendation provides $183,000,000 for an HC–130J Acquisition, $100,000,000 for MH–60T Sustainment, $98,000,000 for large Unmanned Aircraft Systems, and $750,000 for small Unmanned Aircraft Systems.

*HC–130J.*—The recommendation includes $183,000,000 for the purchase of one additional HC–130J aircraft for the Coast Guard's fleet, project management, outfitting of existing aircraft, and a training simulator.

*Long-Range Unmanned Aircraft.*—The recommendation provides $98,000,000 for these aircraft and necessary ground stations. The Committee supports the Coast Guard increasing its use of long-

range, unmanned aircraft given the success of the MQ–9 Joint Program Office with CBP. These aircraft provide a cost-effective platform to improve high-seas interdiction and maritime rescue. Several of the Coast Guard's missions, such as International Ice Patrol, can be entirely replaced by unmanned systems. As the Coast Guard develops this program, the Committee encourages the Service to consider any potential cost savings from co-locating ground stations with existing DHS or DoD facilities.

*Medium Unmanned Aircraft Systems (mUAS).*—The Committee notes the success of unmanned aircraft systems deployed on NSCs for improving intelligence, surveillance, and reconnaissance. The Coast Guard is urged to consider the viability of including mUAS on Medium Endurance Cutters and OPCs.

*MH–60T.*—The Committee supports the Coast Guard's recapitalization and transition to a rotary wing fleet consisting of all MH–60T aircraft and provides $100,000,000 for additional aircraft and other necessary components.

### Other Acquisition Programs

The recommendation includes $30,000,000 for In-Service Systems Sustainment, $30,000,000 for Cyber and Enterprise Mission Platform, $25,000,000 for C4ISR, $21,500,000 for Program Oversight and Management, $9,040,000 for Other Equipment and Systems, and $4,500,000 for Survey and Design—Vessels, Boats, and Aircraft.

*Basic Handheld Radiation Isotope Identifiers.*—The recommendation provides $2,040,000 for Basic Handheld Radiation Isotope Identifiers that were previously procured for the Coast Guard by the Countering Weapons of Mass Destruction Office.

*Command, Control, Communications, Computers, Intelligence, Surveillance and Reconnaissance (C4ISR) Integration.*—The Committee notes the capabilities of the government-owned Minotaur mission system that links sensors, cameras, radar, and other C4ISR components into a single system and understands it is currently deployed or planned for deployment on Coast Guard air and sea assets, as well as other DHS partner agency assets. The Committee encourages the Coast Guard to leverage appropriate resources to continue to include Minotaur in the missionization of new assets and further encourages the Coast Guard to continue expansion of the retrofit of legacy assets such as the fleet of FRCs.

*GIS Modernization.*—The Committee notes the importance of the Coast Guard's Enterprise GIS Modernization and Expansion to allow the SEXTANT program to improve maritime domain awareness workflows that directly support the Marine Transportation System by keeping pace with technological advancements in geographic information systems.

### Shore Facilities and Aids to Navigation

The recommendation provides $270,000,000 for Shore Facilities and Aids to Navigation, including $29,000,000 for Chase Hall Barracks Annex A; $15,000,000 for Phase 2 of the NSC and Ocean-Going Buoy Tender Homeport; and $15,000,000 for planning improvements to the Coast Guard Yard.

*Air Station Barbers Point Hangar Project.*—The Committee supports the Coast Guard's investments at Air Station Barbers Point. Within 180 days of the date of enactment of this Act, the Coast Guard shall provide a report to the Committee containing an update on any unmet requirements for Air Station Barbers Point air assets, including any new maintenance requirements caused by the upgrade of both fixed wing and rotary aircraft and the feasibility of building a permanent hangar in addition to the tension hangar currently under construction.

*Coast Guard Academy Infrastructure.*—The Committee recognizes the significant need for capital investment in Coast Guard Academy infrastructure to support the renovation and modernization of facilities to maintain and increase recruitment and retention. The Committee directs the Coast Guard to provide a report within 180 days of the date of enactment of this Act on a detailed, multi-year investment and modernization plan for Coast Guard Academy infrastructure. Additionally, the Coast Guard should include any actions requested or required of Congress to facilitate such investment and modernization. Further, the recommendation provides $29,000,000 for Chase Hall Barracks Annex A.

*Coast Guard Yard.*—The Coast Guard Yard provides an essential industrial capability for the Service. It cannot currently accommodate NSCs or OPCs and is badly in need of modernization. The Committee recommends $15,000,000 for the Coast Guard to begin planning yard modernization.

RESEARCH AND DEVELOPMENT

| | |
|---|---|
| Appropriation, fiscal year 2025 | $7,476,000 |
| Budget request, fiscal year 2026 | 67,701,000 |
| Recommended in the bill | 7,476,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | – – – |
| Budget request, fiscal year 2026 | −60,225,000 |

HEALTH CARE FUND CONTRIBUTION [1]

| | |
|---|---|
| Appropriation, fiscal year 2025 | $281,851,000 |
| Budget request, fiscal year 2026 | 297,731,000 |
| Recommended in the bill | 297,731,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | +15,880,000 |
| Budget request, fiscal year 2026 | – – – |

The Health Care Fund Contribution accrues the Coast Guard's military, Medicare-eligible health benefit contribution to the Department of Defense Medicare-Eligible Retiree Health Care Fund. Contributions are for future Medicare-eligible retirees, as well as retiree dependents and their potential survivors.

RETIRED PAY

| | |
|---|---|
| Appropriation, fiscal year 2025 | $1,210,840,000 |
| Budget request, fiscal year 2026 | 1,249,000,000 |
| Recommended in the bill | 1,249,000,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | +38,160,000 |
| Budget request, fiscal year 2026 | – – – |

[1] This is a permanent indefinite discretionary appropriation.

The Retired Pay mandatory appropriation provides payments as identified under the Retired Serviceman's Family Protection and Survivor Benefits Plans and other retired personnel entitlements identified under prior-year National Defense Authorization Acts. This appropriation also includes funding for medical care of retired personnel and their dependents.

## UNITED STATES SECRET SERVICE

| | |
|---|---|
| Appropriation, fiscal year 2025 | $3,318,797,000 |
| Budget request, fiscal year 2026 | 3,294,853,000 |
| Recommended in the bill | 3,232,731,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | −86,066,000 |
| Budget request, fiscal year 2026 | −62,122,000 |

### Mission

The United States Secret Service (USSS or "the Secret Service") protects and investigates threats against the President and Vice President, their families, visiting heads of state, and other designated individuals; protects the White House, the Vice President's Residence, foreign missions, and certain other facilities within Washington, D.C.; and coordinates the security at National Special Security Events (NSSEs). The Secret Service also investigates violations of laws relating to counterfeiting of obligations and securities of the United States; financial crimes, including access device fraud, financial institution fraud, identity theft, and computer fraud; and computer-based attacks on financial, banking, and telecommunications infrastructure. In addition, the agency provides support for investigations related to missing and exploited children.

### OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriation, fiscal year 2025 | $3,238,982,000 |
| Budget request, fiscal year 2026 | 3,036,991,000 |
| Recommended in the bill | 3,103,191,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | −135,791,000 |
| Budget request, fiscal year 2026 | +66,200,000 |

Within the total amount provided for Operations and Support, the bill makes $11,299,000 available until September 30, 2027 for certain activities.

*Communications, Law Enforcement, and Awareness.*—The Committee provides $6,000,000 for the Secret Service's initiative to modernize and enhance situational awareness, communications, and sensor automation across protective and law enforcement operations through edge processing in Sensor Network Access Point.

*Countering Small Unmanned Aircraft Systems (sUAS) Technology and Training.*—In light of the growing security threat posed by sUAS and the need for SLTT law enforcement to expand its usage of drones, the Committee recommends an increase of $5,000,000 to develop a portable detection and identification system for countering sUAS and for associated training at the National Computer Forensics Institute.

*Countering Unmanned Aircraft Systems (cUAS) Review.*—USSS is directed to conduct a review of its cUAS capabilities to determine further technological needs to ensure the safety of its protectees. The review shall include an evaluation of the Secret Service's cur-

rent cUAS technology and operational readiness, as well as a cost assessment for technology improvements. USSS shall provide a report to the Committee within 180 days of the date of enactment of this Act on the findings of the review.

*Facial Recognition Technology for Investigations.*—The recommendation includes $5,400,000 for training and technology that leverages open-source image analysis to enhance financial criminal investigations.

*Financial Crimes.*—The Committee recognizes the efforts of the Secret Service's Cyber Fraud Task Forces to combat bank card access device fraud, including skimming, across the United States. The Secret Service, in partnership with the Federal Trade Commission, other law enforcement entities, and small business owners, is encouraged to sustain and strengthen efforts to educate the public about skimming, investigate electronic crimes, and apprehend individuals responsible for skimming.

*Geospatial Technology.*—The Committee is concerned with the Secret Service's ability to access, utilize, and analyze commercial space-based data and imagery products. As such, the recommendation includes $2,000,000 for procurement of such technology across all field offices to better prepare for and execute protection of USSS protectees, as well as for NSSEs. Within 180 days of the date of enactment of this Act, the Secret Service shall brief the Committee on the procurement, technical or policy impediments to integration, and additional funds needed to expand the capabilities afforded by the procured technology.

*Mental Health Professionals.*—The Committee directs the Department to waive any freeze on hiring mental health providers to support Secret Service personnel and report to the Committee on its compliance not later than 30 days after the date of enactment of this Act.

*National Special Security Events (NSSEs).*—The recommendation includes $15,000,000 for the Service to prepare for and execute future NSSEs, including the 2026 FIFA World Cup. USSS shall provide to the Committee updates on a quarterly basis detailing obligation and execution of funds, as well as projected resource requirements for fiscal year 2027 and beyond.

*National Threat Assessment Center (NTAC).*—The recommendation includes an increase of $5,000,000 for NTAC, which supports efforts by public and private sector entities to confront the threat of targeted violence that impacts communities, including schools.

The Committee encourages the NTAC to conduct additional research into targeted violence and evidence-based practices in preventing targeted violence impacting schools, workplaces, houses of worship, universities, and other communities, to establish a nationwide training plan, and promote the development of best practices and standardization across all levels of government. NTAC shall coordinate with relevant federal and SLTT agencies; law enforcement; mental health officials; and private entities in developing and offering training courses on preventing targeted school violence to public or private entities, including local education agencies. Relevant findings shall be made publicly available on SchoolSafety.gov.

The Committee directs the Secret Service to include dedicated resources for NTAC in its fiscal year 2027 budget submission to Congress.

*Recruitment and Retention Initiatives.*—The Committee provides $10,000,000 to support recruitment and retention initiatives that began in fiscal year 2025. The Committee supports all efforts to ensure a robust workforce and encourages the Secret Service to continue updating the Committee with analyses of further recruitment and retention needs.

*Secret Service Hiring.*—The Committee applauds the Secret Service's progress in hiring throughout fiscal year 2025 and provides $10,000,000 to continue such efforts. Within 180 days of the date of enactment of this Act, the Secret Service shall provide updated hiring projections for all law enforcement positions from fiscal year 2026 to fiscal year 2030 and detail resource requirements to meet such projections. The briefing should also include ongoing efforts to decrease the time to hire and increase yield rates from applicants to hires.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

| | |
|---|---|
| Appropriation, fiscal year 2025 | $75,598,000 |
| Budget request, fiscal year 2026 | 254,612,000 |
| Recommended in the bill | 126,290,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | +50,692,000 |
| Budget request, fiscal year 2026 | −128,322,000 |

The recommendation includes $75,000,000 for the initial phase of the White House Defense Training Facility project, located at the James J. Rowley Training Center. USSS shall provide a spend plan for these funds within 45 days of the date of the enactment of this Act and shall submit a schedule of construction progress on a quarterly basis. Additionally, within 180 days of the date of enactment of this Act, the Secret Service shall provide cost estimates for the second phase of the project, to include Federal and contract staffing needs.

RESEARCH AND DEVELOPMENT

| | |
|---|---|
| Appropriation, fiscal year 2025 | $4,217,000 |
| Budget request, fiscal year 2026 | 3,250,000 |
| Recommended in the bill | 3,250,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | −967,000 |
| Budget request, fiscal year 2026 | – – – |

TITLE II—ADMINISTRATIVE PROVISIONS

Section 201. The Committee continues by reference a provision regarding overtime compensation.

Section 202. The Committee continues a provision allowing CBP to sustain or increase operations in Puerto Rico with appropriated funds.

Section 203. The Committee continues a provision regarding the availability of fee revenue collected from certain arriving passengers.

Section 204. The Committee continues a provision allowing CBP access to certain reimbursements for preclearance activities.

Section 205. The Committee continues a provision regarding the importation of prescription drugs by an individual for personal use.

Section 206. The Committee continues a provision regarding waivers of the Jones Act.

Section 207. The Committee continues a provision prohibiting DHS from establishing a border crossing fee.

Section 208. The Committee continues a provision prohibiting the obligation of funds prior to the submission of an expenditure plan for funds made available for "U.S. Customs and Border Protection—Procurement, Construction, and Improvements".

Section 209. The Committee continues by reference a provision prohibiting the construction of border security barriers in specified areas.

Section 210. The Committee continues a provision on vetting operations at existing locations.

Section 211. The Committee continues and modifies a provision that describes the use of funds provided under the heading "U.S. Customs and Border Protection—Procurement, Construction, and Improvements".

Section 212. The Committee includes a new provision prohibiting the admission of aliens on F or M visas for attendance at an unaccredited educational institution.

Section 213. The Committee includes a new provision prohibiting the parole of Chinese nationals into the Commonwealth of the Northern Mariana Islands.

Section 214. The Committee includes a new provision prohibiting the entry of aerosol dispensing drones made in a foreign adversary country.

Section 215. The Committee includes a new provision prohibiting the use of funds to reduce participation in the 287(g) program.

Section 216. The Committee continues a provision regarding the 287(g) program.

Section 217. The Committee continues a provision prohibiting the use of funds provided under the heading "U.S. Immigration and Customs Enforcement—Operations and Support" to contract for detention services if the facility receives less than "adequate" ratings in two consecutive performance evaluations.

Section 218. The Committee continues a provision regarding the reprogramming of funds related to the detention of aliens.

Section 219. The Committee continues by reference a provision that requires ICE to provide statistics about its detention population.

Section 220. The Committee continues and modifies a provision related to reporting on 287(g) agreements.

Section 221. The Committee includes a new provision prohibiting the transportation of aliens into the interior of the country for purposes other than enforcement.

Section 222. The Committee includes a new provision prohibiting the provision or facilitation of abortion services, with limited exceptions, for ICE detainees.

Section 223. The Committee includes a new provision prohibiting the provision of gender-affirming care for ICE detainees.

Section 224. The Committee includes a new provision requiring the Secretary to make certain prioritizations and ensure every

alien enrolled in an Alternatives to Detention program is equipped with mandatory GPS monitoring.

Section 225. The Committee continues a provision requiring ICE to submit an initial obligation plan.

Section 226. The Committee includes a new provision prohibiting the development, pilot, or implementation of a physical identification card for aliens.

Section 227. The Committee includes a new provision establishing the minimum rate of allowance paid to certain ICE detainees.

Section 228. The Committee includes a new provision limiting inspection parameters at certain facilities for the provision of detention services.

Section 229. The Committee includes a new provision regarding ICE's international presence.

Section 230. The Committee continues a provision clarifying that certain elected and appointed officials are not exempt from Federal passenger and baggage screening.

Section 231. The Committee continues a provision authorizing TSA to use funds from the Aviation Security Capital Fund for the procurement and installation of explosive detection systems or for other purposes authorized by law.

Section 232. The Committee continues a provision directing the Administrator of TSA to report to specified Committees about the agency's investment plans.

Section 233. The Committee includes a new provision amending current law to require briefings for unclaimed money at TSA checkpoints.

Section 234. The Committee continues a provision prohibiting funds made available by this Act under the heading "Coast Guard—Operations and Support" for recreational vessel expenses, except to the extent fees are collected from owners of yachts and credited to this appropriation.

Section 235. The Committee continues a provision requiring submission of a future-years capital investment plan for the Coast Guard.

Section 236. The Committee continues a provision allowing for use of the Coast Guard Housing Fund.

Section 237. The Committee includes a new provision prohibiting funds made available to the Coast Guard from being used to enforce restrictions on vessel speed for the North Atlantic right whale or the Rice's whale.

Section 238. The Committee continues a provision allowing the Secret Service to obligate funds in anticipation of reimbursement for personnel receiving training.

Section 239. The Committee continues a provision prohibiting funds made available to the Secret Service from being used for the protection of the head of a federal agency other than the Secretary of Homeland Security, except when the Director has entered into a reimbursable agreement for such protection services.

Section 240. The Committee continues a provision allowing the reprogramming of funds within "United States Secret Service—Operations and Support".

Section 241. The Committee continues a provision allowing for funds made available for "United States Secret Service—Oper-

ations and Support" to be available for travel of employees on protective missions without regard to limitations on such expenditures in this or any other Act after notification to the Committees on Appropriations.

Section 242. The Committee includes a new provision regarding the standard of treatment for certain individuals in CBP custody.

Section 243. The Committee includes a new provision prohibiting funds from detaining or deporting U.S. citizens.

## TITLE III—PROTECTION, PREPAREDNESS, RESPONSE, AND RECOVERY

### CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY

| | |
|---|---|
| Appropriation, fiscal year 2025 | $2,873,008,000 |
| Budget request, fiscal year 2026 | 2,378,338,000 |
| Recommended in the bill | 2,738,206,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | −134,802,000 |
| Budget request, fiscal year 2026 | +359,868,000 |

### Mission

The Cybersecurity and Infrastructure Security Agency (CISA) is responsible for enhancing the security of the Nation's cyber and physical infrastructure and interoperable communications systems; safeguarding and securing cyberspace; and strengthening national preparedness and resilience.

#### OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriation, fiscal year 2025 | $2,382,814,000 |
| Budget request, fiscal year 2026 | 1,957,885,000 |
| Recommended in the bill | 2,237,159,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | −145,655,000 |
| Budget request, fiscal year 2026 | +279,274,000 |

*Bimonthly Division Briefings.*—CISA shall continue to brief the Committee bimonthly on the operations of specific divisions within the agency to include references to funded programs, technology, personnel, contracts, and metrics, among other pressing topics. CISA shall work with the Committee to identify the agenda and scope of such briefings in advance.

*Budget Operations Maturity.*—The Committee is concerned with the budgetary gimmicks used by CISA to account for past over-hiring and shared services transfers that impact congressional program priorities. CISA is directed to notify the Committee at least five business days prior to any realignment of funds under the section 503 threshold within the bill including a detailed description of the PPA changes and purpose. Not later than 60 days after the date of enactment of this Act, CISA shall brief the Committee on its efforts to improve its budgeting operations. The briefing shall include an analysis of the last five fiscal year historical lapsed balances by PPA and specific line items including efforts to avoid this situation in the future. The briefing shall also include a detailed description of all non-pay to pay transfers and shared services transfers made over the last three fiscal years and how CISA will avoid needing to execute similar transfers moving forward.

*Cyber Incident Reporting for Critical Infrastructure Act (CIRCIA) Requirements.*—Public Law 117–103 mandates that CISA publish a Notice of Proposed Rulemaking in the Federal Register within 24 months of enactment of that Act, and issue a final rule 18 months later, due September 2025, to implement mandatory cyber incident reporting for all critical infrastructure owners and operators. A subset of these owners and operators, to be defined in the rulemaking, will be required to report any cyber incident to CISA within 72 hours and any ransom payment within 24 hours. The recommendation includes additional funds for CIRCIA requirements to ensure seamless implementation. As part of the required quarterly budget and staffing briefings, CISA shall brief the Committee on a spend plan for all CIRCIA-dedicated funding and the statutory requirements supported.

*Defense Capabilities.*—The Committee urges CISA to identify and report to Congress on programs and initiatives that bolster its defense capabilities to prevent, identify, and remediate specific tactics and vulnerabilities known to be used by the People's Republic of China and other foreign adversary cyber actors against U.S. critical infrastructure.

*Grant Reporting.*—CISA, in coordination with FEMA, is directed to continue providing the information required under this heading in House Report 118–123 accompanying Public Law 118–47.

*Pay Projections and Analysis.*—CISA shall continue to provide pay projections and analysis as required under this heading in House Report 118–123 accompanying Public Law 118–47 that appropriately compares enacted versus onboard personnel numbers to enable timely congressional review of salary and benefit information during the quarterly budget and staffing briefings. The required pay projections and analysis shall include cyber pay considerations. The Committee notes this information is important when assessing CISA's progress toward hiring goals.

*Quarterly Budget and Staffing Briefings.*—CISA is directed to continue to provide quarterly budget and staffing briefings as described in the explanatory statement accompanying Public Law 117–103.

*Social Media Policy.*—CISA is reminded that it is required under this heading in the explanatory statement accompanying Public Law 118–47 to transmit to the Committee an official policy concerning content-related engagement with social media companies and content platforms, including rules of engagement and subject matter parameters of such engagements among the other listed requirements.

*Triannual Classified Briefings.*—Beginning 30 days after the date of enactment of this Act, and triannually thereafter, CISA shall provide a classified briefing on significant threats to the Nation within the purview of CISA's mission. The briefings shall include at a minimum: intelligence informing programmatic or organizational changes or actions, ongoing threats to cyber or critical infrastructure, and steps taken to mitigate detected threats.

## Cybersecurity

The recommendation includes $1,094,842,000 for the Cybersecurity Division. This includes budget request consolidations within the Cybersecurity Division for shared services efficiencies and

budget request transfers to Mission Support due to strategic contract realignments and the consolidation of IT systems within the Office of the Chief Information Officer; increases of $2,004,000 for CIRCIA implementation and $3,200,000 for cybersecurity shared services for critical infrastructure; and decreases of: $12,022,000 due to cost savings from initial voluntary deferred resignations, $17,430,000 for previously funded vacancies, and $20,000,000 for cost savings due to election security mission consolidation.

The Committee supports the use of further cost savings for protective Domain Name System (DNS), open-source software, and supply chain security enhancements. Accordingly, the recommendation reverses some non-pay to pay transfers made in fiscal year 2025 to allow CISA flexibility to invest in such cybersecurity enhancements.

*Attack Surface Management (ASM).*—The recommendation includes a minimum of $73,700,000 to sustain prior year funding levels for CISA's ASM program to improve situational awareness of internet-facing attack surface vulnerabilities. The Committee recognizes that CISA's ASM capabilities have dramatically improved the agency's situational awareness of internet-facing attack surface vulnerabilities across the Federal Civilian Executive Branch (FCEB), SLTT, and select critical infrastructure partner networks before they can be exploited by foreign adversaries. To ensure the efficient use of funds and enable effective program execution, CISA is encouraged to leverage dedicated and sustainable procurement vehicles for ASM program contractor support and commercial capabilities. Not later than 120 days after the date of enactment of this Act, CISA shall brief the Committee on the feasibility of administering an ASM shared service offering for FCEB partners, similar to what it already provides for DNS security, to include capabilities for high impact environments that handle the Federal government's most sensitive unclassified data.

*Critical Infrastructure Program.*—The Committee directs CISA to prioritize funds for the Critical Infrastructure Program on the most consequential critical infrastructure sectors being targeted by foreign nation-state actors. The recommendation includes an increase of $3,200,000 for the program. CISA shall consider bringing on new services to the program and review the efficacy of a supply-chain vendor certification and real-time risk monitoring tool that ensures adherence to international best practices and security standards. Not later than 120 days after the date of enactment of this Act, CISA shall brief the Committee on a spend plan for the program, the services offered to address specific cybersecurity risks, how they made determinations about which shared services to provide based on risk, and a prioritized list of other shared services the program would implement if resources allowed.

*Cyber Education, Training, and Skilling.*—The Committee acknowledges the need to grow the number of qualified cybersecurity professionals within the Federal government. The Committee acknowledges the need to continue to upskill the current Federal cybersecurity workforce to address the shortage of qualified cybersecurity professionals. The Committee continues to support sustained investment in the Cyber Defense Education and Training (CDET) program; the Federal Cyber Skilling Academy; the National Initiative for Cybersecurity Education; and the Cybersecurity Education

and Training Assistance Program (CETAP). The Committee encourages CISA to collaborate with four-year academic institutions with specific expertise in addressing the challenges of emerging artificial intelligence technology with the goal of strengthening the Nation's cyber defenses and building a more resilient, skills-based workforce. CISA is also encouraged to consider partnerships with universities to create tailored programs that build upon students' prior learning experiences such as skills acquired through military service, community college programs, technical certifications, and other non-degree educational experiences.

*DHS Contractor Cyber Readiness Pilot.*—Not later than 270 days after the date of enactment of this Act, CISA is directed to brief the Committee on its assessment of the efficacy of a cyber readiness pilot that would identify critical DHS contractors based on strategic importance and risk profile, conduct in-depth cybersecurity assessments using NIST SP 800–171 standards, and deliver tailored remediation plans and provide ongoing support to ensure compliance. The goal of such pilot program would be to improve the protection of Controlled Unclassified Information and the integrity of national security supply chains. The assessment shall include resource considerations for: initial planning and contractor selection, vulnerability assessments and remediation consultation services, analytical reporting and tailored remediation recommendations, and follow-up monitoring and compliance verification.

*Memory Safety.*—The Committee encourages CISA, in consultation with the Sector Risk Management Agencies, to support the definition, design, development, distribution, and testing of technology that fosters memory safe protection of critical open-source packages which underpin critical infrastructure. Qualifying critical infrastructure improvements should minimize system downtime by reducing the number of critical security patches that need to be applied, be certified or certifiable to meet safety standards in their industries, and able to be implemented in a timely manner. Not later than 180 days after the date of enactment of this Act, CISA shall brief the Committee on its progress to harden critical infrastructure memory safety attack surfaces across priority critical infrastructure sectors.

*Persistent Access Capability (PAC).*—The Committee recognizes the critical role CISA's Endpoint Detection and Response (EDR) PAC program plays in strengthening the cybersecurity posture of FCEB agencies and ensuring proactive threat hunting and incident response without operational impacts to FCEB networks. The Committee directs CISA to encourage all FCEB agencies to expeditiously implement the timelines and implementation milestones set forth in associated CISA guidance to achieve full enrollment of applicable endpoints in PAC-compliant EDR solutions and adoption of technical controls necessary to support real-time cyber threat visibility across Federal networks. FCEB agencies shall ensure that CISA has timely and effective access to required cybersecurity data, consistent with established security, privacy, and oversight measures. Not later than 120 days after the date of enactment of this Act, CISA shall brief the Committee on PAC implementation, including FCEB agency compliance status, technical challenges, any resource constraints, and recommended actions to ensure expeditious adoption.

*Post-Quantum Cryptography*.—The Committee recognizes the importance of FCEB agencies building robust and accurate cryptographic inventories to support a post-quantum transition. The Committee also recognizes the importance of automating cryptographic inventories at FCEB agencies in alignment with guidance from CISA, the National Institute of Standards and Technology, and the Office of Management and Budget (OMB). Not later than 180 days after the date of enactment of this Act, CISA shall provide a briefing detailing: (1) the status of automated cryptographic inventory adoption at FCEB agencies; (2) gaps or inconsistencies in inventorying methods across agencies; and (3) recommendations for standardizing and enhancing automation to ensure seamless migration to quantum-resistant cryptographic algorithms.

*Red Teaming*.—The Committee encourages CISA to consider ways to enhance cybersecurity penetration testing and red teaming activities for FCEB agencies, as well as high priority critical infrastructure companies, to augment network hardening and security operations.

*Regulation Harmonization*.—The Committee is concerned with the proliferation of cybersecurity regulations from multiple government entities and the potential impacts on effective and efficient compliance. CISA's efforts to promote cybersecurity regulatory harmonization should continue in collaboration with the Office of the National Cyber Director with the goal of strengthening security while reducing duplicative and conflicting cybersecurity requirements to minimize time, expense, and complexity of compliance. Not later than 90 days after the date of enactment of this Act, CISA shall brief the Committee on progress towards harmonizing and streamlining duplicative cybersecurity rules and regulations. Additionally, the brief should identify any remaining barriers to harmonization and provide recommendations to expedite solutions.

*Security Operations Center Modernization*.—CISA's Security Operations Center "as-a-Service" (SOCaaS) offering, currently delivered by the DOJ, provides FCEB agencies with a customizable menu of security operations services including threat monitoring, detection and incident response, threat intelligence, and cybersecurity investigations. The Committee notes that cutting edge cloud-delivered technologies leveraging artificial intelligence and advanced machine learning are rapidly accelerating the capabilities of both network defenders and foreign adversaries. To stay ahead of the threat, Federal network defenders must be able to access, interpret, and rapidly analyze large amounts of security data from a variety of deployed sensors and capabilities; quickly identify, prioritize, and triage potential security incidents; and quickly mitigate threats wherever possible. Therefore, CISA is directed to work with the DOJ to assess the feasibility of transitioning SOCaaS delivery to CISA and deploying a new, modern SOCaaS offering capable of consolidating existing agency network security data and tools into an AI-driven platform to provide FCEB agencies state-of-the-art security intelligence and automation management capabilities. Not later than 60 days after the date of enactment of this Act, CISA and its DOJ partners shall brief the Committee on its assessment and any resources required to facilitate the transition.

*Semiannual Cybersecurity Technology and Services Briefings*.—The Committee directs CISA to continue semiannual briefings on

the National Cybersecurity Protection System (NCPS), the Continuous Diagnostics and Mitigation (CDM) program, and Joint Collaborative Environment (JCE) including information on the remaining NCPS capabilities and the new Cyber Analytics and Data System capabilities. The briefings shall include timelines and acquisition strategies from the NCPS transition to JCE as well as a full description of the CDM and JCE capabilities currently deployed; the gaps remaining; and funding levels for the prior fiscal year, the current fiscal year, and the budget year for each capability.

*Specific Foreign Vehicle Cyber Risks*.—The Committee recognizes the importance of better understanding the potential security risks of vehicles operating in the United States that send telemetry to and receive updates from companies considered foreign entities of concern and whether such entities empower their governments to access sensitive data for national security purposes. Such activity would raise significant privacy and security concerns for data used by connected vehicles manufactured and operated by companies incorporated in foreign countries of concern, particularly the potential for unauthorized access to collect and transmit data, implement surveillance capabilities embedded within a vehicle's technology, and disable some vehicles. The Committee directs CISA, in partnership with the appropriate Sector Risk Management Agencies, to identify potential risks to U.S. critical infrastructure related to vehicles that send telemetry to and receive updates from companies considered as foreign entities of concern. CISA shall report to the Committee on its findings not later than 240 days after the date of enactment of this Act.

*State and Local Cybersecurity Grant Program (SLCGP)*.—The Committee encourages CISA, in coordination with FEMA, to consider targeted outreach to elementary and secondary schools as the Department administers the SLCGP.

## Infrastructure Security

The recommendation includes $120,889,000 for the Infrastructure Security Division. This includes budget request transfers to Mission Support due to strategic contract realignments and consolidation of IT systems within the Office of the Chief Information Officer; an increase of $1,350,000 for 2026 FIFA World Cup activities; and decreases of: $1,895,000 due to cost savings from initial voluntary deferred resignations, $3,398,000 for previously funded vacancies, and $8,251,000 for cost savings due to the lapse in the Chemical Facility Anti-Terrorism Standards program authorization.

*Bombing Prevention*.—The recommendation includes $26,623,000 for the Office for Bombing Prevention (OBP). The CISA OBP plays a critical role in ensuring public safety and reducing the Nation's vulnerability to explosive threats by building capabilities to deter, prevent, and respond to bombing incidents and the use of explosives against critical infrastructure. The Committee encourages CISA to enhance partnerships between OBP and entities addressing similar missions, including the FBI's Hazardous Devices School and Terrorist Devices Analytic Center and the ATF's National Center for Explosives Training and Research and U.S. Bomb Data Center. Not later than 90 days after the date of enactment of this Act,

CISA shall provide a briefing to the Committee on the cost-benefit analysis and feasibility review of collocating OBP with these entities to further such collaboration, including any resources associated with collocating facilities and personnel.

*Strengthening Preparedness for Critical Infrastructure and Special Events*.—The Committee recognizes that the CISA Exercise Program provides valuable services that help SLTT and private sector stakeholders enhance the security and resilience of the Nation's critical infrastructure, enabling them to prepare for and respond to threats or attacks targeting critical infrastructure, mass gatherings, and other high-profile events. This is particularly important in advance of upcoming National Special Security Events, including the 2026 FIFA World Cup and the Olympics. Not later than 90 days after the date of enactment of this Act, CISA shall provide a briefing to the Committee on a spend plan for CISA Exercise Support Services.

Emergency Communications

The recommendation includes $91,422,000 for the Emergency Communications Division. This includes budget request transfers to Mission Support due to strategic contract realignments and consolidation of IT systems within the Office of the Chief Information Officer; increases of: $850,000 for 2026 FIFA World Cup activities and $3,200,000 for network priority services proofs of concept; and decreases of: $210,000 for cost savings due to the workforce transition program, $1,682,000 due to cost savings from initial voluntary deferred resignations, $2,000,000 for a grant program, and $2,100,000 for previously funded vacancies.

*First Responder Emergency Medical Communications Program (REMCDP)*.—The recommendation reduces the REMCDP program to $2,000,000 for CISA to administer competitive grants for SLTT merit-based demonstration projects and technical assistance offerings that support the implementation of the National Emergency Communications Plan through innovative approaches to interoperable emergency medical communications in rural areas.

*Next Generation Network Priority Services (NGN–PS)*.—The Committee is aware of proofs of concept currently supported through the NGN–PS Phase II program, including the development of highly customizable platforms enabling communication between disparate wireless and wired protocols. The recommendation includes an enhancement of $3,200,000 for the NGN–PS program.

*Securing Communications Networks*.—CISA is urged to continue to identify ways to encourage Federal, SLTT, and private sector partners to replace any technology or services provided by companies on the Federal Communications Commission Covered List (List of Equipment and Services Covered by section 2 of the Secure Networks Act), the use of which leaves entities exposed to cyber vulnerabilities and foreign espionage.

Integrated Operations

The recommendation includes $213,398,000 for the Integrated Operations Division. This includes budget request consolidations within Integrated Operations for the chemical security mission and transfers to Mission Support due to strategic contract realignments

and consolidation of IT systems within the Office of the Chief Information Officer; increases of: $800,000 for 2026 FIFA World Cup activities, $2,460,000 for chemical security mission realignment, and $15,219,000 for CIRCIA implementation; and decreases of: $1,950,000 for cost savings due to election security mission consolidation, $5,336,000 for previously funded vacancies, $5,505,000 for cost savings due to the workforce transition program, and $12,331,000 due to cost savings from initial voluntary deferred resignations.

*CISA Support to Pacific Islands*.—The Committee supports the work of CISA in bolstering the cyber and physical security of Federal, SLTT, and critical infrastructure partners in the Indo-Pacific region and encourages CISA to consider potential areas for growth, including resources needed to expand such Pacific Island engagement to counter activities by foreign nation-state actors. The Committee also encourages CISA to assess the cybersecurity of Guam's energy installations, in coordination with Guam Power Authority, to determine areas of need and opportunities for federal support.

*Regional Security Advisors*.—The Committee urges CISA to fill security advisor vacancies in the ten CISA regional offices, as highlighted in the 2022–2026 Strategic Plan. These advisors will be in addition to the Cybersecurity State Coordinators established in furtherance of section 1717 of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (P.L. 116–283), in order to supplement regional capability in areas of high demand or particular national security importance. Within 90 days of the date of enactment of this Act, CISA shall brief the Committee with representatives from the regional offices on efforts to fill these vacancies.

## Risk Management Operations

The recommendation includes $67,206,000 for the Risk Management Operations Division. This includes budget request transfers to Mission Support due to strategic contract realignments and consolidation of IT systems within the Office of the Chief Information Officer and decreases of: $931,000 for cost savings due to election security mission consolidation, $1,091,000 due to cost savings from initial voluntary deferred resignations, $3,093,000 to refocus the National Risk Management Center on critical infrastructure, and $16,295,000 for previously funded vacancies.

*Digital Twin Technology*.—The Committee recognizes that digital twin technology can provide real-time information regarding the physical and cybersecurity of important facilities, systems, and assets. The Committee encourages CISA to consider whether digital twin technology would improve its ability to understand, manage, and reduce risk to the Nation's cyber and physical infrastructure.

## Stakeholder Engagement and Requirements

The recommendation includes $89,847,000 for the Stakeholder Engagement and Requirements Division. This includes budget request transfers to Mission Support due to strategic contract realignments and consolidation of IT systems within the Office of the Chief Information Officer; an increase of $3,200,000 for a cyber capacity building program; and decreases of: $390,000 for cost sav-

ings due to the workforce transition program, $794,000 due to cost savings from initial voluntary deferred resignations, $2,396,000 for previously funded vacancies.

*Cyber Innovation Center*.—The recommendation includes an additional $3,200,000 for the Cyber Innovation Center.

*Cyber Talent Programs*.—The Committee supports CISA's efforts to work with FCEB agencies to streamline cyber workforce and education programs and recognizes the value of the following programs: the CISA Try Cyber program, which helps provide early skill identification and the fostering of cyber career interest of critically needed cyber talent; the Threat Sandbox Challenges program, which allows CISA to provide rapid training to future cyberspace defenders on some of the most dangerous Common Vulnerabilities and Exposures (CVE) identified in the CISA Known Exploited Vulnerabilities (KEV) Catalog; and AI workforce programs. These programs ensure that CISA is prepared to provide early skill identification within cyber and AI jobs internally and support cyber talent identification and pipeline programs for the FCEB. The Committee encourages CISA to use cost savings from deferred resignations within the Stakeholder Engagement PPA to bolster such programs.

## Mission Support

The recommendation includes $559,555,000 for the Mission Support Division. This includes increases due to budget request transfers for strategic contract realignments and consolidation of IT systems within the Office of the Chief Information Officer and decreases of: $853,000 due to cost savings from initial voluntary deferred resignations, $6,510,000 for previously funded vacancies, $16,800,000 for cost savings due to the workforce transition program, and $34,675,000 for Mission Support efficiencies consistent with the budget request.

## PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

| | |
|---|---|
| Appropriation, fiscal year 2025 | $489,401,000 |
| Budget request, fiscal year 2026 | 420,453,000 |
| Recommended in the bill | 501,047,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | +11,646,000 |
| Budget request, fiscal year 2026 | +80,594,000 |

The recommendation for Procurement, Construction, and Improvements includes $396,147,000 for the CDM program, $65,810,000 for the Cyber Analytics Data System (CADS), $29,090,000 for Next Generation Networks Priority Services, and $10,000,000 for the CyberSentry program.

*Cloud-Native Security*.—The Committee is aware of the CISA CDM program's testing and evaluation of commercially available cloud native application protection platform solutions. Such solutions help FCEB agencies better protect cloud infrastructure and modern applications by remediating vulnerabilities and preventing attacks. These solutions also provide CISA with comprehensive visibility into the security posture of Federal network cloud infrastructure. Not less than $8,000,000 of the amount provided for CDM shall be available for the deployment of proven, scalable cloud native application protection platform tooling to the FCEB. The Com-

mittee encourages CISA to leverage commercial solutions that meet the highest level of security requirements for cloud-delivered services on unclassified networks to FCEB agencies, in order to better protect federal agencies' most sensitive unclassified data and secure federal agency software solutions through the software development lifecycle. CISA shall include an update on steps taken to fulfill this guidance during required fiscal year 2026 quarterly CDM program execution briefs.

*CyberSentry*.—Not later than 90 days after the date of enactment of this Act, CISA shall transmit to the Committee a spend plan for the additional CyberSentry capacity it will achieve with the $10,000,000 provided for fiscal year 2026. The Committee encourages CISA to add at least 30 new CyberSentry partners with the funds provided and to accelerate the engineering required to reduce the cost per deployment and achieve further scalability of the program. CISA is directed to prioritize the expansion of the program to the top at-risk critical infrastructure sectors and companies.

*Endpoint Detection and Response Technologies*.—The Committee supports the comprehensive, real-time threat detection and proactive threat prevention capabilities of EDR technologies through the CDM program. These solutions replace key legacy cybersecurity tools, simplify cyber programs, and provide more complete protection for distributed enterprises, including those with travel and remote work requirements. Leveraging EDR, U.S. government defenders can perform threat hunting, incident response, and a variety of other essential cybersecurity tasks. CISA shall continue to provide the data required under this heading as described in the explanatory statement accompanying Public Law 118–47 during the semiannual Cybersecurity Technology and Services briefings. In such briefings, CISA shall include a timeline for deployment to cloud environments and more information on how it is leveraging EDR technologies to support vulnerability management, IT hygiene, and to enable more responsive managed threat hunting. The Committee provided an enhancement of $41,040,000 for CDM Network Security Management, of which EDR is a part.

*Internet of Things (IoT) Patch Automation*.—The Committee is aware that automated software patch remediation capabilities have been certified by MITRE Labs as interoperable with the CDM program's existing hardware asset management tools to effectively remediate out-of-compliance IoT devices through firmware, password, and certificate management capabilities. CISA is directed to evaluate inclusion into CDM to make the technology available for FCEB agencies.

*Mobile Threat Defense (MTD) for Federal Civilian Networks*.—The Committee recognizes the increasingly sophisticated methods being employed by both nation-state and other actors to gain access to government mobile devices. The Committee is concerned about the number of government devices without mobile device security and the pace of deployment. The recommendation includes an increase of $5,000,000 within the CDM program to expedite the distribution of mobile device security capabilities across FCEB agencies. The funds shall address emerging threats to mobile devices by supporting the deployment of MTD technologies, the integration of MTD with other mobile security technologies, and the alignment of these efforts with zero trust cybersecurity principles. Not later than

180 days after the date of enactment of this Act, CISA shall brief the Committee on progress made toward rolling out MTD technologies across the FCEB, including milestones and remaining challenges.

*New CDM Capability Pilot*.—The recommendation includes $6,000,000 within the CDM program for piloting of new technology capabilities to become available to FCEB agencies. The maximum available for a single technology is $2,500,000, and the Committee encourages CISA to test and evaluate multiple commercially available technologies for inclusion in the pilot. Not later than 120 days after the date of enactment of this Act, CISA shall brief the Committee on a spend plan, including the technologies chosen, the process for choosing the technologies, and the new capabilities they would provide for securing FCEB agencies.

*Operational Technology (OT) Security*.—The Committee is encouraged by CISA's increased focus on the cybersecurity posture of OT and Industrial Control Systems. Inventorying allows agencies to establish a baseline to enable monitoring and detecting unauthorized, abnormal, or potentially malicious activities. Requiring agencies to incorporate IoT and OT assets into the CDM program helps reduce agency threat surface, increase visibility into the Federal cybersecurity posture, and improve Federal cybersecurity response capabilities. CISA is directed to evaluate inclusion into the new CDM capability pilot to make the technology available for FCEB agencies.

*Securing Artificial Intelligence (AI) Tools*.—While the safe and secure use of AI can enhance U.S. government mission effectiveness, the use of unauthorized AI software, including models developed by companies headquartered in, or operating from, foreign countries of concern, can put government networks, data, and applications at risk. Maintaining the security and integrity of AI systems requires a comprehensive approach involving continuous monitoring, assessment, and improvement of the security posture of AI models, data, and infrastructure, in order to effectively identify and address vulnerabilities, misconfigurations, and potential risks associated with AI adoption, and ensure compliance with data handling and security regulations. The Committee is aware of AI security posture management, access, and runtime security solutions that can enable U.S. Federal agencies to proactively protect AI systems from threats, minimize data exposure, and maintain the trustworthiness of AI applications in Federal networks. CISA is directed to evaluate inclusion into the new CDM capability pilot to make the technology available for FCEB agencies.

*Software Bill of Materials (SBOM)*.—The Committee recognizes the importance of SBOM protocols as a comprehensive list of all components, libraries, and dependencies that constitute software. This is critical for tracking components to ensure security, compliance, and operational integrity. The Committee also notes that such a program in CDM must support all asset types, including applications, firmware, operating systems, containers, and cloud workloads, at a government-level scale imperative for the CDM program to meet its goals of comprehensive visibility and near-instantaneous response capabilities. CISA is directed to evaluate inclusion into the new CDM capability pilot to make the technology available for FCEB agencies.

*Zero Trust Architecture (ZTA).*—The Committee supports CISA's efforts to guide the adoption of ZTA across FCEB agencies. Not later than 180 days after the date of enactment of this Act, CISA, in coordination with the Office of the National Cyber Director and OMB, shall brief the Committee on FCEB agency progress toward adopting Zero Trust Architectures, as outlined in Federal government-wide policy memoranda and standards, and efforts to engage FCEB agencies on leveraging the CDM program to upgrade to Zero Trust solutions.

RESEARCH AND DEVELOPMENT

| | |
|---|---|
| Appropriation, fiscal year 2025 | $793,000 |
| Budget request, fiscal year 2026 | – – – |
| Recommended in the bill | – – – |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | –793,000 |
| Budget request, fiscal year 2026 | – – – |

The recommendation includes no funds for Research and Development.

## FEDERAL EMERGENCY MANAGEMENT AGENCY

| | |
|---|---|
| Appropriation, fiscal year 2025 | $27,296,780,000 |
| Budget request, fiscal year 2026 | 30,723,891,000 |
| Recommended in the bill | 31,863,515,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | +4,566,735,000 |
| Budget request, fiscal year 2026 | +1,139,624,000 |

Mission

The Federal Emergency Management Agency (FEMA) helps build, sustain, and improve the Nation's capability to prepare for, protect against, respond to, recover from, and mitigate all hazards through disaster response, recovery, and grant programs supporting first responders, emergency management, mitigation activities, and preparedness.

OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriation, fiscal year 2025 | $1,483,990,000 |
| Budget request, fiscal year 2026 | 1,499,955,000 |
| Recommended in the bill | 1,474,420,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | –9,570,000 |
| Budget request, fiscal year 2026 | –25,535,000 |

The recommendation includes $1,474,420,000 for FEMA Operations and Support, including increases of: $111,000 for cloud modernization and maintenance, $2,907,000 for Community Project Funding grant administration, $3,000,000 for 2026 FIFA World Cup activities, $5,137,000 for continuity of communications, $6,000,000 for technology enhancements, $47,000,000 for the Mt. Weather Emergency Operations Center, and decreases of: $83,873,000 for previously funded vacancies and $9,180,000 consistent with the administration's requested reduction of equity related positions.

*Deferred Resignation Program (DRP).*—The Committee is aware that FEMA is one of the DHS components that will see a significant reduction to its number of full-time employees due to the DRP

process in which hundreds of employees chose to voluntarily separate from the agency in fiscal year 2025. The Committee supports the use of further cost savings towards IT modernization efforts to streamline FEMA programs and systems.

## Mitigation

*Building Resilient Infrastructure and Communities (BRIC) Program.*—The BRIC program was established by Congress in the Disaster Recovery Reform Act of 2018 (P.L. 115–254) and signed into law by President Trump with bipartisan support. While the program was originally intended to improve disaster mitigation efforts and decrease the costs associated with Federal disaster relief, over the last few years the program shifted outside its intended scope. However, the Committee is disappointed that FEMA unilaterally decided to cancel the program instead of implementing appropriate reforms to improve it. The Committee urges the Department to identify and implement reforms as needed without forgoing investments critical to communities across the country to prepare for and recover from future natural disasters.

*Forest Fire Mitigation.*—The Committee notes that new homes continue to be built within the "wildland-urban interface" (WUI) and that as many as 4.5 million homes are at high or extreme risk of wildfires. FEMA is encouraged to identify more ways to support at-risk communities, particularly those in the WUI, that wish to proactively implement mitigation measures, particularly through the pre-disaster mitigation program among others.

*Hazard Mitigation Natural Infrastructure.*—The Committee is aware that rehabilitation or establishment of natural infrastructure, including but not limited to marshes, wetlands, mangroves, and dunes can improve resilience, reduce damage from flooding and coastal storm surges, and provide effective floodplain management. Such natural infrastructure can also have long-term beneficial impacts on topography, soils, water quality, wetlands, floodplains, coastal resources, aquatic resources, and public health and safety in coastal areas. The Committee encourages FEMA to continue to engage with other Federal and non-Federal stakeholders to develop and support conservation and environment-based flood mitigation measures and to utilize mitigation grant funds for natural infrastructure projects.

## Preparedness and Protection

*Animal Wellness Act Implementation and Mobile Pet Shelters.*—The Planning for Animal Wellness Act (P.L. 117–212) required FEMA to establish a working group of experts to review and recommend best practices and Federal guidance on the needs of household pets, service and assistance animals, and captive animals, as appropriate, in emergency and disaster preparedness, response, and recovery. FEMA shall keep the Committee apprised of its efforts to implement Public Law 117–212 and any recommendations made by the working group not later than 90 days after the date of enactment of this Act. FEMA is encouraged to consider ways to provide mobile pet shelter sites for use during major disasters or units that can be deployed quickly to offer temporary shelter and transport for household pets.

*Strategic Stockpiles.*—FEMA, in partnership with the Department of Health and Human Services, shall provide an update within 90 days of the date of enactment of this Act on the coordination of Federal resources to strengthen the capabilities of state strategic stockpiles, minimize duplication, and respond strategically to emergencies.

*Wireless Emergency Alerts.*—The Committee reminds FEMA of the requirement under this heading in House Report 118–123 accompanying Public Law 118–47 and urges the on-time transmission of the report.

Response and Recovery

*Innovative Technologies in Coordinated Disaster Response.*—The Committee is aware that FEMA employs innovative technologies, including Geographic Information System (GIS) tools in collaboration with nonprofit entities, to improve disaster response capabilities, such as urban search and rescue software platforms. The recommendation includes $3,000,000 for the Office of Response and Recovery, in close coordination with the U.S. Fire Administration, to expand existing geospatial search and rescue training, planning, and response program in collaboration with appropriate partners and to continue sustainment and expansion of search and rescue geospatial support technology solutions in preparation for emergency incidents and disaster responses. In addition, the Committee directs FEMA to ensure imagery and information collected through these tools and technologies be made routinely available to support joint preliminary damage assessments and the delivery of FEMA's disaster assistance programs, as appropriate. FEMA shall consider appropriate data exchange between these efforts and the National Emergency Response Information System (NERIS). Not later than 60 days after the date of enactment of this Act, FEMA shall brief the Committee on a spend plan for the funds and information on how FEMA plans to integrate the solution, where appropriate, with NERIS.

*National Urban Search and Rescue (US&R) Response System.*—The Committee recommends a total of $56,000,000 to support the 28 US&R Task Forces, which conduct critical search, rescue, and recovery operations around the country and are deployed on a moment's notice. State and local partners provide significant contributions to ensure these teams are operationally ready to deploy to nationwide disasters, but the funding needs of each task force have exceeded the ability of local partners to support them on their own. This reflects rapidly rising costs due to increased labor and equipment costs, an increase in the frequency of deployments, and an expansion of expected response capabilities.

*Synthetic Aperture Radar (SAR) Satellite-Driven Hazard Monitoring.*—The Committee recognizes that shortening natural disaster response times saves lives, reduces suffering, and helps communities recover quicker. The Committee understands that FEMA has used SAR satellite-driven hazard monitoring technology to analyze disasters such as floods and wildfires, and this data has specifically been proven effective in streamlining disaster declarations, improving immediate situational awareness, and in supporting FEMA's community engagements following major disasters. The recommendation includes $3,000,000 for FEMA to expand the use

of this SAR-driven hazard monitoring technology to help FEMA reduce fraud, streamline individual assistance payments, decrease reliance on costly airborne assets, and save taxpayer dollars through enterprise-wide efficiencies. Not later than 120 days after the date of enactment of this Act, FEMA shall brief the Committee on a spend plan for the funds and its efforts to integrate SAR satellite-driven hazard monitoring technology into its disaster operations.

*Veterinary Emergency Teams Pilot.*—Consistent with section 1218 of the Disaster Recovery Reform Act of 2018 (P.L. 115–254), the Committee strongly encourages FEMA to coordinate with appropriate federal agencies to partner with accredited colleges of veterinary medicine with a history of disaster response deployments in order to establish one or more national veterinary emergency teams.

## Mission Support

*Enterprise-Wide Technology.*—Not later than 180 days after the date of enactment of this Act, the FEMA office of the Chief Information Officer, in coordination with program offices including those that utilize GIS and SAR technology, shall develop a strategy to implement a persistent enterprise-wide suite of technology solutions that can be used during the life-cycle of FEMA's emergency response and recovery efforts. The strategy shall incorporate different types of technology that FEMA would benefit having persistent enterprise-wide access to, the use cases for such technology in multiple different types of application, a cost-benefit analysis of persistent versus one-off procurement of such technology, and a process for offices to identify technology needs and nominate solutions for consideration.

## PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

| | |
|---|---|
| Appropriation, fiscal year 2025 | $99,528,000 |
| Budget request, fiscal year 2026 | 156,419,000 |
| Recommended in the bill | 158,419,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | +58,891,000 |
| Budget request, fiscal year 2026 | +2,000,000 |

The recommendation includes $158,419,000 for FEMA Procurement, Construction, and Improvements, including $2,000,000 for the National Fire Incident Reporting System, $12,000,00 for the Integrated Public Alert and Warning System, $12,284,000 for Financial Systems Modernization, $16,135,000 for Enterprise Data & Analytics Modernization, $52,375,000 for the National Continuity Strategic Partner Program, and $63,625,000 for Mt. Weather Facilities.

## FEDERAL ASSISTANCE

| | |
|---|---|
| Appropriation, fiscal year 2025 | $3,203,262,000 |
| Budget request, fiscal year 2026 | 2,593,517,000 |
| Recommended in the bill | 3,756,676,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | +553,414,000 |
| Budget request, fiscal year 2026 | +1,163,159,000 |

A comparison of the fiscal year 2025 enacted level to the Committee recommended level by budget activity is as follows:

| | FY25 Enacted | Recommendation |
|---|---|---|
| Grants | | |
| State Homeland Security Grant Program | 468,000,000 | 520,000,000 |
| (Operation Stonegarden) | (81,000,000) | (90,000,000) |
| (Nonprofit Security) | – – – | – – – |
| (Tribal Homeland Security Grant Program) | (13,500,000) | (15,000,000) |
| Urban Area Security Initiative | 553,500,000 | 615,000,000 |
| (Nonprofit Security) | – – – | – – – |
| Nonprofit Security Grant Program | 274,500,000 | 335,000,000 |
| Public Transportation Security Assistance | 94,500,000 | 94,500,000 |
| (Amtrak Security) | (9,000,000) | (9,000,000) |
| (Over-the-Road Bus Security) | (1,800,000) | (1,000,000) |
| Port Security Grants | 90,000,000 | 100,000,000 |
| Assistance to Firefighter Grants | 324,000,000 | 360,000,000 |
| Staffing for Adequate Fire and Emergency Response | 324,000,000 | 360,000,000 |
| Emergency Management Performance Grants | 319,500,000 | 355,000,000 |
| Flood Hazard Mapping and Risk Analysis Program | 281,475,000 | 312,750,000 |
| Regional Catastrophic Preparedness Grants | 10,800,000 | 9,720,000 |
| Emergency Food and Shelter | 117,000,000 | 105,300,000 |
| Next Generation Warning System | 40,000,000 | 40,000,000 |
| Community Project Funding | – – – | 170,000,000 |
| Subtotal, Grants | 2,897,275,000 | 3,377,270,000 |
| Terrorism and Targeted Violence Prevention (by transfer) | (18,000,000) | – – – |
| Alternatives to Detention Case Management (by transfer) | (15,000,000) | – – – |
| Shelter and Services Program (by transfer) | (650,000,000) | – – – |
| Subtotal, Grants (including transfers) | 3,580,275,000 | 3,377,270,000 |
| Education, Training, and Exercises | | |
| Center for Domestic Preparedness | 71,352,000 | 71,421,000 |
| Center for Homeland Defense and Security | 16,200,000 | 16,200,000 |
| Emergency Management Institute | 32,240,000 | 32,319,000 |
| U.S. Fire Administration | 59,975,000 | 60,084,000 |
| National Domestic Preparedness Consortium | 90,900,000 | 101,000,000 |
| Continuing Training Grants | 14,400,000 | 16,000,000 |
| National Exercise Program | 20,920,000 | 20,956,000 |
| Securing The Cities Program | – – – | 61,426,000 |
| Subtotal, Education, Training, and Exercises | 305,987,000 | 379,406,000 |
| Total, Federal Assistance | 3,203,262,000 | 3,756,676,000 |
| Total, Federal Assistance (including transfers) | $3,886,262,000 | 3,756,676,000 |

## Grants

*Advanced National Security Training.*—The Committee recognizes the importance of providing accredited, advanced national security training for first responders serving urban and rural communities, as well as Tribal communities nationwide. The Committee supports efforts to develop intensive, immersive, and agency-integrated training that enhances preparedness and response capabilities across a range of evolving threats. The Committee encourages FEMA to incorporate best practices and international expertise in areas such as search and rescue, counterterrorism, border enforcement, school safety, cybersecurity, cartel violence response, mass casualty incidents, natural disaster response, trauma care, and Post-Traumatic Stress Disorder. The Committee supports FEMA's continued engagement with first responder communities to ensure this training strengthens interagency cohesion and operational readiness.

*Continuing Training Grants.*—The recommendation includes $16,000,000 for Continuing Training Grants, including not less than $6,000,000 to be competitively awarded for FEMA-certified

rural and Tribal training, of which not less than $3,000,000 is for rural and not less than $3,000,000 is for Tribal. Special emphasis should be given to filling rural training gaps as identified in the National Tribal and Rural Training Needs Assessment. The Committee also supports FEMA's use of Continuing Training Grants for the National Cybersecurity Preparedness Consortium.

*Cost-Share Analysis.*—FEMA is directed to provide recommendations on the appropriateness of adjustments to existing cost-sharing splits, or in the case that none exist, new cost-sharing splits that improve the effectiveness and resilience of the programs on American communities. FEMA shall brief the Committee on the analysis and recommendations within 210 days of the date of enactment of this Act, to include any legislative or regulatory action needed to carry out such recommendations.

*Flood Early Warning System Upgrades.*—The Committee recognizes the importance of early warning systems in protecting communities and infrastructure from the impacts of flooding. The Committee encourages FEMA to work with SLTT governments to identify ways to upgrade their flood warning systems using existing Federal resources.

*National Domestic Preparedness Consortium (NDPC).*—The Committee recommendation includes $101,000,000 for the NDPC and acknowledges its positive impact on domestic preparedness by training emergency responders and event personnel against a range of threats including chemical, biological, radiological, nuclear, and explosives incidents. The Committee recognizes the potential threats inherent to large spectator sports and special events particularly as communities around the Nation prepare for the 2026 FIFA World Cup and the 2028 Olympics. Of the funds provided, $3,000,000 shall be used to improve domestic preparedness and provide training to emergency responders and event personnel involved in such large spectator events.

*Next Generation Warning System.*—The Committee supports the mission of the Next Generation Warning System Grant Program (NGWSGP) to help public media entities replace and upgrade aging infrastructure needed to enhance alert, warning, and other public safety communications systems to ensure national resilience and the ability to meet the evolving nature of public alerting challenges. The recommendation includes $40,000,000 for NGWSGP.

*Nonprofit Security Grant Program.*—The Committee includes $335,000,000 for the Nonprofit Security Grant Program. Within 180 days of the date of enactment of this Act, FEMA is directed to brief the Committee on the Nonprofit Security Grant Program for fiscal years 2023, 2024, and 2025. The briefing shall detail by fiscal year: the number of grant applications submitted, the total amount of grant funding requested, the number of grants awarded, and, for each grant award, the name of the recipient, the amount, and the project type including detailed information on what the funds will be used for. The brief shall also include an analysis of the impacts of the program, including tangible results demonstrating how the program has improved preparedness and reduced the risk of terrorist or other extremist attacks. The briefing shall also include an analysis of the efficacy of the expanded scope of the program to include nonprofit consortia. The Committee encourages FEMA to work with states to consider the eligibility of

nonprofit organizations that memorialize historic sites of acts of terrorism.

*Operation Stonegarden.*—The Committee strongly supports the mission of the Operation Stonegarden program to enhance cooperation and coordination among CBP, Federal, and SLTT law enforcement agencies to improve overall border security. The recommendation includes $90,000,000 for Operation Stonegarden. The Committee reminds FEMA of the need to ensure states make proper and timely distributions to local governments. The Committee encourages the Department to explore how funding can be used by grant recipients to purchase technology such as cameras, sensors, drones, and communications upgrades including land mobile radios. The Committee also encourages the Department to explore how grant funding can be used to help interdict illicit outbound firearms and currency.

*School Safety.*—The Committee encourages FEMA to work with states and school districts to increase awareness of funding opportunities for school hardening measures that may be eligible activities under the Urban Area Security Initiative (UASI), the State Homeland Security Program, and the Nonprofit Security Grant Program. Funds may be used for bullet resistant doors and glass; hinge-locking mechanisms; immediate notification to emergency 911 systems; mechanisms that provide real time actionable intelligence directly to law enforcement and first responders; installation of distraction devices or other countermeasures administered by law enforcement; and other measures determined to provide significant improvement to school physical security.

*Shelter and Services Program (SSP).*—The recommendation includes no funds for SSP for fiscal year 2026.

*UASI Review.*—The Committee encourages the GAO to assess the risk assessment model used to allocate funds for the UASI grants and recommend any necessary changes to Congress to ensure adequate funding for regions of similar populations.

*Unmanned Aircraft Training.*—The Committee supports the FAA Center of Excellence for Unmanned Aerial Systems (ASSURE) Unmanned Aircraft Systems (UAS) training program for first responders in a leadership role to understand how to manage larger-scale and more complex disasters. The Committee encourages FEMA to work toward the development of a framework to build workforce skills and a database of those capable of applying them in local, state, and national emergencies. The Committee supports FEMA's use of Continuing Training Grants for this purpose.

DISASTER RELIEF FUND

| | |
|---|---|
| Appropriation, fiscal year 2025 | $22,510,000,000 |
| Budget request, fiscal year 2026 | 26,474,000,000 |
| Recommended in the bill | 26,474,000,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | +3,964,000,000 |
| Budget request, fiscal year 2026 | – – – |

The recommendation includes $26,474,000,000 for the Disaster Relief Fund, consistent with the President's fiscal year 2026 request.

*Cross-Agency Disaster Data Coordination and Collaboration.*—The Committee directs FEMA to continue to collaborate with the Department of Housing and Urban Development (HUD) and the

Small Business Administration (SBA) in a manner which allows for rapid and timely data collection and sharing as it relates to federal disaster assistance, including the determination of financial need for the DRF, the Community Development Block Grant-Disaster Recovery (CDBG–DR) program, and SBA disaster loans. These agencies are further directed to provide joint monthly reports on need by federally declared disaster, as that data becomes available. Upon enactment of this Act, FEMA, HUD, and SBA are directed to jointly brief the Committee if any of the three agencies indicate that they cannot process or share the data as needed in a timely manner. Finally, FEMA, HUD, and SBA are directed to jointly brief the Committee no later than 90 days after enactment of this Act on any challenges that exist in sharing and processing data related to interplay of these three disaster programs.

*Disaster Assistance for New Mothers.*—The Committee recognizes the clinical benefits of breastfeeding for infants and new mothers and urges FEMA to improve access to breastfeeding supplies after major disasters through Critical Needs Assistance or other programs. In the aftermath of a major disaster, FEMA is directed to coordinate with SLTT and volunteer organizations to ensure that disaster survivors have information on support available for breastfeeding equipment and supplies.

*Disaster Assistance for Persistent Poverty Counties.*—Public Law 117–103 increased the Federal cost share from 75 percent to 90 percent for major disasters declared during calendar years 2020 and 2021. The Committee encourages FEMA to adjust the cost share for persistent poverty counties for disasters declared during calendar year 2024.

*Disaster Declaration Threshold Change Impact on Rural Areas.*—The Committee recognizes FEMA is conducting an ongoing review of disaster declaration thresholds to improve the process, but remains concerned that a rapidly implemented significant increase to the threshold could unfairly affect states that are more rural, with lower budgets, or that are more susceptible to disasters. The Committee urges FEMA to account for these considerations as it evaluates formal policy changes moving forward.

*Distribution of Surplus Goods During Emergencies.*—The Committee recognizes the challenges posed by major disasters and the large volume of supplies that they require. Not later than 120 days after the date of enactment of this Act, FEMA shall brief the Committee on current operations related to the procurement and storage of goods at warehouses for use during major disasters, including the scope and scale of any product insecurity, and an analysis of the efficacy of repurposing returned or surplus consumer goods for these purposes. FEMA is encouraged to engage with organizations that provide resources that serve the public interest and have the capacity to ensure that surplus goods are distributed and used appropriately.

*Domestic Production of Disaster Shelters.*—The Committee recognizes the importance of the timely delivery of vital assistance to victims in the aftermath of major disasters, including shelter and housing assistance for individuals and families displaced from their homes. The Committee strongly encourages FEMA to ensure American-made shelters are considered for purposes of providing federal disaster relief for future major disasters.

*Emergency Housing.*—The Committee recognizes the vital support FEMA provides to communities in the aftermath of major disasters, including sheltering and housing assistance for individuals and families displaced from their homes. The Committee is concerned that housing shortages may impact recovery efforts, reduce community resiliency, and cause long-term displacement after a major disaster. FEMA is directed to submit a report to the Committee within 180 days of the date of enactment of this Act that details emergency housing operations for major disasters over the last four years, including the type of sheltering and housing assistance provided to survivors and responders, the costs associated with the shelter and housing assistance, the number of individuals and families housed, and the duration of housing assistance.

*GAO Assessment of Temporary Shelter Options.*—The Committee recognizes the need for FEMA to ensure vital resources deployed in the aftermath of major disasters are done so in the most efficient and cost-effective manner possible. As such, the Committee requests that GAO conduct an assessment of current commercial off-the-shelf temporary shelter options and whether FEMA has utilized the most cost-effective solutions over the past three years during natural disasters, including for the Maui wildfires and Hurricane Ian.

*Insurance Policy Review.*—The Committee encourages FEMA to review the 2015 Policy on Insurance to consider if there are ways to better reflect the current commercial market and the utilization by applicants of innovative mechanisms, including self-retention plans funded with an applicant's own money, to access commercial insurance products to cover losses from natural disasters.

*Major Disaster Telehealth Capabilities.*—The Committee recognizes the importance of uninterrupted access to health care during major disasters and encourages FEMA to consider ways to enable the deployment of telemedicine and mobile diagnostic units in areas affected by such major disasters, including virtual emergency room consultations and mobile healthcare solutions.

*Post-Disaster Temporary Shelter Options.*—The Committee encourages FEMA to review existing agency parameters regarding the types of shelters eligible for federal reimbursement to consider new and innovative industry materials, and other viable, cost-effective options for SLTT governments. Specifically, the Committee urges FEMA to review current utilization restrictions and categorical eligibility regarding temporary transportable housing units and alternative temporary transportable housing units for disaster recovery efforts.

*Proof of Residence.*—The Committee recognizes that survivors of natural disasters may face challenges in accessing formal deeds and leases to prove ownership when applying for FEMA assistance. The Committee encourages FEMA to consider ways to broaden the array of proof of residence documents, to include both digital and physical copies, without introducing additional risk of fraud into the process. FEMA is encouraged to brief the Committee on any changes it plans to make accordingly not later than 30 days prior to implementation of such changes.

*Reimbursement Delays.*—The Committee encourages FEMA to work with SLTT governments to ensure they are providing reim-

bursements in a timely manner to avoid costs related to reimbursement payment delays.

NATIONAL FLOOD INSURANCE FUND

| | |
|---|---|
| Appropriation, fiscal year 2025 | $239,785,000 |
| Budget request, fiscal year 2026 | 202,100,000 |
| Recommended in the bill | 202,100,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | −37,685,000 |
| Budget request, fiscal year 2026 | – – – |

*Flood Insurance Rate Maps*.—FEMA is reminded of the requirement under this header in House Report 118–123 accompanying Public Law 118–47.

TITLE III—ADMINISTRATIVE PROVISIONS

(INCLUDING TRANSFERS OF FUNDS)

Section 301. The Committee continues and modifies a provision regarding cybersecurity threat feeds.

Section 302. The Committee continues a provision limiting expenses for the administration of grants.

Section 303. The Committee continues a provision specifying timeframes for grant applications and awards.

Section 304. The Committee continues a provision requiring a five-day advance notification for certain grant awards under "Federal Emergency Management Agency—Federal Assistance".

Section 305. The Committee continues a provision addressing the availability of certain grant funds for the installation of communications towers.

Section 306. The Committee continues a provision requiring the submission of a monthly Disaster Relief Fund report.

Section 307. The Committee continues a provision permitting waivers of certain Staffing for Adequate Fire and Emergency Response grant program requirements.

Section 308. The Committee continues a provision providing for the receipt and expenditure of fees collected for the Radiological Emergency Preparedness Program, as authorized by Public Law 105–276.

Section 309. The Committee continues a provision permitting waivers of certain requirements pertaining to Assistance to Firefighter Grants.

Section 310. The Committee continues a provision regarding the transfer of unobligated balances under the National Pre-Disaster Mitigation Fund.

Section 311. The Committee continues a provision regarding the transfer of unobligated balances under the Flood Hazard Mapping and Risk Analysis Program.

Section 312. The Committee includes a new provision that amends the Robert T. Stafford Disaster Relief and Emergency Assistance Act.

# TITLE IV—RESEARCH, DEVELOPMENT, TRAINING, AND SERVICES

## U.S. CITIZENSHIP AND IMMIGRATION SERVICES

| | |
|---|---|
| Appropriation, fiscal year 2025 | $281,140,000 |
| Budget request, fiscal year 2026 | 111,142,000 |
| Recommended in the bill | 112,551,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | −168,589,000 |
| Budget request, fiscal year 2026 | +1,409,000 |

### Mission

U.S. Citizenship and Immigration Services (USCIS) adjudicates and grants immigration and citizenship benefits, confirms eligibility for employment and public services, and promotes an awareness and understanding of citizenship in support of immigrant integration, while protecting the integrity of the Nation's immigration system. USCIS activities are primarily funded through fees collected from applicants for immigration benefits.

### OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriation, fiscal year 2025 | $271,140,000 |
| Budget request, fiscal year 2026 | 111,142,000 |
| Recommended in the bill | 112,551,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | −158,589,000 |
| Budget request, fiscal year 2026 | +1,409,000 |

The recommendation includes $112,551,000 for Operations and Support, which is provided exclusively for the E-Verify program to allow enrolled employers to confirm the eligibility of their employees to work in the United States.

*Application Processing*.—USCIS is directed to prioritize the timely processing of citizenship and other applications, with a goal of adjudicating all requests within six months of submission or referral. USCIS is directed to make available, on a publicly accessible website, an interactive dashboard detailing, for all USCIS forms, the number of forms received, processed, approved, denied, and pending by month, along with the average processing time and the number of forms pending for more than six months. USCIS shall update the Committee on the status of this requirement during the quarterly budget and productivity briefings required by House Report 117–396 and House Report 118–123. The dashboard shall be updated monthly but not later than the tenth business day following the end of each month and permit the downloading of the underlying data in a searchable and sortable spreadsheet format.

*Backlog Reduction and Reporting*.—USCIS is directed to continue monthly reporting to the Committee on the application processing case backlog trends and statistics. USCIS is urged to improve the timeliness of such reporting.

*Budget Justification Materials*.—USCIS is directed to ensure user fee budget justifications include descriptions of planned spending profiles, year-over-year changes, and cost assumptions. The justifications for these accounts should provide the same level of detail and analysis as is provided for the Department's discretionary funding accounts. For example, the justification shall contain detailed budget exhibits for each of the fee PPAs and fully describe

the staffing and hiring strategy. In addition, the materials shall include the plans and budget assumptions for USCIS's international operations and the funding and planned outcome measures for business process improvements and modernization efforts.

A full understanding of USCIS's budget strategy, plans, and assumptions are critical to Congress' oversight responsibilities—regardless of the funding source. The Committee expects these items to be addressed with the annual budget justification materials or that the necessary program details, funding and staffing profiles, and other exhibits be submitted concurrently with the delivery of the annual budget.

*Corrected Employment Documents*.—The Committee encourages USCIS to take necessary steps to issue corrected employment authorization documents.

*Cost Recovery*.—USCIS is urged to limit fee waivers to ensure maximum recovery of costs associated with USCIS services. USCIS is directed to include fee waiver data in the quarterly budget and staffing briefings. The Committee reminds USCIS of the directive in the explanatory statement accompanying Public Law 118–47 to provide a briefing on ways to improve cost recovery at the agency.

*Data on Asylum Operations*.—USCIS is directed to continue to make available, on a publicly accessible website in a downloadable, searchable, and sortable format, the information required under this heading in the explanatory statement accompanying Public Law 117–328.

*E-Verify*.—The Committee encourages USCIS to continue efforts to modernize the E Verify program, as well as continue improvements in outreach efforts and training tools to assist employers in improving the accuracy of information they submit into the system.

*Electronic Processing*.—The Committee continues the requirement for USCIS to provide a quarterly briefing on its electronic processing efforts. The Committee supports the ongoing digitization efforts of USCIS forms and signature requirements to comply with the 21st Century Integrated Digital Experience Act (P.L. 115–336) and encourages USCIS to ensure digitization of all forms.

*Eliminating Confusion in Classifying Job Occupations*.—The Committee directs USCIS to continue to update each of its online and paper forms to ensure that the Standard Occupational Classification codes are the only occupational codes used.

*Quarterly Budget and Productivity Reporting*.—The Committee is concerned by USCIS's lack of urgency in providing timely quarterly budget and productivity briefings and directs USCIS to ensure that the quarterly briefings required under this heading in House Report 117–396 are provided promptly. USCIS shall continue to provide these briefings in fiscal year 2026.

*R–1 Visa Program*.—USCIS shall provide a briefing to the Committee within 180 days of the date of enactment of this Act on deceptive and exploitative labor practice abuses within the R–1 Visa program. The briefing shall include plans on ways to mitigate and prevent such abuse.

*Refugee Admissions*.—USCIS shall continue to provide the information required under this heading in the explanatory statement accompanying Public Law 117–103, including information from fiscal year 2025.

*Spouse Petitions*.—With respect to fiancé(e) or spouse petitions involving a minor party, the Committee continues to direct USCIS to document the age of the minor party at the time of the civil/legal marriage, along with the age difference between the parties, with ages given by months and years.

*Temporary Protected Status (TPS) for Venezuela.*—The Committee acknowledges that TPS for Venezuela should not be used in perpetuity and notes that this status should only be used in cases of ongoing armed conflict, natural disasters, extreme humanitarian crises, or extraordinary and temporary conditions that prevent aliens from safely returning to their country. However, the Committee directs the Secretary to reconsider the termination of TPS for Venezuelans and conduct a more thorough analysis of the situation in-country. Not later than 30 days after the date of enactment of this Act, the Secretary shall provide a briefing to the Committee on the evaluation of the conditions that led to the termination of TPS in Venezuela.

*Uniting for Ukraine Program.*—The USCIS's Uniting for Ukraine (U4U) program has provided critical humanitarian parole pathways for Ukrainian nationals displaced by Russia's full-scale invasion of Ukraine. The Committee is disappointed that USCIS has paused this important initiative and urges USCIS to continue this program, maintain efficient processing timelines, and ensure robust support infrastructure for sponsors and beneficiaries.

FEDERAL ASSISTANCE

| | |
|---|---|
| Appropriation, fiscal year 2025 | $10,000,000 |
| Budget request, fiscal year 2026 | – – – |
| Recommended in the bill | – – – |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | −10,000,000 |
| Budget request, fiscal year 2026 | – – – |

The recommendation does not include any funding for the Citizenship and Integration Grant Program. However, the Committee is concerned with USCIS's unilateral decision to terminate the funds provided in fiscal year 2025, even though this grant program was statutorily authorized and received appropriate funding. USCIS shall provide the Committee with its legal justification for terminating the program and associated funding within 30 days of the date of enactment of this Act.

## Federal Law Enforcement Training Centers

| | |
|---|---|
| Appropriation, fiscal year 2025 | $377,200,000 |
| Budget request, fiscal year 2026 | 397,488,000 |
| Recommended in the bill | 403,944,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | +26,744,000 |
| Budget request, fiscal year 2026 | +6,456,000 |

### Mission

The Federal Law Enforcement Training Centers (FLETC) provide or facilitate basic and advanced law enforcement training for over 90 federal agencies and numerous SLTT and international law enforcement organizations.

OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriation, fiscal year 2025 | $357,100,000 |
| Budget request, fiscal year 2026 | 379,105,000 |
| Recommended in the bill | 385,644,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | +28,544,000 |
| Budget request, fiscal year 2026 | +6,539,000 |

*Human Trafficking Awareness Training*.—The Committee recognizes that in January 2021, FLETC entered into a Memorandum of Understanding with the Blue Campaign, now part of the Center for Combatting Human Trafficking (CCHT), to make the Human Trafficking Awareness Training program available for up to 500 SLTT agents and officers at no cost. The Committee recommends $2,000,000 for Human Trafficking Awareness Training and encourages FLETC, in coordination with the CCHT, to increase its advertising of this critical training to its law enforcement partners in fiscal year 2026 and to include Human Trafficking Awareness within Basic Training course requirements.

*Training Delivery Constraints*.—The Committee directs FLETC to submit a report to the Committee no later than 270 days after the date of the enactment of this Act detailing the number of training requests FLETC received for fiscal year 2025, the number of training requests accepted, the number of training requests FLETC was unable to fulfill due to resource constraints or facility limitations, and the projected number of requests in fiscal year 2026. The Committee directs FLETC to identify the resources required to meet unmet and projected training demands and include that information in the report.

*Use of Training Facilities*.—The Director of FLETC shall schedule basic or advanced law enforcement training, or both, at all four training facilities to ensure they are fully utilized at the highest capacity throughout the fiscal year.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

| | |
|---|---|
| Appropriation, fiscal year 2025 | $20,100,000 |
| Budget request, fiscal year 2026 | 18,383,000 |
| Recommended in the bill | 18,300,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | −1,800,000 |
| Budget request, fiscal year 2026 | −83,000 |

The recommendation provides $18,300,000 to address the most critical of FLETC's major deferred maintenance projects that would improve delivery of training or the health and welfare of students. The Committee directs FLETC to deliver a briefing on deferred and preventative maintenance projects that require additional resources no later than 120 days after the date of enactment of this Act.

## SCIENCE AND TECHNOLOGY DIRECTORATE

| | |
|---|---|
| Appropriation, fiscal year 2025 | $741,634,000 |
| Budget request, fiscal year 2026 | 758,754,000 |
| Recommended in the bill | 758,698,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | +17,064,000 |
| Budget request, fiscal year 2026 | −56,000 |

Mission

The mission of the Science and Technology Directorate (S&T) is to conduct and support research, development, developmental and operational testing and evaluation, and the timely transition of homeland security capabilities to operational end users at the federal, state, and local levels.

OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriation, fiscal year 2025 | $369,811,000 |
| Budget request, fiscal year 2026 | 367,530,000 |
| Recommended in the bill | 368,624,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | −1,187,000 |
| Budget request, fiscal year 2026 | +1,094,000 |

*Redundant Research and Development Efforts*.—Prior to engaging in any new or continuing funding for any existing research and development activities, the Department and any relevant component agencies shall first consider whether any existing efforts are currently or were previously funded elsewhere in the Federal government, such as by DoD.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

| | |
|---|---|
| Appropriation, fiscal year 2025 | $61,000,000 |
| Budget request, fiscal year 2026 | 65,000,000 |
| Recommended in the bill | 40,000,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | −21,000,000 |
| Budget request, fiscal year 2026 | −25,000,000 |

The recommendation provides $20,000,000 for critical improvements to S&T's laboratory facilities and $20,000,000 for the Plum Island Closure and Support (PICS) Program.

*National Biodefense Analysis and Countermeasures Center (NBACC) Facility Expansion*.—In 2023, S&T completed a scoping study for NBACC facility expansion. According to the study, the requirement for facility expansion would accommodate additional BSL–2 laboratories; the required mechanical support and storage space for the generation of data; a data center with state-of-the-art computational and network infrastructure that could support analysis, storage, and transfer of large data sets; and additional Sensitive Compartmented Information Facility space required for the sensitive nature of the work performed. Additionally, the study identified a need to expand the facility for office or administrative space adjacent to the current NBACC laboratory facility. To ensure that the Committee has the full long-term plan for expansion of the laboratory, S&T shall provide a five-year master facility expansion plan, including year-by-year resource requirements, not later than 90 days after the date of enactment of this Act.

*Plum Island Closure and Support (PICS) Program*.—The Committee provides $20,000,000 to continue the transition, closure, and conveyance of all Plum Island real property and all related personal property to facilitate the transfer of the Plum Island Animal Disease Center (PIADC) mission to the National Bio and Agro-Defense Facility (NBAF). The Committee notes that the transition of PIADC science mission activities to NBAF is no longer on schedule.

S&T is directed to continue providing semiannual briefings on the progress of these activities.

RESEARCH AND DEVELOPMENT

| | |
|---|---|
| Appropriation, fiscal year 2025 | $310,823,000 |
| Budget request, fiscal year 2026 | 326,224,000 |
| Recommended in the bill | 350,074,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2025 | +39,251,0000 |
| Budget request, fiscal year 2026 | −23,850,000 |

Research, Development, and Innovation

With the dissolution of Countering Weapons of Mass Destruction (CWMD), S&T will serve as the lead component in developing the next generation of biological detection. CWMD's biological detection program, BioWatch, was plagued by prolonged event-to-detection timelines, a limited suite of detectable pathogens, and high operating costs. As S&T works to develop potential replacements for the BioWatch system, S&T is encouraged to consult with SLTT stakeholders to determine their biodetection needs and with industry and academia to examine existing capabilities. S&T should focus on easily deployable, scalable solutions that are nearly technologically mature. At this time, S&T should avoid focusing developing a single solution that can detect all possible hazards, but rather focus on what is practicable. The recommendation provides $40,000,000 for this activity.

*Advanced Sensors Technologies*.—Within the funds provided, the Committee encourages work on critical research areas such as developing and fielding next generation first responder technology that utilizes advanced sensors and imager technologies.

*Augmented Reality for First Responders*.—Within the funds provided, S&T is encouraged to continue its work advancing next-generation computer vision and augmented reality (AR) technology to enhance firefighter safety, situational awareness, and operational performance through the use of helmet-mounted AR systems to improve navigation and visibility in high-risk, low-visibility environments.

*Binational Industrial Research and Development Homeland Security (BIRD HLS) Program*.—The Committee continues its strong support of the BIRD HLS program, which allows S&T to work with Israeli partners to develop innovative technology solutions for homeland security needs, and encourages funding at the fiscal year 2024 enacted level.

*Combating Transnational Criminal Organizations with Advanced Data Analytics*.—The Committee is concerned with the growing influence of and violence perpetrated by TCOs in the United States. Within the funds provided and in consultation with HSI, the Committee encourages S&T to establish a pilot program to address human trafficking and other illicit activity by developing comprehensive intelligence on TCOs operating domestically by using analytical capabilities. The pilot should focus on three key domains: advanced data collection, sophisticated network analysis, and collaborative intelligence gathering with the goal of creating actionable insights to support prevention and intervention efforts. In determining the location for a pilot, S&T is encouraged to con-

sider areas where SLTT collaboration on such activities has already begun. S&T shall submit a report to the Committee not later than one year after the date of enactment of this Act that details any results of the pilot.

*Critical Infrastructure and Cyber Attacks*.—Within the funds provided, S&T is encouraged to support research to develop and demonstrate timely hierarchical software quality assurance and timely cyber-attack mitigation techniques for hardware in one or more of the following Department-designated critical infrastructure sectors: chemical, IT, critical manufacturing, water and wastewater, communications, and transportation.

*Cross-Border Threat Screening and Supply Chain Defense*.—Within the funds provided, the Committee continues to encourage S&T to expand research and analysis on cross-border threat screening and supply chain defense, including predictive data analytics, to eliminate disruptions to the food and agriculture supply chain and for early detection of public health threats and biothreats.

*Counter Improvised Explosive Device (IED) System*.—Within the funds provided, S&T is encouraged to evaluate and deploy portable counter IED systems.

*Counter Unmanned Aircraft System*.—The Committee supports the cUAS Program, which assesses available cUAS solutions and guides the development of new capabilities to support acquisition, rapid deployment, and utilization decisions based on the needs and requirements of DHS components such as CBP, USSS, Coast Guard, and FPS.

*Cybersecurity for Tourism*.—Within the funds provided, the Committee urges S&T, in coordination with FLETC, to establish a Cybersecurity for Tourism Consortium to help align government interests in public safety and security with the Nation's tourism industry.

*Data Visualization and Emerging Analytics*.—Within existing funds, the Committee supports the further development of the Data Visualization and Emerging Analytics tool to meet the increasing demands in areas with limited border security resources.

*Digital Twin*.—Within the funds provided, S&T is encouraged to pursue research and development related to the use of digital twins. Advanced modeling and simulation can improve and enhance mission effectiveness by developing new paradigms, tools, and simulation-enabled capabilities for DHS operations, including geospatial simulations of the southern border.

*Directed Energy Capabilities.*—The Committee is aware of advances in directed energy technology, including high-power microwave systems, which can support various missions across the Department, including efforts to counter UAS and unmanned vessels. The Committee encourages S&T, within the funds provided, to study the use and application of such technology.

*Durable Lithium-Ion Batteries.*—Within the funds provided, the Committee encourages S&T to research innovative technologies for improving the safety, reliability, and operational durability of lithium-ion batteries utilized by DHS law enforcement personnel, including the development of electrolyte additives with shear thickening and ballistic protection capabilities.

*Enabling Unmanned Aerial Systems.*—The Committee acknowledges the critical value in the establishment of the common test

site for demonstration and research of UAS and is pleased that the site is also available to other federal, state, and local partners. The Committee encourages S&T to continue funding this work, prioritize the use of the common test site to conduct on-site testing and evaluation for the Department, and facilitate a close collaboration with the Federal Aviation Administration UAS Center of Excellence.

*Fentanyl Detection.*—Within the funds provided, the Committee encourages S&T, in conjunction with other federal partners, to improve opioid and fentanyl detection. Such efforts may include research on additional technological solutions to: target and detect low-purity fentanyl, especially in counterfeit pressed tablets; enhance targeting of counterfeit pills through nonintrusive, noninvasive, and other visual screening technologies; and improve data-driven targeting to increase seizure rates of fentanyl and its precursors and may include AI-assisted olfactory sensors.

*Interconnected Passenger Screening.*—The Committee recognizes that interconnected technology can modernize TSA checkpoint screening. Within funds provided, the Committee supports the development of technology that can provide real-time data analysis and support faster, more secure screening.

*Networked Acoustic Sensors.*—Networked acoustic sensors can create a passive surveillance perimeter that can detect and track sUAS. Within the funds provided, the Committee encourages S&T to enable the development and deployment of this technology.

*Partnership Intermediary Agreements.*—Within the funds provided, the Committee encourages S&T to establish Partnership Intermediary Agreements to enable components across the Department to engage immediately on technology transfer and transition activities. Partnership Intermediary Agreements, as defined under section 3715 of title 15, United States Code, support the Department's ability to seek out, assess, and engage non-traditional small business vendors for the Department's development and acquisition efforts.

*Port and Maritime Resiliency and Security.*—The Committee continues to recognize the vast threat facing the U.S. maritime/port sector. Within the funds provided, the Committee encourages support for the ongoing Port and Maritime Resiliency and Security Testbed.

*Quantum Computing Use-Case Identification Initiative.*—The Committee supports a coordinated and focused research program in identifying near-term public sector use cases for quantum computing applications. The Committee encourages S&T, in coordination with the Quantum Economic Development Consortium, Federally Funded Research and Development Centers, and the quantum industry, to identify public sector use cases which could benefit DHS and its components. S&T shall examine all quantum computing technologies including annealing, gate-model, and quantum-hybrid.

*Technology Scouting.*—The Committee encourages S&T to continue its technology scouting program to allow it to leverage existing and emerging technologies and avoid the duplication of research efforts.

*U.S.-Israel Cybersecurity Cooperation Enhancement Program.*—The Committee encourages funding at the fiscal year 2024 enacted

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 397 of 714 PageID #:1447



level for the U.S.-Israel Cybersecurity Cooperation grant program, as authorized by section 1551 of the National Defense Authorization Act for Fiscal Year 2022 (P.L. 117–81), to support cybersecurity research and development, demonstration, and commercialization of cybersecurity technology.

*Voting Technologies and Election Data Security Procedures.*—The Committee supports research to ensure that voting software and hardware is studied and vetted before being used during federal, state, and local elections. Consistent with prior year direction and within the resources provided, S&T is encouraged to fund quality assurance and continuous evaluation research on voting technologies and election procedures in cooperation with a qualified organization with experience performing technical audits of statewide elections systems. In consultation and coordination with other Federal partners, this investment should include the development of new tools and training modules to enable states and localities to ensure that their election systems are secure.

## University Programs

The recommendation provides $45,880,000 for University Programs. S&T's University Programs allow for cooperation with colleges and universities to address pressing homeland security needs. University Programs promote homeland security research and education, train current and future students and professionals, and build a homeland security workforce.

*Centers of Excellence (COE) Program.*—The COE program is the flagship research account for universities at DHS. The program brings together hundreds of academic institutions and private sector entities to generate basic and applied research that rapidly delivers innovative technologies for the homeland security community to meet imminent and future threats. The COE network catalyzes the development of new marketplaces for technologies geared toward keeping our Nation safe and secure. This level of coordination for the development of user-facing security technologies is not funded by any other federal agency.

The Committee is frustrated by the Department's lack of communication on its review of COEs and does not support the Department's termination of COEs as announced in April 2025. The Committee provides $45,880,000 to allow the Department to restore funding to the COEs which were funded in fiscal year 2024 and directs the Department to brief the Committee on its plan to fund COEs in fiscal year 2026 no later than 30 days after the date of enactment of this Act.

## Title IV—Administrative Provisions

Section 401. The Committee continues a provision allowing USCIS to acquire, operate, equip, and dispose of up to five vehicles under certain scenarios.

Section 402. The Committee continues a provision limiting the use of A–76 competitions by USCIS.

Section 403. The Committee includes a new provision prohibiting funds for employment authorization documents for certain aliens.

Section 404. The Committee includes a new provision related to USCIS official reception and representation expenses.

Section 405. The Committee includes a new provision prohibiting the consideration of H–1B petitions from any entity identified under section 1260H of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021.

Section 406. The Committee continues a provision authorizing FLETC to distribute funds for incurred training expenses.

Section 407. The Committee continues a provision directing the FLETC Accreditation Board to lead the Federal law enforcement training accreditation process to measure and assess Federal law enforcement training programs, facilities, and instructors.

Section 408. The Committee continues a provision allowing for the acceptance of funding transfers from other government agencies for construction of special use facilities.

Section 409. The Committee continues a provision classifying FLETC instructor staff as inherently governmental for certain purposes.

Section 410. The Committee includes a new provision regarding an asylum program fee.

Section 411. The Committee includes a new provision regarding credible fear standards for asylum claims.

Section 412. The Committee includes a new provision related to eligibility for certain asylum claims.

Section 413. The Committee includes a new provision related to the H–2B program.

Section 414. The Committee includes a new provision regarding H–2A visas.

Section 415. The Committee includes a new provision prohibiting funds for implementation of a Final Rule related to the H–2 program.

Section 416. The Committee includes a new provision regarding certain visas.

## TITLE V—GENERAL PROVISIONS

### (INCLUDING TRANSFERS OF FUNDS)

Section 501. The Committee continues a provision limiting the availability of appropriations to one year unless otherwise expressly provided.

Section 502. The Committee continues a provision providing that unexpended balances of prior year appropriations may be merged with new appropriation accounts and used for the same purpose, subject to reprogramming guidelines.

Section 503. The Committee continues and modifies a provision related to reprogramming limitations and transfer authority.

The Department must notify the Committees on Appropriations at least 30 days in advance of each reprogramming of funds that would: (1) reduce programs, projects, and activities, or personnel, by ten percent or more; or (2) increase a program, project, or activity by more than $5,000,000 or ten percent, whichever is less.

The term PPA is defined as each functional category listed under an account heading in the funding table at the back of this report, along with each funding amount designated for a particular purpose within the statement narrative, exclusive of simple references to increases or reductions below the budget request. Funding for each PPA should not be used for the purposes of any other PPA.

Within 30 days of the date of enactment of this Act, the Department shall submit to the Committees a table delineating PPAs subject to section 503 notification requirements.

For purposes of reprogramming notifications, the creation of a new PPA is defined as any significant new activity that has not been explicitly justified to the Congress in budget justification material and for which funds have not been appropriated by the Congress.

Limited transfer authority is provided to give the Department flexibility in responding to emerging requirements and significant changes in circumstances, but is not intended to facilitate the implementation of new programs, projects, or activities that were not proposed in a formal budget submission. Transfers may not reduce accounts by more than two and a half percent or augment appropriations by more than five percent. The Department must notify the Committees on Appropriations not fewer than 30 days in advance of any transfer. To avoid violations of the Anti-Deficiency Act, the Secretary shall ensure that any transfer of funds is carried out in compliance with the limitations and requirements of section 503(c). In particular, the Secretary should ensure that any such transfers adhere to the opinion of the Comptroller General's decision in *the Matter of John D. Webster, Director, Financial Services, Library of Congress, dated November 7, 1997*, with regard to the definition of an appropriation subject to transfer limitations.

Notifications should provide complete explanations of proposed funding reallocations, including detailed justifications for increases and offsets; any specific impact the proposed changes are expected to have on future-year appropriations requirements; a table showing the proposed revisions to funding and full-time equivalents (FTE) at the account and PPA levels for the current fiscal year; and any expected funding and FTE impacts during the budget year.

The Department shall manage its PPAs within the levels appropriated and should only submit reprogramming or transfer notifications in cases of unforeseeable and compelling circumstances that could not have been predicted when formulating the budget request for the current fiscal year. When the Department becomes aware of an emerging requirement after the President's budget has been submitted to Congress but prior to the enactment of a full-year funding Act for the budget year, it is incumbent on the Office of the Chief Financial Officer to timely notify the Committees. When the Department submits a reprogramming or transfer notification and does not receive identical responses from the House and Senate Committees, it is expected to work with the Committees to reconcile the differences before proceeding.

Section 504. The Committee continues a provision, by reference, prohibiting funds appropriated or otherwise made available to the Department to make payment to the Working Capital Fund (WCF), except for activities and amounts allowed in the President's fiscal year 2025 budget request.

Section 505. The Committee continues and modifies a provision providing that not to exceed 50 percent of unobligated balances remaining available at the end of the prior fiscal year for each Operations and Support appropriation shall have an additional fiscal

year of availability, subject to a section 503 reprogramming notification.

Section 506. The Committee continues and modifies a provision that deems intelligence activities to be specifically authorized during the current fiscal year until the enactment of an Act authorizing intelligence activities for the current fiscal year.

Section 507. The Committee continues a provision requiring notification to the Committees at least three days before DHS executes or announces grant allocations or grant awards in excess of $1,000,000; contract awards (including contracts covered by the Federal Acquisition Regulation), other transaction agreements, letters of intent, or a task or delivery order on multiple award contracts totaling more than $4,000,000; a task or delivery order greater than $10,000,000 from multi-year funds; or sole-source grant awards. Notifications shall include a description of projects or activities to be funded and their location, including city, county, and state.

Section 508. The Committee continues a provision prohibiting all agencies from purchasing, constructing, or leasing additional facilities for Federal law enforcement training without advance notification to the Committees.

Section 509. The Committee continues a provision prohibiting the use of funds for any construction, repair, alteration, or acquisition project for which a prospectus, if required under chapter 33 of title 40, United States Code, has not been approved.

Section 510. The Committee continues a provision that includes and consolidates by reference prior-year statutory provisions related to sensitive security information and the use of funds in conformance with section 303 of the Energy Policy Act of 1992.

Section 511. The Committee continues a provision prohibiting the use of funds in contravention of the Buy American Act.

Section 512. The Committee continues a provision regarding the oath of allegiance required by section 337 of the Immigration and Nationality Act.

Section 513. The Committee continues and modifies a provision regarding reorganization authority.

Section 514. The Committee continues a provision prohibiting funds for planning, testing, piloting, or developing a national identification card.

Section 515. The Committee continues a provision directing that any official required by this Act to report or certify to the Committees on Appropriations may not delegate such authority unless expressly authorized to do so in this Act.

Section 516. The Committee continues a provision prohibiting funds in this Act to be used for first-class travel.

Section 517. The Committee continues a provision prohibiting the use of funds to employ illegal workers as described in section 274(h)(3) of the Immigration and Nationality Act.

Section 518. The Committee continues a provision prohibiting funds appropriated or otherwise made available by this Act to pay for award or incentive fees for contractors with below satisfactory performance or performance that fails to meet the basic requirements of the contract.

Section 519. The Committee continues and modifies a provision requiring DHS computer systems to block electronic access to pornography, except for law enforcement purposes.

Section 520. The Committee continues a provision regarding the transfer of firearms by Federal law enforcement personnel.

Section 521. The Committee continues a provision regarding funding restrictions and reporting requirements related to conferences occurring outside of the United States.

Section 522. The Committee continues a provision prohibiting funds to reimburse any Federal Department or agency for its participation in a National Special Security Event.

Section 523. The Committee continues a provision requiring a notification, including justification materials, prior to implementing any structural pay reform or instituting a new position classification that affects more than 100 full-time positions or costs more than $5,000,000.

Section 524. The Committee continues a provision directing the Department to post on a public website reports required by the Committees on Appropriations unless public posting compromises homeland or national security or the report contains proprietary information.

Section 525. The Committee continues and modifies a provision authorizing minor procurement, construction, and improvements under "Operations and Support" appropriations, as specified.

Section 526. The Committee continues by reference a provision to authorize DHS to fund out of existing discretionary appropriations the expenses of primary and secondary schooling of eligible dependents in areas of U.S. territories that meet certain criteria.

Section 527. The Committee continues and modifies a provision regarding access to detention facilities by members of Congress or their designated staff.

Section 528. The Committee continues a provision prohibiting the use of funds to use restraints on pregnant detainees in DHS custody, except in certain circumstances.

Section 529. The Committee continues and modifies a provision prohibiting the use of funds for the destruction of records related to detainees in custody.

Section 530. The Committee continues a provision prohibiting funds for a Principal Federal Official during a declared disaster or emergency under the Stafford Act, with certain exceptions.

Section 531. The Committee continues a provision requiring the Under Secretary for Management to submit a component-level report on unfunded priorities classified as budget function 050.

Section 532. The Committee continues a provision requiring notifications when the President designates a former or retired Federal official or employee for protection and reporting regarding the costs of such protection.

Section 533. The Committee continues a provision requiring notifications and reporting on DHS submissions of proposals to the Technology Modernization Fund.

Section 534. The Committee continues a provision requiring the identification of discretionary offsets when fee increase proposals to support current activities assume the enactment of such proposals prior to the beginning of the budget year.

Section 535. The Committee continues a provision related to the Arms Trade Treaty.

Section 536. The Committee continues a provision prohibiting the use of funds related to certain entities identified under section 1260H of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021.

Section 537. The Committee continues a provision prohibiting the use of funds for the transfer or release of certain individuals detained at United States Naval Station, Guantanamo Bay, Cuba into or within the United States.

Section 538. The Committee continues and modifies a provision directing the Secretary of Homeland Security to develop, use, and share estimates of arrivals of aliens at the southern border.

Section 539. The Committee continues a provision related to assistance from the Department of Defense for border security operations.

Section 540. The Committee continues a provision related to the employee emergency back-up care program.

Section 541. The Committee continues a provision providing transfer authority for activities within the Blue Campaign.

Section 542. The Committee includes a new provision prohibiting the use of funds for a Disinformation Governance Board in the Department.

Section 543. The Committee includes a new provision prohibiting the use of funds to classify the speech of a U.S. person as either mis-, dis-, or mal-information or to work with organizations to do the same.

Section 544. The Committee includes a new provision prohibiting the use of funds to discriminate against a person based on sincerely held religious beliefs regarding marriage.

Section 545. The Committee includes a new provision prohibiting the obligation or award of funds to certain jurisdictions.

Section 546. The Committee includes a new provision prohibiting the use of funds for diversity, equity, and inclusion or critical race theory.

Section 547. The Committee includes a new provision prohibiting the use of funds for the purchase of computers, printers, or videoconferencing equipment from companies based in the People's Republic of China.

Section 548. The Committee includes a new provision related to Presidential Residence Protection grants.

Section 549. The Committee includes a new provision prohibiting funds being obligated in contravention of certain Amendments to the Constitution.

Section 550. The Committee includes a new provision regarding the recording of federal law enforcement.

Section 551. The Committee includes a new provision regarding a Spending Reduction Account.

## APPROPRIATIONS CAN BE USED ONLY FOR THE PURPOSES FOR WHICH MADE

Title 31 of the United States Code makes clear that appropriations can be used only for the purposes for which they were appropriated as follows:

Section 1301. Application.

(a) Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law.

HOUSE OF REPRESENTATIVES REPORT REQUIREMENTS

The following items are included in accordance with various requirements of the Rules of the House of Representatives.

**FULL COMMITTEE VOTES**

Pursuant to the provisions of clause 3(b) of rule XIII of the House of Representatives, the results of each roll call vote on an amendment or on the motion to report, together with the names of those voting for and those voting against, are printed below:

Roll Call 1

Date: June 24, 2025
Measure: Homeland Security Appropriations Bill, FY 2026
Motion by: Mr. Amodei
Description of Motion: Amendment in the Second Degree to Amendment #5 (DeLauro).
Results: Adopted 33 yeas to 27 nays

| *Members Voting Yea* | *Members Voting Nay* |
|---|---|
| Mr. Aderholt | Mr. Aguilar |
| Mr. Alford | Mr. Bishop |
| Mr. Amodei | Mr. Case |
| Mrs. Bice | Mr. Clyburn |
| Mr. Calvert | Mr. Cuellar |
| Mr. Ciscomani | Ms. Dean |
| Mr. Cline | Ms. DeLauro |
| Mr. Clyde | Mr. Espaillat |
| Mr. Cole | Ms. Frankel |
| Mr. Diaz-Balart | Mr. Harder |
| Mr. Edwards | Mr. Hoyer |
| Mr. Ellzey | Mr. Ivey |
| Mr. Fleischmann | Ms. Kaptur |
| Mr. Franklin | Ms. Lee |
| Mr. Gonzales | Mr. Levin |
| Mr. Guest | Ms. McCollum |
| Dr. Harris | Ms. Meng |
| Mrs. Hinson | Mr. Morelle |
| Mr. Joyce | Mr. Mrvan |
| Mr. LaLota | Ms. Perez |
| Ms. Letlow | Ms. Pingree |
| Ms. Maloy | Mr. Pocan |
| Mr. Moolenaar | Mr. Quigley |
| Mr. Moore | Mrs. Torres |
| Mr. Newhouse | Ms. Underwood |
| Mr. Reschenthaler | Ms. Wasserman Schultz |
| Mr. Rogers | Mrs. Watson Coleman |
| Mr. Rutherford | |
| Mr. Simpson | |
| Mr. Strong | |
| Mr. Valadao | |
| Mr. Womack | |
| Mr. Zinke | |

**FULL COMMITTEE VOTES**

Pursuant to the provisions of clause 3(b) of rule XIII of the House of Representatives, the results of each roll call vote on an amendment or on the motion to report, together with the names of those voting for and those voting against, are printed below:

Roll Call 2

Date: June 24, 2025
Measure: Homeland Security Appropriations Bill, FY 2026
Motion by: Mr. Bishop
Description of Motion: Restore funding to the DHS Office for Civil Rights and Civil Liberties.
Results: Not adopted 28 yeas to 34 nays

| *Members Voting Yea* | *Members Voting Nay* |
|---|---|
| Mr. Aguilar | Mr. Aderholt |
| Mr. Bishop | Mr. Alford |
| Mr. Case | Mr. Amodei |
| Mr. Clyburn | Mrs. Bice |
| Mr. Cuellar | Mr. Calvert |
| Ms. Dean | Mr. Carter |
| Ms. DeLauro | Mr. Ciscomani |
| Ms. Escobar | Mr. Cline |
| Mr. Espaillat | Mr. Clyde |
| Ms. Frankel | Mr. Cole |
| Mr. Harder | Mr. Diaz-Balart |
| Mr. Hoyer | Mr. Edwards |
| Mr. Ivey | Mr. Ellzey |
| Ms. Kaptur | Mr. Fleischmann |
| Ms. Lee | Mr. Franklin |
| Mr. Levin | Mr. Gonzales |
| Ms. McCollum | Mr. Guest |
| Ms. Meng | Dr. Harris |
| Mr. Morelle | Mrs. Hinson |
| Mr. Mrvan | Mr. Joyce |
| Ms. Perez | Mr. LaLota |
| Ms. Pingree | Ms. Letlow |
| Mr. Pocan | Ms. Maloy |
| Mr. Quigley | Mr. Moolenaar |
| Mrs. Torres | Mr. Moore |
| Ms. Underwood | Mr. Newhouse |
| Ms. Wasserman Schultz | Mr. Reschenthaler |
| Mrs. Watson Coleman | Mr. Rogers |
| | Mr. Rutherford |
| | Mr. Simpson |
| | Mr. Strong |
| | Mr. Valadao |
| | Mr. Womack |
| | Mr. Zinke |

**FULL COMMITTEE VOTES**

Pursuant to the provisions of clause 3(b) of rule XIII of the House of Representatives, the results of each roll call vote on an amendment or on the motion to report, together with the names of those voting for and those voting against, are printed below:

Roll Call 3

Date: June 24, 2025
Measure: Homeland Security Appropriations Bill, FY 2026
Motion by: Ms. Wasserman Schultz
Description of Motion: Restoring $1 million for the Family Reunification Task Force.
Results: Not adopted 28 yeas to 29 nays

| *Members Voting Yea* | *Members Voting Nay* |
|---|---|
| Mr. Bishop | Mr. Aderholt |
| Mr. Carter | Mr. Alford |
| Mr. Case | Mr. Amodei |
| Mr. Clyburn | Mrs. Bice |
| Mr. Cuellar | Mr. Calvert |
| Ms. Dean | Mr. Ciscomani |
| Ms. DeLauro | Mr. Cline |
| Ms. Escobar | Mr. Clyde |
| Mr. Espaillat | Mr. Cole |
| Ms. Frankel | Mr. Diaz-Balart |
| Mr. Harder | Mr. Edwards |
| Mr. Hoyer | Mr. Ellzey |
| Mr. Ivey | Mr. Fleischmann |
| Ms. Kaptur | Mr. Franklin |
| Ms. Lee | Mr. Guest |
| Mr. Levin | Dr. Harris |
| Ms. McCollum | Mrs. Hinson |
| Ms. Meng | Mr. LaLota |
| Mr. Morelle | Ms. Letlow |
| Mr. Mrvan | Ms. Maloy |
| Ms. Perez | Mr. Moolenaar |
| Ms. Pingree | Mr. Moore |
| Mr. Pocan | Mr. Newhouse |
| Mr. Quigley | Mr. Rogers |
| Mrs. Torres | Mr. Rutherford |
| Ms. Underwood | Mr. Strong |
| Ms. Wasserman Schultz | Mr. Valadao |
| Mrs. Watson Coleman | Mr. Womack |
| | Mr. Zinke |

**FULL COMMITTEE VOTES**

Pursuant to the provisions of clause 3(b) of rule XIII of the House of Representatives, the results of each roll call vote on an amendment or on the motion to report, together with the names of those voting for and those voting against, are printed below:

Roll Call 4

Date: June 24, 2025
Measure: Homeland Security Appropriations Bill, FY 2026
Motion by: Ms. Wasserman Schultz
Description of Motion: Prohibits use of funds to eliminate the Federal Emergency Management Agency.
Results: Not adopted 25 yeas to 34 nays

| *Members Voting Yea* | *Members Voting Nay* |
|---|---|
| Mr. Bishop | Mr. Aderholt |
| Mr. Case | Mr. Alford |
| Mr. Clyburn | Mr. Amodei |
| Mr. Cuellar | Mrs. Bice |
| Ms. Dean | Mr. Calvert |
| Ms. DeLauro | Mr. Carter |
| Ms. Escobar | Mr. Ciscomani |
| Mr. Espaillat | Mr. Cline |
| Ms. Frankel | Mr. Cloud |
| Mr. Harder | Mr. Clyde |
| Mr. Hoyer | Mr. Cole |
| Mr. Ivey | Mr. Diaz-Balart |
| Ms. Kaptur | Mr. Edwards |
| Ms. Lee | Mr. Ellzey |
| Mr. Levin | Mr. Fleischmann |
| Ms. Meng | Mr. Franklin |
| Mr. Morelle | Mr. Gonzales |
| Mr. Mrvan | Mr. Guest |
| Ms. Perez | Dr. Harris |
| Ms. Pingree | Mrs. Hinson |
| Mr. Pocan | Mr. Joyce |
| Mrs. Torres | Mr. LaLota |
| Ms. Underwood | Ms. Maloy |
| Ms. Wasserman Schultz | Mr. Moolenaar |
| Mrs. Watson Coleman | Mr. Moore |
| | Mr. Newhouse |
| | Mr. Reschenthaler |
| | Mr. Rogers |
| | Mr. Rutherford |
| | Mr. Simpson |
| | Mr. Strong |
| | Mr. Valadao |
| | Mr. Womack |
| | Mr. Zinke |

**FULL COMMITTEE VOTES**

Pursuant to the provisions of clause 3(b) of rule XIII of the House of Representatives, the results of each roll call vote on an amendment or on the motion to report, together with the names of those voting for and those voting against, are printed below:

Roll Call 5

Date: June 24, 2025
Measure: Homeland Security Appropriations Bill, FY 2026
Motion by: Mrs. Torres
Description of Motion: Disaster Relief Fund emergency supplemental.
Results: Not adopted 28 yeas to 30 nays

| *Members Voting Yea* | *Members Voting Nay* |
|---|---|
| Mr. Aguilar | Mr. Aderholt |
| Mr. Bishop | Mr. Alford |
| Mr. Case | Mr. Amodei |
| Mr. Clyburn | Mr. Calvert |
| Mr. Cuellar | Mr. Carter |
| Ms. Dean | Mr. Ciscomani |
| Ms. DeLauro | Mr. Cloud |
| Ms. Escobar | Mr. Cole |
| Mr. Espaillat | Mr. Diaz-Balart |
| Ms. Frankel | Mr. Edwards |
| Mr. Harder | Mr. Ellzey |
| Mr. Hoyer | Mr. Fleischmann |
| Mr. Ivey | Mr. Franklin |
| Ms. Kaptur | Mr. Guest |
| Ms. Lee | Dr. Harris |
| Mr. Levin | Mrs. Hinson |
| Ms. McCollum | Mr. Joyce |
| Ms. Meng | Mr. LaLota |
| Mr. Morelle | Ms. Letlow |
| Mr. Mrvan | Ms. Maloy |
| Ms. Perez | Mr. Moolenaar |
| Ms. Pingree | Mr. Moore |
| Mr. Pocan | Mr. Newhouse |
| Mr. Quigley | Mr. Reschenthaler |
| Mrs. Torres | Mr. Rogers |
| Ms. Underwood | Mr. Rutherford |
| Ms. Wasserman Schultz | Mr. Strong |
| Mrs. Watson Coleman | Mr. Valadao |
| | Mr. Womack |
| | Mr. Zinke |

**FULL COMMITTEE VOTES**

Pursuant to the provisions of clause 3(b) of rule XIII of the House of Representatives, the results of each roll call vote on an amendment or on the motion to report, together with the names of those voting for and those voting against, are printed below:

Roll Call 6

Date: June 24, 2025
Measure: Homeland Security Appropriations Bill, FY 2026
Motion by: Mrs. Torres
Description of Motion: Prohibits the termination of the Flores Settlement Agreement.
Results: Not adopted 27 yeas to 32 nays

| *Members Voting Yea* | *Members Voting Nay* |
|---|---|
| Mr. Aguilar | Mr. Aderholt |
| Mr. Bishop | Mr. Alford |
| Mr. Case | Mr. Amodei |
| Mr. Clyburn | Mrs. Bice |
| Mr. Cuellar | Mr. Calvert |
| Ms. Dean | Mr. Carter |
| Ms. DeLauro | Mr. Ciscomani |
| Ms. Escobar | Mr. Cloud |
| Mr. Espaillat | Mr. Cole |
| Ms. Frankel | Mr. Diaz-Balart |
| Mr. Harder | Mr. Edwards |
| Mr. Hoyer | Mr. Ellzey |
| Mr. Ivey | Mr. Fleischmann |
| Ms. Kaptur | Mr. Franklin |
| Ms. Lee | Mr. Guest |
| Mr. Levin | Dr. Harris |
| Ms. McCollum | Mrs. Hinson |
| Ms. Meng | Mr. Joyce |
| Mr. Morelle | Mr. LaLota |
| Mr. Mrvan | Ms. Letlow |
| Ms. Pingree | Ms. Maloy |
| Mr. Pocan | Mr. Moolenaar |
| Mr. Quigley | Mr. Moore |
| Mrs. Torres | Mr. Newhouse |
| Ms. Underwood | Mr. Reschenthaler |
| Ms. Wasserman Schultz | Mr. Rogers |
| Mrs. Watson Coleman | Mr. Rutherford |
| | Mr. Simpson |
| | Mr. Strong |
| | Mr. Valadao |
| | Mr. Womack |
| | Mr. Zinke |

**FULL COMMITTEE VOTES**

Pursuant to the provisions of clause 3(b) of rule XIII of the House of Representatives, the results of each roll call vote on an amendment or on the motion to report, together with the names of those voting for and those voting against, are printed below:

Roll Call 7

Date: June 24, 2025
Measure: Homeland Security Appropriations Bill, FY 2026
Motion by: Mrs. Torres
Description of Motion: Prohibits the removal of certain veterans from deportation.
Results: Not adopted 30 yeas to 32 nays

| *Members Voting Yea* | *Members Voting Nay* |
|---|---|
| Mr. Aguilar | Mr. Aderholt |
| Mr. Bishop | Mr. Alford |
| Mr. Case | Mr. Amodei |
| Mr. Ciscomani | Mrs. Bice |
| Mr. Clyburn | Mr. Calvert |
| Mr. Cuellar | Mr. Carter |
| Ms. Dean | Mr. Cline |
| Ms. DeLauro | Mr. Cloud |
| Ms. Escobar | Mr. Clyde |
| Mr. Espaillat | Mr. Cole |
| Ms. Frankel | Mr. Diaz-Balart |
| Mr. Harder | Mr. Edwards |
| Mr. Hoyer | Mr. Ellzey |
| Mr. Ivey | Mr. Fleischmann |
| Ms. Lee | Mr. Franklin |
| Mr. Levin | Mr. Gonzales |
| Ms. McCollum | Mr. Guest |
| Ms. Meng | Dr. Harris |
| Mr. Morelle | Mrs. Hinson |
| Mr. Mrvan | Mr. Joyce |
| Mr. Newhouse | Mr. LaLota |
| Ms. Perez | Ms. Letlow |
| Ms. Pingree | Ms. Maloy |
| Mr. Pocan | Mr. Moolenaar |
| Mr. Quigley | Mr. Moore |
| Mrs. Torres | Mr. Reschenthaler |
| Ms. Underwood | Mr. Rogers |
| Mr. Valadao | Mr. Rutherford |
| Ms. Wasserman Schultz | Mr. Simpson |
| Mrs. Watson Coleman | Mr. Strong |
| | Mr. Womack |
| | Mr. Zinke |

**FULL COMMITTEE VOTES**

Pursuant to the provisions of clause 3(b) of rule XIII of the House of Representatives, the results of each roll call vote on an amendment or on the motion to report, together with the names of those voting for and those voting against, are printed below:

Roll Call 8

Date: June 24, 2025
Measure: Homeland Security Appropriations Bill, FY 2026
Motion by: Mr. Rogers
Description of Motion: Motion to report the bill to the House, as amended.
Results: Adopted 36 yeas to 27 nays

| *Members Voting Yea* | *Members Voting Nay* |
|---|---|
| Mr. Aderholt | Mr. Aguilar |
| Mr. Alford | Mr. Bishop |
| Mr. Amodei | Mr. Case |
| Mrs. Bice | Mr. Clyburn |
| Mr. Calvert | Mr. Cuellar |
| Mr. Carter | Ms. Dean |
| Mr. Ciscomani | Ms. DeLauro |
| Mr. Cline | Ms. Escobar |
| Mr. Cloud | Mr. Espaillat |
| Mr. Clyde | Ms. Frankel |
| Mr. Cole | Mr. Harder |
| Mr. Diaz-Balart | Mr. Hoyer |
| Mr. Edwards | Mr. Ivey |
| Mr. Ellzey | Ms. Kaptur |
| Mr. Fleischmann | Ms. Lee |
| Mr. Franklin | Mr. Levin |
| Mr. Gonzales | Ms. McCollum |
| Mr. Guest | Ms. Meng |
| Dr. Harris | Mr. Morelle |
| Mrs. Hinson | Mr. Mrvan |
| Mr. Joyce | Ms. Pingree |
| Mr. LaLota | Mr. Pocan |
| Ms. Letlow | Mr. Quigley |
| Ms. Maloy | Mrs. Torres |
| Mr. Moolenaar | Ms. Underwood |
| Mr. Moore | Ms. Wasserman Schultz |
| Mr. Newhouse | Mrs. Watson Coleman |
| Ms. Perez | |
| Mr. Reschenthaler | |
| Mr. Rogers | |
| Mr. Rutherford | |
| Mr. Simpson | |
| Mr. Strong | |
| Mr. Valadao | |
| Mr. Womack | |
| Mr. Zinke | |

STATEMENT OF GENERAL PERFORMANCE GOALS AND OBJECTIVES

Pursuant to clause 3(c)(4) of rule XIII of the Rules of the House of Representatives, the following is a statement of general performance goals and objectives for which this measure authorizes funding:

The Committee on Appropriations considers program performance, including a program's success in developing and attaining outcome-related goals and objectives, in developing funding recommendations.

RESCISSIONS OF FUNDS

Pursuant to clause 3(f)(2) of rule XIII of the Rules of the House of Representatives no rescissions are recommended in the accompanying bill.

TRANSFERS OF FUNDS

Pursuant to clause 3(f)(2) of rule XIII of the Rules of the House of Representatives, the following list includes the transfers included in the accompanying bill:

In title II, under "U.S. Customs and Border Protection—Operations and Support", language is included allowing for the transfer of $2,500,000 to the Bureau of Indian Affairs.

In title II, under "Administrative Provisions", section 218 allows for the transfer of funds appropriated within this Act to "U.S. Immigration and Customs Enforcement—Operations and Support" as necessary to ensure the detention of aliens prioritized for removal.

In title III, under "Administrative Provisions", section 310 allows for the transfer of unobligated balances of funds in any prior Act from "Federal Emergency Management Agency—Federal Assistance" to "Federal Emergency Management Agency—Disaster Relief Fund".

In title III, under "Administrative Provisions", section 311 allows for the transfer of funds appropriated under prior Acts from "Federal Emergency Management Agency—Flood Hazard Mapping and Risk Analysis Program" to "Federal Emergency Management Agency—Federal Assistance" for necessary expenses for flood hazard mapping and risk analysis.

In title V, under "General Provisions", section 503 allows for the transfer of up to 2.5 percent of each appropriation in this Act to one or more other appropriations in this Act and permitting the augmentation of each appropriation to not more than 5 percent of the original amount appropriated.

In title V, under "General Provisions", section 506 requires the transfer of funds appropriated in this Act from "Intelligence, Analysis, and Situational Awareness—Operations and Support" to "Management Directorate—Operations and Support" if such funds exceed certain amounts authorized.

In title V, under "General Provisions", section 513 allows the transfer of funds appropriated in this Act from "Countering Weapons of Mass Destruction Office" to one or more other appropriations in this Act to carry out a reallocation of the functions of the office.

In title V, under "General Provisions", section 541 requires the transfer of not less than $5,000,000 from other appropriations funded within this Act to "U.S. Immigration and Customs Enforce-

ment—Operations and Support" to support and conduct necessary operations of the Blue Campaign.

DISCLOSURE OF EARMARKS AND CONGRESSIONAL DIRECTED SPENDING ITEMS

The following table is submitted in compliance with clause 9 of rule XXI and lists the congressional earmarks (as defined in paragraph (e) of clause 9) contained in the bill or in this report. Neither the bill nor the report contain any limited tax benefits or limited tariff benefits as defined in paragraphs (f) or (g) of clause 9 of rule XXI.

HOMELAND SECURITY
[Community Project Funding]

| Agency | Account | Recipient | Project | State | House Amount | House Requestor(s) |
|---|---|---|---|---|---|---|
| FEMA | Federal Assistance—EOC | City of Rancho Cucamonga | Emergency Operations Center (EOC) Relocation | CA | 1,034,487 | Aguilar |
| FEMA | Federal Assistance—PDM | City of San Bernardino | Hazard Mitigation Infrastructure Resiliency Project | CA | 1,145,144 | Aguilar |
| FEMA | Federal Assistance—PDM | City of Providence | West River Flood Response Initiative | RI | 825,000 | Amo |
| FEMA | Federal Assistance—EOC | City of Taunton | Taunton Emergency Operations Center | MA | 1,034,487 | Auchincloss |
| FEMA | Federal Assistance—PDM | City of Beaumont | City of Beaumont Underpass Flooding Early Warning System Improvements | TX | 827,000 | Babin |
| FEMA | Federal Assistance—PDM | City and Borough of Juneau | Glacial Lake Outburst Flood Disaster Mitigation—Flood Resilience on the Mendenhall River | AK | 3,253,000 | Begich |
| FEMA | Federal Assistance—EOC | County of Sacramento | Sacramento County Emergency Operations Center Project | CA | 990,000 | Bera |
| FEMA | Federal Assistance—EOC | County of Washington Emergency Management Agency | Washington County Emergency Operations Center | IL | 2,009,000 | Bost |
| FEMA | Federal Assistance—PDM | County of Monroe | Monroe County Goose Pond Dam Rehabilitation Project | PA | 2,432,000 | Bresnahan |
| FEMA | Federal Assistance—PDM | City of Camarillo | City of Camarillo Hybrid Microgrid Standby Power Resiliency Project | CA | 1,145,144 | Brownley |
| FEMA | Federal Assistance—PDM | City of Thousand Oaks | City of Thousand Oaks Community Resilience Center Project | CA | 1,145,144 | Brownley |
| FEMA | Federal Assistance—EOC | City of Westlake Village | City of Westlake Village Emergency Operations Center Resilience Project | CA | 336,000 | Brownley |
| FEMA | Federal Assistance—PDM | The Town of Longboat Key | Longboat Key Storm Resiliency Project | FL | 1,954,000 | Buchanan |
| FEMA | Federal Assistance—EOC | Central Oregon Intergovernmental Council | CORE3 ECC/Admin Building | OR | 1,034,487 | Bynum |

| | | | | | | |
|---|---|---|---|---|---|---|
| FEMA | Federal Assistance—PDM | City of Indianapolis | City of Indianapolis Howland Ditch Greenway Flood Control Improvement Project Design | IN | 1,145,144 | Carson |
| FEMA | Federal Assistance—EOC | Hawaii Emergency Management Agency | Emergency Operations Center IT Modernization | HI | 1,034,487 | Case |
| FEMA | Federal Assistance—PDM | City of St. Petersburg | 88th Avenue North Storm Drainage Improvements | FL | 1,145,144 | Castor (FL) |
| FEMA | Federal Assistance—PDM | City of St. Petersburg | MLK Street South Flooding Alleviation | FL | 1,145,144 | Castor (FL) |
| FEMA | Federal Assistance—EOC | Shelby County | Shelby County Emergency Operations Center | TN | 1,034,487 | Cohen |
| FEMA | Federal Assistance—PDM | City of Frankfort | Frankfort Riverbank Stabilization | KY | 5,800,000 | Comer |
| FEMA | Federal Assistance—EOC | County of Orange | County of Orange Emergency Operations Center | CA | 1,034,487 | Correa |
| FEMA | Federal Assistance—EOC | Town of Woodbridge | Town of Woodbridge Emergency Operations Center | CT | 1,034,487 | DeLauro |
| FEMA | Federal Assistance—EOC | Town of Hamden | Town of Hamden Emergency Operations Center | CT | 1,034,487 | DeLauro |
| FEMA | Federal Assistance—EOC | City of West Haven | West Haven EOC | CT | 1,034,487 | DeLauro |
| FEMA | Federal Assistance—EOC | City of Concord | Emergency Operations Center Upgrades Project | CA | 1,034,487 | DeSaulnier |
| FEMA | Federal Assistance—PDM | Diablo Water District | Seismic Resiliency Reservoir and Transmission Line Improvement Project | CA | 1,145,144 | DeSaulnier |
| FEMA | Federal Assistance—EOC | Lawrence County Office of Emergency Management | Lawrence County EOC | TN | 2,606,000 | DesJarlais |
| FEMA | Federal Assistance—PDM | City of Austin | Emergency Disaster Energy Hubs | TX | 1,145,144 | Doggett |
| FEMA | Federal Assistance—EOC | Taylor County Board of County Commissioners | Taylor County Emergency Operations and Public Safety Complex | FL | 2,606,000 | Dunn (FL) |
| FEMA | Federal Assistance—PDM | Maryland Department of Natural Resources | Holly Beach Farm Resiliency | MD | 1,145,144 | Elfreth |
| FEMA | Federal Assistance—PDM | El Paso County Hospital District | Alberta Avenue Storm and Domestic Water Improvements | TX | 1,145,144 | Escobar |

HOMELAND SECURITY—Continued

[Community Project Funding]

| Agency | Account | Recipient | Project | State | House Amount | House Requestor(s) |
|---|---|---|---|---|---|---|
| FEMA | Federal Assistance—PDM | City of Greeley | City of Greeley—Gold Hill Pipeline | CO | 8,685,000 | Evans |
| FEMA | Federal Assistance—EOC | Southern University and A&M College | Emergency Operations Centers Complex | LA | 1,034,487 | Fields |
| FEMA | Federal Assistance—EOC | Lafayette Consolidated Government | Lafayette Consolidated Government Emergency Operations Center | LA | 1,034,487 | Fields |
| FEMA | Federal Assistance—PDM | Lower Makefield Township | Lower Makefield Township Flood Mitigation and Stormwater Management | PA | 5,211,000 | Fitzpatrick |
| FEMA | Federal Assistance—EOC | City of Cleveland | Bradley County Emergency Operations Center | TN | 1,328,000 | Fleischmann |
| FEMA | Federal Assistance—PDM | City of Bellaire | Cypress Ditch Improvement Project | TX | 1,145,144 | Fletcher |
| FEMA | Federal Assistance—EOC | Boone County Illinois Emergency Management Agency | Boone County Emergency Operations Center | IL | 800,000 | Foster |
| FEMA | Federal Assistance—PDM | City of Boynton Beach Community Redevelopment Agency | Boynton Beach Harbor Marina Seawall Replacement | FL | 1,145,144 | Frankel |
| FEMA | Federal Assistance—EOC | City of Greenacres | City of Greenacres Emergency Operations Center | FL | 1,034,487 | Frankel |
| FEMA | Federal Assistance—EOC | City of Lake Worth Beach | Lake Worth Beach Emergency Operations Center | FL | 1,034,487 | Frankel |
| FEMA | Federal Assistance—EOC | Village of Wellington | Village of Wellington Emergency Operations Center | FL | 1,034,487 | Frankel |
| FEMA | Federal Assistance—EOC | City of North Myrtle Beach | City of North Myrtle Beach Emergency Operations Center | SC | 2,606,000 | Fry |
| FEMA | Federal Assistance—PDM | City of El Cerrito | Hillside Natural Area Hazardous Fuels Management | CA | 1,145,144 | Garamendi |
| FEMA | Federal Assistance—EOC | Suffolk County Fire, Rescue and Emergency Services | Suffolk County Emergency Operations Center Project | NY | 1,954,000 | Garbarino |
| FEMA | Federal Assistance—PDM | Incoporated Village of Freeport | Freeport Nuisance Flooding Mitigation | NY | 1,145,144 | Gillen |

| | | | | | | |
|---|---|---|---|---|---|---|
| FEMA | Federal Assistance—EOC | Frio County | Frio County EOC | TX | 1,954,000 | Gonzales |
| FEMA | Federal Assistance—PDM | Harris County Flood Control District | Tributary C116–00–00 Conveyance and Drainage Improvements | TX | 1,145,144 | Green (TX) |
| FEMA | Federal Assistance—EOC | Covington County Emergency Management Agency | Covington County Emergency Operations Center | MS | 1,303,000 | Guest |
| FEMA | Federal Assistance—EOC | City of Meriden | City of Meriden for Combined Emergency Operations Center/ Emergency Communications Center Public Safety Communications Upgrades | CT | 1,003,003 | Hayes |
| FEMA | Federal Assistance—EOC | Terrebonne Parish Consolidated Government | Terrebonne Parish Emergency Operations Center | LA | 1,129,000 | Higgins |
| FEMA | Federal Assistance—EOC | Town of Fairfield | Joint Emergency Operations Center | CT | 562,500 | Himes |
| FEMA | Federal Assistance—PDM | City of Cedar Rapids | 3rd Avenue SE Downtown Pump Station Backup Generator | IA | 1,407,000 | Hinson |
| FEMA | Federal Assistance—PDM | Mesa County Public Works Division | Mesa County Douglas Wash Detention Basin Project | CO | 869,000 | Hurd |
| FEMA | Federal Assistance—EOC | City of Peachtree City | City of Peachtree City Emergency Operations Center | GA | 1,172,000 | Jack |
| FEMA | Federal Assistance—PDM | City of Seattle | Seattle Waterfront Elliott Bay Seawall Project, Phase 2 | WA | 1,145,144 | Jayapal |
| FEMA | Federal Assistance—PDM | City of Toledo | N. Summit St. Restoration | OH | 1,145,144 | Kaptur |
| FEMA | Federal Assistance—EOC | Borough of Mountainside | Mountainside Emergency Operations Center | NJ | 365,000 | Kean |
| FEMA | Federal Assistance—PDM | Town of Scituate | Scituate Cedar Point Seawall | MA | 1,145,144 | Keating |
| FEMA | Federal Assistance—EOC | County of Pontotoc, Mississippi | Pontotoc County Emergency Management Operations Center Construction Project | MS | 2,031,000 | Kelly |
| FEMA | Federal Assistance—EOC | City of Erie | City of Erie Emergency Operations Command Center | PA | 2,606,000 | Kelly (PA) |
| FEMA | Federal Assistance—PDM | City of Holladay, Utah | Holladay City Hall Seismic Retrofit Project | UT | 1,759,000 | Kennedy |
| FEMA | Federal Assistance—PDM | City of Chino Hills | Chino Hills Fire Risk Reduction Project | CA | 1,628,000 | Kim (CA) |

HOMELAND SECURITY—Continued
[Community Project Funding]

| Agency | Account | Recipient | Project | State | House Amount | House Requestor(s) |
|---|---|---|---|---|---|---|
| FEMA | Federal Assistance—PDM | Gibson County Tennessee | Gibson County Emergency Generator | TN | 117,000 | Kustoff |
| FEMA | Federal Assistance—EOC | County of Butte | Emergency Operations Center Technology Refresh | CA | 130,000 | LaMalfa |
| FEMA | Federal Assistance—PDM | Village of Pelham | Highbrook Avenue Drainage Improvement Project | NY | 1,145,144 | Latimer |
| FEMA | Federal Assistance—PDM | City of New Rochelle | New Rochelle City Park Drainage Improvements | NY | 1,145,144 | Latimer |
| FEMA | Federal Assistance—PDM | City of Yonkers | Yonkers Warburton Avenue Slope Stabilization Project | NY | 1,145,144 | Latimer |
| FEMA | Federal Assistance—EOC | Clark County | Technology for South Site Emergency Operations Center | NV | 1,034,487 | Lee (NV) |
| FEMA | Federal Assistance—EOC | Livingston Parish | Livingston Parish Emergency Operations Center | LA | 2,606,000 | Letlow |
| FEMA | Federal Assistance—PDM | City of Mountain View | Charleston Slough Tide Gates Improvement Project | CA | 1,145,144 | Liccardo |
| FEMA | Federal Assistance—PDM | City of Rancho Palos Verdes | Abalone Cove Landslide Stabilization Project | CA | 1,145,144 | Lieu |
| FEMA | Federal Assistance—PDM | City of Rancho Palos Verdes | Klondike Canyon Landslide Emergency Mitigation Project | CA | 1,145,144 | Lieu |
| FEMA | Federal Assistance—PDM | City of El Segundo | Pump Station Upgrade Project | CA | 1,145,144 | Lieu |
| FEMA | Federal Assistance—PDM | Pinellas County Board of County Commissioners | Lealman Community Hurricane Shelter Hardening | FL | 2,606,000 | Luna |
| FEMA | Federal Assistance—PDM | Town of Hull | Hull Harborview Road Coastal Resiliency and Shoreline Protection | MA | 1,145,144 | Lynch |
| FEMA | Federal Assistance—EOC | City of Sacramento | Sacramento Fire Department EMS Division Integration EOC | CA | 1,034,487 | Matsui |
| FEMA | Federal Assistance—PDM | City of Frederick, Maryland | West Patrick Street at Maryvale Ditch Flood Mitigation Project | MD | 1,145,144 | McClain Delaney |
| FEMA | Federal Assistance—EOC | City of Concord | Emergency Operations Center Technology and Equipment | NC | 326,000 | McDowell |

| | | | | | | |
|---|---|---|---|---|---|---|
| FEMA | Federal Assistance—EOC | Town of Westhampton | Westhampton Public Safety Complex Emergency Operations Center | MA | 885,757 | McGovern |
| FEMA | Federal Assistance—PDM | City of Davenport | City of Davenport Water Pollution Control Plant Flood Mitigation Project | IA | 2,996,000 | Miller-Meeks |
| FEMA | Federal Assistance—PDM | City of Irvine | City of Irvine/COAST Wildfire Prevention SR–133 Restoration Project | CA | 1,125,000 | Min |
| FEMA | Federal Assistance—EOC | Cleveland County | Cleveland County Emergency Operations Center | NC | 1,954,000 | Moore |
| FEMA | Federal Assistance—EOC | Coffee County, Alabama | Coffee County Emergency Operation Center | AL | 977,000 | Moore |
| FEMA | Federal Assistance—PDM | City of Gladewater | Gladewater High Hazard Dam | TX | 1,563,000 | Moran |
| FEMA | Federal Assistance—EOC | Town of Lynnfield | Lynnfield Emergency Operations Center Project | MA | 1,034,487 | Moulton |
| FEMA | Federal Assistance—PDM | City of Brisbane | Brisbane Glen Park Pump Station Replacement | CA | 1,145,144 | Mullin |
| FEMA | Federal Assistance—PDM | City of East Palo Alto | San Francisquito Creek Floodway Study | CA | 600,000 | Mullin |
| FEMA | Federal Assistance—EOC | Yakima Valley Emergency Management | Yakima Valley Emergency Operation Center | WA | 1,953,000 | Newhouse |
| FEMA | Federal Assistance—EOC | Callaway County | Callaway County Emergency Operations Center Relocation | MO | 2,606,000 | Onder |
| FEMA | Federal Assistance—EOC | Borough of Metuchen | Metuchen Borough Emergency Services Center Building Project | NJ | 1,034,487 | Pallone |
| FEMA | Federal Assistance—EOC | San Miguel Community Services District | San Miguel Community Services District Emergency Operations Center | CA | 1,034,487 | Panetta |
| FEMA | Federal Assistance—PDM | Cowlitz County Public Utility District No. 1 | Northwest Service Area Grid Resiliency | WA | 1,145,144 | Perez |
| FEMA | Federal Assistance—PDM | Jefferson County Parks & Conservation | Roadway Wildfire Hazard Mitigation in Jefferson County | CO | 1,000,000 | Pettersen |
| FEMA | Federal Assistance—PDM | Mason County PUD 1 | Jorstad Substation Grid Resilience Project | WA | 1,145,144 | Randall |
| FEMA | Federal Assistance—PDM | City of Ocean Shores | Southern End Erosion Project | WA | 1,145,144 | Randall |

HOMELAND SECURITY—Continued
[Community Project Funding]

| Agency | Account | Recipient | Project | State | House Amount | House Requestor(s) |
|---|---|---|---|---|---|---|
| FEMA | Federal Assistance—PDM | Montgomery County Department of Environmental Protection | Wheaton Branch Flood Mitigation | MD | 1,145,144 | Raskin |
| FEMA | Federal Assistance—PDM | Kentucky Emergency Management | Kentucky Emergency Management Flood Monitoring System | KY | 869,000 | Rogers |
| FEMA | Federal Assistance—EOC | City of Mt. Juliet | City of Mt. Juliet Emergency Operations Center | TN | 1,000,000 | Rose |
| FEMA | Federal Assistance—PDM | City of Fayetteville | Locks Creek and Sessoms Drainage Improvements | NC | 4,212,000 | Rouzer |
| FEMA | Federal Assistance—EOC | County of Orange | Orange County Emergency Operations Center | NY | 1,034,487 | Ryan |
| FEMA | Federal Assistance—EOC | County of Ulster | Ulster County Emergency Operations Center | NY | 1,034,487 | Ryan |
| FEMA | Federal Assistance—PDM | City of Portsmouth | Gust Lane Flood Mitigation Improvements | VA | 1,145,144 | Scott (VA) |
| FEMA | Federal Assistance—PDM | City of Seattle | Seattle Public Library Columbia Branch Seismic Structural Upgrade | WA | 1,145,144 | Smith (WA) |
| FEMA | Federal Assistance—PDM | City of Huntsville | Huntsville Hospital for Women and Children Generator Project | AL | 2,597,000 | Strong |
| FEMA | Federal Assistance—EOC | Rio Vista Fire Department | Rio Vista—Emergency Operations Center | CA | 1,034,487 | Thompson (CA) |
| FEMA | Federal Assistance—PDM | Clark County Water Reclamation District | Flamingo Water Resources Center Emergency Power Project | NV | 1,145,144 | Titus |
| FEMA | Federal Assistance—EOC | City of Artesia | Artesia Emergency Operations Center | CA | 925,000 | Tran |
| FEMA | Federal Assistance—EOC | City of Los Alamitos | Los Alamitos Emergency Operations Center | CA | 382,880 | Tran |
| FEMA | Federal Assistance—PDM | Miami Conservancy District | Germantown, Englewood, Taylorsville Upstream Dam Walls Rehabilitation | OH | 8,685,000 | Turner |
| FEMA | Federal Assistance—PDM | The Borough of Wildwood Crest | Wildwood Crest Flood Mitigation | NJ | 3,572,000 | Van Drew |
| FEMA | Federal Assistance—PDM | City of Pembroke Pines | Pines Point Hurricane Mitigation | FL | 428,619 | Wasserman Schultz |

COMPLIANCE WITH RULE XIII, CL. 3(e) (RAMSEYER RULE)

In compliance with clause 3(e) of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italics, existing law in which no change is proposed is shown in roman):

COMPLIANCE WITH RULE XIII, CL. 3(e) (RAMSEYER RULE)

In compliance with clause 3(e) of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italics, existing law in which no change is proposed is shown in roman):

**DEPARTMENT OF HOMELAND SECURITY APPROPRIATIONS ACT, 2005**

(Public Law 108-334)

* * * * * * *

TITLE V

GENERAL PROVISIONS

* * * * * * *

SEC. 515. (a) IN GENERAL.—Chapter 449 of title 49, United States Code, is amended by inserting after section 44944 the following new section:

**"SEC. 44945. Disposition of unclaimed money**

"Notwithstanding section 3302 of title 31, unclaimed money recovered at any airport security checkpoint shall be retained by the Transportation Security Administration and shall remain available until expended for the purpose of providing civil aviation security as required in this chapter.".

(b) ANNUAL ⟦REPORT⟧ *BRIEFING*.—Not later than 180 days after the date of enactment of this Act and annually thereafter, the Administrator of the Transportation Security Administration shall transmit to the Committee on Transportation and Infrastructure of the House of Representatives; the Committee on Appropriations of the House of Representatives; the Committee on Commerce, Science and Transportation of the Senate; and the Committee on Appropriations of the Senate, a ⟦report⟧ *briefing* that contains a detailed description of the amount of unclaimed money recovered in total and at each individual airport, and specifically how the unclaimed money is being used to provide civil aviation security.

(c) CLERICAL AMENDMENT.—The analysis for chapter 449 of title 49, United States Code, is amended by adding the following new item after the item relating to section 44944:

"44945. Disposition of unclaimed money.".

* * * * * * *

## ROBERT T. STAFFORD DISASTER RELIEF AND EMERGENCY ASSISTANCE ACT

* * * * * * *

# TITLE II—DISASTER PREPAREDNESS AND MITIGATION ASSISTANCE

* * * * * * *

**SEC. 203. PREDISASTER HAZARD MITIGATION.**

(a) DEFINITION OF SMALL IMPOVERISHED COMMUNITY.—In this section, the term "small impoverished community" means a community of 3,000 or fewer individuals that is economically disadvantaged, as determined by the State in which the community is located and based on criteria established by the President.

(b) ESTABLISHMENT OF PROGRAM.—The President [may] *shall* establish a program to provide technical and financial assistance to States and local governments to assist in the implementation of predisaster hazard mitigation measures that are *related to a major disaster declaration in the previous 4 years and* cost-effective and are designed to reduce injuries, loss of life, and damage and destruction of property, including damage to critical services and facilities under the jurisdiction of the States or local governments.

(c) APPROVAL BY PRESIDENT.—If the President determines that a State or local government has identified natural disaster hazards in areas under its jurisdiction and has demonstrated the ability to form effective public-private natural disaster hazard mitigation partnerships, the President, using amounts in the National Public Infrastructure Predisaster Mitigation Fund established under subsection (i) (referred to in this section as the "Fund"), [may] *shall* provide technical and financial assistance to the State or local government to be used in accordance with subsection (e).

(d) STATE RECOMMENDATIONS.—

(1) IN GENERAL.—

(A) RECOMMENDATIONS.—The Governor of each State may recommend to the President not fewer than five local governments to receive assistance under this section.

(B) DEADLINE FOR SUBMISSION.—The recommendations under subparagraph (A) shall be submitted to the President not later than October 1, 2001, and each October 1st thereafter or such later date in the year as the President may establish.

(C) CRITERIA.—In making recommendations under subparagraph (A), a Governor shall consider the criteria specified in subsection (g).

(2) USE.—

(A) IN GENERAL.—Except as provided in subparagraph (B), in providing assistance to local governments under this section, the President shall select from local governments recommended by the Governors under this subsection.

(B) EXTRAORDINARY CIRCUMSTANCES.—In providing assistance to local governments under this section, the President may select a local government that has not been rec-

ommended by a Governor under this subsection if the President determines that extraordinary circumstances justify the selection and that making the selection will further the purpose of this section.

(3) EFFECT OF FAILURE TO NOMINATE.—If a Governor of a State fails to submit recommendations under this subsection in a timely manner, the President may select, subject to the criteria specified in subsection (g), any local governments of the State to receive assistance under this section.

(e) USES OF TECHNICAL AND FINANCIAL ASSISTANCE.—

(1) IN GENERAL.—Technical and financial assistance provided under this section—

(A) shall be used by States and local governments principally to implement predisaster hazard mitigation measures that are cost-effective and are described in proposals approved by the President under this section; and

(B) may be used—

(i) to support effective public-private natural disaster hazard mitigation partnerships;

(ii) to improve the assessment of a community's vulnerability to natural hazards;

(iii) to establish hazard mitigation priorities, and an appropriate hazard mitigation plan, for a community; or

(iv) to establish and carry out enforcement activities and implement the latest published editions of relevant consensus-based codes, specifications, and standards that incorporate the latest hazard-resistant designs and establish minimum acceptable criteria for the design, construction, and maintenance of residential structures and facilities that may be eligible for assistance under this Act for the purpose of protecting the health, safety, and general welfare of the buildings' users against disasters.

(2) DISSEMINATION.—A State or local government may use not more than 10 percent of the financial assistance received by the State or local government under this section for a fiscal year to fund activities to disseminate information regarding cost-effective mitigation technologies.

(f) ALLOCATION OF FUNDS.—

(1) IN GENERAL.—The President shall award financial assistance under this section on a competitive basis for mitigation activities that are cost effective and in accordance with the criteria in subsection (g).

(2) MINIMUM AND MAXIMUM AMOUNTS.—In providing financial assistance under this section, the President shall ensure that the amount of financial assistance made available to a State (including amounts made available to local governments of the State) for a fiscal year—

(A) is not less than the lesser of—

(i) $575,000; or

(ii) the amount that is equal to 1 percent of the total funds appropriated to carry out this section for the fiscal year; and

(B) does not exceed the amount that is equal to 15 percent of the total funds appropriated to carry out this section for the fiscal year.

(3) REDISTRIBUTION OF UNOBLIGATED AMOUNTS.—The President may—

(A) withdraw amounts of financial assistance made available to a State (including amounts made available to local governments of a State) under this subsection that remain unobligated by the end of the third fiscal year after the fiscal year for which the amounts were allocated; and

(B) in the fiscal year following a fiscal year in which amounts were withdrawn under subparagraph (A), add the amounts to any other amounts available to be awarded on a competitive basis pursuant to paragraph (1).

(g) CRITERIA FOR ASSISTANCE AWARDS.—In determining whether to provide technical and financial assistance to a State or local government under this section, the President shall provide financial assistance only in States that have received a major disaster declaration in the previous ⟦7 years⟧ *4 years*, or to any Indian tribal government located partially or entirely within the boundaries of such States, and take into account—

(1) the extent and nature of the hazards to be mitigated;

(2) the degree of commitment of the State or local government to reduce damages from future natural disasters;

(3) the degree of commitment by the State or local government to support ongoing non-Federal support for the hazard mitigation measures to be carried out using the technical and financial assistance;

(4) the extent to which the hazard mitigation measures to be carried out using the technical and financial assistance contribute to the mitigation goals and priorities established by the State;

(5) the extent to which the technical and financial assistance is consistent with other assistance provided under this Act;

(6) the extent to which prioritized, cost-effective mitigation activities that produce meaningful and definable outcomes are clearly identified;

(7) if the State or local government has submitted a mitigation plan under section 322, the extent to which the activities identified under paragraph (6) are consistent with the mitigation plan;

(8) the opportunity to fund activities that maximize net benefits to society;

(9) the extent to which assistance will fund mitigation activities in small impoverished communities;

(10) the extent to which the State, local, Indian tribal, or territorial government has facilitated the adoption and enforcement of the latest published editions of relevant consensus-based codes, specifications, and standards, including amendments made by State, local, Indian tribal, or territorial governments during the adoption process that incorporate the latest hazard-resistant designs and establish criteria for the design, construction, and maintenance of residential structures and facilities that may be eligible for assistance under this Act for

the purpose of protecting the health, safety, and general welfare of the buildings' users against disasters[;]*; and*

(11) the extent to which the assistance will fund activities that increase the level of resiliency[; and].

[(12) such other criteria as the President establishes in consultation with State and local governments.]

(h) FEDERAL SHARE.—

(1) IN GENERAL.—Financial assistance provided under this section may contribute up to 75 percent of the total cost of mitigation activities approved by the President.

(2) SMALL IMPOVERISHED COMMUNITIES.—Notwithstanding paragraph (1), the President may contribute up to 90 percent of the total cost of a mitigation activity carried out in a small impoverished community.

(i) NATIONAL PUBLIC INFRASTRUCTURE PREDISASTER MITIGATION ASSISTANCE.—

(1) IN GENERAL.—The President [may] *shall* set aside from the Disaster Relief Fund, with respect to each major disaster, an amount [equal to] *that is not less than 3 percent and not more than* 6 percent of the estimated aggregate amount of the grants to be made pursuant to sections 403, 406, 407, 408, 410, 416, and 428 for the major disaster in order to provide technical and financial assistance under this section and such set aside shall be deemed to be related to activities carried out pursuant to major disasters under this Act.

(2) ESTIMATED AGGREGATE AMOUNT.—Not later than 180 days after each major disaster declaration pursuant to this Act, the estimated aggregate amount of grants for purposes of paragraph (1) shall be determined by the President and such estimated amount need not be reduced, increased, or changed due to variations in estimates.

(3) NO REDUCTION IN AMOUNTS.—The amount set aside pursuant to paragraph (1) shall not reduce the amounts otherwise made available for sections 403, 404, 406, 407, 408, 410, 416, and 428 under this Act.

(j) MULTIHAZARD ADVISORY MAPS.—

(1) DEFINITION OF MULTIHAZARD ADVISORY MAP.—In this subsection, the term "multihazard advisory map" means a map on which hazard data concerning each type of natural disaster is identified simultaneously for the purpose of showing areas of hazard overlap.

(2) DEVELOPMENT OF MAPS.—In consultation with States, local governments, and appropriate Federal agencies, the President shall develop multihazard advisory maps for areas, in not fewer than five States, that are subject to commonly recurring natural hazards (including flooding, hurricanes and severe winds, and seismic events).

(3) USE OF TECHNOLOGY.—In developing multihazard advisory maps under this subsection, the President shall use, to the maximum extent practicable, the most cost-effective and efficient technology available.

(4) USE OF MAPS.—

(A) ADVISORY NATURE.—The multihazard advisory maps shall be considered to be advisory and shall not require the

development of any new policy by, or impose any new policy on, any government or private entity.

(B) AVAILABILITY OF MAPS.—The multihazard advisory maps shall be made available to the appropriate State and local governments for the purposes of—

(i) informing the general public about the risks of natural hazards in the areas described in paragraph (2);

(ii) supporting the activities described in subsection (e); and

(iii) other public uses.

(k) REPORT ON FEDERAL AND STATE ADMINISTRATION.—Not later than 18 months after the date of the enactment of this section, the President, in consultation with State and local governments, shall submit to Congress a report evaluating efforts to implement this section and recommending a process for transferring greater authority and responsibility for administering the assistance program established under this section to capable States.

(l) PROHIBITION ON EARMARKS.—

(1) DEFINITION.—In this subsection, the term "congressionally directed spending" means a statutory provision or report language included primarily at the request of a Senator or a Member, Delegate or Resident Commissioner of the House of Representatives providing, authorizing, or recommending a specific amount of discretionary budget authority, credit authority, or other spending authority for a contract, loan, loan guarantee, grant, loan authority, or other expenditure with or to an entity, or targeted to a specific State, locality, or Congressional district, other than through a statutory or administrative formula-driven or competitive award process.

(2) PROHIBITION.—None of the funds appropriated or otherwise made available to carry out this section may be used for congressionally directed spending.

(3) CERTIFICATION TO CONGRESS.—The Administrator of the Federal Emergency Management Agency shall submit to Congress a certification regarding whether all financial assistance under this section was awarded in accordance with this section.

* * * * * * *

## IMMIGRATION AND NATIONALITY ACT

* * * * * * *

### TITLE I—GENERAL

DEFINITIONS

SECTION 101. (a) As used in this Act—

(1) The term "administrator" means the official designated by the Secretary of State pursuant to section 104(b) of this Act.

(2) The term "advocates" includes, but is not limited to, advises, recommends, furthers by overt act, and admits belief in.

(3) The term "alien" means any person not a citizen or national of the United States.

(4) The term "application for admission" has reference to the application for admission into the United States and not to the application for the issuance of an immigrant or nonimmigrant visa.

(5) The term "Attorney General" means the Attorney General of the United States.

(6) The term "border crossing identification card" means a document of identity bearing that designation issued to an alien who is lawfully admitted for permanent residence, or to an alien who is a resident in foreign contiguous territory, by a consular officer or an immigration officer for the purpose of crossing over the borders between the United States and foreign contiguous territory in accordance with such conditions for its issuance and use as may be prescribed by regulations. Such regulations shall provide that (A) each such document include a biometric identifier (such as the fingerprint or handprint of the alien) that is machine readable and (B) an alien presenting a border crossing identification card is not permitted to cross over the border into the United States unless the biometric identifier contained on the card matches the appropriate biometric characteristic of the alien.

(7) The term "clerk of court" means a clerk of a naturalization court.

(8) The terms "Commissioner" and "Deputy Commissioner" mean the Commissioner of Immigration and Naturalization and a Deputy Commissioner of Immigration and Naturalization, respectively.

(9) The term "consular officer" means any consular, diplomatic, or other officer or employee of the United States designated under regulations prescribed under authority contained in this Act, for the purpose of issuing immigrant or nonimmigrant visas or, when used in title III, for the purpose of adjudicating nationality.

(10) The term "crewman" means a person serving in any capacity on board a vessel or aircraft.

(11) The term "diplomatic visa" means a nonimmigrant visa bearing that title and issued to a nonimmigrant in accordance with such regulations as the Secretary of State may prescribe.

(12) The term "doctrine" includes, but is not limited to, policies, practices, purposes, aims, or procedures.

(13)(A) The terms "admission" and "admitted" mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer.

(B) An alien who is paroled under section 212(d)(5) or permitted to land temporarily as an alien crewman shall not be considered to have been admitted.

(C) An alien lawfully admitted for permanent residence in the United States shall not be regarded as seeking an admission into the United States for purposes of the immigration laws unless the alien—

(i) has abandoned or relinquished that status,

(ii) has been absent from the United States for a continuous period in excess of 180 days,

(iii) has engaged in illegal activity after having departed the United States,

(iv) has departed from the United States while under legal process seeking removal of the alien from the United States, including removal proceedings under this Act and extradition proceedings,

(v) has committed an offense identified in section 212(a)(2), unless since such offense the alien has been granted relief under section 212(h) or 240A(a), or

(vi) is attempting to enter at a time or place other than as designated by immigration officers or has not been admitted to the United States after inspection and authorization by an immigration officer.

(14) The term "foreign state" includes outlying possessions of a foreign state, but self-governing dominions and territories under mandate or trusteeship shall be regarded as separate foreign states.

(15) The term "immigrant" means every alien except an alien who is within one of the following classes of nonimmigrant aliens—

(A)(i) an ambassador, public minister, or career diplomatic or consular officer who has been accredited by a foreign government recognized de jure by the United States and who is accepted by the President or by the Secretary of State, and the members of the alien's immediate family;

(ii) upon a basis of reciprocity, other officials and employees who have been accredited by a foreign government recognized de jure by the United States, who are accepted by the Secretary of State, and the members of their immediate families; and

(iii) upon a basis of reciprocity, attendants, servants, personal employees, and members of their immediate families, of the officials and employees who have a nonimmigrant status under (i) and (ii) above;

(B) an alien (other than one coming for the purpose of study or of performing skilled or unskilled labor or as a representative of foreign press, radio, film, or other foreign information media coming to engage in such vocation) having a residence in a foreign country which he has no intention of abandoning and who is visiting the United States temporarily for business or temporarily for pleasure;

(C)(i) an alien in immediate and continuous transit through the United States, for a period not to exceed 29 days;

(ii) an alien who qualifies as a person entitled to pass in transit to and from the United Nations Headquarters District (as defined in section 209A(e) of the State Department Basic Authorities Act of 1956 (22 U.S.C. 4309a(e))) and foreign countries, under the provisions of paragraphs (3), (4), and (5) of section 11 of the Agreement regarding the Headquarters of the United Nations, done at Lake Success June 26, 1947 (61 Stat. 758); or

(iii) an alien passing in transit through the United States to board a vessel on which the alien will perform, or to disembark from a vessel on which the alien performed, ship-to-ship liquid cargo transfer operations to or from another vessel engaged in foreign trade, for a period not to exceed 180 days;

(D)(i) an alien crewman serving in good faith as such in a capacity required for normal operation and service on board a vessel, as defined in section 258(a) (other than a fishing vessel having its home port or an operating base in the United States), or aircraft, who intends to land temporarily and solely in pursuit of his calling as a crewman and to depart from the

United States with the vessel or aircraft on which he arrived or some other vessel or aircraft;

(ii) an alien crewman serving in good faith as such in any capacity required for normal operations and service aboard a fishing vessel having its home port or an operating base in the United States who intends to land temporarily in Guam or the Commonwealth of the Northern Mariana Islands and solely in pursuit of his calling as a crewman and to depart from Guam or the Commonwealth of the Northern Mariana Islands with the vessel on which he arrived; or

(iii) an alien crewman performing ship-to-ship liquid cargo transfer operations to or from another vessel engaged in foreign trade, who intends to land temporarily solely in pursuit of the alien's responsibilities as a crewman and to depart from the United States on the vessel on which the alien arrived or on another vessel or aircraft, for a period not to exceed 180 days;

(E) an alien entitled to enter the United States under and in pursuance of the provisions of a treaty of commerce and navigation between the United States and the foreign state of which the alien is a national (or, in the case of an alien who acquired the relevant nationality through a financial investment and who has not previously been granted status under this subparagraph, the foreign state of which the alien is a national and in which the alien has been domiciled for a continuous period of not less than 3 years at any point before applying for a nonimmigrant visa under this subparagraph), and the spouse and children of any such alien if accompanying or following to join such alien: (i) solely to carry on substantial trade, including trade in services or trade in technology, principally between the United States and the foreign state of which the alien is a national; (ii) solely to develop and direct the operations of an enterprise in which the alien has invested, or of an enterprise in which the alien is actively in the process of investing, a substantial amount of capital; or (iii) solely to perform services in a specialty occupation in the United States if the alien is a national of the Commonwealth of Australia and with respect to whom the Secretary of Labor determines and certifies to the Secretary of Homeland Security and the Secretary of State that the intending employer has filed with the Secretary of Labor an attestation under section 212(t)(1);

(F)(i) an alien having a residence in a foreign country which he has no intention of abandoning, who is a bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study consistent with section 214(l) at an established college, university, seminary, conservatory, academic high school, elementary school, or other academic institution or in an accredited language training program in the United States, particularly designated by him and approved by the Attorney General after consultation with the Secretary of Education, which institution or place of study shall have agreed to report to the Attorney General the termination of attendance of each nonimmigrant student, and if any such institution of learning or place of study fails to make re-

ports promptly the approval shall be withdrawn, (ii) the alien spouse and minor children of any alien described in clause (i) if accompanying or following to join such an alien, and (iii) an alien who is a national of Canada or Mexico, who maintains actual residence and place of abode in the country of nationality, who is described in clause (i) except that the alien's qualifications for and actual course of study may be full or part-time, and who commutes to the United States institution or place of study from Canada or Mexico;

(G)(i) a designated principal resident representative of a foreign government recognized de jure by the United States, which foreign government is a member of an international organization entitled to enjoy privileges, exemptions, and immunities as an international organization under the International Organizations Immunities Act (59 Stat. 669), accredited resident members of the staff of such representatives, and members of his or their immediate family;

(ii) other accredited representatives of such a foreign government to such international organizations, and the members of their immediate families;

(iii) an alien able to qualify under (i) or (ii) above except for the fact that the government of which such alien is an accredited representative is not recognized de jure by the United States, or that the government of which he is an accredited representative is not a member of such international organization, and the members of his immediate family;

(iv) officers, or employees of such international organizations, and the members of their immediate families;

(v) attendants, servants, and personal employees of any such representative, officer, or employee, and the members of the immediate families of such attendants, servants, and personal employees;

(H) an alien (i) (b) subject to section 212(j)(2), who is coming temporarily to the United States to perform services (other than services described in subclause (a) during the period in which such subclause applies and other than services described in subclause (ii)(a) or in subparagraph (O) or (P)) in a specialty occupation described in section 214(i)(1) or as a fashion model, who meets the requirements for the occupation specified in section 214(i)(2) or, in the case of a fashion model, is of distinguished merit and ability, and with respect to whom the Secretary of Labor determines and certifies to the Attorney General that the intending employer has filed with the Secretary an application under section 212(n)(1), or (b1) who is entitled to enter the United States under and in pursuance of the provisions of an agreement listed in section 214(g)(8)(A), who is engaged in a specialty occupation described in section 214(i)(3), and with respect to whom the Secretary of Labor determines and certifies to the Secretary of Homeland Security and the Secretary of State that the intending employer has filed with the Secretary of Labor an attestation under section 212(t)(1), or (c) who is coming temporarily to the United States to perform services as a registered nurse, who meets the qualifications described in section 212(m)(1), and with respect to whom the Secretary of Labor determines and certifies to the Attorney

General that an unexpired attestation is on file and in effect under section 212(m)(2) for the facility (as defined in section 212(m)(6)) for which the alien will perform the services; or (ii)(a) having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform agricultural labor or services, as defined by the Secretary of Labor in regulations and including agricultural labor defined in section 3121(g) of the Internal Revenue Code of 1986, agriculture as defined in section 3(f) of the Fair Labor Standards Act of 1938 (29 U.S.C. 203(f)), and the pressing of apples for cider on a farm, of a temporary or seasonal nature, or (b) having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform other temporary service or labor if unemployed persons capable of performing such service or labor cannot be found in this country, but this clause shall not apply to graduates of medical schools coming to the United States to perform services as members of the medical profession; or (iii) having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States as a trainee, other than to receive graduate medical education or training, in a training program that is not designed primarily to provide productive employment; and the alien spouse and minor children of any such alien specified in this paragraph if accompanying him or following to join him;

(I) upon a basis of reciprocity, an alien who is a bona fide representative of foreign press, radio, film, or other foreign information media, who seeks to enter the United States solely to engage in such vocation, and the spouse and children of such a representative if accompanying or following to join him;

(J) an alien having a residence in a foreign country which he has no intention of abandoning who is a bona fide student, scholar, trainee, teacher, professor, research assistant, specialist, or leader in a field of specialized knowledge or skill, or other person of similar description, who is coming temporarily to the United States as a participant in a program designated by the Director of the United States Information Agency, for the purpose of teaching, instructing or lecturing, studying, observing, conducting research, consulting, demonstrating special skills, or receiving training and who, if he is coming to the United States to participate in a program under which he will receive graduate medical education or training, also meets the requirements of section 212(j), and the alien spouse and minor children of any such alien if accompanying him or following to join him;

(K) subject to subsections (d) and (p) of section 214, an alien who—

(i) is the fiancée or fiancé of a citizen of the United States (other than a citizen described in section 204(a)(1)(A)(viii)(I)) and who seeks to enter the United States solely to conclude a valid marriage with the petitioner within ninety days after admission;

(ii) has concluded a valid marriage with a citizen of the United States (other than a citizen described in section

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 432 of 714 PageID #:1482



204(a)(1)(A)(viii)(I)) who is the petitioner, is the beneficiary of a petition to accord a status under section 201(b)(2)(A)(i) that was filed under section 204 by the petitioner, and seeks to enter the United States to await the approval of such petition and the availability to the alien of an immigrant visa; or

(iii) is the minor child of an alien described in clause (i) or (ii) and is accompanying, or following to join, the alien;

(L) subject to section 214(c)(2), an alien who, within 3 years preceding the time of his application for admission into the United States, has been employed continuously for one year by a firm or corporation or other legal entity or an affiliate or subsidiary thereof and who seeks to enter the United States temporarily in order to continue to render his services to the same employer or a subsidiary or affiliate thereof in a capacity that is managerial, executive, or involves specialized knowledge, and the alien spouse and minor children of any such alien if accompanying him or following to join him;

(M)(i) an alien having a residence in a foreign country which he has no intention of abandoning who seeks to enter the United States temporarily and solely for the purpose of pursuing a full course of study at an established vocational or other recognized nonacademic institution (other than in a language training program) in the United States particularly designated by him and approved by the Attorney General, after consultation with the Secretary of Education, which institution shall have agreed to report to the Attorney General the termination of attendance of each nonimmigrant nonacademic student and if any such institution fails to make reports promptly the approval shall be withdrawn, (ii) the alien spouse and minor children of any alien described in clause (i) if accompanying or following to join such an alien, and (iii) an alien who is a national of Canada or Mexico, who maintains actual residence and place of abode in the country of nationality, who is described in clause (i) except that the alien's course of study may be full or part-time, and who commutes to the United States institution or place of study from Canada or Mexico;

(N)(i) the parent of an alien accorded the status of special immigrant under paragraph (27)(I)(i) (or under analogous authority under paragraph (27)(L)), but only if and while the alien is a child, or (ii) a child of such parent or of an alien accorded the status of a special immigrant under clause (ii), (iii), or (iv) of paragraph (27)(I) (or under analogous authority under paragraph (27)(L));

(O) an alien who—

(i) has extraordinary ability in the sciences, arts, education, business, or athletics which has been demonstrated by sustained national or international acclaim or, with regard to motion picture and television productions a demonstrated record of extraordinary achievement, and whose achievements have been recognized in the field through extensive documentation, and seeks to enter the United States to continue work in the area of extraordinary ability; or

(ii)(I) seeks to enter the United States temporarily and solely for the purpose of accompanying and assisting in the artistic or athletic performance by an alien who is admitted under clause (i) for a specific event or events,

(II) is an integral part of such actual performance,

(III)(a) has critical skills and experience with such alien which are not of a general nature and which cannot be performed by other individuals, or (b) in the case of a motion picture or television production, has skills and experience with such alien which are not of a general nature and which are critical either based on a pre-existing long-standing working relationship or, with respect to the specific production, because significant production (including pre- and post-production work) will take place both inside and outside the United States and the continuing participation of the alien is essential to the successful completion of the production, and

(IV) has a foreign residence which the alien has no intention of abandoning; or

(iii) is the alien spouse or child of an alien described in clause (i) or (ii) and is accompanying, or following to join, the alien;

(P) an alien having a foreign residence which the alien has no intention of abandoning who—

(i)(a) is described in section 214(c)(4)(A) (relating to athletes), or (b) is described in section 214(c)(4)(B) (relating to entertainment groups);

(ii)(I) performs as an artist or entertainer, individually or as part of a group, or is an integral part of the performance of such a group, and

(II) seeks to enter the United States temporarily and solely for the purpose of performing as such an artist or entertainer or with such a group under a reciprocal exchange program which is between an organization or organizations in the United States and an organization or organizations in one or more foreign states and which provides for the temporary exchange of artists and entertainers;

(iii)(I) performs as an artist or entertainer, individually or as part of a group, or is an integral part of the performance of such a group, and

(II) seeks to enter the United States temporarily and solely to perform, teach, or coach as such an artist or entertainer or with such a group under a commercial or noncommercial program that is culturally unique; ⟦or⟧

*(iv) seeks to enter the United States temporarily and solely for the purpose of performing functions that are integral and essential to the operation of a mobile entertainment provider (as set forth in section 214(c)(4)(I)(ii)); or*

⟦(iv)⟧ *(v)* is the spouse or child of an alien described in ⟦clause (i), (ii), or (iii)⟧ *clause (i), (ii), (iii), or (iv)* and is accompanying, or following to join, the alien;

(Q) an alien having a residence in a foreign country which he has no intention of abandoning who is coming temporarily (for a period not to exceed 15 months) to the United States as a participant in an international cultural exchange program

approved by the Secretary of Homeland Security for the purpose of providing practical training, employment, and the sharing of the history, culture, and traditions of the country of the alien's nationality and who will be employed under the same wages and working conditions as domestic workers;

(R) an alien, and the spouse and children of the alien if accompanying or following to join the alien, who—

(i) for the 2 years immediately preceding the time of application for admission, has been a member of a religious denomination having a bona fide nonprofit, religious organization in the United States; and

(ii) seeks to enter the United States for a period not to exceed 5 years to perform the work described in subclause (I), (II), or (III) of paragraph (27)(C)(ii);

(S) subject to section 214(k), an alien—

(i) who the Attorney General determines—

(I) is in possession of critical reliable information concerning a criminal organization or enterprise;

(II) is willing to supply or has supplied such information to Federal or State law enforcement authorities or a Federal or State court; and

(III) whose presence in the United States the Attorney General determines is essential to the success of an authorized criminal investigation or the successful prosecution of an individual involved in the criminal organization or enterprise; or

(ii) who the Secretary of State and the Attorney General jointly determine—

(I) is in possession of critical reliable information concerning a terrorist organization, enterprise, or operation;

(II) is willing to supply or has supplied such information to Federal law enforcement authorities or a Federal court;

(III) will be or has been placed in danger as a result of providing such information; and

(IV) is eligible to receive a reward under section 36(a) of the State Department Basic Authorities Act of 1956,

and, if the Attorney General (or with respect to clause (ii), the Secretary of State and the Attorney General jointly) considers it to be appropriate, the spouse, married and unmarried sons and daughters, and parents of an alien described in clause (i) or (ii) if accompanying, or following to join, the alien;

(T)(i) subject to section 214(o), an alien who the Secretary of Homeland Security, or in the case of subclause (III)(aa) the Secretary of Homeland Security, in consultation with the Attorney General, determines—

(I) is or has been a victim of a severe form of trafficking in persons, as defined in section 103 of the Trafficking Victims Protection Act of 2000;

(II) is physically present in the United States, American Samoa, or the Commonwealth of the Northern Mariana Islands, or at a port of entry thereto, on account of such trafficking, including physical presence

on account of the alien having been allowed entry into the United States for participation in investigative or judicial processes associated with an act or a perpetrator of trafficking;

(III)(aa) has complied with any reasonable request for assistance in the Federal, State or local investigation or prosecution of acts of trafficking or the investigation of crime where acts of trafficking are at least one central reason for the commission of that crime;

(bb) in consultation with the Attorney General, as appropriate, is unable to cooperate with a request described in item (aa) due to physical or psychological trauma; or

(cc) has not attained 18 years of age; and

(IV) the alien would suffer extreme hardship involving unusual and severe harm upon removal; and

(ii) if accompanying, or following to join, the alien described in clause (i)—

(I) in the case of an alien described in clause (i) who is under 21 years of age, the spouse, children, unmarried siblings under 18 years of age on the date on which such alien applied for status under such clause, and parents of such alien;

(II) in the case of an alien described in clause (i) who is 21 years of age or older, the spouse and children of such alien; or

(III) any parent or unmarried sibling under 18 years of age of an alien described in subclause (I) or (II) who the Secretary of Homeland Security, in consultation with the law enforcement officer investigating a severe form of trafficking, determines faces a present danger of retaliation as a result of the alien's escape from the severe form of trafficking or cooperation with law enforcement.

(U)(i) subject to section 214(p), an alien who files a petition for status under this subparagraph, if the Secretary of Homeland Security determines that—

(I) the alien has suffered substantial physical or mental abuse as a result of having been a victim of criminal activity described in clause (iii);

(II) the alien (or in the case of an alien child under the age of 16, the parent, guardian, or next friend of the alien) possesses information concerning criminal activity described in clause (iii);

(III) the alien (or in the case of an alien child under the age of 16, the parent, guardian, or next friend of the alien) has been helpful, is being helpful, or is likely to be helpful to a Federal, State, or local law enforcement official, to a Federal, State, or local prosecutor, to a Federal or State judge, to the Service, or to other Federal, State, or local authorities investigating or prosecuting criminal activity described in clause (iii); and

(IV) the criminal activity described in clause (iii) violated the laws of the United States or occurred in the United States (including in Indian country and mili-

tary installations) or the territories and possessions of the United States;

(ii) if accompanying, or following to join, the alien described in clause (i)—

(I) in the case of an alien described in clause (i) who is under 21 years of age, the spouse, children, unmarried siblings under 18 years of age on the date on which such alien applied for status under such clause, and parents of such alien; or

(II) in the case of an alien described in clause (i) who is 21 years of age or older, the spouse and children of such alien; and

(iii) the criminal activity referred to in this clause is that involving one or more of the following or any similar activity in violation of Federal, State, or local criminal law: rape; torture; trafficking; incest; domestic violence; sexual assault; abusive sexual contact; prostitution; sexual exploitation; stalking; female genital mutilation; being held hostage; peonage; involuntary servitude; slave trade; kidnapping; abduction; unlawful criminal restraint; false imprisonment; blackmail; extortion; manslaughter; murder; felonious assault; witness tampering; obstruction of justice; perjury; fraud in foreign labor contracting (as defined in section 1351 of title 18, United States Code); or attempt, conspiracy, or solicitation to commit any of the above mentioned crimes; or

(V) subject to section 214(q), an alien who is the beneficiary (including a child of the principal alien, if eligible to receive a visa under section 203(d)) of a petition to accord a status under section 203(a)(2)(A) that was filed with the Attorney General under section 204 on or before the date of the enactment of the Legal Immigration Family Equity Act, if—

(i) such petition has been pending for 3 years or more; or

(ii) such petition has been approved, 3 years or more have elapsed since such filing date, and—

(I) an immigrant visa is not immediately available to the alien because of a waiting list of applicants for visas under section 203(a)(2)(A); or

(II) the alien's application for an immigrant visa, or the alien's application for adjustment of status under section 245, pursuant to the approval of such petition, remains pending.

(16) The term "immigrant visa" means an immigrant visa required by this Act and properly issued by a consular officer at his office outside of the United States to an eligible immigrant under the provisions of this Act.

(17) The term "immigration laws" includes this Act and all laws, conventions, and treaties of the United States relating to the immigration, exclusion, deportation, expulsion or removal of aliens.

(18) The term "immigration officer" means any employee or class of employees of the Service or of the United States designated by the Attorney General, individually or by regulation, to perform the functions of an immigration officer specified by this Act or any section thereof.

(19) The term "ineligible to citizenship," when used in reference to any individual, means, notwithstanding the provisions of any treaty relating to military service, an individual who is, or was at any time, permanently debarred from becoming a citizen of the United States under section 3(a) of the Selective Training and Service Act of 1940, as amended (54 Stat. 885; 55 Stat. 844), or under section 4(a) of the Selective Service Act of 1948, as amended (62 Stat. 605; 65 Stat. 76), or under any section of this Act, or any other Act, or under any law amendatory of, supplementary to, or in substitution for, any of such sections or Acts.

(20) The term "lawfully admitted for permanent residence" means the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed.

(21) The term "national" means a person owing permanent allegiance to a state.

(22) The term "national of the United States" means (A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States.

(23) The term "naturalization" means the conferring of nationality of a state upon a person after birth, by any means whatsoever.

(25) The term "noncombatant service" shall not include service in which the individual is not subject to military discipline, court martial, or does not wear the uniform of any branch of the armed forces.

(26) The term "nonimmigrant visa" means a visa properly issued to an alien as an eligible nonimmigrant by a competent officer as provided in this Act.

(27) The term "special immigrant" means—

(A) an immigrant, lawfully admitted for permanent residence, who is returning from a temporary visit abroad;

(B) an immigrant who was a citizen of the United States and may, under section 324(a) or 327 of title III, apply for reacquisition of citizenship;

(C) an immigrant, and the immigrant's spouse and children if accompanying or following to join the immigrant, who—

(i) for at least 2 years immediately preceding the time of application for admission, has been a member of a religious denomination having a bona fide nonprofit, religious organization in the United States;

(ii) seeks to enter the United States—

(I) solely for the purpose of carrying on the vocation of a minister of that religious denomination,

(II) before September 30, 2015, in order to work for the organization at the request of the organization in a professional capacity in a religious vocation or occupation, or

(III) before September 30, 2015, in order to work for the organization (or for a bona fide organization which is affiliated with the religious denomination and is exempt from taxation as an organization described in section 501(c)(3) of the Internal Revenue Code of 1986)

at the request of the organization in a religious vocation or occupation; and

(iii) has been carrying on such vocation, professional work, or other work continuously for at least the 2-year period described in clause (i);

(D) an immigrant who—

(i) is an employee, or an honorably retired former employee, of the United States Government abroad, or of the American Institute in Taiwan, and who has performed faithful service for a total of fifteen years, or more, and his accompanying spouse and children: *Provided,* That the principal officer of a Foreign Service establishment (or, in the case of the American Institute in Taiwan, the Director thereof), in his discretion, shall have recommended the granting of special immigrant status to such alien in exceptional circumstances and the Secretary of State approves such recommendation and finds that it is in the national interest to grant such status; or

(ii) is the surviving spouse or child of an employee of the United States Government abroad: *Provided*, That the employee performed faithful service for a total of not less than 15 years or was killed in the line of duty;

(E) an immigrant, and his accompanying spouse and children, who is or has been an employee of the Panama Canal Company or Canal Zone Government before the date on which the Panama Canal Treaty of 1977 (as described in section 3 (a)(1) of the Panama Canal Act of 1979) enters into force, who was resident in the Canal Zone on the effective date of the exchange of instruments of ratification of such Treaty, and who has performed faithful service as such an employee for one year or more;

(F) an immigrant, and his accompanying spouse and children, who is a Panamanian national and (i) who, before the date on which such Panama Canal Treaty of 1977 enters into force, has been honorably retired from United States Government employment in the Canal Zone with a total of 15 years or more of faithful service, or (ii) who on the date on which such Treaty enters into force, has been employed by the United States Government in the Canal Zone with a total of 15 years or more of faithful service and who subsequently is honorably retired from such employment or continues to be employed by the United States Government in an area of the former Canal Zone or continues to be employed by the United States Government in an area of the former Canal Zone;

(G) an immigrant, and his accompanying spouse and children, who was an employee of the Panama Canal Company or Canal Zone government on the effective date of the exchange of instruments of ratification of such Panama Canal Treaty of 1977, who has performed faithful service for five years or more as such an employee, and whose personal safety, or the personal safety of whose spouse or children, as a direct result of such Treaty, is reasonably placed in danger because of the special nature of any of that employment;

(H) an immigrant, and his accompanying spouse and children, who—

(i) has graduated from a medical school or has qualified to practice medicine in a foreign state,

(ii) was fully and permanently licensed to practice medicine in a State on January 9, 1978, and was practicing medicine in a State on that date,

(iii) entered the United States as a nonimmigrant under subsection (a)(15)(H) or (a)(15)(J) before January 10, 1978, and

(iv) has been continuously present in the United States in the practice or study of medicine since the date of such entry;

(I)(i) an immigrant who is the unmarried son or daughter of an officer or employee, or of a former officer or employee, of an international organization described in paragraph (15)(G)(i), and who (I) while maintaining the status of a nonimmigrant under paragraph (15)(G)(iv) or paragraph (15)(N), has resided and been physically present in the United States for periods totaling at least one-half of the seven years before the date of application for a visa or for adjustment of status to a status under this subparagraph and for a period or periods aggregating at least seven years between the ages of five and 21 years, and (II) applies for a visa or adjustment of status under this subparagraph no later than his twenty-fifth birthday or six months after the date of the enactment of the Immigration Technical Corrections Act of 1988, whichever is later;

(ii) an immigrant who is the surviving spouse of a deceased officer or employee of such an international organization, and who (I) while maintaining the status of a nonimmigrant under paragraph (15)(G)(iv) or paragraph (15)(N), has resided and been physically present in the United States for periods totaling at least one-half of the seven years before the date of application for a visa or for adjustment of status to a status under this subparagraph and for a period or periods aggregating at least 15 years before the date of the death of such officer or employee, and (II) files a petition for status under this subparagraph no later than six months after the date of such death or six months after the date of such death or six months after the date of the enactment of the Immigration Technical Corrections Act of 1988, whichever is later;

(iii) an immigrant who is a retired officer or employee of such an international organization, and who (I) while maintaining the status of a nonimmigrant under paragraph (15)(G)(iv), has resided and been physically present in the United States for periods totaling at least one-half of the seven years before the date of application for a visa or for adjustment of status to a status under this subparagraph and for a period or periods aggregating at least 15 years before the date of the officer or employee's retirement from any such international organization, and (II) files a petition for status under this subparagraph no later than six months after the date of such retirement or six months after the date of enactment of the Immigration and Nationality Technical Corrections Act of 1994, whichever is later; or

(iv) an immigrant who is the spouse of a retired officer or employee accorded the status of special immigrant under

clause (iii), accompanying or following to join such retired officer or employee as a member of his immediate family;

(J) an immigrant who is present in the United States—

(i) who has been declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State, or an individual or entity appointed by a State or juvenile court located in the United States, and whose reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law;

(ii) for whom it has been determined in administrative or judicial proceedings that it would not be in the alien's best interest to be returned to the alien's or parent's previous country of nationality or country of last habitual residence; and

(iii) in whose case the Secretary of Homeland Security consents to the grant of special immigrant juvenile status, except that—

(I) no juvenile court has jurisdiction to determine the custody status or placement of an alien in the custody of the Secretary of Health and Human Services unless the Secretary of Health and Human Services specifically consents to such jurisdiction; and

(II) no natural parent or prior adoptive parent of any alien provided special immigrant status under this subparagraph shall thereafter, by virtue of such parentage, be accorded any right, privilege, or status under this Act;

(K) an immigrant who has served honorably on active duty in the Armed Forces of the United States after October 15, 1978, and after original lawful enlistment outside the United States (under a treaty or agreement in effect on the date of the enactment of this subparagraph) for a period or periods aggregating—

(i) 12 years and who, if separated from such service, was never separated except under honorable conditions, or

(ii) 6 years, in the case of an immigrant who is on active duty at the time of seeking special immigrant status under this subparagraph and who has reenlisted to incur a total active duty service obligation of at least 12 years,

and the spouse or child of any such immigrant if accompanying or following to join the immigrant, but only if the executive department under which the immigrant serves or served recommends the granting of special immigrant status to the immigrant;

(L) an immigrant who would be described in clause (i), (ii), (iii), or (iv) of subparagraph (I) if any reference in such a clause—

(i) to an international organization described in paragraph (15)(G)(i) were treated as a reference to the North Atlantic Treaty Organization (NATO);

(ii) to a nonimmigrant under paragraph (15)(G)(iv) were treated as a reference to a nonimmigrant classifiable under NATO–6 (as a member of a civilian component ac-

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 441 of 714 PageID #:1491



companying a force entering in accordance with the provisions of the NATO Status-of-Forces Agreement, a member of a civilian component attached to or employed by an Allied Headquarters under the "Protocol on the Status of International Military Headquarters" set up pursuant to the North Atlantic Treaty, or as a dependent); and

(iii) to the Immigration Technical Corrections Act of 1988 or to the Immigration and Nationality Technical Corrections Act of 1994 were a reference to the American Competitiveness and Workforce Improvement Act of 1998

(M) subject to the numerical limitations of section 203(b)(4), an immigrant who seeks to enter the United States to work as a broadcaster in the United States for the International Broadcasting Bureau of the Broadcasting Board of Governors, or for a grantee of the Broadcasting Board of Governors, and the immigrant's accompanying spouse and children.

(28) The term "organization" means, but is not limited to, an organization, corporation, company, partnership, association, trust, foundation or fund; and includes a group of persons, whether or not incorporated, permanently or temporarily associated together with joint action on any subject or subjects.

(29) The term "outlying possessions of the United States" means American Samoa and Swains Island.

(30) The term "passport" means any travel document issued by competent authority showing the bearer's origin, identity, and nationality if any, which is valid for the admission of the bearer into a foreign country.

(31) The term "permanent" means a relationship of continuing or lasting nature, as distinguished from temporary, but a relationship may be permanent even though it is one that may be dissolved eventually at the instance either of the United States or of the individual, in accordance with law.

(32) The term "profession" shall include but not be limited to architects, engineers, lawyers, physicians, surgeons, and teachers in elementary or secondary schools, colleges, academies, or seminaries.

(33) The term "residence" means the place of general abode; the place of general abode of a person means his principal, actual dwelling place in fact, without regard to intent.

(34) The term "Service" means the Immigration and Naturalization Service of the Department of Justice.

(35) The term "spouse", "wife", or "husband" does not include a spouse, wife, or husband by reason of any marriage ceremony where the contracting parties thereto are not physically present in the presence of each other, unless the marriage shall have been consummated.

(36) The term "State" includes the District of Columbia, Puerto Rico, Guam, the Virgin Islands of the United States, and the Commonwealth of the Northern Mariana Islands.

(37) The term "totalitarian party" means an organization which advocates the establishment in the United States of a totalitarian dictatorship or totalitarianism. The terms "totalitarian dictatorship" and "totalitarianism" mean and refer to systems of government not representative in fact, characterized by (A) the existence of a single political party, organized on a dictatorial basis, with so

close an identity between such party and its policies and the governmental policies of the country in which it exists, that the party and the government constitute an indistinguishable unit, and (B) the forcible suppression of opposition to such party.

(38) The term "United States", except as otherwise specifically herein provided, when used in a geographical sense, means the continental United States, Alaska, Hawaii, Puerto Rico, Guam, the Virgin Islands of the United States, and the Commonwealth of the Northern Mariana Islands.

(39) The term "unmarried", when used in reference to any individual as of any time, means an individual who at such time is not married, whether or not previously married.

(40) The term "world communism" means a revolutionary movement, the purpose of which is to establish eventually a Communist totalitarian dictatorship in any or all the countries of the world through the medium of an internationally coordinated Communist political movement.

(41) The term "graduates of a medical school" means aliens who have graduated from a medical school or who have qualified to practice medicine in a foreign state, other than such aliens who are of national or international renown in the field of medicine.

(42) The term "refugee" means (A) any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, or (B) in such circumstances as the President after appropriate consultation (as defined in section 207(e) of this Act) may specify, any person who is within the country of such person's nationality or, in the case of a person having no nationality, within the country in which such person is habitually residing, and who is persecuted or who has a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. The term "refugee" does not include any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion. For purposes of determinations under this Act, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

(43) The term "aggravated felony" means—

(A) murder, rape, or sexual abuse of a minor;

(B) illicit trafficking in a controlled substance (as defined in section 102 of the Controlled Substances Act), including a drug trafficking crime (as defined in section 924(c) of title 18, United States Code);

(C) illicit trafficking in firearms or destructive devices (as defined in section 921 of title 18, United States Code) or in explosive materials (as defined in section 841(c) of that title);

(D) an offense described in section 1956 of title 18, United States Code (relating to laundering of monetary instruments) or section 1957 of that title (relating to engaging in monetary transactions in property derived from specific unlawful activity) if the amount of the funds exceeded $10,000;

(E) an offense described in—

(i) section 842 (h) or (i) of title 18, United States Code, or section 844 (d), (e), (f), (g), (h), or (i) of that title (relating to explosive materials offenses);

(ii) section 922(g) (1), (2), (3), (4), or (5), (j), (n), (o), (p), or (r) or 924 (b) or (h) of title 18, United States Code (relating to firearms offenses); or

(iii) section 5861 of the Internal Revenue Code of 1986 (relating to firearms offenses);

(F) a crime of violence (as defined in section 16 of title 18, United States Code, but not including a purely political offense) for which the term of imprisonment at least one year;

(G) a theft offense (including receipt of stolen property) or burglary offense for which the term of imprisonment imposed (regardless of any suspension of such imprisonment) at least one year;

(H) an offense described in section 875, 876, 877, or 1202 of title 18, United States Code (relating to the demand for or receipt of ransom);

(I) an offense described in section 2251, 2251A, or 2252 of title 18, United States Code (relating to child pornography);

(J) an offense described in section 1962 of title 18, United States Code (relating to racketeer influenced corrupt organizations), or an offense described in section 1084 (if it is a second or subsequent offense) or 1955 of that title (relating to gambling offenses), for which a sentence of one year imprisonment or more may be imposed;

(K) an offense that—

(i) relates to the owning, controlling, managing, or supervising of a prostitution business;

(ii) is described in section 2421, 2422, or 2423 of title 18, United States Code (relating to transportation for the purpose of prostitution) if committed for commercial advantage; or

(iii) is described in any of sections 1581–1585 or 1588–1591 of title 18, United States Code (relating to peonage, slavery, involuntary servitude, and trafficking in persons);

(L) an offense described in—

(i) section 793 (relating to gathering or transmitting national defense information), 798 (relating to disclosure of classified information), 2153 (relating to sabotage) or 2381 or 2382 (relating to treason) of title 18, United States Code;

(ii) section 601 of the National Security Act of 1947 (50 U.S.C. 421) (relating to protecting the identity of undercover intelligence agents); or

(iii) section 601 of the National Security Act of 1947 (relating to protecting the identity of undercover agents);

(M) an offense that—

(i) involves fraud or deceit in which the loss to the victim or victims exceeds $10,000; or

(ii) is described in section 7201 of the Internal Revenue Code of 1986 (relating to tax evasion) in which the revenue loss to the Government exceeds $10,000;

(N) an offense described in paragraph (1)(A) or (2) of section 274(a) (relating to alien smuggling), except in the case of a first offense for which the alien has affirmatively shown that the alien committed the offense for the purpose of assisting, abetting, or aiding only the alien's spouse, child, or parent (and no other individual) to violate a provision of this Act

(O) an offense described in section 275(a) or 276 committed by an alien who was previously deported on the basis of a conviction for an offense described in another subparagraph of this paragraph;

(P) an offense (i) which either is falsely making, forging, counterfeiting, mutilating, or altering a passport or instrument in violation of section 1543 of title 18, United States Code, or is described in section 1546(a) of such title (relating to document fraud) and (ii) for which the term of imprisonment imposed (regardless of any suspension of such imprisonment) is at least 12 months, except in the case of a first offense for which the alien has affirmatively shown that the alien committed the offense for the purpose of assisting, abetting, or aiding only the alien's spouse, child, or parent (and no other individual) to violate a provision of this Act;

(Q) an offense relating to a failure to appear by a defendant for service of sentence if the underlying offense is punishable by imprisonment for a term of 5 years or more;

(R) an offense relating to commercial bribery, counterfeiting, forgery, or trafficking in vehicles the identification numbers of which have been altered for which the term of imprisonment is at least one year;

(S) an offense relating to obstruction of justice, perjury or subornation of perjury, or bribery of a witness, for which the term of imprisonment is at least one year;

(T) an offense relating to a failure to appear before a court pursuant to a court order to answer to or dispose of a charge of a felony for which a sentence of 2 years' imprisonment or more may be imposed; and

(U) an attempt or conspiracy to commit an offense described in this paragraph.

The term applies to an offense described in this paragraph whether in violation of Federal or State law and applies to such an offense in violation of the law of a foreign country for which the term of imprisonment was completed within the previous 15 years. Notwithstanding any other provision of law (including any effective date), the term applies regardless of whether the conviction was entered before, on, or after the date of enactment of this paragraph.

(44)(A) The term "managerial capacity" means an assignment within an organization in which the employee primarily—

(i) manages the organization, or a department, subdivision, function, or component of the organization;

(ii) supervises and controls the work of other supervisory, professional, or managerial employees, or manages an essential function within the organization, or a department or subdivision of the organization;

(iii) if another employee or other employees are directly supervised, has the authority to hire and fire or recommend those as well as other personnel actions (such as promotion and leave authorization) or, if no other employee is directly supervised, functions at a senior level within the organizational hierarchy or with respect to the function managed; and

(iv) exercises discretion over the day-to-day operations of the activity or function for which the employee has authority.

A first-line supervisor is not considered to be acting in a managerial capacity merely by virtue of the supervisor's supervisory duties unless the employees supervised are professional.

(B) The term "executive capacity" means an assignment within an organization in which the employee primarily—

(i) directs the management of the organization or a major component or function of the organization;

(ii) establishes the goals and policies of the organization, component, or function;

(iii) exercises wide latitude in discretionary decision-making; and

(iv) receives only general supervision or direction from higher level executives, the board of directors, or stockholders of the organization.

(C) If staffing levels are used as a factor in determining whether an individual is acting in a managerial or executive capacity, the Attorney General shall take into account the reasonable needs of the organization, component, or function in light of the overall purpose and stage of development of the organization, component, or function. An individual shall not be considered to be acting in a managerial or executive capacity (as previously defined) merely on the basis of the number of employees that the individual supervises or has supervised or directs or has directed.

(45) The term "substantial" means, for purposes of paragraph (15)(E) with reference to trade or capital, such an amount of trade or capital as is established by the Secretary of State, after consultation with appropriate agencies of Government.

(46) The term "extraordinary ability" means, for purposes of section 101(a)(15)(O)(i), in the case of the arts, distinction.

(47)(A) The term "order of deportation" means the order of the special inquiry officer, or other such administrative officer to whom the Attorney General has delegated the responsibility for determining whether an alien is deportable, concluding that the alien is deportable or ordering deportation.

(B) The order described under subparagraph (A) shall become final upon the earlier of—

(i) a determination by the Board of Immigration Appeals affirming such order; or

(ii) the expiration of the period in which the alien is permitted to seek review of such order by the Board of Immigration Appeals.

(48)(A) The term "conviction" means, with respect to an alien, a formal judgment of guilt of the alien entered by a court or, if adjudication of guilt has been withheld, where—

(i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and

(ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.

(B) Any reference to a term of imprisonment or a sentence with respect to an offense is deemed to include the period of incarceration or confinement ordered by a court of law regardless of any suspension of the imposition or execution of that imprisonment or sentence in whole or in part.

(49) The term "stowaway" means any alien who obtains transportation without the consent of the owner, charterer, master or person in command of any vessel or aircraft through concealment aboard such vessel or aircraft. A passenger who boards with a valid ticket is not to be considered a stowaway.

(50) The term "intended spouse" means any alien who meets the criteria set forth in section 204(a)(1)(A)(iii)(II)(aa)(BB), 204(a)(1)(B)(ii)(II)(aa)(BB), or 240A(b)(2)(A)(i)(III).

(51) The term "VAWA self-petitioner" means an alien, or a child of the alien, who qualifies for relief under—

(A) clause (iii), (iv), or (vii) of section 204(a)(1)(A);

(B) clause (ii) or (iii) of section 204(a)(1)(B);

(C) section 216(c)(4)(C);

(D) the first section of Public Law 89–732 (8 U.S.C. 1255 note) (commonly known as the Cuban Adjustment Act) as a child or spouse who has been battered or subjected to extreme cruelty;

(E) section 902(d)(1)(B) of the Haitian Refugee Immigration Fairness Act of 1998 (8 U.S.C. 1255 note);

(F) section 202(d)(1) of the Nicaraguan Adjustment and Central American Relief Act; or

(G) section 309 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (division C of Public Law 104–208).

(52) The term "accredited language training program" means a language training program that is accredited by an accrediting agency recognized by the Secretary of Education.

(b) As used in titles I and II—

(1) The term "child" means an unmarried person under twenty-one years of age who is—

(A) a child born in wedlock;

(B) a stepchild, whether or not born out of wedlock, provided the child had not reached the age of eighteen years at the time the marriage creating the status of stepchild occurred;

(C) a child legitimated under the law of the child's residence or domicile, or under the law of the father's residence or domicile, whether in or outside the United States, if such legitimation takes place before the child reaches the age of eighteen years and the child is in the legal custody of the legitimating parent or parents at the time of such legitimation;

(D) a child born out of wedlock, by, through whom, or on whose behalf a status, privilege, or benefit is sought by virtue

of the relationship of the child to its natural mother or to its natural father if the father has or had a bona fide parent-child relationship with the person;

(E)(i) a child adopted while under the age of sixteen years if the child has been in the legal custody of, and has resided with, the adopting parent or parents for at least two years or if the child has been battered or subject to extreme cruelty by the adopting parent or by a family member of the adopting parent residing in the same household: *Provided,* That no natural parent of any such adopted child shall thereafter, by virtue of such parentage, be accorded any right, privilege, or status under this Act; or

(ii) subject to the same proviso as in clause (i), a child who: (I) is a natural sibling of a child described in clause (i) or subparagraph (F)(i); (II) was adopted by the adoptive parent or parents of the sibling described in such clause or subparagraph; and (III) is otherwise described in clause (i), except that the child was adopted while under the age of 18 years; or

(F)(i) a child, under the age of sixteen at the time a petition is filed in his behalf to accord a classification as an immediate relative under section 201(b), who is an orphan because of the death or disappearance of, abandonment or desertion by, or separation or loss from, both parents, or for whom the sole or surviving parent is incapable of providing the proper care and has in writing irrevocably released the child for emigration and adoption; who has been adopted abroad by a United States citizen and spouse jointly, or by an unmarried United States citizen who is at least 25 years of age, at least 1 of whom personally saw and observed the child before or during the adoption proceedings; or who is coming to the United States for adoption by a United States citizen and spouse jointly, or by an unmarried United States citizen at least twenty-five years of age, who have or has complied with the preadoption requirements, if any, of the child's proposed residence: *Provided,* That the Attorney General is satisfied that proper care will be furnished the child if admitted to the United States: *Provided further,* That no natural parent or prior adoptive parent of any such child shall thereafter, by virtue of such parentage, be accorded any right, privilege, or status under this Act; or

(ii) subject to the same provisos as in clause (i), a child who: (I) is a natural sibling of a child described in clause (i) or subparagraph (E)(i); (II) has been adopted abroad, or is coming to the United States for adoption, by the adoptive parent (or prospective adoptive parent) or parents of the sibling described in such clause or subparagraph; and (III) is otherwise described in clause (i), except that the child is under the age of 18 at the time a petition is filed in his or her behalf to accord a classification as an immediate relative under section 201(b).

(G)(i) a child, younger than 16 years of age at the time a petition is filed on the child's behalf to accord a classification as an immediate relative under section 201(b), who has been adopted in a foreign state that is a party to the Convention on Protection of Children and Co-operation in Respect of Intercountry Adoption, done at The Hague on May 29, 1993, or who is emigrating from such a foreign state to be adopted in the

United States by a United States citizen and spouse jointly or by an unmarried United States citizen who is at least 25 years of age, Provided, That—

(I) the Secretary of Homeland Security is satisfied that proper care will be furnished the child if admitted to the United States;

(II) the child's natural parents (or parent, in the case of a child who has one sole or surviving parent because of the death or disappearance of, abandonment or desertion by, the other parent), or other persons or institutions that retain legal custody of the child, have freely given their written irrevocable consent to the termination of their legal relationship with the child, and to the child's emigration and adoption;

(III) in the case of a child having two living natural parents, the natural parents are incapable of providing proper care for the child;

(IV) the Secretary of Homeland Security is satisfied that the purpose of the adoption is to form a bona fide parent-child relationship, and the parent-child relationship of the child and the natural parents has been terminated (and in carrying out both obligations under this subclause the Secretary of Homeland Security may consider whether there is a petition pending to confer immigrant status on one or both of such natural parents); and

(V) in the case of a child who has not been adopted—

(aa) the competent authority of the foreign state has approved the child's emigration to the United States for the purpose of adoption by the prospective adoptive parent or parents; and

(bb) the prospective adoptive parent or parents has or have complied with any pre-adoption requirements of the child's proposed residence; and

(ii) except that no natural parent or prior adoptive parent of any such child shall thereafter, by virtue of such parentage, be accorded any right, privilege, or status under this chapter; or

(iii) subject to the same provisos as in clauses (i) and (ii), a child who—

(I) is a natural sibling of a child described in clause (i), subparagraph (E)(i), or subparagraph (F)(i);

(II) was adopted abroad, or is coming to the United States for adoption, by the adoptive parent (or prospective adoptive parent) or parents of the sibling described in clause (i), subparagraph (E)(i), or subparagraph (F)(i); and

(III) is otherwise described in clause (i), except that the child is younger than 18 years of age at the time a petition is filed on his or her behalf for classification as an immediate relative under section 201(b).

(2) The term "parent", "father", or "mother" means a parent, father, or mother only where the relationship exists by reason of any of the circumstances set forth in (1) above, except that, for pur-

poses of paragraph (1)(F) (other than the second proviso therein) in the case of a child born out of wedlock described in paragraph (1)(D) (and not described in paragraph (1)(C)), the term "parent" does not include the natural father or the child if the father has disappeared or abandoned or deserted the child or if the father has in writing irrevocably released the child for emigration and adoption.

(3) The term "person" means an individual or an organization.

(4) The term "immigration judge" means an attorney whom the Attorney General appoints as an administrative judge within the Executive Office for Immigration Review, qualified to conduct specified classes of proceedings, including a hearing under section 240. An immigration judge shall be subject to such supervision and shall perform such duties as the Attorney General shall prescribe, but shall not be employed by the Immigration and Naturalization Service.

(5) The term "adjacent islands" includes Saint Pierre, Miquelon, Cuba, the Dominican Republic, Haiti, Bermuda, the Bahamas, Barbados, Jamaica, the Windward and Leeward Islands, Trinidad, Martinique, and other British, French, and Netherlands territory or possessions in or bordering on the Caribbean Sea.

(c) As used in title III—

(1) The term "child" means an unmarried person under twenty-one years of age and includes a child legitimated under the law of the child's residence or domicile, or under the law of the father's residence or domicile, whether in the United States or elsewhere, and, except as otherwise provided in sections 320 and 321 of title III, a child adopted in the United States, if such legitimation or adoption takes place before the child reaches the age of 16 years (except to the extent that the child is described in subparagraph (E)(ii) or (F)(ii) of subsection (b)(1)), and the child is in the legal custody of the legitimating or adopting parent or parents at the time of such legitimation or adoption.

(2) The terms "parent", "father", and "mother" include in the case of a posthumous child a deceased parent, father, and mother.

(e) For the purpose of this Act—

(1) The giving, loaning, or promising of support or of money or any other thing of value to be used for advocating any doctrine shall constitute the advocating of such doctrine; but nothing in this paragraph shall be construed as an exclusive definition of advocating.

(2) The giving, loaning, or promising of support or of money or any other thing of value for any purpose to any organization shall be presumed to constitute affiliation therewith; but nothing in this paragraph shall be construed as an exclusive definition of affiliation.

(3) Advocating the economic, international, and governmental doctrines of world communism means advocating the establishment of a totalitarian Communist dictatorship in any or all of the countries of the world through the medium of an internationally coordinated Communist movement.

(f) For the purposes of this Act—

No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was—

(1) a habitual drunkard;

(3) a member of one or more of the classes of persons, whether inadmissible or not, described in paragraphs (2)(D), (6)(E), and (10)(A) of section 212(a) of this Act; or subparagraphs (A) and (B) of section 212(a)(2) and subparagraph (C) thereof of such section (except as such paragraph relates to a single offense of simple possession of 30 grams or less of marihuana); if the offense described therein, for which such person was convicted or of which he admits the commission, was committed during such period;

(4) one whose income is derived principally from illegal gambling activities;

(5) one who has been convicted of two or more gambling offenses committed during such period;

(6) one who has given false testimony for the purpose of obtaining any benefits under this Act;

(7) one who during such period has been confined, as a result of conviction, to a penal institution for an aggregate period of one hundred and eighty days or more, regardless of whether the offense, or offenses, for which he has been confined were committed within or without such period;

(8) one who at any time has been convicted of an aggravated felony (as defined in subsection (a)(43)); or

(9) one who at any time has engaged in conduct described in section 212(a)(3)(E) (relating to assistance in Nazi persecution, participation in genocide, or commission of acts of torture or extrajudicial killings) or 212(a)(2)(G) (relating to severe violations of religious freedom).

The fact that any person is not within any of the foregoing classes shall not preclude a finding that for other reasons such person is or was not of good moral character. In the case of an alien who makes a false statement or claim of citizenship, or who registers to vote or votes in a Federal, State, or local election (including an initiative, recall, or referendum) in violation of a lawful restriction of such registration or voting to citizens, if each natural parent of the alien (or, in the case of an adopted alien, each adoptive parent of the alien) is or was a citizen (whether by birth or naturalization), the alien permanently resided in the United States prior to attaining the age of 16, and the alien reasonably believed at the time of such statement, claim, or violation that he or she was a citizen, no finding that the alien is, or was, not of good moral character may be made based on it.

(g) For the purposes of this Act any alien ordered deported or removed (whether before or after the enactment of this Act) who has left the United States, shall be considered to have been deported or removed in pursuance of law, irrespective of the source from which the expenses of his transportation were defrayed or of the place to which he departed.

(h) For purposes of section 212(a)(2)(E), the term "serious criminal offense" means—

(1) any felony;

(2) any crime of violence, as defined in section 16 of title 18 of the United States Code; or

(3) any crime of reckless driving or of driving while intoxicated or under the influence of alcohol or of prohibited substances if such crime involves personal injury to another.

(i) With respect to each nonimmigrant alien described in subsection (a)(15)(T)(i)—

(1) the Secretary of Homeland Security, the Attorney General, and other Government officials, where appropriate, shall provide the alien with a referral to a nongovernmental organization that would advise the alien regarding the alien's options while in the United States and the resources available to the alien; and

(2) the Secretary of Homeland Security shall, during the period the alien is in lawful temporary resident status under that subsection, grant the alien authorization to engage in employment in the United States and provide the alien with an "employment authorized" endorsement or other appropriate work permit.

* * * * * * *

## TITLE II—IMMIGRATION

* * * * * * *

### CHAPTER 2—QUALIFICATIONS FOR ADMISSION OF ALIENS; TRAVEL CONTROL OF CITIZENS AND ALIENS

* * * * * * *

#### ADMISSION OF NONIMMIGRANTS

SEC. 214. (a)(1) The admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the Attorney General may by regulations prescribe, including when he deems necessary the giving of a bond with sufficient surety in such sum and containing such conditions as the Attorney General shall prescribe, to insure that at the expiration of such time or upon failure to maintain the status under which he was admitted, or to maintain any status subsequently acquired under section 248, such alien will depart from the United States. No alien admitted to Guam or the Commonwealth of the Northern Mariana Islands without a visa pursuant to section 212(l) may be authorized to enter or stay in the United States other than in Guam or the Commonwealth of the Northern Mariana Islands or to remain in Guam or the Commonwealth of the Northern Mariana Islands for a period exceeding 45 days from date of admission to Guam or the Commonwealth of the Northern Mariana Islands. No alien admitted to the United States without a visa pursuant to section 217 may be authorized to remain in the United States as a nonimmigrant visitor for a period exceeding 90 days from the date of admission.

(2)(A) The period of authorized status as a nonimmigrant described in section 101(a)(15)(O) shall be for such period as the Attorney General may specify in order to provide for the event (or events) for which the nonimmigrant is admitted.

(B) The period of authorized status as a nonimmigrant described in section 101(a)(15)(P) shall be for such period as the Attorney

General may specify in order to provide for the competition, event, or performance for which the nonimmigrant is admitted. In the case of nonimmigrants admitted as individual athletes under section 101(a)(15)(P), the period of authorized status may be for an initial period (not to exceed 5 years) during which the nonimmigrant will perform as an athlete and such period may be extended by the Attorney General for an additional period of up to 5 years.

(b) Every alien (other than a nonimmigrant described in subparagraph (L) or (V) of section 101(a)(15), and other than a nonimmigrant described in any provision of section 101(a)(15)(H)(i) except subclause (b1) of such section) shall be presumed to be an immigrant until he establishes to the satisfaction of the consular officer, at the time of application for a visa, and the immigration officers, at the time of application for admission, that he is entitled to a nonimmigrant status under section 101(a)(15). An alien who is an officer or employee of any foreign government or of any international organization entitled to enjoy privileges, exemptions, and immunities under the International Organizations Immunities Act, or an alien who is the attendant, servant, employee, or member of the immediate family of any such alien shall not be entitled to apply for or receive an immigrant visa, or to enter the United States as an immigrant unless he executes a written waiver in the same form and substance as is prescribed by section 247(b).

(c)(1) The question of importing any alien as a nonimmigrant under subparagraph (H), (L), (O), or (P)(i) of section 101(a)(15) (excluding nonimmigrants under section 101(a)(15)(H)(i)(b1)) in any specific case or specific cases shall be determined by the Attorney General, after consultation with appropriate agencies of the Government, upon petition of the importing employer. Such petition shall be made and approved before the visa is granted. The petition shall be in such form and contain such information as the Attorney General shall prescribe. The approval of such a petition shall not, of itself, be construed as establishing that the alien is a nonimmigrant. For purposes of this subsection with respect to nonimmigrants described in section 101(a)(15)(H)(ii)(a), the term "appropriate agencies of Government" means the Department of Labor and includes the Department of Agriculture. The provisions of section 218 shall apply to the question of importing any alien as a nonimmigrant under section 101(a)(15)(H)(ii)(a).

(2)(A) The Attorney General shall provide for a procedure under which an importing employer which meets requirements established by the Attorney General may file a blanket petition to import aliens as nonimmigrants described in section 101(a)(15)(L) instead of filing individual petitions under paragraph (1) to import such aliens. Such procedure shall permit the expedited processing of visas for admission of aliens covered under such a petition.

(B) For purposes of section 101(a)(15)(L), an alien is considered to be serving in a capacity involving specialized knowledge with respect to a company if the alien has a special knowledge of the company product and its application in international markets or has an advanced level of knowledge of processes and procedures of the company.

(C) The Attorney General shall provide a process for reviewing and acting upon petitions under this subsection with respect to

nonimmigrants described in section 101(a)(15)(L) within 30 days after the date a completed petition has been filed.

(D) The period of authorized admission for—

(i) a nonimmigrant admitted to render services in a managerial or executive capacity under section 101(a)(15)(L) shall not exceed 7 years, or

(ii) a nonimmigrant admitted to render services in a capacity that involves specialized knowledge under section 101(a)(15)(L) shall not exceed 5 years.

(E) In the case of an alien spouse admitted under section 101(a)(15)(L), who is accompanying or following to join a principal alien admitted under such section, the Attorney General shall authorize the alien spouse to engage in employment in the United States and provide the spouse with an "employment authorized" endorsement or other appropriate work permit.

(F) An alien who will serve in a capacity involving specialized knowledge with respect to an employer for purposes of section 101(a)(15)(L) and will be stationed primarily at the worksite of an employer other than the petitioning employer or its affiliate, subsidiary, or parent shall not be eligible for classification under section 101(a)(15)(L) if—

(i) the alien will be controlled and supervised principally by such unaffiliated employer; or

(ii) the placement of the alien at the worksite of the unaffiliated employer is essentially an arrangement to provide labor for hire for the unaffiliated employer, rather than a placement in connection with the provision of a product or service for which specialized knowledge specific to the petitioning employer is necessary.

(3) The Attorney General shall approve a petition—

(A) with respect to a nonimmigrant described in section 101(a)(15)(O)(i) only after consultation in accordance with paragraph (6) or, with respect to aliens seeking entry for a motion picture or television production, after consultation with the appropriate union representing the alien's occupational peers and a management organization in the area of the alien's ability, or

(B) with respect to a nonimmigrant described in section 101(a)(15)(O)(ii) after consultation in accordance with paragraph (6) or, in the case of such an alien seeking entry for a motion picture or television production, after consultation with such a labor organization and a management organization in the area of the alien's ability.

In the case of an alien seeking entry for a motion picture or television production, (i) any opinion under the previous sentence shall only be advisory, (ii) any such opinion that recommends denial must be in writing, (iii) in making the decision the Attorney General shall consider the exigencies and scheduling of the production, and (iv) the Attorney General shall append to the decision any such opinion. The Attorney General shall provide by regulation for the waiver of the consultation requirement under subparagraph (A) in the case of aliens who have been admitted as nonimmigrants under section 101(a)(15)(O)(i) because of extraordinary ability in the arts and who seek readmission to perform similar services within 2 years after the date of a consultation under such subparagraph.

Not later than 5 days after the date such a waiver is provided, the Attorney General shall forward a copy of the petition and all supporting documentation to the national office of an appropriate labor organization.

(4)(A) For purposes of section 101(a)(15)(P)(i)(a), an alien is described in this subparagraph if the alien—

(i)(I) performs as an athlete, individually or as part of a group or team, at an internationally recognized level of performance;

(II) is a professional athlete, as defined in section 204(i)(2);

(III) performs as an athlete, or as a coach, as part of a team or franchise that is located in the United States and a member of a foreign league or association of 15 or more amateur sports teams, if—

(aa) the foreign league or association is the highest level of amateur performance of that sport in the relevant foreign country;

(bb) participation in such league or association renders players ineligible, whether on a temporary or permanent basis, to earn a scholarship in, or participate in, that sport at a college or university in the United States under the rules of the National Collegiate Athletic Association; and

(cc) a significant number of the individuals who play in such league or association are drafted by a major sports league or a minor league affiliate of such a sports league; or

(IV) is a professional athlete or amateur athlete who performs individually or as part of a group in a theatrical ice skating production; and

(ii) seeks to enter the United States temporarily and solely for the purpose of performing—

(I) as such an athlete with respect to a specific athletic competition; or

(II) in the case of an individual described in clause (i)(IV), in a specific theatrical ice skating production or tour.

(B)(i) For purposes of section 101(a)(15)(P)(i)(b), an alien is described in this subparagraph if the alien—

(I) performs with or is an integral and essential part of the performance of an entertainment group that has (except as provided in clause (ii)) been recognized internationally as being outstanding in the discipline for a sustained and substantial period of time,

(II) in the case of a performer or entertainer, except as provided in clause (iii), has had a sustained and substantial relationship with that group (ordinarily for at least one year) and provides functions integral to the performance of the group, and

(III) seeks to enter the United States temporarily and solely for the purpose of performing as such a performer or entertainer or as an integral and essential part of a performance.

(ii) In the case of an entertainment group that is recognized nationally as being outstanding in its discipline for a sustained and substantial period of time, the Attorney General may, in consider-

ation of special circumstances, waive the international recognition requirement of clause (i)(I).

(iii)(I) The one-year relationship requirement of clause (i)(II) shall not apply to 25 percent of the performers and entertainers in a group.

(II) The Attorney General may waive such one-year relationship requirement for an alien who because of illness or unanticipated and exigent circumstances replaces an essential member of the group and for an alien who augments the group by performing a critical role.

(iv) The requirements of subclauses (I) and (II) of clause (i) shall not apply to alien circus personnel who perform as part of a circus or circus group or who constitute an integral and essential part of the performance of such circus or circus group, but only if such personnel are entering the United States to join a circus that has been recognized nationally as outstanding for a sustained and substantial period of time or as part of such a circus.

(C) A person may petition the Attorney General for classification of an alien as a nonimmigrant under section 101(a)(15)(P).

(D) The Attorney General shall approve petitions under this subsection with respect to nonimmigrants described in clause (i) or (iii) of section 101(a)(15)(P) only after consultation in accordance with paragraph (6).

(E) The Attorney General shall approve petitions under this subsection for nonimmigrants described in section 101(a)(15)(P)(ii) only after consultation with labor organizations representing artists and entertainers in the United States.

(F)(i) No nonimmigrant visa under section 101(a)(15)(P)(i)(a) shall be issued to any alien who is a national of a country that is a state sponsor of international terrorism unless the Secretary of State determines, in consultation with the Secretary of Homeland Security and the heads of other appropriate United States agencies, that such alien does not pose a threat to the safety, national security, or national interest of the United States. In making a determination under this subparagraph, the Secretary of State shall apply standards developed by the Secretary of State, in consultation with the Secretary of Homeland Security and the heads of other appropriate United States agencies, that are applicable to the nationals of such states.

(ii) In this subparagraph, the term "state sponsor of international terrorism" means any country the government of which has been determined by the Secretary of State under any of the laws specified in clause (iii) to have repeatedly provided support for acts of international terrorism.

(iii) The laws specified in this clause are the following:

(I) Section 6(j)(1)(A) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)(1)(A)) (or successor statute).

(II) Section 40(d) of the Arms Export Control Act (22 U.S.C. 2780(d)).

(III) Section 620A(a) of the Foreign Assistance Act of 1961 (22 U.S.C. 2371(a)).

(G) The Secretary of Homeland Security shall permit a petition under this subsection to seek classification of more than 1 alien as a nonimmigrant under section 101(a)(15)(P)(i)(a).

(H) The Secretary of Homeland Security shall permit an athlete, or the employer of an athlete, to seek admission to the United States for such athlete under a provision of this Act other than section 101(a)(15)(P)(i) if the athlete is eligible under such other provision.

*(I) The following shall apply to the admission of any alien under section 101(a)(15)(P)(iv):*

*(i) The mobile entertainment provider shall be subject to the same program requirements that govern the admission of nonimmigrants pursuant to section 101(a)(15)(H)(ii)(b) of the Immigration and Nationality Act (8 U.S.C. 1101(a) (15)(H)(ii)(b)) as promulgated by the Department of Labor in section 655 of title 20 of the Code of Federal Regulations.*

*(ii) For purposes of section 101(a)(15)(P)(iv), functions that are integral and essential to the operation of a mobile entertainment provider include transporting, assembly, operation, disassembly, and maintenance of mobile entertainment attractions, structures, and equipment, including rides, games, novelties, and food or beverage concessions, as well as other functions that are common in the mobile entertainment industry and are necessary for the safe and efficient operation of the mobile entertainment provider.*

*(iii) For purposes of this subparagraph, the term "mobile entertainment provider" means—*

*(I) a carnival or circus that travels around the United States on a temporary or seasonal basis; or*

*(II) a provider of services normally affiliated with a carnival or circus, such as food and game concessions, that travels around the United States on a seasonal or temporary basis to provide services to State, county, and local fairs and festivals, or support events sponsored by not-for-profit organizations for fundraising.*

(5)(A) In the case of an alien who is provided nonimmigrant status under section 101(a)(15)(H)(i)(b) or 101(a)(15)(H)(ii)(b) and who is dismissed from employment by the employer before the end of the period of authorized admission, the employer shall be liable for the reasonable costs of return transportation of the alien abroad.

(B) In the case of an alien who is admitted to the United States in nonimmigrant status under section 101(a)(15)(O) or 101(a)(15)(P) and whose employment terminates for reasons other than voluntary resignation, the employer whose offer of employment formed the basis of such nonimmigrant status and the petitioner are jointly and severally liable for the reasonable cost of return transportation of the alien abroad. The petitioner shall provide assurance satisfactory to the Attorney General that the reasonable cost of that transportation will be provided.

(6)(A)(i) To meet the consultation requirement of paragraph (3)(A) in the case of a petition for a nonimmigrant described in section 101(a)(15)(O)(i) (other than with respect to aliens seeking entry for a motion picture or television production), the petitioner shall submit with the petition an advisory opinion from a peer group (or other person or persons of its choosing, which may include a labor organization) with expertise in the specific field involved.

(ii) To meet the consultation requirement of paragraph (3)(B) in the case of a petition for a nonimmigrant described in section 101(a)(15)(O)(ii) (other than with respect to aliens seeking entry for a motion picture or television production), the petitioner shall submit with the petition an advisory opinion from a labor organization with expertise in the skill area involved.

(iii) To meet the consultation requirement of paragraph (4)(D) in the case of a petition for a nonimmigrant described in section 101(a)(15)(P)(i) or 101(a)(15)(P)(iii), the petitioner shall submit with the petition an advisory opinion from a labor organization with expertise in the specific field of athletics or entertainment involved.

(B) To meet the consultation requirements of subparagraph (A), unless the petitioner submits with the petition an advisory opinion from an appropriate labor organization, the Attorney General shall forward a copy of the petition and all supporting documentation to the national office of an appropriate labor organization within 5 days of the date of receipt of the petition. If there is a collective bargaining representative of an employer's employees in the occupational classification for which the alien is being sought, that representative shall be the appropriate labor organization.

(C) In those cases in which a petitioner described in subparagraph (A) establishes that an appropriate peer group (including a labor organization) does not exist, the Attorney General shall adjudicate the petition without requiring an advisory opinion.

(D) Any person or organization receiving a copy of a petition described in subparagraph (A) and supporting documents shall have no more than 15 days following the date of receipt of such documents within which to submit a written advisory opinion or comment or to provide a letter of no objection. Once the 15-day period has expired and the petitioner has had an opportunity, where appropriate, to supply rebuttal evidence, the Attorney General shall adjudicate such petition in no more than 14 days. The Attorney General may shorten any specified time period for emergency reasons if no unreasonable burden would be thus imposed on any participant in the process.

(E)(i) The Attorney General shall establish by regulation expedited consultation procedures in the case of nonimmigrant artists or entertainers described in section 101(a)(15)(O) or 101(a)(15)(P) to accommodate the exigencies and scheduling of a given production or event.

(ii) The Attorney General shall establish by regulation expedited consultation procedures in the case of nonimmigrant athletes described in section 101(a)(15)(O)(i) or 101(a)(15)(P)(i) in the case of emergency circumstances (including trades during a season).

(F) No consultation required under this subsection by the Attorney General with a nongovernmental entity shall be construed as permitting the Attorney General to delegate any authority under this subsection to such an entity. The Attorney General shall give such weight to advisory opinions provided under this section as the Attorney General determines, in his sole discretion, to be appropriate.

(7) If a petition is filed and denied under this subsection, the Attorney General shall notify the petitioner of the determination and the reasons for the denial and of the process by which the petitioner may appeal the determination.

(8) The Attorney General shall submit annually to the Committees on the Judiciary of the House of Representatives and of the Senate a report describing, with respect to petitions under each subcategory of subparagraphs (H), (O), (P), and (Q) of section 101(a)(15) the following:

(A) The number of such petitions which have been filed.

(B) The number of such petitions which have been approved and the number of workers (by occupation) included in such approved petitions.

(C) The number of such petitions which have been denied and the number of workers (by occupation) requested in such denied petitions.

(D) The number of such petitions which have been withdrawn.

(E) The number of such petitions which are awaiting final action.

(9)(A) The Attorney General shall impose a fee on an employer (excluding any employer that is a primary or secondary education institution, an institution of higher education, as defined in section 101(a) of the Higher Education Act of 1965 (20 U.S.C. 1001(a), a nonprofit entity related to or affiliated with any such institution, a nonprofit entity which engages in established curriculum-related clinical training of students registered at any such institution, a nonprofit research organization, or a governmental research organization) filing before a petition under paragraph (1)—

(i) initially to grant an alien nonimmigrant status described in section 101(a)(15)(H)(i)(b);

(ii) to extend the stay of an alien having such status (unless the employer previously has obtained an extension for such alien); or

(iii) to obtain authorization for an alien having such status to change employers.

(B) The amount of the fee shall be $1,500 for each such petition except that the fee shall be half the amount for each such petition by any employer with not more than 25 full-time equivalent employees who are employed in the United States (determined by including any affiliate or subsidiary of such employer).

(C) Fees collected under this paragraph shall be deposited in the Treasury in accordance with section 286(s).

(10) An amended H–1B petition shall not be required where the petitioning employer is involved in a corporate restructuring, including but not limited to a merger, acquisition, or consolidation, where a new corporate entity succeeds to the interests and obligations of the original petitioning employer and where the terms and conditions of employment remain the same but for the identity of the petitioner.

(11)(A) Subject to subparagraph (B), the Secretary of Homeland Security or the Secretary of State, as appropriate, shall impose a fee on an employer who has filed an attestation described in section 212(t)—

(i) in order that an alien may be initially granted nonimmigrant status described in section 101(a)(15)(H)(i)(b1); or

(ii) in order to satisfy the requirement of the second sentence of subsection (g)(8)(C) for an alien having such status to obtain certain extensions of stay.

(B) The amount of the fee shall be the same as the amount imposed by the Secretary of Homeland Security under paragraph (9), except that if such paragraph does not authorize such Secretary to impose any fee, no fee shall be imposed under this paragraph.

(C) Fees collected under this paragraph shall be deposited in the Treasury in accordance with section 286(s).

(12)(A) In addition to any other fees authorized by law, the Secretary of Homeland Security shall impose a fraud prevention and detection fee on an employer filing a petition under paragraph (1)—

(i) initially to grant an alien nonimmigrant status described in subparagraph (H)(i)(b) or (L) of section 101(a)(15); or

(ii) to obtain authorization for an alien having such status to change employers.

(B) In addition to any other fees authorized by law, the Secretary of State shall impose a fraud prevention and detection fee on an alien filing an application abroad for a visa authorizing admission to the United States as a nonimmigrant described in section 101(a)(15)(L), if the alien is covered under a blanket petition described in paragraph (2)(A).

(C) The amount of the fee imposed under subparagraph (A) or (B) shall be $500.

(D) The fee imposed under subparagraph (A) or (B) shall only apply to principal aliens and not to the spouses or children who are accompanying or following to join such principal aliens.

(E) Fees collected under this paragraph shall be deposited in the Treasury in accordance with section 286(v).

(13)(A) In addition to any other fees authorized by law, the Secretary of Homeland Security shall impose a fraud prevention and detection fee on an employer filing a petition under paragraph (1) for nonimmigrant workers described in section 101(a)(15)(H)(ii)(b).

(B) The amount of the fee imposed under subparagraph (A) shall be $150.

(14)(A) If the Secretary of Homeland Security finds, after notice and an opportunity for a hearing, a substantial failure to meet any of the conditions of the petition to admit or otherwise provide status to a nonimmigrant worker under section 101(a)(15)(H)(ii)(b) or a willful misrepresentation of a material fact in such petition—

(i) the Secretary of Homeland Security may, in addition to any other remedy authorized by law, impose such administrative remedies (including civil monetary penalties in an amount not to exceed $10,000 per violation) as the Secretary of Homeland Security determines to be appropriate; and

(ii) the Secretary of Homeland Security may deny petitions filed with respect to that employer under section 204 or paragraph (1) of this subsection during a period of at least 1 year but not more than 5 years for aliens to be employed by the employer.

(B) The Secretary of Homeland Security may delegate to the Secretary of Labor, with the agreement of the Secretary of Labor, any of the authority given to the Secretary of Homeland Security under subparagraph (A)(i).

(C) In determining the level of penalties to be assessed under subparagraph (A), the highest penalties shall be reserved for willful failures to meet any of the conditions of the petition that involve harm to United States workers.

(D) In this paragraph, the term "substantial failure" means the willful failure to comply with the requirements of this section that constitutes a significant deviation from the terms and conditions of a petition.

(d)(1) A visa shall not be issued under the provisions of section 101(a)(15)(K)(i) until the consular officer has received a petition filed in the United States by the fiancée or fiancé of the applying alien and approved by the Secretary of Homeland Security. The petition shall be in such form and contain such information as the Secretary of Homeland Security shall, by regulation, prescribe. Such information shall include information on any criminal convictions of the petitioner for any specified crime described in paragraph (3)(B) and information on any permanent protection or restraining order issued against the petitioner related to any specified crime described in paragraph (3)(B)(i). It shall be approved only after satisfactory evidence is submitted by the petitioner to establish that the parties have previously met in person within 2 years before the date of filing the petition, have a bona fide intention to marry, and are legally able and actually willing to conclude a valid marriage in the United States within a period of ninety days after the alien's arrival, except that the Secretary of Homeland Security in his discretion may waive the requirement that the parties have previously met in person. In the event the marriage with the petitioner does not occur within three months after the admission of the said alien and minor children, they shall be required to depart from the United States and upon failure to do so shall be removed in accordance with sections 240 and 241.

(2)(A) Subject to subparagraphs (B) and (C), the Secretary of Homeland Security may not approve a petition under paragraph (1) unless the Secretary has verified that—

(i) the petitioner has not, previous to the pending petition, petitioned under paragraph (1) with respect to two or more applying aliens; and

(ii) if the petitioner has had such a petition previously approved, 2 years have elapsed since the filing of such previously approved petition.

(B) The Secretary of Homeland Security may, in the Secretary's discretion, waive the limitations in subparagraph (A) if justification exists for such a waiver. Except in extraordinary circumstances and subject to subparagraph (C), such a waiver shall not be granted if the petitioner has a record of violent criminal offenses against a person or persons.

(C)(i) The Secretary of Homeland Security is not limited by the criminal court record and shall grant a waiver of the condition described in the second sentence of subparagraph (B) in the case of a petitioner described in clause (ii).

(ii) A petitioner described in this clause is a petitioner who has been battered or subjected to extreme cruelty and who is or was not the primary perpetrator of violence in the relationship upon a determination that—

(I) the petitioner was acting in self-defense;

(II) the petitioner was found to have violated a protection order intended to protect the petitioner; or

(III) the petitioner committed, was arrested for, was convicted of, or pled guilty to committing a crime that did not re-

sult in serious bodily injury and where there was a connection between the crime and the petitioner's having been battered or subjected to extreme cruelty.

(iii) In acting on applications under this subparagraph, the Secretary of Homeland Security shall consider any credible evidence relevant to the application. The determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Secretary.

(3) In this subsection:

(A) The terms "domestic violence", "sexual assault", "child abuse and neglect", "dating violence", "elder abuse", and "stalking" have the meaning given such terms in section 3 of the Violence Against Women and Department of Justice Reauthorization Act of 2005.

(B) The term "specified crime" means the following:

(i) Domestic violence, sexual assault, child abuse and neglect, dating violence, elder abuse, stalking, or an attempt to commit any such crime.

(ii) Homicide, murder, manslaughter, rape, abusive sexual contact, sexual exploitation, incest, torture, trafficking, peonage, holding hostage, involuntary servitude, slave trade, kidnapping, abduction, unlawful criminal restraint, false imprisonment, or an attempt to commit any of the crimes described in this clause.

(iii) At least three convictions for crimes relating to a controlled substance or alcohol not arising from a single act.

(e)

(1) An alien who is a citizen of Canada or Mexico, and the spouse and children of any such alien if accompanying or following to join such alien, who seeks to enter the United States under and pursuant to the provisions of Section D of Annex 16–A of the USMCA (as defined in section 3 of the United States-Mexico-Canada Agreement Implementation Act) to engage in business activities at a professional level as provided for in such Annex, may be admitted for such purpose under regulations of the Attorney General promulgated after consultation with the Secretaries of State and Labor. For purposes of this Act, including the issuance of entry documents and the application of subsection (b), such alien shall be treated as if seeking classification, or classifiable, as a nonimmigrant under section 101(a)(15). For purposes of this paragraph, the term "citizen of Mexico" means "citizen" as defined in article 16.1 of the USMCA.

(2) In the case of an alien spouse admitted under section 101(a)(15)(E), who is accompanying or following to join a principal alien admitted under such section, the Attorney General shall authorize the alien spouse to engage in employment in the United States and provide the spouse with an "employment authorized" endorsement or other appropriate work permit.

(f)(1) Except as provided in paragraph (3), no alien shall be entitled to nonimmigrant status described in section 101(a)(15)(D) if the alien intends to land for the purpose of performing service on board a vessel of the United States (as defined in section 2101(46) of title 46, United States Code) or on an aircraft of an air carrier (as defined in section 40102(a)(2) of title 49, United States Code) during a labor dispute where there is a strike or lockout in the bar-

gaining unit of the employer in which the alien intends to perform such service.

(2) An alien described in paragraph (1)—

(A) may not be paroled into the United States pursuant to section 212(d)(5) unless the Attorney General determines that the parole of such alien is necessary to protect the national security of the United States; and

(B) shall be considered not to be a bona fide crewman for purposes of section 252(b).

(3) Paragraph (1) shall not apply to an alien if the air carrier or owner or operator of such vessel that employs the alien provides documentation that satisfies the Attorney General that the alien—

(A) has been an employee of such employer for a period of not less than 1 year preceding the date that a strike or lawful lockout commenced;

(B) has served as a qualified crewman for such employer at least once in each of 3 months during the 12-month period preceding such date; and

(C) shall continue to provide the same services that such alien provided as such a crewman.

(g)(1) The total number of aliens who may be issued visas or otherwise provided nonimmigrant status during any fiscal year (beginning with fiscal year 1992)—

(A) under section 101(a)(15)(H)(i)(b), may not exceed—

(i) 65,000 in each fiscal year before fiscal year 1999;

(ii) 115,000 in fiscal year 1999;

(iii) 115,000 in fiscal year 2000;

(iv) 195,000 in fiscal year 2001;

(v) 195,000 in fiscal year 2002;

(vi) 195,000 in fiscal year 2003; and

(vii) 65,000 in each succeeding fiscal year; or

(B) under section 101(a)(15)(H)(ii)(b) may not exceed 66,000.

(2) The numerical limitations of paragraph (1) shall only apply to principal aliens and not to the spouses or children of such aliens.

(3) Aliens who are subject to the numerical limitations of paragraph (1) shall be issued visas (or otherwise provided nonimmigrant status) in the order in which petitions are filed for such visas or status. If an alien who was issued a visa or otherwise provided nonimmigrant status and counted against the numerical limitations of paragraph (1) is found to have been issued such visa or otherwise provided such status by fraud or willfully misrepresenting a material fact and such visa or nonimmigrant status is revoked, then one number shall be restored to the total number of aliens who may be issued visas or otherwise provided such status under the numerical limitations of paragraph (1) in the fiscal year in which the petition is revoked, regardless of the fiscal year in which the petition was approved.

(4) In the case of a nonimmigrant described in section 101(a)(15)(H)(i)(b), the period of authorized admission as such a nonimmigrant may not exceed 6 years.

(5) The numerical limitations contained in paragraph (1)(A) shall not apply to any nonimmigrant alien issued a visa or otherwise provided status under section 101(a)(15)(H)(i)(b) who—

(A) is employed (or has received an offer of employment) at an institution of higher education (as defined in section 101(a)

of the Higher Education Act of 1965 (20 U.S.C. 1001(a))), or a related or affiliated nonprofit entity;

(B) is employed (or has received an offer of employment) at a nonprofit research organization or a governmental research organization; or

(C) has earned a master's or higher degree from a United States institution of higher education (as defined in section 101(a) of the Higher Education Act of 1965 (20 U.S.C. 1001(a)), until the number of aliens who are exempted from such numerical limitation during such year exceeds 20,000.

(6) Any alien who ceases to be employed by an employer described in paragraph (5)(A) shall, if employed as a nonimmigrant alien described in section 101(a)(15)(H)(i)(b), who has not previously been counted toward the numerical limitations contained in paragraph (1)(A), be counted toward those limitations the first time the alien is employed by an employer other than one described in paragraph (5).

(7) Any alien who has already been counted, within the 6 years prior to the approval of a petition described in subsection (c), toward the numerical limitations of paragraph (1)(A) shall not again be counted toward those limitations unless the alien would be eligible for a full 6 years of authorized admission at the time the petition is filed. Where multiple petitions are approved for 1 alien, that alien shall be counted only once.

(8)(A) The agreements referred to in section 101(a)(15)(H)(i)(b1) are—

(i) the United States-Chile Free Trade Agreement; and

(ii) the United States-Singapore Free Trade Agreement.

(B)(i) The Secretary of Homeland Security shall establish annual numerical limitations on approvals of initial applications by aliens for admission under section 101(a)(15)(H)(i)(b1).

(ii) The annual numerical limitations described in clause (i) shall not exceed—

(I) 1,400 for nationals of Chile (as defined in article 14.9 of the United States-Chile Free Trade Agreement) for any fiscal year; and

(II) 5,400 for nationals of Singapore (as defined in Annex 1A of the United States-Singapore Free Trade Agreement) for any fiscal year.

(iii) The annual numerical limitations described in clause (i) shall only apply to principal aliens and not to the spouses or children of such aliens.

(iv) The annual numerical limitation described in paragraph (1)(A) is reduced by the amount of the annual numerical limitations established under clause (i). However, if a numerical limitation established under clause (i) has not been exhausted at the end of a given fiscal year, the Secretary of Homeland Security shall adjust upwards the numerical limitation in paragraph (1)(A) for that fiscal year by the amount remaining in the numerical limitation under clause (i). Visas under section 101(a)(15)(H)(i)(b) may be issued pursuant to such adjustment within the first 45 days of the next fiscal year to aliens who had applied for such visas during the fiscal year for which the adjustment was made.

(C) The period of authorized admission as a nonimmigrant under section 101(a)(15)(H)(i)(b1) shall be 1 year, and may be extended,

but only in 1-year increments. After every second extension, the next following extension shall not be granted unless the Secretary of Labor had determined and certified to the Secretary of Homeland Security and the Secretary of State that the intending employer has filed with the Secretary of Labor an attestation under section 212(t)(1) for the purpose of permitting the nonimmigrant to obtain such extension.

(D) The numerical limitation described in paragraph (1)(A) for a fiscal year shall be reduced by one for each alien granted an extension under subparagraph (C) during such year who has obtained 5 or more consecutive prior extensions.

(9)(A) Subject to subparagraphs (B) and (C), an alien who has already been counted toward the numerical limitation of paragraph (1)(B) during fiscal year 2013, 2014, or 2015 shall not again be counted toward such limitation during fiscal year 2016. Such an alien shall be considered a returning worker.

(B) A petition to admit or otherwise provide status under section 101(a)(15)(H)(ii)(b) shall include, with respect to a returning worker—

(i) all information and evidence that the Secretary of Homeland Security determines is required to support a petition for status under section 101(a)(15)(H)(ii)(b);

(ii) the full name of the alien; and

(iii) a certification to the Department of Homeland Security that the alien is a returning worker.

(C) An H–2B visa or grant of nonimmigrant status for a returning worker shall be approved only if the alien is confirmed to be a returning worker by—

(i) the Department of State; or

(ii) if the alien is visa exempt or seeking to change to status under section 101 (a)(15)(H)(ii)(b), the Department of Homeland Security.

(10) The numerical limitations of paragraph (1)(B) shall be allocated for a fiscal year so that the total number of aliens subject to such numerical limits who enter the United States pursuant to a visa or are accorded nonimmigrant status under section 101(a)(15)(H)(ii)(b) during the first 6 months of such fiscal year is not more than 33,000.

(11)(A) The Secretary of State may not approve a number of initial applications submitted for aliens described in section 101(a)(15)(E)(iii) that is more than the applicable numerical limitation set out in this paragraph.

(B) The applicable numerical limitation referred to in subparagraph (A) is 10,500 for each fiscal year.

(C) The applicable numerical limitation referred to in subparagraph (A) shall only apply to principal aliens and not to the spouses or children of such aliens.

(h) The fact that an alien is the beneficiary of an application for a preference status filed under section 204 or has otherwise sought permanent residence in the United States shall not constitute evidence of an intention to abandon a foreign residence for purposes of obtaining a visa as a nonimmigrant described in subparagraph (H)(i)(b) or (c), (L), or (V) of section 101(a)(15) or otherwise obtaining or maintaining the status of a nonimmigrant described in such subparagraph, if the alien had obtained a change of status under

section 248 to a classification as such a nonimmigrant before the alien's most recent departure from the United States.

(i)(1) Except as provided in paragraph (3), for purposes of section 101(a)(15)(H)(i)(b), section 101(a)(15)(E)(iii), and paragraph (2), the term "specialty occupation" means an occupation that requires—

(A) theoretical and practical application of a body of highly specialized knowledge, and

(B) attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States.

(2) For purposes of section 101(a)(15)(H)(i)(b), the requirements of this paragraph, with respect to a specialty occupation, are—

(A) full state licensure to practice in the occupation, if such licensure is required to practice in the occupation,

(B) completion of the degree described in paragraph (1)(B) for the occupation, or

(C)(i) experience in the specialty equivalent to the completion of such degree, and (ii) recognition of expertise in the specialty through progressively responsible positions relating to the specialty.

(3) For purposes of section 101(a)(15)(H)(i)(b1), the term "specialty occupation" means an occupation that requires—

(A) theoretical and practical application of a body of specialized knowledge; and

(B) attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States.

(j)

(1) Notwithstanding any other provision of this Act, an alien who is a citizen of Canada or Mexico who seeks to enter the United States under and pursuant to the provisions of Section B, Section C, or Section D of Annex 16–A of the USMCA (as defined in section 3 of the United States-Mexico-Canada Agreement Implementation Act), shall not be classified as a nonimmigrant under such provisions if there is in progress a strike or lockout in the course of a labor dispute in the occupational classification at the place or intended place of employment, unless such alien establishes, pursuant to regulations promulgated by the Attorney General, that the alien's entry will not affect adversely the settlement of the strike or lockout or the employment of any person who is involved in the strike or lockout. Notice of a determination under this paragraph shall be given as may be required by paragraph 3 of article 16.4 of the USMCA. For purposes of this paragraph, the term "citizen of Mexico" means "citizen" as defined in article 16.1 of the USMCA.

(2) Notwithstanding any other provision of this Act except section 212(t)(1), and subject to regulations promulgated by the Secretary of Homeland Security, an alien who seeks to enter the United States under and pursuant to the provisions of an agreement listed in subsection (g)(8)(A), and the spouse and children of such an alien if accompanying or following to join the alien, may be denied admission as a nonimmigrant under subparagraph (E), (L), or (H)(i)(b1) of section 101(a)(15) if there is in progress a labor dispute in the occupational classification at the place or intended place of

employment, unless such alien establishes, pursuant to regulations promulgated by the Secretary of Homeland Security after consultation with the Secretary of Labor, that the alien's entry will not affect adversely the settlement of the labor dispute or the employment of any person who is involved in the labor dispute. Notice of a determination under this paragraph shall be given as may be required by such agreement.

(k)(1) The number of aliens who may be provided a visa as nonimmigrants under section 101(a)(15)(S)(i) in any fiscal year may not exceed 200. The number of aliens who may be provided a visa as nonimmigrants under section 101(a)(15)(S)(ii) in any fiscal year may not exceed 50.

(2) The period of admission of an alien as such a nonimmigrant may not exceed 3 years. Such period may not be extended by the Attorney General.

(3) As a condition for the admission, and continued stay in lawful status, of such a nonimmigrant, the nonimmigrant—

(A) shall report not less often than quarterly to the Attorney General such information concerning the alien's whereabouts and activities as the Attorney General may require;

(B) may not be convicted of any criminal offense punishable by a term of imprisonment of 1 year or more after the date of such admission;

(C) must have executed a form that waives the nonimmigrant's right to contest, other than on the basis of an application for withholding of removal, any action for removal of the alien instituted before the alien obtains lawful permanent resident status; and

(D) shall abide by any other condition, limitation, or restriction imposed by the Attorney General.

(4) The Attorney General shall submit a report annually to the Committee on the Judiciary of the House of Representatives and the Committee on the Judiciary of the Senate concerning—

(A) the number of such nonimmigrants admitted;

(B) the number of successful criminal prosecutions or investigations resulting from cooperation of such aliens;

(C) the number of terrorist acts prevented or frustrated resulting from cooperation of such aliens;

(D) the number of such nonimmigrants whose admission or cooperation has not resulted in successful criminal prosecution or investigation or the prevention or frustration of a terrorist act; and

(E) the number of such nonimmigrants who have failed to report quarterly (as required under paragraph (3)) or who have been convicted of crimes in the United States after the date of their admission as such a nonimmigrant.

(l)(1) In the case of a request by an interested State agency, or by an interested Federal agency, for a waiver of the 2-year foreign residence requirement under section 212(e) on behalf of an alien described in clause (iii) of such section, the Attorney General shall not grant such waiver unless—

(A) in the case of an alien who is otherwise contractually obligated to return to a foreign country, the government of such country furnishes the Director of the United States Informa-

tion Agency with a statement in writing that it has no objection to such waiver;

(B) in the case of a request by an interested State agency, the grant of such waiver would not cause the number of waivers allotted for that State for that fiscal year to exceed 30;

(C) in the case of a request by an interested Federal agency or by an interested State agency—

(i) the alien demonstrates a bona fide offer of full-time employment at a health facility or health care organization, which employment has been determined by the Attorney General to be in the public interest; and

(ii) the alien agrees to begin employment with the health facility or health care organization within 90 days of receiving such waiver, and agrees to continue to work for a total of not less than 3 years (unless the Attorney General determines that extenuating circumstances exist, such as closure of the facility or hardship to the alien, which would justify a lesser period of employment at such health facility or health care organization, in which case the alien must demonstrate another bona fide offer of employment at a health facility or health care organization for the remainder of such 3-year period); and

(D) in the case of a request by an interested Federal agency (other than a request by an interested Federal agency to employ the alien full-time in medical research or training) or by an interested State agency, the alien agrees to practice primary care or specialty medicine in accordance with paragraph (2) for a total of not less than 3 years only in the geographic area or areas which are designated by the Secretary of Health and Human Services as having a shortage of health care professionals, except that—

(i) in the case of a request by the Department of Veterans Affairs, the alien shall not be required to practice medicine in a geographic area designated by the Secretary;

(ii) in the case of a request by an interested State agency, the head of such State agency determines that the alien is to practice medicine under such agreement in a facility that serves patients who reside in one or more geographic areas so designated by the Secretary of Health and Human Services (without regard to whether such facility is located within such a designated geographic area), and the grant of such waiver would not cause the number of the waivers granted on behalf of aliens for such State for a fiscal year (within the limitation in subparagraph (B)) in accordance with the conditions of this clause to exceed 10; and

(iii) in the case of a request by an interested Federal agency or by an interested State agency for a waiver for an alien who agrees to practice specialty medicine in a facility located in a geographic area so designated by the Secretary of Health and Human Services, the request shall demonstrate, based on criteria established by such agency, that there is a shortage of health care professionals able to provide services in the appropriate medical specialty to the patients who will be served by the alien.

(2)(A) Notwithstanding section 248(a)(2), the Attorney General may change the status of an alien who qualifies under this subsection and section 212(e) to that of an alien described in section 101(a)(15)(H)(i)(b). The numerical limitations contained in subsection (g)(1)(A) shall not apply to any alien whose status is changed under the preceding sentence, if the alien obtained a waiver of the 2-year foreign residence requirement upon a request by an interested Federal agency or an interested State agency.

(B) No person who has obtained a change of status under subparagraph (A) and who has failed to fulfill the terms of the contract with the health facility or health care organization named in the waiver application shall be eligible to apply for an immigrant visa, for permanent residence, or for any other change of nonimmigrant status, until it is established that such person has resided and been physically present in the country of his nationality or his last residence for an aggregate of at least 2 years following departure from the United States.

(3) Notwithstanding any other provision of this subsection, the 2-year foreign residence requirement under section 212(e) shall apply with respect to an alien described in clause (iii) of such section, who has not otherwise been accorded status under section 101(a)(27)(H), if—

(A) at any time the alien ceases to comply with any agreement entered into under subparagraph (C) or (D) of paragraph (1); or

(B) the alien's employment ceases to benefit the public interest at any time during the 3-year period described in paragraph (1)(C).

(m)(1) An alien may not be accorded status as a nonimmigrant under clause (i) or (iii) of section 101(a)(15)(F) in order to pursue a course of study—

(A) at a public elementary school or in a publicly funded adult education program; or

(B) at a public secondary school unless—

(i) the aggregate period of such status at such a school does not exceed 12 months with respect to any alien, and (ii) the alien demonstrates that the alien has reimbursed the local educational agency that administers the school for the full, unsubsidized per capita cost of providing education at such school for the period of the alien's attendance.

(2) An alien who obtains the status of a nonimmigrant under clause (i) or (iii) of section 101(a)(15)(F) in order to pursue a course of study at a private elementary or secondary school or in a language training program that is not publicly funded shall be considered to have violated such status, and the alien's visa under section 101(a)(15)(F) shall be void, if the alien terminates or abandons such course of study at such a school and undertakes a course of study at a public elementary school, in a publicly funded adult education program, in a publicly funded adult education language training program, or at a public secondary school (unless the requirements of paragraph (1)(B) are met).

(n)(1) A nonimmigrant alien described in paragraph (2) who was previously issued a visa or otherwise provided nonimmigrant status

under section 101(a)(15)(H)(i)(b) is authorized to accept new employment upon the filing by the prospective employer of a new petition on behalf of such nonimmigrant as provided under subsection (a). Employment authorization shall continue for such alien until the new petition is adjudicated. If the new petition is denied, such authorization shall cease.

(2) A nonimmigrant alien described in this paragraph is a nonimmigrant alien—

(A) who has been lawfully admitted into the United States;

(B) on whose behalf an employer has filed a nonfrivolous petition for new employment before the date of expiration of the period of stay authorized by the Attorney General; and

(C) who, subsequent to such lawful admission, has not been employed without authorization in the United States before the filing of such petition.

(o)(1) No alien shall be eligible for admission to the United States under section 101(a)(15)(T) if there is substantial reason to believe that the alien has committed an act of a severe form of trafficking in persons (as defined in section 103 of the Trafficking Victims Protection Act of 2000).

(2) The total number of aliens who may be issued visas or otherwise provided nonimmigrant status during any fiscal year under section 101(a)(15)(T) may not exceed 5,000.

(3) The numerical limitation of paragraph (2) shall only apply to principal aliens and not to the spouses, sons, daughters, siblings, or parents of such aliens.

(4) An unmarried alien who seeks to accompany, or follow to join, a parent granted status under section 101(a)(15)(T)(i), and who was under 21 years of age on the date on which such parent applied for such status, shall continue to be classified as a child for purposes of section 101(a)(15)(T)(ii), if the alien attains 21 years of age after such parent's application was filed but while it was pending.

(5) An alien described in clause (i) of section 101(a)(15)(T) shall continue to be treated as an alien described in clause (ii)(I) of such section if the alien attains 21 years of age after the alien's application for status under such clause (i) is filed but while it is pending.

(6) In making a determination under section 101(a)(15)(T)(i)(III)(aa) with respect to an alien, statements from State and local law enforcement officials that the alien has complied with any reasonable request for assistance in the investigation or prosecution of crimes such as kidnapping, rape, slavery, or other forced labor offenses, where severe forms of trafficking in persons (as defined in section 103 of the Trafficking Victims Protection Act of 2000) appear to have been involved, shall be considered.

(7)(A) Except as provided in subparagraph (B), an alien who is issued a visa or otherwise provided nonimmigrant status under section 101(a)(15)(T) may be granted such status for a period of not more than 4 years.

(B) An alien who is issued a visa or otherwise provided nonimmigrant status under section 101(a)(15)(T) may extend the period of such status beyond the period described in subparagraph (A) if—

(i) a Federal, State, or local law enforcement official, prosecutor, judge, or other authority investigating or prosecuting activity relating to human trafficking or certifies that the pres-

ence of the alien in the United States is necessary to assist in the investigation or prosecution of such activity;

(ii) the alien is eligible for relief under section 245(l) and is unable to obtain such relief because regulations have not been issued to implement such section; or

(iii) the Secretary of Homeland Security determines that an extension of the period of such nonimmigrant status is warranted due to exceptional circumstances.

(C) Nonimmigrant status under section 101(a)(15)(T) shall be extended during the pendency of an application for adjustment of status under section 245(l).

(p) REQUIREMENTS APPLICABLE TO SECTION 101(a)(15)(U) VISAS.—

(1) PETITIONING PROCEDURES FOR SECTION 101(a)(15)(U) VISAS.—The petition filed by an alien under section 101(a)(15)(U)(i) shall contain a certification from a Federal, State, or local law enforcement official, prosecutor, judge, or other Federal, State, or local authority investigating criminal activity described in section 101(a)(15)(U)(iii). This certification may also be provided by an official of the Service whose ability to provide such certification is not limited to information concerning immigration violations. This certification shall state that the alien "has been helpful, is being helpful, or is likely to be helpful" in the investigation or prosecution of criminal activity described in section 101(a)(15)(U)(iii).

(2) NUMERICAL LIMITATIONS.—

(A) The number of aliens who may be issued visas or otherwise provided status as nonimmigrants under section 101(a)(15)(U) in any fiscal year shall not exceed 10,000.

(B) The numerical limitations in subparagraph (A) shall only apply to principal aliens described in section 101(a)(15)(U)(i), and not to spouses, children, or, in the case of alien children, the alien parents of such children.

(3) DUTIES OF THE ATTORNEY GENERAL WITH RESPECT TO "U" VISA NONIMMIGRANTS.—With respect to nonimmigrant aliens described in subsection (a)(15)(U)—

(A) the Attorney General and other government officials, where appropriate, shall provide those aliens with referrals to nongovernmental organizations to advise the aliens regarding their options while in the United States and the resources available to them; and

(B) the Attorney General shall, during the period those aliens are in lawful temporary resident status under that subsection, provide the aliens with employment authorization.

(4) CREDIBLE EVIDENCE CONSIDERED.—In acting on any petition filed under this subsection, the consular officer or the Attorney General, as appropriate, shall consider any credible evidence relevant to the petition.

(5) NONEXCLUSIVE RELIEF.—Nothing in this subsection limits the ability of aliens who qualify for status under section 101(a)(15)(U) to seek any other immigration benefit or status for which the alien may be eligible.

(6) DURATION OF STATUS.—The authorized period of status of an alien as a nonimmigrant under section 101(a)(15)(U) shall

be for a period of not more than 4 years, but shall be extended upon certification from a Federal, State, or local law enforcement official, prosecutor, judge, or other Federal, State, or local authority investigating or prosecuting criminal activity described in section 101(a)(15)(U)(iii) that the alien's presence in the United States is required to assist in the investigation or prosecution of such criminal activity. The Secretary of Homeland Security may extend, beyond the 4-year period authorized under this section, the authorized period of status of an alien as a nonimmigrant under section 101(a)(15)(U) if the Secretary determines that an extension of such period is warranted due to exceptional circumstances. Such alien's nonimmigrant status shall be extended beyond the 4-year period authorized under this section if the alien is eligible for relief under section 245(m) and is unable to obtain such relief because regulations have not been issued to implement such section and shall be extended during the pendency of an application for adjustment of status under section 245(m). The Secretary may grant work authorization to any alien who has a pending, bona fide application for nonimmigrant status under section 101(a)(15)(U).

(7) AGE DETERMINATIONS.—

(A) CHILDREN.—An unmarried alien who seeks to accompany, or follow to join, a parent granted status under section 101(a)(15)(U)(i), and who was under 21 years of age on the date on which such parent petitioned for such status, shall continue to be classified as a child for purposes of section 101(a)(15)(U)(ii), if the alien attains 21 years of age after such parent's petition was filed but while it was pending.

(B) PRINCIPAL ALIENS.—An alien described in clause (i) of section 101(a)(15)(U) shall continue to be treated as an alien described in clause (ii)(I) of such section if the alien attains 21 years of age after the alien's application for status under such clause (i) is filed but while it is pending.

(q)(1) In the case of a nonimmigrant described in section 101(a)(15)(V)—

(A) the Attorney General shall authorize the alien to engage in employment in the United States during the period of authorized admission and shall provide the alien with an "employment authorized" endorsement or other appropriate document signifying authorization of employment; and

(B) the period of authorized admission as such a nonimmigrant shall terminate 30 days after the date on which any of the following is denied:

(i) The petition filed under section 204 to accord the alien a status under section 203(a)(2)(A) (or, in the case of a child granted nonimmigrant status based on eligibility to receive a visa under section 203(d), the petition filed to accord the child's parent a status under section 203(a)(2)(A)).

(ii) The alien's application for an immigrant visa pursuant to the approval of such petition.

(iii) The alien's application for adjustment of status under section 245 pursuant to the approval of such petition.

(2) In determining whether an alien is eligible to be admitted to the United States as a nonimmigrant under section 101(a)(15)(V), the grounds for inadmissibility specified in section 212(a)(9)(B) shall not apply.

(3) The status of an alien physically present in the United States may be adjusted by the Attorney General, in the discretion of the Attorney General and under such regulations as the Attorney General may prescribe, to that of a nonimmigrant under section 101(a)(15)(V), if the alien—

(A) applies for such adjustment;

(B) satisfies the requirements of such section; and

(C) is eligible to be admitted to the United States, except in determining such admissibility, the grounds for inadmissibility specified in paragraphs (6)(A), (7), and (9)(B) of section 212(a) shall not apply.

(r)(1) A visa shall not be issued under the provisions of section 101(a)(15)(K)(ii) until the consular officer has received a petition filed in the United States by the spouse of the applying alien and approved by the Attorney General. The petition shall be in such form and contain such information as the Attorney General shall, by regulation, prescribe. Such information shall include information on any criminal convictions of the petitioner for any specified crime described in paragraph (5)(B) and information on any permanent protection or restraining order issued against the petitioner related to any specified crime described in subsection (5)(B)(i).

(2) In the case of an alien seeking admission under section 101(a)(15)(K)(ii) who concluded a marriage with a citizen of the United States outside the United States, the alien shall be considered inadmissible under section 212(a)(7)(B) if the alien is not at the time of application for admission in possession of a valid nonimmigrant visa issued by a consular officer in the foreign state in which the marriage was concluded.

(3) In the case of a nonimmigrant described in section 101(a)(15)(K)(ii), and any child of such a nonimmigrant who was admitted as accompanying, or following to join, such a nonimmigrant, the period of authorized admission shall terminate 30 days after the date on which any of the following is denied:

(A) The petition filed under section 204 to accord the principal alien status under section 201(b)(2)(A)(i).

(B) The principal alien's application for an immigrant visa pursuant to the approval of such petition.

(C) The principal alien's application for adjustment of status under section 245 pursuant to the approval of such petition.

(4)(A) The Secretary of Homeland Security shall create a database for the purpose of tracking multiple visa petitions filed for fiancé(e)s and spouses under clauses (i) and (ii) of section 101(a)(15)(K). Upon approval of a second visa petition under section 101(a)(15)(K) for a fiancé(e) or spouse filed by the same United States citizen petitioner, the petitioner shall be notified by the Secretary that information concerning the petitioner has been entered into the multiple visa petition tracking database. All subsequent fiancé(e) or spouse nonimmigrant visa petitions filed by that petitioner under such section shall be entered in the database.

(B)(i) Once a petitioner has had two fiancé(e) or spousal petitions approved under clause (i) or (ii) of section 101(a)(15)(K), if a subse-

quent petition is filed under such section less than 10 years after the date the first visa petition was filed under such section, the Secretary of Homeland Security shall notify both the petitioner and beneficiary of any such subsequent petition about the number of previously approved fiancé(e) or spousal petitions listed in the database.

(ii) To notify the beneficiary as required by clause (i), the Secretary of Homeland Security shall provide such notice to the Secretary of State for inclusion in the mailing to the beneficiary described in section 833(a)(5)(A)(i) of the International Marriage Broker Regulation Act of 2005 (8 U.S.C. 1375a(a)(5)(A)(i)).

(5) In this subsection:

(A) The terms "domestic violence", "sexual assault", "child abuse and neglect", "dating violence", "elder abuse", and "stalking" have the meaning given such terms in section 3 of the Violence Against Women and Department of Justice Reauthorization Act of 2005.

(B) The term "specified crime" means the following:

(i) Domestic violence, sexual assault, child abuse and neglect, dating violence, elder abuse, stalking, or an attempt to commit any such crime.

(ii) Homicide, murder, manslaughter, rape, abusive sexual contact, sexual exploitation, incest, torture, trafficking, peonage, holding hostage, involuntary servitude, slave trade, kidnapping, abduction, unlawful criminal restraint, false imprisonment, or an attempt to commit any of the crimes described in this clause.

(iii) At least three convictions for crimes relating to a controlled substance or alcohol not arising from a single act.

* * * * * * *

CHANGES IN THE APPLICATION OF EXISTING LAW

Pursuant to clause 3(f)(1)(A) of rule XIII of the Rules of the House of Representatives, the following statements are submitted describing the effect of provisions proposed in the accompanying bill which may be considered, under certain circumstances, to change the application of existing law, either directly or indirectly.

In some instances, the bill provides funding for agencies and activities for which legislation has not yet been finalized. In addition, the bill in some instances carries language permitting the use of funds for activities not authorized by law. Additionally, the Committee includes a number of administrative and general provisions.

## TITLE I—DEPARTMENTAL MANAGEMENT, INTELLIGENCE, SITUATIONAL AWARENESS, AND OVERSIGHT

### OFFICE OF THE SECRETARY AND EXECUTIVE MANAGEMENT

#### OPERATIONS AND SUPPORT

The Committee includes language providing funds for the operations and support of the Office of the Secretary and for the executive management offices, including funds for official reception and

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 474 of 714 PageID #:1524



representation expenses. The Committee provides two-year availability of funds for certain activities.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

The Committee includes language providing funds for procurement, construction, and improvements. The Committee provides three-year availability of funds for these purposes.

## MANAGEMENT DIRECTORATE

OPERATIONS AND SUPPORT

The Committee includes language providing funds for operations and support, including funds for official reception and representation expenses.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

The Committee includes language providing funds for procurement, construction, and improvements. The Committee provides three-year and five-year availability of funds for these purposes.

FEDERAL PROTECTIVE SERVICE

The Committee includes language making funds available until expended for the operations of the Federal Protective Service.

## INTELLIGENCE, ANALYSIS, AND SITUATIONAL AWARENESS

OPERATIONS AND SUPPORT

The Committee includes language providing funds for the Office of Intelligence and Analysis and the Office of Situational Awareness, including funding for facility needs associated with secure space at fusion centers and for official reception and representation expenses. The Committee provides two-year availability of funds for certain activities.

## OFFICE OF INSPECTOR GENERAL

OPERATIONS AND SUPPORT

The Committee includes language providing funds for the Office of Inspector General, including certain confidential operational expenses such as the payment of informants.

## ADMINISTRATIVE PROVISIONS

Language requiring a report on grants or contracts awarded by means other than full and open competition and requiring the Inspector General to review such grants or contracts and report the results to the Committees.

Language requiring the Chief Financial Officer to submit monthly budget and staffing reports.

Language requiring the Secretary to notify the Committees of any proposed transfers from the Department of the Treasury Forfeiture Fund to any DHS component.

Language related to official costs of the Secretary and Deputy Secretary for official travel.

Language requiring the Under Secretary for Management to report on certain acquisition programs.

Language regarding pilot and demonstration programs.

Language prohibiting certain collection of intelligence on U.S. persons.

## TITLE II—SECURITY, ENFORCEMENT, AND INVESTIGATIONS

### U.S. Customs and Border Protection

#### OPERATIONS AND SUPPORT

The Committee includes language making funds available for operations and support, including funds for the transportation of unaccompanied alien minors; air and marine assistance to other law enforcement agencies and humanitarian efforts; purchase or lease of vehicles; the purchase, maintenance, and procurement of marine vessels, aircraft, and unmanned aircraft systems; contracting with individuals for personal services abroad; Harbor Maintenance Fee collections; customs officers; official reception and representation expenses; Customs User Fee collections; payment of rental space in connection with preclearance operations; compensation of informants; and the repair of roads on Native American reservations. The Committee provides two-year availability of funds for certain activities.

#### PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

The Committee includes language providing funds for procurement, construction, and improvements, including procurement of marine vessels, aircraft, and unmanned aerial systems. The Committee provides three-year availability of funds for these activities.

### U.S. Immigration and Customs Enforcement

#### OPERATIONS AND SUPPORT

The Committee includes language providing funds for operations and support, including funds for overseas vetted units; the purchase or lease of vehicles; maintenance, minor construction, and minor improvements of owned and leased facilities; the enforcement of child labor laws; paid apprenticeships for the Human Exploitation Rescue Operations Corps; the investigation of intellectual property rights violations; official reception and representation expenses special operations; compensation to informants; and the reimbursement of other Federal agencies for certain costs. The Committee specifies a funding level for enforcement and removal operations, including transportation of unaccompanied minor aliens; the delegation of 287(g) agreements; and detention beds. The Committee provides two-year availability and no-year availability of funds for certain activities.

#### PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

The Committee includes language providing funds for procurement, construction, renovation, and improvements to include funds for facilities repair and maintenance projects. The Committee pro-

vides three-year and five-year availability of funds for these activities.

## Transportation Security Administration

### OPERATIONS AND SUPPORT

The Committee includes language providing funds for operations and support, including funds for official reception and representation expenses, and establishes conditions under which security fees are collected and credited. The Committee provides for two-year availability of funds for certain activities.

### PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

The Committee includes language providing funds for procurement, construction, and improvements. The Committee provides three-year availability of funds for these activities.

### RESEARCH AND DEVELOPMENT

The Committee includes language providing funds for research and development. The Committee provides two-year availability of funds for these activities.

## Coast Guard

### OPERATIONS AND SUPPORT

The Committee includes language providing funds for the operations and support including for the purchase or lease of passenger motor vehicles; small boats; repairs and service life-replacements; purchase, lease, or improvement of boats necessary for overseas deployments and activities; special pay allowances; recreation and welfare; environmental compliance and restoration; defense-related activities and official reception and representation expenses. The Committee includes language authorizing funds to be derived from the Oil Spill Liability Trust Fund. The Committee provides two-year, three-year, and five-year availability of funds for certain activities.

### PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

The Committee includes language providing funds for the procurement, construction, and improvements, including aids to navigation, shore facilities, vessels, and aircraft. The Committee includes language authorizing funds to be derived from the Oil Spill Liability Trust Fund. The Committee provides five-year availability of funds for these purposes.

### RESEARCH AND DEVELOPMENT

The Committee includes language providing funds for research and development, and for maintenance, rehabilitation, lease, and operation of related facilities and equipment. The Committee includes language authorizing funds to be derived from the Oil Spill Liability Trust Fund, and authorizing funds received from state and local governments, other public authorities, private sources, and foreign countries to be credited to this account and used for

certain purposes. The Committee provides three-year availability of funds for these purposes.

### RETIRED PAY

The Committee includes language providing funds for retired pay and medical care for the retired personnel and their dependents and makes these funds available until expended.

## UNITED STATES SECRET SERVICE

### OPERATIONS AND SUPPORT

The Committee includes language that provides funds for operations and support, to include funds for the purchase and replacement of vehicles; hire of passenger motor vehicles and aircraft; purchase of motorcycles; rental of certain buildings; improvements to buildings as may be necessary for protective missions; firearms matches; presentation of awards; behavioral research; advance payment for commercial accommodations; per diem and subsistence allowances; official reception and representation expenses; grant activities related to missing and exploited children investigations; premium pay; and technical assistance and equipment provided to foreign law enforcement organizations. The Committee provides for two-year availability of funds for certain activities.

### PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

The Committee includes language providing funds for procurement, construction, and improvements. The Committee provides three-year and five-year availability of funds for these purposes.

### RESEARCH AND DEVELOPMENT

The Committee includes language providing funds for research and development. The Committee provides two-year availability of funds for these purposes.

## ADMINISTRATIVE PROVISIONS

Language regarding overtime compensation.

Language allowing CBP to sustain or increase operations in Puerto Rico and the U.S. Virgin Islands with appropriated funds.

Language regarding the availability of fee revenue collected from certain arriving passengers.

Language allowing CBP access to certain reimbursements for preclearance activities.

Language regarding the importation of prescription drugs by an individual for personal use.

Language regarding waivers of the Jones Act.

Language prohibiting DHS from establishing a border crossing fee.

Language prohibiting the obligation of funds prior to the submission of an expenditure plan for funds made available for “U.S. Customs and Border Protection—Procurement, Construction, and Improvements”.

Language prohibiting the construction of border security barriers in specified areas.

Language regarding vetting operations at existing locations.

Language regarding the use of funds provided under the heading "U.S. Customs and Border Protection—Procurement, Construction, and Improvements".

Language prohibiting the admission of international students with certain visas if certain institutions are not accredited.

Language regarding parole of Chinese nationals into the Commonwealth of the Northern Marianas.

Language regarding certain drones from foreign adversary countries.

Language prohibiting the use of funds to reduce participation in the 287(g) program.

Language prohibiting the use of funds for the 287(g) program if the terms of the agreement governing the delegation of authority have been materially violated.

Language prohibiting the use of funds to contract for detention services if the facility receives less than "adequate" ratings in two consecutive performance evaluations.

Language regarding the reprogramming of funds related to the detention of aliens.

Language requiring ICE to provide statistics about its detention population.

Language regarding previous reporting requirements.

Language prohibiting the transportation of aliens into the interior of the United States for purposes other than enforcement.

Language prohibiting the provision of abortion services, with limited exceptions, for ICE detainees.

Language prohibiting the provision of gender-affirming care for ICE detainees.

Language requiring the Secretary to make certain prioritizations and ensure every alien enrolled in an Alternatives to Detention program is equipped with mandatory GPS monitoring.

Language regarding ICE obligation plans.

Language regarding physical identification cards for aliens.

Language establishing the minimum rate of allowance paid to certain ICE detainees.

Language regarding inspection parameters of certain ICE detention facilities.

Language regarding ICE's international presence.

Language clarifying that certain elected and appointed officials are not exempt from Federal passenger and baggage screening.

Language authorizing TSA to use funds from the Aviation Security Capital Fund for the procurement and installation of explosives detection systems or for other purposes authorized by law.

Language requiring a report from TSA on the agency's investment plans.

Language amending Section 515 of Public Law 108–334.

Language prohibiting funds made available under the heading "Coast Guard—Operations and Support" for recreational vessel inspection expenses, except to the extent fees are collected from owners of yachts and credited to this appropriation.

Language requiring the Coast Guard to submit a future-years capital investment plan.

Language allowing for the use of the Coast Guard Housing Fund.

Language prohibiting funds made available to the Coast Guard from being used to enforce National Oceanic and Atmospheric Ad-

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 479 of 714 PageID #:1529



ministration restrictions on vessel speed for the North Atlantic right whale and Rice's whale.

Language allowing the Secret Service to obligate funds in anticipation of reimbursement for personnel receiving training.

Language prohibiting funds made available to the Secret Service for the protection of the head of a federal agency other than the Secretary of Homeland Security, except when the Director has entered into a reimbursable agreement for such protection services.

Language permitting up to $15,000,000 to be reprogrammed within "United States Secret Service—Operations and Support".

Language allowing funds made available for "United States Secret Service—Operations and Support" to be available for travel of employees on protective missions without regard to limitations on such expenditures.

Language regarding the treatment of certain individuals in CBP custody.

Language prohibiting funds from detaining or deporting U.S. citizens.

## TITLE III—PROTECTION, PREPAREDNESS, RESPONSE, AND RECOVERY

### CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY

#### OPERATIONS AND SUPPORT

The Committee includes language providing funds for operations and support, including funds for official reception and representation expenses. The Committee provides for two-year availability of funds for certain activities.

#### PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

The Committee includes language providing funds for procurement, construction, and improvements. The Committee provides three-year availability of funds for these purposes.

### FEDERAL EMERGENCY MANAGEMENT AGENCY

#### OPERATIONS AND SUPPORT

The Committee includes language providing funds for operations and support, including funds for official reception and representation expenses.

#### PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

The Committee includes language providing funds for procurement, construction, and improvements. The Committee provides three- and five-year availability of funds for these purposes.

#### FEDERAL ASSISTANCE

The Committee includes language providing funds for grants, contracts, cooperative agreements, and other activities, including for terrorism prevention; nonprofit organizations; public transportation security, including buses and railroads; port security; firefighter assistance; emergency management; flood hazard mapping and risk analysis; catastrophic preparedness, emergency food and shelter; warning systems; community project grants; education,

training, exercises, and technical assistance; and other programs. The Committee provides two-year availability of funds for certain purposes.

### DISASTER RELIEF FUND

The Committee includes language making funds available until expended for the Disaster Relief Fund.

### NATIONAL FLOOD INSURANCE FUND

The Committee includes language making funds available for mission support associated with flood management and programs and activities under the National Flood Insurance Fund, including flood plain management and flood mapping. The Committee includes provisions making funds available for interest on Treasury borrowings and limiting amounts available for operating expenses, commissions and taxes of agents, and flood mitigation activities associated with the National Flood Insurance Act of 1968. The Committee includes language permitting additional fees collected to be credited as an offsetting collection and available for floodplain management; providing that not to exceed four percent of the total appropriation is available for administrative costs; and making funds available for the Flood Insurance Advocate.

### ADMINISTRATIVE PROVISIONS

Language regarding CISA cybersecurity threat feeds.

Language related to the administration of FEMA grants.

Language specifying timeframes for certain FEMA grant applications and awards.

Language requiring a five-day advance notification prior to the announcement of certain grant awards under "Federal Emergency Management Agency—Federal Assistance".

Language addressing the use of certain grant funds for the installation of communications towers.

Language requiring the submission of a monthly Disaster Relief Fund report.

Language permitting the FEMA Administrator to grant waivers from specified requirements of section 34 of the Federal Fire Prevention and Control Act of 1974.

Language providing for the receipt and expenditure of fees collected for the Radiological Emergency Preparedness Program.

Language permitting the FEMA Administrator to grant waivers from specified requirements of section 33 of the Federal Fire Prevention and Control Act of 1974.

Language related to the FEMA Pre-Disaster Mitigation Fund.

Language related to the FEMA Flood Hazard Mapping and Risk Analysis Program.

Language amending BRIC Program requirements.

## TITLE IV—RESEARCH, DEVELOPMENT, TRAINING, AND SERVICES

### U.S. Citizenship and Immigration Services

#### operations and support

The Committee includes language making funds available for operations and support for the E-Verify program.

### Federal Law Enforcement Training Centers

#### operations and support

The Committee includes language making funds available for operations and support, including for official reception and representation expenses and purchase of police-type vehicles. The Committee provides two-year availability of funds for certain activities.

#### procurement, construction, and improvements

The Committee includes language providing funds for procurement, construction, and improvements to include acquisition of necessary additional real property and facilities, construction and ongoing maintenance, facility improvements and related expenses. The Committee provides five-year availability of funds for these activities.

### Science and Technology Directorate

#### operations and support

The Committee includes language providing funds for operations and support, including the purchase or lease of vehicles and official reception and representation expenses. The Committee provides two-year availability of funds for certain activities.

#### procurement, construction, and improvements

The Committee includes language providing funds for procurement, construction, and improvements. The Committee provides five-year availability of funds for these activities.

#### research and development

The Committee includes language providing funds for research and development. The Committee provides three-year availability of funds for these activities.

### Administrative Provisions

Language allowing USCIS to acquire, operate, equip, and dispose of up to five vehicles under certain scenarios.

Language limiting the use of A–76 competitions by USCIS.

Language prohibiting the use of funds to provide employment authorization documents for certain aliens.

Language related to USCIS official reception and representation expenses.

Language related to H–1B petitioners from entities identified under section 1260H of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021.

Language authorizing FLETC to distribute funds for incurred training expenses.

Language directing the FLETC Accreditation Board to lead the Federal law enforcement training accreditation process for measuring and assessing Federal law enforcement training programs, facilities, and instructors.

Language allowing FLETC to accept transfers from other government agencies for the construction of special use facilities.

Language classifying FLETC instructor staff as inherently governmental for certain purposes.

Language prohibiting the use of funds by USCIS to collect an Asylum Program Fee.

Language regarding credible fear standards for asylum claims.

Language related to eligibility for certain asylum claims.

Language regarding H–2B visas.

Language regarding H–2A visas.

Language prohibiting the use of funds for implementation of a Final Rule related to the H–2 program.

Language regarding certain visas.

## TITLE V—GENERAL PROVISIONS

Language limiting the availability of appropriations to one year unless otherwise expressly provided.

Language providing authority to merge unexpended balances of prior year appropriations with new appropriations accounts for the same purpose.

Language limiting reprogramming authority and providing limited transfer authority.

Language prohibiting funds appropriated or otherwise made available to the Department to make payment to the working capital fund, except for activities and amounts proposed in the President's budget request.

Language providing authority regarding the availability and uses of prior year balances for Operations and Support accounts.

Language deeming intelligence activities to be specifically authorized during the fiscal year until the enactment of an act authorizing intelligence activities for that year.

Language requiring notification to the Committees at least three days before DHS announces or executes grant allocations, grant awards, contract awards (including contracts covered by the Federal Acquisition Regulation), other transaction agreements, letters of intent, or a task or delivery order on multiple award contracts, or sole-source grant awards.

Language prohibiting all agencies from purchasing, constructing, or leasing additional facilities for Federal law enforcement training without advance notification to the Committees.

Language prohibiting the use of funds for any construction, repair, alteration, or acquisition project for which a prospectus, if required under chapter 33 of title 40, United States Code, has not been approved.

Language related to sensitive security information and the use of funds in conformance with section 303 of the Energy Policy Act of 1992.

Language prohibiting the use of funds in contravention of the Buy American Act.

Language prohibiting the use of funds to amend the oath of allegiance required by section 337 of the Immigration and Nationality Act.

Language regarding reorganization authority.

Language prohibiting the use of funds for planning, testing, piloting, or developing a national identification card.

Language directing that any official required by this Act to report or certify to the Committees may not delegate such authority unless expressly authorized to do so.

Language prohibiting the use of funds from being used for first-class travel.

Language prohibiting the use of funds to employ workers described in section 274A(h)(3) of the Immigration and Nationality Act.

Language prohibiting the use of funds to pay award or incentive fees for contractors with a below satisfactory performance or a performance that fails to meet the basic requirements of the contract.

Language requiring that DHS computer systems block electronic access to pornography, except for law enforcement purposes.

Language regarding the transfer of firearms by Federal law enforcement personnel.

Language regarding funding restrictions and reporting requirements related to conferences occurring outside of the United States.

Language prohibiting funds to reimburse any federal department or agency for its participation in a National Special Security Event.

Language requiring a notification, including justification materials, prior to implementing any structural pay reform or introducing any new position classification that affects more than 100 full-time positions or costs more than $5,000,000.

Language directing the Department to post reports required by the Committees on a public website unless public posting compromises homeland or national security or contains proprietary information.

Language authorizing minor procurement, construction, and improvement activities using Operations and Support appropriations, as specified.

Language authorizing DHS to use discretionary appropriations for the primary and secondary schooling of eligible dependents of DHS personnel stationed in areas of U.S. territories that meet certain criteria.

Language prohibiting the use of funds to limit access to detention facilities by members of Congress or their designated staff.

Language prohibiting the use of funds to use restraints on pregnant detainees in DHS custody except in certain circumstances.

Language prohibiting the use of funds for the destruction of records related to detainees in custody.

Language continuing by reference a prohibition on the use of funds for a Principal Federal Official during a declared disaster or emergency under the Stafford Act, with certain exceptions.

Language requiring the Under Secretary for Management to submit a component-level report on unfunded priorities for which appropriated funds would be classified as budget function 050.

Language requiring notifications when the President designates a former or retired Federal official or employee for protection and requiring reporting on the costs of such protection.

Language requiring notifications and reporting on DHS submissions of proposals to the Technology Modernization Fund.

Language relating to DHS budget submission requirements regarding user fees and offsets.

Language relating to the Arms Trade Treaty.

Language prohibiting the use of funds related to certain entities identified under section 1260H of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021.

Language prohibiting the use of funds for the transfer or release of individuals detained at United States Naval Station, Guantanamo Bay, Cuba, into or within the United States.

Language requiring the Secretary of Homeland Security on a bimonthly basis to provide estimates of the number of aliens anticipated to arrive at the southern border of the United States.

Language regarding requests for assistance from the Department of Defense.

Language regarding the employee emergency back-up care program.

Language regarding transfer authority for certain activities.

Language prohibiting the use of funds for a Disinformation Governance Board.

Language prohibiting the use of funds to classify the speech of a U.S. citizen as mis-, dis-, or mal-information, or work with organizations to do the same.

Language prohibiting the use of funds to discriminate against a person based on sincerely-held religious beliefs regarding marriage.

Language prohibiting the obligation or award of funds to certain jurisdictions.

Language prohibiting funds to be used to implement Diversity, Equity, and Inclusion, or to promote critical race theory.

Language prohibiting the use of funds for the purchase of computers, printers or teleconferencing equipment from companies based in the People's Republic of China.

Language related to Presidential Residence Protection grants.

Language prohibiting the use of funds in contravention of certain Amendments of the Constitution.

Language regarding the recording of federal law enforcement.

Language regarding a Spending Reduction Account.

## APPROPRIATIONS NOT AUTHORIZED BY LAW

Pursuant to clause 3(f)(1) of rule XIII of the Rules of the House of Representatives, the following table lists the appropriations in the accompanying bill that are not authorized by law:

FY 2026 SCHEDULE OF UNAUTHORIZED APPROPRIATIONS

[Gross Discretionary—Dollars in thousands]

| Agency/Program | Last Year of Authorization | Authorized Level | Appropriation in Last Year of Authorization | Appropriations in this bill |
|---|---|---|---|---|
| Customs and Border Protection, Operations and Support | [1] 2004 | [2] $3,083,259 | [3] $4,396,750 | [4] $18,088,596 |
| Customs and Border Protection, International Cargo Screening | [5] 2010 | $153,300 | $162,000 | [6] $4,708,268 |
| Customs and Border Protection, Customs-Trade Partnership Against Terrorism (C–TPAT) | [7] 2010/2012 | $75,600/$21,000 | [8] $62,612/$44,979 | [9] $4,508,543 |
| Customs and Border Protection, Automated Targeting Systems | [10] 2010 | $37,485 | $34,560 | [11] $315,112 |
| Customs and Border Protection, Automated Commercial Environment | [12] 2018 | $153,736 | N/A | [13] $498,696 |
| Customs and Border Protection, Air and Marine Interdiction, Operations, Maintenance, and Procurement | [14] 2004 | $175,100 | $240,200 | [15] $419,289 |
| Immigration and Customs Enforcement, Operations and Support | [16] 2003/[17] 2004 | $4,131,811/$1,399,592 | [18] $3,032,094/[19] N/A | [20] $10,967,045 |
| Transportation Security Administration, Operations and Support | [21] 2021 | $7,917,936 | $7,793,715 | [22] $7,348,064 |
| Transportation Security Administration, EDS/ETD Systems | [23] 2011 | $400,000 | $110,100 | [24] $258,230 |
| Transportation Security Administration, Surface Transportation Security, National Explosives Detection Canine Team Program | [25] 2021 | Such sums | $169,513 | $169,001 |
| Transportation Security Administration, Transportation Threat Assessment and Credentialing | [26] 2005 | Such sums | [27] $115,000 | [28] $122,205 |
| Transportation Security Administration, Federal Air Marshal Service | [29] 2007 | $83,000 | $764,643 | [30] $660,340 |
| Transportation Security Administration Law Enforcement Officer Reimbursement Program | [31] 2021 | $55,000 | $46,392 | [32] $50,000 |
| Coast Guard, Operations and Support | [33] 2023 | $10,750,000 | $9,700,478 | $10,802,656 |
| Coast Guard, Procurement, Construction, and Improvements | [33] 2023 | $3,477,600 | $1,669,650 | $1,946,790 |
| Coast Guard, Research and Development | [33] 2023 | $14,681 | $7,476 | $7,476 |
| Countering Weapons of Mass Destruction Office | [34] 2023 | N/A | $409,441 | $0 |
| Cybersecurity and Infrastructure Security Agency, Operations and Support | [35] 2012 | Such sums | [36] $888,243 | [37] $2,237,159 |
| FEMA, Salaries and Expenses | [38] 2010 | $375,342 | $797,650 | [39] $1,474,420 |
| FEMA, Integrated Public Alert and Warning System (IPAWS) | [40] 2018 | Such sums | N/A | $70,697 |
| FEMA, State and Local Programs | | | | |
| Port Security Grants | [41] 2013 | $400,000 | $250,000 | $100,000 |
| Non-Profit Security Grants | [42] 2024 | $75,000 | [43] $274,500 | $335,000 |
| Public Transportation Security Grants | [44] 2011 | $1,108,000 | $250,000 | $94,500 |
| Amtrak Security | [45] 2011 | $175,000 | $20,000 | $9,000 |
| Over the Road Bus Security | [46] 2011 | $25,000 | $5,000 | $1,000 |
| National Domestic Preparedness Consortium | [47] 2011 | $219,000 | N/A | $101,000 |
| Center for Domestic Preparedness | [46] 2011 | $66,000 | N/A | $71,421 |
| FEMA, Urban Search and Rescue Response System | [48] 2008 | $45,000 | $36,700 | $56,000 |
| FEMA, Emergency Management Performance Grants | [49] 2022 | $950,000 | $355,000 | $355,000 |
| FEMA, Emergency Food and Shelter | [50] 1994 | $188,000 | N/A | $105,300 |
| FEMA, National Flood Mapping Program | [51] 2017 | $400,000 | [52] $168,363 | $312,750 |
| Immigration and Naturalization Service, Citizenship and Benefits, Immigration Support and Program Direction | [53] 2002 | $631,745 | [54] $631,745 | [55] $0 |

FY 2026 SCHEDULE OF UNAUTHORIZED APPROPRIATIONS—Continued

[Gross Discretionary—Dollars in thousands]

| Agency/Program | Last Year of Authorization | Authorized Level | Appropriation in Last Year of Authorization | Appropriations in this bill |
|---|---|---|---|---|
| Federal Law Enforcement Training Center, Salaries and Expenses | [56] 1988 | $50,000 | [57] $40,265 | [58] $364,000 |

[1] P.L. 107–210, Sec. 311.
[2] P.L. 107–210 authorized what was formerly U.S. Customs Service (does not include Border Patrol).
[3] U.S. Customs Service operations only (does not include Border Patrol).
[4] Funding recommended for fiscal year 2026 is for the U.S. Customs and Border Protection, Operations and Support appropriation. This is not a true comparison to the legacy ''Salaries and Expenses'' appropriation.
[5] P.L. 109–347, Sec. 205(m).
[6] Funding recommended for fiscal year 2026 is for the ''Domestic Operations'' and ''International Operations'' sub-PPAs within the ''Trade and Travel Operations'' PPA. This is not a true comparison to the legacy ''International Cargo Screening'' PPA.
[7] P.L. 109–347, Sec. 223(a) authorized operations for fiscal year 2010 and personnel through fiscal year 2012.
[8] Funding provided for fiscal year 2010 and for fiscal year 2012 include personnel and operations.
[9] This is not a true comparison to the legacy ''Customs-Trade Partnership Against Terrorism (C–TPAT)'' PPA. These funds have been realigned to the ''Domestic Operations'' sub-PPA within the ''Trade and Travel Operations'' PPA.
[10] P.L. 109–347, Sec. 203(g).
[11] This is not a true comparison to the legacy ''Automated Targeting Systems'' PPA. These funds have been realigned to the ''Targeting Operations'' sub-PPA within the ''Trade and Travel Operations'' PPA.
[12] P.L. 114–125, Sec. 106 requires that funding shall not be less than this amount.
[13] This is not a true comparison to the legacy ''Automated Commercial Environment'' PPA; however, the preponderance of these funds were realigned into the ''Office of Trade'' sub-PPA within the ''Trade and Travel Operations'' PPA.
[14] P.L. 107–210, Sec. 311.
[15] These funds have been realigned to the ''Air and Marine Operations'' sub-PPA that exists within the ''Integrated Operations'' PPA.
[16] Immigration and Naturalization Service—some investigations, and detention and removals only, P.L. 107–273, Sec. 102(11).
[17] Customs Service noncommercial operations, P.L. 107–210, Sec. 311(a) (19 U.S.C. 2075(b)(1)).
[18] Includes $2,862,094,000 from fiscal year 2003 Immigration and Naturalization Service—Salaries and Expenses, P.L. 108–7, and $170,000,000 included in the fiscal year 2003 Wartime Supplemental Appropriations Act, P.L. 108–11.
[19] There was no fiscal year 2004 appropriation for the U.S. Customs Service.
[20] Funding recommended for fiscal year 2026 is for U. S. Immigration and Customs Enforcement, Operations and Support. This is not a true comparison to the legacy ''Salaries and Expenses'' appropriation.
[21] P.L. 115–254 Sec. 1903 Reauthorized TSA Activities for ''salaries, operations and maintenance'', but did not specifically authorize the current account structure. construction and improvements.
[22] Recommended funding is the total for TSA ''Operations and Support'' appropriation.
[23] P.L. 108–458, Sec. 4019.
[24] These funds have been realigned to the ''Aviation Screening Infrastructure'' PPA within the ''Procurement, Construction, and Improvements'' appropriation and to the ''Research and Development'' appropriation.
[25] P.L. 115–254, Sec. 1971.
[26] P.L. 107–71, Sec. 101.
[27] Includes the Maritime and Land Security PPA and Credentialing Activities PPA.
[28] Funding recommended for fiscal year 2026 is for the ''Other Operations and Enforcement, Vetting Programs'' and ''Other Operations and Enforcement, Intelligence and TSOC'' sub-PPAs within the ''Operations and Support'' appropriation, and the ''Infrastructure for Other Operations, Vetting Programs'' sub-PPA within the Procurement, Construction, and Improvements appropriation.
[29] P.L. 108–458, Sec. 4016.
[30] Funding for the Federal Air Marshals Service is in the ''Other Operations and Enforcement, In-Flight Security'' sub-PPA. The recommended funding level is for that sub-PPA.
[31] P.L. 115–254, Sec. 1935.
[32] Funding for LEO Reimbursement Program is in the ''Other Operations and Enforcement, Aviation Regulation'' sub-PPA. The recommended funding is for the non-pay portion of the Law Enforcement and Assessment program.
[33] P.L. 117–263, Sec. 11101.
[34] P.L. 115–387, Sec. 2; 6 U.S.C. 591(e). No specific funding authorization, but the office statutorily terminates on December 21, 2023.
[35] Critical infrastructure protection, cybersecurity, and other related programs, P.L. 110–53, Sec. 541 (note, the ''National Protection and Programs Directorate'' is now known as the ''Cybersecurity and Infrastructure Security Agency'', as authorized in P.L. 115–278, Sec. 2 (6 U.S.C. 651 et. seq.)).
[36] Infrastructure Protection and Information Security activities in P.L. 112–74.
[37] Represents funding that would traditionally be categorized as defense that is recommended for the Cybersecurity and Infrastructure Security Agency.
[38] P.L. 109–295, Sec. 699.
[39] Funding recommended for fiscal year 2025 is for Federal Emergency Management Agency, Operations and Support. This is not a true comparison to the legacy ''Salaries and Expenses'' appropriation.
[40] P.L. 114–143, Sec. 2(c).

[41] P.L. 111–281, Sec. 828(b)(4).
[42] P.L. 116–108, Sec. 2.
[43] P.L. 118–47.
[44] P.L. 110–53, Sec. 1406(m).
[45] P.L. 110–53, Sec. 1514(d).
[46] 6 U.S.C. 1182.
[47] P.L. 110–53, Sec. 1204; 6 U.S.C. 1102.
[48] P.L. 109–295, Sec. 634; 6 U.S.C. 722.
[49] P.L. 115–254, Sec. 1217(b); 6 U.S.C. 762(f).
[50] P.L. 102–550, Sec. 1431.
[51] P.L. 112–141, Sec. 100216.
[52] P.L. 115–31.
[53] P.L. 107–273, Div. A., Sec. 101(12)(B), ''for salaries and expenses of citizenship and benefits''.
[54] P.L. 107–77, see also, H. Rept. 107–278 (the accompanying conference report).
[55] Represents funding for the Citizenship and Integration Grant Program within discretionary funds for U.S. Citizenship and Immigration Services. This is not a true comparison to the legacy funding.
[56] P.L. 100–690, Sec. 6164.
[57] P.L. 101–509.
[58] Funding recommended for fiscal year 2026 is for the Federal Law Enforcement Training Centers, Operations and Support appropriation. This is not a true comparison to the legacy ''Salaries and Expenses'' appropriation.

BUDGETARY IMPACT OF THE FY 2025 DEPARTMENT OF HOMELAND SECURITY APPROPRIATIONS BILL PREPARED IN CONSULTATION WITH THE CONGRESSIONAL BUDGET OFFICE PURSUANT TO SECTION 308(a) OF THE CONGRESSIONAL BUDGET ACT OF 1974

[In millions of dollars]

COMPARISON WITH BUDGET RESOLUTION

Pursuant to clause 3(c)(2) of rule XIII of the Rules of the House of Representatives and section 308(a)(1)(A) of the Congressional Budget Act of 1974, the following table compares the levels of new budget authority provided in the bill with the appropriate allocation under section 302(b) of the Budget Act.

[In millions of dollars]

| | 302(b) Allocation | | This Bill | |
|---|---|---|---|---|
| | Budget Authority | Outlays | Budget Authority | Outlays |
| Comparison of amounts in the bill with Committee allocations to its subcommittees: Subcommittee on Homeland Security: | | | | |
| Discretionary | 66,361 | | 92,835 | 101,364 |
| Mandatory | | | 1,249 | 1,249 |

[1] Includes outlays from prior-year budget authority.

NOTE.—The bill reported to the House contains an additional $26,474 million in discretionary budget authority and $2,912 million in associated outlays for those recommended amounts, which are designated as disaster relief funding. Pursuant to section 251(b)(2) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended by the Fiscal Responsibility Act of 2023 (P.L. 118–5), these amounts are considered adjustmentsto the discretionary spending limits.

FIVE-YEAR OUTLAY PROJECTIONS

Pursuant to clause 3(c)(2) of rule XIII and section 308(a)(1)(B) of the Congressional Budget Act of 1974, the following table contains five-year projections associated with the budget authority provided in the accompanying bill as provided to the Committee by the Congressional Budget Office.

[In millions of dollars]

| | Outlays |
|---|---|
| Projection of outlays associated with the recommendation: | |
| 2026 | [1] 47,854 |
| 2027 | 18,248 |
| 2028 | 10,758 |
| 2029 | 4,985 |
| 2030 and future years | 9,752 |

[1] Excludes outlays from prior-year budget authority.

FINANCIAL ASSISTANCE TO STATE AND LOCAL GOVERNMENTS

Pursuant to clause 3(c)(2) of rule XIII and section 308(a)(1)(C) of the Congressional Budget Act of 1974, the Congressional Budget Office has provided the following estimates of new budget authority and outlays provided by the accompanying bill for financial assistance to State and local governments.

[In millions of dollars]

| | Budget Authority | Outlays |
|---|---|---|
| Financial assistance to State and local governments for 2025 | 16,918 | 1,763 |

[1] Excludes outlays from prior-year budget authority.

## PROGRAM DUPLICATION

No provision of this bill establishes or reauthorizes a program of the Federal Government know to be duplicative of another Federal program, a program that was included in any report from the Government Accountability Office to Congress pursuant to section 21 of Public Law 111–139, or a program identified in the most recent Catalog of Federal Domestic Assistance.

## COMMITTEE HEARINGS

For the purposes of clause 3(c)(6) of rule XIII of the Rules of the House of Representatives, the following hearings were used to develop or consider the Department of Homeland Security Appropriations Act, 2026:

The Subcommittee on Homeland Security held a hearing on April 9, 2025, entitled "Member Day." The Subcommittee received testimony from:

The Honorable Sylvia R. Garcia (TX–29)

The Honorable Laura A. Gillen (NY–04)

The Honorable Jared E. Moskowitz (FL–23)

The Honorable Jefferson H. Van Drew (NJ–02)

The Subcommittee on Homeland Security held a hearing on May 6, 2025, entitled "Oversight Hearing—Department of Homeland Security." The Subcommittee received testimony from:

The Honorable Kristi Noem, Secretary, U.S. Department of Homeland Security

The Subcommittee on Homeland Security held a hearing on May 7, 2025, entitled "Oversight Hearing—The Federal Emergency Management Agency."

The Subcommittee received testimony from:

Cameron Hamilton, Senior Official Performing the Duties of the Administrator, Federal Emergency Management Agency

The Subcommittee on Homeland Security held a hearing on May 8, 2025, entitled "Oversight Hearing—The Cybersecurity and Infrastructure Security Agency." The Subcommittee received testimony from:

Bridget Bean, Senior Official Performing the Duties of the Director, Cybersecurity and Infrastructure Security Agency

The Subcommittee on Homeland Security held a hearing on May 14, 2025, entitled "Oversight Hearing—U.S. Immigration and Customs Enforcement." The Subcommittee received testimony from:

Todd M. Lyons, Acting Director, U.S. Immigration and Customs Enforcement

The Subcommittee on Homeland Security held a hearing on May 14, 2025, entitled "Oversight Hearing—The United States Coast Guard." The Subcommittee received testimony from:

Admiral Kevin E. Lunday, Acting Commandant, United States Coast Guard

The Subcommittee on Homeland Security held a hearing on May 15, 2025, entitled "Oversight Hearing—U.S. Customs and Border Protection." The Subcommittee received testimony from:

Pete R. Flores, Acting Commissioner, U.S. Customs and Border Protection

The Subcommittee on Homeland Security held a hearing on May 20, 2025, entitled "Oversight Hearing—The Transportation Security Administration." The Subcommittee received testimony from:

Ha Nguyen McNeill, Acting Administrator, Transportation Security Administration

DETAILED EXPLANATIONS IN REPORT

The following table contains detailed funding recommendations at the program, project, and activity (PPA) level.

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| DEPARTMENT OF HOMELAND SECURITY | | | |
| TITLE I - DEPARTMENTAL MANAGEMENT, INTELLIGENCE, SITUATIONAL AWARENESS, AND OVERSIGHT | | | |
| Office of the Secretary and Executive Management | | | |
| Operations and Support: | | | |
| Management and Oversight: | | | |
| Office of the Secretary | 54,381 | 17,035 | -37,346 |
| Office of Public Affairs | 11,125 | --- | -11,125 |
| Office of Legislative Affairs | 7,132 | --- | -7,132 |
| Office of General Counsel | 30,667 | 27,737 | -2,930 |
| Office of Health Security | 62,647 | 92,962 | +30,315 |
| Privacy Office | 18,854 | 19,236 | +382 |
| Subtotal, Management and Oversight | 184,806 | 156,970 | -27,836 |
| Office of Strategy, Policy, and Plans | 85,735 | 78,192 | -7,543 |
| Operations and Engagement: | | | |
| Office for Civil Rights and Civil Liberties | 42,964 | 4,969 | -37,995 |
| Office of the Citizenship and Immigration Services Ombudsman | 11,597 | 1,663 | -9,934 |
| Office of the Immigration Detention Ombudsman | 28,641 | --- | -28,641 |
| Office of Partnership and Engagement | 9,839 | 9,436 | -403 |
| Subtotal, Operations and Engagement | 93,041 | 16,068 | -76,973 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| Full Committee Amendment | --- | -5,000 | -5,000 |
| Subtotal, Operations and Support | 363,582 | 246,230 | -117,352 |
| Procurement, Construction, and Improvements: | | | |
| Medical Information Exchange | 8,113 | 8,113 | --- |
| Federal Assistance: | | | |
| Office of Strategy, Policy, and Plans: | | | |
| Targeted Violence and Terrorism Prevention Grants | 18,000 | --- | -18,000 |
| Office for Civil Rights and Civil Liberties: | | | |
| ATD Case Management Grant Program | 15,000 | --- | -15,000 |
| Subtotal, Federal Assistance | 33,000 | --- | -33,000 |
| FEMA Assistance Grants (transfer out) | (-33,000) | --- | (+33,000) |
| Total, Office of the Secretary and Executive Management | 404,695 | 254,343 | -150,352 |
| (transfer out) | -33,000 | --- | +33,000 |
| Total, Office of the Secretary and Executive Management (including transfer) | 371,695 | 254,343 | -117,352 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| **Management Directorate** | | | |
| Operations and Support: | | | |
| Immediate Office of the Under Secretary for Management | 6,785 | 7,053 | +268 |
| Office of the Chief Readiness Support Officer | 231,526 | 231,434 | -92 |
| Office of the Chief Human Capital Officer | 150,490 | 139,885 | -10,605 |
| Office of the Chief Security Officer | 202,880 | 206,988 | +4,108 |
| Office of the Chief Procurement Officer | 95,953 | 116,670 | +20,717 |
| Office of the Chief Financial Officer | 118,018 | 120,368 | +2,350 |
| Office of the Chief Information Officer | 627,854 | 611,776 | -16,078 |
| Office of Program Accountability and Risk Management | 18,245 | 16,593 | -1,652 |
| Office of Biometric Identity Management: | | | |
| Identity and Screening Program Operations | 270,453 | 271,742 | +1,289 |
| Full Committee Amendments | --- | -74,000 | -74,000 |
| Subtotal, Operations and Support | 1,722,204 | 1,648,509 | -73,695 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| Procurement, Construction, and Improvements: | | | |
| Construction and Facility Improvements.............. | 172,763 | 30,000 | -142,763 |
| Mission Support Assets and Infrastructure........... | 77,670 | 55,106 | -22,564 |
| Subtotal, Mission Support Assets and Infrastructure.............................. | 77,670 | 55,106 | -22,564 |
| IDENT/Homeland Advanced Recognition Technology...... | 10,000 | 11,200 | +1,200 |
| Subtotal, Procurement, Construction, and Improvements................................. | 260,433 | 96,306 | -164,127 |
| (Appropriations)........................... | (260,433) | (96,306) | (-164,127) |
| Federal Protective Service: | | | |
| FPS Operations: | | | |
| Operating Expenses............................... | 473,820 | 481,689 | +7,869 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| Countermeasures: | | | |
| Protective Security Officers | 1,528,205 | 1,507,201 | -21,004 |
| Technical Countermeasures | 26,778 | 37,565 | +10,787 |
| Subtotal, Federal Protective Service (Gross) | 2,028,803 | 2,026,455 | -2,348 |
| Offsetting Collections | -2,028,803 | -2,026,455 | +2,348 |
| Subtotal, Federal Protective Service (Net) | --- | --- | --- |
| Total, Management Directorate | 1,982,637 | 1,744,815 | -237,822 |
| (Appropriations) | (4,011,440) | (3,771,270) | (-240,170) |
| (Offsetting Collections) | (-2,028,803) | (-2,026,455) | (+2,348) |
| Intelligence, Analysis, and Situational Awareness | | | |
| Operations and Support | 345,410 | 360,788 | +15,378 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| **Office of Inspector General** | | | |
| Operations and Support | 220,127 | 223,063 | +2,936 |
| Total, Title I, Departmental Management, Intelligence, Situational Awareness, and Oversight | 2,952,869 | 2,583,009 | -369,860 |
| (Appropriations) | (4,981,672) | (4,609,464) | (-372,208) |
| (Defense) | --- | --- | --- |
| (Nondefense) | (4,981,672) | (4,609,464) | (-372,208) |
| (Offsetting Collections) | (-2,028,803) | (-2,026,455) | (+2,348) |
| (Transfer out) | (-33,000) | --- | (+33,000) |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| TITLE II - SECURITY, ENFORCEMENT, AND INVESTIGATIONS | | | |
| U.S. Customs and Border Protection | | | |
| Operations and Support: | | | |
| Border Security Operations: | | | |
| U.S. Border Patrol: | | | |
| Operations | 7,316,574 | 5,518,397 | -1,798,177 |
| Assets and Support | 992,273 | 1,097,048 | +104,775 |
| Office of Training and Development | 160,862 | 176,474 | +15,612 |
| Subtotal, Border Security Operations | 8,469,709 | 6,791,919 | -1,677,790 |
| Trade and Travel Operations: | | | |
| Office of Field Operations: | | | |
| Domestic Operations | 3,933,253 | 4,508,543 | +575,290 |
| International Operations | 157,797 | 199,725 | +41,928 |
| Targeting Operations | 276,875 | 315,112 | +38,237 |
| Assets and Support | 1,029,533 | 1,122,653 | +93,120 |
| Office of Trade | 423,587 | 498,696 | +75,109 |
| Office of Training and Development | 77,156 | 103,192 | +26,036 |
| Subtotal, Trade and Travel Operations | 5,898,201 | 6,747,921 | +849,720 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| Integrated Operations: | | | |
| Air and Marine Operations: | | | |
| Operations | 388,926 | 419,289 | +30,363 |
| Assets and Support | 624,612 | 722,886 | +98,274 |
| Air and Marine Operations Center | 50,861 | 53,908 | +3,047 |
| Office of International Affairs | 52,892 | 61,074 | +8,182 |
| Office of Intelligence | 88,197 | 91,886 | +3,689 |
| Office of Training and Development | 13,539 | 15,720 | +2,181 |
| Operations Support | 436,330 | 370,719 | -65,611 |
| Subtotal, Integrated Operations | 1,655,357 | 1,735,482 | +80,125 |
| Mission Support: | | | |
| Enterprise Services | 1,796,988 | 2,140,739 | +343,751 |
| (Harbor Maintenance Trust Fund) | (3,274) | (3,274) | --- |
| Office of Professional Responsibility | 354,870 | 380,917 | +26,047 |
| Executive Leadership and Oversight | 251,745 | 291,618 | +39,873 |
| Subtotal, Mission Support | 2,403,603 | 2,813,274 | +409,671 |
| Subtotal, Operations and Support | 18,426,870 | 18,088,596 | -338,274 |
| (Appropriations) | (18,426,870) | (18,088,596) | (-338,274) |
| (Transfer out to FEMA Federal Assistance) | (-650,000) | --- | (+650,000) |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| Procurement, Construction, and Improvements: | | | |
| Border Security Assets and Infrastructure | 283,500 | 346,000 | +62,500 |
| Trade and Travel Assets and Infrastructure | 380,900 | 300,000 | -80,900 |
| Integrated Operations Assets and Infrastructure: | | | |
| Airframes and Sensors | 71,583 | 175,200 | +103,617 |
| Watercraft | 4,400 | 7,200 | +2,800 |
| Construction and Facility Improvements | 92,114 | --- | -92,114 |
| Mission Support Assets and Infrastructure | 17,673 | 32,000 | +14,327 |
| Radiological Detection Systems | --- | 37,718 | +37,718 |
| Subtotal, Procurement, Construction, and Improvements | 850,170 | 898,118 | +47,948 |
| (Appropriations) | (850,170) | (898,118) | (+47,948) |
| CBP Services at User Fee Facilities (Small Airport) (Permanent Indefinite Discretionary) | 24,000 | 25,000 | +1,000 |
| Global Entry Program (International Registered Traveler) (Permanent Indefinite Discretionary) | 457,000 | 444,000 | -13,000 |
| Offsetting Collections | -457,000 | -444,000 | +13,000 |
| Total, Global Entry Program | --- | --- | --- |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| Fee Funded Programs: | | | |
| Immigration Inspection User Fee | (854,365) | (1,010,937) | (+156,572) |
| Immigration Enforcement Fines | (254) | (1,283) | (+1,029) |
| Electronic System for Travel Authorization (ESTA) Fee | (61,659) | (60,544) | (-1,115) |
| Land Border Inspection Fee | (80,165) | (92,556) | (+12,391) |
| COBRA Passenger Inspection Fee | (821,059) | (1,003,486) | (+182,427) |
| Agricultural Quarantine Inspection Fee | (591,360) | (791,121) | (+199,761) |
| Puerto Rico Trust Fund | (304,133) | (283,871) | (-20,262) |
| Virgin Islands Deposit Fund | (14,994) | (14,818) | (-176) |
| Customs Unclaimed Goods | (3,880) | (1,828) | (-2,052) |
| 9-11 Response and Biometric Exit Account | (21,350) | (15,942) | (-5,408) |
| Subtotal, Fee Funded Programs | 2,753,219 | 3,276,386 | +523,167 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| Administrative Provisions | | | |
| Colombia Free Trade Act Collections (Sec. 203) | 281,000 | 321,000 | +40,000 |
| Reimbursable Preclearance (Sec. 204) | 39,000 | 39,000 | --- |
| Subtotal, Administrative Provisions | 320,000 | 360,000 | +40,000 |
| Reimbursable Preclearance (Offsetting Collections) | -39,000 | -39,000 | --- |
| Total, Administrative Provisions | 281,000 | 321,000 | +40,000 |
| Total, U.S. Customs and Border Protection | 19,582,040 | 19,332,714 | -249,326 |
| (Appropriations) | (20,078,040) | (19,815,714) | (-262,326) |
| (Offsetting Collections) | (-496,000) | (-483,000) | (+13,000) |
| Fee Funded Programs | 2,753,219 | 3,276,386 | +523,167 |
| (Transfer out) | (-650,000) | --- | (+650,000) |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| U.S. Immigration and Customs Enforcement | | | |
| Operations and Support: | | | |
| Homeland Security Investigations: | | | |
| Domestic Investigations | 2,138,131 | 2,218,106 | +79,975 |
| International Investigations | 214,323 | 220,289 | +5,966 |
| Intelligence | 106,651 | 107,092 | +441 |
| Subtotal, Homeland Security Investigations | 2,459,105 | 2,545,487 | +86,382 |
| Enforcement and Removal Operations: | | | |
| Custody Operations | 3,434,952 | 4,451,603 | +1,016,651 |
| Subtotal, Custody Operations | 3,434,952 | 4,451,603 | +1,016,651 |
| Fugitive Operations | 159,134 | 178,703 | +19,569 |
| Criminal Alien Program | 296,525 | 349,807 | +53,282 |
| Alternatives to Detention | 470,190 | 391,784 | -78,406 |
| Transportation and Removal Operations | 721,417 | 1,030,780 | +309,363 |
| Subtotal, Transportation and Removal Operations | 721,417 | 1,030,780 | +309,363 |
| Subtotal, Enforcement and Removal Operations | 5,082,218 | 6,402,677 | +1,320,459 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| Mission Support: | | | |
| Enterprise Services | 1,199,009 | 1,210,328 | +11,319 |
| Office of Professional Responsibility | 197,600 | 198,146 | +546 |
| Executive Leadership and Oversight | 122,095 | 127,653 | +5,558 |
| Subtotal, Mission Support | 1,518,704 | 1,536,127 | +17,423 |
| Office of the Principal Legal Advisor | 441,515 | 482,754 | +41,239 |
| Subtotal, Office of the Principal Legal Advisor | 441,515 | 482,754 | +41,239 |
| Additional funding (P.L. 119-4) | 485,000 | --- | -485,000 |
| Subtotal, Operations and Support | 9,986,542 | 10,967,045 | +980,503 |
| (Appropriations) | (9,986,542) | (10,967,045) | (+980,503) |

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 504 of 714 PageID #:1554



COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| Procurement, Construction, and Improvements: | | | |
| Operational Communications/Information Technology... | 35,420 | 20,000 | -15,420 |
| Construction and Facility Improvements............. | 20,100 | 15,000 | -5,100 |
| Subtotal, Procurement, Construction, and Improvements................................. | 55,520 | 35,000 | -20,520 |
| (Appropriations)........................... | 55,520 | 35,000 | -20,520 |
| Fee Funded Programs: | | | |
| Immigration Inspection User Fee.................. | (135,000) | (135,000) | --- |
| Breached Bond/Detention Fund..................... | (55,000) | (55,000) | --- |
| Student and Exchange Visitor Program Fee......... | (186,610) | (216,500) | (+29,890) |
| Detention and Removal Office Fee................. | (3,000) | (3,000) | --- |
| Subtotal, Fee Funded Programs................ | 379,610 | 409,500 | +29,890 |
| Total, U.S. Immigration and Customs Enforcement. | 10,042,062 | 11,002,045 | +959,983 |
| Fee Funded Programs............................ | 379,610 | 409,500 | +29,890 |

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 505 of 714 PageID #:1555



COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| Transportation Security Administration | | | |
| Operations and Support: | | | |
| Aviation Screening Operations: | | | |
| Screening Workforce: | | | |
| Screening Partnership Program | 253,759 | 284,703 | +30,944 |
| Screener Personnel, Compensation, and Benefits | 5,302,075 | 5,658,599 | +356,524 |
| Screener Training and Other | 272,357 | 265,702 | -6,655 |
| Airport Management | 871,626 | 918,763 | +47,137 |
| Canines | 159,818 | 169,001 | +9,183 |
| Screening Technology Maintenance | 561,848 | 624,715 | +62,867 |
| Secure Flight | 137,888 | 116,844 | -21,044 |
| Subtotal, Aviation Screening Operations | 7,559,371 | 8,038,327 | +478,956 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| Other Operations and Enforcement: | | | |
| Inflight Security: | | | |
| Federal Air Marshals | 808,852 | 628,033 | -180,819 |
| Federal Flight Deck Officer and Crew Training | 26,681 | 32,307 | +5,626 |
| Aviation Regulation | 243,766 | 298,605 | +54,839 |
| Air Cargo | 135,640 | 116,055 | -19,585 |
| Intelligence and TSOC | 98,793 | 85,570 | -13,223 |
| Surface Programs | 173,142 | 85,692 | -87,450 |
| Vetting Programs | 49,525 | 36,635 | -12,890 |
| Subtotal, Other Operations and Enforcement | 1,536,399 | 1,282,897 | -253,502 |
| Mission Support | 1,069,198 | 1,056,839 | -12,359 |
| Aviation Passenger Security Fees (offsetting collections) | -2,860,000 | -3,030,000 | -170,000 |
| Additional funding (P.L. 119-4) | 450,000 | --- | -450,000 |
| Subtotal, Operations and Support | 7,754,968 | 7,348,063 | -406,905 |
| (Appropriations) | (10,614,968) | (10,378,063) | (-236,905) |
| (Offsetting Collections) | (-2,860,000) | (-3,030,000) | (-170,000) |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| Vetting Fee Programs: | | | |
| Transportation Worker Identification Card | 65,000 | 72,700 | +7,700 |
| Hazardous Materials Endorsement Fee | 20,000 | 16,400 | -3,600 |
| General Aviation at DCA Fee | 600 | 600 | --- |
| Commercial Aviation and Airports Fee | 11,000 | 11,000 | --- |
| Other Security Threat Assessments Fee | 50 | 50 | --- |
| Air Cargo/Certified Cargo Screening Program Fee | 4,000 | 4,000 | --- |
| TSA PreCheck Fee | 452,000 | 427,900 | -24,100 |
| Adjustment based on CBO estimate of receipts | -93,650 | -10,650 | +83,000 |
| Subtotal, Vetting Fee Programs | 459,000 | 522,000 | +63,000 |
| Vetting Fees (Offsetting Collections) | -459,000 | -522,000 | -63,000 |
| Procurement, Construction, and Improvements: | | | |
| Aviation Screening Infrastructure: | | | |
| Checkpoint Support | 40,678 | 224,290 | +183,612 |
| Checked Baggage | --- | 33,940 | +33,940 |
| Subtotal, Procurement, Construction, and Improvements | 40,678 | 258,230 | +217,552 |
| Research and Development | 14,641 | 14,641 | --- |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| Fee Funded Programs: | | | |
| Alien Flight School Fee (mandatory) | (6,000) | (6,000) | --- |
| Aviation Security Capital Fund (mandatory) | (250,000) | (250,000) | --- |
| Subtotal, Fee Funded Programs | 256,000 | 256,000 | --- |
| Total, Transportation Security Administration | 7,810,287 | 7,620,934 | -189,353 |
| (Appropriations) | (11,129,287) | (11,172,934) | (+43,647) |
| (Offsetting Collections) | (-3,319,000) | (-3,552,000) | (-233,000) |
| Fee Funded Programs | 256,000 | 256,000 | --- |
| Coast Guard | | | |
| Operations and Support: | | | |
| Military Personnel | 5,247,722 | 5,751,135 | +503,413 |
| Mission Support | 420,206 | 435,681 | +15,475 |
| Field Operations: | | | |
| Surface, Air, and Shore Operations | 3,125,281 | 3,289,983 | +164,702 |
| Command, Control, and Communications | 1,261,562 | 1,325,857 | +64,295 |
| Subtotal, Operations and Support | 10,415,271 | 10,802,656 | +387,385 |
| (Non-defense) | (9,885,271) | (10,272,656) | (+387,385) |
| (Defense) | (530,000) | (530,000) | --- |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| Procurement, Construction, and Improvements: | | | |
| Vessels: | | | |
| In-Service Vessel Sustainment | 120,000 | 160,000 | +40,000 |
| National Security Cutter | 17,100 | --- | -17,100 |
| Offshore Patrol Cutter | 579,000 | 530,000 | -49,000 |
| Fast Response Cutter | 220,000 | 300,000 | +80,000 |
| Cutter Boats | 6,500 | 10,000 | +3,500 |
| Polar Security Cutter | --- | 100,000 | +100,000 |
| Commercially Available Polar Icebreaker | 125,000 | --- | -125,000 |
| Great Lakes Icebreaker | 20,000 | 20,000 | --- |
| Waterways Commerce Cutter | 1,000 | 135,000 | +134,000 |
| Subtotal, Vessels | 1,088,600 | 1,255,000 | +166,400 |
| Aircraft: | | | |
| HC-130J Acquisition/Conversion/Sustainment | 4,000 | 183,000 | +179,000 |
| HH-65 Conversion/Sustainment Projects | 6,000 | --- | -6,000 |
| MH-60T Sustainment | 58,250 | 100,000 | +41,750 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| Small Unmanned Aircraft Systems | 500 | 750 | +250 |
| Large Unmanned Aircraft Systems | --- | 98,000 | +98,000 |
| Subtotal, Aircraft | 68,750 | 381,750 | +313,000 |
| Other Acquisition Programs: | | | |
| Survey and Design - Vessels, Boats, and Aircraft | 5,000 | 4,500 | -500 |
| Other Equipment and Systems | 5,600 | 9,040 | +3,440 |
| Program Oversight and Management | 21,000 | 21,500 | +500 |
| C4ISR | 16,000 | 25,000 | +9,000 |
| Cyber and Enterprise Mission Platform | 21,500 | 30,000 | +8,500 |
| In-Service Systems Sustainment | --- | 30,000 | +30,000 |
| Subtotal, Other Acquisition Programs | 69,100 | 120,040 | +50,940 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| Shore Facilities and Aids to Navigation: | | | |
| Major Construction; Housing; ATON; and Survey and Design | 52,500 | 160,000 | +107,500 |
| Major Acquisition Systems Infrastructure | 130,000 | 100,000 | -30,000 |
| Minor Shore | 5,000 | 10,000 | +5,000 |
| Subtotal, Shore Facilities and Aids to Navigation | 187,500 | 270,000 | +82,500 |
| Subtotal, Procurement, Construction, and Improvements | 1,413,950 | 2,026,790 | +612,840 |
| (Appropriations) | (1,413,950) | (2,026,790) | (+612,840) |
| Research and Development | 7,476 | 7,476 | --- |
| Health Care Fund Contribution (Permanent Indefinite Discretionary) | 281,851 | 297,731 | +15,880 |
| Mandatory Funding: | | | |
| Retired Pay | 1,210,840 | 1,249,000 | +38,160 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| Administrative Provisions | | | |
| Coast Guard Housing Fund | 4,000 | 4,000 | --- |
| Coast Guard Housing Fund (Offsetting Collections) | -4,000 | -4,000 | --- |
| Total, Coast Guard | 13,329,388 | 14,383,653 | +1,054,265 |
| (Appropriations) | (13,333,388) | (14,387,653) | (+1,054,265) |
| (Defense) | (530,000) | (530,000) | --- |
| (Non-Defense) | (11,592,548) | (12,608,653) | (+1,016,105) |
| (Offsetting Collections) | (-4,000) | (-4,000) | --- |
| (Mandatory Funding) | (1,210,840) | (1,249,000) | (+38,160) |
| Total Gross, Coast Guard | 13,333,388 | 14,387,653 | +1,054,265 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| United States Secret Service | | | |
| Operations and Support: | | | |
| Protective Operations: | | | |
| Protection of Persons and Facilities | 1,031,766 | 1,173,191 | +141,425 |
| Protective Countermeasures | 72,374 | 83,481 | +11,107 |
| Protective Intelligence | 84,973 | 95,808 | +10,835 |
| Presidential Campaigns and National Special Security Events | 243,699 | 109,588 | -134,111 |
| Subtotal, Protective Operations | 1,432,812 | 1,462,068 | +29,256 |
| Field Operations: | | | |
| Domestic and International Field Operations | 794,184 | 791,409 | -2,775 |
| Support for Missing and Exploited Children Investigations | 6,000 | 6,000 | --- |
| Support for Computer Forensics Training | 48,612 | 53,647 | +5,035 |
| Subtotal, Field Operations | 848,796 | 851,056 | +2,260 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| Basic and In-Service Training and Professional Development | 115,836 | 144,114 | +28,278 |
| Mission Support | 610,538 | 645,953 | +35,415 |
| Additional funding (P.L. 118-83) | (231,000) | --- | (-231,000) |
| )perations and Support (Sec. 136) (P.L. 118 - Division A) | 231,000 | --- | -231,000 |
| Subtotal, Operations and Support | 3,238,982 | 3,103,191 | -135,791 |
| (Appropriations) | (3,007,982) | (3,103,191) | (+95,209) |
| ᵓrocurement, Construction, and Improvements: | | | |
| Protection Assets and Infrastructure | 59,198 | 51,290 | -7,908 |
| Construction and Facility Improvements | 16,400 | 75,000 | +58,600 |
| Subtotal, Procurement, Construction, and Improvements | 75,598 | 126,290 | +50,692 |
| (Appropriations) | (75,598) | (126,290) | (+50,692) |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| Research and Development | 4,217 | 3,250 | -967 |
| Total, United States Secret Service | 3,318,797 | 3,232,731 | -86,066 |
| (Appropriations) | (3,318,797) | (3,232,731) | (-86,066) |
| Total, Title II, Security, Enforcement, and Investigations | 54,082,574 | 55,572,077 | +1,489,503 |
| (Appropriations) | (56,690,734) | (58,362,077) | (+1,671,343) |
| (Non-Defense) | (56,160,734) | (57,832,077) | (+1,671,343) |
| (Defense) | (530,000) | (530,000) | --- |
| (Offsetting Collections) | (-3,819,000) | (-4,039,000) | (-220,000) |
| (Mandatory Funding) | (1,210,840) | (1,249,000) | (+38,160) |
| Aviation Security Capital Fund (Mandatory) | 250,000 | 250,000 | --- |
| Fee Funded Programs | 3,388,829 | 3,941,886 | +553,057 |
| (Transfer out) | (-650,000) | --- | (+650,000) |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| TITLE III - PROTECTION, PREPAREDNESS, RESPONSE, AND RECOVERY | | | |
| Cybersecurity and Infrastructure Security Agency | | | |
| Operations and Support: | | | |
| Cybersecurity: | | | |
| Cyber Operations: | | | |
| Strategy and Performance | 21,383 | 31,258 | +9,875 |
| Threat Hunting | 260,139 | 238,642 | -21,497 |
| Vulnerability Management | 208,652 | 195,974 | -12,678 |
| Capacity Building | 206,661 | 196,839 | -9,822 |
| Operational Planning and Coordination | 122,496 | 95,452 | -27,044 |
| Subtotal, Cyber Operations | 819,331 | 758,165 | -61,166 |
| Technology and Services: | | | |
| Cybersecurity Services | 7,417 | 9,110 | +1,693 |
| Continuous Diagnostics and Mitigation | 82,396 | 75,799 | -6,597 |
| Joint Collaborative Environment | 272,504 | 251,768 | -20,736 |
| Subtotal, Technology and Services | 362,317 | 336,677 | -25,640 |
| Subtotal, Cybersecurity | 1,181,648 | 1,094,842 | -86,806 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| Infrastructure Security: | | | |
| Infrastructure Assessments and Security: | | | |
| Strategy and Performance | 15,547 | 7,037 | -8,510 |
| Security Programs | 22,096 | 21,638 | -458 |
| CISA Exercises | 26,914 | 25,242 | -1,672 |
| Assessments and Infrastructure Information | 38,397 | 28,458 | -9,939 |
| Bombing Prevention | 30,309 | 26,623 | -3,686 |
| Subtotal, Infrastructure Assessments and Security | 133,263 | 108,998 | -24,265 |
| Chemical Security | 25,866 | 11,891 | -13,975 |
| Countering Weapons of Mass Destruction | --- | --- | --- |
| Subtotal, Infrastructure Security | 159,129 | 120,889 | -38,240 |
| Emergency Communications: | | | |
| Emergency Communications Preparedness | 46,971 | 34,786 | -12,185 |
| Priority Telecommunications Service: | | | |
| GETS/WPS/SRAS/TSP | 50,375 | 49,566 | -809 |
| Next Generation Networks Priority Services | 4,219 | 7,070 | +2,851 |
| Subtotal, Priority Telecommunications Services | 54,594 | 56,636 | +2,042 |
| Subtotal, Emergency Communications | 101,565 | 91,422 | -10,143 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| Integrated Operations: | | | |
| Regional Operations: | | | |
| Coordination and Service Delivery | 27,724 | 31,556 | +3,832 |
| Security Advisors | 82,375 | 95,322 | +12,947 |
| Chemical Inspectors | 24,700 | --- | -24,700 |
| Subtotal, Regional Operations | 134,799 | 126,878 | -7,921 |
| Operations Coordination and Planning: | | | |
| Intelligence | 5,060 | 4,486 | -574 |
| Operations Center | 78,376 | 73,028 | -5,348 |
| Planning and Readiness | 6,684 | 5,547 | -1,137 |
| Business Continuity and Emergency Preparedness | 3,459 | 3,459 | --- |
| Subtotal, Operations Coordination and Planning | 93,579 | 86,520 | -7,059 |
| Subtotal, Integrated Operations | 228,378 | 213,398 | -14,980 |
| Risk Management Operations: | | | |
| National Infrastructure Simulation Analysis Center | 24,424 | 24,424 | --- |
| Infrastructure Analysis | 109,446 | 42,782 | -66,664 |
| Subtotal, Risk Management Operations | 133,870 | 67,206 | -66,664 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| Stakeholder Engagement and Requirements: | | | |
| Sector Risk Management Agency | 28,982 | 24,412 | -4,570 |
| Council Management | 16,895 | 14,006 | -2,889 |
| Stakeholder Engagement | 43,242 | 43,238 | -4 |
| International Affairs | 10,599 | 8,191 | -2,408 |
| (Defense) | (6,995) | (5,406) | (-1,589) |
| Subtotal, Stakeholder Engagement and Requirements | 99,718 | 89,847 | -9,871 |
| Mission Support: | | | |
| Executive Leadership and Oversight | 62,943 | 47,549 | -15,394 |
| (Defense) | (29,835) | (22,538) | (-7,297) |
| Enterprise Services | 415,563 | 512,006 | +96,443 |
| (Defense) | (196,977) | (242,691) | (+45,714) |
| Subtotal, Mission Support | 478,506 | 559,555 | +81,049 |
| Subtotal, Operations and Support | 2,382,814 | 2,237,159 | -145,655 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| Procurement, Construction, and Improvements: | | | |
| Cybersecurity: | | | |
| Continuous Diagnostics and Mitigation | 265,279 | 396,147 | +130,868 |
| Threat Hunting | 20,000 | 10,000 | -10,000 |
| National Cybersecurity Protection System | 30,000 | --- | -30,000 |
| Cyber Analytics and Data System | 145,499 | 65,810 | -79,689 |
| Subtotal, Cybersecurity | 460,778 | 471,957 | +11,179 |
| Emergency Communications: | | | |
| Next Generation Networks Priority Services | 28,623 | 29,090 | +467 |
| Subtotal, Procurement, Construction, and Improvements | 489,401 | 501,047 | +11,646 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| Research and Development: | | | |
| Infrastructure Security | 793 | --- | -793 |
| Subtotal, Research and Development | 793 | --- | -793 |
| Total, Cybersecurity and Infrastructure Security Agency | 2,873,008 | 2,738,206 | -134,802 |
| (Defense) | (2,614,251) | (2,437,636) | (-176,615) |
| (Non-Defense) | (258,757) | (300,570) | (+41,813) |
| Federal Emergency Management Agency | | | |
| Operations and Support: | | | |
| Regional Operations | 210,095 | 218,485 | +8,390 |
| Mitigation | 75,594 | 40,955 | -34,639 |
| Preparedness and Protection | 278,940 | 346,726 | +67,786 |
| Response and Recovery: | | | |
| Response | 236,868 | 255,413 | +18,545 |
| (Urban Search and Rescue) | (40,832) | (56,000) | (+15,168) |
| Recovery | 57,531 | 55,022 | -2,509 |
| Mission Support | 624,962 | 557,819 | -67,143 |
| Subtotal, Operations and Support | 1,483,990 | 1,474,420 | -9,570 |
| (Defense) | (98,089) | (150,364) | (+52,275) |
| (Non-defense) | (1,385,901) | (1,324,056) | (-61,845) |
| Procurement, Construction, and Improvements: | | | |
| Operational Communications/Information Technology | 21,900 | 66,375 | +44,475 |
| Construction and Facility Improvements | 36,250 | 63,625 | +27,375 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| Mission Support Assets and Infrastructure | 41,378 | 28,419 | -12,959 |
| Subtotal, Procurement, Construction, and Improvements | 99,528 | 158,419 | +58,891 |
| (Appropriations) | (99,528) | (158,419) | (+58,891) |
| (Defense) | (46,900) | (128,000) | (+81,100) |
| (Non-defense) | (52,628) | (30,419) | (-22,209) |
| Federal Assistance: | | | |
| Grants: | | | |
| State Homeland Security Grant Program | 468,000 | 520,000 | +52,000 |
| (Base Program) | (373,500) | (415,000) | (+41,500) |
| (Operation Stonegarden) | (81,000) | (90,000) | (+9,000) |
| (Tribal Security) | (13,500) | (15,000) | (+1,500) |
| Urban Area Security Initiative | 553,500 | 615,000 | +61,500 |
| Nonprofit Security Grant Program | 274,500 | 335,000 | +60,500 |
| Public Transportation Security Assistance | 94,500 | 94,500 | --- |
| (Amtrak Security) | (9,000) | (9,000) | --- |
| (Over-the-Road Bus Security) | (1,800) | (1,000) | (-800) |
| Port Security Grants | 90,000 | 100,000 | +10,000 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| Assistance to Firefighter Grants | 324,000 | 360,000 | +36,000 |
| Staffing for Adequate Fire and Emergency Response (SAFER) Grants | 324,000 | 360,000 | +36,000 |
| Emergency Management Performance Grants | 319,500 | 355,000 | +35,500 |
| Flood Hazard Mapping and Risk Analysis Program (RiskMAP) | 281,475 | 312,750 | +31,275 |
| Regional Catastrophic Preparedness Grants | 10,800 | 9,720 | -1,080 |
| Emergency Food and Shelter | 117,000 | 105,300 | -11,700 |
| Next Generation Warning System | 40,000 | 40,000 | --- |
| Community Project Funding | --- | 170,000 | +170,000 |
| Subtotal, Grants | 2,897,275 | 3,377,270 | +479,995 |
| Targeted Violence and Terrorism Prevention Grants (by transfer) | (18,000) | --- | (-18,000) |
| Alternatives to Detention Case Management Grants (by transfer) | (15,000) | --- | (-15,000) |
| Shelter and Services Program (by transfer) | (650,000) | --- | (-650,000) |
| Subtotal, Grants (with transfers) | 3,580,275 | 3,377,270 | -203,005 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| Education, Training, and Exercises: | | | |
| Center for Domestic Preparedness | 71,352 | 71,421 | +69 |
| Center for Homeland Defense and Security | 16,200 | 16,200 | --- |
| Emergency Management Institute | 32,240 | 32,319 | +79 |
| U.S. Fire Administration | 59,975 | 60,084 | +109 |
| National Domestic Preparedness Consortium | 90,900 | 101,000 | +10,100 |
| Continuing Training Grants | 14,400 | 16,000 | +1,600 |
| National Exercise Program | 20,920 | 20,956 | +36 |
| Securing the Cities Program | --- | 61,426 | +61,426 |
| Subtotal, Education, Training, and Exercises | 305,987 | 379,406 | +73,419 |
| Subtotal, Federal Assistance | 3,203,262 | 3,756,676 | +553,414 |
| (Defense) | (40,000) | (40,000) | --- |
| (Non-defense) | 3,163,262 | 3,716,676 | +553,414 |
| (by transfer) | (683,000) | --- | (-683,000) |
| Subtotal, Federal Assistance (including transfer) | 3,886,262 | 3,756,676 | -129,586 |
| Disaster Relief Fund: | | | |
| Disaster Relief Category | 22,510,000 | 26,474,000 | +3,964,000 |
| Subtotal, Disaster Relief Fund | 22,510,000 | 26,474,000 | +3,964,000 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| National Flood Insurance Fund: | | | |
| Floodplain Management and Mapping | 225,207 | 187,522 | -37,685 |
| Mission Support | 14,578 | 14,578 | --- |
| Subtotal, National Flood Insurance Fund | 239,785 | 202,100 | -37,685 |
| Offsetting Fee Collections | -239,785 | -202,100 | +37,685 |
| Administrative Provision | | | |
| Radiological Emergency Preparedness Program (Sec. 308): | | | |
| Operating Expenses | 34,000 | 34,000 | --- |
| Offsetting Collections | -34,000 | -34,000 | --- |
| Subtotal, Administrative Provision | --- | --- | --- |
| Total, Federal Emergency Management Agency | 27,296,780 | 31,863,515 | +4,566,735 |
| (Appropriations) | (27,570,565) | (32,099,615) | (+4,529,050) |
| (Defense) | (184,989) | (318,364) | (+133,375) |
| (Non-defense) | (27,385,576) | (31,781,251) | (+4,395,675) |
| (Disaster Relief Category) | (22,510,000) | (26,474,000) | (+3,964,000) |
| (Regular appropriations, not Disaster Relief) | (4,875,576) | (5,307,251) | (+431,675) |
| (Offsetting Collections) | (-273,785) | (-236,100) | (+37,685) |
| (by transfer) | (683,000) | --- | (-683,000) |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| Total, Title III, Protection, Preparedness, Response, and Recovery | 30,169,788 | 34,601,721 | +4,431,933 |
| (Appropriations) | (30,443,573) | (34,837,821) | (+4,394,248) |
| (Defense) | (2,799,240) | (2,756,000) | (-43,240) |
| (Non-Defense) | (27,644,333) | (32,081,821) | (+4,437,488) |
| (Disaster Relief Category) | (22,510,000) | (26,474,000) | (+3,964,000) |
| (Regular Appropriations) | (5,134,333) | (5,607,821) | (+473,488) |
| (Offsetting Collections) | (-273,785) | (-236,100) | (+37,685) |
| (by transfer) | (683,000) | --- | (-683,000) |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| TITLE IV - RESEARCH, DEVELOPMENT, TRAINING, AND SERVICES | | | |
| U.S. Citizenship and Immigration Services | | | |
| Operations and Support: | | | |
| Employment Status Verification | 111,085 | 112,551 | +1,466 |
| Application Processing | 160,055 | --- | -160,055 |
| Subtotal, Operations and Support | 271,140 | 112,551 | -158,589 |
| Federal Assistance | 10,000 | --- | -10,000 |
| Fee Funded Programs: | | | |
| Immigration Examinations Fee Account: | | | |
| Adjudication Operations: | | | |
| Adjudication Operations | --- | (2,561,765) | (+2,561,765) |
| Field Operations Directorate | (1,177,268) | --- | (-1,177,268) |
| Fraud Detection and National Security Directorate | (299,506) | --- | (-299,506) |
| Service Center Operations Directorate | (664,569) | --- | (-664,569) |
| Support Services | (195,626) | --- | (-195,626) |
| Subtotal, Adjudication Operations | 2,336,969 | 2,561,765 | +224,796 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| Immigration Policy and Support | (1,526,859) | (1,671,586) | (+144,727) |
| Refugee and Asylum Operations | (546,219) | (433,605) | (-112,614) |
| Immigration Records and Applicant Services | (675,328) | (718,054) | (+42,726) |
| Premium Processing (Including Transformation) | (1,523,963) | (1,357,573) | (-166,390) |
| Subtotal, Immigration Examinations Fee Account | (6,609,338) | (6,742,583) | (+133,245) |
| H1-B Non-Immigrant Petitioner Account: | | | |
| Adjudication Services: | | | |
| Service Center Operations | (20,000) | (18,808) | (-1,192) |
| Fraud Prevention and Detection Account: | | | |
| Adjudication Services: | | | |
| Adjudication Services: | --- | (46,066) | (+46,066) |
| District Operations | (29,151) | --- | (-29,151) |
| Service Center Operations | (27,430) | --- | (-27,430) |
| Asylum and Refugee Operating Expenses | (348) | --- | (-348) |
| Subtotal, Fraud Prevention and Detection Account | 56,929 | 46,066 | -10,863 |
| EB-5 Integrity Fund | (8,918) | (10,800) | (+1,882) |
| Subtotal, Fee Funded Programs | 6,695,185 | 6,818,257 | +123,072 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| Full Committee Amendment: H-2B Returning Worker (Sec. 413) | --- | 44,000 | +44,000 |
| Full Committee Amendment: H-2A Workers (Sec. 414) | --- | 2,000 | +2,000 |
| Full Committee Amendment: P Visas (Sec. 416) | --- | 3,000 | +3,000 |
| Total, U.S. Citizenship and Immigration Services | 281,140 | 161,551 | -119,589 |
| Fee Funded Programs | 6,695,185 | 6,818,257 | +123,072 |
| Federal Law Enforcement Training Centers | | | |
| Operations and Support: | | | |
| Law Enforcement Training | 324,087 | 351,062 | +26,975 |
| Mission Support | 33,013 | 34,582 | +1,569 |
| Subtotal, Operations and Support | 357,100 | 385,644 | +28,544 |
| Procurement, Construction, and Improvements: | | | |
| Construction and Facility Improvements | 20,100 | 18,300 | -1,800 |
| Total, Federal Law Enforcement Training Centers | 377,200 | 403,944 | +26,744 |
| Science and Technology | | | |
| Operations and Support: | | | |
| Laboratory Facilities | 128,373 | 130,407 | +2,034 |
| Acquisition and Operations Analysis | 77,720 | 77,720 | --- |
| Mission Support | 163,718 | 160,497 | -3,221 |
| Subtotal, Operations and Support | 369,811 | 368,624 | -1,187 |

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 530 of 714 PageID #:1580



COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| Procurement, Construction, and Improvements: | | | |
| Laboratory Facilities: | | | |
| Plum Island Closure and Support | 1,000 | 20,000 | +19,000 |
| Critical Repair/Replacement Requirement | 5,000 | 20,000 | +15,000 |
| Detection Sciences Testing and Applied Research Center | 55,000 | --- | -55,000 |
| Subtotal, Procurement, Construction, and Improvements | 61,000 | 40,000 | -21,000 |
| Research and Development: | | | |
| Research, Development, and Innovation | 259,786 | 304,194 | +44,408 |
| University Programs | 51,037 | 45,880 | -5,157 |
| Subtotal, Research and Development | 310,823 | 350,074 | +39,251 |
| Total, Science and Technology | 741,634 | 758,698 | +17,064 |
| Countering Weapons of Mass Destruction Office | | | |
| Operations and Support: | | | |
| Mission Support | 93,916 | --- | -93,916 |
| Capability and Operations Support | 69,364 | --- | -69,364 |
| Subtotal, Operations and Support | 163,280 | --- | -163,280 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| Procurement, Construction, and Improvements: | | | |
| Large Scale Detection Systems | 35,678 | --- | -35,678 |
| Portable Detection Systems | 6,660 | --- | -6,660 |
| Subtotal, Procurement, Construction, and Improvements | 42,338 | --- | -42,338 |
| Research and Development: | | | |
| Transformational R&D/Technical Forensics: | | | |
| Transformational R&D | 39,460 | --- | -39,460 |
| Technical Forensics | 6,530 | --- | -6,530 |
| Subtotal, Transformational R&D/Technical Forensics | 45,990 | --- | -45,990 |
| Detection Capability Development and Rapid Capabilities: | | | |
| Detection Capability Development | 14,948 | --- | -14,948 |
| Subtotal, Detection Capability Development and Rapid Capabilities | 14,948 | --- | -14,948 |
| Subtotal, Research and Development | 60,938 | --- | -60,938 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| Federal Assistance: | | | |
| Capability Building: | | | |
| Training, Exercises, and Readiness | 21,268 | --- | -21,268 |
| Securing the Cities | 34,465 | --- | -34,465 |
| Biological Support | 87,152 | --- | -87,152 |
| Subtotal, Federal Assistance | 142,885 | --- | -142,885 |
| (Appropriations) | (142,885) | --- | (-142,885) |
| Total, Countering Weapons of Mass Destruction | 409,441 | --- | -409,441 |
| (Appropriations) | (409,441) | --- | (-409,441) |
| Total, Title IV, Research, Development, Training, and Services | 1,809,415 | 1,324,193 | -485,222 |
| (Appropriations) | (1,809,415) | (1,324,193) | (-485,222) |
| Fee Funded Programs | 6,695,185 | 6,818,257 | +123,072 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| TITLE V - GENERAL PROVISIONS | | | |
| Presidential Residence Protection Assistance (Sec.528) | --- | 3,000 | +3,000 |
| DHS Lapsed Balances (non-defense) (rescission)........ | -27,030 | --- | +27,030 |
| DHS Lapsed Balances (defense) (rescission)............ | -2,545 | --- | +2,545 |
| DHS Nonrecurring Expenses Fund (70 x 1914) (Sec. 550) (rescission)........................................ | -133,000 | --- | +133,000 |
| Derived by transfer from P.L. 117-58.................. | -115,000 | --- | +115,000 |
| Total, Title V, General Provisions.............. | -277,575 | 3,000 | +280,575 |
| (Defense).................................. | (-2,545) | --- | (+2,545) |
| (Non-Defense).............................. | (-275,030) | (3,000) | (+278,030) |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| OTHER APPROPRIATIONS | | | |
| DISASTER RELIEF SUPPLEMENTAL APPROPRIATIONS ACT, 2025 (P.L. 118-158 DIVISION B) | | | |
| DEPARTMENT OF HOMELAND SECURITY | | | |
| United States Coast Guard | | | |
| Procurement, Construction, and Improvements (emergency) | 210,200 | --- | -210,200 |
| Operations and Support (emergency) | 102,500 | --- | -102,500 |
| Total, USCG | 312,700 | --- | -312,700 |
| Federal Emergency Management Agency | | | |
| Disaster Relief Fund (DRF) (emergency) | 29,000,000 | --- | -29,000,000 |
| Hermit's Peak (emergency) | 1,500,000 | --- | -1,500,000 |
| Total, FEMA | 30,500,000 | --- | -30,500,000 |
| Federal Law Enforcement Training Centers - Procurement, Construction, and Improvements (emergency) | 14,020 | --- | -14,020 |
| Total, Disaster Relief Supplemental Appropriations Act, 2025 | 30,826,720 | --- | -30,826,720 |
| Total, Other Appropriations | 30,826,720 | --- | -30,826,720 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2025
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2026
(Amounts in thousands)

| | FY 2025 Enacted | Bill | Bill vs. Enacted |
|---|---|---|---|
| Grand Total | 119,563,791 | 94,084,000 | -25,479,791 |
| (Discretionary Appropriations) | (93,925,394) | (99,136,555) | (+5,211,161) |
| (Defense) | (3,329,240) | (3,286,000) | (-43,240) |
| (Non-Defense) | (90,596,154) | (95,850,555) | (+5,254,401) |
| (Disaster Relief Category) | (22,510,000) | (26,474,000) | (+3,964,000) |
| (Other Non-Defense) | (68,086,154) | (69,376,555) | (+1,290,401) |
| (Rescissions) (Defense) | (-2,545) | --- | (+2,545) |
| (Rescissions) (Non-defense) | (-160,030) | --- | (+160,030) |
| (Offsetting Collections) | (-6,236,588) | (-6,301,555) | (-64,967) |
| (Emergency Appropriations) | (30,826,720) | --- | (-30,826,720) |
| (Mandatory Funding) | (1,210,840) | (1,249,000) | (+38,160) |
| | | | |
| (By transfer) | 683,000 | --- | -683,000 |
| (Transfer out) | -683,000 | --- | +683,000 |
| Aviation Security Capital Fund | 250,000 | 250,000 | --- |
| Fee Funded Programs | 9,834,014 | 10,510,143 | +676,129 |
| | | | |
| (Grand Total without Other Appropriations) | (88,737,071) | (94,084,000) | (+5,346,929) |

# MINORITY VIEWS

We first and foremost want to convey our deep appreciation to all Department of Homeland Security (DHS) personnel for the critical work they do every day to protect our country. We recognize our shared goals to make smart, cost-effective investments that prioritize the DHS workforce as well as its versatile mission. While we acknowledge that there are several bipartisan funding initiatives in this bill, unfortunately, we cannot support it. The bill underinvests in critical missions that keep our communities safe from growing national security threats and will ultimately increase costs and burdens on State and local governments to respond to future major disasters. Furthermore, it fails to hold the current administration accountable and uphold core, constitutional protections in the Department's execution of the laws it is entrusted to enforce. We regret that this legislation reflects a missed opportunity to strike a balance in optimizing funding across all parts of the DHS mission while upholding the ideals and values that make America the greatest nation in the world.

There is no question that encounters at the border began to decline at the start of fiscal year 2025. However, U.S. Immigration and Customs Enforcement (ICE) made a conscious choice under a continuing resolution to ramp up detention space, well above the levels that would be fiscally responsible, without clear justification to the Committee. The current administration has made no secret of their goals to deport one million individuals this calendar year, and it appears they are willing to do so at any cost. While the bill rewards poor financial management with even more investment in for-profit detention centers with 50,000 detention beds, it neglects to ensure commensurate independent oversight for this growth. However, we are pleased the bill now includes Democratic provisions that will prohibit the Department using funds to detain and deport American citizens and reaffirm constitutional protections. Such provisions would not need to be restated in normal times. However, the current administration's reckless approach to deportation and reliance on private contractors requires these additions to the bill.

The bill also embraces the elimination of longstanding programs that provide legal pathways, such as preventing the use of country-specific parole processes for certain nationals fleeing socialist dictatorships or gang rule from Cuba, Haiti, Nicaragua, and Venezuela or temporary protected status for individuals from Afghanistan, Cameroon, and Honduras. In particular, the bill's failure to extend temporary protected status to Afghans who in some cases directly assisted U.S. troops during the war there, is tantamount to a death sentence for these individuals. Democrats attempted to include protections in the bill for these individuals and look forward to hopefully securing protections in a final bill.

The bill eliminates the Family Reunification Task Force in defiance of the *Ms. L et al.* settlement despite Democratic efforts to restore them. Further, the bill guts funding for refugee and asylum programs and eliminates the Citizenship and Integration Grant Program which provides resources for those seeking to lawfully pursue U.S. citizenship. Underfunding asylum operations will only further overwhelm the immigration court backlog and ensure more noncitizens are released into the interior with the threat of deportation looming over them as they await the outcome of their case.

Additionally, despite the ever-increasing threats against American families, businesses, critical infrastructure, and national institutions, this bill weakens our national security and leaves Americans vulnerable to attacks from our adversaries. Following the administration's June 21, 2025 bombing of Iran nuclear sites, the Department issued a National Terrorism Advisory System Bulletin confirming the likeliness of cyber-attacks against U.S. networks by pro-Iranian hackers and cyber actors affiliated with the Iranian government. Unfortunately, this bill takes years of investment in cybersecurity backwards through the adoption of $130 million in DOGE staffing cuts to the Cybersecurity and Infrastructure Security Agency (CISA). The bill sets in motion a growing push to require State and local governments to detect and mitigate the next ransomware attack and protect Americans' sensitive data from hackers with fewer CISA personnel to work alongside them. Communities nationwide, which lack the funding and expertise to navigate the next attack on hospitals, schools, water plants, financial institutions, or telecommunications, will have to prepare to do so on their own.

Further, in the face of worsening hurricanes, wildfires, and other natural disasters, this bill doubles-down on the current administration's effort to throw the responsibility of disaster recovery and mitigation onto the States. The bill reduces Federal Emergency Management Agency (FEMA) personnel by $93 million and ignores a current $8 billion shortfall in the Disaster Relief Fund. Emergency management, response, recovery, and mitigation is not waste. Helping our neighbors and fellow Americans rebuild their lives after disasters is not abuse. States simply don't have the ability to rebuild after disasters on their own. We saw earlier this year after our FEMA fiscal year 2026 budget hearing what the Department does to leadership when they speak truth to power. While we are disappointed that Democratic amendments to protect the elimination of FEMA and secure additional emergency supplemental funds for the DRF ahead of hurricane season were not agreed to, we look forward to continuing to work with the majority on the restoration of the Building Resilient Infrastructure and Communities funding that so many of our communities rely on to reduce their vulnerability to future and repeat disasters.

Finally, this bill has been considered during a time of remarkable upheaval for the Committee. Since taking office in January 2025, the executive branch has been engaged in a rampant, unlawful, and unconstitutional disregard for spending laws. In particular, the Office of Management and Budget has been at the center of a government-wide effort to thwart the intent of this Committee's laws in its actions, while also unlawfully refusing to publish the

agency's legally-binding budget decisions (known as apportionments) in contravention of an unambiguous and constitutionally sound assertion of the Congress's authority to impose transparency requirements upon the executive branch.

The current executive branch has contended—at times—an inherent Presidential power to impound. However, while this bill was approved over the objection of almost all Democrats on the Committee, the debate and proceedings made unmistakably clear, just as former Chief Justice of the Supreme Court of the United States William Rehnquist concluded (at the time an Assistant Attorney General with the Department of Justice Office):

> "With respect to the suggestion that the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent."

The laws considered and enacted by this Committee reflect the legally binding expression of Congress's constitutional power of the purse, effectuated through the conditions and permissions the Committee places on spending authority through the Congress's Article I powers. Just as the Committee chooses to allow or restrict the *purpose* for any funds in the bill, so too does the Committee decide the *amount* for which an activity shall be funded. When the Committee allows the flexibility of merely mandating a ceiling (or upper limit) or a floor (lowest required level) for an activity, it does so in contrast to every other instance where it has included a specific amount, which unless otherwise stated is Congress's clear intent to be both a floor and a ceiling.

These perspectives are both uncontroversial and longstanding principles on which all of the Committee's work rests.

In closing, this bill falls far short of our responsibility to provide for the safety and security of Americans. As the appropriations process continues, we look forward to working with the majority and urge them to join us in developing final legislation that exemplifies our responsibility to govern and prioritizes the safety and security of the homeland.

ROSA DELAURO,
*Ranking Member*.
LAUREN UNDERWOOD.

○

# Exhibit B-3

# EXPLANATORY STATEMENT FOR THE HOMELAND SECURITY APPROPRIATIONS BILL, 2026

## OVERVIEW AND SUMMARY OF THE BILL

Fiscal year 2026 represents the 23rd annual appropriations cycle for the Department of Homeland Security. The Department continues to mature and prove its value to our Nation during periods of calm and adversity, and the Committee recognizes the Department's efforts to maintain our overall national security posture, especially in light of developing challenges and threats, without forsaking the mission to safeguard the American people and that of our homeland.

The Committee acknowledges the success in executing the Department's substantial missions is primarily due to the dedication of Department personnel and the Committee is grateful to the thousands of personnel across the Department for their commitment to public service and recognizes the contributions and sacrifices of their families.

The Committee continues to emphasize initiatives to connect and integrate programs across the homeland security enterprise to meaningfully quantify the value of new investments in improving operational capabilities and achieving performance improvements. This type of work must become common practice and not isolated exceptions. Future requests for investments should be informed by workload analyses and predictive analytics, appropriately leveraging AI and machine-learning, to clearly detail anticipated requirements and the costs relating to those requirements and the Committee directs the Department to actively examine new, innovative capabilities to successfully meet mission goals. The Committee calls on the Department to incorporate into future budget submissions the data resulting from modeling efforts and other analytics that directly speak to future workload impacts and operational requirements. The Committee expects the Department to continue gaining management and cost efficiencies by consolidating cross-component efforts while allowing components a reasonable flexibility necessary to respond quickly to changing or emergent threats.

The Committee recommends a total appropriation of $92,323,000,000 for the Department of Homeland Security for fiscal year 2026. Of this amount, $65,956,000,000 is for discretionary programs and $26,367,000,000 is for the Disaster Relief Fund designated by the Congress as disaster relief pursuant to Public Law 112–25. This recommended level and the accompanying direction in the bill and report advance key, bipartisan priorities across the Department, including: (1) resources to maintain existing capabilities related to maintaining a secure border and enforcing the Nation's immigration laws; (2) funding to help safeguard against, and en-

able the recovery from, natural and manmade disasters; (3) enhancing capabilities to detect and respond to growing numbers of cybersecurity threats from around the world, including threats to both the Federal Government, as well as non-Federal critical infrastructure and services; and (4) modernizing Coast Guard's surface and air fleets, enhancing our Nation's maritime safety and security capabilities and protecting our interests.

In addition, this bill makes unprecedented investments to protect American families against fentanyl. The Committee provides $29,999,000,000 to Customs and Border Protection [CBP] and Immigration and Customs Enforcement [ICE] for a range of critical investments in the fight to stem the flow of fentanyl and other synthetic narcotics into the U.S. Such funds will also extend the fight beyond the border, and support and expand efforts to disrupt and dismantle transnational criminal organizations that operate on a business model involving an endless cycle of narcotics, firearms, and human trafficking which threatens lives at home and abroad. Of this amount, $499,278,000 is provided to CBP for improving the detection and seizure of fentanyl at ports of entry. For outbound operations, this level of funding will expand the number of ports of entry on the southwest border with dedicated outbound capabilities to stop the flow of currency, firearms, ammunition, and other contraband being trafficked across the southern border to Mexico in connection with the sale of fentanyl. Of this amount, $6,162,091,000 is provided to Enforcement and Removal Operations [ERO] to maintain 50,000 detention beds.

Fiscal year 2026 funding levels cited in this explanatory statement reflect the enacted amounts in the Full-Year Continuing Appropriations Act, 2025 (Public Law 119–4), adjusted for comparability where noted, and do not include supplemental appropriations.

BILL FUNDING PRIORITIES

[In thousands of dollars]

| | Fiscal year 2025 enacted | Committee recommendation |
|---|---|---|
| Title I—Departmental Management Operations | 2,952,869 | 2,987,406 |
| Title II—Security, Enforcement, and Investigations | 52,871,734 | 53,381,008 |
| Title III—Protection, Preparedness, Response, and Recovery | 30,169,788 | 34,703,392 |
| Title IV—Research, Development, Training, and Services | 1,809,415 | 1,448,782 |
| Title V—General Provisions | (277,575) | (197,588) |
| Total, new budget (obligational authority) | 87,526,231 | 92,323,000 |

## REFERENCES

Any reference in this explanatory statement to the Secretary shall be interpreted to mean the Secretary of Homeland Security.

Any reference to the Department shall be interpreted to mean the Department of Homeland Security.

Any reference to a departmental component shall be interpreted to mean offices, components, directorates, or other organizations within the Department of Homeland Security.

Any reference to the budget request or the request shall be interpreted to mean the budget of the U.S. Government, fiscal year 2026.

Any reference to FTE shall mean full-time equivalents.

Any reference to PPA shall mean program, project, and activity.

Any reference to GAO shall mean the Government Accountability Office.

Any reference to OIG shall mean the Office of the Inspector General of the Department of Homeland Security.

Any reference to IT shall mean information technology.

Any reference to SLTT shall mean State, Local, Tribal, and Territorial.

# DEPARTMENT OF HOMELAND SECURITY

## TITLE I

## DEPARTMENTAL MANAGEMENT, OPERATIONS, INTELLIGENCE, AND OVERSIGHT

### OFFICE OF THE SECRETARY AND EXECUTIVE MANAGEMENT

The Office of the Secretary and Executive Management [OSEM] supports the Department by providing direction, management, and policy guidance to operating components. The programs, projects, and activities funded by this appropriation include: the Office of the Secretary [OE]; the Office of Policy [OPE]; the Office of Public Affairs [OPA]; the Office of Legislative Affairs [OLA]; the Office of Partnership and Engagement [OPE]; the Office of General Counsel [OGC]; the Office for Civil Rights and Civil Liberties [OCRCL]; the Office of the Citizenship and Immigration Services Ombudsman [CIS Ombudsman]; the Office of the Immigration Detention Ombudsman [OIDO]; and the Privacy Office [PRIV].

#### COMMITTEE RECOMMENDATIONS

The Committee recommends $370,106,000 for OSEM. The following table summarizes the Committee's recommendation as compared to the fiscal year 2025 enacted and budget request levels:

OFFICE OF THE SECRETARY AND EXECUTIVE MANAGEMENT

[In thousands of dollars]

| | Fiscal year 2025 enacted | Committee recommendations |
|---|---|---|
| Management and Oversight | 184,806 | 168,059 |
| Office of Strategy, Policy, and Plans | 85,735 | 120,296 |
| Operations and Engagement | 93,041 | 36,073 |
| Procurement, Construction and Improvement | 8,113 | 8,113 |
| Federal Assistance (Transfer out) | 33,000 | .......................... |
| Total, Office of Secretary and Executive Management | 371,695 | 332,541 |

#### OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriations, 2025 | $371,695,000 |
| Committee recommendation | 332,541,000 |

#### COMMITTEE RECOMMENDATIONS

The Committee recommends $332,541,000 for Operations and Support [O&S].

*2026 FIFA World Cup Planning*.—The Committee recognizes that cities hosting events related to the 2026 World Cup face critical public safety needs that require adequate preparation. These

include ensuring swift secure communications abilities among first responders and emergency services; working with Federal and SLTT jurisdictions to provide emergency services; and ensuring a safe environment for all attendees, residents, and visitors to the United States. The Committee directs the Secretary to submit a report on the security planning processes, expected budgetary impacts, including from Public Law 119–21, coordination efforts with Federal and SLTT entities, and additional resource requirements necessary for the 2026 FIFA World Cup not later than 90 days after the date of enactment of this act.

*2028 Olympic & Paralympic Games*.—The Secretary shall submit a report to the Committee, in coordination with the U.S. Secret Service and other relevant components, not later than 90 days after the date of enactment of this act, describing the full scope of the Department's obligations, including the nature of its coordination with other Federal agencies and departments as well as representatives of the relevant State and local security related entities involved in securing the 2028 Olympic & Paralympic Games. The report shall also include the Department's projected resource needs, by component, for fiscal year 2026 through fiscal year 2029 including specific account details and how the Department is using the funds provided for this purpose in Public Law 119–21. If there are any projected budgetary shortfalls, the report shall also include those broken out by each fiscal year.

*287(g) Programs*.—The Department shall evaluate its interactions and relationships with local law enforcement agencies, including but not limited to the 287(g) program. This evaluation should result in specific recommendations for ensuring that the Department considers the costs and benefits of the program, including for local law enforcement agencies, particularly as it relates to the workload and community relationships. The Office of Strategy, Policy, and Plans, in consultation with the Office of Partnership and Engagement is directed to brief the Committee on the results of its evaluation not later than 180 days after the date of enactment of this act.

*Access to High-Quality Affordable Childcare for Federal Employees*.—Within 90 days of the date of enactment of this act, and semiannually thereafter, the Department is directed to provide a report on access to high-quality affordable childcare for children of Department employees. The report shall detail all current programs or efforts that assist Federal employees with childcare, identify programs, including recruitment and retention programs, that would assist with childcare, and detail all associated costs, even if such costs are projections. Additionally, the Department shall survey employees to capture interest in such programs or efforts and identify to the Committee the level of interest and provide the number of employees using such programs. Where possible, the Department shall identify whether access to childcare hinders recruitment or retention efforts, provide the geographical locations where such hindrance occurs, and identify targeted programs for such cases.

*Artificial Intelligence Implementation*.—The Committee commends the Department for its commitment to deploying artificial intelligence [AI] in a manner that is scalable, secure, and responsible. The Committee directs the Department, within 90 days of the

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 545 of 714 PageID #:1595



date of enactment of this act, to brief the Committee on the Department's AI activities, including progress on the Department's implementation of its AI strategy and new use cases of AI.

*Body Armor*.—The Committee recognizes the critical importance of ensuring that DHS law enforcement personnel operating in high-risk environments are equipped with state-of-the-art ballistic protection. This need is greater than ever before, given the rising number of attacks of DHS law enforcement officers. The Committee directs DHS to procure ballistic body armor and related protective equipment that is specifically designed to fully protect the body shapes of agents and officers and is made to conform to the individual wearer and provide the best possible fit and coverage to allow for either a flat or shaped front panel. The body armor procured must meet or exceed the most current ballistic resistance standards developed by the National Institute of Justice [NIJ]. Within 180 days of the date of enactment of this act, the Secretary shall submit a report to the Committee detailing: (1) an assessment of the current ballistic protection inventory across DHS components; (2) a plan to ensure all newly procured body armor conforms to the latest NIJ standards; (3) an inventory management strategy, including equipment lifecycle replacement schedules; and (4) steps to maximize the health, safety, and operational effectiveness of DHS law enforcement personnel through improved protective technologies.

*Biometric Exit and Visa Overstay*.—The Department is directed to provide a spend plan for H–1B and L–1 fee revenues and any other resources being applied to biometric exit implementation not later than 30 days after the date of enactment of this act. The Committee further directs the Department to brief the Committee within 180 days of the date of enactment of this act, to detail ongoing efforts to address entry and exit data collection and exchange in the land border environment. Further, pursuant to section 1376 of title 8, United States Code, the Department is required to collect data on nonimmigrants who have overstayed their visas and to report annual estimates to Congress. The Committee expects that the Department will provide the report on an annual basis. As previously required, the Department shall submit an updated report outlining its comprehensive strategy for overstay enforcement and deterrence not later than 180 days after the date of enactment of this act. The report shall detail the ongoing actions to identify individuals who have overstayed their visas, including those necessary to improve the capabilities to report such information; notify individuals of their required departure dates in advance; track such overstays for enforcement action; refuse or revoke current and future visas and travel authorization; and otherwise deter violations or take enforcement action.

*Border-Related Data and Transparency*.—In addition to the reporting requirements found in the National Defense Authorization Act of 2017 (Public Law 114–328) and in the explanatory statement accompanying Public Law 118–47, the Committee continues its requirement that the Department submit quarterly Border Security Status reports and data on the deportation, or removal, of the parents of citizen children semiannually.

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 546 of 714 PageID #:1596



*Border-Related Executive Orders*.—As the administration considers and executes further executive action that directly impacts operations on the border, the Committee directs ICE, CBP, U.S. Citizenship and Immigration Services, and the Office of Strategy, Policy, and Plans to jointly brief the Committee no later than 7 days after the execution of any border-related executive actions on preliminary budgetary impacts, operational changes, new training that may be required, revised or new international agreements, and any additional FTE that have been deployed to implement the executive action. The Department shall also provide to the Committee any data, not less than weekly, utilized in the execution of such actions.

*Combatting Economic and Industrial Espionage by Foreign Adversaries*.—Within 180 days of the date of enactment of this act, the Department shall brief the Committee on its efforts to combat economic and industrial espionage by foreign adversaries. This briefing shall include a description of the Department's actions to address and prevent cyber intrusions and potential abuse of U.S. academic and other visa programs, as well as its interagency coordination with the Department of Justice [DOJ], Department of State, and other relevant agencies in these efforts.

*Congressional Requests for Information*.—The Committee recognizes the work that the Department is accomplishing by arresting and removing criminals, interdicting drugs, investigating heinous crimes, and helping to rebuild and strengthen communities after disasters. The members of the Committee are keenly interested in responses to their requests for information and briefing requests, particularly as they relate to ongoing operations conducted by the Department. The Committee includes a new General Provision that will enable members and staff of the Committee to receive information from the Department on topics of interest directly from the Department, and allow for them to have information to inform their constituents and communities, as well as funding decisions, before external actors are able to set the narrative.

*Coordination with Border-Adjacent Tribes*.—The Committee recognizes the need for CBP and ICE to closely coordinate with Indian Tribes along the United States' land borders to address the shared aims of cultural preservation and national security, and supports the ongoing implementation of CBP's December 4, 2023, memorandum of Support to Tribes at or near the U.S. Southwest Border.

*Coordination with Other Departments*.—The Secretary or heads of agencies are encouraged to coordinate with their counterparts at other agencies prior to conducting a targeted enforcement action on an individual who is employed or contracted by the Federal government when that individual is responding to an active natural disaster (defined as a hurricane, tornado, storm, high water, wind-driven water, tidal wave, tsunami, earthquake, volcanic eruption, landslide, mudslide, snowstorm, or drought, or, regardless of cause, fire, flood, or explosion) or a declared emergency.

*Countering Unmanned Aerial Systems [UAS]*.—The Committee remains concerned about the increasing threat that Unmanned Aerial Systems [UAS] pose to our National security and to the safety of the public and the Federal workforce, including their use in facilitating illicit activity at the southern border. The Secretary, in

conjunction with the Office of Intelligence and Analysis [I&A] and CBP, shall provide a report to the Committee not later than 90 days after the date of enactment of this act, detailing the current threats posed by the use of drones by transnational criminal organizations along the southern border, the Department's ability to address this threat through counter-UAS activities, and any authorities and resources, including for detection, tracking and identification technology and jammer-based mitigation, that would allow the Department to better interdict and deter UAS.

*Countering Weapons of Mass Destruction [CWMD] Transition*.—The Committee notes that the authorization for the Office of Countering Weapons of Mass Destruction, which was extended beyond its statutory end date through fiscal year 2024 continuing resolutions, ended on March 22, 2024. While the Committee does not continue funding for the CWMD office as a standalone entity, it recognizes the critical importance of the office's underlying mission functions. The Committee directs the Department to ensure that all programs, capabilities, and statutory responsibilities previously managed by CWMD continue without interruption upon transfer to their respective receiving components. The Department shall brief the Committee not later than 30 days after the date of enactment of this act, and quarterly thereafter, on the operational and staffing status of each function as well as any risks to mission continuity and the Department's mitigation plans. The table below shows the accounts to which the funds from CWMD are being moved.

COUNTERING WEAPONS OF MASS DESTRUCTION

[In thousands of dollars]

| Component | Account | Purpose | Committee recommendation |
|---|---|---|---|
| OSEM | Operations and Support | CBRN Risk Assessments, Detection Architecture, Policy, and Strategy. | 36,854 |
| | | Mission Support | 21,903 |
| | | Capability and Operational Support | 14,951 |
| OSEM | Operations and Support | National Biosurveillance Integration Center | 24,718 |
| | | Mission Support | 6,708 |
| | | Capability and Operational Support | 18,010 |
| CISA | Operations and Support | Personnel Support for Federal Assistance Program | 94,964 |
| | | Mission Support | 58,561 |
| | | Capability and Operational Support | 36,403 |
| S&T | Operations and Support | Personnel Support for R&D | 4,353 |
| | | Mission Support | 4,353 |
| CBP | Operations and Support | Rad/Nuc Support Personnel for Safe Port Act Public Law 109–347. | 4,356 |
| | | Mission Support | 4,356 |

| Component | Component | Description | Total |
|---|---|---|---|
| S&T | Research and Development | Research and Development | 60,938 |
| CISA | Operations and Support | Training, Exercises, and Readiness | 21,268 |
| | | Securing the Cities | 34,465 |
| | | Biological Support (Biowatch) | 87,152 |

*DATA Act Reporting*.—The Committee expects the Department to submit timely, accurate, and complete financial and award infor-

mation under existing Department of the Treasury reporting obligations in accordance with established management guidance, reporting processes, and data standards established under the requirements of the Digital Accountability and Transparency Act (Public Law 113–101).

*Data Aggregation*.—The Committee is aware of public concerns regarding the aggregation and use of multiple data sources that include information on U.S. citizens for the purposes of monitoring, surveillance, or tracking. The Department is directed to provide a briefing to the Committee not later than 90 days after the date of enactment of this act on current or planned systems that draw on data from more than two sources and include information on U.S. citizens. The briefing should describe the purpose and use of such systems, the sources and types of data involved, any applicable oversight or privacy safeguards, and how the Department ensures that such systems are not used for systemic, indiscriminate, or wide-scale surveillance.

*Department's Mission in Rural Areas and Tribes*.—The Office of Partnership and Engagement is directed to provide a briefing to the Committee not later than 90 days after the date of enactment of this act on its outreach efforts to rural communities and Tribes in their efforts to support the homeland security mission.

*Department of Defense Border and Immigration Enforcement Support*.—Within 90 days of the date of enactment of this act, and monthly thereafter, the Department [including representatives from CBP and ICE] is directed to brief the Committee on the continued support from the Department of Defense [DoD] to augment DHS border and immigration enforcement operations. The briefing shall include: (1) The support DHS requested to DoD during the reporting period, including a copy of the written request; (2) The support approved by DoD for the reporting period, including a copy of the written approval; (3) The duties, functions, and stations the DoD assets filled to provide support to DHS during the reporting period; (4) A list of each DoD installation or facility on or off an installation that is being used to support DHS or any of its components; and (5) the DHS steady-state posture plans for border and immigration enforcement operations on the southern border and assessment for continued DoD support.

*Deputization of Law Enforcement*.—Within 90 days of the date of enactment of this act, the Department shall submit to the Committee the memorandums of understanding for the deputization of law enforcement officers that have been signed with departments and agencies across the Federal Government, including but not limited to, DoD, DOJ, the Internal Revenue Service, the Department of State, and components within DHS. In addition, the Department is directed to provide a report on the authorities utilized for each agency agreement and the training provided to the deputized law enforcement officers, including the costs and which agency incurs the cost for training. For those officers deputized from other DHS components, the report shall include an analysis of the operational impacts of such actions, including a breakdown of number of officers deputized by component and any impacts on the original mission of such agency, across the Department.

*DHS Uniform Policy*.—The Committee encourages DHS to develop and implement a standardized uniform policy for domestic law enforcement operations to ensure that law enforcement officers are clearly identifiable as Federal law enforcement. The policy may make exceptions for unique situations, such as those involving undercover operations, or for life and safety considerations in areas of increased threat as covered under Title 8 for enforcement activities. The Department is directed to brief the Committees within 60 days of the date of enactment of this act, on the policy that has been developed, the implementation plan, and any associated resource costs.

*DHS Law Enforcement Officer Assault Reporting*.—The Department is directed to brief the committee on a monthly basis on the number of assaults on DHS law enforcement officers within 90 days of the date of enactment of this act. The data provided in the brief shall include statistics for the last five fiscal years.

*Duplicative Activities*.—The Government Accountability Office's 2025 Annual Report entitled "Additional Opportunities to Reduce Fragmentation, Overlap, and Duplication and Achieve Billions of Dollars in Financial Benefits" notes that the Department has 20 open and unaddressed recommendations with another 8 recommendations only partially addressed. The Department shall provide a report, not later than 180 days after the date of enactment of this act, on the status of the Department's efforts to address the GAO's recommendations, and any legal, resource, or other barriers preventing the Department from addressing the recommendations.

*Ending Online Child Exploitation*.—The Committee directs the Department to brief the Committee semiannually on all of the required data pertaining to Department-wide efforts to combat human trafficking and child exploitation and provide the appropriate committees of jurisdiction with an updated comprehensive study on human trafficking as required in the Trafficking Victims Protection Reauthorization Act of 2008 (Public Law 110–457). The briefing shall include steps the Department has taken to respond to the recent media reports concerning the safety and well-being of vulnerable unaccompanied children.

*Family Reunification*.—The Committee expects that the Department will, consistent with assessments that it is in the best interest of the child, and whenever possible, ensure that separated family units are reunited prior to removal or deportation, released from CBP or Bureau of Prisons custody, or remain together upon transfer to ICE or Office of Refugee Resettlement custody. The Committee expects the Department to ensure that individuals transferred from CBP to ICE custody, currently in ICE custody, or under ICE supervision, have opportunities to report family separation incidents; to verify the status, location, and disposition of family members; and to regularly communicate by telephone with one another. The Department shall also ensure that agents and officers are properly trained in child welfare screening for child victims of trafficking, in accordance with the Trafficking Victims Protection Reauthorization Act of 2008 (Public Law 110–457).

*Federal Trust and Treaty Responsibilities*.—The Committee reminds the Department of their obligation to uphold the Federal trust and treaty responsibilities to Tribes and Federal obligations

to the Native Hawaiian Community. This includes upholding treaty and reserved rights, and any other rights and obligations under Federal law; supporting self-determination efforts by Native communities; fulfilling obligations under Presidential Memoranda and Executive Orders; and conducting early and robust government-to-government consultation with Tribes, and meaningful outreach and engagement with Native Hawaiians.

*Future Goods and Services for Homeland Security Feasibility Report*.—The Secretary, in conjunction with Federal Emergency Management Agency [FEMA] and Cybersecurity and Infrastructure Security Agency [CISA], as well as relevant departmental components and other Federal agencies and departments, shall provide a report to the Committee not later than 90 days after the date of enactment of this act on the feasibility of producing an annual projection of needs for goods and services regarding response to and recovery from nationwide events. The feasibility report shall detail the ways in which sourcing domestic and foreign supplies affects response and recovery preparedness and shall include the potential impact of the development of a program that communicates anticipated national needs on the reliability of the supply chain.

*ICE Pact Implementation*.—The Committee recognizes the significant potential benefits of the Icebreaker Collaboration Effort [ICE] Pact for the U.S. Coast Guard, for the U.S. shipbuilding industrial base, and U.S. Arctic security. The Committee directs the Department of Homeland Security and the Coast Guard to provide a joint briefing within 90 days of the date of enactment of this act, detailing the progress in ICE Pact implementation, future implementation timelines, and estimated resource or other needs, including statutory and regulatory changes, for full implementation.

*Office of Homeland Security Statistics [OHSS]*.—The Committee is concerned that monthly reports have not been updated since January 2025, despite the requirements in the explanatory statement accompanying Public Law 117–328. The Committee directs OHSS to continue to provide monthly reports for fiscal year 2026. The Committee also directs OHSS to include in its report the arrest location and the number of repatriations by arresting agency, as well as detentions, removals, and ICE arrests of U.S. citizens, Lawful Permanent Residents, and former members of the Armed Services. The report shall also include detailed summary-level data on prosecution types of charges broken down by sector, country of origin, asylum claim and sentencing outcome.

*Limited English Proficient Communities*.—The Committee encourages the Department to review its practices and create uniform applications across all Department agencies to strengthen communication practices to include digital, television, and radio advertising when working with limited English proficient communities. Not later than 90 days after the date of enactment of this act, and annually thereafter, the Department is directed to provide a detailed report to the Committee covering the Department's annual advertising expenditures by component. The report shall identify expenditures that relate to limited English proficient communities and shall delineate between forms of advertising such as television, radio, or Internet.

*National Strategy to Counter Antisemitism*.—Within 90 days of the date of enactment of this act, the Department is directed to provide a report to the Committee that details its progress on fulfilling its commitments outlined in the U.S. National Strategy to Counter Antisemitism.

*Non-Leaded Ammunition*.—Within 90 days of the date of enactment of this act, the Department is directed to provide a report to the Committee that examines whether current brass and lead can be recycled and the environmental implications of such recycling. Within 180 days of the date of enactment of this act, the Department is directed to report to the Committee on examining alternatives to traditional bullet backstops and berms in indoor and outdoor firing ranges that would mitigate or preserve the integrity for the reduction of lead dust and the ability to recycle, and the availability of Reduced Training Hazard Ammunition to meet the current training requirements across DHS components. Additionally, the report shall include a summary of any amounts of lead or brass that were recycled by DHS and a summary of the expenditure of applicable recycling funds over the past five fiscal years.

*Parole Requests for Servicemembers and Veterans*.—The Committee appreciates the Department's efforts to expedite processing and consideration, on a case-by-case basis, of parole requests under section 212(d)(5) of the Immigration and Nationality Act from certain noncitizen current and former military servicemembers and qualifying family members who are outside of the United States. However, the Committee is concerned that processing times remain lengthy and irregular. The Committee directs the Department to continue processing these parole requests on an expedited basis and at a minimum within 180 days of receipt. The Department is directed to make available, on a publicly accessible website, an interactive dashboard detailing the number of such parole requests made, processed, approved, denied and pending by month, along with the average processing time. For each parole request denial, the Department is directed to report the country of nationality or last habitual residence of the noncitizen, whether the noncitizen was discharged or released from service under honorable conditions, whether the noncitizen was deployed overseas, whether the noncitizen served on active duty in the Armed Forces in an overseas contingency operation, their branch of service, whether the noncitizen was awarded military decorations or medals, and whether the noncitizen has a spouse, child or other immediate family member residing in the United States.

*Parole Report*.—The Department is reminded of the instruction in Public Law 117–103 to produce a report on its use of parole authority, including the number of parole requests received and granted, and for those granted, the rationale for each grant and its duration. The report shall be required on a monthly basis and shall be released at the same time as CBP releases its monthly operation statistics update.

*Quarterly Obligation Reports*.—The Department shall continue to submit quarterly obligation reports to the Committee for all reception and representation expenses as required in prior years. The Department shall refrain from using funds available for reception

and representation expenses to purchase unnecessary collectibles or memorabilia.

*Recalcitrant Countries*.—Not later than 90 days after the date of enactment of this act, the Department shall, in consultation with the Department of State and other relevant agencies, brief the Committee on efforts to remove aliens encountered from countries who currently refuse to accept returns. This brief shall include the list of countries the Department considers recalcitrant, as well as the number of aliens from each of these countries subject to final orders of removal, including their detention status. The brief shall be submitted in unclassified form but may contain a classified annex.

*Records Management*.—The Committee expects the Department to maintain records and respond to records requests, consistent with the requirements of section 552 of title 5, United States Code, for information related to all detainees in the custody of the Department, regardless of whether such detainees are housed in a Federal or non-Federal detention facility. The Committee further notes that the Department should not withhold records from disclosure unless the Department reasonably foresees that disclosure would harm an interest protected by an exemption described in section 552(b) of title 5, United States Code or is otherwise prohibited by law.

*State Police and Crime Labs*.—The work of CBP, ICE, the Coast Guard, and the Secret Service includes investigations and operations in communities throughout the United States. As a result, the Department often shares capabilities and relies upon cooperation with SLTT and foreign law enforcement agencies, including State police crime labs. These labs provide the Department with a number of critical capabilities, including fingerprint, drug, and cellular telephone analysis. Likewise, these capabilities are the same services shared among SLTT and foreign law enforcement agencies. Coordination among these agencies not only ensures efficient use of resources, it also improves public safety outcomes. To that end, the Department should continue to work with State crime labs where available, particularly in areas not adequately served by Department labs or other Federal facilities. The Department should also continue to provide any assistance that is appropriate to State police crime labs to ensure Federal requirements do not burden State resources. Moreover, in areas where the Department frequently relies on State crime labs, additional support may be appropriate to prevent the accumulation of backlogs that can slow investigations. Within 90 days of the date of enactment of this act, the Department shall report on its use of and partnerships with State crime labs, including funds associated with such partnerships, and should fully reimburse State crime labs for the service they provide to the Department.

*Terrorism Watch List*.—The Department shall notify the Committee within 7 days if an individual on the Federal Bureau of Investigation's Terrorist Screening Data Set [TSDS] is encountered by the Department or another Federal agency supporting the Department's law enforcement mission at or between a port of entry, or while conducting immigration enforcement activities.

*TSDS Encounters*.—The Department shall continue the requirement to provide quarterly reports to the Committee detailing what actions, if any, the Department has taken or plans to take to determine whether each individual on the TSDS encountered at or between ports of entry poses a homeland security threat that needs to be mitigated and the total number of individuals determined to pose such a threat.

*Tribal Consultation*.—Department personnel interact with Tribes and thousands of Tribal members every day. Some Department personnel do not have training on Tribal issues, which may lead to misunderstandings that negatively impact Tribes, Tribal members, and ultimately, the Department. The Committee recognizes that the Department is required under Executive Order 13175 to consult and coordinate with Tribal governments. The Department shall continue to consult and work with Tribes to improve the mandatory base level training course for Department personnel, including but not limited to FTE, part-time employees, and contractors, who have regular interactions with Tribal members or are likely to encounter Tribal members at their duty station. Within 180 days of the date of enactment of this act, the Department is directed to brief the Committee on the status of such training improvements.

*Women in Law Enforcement*.—The Committee strongly supports female law enforcement officers within the Department and recognizes how vital they are to the mission and making our country more secure. The Committee remains committed to working with the Department to continue to recruit, retain and elevate women in the law enforcement ranks. Within 90 days of the date of enactment of this act, the Department shall brief the Committee on current Department-wide efforts to recruit and retain women in law enforcement. At a minimum, the briefing shall include information of all law enforcement components detailing: an overview of current recruitment and retention efforts of women by component; with base funding for such efforts; success of current efforts including identification of the metrics of success by fiscal year; and the current percentage of women in law enforcement and their seniority per component. The briefing shall also identify planned recruitment and retention efforts by component for the next fiscal year, any funding requirements to improve the recruitment and retention of women in law enforcement fields by component with comparisons of similar efforts by other Federal law enforcement agencies, including the DOJ, and provide recommendations by component for new programs or efforts that would further support the recruitment and retention of women in law enforcement.

## OFFICE OF STRATEGY, POLICY, AND PLANS

*Center for Prevention Programs and Partnerships [CP3]*.—The Committee directs the Department to coordinate with the DOJ, the Federal Bureau of Investigation, and key public safety officials across the Nation to promote information sharing and ensure an effective, responsive, and organized joint effort to combat domestic terrorism. The Committee further directs the Department to review the anti-terrorism training and resource programs that the Department provides to Federal and SLTT law enforcement agencies and ensure that such programs include training and resources to assist

SLTT law enforcement agencies in understanding, detecting, deterring, and investigating acts of domestic terrorism and extremists' activities targeting infiltration of law enforcement agencies. The Committee also directs the Department to report to the Committee within 90 days of the date of enactment of this act on the Department's assessment of the domestic terrorism threat, including extremists' activities targeting infiltration of Federal and SLTT law enforcement agencies. Such report shall also include an analysis of incidents or attempted incidents of domestic terrorism that occurred in the United States during the preceding fiscal year. Within 180 days of the date of enactment of this act, the Department shall produce a report that provides a description of all procedural and substantive privacy, civil rights, and civil liberties protections applicable to CP3 programs, whether administered directly by the Department, through grant recipients, or by other third parties, and a detailed description of how CP3 monitors grant recipient compliance with Federal civil rights laws pursuant to 44 CFR part 7, as well as of any other applicable statutory or regulatory provisions.

*Federally Recognized Tribal Nations*.—The Committee reminds the Department to conduct Tribal consultations on how to comply with U.S. obligations under the Jay Treaty of 1794 while respecting each Tribe's sovereign determination of their own membership, without requiring any visa application process. The Committee further encourages the Department to improve training and compliance with regard to the Department's government-to-government relationships with and responsibilities to Tribal Nations.

*Gordie Howe Bridge Operations*.—Not later than 60 days after the date of enactment of this act, the Department shall brief the Committee on the operations at the bridge, to include staffing levels.

*Policy on Legal Orientation and Access Within all Department Facilities*.—The Committee is aware that immigration-benefit request outcomes and the pace of processing can be substantially different when all parties are represented by competent counsel. Within 180 days of the date of enactment of this act, the Department, in cooperation with the OCRCL, shall brief the Committee on the benefits, challenges and the potential overall impact on the immigration system, if legal orientation and access programs were required or permitted in all custody and detention facilities. The briefing shall discuss the specific changes necessary to facilitate legal orientation and meaningful access if conducted in facilities where the right to counsel does not presently exist and identify the necessary funding requirements.

*Report on Asylum Processing at Ports of Entry*.—The Committee directs the Department, within 180 days of the date of enactment of this act, to provide to the Committee an analysis of current capacity to handle asylum seekers and any constraints based on Department projections of the number of anticipated asylum applicants at the southwest border over the next five fiscal years at ports of entry.

*Report on Crew-Manned Weapons*.—Within 90 days of the date of enactment of this act, the Department shall make publicly available the total number of ammunition and weapons that are de-

signed for or are considered crew-manned weapons that are in the possession of a component, other than the Coast Guard or CBP's Air and Marine Operations.

*Report on Transnational Repression*.—Within 120 days of the date of enactment of this act, the Department shall brief the Committee on the issue of transnational repression to include awareness of reported incidents, interagency coordination with the DOJ and other domestic Federal departments and agencies, and in coordination with the Department of State, and any related activities the Department has taken within the United States.

OFFICE FOR CIVIL RIGHTS AND CIVIL LIBERTIES

*Elevated Medical Risk*.—The Committee acknowledges that while CBP currently has a system for identifying children who are at an elevated medical risk while in their custody, there is little to no coordination for children with elevated medical risk after they are released from CBP custody. The Committee directs CBP and OCRCL to coordinate to identify requirements for a system to reduce the number of child deaths in custody or immediately upon release. One year after the date of enactment of this act, OCRCL shall produce a report to the Committee detailing the program and creating an outline of necessary additional positions within the program.

*Investigations Backlog*.—Within 60 days of the date of enactment of this act, OCRCL shall report to the Committee on the current status of its complaint investigations backlog, and processes the Office is implementing to reduce the backlog.

*Language Access Programs*.—Within 180 days of the date of enactment of this act, OCRCL shall conduct an analysis of existing language access plans for the Department. The report shall include but not be limited to: (1) an assessment of current language access plans; (2) whether existing language access plans meet applicable requirements; and (3) whether any legal rights orientations are provided in the appropriate language for migrants participating in agency programs. Any recommendations developed after review of the existing plans shall utilize the four-factor analysis identified in section 4 of the Department's Master Language Access plan.

*Statutory Requirements*.—Within 90 days of the date of enactment of this act, OCRCL shall report to the Committee, and publicly post on its website, how it is fulfilling the statutory requirements of the CRCL Officer and the Equal Employment Opportunity Division and shall provide detailed reports on these requirements, including the number of staff within in each branch and division of the office. The report shall also include data for the current fiscal year and the previous two fiscal years, broken out by month, on the number of complaints received by the Equal Employment Opportunity division and within the Compliance branch and how they were handled as well as the number of civil rights and civil liberties investigation open and closed during that time period. The report shall also include a description of any previous OCRCL responsibility that is no longer being implemented and a justification for why it is no longer being implemented.

OFFICE OF HEALTH SECURITY

*Child Well-Being Program*.—Within 60 days of the date of enactment of this act, the Department shall post a report on its website identifying: (1) how many licensed child well-being professionals OHS has hired; (2) how many additional licensed child well-being professionals OHS intends to hire and on what timetable; (3) in which locations OHS-hired licensed child well-being professionals have been assigned or will be assigned; (4) how the Department is utilizing and will utilize OHS-hired child well-being professionals; and (5) any standards guiding the work of OHS-hired licensed child well-being professionals. Within 180 days of the date of enactment of this act, OHS is directed to brief the Committee on the status of the implementation of the Child Well-Being Program.

PRIVACY OFFICE

*Collected Personal Information*.—Within 180 days of the date of enactment of this act, the Secretary shall submit to the Committee, a report detailing the collection and use of personal information by all components of the Department. The report shall include information about the collection of personally identifiable data of U.S. and non-U.S. persons by all components of the Department, including data reflecting expressive or associational activities, and including but not limited to collection from social media platforms, data brokers, electronic devices, applications for services and accreditations provided by components, encounters at ports of entry, and other travel information. It shall also include how the data is stored and shared, or accessed, which internal components it is shared with, which external partners inside and outside the Federal Government, including but not limited to local, State and Tribal law enforcement, foreign governments, and private businesses it is shared with, the legal basis for its collection, and all civil rights, civil liberties and privacy mechanisms that are used to protect the rights of individuals whose data is accessed, stored, or shared. Finally, the report shall address any mechanisms that allow individuals to seek redress if they believe that they are erroneously included in any of the lists maintained by the Department or erroneously subjected to additional screening, scrutiny, or surveillance as a result of a Department risk assessment process. The report shall be provided in an unclassified manner that can be shared with the public to the greatest extent possible and with a classified annex as necessary.

*FOIA Backlog*.—Within 90 days of the date of enactment of this act, the Department shall submit to the Committee a report on the status of the FOIA backlog, its efforts to ensure that FOIA reading room and information requests continue, and how the Privacy Office is using generative artificial intelligence and automation technologies to streamline the process and reduce the backlog.

OFFICE OF THE IMMIGRATION DETENTION OMBUDSMAN

*Future Outlook of the Immigration Ombudsman*.—The Committee believes that internal and external inspection programs are essential to ensure that individuals in the physical custody of the Department reside in safe, secure and humane environments.

Within 45 days of the date of enactment of this act, the Department is directed to provide a briefing to the Committee detailing their strategy to ensure that the Office of the Immigration Detention Ombudsman [OIDO] is capable of implementing statutorily required independent oversight of detention facilities, how the Administration's new approach to detention oversight has impacted DHS components responsible for detention, and any associated capability gaps that may incur additional costs for components. The briefing shall also include current and anticipated staffing levels for each division within OIDO.

OFFICE OF THE CITIZENSHIP AND IMMIGRATION SERVICES OMBUDSMAN

*Federal Employment Separation Data*.—The Committee recognizes the importance of understanding the recent Federal employee separations in order to conduct oversight of agency missions and spending. The Committee directs the Department of Homeland Security to brief the Committee, no later than 60 days after the date of enactment of this act, providing the full number of Federal civilian employees in service at the Office of the Citizenship and Immigration Services Ombudsman [CISOMB] as of January 20, 2025, including those in full and part-time status, along with the full number of employees separated from service as of January 20, 2025, through enactment. The brief will further provide metrics for measuring performance of statutorily required functions at a program, project, or activity level and the number of: separated veterans; terminated probationary employees categorized as new to government or recently promoted; employees placed on administrative leave; employees who participated in the Deferred Resignation Program; employees voluntarily separated and receiving separation incentives or early retirement payments; employees separated through formal reduction in force plans; and employees utilizing optional immediate retirement, categorized by department, pay plan, grade, occupational classification and duty-station location beginning January 20, 2025.

*Reporting Requirements*.—Not later than 90 days after the date of enactment of this act, and quarterly thereafter, the Department is directed to brief the Committee on its hiring process including (1) a breakdown of how the office intends to allocate fiscal year 2026 funds to each of the following divisions: Executive, Casework, Policy, Public Engagement, Strategy, and Operations. CISOMB is directed to include information about progress made in appointing regional representatives from the following regions: Western, Central, Northeast, and Southeast. The briefing shall also include the staffing levels for each of the divisions and regions mentioned above. The briefing shall also include the following information on case requests from the date of enactment up until the briefing (1) the total number of requests received; (2) the number of requests received or sent to USCIS within 30 days of receipt; (3) the number of public stakeholder engagement events conducted; (4) the total number of requests outstanding by CISOMB and (5) a detailed plan explaining how the office intends to reply to requests for case assistance within a timely manner.

MANAGEMENT DIRECTORATE

The Management Directorate has responsibility for oversight of the management and operations of the Department. The specific activities funded by this appropriation include the Immediate Office of the Under Secretary for Management [IOUSM], the Office of the Chief Readiness Support Officer [CRSO], the Office of the Chief Human Capital Officer [CHCO], the Office of the Chief Security Officer [CSO], the Office of the Chief Procurement Officer [CPO], the Office of the Chief Financial Officer [CFO], the Office of the Chief Information [CIO], and the Office of Biometric Identity Management [OBIM].

COMMITTEE RECOMMENDATIONS

The Committee recommends $1,941,213,000 for the Management Directorate. The Committee continues to support the Department's efforts to provide greater transparency of the cost of management operations and to strengthen integration, coordination, and performance across components. The following table summarizes the Committee's recommendation as compared to the fiscal year 2025 enacted level:

MANAGEMENT DIRECTORATE

[In thousands of dollars]

| | Fiscal year 2025 enacted | Committee recommendations |
|---|---|---|
| Immediate Office of the Under Secretary for Management | 6,906 | 7,057 |
| Office of the Chief Readiness Support Officer | 232,802 | 228,179 |
| Office of the Chief Human Capital Officer | 148,156 | 150,169 |
| Office of the Chief Security Officer | 201,810 | 212,812 |
| Office of the Chief Procurement Officer | 95,953 | 100,773 |
| Office of the Chief Financial Officer | 121,018 | 125,574 |
| Office of the Chief Information Officer | 626,946 | 627,923 |
| Office of Program Accountability and Risk Management | 17,929 | 19,455 |
| Office of Biometric Identity Management | 270,684 | 293,089 |
| Total, Operations and Support | 1,722,204 | 1,765,031 |
| Construction and Facility Improvements | 172,763 | |
| Mission Support Assets and Infrastructure | 77,670 | 122,182 |
| Homeland Advanced Recognition Technology | 10,000 | 40,000 |
| Total, Procurement, Construction, and Improvements | 260,433 | 162,182 |
| Total, Management Directorate | 1,982,637 | 1,927,213 |

OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriations, 2025 | $1,722,204,000 |
| Committee recommendation | 1,765,031,000 |

COMMITTEE RECOMMENDATIONS

The Committee recommends $1,765,031,000 for Operations and Support [O&S] and includes an additional $110,000,000 in an administrative provision for the protection of DHS property and personnel, as well as individuals in the Department's custody.

*Component Obligation Plans*.—The Department shall continue submitting obligation plans in a timely manner to the Committee

on a quarterly basis, consistent with direction provided in the explanatory statement accompanying Public Law 114–113, and shall ensure that the obligation plans are connected to activity-level details in the budget justification materials.

*Public Reporting on Use of Section 503 Authority*.—Within 60 days of the date of enactment of this act, and quarterly thereafter, the Department shall make publicly available each time a reprogramming or transfer to or from an appropriation, account, or Treasury Appropriation Fund Symbol occurs. At a minimum, such report shall include the purpose, amount, the authority for such action, and shall include all reprogramming and transfers, irrespective of whether such action is below an existing applicable threshold.

*Public Reporting on Final Spend Plans*.—Within 60 days of the date of enactment of this act, and quarterly thereafter, the Department shall publicly report any final spend plan. At a minimum, the report shall include the purpose and amount of the spend plan and identify the source of funds.

*Small Unmanned Aircraft Systems [sUAS] Procurement*.—The Committee remains concerned about the threat of foreign-made sUAS collecting intelligence on U.S. national security facilities and critical infrastructure. For the purposes of securing and protecting infrastructure critical to national security, requirements for purchases of American-made UAS should be implemented as soon as practicable. Until such requirements are in place, for any acquisition using funds in this act, including those by Federal grant recipients, the Department is directed to require certification of review of the industry alert, and any subsequent UAS guidance, and completion of a risk assessment that considers the proposed use of the foreign-made UAS. The Committee directs the Department to conduct a review of domestically produced alternatives and update guidance, as appropriate.

### OFFICE OF THE CHIEF HUMAN CAPITAL OFFICER

*DHS Cybersecurity Professionals*.—Not later than 60 days after the date of enactment of this act, OCHCO, in coordination with OCIO and CISA, shall brief the Committee on the status of hiring cybersecurity professionals and proposed solutions to develop standardized metrics used to ensure consistency in identifying skills and talents of employees across the Department. The briefing shall include recommendations on how IT-focused jobs can be classified for qualification standards that could be updated to meet the Department's needs, and shall incorporate the use of the new Cybersecurity Talent Management System [CTMS].

*Hiring in Rural Communities*.—Departmental components continue to face challenges with filling vacant positions and providing for public safety in non-contiguous and rural States. Challenges in recruiting and retaining Federal employees have exacerbated chronic staffing problems at areas critical to public safety. The Department is urged to examine how small businesses, including Native American, Alaska Native, and Native Hawaiian small businesses, could help the Department fill its unmet needs in communities and the Department is encouraged to explore existing opportunities to fill vacancies where possible. Not later than 90 days

after the date of enactment of this act, the Department shall provide a report to the Committee on the challenges of recruiting and retaining Federal employees in non-contiguous and rural States. The report shall include a clear description of the obstacles related to using small businesses, information about rates of attrition, the number of unfilled positions, and the duration of time those positions have remained vacant. The report shall also provide an assessment of the effect these vacancies have on the ability of components to accomplish their statutory and administrative responsibilities and shall specifically describe steps the Department has taken to address the identified challenges or identify requirements to address the identified challenges.

*STEM Hiring*.—The Committee recognizes the importance of retaining highly trained STEM graduates from U.S. institutions to advance national competitiveness, economic growth, and security. The Committee directs DHS to provide a briefing not later than 120 days after the date of enactment of this act on actions taken to streamline pathways for such qualified STEM graduates including any updates to guidance, training, or public-facing materials.

*OBBBA Hiring*.—The Committee is concerned about the seemingly inconsistent policies for hiring with funds from OBBBA and how positions will be treated after September 30, 2029. Within 60 days of enactment of this Act, OCHO, in consultation with the Office of the Chief Financial Officer, is directed to brief the Committee on projections, by component, for hiring goals associated with funding from OBBBA, to include how new positions will be tracked and transferred from OBBBA funding to base funding.

## OFFICE OF THE CHIEF FINANCIAL OFFICER

*Fiscal Year 2027 Budget Justification*.—The CFO is directed to ensure that fiscal year 2027 budget justification materials for classified and unclassified budgets of all components are submitted, concurrent with the President's budget submission to the Congress. The justifications shall continue to include:

—Detailed data and explanatory descriptions for each request and for each PPA, including offices that have been identified as PPAs, reflected in the table at the end of this explanatory statement. Information should be presented in quantifiable terms with specific breakdowns of the funding.

—Tables that compare prior year actual appropriations and obligations, estimates of current year appropriations and obligations, and the projected budget year appropriations and obligations for all PPAs, sub-PPAs, and FTE, including identifying each adjustment to base, transfer, program increase, program decrease, and staffing change proposed in fiscal year 2026.

—Year-to-year changes described in terms that are clear and unambiguous, excluding nonspecific terms such as "technical adjustment" or "administrative change" unless accompanied by a detailed explanation. Explanations of adjustments to base funding, whether increases or decreases, should be specific and compared to prior year activity level, not just the entire PPA level. All requested increases shall be justified with measurable outcomes above the current baseline of activity. If the Department does not have a current measure of such baseline ac-

tivity, the Department shall establish one before requesting an increase.

—For each operations and support PPA or sub-PPA reflected in the table at the end of this explanatory statement, a breakdown, for fiscal year 2026 enacted amounts and fiscal year 2027 requested amounts, of pay and non-pay amounts.

—For investment end items with severable unit costs in excess of $250,000 or a lifecycle cost in excess of $300,000,000 the project description, justification, total cost, and scope; key acquisition milestones from the prior year, year of execution, and budget year; the funding history by fiscal year, to include prior enacted appropriations, obligations, and expenditures; contract information to include contract number, contractor, type, award date, start date, end date, earned value management potential in the contract, and total contract value; and significant changes to the prior year enacted budget, project schedule, and estimated time to completion.

—For severable end items, the quantity of each item by prior years, current year, budget year, and out-year; the quantity of units delivered on contract, funded but not yet on contract, and planned but unfunded; and the delivery schedule by quarter for the end item, delineated by fiscal year funding.

—Information by appropriation and PPA on all reimbursable agreements and significant uses of the Economy Act (Public Law 73–2) for each fiscal year.

—An accurate, detailed table identifying the last year that authorizing legislation was enacted into law for each appropriation, including the amount of the authorization, when the authorization expires, and the appropriation in the last year of authorization.

—The text and citation of all Department appropriations provisions enacted to date that are permanent law.

—Explanations and justifications for all proposed legislative changes, whether they are new or amend existing law and whether they are substantive or technical in nature, with an annotated comparison of proposed versus existing language.

—A report on the status of overdue Committee-required reports, plans, or briefings for each of fiscal years 2025 and 2026.

Additionally, the CFO, working with component agencies, shall ensure that output from predictive models used by agencies to inform likely impacts to future workloads are incorporated into the Department's fiscal year 2027 budget justification materials. For each relevant program area, budget materials shall clearly describe and quantify the projections used to inform resource requests, indicate the agencies impacted by the projections, and confirm whether the budget requests for those agencies were developed using the same assumptions. While the Committee recognizes that deviations in spend plans are likely in program implementation, the Department is directed to notify the Committee when significant, policy related changes are made to spend plans. Any significant new activity that has not been explicitly justified to the Committee or for which funds have not been provided in appropriations acts requires the submission of a reprogramming or transfer request.

*Congressional Request for Information Tracking Software*.—The Committee provides $1,000,000 for the procurement of a consolidated system to better allow the Office of the Chief Financial Officer to track and have oversight of currently outstanding briefing or information requests that the Committee has made to the Department. Not later than 120 days from the date of enactment of this Act, and monthly thereafter, the Department is directed to brief the Committees on the status of all outstanding responses to requests for information, briefings, and overdue reports and briefings stemming from statutory or report requirements. This briefing shall include representatives from each DHS component with outstanding responses due to the Committee that are expected to be able to provide detailed information as to the current status of each requested item.

OFFICE OF THE CHIEF INFORMATION OFFICER

*Enterprise-Wide IT License Agreements*.—The Committee is aware that the Department is improving its IT service, operations, and asset management, low-code application development, and human resources management systems to create improvements in IT auditability, security, and efficiency at several operational components. The Committee supports these efforts and strongly encourages the Department to evaluate opportunities to achieve improved economies of scale through the consolidation of disparate contracts into enterprise-wide agreements. Accordingly, the Committee directs the Chief Information Officer [CIO] to provide a briefing to the Committee, within 180 days of the date of enactment of this act, on the Department's efforts to consolidate IT license agreements across components to reduce cost and improve performance.

*Federal Risk and Authorization Management Program [FedRAMP]*.—The Committee recognizes the importance of the DHS Office of Chief Information Officer's [OCIO] responsibility as a member of the FedRAMP Joint Authorization Board and the value of modern cloud products and services. Accordingly, the Committee directs the OCIO to provide a report to the Committee, within 180 days of the date of enactment of this act, on the resources necessary to enable increased FedRAMP continuous monitoring workload and the facilitation of cloud services.

*Technology Modernization Fund [TMF] Reporting*.—The Committee supports the Department's efforts to leverage the TMF to improve the delivery of mission critical services. The Committee directs the Department to provide notice to the Committee when the Department, or a component agency, submits an initial project proposal to the Technology Modernization Board. If a proposal from the Department or component agency is accepted, the Department shall provide the Committee a briefing on the project and the plan for paying back the TMF, e.g., identify projected cost savings immediately thereafter.

OFFICE OF THE CHIEF PROCUREMENT OFFICER

*Homeland Procurement Reform [HOPR] Act Implementation*.—The Committee expects the reports regarding recommendations on how the Department could procure additional items from domestic

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 563 of 714 PageID #:1613



sources and bolster the domestic supply chain or items related to national security, as required by the HOPR Act, be submitted. The Committee directs the Department to consider opportunities to engage with the domestic industrial base to identify what additional items can be procured from domestic sources and communicate forecasted demand for current and potential future covered uniform component items. In addition, the Committee reminds the Department of the requirements of the Make PPE in America Act, and expects the Department to secure personal protective equipment, including nitrile gloves, from domestic sources before utilizing foreign suppliers.

OFFICE OF BIOMETRIC IDENTITY MANAGEMENT

*Briefings on the Homeland Security Advanced Recognition Technology [HART].*—The Committee remains concerned with the continuing delays and cost overruns for HART and directs the Department to continue to provide, until full operational capability of HART is achieved, monthly briefings to the Committees on system development progress, associated costs, and schedule. Such briefings shall also provide the Committees with similar updates regarding IDENT. The Department shall also continue the disclosure of technologies, data collection mechanisms, and sharing agreements among Department agencies, other Federal, State, local, and foreign law enforcement agencies, and fusion centers as it relates to the development of the HART biometric database. In cases where the Department relies on information obtained through the HART database or through the State Department foreign intelligence sharing, to separate a minor child from a parent, primary caregiver, or close relative who is caring for or traveling with that child, the Department shall report this incident to the OIG and OCRCL within 24 hours of the separation.

*HART Reports.*—Not later than 180 days after the date of enactment of this act, the Secretary shall provide the following documentation to the Committee:

—Component Requirements Executives [CRE] Council-validated operational requirements and an associated adjudication matrix identifying requirements submitted by all users, including users from other DHS components, Federal agencies, and international partners;

—An updated Privacy Impact Assessment [PIA] for HART describing the categories of individuals whose data will be stored in HART, and all users that shall have access to that data, as well as the various permissions delegated to those users;

—Documentation of a HART privacy compliance review, conducted by the DHS Chief Privacy Officer, which demonstrates all deficiencies identified in current and previous HART PIAs have been addressed;

—Privacy training requirements and materials for all HART users, spanning both initial and refresher training.

OFFICE OF PROGRAM ACCOUNTABILITY AND RISK MANAGEMENT

*Requirements Development Framework.*—No later than 90 days after the date of enactment of this act, the Department shall brief the Committee on the implementation of the Requirements Devel-

opment Framework within PARM including the status of the CRE Council. The briefing shall also describe how digital tools and AI are being leveraged to streamline processes within the Framework.

*Dissolution*.—The Committee recognizes that the Department has stated a desire to dissolve the Office of Program Accountability and Risk Management and to transfer responsibilities performed under this office to other components. The Committee looks forward to receiving a detailed plan for the transfer of such responsibilities from the Department. In the interim, the Committee maintains funding for the Office of Program Accountability and Risk Management to ensure there is proper oversight of contracting activities within the Department, which has been a high priority for both this Administration and Congress.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

| | |
|---|---|
| Appropriations, 2025 | $260,433,000 |
| Committee recommendation | 162,182,000 |

The Committee recommends $107,276,000 for Financial Systems Modernization, $40,000,000 to support development efforts in the Office of Biometric Identity Management. $8.434,000 for One Net, $3,200,000 for Human Resources Information Technology, and $3,272,000 for the DHS Data Framework.

FEDERAL PROTECTIVE SERVICE

The Federal Protective Service [FPS] is responsible for: the security and protection of Federal property under the control of the General Services Administration [GSA]; the enforcement of laws pertaining to the protection of persons and designated property; the prevention of breaches of peace; and enforcement of any rules and regulations made and promulgated by the GSA Administrator or the Secretary. The FPS authority can also be extended by agreement to any area with a significant Federal interest. The FPS account provides funds for the salaries, benefits, travel, training, and other expenses of the program.

The following table summarizes the Committee's recommendation as compared to the fiscal year 2025 enacted level:

FEDERAL PROTECTIVE SERVICE

[In thousands of dollars]

| | Fiscal year 2025 enacted | Committee recommendations |
|---|---|---|
| FPS Operations | 473,820 | 481,689 |
| Countermeasures | 1,730,567 | 1,544,766 |
| Subtotal, Federal Protective Service | 2,204,387 | 2,026,455 |
| Offsetting fee collections | −2,204,387 | −2,026,455 |

COMMITTEE RECOMMENDATIONS

The Committee recommends $2,026,455,000 for FPS, as requested, and these amounts are offset by collections paid by GSA tenants and credited to the account.

| | |
|---|---|
| Appropriations, 2025 | $2,204,387,000 |
| Committee recommendation | 2,026,455,000 |

*Federal Protective Service Contingency Funding.*—The Committee notes an alarming increase in threats and violent actions directed at frontline law enforcement officers, and Federal facilities. These politically-motivated attacks have resulted in injury and harm, as well as the tragic and unfortunate death of individuals in the care and custody of the U.S. Government. The Committee abhors political violence, regardless of at whom it is directed and wants to ensure that DHS is adequately equipped and resourced to be able to secure facilities and provide for the safety of all people, in light of these threats. To that end, the Committee includes an administrative provision providing an additional $110,000,000. Of this, $10,000 to be available until expended, to allow FPS additional flexibility to respond to imminent threats to Federal property or personnel. The Secretary is directed to notify the Committees on Appropriations of the House of Representatives and Senate within three business days of utilizing the contingency funding. The notification shall include the purpose for which funds for used, the amount of funds used, the agencies for which the funding was used to support, and the amount per agency to be reimbursed should any such amount exist.

Additionally, $100,000,000 is made available to allow FPS to increase contract support or make upgrades to federally owned facilities with identified security gaps in the face of increasing threats. The Committee expects that this funding shall not be used to infringe on any protected rights of individuals to protest, and shall be used solely for items and staffing directly related to the physical security of federally owned facilities, staff, or individuals in the custody of the government.

The Department is directed to provide the Committees on Appropriations of the House of Representatives and Senate with quarterly updates that consolidate expenditures for that quarter and provide the remaining balance of the account.

## INTELLIGENCE, ANALYSIS, AND SITUATIONAL AWARENESS

The Intelligence, Analysis, and Situational Awareness appropriation supports activities to improve the analysis and sharing of threat information and includes activities of the Office of Intelligence and Analysis [I&A] and the Office of Situational Awareness [OSA]. The following table summarizes the Committee's recommendation as compared to the fiscal year 2025 enacted level:

INTELLIGENCE, ANALYSIS, AND SITUATIONAL AWARENESS

[In thousands of dollars]

| | Fiscal year 2025 enacted | Committee recommendations |
|---|---|---|
| Operations and Support | 345,410 | 371,898 |
| Subtotal, Intelligence, Analysis, and Situational Awareness | 345,410 | 371,898 |

### OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriations,2025 | $345,410,000 |
| Committee recommendation | 371,898,000 |

COMMITTEE RECOMMENDATIONS

The Committee recommends $371,898,000 for Operations and Support [O&S].

*Annual Budget Justification Materials*.—The fiscal year 2027 budget justification materials for the classified budget shall include the same level of detail required for other appropriations and PPAs.

*Cyber Harassment Threat Assessment*.—Within 180 days of the date of enactment of this act, the Department of Homeland Security shall develop and publicly disseminate a threat assessment on the use of cyber harassment by terrorists and foreign malign actors.

*Intelligence Expenditure Plan*.—The Department's Chief Intelligence Officer is directed to brief the Committee on the fiscal year 2026 expenditure plan for the Office of Intelligence and Analysis within 30 days of the date of enactment of this act. The plan shall include the following:

(1) fiscal year 2026 expenditures and staffing allotted for each program as compared to fiscal years 2020 through 2025;
(2) all funded versus on-board positions, including FTE, contractors, and reimbursable and non-reimbursable detailees;
(3) a plan for all programs and investments, including dates or timeframes for achieving key milestones;
(4) allocations of funding within each PPA for individual programs and a description of the desired outcomes for fiscal year 2026; and
(5) items outlined in the classified annex accompanying the fiscal year 2022 explanatory statement, updated for fiscal year 2026.

*State Judicial Security*.—The Committee remains concerned about threats and violence towards Federal and State employees, especially judges and judicial employees, and the potential for threat information and intelligence to become siloed. Therefore, the Committee directs the Office of Intelligence and Analysis to work with fusion centers to draft and implement a plan to increase outreach to stakeholders, as appropriate, to ensure that intelligence and threat information regarding Federal and State employees is shared to the extent possible, and to brief the Committee on such plan within 180 days of the date of enactment of this act.

*Continuation of Reporting on Domestic Terrorism*.—For the next 5 years, Department of Homeland Security [DHS], in coordination with the Federal Bureau of Investigation [FBI], shall continue to produce reports first required under section 5602 of the National Defense Authorization Act for fiscal year 2020 (Public Law 116–92), on the threat from domestic terrorism and how the agencies are resourcing to these threats. Each report shall be provided to the Committee in addition to any other committees receiving the report under section 5602.

*Continuation of Fiscal Year 2022 Requirements*.—The Department is directed to continue providing in fiscal year 2026 any briefing and report as outlined in the classified annex accompanying the fiscal year 2022 explanatory statement.

## OFFICE OF INSPECTOR GENERAL

The Office of Inspector General [OIG] conducts audits, inspections, investigations, and other reviews of the Department's programs and operations with the goal of preventing and detecting fraud, waste, and abuse.

### OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriations, 2025 | $220,127,000 |
| Committee recommendation | 245,754,000 |

### COMMITTEE RECOMMENDATIONS

The Committee recommends $245,754,000 for Operations and Support [O&S]. This total includes $5,434,000 for Zero Trust Network architecture and hardware refresh, $15,000,000 for oversight of funding provided in Public Law 119–21.

OPERATIONS AND SUPPORT

[In thousands of dollars]

| | Fiscal year 2025 enacted | Committee recommendations |
|---|---|---|
| Operations and Support | 220,127 | 245,754 |
| Total, Office of Inspector General | 220,127 | 245,754 |

Inspectors General across the government, including the Department's OIG, perform a critical function on behalf of the Congress and the American public. Over the last 5 years, OIG estimates that its work to deter waste, fraud, and abuse saves the Department $27.26 for every $1.00 obligated in support of OIG operations.

*Denial of OIG Access to Records and Information*.—The Committee is concerned about denials and delayed responses by Department component agencies to OIG requests that are properly scoped. OIG shall continue to provide a quarterly report to the Committee concerning efforts of components to prevent or impede OIG access to such records, documents, or other materials. The report shall include at a minimum, a summary of the OIG request, including the justification or legal rationale for the request, a description of the component response to the request, and any other information the OIG determines is appropriate.

*Deputization of Federal Law Enforcement for Immigration Enforcement*.—The Committee directs the DHS Office of the Inspector General to report to the Committee within 60 days of the date of enactment of this act on how the Department is collaborating with other Department Inspectors General on this oversight including, but not limited to, the Department of Defense and the Department of Justice. The report shall include the number of law enforcement officers from each agency that have been deputized, the authorities the officers are operating under as it relates to immigration enforcement, and the length of their detail.

*Quarterly Budget and Staffing Briefings*.—OIG shall continue to provide the Committee quarterly budget and staffing briefings which shall include all available funding sources, contracts, and contract staffing.

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 568 of 714 PageID #:1618



## TITLE I—ADMINISTRATIVE PROVISIONS

Section 101. The Committee continues a provision regarding grants or contracts awarded by means other than full and open competition and requires OIG to review them and report the results to the Committee.

Section 102. The Committee continues a provision requiring the Chief Financial Officer to submit monthly budget execution and staffing reports within 30 days after the close of each month.

Section 103. The Committee continues a provision requiring the Secretary, in conjunction with the Secretary of Treasury, to notify the Committee of any proposed transfers from the Department of the Treasury Forfeiture Fund to any agency at the Department.

Section 104. The Committee continues a provision related to official travel costs of the Secretary and Deputy Secretary.

Section 105. The Committee continues a provision related to acquisition reporting.

Section 106. The Committee continues a modified provision related to pilot projects undertaken by the Department.

Section 107. The Committee includes a provision related to the DRF monthly report.

Section 108. The Committee includes a provision related to Inspector General Oversight.

Section 109. The Committee includes a provision related to FPS.

# TITLE II

## SECURITY, ENFORCEMENT, AND INVESTIGATIONS

### U.S. CUSTOMS AND BORDER PROTECTION

U.S. Customs and Border Protection [CBP] is responsible for enforcing laws regarding the admission of foreign-born persons into the United States and for ensuring that all goods and persons entering and exiting the United States do so legally.

COMMITTEE RECOMMENDATIONS

The Committee recommends $18,744,718,000 for CBP.

The following table summarizes the Committee's recommendation for the Operations and Support account as compared to the fiscal year 2025 enacted level:

U.S. CUSTOMS AND BORDER PROTECTION

[In thousands of dollars]

| | Fiscal year 2025 enacted | Committee recommendations |
|---|---|---|
| Operations and Support | 18,426,870 | 17,829,667 |
| Small Airport User Fee | 24,000 | 25,000 |
| Columbia Free Trade Collections | 281,000 | 321,000 |
| Procurement, Construction, and Improvements | 850,170 | 570,051 |
| Total, Customs and Border Protection | 19,582,040 | 18,745,718 |
| Estimated fee collections: | | |
| Immigration inspection user fee | 854,365 | 1,010,937 |
| Immigration enforcement fines | 254 | 1,283 |
| ESTA | 61,659 | 60,544 |
| Land border inspection fee | 80,165 | 92,556 |
| COBRA fee | 821,059 | 1,003,486 |
| APHIS inspection fee | 591,360 | 791,121 |
| Puerto Rico Trust Fund | 304,133 | 283,871 |
| Virgin Island fee | 14,994 | 14,818 |
| Customs Unclaimed Goods | 3,880 | 1,828 |
| 9/11 Response and Biometric Account | 21,350 | 15,942 |
| Total, Estimated fee collections | 2,753,219 | 3,276,386 |
| Reimbursable Preclearance | 39,000 | 39,000 |
| Global entry user fee | 457,000 | 444,000 |
| Transfer Out | −650,000 | .............................. |
| Total, U.S. Customs and Border Protection, available funding | 22,181,259 | 22,504,104 |

*Reconciliation Funding for CBP*.—Public Law 119–21 provides CBP with over $64,000,000,000 in funding through Fiscal Year 2029 for investments ranging from thousands of new personnel (Border Patrol Agents, Customs and Border Protection Officers, and support staff), to border security technology, nonintrusive in-

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 570 of 714 PageID #:1620



spection equipment, and facility and construction investments. Based on this unprecedented level of funding for these purposes, the Committee prioritized other areas to strengthen CBP operational capabilities, such as key investments to support the continued modernization of systems for travel and trade missions.

*Expanding Outbound Operations at Ports of Entry*.—The Committee provides $100,000,000 to expand the number of locations equipped for outbound operations at land ports of entry. This level of funding builds on prior funding, expanding the number of ports of entry on the southwest border with dedicated outbound capabilities from six current locations. The investment in outbound operations will help stop the flow of currency, firearms, ammunition, and other contraband being trafficked across the southern border to Mexico in connection with the sale of fentanyl and other narcotics. Within 60 days of the date of enactment of this act, CBP shall provide the Committee a spend plan with timeframes for the execution of these funds and projected performance impacts to operational capabilities as a result of these funds. CBP shall update the Committee on a monthly basis on the use of these funds and provide actual performance impacts against projections, including measures to assess disruption to cartel activities.

*Integrating Budget Requests*.—The Committee receives individual requests for funding for personnel, technology, equipment, infrastructure, and services for CBP operations that do not take into account how funding in one area impacts another. To date, the Committee must assess and fund these requests as stand-alone budget proposals, potentially resulting in funding imbalances across CBP programs and minimizing the value of investments. To make more informed budget decisions, CBP must provide the Committee with appropriate data that describes and quantifies the relationships between investments. The Committee continues its direction to CBP to include with any requests for new funds a description of other programs the investment is expected to impact and a description of the anticipated impact. This should apply to both internal CBP impacts and to impacts across other DHS components. The Committee directs CBP to provide a plan and a briefing within 60 days of the date of enactment of this act on how the agency will comply with this requirement, to include how CBP plans to adjust internal planning and budgeting processes in order to be able to capture the data necessary to fully comply with this requirement.

*Developing and Using Predictive Analytics*.—The Committee has a long history of funding analytic and modeling capabilities across CBP, from the Advanced Trade Analytics Platform to tools that project future flow of travel and trade to the U.S. The development and use of the output from these investments brings a critical understanding of future workload and the optimal requirements to meet that workload in a more cost effective manner. Unfortunately, much of the data resulting from these investments are not provided to the Committee through budget justifications and reporting requirements. The Committee directs CBP to provide, within 45 days of the date of enactment of this act, a list of all analytic and modeling capabilities at the agency, a description of the data provided by those capabilities, how CBP currently uses that data, and any plans to expand that use. Further, CBP shall provide a briefing

within the same time period to the Committee with a plan to incorporate the data output from analytic and modeling investments into reporting requirements in fiscal years 2025 and 2026, and budget justifications for fiscal year 2027.

*Prioritizing the Acquisition of Innovative and Emerging Technologies and Capabilities*.—The Commissioner shall ensure that all funding provided in this act for the acquisition of operational or administrative technology, equipment, and services focuses on innovative and emerging capabilities. Agency policies should prioritize the testing and, when testing results support a sound business case, their acquisition and operationalization. New technologies, including artificial intelligence [AI]/machine learning [ML] tools and autonomous capabilities, are critical for improving mission performance and personnel effectiveness, particularly in combatting fentanyl and other illicit activities. None of the funds provided for border security assets and infrastructure shall be used for the procurement or deployment of border security technology that is not autonomous. Within 60 days of the date of enactment of this act, CBP shall provide a briefing to the Committee on a plan to better prioritize innovative and emerging technologies and autonomous capabilities into the agency's internal planning, budgeting, and programming processes.

*Artificial Intelligence*.—The Committee is encouraged by the example being set by CBP in utilizing AI to achieve efficiencies and successes across the enterprise but, is aware of the growing cost to procure, implement, and utilize AI technologies and platforms. The Committee understands that the costs associated with AI can be substantial, encompassing personnel resource constraints and the need for significant computing power. Within 180 days of enactment of this Act and semi-annually thereafter, the CIO and CAIO of CBP shall brief on the current AI inventory and its resource requirements, costs associated with operating and maintaining AI technology, and the operational impacts those technologies have helped realize across all of CBP.

OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriations, 2025 | $18,426,870,000 |
| Committee recommendation | 17,829,667,000 |

The CBP Operations and Support [O&S] appropriation provides funds for border security, immigration, customs, agricultural inspections, the regulation and facilitation of international trade, the collection of import duties, and the enforcement of U.S. trade laws. In addition to directly-appropriated resources, fee collections ranging from immigration, cargo, and agriculture inspections; public-private partnership reimbursements, travel authorizations; registered traveler programs; and other programs are available for the operations of CBP.

COMMITTEE RECOMMENDATIONS

The Committee recommends $17,829,667,000 for O&S.

*Resource Prioritization*.—The Committee directs CBP to brief the Committee bimonthly on efforts to evaluate CBP-wide workload, capabilities, assets, and human resource gaps, describe how those

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 572 of 714 PageID #:1622



gaps impact mission performance, and to use the results of the ongoing analyses to support the fiscal year 2027 budget request.

*Recruitment, Hiring, and Retention*.—Within 90 days of the date of enactment of this act, CBP shall brief the Committee on its efforts to improve hiring and retention at all of its law enforcement components, including existing and planned strategies and initiatives to accomplish this goal. Given hiring and retention challenges, CBP shall prioritize and continue efforts to use available incentives to recruit and retain employees in rural and remote areas and explore other strategies, such as innovative pilot programs that include successful strategies from the private sector, career path enhancements, alternative schedules, and workforce support programs for employees who are willing to choose such locations. CBP shall ensure that staff are trained on recognizing signs of trauma exposure, understanding common behaviors of people exposed to trauma and trauma-informed practices. The Committee encourages CBP to review the Department's Memorandum of Understanding with the Department of Defense [DoD] for potential participation in the DoD Skill Bridge program as an opportunity to identify, recruit, and train highly qualified applicants from the population of service members who are transitioning from active duty in order to address staff shortages across the agency and potentially reduce the personnel costs associated with training new employees. As CBP continues working to improve hiring and retention at all of its law enforcement components, the Committee reminds the agency to use valid, competency-based assessments, rather than self-assessments, to determine whether a candidate is qualified for a particular position. To reduce the number of unqualified candidates being considered for CBP positions, and to improve time-to-hire and other hiring outcomes, the Committee directs CBP to review existing Federal assessment programs, such as USA Hire, for use within the agency. The Committee directs the Commissioner to submit a report within 120 days of the date of enactment of this act, detailing the impact that mental health hours, alternative work schedules, on-duty physical fitness, and other related incentives have on personnel morale, recruitment, and retention. The report should also include such policies' impact on CBP's ability to achieve its national and economic security mission at 24-hour ports of entry.

*Law Enforcement Suitability Analysis*.—The Committee understands that CBP has fully implemented a new test supported by the National Center for Credibility Assessment [NCCA] as appropriate for use by CBP to inform law enforcement suitability for new hires. The Committee is aware that this test has been criticized by experts as lacking the effectiveness of the Law Enforcement Pre-Employment Test [LEPET] examination. The Committee directs CBP to submit a report on the effectiveness of polygraph tests within 90 days of the date of enactment of this act. The report shall again include data comparing CBP's failure rates to those of other Federal law enforcement agencies; a list of admissions elicited during polygraph tests since CBP implemented a mandatory polygraph test requirement; details regarding the total and annualized number of such admissions and types of admissions; and an assessment of this test compared to the Law Enforcement Pre-Employment

Test certified by the NCCA. This assessment shall include a detailed analysis of the effectiveness of both tests.

*Northern Border Strategy Implementation*.—The Committee recognizes the importance of ensuring Border Patrol and Office of Field Operations [OFO] are properly resourced to effectively manage operations along the more than five thousand miles of border between the United States and Canada. Within 60 days of the date of enactment of this act, and quarterly thereafter, Border Patrol and OFO are directed to brief the Committee on northern border operations. At a minimum, the brief shall include information on staffing levels at each sector. The Committee directs CBP to review its table of operations in light of changing levels of activity along the northern border and to report to the Committee on actual staffing levels compared to projected requirements within 120 days of the date of enactment of this act. For Border Patrol, the brief shall include border security technology requirements and investments made and planned, to include increased reliance on autonomous systems. Additionally, the brief shall address challenges for telecommunications and signal transmission posed by mountainous areas. Further, the Committee directs CBP to assess the technology needs across the northern border and provide a report within 180 days after the date of enactment of this act on its plan to address these needs. For OFO, the brief shall include data on any changes in hours of ports of entry, to include an explanation for why those hours were changed and how OFO assesses future changes. Finally, the Committee continues the requirement for CBP to notify the Committee should CBP determine that it is necessary to divert more than 10 percent of staffing in any sector and field office along the northern border to other assignments along the southwest border or other ports of entry. The notification shall occur within 15 days of deployment and include the number and location of the personnel diverted, any operational impacts on the sector, the duration of the diversion, and when the personnel shall return to their posts.

*Tracking the Use of Warrants in Arrests*.—The Committee directs CBP to report within 45 days of the date of enactment of this act and quarterly thereafter on the number of warrantless arrests it conducts, and in how many of those arrests CBP had established probable cause that the arrested individual was in fact undocumented and determined they pose a flight risk.

BORDER SECURITY OPERATIONS

The Committee recommends $6,524,919,000 for Border Security Operations.

*Compliance With National Standards on Transport, Escort, Detention, and Search [TEDS]*.—The Committee reaffirms and directs that CBP is required to comply with the agency's National Standards on Transport, Escort, Detention, and Search [TEDS] policy once encountering an alien, including in the field and prior to their processing at a holding station or facility. The Committee further reaffirms and directs that aliens encountered at the southwest border should be expeditiously processed and not forced to wait outside for extended periods of time. CBP shall provide notice to CRCL within 24 hours if the agency holds aliens outside for more

than 12 hours. CBP shall provide adequate shelter, water, food, sanitation, medical care, and other necessities and prioritize expeditious processing; the agency should take special care to comply with this requirement when aliens face severe weather or experience medical emergencies in the field.

*Workload Staffing Model for Between the Ports*.—The Committee has provided significant resources toward border security across all resource types, ranging from personnel, infrastructure, equipment, and aircraft, as well as ground, air, and marine surveillance capabilities. To understand how these investments impact requirements for Border Patrol agents, Processing Coordinators, and other mission support staff, the Committee, again, reiterates its request for CBP to develop a comprehensive workload staffing model that takes into account how these investments inform the operational requirement for agents, coordinators, and support staff. Within 30 days of the date of enactment of this act, CBP shall provide a briefing to the Committee on Border Patrol's Mission Advantage Program and how that work demonstrates the impact, with data, that existing and potential resources are expected to have on personnel needs. Further, the Committee notes this longstanding requirement has still not been met and directs CBP to prioritize completion of the staffing model within fiscal year 2026. CBP shall brief the Committee within 90 days of the date of enactment of this act on updated plans to meet this deadline to develop and use such a model. Within 60 days of the date of enactment of this act, CBP shall provide a report to the Committee detailing the model and the process that CBP used to create and validate the model. The report shall include descriptions of: (1) steps and associated timelines taken to create the model and resources used to develop it; (2) data sources and methodology used to generate the model; (3) actions taken to independently verify the model, including on the following dimensions: data source analysis and findings; variables and assumptions; processes, information, distribution, and reporting; advanced analytics; and probability and risk analysis; (4) an inventory of Border Patrol technology assets, and how those assets and their capabilities inform workload staffing requirements; and (5) a plan for periodically updating and improving upon the model, including a plan for incorporating planned technological investments and associated force multiplier effects into the model, including changes in programs and processes, air and marine assets, and deployment of additional surveillance technologies.

*Border Patrol Hiring*.—The Committee directs CBP to provide, within 90 days of the date of enactment of this act, the following: (1) a plan with a timeframe for bringing on board the additional agents and reaching the funded level of agents; (2) how additional agents hired will impact the total number of agents on the northern border as an increasing number of agents have been re-deployed from the northern border to the southwest border; and (3) how CBP is responding to and altering policies to ensure appropriate oversight and execution of recommendations in response to investigations of Border Patrol activities.

*Border Security Technology Gaps*.—The Committee notes the requirement in Public Law 116–260, for CBP to examine technology gaps along the southwest border at ports of entry and between

ports of entry. This critical analysis should guide CBP decisions on improving its technology development and acquisition. Within 180 days of the date of enactment of this act, CBP shall brief the Committee on its efforts to improve border security technology development and acquisition based on the analysis required by this law.

*Border Barrier Reporting*.—The Committee directs CBP to provide, within 60 days of the date of enactment of this act, and quarterly thereafter, a report on the status and plans during fiscal year 2026 for any funds provided for border barriers and related investments such as roads, lighting, and technology. The report shall include: (1) total funds obligated since January 2021 by project and Border Patrol sector; and (2) total funds planned for obligation by project, including number of miles and type of barrier, and Border Patrol sector. Additionally, the report shall provide a description of the type of project, to include, at a minimum, the amounts obligated and outcomes for each of the following: construction of new barriers, replacement of existing barriers, closure of gaps; installation of gates; linear ground detection capabilities; and remediation activities necessary to address life, safety, environmental and remediation requirements.

*International Training and Assistance Programs*.—The Committee supports CBP's efforts, in coordination with the Department of State and other agencies, to provide technical training and assistance to build the border security and customs capacity of foreign law enforcement agencies. CBP is directed to provide a briefing to the Committee not later than 180 days after the date of enactment of this act, summarizing which countries and law enforcement agencies CBP provided such training to and the type of training provided. The briefing shall also provide additional details of any trainings provided to Haiti.

*Reporting on Prosecutions for Improper Entry and Reentry*.—Within 60 days of the date of enactment of this act, CBP, in coordination with ICE and USCIS, shall make publicly available the following records and data on improper entry and reentry prosecutions, redacted only to the extent required by the Freedom of Information Act: policy guidance currently in use regarding referrals for prosecutions; numbers of individuals referred for prosecution, broken down by sector; and numbers of individuals referred for prosecutions who are charged and sentenced. Data shall also include whether the individual has claimed asylum, country of origin, race, and justification for referring each individual for prosecution for improper and or reentry offenses. In addition, the Department shall provide the Committee with CBP's latest Consequence Delivery System guidance, in both unredacted and redacted (consistent with FOIA) versions, and promptly update with any changes made.

*Video Monitoring*.—The Committee continues the direction included under this heading in the explanatory statement accompanying Public Law 118–47.

*Prison Rape Elimination Act [PREA]*.—The Committee directs CBP to post on its website within 60 days of the date of enactment of this act a schedule for achieving 100 percent compliance with PREA requirements. In addition, the Committee requests CBP examine options to provide PREA training to relevant agency staff

and personnel during their onboarding process and to maintain annual training.

*Transportation Checks and Roving Enforcement.*—The Committee directs CBP to continue to collect and semiannually report to the Committee data pertaining to Border Patrol transportation and immigration checkpoints. The report shall exclude law enforcement sensitive information and include necessary redactions of all personal and identifying information about specific individuals. The report shall include, at a minimum, the total number of patrol stops made by CBP personnel during transportation checks and a description of the boarding of public conveyances by CBP personnel at air, maritime, and land environments, including ports and terminals. Additionally, the report shall include the following information when an arrest is made: the total number of arrests by location; the total number of use-of-force incidents during an arrest by location; the citizenship status of any individual arrested; and the total amount of drugs, currency, and firearms seized as a result of transportation checks. The report shall also include the following information pertaining to immigration checkpoints: the location of all tactical and permanent checkpoints that were in operation for any period of time; the total number of arrests by location; the total number of use-of-force incidents during an arrest by location; the citizenship status of subjects stopped or arrested following secondary inspection at checkpoints; and the total amount of drugs, currency, and firearms seized at checkpoints.

*Reporting Requirements for Deaths in Custody.*—CBP shall continue to provide the data required in House Report 116–80 regarding deaths of individuals in custody.

*Short Term Detention.*—The Committee is sympathetic to the operational needs of CBP which can fluctuate greatly, with surges to the border resulting in overcrowding in facilities presenting safety and health risks to individuals in custody, particularly children, as well as to CBP personnel. CBP shall continue to follow the directives in the explanatory statement accompanying Public Law 116–260 related to Holding Facility Length of Stay and Short-Term Detention, as well as the directives in House Report 116–458 on Initial Health Screenings, High-Priority Populations, Medical Equipment and Personnel, Access to Water and Food, Holding Facility Standards, Consumables, Child Welfare Professionals, Families in Custody, Personnel Training, Migrant Property, and Migrants-Safety. However, the Committee's expectations should not be construed to interfere with the rights obtained, or obligations owed, by any Federal consent decree. Additionally, within 90 days of the date of enactment of this act, the Commissioner shall provide a report to the Committee on infrastructure changes, training protocols, and other investments to ensure the safe, humane, and orderly processing of single adults, families, and unaccompanied children in CBP custody, in compliance with the CBP National Standards on Transport, Escort, Detention, and Search as well as the Flores Settlement. As part of the report, the Department shall solicit and include feedback and suggestions from non-governmental, non-profit organizations with a focus on immigration and civil rights to improve stakeholder monitoring and access policy at CBP facilities.

*Emergency Driving and Vehicular Pursuits*.—The Committee directs CBP to provide a report within 180 days of the date of enactment of this act, on the following: (1) the number of vehicular pursuits over the last three fiscal years, disaggregated by component, reason for pursuit initiation, reason for pursuit termination, pursuit disposition, location, duration, distance, maximum speed, use of force, involvement of other agency/organization, injuries, and fatalities; (2) a detailed description of all training curriculum and materials relating to CBP Directive No. 4510–026A, any updates or modifications thereto, and statistics on the training of personnel to date; (3) a detailed description of the Vehicular Pursuits Review Committee(s) including membership, frequency of meetings, number of incident reports reviewed to date disaggregated by fiscal year, and outcomes of the reviews; and (4) a detailed description of review and compliance assessments by the National Use of Force Review Board and Local Use of Force Review Boards regarding vehicular pursuit incident reports, including the number of incident reports reviewed in the previous fiscal year and outcomes of the reviews. The Committee further directs CBP to provide copies prospectively of: (1) any and all annual Law Enforcement Safety and Compliance [LESC] Directorate vehicular pursuit reports documenting and analyzing pursuits from the previous fiscal year; and (2) any and all final reports of investigation by the CBP Office of Professional Responsibility relating to emergency driving and/or vehicular pursuits. Each of these records shall be made available to the public with appropriate redactions no later than 90 days after the date of submission to the Committee.

*Non-Mission Duties*.—The Committee is aware that CBP personnel are carrying out the duties of other Federal agencies or components, known as “non-mission duties.” Not later than 30 days after the date of enactment of this act, CBP shall submit to the Committee a detailed report which shall include: (1) the total number of CBP agents or officers carrying out non-mission duties; (2) identification of the funding source associated with non-mission duties; (3) the rationale for CBP personnel to perform non-mission duties and the duration they are expected to perform those duties; (4) a detailed description of all required training for CBP agents and officers in order to carry out the non-mission duties; and (5) identification of any impacts to CBP’s mission due to agents and officers carrying out non-mission duties. The report does not need to include CBP personnel on temporary duty [TDY] assignment within CBP but shall include TDY assignments to other DHS components and executive branch departments.

*Assessing Commercial Satellite Radio Frequency [RF]*.—The Committee notes recent efforts and pilot programs to evaluate the utility of incorporating commercial satellite RF collections to improve situational awareness around the land borders of the United States. CBP should continue these efforts, which will allow for further evaluation of how RF collection fits into existing surveillance and reconnaissance architectures.

*Border Patrol Supervisor Staffing*.—The Committee directs CBP to report quarterly to the Committee on: (1) the number of supervisory agents assigned at headquarters, each sector, and each station; (2) the number of agents assigned to administrative and non-

enforcement positions; (3) the number of agents assigned to intelligence positions; and (4) the number of agents assigned to task forces.

*Rapid Single Nucleotide Polymorphism [NSP] DNA Testing*.—The Committee understands the DNA verification technology currently deployed along the southern border is sufficient only for basic relationship testing with family members. Advancements in genomics allow for the determination of more distant relationships precise biogeographical origins, and geolocation insights. Given its potential border security applicability, the Committee directs Border Patrol to conduct a pilot to verify familial relationships using SNP DNA testing along the southwest border. Within 365 days after the date of enactment of this act, the Commissioner is directed to brief the Committee on the results of the pilot, including the number of verified family units, fraudulent claims detected, and arrests made based on intelligence provided by the technology.

*Northern Border Mission Center*.—The Committee provides $6,000,000 for the Northern Border Mission Center to improve northern border air and maritime domain awareness, and coordinate with key partners across DHS and other Federal agencies. This funding will help to ensure that the Center has the tools and resources necessary to meet the statutory requirements to support domain awareness and training, as well as testing new technologies.

*Coordination with Border-Adjacent Tribes*.—The Committee recognizes the need for CBP to closely coordinate with Indian Tribes along the United States' land borders to address the shared aims of cultural preservation and national security, and supports the ongoing implementation of CBP's December 4, 2023, memorandum of Support to Tribes at or near the U.S. Southwest Border.

*Multiple-Use Public Lands on the Southwest Border*.—Within 120 days of the date of enactment of this act, CBP shall provide a briefing, in coordination with the Department of Defense [DOD] on the multiple-use public lands along the southern border that have been transferred to the DOD. The briefing shall include: (1) the level of collaboration between CBP employees with law enforcement and immigration enforcement authorities and DOD; (2) the division of responsibilities for patrolling the National Defense Area between CBP and DOD personnel; and (3) summaries of any encounters between CBP employees in the National Defense Area and U.S. citizens or any other individuals lawfully present in the United States.

TRADE AND TRAVEL OPERATIONS—OFFICE OF FIELD OPERATIONS [OFO]

The Committee recommends $6,149,833,000 for OFO.

*OFO Workload Staffing Model*.—Within 90 days of the date of enactment of this act, the Committee directs CBP to report on a workload staffing model to mitigate the impacts of vehicular wait times at the busiest land ports of entry, including loss of economic output and jobs. The Committee encourages CBP to ensure appropriate staffing levels are maintained at the top 10 U.S. air ports of entry, as determined by passenger enplanements as measured by the Federal Aviation Administration. The Committee notes that the Freight Logistics Optimization Works [FLOW] program provides a forward-looking, integrated view of supply chain conditions in the

United States. The Committee directs CBP to coordinate with the Department of Transportation to improve forecasting for staffing at U.S. ports, and to consider both cargo and passenger screening requirements at maritime ports of entry. Further, the Committee notes that CBP is projecting a "retirement" cliff as a large number of CBP officers will be eligible for retirement over the next few years. CBP shall provide a briefing to the Committee within 120 days of the date of enactment of this act on those projections, steps the agency is taking to manage the risks associated with a loss in workforce, and consequences of inaction on the agency's operational capabilities, including data on impacts to trade, travel, and economic and security impacts.

*CBP Home Mobile Application*.—Within 120 days of the date of enactment of this act, the Committee directs CBP to provide the following information on the use of the CBP Home mobile application: (1) current uses of the application to include purpose, users, and data collected and/or shared through the application; (2) a list of the agencies and programs that have access to the data (including sharing of data) and the reason the data is shared with that agency; and (3) plans for any changes to the use of the application. Any such changes shall be reported to the Committee prior to execution of such change. CBP shall provide the Committee a deployment plan for the CBP mobile application, including the user rate for each service available on the mobile application as of the date of enactment of this act, and a description of additional services and features that will be implemented by the end of fiscal year 2026.

*Combatting Transportation of Firearms and Illicit Funds*.—The Committee is concerned that illicit monetary instruments and firearms continue to be smuggled from the United States into Mexico, fueling transnational criminal organization activities, including drug trafficking and violent crime. The Committee encourages CBP to continue to collaborate with domestic and international partners to disrupt the flow of finances that support these activities and report to the Committee any additional authorities or resources needed to stymie the flow.

*Illicit Vaping Products*.—The Committee remains concerned with the prevalence of illicit vaping products that remain on the market in direct violation of the law, almost exclusively from China, that are unregulated and putting both adults and children at risk. Not later than 180 days after the date of enactment of this act, CBP shall report to the Committee on its enforcement actions to halt, reduce, and prevent illegal electronic nicotine delivery system [ENDS] products from entering the stream of commerce within the United States and any potential regulatory, statutory, or other process-related enhancements that would help facilitate greater enforcement efforts. CBP shall provide the number of shipments of vapor products in fiscal year 2024 that have been stopped at the border, and whether the shipments were ultimately released into the country, and if so, for what reason. The report shall also include the processes in place for stopping illegal vaping products from being allowed entry into the country, including coordination with the Food and Drug Administration [FDA] to determine whether the FDA issues Import Alerts for all products receiving any en-

forcement actions by FDA, including all products cited in warning letters to retailers, and if the products are ultimately returned to the importer, released, or destroyed.

*International Mail and Express Consignment Facilities*.—CBP's continued collaboration with the U.S. Postal Service [USPS] and the FDA at International Mail and Express Consignment Facilities is key to reducing the entry of scheduled narcotics and other illicit and restricted drugs (and their precursor materials) through these facilities. The Committee recognizes that illicit substances are often smuggled or mailed in small amounts, making it challenging for CBP to detect. Previously provided funds, and funds provided in this act, shall be made available for facility improvements; detection and testing equipment upgrades; increased capacity for testing and storing illegal and regulated substances; interoperability improvements with FDA detection equipment; and innovative technologies that apply advanced analytics and machine learning capabilities.

*E–Cigarettes*.—The Committee directs CBP to allocate not less than $5,000,000 to improve coordination between OFO and FDA with respect to the multi-agency work on illegal e-cigarettes. Specifically, The Committee directs CBP to (1) improve its coordination with the FDA, as part of the multi-agency task force on illegal e-cigarettes, (2) increase the number of random joint inspections at ports of entry and targeted inspections of entries by known manufacturers, brokers, and importers of illicit e-cigarettes; (3) increase the number of field examinations at ports of entry with high import volumes to target manufacturers, importers, and brokers known to engage in illicit activity; and (4) improve screening systems, including risk-based analytics tools, including through additional training for field staff, to detect mis-declared e-cigarette imports.

*Identifying Fentanyl Analogues and Related Substances at the Southwest Border*.—The Committee commends CBP on ongoing efforts to interdict fentanyl, fentanyl-related substances, and fentanyl analogues along the southwest border. CBP shall identify the specific types of fentanyl analogues and fentanyl-related substances, as defined by Public Law 116–114, it encounters at ports of entry. The Commissioner shall include the totals of fentanyl analogues and fentanyl-related substances, in addition to the other controlled substances for which it reports data in its drug seizure statistics, and make such information publicly available not less than monthly. The Committee directs CBP to continue to pursue and seek to rapidly deploy innovative and proven border technology to detect, interdict and deter the flow of illicit drugs, including fentanyl, carfentanil, and heroin. The Committee supports CBP's continued acquisition of chemical screening capabilities, non-intrusive inspection equipment and other capabilities to stem the flow of illicit drugs. The Committee also supports CBPs efforts to increase the percentage of vehicles inspected at land Ports of Entry while minimizing the impact to the flow of traffic, commercial or otherwise. Within 120 days of the date of enactment of this act, CBP shall provide a briefing on how the agency tracks fentanyl data with the Drug Enforcement Administration [DEA] and whether current capabilities allow for a comprehensive fentanyl tracking system, which includes documentation of seizure location, chemical

composition, probable or known manufacturing location, and probable or known point of entry into the United States, if applicable.

*Maritime Ports of Entry*.—The Committee continues to support robust staffing at the Nation's cargo and passenger maritime POEs. Within the funds provided for O&S, CBP shall ensure adequate staffing at new and expanded maritime POEs in order to meet peak passenger wait time goals.

*Border Security Deployment Program [BSDP]*.—The Committee commends CBP on its work in executing BSDP as the program provides CBP with a comprehensive, integrated, and continuous surveillance and intrusion detection system at Land Ports of Entry [LPOE]. BSDP improves the safety and security of CBP officers, Border Patrol agents, and the traveling public and facilitates cross-border trade. The program provides a valuable contribution to the prevention and detection of potential corruption among CBP officers by allowing for court admissible video and audio recordings. BSDP provides critical real-time surveillance by using over 15,000 sensors across all LPOEs; such sensors are utilized at 24-hour operating and non-24-hour operating U.S. POEs. Such sensors allow for a better allocation of resources and manpower by acting as a significant force multiplier. CBP shall provide the Committee a briefing within 120 days of the date of enactment of this act on the agency's plan to expand BSDP at LPOEs.

*Outbound Operations at Land Ports of Entry*.—The Committee continues strong support for robust outbound operations along the southwest border and recognizes the importance of CBP's outbound operations to support efforts to disrupt and dismantle transnational criminal operations at the southwest border. These efforts support the Federal Government's mission of stopping the flow of fentanyl and other synthetic narcotics into the U.S. and stopping human trafficking by disrupting the business model of the transnational criminal organizations' movement of firearms and currency resulting from the sale of narcotics in the U.S. Within 90 days of the date of enactment of this act, CBP shall submit to the Committee a spend plan on NII outbound funding and shall identify how such funds will be deployed across the southwest border land ports of entry. Furthermore, not later than 180 days after the date of enactment of this act, CBP shall submit a report that analyzes the necessary requirements that would ensure 100 percent outbound inspection for all land port of entry passenger vehicles.

*Port Runners*.—Not later than 180 days after the date of enactment of this act, CBP shall provide the Committee with a briefing on the status of the pilot program for energy-absorbing vehicle barrier systems and mobile technology designed to deter, safely stop, and contain "port runner" vehicles at CBP POEs.

*High Energy Rail Projects*.—The Committee is aware of delays on the high energy rail projects being carried out at border crossings across the country. The Committee directs CBP to provide a briefing within 120 days of the date of enactment of this act on the status of those projects, steps the agency is taking to minimize future delays, and updated projected completion dates.

*Agricultural Inspections*.—The Committee recognizes that agricultural specialists are crucial for ensuring trade and travel safety; preventing the introduction of harmful exotic plant pests and for-

eign animal diseases, including from Asian pork products; and averting potential agricultural and bio-terrorism in the United States. Currently, many POEs are understaffed relative to CBP's Workload Staffing Model, as well as the Agriculture Resource Allocation Model. CBP shall continue working with the U.S. Department of Agriculture to better leverage existing staff in addressing the agricultural inspection workload, such as through the authorization of additional work hours or dual certification.

*Land Ports of Entry Hours of Operation*.—The Committee recognizes the importance of maintaining 24-hour staffing at remote land ports of entry to prevent negative impacts to local communities and regional economic activity and directs CBP to consult with elected officials at all levels, community members, and industry prior to making changes. CBP shall refrain from reducing the hours of operation at any land port of entry unless CBP can demonstrate, after consultations with local elected officials, that the reduction in hours will not impede local or regional commerce or unduly impede local resident traffic. Further, not later than 90 days after the date of enactment of this act, CBP shall provide a report to this Committee detailing operating hours at all northern border ports of entry, and describing how CBP plans to improve the recruitment and retention of CBP personnel at remote northern border ports of entry to sustain those operating hours and to consider restoring them to pre-COVID hours. Additionally, to assist with the challenges relating to operating hours, the Committee directs CBP to establish a pilot program for the co-location of CBP and Canada Border Services Agency border agents at remote LPOEs to maintain border security and reduce costs.

*Baseline Service Levels at Ports of Entry*.—The Committee notes that the explanatory statement accompanying Public Law 117–328 directed CBP to provide each air, land, and sea port operator, including cruise terminals, with information on baseline service levels and report to the Committee quarterly on its adherence to these baseline levels. To date, the Committee has not received the first quarterly report. The Committee directs CBP to provide the aforementioned report no later than 30 days after the date of enactment of this act, and to provide future reports on a semi-annual basis. Further, the Committee reminds CBP that the report shall address staffing shortages, requirements for facility and security upgrades, and plans for technology recapitalization; the process used to decide how initiatives are funded; a justification for the scope of the requests; and how CBP will negotiate with port operators and incorporate their feedback into the development of plans to address future facility and security needs. CBP is encouraged to defer all current and future seaport facility agreements until it has provided details on baseline service levels to each port operator and provided the Committee with estimates for future facility and security requirement improvements and associated federally mandated technology. CBP is expected to work in partnership with seaports and refrain from imposing requirements on seaports in a unilateral fashion.

*Locality Payscale Flexibility*.—The explanatory statement accompanying Public Law 117–328 directed CBP to provide a report, in coordination with the Office of Personnel Management, on: (1) an

analysis of local pay scales and how those pay brackets impact recruitment and retention; (2) an overview of agency authorities for adjusting pay; and (3) recommendations to better align local pay with the costs of living to improve recruitment and retention. The Committee is disappointed that CBP has not completed this report. The Committee directs CBP to complete the aforementioned report no later than 30 days after the date of enactment of this act.

*Preclearance*.—The Committee notes the continued success of the Preclearance program in expediting the security process for passengers traveling to the United States, while simultaneously enforcing procedures that deter and detect national security threats from individuals, groups, or cargo attempting to enter the United States. Fees collected for this program shall be used in a targeted, risk-based fashion and shall prioritize the expansion of preclearance operations as outlined in the Department's Beyond the Border Action Plan between the United States and Canada for land, marine, rail, and air POEs. The Committee appreciates progress on efforts to establish preclearance for the mutually agreed upon sites of Billy Bishop Toronto City Airport, Quebec City Jean Lesage International Airport, Montreal Rail, and Rocky Mountaineer and reiterates that such expansion is contingent upon each site meeting all terms and conditions of the agreement. Additionally, the Committee directs CBP to report on the ongoing efforts to establish a customs and immigration pre-clearance facility at Montreal's Central Station to facilitate passenger rail service along Amtrak's Vermonter route, including by directly engaging State Departments of Transportation and providing biannual progress reports to relevant stakeholders and interested parties. The Committee encourages CBP to meet the objectives for preclearance activities, including obligations in advance of reimbursement, authorized by the Trade Facilitation and Trade Enforcement Act of 2015 (Public Law 114–125), and provides necessary funding to collect and expend reimbursements, including anticipated reimbursements for preclearance activities. As Canada has adopted companion legislation, the Committee expects CBP to make progress in negotiations with the Canada Border Services Agency, Transport Canada, and Public Safety Canada on expanding preclearance activities in Canada. The Committee also encourages CBP to consider the significant economic impact that the expansion of preclearance activities in Canada will have for U.S. communities that neighbor the northern border when prioritizing preclearance expansion projects. The Committee urges CBP to reengage in negotiations with international airports on expansions to the existing preclearance program by prioritizing airports that were previously identified for possible preclearance locations in 2015 and 2016 and that have the highest number of travelers arriving in the U.S. each year. The Committee supports CBP meeting the expansion of the preclearance program as the opportunity for increased traveler volume, increased revenue, and new flight routes are dependent on the success of the program.

*Data on Asylum Seekers*.—The Committee directs OFO to continue to produce a monthly report detailing for each preceding month: the POEs along the southwest border at which queue management or metering practices have been employed; the number of

asylum seekers processed at each such POE; and the number of asylum seekers turned away from each such POE due to queue management or metering practices. The Committee also requests the report include: CBP's rationale for queue management or metering practices at POEs; capacity and resource constraints leading to or requiring the implementation of queue management or metering practices at POEs; recommendations for alleviating such capacity and resource constraints at POEs; and any agreements or arrangements between CBP, or the Federal Government, and Government of Mexico authorities involving efforts to restrict the number of potential asylum seekers that can access a POE prior to entering the United States. While the Committee acknowledges that CBP has provided some of the data requested, the data is incomplete and not fully responsive to the Committee's prior requests for information. Further, the Committee directs CBP to include within its monthly southwest migration reports data detailing the number of individuals claiming fear, or attempting to claim a fear of return to their home country, in addition to, and separate from, its monthly apprehension and inadmissible statistics. The data should include individuals presenting at both POEs and between POEs, claiming credible fear as a separate, distinct category from either the monthly "apprehensions" or "inadmissibles" statistics. The Committee acknowledges that CBP has provided annual statistics on the number of "credible fear apprehensions" and "credible fear inadmissibles," but directs CBP to disaggregate this data such that individuals claiming credible fear are not included within or counted towards either the "apprehensions" or "inadmissibles" statistics and do so on a monthly basis.

*Assessing Options for Fishing Vessels Crew*.—The Committee is aware of the workforce requirements and challenges that are unique to the federally managed longline fishing fleet based out of Hawaii and the impacts that are the result of denying U.S. vessel owners and operators the ability to facilitate the employment of foreign crewmen through commercial air travel. The restriction of these crewmen to fishing vessels allows for consideration of a process to permit entry for the immediate transfer of crewmen to onboard vessels on which they reside and are employed to fish exclusively for tuna and other highly migratory species. To mitigate the impacts from restricting crewmen entry, as well as countering illegal, under-reported, and unregulated fishing by foreign fleets including China, the Committee directs CBP to assess options for a limited or temporary use of authority to allow for the entry of designated crewman via air travel and transfer to their place of employment onboard Hawaii-based longline fishing vessels and provide a list of options to the Committee within 90 days of the date of enactment of this act.

*Border Searches and Electronics*.—The Committee continues to require CBP to publish annually and make publicly available on its website data pertaining to searches of electronic devices. This data should include: the total number of U.S. persons for which a Governmental entity obtained access to the digital contents of electronic equipment belonging to or in the possession of the U.S. person at the border; the total number and nationality of individuals for which a Governmental entity obtained access to the digital con-

tents of electronic equipment; aggregate data regarding the race and ethnicity of individuals for whom a Governmental entity obtained access to the digital contents of electronic equipment belonging to or in the possession of an individual at the border; and the number of times CBP searched an electronic device at the request of a Federal, State, local or foreign governmental entity, including another component of the Department, or disclosed to such entity information from any searched device.

*Environmental Crimes Enforcement*.—Within 120 days of the date of enactment of this act, CBP shall provide a briefing to the Committee on the activities and resources applied towards the enforcement of the Lacey Act amendments of 2008, which help address international deforestation and combat the trade of illegal wildlife and timber products. Additionally, the briefing shall include efforts by CBP to assist the U.S. Department of Agriculture's Animal and Plant Health Inspection Service with the electronic collection of data as well as continued consultations with trading partners, importers, exporters, and other interested groups as the provisions of the act are fully implemented. Additionally, CBP shall provide the Committee a briefing within 90 days of the date of enactment of this act on actions and funding to combat illegal, unreported and unregulated fishing-related activities relating to the illegal timber trade.

*Advanced Electronic Data [AED]*.—The Synthetics Trafficking and Overdose Prevention Act [STOP Act] (Public Law 115–271) required that all packages coming into the United States from foreign countries use Advanced Electronic Data by January 1, 2021. Within 180 days of the date of enactment of this act, the Committee directs CBP, in coordination with the United States Postal Service, to issue a report with a detailed plan for how the USPS can scan every package or letter entering the United States that could contain an illegal opioid. Furthermore, within 180 days of the date of enactment of this act, CBP shall provide a report to the Committee on the implementation of the AED initiative. This report must include: (1) total volume received by USPS and volume containing AED; (2) the volume received by country containing AED; (3) number of packages CBP requests to screen and the number actually tendered by the USPS; (4) reports on the number of goods seized during blitzes on Mail Facilities; and (5) volume received from countries exempted from AED by CBP.

*Prevent Abduction Program*.—The Committee recognizes that Federal law prohibits any one parent from removing a child from the United States with intent to obstruct another parent's custodial rights. The Committee further recognizes that the International Child Prevention and Abduction Prevention and Return Act (Public Law 113–150) required CBP, in coordination with other Federal agencies, to establish a program to ensure children were not unlawfully removed from the United States in violation of a valid State court order. The Committee appreciates CBP's efforts to establish the Prevent Abduction Program to meet this statutory requirement and protect the rights of parents and children and further appreciates recent updates on the public facing website about the program. The Committee recognizes that CBP officers have many responsibilities, but officers are sometimes the last oppor-

tunity to prevent an unlawful international parental abduction. Within 180 days of the date of enactment of this act, CBP is directed to report to the Committee on the status of the Prevent Abduction Program, which shall include: (1) the total hours of training CBP officers receive on the issue of international parental child abduction; (2) the accumulative number of children enrolled in the program and the number of children enrolled in the preceding fiscal year; (3) the number of children enrolled in the program who, despite their enrollment in the program, were removed at an air POE, if any; and (4) identification of resources CBP might need to ensure children are not removed from the United States in violation of a valid State court order.

*Tariff Evasion*.—Within 180 days of the date of enactment of this act, OFO shall brief the Committee on its plans to further develop a unique identifier for commercial shippers to identify fraudulent customs declarations and tariff fraud. This briefing should, to the extent practicable, include an operational demonstration.

*Cannabis Seizures*.—Within 120 days of the date of enactment of this act, CBP shall provide a briefing on cannabis seizures, to include products containing cannabis, or related paraphernalia that are possessed, sold, or transferred by a cannabis distributor in compliance with applicable State or Tribal law and regulations.

*Global Business Identifier*.—The Committee is pleased by the success to date of the Global Business Identifier [GBI] test as a tool to improve U.S. government visibility into imports and facilitate supply chain traceability. The Committee directs CBP to expand the GBI program as feasible and within 90 days of the date of enactment of this act, provide a briefing to the Committee on plans for GBI expansion.

*International Tourism*.—Within 90 days of the date of enactment of this act, CBP shall provide a briefing to the Committee on travel data to the United States that covers fiscal years 2023 to 2025, and includes total number of visitors, mode of entry (air, land, sea port of entry), and total amount of immigration and customs fees collected.. The Committee requests the Government Accountability Office, within 120 days of the date of enactment of this act, to issue a report studying changes in travel to the United States and impacts on the tourism industry.

*Access to Counsel*.—Withing 90 days of the date of enactment of this act, the Committee directs CBP to provide a briefing on the requirements, to include cost estimates, to ensure that individuals with lawful travel documents be given a meaningful opportunity within one hour after entering CBP's secondary or deferred inspection to consult with counsel and/or an interested party. In identifying the requirements, CBP should assume that the counsel and interested party shall be allowed to advocate on behalf of the individual and, to the greatest extent practicable, be allowed to appear in person at the secondary or deferred inspection site. Individuals for the purpose of this section shall include a national of the U.S.; an immigrant lawfully admitted for permanent residence who is returning from a temporary visit abroad; an individual seeking admission as an immigrant in possession of a valid unexpired immigrant visa; an individual seeking admission as a nonimmigrant in

possession of a valid unexpired nonimmigrant visa; a refugee; a returning asylee; or an individual who has been approved for parole.

TRADE AND TRAVEL OPERATIONS—OFFICE OF TRADE

Within the total funding recommended for Trade and Travel Operations, including OFO and Office of Trade, the Committee recommends $499,696,000.

*Combatting Forced Labor*.—Section 307 of the Tariff Act of 1930 (19 U.S.C. 1307) prohibits the importation of merchandise mined, produced or manufactured, wholly or in part, in any foreign country by forced labor-including forced or indentured child labor. Such merchandise is subject to exclusion and/or seizure to prevent those items from entering the U.S. economy. The Committee commends CBP's Office of Trade for their increased efforts to identify and prevent entry of such merchandise.

The Committee directs CBP to allocate not less than Fiscal Year 2025 levels to forced labor enforcement capabilities and to continue to support implementation of the Uyghur Forced Labor Prevention Act [UFLPA] (Public Law 117–78) and support additional personnel, technological capability, training, and other activities to faithfully implement the law and protect U.S. consumers from products tainted by forced labor, and reduce unintended impacts on supply chains. Within 60 days of the date of enactment of this act, CBP shall provide a briefing to the Committee on implementation of the UFLPA, including an update on addressing the challenge of transshipment of Xinjiang Uyghur Autonomous Region-related goods, the tools and technology CBP deploys to enhance enforcement of the law, steps to coordinate international engagement to prevent bifurcated supply chains or dumping grounds for the products of forced labor, the obstacles to enforcing UFLPA in cases of rail, road, and air transportation, and CBP engagement with shippers to ensure timely but full review of shipments flagged for review.

*Sugar Inspection*.—The Committee is concerned about possible circumvention with respect to imported molasses at northern border POEs. Therefore, the Committee directs CBP to coordinate with the U.S. Department of Agriculture's Agricultural Marketing Service as it implements directives contained in Senate Report 118–193. Within 60 days of the date of enactment of this act, and quarterly thereafter, CBP shall brief the Committee on this effort, to include any enforcement actions taken as a result of the aforementioned directives.

*Trade Enforcement*.—The Committee continues to support a range of trade enforcement activities pertaining to intellectual property rights and online anti-counterfeiting. The Committee directs CBP to expand its partnership with the USPS to provide advance electronic data to identify counterfeit goods and to enhance communication with rights holders through sharing specific detention information and images, as recommended in the March 2021 Commercial Customs Operations Advisory Committee background paper. Within 90 days of the date of enactment of this act, CBP shall provide a report to the Committee detailing implementation of this directive.

*Combatting Transshipment*.—The Committee is aware of the continued efforts by some foreign traders to circumvent U.S. trade laws and evade duty payments by transshipping products through third party countries. Therefore, the Committee continues to direct CBP to modify targeting criteria and make additional changes necessary to provide CBP with the administrative flexibility required to identify transshipped products.

*Imported Wood Products*.—The Committee recognizes the majority of U.S. manufactured finished wood products require a combination of domestically grown species with international species, the latter of which cannot be grown in the United States. Multiple Federal agencies, including CBP, are jointly responsible for overseeing processes with respect to clearing imported wood products at U.S. ports of entry. The Committee supports further coordination across the agencies with respect to wood product imports and directs CBP to provide a report to the Committee not later than 180 days after the date of enactment of this act detailing CBP's current role in the wood importation declaration process, how it interacts with other agencies, and concrete steps the agencies can take to expedite shipments that are delayed.

*Section 321 Data Pilot*.—The Committee recognizes the importance of CBP's Section 321 Data Pilot program, which is a public-private partnership mitigating risk and expediting legitimate low value e-commerce shipments entering the U.S. under de minimis procedures. The Committee requests CBP provide a briefing on next steps based on the results of the pilot to include potential expansion that identifies the costs and benefits to government and industry by accelerating data collection and deterring illegal practices. Additionally, the Committee requests GAO review the findings and merits of the Section 321 Data Pilot program to include whether additional legislative authorities would improve CBP's ability to collect data for goods imported under de minimis.

*Report on CBP Authority to Investigate Anti-Dumping and Countervailing Duties [AD/CVD] Circumvention*.—The Committee notes that, since passage of the Enforce and Protect Act [EAPA] (Public Law 114–125), CBP has identified over $1,000,000,000 in AD/CVD duties that have since been repaid. However, CBP does not currently have self-initiation authority to investigate circumvention allegations. Within 90 days of the date of enactment of this act, CBP shall submit a report on whether self-initiation authority would allow CBP to pursue more circumvention cases and extend existing investigations deeper into supply chains fully and whether such authority would result in greater enforcement.

*U.S. Foreign-Trade Zones [FTZs]*.—Within 120 days of the date of enactment of this act, CBP shall provide a briefing on the current state of FTZs, the performance measures used to evaluate the impact of FTZs, the level of support provided by CBP, and plans for expanding FTZs. Additionally, CBP shall include with the briefing a plan for incorporating requirements relating to FTZs in the OFO Workforce Staffing Model. The Committee directs CBP to use within funds provided to create a FTZ-dedicated regional staffing program that aligns with CBP Field Office structure, and reports to dedicated personnel at CBP Headquarters.

*Transparency of Import Data for AD/CVD Enforcement*.—The Committee is concerned that importers involved in the evasion or circumvention of antidumping and countervailing duty [AD/CVD] orders may continue to receive confidential treatment for vessel manifest data under 19 C.F.R. § 103.31, limiting visibility into high-risk trade flows. The Committee directs CBP to review its confidentiality policies as they apply to importers, consignees, or HTS codes subject to active Enforce and Protect Act [EAPA] investigations or ongoing AD/CVD enforcement actions. CBP shall submit a report to the Committee within 120 days of the date of enactment of this act outlining potential administrative or regulatory reforms to enhance transparency in these cases, while preserving legitimate confidentiality protections for compliant importers.

*Enforcement of AD Orders on Magnesium Metal*.—The Committee remains concerned about evasion of antidumping duties on magnesium metal, particularly through transshipment and alloy blending practices intended to obscure Chinese origin. The Committee encourages CBP, in coordination with the Department of Commerce, to enhance scrutiny of supply chains involving third-country foundries and recycling operations that import Chinese magnesium for reprocessing. The Committee urges CBP to expand use of production verification tools and to strengthen international cooperation with key trading partners to address these vulnerabilities without undermining legitimate trade.

*Solar Panel Stockpiling*.—The Committee is concerned that Chinese solar companies have been found to be shipping products through Southeast Asian countries for minor processing in an attempt to avoid paying antidumping and countervailing duties. The Committee notes that since December 3, 2024, these illegal circumventions have resulted in stockpiles of Chinese solar panels remaining in the U.S. unutilized by the deadline. Within 90 days of the date of enactment of this act, the Committee directs CBP to provide a detailed report addressing the agency's enforcement action taken with respect to the anti-stockpiling Utilization Requirement concerning the Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells and Modules Imported from Cambodia, Malaysia, Thailand, and Vietnam (as detailed in 88 Fed. Reg. 57419), including the cumulative amount of pending duties for unutilized panels and the total duties recovered as a result of such enforcement actions.

## INTEGRATED OPERATIONS

*Center for Air and Marine Drone Exploitation [CAMDEx]*.—The Committee includes an increase of $2,750,000 for the drone exploitation program within Air and Marine Operations [AMO] to counter threats posed by hostile Small Unmanned Aerial System. Within 180 days of the date of enactment of this act, CBP shall brief the Committee on the program's progress.

*Counter-UAS [c-UAS] Operations*.—The Committee is concerned about the use of drones by transnational criminal organizations in border areas. CBP, in coordination with the DHS Office of Intelligence and Analysis, shall provide a briefing to the Committee not later than 120 days after the date of enactment of this act outlining the current threats posed by the use of drones by transnational

criminal organizations along the border, the resources necessary to deter this threat, and any authorities or resources that would allow for CBP to better interdict and deter narco-drones, including consolidation of the existing concepts of operations [CONOPS] in southwest border sectors into a single CONOPS overlaying the entire southwest land border.

*Office of International Affairs*.—The Committee directs CBP to provide a briefing within 60 days of the date of enactment of this act on recommendations to, in conjunction with the Department of State, expand information campaigns in El Salvador, Guatemala, and Honduras through social and behavior change communication advertising the dangers of irregular migration to the United States and educating citizens of those countries about legal pathways.

*Persistent Maritime Domain Awareness [MDA]*.—The Committee recognizes there are benefits and efficiencies to be gained by deploying uncrewed surface vehicles [USVs] for homeland security missions, specifically interdiction related efforts. Therefore, the Committee directs AMO to continue to work with the CBP Innovation Team [INVNT] and with industry partners to conduct a persistent, long duration MDA demonstration in an area where illicit maritime activity is known to be concentrated.

*Tethered Aerostat Radar System [TARS]*.—The Committee is aware that TARS employs a legacy radar system that operates in the contested L-band of the electromagnetic spectrum, requires regular maintenance but oftentimes lacks replacement parts due to its age, and may not adequately meet the evolving surveillance mission requirements at the southwest border largely due to the proliferation of drones. The Committee directs CBP to report on innovative options to address these challenges within 120 days of the date of enactment of this act.

ENTERPRISE SERVICES

*Mission Support Contracting*.—The Committee repeats its request for CBP to provide, within 120 days of the date of enactment of this act, an inventory of all Enterprise Services contracts organized by category, to identify opportunities to save costs with a plan to reduce current duplication, and to consolidate to leverage economies of scale. To promote more efficient and effective use of these resources, CBP shall apply advanced analytics and machine learning tools to develop an inventory and identify opportunities to save costs.

*Caregivers, Child Care Services and Employee Resiliency*.—The Committee continues support for suicide prevention clinicians, child care services, and human resources activities and provides an increase of $6,000,000. Not later than 60 days after the date of enactment of this act, CBP shall provide a report to the Committees on its wellness and suicide prevention efforts, including existing and planned strategies and initiatives, and the accessibility of the Department's telemental health and employee assistant pilot. The Committee continues to encourage the Department to work with organizations who have demonstrated success using a proven mental health model.

*Independent Verification and Validation [IV&V]*.—Not later than 30 days after the last day of each fiscal quarter, the Committee di-

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 591 of 714 PageID #:1641



rects the Commissioner to submit a report on IV&V, including: (1) any Level 1, Level 2 and Level 3 acquisition programs that have IV&V resources assigned; and (2) a summary of the findings of any IV&V activities or an explanation for why no such verification and validation has been performed.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

| | |
|---|---|
| Appropriations, 2025 | $850,170,000 |
| Committee recommendation | 570,051,000 |

COMMITTEE RECOMMENDATIONS

The Committee recommends $570,051,000 for Procurement, Construction, and Improvements [PC&I], as included in the table below.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

[In thousands of dollars]

| | Committee recommendation |
|---|---|
| Program Funding for Border Security Assets and Infrastructure | |
| Innovative Technology | 20,000 |
| BECN-ES | 46,800 |
| BECN-iBOS | 29,800 |
| Program Funding for Trade and Travel Assets and Infrastructure | |
| Fentanyl Initiative: NII Outbound | 100,000 |
| Electronic Export Manifest Capability (Outbound) | 10,000 |
| Program Funding for Integrated Operations Assets and Infrastructure | |
| AWI | 10,000 |
| International Rail (IRAIL) | 1,300 |
| Radiation Portal Monitor Program (RPMP) | 20,478 |
| Radiation Portal Monitor Replacement Program (RPM RP) | 13,900 |
| Program Funding for Construction and Facility Improvements | |
| Border Patrol Facilitites | 60,000 |
| OFO Facilities | 187,000 |
| Program Funding for Mission Support Assets and Infrastructure | |
| Revenue Modernization | 4,973 |
| Financial Systems Enhancements | 5,000 |
| Employee Lifecycle Program (EL360) | 3,000 |
| S4HANA | 32,000 |
| UPRO | 25,800 |

*Identifying Impact of Border Security Investments*.—The Committee is committed to providing funding to strengthen the security of U.S. borders in a smart, data-driven manner that is informed by robust, cost-benefit analysis that incorporates all types of border security assets and is tied to identified capability gaps. As part of CBP's briefing of the fiscal year 2027 request, CBP shall provide the Committee the outcome of such analysis.

*Border Security Technology*.—The Committee directs CBP to reallocate funding as appropriate to ensure technology is deployed at the locations where it will have the greatest impact on CBP's ability to identify and interdict illicit activity. The Commissioner is directed to prioritize procurement of the most cost-effective technologies based on lifecycle costs, system availability, reduced requirements for personnel, and input from sector leadership. The Committee directs CBP to ensure that the appropriate amount of technology is piloted, tested, and deployed along the northern bor-

der, in addition to the southern border. CBP shall notify the Committee quarterly on the operational availability of all fixed, relocatable, and mobile surveillance systems deployed by CBP throughout the United States, including maintenance needs of such systems and the agency's maintenance plan for keeping the systems operational, including recapitalization or replacement of systems.

*Transitioning Innovative Technologies and Equipment Into CBP Operations*.—The Committee continues support for CBP's Innovation Team and the progress the agency has made in identifying, piloting, and evaluating innovative capabilities that likely would have previously gone undiscovered. Key to the success of this program is the ability of the agency to transition successful pilots into operations. The Committee directs CBP to provide a briefing within 90 days of the date of enactment of this act and quarterly thereafter on: the current rate of pilots that have transitioned to operations; the performance impact to operations as a result of the transition; a plan to evaluate whether there are common indicators for unsuccessful pilots; and recommendations to incentivize CBP programs to participate and ultimately execute promising capabilities. Further, the Committee directs CBP to provide a briefing within 30 days of the date of enactment of this act on the outreach to frontline personnel that informs decisions on piloting innovative capabilities.

*Non-Intrusive Inspection [NII] at Ports of Entry*.—CBP shall continue to provide monthly updates to the Committee on the obligation of all funds for NII equipment along with actual and projected performance gains as a result of deployments for NII funded in this or prior appropriations, including funding provided through Public Law 119–21. Those updates shall include progress on incorporating AI/ML capabilities to aid in faster detection of anomalies. Within 90 days of the date of enactment of this act, CBP shall provide a briefing to the Committee on the status of NII coverage in pre-primary lanes along the southwest border and to report on whether the increase in pre-primary screening will create additional alarms at POEs, impacting current secondary inspection capacity and possibly the workflow of other Federal agencies that may not have sufficient opportunity to plan for additional resource needs.

The Committee encourages CBP, in coordination with S&T and private sector partners, to conduct research and development activities to enhance existing equipment and develop advanced mobile NII equipment for large-scale cargo and other items requiring screening. Such activities should include an examination of how enhanced mobile systems could contribute to saving taxpayer dollars. Not later than 180 days of the date of enactment of this act, CBP shall provide a report on the current status of mobile NII technology and proposals for enhancing it.

*Deterring Illicit Substances*.—The Committee is aware of CBP's ongoing testing of innovative technologies, including recent testing of radiation-free passive cargo scanning technology, and encourages CBP's efforts to leverage evolving and advanced capabilities to accelerate progress in achieving screening goals to detect, interdict, and deter the flow of illicit drugs and other contraband at the POEs. The Committee seeks to ensure CBP dedicates the necessary

resources to procuring technologies, including NII and passive radiation scanning, as well as X-ray/Gamma-ray imaging of cargo and conveyances, that detect, interdict, and deter the flow of illicit drugs, including fentanyl, carfentanil, and heroin. The dramatic influx of fentanyl into the United States, including through the mail, is contributing substantially to the opioid epidemic. The Committee supports CBP's continued efforts to combat this influx through the acquisition of portable chemical screening capabilities necessary to determine the presence of fentanyl and other narcotics, including lab equipment, decontamination solutions, personal protective equipment, and other consumables, and increasing the number of scientists at POEs and consignment facilities to rapidly interpret screening test results.

*Land Ports of Entry*.—While the Committee continues direction to CBP to provide to the Committee its annual report prioritizing facility needs at LPOEs with the annual budget submission, the Committee notes significant delays with this submission. The Committee directs CBP to take appropriate steps to ensure submission of the report in a timely manner. CBP shall continue to work with GSA and the Office of Management and Budget on this 5-year strategy to modernize POEs. Specific attention shall be paid to the health, safety, and welfare needs of CBP officers. Special consideration shall also be considered for facilities where reconfiguration or upgrades will improve the flow of local traffic and allow local residents to move freely in their own communities. Additionally, CBP shall provide a detailed report and timeline within 90 days of the date of enactment of this act outlining completion of the Blue Water Bridge Plaza expansion project and any steps taken in the last fiscal year toward project completion. The report shall align with the annual LPOE priority list, outline projected CBP costs, and should explain how CBP will engage with State and local entities and the specific milestones and timeline for the project's completion. Within 120 days of the date of enactment of this act, CBP, working with GSA, shall provide the Committee with a briefing on plans to execute the funds provided in the Infrastructure Investment and Jobs Act of 2021 (Public Law 117–58) and whether there are any significant changes involving the 26 LPOE projects supported in that act. The Committee also acknowledges that CBP and GSA findings in their completed feasibility study for the expansion and modernization of land ports of entry would increase CBP's capacity to facilitate increased international trade and interdict fentanyl. The Committee urges CBP to work expeditiously with GSA to prioritize modernization and expansion on its 5-year Capital Investment Plan while adhering to the proposals in the completed feasibility study. As part of this briefing, CBP shall also provide the Committee an update on steps to "rebuild" the annual 5-year LPOE plan.

The Committee acknowledges that CBP and GSA findings in their completed feasibility study for the expansion and modernization of the Santa Teresa LPOE. The Committee directs CBP to report to the Committee within 90 days of the date of enactment of this act on a timeline for a project design study and environmental impact assessment for this LPOE during Fiscal Year 2026. Additionally, CBP shall provide a detailed report and timeline within 90

days of the date of enactment of this act outlining the Dennis DeConcini Port of Entry modernization project and a detailed timeline for project completion and outline projected CBP costs, and explain how CBP will engage with State and local entities and the specific milestones and timeline for the project's completion.

*Construction and Facility Improvements*.—

Additionally, not later than 90 days after the date of enactment of this act, CBP shall submit a report to the Committee that includes:

(1) the details of the design and construction process for new or renovated Border Patrol facilities, including stations, processing centers, and checkpoints;

(2) detailed requirements for each facility currently funded or proposed for funding, including buildings, parking facilities, sally ports, vehicle maintenance facilities, fueling stations, temporary detainee holding facilities, and kennels;

(3) for each currently funded facility:

- (a) the total amount funded, obligated, and expended, by fiscal year; and
- (b) if funds were obligated to an outside agency (e.g., General Services Administration and U.S. Army Corps of Engineers), the obligation and expenditure status of those funds;

(4) for each currently funded facility and for proposed facilities, a construction schedule and associated expenditure plan broken out by quarter (to include funds appropriated through other agencies);

(5) For each requirement described in (2):

- (a) the severability of each requirement that is specific to the location;
- (b) confirmation that each requirement is an independently awardable option for all contracts currently funded;
- (c) the requirements for facilities that are unfunded; and
- (d) the requirements for facilities described in (2) that are unfunded; and

(6) the number of personnel to be assigned at each location, with confirmation the design is scoped to address current and anticipated future staffing needs.

The report shall also include a detailed plan to improve CBP's cost estimating capability for these facilities.

*Advanced Training Center [ATC]*.—The Committee continues to support the investments made at the ATC's construction of the Instructional Design Center/Distance Learning Center. Within 90 days of the date of enactment of this act, CBP shall brief the Committee on progress made with the use of previously appropriated funds.

*PC&I Spend Plan*.—The Committee reminds CBP of the continuing requirement for a detailed PC&I Spend Plan and, once submitted, updated and shared with the Committee in a timely manner if there are any deviations from congressional direction provided concerning the purpose of funds provided and any changes from the plan.

*Maritime Patrol Aircraft [MPA] Support*.—Within 120 days of the date of enactment of this act, CBP shall brief the Committee on existing capabilities to test complex hardware, software configurations, and inter-component/international partner tactical data communications systems essential to the CBP MPA mission. The briefing shall identify existing requirements for such capabilities and options, including accessing other DHS component facilities, to meet requirements.

## U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

U.S. Immigration and Customs Enforcement [ICE] is the principal investigative agency within the Department of Homeland Security. ICE is responsible for securing the Nation's borders, enforcing U.S. immigration laws, and safeguarding cyberspace through the enforcement of Federal laws that govern trade and travel, including but not limited to narcotics enforcement, financial crimes, child exploitation, and human smuggling.

### COMMITTEE RECOMMENDATIONS

The Committee recommends total appropriations of $10,769,805,000 for ICE. This amount is in addition to estimated fee collections of $409,500,000.

The following table summarizes the Committee's recommendation as compared to the fiscal year 2025 enacted level:

IMMIGRATION AND CUSTOMS ENFORCEMENT

[In thousands of dollars]

| | Fiscal year 2025 enacted | Committee recommendations |
|---|---|---|
| Operations and Support | 9,986,542 | 10,740,305 |
| Procurement, Construction, and Improvements | 55,520 | 29,500 |
| Total, Immigration and Customs Enforcement | 10,042,062 | 10,769,805 |

### OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriations, 2025 | $9,986,542,000 |
| Committeee recommendation | 10,760,505,000 |

The ICE Operations and Support [O&S] appropriation provides for the enforcement of immigration and customs laws, related intelligence activities, and the detention and removal of illicit people and goods. In addition to directly appropriated resources, funding is derived from the following existing offsetting collections:

*Immigration Inspection User Fee*.—ICE derives funds from user fees to support the costs of detention and removals in connection with international inspection activities at airports and seaports, as authorized by the Immigration and Nationality Act (8 U.S.C. 1356).

*Student Exchange Visitor Program Fee*.—ICE collects fees from foreign students, exchange visitors, schools, and universities to certify, monitor, and audit participating exchange programs.

*Immigration Breached Bond/Detention Fund*.—ICE derives funds from the recovery of breached cash and surety bonds in excess of $8,000,000, as authorized by the Immigration and Nationality Act (8 U.S.C. 1356), and from a portion of fees charged under

section 245(i) of that act to support the cost of the detention of aliens.

*Detention and Removal Office Fee*.—ICE collects fees from bonds filed by individuals arriving at an air or sea port of entry where the individual is needed to testify in the prosecution of a person for violating a State or Federal law. These fees cover the costs incurred during the stay of removal, if granted. The collections are also used to fund some Custody Operations non-bed general expenses [GE].

COMMITTEE RECOMMENDATIONS

*Annual ICE Report*.—The Committee continues the direction under this heading outlined in Senate Report 118–85.

*Contract Notifications*.—ICE shall inform the Committees five days prior to any substantive change to any contract that is greater than $5,000,000. Substantive changes include but are not limited to modifications, renegotiations, recompetes, extensions, and terminations.

*Financial Management*.—The Committee holds serious concerns regarding ICE's ability to sustainably manage congressionally appropriated funds for the duration of a given fiscal year. ICE is directed to adhere to the recommendations outlined in GAO–24–106550 expeditiously. The Committee further directs ICE to update the Committee on a quarterly basis its progress toward implementing all GAO–24–106550 recommendations.

*Initial Obligation Plan*.—The bill continues language requiring ICE to provide an initial obligation plan to the Committee within 45 days of the date of enactment of this act.

*Monthly Reporting Requirements*.—ICE is directed to continue the monthly reporting requirements outlined in the Joint Explanatory Statement accompanying Public Law 118–47.

*Execution of Funding Provided in P.L. 119–21*.—The Committee includes a new Administrative Provision requiring quarterly updates on ICE's execution of funding provided in P.L. 119–21, particularly as it relates to detention and transportation operations. The Committee views the resources entrusted to ICE under P.L. 119–21 as setting the foundation for transformational growth for how ICE conducts it's operations, and will need to work closely with ICE to align base funding with those resources. These quarterly updates will help inform future base funding investments to be made in such a way as to ensure a seamless transition for ICE operations at the end of the period of availability for funding provided in P.L. 119–21.

HOMELAND SECURITY INVESTIGATIONS

*Additional Agents*.—The Committee recognizes significant increases in seizures of illicit contraband, both inbound and outbound, by made by U.S. Customs and Border Protection [CBP]. The Committee provides funding for 50 additional HSI agents to augment ICE's ability to investigate these seizures and directs that these additional personnel be used exclusively for investigations stemming from CBP seizures or interdictions. The Committee strongly believes that focusing on investigations, arrests and dismantling criminal networks will help stem the flow of illicit mate-

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 597 of 714 PageID #:1647



rials by delivering consequences to bad actors. ICE is directed to brief the Committee within 60 days of the date of enactment of this act on the geographic locations that they plan to deploy these additional agents, as well as the measurements of effectiveness that ICE will use to assess the impact of the investment.

*Additional Fentanyl, Opioids, and other Synthetic Narcotics Investments*.—The recommendation includes an additional $7,000,000 to assist with the investigation of crimes related to the smuggling of opioids and synthetic narcotics, and to support procurement of technologies that utilizes artificial intelligence and machine learning to enhance traditional methods of investigation. ICE, in conjunction with the DHS OCIO and Chief AI Officer, is directed to brief the Committee within 90 days of the date of enactment of this act on a plan to execute this funding and the impact it will have on the DHS enterprise.

*Advanced Analytics*.—The Committee supports HSI's continued efforts to grow its advanced analytics capabilities in support of HSI counterproliferation investigations. The Committee provides $1,000,000 to continue and expand the advanced analytics work of HSI's Counterproliferation Mission Center.

*Aggressively Pursuing Illegal E–Cigarette Importation*.—The Committee is concerned that, despite the vast quantities of e-cigarettes being illegally imported into the U.S., there are few arrests, indictments, and convictions of the perpetrators. The recommendation includes an increase of not less than $5,000,000 for the National Intellectual Property Rights Coordination Center to increase its criminal investigations with respect to misdeclarations of illicit e-vapor products, through its Tobacco Program, in an effort to improve prosecution rates.

*Center for Countering Human Trafficking [CCHT]*.—The recommendation includes funding to implement the requirements of the Countering Human Trafficking Act of 2021 (Public Law 117–322). The Committee also recommends continued support for the Department of Homeland Security's Blue Campaign, to educate the American public about the signs of trafficking and how they can help victims and bring suspected traffickers to justice.

*Child Exploitation*.—The recommendation continues enhancements provided in prior fiscal years for the Child Exploitation Investigations Unit at the Cyber Crimes Center. The recommendation also includes funding for the campaign to combat child sexual exploitation and abuse [CSEA] and an increase of $6,000,000 for Child Sexual Abuse Material [CSAM] investigations. The Committee directs HSI to provide a spend plan for this enhanced funding, including funding that will be spent on forced labor investigations, within 60 days of the date of enactment of this act.

*Cross-Border Financial Crime Center*.—The Committee recommends an additional $2,000,000 for the Cross-Border Financial Crime Center. HSI is directed to provide a briefing within 90 days of the date of enactment of this act detailing the current scope of operations, any major achievements, and any major resource gaps that are hindering investigations.

*International Forensic Science Research*.—HSI shall provide a briefing within 120 days of the date of enactment of this act to the Committee on partnerships with external academic partners aim-

ing to grow existing efforts on international forensic science research. The briefing shall include any efforts to build holistic approaches to combating transnational crime organizations. The Committee is supportive of the Department's engagement with academic research partners as a proactive and multilayered approach to policing and combating international crime syndicates and activities.

*Fentanyl Precursors*.—While the majority of the fentanyl that continues to devastate American communities is smuggled across our borders as a finished product, domestic manufacturing of fentanyl is steadily increasing. Often under derivative names to mask their true purpose, precursor chemicals available online are a critical component to fentanyl manufacturing. The Committee encourages HSI to use its analytical abilities to identify and compile all nomenclature associated with precursor chemicals, interrupt online operations, map distribution networks, and obtain express consignment shipment data to interdict these chemicals.

*Full Title 21 Authority for HSI*.—The Committee continues the requirement under this heading in Senate Report 118–85.

*Forced Labor and Child Exploitation*.—The Committee is concerned with recent reports of forced child labor and human trafficking, particularly with respect to unaccompanied minors. The Committee applauds HSI's efforts to investigate and combat these crimes and understands that continued efforts in this area necessitate coordination with other departments and agencies across the Federal Government. Within 90 days of the date of enactment of this act, DHS, in coordination with the Department of Labor, shall brief the Committee on how they are working together to combat forced child labor and provide recommendations for improved coordination. Additionally, within 90 days of the date of enactment of this act and quarterly thereafter, DHS shall submit a report on the number of referrals from the Department of Health and Human Services related to possible instances of forced child labor and human trafficking.

*Human Exploitation Rescue Operative [HERO]*.—The Committee continues to support the concept of paid HERO apprenticeships.

*Human Rights Violators*.—The Committee is concerned by the large number of suspected human rights violators from foreign countries who have found safe haven in the United States. The Committee directs ICE to continue its efforts to investigate, remove, and prosecute individuals who have committed human rights abuses, including persecution, genocide, severe violations of religious freedom, torture, extrajudicial killing, use or recruitment of child soldiers, crimes against humanity, or war crimes. ICE shall report to the Committee within 180 days of the date of enactment of this act on the following: the total number of prosecutions and investigations of human rights offenses and other offenses committed and their outcomes, delineated by serious human rights violators within each of the last five fiscal years; the efforts of ICE to increase the number of human rights investigations and prosecutions; and any organizational, resource, or legal impediment to investigating and prosecuting more human rights violators, including whether the identified amount above is sufficient. ICE shall also update the Committee on base funding for this effort.

*The National Intellectual Property Rights Coordination Center [IPR Center]*.—The Committee directs HSI to ensure that it appropriately staffs the National IPR Center to facilitate continued enforcement actions against theft of U.S. intellectual property, particularly online.

*National Academy for Advanced Training and Leadership [NAATL]*.—The Committee recognizes the importance of providing cutting-edge training and leadership opportunities for criminal investigators in a rapidly evolving environment, and is disappointed in a lack of progress in completing construction work at NAATL. ICE is directed to provide a brief, in collaboration with the General Services Administration, on progress made at the facility within 90 days of the date of enactment of this act, and quarterly thereafter. The first briefing shall include a summary and timeline of efforts made to complete work at this facility, and lessons learned from any process issues that have caused a delay.

*Office of Intelligence*.—The Committee notes increasingly advanced and sophisticated digital operations by Transnational Criminal Organizations [TCO] and provides an additional $3,000,000 for procurement of threat intelligence, data analytics, artificial intelligence and managed attribution capabilities to help counter this threat. The HSI Office of Intelligence is directed to brief the Committees within 60 days of the date of enactment of this act to provide an assessment of TCO activity and current trends, particularly related to the threat of fentanyl smuggling, how their intelligence informs ICE operations, any capability gaps and their associated resource requirements, and how they plan to leverage these additional funds to counteract illicit TCO activity.

*Organized Supply Chain Crime*.—The Committee is concerned with the alarming rise of organized crime targeting the U.S. supply chain. Organized Theft Groups, including transnational criminal organizations, are utilizing a variety of illicit means to steal cargo and systematically target all stages of the supply chain, from agricultural producers to transportation to distribution to retail. The negative economic effects and public safety concerns stemming from organized crime are impacting all facets of the American economy, including the security of our food, the movement of cargo by rail and commercial motor vehicle, and the systematic targeting of retail outlets. Therefore, the Committee provides $2,000,000 for HSI to establish a Cargo Theft-Crime Coordination section within the Cross-Border Financial Crimes Center to ensure a coordinated, multi-agency, intelligence-based, and prosecutor-led approach to identifying, disrupting, and dismantling those poly-criminal organizations responsible for putting our supply chains and Nation at risk. This section should collect and analyze data from various stakeholders to identify regions in the United States, modes of transportation, and specific distribution and retail networks that are experiencing high volumes of organized crime, and utilize that data to coordinate HSI's resources and response in collaboration other government agencies, including but not limited to the FBI, Drug Enforcement Agency [DEA], ATF, and DOJ. In addition, the Committee recognizes the unique ways HSI can mitigate and investigate these crimes using its broad cross-border authorities and en-

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 600 of 714 PageID #:1650



courages HSI to consider organized supply chain crime among its BEST activities.

*Protecting Vulnerable Children*.—The Committee continues the requirement under this heading in Senate Report 118–85 to detail costs associated with expanding the Mutual Agreement between Government and Employers [IMAGE].

*Repository for Analytics in a Virtual Environment [RAVEn]*.—The Committee understands the value of utilizing Artificial Intelligence in law enforcement capabilities, but stresses the need to ensure privacy and public accountability associated with the growth of these tools. The Committee strongly encourages HSI to update all required Privacy notices, and to identify, develop and monitor potential violations of civil rights and civil liberties as further development occurs.

*Shadow Wolves*.—The Committee provides an additional $2,000,000 for the Shadow Wolves program to address recruitment and retention challenges that have prevented the program from expanding. Within 90 days of the date of enactment of this act, ICE is required to provide a briefing on their recruitment and retention efforts for this program and a spend plan for these funds.

*Trade-Based Money Laundering [TBML] Schemes*.—The Committee directs HSI to provide a briefing on current HSI efforts to combat TBML schemes and resources that may be required to enhance these efforts within 90 days of the date of enactment of this act.

ENFORCEMENT AND REMOVAL OPERATIONS

*Access to Oversight*.—The Committee recognizes the role that oversight plays in ensuring that detention centers are safe and healthy for individuals in custody and for staff. ICE is directed to ensure that individuals in custody have the opportunity to confidentially contact oversight entities without retaliation, at no cost to the individual in custody. Within 60 days of the date of enactment of this act, ICE shall brief the Committee on the facility-specific level existing method of outreach to oversight entities and whether such outreach is monitored by ICE or contractors. Additionally, ICE shall provide a summary of efforts in place to deter retaliation should outreach occur. ICE is discouraged from limiting access to oversight entities in any fashion that would only permit the individual in custody to go through ICE or a contractor to reach oversight entities.

*Intensive Alien Supervision Program*.—ICE shall continue to brief the Committee on any ATD contracts it awards under this program. The monthly reports shall continue as outlined under this heading in Senate Report 118–85 and as outlined under the heading “ATD Program” in the explanatory statement accompanying Public Law 118–47. The Committee directs ICE to continue to publish annually the following policies and data relating to ATD: guidance for referral, placement, escalation, and de-escalation decisions; enrollment by Field Office; information on the length of enrollment broken down by type of ATD; and a breakdown of enrollment by type and point of apprehension. The Committee further directs ICE to report on a monthly basis a description of the steps it is taking to close the Government Accountability Office’s recommendations

in "Alternatives to Detention: ICE Needs to Better Assess Program Performance and Improve Oversight" (GAO–22–104529) until such recommendations have been closed.

*ATD Metrics Reporting*.—Within 30 days of the date of enactment of this act, and monthly thereafter, ICE shall provide to the Committee standardized data on all ATD programs, compliance with court hearing attendance, compliance with final order of removal, number of removals of ATD participants, number of individuals removed from ATD prior to termination of proceedings, number of ATD program violations for enrolled participants in each program that occurred in the prior month, whether the individual was subject to an enforcement action upon such program violation, number of recent border entrants enrolled in ATD without electronic monitoring, number of individuals enrolled in ATD on continuous GPS monitoring in total and disaggregated by nationality, number of individuals enrolled in ATD subject to curfew in total and disaggregated by nationality, total size of the non-detained docket, compliance data of individuals on the non-detained docket not enrolled in an ATD program, disaggregating persons previously enrolled in ATD, and those that were never enrolled.

*ATD Technology*.—The Committee is concerned with the cost effectiveness of some of the technology utilized to manage the non-detained docket. The Committee directs ICE to explore the feasibility of utilizing wearable, cost effective technologies that achieve law enforcement objectives within the program. ICE shall report to the Committee within 90 days of the date of enactment of this act, on potential external vendors, a cost estimate, and the number of those on the non-detained docket that would meet qualifications for such technologies.

*Custody Operations*.—The recommendation provides funding to maintain 50,000 detention beds.

*Detention of Stateless Aliens*.—ICE shall identify individuals in its custody who are stateless and shall continue to work, in conjunction with the Department of State, to secure a travel document for the individual's removal to a third country, including one where the individual has family ties, had previously held residence, or has some other connection. For those stateless individuals for whom there is no significant likelihood of removal in the reasonably foreseeable future, ICE shall, after considering whether the individual poses a danger to the community or is a flight risk, facilitate the release of such individuals under Alternatives to Detention or order of release on recognizance. Within 60 days of the date of enactment of this act, and quarterly thereafter, ICE is directed to report to the Committee on the number of stateless individuals in detention, the number of stateless individuals removed, and the number released from detention.

*Detained Population Statistics*.—ICE shall continue to submit the report required under section 216 of the Department of Homeland Security Appropriations Act, 2021 (division F of Public Law 116–260) with respect to the period beginning 15 days after the date of the enactment of this act and semimonthly thereafter, and include additional requirements as follows:

1. Statistics on the number of detainees by race, ethnicity, age, and nationality over multiple fiscal years;

2. Statistics on the number of detainees who are minors, including whether they are unaccompanied;
3. Statistics on the number of detainees by number of criminal convictions and by number of pending criminal charges over multiple fiscal years, broken out by whether those convictions and charges are for violent crimes or felonies; and
4. Statistics on individuals enrolled in the Alternatives to Detention program and the criteria for escalation and de-escalation and application of such criteria.

*Detention Standards and Inspections*.—The Committee continues the direction under this heading in Senate Report 118–85. The Committee looks forward to receiving further briefings from ICE on resource requirements to achieve full PREA compliance at all facilities.

*Enforcement Surrounding Emergency Shelters*.—Not later than 90 days after the date of enactment of this act, ICE shall brief the Committee on enforcement operations surrounding emergency shelters and other evacuation-related facilities during and following a disaster.

*Health and Safety in Immigration Detention*.—The Committee directs ICE to ensure medical access for detention beds belonging to the Bureau of Prisons, DOD facilities, State and local jails, and any other detention facility space. Within 90 days of the date of enactment of this act, U.S. Immigration and Customs Enforcement shall submit a report to the Committee on Appropriations on the agency's plan to improve the provision of medical services to detained persons in its custody. To support the health and wellbeing of detained individuals, the Committee recommends ICE ensure individuals in ICE custody have ample recreation space and access to nutrition outside of regular mealtimes to account for varying nutritional and medical needs across the detained population when appropriate. ICE shall ensure that individuals in any form of segregation, including medical segregation, also have ample recreation time.

*ICE Public Reporting*.—ICE shall continue updating its public website on a quarterly basis with the following information:

1. Arrests by country of citizenship and criminal history;
2. Arrests over time disaggregated by single adults and members of family units, the agency conducting the initial arrest for civil immigration violations, whether the arrest was made on Tribal land, the number of arrests disaggregated by fugitive arrest or custodial arrest;
3. Arrests by Area of Responsibility; and
4. Removal data as outlined in the section in this report entitled *Removal Orders Reporting*.

*Hunger Strikes*.—Within 90 days of the date of enactment of this act, ICE is directed to make public the following data quarterly: (1) the number of individuals known to be presently on a hunger strike (as defined by the 2011 Performance Based National Detention Standards); and (2) the number of individuals who have participated in a hunger strike who were also subject to force feeding, hydration or forced urinary catheterization or involuntary blood draws. Additionally, ICE shall provide the Committee with the projected costs associated with hunger strikes per fiscal year, which

shall include costs for equipment, additional medical supplies, and transportation, as applicable.

*Intensive Supervision Appearance Program [ISAP] Utilization*.—Within 90 days of the date of the enactment of this act, ICE shall provide the Committee a report that examines the alternatives to detention program. The report shall identify all consequences for noncompliance options currently available within the ATD program, identify how many individuals remain on ATD through the duration of their immigration court proceedings, provide the associated costs to provide ATD services for the duration of such immigration proceedings, identify how many times in the prior fiscal year a form of de-escalation was utilized in the program and whether such de-escalation was in accordance with existing policy, and whether any such individuals who are determined to be noncompliant are escalated to a higher level of supervision, which shall include the basis for such escalation and the noncompliant act.

*Language Access*.—The Committee directs ICE to ensure that language access is available, and services are high quality and accurate. ICE shall ensure that translation services to facilitate language access are available at no cost to individuals in custody. Within 90 days of the date of enactment of this act, ICE shall brief the Committee on all existing language access contracts, efforts, or plans and identify the costs and challenges associated with improving and expanding language access to ensure that individuals in custody understand their rights and obligations, have access to competent counsel, and understand ICE staff while in custody.

*Law Enforcement Support Center [LESC]*.—The Committee directs ICE to ensure that current operations performed by the LESC remain centralized at the LESC facility in Williston, Vermont, and that these operations are not unnecessarily duplicated elsewhere. The Committee directs ICE to ensure that the LESC has the resources and approvals necessary to fully utilize its recruitment incentives program. The LESC is also encouraged to use hiring campaigns, education, and outreach, including coordination with nearby community, technical, and State colleges and universities.

*Parental Interests Directive*.—ICE is reminded of the directive under this heading in Senate Report 118–85.

*Removal of Parents of U.S. Citizen Children*.—The Committee continues its requirement that the Department submit data to the Committee on the removal of parents of U.S. citizen children semiannually.

*Removal Orders Reporting*.—The Commitee continues the requirement under this heading in the explanatory statement accompanying Public Law 118–47 to provide quarterly briefings on removal orders. Not later than 90 days after the date of enactment of this act, this briefing shall also include the total number of nonexecutable final orders of removal and the number of non-executable final orders that are due to aliens not meeting current enforcement priorities.

*Removal Flight Reporting*.—Within 60 days of the date of enactment of this act, and quarterly thereafter, ICE shall provide a report to the Committee that includes:

1. the monthly number of removal flights conducted during the reporting period;

2. the number of people removed on each flight;
3. the citizenship of the individuals removed;
4. the statutory authority claimed for each removal;
5. the number of removals within each criminality category, as defined in the integrated decision support system, disaggregated by gender;
6. the number of migrants removed with removal orders, including the agency that issued the removal order, i.e. Executive Office for Immigration Review [EOIR] or DHS; and
7. the average cost per removal flight.

Further, within 60 days of the enactment of this act, and every 30 days thereafter, ICE shall make available on a publicly accessible website the number of flights chartered to transfer migrants to Naval Station Guantanamo Bay, the cost of each of those chartered flights, the number of migrants on each flight, and the cost to the U.S. Government house a migrant on Naval Station Guantanamo Bay. The website must also list from which congressionally appropriated account the money is being drawn.

*Reporting Requirements*.—ICE shall continue to provide results of detention inspections on a public facing website within 60 days of each inspection in a similar fashion as required of inspection reports in fiscal year 2021. ICE is directed to make public all final detention facility inspection reports within 60 days of inspection; complete and make public an initial report regarding any in-custody death within 30 days of such death, with subsequent reporting to be completed and released within 60 days of the initial report unless additional time is required for redacting personally identifiable information; make public a full list, updated monthly, of all facilities in use for detention of adults or children, including the average daily population, the type of contract, the governing detention standards, and the complement of on-board medical and mental health personnel; ensure that non-governmental organizations are provided with independent and timely access to all facilities for the purpose of providing representation, legal education, and programming, and for purposes of monitoring and visitation; and update detainee location information in the ICE Detainee Online Locator system within 48 hours of detention and 24 hours of completion of any transfer.

*Segregated Housing in Detention*.—The Committee directs ICE to report to the Committee beginning within 90 days of the date of enactment of this act and then quarterly thereafter, on use of segregation in ICE facilities and facilities that contract with ICE for detention purposes during the preceding fiscal year, including an overview of all placements in segregation by facility, the duration of such placements, and the rationale for such placements.

*Sensitive Locations and Protected Areas*.—The Committee continues a requirement to provide officers with guidance and training for engaging with victims and witnesses of crime, and the conduct of enforcement actions in or near formerly identified sensitive locations, including courthouses. Within 180 days of the date of enactment of this act, ICE shall brief the Committee about steps taken to minimize the effect of immigration enforcement activity on victims and witnesses of crime. ICE shall provide monthly notifications to the Committee on enforcement actions that take place in

or near formerly identified sensitive locations, including courthouses.

*Sex Offender Release Notifications*.—The Committee understands that ICE is currently notifying law enforcement authorities and State regulatory organizations through the Sex Offender Registration and Notification Act (Public Law 109–248) exchange portal when ICE releases into their jurisdictions individuals who have a registration requirement. The Committee recommends continued funding to identify any potential information gaps within this system and to address these gaps in a manner that ensures that data on ICE detainees with sex or violent offender records are provided in real time to jurisdictions where such detainees will reside.

*Short-Term Holding Facilities*.—The Committee reminds ICE of its outstanding recommendation from GAO–16–514 to develop and issue guidance on how and which complaint mechanisms should be communicated to individuals in custody at holding facilities. ICE shall provide monthly updates to the Committee on its progress towards compliance in addition to the completed field guidance once applicable. In addition, ICE shall provide to the Committee all written guidance on its "self inspection" program being utilized in short-term holding facilities.

*Transportation and Removal Program [TRP]*.—The recommendation includes an additional $170,000,000 for TRP. The Committee recognizes that there has been a significant increase in the costs associated with the TRP mission but remains concerned about ICE's planning for these costs and continued reliance on reprogrammings and transfers to solve the challenges. The Committee understands the evolving nature of the ICE mission but emphasizes the importance of spending within the confines of appropriated funds. While ICE now has significant resources available to conduct necessary transportation activities, the Committee remains concerned about past patterns of overspending.

*Transfers of Persons in Custody*.—Within 90 days of the date of enactment of this act, ICE shall submit a report to the Committee which includes quality assurance processes currently put into place by all Field Office Directors, the detainee transfer checklist currently being utilized, and the current statistics on transfers as required by section 5.16 of Policy 11022.1. ICE shall also include within this report any barriers to achieving full compliance with Policy 11022.1.

*Unaccompanied Minor Reporting*.—Within 90 days of the date of enactment of this act and monthly thereafter, the Secretary shall provide the Committee with and make publicly available online a report which shall: (1) include the number of individuals currently in ICE's custody who were transferred to ICE by the Office of Refugee Resettlement and a breakdown, delineated by ICE area of responsibility, of the type of placement and accompanying justification for such placement; (2) the number of unaccompanied children transferred by DHS (including DHS contractors) into ORR custody over the prior year, disaggregated by month, transferring agency, justification for such transfers, and each minor's age, gender, and country of nationality; (3) the number of unaccompanied minor removed or otherwise returned from the United States by DHS (including DHS contractors) over the prior year, disaggregated by

month, returning agency, and each minor's age, gender, country of nationality, and country of return.

*Veterans Subject to Removal*.—The Committee appreciates ICE Directive 10039.2, regarding consideration of U.S. military service in making discretionary determinations regarding enforcement actions against individuals subject to removal. However, the Committee is concerned by reports that veterans continue to be deported without consideration of their service. Not later than 90 days after the date of enactment of this act, ICE is directed to brief the Committee on implementation and training with regard to ICE Directive 10039.2, including an evaluation of the sufficiency of current methods of identifying veterans and former members of the Armed Forces who are placed in removal proceedings and considering veteran status prior to initiation of removal proceedings against such individuals. ICE is further directed to report, on a publicly accessible website, the number of individuals removed from the United States who are service members or veterans, their length of service in the Armed Forces, their branch of service, their receipt of medals or military decorations, whether the individual appealed the removal order to the Board of Immigration Appeals, and their country of removal.

*287(g) Agreements*.—The recommendation includes an additional $2,000,000 for the 287(g) program. The Committee directs ICE to publicly publish on its website applications for new or renewed 287(g) agreements on its website 8 weeks prior to entering into any such agreement. ICE shall ensure thorough vetting of 287(g) applicants in an effort to minimize detention conditions that do not fully comply with the detention standards in place at any facility or location holding individuals in ICE custody and PREA standards. Before renewing or initiating any 287(g) agreement, the Director of ICE shall make a formal determination, that explains: (1) Why ICE is unable to perform the delegated duties itself; (2) What measures ICE is taking to assume those responsibilities itself in the future; and, (3) An estimate of the resources required, and how long it will take, until ICE no longer requires the agreement because it has internally addressed the covered jurisdiction's needs. ICE is further required to provide a report to the Committee within 60 days of the date of enactment of this act and monthly thereafter on the cost for implementation of this program, including a breakout for how the funds have been spent, the source of the funding, the model of agreement for each jurisdiction, the number of arrests effectuated per 287(g) agreement, and the personnel dedicated to training for new or existing agreements.

MISSION SUPPORT

*Tactical Communications*.—The Committee is concerned that the current capacity of Tactical Communications [TACCOM] systems are insufficient to accommodate the majority of ICE's Law Enforcement Officers [LEOs]. Many of the legacy systems are overdue for upgrade and do not provide sufficient capacity or coverage to support the mission-critical operations undertaken by ICE. Within 90 days of the date of enactment of this act, ICE shall submit a detailed plan for initiating and completing additional TACCOM equipment and infrastructure upgrade and expansion projects. The

plan shall include regional modernization priorities, including any geographic areas that may require upgrades, budget projections, and a timeline for initiating and completing these site expansion priorities.

*Personnel Well-Being*.—The Committee recognizes the need to invest in the mental health and well-being of the law enforcement officers facing increasing rates of operation and threats to health and safety. While previous investments have largely focused on agents experiencing threats to mental health based on CSAM investigations, the Committee sees value in extending support to all law enforcement officers. The Committee provides an additional $5,000,000 above the request to support workforce readiness efforts. Within 60 days of the date of enactment of this act, ICE shall brief the Committees on their plans to execute this funding, other investment opportunities, and the feasibility of establishing an office modeled after the Workforce Care Division of U.S. Customs and Border Protection.

### OFFICE OF THE PRINCIPAL LEGAL ADVISOR

*Office of the Principal Legal Advisor [OPLA] Hiring*.—Within 60 days of the date of enactment of this act, ICE shall submit a report to the Committee on a strategy for OPLA hiring over the next 5 years, ongoing retention efforts, recruitment goals, and litigation team augmentation requirements to match EOIR hiring cadence.

### EXECUTIVE LEADERSHIP AND OVERSIGHT

*Staffing Augmentation*.—The Committee provides an additional $750,000 to augment the Appropriations Liaison team within the Office of the Chief Financial Officer. ICE is directed to ensure that these new positions are filled through an open, competitive interview process. Within 15 days of the date of enactment of this act, and monthly thereafter, the Appropriations Liaison team is directed to brief the Committee on the status of all currently outstanding items owed to the Committee, including outstanding requests for information, briefings that are overdue or due within the next 20 business days, and reports that are overdue or due within the next 20 business days.

### PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

| | |
|---|---|
| Appropriations, 2025 | $55,520,000 |
| Committee recommendation | 29,500,000 |

## TRANSPORTATION SECURITY ADMINISTRATION

The Transportation Security Administration [TSA] is charged with ensuring security across U.S. transportation systems, including aviation, railways, highways, pipelines, and waterways; and safeguarding the freedom of movement of people and commerce.

### COMMITTEE RECOMMENDATIONS

The Committee recommends a gross discretionary total of $11,591,478,000 and a net of $8,028,828,000 for TSA.

The following table summarizes the Committee's recommendation as compared to the fiscal year 2025 enacted level:

TRANSPORTATION SECURITY ADMINISTRATION

[In thousands of dollars]

| | Fiscal year 2025 enacted | Committee recommendations |
|---|---|---|
| Operations and Support | 10,614,968 | 10,676,598 |
| Aviation Passenger Security Fees | −2,804,400 | −3,030,000 |
| Subtotal, Operations and Support (net) | 7,810,568 | 7,646,598 |
| Procurement, Construction, and Improvements | 40,678 | 358,230 |
| Research and Development | 14,641 | 24,000 |
| Total, Transportation Security Administration (net) | 7,865,887 | 8,028,828 |
| Total, Transportation Security Administration (gross) | 11,222,937 | 11,591,478 |

OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriations, 2025 | $7,810,568,000 |
| Committee recommendation | 7,646,598,000 |

COMMITTEE RECOMMENDATIONS

The Committee recommends an appropriation of $10,676,598,000 for Operations and Support [O&S]. Within the total amount provided, the bill makes $600,000,000 available until September 30, 2027. TSA's entire Operations and Support appropriation has historically been made available for two fiscal years, which runs counter to the 1 year period of availability that is the baseline for Operations and Support appropriations provided for other DHS components and the standard across the Federal Government for appropriations that fund salaries and operating expenses. TSA is directed to continue to work with the DHS OCFO and the Committee to develop a proposal for the TSA Operations and Support appropriation, including potential modifications to the current PPA structure, that would limit the 2 year period of availability to only the necessary activities that may require such flexibility, consistent with the other DHS components. TSA shall incorporate such proposal in its fiscal year 2027 budget request.

The recommendation includes the following: $98,523,000 to continue staffing at certain exit lanes; $45,868,000 for the Law Enforcement Officer [LEO] Reimbursement Program; and $34,088,000 for Canine LEO Other Transaction Agreements.

*Aviation Worker Screening*.—The Committee recognizes TSA's authority to deter and detect threats to airport security. TSA recently issued an Airport Security Program [ASP] amendment that requires airports to significantly increase airport-performed physical screening of employees and procure explosive detection screening [EDS] equipment for the first time. The Committee is concerned that these new mandates impose an undue burden on airport operators and are being implemented without conducting a thorough cost-benefit analysis or risk assessment to justify the change. The Committee urges TSA to rescind the current ASP amendment and solicit a formal round of notice and comment to examine the benefits to aviation security and the full financial and operational impacts of this proposal on airports.

*Federal Flight Deck Officer [FFDO] and Flight Crew Training Programs*.—The Committee recommends $27,437,000, for the FFDO and Flight Crew Training programs. Within 90 days of the date of enactment of this act, TSA shall brief the Committee on the FFDO Program. The brief shall, at a minimum, include current backlogs of candidates awaiting initial training, utilization numbers for FFDO recurrent training, FFDO firearms recertification training, plans to address the backlog, and the status of the full-time Atlanta FFDO Recurrent Training Program facility.

*Hiring in Rural Communities*.—The Committee remains concerned about the ability for TSA to recruit and retain personnel, particularly in non-contiguous and rural States. Not later than 180 days after the date of enactment of this act, the Department shall provide a briefing to the Committees addressing these concerns. The briefing shall include a clear description of how TSA is solving these challenges, the rates of attrition in these areas compared to larger and more urban areas, and the duration of time for which those positions have remained vacant.

*Multimodal Generative AI Language Technology*.—The Committee provides $3,000,000 to enable TSA to carry out the requirements set forth by the Sec. 7131 of Public Law 117–263. The Administrator shall provide a briefing to the Committee not later than 6 months after the date of enactment of this act on the status of this program.

*On-Person Detection/Next Gen Advanced Imaging Technology [AIT]*.—The Committee supports TSA's ongoing efforts to recapitalize its aging Advanced Imaging Technology [AIT] fleet and address longstanding performance challenges identified in Government Accountability Office and Department of Homeland Security Inspector General reports. The Committee notes that a significant portion of TSA's deployed AIT systems are nearing or beyond end of life and urges TSA to prioritize the deployment of enhanced screening systems that improve detection performance, reduce false alarm rates, and enhance passenger throughput and experience.

*Screening Partnership Program [SPP]*.—The recommendation maintains necessary funds for security at airports where private screening contracts are in place. The Committee finds that small and rural airports play a critical role in the security of our National Airspace System as the first point of entry for millions of travelers every year. Therefore, the Committee encourages TSA to work with local airport authorities and stakeholders to ensure that appropriate security screening services are deployed to any public use airport with regularly scheduled commercial air service.

*Throughput and Wait Times at TSA Checkpoints*.—The Committee is concerned about the impact of staffing reductions and delays in equipment and technology investment on checkpoint efficiency and the traveler experience. Not later than 90 days after the date of enactment of this act, and quarterly thereafter, TSA shall provide a briefing to the Committees on how staffing levels, including any anticipated or proposed reductions, and investments in screening equipment and technology are projected to affect passenger throughput and wait times. The briefing shall include analysis of current staffing models, deployment timelines for new technologies such as computed tomography [CT] machines, and the an-

ticipated effects of these changes on operational efficiency and passenger wait times at checkpoints.

*TSA PreCheck Enrollment*.—The Committee notes TSA's goal of 70 percent of American fliers enrolled in TSA PreCheck. PreCheck not only drives revenue for TSA, but also reduces screening costs and increases security. However, to date, enrollment sits significantly below the goal across the traveling public. The Committee urges the Administrator to work with private sector TSA enrollment providers to increase the number of travelers in the PreCheck program. No later than 60 after enactment of this act, the Administrator shall brief the Committee detailing PreCheck enrollment numbers to date.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

| | |
|---|---|
| Appropriations, 2025 | $40,678,000 |
| Committee recommendation | 358,230,000 |

COMMITTEE RECOMMENDATIONS

The Committee recommends $358,230,000 for Procurement, Construction, and Improvements [PC&I].

The recommendation includes $300,000,000 for the purchase and installation of computed tomography [CT] machines at passenger checkpoints at U.S. airports, providing a total of $320,000,000 for checkpoint support.

The recommendation also includes $13,940,000 to complete the process of reimbursing airports for the cost of in-line baggage screening systems installed prior to December 31, 2007.

*Category-X Interconnection Program*.—The Committee supports efforts to interconnect all Category-X airports and the TSA cloud environment and includes $20,000,000 for this purpose. The Administrator shall provide a briefing to the Committee not later than 6 months after the date of enactment of this act on the status of this program and an expansion plan for all TSA serviced airports.

*Identity Risk and Security Management*.—The Committee supports cost-effective development of systems that support the use of biometric identity validation tools by both the private and public sector to improve security, the passenger experience, and operational efficiency at the checkpoint. The Committee directs TSA to continue support of pilot deployment at key airports to further advance the necessary infrastructure and investment to support these operations.

RESEARCH AND DEVELOPMENT

| | |
|---|---|
| Appropriations, 2025 | $14,641,000 |
| Committee recommendation | 24,000,000 |

COMMITTEE RECOMMENDATIONS

The Committee recommends $24,000,000 for Research and Development [R&D].

*On-Person Detection/Next Gen Advanced Imagining Technology [AIT]*.—The Committee's recommendation includes $3,000,000 to further develop and certify screening equipment that combine Artificial Intelligence with hardware solutions. This technology should

enable the screening of limited mobility passengers in hybrid lanes with regular passengers eliminating the need for special limited mobility lanes.

## Coast Guard

The primary responsibilities of the Coast Guard include: enforcement of all applicable Federal laws on the high seas and other waters subject to the jurisdiction of the United States; promotion of safety of life and property at sea; assistance to navigation; protection of the marine environment; and maintenance of a State of readiness to function as a specialized service of the Navy in time of war, as authorized by sections 1 and 2 of title 14, United States Code. The Commandant of the Coast Guard reports directly to the Secretary of Homeland Security.

### COMMITTEE RECOMMENDATIONS

The Committee recommends $13,918,721,000 for the Coast Guard.

The following table summarizes the Committee's recommendation as compared to the fiscal year 2025 enacted level:

COAST GUARD

[In thousands of dollars]

| | Fiscal year 2025 enacted | Committee recommendations |
|---|---|---|
| Operations and Support | 10,415,271 | 11,267,499 |
| Procurement, Construction, and Improvements | 1,413,950 | 1,094,228 |
| Research and Development | 7,476 | 10,263 |
| Health Care Fund Contribution (Permanent Indefinite Appropriations) | 290,093 | 297,731 |
| Retired Pay | 1,147,244 | 1,249,000 |
| Administrative Provisions | .......... | .......... |
| Total, Coast Guard | 13,274,034 | 13,918,721 |
| (Defense) | 530,000 | 530,000 |

### OPERATIONS AND SUPPORT

Appropriations,2025 ........ $10,415,271,000
Committee recommendation ........ 11,267,499,000

The Operations and Support [O&S] appropriation provides funds for the salaries and benefits of both military and civilian personnel and the operation and maintenance of multipurpose vessels, aircraft, and shore units strategically located along the coasts and inland waterways of the United States and in selected areas overseas. The program activities of this appropriation include: search and rescue; aids to navigation; marine safety; marine environmental protection; enforcement of laws and treaties; Arctic and Antarctic operations; and defense readiness.

### COMMITTEE RECOMMENDATIONS

The Committee recommends $11,267,499,000 for O&S. The recommendation includes adjustments to reflect the fiscal year 2025 enacted appropriation and fiscal year 2026 current services needs. The Committee provides $116,405,000 for Indo-Pacific Expansion,

$1,000,000 for the Sexual Assault, Prevention, Response, and Recovery [SAPRR] Program, $12,000,000 for the former Commandant-directed actions following the Accountability and Transparency Review [ATR] report, $10,000,000 for legal support and oversight, $1,000,000 for environmental compliance and restoration, $6,000,000 for fishing safety grants, $10,000,000 for an uncrewed acoustic monitoring system pilot, and $50,000,000 for autonomous uncrewed surface vehicles; increases for certain follow-on activities; and other changes. The total includes $24,500,000 from the Oil Spill Liability Trust Fund and $530,000,000 for Coast Guard defense-related activities. For the fiscal year 2027 budget justification, the Committee expects the request to contain the same sub-PPA level of detail.

*Aerial Maritime Domain Awareness*.—The Committee directs the Coast Guard to test, train, and deploy unmannned aerial systems to support search and rescue, illegal unreported unregulated fishing, drug smuggling, and humanitarian support missions, and to expand domain awareness in expansive areas of responsibility. Within 180 days of the date of enactment of this act, the Coast Guard shall brief the Committee on its efforts.

*Cetacean Desk for Puget Sound Region*.—The Committee provides $400,000 for implementation of the Cetacean Desk for Puget Sound Region, as authorized in the 2023 James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263).

*Child Care Subsidy*.—The Committee recognizes the unique barriers service members at remote and small duty stations experience with respect to securing adequate child care. The Committee provides not less than $35,000,000 for Fee Assistance, child care subsidies, and related child care provisions authorized by the Don Young Coast Guard Authorization Act of 2022 (Public Law 117–263). Within 90 days of the date of enactment of this act, the Coast Guard shall provide a briefing on the implementation of this program.

*Coast Guard Oversight*.—The Committee directs the Coast Guard to fully comply with all oversight inquiries, including into its Operation Fouled Anchor investigation. The Committee acknowledges the challenges of facing multiple investigations from congressional and executive entities but reminds the Coast Guard of its obligations to respond to inquiries. In addition, the Coast Guard has indicated its technology has impeded its responsiveness to some inquiries. Within 30 days of the date of enactment of this act, the Coast Guard shall provide the Committee with a specific list of impediments to responsiveness, as well as potential mitigation opportunities.

*Combatting Illegal, Unreported, and Unregulated [IUU] Fishing*.—The Committee recognizes the importance of bolstering the maritime domain awareness of partner island nations through the Coast Guard's Shiprider program, specifically in the Indo-Pacific region. The Department is encouraged to use amounts appropriated to improve security cooperation with island States on IUU fishing. Additionally, the Committee recognizes IUU is a pervasive and serious global problem that threatens ocean ecosystems and sustainable fisheries. Therefore, the Committee encourages the Coast

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 613 of 714 PageID #:1663



Guard to collaborate with state and academic partners to identify the impacts of IUU on U.S. waters, including the Gulf of Mexico. Additionally, the Committee recognizes the need to characterize and quantify IUU fishing of fish species. Therefore, the Committee provides an additional $250,000 for the Coast Guard to collaborate with state and academic partners that will quantify the impact and explore the factors influencing increased IUU fishing activity.

*Counternarcotics Efforts*.—The Committee recognizes the Coast Guard's engagement across the Pacific in support of countering the flow of narcotics and precursor chemicals that have devastated communities across the United States and our Pacific partners. The Coast Guard has worked with the Department of Defense, the Drug Enforcement Agency, and foreign partners on this counternarcotics mission, but there seems to be potential for further operations and capacity-building to stem the flow of destabilizing and life-threatening drugs-including methamphetamine and fentanyl-across the Pacific. Within 60 days of the date of enactment of this act and monthly thereafter, the Coast Guard shall report to the Committee the amounts and types of narcotics it intercepts across each of its Districts. Within 180 days of the date of enactment of this act, the Coast Guard shall brief the Committee on options for heightening drug interdiction efforts, particularly in the Pacific in collaboration with other Federal agencies, military branches, and foreign partners. The briefing shall detail the additional resources, intelligence, and other support the Coast Guard would require to more fully meet the demands of countering the shifting drug smuggling environment across the Pacific.

*Environmental Compliance and Remediation*.—The fiscal year 2025 appropriation included $24,717,000 for site investigations and remediation activities at Coast Guard locations for the cleanup of hazardous substances and pollutants. The Coast Guard is encouraged to continue its progress on these studies and to include any known funding needs related to such remediation work in the annual President's Budget. The Committee provides $25,335,000 to help address the environmental compliance and restoration project backlog.

*Impacts on the U.S. Coast Guard Academy*.—The Committee wants to ensure that the Coast Guard Academy continues to be a cradle of confident leaders, and a ready, effective military service. The Department of Homeland Security and the Coast Guard are directed to provide a report and briefing to the Committee within 120 days of the date of enactment of this act, detailing the full extent of changes to Academy curricula, policies, and organization, as well as their impacts on campus culture, cadets' morale, and the Academy's overall mission.

*Fishing Safety Grants*.—The Committee provides $6,000,000 for Fishing Safety Training and Research grants. The Committee supports an agreement between the Coast Guard and the National Institute for Occupational Safety and Health [NIOSH] to efficiently administer the Fishing Safety Training and Fishing Safety Research Grant Programs in fiscal year 2026. The Coast Guard is directed to provide a briefing to the Committee within 90 days of the date of enactment of this act on the execution of the Fishing Safety Training and Fishing Safety Research Grant Programs since the

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 614 of 714 PageID #:1664



start of the programs. If the Administration believes funding for this activity should be provided directly to NIOSH in fiscal year 2027, the brief shall provide that justification and such a change should be articulated in the next budget request.

*Great Lakes Center of Expertise for Oil Spill Preparedness and Response*.—The Committee recognizes the importance of examining the impacts of oil spills in freshwater environments and helping develop effective responses, and continues its support of the Coast Guard's work as a co-host of the Great Lakes Center of Expertise for Oil Spill Preparedness and Response.

*Increased Initial Entry Training*.—The Committee recognizes increased recruiting and accessions within the Coast Guard and the strain placed on its current initial entry training at Training Center Cape May. Therefore, the Committee provides $3,000,000 for the Coast Guard to evaluate and plan for acquisition of an additional initial entry training facility. The Committee encourages the Coast Guard to evaluate existing facilities that could easily be transitioned to a new training facility, opposed to new construction that would be timely and cost inefficient.

*Implementation of Efforts to End Sexual Assault and Harassment*.—The Committee recognizes the Coast Guard's attention to the need to address its history of sexual assault, harassment, and coverups, and the need to chart a path towards stronger transparency, accountability, culture, and support for all cadets and servicemembers at the Coast Guard Academy and across the full Service. The November 2023 Accountability and Transparency Review [ATR] Team Report laid out concrete steps for the Coast Guard to take, and the independent review required by the Further Consolidated Appropriations Act, 2024 (Public Law 118–47), will offer additional recommendations. The Committee directs the Department to provide the overdue independent review of the Coast Guard's efforts to reduce and respond to sexual assault and sexual harassment as required in the Further Consolidated Appropriations Act, 2024. The Committee directs the Coast Guard to provide a briefing within 30 days of the date of enactment of this act on what has been done to implement the former Commandant's directives following the ATR Team Report, detailing its implementation of efforts to reduce and respond to sexual assault, and specific resources the Service is dedicating to each line of effort. The briefing shall also detail the steps taken to enhance survivor advocacy and support, and efforts of the Sexual Assault, Prevention, Response, and Recovery [SAPRR] Office. The Committee also directs the Coast Guard to provide with each future budget request submitted to the Committee a full accounting of all personnel, funding, training, curriculum, and other efforts to end sexual assault and sexual harassment within the Service; measurable outcomes of such efforts; lessons learned; and descriptions of efforts proposed within each budget request to eliminate sexual assault and sexual harassment.

*Funding Efforts to End Sexual Assault and Harassment*.—The Coast Guard continues to struggle with sexual assault and harassment both in the field and at the Academy. The SAPRR Office can help change the mindset and set expectations Service-wide. However, because the Office is understaffed, the Committee provides

$1,000,000 to hire 10 new staff in order to implement the best and most current sexual assault and harassment prevention practices. The Committee provides an additional $12,000,000 to fund the directed actions of the former Commandant related to the ATR to address workforce support through a new recruit preparatory course, increased leadership courses, Integrated Primary Prevention, a victim mentor program, and core values updates and communication. Finally, the Committee provides an additional $10,000,000 for legal support and oversight, including travel and expert witness support for courts martial, training and coordination, recruiting, reserve support, licensure requirements, technology modernization, and advice related to sexual assault and sexual harassment in the maritime industry.

*Healthcare*.—The Committee encourages the Coast Guard to conduct a study of all healthcare resources by sector, especially isolated sectors, and establish a plan to upgrade facilities to meet the needs of the men and women in service.

*Indo-Pacific Expansion*.—The Committee provides $116,405,000 for increased presence, maritime governance, and meaningful engagement activities in the Indo-Pacific. Within 90 days of the date of enactment of this act, the Coast Guard shall provide to the Committee a spend plan for these efforts, including personnel and operations costs, timelines for implementation, and planned activities and operations. The Coast Guard shall brief the Committee within 270 days of the date of enactment of this act and semi-annually thereafter on its activities in the Indo-Pacific, including implementation of the U.S. Indo-Pacific Strategy, progress related to maritime governance, and engagement with regional partners.

*Inspections of New Maritime Transportation Solutions*.—The Committee is aware of new transportation solutions in the maritime industry that could increase the efficiency and speed of coastal and inter-island transportation, including the development of electric wing-in-ground coastal passenger vessels. Within 180 days of the date of enactment of this act, the Coast Guard shall brief the Committee on its plans to accommodate expanding demand for inspection of such new transportation solutions.

*Maritime Industry Cybersecurity Sector Risk Management*.—The Committee provides an additional $3,000,000 for the Coast Guard to mitigate current and emerging cybersecurity risks to maritime industry. Within 90 days of the date of enactment of this act, the Coast Guard shall provide a briefing to the Committee on the integration of additional cybersecurity risk mitigation activities funded by this increase.

*Medical Readiness*.—The shortage of medical providers is a serious issue facing readiness and wellbeing in the Service, therefore the Committee encourages the Coast Guard to ensure that no fewer than two training allowance billets are available for officers for the purposes of Uniformed Services University of the Health Sciences [USUHS] School of Medicine and no fewer than two training allowance billets are available for enlisted members for the Enlisted to medical Degree Preparatory Program [EMDP2].

*Merchant Mariner Credential Program*.—The Coast Guard was provided $11,000,000 in fiscal year 2025 to modernize the mariner credentialing program. The Coast Guard shall provide a briefing to

the Committee within 60 days of the date of enactment of this act on its progress to-date of implementing the new program, including an overview of the features that are intended to improve the efficiency of the credentialing process.

*Minor Shore Infrastructure*.—The bill includes long-established language to allow funds for operations to be used for the sustainment, repair, replacement, and maintenance of shore infrastructure projects, including projects to correct deficiencies in code compliance or to mitigate against threats to life, health, or safety, with costs not exceeding 75 percent of a building's or structure's replacement value. Additionally, O&S funds can be used for contingent, emergent, or other unspecified minor construction projects which include new construction, procurement, development, conversion, rebuilding, improvement, or extension of any facility not exceeding $2,000,000 in total cost at any location for planned or unplanned operational needs.

*Next Generation Buoys*.—The Committee is aware that the Coast Guard completed its "Next Generation Aids to Navigation [ATON] Buoys & Alternative Moorings: New Buoy & Moorings Field Trial Summary Report" and found that Next Generation [Next Gen] buoys "represent a cost-efficient opportunity for the CG to help close the gap on buoy shortages and modernize the ATON system with lighter, less maintenance-intensive buoy hulls while still maintaining a high, system level of service." The Committee understands that other nations are using non-steel buoys, and many of these buoys are commercially available and consist of hard-shell plastic, foam, and other materials. The Committee encourages the Coast Guard to prioritize the adoption of Next Gen buoys, including Commercial Off The Shelf [COTS] buoys, where feasible and in appropriate circumstances and conditions.

*Persistent Maritime Domain Awareness [MDA]*.—The Committee provides $50,000,000 to satisfy the increasing demand for autonomous uncrewed surface vessels to support more robust coverage and patrols of the southern maritime corridors across the Southeast and Southwest Districts.

*Recruitment and Retention*.—The Committee understands that the Coast Guard has temporarily reduced status at some stations to best preserve search and rescue capabilities and personnel morale in the face of personnel shortfalls. Within 60 days of the date of enactment of this act and quarterly thereafter, the Coast Guard shall provide a briefing on efforts to recruit and retain sufficient personnel, and plans with timelines to return stations to their previous operational status.

*Restoration of Capabilities*.—The Committee notes the effects that major storms and other disasters have had on the Coast Guard's facilities and vessels and is concerned that such damages could negatively impact Coast Guard capabilities. The Coast Guard shall brief the Committee within 90 days of the date of enactment of this act on its plans to restore operational capabilities at locations with degraded capabilities as a result of such damages.

*Review of Coast Guard Command Centers' Needs*.—The Committee recognizes the importance of Coast Guard command centers across the globe for fielding emergency calls and routing Coast Guard assets effectively to address threats and save lives. How-

ever, command centers continue to operate with outdated technology and insufficient integration of systems, leaving them struggling to perform their critical missions. In addition, the issue of hoax emergency calls continues to cause difficulties for command centers, requiring the diversion of time and resources from real emergencies. The Coast Guard is directed to provide a report and briefing to the Committee within 120 days of the date of enactment of this act, detailing the state of Coast Guard command centers, including their technology, top challenges (including fielding hoax emergency calls), and options for improvements to better support their mission.

*Seismic Problem Study*.—The Committee is concerned about reports of seismic vulnerabilities in Coast Guard facilities and infrastructure, which could jeopardize mission readiness and the safety of personnel. To address these concerns, the Committee provides $2,000,000 for the Coast Guard, in coordination with the Department of Homeland Security, to conduct a comprehensive study of seismic risks to its facilities, including but not limited to operational centers, housing units, and mission-critical assets located in regions prone to seismic activity. This study should identify infrastructure most at risk, assess potential operational impacts of seismic events, and propose mitigation strategies to improve resilience. The Coast Guard is directed to submit a report to the Committee no later than 3 years after the date of enactment of this act, detailing findings and recommendations for mitigation measures. Within 6 months of the date of enactment of this act and semiannually thereafter, Coast Guard shall brief the Committee on the progress of the study.

*Short-Range Reconnaissance Program*.—The Committee believes that small drones could further contribute to the Coast Guard's mission to secure the homeland and conduct search and rescue operations. Section 11255 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263) required the Coast Guard to, within 90 days, discontinue using drones manufactured by the People's Republic of China, the Russian Federation, the Islamic Republic of Iran, or the Democratic People's Republic of Korea and replace such drones with unmanned aircraft systems manufactured in the United States or an allied country (as that term is defined in section 2350f(d)(1) of title 10, United States Code). The Committee directs the Coast Guard to brief the Committee within 180 days of the date of enactment of this act on its plan to replenish its small unmanned aircraft fleet to restore its short-range reconnaissance capabilities.

*Small Arms Simulation and Cognitive Training Capability Improvements*.—The Committee supports ensuring the Coast Guard has the appropriate tools to train Service personnel to meet the cognitive decision-making demands and small arms readiness skills required to engage in unique operational environments that transition between law enforcement and potential military environments, to include the appropriate use of force and lethality. Within 180 days of the date of enactment of this act, the Coast Guard shall provide a briefing on its current capabilities and practices to improve cognitive skills, operator situational awareness, judgment, and proficiency in high-risk operations.

*State Boating Fees*.—The Committee directs the Coast Guard to provide a briefing within 90 days of the date of enactment of this act discussing any statutes, regulations, and policies governing the ability of States to collect fees including those related to boating safety, search and rescue operations, and aquatic invasive species as part of a process for numbering undocumented vessels under chapter 123 of title 46, United States Code.

*Surface and Shore Maintenance*.—Within 120 days of the date of enactment of this act, the Coast Guard shall provide a briefing to the Committees on Appropriations of the House of Representatives and the Senate; the Committee on Commerce, Science, and Transportation of the Senate; and the Committee on Transportation and Infrastructure of the House of Representatives, on the status of infrastructure repairs, dredging, and the plan to ensure long-term operability of Coast Guard Station Cape Disappointment and the National Motor Lifeboat School in Ilwaco, WA.

*Surface Maritime Domain Awareness*.—The Committee provides an additional $2,000,000 for the expansion of persistent, long-duration, surface MDA data collection from uncrewed surface systems to support the interdiction operations and enhance security along U.S. maritime borders. The Coast Guard is directed to update the Committee on the planned obligation of these funds at least 15 days prior to obligation.

*Uncrewed Acoustic Monitoring System Pilot*.—The Committee provides the Coast Guard an additional $10,000,000 to pilot autonomous, wave and solar powered, persistent, passive acoustic large-aperture towed sonar arrays for functions including monitoring transit routes, enhancing port and maritime security, and detecting narcotic trafficking vessels, particularly semi-submersibles in the Eastern Pacific and Caribbean Sea.

*U.S. Coast Guard C5I Service Center*.—The U.S. Coast Guard C5I Service Center (previously known as the Operations Systems Center) supports the 11 Coast Guard statutory mission areas by housing and maintaining all of the Coast Guard's IT systems and computer servers, as well as by providing operational watches worldwide through the Mutual-Assistance Vessel Rescue System. The Committee appreciates the Coast Guard's continued commitment to advancing the work of the C5I Service Center.

*Unfunded Priorities List [UPL]*.—The Committee directs the Coast Guard to provide to the Committee a list of approved but unfunded Coast Guard priorities and the funding needs for each priority, not later than 30 days after submission of the fiscal year 2027 budget request.

*Visit, Board, Search and Seizure [VBSS] equipment*.—The Committee is aware that Coast Guard deployable specialized forces need ladder kits and powered ascenders to execute advanced interdiction missions. The Committee supports the Coast Guard's desire to purchase specialized equipment to conduct VBSS maritime operations and provides an additional $1,750,000 for the Coast Guard to modernize its equipment and address its needs.

*Wing-in-Ground Craft Inspections*.—The Committee is encouraged by new transportation solutions in the maritime industry including the development of electric wing-in-ground coastal passenger vessels. Wing-in-Ground craft promise to increase the effi-

ciency and speed of coastal and inter-island transportation while reducing overall passenger expenses. The Committee encourages the Coast Guard to develop the capacity for wing-in-ground craft inspections and certification.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

| | |
|---|---|
| Appropriations, 2025 | $1,413,950,000 |
| Committee recommendation | 1,094,228,000 |

The Procurement, Construction, and Improvements [PC&I] appropriation provides funds for vessels, aircraft, information management resources, shore facilities, aids to navigation, and military housing required to execute the Coast Guard's missions and achieve its performance goals.

COMMITTEE RECOMMENDATIONS

The Committee recommends $1,094,228,000 for PC&I. The total includes $20,000,000 from the Oil Spill Liability Trust Fund.

*Fleet Mix Analysis*.—Within 30 days of the date of enactment of this act, the Coast Guard shall submit the Fleet Mix Analysis originally required in the explanatory statement accompanying Public Law 117–103, While the Committee appreciates the Coast Guard's periodic status updates, the Analysis itself must be delivered. The Committee reiterates its expectation, as stated in the requirement, that the analysis be truly comprehensive and include all classes of vessels, even those whose mission might not have a direct bearing on the workload of other vessel classes.

*Full-Funding Policy*.—The Committee again directs an exception to the current acquisition policy that requires the Coast Guard to attain the total acquisition cost for a vessel, including long lead time materials [LLTM], production costs, and post-production costs, before a production contract can be awarded. This policy has the potential to make shipbuilding less efficient, to force delayed obligation of production funds, and to require post-production funds far in advance of when they will be used. The Department should position itself to acquire vessels in the most efficient manner within the guidelines of strict governance measures.

*Funded Projects*.—The Committee expects that when Congress funds projects, those projects shall be executed expeditiously and responsibly. Within 90 days of the date of enactment of this act and quarterly thereafter, the Coast Guard shall provide a briefing on any projects experiencing significant cost increases, executability concerns, and any other issues that may increase the risk profile of a project. Coast Guard shall provide the Committee sufficient time to consider such increased risk profiles and respond in an appropriate manner.

VESSELS

*47-foot Motor Lifeboat Service Life Extension Program [MLB–SLEP]*.—The Committee provides $45,000,000 for the 47-foot MLB–SLEP program. The Committee notes that the condition of many of the MLBs is significantly worse than expected at program inception and urges the Coast Guard to continue providing the re-

sources necessary to sufficiently upgrade and extend the service life of the entire fleet.

*Great Lakes Icebreaker*.—The Committee provides $25,000,000 for LLTM for a Great Lakes Icebreaker. The Coast Guard is required by law to maintain a heavy icebreaking capability on the Great Lakes to assist in keeping channels and harbors open to navigation in response to the reasonable demands of commerce to meet the winter shipping needs of industry. The Committee remains concerned that the Coast Guard does not possess adequate capacity to meet its statutorily-required icebreaking mission on the Great Lakes, with negative consequences to the regional and national economy as well as to the safety of local communities, and directs the Coast Guard to provide a briefing on the Great Lakes Icebreaker Program within 180 days of the date of enactment of this act.

*Cutter Boats*.—The Coast Guard removed its 52-foot heavy weather motor lifeboats from service due to their reaching the end of their service life and increasing maintenance issues, causing an operational capability gap. The recommendation includes an additional $24,000,000 to support the procurement of two Heavy Weather Boat [SPC–HWX] replacement boats and program costs related to the acquisition program. The Committee recognizes the Coast Guard's need for new equipment and technologies to support mission critical functions for U.S. border security, and thus provides an additional $22,000,000 to purchase a minimum of four unmanned monohull surface vessels that are uncrewed fully autonomous, but also capable of remote operations, amphibious, and capable of self launching and self recovery, from a wholly U.S. owned and operated shipyard.

*Waterways Commerce Cutter [WCC]*.—The Committee provides $54,588,000, for the WCC program.

*Polar Security Cutter [PSC]*.—$96,500,000 is provided for costs related to PSC 3 construction. The Committee is hopeful that the Coast Guard continues to show progress with the program. Within 90 days of the date of enactment of this act, the Coast Guard shall brief the Committee on the program's progress and shall provide a timeline and spend plan for the completion of construction of PSC 1 and PSC 2. The Coast Guard is directed to continue to keep the Committee fully informed of the PSC program's progress both with regular quarterly updates and, in the case of emergency or time-sensitive issues, as soon as possible.

*Arctic Security Cutters*.—The Committee notes that a 2023 Coast Guard fleet mix analysis concluded that the Service requires a total of eight to nine polar icebreakers, including four to five heavy polar icebreakers and four to five medium polar icebreakers, to perform its polar (i.e. Arctic and Antarctic) missions in coming years. In order to accelerate the production of assets to compete in the Arctic region, and consistent with the authority and direction provided in Section 11218 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263) to establish a program office for the acquisition of the Arctic Security Cutters. Within 90 days of the date of enactment of this act, the Coast Guard shall submit to the Committee a multi-year investment plan

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 621 of 714 PageID #:1671



and current spend plan to achieve the total number of icebreakers required in the 2023 fleet mix analysis.

AIRCRAFT

*HC–130J Acquisition, Conversion, and Sustainment*.—$12,000,000 is provided for the HC–130J Acquisition, Conversion, and Sustainment program.

*MH–60 Service Life Extension and Recapitalization*.—The Coast Guard's MH–60 helicopters perform a critical and often life-saving role on a daily basis. The Committee is aware that the current fleet of MH–60 helicopters is rapidly accumulating flight hours and is nearing the end of its service life. Efforts to extend the service life of these aircraft, including the development and integration of electric braking systems are strongly supported by the Committee. The recommendation includes $151,600,000, for the MH–60 program to accelerate the rotary wing fleet transition.

*Review of MH–60 Acquisition and Missionization*.—Within 60 days of the date of enactment of this act, the Coast Guard shall brief the Committee on options for streamlining the acquisition and missionization of MH–60 rotary wing aircraft, including potential utilization of similar design specifications and production lines used for the Navy's MH–60R. The Coast Guard shall brief the Committee on the program's progress and shall provide a timeline and spend plan for the completion of fleet expansion. The Coast Guard is directed to continue to keep the Committee fully informed of the program's progress both with regular quarterly updates and, in the case of emergency or time-sensitive issues, as soon as possible.

OTHER ACQUISITION PROGRAMS

*Command, Control, Communications, Intelligence, Surveillance and Reconnaissance [C4ISR]*.—The Committee provides $10,000,000 for C4ISR.

*In-Service Systems Sustainment*.—$30,000,000 is provided for the In-Service Systems Sustainment program.

*Cyber and Enterprise Mission Platform*.—$25,800,000 is provided for the Cyber and Enterprise Mission Platform.

SHORE FACILITIES AND AIDS TO NAVIGATION

*Coast Guard Academy Infrastructure*.—The Coast Guard Academy has long suffered from outdated, unsafe, and decaying infrastructure that sets back cadets' recruitment, retention, education, and training, ultimately impacting the readiness of the Coast Guard to execute its many critical missions. It is necessary to address these deficiencies to improve Academy operations in fiscal year 2026 and the years beyond. The Committee provides $39,800,000 for the Major Construction, Housing, AtoN, and Survey and Design programs, of which $25,000,000 is to make critical capital improvements at the Coast Guard Academy, including barracks habitability upgrades and improvements to utility services to ensure compliance with fire and safety standards; mold, asbestos, and lead remediation; maintenance and repair activities; electrical distribution; heating, ventilation, and air conditioning; boiler plant

and locker room repairs; and elevator replacement. Within 120 days of the date of enactment of this act, the Coast Guard shall brief the Committee on an initial plan for Academy improvements using these funds.

*Coast Guard Cutter Homeports*.—The Committee is concerned with the Coast Guard's ability to complete homeport projects in an adequate timeframe, particularly for the Fast Response Cutter program. Within 90 days of the date of enactment of this act, the Committee directs the Coast Guard to provide a report for each homeport where an asset is in active status, but its designated permanent homeport is not complete. The report shall include the detailed timeline for and projected costs associated with land acquisition, permitting, planning, engineering, design, and construction.

*Engineering and Design*.—The Committee is concerned with the track record of appropriation reprogramming actions for new construction development. The Committee encourages the Coast Guard to factor in the preconstruction, engineering and design needs when developing cost estimates for Coast Guard projects. Additionally, within 180 days of the date of enactment of this act, the Coast Guard is directed to provide a report on past Coast Guard construction projects that have been appropriated that did not proceed to construction for failure to properly factor in preconstruction and engineering and design needs.

*Facilities Plans*.—Within 180 days of the date of enactment of this act, the Coast Guard shall provide to the Committee long-term master facilities plans for the modernization and upgrading of the campuses of Training Center Cape May and the U.S. Coast Guard Academy, which are necessary to facilitate additional personnel accessions to accommodate the growing mission demands on the Coast Guard. Each plan shall include a capital improvement plan [CIP] that includes capital project budgets, an inventory of deferred maintenance items necessary to sustain campus operations through completion of the CIP, and schedule and sequencing estimates based upon funding assumptions.

*Major Acquisition Systems Infrastructure [MASI]*.—The Committee recommends $330,000,000 for MASI, including $30,000,000 for an aircraft hangar in Saint Paul, AK, and $50,000,000 for Alaska housing.

*Polar Security Cutter [PSC] Homeport Base Seattle*.—The Committee recognizes the strategic and geographical importance Coast Guard Base Seattle provides, specifically as it is the homeport for Coast Guard Polar operations and the new Polar Security Cutters [PSC]. However, the Committee is concerned with the continued base improvement and expansion delays. Included within the amounts provided for MASI is $160,000,000 to prepare for PSC Homeport Seattle, as identified on the fiscal year 2025 unfunded priorities list [UPL]. Within 90 days of the date of enactment of this act and quarterly thereafter, the Coast Guard shall provide briefings updating the progress, timelines, and funding execution of the project to date, as well as updates on future planning and deliverables to facilitate Base Seattle's expansion. The Committee further directs the Coast Guard to continue using funding appropriated for Base Seattle modernization to ensure homeport comple-

tion and support for the 3 PSCs, the CGC Healy, and up to 4 additional major cutters.

RESEARCH AND DEVELOPMENT

| | |
|---|---|
| Appropriations, 2025 | $7,476,000 |
| Committee recommendation | 10,263,000 |

The Coast Guard's Research and Development [R&D] appropriation provides funds to develop techniques, methods, hardware, and systems that contribute directly to increasing the productivity and effectiveness of the Coast Guard's operational missions. This appropriation also provides funds to operate and maintain the Coast Guard Research and Development Center.

COMMITTEE RECOMMENDATIONS

The Committee recommends $10,263,000 for R&D. The total includes $500,000 from the Oil Spill Liability Trust Fund.

*Enhancing Search and Rescue*.—The Committee encourages the Coast Guard to develop and integrate fully autonomous technologies, such as artificial intelligence and human-machine collaboration, for use in Coast Guard search and rescue operations during extreme weather events to improve efficiency and de-risk rescue personnel.

HEALTH CARE FUND CONTRIBUTION

| | |
|---|---|
| Appropriations, 2025 | $290,093,000 |
| Committee recommendation | 297,731,000 |

According to estimates by the Congressional Budget Office, the Coast Guard will pay $297,731,000 in fiscal year 2026 to the Medicare-Eligible Retiree Health Care Fund for the costs of military Medicare-eligible health benefits earned by its uniformed service members. The contribution is funded by permanent indefinite discretionary authority pursuant to Public Law 108–375.

RETIRED PAY

| | |
|---|---|
| Appropriations, 2025 | $1,147,244,000 |
| Committee recommendation | 1,249,000,000 |

The Retired Pay account provides for: the pay of retired military personnel of the Coast Guard, Coast Guard Reserve, and members of the former Lighthouse Service; annuities payable to beneficiaries of retired military personnel under the retired serviceman's family protection plan pursuant to sections 1431–1446 of title 10, United States Code and survivor benefit plan pursuant to sections 1447–1455 of title 10, United States Code; payments for career status bonuses under the National Defense Authorization Act (Public Law 115–232); continuation pay; and payments for medical care of retired personnel and their dependents under the Dependents Medical Care Act (10 U.S.C., ch. 55).

COMMITTEE RECOMMENDATIONS

The Committee recommends $1,249,000,000 for Retired Pay.

## UNITED STATES SECRET SERVICE

The United States Secret Service's [USSS] appropriation provides funds for: the protection of the President, the Vice President, and other dignitaries and designated individuals; enforcement of laws relating to obligations and securities of the United States; enforcement of laws and investigations relating to financial crimes that include, but are not limited to, access device fraud, financial institution fraud, identity theft, and computer fraud; mitigation against computer-based attacks on financial, banking, and telecommunications infrastructure; and protection of the White House and other buildings within the Washington, D.C. metropolitan area. The agency also provides support for investigations related to missing and exploited children and for digital forensics investigative training for State and local cybersecurity task forces.

### COMMITTEE RECOMMENDATIONS

The Committee recommends $3,166,936,000 for USSS. Within the total amount provided, the recommendation makes $80,041,000 available until September 30, 2026.

The Committee recognizes that work remains to ensure the agency is properly staffed and encourages adequate staffing to reduce the reliance on overtime that continues to strain the agency's budget and personnel, which limits investments in other areas.

The Committee commends the United States Secret Service on their work to improve protective efforts, workforce resiliency, and tactical communications procedures since the events of July 13, 2024.

USSS shall also provide a quarterly spend plan to the Committee on the planned utilization of the $1,170,000,000 provided in Public Law 119–21, Sec. 100057 entitled "Appropriation for the United States Secret Service" until such funds are expended.

UNITED STATES SECRET SERVICE

[In thousands of dollars]

| | Fiscal year 2025 enacted | Committee recommendations |
|---|---|---|
| Operations and Support | 3,238,982 | 3,064,300 |
| Procurement, Construction, and Improvements | 75,598 | 99,386 |
| Research and Development | 4,217 | 3,250 |
| Total, USSS | 3,318,797 | 3,166,936 |

### OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriations, 2025 | $3,238,982,000 |
| Committee recommendation | 3,064,300,000 |

### COMMITTEE RECOMMENDATIONS

#### PROTECTIVE OPERATIONS

*Presidential Campaigns and National Special Security Event [NSSE].*—The Committee continues the directive under this heading from Senate Report 118–85.

*2026 FIFA World Cup*.—$16,000,000 is provided for USSS to continue planning efforts for the 2026 FIFA World Cup. USSS is directed to provide a briefing on a quarterly basis outlining their planning and coordination efforts with State, Local, Tribal, and Territories Law Enforcement ahead of the 2026 FIFA World Cup.

*Protective Mission*.—The Committee understands that the USSS continues to work toward improvements and enhanced capabilities in their protective mission. Within 60 days of the date of enactment of this act, the USSS shall submit a report to the Committee that examines the efforts to identify and communicate threats with law enforcement partners during a protective event and include an evaluation of the lessons learned in light of the events of July 13th, 2024. The Committee reminds the USSS that a similar report was required after the threat identification failures of January 6th, 2021 in the explanatory statement accompanying Public Law 117–103.

FIELD OPERATIONS

*Domestic and International Field Operations*.—The Committee recommends $788,852,000 for Domestic and International Field Operations.

*Support for Missing and Exploited Children Investigations [NCMEC]*.—The recommendation includes $6,000,000 for grants in support of missing and exploited children. NCMEC was created in 1984 to serve as a national resource on missing and exploited children. NCMEC provides assistance to law enforcement for long-term missing persons cases; identification of signs of facial reconstruction procedures; outreach and prevention programs for children, their families, and the public; and assistance to victims of child sex trafficking and child sexual exploitation.

*Support for Computer Forensics Training*.—The Committee recommends $66,812,000, to continue training in computer forensics, academic certification efforts, and to expand subject matter expert contracts as necessary in response to unmet training needs. National Computer Forensics Institute [NCFI] shall continue to prioritize the training needs of SLTT law enforcement, and legal and judicial professionals, in computer forensics and cyber investigations. Further, the Committee is deeply concerned about the growing threat of small unmanned aerial systems [sUAS] that can be utilized by malicious actors to commit crimes and acts of terrorism. Therefore, the Committee provides $7,000,000 for NCFI to expand its curriculum to include forensic analysis of sUAS.

MISSION SUPPORT

*Autonomous Robotic Targets [ART]*.—The Committee is encouraged to learn how the use of ART has drastically increased the effectiveness of firearms training for USSS Special Agents and Officers. This technology provides instant feedback, models real world threats, and enables the USSS to provide more tailored training to personnel, essential in their support of the National Command Authority. Therefore, the recommendation provides $20,000,000 to support the use of ART in USSS firearm and tactical training.

*Employee Resiliency Programs*.—The Committee applauds the USSS for their continued efforts to improve employee resiliency

programs, including the establishment of an Employee Wellness and Workforce Care Division. The USSS is encouraged to coordinate with other DHS agencies on best practices for implementing additional health and resiliency programming for the USSS workforce. The Committee directs the USSS to brief the Committee on their efforts to improve employee resiliency programming and efforts, including the impact of current employee resiliency programs on retention no later than 90 days after the date of enactment of this act. The briefing shall also include ongoing retention efforts for more senior agents aimed at reducing the utilization of supermax pay.

*Secret Service Overtime*.—The Committee continues the direction under this heading in Senate Report 118–85.

*Strategic Human Capital Plan*.—The Committee continues to be concerned with the prolonged workforce effects stemming from reliance on overtime pay to fill personnel gaps. The Committee directs the USSS, in coordination with the Department's Chief Human Capital Officer, to ensure the annual evaluation of the 5-year plan in order to meet all benchmarks and goals as identified. The Committee further directs the USSS to brief the Committee, not less than bi-annually, on the status of the plan.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

| | |
|---|---|
| Appropriations, 2025 | $75,598,000 |
| Committee recommendation | 99,386,000 |

COMMITTEE RECOMMENDATIONS

*Long Term Acquisition and Refresh Cycles*.—The USSS is directed to brief the Committee within 120 days on all ongoing and anticipated Procurement, Construction, and Improvements projects that operate on a sliding refresh cycle. The brief should include current and anticipated costs, including out year projections through fiscal year 2030.

RESEARCH AND DEVELOPMENT

| | |
|---|---|
| Appropriations, 2025 | $4,217,000 |
| Committee recommendation | 3,250,000 |

COMMITTEE RECOMMENDATIONS

The Committee recommends $3,250,000 for Research and Development.

TITLE II–ADMINISTRATIVE PROVISIONS

Section 201. The Committee continues a provision regarding overtime compensation.

Section 202. The Committee continues a provision allowing CBP to sustain or increase operations in Puerto Rico and the U.S. Virgin Islands with appropriated funds.

Section 203. The Committee continues a provision regarding the availability of Consolidated Omnibus Budget Reconciliation Act of 1985 (Public Law 99–272) fee revenue.

Section 204. The Committee continues a provision allowing CBP access to certain reimbursements for preclearance activities.

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 627 of 714 PageID #:1677



Section 205. The Committee continues a provision regarding the importation of prescription drugs by an individual for personal use.

Section 206. The Committee continues a provision regarding waivers of the Jones Act (Public Law 66–261).

Section 207. The Committee continues a provision prohibiting the establishment of a new border crossing fee.

Section 208. The Committee continues a provision requiring an expenditure plan for CBP's Procurement, Construction, and Improvements account.

Section 209. The Committee continues a provision limiting construction in specific areas.

Section 210. The Committee continues a provision on vetting operations at existing locations.

Section 211. The Committee continues and modifies provision detailing CBP's Procurement, Construction, and Improvements funding levels.

Section 212. The Committee continues a provision prohibiting the use of funds provided under the heading "U.S. Immigration and Customs Enforcement—Operations and Support" for a 287(g) program agreement if the terms of the agreement governing the delegation of authority have been materially violated.

Section 213. The Committee continues a provision prohibiting the use of funds provided under the heading "U.S. Immigration and Customs Enforcement—Operations and Support" to contract for detention services provided by a facility that receives less than "adequate" ratings in two consecutive performance evaluations.

Section 214. The Committee continues a provision allowing the Secretary to reprogram funds within and transfer funds to "U.S. Customs and Immigration Enforcement—Operations and Support" to ensure the detention of aliens prioritized for removal

Section 215. The Committee continues provisions requiring the public reporting of data.

Section 216. The Committee continues prohibitions on the use of funds to take enforcement actions against sponsors of unaccompanied children and continues reporting requirements for ICE.

Section 217. The Committee continues a provision on "Monthly Reporting Requirements."

Section 218. The Committee continues a provision requiring ICE reporting on funding obligations.

Section 219. The Committee includes a provision on planning related to detention and removal operations.

Section 220. The Committee includes a provision related to overseas staffing.

Section 221. The Committee continues a provision clarifying that certain elected and appointed officials are not exempt from Federal passenger and baggage screening.

Section 222. The Committee continues a provision allowing the use of the Aviation Security Capital Fund.

Section 223. The Committee includes a provision requiring TSA's Capital Investment Plan.

Section 224. The Committee continues a provision prohibiting the use of funds made avialable by this act under the heading "Coast Guard—Operations and Support" for recreational vessel expenses,

except to the extent fees are collected from owners of yachts and creditied to this appropriation.

Section 225. The Committee continues a provision requiring the Coast Guard to submit a future years capital investment plan.

Section 226. The Committee continues a provision prohibiting funds from being used to reduce the staff or mission at the Coast Guard's legacy Operations Systems Center.

Section 227. The Committee continues a provision prohibiting the Coast Guard from performing an Office of Management and Budget Circular A–76 study at the Coast Guard National Vessel Documentation Center.

Section 228. The Committee continues a provision prohibiting the Coast Guard from reducing operations within the Civil Engineering program.

Section 229. The Committee continues a provision making available certain Coast Guard housing receipts.

Section 230. The Committee continues a provision prohibiting certain inspection fees absent a determination by the Commandant of the Coast Guard.

Section 231. The Committee includes a provision on Force Design 2028.

Section 232. The Committee continues a provision allowing USSS to obligate funds in anticipation of reimbursement to personnel receiving training.

Section 233. The Committee continues a provision prohibiting the use of funds made available to USSS for the protection of the head of a Federal agency other than the Department of Homeland Security, unless the Director has entered into a reimbursable agreement for such protection services.

Section 234. The Committee continues a provision allowing for funds made available for "United States Secret Service-Operations and Support" without regard to limitations on such expenditures in this or any other act after notification to the Committee.

Section 235. The Committee continues a provision providing flexibility to address travel anomalies as a result of protective travel.

Section 236. The Committee includes a provision for the National Computer Forensics Institute.

# TITLE III

## PROTECTION, PREPAREDNESS, RESPONSE, AND RECOVERY

### CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY

The Cybersecurity and Infrastructure Security Agency [CISA] aims to foster better integration of national approaches among strategic homeland security programs, facilitate infrastructure protection, and ensure broad emergency communications capabilities.

#### COMMITTEE RECOMMENDATIONS

The Committee recommends a total program level of $2,832,020,000 for CISA. The following table summarizes the Committee's recommendation as compared to the fiscal year 2025 enacted level:

CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY

[In thousands of dollars]

| | Fiscal year 2025 enacted | Committee recommendations |
|---|---|---|
| Operations and Support | 2,382,814 | 2,266,975 |
| Procurement, Construction, and Improvements | 489,401 | 545,045 |
| Research and Development | 793 | ............ |
| Total, Cybersecurity and Infrastructure Security Agency | 2,873,008 | 2,812,020 |
| (Defense) | 2,541,357 | 2,386,651 |

#### OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriations, 2025 | $2,382,814,000 |
| Committee recommendation | 2,266,975,000 |

#### COMMITTEE RECOMMENDATIONS

The Committee recommends $2,266,975,000 for Operations and Support [O&S]. The recommendation includes $3,000,000 for World Cup 2026 and America250 support, $25,000,000 for Endpoint Detection and Response, $5,000,000 for Attack Surface Management.

*Election Security*.—The Committee provides $39,610,000 for the Election Security Program within the Cybersecurity ($36,729,000), Integrated Operations (10 full-time equivalents; $1,950,000), and Risk Management (4 full-time equivalents; $931,000) Divisions, including Election Security Advisors [ESAs] in each of the 10 CISA Regions who act as liaisons between CISA and its partners, and the continuation of the Elections Infrastructure Information Sharing and Analysis Center [EI–ISAC].

CYBERSECURITY

*Assistance for Health Information Sharing and Analysis Center [H–ISAC].*—The Committee recognizes the importance of securing healthcare infrastructure from cyberattacks and urges CISA to mature and expand CISA's existing relationship with the Health Information Sharing and Analysis Center [H–ISAC] and related entities that help mitigate risk to our healthcare infrastructure. The Committee additionally urges CISA to increase its outreach and public education to small and medium-sized hospitals.

*Attack Surface Management [ASM] Capability*.—As asset visibility and vulnerability detection remains an increasingly critical capability throughout the Federal Civilian Executive Branch [FCEB] and across critical infrastructure and State, local, Tribal, and territorial [SLTT] networks, CISA is directed to continue enhancing its ability to centrally verify and manage asset and vulnerability data on Internet-facing cyber terrain for Federal, critical infrastructure, and SLTT partner networks. In addition, CISA shall sustain efforts funded in fiscal years 2022, 2023, and 2024 for ASM. Within 180 days of the date of enactment of this act, CISA shall brief the Committee on progress made deploying its ASM capabilities. The brief shall include a detailed description of fiscal year 2023, 2024, and 2025 funds execution and deliverables provided; a plan and milestones for execution of fiscal year 2026 funds; a demonstration of asset and vulnerability identification capability currently deployed, and a discussion of how CISA uses this capability to verify and manage Federal, critical infrastructure, and SLTT asset and vulnerability data and help these partners prioritize and remediate critical vulnerabilities.

*Attack Surface Management [ASM] Program*.—CISA's Attack Surface Management [ASM] program has been instrumental in providing situational awareness of Federal, SLTT, and priority critical infrastructure entities' Internet-facing attack surfaces, proactively identifying network vulnerabilities, and effectively mitigating vulnerabilities before they can be exploited by adversaries like China and Russia. The Committee provides $73,700,000 for CISA's ASM program. The Committee believes other Federal agencies would benefit substantially from direct access to this ASM data to more nimbly defend their own networks. Therefore, CISA shall assess the feasibility of administering an ASM shared service offering for Federal partners. CISA shall report its findings, including an estimate of any additional resources required to administer the proposed shared service offering, within 270 days of the date of enactment of this act.

*Cybersecurity Education and Training Assistance Program [CETAP]*.—The funding level includes $10,000,000 for CETAP to enhance cybersecurity education, training, and other related efforts to address the National shortfall of cybersecurity professionals. The Committee is encouraged by the Department's inclusion of CETAP in underserved communities including historically black colleges and universities and minority serving institutions, rural and Tribal areas, as well as students with disabilities, which is helping to address the historical underrepresentation of minorities and women in the Federal cybersecurity workforce.

*Cybersecurity Grant Program*.—Within 60 days of the date of enactment of this act, CISA is required to report to and brief the Committee on any request to establish a cybersecurity grant program aimed at private and public water, transportation, and energy providers to implement risk reduction strategies. The Committee urges CISA to consider burdens on small businesses and critical operators for grant compliance. For private operators and providers, to the extent practical, CISA is urged to adopt the definitions of small businesses under the Small Business Act. Before finalizing any grant requirements, CISA is urged to conduct stakeholder outreach to appropriately tailor the requirements to individual industrial settings. The brief should include any plans to conduct outreach to stakeholders.

*Cybersecurity Training*.—The Committee encourages CISA to collaborate with a 4 year academic institution with specific expertise in practical policy applications, workforce development, and Senior Executive Service level education to assist CISA leadership in identifying challenges and innovating solutions in developing hands-on, real world scenario training exercises, and addressing the challenges of emerging artificial intelligence technology with the goal of strengthening the Nation's cyber defenses and building a more resilient, skills based workforce.

*Data Security Vulnerability Improvements*.—The Committee is increasingly concerned with the ability of adversaries to circumvent and utilize existing cybersecurity solutions to gain access to critical systems and data. Within 180 days of the date of enactment of this act, CISA shall submit a report to the Committee that examines existing security vulnerabilities of government information technology [IT] systems. The report shall include an examination of emerging technologies that could improve the government's data security and protection, such as immutable logging of suspect activity by default, intrusion detection and prevention of mechanisms, automation of asset management, and behavioral indicators.

*Federal Cyber Skilling Academy*.—The Committee acknowledges the need to grow the pipeline of qualified cybersecurity professionals within the Federal Government at a large scale, given the massive need. The Committee believes we need to continue to both "upskill" and "reskill" the current Federal cybersecurity workforce to address the shortage of qualified cybersecurity professionals, trained in cyber defense, cyber threat intelligence analysis, and risk informed analysis, including through the Federal Cyber Skilling Academy. Within 90 days of the date of enactment of this act, CISA is directed to provide a briefing on the steps taken to meet these goals and the progress made, including the number of personnel who have been trained and been placed into a cybersecurity-related position since the inception of the Academy.

*Federal Cyber Workforce Development Institute*.—The Committee notes the Federal Government faces a persistent challenge in filling essential cyber roles amid a nationwide cyber workforce shortage. Weak personnel management practices and private sector competition, with higher salaries and streamlined hiring processes, make it difficult for government agencies to recruit and retain talent. Therefore, the Committee recommends development of a plan to create a Federal Cyber Workforce Development Institute to im-

prove the accession and training of cyber personnel across the government. The Institute would serve as a centralized training entity for human resources [HR] professionals as well as cyber personnel. HR would receive specialized training on the recruiting and personnel management of cyber personnel. For cyber personnel the Institute would provide modular role specific instruction for new entrants and mid-career personnel seeking to upskill or reskill for cyber roles. The training should align with the National Initiative for Cybersecurity Education [NICE]. Upon completion of training, personnel would receive a formal certification.

*Federal Network Security Reporting*.—The Committee directs CISA to provide a progress report, within 180 days of the date of enactment of this act, on the success of each Federal agency and department to implement the established program goals. The report shall also include an accounting of non-CISA resources that lent to implementation in order to provide needed context on the entire effort. Finally, the report shall include a description of implementation plans through fiscal year 2028, including desired target completion goals, methods for updating lifecycle costs, acquisition program schedules, and details on how innovation and evolving technology such as end point detection could improve Federal network and data security. This report may be submitted in a classified format if necessary along with an unclassified summary that provides a summary of progress.

*Operational Technology [OT]*.—The Committee is aware of government directives for Federal agencies to inventory their Internet of Things [IoT] and OT by the end of the fiscal year 2024 to pursue full asset visibility and abide by updated Federal information security requirements. The Committee is also encouraged by CISA's increased focus on the cybersecurity posture of OT and Industrial Control Systems. Inventorying allows agencies to establish a baseline to enable monitoring and detecting unauthorized, abnormal, or potentially malicious activities. Requiring agencies to incorporate IoT and OT assets into the Continuous Diagnostics and Mitigation [CDM] program helps reduce agency threat surface, increase visibility into the Federal cybersecurity posture, and improve Federal cybersecurity response capabilities. The Committee encourages CISA to include information on the status and planned actions to secure IoT and OT assets as part of the CDM program.

*Post-Quantum Cryptography Initiative*.—The Committee is concerned that critical U.S. infrastructure and government systems face serious cybersecurity challenges posed by quantum computing. Traditional encryption methods are known to be breakable by quantum computing algorithms, which would create new vulnerabilities that the United States should proactively address. The Committee directs CISA to continue its Post-Quantum Cryptography [PQC] Initiative to prepare for this eventuality. PQC should continue to work with interagency and industry partners to address threats posed by quantum computing and to support critical infrastructure and government network owners and operators during the transition to post-quantum cryptography.

*Security Operations Center Modernization and Centralized Security Operations Center Services*.—The Department of Justice's [DOJ] Security Operations Center "as-a-Service" [SOCaaS] offering,

governed by CISA in its role as the Cybersecurity Quality Service Management Office [QSMO] as specified in OMB Memorandum M–19–16, provides FCEB agencies with a customizable menu of security operations center services including threat monitoring, detection and incident response, threat intelligence, and cybersecurity investigations. The Committee notes that cloud-delivered technologies like artificial intelligence and advanced machine learning are rapidly accelerating the capabilities of both network defenders and our adversaries. To stay ahead of our adversaries, Federal network defenders must be able to access, interpret, and rapidly analyze large amounts of security data at scale; quickly identify, prioritize, and triage potential security incidents, and mitigate threats with automation wherever possible. Therefore, CISA is directed to assess (1) the feasibility of transitioning the operation and administration of any federally-provided and/or CISA endorsed SOCaaS offerings, including but not limited to any DOJ SOCaaS capabilities, to CISA so that it can most effectively and efficiently provide FCEB agencies state-of-the-art security information and automation management capabilities; and (2) the approach it would take to re-design (and if necessary, redevelop) those transitioned offerings into a comprehensive Federal-wide CISA SOCaaS, which offers a range of Security Operations Center services and capabilities under CISA management, not a single technology platform. Within 180 days of the date of enactment of this act, CISA shall brief the Committee on its assessment and any resources required to facilitate the transition, redesign, and management.

*Shared Services*.—The Committee provides 146 full-time equivalents and $206,661,000 for the Cybersecurity Shared Service Office [CSSO] to continue fiscal year 2024 service levels.

*Space Systems*.—Within 90 days of the date of enactment of this act, CISA shall brief the Committee on its current efforts related to commercial space system and related cybersecurity, as well as the feasibility and costs of implementing a pilot program in coordination with the Office of the National Cyber Director [ONCD], National Space Council, and heads of other agencies as determined appropriate. Such a pilot program should include the development of a clearinghouse of information that is publicly available online, containing publicly available commercial satellite system cybersecurity resources and information, including voluntary risk-based recommendations for cybersecurity-informed engineering, planning, protection measures, supply chain threats, and other threats to the confidentiality, availability, and integrity of data residing on or in transit through commercial satellite systems and other materials specifically aimed at assisting small business concerns with the secure development, operation, and maintenance of commercial satellite systems.

*State Court Electronic Data*.—The Committee is concerned with potential cyber-attacks on State court electronic data systems. A large majority of the annual caseload of the United States is handled by State courts. State and Federal agencies, including all law enforcement communities, rely on the determinations reflected in these State court data systems. It is important to ensure the integrity and reliability of the approximately three billion records held

by State courts in their systems and often shared with other justice system agencies.

The Committee directs CISA to maintain and expand upon prior year outreach to the State courts through national level associations to drive participation and understanding of services available to prevent, protect against, and respond to cyber-attacks on State court electronic data systems.

*Vulnerability Assessments*.—The Committee provides 211 full-time equivalents and $208,652,000 for vulnerability assessments to continue fiscal year 2024 service levels.

*Cyber Workforce Development Activities*.—Within 180 days of the date of enactment of this act, CISA shall brief the Committee on the TryCyber, Threat Sandbox Challenges, and other cyber workforce development programs. The briefing shall include a discussion of such programs' integration of artificial intelligence tools and other emerging technologies.

*Zero Trust Network Architecture*.—Within 180 days of the date of enactment of this act, CISA, in coordination with the ONCD and the Office of Management and Budget [OMB] shall provide a comprehensive assessment report of Federal agency progress toward adopting Zero Trust Architectures, as outlined in Federal Government wide policy memoranda and standards. The assessment shall include a strategy to proactively engage Federal agencies on leveraging CISA's CDM program to upgrade to zero trust solutions in fiscal year 2026 and beyond.

INFRASTRUCTURE SECURITY

*Artificial Intelligence [AI] Emergency Preparedness and Continuity Planning*.—Within 90 days of the date of enactment of this act, CISA shall brief the Committee on its efforts to strengthen AI emergency preparedness and continuity planning activities across critical infrastructure sectors that implement artificial intelligence in their operations. This includes enhanced regional coordination, technical assistance to State and local governments, risk assessments, and pre-incident operational planning. The briefing shall include initiatives to prioritize support to high-risk communities and sectors vulnerable to natural disasters, cyber incidents, and complex emergencies.

*Bomb Disposal Technician Training and Technology Events [TTEs]*.—The Committee remains concerned with the threat of Improvised Explosive Devices [IED] both internationally and domestically. To keep pace with evolving threats and ever-advancing technology development, CISA shall utilize the Office of Bombing Prevention resources to hold a minimum of four technician TTEs across the Nation to bring together Federal and SLTT agencies, and industry. These events would provide a unique opportunity for training the Nation's bomb technicians. Within 120 days of the date of enactment of this act, CISA shall brief the Committee on efforts to conduct these annual TTEs across the Nation. This briefing shall include schedules to conduct at a minimum four TTEs and total program cost.

*Bombing Prevention*.—The Committee supports critical training for Public Safety Bomb Technicians. The Office for Bombing Prevention can play a critical role in providing for the public safety by

ensuring counter IED training, awareness, information sharing, and technical assistance. Within 90 days of the date of enactment of this act, CISA is directed to brief the Committee on its fiscal year 2026 plans to support the bomb technician community to include continuing education, post graduate proficiency, and advanced training.

*Protecting the Critical Infrastructure from National Security Risks*.—The Committee wishes to better understand the potential security risks of vehicles operating in the United States that send telemetry to and receive updates from companies located in foreign entities of concern, and whether such entities empower their governments to access sensitive data for national security purposes. Such activity would raise significant privacy and security concerns surrounding data used by connected vehicles manufactured and operated by companies incorporated in foreign countries of concern, particularly the potential for unauthorized access to collect and transmit data, implement surveillance capabilities embedded within a vehicle's technology, and disable some vehicles. Some foreign entities of concern are increasingly among the world's largest exporters of automobiles through the use of unfair trade and workforce practices. The Committee wishes to learn whether such activity would pose a cybersecurity risk to U.S. critical infrastructure. Therefore, the Committee directs CISA to identify potential cybersecurity risks to U.S. critical infrastructure related to vehicles that send telemetry to and receive updates from companies located in foreign entities of concern. CISA is directed to report its findings to the Committee within 180 days of the date of enactment of this act.

*School Safety*.—The Committee provides $3,341,000 to maintain the fiscal year 2024 current services level for Federal school safety programs.

EMERGENCY COMMUNICATIONS

*First Responder Emergency Medical Communications*.—The Committee recognizes the need for reliable communications capabilities during emergencies that leave normal communications networks inoperable or overwhelmed. The Committee provides $6,000,000 for this effort to continue fiscal year 2024 service levels.

INTEGRATED OPERATIONS

*Cybersecurity Advisors*.—Recognizing CISA's commitment in its Strategic Plan to strengthen its regional presence, the Committee supports the use of funds appropriated to support additional cybersecurity advisors in the 10 CISA regional offices. These advisors will be in addition to the State cybersecurity coordinators established in furtherance of Section 1717 of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116–283), in order to supplement regional capability in areas of high demand or particular national security importance.

*Election Security Advisors*.—The Committee recognizes the important role of Election Security Advisors in providing support to State and local elected officials so that these election professionals can ensure the American people have confidence in the security of

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 636 of 714 PageID #:1686



our democratic process each election cycle. The Committee is also concerned by threats in recent years to State and local election officials, including suspicious substances in the mail, online harassment, and "swatting" incidents, and encourages CISA to allocate additional resources to ensure its capabilities and services are being employed to mitigate cyber and physical threats related to our States' and communities' elections infrastructure.

*Regional Operations*.—The Committee provides 113 full-time equivalents and $28,580,000 for Coordination and Service Delivery to continue fiscal year 2024 service levels, including maintaining the delivery of services, oversight of field staff, and the coordination of critical infrastructure protection missions.

RISK MANAGEMENT OPERATIONS

*National Risk Management Center [NRMC]*.—The Committee provides $126,062,000 to maintain fiscal year 2024 service and staffing levels of the NRMC. In addition, within 180 days of the date of enactment of this act, CISA shall provide a briefing on the NRMC's strategic engagement with election stakeholders, including engagement progress to date, future engagement plans and priorities, and information regarding any identified election security risks and shortfalls that should be mitigated in the near-, mid-, and long-terms.

STAKEHOLDER ENGAGEMENT AND REQUIREMENTS

*Cyber Incident Reporting for Critical Infrastructure [CIRCIA] Act Requirements*.—As a part of CISA's quarterly budget and staffing briefing requirements, CISA shall brief the Committee on its spend plan for all CIRCIA-dedicated funding and the statutory requirements supported.

*Cybersecurity Regulation Harmonization*.—The Committee is concerned with the proliferation of cybersecurity regulations from different entities and the potential impacts to effective and efficient compliance. CISA's efforts to promote cybersecurity regulatory harmonization should continue in collaboration with the ONCD with the goal of strengthening security while reducing duplicative and conflicting cybersecurity requirements to minimize time, expense, and complexity of compliance. Therefore, within 90 days of the date of enactment of this act, CISA is directed to report on progress towards harmonization and streamlining of duplicative cybersecurity rules and regulations. Additionally, the report should identify any remaining barriers to harmonization and provide recommendations to expedite solutions.

*International Cybersecurity Engagement*.—CISA shall coordinate with the Department of State and other entities as appropriate to evaluate and assess ongoing and recently-completed cybersecurity engagement activities with international partners, including requests for cybersecurity support, technical assistance, or expertise provided to foreign governments and foreign owners and operators of critical infrastructure. The assessment shall include details on the processes for requesting support or assistance, barriers to providing requested support or assistance to international partners, and the average time and cost of providing such support or assistance. CISA shall submit a report on the assessment and how it will

inform new engagement strategies, including a classified annex if appropriate, to the Committee within 180 days of the date of enactment of this act.

*Tribal Engagement*.—CISA shall brief the Committee within 180 days of the date of enactment of this act on its engagement with federally recognized tribes. The briefing shall identify how CISA promotes the effective delivery of agency programs, resources, and services to Alaska Native, American Indian, and Native Hawaiian communities within the United States.

MISSION SUPPORT

*Open Source Software*.—Within 90 days of the date of enactment of this act, CISA shall brief the Committee on the feasibility, benefits, and costs of establishing an Open Source Software Management function. The pilot function would be modeled after open source program offices-such as those in the private sector, the nonprofit sector, academia, and other non-Federal entities-and would support the secure usage of open source software at CISA, develop policies and process for contributions to and releases of open source software at the agency, interface with the open source software community, and manage and reduce risks of using open source software at the agency.

*CISA Workforce*.—CISA shall maintain a workforce consistent with the personnel and full-time equivalents funded by the pay and non-pay amounts provided in this act. CISA shall not reduce staffing in such a way that it lacks sufficient staff to effectively carry out its statutory missions, including cybersecurity and infrastructure security for the FCEB agencies, SLTT partners, Sector Risk Management Agencies [SRMA], international partners, and other stakeholders. Further, CISA is directed to maintain no fewer than 10 regional field offices around the country, and is directed to ensure that CISA employs no fewer than one expert "Cyber Security Advisor" per State or territory devoted exclusively to assisting such state or territory.

*Quarterly Budget and Staffing Briefings*.—CISA is directed to continue to provide quarterly budget and staffing briefings as described in the explanatory statement accompanying Public Law 117–103.

*Quarterly Classified Briefings*.—CISA is directed to continue to provide the Committee quarterly classified briefings required under this heading in House Report 118–123.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

| | |
|---|---|
| Appropriations, 2025 | $489,401,000 |
| Committee recommendation | 545,045,000 |

COMMITTEE RECOMMENDATIONS

The Committee recommends a total program level of $545,045,000 for Procurement, Construction, and Improvements [PC&I].

CYBERSECURITY

*Artificial Intelligence [AI] Systems Cybersecurity*.—The Committee applauds the April 2024 release of the "Deploying AI Systems Securely" Cybersecurity Information Sheet. Developed through collaboration with CISA, the National Security Agency [NSA], Federal Bureau of Investigation [FBI], and other partner agencies, this guidance provides best practices for deploying and operating AI systems. While the safe and secure use of AI can enhance U.S. Government mission effectiveness, the use of untrusted or unreliable AI software, including models developed by companies headquartered in, or operating from, China or other foreign countries of concern, can put government networks, data, and applications at risk. Maintaining the security and integrity of AI systems requires a comprehensive approach involving continuous monitoring, assessment, and improvement of the security posture of AI models, data, and infrastructure. This comprehensive approach needs to effectively identify and address vulnerabilities, misconfigurations, and potential risks associated with AI adoption, as well as ensure AI adoption complies with applicable data handling and security regulations. Therefore, the Committee recommends that not less than $5,000,000 for the CDM PC&I appropriation shall be available for CISA to test and evaluate available commercial off-the-shelf artificial intelligence security posture management, access, and runtime security solutions that can enable U.S. Federal agencies to proactively protect AI systems from threats, minimize data exposure to the extent practicable, and maintain the trustworthiness of AI applications in Federal networks.

*Continuous Diagnostics and Mitigation [CDM]*.—Within 120 days of the date of enactment of this act, CISA shall brief the Committee on its implementation of the CDM program, including agencies' CDM activities previously or currently supported with CISA funding, the duration of such funding support for each agency (including durations for those that are no longer supported with CISA funds), and when such agencies will begin fully funding their CDM activities.

*Continued Implementation, Modernization, and Expansion of Endpoint Detection and Response [EDR] Across the FCEB*.—The Committee has supported CISA's efforts to deploy EDR technologies across Federal agencies in furtherance of the May 2021 Executive Order 14028 on Improving the Nation's Cybersecurity, which required all Federal agencies to implement EDR solutions to better protect their networks. Within 90 days of the date of enactment of this act, CISA shall report to the Committee on the status of EDR deployment across Federal agencies, and if EDR is being deployed to cloud environments. The report shall include a timeline to modernize and upgrade existing EDR deployments for future technologies such as the next-generation security information and event management solutions. CISA is also directed to report to the Committee within 90 days of the date of enactment of this act on how it is leveraging EDR technologies to support vulnerability management, IT hygiene, and to enable better and more responsive managed threat hunting.

*Threat Hunting*.—As a part of CISA's quarterly budget and staffing briefing requirements, CISA shall brief the Committee on the progress made under the CyberSentry program.

EMERGENCY COMMUNICATIONS

*Next Generation Networks-Priority Services [NGN–PS] Phase 2*.—The Committee provides $30,000,000 for NGN–PS Phase 2.

RESEARCH AND DEVELOPMENT

| | |
|---|---|
| Appropriations, 2025 | $793,000 |
| Committee recommendation | ................ |

COMMITTEE RECOMMENDATIONS

The Committee recommends no funding for Research and Development [R&D].

## FEDERAL EMERGENCY MANAGEMENT AGENCY

The primary mission of the Federal Emergency Management Agency [FEMA] is to reduce the loss of life and property and to protect the United States from all hazards, including natural disasters, acts of terror, and other manmade disasters, through a risk-based, comprehensive emergency management system of preparedness, protection, response, recovery, and mitigation.

COMMITTEE RECOMMENDATIONS

The Committee recommends $32,151,372,000 for FEMA. The following table summarizes the Committee's recommendation as compared to the fiscal year 2025 enacted level:

FEDERAL EMERGENCY MANAGEMENT AGENCY

[In thousands of dollars]

| | Fiscal year 2025 enacted | Committee recommendations |
|---|---|---|
| Operations and Support | 1,483,990 | 1,579,705 |
| Procurement, Construction, and Improvements | 99,528 | 188,419 |
| Federal Assistance | 3,203,499 | 3,756,248 |
| Disaster Relief Fund | 22,510,000 | 26,367,000 |
| Disaster Relief Base | ........................... | ........................... |
| Disaster Relief Category | 22,510,000 | 26,367,000 |
| National Flood Insurance Fund | 175,029 | 226,000 |
| Radiological Emergency Preparedness Program | 40,065 | 34,000 |
| Total, Federal Emergency Management Agency | 27,512,111 | 32,151,372 |
| Offsetting Fee Collections | −215,094 | −260,000 |

OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriations, 2025 | $1,483,990,000 |
| Committee recommendation | 1,579,705,000 |

COMMITTEE RECOMMENDATIONS

The Committee recommends $1,579,705,000 for Operations and Support [O&S]. The recommended increase includes adjustments to reflect the fiscal year 2025 enacted appropriation and fiscal year

2026 current services needs. The Committee provides $6,000,000 for innovative technologies in coordinated response, $4,000,000 for synthetic aperture radar, $8,000,000 for veterinary teams, $40,000,000 to hire critical positions to meet statutory requirements.

*Congressionally Directed Spending [CDS] Administration*.—The Committee provides $1,760,000 to maintain fiscal year 2024 service levels for CDS management and administration.

*FEMA Advisory Committee*.—The Committee would like additional information regarding FEMA's disbanding of the National Advisory Council, the National Dam Safety Review Board, and the Technical Mapping Advisory Council. Within 30 days of the date of enactment of this act, FEMA shall report to the Committee on the status of the three groups and provide a timeline for appointing members to unfilled positions.

*FEMA Hiring*.—The Committee is concerned that staffing levels are insufficient to effectively and efficiently execute FEMA's statutory missions, and provides an additional $40,000,000 to hire additional Federal staff to critical positions. Positions and funding are provided to the programs, projects, and activities in the following amounts: Regional Operations, $10,000,000; Response and Recovery, other response, $20,000,000; Response and Recovery, recovery, $10,000,000. Within 60 days of the date of enactment of this act, FEMA shall brief the Committee on a hiring plan for these positions.

*FEMA Workforce*.—FEMA shall maintain a workforce consistent with the personnel and full-time equivalents funded by the pay and non-pay amounts provided in this act. FEMA shall not reduce staffing in such a way that it lacks sufficient staff to issue guidance, provide payments, and provide technical assistance and operational support to grantees in a timely manner; review and approve plans for obligating and expending Federal funds; review expenditures and reports for waste, fraud, and abuse; and perform all other necessary duties to allow recipients to proceed without unnecessary interruption.

*State Strategic Stockpiles*.—The Committee requests that FEMA provide an update in the fiscal year 2027 Congressional Justification about how FEMA and the Department of Health and Human Services are coordinating Federal resources to strengthen the capabilities of state strategic stockpiles, minimize duplication, and strategically respond to emergencies.

MITIGATION

*Building Resilient Infrastructure and Communities [BRIC]*.—The Committee continues its interest in the BRIC program (42 U.S.C. 5133) and the need for mitigation and resiliency for a disaster-ready Nation. Accordingly, the bill contains a provision to require the implementation of the BRIC program, therefore, within 60 days of the date of enactment of this act and quarterly thereafter, FEMA shall brief the Committee on the status of BRIC, including projected funding levels. Recognizing the importance of stakeholder input, the briefing shall include a description of how stakeholder views are incorporated, including the needs of local governments. Further, the Committee is concerned that many communities may

be disadvantaged during the technical scoring process due to FEMA's lack of consideration of the unique circumstances of many local municipalities. For example, certain applicants may be disadvantaged due to State building code laws outside of their control, such as those stating they may not be responsible for enforcing building codes, even where a project takes place in an area that has high building code enforcement standards. Accordingly, within 180 days of the date of enactment of this act, FEMA is directed to brief the Committee on the steps it has taken to address applicants' concerns.

*Community Disaster Resilience Zones*.—Within 180 days of the date of enactment of this act, FEMA is directed to brief the Committee on lessons learned from the development and rollout of Community Disaster Resilience Zones [CDRZ], and how those lessons learned will be incorporated into future selection criteria. Prior to briefing the Committee, FEMA shall engage with SLTT stakeholders in the development of the lessons learned and plans for incorporating such lessons into future selection criteria.

*FEMA and U.S. Fish and Wildlife Service [FWS] Dam Removal Coordination*.—The Committee encourages coordination between FEMA and FWS following the removal of dams, including necessary flood map updates. The Committee directs that within 180 days of the date of enactment of this act, FEMA and FWS shall jointly brief their plans to increase interagency coordination around dam removal and flood map updates and provide a timeline for the updating of flood maps for States where dam removals have taken place within the past 10 years.

*Flexible Mitigation*.—The Committee encourages the Flood Mitigation Assistance Program and the Hazard Mitigation Grant Program to provide States with flexible funding prior to a disaster for the purposes of property acquisition or elevation when the risk of repetitive losses due to extreme weather is identified.

*Flood Resilience*.—The Committee provides 25 full-time equivalents and $6,900,000 to maintain fiscal year 2024 service levels for flood resilience measures.

*Habitat Restoration*.—The Committee recognizes the importance of habitat restoration and directs FEMA to streamline the permitting process as soon as practicable for such projects, and to the greatest extent possible under its applicable authorities and responsibilities. FEMA shall brief the Committee within 90 days of the date of enactment of this act on its current progress, as well as its plans and estimated timelines for continued implementation.

*Hail*.—The Committee is aware that the frequency and severity of extreme weather involving significant sized hail is increasing, as is the number of declared disasters resulting from severe weather involving hail causing billions of dollars of damage to structures, crops, and livestock. Unfortunately, some of the most effective methods of mitigating the damage caused by hail are still only improvised. The Committee directs FEMA to identify cost-effective and widely deployable solutions to reduce damage caused by severe weather involving hail, and to report to the Committee within 180 days of the date of enactment of this act.

*Hazard Mitigation Grant Program*.—Within 30 days of the date of enactment of this act, FEMA shall brief the Committee on execu-

tion of the Hazard Mitigation Grant Program authorized by section 404 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (as amended) (42 U.S.C. 5170c).

*Hazard Mitigation Plans*.—The Committee recognizes the importance of hazard mitigation plans and encourages counties to develop FEMA-approved hazard mitigation plans to protect their communities and public and private assets. The Committee also encourages such actions to increase the number of communities in rural areas that are eligible for hazard mitigation dollars in the future.

*Nation-State Actor Threats*.—Department of Homeland Security [DHS] and FEMA have stressed increasing threats associated with Nation state actors. While the increased awareness is helpful to SLTT partners, DHS and FEMA should expand the dialogue to include actions that should be taken to prevent or prepare for such an event. They should also expand access to unclassified briefings and engagement in exercises related to the Nation-State threat. FEMA, in conjunction with the Cybersecurity and Infrastructure Security Agency [CISA], DHS leadership, and other DHS stakeholders, is therefore directed to develop an outreach plan amongst emergency management leadership to provide regular updates on potential threats, identify ways in which existing programs can be updated and utilized to enhance preparedness, and communicate strategies to increase public awareness, and shall brief the Committee on such plan within 270 days of the date of enactment of this act.

*National Inventory of Dams*.—The Committee is concerned about the state of dams across the country, many of which were built before 1970 and have either reached or are about to reach the end of their useful lives. There is a strong demand for fast, reliable, cost-effective and national decision support tools to generate flood inundation maps and other products to support the goals of dam safety. As such, the Committee provides an additional $2,500,000 for FEMA to update its current modeling software to allow the incorporation of upstream and downstream flow of a dam to ensure that the model represents accurate field conditions during an extreme wet weather event.

*Nature Based Solutions*.—The Committee provides $5,300,000 to maintain the fiscal year 2024 service level for nature based solutions.

*Safeguarding Tomorrow through Ongoing Risk Mitigation [STORM] Act*.—The Committee continues $1,000,000 and seven full-time equivalents to continue the fiscal year 2024 service level in the management and administration of grants made available in paragraph (1) under the heading "Federal Emergency Management Agency—Federal Assistance" in title V of division J of Public Law 117–58.

*Safety and Efficiency Advantages of Unvented Attics*.—As FEMA supports the home rebuilding efforts following the devastating wildfires in Maui and California, and recognizing the critical need to address wildfire spread and protect households from other natural disasters, FEMA shall charter a university led engineering research initiative to assess the relative advantages of unvented attics in areas threatened by wildfires and other severe weather re-

lated events. This initiative will study the safety and other benefits of unvented attics, including those sealed with air impermeable insulation, compared to other current methods employed to protect attics from weather, wind uplift prevention, wildfire, and other damage.

*Urban Flood Mapping Pilot Program*.—The Committee is concerned about FEMA's lack of implementation of the previously enacted $1,200,000 pilot program included in Public Law 116–93. Within 60 days of the date of enactment of this act, FEMA shall brief the Committee on its progress in developing this program.

*Urban Flooding*.—The Committee encourages FEMA to explore opportunities to improve coordination across agencies that have a role in managing small or large urban floods. This should include both vertical coordination (i.e., Federal, State, and local government entities) and horizontal coordination (i.e., local agencies responsible for storm water systems, flood control, and removal of damaged property; and Federal agencies responsible for severe storm warnings, evacuation, and community redevelopment and flood mitigation in urban areas). The Committee urges FEMA to employ geospatial indicators, such as the Social Vulnerability Index, to quantify and map social vulnerability using census demographic data to allow for more efficient allocation of resources for flood disaster mitigation and recovery.

FEMA has established methods for analyzing several types of flood hazards, including riverine and coastal flood hazards. To assist in the prevention and mitigation of urban flooding, the Committee encourages FEMA to include, in its analyses of flood hazards, methods that incorporate capacity of storm water systems, small topographic variations or local drainage patterns, and site-specific structural designs that drive the granular nature of urban flood impacts.

*Wildland Fire Mitigation and Management Commission Recommendations*.—The September 2023 report, "ON FIRE: The Report of the Wildland Fire Mitigation and Management Commission," included 148 recommendations covering the full landscape of how Federal agencies manage wildfire assistance. FEMA is directed to brief the Committee within 180 days of the date of enactment of this act, and semi-annually thereafter, on efforts to implement such recommendations appropriate to FEMA. These briefings shall include efforts to conduct stakeholder engagement, identifying which recommendations are regulatory in nature or require Congressional action, and available resources to aid in implementation.

### PREPAREDNESS AND PROTECTION

*Deployable Cellular Communications System*.—The Committee provides an additional $290,000 for deployable cellular communications equipment.

*Disaster-Impacted Renters and Rental Markets*.—Within the funds provided, FEMA is directed to coordinate with the Department of Housing and Urban Development [HUD] and, within 30 days of the date of enactment of this act, contribute toward a National Academy of Public Administration [NAPA] study examining how renters and rental markets have recovered from recent major

disasters, with a focus on disasters involving long displacement times for large numbers of renter households.

*Flood Early Warning Systems*.—The Committee recognizes the importance of flood early warning systems in protecting communities and infrastructure from the impacts of flooding, and especially deadly flash flooding events. These systems play a critical role in providing real-time data on rainfall rates, identifying safe evacuation routes and they inform the deployment of emergency resources in areas at highest risk of life-threatening flooding. The Committee is concerned, however, that many non-Federal flood early warning systems across the country are outdated and in need of modernization and expansion to address the increased frequency of heavy rainfall events and serious floods. Within 90 days of the date of enactment of this act, FEMA shall brief the Committee on its understanding of the operational reliability of these systems.

*Hazard Mitigation Natural Infrastructure*.—The Committee is aware that rehabilitation or establishment of natural infrastructure, including but not limited to marshes, wetlands, mangroves and dunes, is capable of improving resiliency, reducing damage from flooding and coastal storm surge and can provide effective floodplain management. Such natural infrastructure can also have long-term beneficial impacts on topography and soils, water quality, wetlands, floodplains, coastal resources, aquatic resources, environmental justice, and public health and safety in coastal areas. The Committee urges FEMA to continue to engage other Federal and non-Federal stakeholders to develop and support conservation and environment-based flood mitigation measures and utilize mitigation grant funds for natural infrastructure projects consistent with the directive under this heading in House Report 117–396.

*Integrated Public Alert and Warning System [IPAWS]*.—The Committee provides an additional $1,013,000 for IPAWS implementation.

*National Continuity Programs [NCP] Readiness*.—The Committee provides an additional $581,000 for NCP readiness implementation.

*Next Generation Warning System [NGWS]*.—The Committee provides an additional $1,000,000 for administration of the NGWS program.

*Water Generation*.—The Committee encourages FEMA to evaluate the need for new technologies, including an inventory of atmospheric water generation machines, to better prepare for disaster response activities.

REGIONAL OPERATIONS

*FEMA Regional Offices*.—FEMA shall not close, eliminate, or consolidate its regional offices in a manner that violates 6 U.S.C. 313(b)(2)(E) or 6 U.S.C. 317.

RESPONSE AND RECOVERY

*Coordinated Information Dissemination*.—The Committee is concerned with the time and strain on families to jump-start their recovery from a major disaster. We also remain concerned with the overwhelming amount of information with which families and individuals need to familiarize themselves to begin recovery. Therefore,

we recommend that FEMA-in coordination with other relevant Federal and State agencies-evaluate how post-disaster and recovery information is disbursed to individuals, communities, and community leadership and consider opportunities to simplify and improve dissemination of such information.

*Emergency Management Assistance Compact [EMAC]*.—The Committee recognizes the important value of EMAC as a cost-effective solution to requesting and deploying assets; conducting planning, training, and exercises; and completing and implementing lessons learned. As natural disasters continue to increase in both number and intensity, the Committee anticipates reliance on EMAC will also grow. Therefore, the Committee directs FEMA to allocate not less than $3,000,000 to EMAC to strengthen state EMAC capacity and readiness and ensure States are better prepared to respond to natural disasters, including by making necessary improvements to the deployment operating system and providing training for EMAC coordinators. The Committee also directs FEMA to ensure that the level of funding for EMAC is specified in the President's Budget for fiscal year 2027.

*Innovative Technologies in Coordinated Disaster Response*.—The recommendation includes an additional $6,000,000 for FEMA's Office of Response and Recovery to expand and build upon existing efforts between FEMA and collaborators for use of geospatial information system [GIS] tools and technologies to improve disaster response capabilities, specifically for search and rescue common operating platforms and in coordination with the U.S. Fire Administration [USFA] data and analytics platform. The Committee directs FEMA to expand this geospatial search and rescue training, planning, and response program in collaboration with appropriate partners and to continue sustainment and expansion of search and rescue geospatial support technology solutions in preparation for emergency incidents and disaster responses. In addition, the Committee directs FEMA to ensure imagery and information collected through these tools and technologies be made routinely available to support joint preliminary damage assessments and the delivery of FEMA's disaster assistance programs, as appropriate.

*Synthetic Aperture Radar [SAR] Satellite-Driven Hazard Monitoring*.—Faster disaster response saves lives, reduces suffering, and helps communities recover quickly. FEMA's use of SAR satellite-driven hazard monitoring technology allows the agency to rapidly assess disasters such as floods and wildfires. This data has already been proven effective at improving situational awareness, expediting disaster declarations, and targeting response efforts more efficiently. Expanding the use of SAR driven technology will help FEMA reduce fraud, streamline individual assistance payments, decrease reliance on costly airborne assets, and save millions of taxpayer dollars through agency-wide efficiencies. The Committee provides an additional $4,000,000 to FEMA's Response Geospatial Office to expand the use of this technology across the entirety of the agency including resilience, response, and recovery. Within 180 days of the date of enactment of this act, the Committee directs FEMA to report on its efforts to integrate SAR satellite-driven hazard monitoring technology into its disaster response.

*Unmanned Aerial System [UAS] Training*.—The Committee is aware of the need to build a federated ecosystem to teach, train, educate, certify, and credential first responders to employ UAS skills to crises and emergency management events. Therefore, the Committee directs FEMA to work in collaboration with the FAA Center of Excellence for UAS and other subject matter experts in UAS training. The Committee provides an additional $7,500,000 for this program.

*Veterinary Emergency Team*.—The Committee recognizes that section 1218 of the Disaster Recovery Reform Act (Public Law 115–254) authorizes the establishment of one or more national veterinary emergency teams at accredited colleges of veterinary medicine. To date, FEMA relies on the Department of Health and Human Services and the Department of Agriculture to provide this capability. The Committee directs FEMA to develop a series of national veterinary emergency teams, regionally located, with demonstrated capabilities of responding to natural disasters and includes an additional $8,000,000 for this purpose.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

| | |
|---|---|
| Appropriations, 2025 | $99,528,000 |
| Committee recommendation | 188,419,000 |

COMMITTEE RECOMMENDATIONS

The Committee recommends $188,419,000 for Procurement, Construction, and Improvements [PC&I].

*Construction and Facilities Improvements*.—The recommendation includes $95,625,000 for construction and facilities improvements, including $73,625,000 for Mt. Weather facility projects, and $5,000,000 for the Center for Domestic Preparedness for mobile radio system upgrades and other construction backlogs, $3,000,000 for maintenance backlogs at the U.S. Fire Administration, and $3,000,000 for maintenance backlogs at the Emergency Management Institute.

FEDERAL ASSISTANCE

| | |
|---|---|
| Appropriations, 2025 | $3,203,499,000 |
| Committee recommendation | 3,756,248,000 |

COMMITTEE RECOMMENDATIONS

The Committee recommends $3,756,248,000 for Federal Assistance. When awarding grants, the Administrator shall consider the needs of cybersecurity preparedness and planning, State court cybersecurity, 911 call capability, alert and warning capabilities, implementation of the REAL ID Act (Public Law 109–13), and countering targeted violence and terrorism prevention programs. A comparison of the budget request to the Committee-recommended levels by budget activity is provided in the table at the end of this explanatory statement.

*Advance Wildfire Mitigation*.—The Committee notes that new homes continue to be built within the “wildland-urban interface” [WUI] and that as many as 4.5 million homes are at high or extreme risk of wildfires. FEMA’s Hazard Mitigation Grant Program has Post Fire assistance available to help communities implement

wildfire mitigation projects including defensible space measures, ignition-resistant construction, and hazardous fuels reduction, but only after a community has suffered a major fire or is under active threat from one. FEMA is encouraged to do more to support at-risk communities, particularly those within the WUI, that wish to proactively implement such mitigation measures, particularly through pre-disaster mitigation programs. Additionally, the Committee recognizes the critical role of urban firefighters in prevention and response and encourages FEMA to support training programs that enhance firefighter preparedness.

*Center for Domestic Preparedness [CDP].*—The Committee provides $86,469,000 for the Center for Domestic Preparedness, including $12,000,000 for increased costs to services.

*Combatting Domestic Violent Extremism.*—The Committee directs FEMA to report, within 120 days of the date of enactment of this act, on how States and urban areas use State Homeland Security Grant Program and Urban Area Security Initiative Grant Program funding in support of combating domestic violent extremism as part of the National Priority Area.

*Congressionally Directed Spending.*—See "Disclosure of Congressionally Directed Spending Items" and the associated table at the end of this explanatory statement. Not later than 60 days after the release of the Notice of Funding Opportunity for Congressionally Directed Spending, and monthly thereafter, FEMA is directed to provide a list of all projects that have been deemed ineligible (including expired or non-existent Hazard Mitigation Plans) or are at risk of being deemed as such, to include amounts for each project.

*Continuing Training Grants.*—Of the total amount provided for Continuing Training Grants, $2,000,000 is for FEMA to partner with the Federal Aviation Administration Unmanned Aircraft Systems [UAS] Center of Excellence, which has expertise in disaster response, to conduct a regional training program for SLTT responders in utilizing UAS for disaster preparedness and response. In addition, improvement in cybersecurity preparedness among SLTT governments and non-governmental partners with the public sector requires a sustained, multi-year effort. The Committee provides $6,000,000 under Continuing Training Grants for the National Cybersecurity Preparedness Consortium [NCPC], which was created to utilize the subject-matter expertise of universities to develop such relationships. FEMA shall continue its activities as it relates to the NCPC, which has been developing and delivering training in partnership with FEMA to help States and communities establish a viable and sustainable program to prevent, detect, respond to, and recover from cyber-attacks. FEMA is also encouraged to develop and implement opportunities to provide emergency response training to ensure rural county officials are prepared to respond to emergencies.

*Emergency Response Training.*—The Committee recognizes the importance of FEMA's education, training, and exercise programs in improving the Nation's response to extreme weather events and natural disasters. Given the unique challenges underserved, rural, and remote communities face in training for emergencies, the Committee encourages FEMA training programs to support initiatives

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 648 of 714 PageID #:1698



that serve rural and remote communities and help them prepare for and respond to extreme weather events.

*Flood Hazard Mapping and Risk Analysis Program [RiskMAP].*—In the past 5 years, all 50 States have experienced some form of extreme and significant flooding. These disasters result in expensive Federal obligations for recovery efforts and liability for insurance claims, while flood maps help manage and minimize this risk. Funding for the RiskMAP is critical to updating flood maps, which are used to educate communities about flood risks including how to minimize losses from flooding. Within 180 days of the date of enactment of this act, FEMA shall brief the Committee on its progress in implementing RiskMAP.

*Firefighter Assistance Grants for Turnout Gear Without Added [PFAS].*—The Committee recognizes recent advancements in firefighter turnout gear made without added perfluoroalkyl and polyfluoroalkyl substances [PFAS], including the commercial availability of outer shells and moisture barriers that meet National Fire Protection Association Standards without PFAS added to achieve performance characteristics. Recognizing the ongoing demand for firefighting gear made without added PFAS, the Committee encourages the designation of replacement turnout gear as a priority in establishing criteria under the program.

*Grants Reporting.*—Within 30 days of the date of enactment of this act, and not later than the fifth business day of each month thereafter, FEMA shall provide to the Committee a report identifying the current expected Notice of Funding Opportunity [NOFO] release dates for each federal assistance program administered by FEMA for which funding is provided or otherwise made available in fiscal year 2025 and fiscal year 2026, by this or any other act. Each report shall also identify the current expected application, review, and award schedules for each such program. Following the awarding of Federal assistance for each such program, each report shall also include the amounts expended under each such program's awards.

The report shall also include the status of all prior year FEMA-administered Federal assistance funding, including at a minimum, whether and for what amounts any such funds have been reprogrammed, transferred, obligated, expended, or lapsed.

The Committee is aware that grant recipients and sub-recipients who incurred costs prior to any notices to terminate awards have not been reimbursed for allowable costs incurred pursuant to each program's rules and guidelines. These recipients and sub-recipients performed work with the reasonable expectation that they would be reimbursed for their services, which were delivered in accordance with each program's intent and guidelines. The Committee directs FEMA to provide, within 90 days of the date of enactment of this act, a report detailing the rationale for each individual award termination and the amount terminated.

*Hazard Mitigation Plans.*—The Committee recognizes the importance of hazard mitigation plans. The Committee encourages counties to develop FEMA-approved hazard mitigation plans to protect their communities and public and private assets. The Committee also encourages such development so that more communities in

rural areas can become eligible for hazard mitigation grants in the future.

*Hermit's Peak/Calf Canyon*.—The Committee encourages the Hermit's Peak/Calf Canyon Claims Office to standardize and streamline the claims process to the extent practicable for individuals and entities filing claims based on erosion damage stemming from the flooding that occurred after the Hermit's Peak/Calf Canyon wildfire. The Committee further urges the Hermit's Peak/Calf Canyon Claims Office to expand their community-centered engagement efforts where possible, and requests that the Claims Office continue efforts to most effectively and efficiently reach community members. Finally, the Committee requests that the Hermit's Peak/Calf Canyon Claims Office expand the scope of their outreach and workforce development when searching for New Mexico-based employees and contractors to perform the work needed in response to Hermit's Peak/Calf Canyon wildfire. In the instances where local and other New Mexico-based contractors may require assistance in executing Federal contracts, the Committee encourages the Claims Office to offer those individuals supplemental training and support where such training and support is authorized.

*Implementing Technical Mapping Advisory Council Recommendations*.—The Committee urges FEMA to implement the final recommendations and goals of the Technical Mapping Advisory Council's Annual Reports, including transitioning to current and future condition risk scores, structure-specific flood risk analysis, incorporating high-resolution topographic data into flood risk maps, and better communicating current and future direct and residual flood risk to property owners. FEMA should coordinate with State agencies and other experts that have developed mapping expertise and models that can be useful in FEMA's efforts to consider future conditions, such as sea level rise and coastal erosion.

*Improving Rural Access to Assistance to Firefighters Grants [AFG] and Staffing for Adequate Fire and Emergency Response [SAFER]*.—The Committee directs FEMA to review these programs and identify potential improvements, and to report to the Committee within 270 days of the date of enactment of this act on recommendations to improve access and distribution of AFG and SAFER grants to rural fire departments.

*Law Enforcement Terrorism Prevention Activities [LETPA] Set-Aside for State Homeland Security Program and Urban Area Security Initiative*.—Prior to setting the LETPA set-aside for the State Homeland Security Program and Urban Area Security Initiative, FEMA is directed to brief the Committee on the threat environment. FEMA is also directed to include in this brief a discussion of any stakeholder engagement undertaken up to that date. The Committee believes that preventing and responding to terrorist activity and targeted violence requires a whole-of-community approach. As such, FEMA is strongly encouraged to engage with a range of stakeholders beyond only law enforcement entities to ensure all entities that play a role in preparing for and responding to a terrorist activity and targeted violence are given the opportunity to provide inputs and feedback.

*National Domestic Preparedness Consortium [NDPC]*.—The Committee provides $104,000,000 for NDPC and acknowledges its posi-

tive impact on domestic preparedness by training emergency responders and event personnel against a range of threats. The Committee directs FEMA to consider threats inherent to large spectator sports and special events within the NDPC purview and provides $3,000,000 for this effort. Additionally, the Committee directs the NDPC to continue to provide training for rural county emergency response to ensure rural county officials are prepared to respond to any emergency and provides $5,000,000 for this effort.

*Natural Infrastructure Activities*.—Within 180 days of the date of enactment of this act, FEMA shall provide the Committees a report on the number, total requested funding, and percentage of fiscal year 2023 and 2024 BRIC applications for natural infrastructure projects, and a comparison of these numbers to each of the fiscal years 2020 through 2022 grant cycles. The report shall be disaggregated by successful and unsuccessful applications and describe the types of natural infrastructure activities funded.

FEMA may utilize public/private partnerships, pursuant to 16 U.S.C. 3701 and 16 U.S.C. 3709, to enhance and leverage nature-based infrastructure within the BRIC and pre-disaster mitigation programs through one or more pilot projects. Such projects should provide additional expedited and streamlined opportunities for communities, including disadvantaged communities, to utilize funding for enhancing nature-based strategies that provide resilience and protection against natural threats, including but not limited to coastal and inland flooding, wildland fires, and drought.

*Next Generation Warning System*.—This recommendation includes $76,000,000 for the Next Generation Warning System as part of the Integrated Public Alert and Warning System. Of the funds provided $20,000,000 shall be for Tribal governments. The Department is reminded that these funds are supporting the continuity, redundancy, and modernization of public radio broadcast stations serving rural, remote, Tribal, and underserved communities. FEMA shall use these funds for technical assistance, infrastructure replacement, infrastructure hardening, cybersecurity, technology infrastructure, improving access to alerts, and operational continuity support. FEMA is directed to work with non-governmental entities that have proven expertise and focus on resilient infrastructure, a technical assistance center or hub, and an existing memorandum of agreement with FEMA.

*Nonprofit Security Grant Program [NSGP]*.—The Committee directs FEMA to provide, within 180 days of the date of enactment of this act, a report on fiscal year 2023, 2024, and 2025 (if available) NSGP funding awards, the number of grant applicants in those years, and any quantitative or qualitative results or other outcomes related to such awards. FEMA is also encouraged to utilize NSGP grants to help nonprofits detect and respond to threats. The Committee further notes that eligible uses of NSGP grant funding include the acquisition of technology providing immediate notification to emergency 911 services; real-time, actionable intelligence directly to law enforcement and first responders; and other DHS-certified technology designed to prevent and respond to terrorism and other threats.

*Operation Stonegarden*.—The Committee believes that the State Homeland Security Grant Program [SHSGP] provides funding for

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 651 of 714 PageID #:1701



a range of crucial activities and equipment for States. The Committee is also well aware of how vital SHSGP's Operation Stonegarden grant funds are for States in partnering with U.S. Border Patrol to secure U.S. borders. The Committee is aware that apprehensions and activity is increasing along the U.S.-Canada border, which is the world's largest land border. Many areas of this border are remote and properly securing the border is a national security priority. Within 180 days of the date of enactment of this act, the Committee directs the Secretary to submit data from the last three fiscal years detailing Operation Stonegarden awards by State and recipient, and the process used to determine such awards and recipients. Moreover, for fiscal year 2026, the Secretary is directed to brief the Committee and provide the data and justifications for Operation Stonegarden awards 15 days before such awards are publicly announced.

*Reducing Carcinogen Exposure Among Firefighters*.—The Committee is concerned about the prevalence of cancer among firefighters and urges FEMA to collaborate with fire departments to find cost-effective procedures to reduce chemical exposure.

*Reporting on Lithium-ion Battery Related Fires*.—The Committee commends the U.S. Fire Administration [USFA] for modernizing the U.S. Fire Data System and empowering the fire and emergency services community by equipping them with an empirical basis for decision-making to improve fire reporting and data collection through the National Emergency Response Information System [NERIS]. The Committee, however, is concerned with the lack of available data at the National level relating to lithium-ion battery fires. The Committee provides an additional $5,000,000 in support of USFA's user training on NERIS, including training on reporting lithium-ion battery-related fires. With the launch and availability of NERIS, the Committee directs the U.S. Fire Administration to form a cadre of Fire Data Leaders nationwide to provide technical expertise and assistance to local fire departments in need, and provides an additional $500,000 to support the development of a National Fire Data Corps that will support fire and emergency services in their adoption and use of NERIS.

*State Rural Water Associations*.—The Committee recognizes that State rural water associations continue to be the primary first responders to natural disasters for rural and small communities with emergency water needs. Each time there is a natural disaster, State rural water associations are called on for immediate response. No other government agency or organization serves this purpose or has the expertise to provide the necessary technical assistance and equipment.

*Temporary Housing and Non-Congregate Sheltering*.—The Committee directs the Government Accountability Office [GAO] to conduct an assessment of current temporary housing and non-congregate sheltering options, including non-congregate structures, that are available on the market and whether FEMA has utilized the most cost-effective, viable solutions following major disaster declarations in fiscal years 2022–2025, including the Maui wildfires and Hurricane Ian. GAO shall brief the Committee within 120 days of the date of enactment of this act on the costs, benefits, disadvan-

tages, feasibility, and utility of the creation of a national stockpile of rapid response, cost-effective temporary shelter solutions.

*United States Fire Administration [USFA]*.—The recommendation includes funding for USFA to fulfill its mission of providing training and professional development to the fire community. FEMA is directed to continue its traditional funding for the congressionally-mandated National Fallen Firefighters Memorial. The Committee further directs USFA to provide a briefing within 180 days of the date of enactment of this act regarding any plans to revise Emergency Support Function [ESF]–4, Firefighting, to clarify or change USFA's role in responding to structural fires and wildland fires that burn into the Wildland Urban Interface.

*Urban Area Security Initiative [UASI]*.—The Committee directs FEMA to, within 90 days of the date of enactment of this act, provide the current risk and threat assessment methodology used for UASI, identify any geographic-related factors used to assess the risk of urban areas applying for funding, and identify how such geographic-related factors are used in developing urban areas' risk and threat assessments. The Committee directs FEMA to provide, within 180 days of the date of enactment of this act, a report on fiscal year 2022, 2023, and 2024 UASI funding awards, the number of grant applicants in those years, and any quantitative or qualitative results or other outcomes related to such awards. The report shall include information about potential violations of Title VI of the Civil Rights Act of 1964, (Public Law 88–352) arising from the use of acoustic gunshot detection systems. The Committee also directs FEMA to examine the enhanced use of the Federal Bureau of Investigation's Threat Review and Prioritization program in the development of Metropolitan Statistical Area Risk Profiles.

*Grant Eligibility*.—The Committee recommends that FEMA list regional councils and councils of governments as eligible entities in competitions for Federal funding whenever local governments or non-profit agencies are eligible entities, where such listing is permitted under current statute. Furthermore, it is the desire of this Committee that FEMA actively seek opportunities for regional councils and councils of governments to serve as lead applicants and grantees in order to encourage and expand greater regional collaboration. In the competitive grants process, FEMA should continue to work with all eligible entities including those having previous experience with administering Federal funding that resulted in successful, comprehensive, well-coordinated outcomes.

DISASTER RELIEF FUND

| | |
|---|---|
| Appropriations (regular), 2025 | $22,510,000,000 |
| Committee recommendation | 26,367,000,000 |

COMMITTEE RECOMMENDATIONS

The Committee recommends $26,367,000,000 for the Disaster Relief Fund [DRF] for the Major Disaster Allocation category. No funding is provided for the Base Disaster Relief category.

*BRIC Termination Reporting*.—Within 180 days of the date of enactment of this act, FEMA shall brief the Committee on which BRIC grants were terminated by FEMA. At a minimum, the brief shall include a table for each cancelled BRIC grant detailing the

previous grant award amount, the percentage of the award disbursed prior to cancellation, the amount of the award that the grantee returned as a result of the BRIC award termination, a description of work completed under the BRIC award prior to cancellation, and a description of work unable to be completed due to BRIC award termination.

*Building Resilient Infrastructure and Communities [BRIC]*.—The Committee is disappointed in the Administration's decision to cancel the BRIC program, which invests funding to mitigate risks from disasters before they happen. Studies have shown that predisaster mitigation projects can directly save $6 in response and recovery costs for every $1 invested, and far more when economic savings are considered. In addition, predisaster mitigation under BRIC reduces the risk of the loss of life and property in our communities. Within 60 days of the date of enactment of this act, the Department shall brief the Committee on its rationale for ending the BRIC program, including justifying forgoing long-term savings associated with investing in predisaster mitigation. The briefing shall include comprehensive empirical data related to any claims of waste, fraud, and abuse, to the extent that any exists.

*Debris Removal*.—The Committee recognizes that the Robert T. Stafford Disaster Relief and Emergency Assistance Act incorporates provisions aimed at ensuring debris removal for all taxpayers in the aftermath of an emergency under section 5173 of title 42, United States Code. However, the Committee is aware that in practice, certain types of communities may not receive FEMA-sponsored post-disaster cleanup assistance despite express Congressional authorization to do so. As a matter of either practice or policy, disaster cleanup procedures should not result in the exclusion of, or discrimination against specific populations based on communal association. Prohibitions of this nature are unacceptable, and the Committee expects distribution of critical aid to impacted communities to ensure complete coverage for all taxpayers, including those accessed via community associations' roads. Within 90 days of the date of enactment of this act, FEMA is directed to submit to the Committee a report clarifying debris removal and public safety policies across all types of communities, including those characterized by manufactured homes and communities with established formal community associations. Within 180 days of the date of enactment of this act, FEMA shall brief the Committee on the number and type of discrimination incidents related to debris removal reported to FEMA's Office of Equal Rights since October 1, 2022, as well as a summary of related public comments received during the drafting of Public Assistance Program and Policy Guide [PAPPG] version 5.

*Declaration of a Disaster*.—The Federal Emergency Management Agency shall brief the Committee on current or updated written evaluation factors, thresholds, and any other written or unwritten criteria used to determine eligibility requirements, when making recommendations to the President related to emergency (42 U.S.C. 5122(1)) or major disaster (42 U.S.C. 5122(2)) declarations under the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.)—with respect to current factors, thresholds, and criteria, within 30 calendar days of the date of en-

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 654 of 714 PageID #:1704



actment of this Act; and with respect to updated factors, thresholds, and criteria, not later than the day on which such update takes effect. The brief should include how each emergency or major disaster declaration request received by the Executive Branch in the previous fiscal quarter measures against the specific factors, thresholds, and criteria identified and the specific reason or reasons for any delays in findings of eligibility or non-eligibility of more than 20 calendar days from the receipt of each outstanding emergency declaration request, or 30 calendar days from the receipt of each outstanding major disaster declaration request.

*Disaster Relief Fund [DRF] Monthly Report*.—The Committee is concerned that projections in each report are only provided through the end of the fiscal year. Therefore, in addition to the information provided in the monthly report, the Committee directs FEMA to provide a projection of obligations from the DRF for the twelve-month period following the date of submission of the current month's report to the Committee. Further, the Department is reminded of its statutory obligation to provide the report by the fifth business day of the succeeding month.

*Distribution of Surplus Goods During Emergencies*.—The Committee is concerned with the lack of essentials such as food, hygiene products, clothing, and household items needed in times of disasters and other national emergencies. The Committee urges FEMA to survey programs and conduct research initiatives to assess the scope and scale of product insecurity and the potential to incentivize initiatives that address the massive need for goods by repurposing returned or surplus consumer goods. This effort may also address how the Federal Government can expand relationships with organizations that provide specific resources that serve the public interest and have the capacity to ensure that surplus goods are distributed and used at the right time when they are most needed.

*Hazard Mitigation Grant Program [HMGP]*.—FEMA is encouraged to simplify requirements for Local Hazard Mitigation Plans [LHMP] for communities with populations below 2,000 residents, including by providing these communities with easy-to-access resources and technical assistance. Additionally, FEMA is encouraged to consider other ways to make LHMP completion easier for small communities, such as by offering approved template language that can be adapted to meet the needs of a small community's LHMP. FEMA is further encouraged to enact internal deadlines for the disbursement of HMGP funds for approved projects. Finally, when the risk of repetitive losses due to extreme weather are identified, HMGP should provide States with flexible funding prior to a disaster for property acquisition and/or elevation.

*Housing Assistance Delivery*.—The Committee is concerned that FEMA's provision of Housing Assistance may have unintended consequences for parts of the country that have shortages of housing units. Typically FEMA relies on financial housing assistance to disaster-displaced households and increases the assistance relative to the area's fair market rent where housing shortages make it difficult to find a unit. Providing direct housing instead could address an area's housing shortage while housing survivors. The Committee requires the Government Accountability Office [GAO] to

produce a report and briefing within 270 days of the date of enactment of this act, that analyzes the economic impacts of FEMA's financial housing assistance on communities that have housing shortages and encourages FEMA to prioritize the use of direct housing solutions in eligible disasters with a shortage of available housing.

*Immediate Needs Funding*.—FEMA shall brief the Committee monthly on its use of Immediate Needs Funding [INF]. At a minimum, this brief shall include current policies and procedures for when FEMA would deploy INF, specifically at what level(s) of DRF balances and under what categories of work FEMA would plan to discontinue reimbursements of otherwise eligible costs. Additionally, the brief shall include an analysis of the benefits and costs of utilizing a strategic approach to the deployment of INF vice an across-the-board cessation of reimbursements.

*Improving Access to BRIC*.—Within 90 days of the date of enactment of this act, FEMA shall brief the Committee on the abilities of States and local jurisdiction to qualify for access to BRIC. The brief shall include, but not be limited to, an analysis of the applicants' abilities to meet the program's building code requirements, their options outside of this program to assist communities with needed predisaster mitigation, and other challenges in addressing predisaster mitigation. It shall also include a discussion of the feasibility of modifying the existing technical scoring criteria in the Notice of Funding Opportunity to provide local jurisdictions with full application points for the building codes implemented by municipalities within the boundary of a county, as well as for other mechanisms to protect property such as advanced floodplain regulations and drainage criteria carried out by a county.

*Indirect Costs Reimbursement*.—The Committee urges FEMA to improve provider capacity of its Disaster Case Management [DCM] program by establishing "management cost" rates, for grantees and subgrantees of the program, as required by section 324 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5165b) and defined therein. Further, until such time as FEMA establishes management cost rates for the DCM program, FEMA shall provide an annual report to Congress on the effect of having not established management cost rates on DCM capacity, in particular with respect to nonprofit DCM providers.

*Public and Individual Assistance*.—FEMA leadership and the DHS Office of Legislative Affairs have consistently stymied attempts by the Committee to receive timely, transparent, and accurate information related to spending from the Disaster Relief Fund. This is unacceptable and is counterintuitive to the goal of empowering States and communities to do more in the disaster response and recovery space. As such, the bill includes a new provision requiring FEMA to produce an interactive dashboard on its public-facing website showing the status of certain requests for reimbursement. The dashboard shall include the following information:

a) The damage category code;

b) For each proposed grant award, information on each cost estimate, applicant ID, the date of each submission, the descriptions for each project, and the cost of each project with a

breakdown of the Federal cost-share and non-Federal cost-share;

c) Status of the Agency review and approval of each cost estimate submitted, including the date on which a project is approved and the date on which the grant is issued;

d) An explanation for any cost estimate that is not approved, or if the grant is not provided in the timeline as required, and any corrective action taken by the Agency;

e) Project-level progress updates;

f) Information on requests for assistance made, including dates and amounts of each request, timelines for submissions of required information, and dates of approval and disbursement of awards; and

g) Any other information the Administrator determines to be appropriate to ensure transparency and accountability in the administration of public assistance.

*Preservation of Surveyors Marks*.—The Committee directs FEMA to provide a brief within 180 days of the date of enactment of this act on the potential benefits of including surveying mark preservation performed by land surveyors as a core activity for disaster planning, emergency response, disaster cleanup, and disaster recovery efforts.

*Reimbursement for Interest*.—Within 180 days of the date of enactment of this act, FEMA shall provide a report to the Committee detailing reimbursements for interest on qualifying disaster relief loans pursuant to the Public Assistance Program and Policy Guide Version 5. The report shall include details on the process through which entities can apply for interest reimbursement and information or examples about how interest reimbursement has been provided.

*Reimbursements*.—The Committee is concerned by the pace and scale of FEMA disaster reimbursement delays, especially to school districts, nonprofits, nongovernmental organizations, and hospitals. The Committee directs FEMA to complete a review of outstanding reimbursements expeditiously and to provide a report within 60 days of the date of enactment of this act outlining any previous or ongoing challenges to reviewing reimbursement claims within a timely manner.

*Snowstorms*.—The Committee reaffirms Congress' intent, pursuant to 42 U.S.C. 5122(2), that snowstorms shall be eligible for Federal relief under major disaster declarations and notes that a major disaster declaration shall not be withheld simply due to that disaster's classification as a snowstorm.

*Temporary Shelters and Emergency Housing*.—The Committee recognizes the vital support FEMA provides to communities and disaster survivors in the aftermath of major disasters, including housing assistance for individuals and families displaced from their homes. The Committee encourages FEMA to continue working with potential suppliers of temporary shelter solutions to clearly articulate the requirements for meeting FEMA's standards. FEMA is further directed to brief the Committee within 270 days of the date of enactment of this act on the current utilization restrictions and categorical eligibility regarding temporary transportable housing units [TTHU] and alternative temporary transportable housing

units [ATTHU], the reasons they're in place, and potential future adjustments. Finally, the Committee is concerned that housing shortages may impact recovery efforts, reduce community resiliency, and cause long-term displacement after a major disaster. FEMA is directed to submit a report to the Committee within 180 days of the date of enactment of this act detailing emergency housing operations for major disasters over the last 4 years, including the type of sheltering and housing assistance provided to survivors and responders, the costs associated with the shelter and housing assistance, the number of individuals and families housed, and the duration of housing assistance.

NATIONAL FLOOD INSURANCE FUND

| | |
|---|---|
| Appropriations, 2025 | $175,029,000 |
| Committee recommendation | 226,000,000 |

COMMITTEE RECOMMENDATIONS

The Committee recommends $226,000,000 for National Flood Insurance Fund [NFIF] activities related to flood plain management, flood mapping and mitigation, and flood insurance operations.

The Committee notes the importance of the long-term financial stability of the NFIF and recognizes FEMA's efforts to publish a quarterly "Watermark" report on the NFIF's finances. The Committee directs FEMA to conduct quarterly reporting on the NFIF in a public and transparent manner while complying with other reporting requirements in statute. Should FEMA fail to meet the quarterly reporting requirement, the Administrator is required to provide a documented reason for the delay and status update every 30 days to the Committee until the report is issued. If the Administrator fails to produce a quarterly report the Administrator or their designee is required to provide a briefing to Committee staff within 5 business days on the National Flood Insurance Programs debt repayment plan.

*Flood Mitigation Assistance Grant [FMAG] Program*.—When the risk of repetitive losses due to extreme weather are identified, the FMAG Program should provide States with flexible funding prior to a disaster for property acquisition and/or elevation.

*Habitat Restoration Permitting*.—The Committee recognizes the importance of habitat restoration and directs FEMA to streamline the permitting process for such projects. Within 60 days of the date of enactment of this act, FEMA shall brief the Committee on the steps taken to streamline such processes, and a timeline for future related actions.

*Swift Current Program*.—The Committee recognizes that FEMA is utilizing its investment from the Infrastructure Investment and Jobs Act (Public Law 117–58) through its Swift Current program. However, not all States were able to complete applications for all communities that sustained damage following a disaster, leaving some potentially eligible homeowners without mitigation assistance. The Committee directs FEMA to provide additional time for eligible States, territories, and tribes to apply for Swift Current funding through a process determined by the Administrator. Within 180 days of the date of enactment of this act, and not less than

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 658 of 714 PageID #:1708



15 days prior to implementation of such process, FEMA shall brief the Committee on its plans for implementing such process.

TITLE III—ADMINISTRATIVE PROVISIONS

Section 301. The Committee continues a provision allowing for procuring or providing access to cybersecurity threat feeds.

Section 302. The Committee continues a provision limiting expenses for the administration of grants.

Section 303. The Committee continues a provision specifying timeframes for grant applications and awards.

Section 304. The Committee continues a provision requiring five day advance notification for certain grant awards under "FEMA—Federal Assistance".

Section 305. The Committee continues a provision that addresses the availability of certain grant funds for the installation of communications towers.

Section 306. The Committee continues a provision requiring a report on the expenditures of the DRF.

Section 307. The Committee continues a provision regarding certain grants.

Section 308. The Committee continues a provision providing for the receipt and expenditure of fees collected for the Radiological Emergency Preparedness Program, as authorized by Public Law 105–276.

Section 309. The Committee continues a provision regarding certain grants.

Section 310. The Committee includes a provision regarding the transfer of unobligated balances under the National Predisaster Mitigation Fund.

Section 311. The Committee includes a provision regarding the transfer of unobligated balances under Flood Hazard Mapping and Risk Analysis Program.

Section 312. The Committee includes a provision on training opportunities.

Section 313. The Committee includes a provision on period of performance.

Section 314. The Committee includes a provision on BRIC.

Section 315. The Committee includes a provision on the use of funds.

Section 316. The Committee includes a provision on obligation backlogs.

# TITLE IV

## RESEARCH, DEVELOPMENT, TRAINING, AND SERVICES

### UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES

United States Citizenship and Immigration Services [USCIS] carries out activities necessary for the administration of laws and the provision of services related to people seeking to enter, reside, work, and naturalize in the United States. In addition to directly appropriated resources, fee collections are available for the operations of USCIS.

*Immigration Examinations Fees*.—USCIS collects fees from persons applying for immigration benefits to support the adjudication of applications, as authorized by the Immigration and Nationality Act (8 U.S.C. 1356).

*H–1B and L Fraud Prevention and Detection Fees*.—USCIS collects fees from petitioners seeking a beneficiary's initial grant of H–1B or L nonimmigrant classification or those petitioners seeking to change a beneficiary's employer within those classifications pursuant to Public Law 108–447.

*H–1B Nonimmigrant Petitioner Fees*.—USCIS collects fees from petitioners under the H–1B program pursuant to Public Law 108–447.

#### COMMITTEE RECOMMENDATIONS

The Committee recommends total appropriations of $122,941,000 for USCIS. The following table summarizes the Committee's recommendation.

UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES

[In thousands of dollars]

| | Fiscal year 2025 enacted | Committee recommendations |
|---|---|---|
| Operations and Support | 271,140 | 122,941,000 |
| Federal Assistance | 10,000 | .......................... |
| Total United States Citizenship and Immigration Services | 281,140 | 122,941,000 |

#### OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriations, 2025 | $271,140,000 |
| Committee recommendation | 122,941,000 |

The Operations and Support [O&S] appropriation provides for ongoing operations, mission support, and management and administration costs for the Employment Status Verification [E–Verify] program, which allows businesses to determine the eligibility of their employees to work in the United States in addition to pro-

viding funding for application processing and Refugee, Asylum and International Operations [RAIO]. The Committee includes an administrative provision providing an additional $35,200,000 for the purposes of continuous vetting operations in addition to the sums provided in the above table.

COMMITTEE RECOMMENDATIONS

*Affirmative Asylum Backlog*.—The Committee reminds USCIS of the reporting requirements in the explanatory statement accompanying Public Law 118–47 and further directs USCIS to submit a report to the Committee within 90 days of the date of enactment of this act regarding the status of the affirmative asylum backlog, including how the funds in fiscal year 2025 were used to reduce the backlog, the number of affirmative asylum cases still pending by year of application date, whether the cases have received an interview, the number of personnel dedicated to reducing the backlog, and any additional financial resources necessary to reduce the backlog.

*Asylum Officer Staffing*.—USCIS is directed to publish publicly the number of asylum officers, the offices each asylum officer is assigned to, the number of asylum officers dedicated to backlog cases, and the number of asylum officers deployed to the southwest border within 120 days of the date of enactment of this act.

*Backlog Funding*.—The recommendation provides $10,000,000 for Employment Authorization Document backlog reduction efforts. USCIS shall provide a spend plan for all backlog reduction efforts within 30 days of the date of enactment of this act. USCIS is encouraged to prioritize dedicating personnel towards these efforts. The Committee includes a new provision requiring that all EAD renewals go through a re-vetting process prior to being approved.

*Continuous Vetting and Evaluation*.—The Committee notes that increases in issued visas, paroles and asylum claims in prior administrations have not been paired with adequate investments in monitoring and investigation of foreign nationals on temporary release in the country to ensure compliance with requirements set forward by USCIS and to maintain the security of our homeland.

Accordingly, the Committee includes an administrative provision that provides an additional $35,200,000 for USCIS to create a unit devoted to continuing evaluation and monitoring of foreign nationals who hail from countries designated by Executive Order to be national security or public safety threats. The Committee notes that USCIS has recently begun recruitment and training of law enforcement officers, and believes that a complementary investigatory and monitoring program will greatly enhance the efficacy of their operations.

The Committee allows for the transfer of up to $5,000,000 to the National Vetting Center within the National Targeting Center of U.S. Customs and Border Protection, to be used, if necessary, as supplementary support for the USCIS program or as a bridge until USCIS can get their program up and operational.

While the Committee believes that USCIS is the most logical place for a continuous vetting unit to exist, it directs the Department to submit a proposal for the centralization of domestic vetting of foreign nationals within one component, and looks forward to

working with the Department on the development of such an office in future fiscal years and any necessary realignments of operations to best fit the mission.

*Electronic Processing*.—The Committee supports the completion and implementation of an electronic filing and processing system for immigration benefits at USCIS but remains frustrated by the lengthy process required to bring applications and petitions fully into e-processing. The Committee continues the fiscal year 2024 explanatory statement requirement for USCIS to provide a quarterly brief on its electronic processing efforts.

*Employment Authorization Backlog Reporting*.—The Committee continues to direct USCIS to make available on a publicly available website employment authorization backlog statistics on a quarterly basis with the following modifications: (1) the total number of pending filed employment authorization applications; (2) the total number of such applications that have been pending for: (a) 30 or fewer days, (b) 31–60 days, (c) 61–90 days, (d) 91–120 days, (e) 121–179 days, (f) 180–540 days; (g) 541 or more days; and (3) a summary, on an annual basis, of all existing processing time goals, the source of the time goal, and whether the agency met the time goal for the prior fiscal year.

*Employment Authorization Errors*.—The Committee notes that USCIS-issued employment authorization documents [EADs] may contain errors, and there are significant several-month-long delays in USCIS re-issuing corrected documents. The Committee directs USCIS to brief the Committee on the resources required to issue corrected employment authorization documents within 90 days of receipt. The Committee recognizes that refugees resettled through the U.S. Refugee Admissions Program [USRAP] are permitted to work with a Form I–94 for 90 days before they must produce additional valid documents. The Committee recommends that USCIS lengthen the I–94 work eligibility period to at least 180 days for refugee applicants in light of the processing delays that result in many refugees who do not receive employment authorization documents before the 90 days expire. The Committee notes that as a temporary solution, USCIS issued a notice of automatic extensions in validity to certain expiring EADs, which restored the ability of tens of thousands of aliens, whose EADs had expired through no fault of their own, to work. The Committee encourages USCIS to conduct an awareness campaign so that employers are better equipped to comply with Federal Government directives.

*Fee Collection Transparency*.—Within 30 days of the date of enactment of this act, and every 30 days thereafter, USCIS shall publicly report whether any fees collected by USCIS have been utilized for immigration enforcement purposes and the statutory authority for such utilization. Such report shall include the purpose and amount of such uses and shall indicate the original source of fees based on form type of such collected fee.

*Fee Waivers and Application and Petition Costs*.—The Committee continues the direction under this heading included in the explanatory statement accompanying Public Law 118–47.

*H–2B Visa Distribution*.—The Committee directs the Department, in consultation with the U.S. Department of Labor, to examine the impacts of the current H–2B visa semiannual distribution

on employers, employees, and agency operations and to provide the Committee with a briefing on the study not later than 180 days after the date of enactment of this act. The Committee further directs the Department, in coordination with the U.S. Department of Labor and other departments as necessary, to provide a report within 180 days of enactment of this act providing data on the economic impact of the H–2B visa program on a State-by-state and national level; the estimated number of H–2B visas that would have been required to meet demand in fiscal year 2025 on a State-by-state and national level; and any adverse economic impact that resulted from the inability to meet such demand.

*H–2B Visas*.—Given the growing reliance on H–2B visas, the Committee directs the Department of Homeland Security, in coordination with the U.S. Department of Labor [DOL], to provide a report within 120 days of enactment of this act providing data on the H–2B program and making recommendations to ensure that the integrity of the program is safeguarded and that the limited number of H–2B visas are reserved for law-abiding employers. The report shall include: the effects on prohibitions on implementation of DOL regulations relating to corresponding employment, the three-quarter guarantee, and prevailing wages and working conditions for individuals and U.S. workers; and the number of H–2B visas, including the number of supplemental visas, issued in each of the past 3 years to entities and individuals who in the past 5 years were found to have committed H–2A or H–2B violations, including the number of visas allocated to violators who at any point have committed egregious H–2A or H–2B violations such as visa fraud and wage theft, and indicating the dates of the violations and visa issuance.

*Naturalization at Basic Training*.—The Committee appreciates USCIS's efforts to establish the Naturalization at Basic Training program in partnership with branches of the Armed Services. However, the Committee is concerned that noncitizen servicemembers continue to encounter barriers to applying for and completing naturalization through service in the Armed Forces under sections 328 and 329 of the Immigration and Nationality Act (8 U.S.C. 1439–1440). Not later than 90 days after the date of enactment of this act, USCIS shall brief the Committee on plans to further expand Naturalization at Basic Training and ensure eligible military recruits and servicemembers have necessary assistance to complete the process, including attending interviews and appointments.

*Parole Requests for Servicemembers and Veterans*.—The Committee appreciates the Department's efforts to expedite processing and consideration, on a case-by-case basis, of immigrant's parole requests under section 212(d)(5) of the Immigration and Nationality Act from certain current and former military servicemembers and qualifying family members who are outside of the United States. However, the Committee is concerned that processing times remain lengthy and irregular. The Committee directs the Department to continue processing these parole requests on an expedited basis and at a minimum within 180 days of receipt. The Department is directed to make available, on a publicly accessible website, an interactive dashboard detailing the number of such parole requests made, processed, approved, denied and pending by month, along

with the average processing time. For each parole request denial, the Department is directed to report the country of nationality or last habitual residence of the immigrant, whether the individual was discharged or released from service under honorable conditions, whether the individual was deployed overseas, whether the individual served on active duty in the Armed Forces in an overseas contingency operation, their branch of service, whether the individual was awarded military decorations or medals, and whether the individual has a spouse, child or other immediate family member residing in the United States.

*Policy Changes*.—Within 30 days of the date of enactment of this act, and immediately upon any policy changes made thereafter, USCIS shall continue to make all policy memos publicly available.

*Refugee Admissions and Processing*.—The Committee directs the Department to submit to the Committee and make available to the public on its website within 90 days of the date of enactment of this act the following information for each of fiscal years 2020 through 2026: the number of USCIS staff assigned to the Refugee Corps at the Refugee Affairs Division of USCIS; the number of refugee processing circuit rides conducted; the number of USCIS Refugee Corps officers assigned to each circuit ride; the destination region and country for each circuit ride; the number of refugee interviews conducted by USCIS; and the number of approvals and denials issued by USCIS.

*Reducing Barriers to Access for USCIS Services*.—The Committee encourages USCIS to continue to expand its efforts to reduce barriers to USCIS services, including any geographic, financial and paperwork barriers. Such efforts shall include, but not be limited to, additional field or satellite offices, reductions in paperwork burdens, and an increase and expansion of circuit rides into additional areas.

*H–2A Visas*.—The Committee is concerned that the classification of dairy work as ineligible for seasonal H–2A visas by the definition under 8 CFR 214.2(h)(5)(iv) hampers dairy farm production. The Committee directs the Department, in consultation with the Department of Labor, to produce a report on the impacts of exempting dairy industry activities from the temporary or seasonal requirements of the H–2A program. The Department shall provide this report to the Committee within 120 days of the date of enactment of this act.

*Training Materials*.—Within 90 days of the date of enactment of this act, USCIS shall provide to the Committee all training materials and internal guidance provided to immigration officers and adjudicators related to vetting for anti-Americanism.

*USCIS Backlog and Frontlog Reporting*.—The Committee continues the directives under this heading in Senate Report 118–85.

*USCIS Quarterly Budget, Staffing and Productivity Reporting*.—USCIS shall continue to brief the Committee quarterly on budget operations, including revenue projections, actual spending, and other financial forecasts. At a minimum, the briefing shall detail the spending of each directorate and office (compared to projections), provide revenue and expenses delineated by form type, other agency expenses including payments or transfers to other Federal agencies, and carryover or reserve fund projections and spending.

USCIS shall ensure the agency maintains a sufficient carryover balance which is intended to provide stability amid fluctuating receipts. Additionally, USCIS shall develop productivity measures that convey the baseline capacity and capabilities for processing applications and petitions and capture the impact of investments in personnel, technology, or changes to processes and policies on such measures. Updates on USCIS performance against these measures shall be included with the quarterly budget reporting. USCIS shall also include in this quarterly brief to the Committee staffing data, based on the USCIS workload staffing model. At a minimum the staffing data should include actuals from the start of the fiscal year through the most recent pay period and projections through the end of the fiscal year.

## FEDERAL LAW ENFORCEMENT TRAINING CENTERS

The Federal Law Enforcement Training Centers [FLETC] serves as an interagency law enforcement training organization for 127 Federal agencies and certain SLTT and international law enforcement agencies on a space-available basis.

### COMMITTEE RECOMMENDATIONS

The Committee recommends $394,508,000 for FLETC.

The following table summarizes the Committee's recommendation as compared to the fiscal year 2025 enacted level:

FLETC

[In thousands of dollars]

| | Fiscal year 2025 enacted | Committee recommendations |
|---|---|---|
| Operations and Support | 357,100 | 376,125 |
| Procurement, Construction, and Improvements | 20,100 | 18,383 |
| Total, FLETC | 377,200 | 394,508 |

### OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriations, 2025 | $357,100,000 |
| Committee recommendation | 376,125,000 |

Funding is provided to meet basic law enforcement training requirements. The Committee expects FLETC to maintain training at or near facility capacity before entering into new leases or establishing new partnerships with training organizations. To that end, the Committee directs FLETC to provide a cost analysis detailing, at minimum, each training center's maximum instructional capacity by course and measured against its annual student occupancy.

### PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

| | |
|---|---|
| Appropriations, 2025 | $20,100,000 |
| Committee recommendation | 18,383,000 |

### COMMITTEE RECOMMENDATIONS

The Committee recommends $18,383,000 for Procurement, Construction, and Improvements [PC&I]

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 665 of 714 PageID #:1715



*Construction and Facility Improvements*.—The Committee supports the partnership between the Bureau of Indian Affairs and the U.S. Army National Guard to enhance advanced Tribal law enforcement training operations. The Committee is aware of the need for additional, well-trained Tribal law enforcement, particularly in northern Tribal areas. The Committee strongly encourages the Federal Law Enforcement Training Centers to engage in this partnership and identify what facilities, infrastructure, and resources are necessary in order to meet the growing demand for Tribal law enforcement training.

## SCIENCE AND TECHNOLOGY

The mission of Science and Technology [S&T] is to conduct, stimulate, and enable homeland security research, development, and testing and to facilitate the timely transition of capabilities to the Department's components and, as practicable, to other Federal and SLTT end users.

### COMMITTEE RECOMMENDATIONS

The Committee recommends $896,133,000 for S&T.

The following table summarizes the Committee's recommendation as compared to fiscal year 2025 enacted level:

SCIENCE AND TECHNOLOGY

[In thousands of dollars]

| | Fiscal year 2025 enacted | Committee recommendations |
|---|---|---|
| Operations and Support | 369,811 | 372,091 |
| Procurement, Construction and Improvements | 61,000 | 65,000 |
| Research and Development | 310,823 | 459,042 |
| Total, Science and Technology | 741,634 | 896,133 |

### OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriations, 2025 | $369,811,000 |
| Committee recommendation | 372,091,000 |

The Operations and Support [O&S] appropriation funds the management functions necessary to facilitate the research and development mission of S&T.

### COMMITTEE RECOMMENDATIONS

The Committee recommends $372,091,000 for O&S. Of the amount provided, the Committee recommends not to exceed $10,000 for official reception and representation expenses.

### LABORATORY FACILITIES

The recommendation includes $131,505,000 for Laboratory Facilities operations.

*National Biodefense Analysis and Countermeasures Center [NBACC] Facility Expansion*.—In 2023, S&T completed a scoping study for NBACC Facility Expansion. The requirement for facility expansion would accommodate additional BSL–2 laboratories, the

required mechanical support and storage space for the generation of data; a data center with state-of-the-art computational and network infrastructure that is capable of supporting analysis, storage, and transfer of large data sets; and additional Sensitive Compartmented Information Facility [SCIF] space required for the sensitive nature of the work performed. Additionally, there is a need to expand the facility for office/administrative space adjacent to the current NBACC laboratory facility. S&T shall provide a 5-year master facility expansion plan, including year-by-year resource requirements, no later than 90 days after the date of enactment of this act.

ACQUISITION AND OPERATIONS ANALYSIS

The Committee recommends $73,333,000 for Acquisition Operations and Analysis.

*Partnership Intermediary Agreements*.—The Committee supports the Department's efforts to establish Partnership Intermediaries, as defined under section 3715 of title 15, United States Code, to support its ability to seek out, assess, and engage non-traditional small business vendors for the Department's development and acquisition efforts. The Committee sustains base funding for Partnership Intermediary Agreements to enable components across the Department to engage immediately on technology transfer and transition activities.

*SAFETY Act*.—The recommendation includes $2,000,000 for the Support Anti-Terrorism by Fostering Effective Technologies [SAFETY] Act (Public Law 107–296) program, which encourages anti-terrorism preparedness and mitigation by providing liability protections for technologies or processes the program certifies or designates as meeting certain anti-terrorism standards. Within the amount provided, the Committee directs S&T to eliminate the backlog of renewal certifications of qualified anti-terrorism technologies [QATTs], which are designed to prevent, detect, identify, or deter terrorist attacks or limit the harm that such attacks may cause. The Committee further directs S&T to complete all future renewal certifications within 90 days of the date of application.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

| | |
|---|---|
| Appropriations, 2025 | $61,000,000 |
| Committee recommendation | 65,000,000 |

COMMITTEE RECOMMENDATIONS

The Committee recommends $65,000,000 for Procurement, Construction, and Improvements [PC&I]. The recommendation provides $10,000,000 for critical improvements to S&T's laboratory facilities.

*Plum Island Closure and Support [PICS] Program*.—The recommendation provides $55,000,000 to continue the transition, closure, and conveyance of all Plum Island real property and all related personal property to facilitate the transfer of the Plum Island Animal Disease Center [PIADC] mission to the National Bio and Agro-Defense Facility [NBAF]. It is acknowledged that the transition of PIADC science mission activities to NBAF is no longer on schedule and encourage DHS, in consultation with the General

Services Administration [GSA], and the Department of Agriculture [USDA] to work expeditiously to ensure permanent conservation of Plum Island for the protection in perpetuity of its natural and cultural resources under the management of any future entity. Not later than 90 days after the date of enactment of this act, DHS and USDA shall provide a joint briefing to the Committee. The briefing shall identify the root causes that delayed the transition from PIADC to NBAF, the remaining barriers to the transition, and the joint plan to overcome those barriers. The briefing shall include a revised timeline and detailed budget requirements to finalize the transition. Further, S&T is directed to continue providing semiannual briefings on the progress of these activities.

RESEARCH AND DEVELOPMENT

| | |
|---|---|
| Appropriations, 2025 | $310,823,000 |
| Committee recommendation | 459,042,000 |

S&T supports the mission of the Department through basic and applied research, fabrication of prototypes, research and development to mitigate the effects of weapons of mass destruction, and acquiring and field testing equipment.

COMMITTEE RECOMMENDATIONS

The Committee recommends $459,042,000 for Research and Development [R&D].

RESEARCH, DEVELOPMENT, AND INNOVATION

*Airport Screening Technology*.—Within the funds provided, S&T is encouraged to support research into updating security data and developing improved algorithms for airport screening technology, including enhanced explosive device detection.

*Bi-National Cooperative Program*.—Within the funds provided, the Committee directs S&T to continue its engagement in the Binational Research and Development program and work with partners to develop innovative technology solutions for homeland security needs.

*Composite Maritime Shipping Containers*.—Within the funds provided, S&T is encouraged to continue efforts to validate the performance of secure, composite maritime shipping containers and recommend standards for their use to ship sensitive cargo.

*Counter Improvised Explosive Device [IED] System*.—The Committee is concerned with the lack of capability to enable the detection and render safe of IEDs. Therefore, S&T is encouraged to test, evaluate, and develop concepts of operations for technology that can detect and render safe IEDs. S&T should consider partnership with other government agencies, to include the Department of Defense in evaluating potential technology.

*Detection Canine*.—The Committee funds the request for the Detection Canine Program. As the variety and number of national, State and local threats have increased in recent years, detection canines have proven to be an increasingly important counterterrorism tool to safeguard national security and public safety and are force multipliers across various law enforcement units. With support from S&T, the Detection Canine, Science, Innovation, Tech-

nology, and Education [DCSITE] Program is structured to be transdisciplinary and comprehensive of all threats, providing a sustained, large-scale, comprehensive government and academic effort to advance innovation, technology and education in detection canine sciences. Further, the Committee acknowledges the critical importance of maintaining a U.S. based source for highly capable detection canines.

*Enabling Unmanned Aerial Systems*.—The Committee acknowledges the critical value in the establishment of the common test site for demonstration and research of UAS and is pleased that the site is also available to other Federal, State, and local partners. The Committee encourages S&T to prioritize the Demonstration Site for the JUSTICE project to conduct on-site testing and evaluation for the Department and encourages the close collaboration with the FAA UAS Center of Excellence.

*Next-Generation Biosurveillance Systems*.—Within funds provided, the Committee encourages S&T to continue to advance research into agnostic bio-detection capabilities that provide rapid screening of large volumes of individuals. In particular, the Committee is very concerned about the lack of any means to conduct high volume screening at our borders or transportation hubs and believes that the matrix assisted laser desorption ionization-time of flight mass spectrometry [MALDI–TOF MS] being developed by S&T would fill this gap. Within 90 days, DHS S&T is directed to provide a funding plan by fiscal year and transition plans describing how MALDI–TOF MS will be employed.

*Opioid and Fentanyl Detection*.—The Committee supports continued S&T collaboration with ICE Homeland Security Investigations [HSI] with the development of opioid-related investigative, training, analytical and other capabilities and to partner with the Center of Excellence for Criminal Investigations and Network Analysis. Additionally, the Committee encourages S&T to increase the development of rapid scanning technology, including portable devices and potential artificial intelligence [AI] and machine learning [ML] applications, and directs S&T to provide a briefing within 90 days of the date of enactment of this act on any research or development to incorporate rapid scanning into screening methods for drug interdiction. Further, the Committee encourages S&T to pursue the development and testing, in consultation with U.S. Customs and Border Protection, of three-dimensional graphene-based sensors that can detect the presence of illicit fentanyl and other harmful substances at the international borders of the United States.

*Partnership Intermediary Agreement [PIA]*.—The Committee acknowledges that innovation can be found throughout our Nation. Therefore, the Committee urges S&T to pursue a Partnership Intermediary, as defined in Title 15 U.S.C. 3715, to support the Department's ability to seek out, assess, and engage non-traditional small business vendors into the Department's development and acquisition efforts.

*Port and Maritime Resiliency & Security Testbed*.—The Committee continues to recognize the vast data threat facing the U.S. Maritime/Port sector and the direct threats this poses against critical infrastructure components for mission critical functions. The Committee encourages S&T to continue ongoing Port and Maritime

Resiliency and Security Testbed research program to support the design and development of tactics, techniques, and procedures for effective threat response to critical maritime infrastructure.

*Technology Scouting*.—The Committee encourages S&T to continue its technology scouting program to allow it to leverage existing and emerging technologies and avoid the duplication of research efforts.

*U.S.-Israel Cybersecurity Cooperation Enhancement Program*.—S&T is encouraged to continue supporting the U.S.-Israel Cybersecurity Cooperation enhancement program, as authorized by section 1551 of the National Defense Authorization Act for Fiscal Year 2022 (Public Law 117–81), to support cybersecurity research and development and demonstration and commercialization of cybersecurity technology.

UNIVERSITY PROGRAMS

The recommendation includes $55,880,000 for S&T's University Programs. DHS shall continue to leverage partnerships with top research and educational institutions.

*Centers of Excellence [COE] Program*.—The Committee recognizes the importance of the Centers of Excellence program to generate basic and applied research that delivers innovative technologies to the Homeland Security Enterprise. Therefore, the Committee does not support the Department's termination of COEs as announced in April 2025 and is disappointed by the lack of transparency surrounding the decision. S&T shall maintain the existing COEs and take all necessary steps to restore partnerships with any COEs that were terminated during fiscal year 2025 but had future contract options for fiscal year 2026 and beyond. The Committee further directs S&T to brief the Committees on Appropriations within 60 days of enactment of this act on its plan for restoring partnerships with all affected institutions.

*Critical Infrastructure and Cyber Attacks*.—The Committee recognizes the increased threat of cyber-attacks on U.S. critical infrastructure and the need to develop and deploy timely software quality assurance tools for monitoring and timely cyber-attack mitigation. The Committee supports university research in partnership with a National Laboratory critical infrastructure testbed to develop and demonstrate timely hierarchical software quality assurance and timely cyber-attack mitigation techniques for hardware in one or more of the following Department-designated critical infrastructure sectors: Chemical, Information Technology, Critical Manufacturing, Water, and Communications.

*Understanding Threats to Public Officials*.—The Committee encourages S&T and the National Counter-terrorism Innovation, Technology, and Education Center of Excellence [NCITE COE] to pursue research into threats to public officials, create a threats tracker, and develop threats assessment credentials and training for at-risk sectors.

TITLE IV—ADMINISTRATIVE PROVISIONS

Section 401. The Committee continues a provision allowing USCIS to acquire, operate, equip, and dispose of up to five vehicles under certain scenarios.

Section 402. The Committee continues a provision limiting the use of A–76 competitions by USCIS.

Section 403. The Committee includes a provision to permit USCIS to oversee the collection of biometrics virtually.

Section 404. The Committee includes a new provision providing funding for continuous vetting by USCIS.

Section 405. The Committee continues a provision authorizing FLETC to distribute funds for incurred training expenses.

Section 406. The Committee continues a provision directing the FLETC Accreditation Board to lead the Federal law enforcement training accreditation process to measure and assess Federal law enforcement training programs, facilities, and instructors.

Section 407. The Committee continues a provision allowing for FLETC's acceptance of transfers from government agencies into this appropriation.

Section 408. The Committee continues a provision classifying FLETC instructor staff as inherently governmental for certain considerations.

# TITLE V

## GENERAL PROVISIONS

(INCLUDING RESCISSIONS AND TRANSFERS OF FUNDS)

Section 501. The bill includes a provision stipulating that no part of any appropriation shall remain available for obligation beyond the current fiscal year unless expressly provided.

Section 502. The bill includes a provision stipulating that unexpended balances of prior appropriations may be merged with new appropriations accounts and used for the same purpose, subject to reprogramming guidelines.

Section 503. The bill includes a modified provision that provides authority to reprogram appropriations within an account and to transfer up to 2.5 percent between accounts with advance notification to the Committee. A detailed funding table identifying each congressional control level for reprogramming purposes is included at the end of this statement. These reprogramming guidelines shall be complied with by all departmental components funded by this act.

The Committee expects the Department to submit reprogramming requests on a timely basis and to provide complete explanations of the reallocations proposed, including detailed justifications of the increases and offsets, and any specific impact the proposed changes will have on the budget request for the following fiscal year and future-year appropriations requirements. Each request submitted to the Committee should include a detailed table showing the proposed revisions at the account, program, project, and activity level to the funding and staffing FTE levels for the current fiscal year and to the levels required for the following fiscal year.

The Committee expects the Department to manage its programs and activities within the levels appropriated. The Committee reminds the Department that reprogramming or transfer requests should be submitted only in the case of an unforeseeable emergency or a situation that could not have been predicted when formulating the budget request for the current fiscal year. When the Department submits a reprogramming or transfer request to the Committee and does not receive identical responses from the House and Senate, it is the responsibility of the Department to reconcile the House and Senate differences before proceeding, and if reconciliation is not possible, to consider the reprogramming or transfer request unapproved.

The Department shall not propose a reprogramming or transfer of funds after June 15 unless there are extraordinary circumstances that place human lives or property in imminent danger. To the extent that any reprogramming proposals are required, the Department is strongly encouraged to submit them well in advance of the June 15 deadline.

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 672 of 714 PageID #:1722



Section 504. The bill includes a provision relating to the Department's Working Capital Fund [WCF] that: extends the authority of the WCF; prohibits funds appropriated or otherwise made available to the Department from being used to make payments to the WCF, except for the activities and amounts allowed in the budget request; makes WCF funds available until expended; ensures departmental components are only charged for direct usage of each WCF service; makes funds provided to the WCF available only for purposes consistent with the contributing component; and requires the WCF to be paid in advance or reimbursed at rates that will return the full cost of each service. The WCF table included in the justification materials accompanying the budget request shall serve as the control level for quarterly execution reports submitted to the Committee not later than 30 days after the end of each quarter. These reports shall identify any activity added or removed from the fund.

Section 505. The bill includes a provision stipulating that not to exceed 50 percent of unobligated balances recorded not later than June 30 from appropriations made for salaries and expenses in fiscal year 2025 shall remain available through fiscal year 2026, subject to reprogramming.

Section 506. The bill includes a provision providing that funds for intelligence activities are specifically authorized during fiscal year 2026 until the enactment of an act authorizing intelligence activities for fiscal year 2026.

Section 507. The bill includes a modified provision specifying Committee notification thresholds related to awards for grants, contracts, other transaction agreements, certain task or delivery orders, letters of intent, and certain public announcements.

Section 508. The bill includes a provision stipulating that no agency shall purchase, construct, or lease additional facilities for Federal law enforcement training without the advance notification to the Committees on Appropriations of the Senate and the House of Representatives.

Section 509. The bill includes a provision stipulating that none of the funds provided by this act may be used for any construction, repair, alteration, or acquisition project for which a prospectus, if required under chapter 33 of title 40, United States Code, has not been approved. The bill excludes funds that may be required for development of a proposed prospectus.

Section 510. The bill includes a provision that consolidates and continues by reference prior-year statutory bill language into one provision. These provisions concern contracting officers' training and Federal building energy performance.

Section 511. The bill includes a provision stipulating that none of the funds provided by this act may be used in contravention of the Buy American Act (Public Law 72–428).

Section 512. The bill includes a provision prohibiting funds from being used to amend the oath of allegiance required under section 337 of the Immigration and Nationality Act (8 U.S.C. 1448).

Section 513. The bill includes a provision prohibiting funds from being used to carry out section 872 of the Homeland Security Act of 2002 (Public Law 107–296).

Section 514. The bill includes a provision prohibiting funds from being used to plan, test, pilot, or develop a national identification card.

Section 515. The bill includes a provision directing that any official required by this act to report or certify to the Committees on Appropriations of the Senate and the House of Representatives may not delegate such authority unless expressly authorized to do so in this act.

Section 516. The bill includes a provision prohibiting funds provided by this act to be used for first-class travel.

Section 517. The bill includes a provision prohibiting funds provided by this act to be used to employ workers in contravention of section 274A(h)(3) of the Immigration and Nationality Act.

Section 518. The bill includes a provision prohibiting funds appropriated or otherwise made available by this act to pay for award or incentive fees for contractors with below satisfactory performance or performance that fails to meet the basic requirements of the contract.

Section 519. The bill includes a provision regarding restrictions on electronic access to pornography.

Section 520. The bill includes a provision regarding the transfer of an operable firearm by a Federal law enforcement officer to an agent of a drug cartel.

Section 521. The bill includes language regarding the number of employees permitted to attend international conferences.

Section 522. The bill includes a provision prohibiting funds made available by this act to reimburse any Federal department or agency for its participation in an NSSE.

Section 523. The bill includes a provision on structural pay reform that affects more than 100 full-time positions or costs more than $5,000,000 in a single year.

Section 524. The bill includes a modified provision directing the Department to post on a public website reports required by the Committees on Appropriations of the Senate and the House of Representatives unless public posting compromises homeland or national security or contains proprietary information.

Section 525. The bill includes a provision allowing Operations and Support funding to be used for certain activities.

Section 526. The bill includes a provision related to schooling for certain overseas dependents.

Section 527. The bill includes a modified provision regarding congressional visits to detention facilities.

Section 528. The bill includes a provision prohibiting the use of funds to use restraints on pregnant detainees in the Department's custody except in certain circumstances.

Section 529. The bill includes a provision prohibiting the use of funds for the destruction of records related to the sexual abuse or assault of detainees in custody.

Section 530. The bill includes a provision regarding funding for a Principal Federal Official.

Section 531. The bill includes a provision regarding a report on defense funding.

Section 532. The bill continues a provision regarding protection for a former or retired Government official or employee.

Section 533. The bill includes a provision regarding oversight of the Department of Homeland Security's use of the Technology Modernization Fund.

Section 534. The bill includes a provision related to user fee proposals that have not been enacted into law prior to submission of the budget request.

Section 535. The bill includes a provision related to the Arms Trade Treaty.

Section 536. The bill includes a provision that prohibits a procurement contract, grant, loan, cooperative agreement with certain foreign military company.

Section 537. The bill continues a provision regarding detainees held in Guantanamo Bay, Cuba.

Section 538. The bill includes a provision directing the Secretary of Homeland Security to develop, use, and share estimates of arrivals of migrants on the southwest border.

Section 539. The bill includes a new provision directing the Secretary of Homeland Security to develop, use, and share estimates of detained and removed individuals.

Section 540. The bill includes a modified provision requiring the Secretary of Homeland Security ensure an alternatives analysis and cost-benefit analysis is conducted before requesting assistance from the Department of Defense for border security operations and immigration enforcement.

Section 541. The bill includes a provision regarding employee emergency back-up care.

Section 542. The bill includes a provision regarding funding for the Blue Campaign.

Section 543. The Committee includes a provision relating to the E–Verify program.

Section 544. The Committee includes a provision relating to the Religious Workers program.

Section 545. The Committee includes a provision relating to H–2B visas.

Section 546. The Committee includes a provision relating to the Conrad 30 program.

Section 547. The bill extends other transaction authority.

Section 548. The bill includes a provision regarding medical professionals.

Section 549. The bill includes a new provision regarding classified materials.

Section 550. The bill includes a new provision regarding the transfer of funds.

Section 551. The bill includes a new provision related to the disbursement of funds.

Section 552. The bill repurposes funding previously provided.

Section 553. The bill includes a provision relating to Public Law 119–21.

Section 554. The bill rescinds previously appropriated funding.

## PROGRAM, PROJECT, AND ACTIVITY

In fiscal year 2021, for purposes of the Balanced Budget and Emergency Deficit Control Act of 1985 (Public Law 99–177), as amended, the following information provides the definition of the

term "program, project, and activity" for the components of the Department of Homeland Security under the jurisdiction of the Homeland Security Subcommittee of the Committee on Appropriations. The term "program, project, and activity" shall include the most specific level of budget items identified in the Department of Homeland Security Appropriations Act, 2024, the House and Senate Committee reports, and the conference report and the accompanying Joint Explanatory Statement of the managers of the committee of conference.

If a percentage reduction is necessary, in implementing that reduction, components of the Department of Homeland Security shall apply any percentage reduction required for fiscal year 2023 to all items specified in the justifications submitted to the Committees on Appropriations of the Senate and the House of Representatives in support of the fiscal year 2021 budget estimates, as amended, for such components, as modified by congressional action.

## COMPLIANCE WITH PARAGRAPH 7, RULE XVI OF THE STANDING RULES OF THE SENATE

Paragraph 7 of rule XVI requires that Committee reports accompanying general appropriations bills identify each recommended amendment which proposes an item of appropriation which is not made to carry out the provisions of an existing law, a treaty stipulation, or an act or resolution previously passed by the Senate during that session.

The Committee recommends funding for the following programs or activities which currently lack authorization for fiscal year 2025:

—Analysis and Operations: Operations and Support.
—U.S. Customs and Border Protection: Operations and Support; and Procurement, Construction, and Improvements.
—U.S. Immigration and Customs Enforcement: Operations and Support; and Procurement, Construction, and Improvements.
—Transportation Security Administration: Operations and Support; Procurement Construction and Improvements; and Research and Development.
—Coast Guard: Operations and Support; Procurement Construction and Improvements; and Research and Development; and Retired Pay.
—Cybersecurity and Infrastructure Security Agency: Operations and Support; Procurement Construction and Improvements; and Research and Development.
—Federal Emergency Management Agency: Operations and Support; Procurement, Construction and Improvements; and Federal Assistance Programs.

## COMPLIANCE WITH PARAGRAPH 12, RULE XXVI, OF THE STANDING RULES OF THE SENATE

Paragraph 12 of rule XXVI requires that Committee reports on a bill or joint resolution repealing or amending any statute or part of any statute include "(a) the text of the statute or part thereof which is proposed to be repealed; and (b) a comparative print of that part of the bill or joint resolution making the amendment and of the statute or part thereof proposed to be amended, showing by stricken-through type and italics, parallel columns, or other appropriate typographical devices the omissions and insertions which would be made by the bill or joint resolution if enacted in the form recommended by the Committee."

In compliance with this rule, changes in existing law proposed to be made by the bill are shown as follows: existing law to be omitted is enclosed in black brackets; new matter is printed in italic; and existing law in which no change is proposed is shown in roman.

## TITLE 8—ALIENS AND NATIONALITY

### CHAPTER 12—IMMIGRATION AND NATIONALITY

SUBCHAPTER I—GENERAL PROVISIONS

### § 1101. Definitions

(a) As used in this chapter—

* * * * * * *

(27) The term "special immigrant" means—

(A) an immigrant, lawfully admitted for permanent residence, who is returning from a temporary visit abroad;

* * * * * * *

(C) an immigrant, and the immigrant's spouse and children if accompanying or following to join the immigrant, who—

(i) for at least 2 years immediately preceding the time of application for admission, has been a member of a religious denomination having a bona fide nonprofit, religious organization in the United States;

(ii) seeks to enter the United States—

(I) solely for the purpose of carrying on the vocation of a minister of that religious denomination,

(II) before ⟦September 30, 2015⟧ *September 30, 2026*, in order to work for the organization at the request of the organization in a professional capacity in a religious vocation or occupation, or

(III) before ⟦September 30, 2015⟧ *September 30, 2026*, in order to work for the organization (or for a bona fide organization which is affiliated with the religious denomination and is exempt from taxation as an organization described in section 501(c)(3) of title 26) at the request of the organization in a religious vocation or occupation; and

* * * * * * *

SUBCHAPTER II—IMMIGRATION

PART II—ADMISSION QUALIFICATIONS FOR ALIENS; TRAVEL CONTROL OF CITIZENS AND ALIENS

### § 1182. Inadmissible aliens

* * * * * * *

Pub. L. 103–416, title II, § 220(c), Oct. 25, 1994, 108 Stat. 4320, as amended by Pub. L. 104–208, div. C, title VI, § 622(a), Sept. 30, 1996, 110 Stat. 3009–695; Pub. L. 107–273, div. C, title I, § 11018(b), Nov. 2, 2002, 116 Stat. 1825 ; Pub. L. 108–441, § 1(a)(1), Dec. 3, 2004, 118 Stat. 2630; Pub. L. 109–477, § 2, Jan. 12, 2007, 120 Stat. 3572; Pub. L. 110–362, § 1, Oct. 8, 2008, 122 Stat. 4013; Pub. L. 111–9, § 2, Mar. 20, 2009, 123 Stat. 989; Pub. L. 111–83, title V, § 568(b), Oct. 28, 2009, 123 Stat. 2186; Pub. L. 112–176, § 4, Sept. 28, 2012, 126 Stat. 1325, provided that: "The amendments made by this section [amending this section and section 1184 of this title] shall apply to aliens admitted to the United States under

section 101(a)(15)(J) of the Immigration and Nationality Act [8 U.S.C. 1101(a)(15)(J)], or acquiring such status after admission to the United States, before, on, or after the date of enactment of this Act [Oct. 25, 1994] and before ⟦September 30, 2015⟧ *September 30, 2026*."

* * * * * * *

PART VIII—GENERAL PENALTY PROVISIONS

**§ 1324a. Unlawful employment of aliens**

* * * * * * *

**SEC. 401. ESTABLISHMENT OF PROGRAMS.**

(a) IN GENERAL.—The Secretary of Homeland Security shall conduct 3 pilot programs of employment eligibility confirmation under this subtitle.

(b) IMPLEMENTATION DEADLINE; TERMINATION.—The Secretary of Homeland Security shall implement the pilot programs in a manner that permits persons and other entities to have elections under section 402 of this division made and in effect no later than 1 year after the date of the enactment of this Act [Sept. 30, 1996]. Unless the Congress otherwise provides, the Secretary of Homeland Security shall terminate a pilot program on ⟦September 30, 2015⟧ *September 30, 2026*.

---

## TITLE 42—THE PUBLIC HEALTH AND WELFARE

### CHAPTER 68—DISASTER RELIEF

SUBCHAPTER II—DISASTER PREPAREDNESS AND MITIGATION ASSISTANCE

**§ 5133. Predisaster hazard mitigation**

**(a) Definition of small impoverished community**

* * * * * * *

**(b) Establishment of program**

The President ⟦may⟧ *shall* establish a program to provide technical and financial assistance to States and local governments to assist in the implementation of predisaster hazard mitigation measures that are cost-effective and are designed to reduce injuries, loss of life, and damage and destruction of property, including damage to critical services and facilities under the jurisdiction of the States or local governments.

**(c) Approval by President**

If the President determines that a State or local government has identified natural disaster hazards in areas under its jurisdiction and has demonstrated the ability to form effective public-private natural disaster hazard mitigation partnerships, the President, using amounts in the National Public Infrastructure Predisaster Mitigation Fund established under subsection (i) (referred to in this section as the "Fund"), ⟦may⟧ *shall* provide tech-

nical and financial assistance to the State or local government to be used in accordance with subsection (e).

* * * * * * *

**(i) National public infrastructure predisaster mitigation assistance**

**(1) In general**

The President [may] *shall* set aside from the Disaster Relief Fund, with respect to each major disaster, an amount [equal to] *that is not less than 3 percent and not more than* 6 percent of the estimated aggregate amount of the grants to be made pursuant to sections 5170b, 5172, 5173, 5174, 5177, 5183, and 5189f of this title for the major disaster in order to provide technical and financial assistance under this section and such set aside shall be deemed to be related to activities carried out pursuant to major disasters under this chapter.

---

## DEPARTMENT OF HOMELAND SECURITY APPROPRIATIONS ACT, 2015, PUBLIC LAW 114–4

FEDERAL EMERGENCY MANAGEMENT AGENCY

* * * * * * *

DISASTER RELIEF FUND

(INCLUDING TRANSFER OF FUNDS)

For necessary expenses in carrying out the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.), $7,033,464,494, to remain available until expended, of which $24,000,000 shall be transferred to the Department of Homeland Security Office of Inspector General for audits and investigations related to disasters: *Provided*, That the Administrator of the Federal Emergency Management Agency shall submit to the Committees on Appropriations of the Senate and the House of Representatives the following reports, including a specific description of the methodology and the source data used in developing such reports:

(1) an estimate of the following amounts shall be submitted for the budget year at the time that the President's budget proposal for [fiscal year 2016] *fiscal year 2027* is submitted pursuant to section 1105(a) of title 31, United States Code:

* * * * * * *

(2) an estimate or actual amounts, if available, of the following for the current fiscal year shall be submitted not later than the fifth business day of each month, and shall be published by the Administrator on the Agency's Web site not later than the fifth *business* day of each month:

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 680 of 714 PageID #:1730



**CONSOLIDATED APPROPRIATIONS ACT, 2018, PUBLIC LAW 115–141**

**DIVISION F—DEPARTMENT OF HOMELAND SECURITY APPROPRIATIONS ACT, 2018**

TITLE II

SECURITY, ENFORCEMENT, AND INVESTIGATIONS

* * * * * * *

ADMINISTRATIVE PROVISIONS

SEC. 201. (a) For ⟦fiscal year 2018⟧ *fiscal year 2026*, the overtime limitation prescribed in section 5(c)(1) of the Act of February 13, 1911 (19 U.S.C. 267(c)(1)) shall be $45,000; and notwithstanding any other provision of law, none of the funds appropriated by this Act shall be available to compensate any employee of U.S. Customs and Border Protection for overtime, from whatever source, in an amount that exceeds such limitation, except in individual cases determined by the Secretary of Homeland Security, or the designee of the Secretary, to be necessary for national security purposes, to prevent excessive costs, or in cases of immigration emergencies.

---

DISCLOSURE OF CONGRESSIONALLY DIRECTED SPENDING ITEMS

The Constitution vests in the Congress the power of the purse. The Committee believes strongly that Congress should make the decisions on how to allocate the people's money. As defined in Rule XLIV of the Standing Rules of the Senate, the term "congressionally directed spending item" means a provision or report language included primarily at the request of a Senator, providing, authorizing, or recommending a specific amount of discretionary budget authority, credit authority, or other spending authority for a contract, loan, loan guarantee, grant, loan authority, or other expenditure with or to an entity, or targeted to a specific State, locality or congressional district, other than through a statutory or administrative, formula-driven, or competitive award process.

For each item, a Member is required to provide a certification that neither the Member nor the Member's immediate family has a pecuniary interest in such congressionally directed spending item. Such certifications are available to the public on the website of the Senate Committee on Appropriations (https://www.appropriations.senate.gov/congressionally-directed-spending-requests). Following is a list of congressionally directed spending items included in the Senate recommendation discussed in this explanatory statement, along with the name of each Senator who submitted a request to the Committee of jurisdiction for each item so identified. Neither the Committee recommendation nor this report contains any limited tax benefits or limited tariff benefits as defined in rule XLIV.

CONGRESSIONALLY DIRECTED SPENDING ITEMS

| Senator(s) | Recipient | Project | Amount | Type |
|---|---|---|---|---|
| Alsobrooks, Van Hollen | Harford County Department of Emergency Services. | Harford County Department of Emergency Services Emergency Operations Center Equipment Upgrade. | $525,000 | Emergency Operations Center |
| Alsobrooks, Van Hollen | Prince George's County Government | Emergency Operations Center Communications Enhancements. | 469,000 | Emergency Operations Center |
| Alsobrooks, Van Hollen | Anne Arundel County | Historic Whitehall Shoreline | 226,000 | Predisaster Mitigation |
| Alsobrooks, Van Hollen | Anne Arundel County | Columbia Beach Resilience Project | 1,175,000 | Predisaster Mitigation |
| Baldwin | UW–Whitewater Police Department | UW–Whitewater Emergency Operations Center | 225,000 | Emergency Operations Center |
| Baldwin | Iron County Forestry Department | Iron County Forestry Department—Saxon Harbor Lake Superior Shoreline Restoration Project. | 375,000 | Predisaster Mitigation |
| Baldwin | Resilient Southwest Wisconsin | Southwestern WI Regional Planning Commission—Resilient Southwest Wisconsin. | 150,000 | Predisaster Mitigation |
| Baldwin | Village of La Farge | Village of La Farge Storm Sewer Improvements | 250,000 | Predisaster Mitigation |
| Bennet, Hickenlooper | City of Brighton/ Brighton Fire | City of Brighton Emergency Operations Center Software | 15,000 | Emergency Operations Center |
| Bennet, Hickenlooper | City of Louisville | City of Louisville Emergency Operations Center | 100,000 | Emergency Operations Center |
| Bennet, Hickenlooper | Colorado Department of Public Safety—Division of Homeland Security and Emergency Management. | State Emergency Operations Center Technology Update | 585,000 | Emergency Operations Center |
| Bennet, Hickenlooper | Montezuma County | Montezuma County Emergency Operations Center | 186,000 | Emergency Operations Center |
| Blumenthal, Murphy | Town of East Lyme CT Emergency Management. | East Lyme EOC | 395,000 | Emergency Operations Center |
| Blumenthal, Murphy | City of West Haven | Savin Rock Beach Reinforcement | 2,479,000 | Predisaster Mitigation |
| Blumenthal, Murphy | Town of Southington | Plantsville Center Flooding Study | 300,000 | Predisaster Mitigation |
| Blunt Rochester, Coons | City of Wilmington, Delaware | Lower Brandywine Flood Mitigation Project | 1,509,000 | Predisaster Mitigation |
| Blunt Rochester, Coons | New Castle County, Delaware (Public Works Department). | Little Mill Creek Upper Reach Flood Control Project Major Maintenance. | 758,000 | Predisaster Mitigation |
| Booker, Kim | County of Mercer | Mercer County for Emergency Operations Center Improvements. | 1,875,000 | Emergency Operations Center |
| Britt | Coosa County Emergency Management Agency | Coosa County Emergency Management Utilities Preservation. | 126,000 | Emergency Operations Center |
| Britt | City of Atmore | City of Atmore Storm Drainage Improvements | 1,250,000 | Predisaster Mitigation |
| Britt | City of Birmingham | Village Creek Stormwater Park Floodplain Restoration | 2,645,000 | Predisaster Mitigation |
| Britt | City of Foley | Strategic Placement of City of Foley Utilities Underground. | 2,063,000 | Predisaster Mitigation |
| Britt | City of Jasper | City of Jasper Flood Mitigation Infrastructure | 893,000 | Predisaster Mitigation |
| Britt | City of Livingston | Sumter County Storm Drainage Improvements | 3,093,000 | Predisaster Mitigation |
| Britt | Montgomery Area Chamber of Commerce | Washington Ferry Road Restoration | 4,000,000 | Predisaster Mitigation |

| | | | | |
|---|---|---|---|---|
| Britt | Winston County Commission | Winston County Road and Bridge Restoration | 900,000 | Predisaster Mitigation |
| Cantwell | Sammamish Plateau Water and Sewer District | Well 9 Seismic Resiliency Water Transmission Main Design. | 1,125,000 | Predisaster Mitigation |
| Capito, Justice | Beckley-Raleigh County Convention Center | Beckley-Raleigh County EOC HVAC Upgrades | 3,206,000 | Predisaster Mitigation |
| Capito, Justice | Town of Burnsville | Town of Burnsville Landslide Remediation Project | 488,000 | Predisaster Mitigation |
| Cassidy, Kennedy | Ouachita Parish Police Jury | Ouachita Parish I–20 South Frontage Road Drainage Improvements. | 6,000,000 | Predisaster Mitigation |
| Collins | York County Emergency Management Agency | York County Flood Protection | 1,762,000 | Predisaster Mitigation |
| Collins, King | Town of Southport | Hendricks Head Infrastructure Improvements | 1,165,000 | Predisaster Mitigation |
| Collins, King | Town of Surry | Newbury Neck Peninsula Storm Evacuation | 2,928,000 | Predisaster Mitigation |
| Cortez Masto, Rosen | City of Las Vegas | City of Las Vegas—Emergency Operations Upgrades | 150,000 | Emergency Operations Center |
| Cortez Masto, Rosen | Humboldt County | Humboldt County—Emergency Operations Center | 500,000 | Emergency Operations Center |
| Cortez Masto, Rosen | Lyon County | Lyon County—Emergency Backup Generators | 375,000 | Emergency Operations Center |
| Cortez Masto, Rosen | Nye County | Nye County—Gamebird Road Improvements Planning and Design Project. | 323,000 | Predisaster Mitigation |
| Curtis | City of Holladay | City Hall Seismic Retrofit Project | 1,650,000 | Predisaster Mitigation |
| Duckworth, Durbin | City of Rockford | Keith Creek Greenway Improvements | 2,000,000 | Predisaster Mitigation |
| Durbin | DuPage County Stormwater Management | Flood Reduction Project | 225,000 | Predisaster Mitigation |
| Fetterman | The Municipal Authority of the City of Sunbury | City of Sunbury Flood Mitigation Project | 1,000,000 | Predisaster Mitigation |
| Fetterman, McCormick | Municipal Authority of the Town of Bloomsburg. | MATB Wastewater Treatment Plant Flood Mitigation Project. | 2,205,000 | Predisaster Mitigation |
| Gallego, Kelly | City of Flagstaff | City of Flagstaff—Fanning Wash Flood Mitigations | 1,500,000 | Predisaster Mitigation |
| Gallego, Kelly | City of Kingman | City of Kingman—Bull Mountain Channel Improvements | 493,000 | Predisaster Mitigation |
| Gillibrand, Schumer | Town of Hempstead | Town of Hempstead—Bulkheads | 1,780,000 | Predisaster Mitigation |
| Gillibrand, Schumer | Town of Ossining | Town of Ossining—Town-Wide Drainage Study | 99,000 | Predisaster Mitigation |
| Graham | SC Emergency Management Division | City of Westminster Emergency Stand-by Generator and Control Center for Drinking Water Plant. | 1,314,000 | Predisaster Mitigation |
| Graham | South Carolina Office of Resilience | Catfish Canal Stormwater Improvements Mitigation Project. | 1,359,000 | Predisaster Mitigation |
| Heinrich | City of Bloomfield | Boyd Lining Project | 750,000 | Predisaster Mitigation |
| Heinrich, Luján | NM Department of Homeland Security and Emergency Management. | DHSEM Portable Backup Generators and Water Support | 1,500,000 | Predisaster Mitigation |
| Heinrich, Luján | Roosevelt County | Emergency Siren Warning System Upgrades | 262,000 | Predisaster Mitigation |
| Hirono, Schatz | Agribusiness Development Corporation | Hazard Monitoring and Wildfire Detection System | 1,125,000 | Predisaster Mitigation |
| Hyde-Smith | City of Long Beach | Long Beach Harbor Mitigation Project | 2,558,000 | Predisaster Mitigation |
| Hyde-Smith | City of Ridgeland | Citywide Flood Mitigation | 4,000,000 | Predisaster Mitigation |
| Kaine, Warner | Middle Peninsula Planning District Commission. | Middle Peninsula Emergency Operations Center Improvements. | 506,000 | Emergency Operations Center |
| Kaine, Warner | City of Harrisonburg | City of Harrisonburg Suter Street Drainage Improvement Project. | 1,750,000 | Predisaster Mitigation |

CONGRESSIONALLY DIRECTED SPENDING ITEMS—Continued

| Senator(s) | Recipient | Project | Amount | Type |
|---|---|---|---|---|
| Kennedy | Town of Lake Arthur | Town of Lake Arthur Pump Station | 900,000 | Predisaster Mitigation |
| Kim | Borough of Hamburg | Portable Generator for Critical Infrastructure | 220,000 | Predisaster Mitigation |
| Klobuchar, Smith | City of Madelia | Madelia Wastewater Lift Station Accredited Levee | 1,980,000 | Predisaster Mitigation |
| Markey, Warren | Acushnet Office of Emergency Management | Acushnet Office of Emergency Management | 2,140,000 | Emergency Operations Center |
| Markey, Warren | Berkley Police Department | Town of Berkley Emergency Operations Center | 105,000 | Emergency Operations Center |
| Markey, Warren | Town of Norton | New Town Hall Emergency Operations Center | 22,000 | Emergency Operations Center |
| Merkley, Wyden | City of Toledo | Toledo Public Safety Building Outfit | 1,000,000 | Emergency Operations Center |
| Merkley, Wyden | Oregon Department of Emergency Management. | Statewide Emergency Coordination Center | 1,500,000 | Emergency Operations Center |
| Moran | Sedgwick County | Sedgwick County Emergency Operations Center | 2,000,000 | Emergency Operations Center |
| Moran | City of Englewood | Back-Up Generator Procurement | 44,000 | Predisaster Mitigation |
| Murkowski | Chilkat Indian Village | Klukwan Landslide Protection Project | 1,234,000 | Predisaster Mitigation |
| Murkowski | City and Borough of Juneau | Glacial Lake Outburst Flooding—Infrastructure Protection. | 1,500,000 | Predisaster Mitigation |
| Murkowski | City of Saint Paul | Planning & Design of Salt Lagoon & Community Pond Flood Mitigation. | 375,000 | Predisaster Mitigation |
| Murkowski | Matanuska-Susitna Borough | Mat-Su Revetment and Road Upgrades | 2,000,000 | Predisaster Mitigation |
| Ossoff | Habersham County | Emergency Operations Center | 2,500,000 | Emergency Operations Center |
| Ossoff | Henry County | Emergency Operations Center Display and Control Systems Equipment. | 1,149,000 | Emergency Operations Center |
| Padilla | City of Palm Desert | City of Palm Desert Emergency Resiliency Plan | 296,000 | Predisaster Mitigation |
| Padilla, Schiff | City of Atascadero | City of Atascadero Emergency Operations Center Technology Project. | 1,000,000 | Emergency Operations Center |
| Padilla, Schiff | City of Chula Vista | Otay Valley Regional Park (OVRP) Wildfire Hazardous Fuels Reduction. | 837,000 | Predisaster Mitigation |
| Peters, Slotkin | City of New Baltimore | Walter Mary Burke Park Shoreline Restoration Project | 1,000,000 | Predisaster Mitigation |
| Reed | Town of Burrillville | Wallum Lake Dam Spillway improvements | 345,000 | Predisaster Mitigation |
| Reed, Whitehouse | Town of Barrington | Barrington Police Cove Park Seawall Repair | 475,000 | Predisaster Mitigation |
| Reed, Whitehouse | Town of Bristol | Bristol Independence Park Seawall Restoration | 900,000 | Predisaster Mitigation |
| Rosen | Nye County | Nye County—Area Master Drainage Plan (AMDP) Update | 338,000 | Predisaster Mitigation |
| Sanders, Welch | Barre City | Gunners Brook Floodplain Restoration and Debris Catcher Reconfiguration. | 591,000 | Predisaster Mitigation |
| Sanders, Welch | City of Montpelier | Elm Street Housing Elevation | 1,458,000 | Predisaster Mitigation |
| Schatz | Honolulu Fire Department | Mobile Generators for the Honolulu Fire Department | 315,000 | Predisaster Mitigation |
| Schiff | City of Lompoc | City of Lompoc—EOC Emergency Generator Project | 375,000 | Emergency Operations Center |

| | | | | |
|---|---|---|---|---|
| Shaheen | New Hampshire Division of Homeland Security and Emergency Management. | New Hampshire State Emergency Operations Center Modernization Project. | 250,000 | Emergency Operations Center |
| Shaheen | City of Hampton Department of Emergency Management. | Hampton NH Coastal Resiliency Storm Water Inflow/Infiltration Reduction Project. | 1,250,000 | Predisaster Mitigation |
| Sheehy | City of Glasgow | Flood Control Levee Improvements | 2,487,000 | Predisaster Mitigation |
| Slotkin | St. Clair Township | St. Clair Township Sanitary Pump Station Rehabilitation | 1,144,000 | Predisaster Mitigation |
| Tillis | North Carolina Department of Commerce | Wanchese Marine Industrial Park Authority Living Shoreline Resiliency Project. | 2,605,000 | Predisaster Mitigation |
| Warnock | City of Wrightsville | City of Wrightsville Emergency Operations Center Improvements. | 450,000 | Emergency Operations Center |
| Warnock | Pulaski County | Pulaski County Emergency Operations Center Radio System Modernization. | 570,000 | Emergency Operations Center |
| Welch | Town of Hardwick | Hardwick Flood Recovery & Resilience Plan | 70,000 | Predisaster Mitigation |
| Whitehouse | Town of Bristol | Bristol Seawall Repair | 660,000 | Predisaster Mitigation |
| Wicker | City of Jackson Public Works Department | City of Jackson Midtown Area Stormwater Infrastructure Improvements. | 1,125,000 | Predisaster Mitigation |
| Wicker | City of Jackson Public Works Department | City of Jackson Queens Area Stormwater Infrastructure Improvements. | 1,125,000 | Predisaster Mitigation |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR FISCAL YEAR 2025 AND BUDGET ESTIMATES AND AMOUNTS RECOMMENDED IN THE BILL FOR FISCAL YEAR 2026

[In thousands of dollars]

| Item | 2025 appropriation | Committee recommendation | Senate Committee recommendation compared with (+ or −) 2025 appropriation |
|---|---|---|---|
| DEPARTMENT OF HOMELAND SECURITY | | | |
| TITLE I—DEPARTMENTAL MANAGEMENT, INTELLIGENCE, SITUATIONAL AWARENESS, AND OVERSIGHT | | | |
| Office of the Secretary and Executive Management | | | |
| Operations and Support: | | | |
| Management and Oversight: | | | |
| Office of the Secretary | 54,381 | 14,639 | −39,742 |
| Office of Public Affairs | 11,125 | 5,563 | −5,562 |
| Office of Legislative Affairs | 7,132 | .............................. | −7,132 |
| Office of General Counsel | 30,667 | 27,256 | −3,411 |
| Office of Health Security | 62,647 | 91,365 | +28,718 |
| Privacy Office | 18,854 | 29,236 | +10,382 |
| Subtotal, Management and Oversight | 184,806 | 168,059 | −16,747 |
| Office of Strategy, Policy, and Plans | 85,735 | 120,296 | +34,561 |
| Operations and Engagement: | | | |
| Office for Civil Rights and Civil Liberties | 42,964 | 4,969 | −37,995 |
| Office of the Citizenship and Immigration Services Ombudsman | 11,597 | 6,853 | −4,744 |
| Office of the Immigration Detention Ombudsman | 28,641 | 14,815 | −13,826 |
| Office of Partnership and Engagement | 9,839 | 9,436 | −403 |
| Subtotal, Operations and Engagement | 93,041 | 36,073 | −56,968 |
| Full Committee Amendment | | | |
| Subtotal, Operations and Support | 363,582 | 324,428 | −39,154 |

| | | | |
|---|---|---|---|
| Procurement, Construction, and Improvements: | | | |
| Medical Information Exchange | 8,113 | 8,113 | .................. |
| Federal Assistance: | | | |
| Office of Strategy, Policy, and Plans: | | | |
| Targeted Violence and Terrorism Prevention Grants | 18,000 | .................. | −18,000 |
| Office for Civil Rights and Civil Liberties: | | | |
| ATD Case Management Grant Program | 15,000 | .................. | −15,000 |
| Subtotal, Federal Assistance | 33,000 | .................. | −33,000 |
| FEMA Assistance Grants (transfer out) | (−33,000) | .................. | (+33,000) |
| Total, Office of the Secretary and Executive Management | 404,695 | 332,541 | −72,154 |
| (transfer out) | −33,000 | .................. | +33,000 |
| Total, Office of the Secretary and Executive Management (including transfer) | 371,695 | 332,541 | −39,154 |
| Management Directorate | | | |
| Operations and Support: | | | |
| Immediate Office of the Under Secretary for Management | 6,785 | 7,057 | +272 |
| Office of the Chief Readiness Support Officer | 231,526 | 228,179 | −3,347 |
| Office of the Chief Human Capital Officer | 150,490 | 150,169 | −321 |
| Office of the Chief Security Officer | 202,880 | 322,812 | +119,932 |
| Office of the Chief Procurement Officer | 95,953 | 100,773 | +4,820 |
| Office of the Chief Financial Officer | 118,018 | 125,574 | +7,556 |
| Office of the Chief Information Officer | 627,854 | 627,923 | +69 |
| Office of Program Accountability and Risk Management | 18,245 | 19,455 | +1,210 |
| Office of Biometric Identity Management: | | | |
| Identity and Screening Program Operations | 270,453 | 293,089 | +22,636 |
| Full Committee Amendments | .................. | .................. | .................. |
| Subtotal, Operations and Support | 1,722,204 | 1,875,031 | +152,827 |
| Procurement, Construction, and Improvements: | | | |
| Construction and Facility Improvements | 172,763 | .................. | −172,763 |
| Mission Support Assets and Infrastructure | 77,670 | 122,182 | +44,512 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR FISCAL YEAR 2025 AND BUDGET ESTIMATES AND AMOUNTS RECOMMENDED IN THE BILL FOR FISCAL YEAR 2026—Continued

[In thousands of dollars]

| Item | 2025 appropriation | Committee recommendation | Senate Committee recommendation compared with (+ or −) 2025 appropriation |
|---|---|---|---|
| Additional funding (emergency) | | | |
| Subtotal, Mission Support Assets and Infrastructure | 77,670 | 122,182 | +44,512 |
| IDENT/Homeland Advanced Recognition Technology | 10,000 | 40,000 | +30,000 |
| Additional funding (emergency) | | | |
| Subtotal, Procurement, Construction, and Improvements | 260,433 | 162,182 | −98,251 |
| (Appropriations) | (260,433) | (162,182) | (−98,251) |
| Federal Protective Service: | | | |
| FPS Operations: | | | |
| Operating Expenses | 473,820 | 481,689 | +7,869 |
| Countermeasures: | | | |
| Protective Security Officers | 1,528,205 | 1,507,201 | −21,004 |
| Technical Countermeasures | 26,778 | 37,565 | +10,787 |
| Subtotal, Federal Protective Service (Gross) | 2,028,803 | 2,026,455 | −2,348 |
| Offsetting Collections | −2,028,803 | −2,026,455 | +2,348 |
| Subtotal, Federal Protective Service (Net) | | | |
| Total, Management Directorate | 1,982,637 | 2,037,213 | +54,576 |
| (Appropriations) | (4,011,440) | (4,063,668) | (+52,228) |
| (Emergency Appropriations) | | | |
| (Offsetting Collections) | (−2,028,803) | (−2,026,455) | (+2,348) |

| | | | |
|---|---|---|---|
| **Intelligence, Analysis, and Situational Awareness** | | | |
| Operations and Support | 345,410 | 371,898 | +26,488 |
| **Office of Inspector General** | | | |
| Operations and Support | 220,127 | 245,754 | +25,627 |
| PL 119–21 Oversight | .............. | (15,000) | (+15,000) |
| Total, Title I, Departmental Management, Intelligence, Situational Awareness, and Oversight | 2,952,869 | 2,987,406 | +34,537 |
| (Appropriations) | (4,981,672) | (5,013,861) | (+32,189) |
| (Defense) | | | |
| (Nondefense) | (4,981,672) | (5,013,861) | (+32,189) |
| (Emergency Appropriations) | | | |
| (Offsetting Collections) | (−2,028,803) | (−2,026,455) | (+2,348) |
| (Transfer out) | (−33,000) | .............. | (+33,000) |
| (By transfer) | | | |
| (By transfer) (emergency) | | | |
| **TITLE II—SECURITY, ENFORCEMENT, AND INVESTIGATIONS** | | | |
| **US Customs and Border Protection** | | | |
| Operations and Support: | | | |
| Border Security Operations: | | | |
| US Border Patrol: | | | |
| Operations | 7,316,574 | 5,221,397 | −2,095,177 |
| Assets and Support | 992,273 | 1,127,048 | +134,775 |
| Office of Training and Development | 160,862 | 176,474 | +15,612 |
| Subtotal, Border Security Operations | 8,469,709 | 6,524,919 | −1,944,790 |
| Trade and Travel Operations: | | | |
| Office of Field Operations: | | | |
| Domestic Operations | 3,933,253 | 4,510,543 | +577,290 |
| International Operations | 157,797 | 199,725 | +41,928 |
| Targeting Operations | 276,875 | 315,112 | +38,237 |
| Assets and Support | 1,029,533 | 1,124,453 | +94,920 |
| Office of Trade | 423,587 | 499,696 | +76,109 |

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 689 of 714 PageID #:1739



COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR FISCAL YEAR 2025 AND BUDGET ESTIMATES AND AMOUNTS RECOMMENDED IN THE BILL FOR FISCAL YEAR 2026—Continued

[In thousands of dollars]

| Item | 2025 appropriation | Committee recommendation | Senate Committee recommendation compared with (+ or −) 2025 appropriation |
|---|---|---|---|
| Office of Training and Development | 77,156 | 103,192 | +26,036 |
| Subtotal, Trade and Travel Operations | 5,898,201 | 6,752,721 | +854,520 |
| Integrated Operations: | | | |
| Air and Marine Operations: | | | |
| Operations | 388,926 | 419,289 | +30,363 |
| Assets and Support | 624,612 | 722,886 | +98,274 |
| Air and Marine Operations Center | 50,861 | 53,908 | +3,047 |
| Office of International Affairs | 52,892 | 61,074 | +8,182 |
| Office of Intelligence | 88,197 | 91,886 | +3,689 |
| Office of Training and Development | 13,539 | 15,720 | +2,181 |
| Operations Support | 436,330 | 373,719 | −62,611 |
| Subtotal, Integrated Operations | 1,655,357 | 1,738,482 | +83,125 |
| Mission Support: | | | |
| Enterprise Services | 1,796,988 | 2,141,010 | +344,022 |
| (Harbor Maintenance Trust Fund) | (3,274) | (−3,274) | (−6,548) |
| Office of Professional Responsibility | 354,870 | 380,917 | +26,047 |
| Executive Leadership and Oversight | 251,745 | 291,618 | +39,873 |
| Subtotal, Mission Support | 2,403,603 | 2,813,545 | +409,942 |
| Subtotal, Operations and Support | 18,426,870 | 17,829,667 | −597,203 |
| (Appropriations) | (18,426,870) | (17,829,667) | (−597,203) |
| (Emergency Appropriations) | .............. | .............. | .............. |

| | | | |
|---|---|---|---|
| (Transfer out to FEMA Federal Assistance) | (−650,000) | ............ | (+650,000) |
| Procurement, Construction, and Improvements: | | | |
| Border Security Assets and Infrastructure | 283,500 | 96,600 | −186,900 |
| Additional funding (emergency) | ............ | ............ | ............ |
| Trade and Travel Assets and Infrastructure | 380,900 | 110,000 | −270,900 |
| Additional funding (emergency) | ............ | ............ | ............ |
| Integrated Operations Assets and Infrastructure: | | | |
| Airframes and Sensors | 71,583 | ............ | −71,583 |
| Additional funding (emergency) | | | |
| Watercraft | 4,400 | 10,000 | +5,600 |
| Construction and Facility Improvements | 92,114 | 247,000 | +154,886 |
| Additional funding (emergency) | ............ | ............ | ............ |
| Mission Support Assets and Infrastructure | 17,673 | 70,773 | +53,100 |
| Radiological Detection Systems | ............ | 35,678 | +35,678 |
| Floor Amendment | ............ | ............ | ............ |
| Subtotal, Procurement, Construction, and Improvements | 850,170 | 570,051 | −280,119 |
| (Appropriations) | (850,170) | (570,051) | (−280,119) |
| (Emergency Appropriations) | ............ | ............ | ............ |
| CBP Services at User Fee Facilities (Small Airport) (Permanent Indefinite Discretionary) | 24,000 | 25,000 | +1,000 |
| Global Entry Program (International Registered Traveler) (Permanent Indefinite Discretionary) | 457,000 | 444,000 | −13,000 |
| Offsetting Collections | −457,000 | −444,000 | +13,000 |
| Total, Global Entry Program | ............ | ............ | ............ |
| Fee Funded Programs: | | | |
| Immigration Inspection User Fee | (854,365) | (1,010,937) | (+156,572) |
| Immigration Enforcement Fines | (254) | (1,283) | (+1,029) |
| Electronic System for Travel Authorization (ESTA) Fee | (61,659) | (60,544) | (−1,115) |
| Land Border Inspection Fee | (80,165) | (92,556) | (+12,391) |
| COBRA Passenger Inspection Fee | (821,059) | (1,003,486) | (+182,427) |
| Agricultural Quarantine Inspection Fee | (591,360) | (791,121) | (+199,761) |
| Puerto Rico Trust Fund | (304,133) | (283,871) | (−20,262) |
| Virgin Islands Deposit Fund | (14,994) | (14,818) | (−176) |
| Customs Unclaimed Goods | (3,880) | (1,828) | (−2,052) |
| 9–11 Response and Biometric Exit Account | (21,350) | (15,942) | (−5,408) |
| Subtotal, Fee Funded Programs | 2,753,219 | 3,276,386 | +523,167 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR FISCAL YEAR 2025 AND BUDGET ESTIMATES AND AMOUNTS RECOMMENDED IN THE BILL FOR FISCAL YEAR 2026—Continued

[In thousands of dollars]

| Item | 2025 appropriation | Committee recommendation | Senate Committee recommendation compared with (+ or −) 2025 appropriation |
|---|---|---|---|
| Administrative Provisions | | | |
| Colombia Free Trade Act Collections (Sec 203) | 281,000 | 321,000 | +40,000 |
| Reimbursable Preclearance (Sec 204) | 39,000 | 39,000 | |
| Subtotal, Administrative Provisions | 320,000 | 360,000 | +40,000 |
| Reimbursable Preclearance (Offsetting Collections) | −39,000 | −39,000 | |
| Total, Administrative Provisions | 281,000 | 321,000 | +40,000 |
| Total, US Customs and Border Protection | 19,582,040 | 18,745,718 | −836,322 |
| (Appropriations) | (20,078,040) | (19,228,718) | (−849,322) |
| (Emergency Appropriations) | | | |
| (Offsetting Collections) | (−496,000) | (−483,000) | (+13,000) |
| Fee Funded Programs | 2,753,219 | 3,276,386 | +523,167 |
| (Transfer out) | (−650,000) | | (+650,000) |
| US Immigration and Customs Enforcement | | | |
| Operations and Support: | | | |
| Homeland Security Investigations: | | | |
| Domestic Investigations | 2,138,131 | 2,243,356 | +105,225 |
| International Investigations | 214,323 | 222,992 | +8,669 |
| Intelligence | 106,651 | 109,264 | +2,613 |
| Subtotal, Homeland Security Investigations | 2,459,105 | 2,575,612 | +116,507 |
| Enforcement and Removal Operations: | | | |
| Custody Operations | 3,434,952 | 4,237,594 | +802,642 |

| | | | |
|---|---|---|---|
| Additional funding (emergency) | ............ | ............ | ............ |
| Subtotal, Custody Operations | 3,434,952 | 4,237,594 | +802,642 |
| Fugitive Operations | 159,134 | 180,145 | +21,011 |
| Criminal Alien Program | 296,525 | 336,834 | +40,309 |
| Alternatives to Detention | 470,190 | 399,826 | −70,364 |
| Transportation and Removal Operations | 721,417 | 1,007,692 | +286,275 |
| Additional funding (emergency) | ............ | ............ | ............ |
| Subtotal, Transportation and Removal Operations | 721,417 | 1,007,692 | +286,275 |
| Third Party Medical Care | ............ | ............ | ............ |
| Additional funding (emergency) | ............ | ............ | ............ |
| Total, Third Party Medical Care | ............ | ............ | ............ |
| Subtotal, Enforcement and Removal Operations | 5,082,218 | 6,162,091 | +1,079,873 |
| Mission Support: | | | |
| Enterprise Services | 1,199,009 | 1,237,266 | +38,257 |
| Office of Professional Responsibility | 197,600 | 202,990 | +5,390 |
| Executive Leadership and Oversight | 122,095 | 109,823 | −12,272 |
| Subtotal, Mission Support | 1,518,704 | 1,550,079 | +31,375 |
| Office of the Principal Legal Advisor | 441,515 | 452,523 | +11,008 |
| Subtotal, Office of the Principal Legal Advisor | 441,515 | 452,523 | +11,008 |
| Floor Amendments | ............ | ............ | ............ |
| Additional funding (PL 119–4) | 485,000 | ............ | −485,000 |
| Subtotal, Operations and Support | 9,986,542 | 10,740,305 | +753,763 |
| (Appropriations) | (9,986,542) | (10,740,305) | (+753,763) |
| (Emergency Appropriations) | ............ | ............ | ............ |
| Procurement, Construction, and Improvements: | | | |
| Operational Communications/Information Technology | 35,420 | ............ | −35,420 |
| Construction and Facility Improvements | 20,100 | ............ | −20,100 |
| Mission Support Assets and Infrastructure | ............ | 29,500 | +29,500 |
| Additional funding (emergency) | ............ | ............ | ............ |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR FISCAL YEAR 2025 AND BUDGET ESTIMATES AND AMOUNTS RECOMMENDED IN THE BILL FOR FISCAL YEAR 2026—Continued

[In thousands of dollars]

| Item | 2025 appropriation | Committee recommendation | Senate Committee recommendation compared with (+ or −) 2025 appropriation |
|---|---|---|---|
| Subtotal, Procurement, Construction, and Improvements | 55,520 | 29,500 | −26,020 |
| (Appropriations) | 55,520 | 29,500 | −26,020 |
| (Emergency Appropriations) | ............ | ............ | ............ |
| Fee Funded Programs: | | | |
| Immigration Inspection User Fee | (135,000) | (135,000) | ............ |
| Breached Bond/Detention Fund | (55,000) | (55,000) | ............ |
| Student and Exchange Visitor Program Fee | (186,610) | (216,500) | (+29,890) |
| Detention and Removal Office Fee | (3,000) | (3,000) | ............ |
| Subtotal, Fee Funded Programs | 379,610 | 409,500 | +29,890 |
| Total, US Immigration and Customs Enforcement | 10,042,062 | 10,769,805 | +727,743 |
| (Appropriations) | (10,042,062) | (10,769,805) | (+727,743) |
| (Emergency Appropriations) | | | |
| Fee Funded Programs | 379,610 | 409,500 | +29,890 |
| Transportation Security Administration | | | |
| Operations and Support: | | | |
| Aviation Screening Operations: | | | |
| Screening Workforce: | | | |
| Screening Partnership Program | 253,759 | 295,967 | +42,208 |
| Screener Personnel, Compensation, and Benefits | 5,302,075 | 5,531,861 | +229,786 |
| Screener Training and Other | 272,357 | 279,049 | +6,692 |
| Airport Management | 871,626 | 923,745 | +52,119 |
| Canines | 159,818 | 198,254 | +38,436 |
| Screening Technology Maintenance | 561,848 | 602,035 | +40,187 |

| | | | |
|---|---|---|---|
| Secure Flight | 137,888 | 142,776 | +4,888 |
| Subtotal, Aviation Screening Operations | 7,559,371 | 7,973,687 | +414,316 |
| Other Operations and Enforcement: | | | |
| Inflight Security: | | | |
| Federal Air Marshals | 808,852 | 866,320 | +57,468 |
| Federal Flight Deck Officer and Crew Training | 26,681 | 27,437 | +756 |
| Aviation Regulation | 243,766 | 297,481 | +53,715 |
| Air Cargo | 135,640 | 139,067 | +3,427 |
| Intelligence and TSOC | 98,793 | 103,044 | +4,251 |
| Surface Programs | 173,142 | 126,186 | −46,956 |
| Vetting Programs | 49,525 | 48,344 | −1,181 |
| Subtotal, Other Operations and Enforcement | 1,536,399 | 1,607,879 | +71,480 |
| Mission Support | 1,069,198 | 1,095,032 | +25,834 |
| Aviation Passenger Security Fees (offsetting collections) | −2,860,000 | −3,030,000 | −170,000 |
| legislative proposal (offsetting collections) | | | |
| Additional funding (PL 119–4) | 450,000 | ............ | −450,000 |
| Subtotal, Operations and Support | 7,754,968 | 7,646,598 | −108,370 |
| (Appropriations) | (10,614,968) | (10,676,598) | (+61,630) |
| (Offsetting Collections) | (−2,860,000) | (−3,030,000) | (−170,000) |
| Vetting Fee Programs: | | | |
| Transportation Worker Identification Card | 65,000 | 72,700 | +7,700 |
| Hazardous Materials Endorsement Fee | 20,000 | 16,400 | −3,600 |
| General Aviation at DCA Fee | 600 | 600 | ............ |
| Commercial Aviation and Airports Fee | 11,000 | 11,000 | ............ |
| Other Security Threat Assessments Fee | 50 | 50 | ............ |
| Air Cargo/Certified Cargo Screening Program Fee | 4,000 | 4,000 | ............ |
| TSA PreCheck Fee | 452,000 | 427,900 | −24,100 |
| Adjustment based on CBO estimate of receipts | −93,650 | ............ | +93,650 |
| Subtotal, Vetting Fee Programs | 459,000 | 532,650 | +73,650 |
| Vetting Fees (Offsetting Collections) | −459,000 | −532,650 | −73,650 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR FISCAL YEAR 2025 AND BUDGET ESTIMATES AND AMOUNTS RECOMMENDED IN THE BILL FOR FISCAL YEAR 2026—Continued

[In thousands of dollars]

| Item | 2025 appropriation | Committee recommendation | Senate Committee recommendation compared with (+ or −) 2025 appropriation |
|---|---|---|---|
| Procurement, Construction, and Improvements: | | | |
| Aviation Screening Infrastructure: | | | |
| Checkpoint Support | 40,678 | 320,000 | +279,322 |
| Checked Baggage | .............. | 13,940 | +13,940 |
| Mission Support Assets and Infrastructure | .............. | 24,290 | +24,290 |
| Subtotal, Procurement, Construction, and Improvements | 40,678 | 358,230 | +317,552 |
| Research and Development | 14,641 | 24,000 | +9,359 |
| Fee Funded Programs: | | | |
| Alien Flight School Fee (mandatory) | (6,000) | (5,300) | (−700) |
| Aviation Security Capital Fund (mandatory) | (250,000) | (250,000) | .............. |
| Subtotal, Fee Funded Programs | 256,000 | 255,300 | −700 |
| Total, Transportation Security Administration | 7,810,287 | 8,028,828 | +218,541 |
| (Appropriations) | (11,129,287) | (11,591,478) | (+462,191) |
| (Offsetting Collections) | (−3,319,000) | (−3,562,650) | (−243,650) |
| Fee Funded Programs | 256,000 | 255,300 | −700 |
| Coast Guard | | | |
| Operations and Support: | | | |
| Military Personnel | 5,247,722 | 5,817,213 | +569,491 |
| Mission Support | 420,206 | 630,624 | +210,418 |
| Field Operations: | | | |
| Surface, Air, and Shore Operations | 3,125,281 | 3,501,488 | +376,207 |
| Command, Control, and Communications | 1,261,562 | 1,318,174 | +56,612 |

| | | | |
|---|---|---|---|
| Floor Amendment | | | |
| Additional funding (PL 119–4) | 360,500 | | −360,500 |
| Subtotal, Operations and Support | 10,415,271 | 11,267,499 | +852,228 |
| (Non-defense) | (9,885,271) | (10,737,499) | (+852,228) |
| (Defense) | (530,000) | (530,000) | |
| Procurement, Construction, and Improvements: | | | |
| Vessels: | | | |
| In-Service Vessel Sustainment | 120,000 | 152,000 | +32,000 |
| National Security Cutter | 17,100 | | −17,100 |
| Offshore Patrol Cutter | 579,000 | | −579,000 |
| Fast Response Cutter | 220,000 | | −220,000 |
| Cutter Boats | 6,500 | 76,900 | +70,400 |
| Polar Security Cutter | | 96,500 | +96,500 |
| Commercially Available Polar Icebreaker | 125,000 | | −125,000 |
| Great Lakes Icebreaker | 20,000 | 25,000 | +5,000 |
| Waterways Commerce Cutter | 1,000 | 54,588 | +53,588 |
| Subtotal, Vessels | 1,088,600 | 404,988 | −683,612 |
| Aircraft: | | | |
| HC–144 Conversion/Sustainment | | | |
| HC–130J Acquisition/Conversion/Sustainment | 4,000 | 12,000 | +8,000 |
| HH–65 Conversion/Sustainment Projects | 6,000 | | −6,000 |
| MH–60T Sustainment | 58,250 | 151,600 | +93,350 |
| Small Unmanned Aircraft Systems | 500 | 51,000 | +50,500 |
| Large Unmanned Aircraft Systems | | | |
| Subtotal, Aircraft | 68,750 | 214,600 | +145,850 |
| Other Acquisition Programs: | | | |
| Survey and Design—Vessels, Boats, and Aircraft | 5,000 | 5,000 | |
| Other Equipment and Systems | 5,600 | 7,040 | +1,440 |
| Program Oversight and Management | 21,000 | 22,000 | +1,000 |
| C4ISR | 16,000 | 10,000 | −6,000 |
| CG–Logistics Information Management System (CG–LIMS) | | | |
| Cyber and Enterprise Mission Platform | 21,500 | 30,000 | +8,500 |
| In-Service Systems Sustainment | | 25,800 | +25,800 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR FISCAL YEAR 2025 AND BUDGET ESTIMATES AND AMOUNTS RECOMMENDED IN THE BILL FOR FISCAL YEAR 2026—Continued

[In thousands of dollars]

| Item | 2025 appropriation | Committee recommendation | Senate Committee recommendation compared with (+ or −) 2025 appropriation |
|---|---|---|---|
| Subtotal, Other Acquisition Programs | 69,100 | 99,840 | +30,740 |
| Shore Facilities and Aids to Navigation: | | | |
| Major Construction; Housing; ATON; and Survey and Design | 52,500 | 39,800 | −12,700 |
| Major Acquisition Systems Infrastructure | 130,000 | 330,000 | +200,000 |
| Minor Shore | 5,000 | 5,000 | |
| Subtotal, Shore Facilities and Aids to Navigation | 187,500 | 374,800 | +187,300 |
| Subtotal, Procurement, Construction, and Improvements | 1,413,950 | 1,094,228 | −319,722 |
| (Appropriations) | (1,413,950) | (1,094,228) | (−319,722) |
| Research and Development | 7,476 | 10,263 | +2,787 |
| Health Care Fund Contribution (Permanent Indefinite Discretionary) | 281,851 | 297,731 | +15,880 |
| Mandatory Funding: | | | |
| Retired Pay | 1,210,840 | 1,249,000 | +38,160 |
| Administrative Provisions | | | |
| Coast Guard Museum | | | |
| Coast Guard Housing Fund | 4,000 | 4,000 | |
| Coast Guard Housing Fund (Offsetting Collections) | −4,000 | −4,000 | |
| Total, Coast Guard | 13,329,388 | 13,918,721 | +589,333 |
| (Appropriations) | (13,333,388) | (13,922,721) | (+589,333) |
| (Defense) | (530,000) | (530,000) | |
| (Non-Defense) | (11,592,548) | (12,143,721) | (+551,173) |

| | | | |
|---|---|---|---|
| (Emergency Appropriations) | | | |
| (Offsetting Collections) | (−4,000) | (−4,000) | ............ |
| (Mandatory Funding) | (1,210,840) | (1,249,000) | (+38,160) |
| Total Gross, Coast Guard | 13,333,388 | 13,922,721 | +589,333 |
| United States Secret Service | | | |
| Operations and Support: | | | |
| Protective Operations: | | | |
| Protection of Persons and Facilities | 1,031,766 | 1,135,831 | +104,065 |
| Protective Countermeasures | 72,374 | 95,661 | +23,287 |
| Protective Intelligence | 84,973 | 80,254 | −4,719 |
| Presidential Campaigns and National Special Security Events | 243,699 | 27,600 | −216,099 |
| Subtotal, Protective Operations | 1,432,812 | 1,339,346 | −93,466 |
| Field Operations: | | | |
| Domestic and International Field Operations | 794,184 | 803,477 | +9,293 |
| Support for Missing and Exploited Children Investigations | 6,000 | 6,000 | ............ |
| Support for Computer Forensics Training | 48,612 | 66,812 | +18,200 |
| Subtotal, Field Operations | 848,796 | 876,289 | +27,493 |
| Basic and In-Service Training and Professional Development | 115,836 | 176,605 | +60,769 |
| Mission Support | 610,538 | 672,060 | +61,522 |
| Additional funding (PL 118–83) | (231,000) | ............ | (−231,000) |
| Operations and Support (Sec 136) (PL 118—Division A) | 231,000 | ............ | −231,000 |
| Subtotal, Operations and Support | 3,238,982 | 3,064,300 | −174,682 |
| (Appropriations) | (3,007,982) | (3,064,300) | (+56,318) |
| (Emergency Appropriations) | | | |
| Procurement, Construction, and Improvements: | | | |
| Protection Assets and Infrastructure | 59,198 | 58,283 | −915 |
| Construction and Facility Improvements | 16,400 | 41,103 | +24,703 |

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 699 of 714 PageID #:1749



COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR FISCAL YEAR 2025 AND BUDGET ESTIMATES AND AMOUNTS RECOMMENDED IN THE BILL FOR FISCAL YEAR 2026—Continued

[In thousands of dollars]

| Item | 2025 appropriation | Committee recommendation | Senate Committee recommendation compared with (+ or −) 2025 appropriation |
|---|---|---|---|
| Subtotal, Procurement, Construction, and Improvements | 75,598 | 99,386 | +23,788 |
| (Appropriations) | (75,598) | (99,386) | (+23,788) |
| Research and Development | 4,217 | 3,250 | −967 |
| Total, United States Secret Service | 3,318,797 | 3,166,936 | −151,861 |
| (Appropriations) | (3,318,797) | (3,166,936) | (−151,861) |
| Total, Title II, Security, Enforcement, and Investigations | 54,082,574 | 54,630,008 | +547,434 |
| (Appropriations) | (56,690,734) | (57,430,658) | (+739,924) |
| (Non-Defense) | (56,160,734) | (56,900,658) | (+739,924) |
| (Defense) | (530,000) | (530,000) | |
| (Offsetting Collections) | (−3,819,000) | (−4,049,650) | (−230,650) |
| (Mandatory Funding) | (1,210,840) | (1,249,000) | (+38,160) |
| Aviation Security Capital Fund (Mandatory) | 250,000 | 250,000 | |
| Fee Funded Programs | 3,388,829 | 3,941,186 | +552,357 |
| (Transfer out) | (−650,000) | | (+650,000) |
| TITLE III—PROTECTION, PREPAREDNESS, RESPONSE, AND RECOVERY | | | |
| Cybersecurity and Infrastructure Security Agency | | | |
| Operations and Support: | | | |
| Cybersecurity: | | | |
| Cyber Operations: | | | |
| Cyber Operations | 122,496 | 769,878 | +647,382 |
| Subtotal, Cyber Operations | 122,496 | 769,878 | +647,382 |

| | | | |
|---|---|---|---|
| Technology and Services: | | | |
| Technology and Services | 7,417 | 279,574 | +272,157 |
| Continuous Diagnostics and Mitigation | 82,396 | 108,821 | +26,425 |
| Joint Collaborative Environment | 272,504 | ............ | −272,504 |
| Subtotal, Technology and Services | 362,317 | 388,395 | +26,078 |
| Subtotal, Cybersecurity | 484,813 | 1,158,273 | +673,460 |
| Infrastructure Security: | | | |
| Infrastructure Assessments and Security: | | | |
| Strategy and Performance | 15,547 | 8,257 | −7,290 |
| Security Programs | 22,096 | 14,362 | −7,734 |
| CISA Exercises | 26,914 | 18,213 | −8,701 |
| Assessments and Infrastructure Information | 38,397 | 20,576 | −17,821 |
| Bombing Prevention | 30,309 | 29,522 | −787 |
| Subtotal, Infrastructure Assessments and Security | 133,263 | 90,930 | −42,333 |
| Chemical Security | 25,866 | 3,112 | −22,754 |
| Countering Weapons of Mass Destruction | ............ | 237,849 | +237,849 |
| Subtotal, Infrastructure Security | 159,129 | 331,891 | +172,762 |
| Emergency Communications: | | | |
| Emergency Communications Preparedness | 46,971 | 35,010 | −11,961 |
| Priority Telecommunications Service: | | | |
| GETS/WPS/SRAS/TSP | 50,375 | 49,750 | −625 |
| Next Generation Networks Priority Services | 4,219 | 2,218 | −2,001 |
| Subtotal, Priority Telecommunications Services | 54,594 | 51,968 | −2,626 |
| Subtotal, Emergency Communications | 101,565 | 86,978 | −14,587 |
| Integrated Operations: | | | |
| Regional Operations: | | | |
| Coordination and Service Delivery | 27,724 | 25,580 | −2,144 |
| Security Advisors | 82,375 | 73,042 | −9,333 |

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 701 of 714 PageID #:1751



COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR FISCAL YEAR 2025 AND BUDGET ESTIMATES AND AMOUNTS RECOMMENDED IN THE BILL FOR FISCAL YEAR 2026—Continued

[In thousands of dollars]

| Item | 2025 appropriation | Committee recommendation | Senate Committee recommendation compared with (+ or −) 2025 appropriation |
|---|---|---|---|
| Chemical Inspectors | 24,700 | 7,985 | −16,715 |
| Subtotal, Regional Operations | 134,799 | 106,607 | −28,192 |
| Operations Coordination and Planning: | | | |
| Intelligence | 5,060 | .............................. | −5,060 |
| Operations Center | 78,376 | 73,048 | −5,328 |
| Planning and Readiness | 6,684 | 5,746 | −938 |
| Business Continuity and Emergency Preparedness | 3,459 | 3,512 | +53 |
| Subtotal, Operations Coordination and Planning | 93,579 | 82,306 | −11,273 |
| Subtotal, Integrated Operations | 228,378 | 188,913 | −39,465 |
| Risk Management Operations: | | | |
| National Infrastructure Simulation Analysis Center | 24,424 | 21,561 | −2,863 |
| Infrastructure Analysis | 109,446 | 85,180 | −24,266 |
| Subtotal, Risk Management Operations | 133,870 | 106,741 | −27,129 |
| Stakeholder Engagement and Requirements: | | | |
| Sector Risk Management Agency | 28,982 | 28,206 | −776 |
| Council Management | 16,895 | 2,210 | −14,685 |
| Stakeholder Engagement | 43,242 | 12,801 | −30,441 |
| International Affairs | 10,599 | 3,213 | −7,386 |
| (Defense) | (6,995) | (2,121) | (−4,874) |

| | | | |
|---|---|---|---|
| Subtotal, Stakeholder Engagement and Requirements | 99,718 | 46,430 | −53,288 |
| Mission Support: | | | |
| Executive Leadership and Oversight | 62,943 | 40,237 | −22,706 |
| (Defense) | (29,835) | (19,072) | (−10,763) |
| Enterprise Services | 415,563 | 307,512 | −108,051 |
| (Defense) | (196,977) | (145,761) | (−51,216) |
| Subtotal, Mission Support | 478,506 | 347,749 | −130,757 |
| Subtotal, Operations and Support | 1,685,979 | 2,266,975 | +580,996 |
| Procurement, Construction, and Improvements: | | | |
| Cybersecurity: | | | |
| Continuous Diagnostics and Mitigation | 265,279 | 412,116 | +146,837 |
| Threat Hunting | 20,000 | 37,119 | +17,119 |
| National Cybersecurity Protection System | 30,000 | | −30,000 |
| Cyber Analytics and Data System | 145,499 | 65,810 | −79,689 |
| Subtotal, Cybersecurity | 460,778 | 515,045 | +54,267 |
| Emergency Communications: | | | |
| Next Generation Networks Priority Services | 28,623 | 30,000 | +1,377 |
| Subtotal, Procurement, Construction, and Improvements | 489,401 | 545,045 | +55,644 |
| Research and Development: | | | |
| Infrastructure Security | 793 | | −793 |
| Risk Management | | | |
| Subtotal, Research and Development | 793 | | −793 |
| Total, Cybersecurity and Infrastructure Security Agency | 2,176,173 | 2,812,020 | +635,847 |
| (Appropriations) | (2,176,173) | (2,812,020) | (+635,847) |
| (Defense) | (1,917,416) | (2,386,651) | (+469,235) |
| (Non-Defense) | (258,757) | (425,369) | (+166,612) |
| (Emergency Aprropriations, Defense) | | | |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR FISCAL YEAR 2025 AND BUDGET ESTIMATES AND AMOUNTS RECOMMENDED IN THE BILL FOR FISCAL YEAR 2026—Continued

[In thousands of dollars]

| Item | 2025 appropriation | Committee recommendation | Senate Committee recommendation compared with (+ or −) 2025 appropriation |
|---|---|---|---|
| Federal Emergency Management Agency | | | |
| Operations and Support: | | | |
| Regional Operations | 210,095 | 215,883 | +5,788 |
| Mitigation | 75,594 | 42,234 | −33,360 |
| Preparedness and Protection | 278,940 | 398,146 | +119,206 |
| Response and Recovery: | | | |
| Response | 236,868 | 284,456 | +47,588 |
| (Urban Search and Rescue) | (40,832) | (34,832) | (−6,000) |
| Recovery | 57,531 | 60,090 | +2,559 |
| Mission Support | 624,962 | 578,896 | −46,066 |
| Subtotal, Operations and Support | 1,483,990 | 1,579,705 | +95,715 |
| (Defense) | (98,089) | (97,137) | (−952) |
| (Non-defense) | (1,385,901) | (1,482,568) | (+96,667) |
| Procurement, Construction, and Improvements: | | | |
| Operational Communications/Information Technology | 21,900 | 64,375 | +42,475 |
| Construction and Facility Improvements | 36,250 | 95,625 | +59,375 |
| Mission Support Assets and Infrastructure | 41,378 | 28,419 | −12,959 |
| Subtotal, Procurement, Construction, and Improvements | 99,528 | 188,419 | +88,891 |
| (Appropriations) | (99,528) | (188,419) | (+88,891) |
| (Defense) | (46,900) | (138,000) | (+91,100) |
| (Non-defense) | (52,628) | (50,419) | (−2,209) |
| Federal Assistance: | | | |
| Grants: | | | |
| State Homeland Security Grant Program | 468,000 | 520,000 | +52,000 |

| | | | |
|---|---|---|---|
| (Base Program) | (373,500) | (415,000) | (+41,500) |
| (Operation Stonegarden) | (81,000) | (90,000) | (+9,000) |
| (Tribal Security) | (13,500) | (15,000) | (+1,500) |
| Urban Area Security Initiative | 553,500 | 615,000 | +61,500 |
| Nonprofit Security Grant Program | 274,500 | 330,000 | +55,500 |
| Public Transportation Security Assistance | 94,500 | 105,000 | +10,500 |
| (Amtrak Security) | (9,000) | (10,000) | (+1,000) |
| (Over-the-Road Bus Security) | (1,800) | (2,000) | (+200) |
| Port Security Grants | 90,000 | 100,000 | +10,000 |
| Assistance to Firefighter Grants | 324,000 | 360,000 | +36,000 |
| Staffing for Adequate Fire and Emergency Response (SAFER) Grants | 324,000 | 360,000 | +36,000 |
| Emergency Management Performance Grants | 319,500 | 355,000 | +35,500 |
| Flood Hazard Mapping and Risk Analysis Program (RiskMAP) | 281,475 | 312,750 | +31,275 |
| Regional Catastrophic Preparedness Grants | 10,800 | 12,000 | +1,200 |
| High Hazard Potential Dams/High Risk Dam Safety | ............ | 16,000 | +16,000 |
| Emergency Food and Shelter | 117,000 | 130,000 | +13,000 |
| Targeted Violence and Terrorism Prevention Grants (by transfer) | ............ | ............ | ............ |
| Tribal Homeland Security Grant Program | ............ | ............ | ............ |
| Next Generation Warning System | 40,000 | 76,000 | +36,000 |
| Next Generation Warning System—Tribal | ............ | (20,000) | (+20,000) |
| Community Project Funding | ............ | 109,000 | +109,000 |
| Subtotal, Grants | 2,897,275 | 3,400,750 | +503,475 |
| Alternatives to Detention Case Management Grants (by transfer) | (15,000) | ............ | (−15,000) |
| Shelter and Services Program (by transfer) | (650,000) | ............ | (−650,000) |
| Subtotal, Grants (with transfers) | 3,562,275 | 3,400,750 | −161,525 |
| Education, Training, and Exercises: | | | |
| Center for Domestic Preparedness | 71,352 | 86,469 | +15,117 |
| Center for Homeland Defense and Security | 16,200 | 18,000 | +1,800 |
| Emergency Management Institute | 32,240 | 31,258 | −982 |
| US Fire Administration | 59,975 | 75,744 | +15,769 |
| National Domestic Preparedness Consortium | 90,900 | 104,000 | +13,100 |
| Continuing Training Grants | 14,400 | 20,000 | +5,600 |
| National Exercise Program | 20,920 | 20,027 | −893 |
| Securing the Cities Program | | | |
| Subtotal, Education, Training, and Exercises | 305,987 | 355,498 | +49,511 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR FISCAL YEAR 2025 AND BUDGET ESTIMATES AND AMOUNTS RECOMMENDED IN THE BILL FOR FISCAL YEAR 2026—Continued

[In thousands of dollars]

| Item | 2025 appropriation | Committee recommendation | Senate Committee recommendation compared with (+ or −) 2025 appropriation |
|---|---|---|---|
| Subtotal, Federal Assistance | 3,203,262 | 3,756,248 | +552,986 |
| Subtotal, Federal Assistance (incl transfers) | 3,868,262 | 3,756,248 | −112,014 |
| (Defense) | (40,000) | .................... | (−40,000) |
| (Non-defense) | 3,163,262 | 3,756,248 | +592,986 |
| (by transfer) | (665,000) | .................... | (−665,000) |
| Subtotal, Federal Assistance (including transfer) | 3,868,262 | 3,756,248 | −112,014 |
| Disaster Relief Fund: | | | |
| Base Disaster Relief | .................... | .................... | .................... |
| Disaster Relief Category | 22,510,000 | 26,367,000 | +3,857,000 |
| Subtotal, Disaster Relief Fund | 22,510,000 | 26,367,000 | +3,857,000 |
| National Flood Insurance Fund: | | | |
| Floodplain Management and Mapping | 225,207 | 187,522 | −37,685 |
| Mission Support | 14,578 | 38,478 | +23,900 |
| Subtotal, National Flood Insurance Fund | 239,785 | 226,000 | −13,785 |
| Offsetting Fee Collections | −239,785 | −226,000 | +13,785 |
| Administrative Provision | | | |
| Radiological Emergency Preparedness Program (Sec 308): | | | |
| Operating Expenses | 34,000 | 34,000 | .................... |
| Offsetting Collections | −34,000 | −34,000 | .................... |

| | | | |
|---|---|---|---|
| Subtotal, Administrative Provision | ............ | ............ | ............ |
| Total, Federal Emergency Management Agency | 27,296,780 | 31,891,372 | +4,594,592 |
| (Appropriations) | (27,570,565) | (32,151,372) | (+4,580,807) |
| (Defense) | (184,989) | (311,137) | (+126,148) |
| (Non-defense) | (27,385,576) | (31,840,235) | (+4,454,659) |
| (Disaster Relief Category) | (22,510,000) | (26,367,000) | (+3,857,000) |
| (Emergency Appropriations) | | | |
| (Regular appropriations, not Disaster Relief) | (4,875,576) | (5,473,235) | (+597,659) |
| (Offsetting Collections) | (−273,785) | (−260,000) | (+13,785) |
| (by transfer) | (665,000) | ............ | (−665,000) |
| Total, Title III, Protection, Preparedness, Response, and Recovery | 29,472,953 | 34,703,392 | +5,230,439 |
| (Appropriations) | (29,746,738) | (34,963,392) | (+5,216,654) |
| (Defense) | (2,102,405) | (2,697,788) | (+595,383) |
| (Non-Defense) | (27,644,333) | (32,265,604) | (+4,621,271) |
| (Disaster Relief Category) | (22,510,000) | (26,367,000) | (+3,857,000) |
| (Regular Appropriations) | (5,134,333) | (5,898,604) | (+764,271) |
| (Emergency Appropriations) | | | |
| (Offsetting Collections) | (−273,785) | (−260,000) | (+13,785) |
| (by transfer) | (665,000) | ............ | (−665,000) |
| TITLE IV—RESEARCH, DEVELOPMENT, TRAINING, AND SERVICES | | | |
| US Citizenship and Immigration Services | | | |
| Operations and Support: | | | |
| Employment Status Verification | 111,085 | 112,566 | +1,481 |
| Application Processing | 160,055 | 10,375 | −149,680 |
| Refugee, Asylum, and International Operations | ............ | 35,200 | +35,200 |
| Subtotal, Operations and Support | 271,140 | 158,141 | −112,999 |
| Federal Assistance | 10,000 | ............ | −10,000 |
| Fee Funded Programs: | | | |
| Immigration Examinations Fee Account: | | | |
| Adjudication Operations: | | | |
| Adjudication Operations | ............ | (2,561,765) | (+2,561,765) |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR FISCAL YEAR 2025 AND BUDGET ESTIMATES AND AMOUNTS RECOMMENDED IN THE BILL FOR FISCAL YEAR 2026—Continued

[In thousands of dollars]

| Item | 2025 appropriation | Committee recommendation | Senate Committee recommendation compared with (+ or −) 2025 appropriation |
|---|---|---|---|
| Field Operations Directorate | (1,177,268) | | (−1,177,268) |
| Fraud Detection and National Security Directorate | (299,506) | | (−299,506) |
| Service Center Operations Directorate | (664,569) | | (−664,569) |
| Support Services | (195,626) | | (−195,626) |
| Subtotal, Adjudication Operations | 2,336,969 | 2,561,765 | +224,796 |
| Immigration Policy and Support | (1,526,859) | (1,671,586) | (+144,727) |
| Refugee and Asylum Operations | (546,219) | (433,605) | (−112,614) |
| Immigration Records and Applicant Services | (675,328) | (718,054) | (+42,726) |
| Premium Processing (Including Transformation) | (1,523,963) | (1,357,573) | (−166,390) |
| Subtotal, Immigration Examinations Fee Account | (6,609,338) | (6,742,583) | (+133,245) |
| H1–B Non-Immigrant Petitioner Account: | | | |
| Adjudication Services: | | | |
| Service Center Operations | (20,000) | (18,808) | (−1,192) |
| Fraud Prevention and Detection Account: | | | |
| Adjudication Services: | | | |
| Adjudication Services: | | (46,066) | (+46,066) |
| District Operations | (29,151) | | (−29,151) |
| Service Center Operations | (27,430) | | (−27,430) |
| Asylum and Refugee Operating Expenses | (348) | | (−348) |
| Subtotal, Fraud Prevention and Detection Account | 56,929 | 46,066 | −10,863 |
| EB–5 Integrity Fund | (8,918) | (10,800) | (+1,882) |

| | | | |
|---|---|---|---|
| Subtotal, Fee Funded Programs | 6,695,185 | 6,818,257 | +123,072 |
| Full Committee Amendment: H–2B Returning Worker (Sec 413) | | | |
| Full Committee Amendment: H–2A Workers (Sec 414) | | | |
| Full Committee Amendment: P Visas (Sec 416) | | | |
| Total, US Citizenship and Immigration Services | 281,140 | 158,141 | −122,999 |
| Fee Funded Programs | 6,695,185 | 6,818,257 | +123,072 |
| Federal Law Enforcement Training Centers | | | |
| Operations and Support: | | | |
| Law Enforcement Training | 324,087 | 342,496 | +18,409 |
| Mission Support | 33,013 | 33,629 | +616 |
| Subtotal, Operations and Support | 357,100 | 376,125 | +19,025 |
| Procurement, Construction, and Improvements: | | | |
| Construction and Facility Improvements | 20,100 | 18,383 | −1,717 |
| Total, Federal Law Enforcement Training Centers | 377,200 | 394,508 | +17,308 |
| Science and Technology | | | |
| Operations and Support: | | | |
| Laboratory Facilities | 128,373 | 167,253 | +38,880 |
| Acquisition and Operations Analysis | 77,720 | 73,333 | −4,387 |
| Mission Support | 163,718 | 131,505 | −32,213 |
| Subtotal, Operations and Support | 369,811 | 372,091 | +2,280 |
| Procurement, Construction, and Improvements: | | | |
| Laboratory Facilities: | | | |
| Plum Island Closure and Support | 1,000 | 55,000 | +54,000 |
| Critical Repair/Replacement Requirement | 5,000 | 10,000 | +5,000 |
| Detection Sciences Testing and Applied Research Center | 55,000 | | −55,000 |
| Subtotal, Procurement, Construction, and Improvements | 61,000 | 65,000 | +4,000 |
| Research and Development: | | | |
| Research and Development | | | |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR FISCAL YEAR 2025 AND BUDGET ESTIMATES AND AMOUNTS RECOMMENDED IN THE BILL FOR FISCAL YEAR 2026—Continued

[In thousands of dollars]

| Item | 2025 appropriation | Committee recommendation | Senate Committee recommendation compared with (+ or −) 2025 appropriation |
|---|---|---|---|
| Research, Development, and Innovation | 259,786 | 403,162 | +143,376 |
| University Programs | 51,037 | 55,880 | +4,843 |
| Floor Amendments | | | |
| Subtotal, Research and Development | 310,823 | 459,042 | +148,219 |
| Total, Science and Technology | 741,634 | 896,133 | +154,499 |
| Countering Weapons of Mass Destruction Office | | | |
| Operations and Support: | | | |
| Mission Support | 93,916 | .............................. | −93,916 |
| Capability and Operations Support | 69,364 | .............................. | −69,364 |
| Subtotal, Operations and Support | 163,280 | .............................. | −163,280 |
| Procurement, Construction, and Improvements: | | | |
| Large Scale Detection Systems | 35,678 | .............................. | −35,678 |
| Portable Detection Systems | 6,660 | .............................. | −6,660 |
| Subtotal, Procurement, Construction, and Improvements | 42,338 | .............................. | −42,338 |
| Research and Development: | | | |
| Transformational R&D/Technical Forensics: | | | |
| Transformational R&D | 39,460 | .............................. | −39,460 |
| Technical Forensics | 6,530 | .............................. | −6,530 |
| Subtotal, Transformational R&D/Technical Forensics | 45,990 | .............................. | −45,990 |

| | | | |
|---|---|---|---|
| Detection Capability Development and Rapid Capabilities: | | | |
| Detection Capability Development | 14,948 | | −14,948 |
| Subtotal, Detection Capability Development and Rapid Capabilities | 14,948 | | −14,948 |
| Subtotal, Research and Development | 60,938 | | −60,938 |
| Federal Assistance: | | | |
| Capability Building: | | | |
| Training, Exercises, and Readiness | 21,268 | | −21,268 |
| Securing the Cities | 34,465 | | −34,465 |
| Biological Support | 87,152 | | −87,152 |
| Additional funding (emergency) | | | |
| Subtotal, Federal Assistance | 142,885 | | −142,885 |
| (Appropriations) | (142,885) | | (−142,885) |
| (Emergency Appropriations) | | | |
| Total, Countering Weapons of Mass Destruction | 409,441 | | −409,441 |
| (Appropriations) | (409,441) | | (−409,441) |
| (Emergency Appropriations) | | | |
| Total, Title IV, Research, Development, Training, and Services | 1,809,415 | 1,448,782 | −360,633 |
| (Appropriations) | (1,809,415) | (1,448,782) | (−360,633) |
| (Emergency Appropriations) | | | |
| Fee Funded Programs | 6,695,185 | 6,818,257 | +123,072 |
| TITLE V—GENERAL PROVISIONS | | | |
| Presidential Residence Protection Assistance (Sec528) | | | |
| OSEM Operations and Support (70 23/24 0100) (Sec 543) (rescission) | | | |
| Management Directorate (70 x 0113) (Sec 543) (rescission) | | | |
| CBP PC&I (70 x 0532) (Sec 543) (rescission) | | | |
| CBP BSFIT (70 x 0533) (Sec 543) (rescission) | | | |
| CBP Air and Marine Interdiction (070 x 0544) (Sec 543) (rescission) | | | |
| CBP PC&I FY21 (PL 116–260) (Sec 549) (rescission) | | | |
| ICE Operations and Support (70 23/24 0540) (Sec 543) (rescission) | | | |
| ICE Operations and Support (70 x 0540) (Sec 543) (rescission) | | | |
| ICE Automation Modernization (70 x 0543) (Sec 543) (rescission) | | | |
| Coast Guard AC&I (70 x 0613) (Sec 543) (rescission) | | | |

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 711 of 714 PageID #:1761



COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR FISCAL YEAR 2025 AND BUDGET ESTIMATES AND AMOUNTS RECOMMENDED IN THE BILL FOR FISCAL YEAR 2026—Continued

[In thousands of dollars]

| Item | 2025 appropriation | Committee recommendation | Senate Committee recommendation compared with (+ or −) 2025 appropriation |
|---|---|---|---|
| Coast Guard PC&I (Sec 543) (rescission) | | −194,800 | −194,800 |
| USSS O&S (70 x 0400) (Sec 543) (rescission) | | | |
| USSS PC&I (70 23/25 0401) Sec 543) (rescission) | | | |
| CISA PC&I (70 23/27 0412) (Sec 543) (rescission) | | | |
| CISA R&D (70 23/24 0805) (Sec 543) (rescission) | | | |
| FEMA Predisaster Mitigation Fund (70 x 0716) (Sec 543) (rescission) | | | |
| USCIS Operations and Support (70 X 0300) (Sec 543) (rescission) | | | |
| FLETC PC&I (70 20/24 0510) (Sec 543) (rescission) | | | |
| S&T Operations and Support (70 x 0800) (Sec 543) (rescission) | | | |
| CWMD PC&I (70 22/24 0862) (Sec 543) (rescission) | | | |
| CWMD PC&I (70 23/25 0862) (Sec 543) (rescission) | | | |
| CWMD R&D (70 22/24 0860) (Sec 543) (rescission) | | | |
| CWMD R&D (70 23/25 0860) (Sec 543) (rescission) | | | |
| CWMD R&D (70 x 0860) (Sec 543) (rescission) | | | |
| DHS Lapsed Balances (non-defense) (rescission) | −27,030 | | +27,030 |
| DHS Lapsed Balances (defense) (rescission) | −2,545 | | +2,545 |
| DHS Nonrecurring Expenses Fund (70 x 1914) (Sec 550) (rescission) | −133,000 | | +133,000 |
| Payment from the presidential election campaign fund | | | |
| Derived by transfer from PL 117–58 | −115,000 | | +115,000 |
| Unobligated Balances (rescission) | | | |
| H–2B Returning Worker (Sec 546) | | 24,000 | +24,000 |
| Conrad-30 Extension | | 1,000 | +1,000 |
| IIJA Repurposing (Sec 554) | | −27,788 | −27,788 |
| Total, Title V, General Provisions | −277,575 | −197,588 | +79,987 |
| (Defense) | (−2,545) | (−27,788) | (−25,243) |
| (Non-Defense) | (−275,030) | (−169,800) | (+105,230) |

| | | | |
|---|---|---|---|
| OTHER APPROPRIATIONS | | | |
| THE INFRASTRUCTURE INVESTMENT AND JOBS ACT | | | |
| (P L 117–58) | | | |
| DIVISION J—APPROPRIATIONS | | | |
| DEPARTMENT OF HOMELAND SECURITY | | | |
| Cybersecurity and Infrastructure Security Agency | | | |
| Cybersecurity Response and Recovery Fund: | | | |
| Appropriations available from prior year advances (emergency) | (20,000) | ............ | (−20,000) |
| Federal Emergency Management Agency | | | |
| Federal Assistance: | | | |
| Sec 205 Grants: | | | |
| Appropriations available from prior year advances (emergency) | (100,000) | ............ | (−100,000) |
| Grants for Cybersecurity and Critical Infrastructure: | | | |
| Appropriations available from prior year advances (emergency) | (300,000) | ............ | (−300,000) |
| Disaster Relief Fund: | | | |
| Appropriations available from prior year advances (emergency) | (200,000) | ............ | (−200,000) |
| National Flood Insurance Fund: | | | |
| Appropriations available from prior year advances (emergency) | (700,000) | ............ | (−700,000) |
| Total, Federal Emergency Management Agency | ............ | ............ | ............ |
| Total, Infrastructure Investment and Jobs Act | ............ | ............ | ............ |
| DISASTER RELIEF SUPPLEMENTAL APPROPRIATIONS ACT, 2025 | | | |
| (PL 118–158 DIVISION B) | | | |
| DEPARTMENT OF HOMELAND SECURITY | | | |
| United States Coast Guard | | | |
| Procurement, Construction, and Improvements (emergency) | 210,200 | ............ | −210,200 |
| Operations and Support (emergency) | 102,500 | ............ | −102,500 |
| Total, USCG | 312,700 | ............ | −312,700 |

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 713 of 714 PageID #:1763



COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR FISCAL YEAR 2025 AND BUDGET ESTIMATES AND AMOUNTS RECOMMENDED IN THE BILL FOR FISCAL YEAR 2026—Continued

[In thousands of dollars]

| Item | 2025 appropriation | Committee recommendation | Senate Committee recommendation compared with (+ or −) 2025 appropriation |
|---|---|---|---|
| Federal Emergency Management Agency | | | |
| Disaster Relief Fund (DRF) (emergency) | 29,000,000 | .................. | −29,000,000 |
| Hermit's Peak (emergency) | 1,500,000 | .................. | −1,500,000 |
| Total, FEMA | 30,500,000 | .................. | −30,500,000 |
| Federal Law Enforcement Training Centers—Procurement, Construction, and Improvements (emergency) | 14,020 | .................. | −14,020 |
| Total, Disaster Relief Supplemental Appropriations Act, 2025 | 30,826,720 | .................. | −30,826,720 |
| Total, Other Appropriations | 30,826,720 | .................. | −30,826,720 |
| Grand Total | 118,866,956 | 93,572,000 | −25,294,956 |
| (Discretionary Appropriations) | (93,228,559) | (98,853,905) | (+5,625,346) |
| (Defense) | (2,632,405) | (3,200,000) | (+567,595) |
| (Non-Defense) | (90,596,154) | (95,653,905) | (+5,057,751) |
| (Disaster Relief Category) | (22,510,000) | (26,367,000) | (+3,857,000) |
| (Other Non-Defense) | (68,086,154) | (69,286,905) | (+1,200,751) |
| (Rescissions) (Defense) | (−2,545) | .................. | (+2,545) |
| (Rescissions) (Non-defense) | (−160,030) | (−194,800) | (−34,770) |
| (Offsetting Collections) | (−6,236,588) | (−6,336,105) | (−99,517) |
| (Emergency Appropriations) | (30,826,720) | .................. | (−30,826,720) |
| (Mandatory Funding) | (1,210,840) | (1,249,000) | (+38,160) |
| (By transfer) | 665,000 | .................. | −665,000 |
| (By transfer) (emergency) | .................. | .................. | .................. |
| (Transfer out) | −683,000 | .................. | +683,000 |
| (Transfer out) (emergency) | | | |
| Aviation Security Capital Fund | 250,000 | 250,000 | .................. |

Case: 1:25-cv-05462 Document #: 65-1 Filed: 09/02/26 Page 714 of 714 PageID #:1764



| | | | |
|---|---|---|---|
| Fee Funded Programs | 9,834,014 | 10,509,443 | +675,429 |
| (Grand Total without Other Appropriations) | (88,040,236) | (93,572,000) | (+5,531,764) |