**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

CITY OF CHICAGO, CITY OF BOSTON, CITY AND COUNTY OF DENVER, CITY AND COUNTY OF SAN FRANCISCO, and CITY OF SEATTLE,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY and MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security,

Defendants.

Case No. 1:25-cv-05462

Hon. John J. Tharp, Jr.

**PLAINTIFFS' COMBINED REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ........ 1

BACKGROUND: DEVELOPMENTS SINCE DHS CERTIFIED THE ADMINISTRATIVE RECORD ........ 3

ARGUMENT ........ 7

I. The Tucker Act Does Not Divest the Court of Jurisdiction. ........ 7

II. Plaintiffs Are Entitled to Summary Judgment as to the Reimbursement Freeze. ........ 12

A. Plaintiffs' Challenge to the Reimbursement Freeze Is Not Moot. ........ 13

B. The Reimbursement Freeze Was a Final Agency Action. ........ 15

C. DHS Concedes that the Reimbursement Freeze Fails Review Under Both Sections 706(2)(A) and 706(2)(D). ........ 19

III. Plaintiffs Are Entitled to Summary Judgment as to the Equipment Freeze. ........ 20

A. The Court Should Decide This Case on the Certified Administrative Record, Without Drawing on DHS's Post Hoc Rationalizations. ........ 20

B. The Equipment Freeze Cannot Survive APA Review, Whether Based on the Certified Administrative Record or the Purported Supplemental Administrative Record. ........ 29

1. The Decision to Freeze Equipment Purchases Was Not "Committed to Agency Discretion by Law." ........ 29

2. Neither Version of the Record Contains a Satisfactory Explanation for the Equipment Freeze. ........ 34

3. DHS Concedes It Did Not Consider Plaintiffs' Reliance Interests. ........ 38

4. DHS Concedes It Did Not Consider the Equipment Freeze's Impact on Public Safety. ........ 42

IV. DHS Concedes that if the Court Finds the Freezes Unlawful, Plaintiffs Are Entitled to Declaratory Relief, Vacatur, and Injunctive Relief. ........ 44

CONCLUSION ........ 45

**TABLE OF CASES**

*Afterschool for Child. & Teens (ACT) Now v. Dep't of Educ.*,
2026 WL 1847100 (N.D. Ill. June 26, 2026) .... 12

*Alper v. Altheimer & Gray*,
2002 WL 31133287 (N.D. Ill. Sept. 26, 2002).... 24

*Am. Ctr. for Int'l Lab. Solidarity v. Chavez-DeRemer*,
789 F. Supp. 3d 66 (D.D.C. 2025) .... 10

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. HHS*,
2026 WL 2549267 (N.D. Cal. June 18, 2026) .... 17

*Am. Hosp. Ass'n v. Kennedy*,
164 F.4th 28 (1st Cir. 2026) .... 27

*Am. Pub. Health Assoc. v. Nat'l Insts. of Health*,
791 F. Supp. 3d 119 (D. Mass. 2025).... 37, 40

*Am. Textile Mfrs. Inst., Inc. v. Donovan*,
452 U.S. 490 (1981).... 26

*Bennett v. Spear*,
520 U.S. 154 (1997).... 15

*Bhattacharya v. Chi. Hous. Auth.*,
2017 WL 1197095 (N.D. Ill. Mar. 31, 2017) .... 30, 33

*Blue & Gold Fleet, LP v. United States*,
70 Fed. Cl. 487 (2006) .... 22

*Bonte v. U.S. Bank, N.A.*,
624 F.3d 461 (7th Cir. 2010) .... 19, 39, 42, 45

*Boucher v. U.S. Dep't of Ag.*,
934 F.3d 530 (7th Cir. 2019) .... 28

*Bouder v. Prudential Fin., Inc.*,
2010 WL 2026707 (D.N.J. May 21, 2010) .... 24

*Camp v. Pitts*,
411 U.S. 138 (1973).... 20, 22

*Cayuga Nation v. United States*,
594 F. Supp. 3d 64 (D.D.C. 2022).... 37

*Centro de Trabajadores Unidos v. Bessent*,
167 F.4th 1218 (D.C. Cir. 2026) .... 28

*Chi. Transit Auth. v. U.S. Dep't of Transp.*,
824 F. Supp. 3d 677 (N.D. Ill. 2026) ........ 7

*Chi. Women in Trades v. Trump*,
778 F. Supp. 3d 959 (N.D. Ill. 2025) ........ 7

*City & County of San Francisco v. Trump*,
783 F. Supp. 3d 1148 (N.D. Cal. 2025)........ 18

*City of Chicago v. DHS*,
2026 WL 353581 (N.D. Ill. Feb. 9, 2026)........7, 11

*City of Chicago v. DHS*,
815 F. Supp. 3d 727 (N.D. Ill. 2025) ........7, 9, 11, 12, 33

*City of Chicago v. DOJ*,
822 F. Supp. 3d 873 (N.D. Ill. 2026) ........ 7

*City of Chicago v. Noem*,
2025 WL 3251222 (N.D. Ill. Nov. 21, 2025)........ 7, 30

*Clifford v. Pena*,
77 F.3d 1414 (D.C. Cir. 1996)........ 27

*Climate United Fund v. Citibank, N.A.*,
154 F.4th 809 (D.C. Cir. 2025) ........ 12

*Cmty. Legal Servs. v. HHS*,
155 F.4th 1099 (9th Cir. 2025)........ 8, 9

*Cook County v. Wolf*,
962 F.3d 208 (7th Cir. 2020)........ 37

*Crowley Gov't Servs., Inc. v. GSA*,
38 F.4th 1099 (D.C. Cir. 2022) ........9, 11

*Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*,
2020 WL 5642287 (D.D.C. Sept. 22, 2020) ........ 20

*Defs. of Wildlife v. Gutierrez*,
532 F.3d 913 (D.C. Cir. 2008)........ 35, 43

*Del. Dep't. of Nat. Res. & Env't Control v. U.S. Army Corps of Eng'rs*,
722 F. Supp. 2d 535 (D. Del. 2010) ........ 22

*Dep't of Com. v. New York*,
588 U.S. 752 (2019)........ 29, 31, 32, 33, 34

*DHS v. Regents of Univ. of Cal.*,
591 U.S. 1 (2020) .......... 2, 25, 26, 28, 40, 41

*Drs. for Am. v. Off. of Pers. Mgmt.*,
793 F. Supp. 3d 112 (D.D.C. 2025) .......... 37, 40

*Freedom Network USA v. Trump*,
830 F. Supp. 3d 681 (N.D. Ill. 2026) .......... 7

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) .......... 1, 13, 14

*Gen. Elec. Co. v. U.S. Nuclear Regul. Comm'n*,
750 F.2d 1394 (7th Cir. 1984) .......... 27

*Glob. Comput. Enters., Inc. v. United States*,
88 Fed. Cl. 52 (2009) .......... 26

*Great-West Life & Annuity Ins. Co. v. Knudson*,
534 U.S. 204 (2002) .......... 12

*Harriman v. Hancock County*,
627 F.3d 22 (1st Cir. 2010) .......... 24

*Heckler v. Chaney*,
470 U.S. 821 (1985) .......... 31

*Highway J Citizens Grp., U.A. v. U.S. Dep't of Transp.*,
2016 WL 4288995 (E.D. Wis. Aug. 15, 2016) .......... 23

*Hisp. Affs. Project v. Acosta*,
901 F.3d 37 (D.C. Cir. 2018) .......... 21

*Hous. Auth. of City of New Haven v. United States*,
140 Fed. Cl. 773 (2018) .......... 10

*Hymas v. United States*,
810 F.3d 1312 (Fed. Cir. 2016) .......... 10

*Illinois v. FEMA*,
801 F. Supp. 3d 75 (D.R.I. 2025) .......... 37, 40, 41, 43

*Illinois v. Noem*,
813 F. Supp. 3d 282 (D.R.I. 2025) .......... 41

*Illinois v. Vought*,
2026 WL 2099046 (N.D. Ill. July 21, 2026) .......... 7

*Illinois v. Vought*,
825 F. Supp. 3d 721 (N.D. Ill. 2026) .......... 16

*James v. City of Chicago*,
2026 WL 885061 (N.D. Ill. Mar. 31, 2026) .......... 19

*Khan v. United States*,
201 F.3d 1375 (Fed. Cir. 2000) .......... 9

*Knox v. Serv. Emps. Int'l Union, Local 1000*,
567 U.S. 298 (2012) .......... 14

*Lincoln v. Vigil*,
508 U.S. 182 (1993) .......... 33

*LS3, Inc. v. United States*,
163 Fed. Cl. 1 (2022) .......... 22

*Martinez v. United States*,
333 F.3d 1295 (Fed. Cir. 2003) .......... 8

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982) .......... 11

*Metro. Transp. Auth. v. Duffy*,
2026 WL 588117 (S.D.N.Y. Mar. 3, 2026) .......... 9

*Michigan v. EPA*,
576 U.S. 743 (2015) .......... 38

*Nally v. Obaisi*,
2023 WL 8236608 (N.D. Ill. Nov. 28, 2023) .......... 19, 39, 42, 45

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
763 F. Supp. 3d 36 (D.D.C. 2025) .......... 42

*Nat'l Ctr. for Mfg. Scis. v. United States*,
114 F.3d 196 (Fed. Cir. 1997) .......... 12

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025) .......... 12

*Nava v. DHS*,
435 F. Supp. 3d 880 (N.D. Ill. 2020) .......... 16

*New Jersey v. U.S. Dep't of Transp.*,
835 F. Supp. 3d 477 (S.D.N.Y. 2026) .......... 9, 11, 17

*New York v. Trump*,
171 F.4th 1 (1st Cir. 2026) ........................................ 16, 17

*New York v. Trump*,
764 F. Supp. 3d 46 (D.R.I. 2025) ........................................ 15

*Oceana, Inc. v. Ross*,
290 F. Supp. 3d 73 (D.D.C. 2018) ........................................ 21, 22

*Pacito v. Trump*,
169 F.4th 895 (9th Cir. 2026) ........................................ 9, 10, 11, 12

*Palmer v. Marion County*,
327 F.3d 588 (7th Cir. 2003) ........................................ 42, 45

*Physicians for Soc. Resp. v. Wheeler*,
956 F.3d 634 (D.C. Cir. 2020) ........................................ 28, 31

*Ratcliff v. TranStewart Trucking Inc.*,
684 F. Supp. 3d 845 (S.D. Ind. 2023) ........................................ 19, 39, 42, 45

*Rick's Mushroom Serv., Inc. v. United States*,
521 F.3d 1338 (Fed. Cir. 2008) ........................................ 9

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943) ........................................ 25

*St. Bernard Par. Gov't v. United States*,
134 Fed. Cl. 730 (2017) ........................................ 9

*Sustainability Inst. v. Trump*,
165 F.4th 817 (4th Cir. 2026) ........................................ 12

*Tootle v. Sec'y of Navy*,
446 F.3d 167 (D.C. Cir. 2006) ........................................ 8, 9

*United Student Aid Funds, Inc. v. Devos*,
237 F. Supp. 3d 1 (D.D.C. 2017) ........................................ 21

*Vahora v. Holder*,
626 F.3d 907 (7th Cir. 2010) ........................................ 32

*Washington v. U.S. Dep't of Com.*,
812 F. Supp. 3d 1169 (W.D. Wash. 2025) ........................................ 11

*Washington v. U.S. Dep't of Educ.*,
813 F. Supp. 3d 1222 (W.D. Wash. 2025) ........................................ 21

*Washington v. U.S. Dep't of Transp.*,
2026 WL 183584 (W.D. Wash. Jan. 23, 2026) .......... 15, 18

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
586 U.S. 9 (2018) .......... 30, 31, 33

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) .......... 16

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
186 F.4th 25 (1st Cir. 2026) .......... 16, 39, 40

## INTRODUCTION

In early 2025, DHS began illegally withholding millions of dollars in congressionally appropriated funds from Plaintiffs and reversed its longstanding practice of permitting Plaintiffs to purchase nuclear detection equipment using Securing the Cities program funds. After Plaintiffs challenged both the "Reimbursement Freeze" and the "Equipment Freeze" under the Administrative Procedure Act and on other grounds, DHS filed the administrative record underlying its decisions, which was certified by Brian Kuleski, head of the Securing the Cities program and custodian of the administrative record. Once Plaintiffs raised questions about the completeness of that record, counsel for DHS confirmed that the record was complete and that DHS would not be supplementing it to address Plaintiffs' concerns that particular documents had been omitted. Relying on the certified record and DHS's assurances, Plaintiffs moved for partial summary judgment.

Plaintiffs explained that the Reimbursement Freeze violated the APA, as it was arbitrary and capricious and adopted contrary to law and procedure. *See* Count IV (5 U.S.C. § 706(2)(A)); Count VI (§ 706(2)(D)). In response, DHS does not dispute and therefore concedes that the Reimbursement Freeze fails scrutiny under both prongs of the APA. DHS instead argues only that the Court cannot review the agency's blatantly unlawful conduct. But DHS's assertion that the Tucker Act divests this Court of jurisdiction is wrong, according to the plain terms of DHS's cooperative agreements with Plaintiffs. DHS's post-litigation decision to voluntarily cease its conduct, meanwhile, has not mooted this controversy, because DHS has failed to satisfy its "formidable burden" to show that it is "absolutely clear" its conduct cannot be expected to recur. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000). And DHS's argument that its decision to freeze funds was really just a "pause," such that it did not constitute a reviewable final agency action, has been roundly rejected by multiple courts.

Plaintiffs further explained that the Equipment Freeze was arbitrary and capricious, as reflected in the 28-page administrative record that barely referenced the Freeze and provided no evidence of reasoned decision-making. *See* Count IV (§ 706(2)(A)). DHS responded by putting forward a new declaration from Mr. Kuleski—not claiming that documents had been inadvertently omitted from the record or that he had erred in certifying it, but rather providing a novel account of his decision to implement the Equipment Freeze. In support, Mr. Kuleski attached more than 1,000 pages of exhibits. DHS concedes that the "meager" certified record "does not provide a full and complete understanding of the issues" and tells—not asks—the Court to consider these "supplement[al]" materials. Defs.' Mem. in Supp. of Cross-Mot. for Partial Summ. J., ECF No. 64-1 ("Defs.' Opp.") at 6–7. DHS's conduct is procedurally irregular, to say the least, and has prejudiced Plaintiffs. But even if DHS had promptly provided the materials by including them in the certified record, they would be irrelevant, as they are no more than "'impermissible post hoc rationalization.'" *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 20 (2020).

Regardless of whether the Court considers the certified or the "supplemented" version of the record, DHS cannot show that it provided a "satisfactory explanation" of the Equipment Freeze, as the law requires. Moreover, DHS does not dispute and therefore concedes that it failed to assess Plaintiffs' reliance interests before implementing the Freeze, in violation of the APA. DHS also fails to dispute and therefore concedes that it did not consider public safety before issuing the Equipment Freeze, an additional violation of the APA. Because the Equipment Freeze is reviewable—DHS's Tucker Act argument fails equally for the Equipment Freeze as for the Reimbursement Freeze, and the decision to issue the Equipment Freeze was not committed to DHS's unbridled discretion—these concessions are dispositive.

Finally, DHS does not dispute and therefore concedes that if the Court rules for Plaintiffs on the merits, it should grant Plaintiffs their requested relief.

In sum, DHS cannot salvage its unlawful actions. The Court should grant Plaintiffs' Motion for Partial Summary Judgment and deny DHS's mirror-image Cross-Motion for Partial Summary Judgment. Further, the Court should grant Plaintiffs' relief as unopposed.

## BACKGROUND: DEVELOPMENTS SINCE DHS CERTIFIED THE ADMINISTRATIVE RECORD

In its opposition brief, DHS asserted for the first time—almost four months after it certified the administrative record—that it should be permitted to "supplement" the record regarding the Equipment Freeze. Defs.' Opp. at 6–7. In particular, DHS argued that the Court "can and should" consider a litigation affidavit prepared by Mr. Kuleski, which in turn attaches 39 documents as exhibits for a total of over 1,000 pages. *Id.*; ECF No. 65 ("Kuleski Dec."); ECF No. 65-1 (Kuleski Dec., Exs. A to B-3); ECF No. 65-2 (Kuleski Dec., Exs. C–O). Some background on what preceded this remarkable turn of events is called for.

In January 2026, DHS requested an extension "to accommodate defendants' preparation and filing of the administrative record." ECF No. 41 ¶ 5. Once DHS reopened from a shutdown, it requested another extension to "finish compiling the administrative record and file it with the [C]ourt." ECF No. 48 ¶¶ 3–4. Plaintiffs consented to these and other interim requests for extensions, but emphasized the need to receive the administrative record sufficiently far in advance of their deadline to move for summary judgment. ECF No. 41 ¶ 5 (Plaintiffs agreed to DHS's request "on the condition that the summary judgment briefing schedule would … begin at least 30 days after defendants file[d] the administrative record").

On May 12, 2026, DHS filed "the certified contents of the Administrative Record." ECF No. 50. DHS stated that the record "contain[ed] the non-privileged documents that were directly

or indirectly considered in connection with the challenged 2025 decision[] [to implement the Equipment Freeze, in relevant part]." *Id.* Mr. Kuleski certified that the documents "constitute[d] the administrative record the agency considered." ECF No. 50-1 at 1. In total, the record contained ten documents spanning 28 pages. ECF No. 50-3.

Counsel for Plaintiffs promptly followed up with counsel for DHS. On May 22, 2026, Plaintiffs requested that DHS: (i) confirm that the administrative record "contain[ed] *all* the non-privileged documents that were directly or indirectly considered" in connection with the Equipment Freeze; (ii) confirm whether DHS "ha[d] any intention of supplementing the record" with particular materials that were referenced, but not included, in the record; and (iii) re-file the record on the public docket. 2d Metcalf Dec., Ex. G at 5.[1] One week later, counsel for Plaintiffs followed up on these questions and highlighted the need to "make sure we have enough time to raise any concerns/motions with the Court *before the MSJ briefing gets under way*." *Id.* at 4. (emphasis added). On June 4, counsel for Plaintiffs reached out again, requesting that when DHS re-filed the administrative record publicly, the accompanying certification be worded to eliminate any ambiguity about whether it contained all the non-privileged documents considered, directly or indirectly, by DHS. *Id.*, Ex. H at 8.

On June 12, 2026, counsel for the parties conferred, and counsel for DHS confirmed that the administrative record was complete. 2d Metcalf Dec. ¶ 5. Counsel for DHS further stated that the agency did not intend to supplement the record with the materials Plaintiffs had inquired about. *Id.* Later that day, DHS re-filed the same administrative record, this time on the public docket. ECF No. 54. DHS's filing once again stated that it contained the non-privileged documents "that were directly or indirectly considered in connection with the [Equipment Freeze]," *id.*, and once

[1] All exhibit pin cites refer to the file-stamped CM/ECF "Page" numbers at the top of the documents.

again was accompanied by Mr. Kuleski's certification that the materials "constitute[d] the administrative record the agency considered," ECF No. 54-1.

Three days later, Plaintiffs moved for summary judgment based on the certified administrative record. Pls.' Mot. for Partial Summ. J., ECF No. 55 ("Pls.' Mot."). Plaintiffs' arguments rested, in large part, on what was *not* in the record—the reasoning that DHS did not provide, and the reliance interests and collateral consequences that DHS ignored. *See* Pls.' Mem. in Supp. of Mot. for Partial Summ. J., ECF No. 55-1 ("Pls.' Mem.") at 15–22.

After receiving two extensions, DHS filed its opposition and cross-motion, accompanied by Mr. Kuleski's declaration and supporting exhibits, on September 2, 2026. *See* ECF Nos. 59, 62. The declaration, as set out more fully below, included an extensive description of Mr. Kuleski's alleged analyses that led up to his decision to implement the Equipment Freeze.[2] Kuleski Dec. ¶¶ 9–17. A number of the claims that Mr. Kuleski makes in the declaration are factually impossible. For example, Mr. Kuleski repeatedly cites events that took place *after* the Equipment Freeze went into effect as justification for his decision to implement the Freeze. *See infra* at 28. And Mr. Kuleski references "[m]onitoring and collecting" "weekly" feedback as part of his analysis, but states that he decided to implement the Freeze after just two days on the job. Kuleski Dec. ¶¶ 9, 17. Mr. Kuleski's post hoc description of his supposed decision-making process does not include any references to the agency's certified record; rather, he cites a variety of documents attached to his declaration. *See* Kuleski Dec. ¶¶ 9–17 (citing Exs. B-1, B-2, B-3, C, D, F-1, F-7).

Notably, Mr. Kuleski never states that he, or anyone at DHS, actually considered the supplemental materials that he attaches to his declaration as part of the decision-making process in 2025. Mr. Kuleski—who, as "the custodian of the administrative record for the [Countering

---

[2] Mr. Kuleski's declaration deals only with the Equipment Freeze, not the Reimbursement Freeze.

Weapons of Mass Destruction Office's] STC program," is presumably well aware of its contents—does not claim that he mistakenly omitted any documents from the as-filed record. ECF No. 54-1. Mr. Kuleski also did not withdraw or amend his certification that the as-filed record "contains the non-privileged documents considered by DHS, and that these documents constitute the administrative record the agency considered." *Id.*

In its opposition brief, DHS took the position for the first time that the administrative record, "standing on its own, does not provide a full and complete understanding of the issues." Defs.' Opp. at 7; *see also id.* at 6 (alleging that the "record is insufficient for the Court to render a decision"). DHS determined that the record should be supplemented, and selected what documents to put in that supplement, only *after* receiving Plaintiffs' motion and learning what arguments it needed to respond to. (Or at least Plaintiffs assume that is the case, as the alternative would be worse—that DHS determined it would attempt to supplement the record and prepared the documents for the supplement before Plaintiffs moved for summary judgment, yet chose to withhold that information for two and a half months.)

Once DHS determined that supplemental materials were necessary for the Court to rule on Plaintiffs' motion (whenever that was), it did not advise Plaintiffs that it planned to request supplementation or promptly provide Plaintiffs copies of the materials. Plaintiffs received the materials only as attachments to DHS's opposition brief. Some of those materials had previously been classified (*see* Kuleski Dec., Ex. C) or uniquely in the possession of DHS (*see id.*, Ex. E). DHS did not even file a motion for leave to supplement the record, instead simply asserting in its opposition that the "[C]ourt can and should consider the Kuleski Declaration." Defs.' Opp. at 7.

As a result of its choices, DHS deprived Plaintiffs of the chance to address the supplemental materials in their opening brief (whereas DHS has the opportunity to address the materials in both

its combined opposition / cross-motion and in its reply in support of its cross-motion). DHS's conduct also deprived Plaintiffs of the ability to analyze the materials between the time that DHS had gathered the materials and when it filed them with the Court. And DHS's actions forced Plaintiffs to choose between halting summary judgment briefing to seek judicial intervention regarding the improper supplementation—after the schedule had already been delayed by about six months—or pressing forward with briefing based on two, alternative records.

As explained below, the Court should not countenance DHS's improper and prejudicial attempt to supplement the record. And, regardless of which version of the record the Court considers, DHS's decision to implement the Equipment Freeze cannot survive review under the Administrative Procedure Act.

## ARGUMENT

### I. The Tucker Act Does Not Divest the Court of Jurisdiction.

DHS argues that the Tucker Act displaces this Court's jurisdiction because Plaintiffs' claims are purportedly "founded … upon" the parties' cooperative agreements, 28 U.S.C. § 1491(a)(1), requiring Plaintiffs to sue in the Court of Federal Claims. Defs.' Opp. at 7–16. But courts in this District have repeatedly rejected the federal government's reliance on the Tucker Act in grant litigation filed by Chicago and others.[3] The result should be the same here, for three independent reasons.

[3] *See City of Chicago v. DOJ*, 822 F. Supp. 3d 873, 884–85 (N.D. Ill. 2026); *City of Chicago v. Noem*, 2025 WL 3251222, at *4–5 (N.D. Ill. Nov. 21, 2025); *City of Chicago v. DHS*, 815 F. Supp. 3d 727, 739–49 (N.D. Ill. 2025) (exercising jurisdiction over challenge to funding freeze but not grant terminations); *City of Chicago v. DHS*, 2026 WL 353581, at *5 (N.D. Ill. Feb. 9, 2026); *see also Illinois v. Vought*, 2026 WL 2099046, at *3–8 (N.D. Ill. July 21, 2026); *Freedom Network USA v. Trump*, 830 F. Supp. 3d 681, 699–700 (N.D. Ill. 2026); *Chi. Transit Auth. v. U.S. Dep't of Transp.*, 824 F. Supp. 3d 677, 681–83 (N.D. Ill. 2026); *Chi. Women in Trades v. Trump*, 778 F. Supp. 3d 959, 980–82 (N.D. Ill. 2025), *appeal filed*, No. 25-2144 (7th Cir.).

*First*, Plaintiffs explained in their opening motion that they "do not rely on [the parties' cooperative agreements to support their claims." Pls.' Mem. at 11–12; *see also id.* at 12 ("Plaintiffs' action is entirely based on DHS violating the APA …."). DHS insists, incorrectly, that Plaintiffs' APA claims "plainly depend on [the] cooperative agreements." Defs.' Opp. at 11; *see also id.* at 12 ("The rights that [P]laintiffs seek to vindicate in the equipment pause claim stem solely from those agreements."). But DHS's attempt to frame the APA claims as ones for breach of the cooperative agreements immediately fails, because those agreements disclaim jurisdiction under the Tucker Act. The agreements provide: "Monetary damages are not available to the Recipient in the event of a breach of the grant or cooperative agreement by DHS, such that *the United States Court of Federal Claims does not have jurisdiction to render judgment upon any claim against the United States arising under the grant or cooperative agreement* under 28 U.S.C. § 1491(a)." Chicago Dec. 1, Ex. H at 194 (emphasis added). The agreements further state: "The scope of any judicial review for a [sic] DHS actions, findings, and conclusions under this cooperative agreement is limited to the standard of review *under the Administrative Procedure Act*, 5 U.S.C. § 706." *Id.* (emphasis added); *accord* Boston Dec., Ex. H at 132; Denver Dec., Ex. H at 57; S.F. Dec., Ex. H at 125; Seattle Dec., Ex. B at 38.

Thus, even if Plaintiffs' claims arise under the cooperative agreements, the agreements preclude the Court of Federal Claims from exercising jurisdiction. And because "the Court of Federal Claims lacks APA jurisdiction," *Martinez v. United States*, 333 F.3d 1295, 1313 (Fed. Cir. 2003), Plaintiffs cannot assert their APA claims in that court either. Courts "categorically reject the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006); *accord Cmty. Legal Servs. v. HHS*, 155 F.4th 1099, 1102 (9th Cir. 2025); *Crowley Gov't*

*Servs., Inc. v. GSA*, 38 F.4th 1099, 1109 (D.C. Cir. 2022); *Chicago v. DHS*, 815 F. Supp. 3d at 749. For good reason: under DHS's position, "Plaintiffs can seek no relief anywhere." *Metro. Transp. Auth. v. Duffy*, 2026 WL 588117, at *32 (S.D.N.Y. Mar. 3, 2026), *appeal filed*, No. 26-1213 (2d Cir.). That would be, "to say the least, troublesome." *Tootle*, 446 F.3d at 176. The Court should "reject the notion that" the Tucker Act "create[s] a jurisdictional Catch-22 in which no court can consider Plaintiffs' claims." *Cmty. Legal Servs.*, 155 F.4th at 1107; *accord New Jersey v. U.S. Dep't of Transp.*, 835 F. Supp. 3d 477, 506 (S.D.N.Y. 2026), *appeal filed*, No. 26-2416 (2d Cir.).

*Second*, even if the cooperative agreements had not expressly disclaimed jurisdiction under the Tucker Act, the Court of Federal Claims would lack jurisdiction. The Court of Federal Claims' jurisdiction is limited to cases founded upon agreements that are supported by consideration and mandate damages for a breach. *See Khan v. United States*, 201 F.3d 1375, 1377 (Fed. Cir. 2000); *Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1343 (Fed. Cir. 2008). To supply consideration for Tucker Act purposes, an agreement must give the federal government a "direct" rather than "incidental" benefit. *St. Bernard Par. Gov't v. United States*, 134 Fed. Cl. 730, 736 (2017), *aff'd*, 916 F.3d 987 (Fed. Cir. 2019). In deciding whether consideration exists, courts "have looked to" the Federal Grant and Cooperative Agreement Act. *Pacito v. Trump*, 169 F.4th 895, 926 (9th Cir. 2026) (citing cases). That Act instructs agencies to use procurement contracts when "the principal purpose of the instrument is to acquire (by purchase, lease, or barter) property or services *for the direct benefit or use of the United States Government*." 31 U.S.C. § 6303 (emphasis added). By contrast, agencies must use cooperative agreements when "the principal purpose of the relationship is to transfer a thing of value to the State, local government, or other recipient to carry out a public purpose of support or stimulation authorized by a law of the United States *instead of*

*acquiring* (by purchase, lease, or barter) *property or services for the direct benefit or use of the United States Government*." *Id.* § 6305 (emphasis added).

DHS's decision to use cooperative agreements rather than procurement contracts "has probative value in assessing the sufficiency of the consideration the agency expects and whether such consideration is of sufficient direct benefit to the agency to qualify as a contract for purposes of the Tucker Act." *Am. Ctr. for Int'l Lab. Solidarity v. Chavez-DeRemer*, 789 F. Supp. 3d 66, 87 (D.D.C. 2025); *accord Pacito*, 169 F.4th at 926. DHS nevertheless asserts that consideration exists here because the cooperative agreements advance the agency's "interest in protecting the nation … from terrorist attacks." Defs.' Opp. at 14. But it is not enough that a cooperative agreement may "advance the agency's overall mission"; "that is true for nearly all cooperative agreements." *Hymas v. United States*, 810 F.3d 1312, 1328 (Fed. Cir. 2016). At most, the cooperative agreements "*indirectly* benefit" DHS, *id.* (emphasis added), and "carry out a public purpose of support" as the cooperative agreement statute contemplates, 31 U.S.C. § 6305, by helping local governments "reduce the risk" of a terrorist attack "against a major metropolitan area," Chicago Dec. 1, Ex. A at 14.

Even if consideration existed, the cooperative agreements do not mandate damages for a breach. "Contracts that 'expressly disavow[ ] money damages' … and cooperative agreements are not money-mandating contracts." *Hous. Auth. of City of New Haven v. United States*, 140 Fed. Cl. 773, 786 (2018) (quoting *Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011)). Far from mandating damages, the cooperative agreements state that "[m]onetary damages are not available to the Recipient in the event of a breach." Chicago Dec. 1, Ex. H at 194. As courts and the federal government have both stated, "this fact" is "determinative" in establishing that the Court of Federal

Claims lacks jurisdiction under the Tucker Act. *Pacito*, 169 F.4th at 928 n.14 (citing authorities); *see also Washington v. U.S. Dep't of Com.*, 812 F. Supp. 3d 1169, 1180–81 (W.D. Wash. 2025).

*Third*, the test set forth in *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982), confirms that this Court has jurisdiction. Plaintiffs "base[]" their claims on the APA, not any contract. *Megapulse*, 672 F.2d at 968. For instance, Plaintiffs allege that DHS acted contrary to law by implementing the Reimbursement Freeze in violation of 2 C.F.R. § 200.305(b)(3). Judge Kennelly held that a similar APA claim filed by Chicago, alleging that another DHS funding freeze violated section 200.305(b)(3), belonged in district court. *Chicago v. DHS*, 815 F. Supp. 3d at 749; *Chicago v. DHS*, 2026 WL 353581, at *5. Judge Kennelly was right: the "source" of Plaintiffs' right "is found in the federal regulations," not a contract. *New Jersey*, 835 F. Supp. 3d at 498. And contrary to DHS's suggestion, Defs.' Opp. at 11, 15, this Court is not "'deprive[d] ... of jurisdiction it might otherwise have'" just because Plaintiffs' claim "presupposes" and "references" the cooperative agreements. *Crowley*, 38 F.4th at 1110. Otherwise, section 200.305(b)(3) and the rest of the federal government's Uniform Grant Guidance would be "unenforceable under the APA" because that guidance "inherently presuppose[s] contractual relationships with the federal government." *New Jersey*, 835 F. Supp. 3d at 499.

Plaintiffs seek declaratory and equitable relief, not damages. *See* Pls.' Mem. at 12–13. DHS responds that Plaintiffs seek specific performance of the cooperative agreements. Defs.' Opp. at 16. Under that view, agencies could routinely recharacterize requests to vacate grant policies as seeking specific performance. Regardless, even if "an injunction would require the same governmental restraint that specific (non)performance might require in a contract setting," that "is an insufficient basis to deny a district court the jurisdiction otherwise available." *Megapulse*, 672 F.2d at 971. And this is not a case where Plaintiffs seek "specific performance of a contractual

obligation to pay *past* due sums." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002). Rather, Plaintiffs seek only forward-looking relief: to declare the Equipment and Reimbursement Freezes unlawful, vacate the Freezes, and enjoin DHS from implementing the Equipment Freeze. Plaintiffs thus "do not pursue specific performance … in a manner that sounds in contract." *Pacito*, 169 F.4th at 929; *see Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 198 (Fed. Cir. 1997).

Cases cited by DHS are inapposite. None involved agreements that disclaimed Tucker Act jurisdiction. Nor did any involve cooperative agreements that lacked consideration or money-mandating provisions. And DHS's principal cases "addressed grant terminations that had already occurred," so orders vacating the terminations "were effectively money judgments enforcing contracts between the parties for past due sums." *Chicago v. DHS*, 815 F. Supp. 3d at 747 (distinguishing *Nat'l Insts. of Health v. Am. Pub. Health Ass'n* ("*NIH*"), 145 S. Ct. 2658 (2025) and *Dep't of Educ. v. California*, 604 U.S. 650 (2025)); *accord, e.g.*, *Sustainability Inst. v. Trump*, 165 F.4th 817 (4th Cir. 2026); *Climate United Fund v. Citibank, N.A.*, 154 F.4th 809 (D.C. Cir. 2025), *rev'd*, 184 F.4th 679 (D.C. Cir. 2026); *Afterschool for Child. & Teens (ACT) Now v. Dep't of Educ.*, 2026 WL 1847100 (N.D. Ill. June 26, 2026). By contrast, there are no past-due sums at issue here; Plaintiffs seek only forward-looking relief to govern ongoing relationships. And even in backward-looking grant-termination cases, district courts have jurisdiction to resolve challenges to "policies" like the Equipment and Reimbursement Freezes. *NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring).

## II. Plaintiffs Are Entitled to Summary Judgment as to the Reimbursement Freeze.

DHS defends the Reimbursement Freeze on only two grounds: mootness and lack of final agency action. As explained below, neither argument has merit. *See infra*, Parts II.A & II.B. And because DHS does not even attempt to defend the Reimbursement Freeze on the merits, Plaintiffs

are entitled to summary judgment on Counts IV and VI as to the Reimbursement Freeze if the Court rejects DHS's two threshold defenses. *See infra*, Part II.C.

**A. Plaintiffs' Challenge to the Reimbursement Freeze Is Not Moot.**

DHS's argument that Plaintiffs' challenge to the Reimbursement Freeze is moot fails because DHS does not respond, in any meaningful way, to Plaintiffs' showing that the voluntary-cessation doctrine preserves a live controversy. DHS does not dispute the governing rule that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice," Pls.' Mem. at 13 (quoting *Friends of the Earth*, 528 U.S. at 189), and it candidly admits that "courts are reluctant to dismiss a claim on mootness grounds where the defendant voluntarily changes its behavior after litigation begins," Defs.' Opp. at 17 (citing *Friends of the Earth*, 528 U.S. at 189). Nor does DHS dispute that it bears the "formidable burden" of showing it is "*absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." Pls.' Mem. at 13 (quoting *Friends of the Earth*, 528 U.S. at 190) (emphasis added). And DHS does not dispute that it voluntarily reversed its policy of freezing reimbursements only after Plaintiffs filed this lawsuit. Defs.' Opp. at 17.

Instead, DHS largely sidesteps the standard that a defendant must meet to show that its voluntary cessation has rendered a controversy moot. DHS principally responds that it resumed processing Plaintiffs' reimbursements in June 2025 for reasons unrelated to this litigation. *See* Defs.' Opp. at 16–17. Even if true, simply proffering a non-litigation-related reason for the cessation is not sufficient to establish mootness. *Friends of the Earth* does not limit the voluntary-cessation doctrine to instances where defendants changed course because they were sued; the doctrine is relevant whenever a defendant voluntarily ceases the challenged conduct, regardless of what prompted the change. *See* 528 U.S. at 189. The reason for DHS's change in behavior, therefore, does not independently negate the Court's continuing authority to determine whether the

Reimbursement Freeze was unlawful. Whatever prompted DHS to resume payments, its unilateral decision to end the Freeze after litigation commenced cannot by itself erase the underlying controversy.

DHS likewise falls well short of showing it is "absolutely clear" that the challenged conduct will not recur. *Friends of the Earth*, 528 U.S. at 190. DHS's only proffered evidence is that approximately fourteen months have passed without DHS refusing to timely process Plaintiffs' reimbursement requests. Defs.' Opp. at 17. But a period of compliance during the pendency of litigation is not the same as an assurance that the challenged conduct cannot reasonably recur. DHS identifies no binding policy change, regulatory amendment, formal commitment, or other constraint preventing the agency from again withholding reimbursements beyond the deadlines imposed by law. And DHS does not address Plaintiffs' evidence that, during this same period, DHS repeatedly violated court orders concerning the same reimbursement obligation in contemporaneous litigation. *See* Pls.' Mem. at 14 (citing *Chicago v. DHS*, 815 F. Supp. 3d 727, and subsequent opinions). That history sharply undercuts the idea that DHS's recent compliance with 2 C.F.R. § 200.305(b)(3) as to the Securing the Cities program makes it "absolutely clear" that future violations will not recur.

Because DHS's voluntary cessation of its non-reimbursement policy has not stripped this Court of jurisdiction, a live controversy remains as to whether the Reimbursement Freeze violated 2 C.F.R. § 200.305(b)(3), and the Court can grant relief that would meaningfully resolve the parties' legal dispute and bind DHS going forward. *See Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) ("[A] case becomes moot only when it is impossible for a court to grant 'any effectual relief whatever' to the prevailing party.").

### B. The Reimbursement Freeze Was a Final Agency Action.

Plaintiffs' opening brief explained that "[c]ourts have routinely found funding freezes to be final agency actions." *Washington v. U.S. Dep't of Transp.*, 2026 WL 183584, at *10 (W.D. Wash. Jan. 23, 2026) (citing cases); *see* Pls.' Mem. at 15–16 (discussing same, in context of Equipment Freeze). DHS nevertheless argues that the Reimbursement Freeze was not final. Defs.' Opp. at 18–19. Under *Bennett v. Spear*, an agency action is final where it (1) "mark[s] the 'consummation' of the agency's decisionmaking process" and (2) is one "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" 520 U.S. 154, 177–78 (1997). Both requirements are satisfied here.

In asserting that Plaintiffs fail *Bennett*'s first prong, DHS contends that "[t]he only 'actions'" at issue here are "a handful of emails" informing Plaintiffs about the Reimbursement Freeze. Defs.' Opp. at 18. But DHS's own summary of the administrative record refutes that contention. *See id.* at 4; *see also* Pls.' Mem. at 7 (summarizing contents of AR). In a January 2025 memo, the Office of Management and Budget required agency heads to "temporarily pause all activities related to … disbursement of all Federal financial assistance." AR at 0001–0002 (emphasis omitted). After courts temporarily restrained OMB from implementing that memo, *e.g.*, *New York v. Trump*, 764 F. Supp. 3d 46, 53 (D.R.I. 2025), President Trump issued an executive order in February 2025 directing agency heads to create technological systems to process grant payment requests and "terminate or modify" grants deemed inconsistent with Administration policies. AR at 0006–0011. In early March 2025, DHS's Chief Procurement Officer and Acting Chief Financial Officer sent a memo instructing agency employees that "DHS will pause payments to all covered contracts and grants" until DHS complied with the executive order. AR at 0012–0014. The administrative record that DHS certified contains all documents the agency

"considered" in adopting the Reimbursement Freeze therefore establishes that the Freeze was official agency action. *See* ECF No. 54-1 at 1.

Beyond this, DHS appears to improperly conflate the existence of a final agency "action" with the existence of a formal written memorialization of that action. *See* Defs.' Opp. at 18. The APA defines agency "action" broadly to encompass "comprehensively every manner in which an agency may exercise its power," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001), and an "'agency action need not be in writing to be judicially reviewable as a final action,'" *Nava v. DHS*, 435 F. Supp. 3d 880, 902 (N.D. Ill. 2020); *see also New York v. Trump*, 171 F.4th 1, 16 (1st Cir. 2026) (plaintiffs were "challenging the OMB Directive, not the piece of paper that contained it"); *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 186 F.4th 25, 41–42 & n.9 (1st Cir. 2026) ("'a hodgepodge of memos and emails'" can constitute final agency action); *Illinois v. Vought*, 825 F. Supp. 3d 721, 726–28 (N.D. Ill. 2026) (finding agency action to be reviewable despite "no formal, official memo" where "circumstantial" evidence established the challenged policy).

The same is true here. Plaintiffs did not infer the Reimbursement Freeze from a stray remark or preliminary discussion. Plaintiffs instead learned about the Freeze when they stopped receiving reimbursements to which they were entitled. On the same day that DHS leadership directed agency employees to "pause payments," AR at 0012–0014, a federal employee responsible for processing grant reimbursement requests for the first time affirmatively informed Plaintiffs that "'[a]ll DHS-OPO payments are on pause'" pending further guidance, Pls.' Mem. at 22–23. Notably, DHS "does not deny" that it "adopted a policy" to halt Securing the Cities funding. *Woonasquatucket*, 186 F.4th at 42. On the contrary, DHS admits that it "paused STC reimbursements between February and June 2025." Defs.' Opp. at 4. These undisputed facts

establish that DHS adopted and implemented a policy of withholding reimbursements for Securing the Cities expenditures.

DHS also argues that the Reimbursement Freeze was not final because DHS characterized the Freeze as a "pause." Defs.' Opp. at 18. But "an agency action can satisfy the 'consummation' prong 'notwithstanding the agency's characterization of the [action] as an interim' one." *New Jersey*, 835 F. Supp. 3d at 510 (brackets in original). Otherwise, "an agency could indefinitely withhold funds without judicial review" simply by labeling its action as temporary, "contrary to the APA's presumption of judicial review." *Id.* at 511 (holding that funding freeze was final agency action). The actions challenged here, implemented at DHS leadership's express directive, "amounted to a consummation of the agency's decision to freeze [Plaintiffs'] funding." *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. HHS*, 2026 WL 2549267, at *2, *6 (N.D. Cal. June 18, 2026) (agency's action, which froze funding "'until'" the agency finished its review of grantees' conduct, was final). DHS thus cannot evade APA review of illegal action by labeling its action as temporary, nor does DHS's later decision to reverse course retroactively render the earlier action preliminary. *See New York v. Trump*, 171 F.4th at 18 (holding that January 2025 OMB memo and agency funding freezes were final agency action).

DHS fares no better under *Bennett*'s second prong. DHS states that Plaintiffs ultimately "received all the funding to which they had a right," Defs.' Opp. at 18, but this misses the point. Plaintiffs' legal entitlement was not merely to eventual reimbursement; governing regulations required reimbursement *within 30 days*. *See* 2 C.F.R. § 200.305(b)(3). By withholding payments beyond that deadline, DHS altered Plaintiffs' legal position in a concrete and immediate way: Plaintiffs were denied timely payment required by binding law and were forced to operate for months without funds that DHS admits they were legally entitled to receive. *See* Boston Dec.

¶¶ 22–25, 28–30; Chicago Dec. 2 ¶¶ 10–20; Denver Dec. ¶¶ 15–17, 23–25; S.F. Dec. ¶¶ 24–28; Seattle Dec. ¶ 16. Those are legal consequences that flowed directly from the Reimbursement Freeze, regardless of whether DHS eventually paid the amounts owed.

DHS's attempt to distinguish *Washington v. U.S. Department of Transportation* fails. The *Washington* court held that a funding freeze the government characterized as only a temporary "pause" was a final agency action, despite the fact that the government later issued superseding guidance on the matter. 2026 WL 183584, at *10. DHS does not dispute this holding. *See* Defs.' Opp. at 18–19. DHS focuses instead on the court's observation that, had the later guidance truly "undone" the so-called temporary pause, the court "*could* consider" whether the original action had been preliminary as opposed to final. *Washington*, 2026 WL 183584, at *10 (emphasis added); *see* Defs.' Opp. at 19. But that hypothetical does not establish a rule that any funding restriction later rescinded is necessarily nonfinal, much less identify when a purportedly "temporary" pause crosses the line into final agency action. DHS offers no authority supplying such a rule. Nor does DHS address *City & County of San Francisco v. Trump*, cited by Plaintiffs in their opening brief, which similarly held that a funding freeze characterized by the government as a "pause" was nevertheless a final agency action. 783 F. Supp. 3d 1148, 1198–99 (N.D. Cal. 2025); *see* Pls.' Mem. at 22.

More fundamentally, whatever force the label "temporary" might have in another case, it cannot erase the legal consequences that had already accrued here. Once DHS withheld reimbursements beyond the 30-day regulatory deadline, Plaintiffs' legal rights had been affected and DHS's obligations breached. And when Plaintiffs filed this action, reimbursements had indisputably been stopped, with no identified reinstatement date. DHS's later decision to resume compliance with the governing regulations does not transform the operative policy that Plaintiffs

challenged into a merely tentative or interlocutory act. The Reimbursement Freeze therefore constituted final agency action subject to review under the APA.

### C. DHS Concedes that the Reimbursement Freeze Fails Review Under Both Sections 706(2)(A) and 706(2)(D).

Plaintiffs' opening brief explained at length why the Reimbursement Freeze was arbitrary and capricious, not in accordance with law, and imposed without observance of procedure required by law. *See* Pls.' Mem. at 22–28; 5 U.S.C. § 706(2)(A), (D). DHS does not address these arguments *at all*.

That silence is consequential. "'The Seventh Circuit has clearly held that a party who fails to respond to points made upon a motion for summary judgment concedes those points.'" *Nally v. Obaisi*, 2023 WL 8236608, at *8 (N.D. Ill. Nov. 28, 2023) (citing *Palmer v. Marion County*, 327 F.3d 588, 597–98 (7th Cir. 2003)); *see also Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 462, 466 (7th Cir. 2010) (affirming district court's holding that plaintiff's "failure to respond" to defendant's arguments "amounted to waiver" and holding that a non-moving party's "silence leaves [the court] to conclude … that [the non-moving party] concede[s] [the point]"); *Ratcliff v. TranStewart Trucking Inc.*, 684 F. Supp. 3d 845, 866 (S.D. Ind. 2023) (holding that "Plaintiffs' response brief does not address any of these arguments, and Plaintiffs therefore have conceded these points," and collecting cases); *accord James v. City of Chicago*, 2026 WL 885061, at *5 (N.D. Ill. Mar. 31, 2026) (Tharp, J.). DHS has therefore waived any argument that the Reimbursement Freeze survives review under sections 706(2)(A) or 706(2)(D). Accordingly, should the Court reject DHS's arguments concerning mootness and final agency action, Plaintiffs are entitled to summary judgment on their APA challenges to the Reimbursement Freeze and the corresponding relief requested in their motion.

## III. Plaintiffs Are Entitled to Summary Judgment as to the Equipment Freeze.

The Court should reject DHS's attempts to justify the Equipment Freeze and grant summary judgment in Plaintiffs' favor on that aspect of Count IV. DHS's belated effort to supplement the administrative record—concededly made to supply the reasoning missing from the certified record—is both procedurally improper and impermissible as post hoc rationalization. *See infra*, Part III.A. DHS's decision does not fall within the "narrow exception" for actions committed to agency discretion and is readily susceptible to this Court's review. *See infra*, Part III.B.1. And regardless of whether the Court decides this issue based on DHS's certified administrative record or entertains Mr. Kuleski's tardy submissions (which it should not), the Equipment Freeze cannot survive arbitrary and capricious review because DHS failed to offer a satisfactory explanation for its action; failed to assess Plaintiffs' reliance interests; and failed to consider the impact of the Freeze on public safety. *See infra*, Parts III.B.2, III.B.3, III.B.4.

### A. The Court Should Decide This Case on the Certified Administrative Record, Without Drawing on DHS's Post Hoc Rationalizations.

DHS's inclusion of the Kuleski Declaration and more than 1,000 pages of accompanying exhibits in opposition to Plaintiffs' motion for summary judgment is an improper attempt to explain away DHS's unlawful Equipment Freeze with new post hoc reasoning, months after DHS filed the certified administrative record. The Court should reject it as such, for three independent reasons.

*First*, DHS has not carried its burden to justify supplementing the record. Judicial review under the APA is, with rare exception, focused on "the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Accordingly, courts are "leery of requests to consider extra-record evidence in APA cases," *Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*, 2020 WL 5642287, at *8 (D.D.C. Sept. 22, 2020), and a party seeking to supplement the administrative record bears the burden of

"demonstrat[ing] unusual circumstances justifying a departure from the general rule," *Oceana, Inc. v. Ross*, 290 F. Supp. 3d 73, 77 (D.D.C. 2018). As explained in Plaintiffs' opening brief, the exceptions are narrow and serve specific purposes—for example, permitting limited evidence necessary to determine whether an agency has a practice or policy that is unlawful, or to address matters such as irreparable harm or the appropriate scope of relief.[4] *See* Pls.' Mem. at 9–10 (citing cases). They are *not* an invitation for an agency to retroactively enlarge the evidentiary basis for the challenged agency action whenever the certified record proves inadequate to defend it.

Here, DHS seeks to introduce a massive body of new evidence—approximately 35 times larger than the certified AR, *compare* ECF No. 54-3, *with* ECF Nos. 65-1, 65-2—for the express purpose of bolstering an administrative record that it concedes is "meager." Defs.' Opp. at 6. Plaintiffs' opening brief explained that the certified administrative record contains *no* reasoning for the Equipment Freeze, and that the only mention of the Freeze in the record is the Equipment Freeze Memo itself. *See* Pls.' Mem. at 6–8, 16–18. DHS does not dispute that characterization; to the contrary, DHS invokes the record's very paucity as the justification for introducing additional material. *See* Defs.' Opp. at 6–7. Although DHS cites a handful of cases indicating that supplementation is permissible where extra-record evidence is necessary for judicial review, *see id.*, the agency never explains why the Kuleski Declaration and its nearly 40 new exhibits are

---

[4] For this reason, there is a fundamental difference between the materials Plaintiffs submitted with their opening motion for summary judgment and those DHS now puts forth. Plaintiffs submitted, for example, correspondence establishing that DHS had frozen reimbursements in order to allow the Court "to determine whether [the] agency's challenged policy [*i.e.*, the Reimbursement Freeze] exists." *Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 386 n.4 (D.C. Cir. 2018); *see, e.g.*, Chicago Dec. 2, Ex. B. Plaintiffs further submitted declarations from their STC program managers to establish that DHS's actions were "inconsistent with [its] past practice," including the prior practice of promptly reimbursing Plaintiffs and of permitting Plaintiffs to purchase equipment, *United Student Aid Funds, Inc. v. Devos*, 237 F. Supp. 3d 1, 5–6 (D.D.C. 2017); to demonstrate DHS's failure to "take the[ir] … reliance interests into account," *id.*; and to highlight the "irreparable harm" they have suffered as a result of the Equipment Freeze, *Washington v. U.S. Dep't of Educ.*, 813 F. Supp. 3d 1222, 1233 (W.D. Wash. 2025). *See, e.g.*, Boston Dec. ¶ 20; S.F. Dec. ¶¶ 33–39. All of these are properly within the Court's scope of review under the law.

necessary *here*. A citation to a case recognizing an exception is not itself a showing that the exception applies. *See Oceana*, 290 F. Supp. 3d at 87 (rejecting supplementation where movant invoked recognized exceptions but "ha[d] not demonstrated that either circumstance [was] present"); *see also LS3, Inc. v. United States*, 163 Fed. Cl. 1, 7 (2022) ("A party seeking to supplement the administrative record bears the burden of showing *why* the current record is insufficient for effective judicial review." (emphasis added)).

Indeed, DHS's own argument is internally inconsistent. DHS insists that "the administrative record makes clear why Kuleski implemented the equipment pause," yet concedes that the record "standing on its own, does not provide a full and complete understanding of the issues." Defs.' Opp. at 6–7. DHS cannot have it both ways. If the certified record already makes clear the basis for the challenged agency actions, then DHS has no extraordinary need to introduce extra-record materials. And if the certified record is too sparse to provide a "full and complete understanding of the issues," *Blue & Gold Fleet, LP v. United States*, 70 Fed. Cl. 487, 494 (2006), then that deficiency does not entitle DHS to construct a more persuasive evidentiary record during litigation.

It is the agency's "province," in the first instance, to submit for the court's review the complete administrative record that existed at the time the decision was made. *Del. Dep't. of Nat. Res. & Env't Control v. U.S. Army Corps of Eng'rs*, 722 F. Supp. 2d 535, 541–42 (D. Del. 2010) (citing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985)). Where that record fails to demonstrate a reasoned basis for the agency's action, the consequence is not that the agency may construct a stronger evidentiary record after suit is filed. *See Camp*, 411 U.S. at 143 ("If [an agency's] finding is not sustainable *on the administrative record made*, then the [ ] decision must be vacated …." (emphasis added)). Allowing DHS to supplement the administrative record that it

already certified in this way would turn the basic rule of record review on its head: the weaker the administrative record, the greater the agency's entitlement to supplement it in litigation. This cannot be the case.

*Second*, the highly unusual manner and timing of DHS's actions counsel against permitting supplementation. DHS never moved to supplement the administrative record; instead, DHS simply appended its new materials to its opposition brief, after Plaintiffs had already filed their summary judgment motion based on the administrative record that Mr. Kuleski himself certified. *See* ECF No. 54-1. At least one district court in this Circuit has rejected an attempt to supplement the administrative record without following appropriate procedures. *See Highway J Citizens Grp., U.A. v. U.S. Dep't of Transp.*, 2016 WL 4288995, at *4 (E.D. Wis. Aug. 15, 2016) (striking extra-record materials where the party failed to timely move to supplement the administrative record). DHS's novel approach is especially problematic because it deprived Plaintiffs of an orderly opportunity to assess—and the Court an opportunity to rule on—whether supplementation was warranted and what materials, if any, could properly be considered before merits briefing began.

The procedural history makes such a late maneuver particularly difficult to justify. DHS has known throughout this litigation that Plaintiffs' principal claims arise under the APA and would be adjudicated based on the administrative record that DHS submitted to the Court. DHS sought and received three extensions of time to prepare that record. *See* ECF Nos. 43, 44, 45, 47, 48, 49. When DHS ultimately filed the record—nearly one year after the amended complaint was filed—counsel for DHS represented to Plaintiffs that the record was complete and would not be supplemented with the documents that Plaintiffs had brought to DHS's attention. *See supra* at 4. Plaintiffs then moved for summary judgment on that understanding. After Plaintiffs filed their opening brief, DHS sought additional extensions of the briefing schedule, *see* ECF Nos. 59, 62,

yet at no point advised Plaintiffs that it believed the certified record was inadequate or that it intended to introduce hundreds of pages of additional evidentiary material alongside its opposition brief. Only after Plaintiffs filed a summary judgment motion demonstrating the deficiencies in the certified administrative record did DHS reverse course.

DHS offers no explanation for that sequence of events. DHS does not state when it determined that supplementation was supposedly necessary or why, if supplementation were genuinely required to permit meaningful judicial review, it waited to disclose the materials until the day it filed its opposition brief. The result is asymmetric briefing. In an APA case, an opposition presents arguments concerning the administrative record on which the moving party relied, to which the movant may respond in reply. Here, DHS has instead attempted to alter the underlying factual universe of the case after Plaintiffs' opening brief had already been filed.

This maneuver prejudices Plaintiffs. Courts routinely recognize that introducing substantial new evidence after a party has filed its summary judgment motion creates cognizable prejudice because it deprives that party of the ordinary opportunity to investigate and address the evidence in its opening submission. *See, e.g.*, *Harriman v. Hancock County*, 627 F.3d 22, 31 (1st Cir. 2010) (finding "real" prejudice where movant "prepared and filed a summary judgment motion premised on" previously disclosed evidence before non-moving party introduced new affidavits with his opposition); *Bouder v. Prudential Fin., Inc.*, 2010 WL 2026707, at *4 (D.N.J. May 21, 2010) (party's "tardy disclosure during summary judgment briefing [was] prejudicial," particularly where the opposing party was already "under a deadline to prepare and file [its] reply brief"); *Alper v. Altheimer & Gray*, 2002 WL 31133287, at *39–40 (N.D. Ill. Sept. 26, 2002) (party's late submission of expert affidavits "was [not] harmless" where opposing parties had already "prepared extensive summary judgment submissions," and "[t]he fact that [the opposing parties] made

arguments in the alternative" responding to those affidavits "should not be viewed as a waiver" of their request for the court to disregard them altogether).

Plaintiffs prepared their summary judgment motion based on the administrative record that DHS certified and submitted to the Court. Then, Plaintiffs had to review and evaluate more than 1,000 pages of new evidentiary material, determine its provenance and relevance, assess whether and how it related to the challenged agency actions, and respond to DHS's improper reliance on it. Permitting DHS to transform the administrative record in the middle of dispositive briefing would reward an irregular and unjust procedure, while Plaintiffs would be left to carry the burden on their motion.

The Court should not condone this procedural gamesmanship. DHS certified an administrative record on the Court's docket and allowed Plaintiffs to proceed with summary judgment briefing with assurances that the record was closed. Having now essentially conceded the central premise of one of Plaintiffs' core arguments—that the certified record is too sparse to justify the Equipment Freeze—DHS cannot remedy that deficiency by attaching supplemental evidence to its opposition without leave of Court, without demonstrating why supplementation is warranted, and without explaining why those materials surfaced only after Plaintiffs set out their arguments for summary judgment in their opening brief.

*Third*, Mr. Kuleski's late-breaking declaration offers only post hoc justifications for the Equipment Freeze, which are not a proper basis for APA review. "The basic rule here is clear: An agency must defend its actions based on the reasons it gave when it acted." *DHS v. Regents*, 591 U.S. at 24; *see SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943). An agency may, in limited circumstances, "elaborate" on an already-given explanation for a prior action, but it may not offer an entirely new one. *DHS v. Regents*, 591 U.S. at 20–21. When an agency does provide an

elaboration, its "explanation 'must be viewed critically' to ensure that the [decision] is not upheld on the basis of impermissible '*post hoc* rationalization.'" *Id.* at 20.

To that end, the Supreme Court has long held that "litigation affidavits" from agency officials are a poor substitute for contemporaneous explanation. *DHS v. Regents*, 591 U.S. at 23 (citing *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971)). For good reason. Agencies forced to defend themselves in court may offer any number of "'convenient litigating position[s]'" why their actions make sense in hindsight. *Id.* But courts keep appointed officials accountable, and allow "parties and the public [to] respond fully and in a timely manner to an agency's exercise of authority," by holding officials to their reasoning at the time the decision was made. *Id.*

Mr. Kuleski's litigation affidavit is a classic "*post hoc* rationalization" that "cannot serve as a sufficient predicate for agency action." *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981). To understand why, the Court need look no further than DHS's own brief. DHS characterizes the Kuleski Declaration as "supplement[ing]" the record because its prior submissions do not permit "'meaningful judicial review.'" Defs.' Opp. at 6–7. But DHS's own cited authority makes clear that "supplementing" the record means introducing "evidence not considered by the agency below," as opposed to adding in materials that *were* before the agency but mistakenly omitted. *Glob. Comput. Enters., Inc. v. United States*, 88 Fed. Cl. 52, 61–62 & n.12 (2009). The Court should take DHS at its word: Mr. Kuleski's new explanation rests on factors and evidence *not* before him when he implemented the Equipment Freeze in May 2025. Otherwise, some indication of those factors and evidence would have been in the original administrative record—which remains the sole certified record before the Court.

That aside, DHS's new materials cannot reasonably be viewed as mere "elaboration" on the agency's already-stated reasoning. The agency, by its own admission, offers Mr. Kuleski's declaration and its supporting exhibits to "'fill the yawning void in the administrative record'" with more details from the relevant decisionmaker. *Am. Hosp. Ass'n v. Kennedy*, 164 F.4th 28, 34 (1st Cir. 2026). But the certified administrative record "contains almost no contemporaneous explanation" for the Equipment Freeze, *id.*, beyond a single cryptic mention of "[f]ederal funding constraints" in Mr. Kuleski's May 14, 2025 email. AR at 0027; *see* Pls.' Mem. at 16. That cursory reference offers "nothing upon which [Mr. Kuleski's] declaration could 'elaborate.'" *Am. Hosp. Ass'n*, 164 F.4th at 34. Rather, his submission "present[s] new information in an attempt to justify the [Equipment Freeze] retroactively." *Id.* (declining to consider a similar litigation affidavit); *see Gen. Elec. Co. v. U.S. Nuclear Regul. Comm'n*, 750 F.2d 1394, 1403–04 (7th Cir. 1984) ("We can give no weight to [the] separate affidavit that was submitted to the district court … [and] cannot reconstruct the Commission's thinking process from an opinion that devotes one short sentence to the issue ….").

DHS cannot reasonably claim that over 1,000 pages of newly submitted material merely "illuminat[e]" a single sentence of explanation given in the moment. *Clifford v. Pena*, 77 F.3d 1414, 1418 (D.C. Cir. 1996). The sheer volume and breadth of the new submissions underscore the point: This is not a modest clarification of reasoning already evident in the administrative record, but an attempt to furnish the Court with a variety of new justifications for the Equipment Freeze that the certified record itself lacks. Broadly, Mr. Kuleski's declaration describes purported uncertainty over the future of the STC program, coupled with inconsistent guidance on program expansion, as the basis for the Equipment Freeze. Kuleski Dec. ¶¶ 10–16. But that supposed "backdrop" "appears nowhere" in his actual directive to freeze equipment purchases. *Physicians*

*for Soc. Resp. v. Wheeler*, 956 F.3d 634, 648 (D.C. Cir. 2020), *abrogated on other grounds as recognized in Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1237 (D.C. Cir. 2026). DHS "was required to 'provide an explanation that will enable the [C]ourt to evaluate the agency's rationale *at the time of decision*,'" and its failure to do so in the moment "'cros[sed] the line from the tolerably terse to the intolerably mute.'" *Wheeler*, 956 F.3d at 648 (emphasis added).

A closer look at Mr. Kuleski's declaration only confirms that its reasoning was devised after the fact. Mr. Kuleski's declaration attributes his supposed concerns about the program's budget to several sources that were not published until *after* he initiated the Equipment Freeze. *Compare* AR at 0027–0028 (announcing Equipment Freeze on May 14, 2025), *with* Kuleski Dec. ¶ 16 & n.2 (citing Exs. B-1, B-2, and B-3, materials related to proposed appropriations legislation dated June 26 and December 9, 2025). And while Mr. Kuleski cites documents like a 2023 implementation plan for Securing the Cities and a 2024 Government Accountability Office report as a basis for his concerns, he conspicuously does not assert that he reviewed these documents *before* implementing the Freeze. Kuleski Dec. ¶¶ 11–12 & Exs. C–D; *see also Boucher v. U.S. Dep't of Ag.*, 934 F.3d 530, 553 n.14 (7th Cir. 2019) (finding agency action arbitrary and capricious where "it [was] unclear from the administrative record what [materials] the agency experts reviewed before" making their final determination).

These inconsistencies show why the Court should not rely on DHS's new submissions to assess the agency's contemporaneous decision-making. Instead, the submissions reflect DHS's best case for the Equipment Freeze *now*, with the benefit of over a year's reflection and knowledge of Plaintiffs' arguments. That is not how arbitrary and capricious review works, and neither Plaintiffs nor the Court should be forced "to chase a moving target." *DHS v. Regents*, 591 U.S. at 23.

The Court should reject DHS's alternative history, disregard the Kuleski Declaration and its accompanying exhibits, and adjudicate Plaintiffs' APA claims on the certified administrative record that was before the Court when summary judgment briefing began (ECF No. 54-3).

### B. The Equipment Freeze Cannot Survive APA Review, Whether Based on the Certified Administrative Record or the Purported Supplemental Administrative Record.

Regardless of whether the Court considers the Kuleski Declaration, the Equipment Freeze cannot survive arbitrary and capricious review. DHS, by adding post hoc materials, has all but admitted that the certified administrative record did not support the Freeze; the purported supplemental record does not provide the requisite "satisfactory explanation" for the Freeze, either. *Infra*, Part III.B.2. Moreover, DHS does not dispute and therefore concedes that it failed to assess whether Securing the Cities regions had reliance interests engendered by the prior equipment purchasing policy. *Infra*, Part III.B.3. DHS likewise does not dispute and therefore concedes that it failed to consider an important aspect of the problem before acting, namely, the impact that freezing purchases of radiological detection equipment would have on public safety. *Infra*, Part III.B.4. For each of these three independent reasons, the Freeze was unlawful.

#### 1. The Decision to Freeze Equipment Purchases Was Not "Committed to Agency Discretion by Law."

DHS does not dispute that the Equipment Freeze was a final agency action. *Compare* Pls.' Mem. at 15–16, *with* Defs.' Opp. at 17–20. However, DHS asserts that the decision to implement the Freeze was "committed to agency discretion by law," such that it falls outside the scope of APA review. Defs.' Opp. at 19 (quoting 5 U.S.C. § 701(a)(2)). Courts interpret section 701(a)(2) "'narrowly, restricting it to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019). Because DHS cannot overcome

the "'long applied[,] … strong presumption favoring judicial review of administrative action,'" its attempt to dodge review of the Equipment Freeze fails. *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018).

Just last year DHS argued, in a case brought in this District by several of the same plaintiffs as here, that the same statute currently at issue—6 U.S.C. § 596b, which codified the Securing the Cities program—did not provide a "meaningful standard[] by which a court could conduct judicial review," such that the "narrow exception" of section 701(a)(2) applied. *Chicago v. Noem*, 2025 WL 3251222, at *5. Judge Shah squarely rejected DHS's argument. *Id.* DHS does not offer any reason why this Court should reach a different conclusion. And review of the statute governing Securing the Cities confirms that there is no reason for the Court to do so:

Section 596b "manifests a clear intent by Congress to limit agency discretion, and provides the Court with a meaningful standard by which to evaluate [the agency]'s exercise of its congressionally delegated authority." *Bhattacharya v. Chi. Hous. Auth.*, 2017 WL 1197095, at *7–8 (N.D. Ill. Mar. 31, 2017). In the statute, Congress first defined the purpose of the Securing the Cities program: to enhance the ability of the U.S. to detect and prevent terrorist attacks using nuclear materials in high-risk urban areas. 6 U.S.C. § 596b(a). The statute then directed that DHS "shall" carry out enumerated elements of the program (as well as provide additional "assistance [that] the Secretary [of Homeland Security] determines appropriate"). *Id.* § 596b(b). These statutorily mandated elements include "provid[ing] resources to enhance detection" and "provid[ing] augmenting resources, as appropriate, to enable State[ and] local … governments to sustain and refresh their capabilities developed under the STC program." *Id.* § 596b(b)(3), (6).

Section 596b further required DHS to "develop, in consultation with relevant stakeholders, an implementation plan for carrying out the STC Program" and to submit the plan to Congress and

the Government Accountability Office. 6 U.S.C. § 596b(d)(1). The implementation plan had to set out, among other components, the goals of the Securing the Cities program, a strategy to achieve those goals, and metrics and milestones for the program. *Id.* § 596b(d)(1)(A). The statute required DHS to later submit to the same bodies an assessment of the effectiveness of the program and proposals for any changes to the program. *Id.* § 596b(d)(2). Finally, section 596b barred DHS from "making any changes to the structure or requirements of the STC program" without "consult[ing] with the appropriate congressional committees" and providing them "(i) a briefing on the proposed changes, including a justification for the changes; (ii) documentation relating to the changes …; and (iii) an assessment of the effect of the changes on the capabilities of the STC program …." *Id.* § 596b(d)(4). It cannot credibly be said, as DHS would have it, that the Court is unable to review the Equipment Freeze "for compliance with th[e]se and other provisions of [section 596b], according to the general requirements of reasoned agency decisionmaking." *Dep't of Com.*, 588 U.S. at 773.[5]

DHS makes two arguments for why the "quite narrow[]" exception for action committed to agency discretion applies, but neither has merit. *Weyerhaeuser*, 586 U.S. at 23. *First*, DHS analogizes its decision to an agency's choice not to bring an enforcement proceeding, which the Supreme Court found unreviewable in *Heckler v. Chaney*, 470 U.S. 821 (1985). Defs.' Opp. at 19–20. But DHS ignores the extensive body of law that has "limited" the exception discussed in *Heckler* "to 'certain categories of administrative decisions that courts traditionally have regarded

[5] In addition to the numerous requirements contained within section 596b itself that facilitate judicial review, the statute's provisions for an implementation plan further bound DHS's discretion, rendering the exercise of that discretion susceptible to review. *See Wheeler*, 956 F.3d at 643 ("'[J]udicially manageable standards may be found in formal and informal policy statements and regulations as well as in statutes.'"). That is, a court could review whether DHS complied with "the general requirements of reasoned agency decisionmaking," *Dep't of Com.*, 588 U.S. at 773, by reference to the purpose and mandatory elements of the Securing the Cities program set out in section 596b as well as to the goals and strategies set out in the implementation plan that DHS adopted.

as committed to agency discretion,' such as a decision not to institute enforcement proceedings, or a decision by an intelligence agency to terminate an employee in the interest of national security." *Dep't of Com.*, 588 U.S. at 772; *see Vahora v. Holder*, 626 F.3d 907, 915–16 (7th Cir. 2010) (similar). DHS asserts that "the same considerations [that were at issue in *Heckler*] preclude review here," Defs.' Opp. at 20, but that is incorrect. *Heckler* and its progeny dealt with "distinct, policy-based areas in which the courts 'have long been hesitant to intrude.'" *Vahora*, 626 F.3d at 916. A routine (albeit unlawful) agency decision to alter an aspect of a federal program is not akin to the traditionally unreviewable exercise of prosecutorial discretion.

*Second*, DHS incorrectly states that "[t]he thrust of [P]laintiffs' … claim is the CWMD Office began arbitrarily and capriciously denying certain requests for equipment purchases," such that Plaintiffs "ask[] the [C]ourt to … scrutinize[e] discrete funding choices." Defs.' Opp. at 21. In fact, Plaintiffs challenge DHS's decision to implement a general freeze on purchasing new radiological and nuclear detection equipment. *See* Pls.' Mot. ¶ 1 (challenging the "freeze on Plaintiffs' ability to purchase new equipment"); Pls.' Mem. at 1 (similar). DHS cannot reframe Plaintiffs' claim for them, particularly given that DHS itself adopts Plaintiffs' framing of the relevant agency action elsewhere in its opposition. *See* Defs.' Opp. at 5 (DHS acknowledging that it had implemented a "pause[]" on "all radiological and nuclear detection equipment purchases" (emphasis omitted)); *see also* Defs.' Notice of Filing Admin. Record, ECF No. 54 (referring to the "challenged 2025 decision[] … to pause procurement of radiological and nuclear detection equipment"); Kuleski Dec. ¶ 17 (acknowledging the "pause[] [of] all new purchases of R/N detection equipment").

Even if Plaintiffs were challenging one-off purchasing decisions (and they are not), DHS's "committed to agency discretion" argument would fail. DHS argues that "the [C]ourt would have

to weigh the statutory factors that the Office itself has to weigh," Defs.' Opp. at 21, but that is "the sort of claim that federal courts routinely assess when determining whether to set aside an agency decision as an abuse of discretion," *Weyerhaeuser*, 586 U.S. at 25. The provisions of the Securing the Cities statute described above provide more than sufficient "law to apply" to allow review of DHS's action. *Cf. Dep't of Com.*, 588 U.S. at 772–73 (setting out provisions of Census Act that bounded Secretary's discretion); *Weyerhaeuser*, 586 U.S. at 23–24 (similar, for Endangered Species Act); *Bhattacharya*, 2017 WL 1197095, at *7–8 (similar, for Housing Act). Meanwhile, the fact that section 596b gives DHS *some* discretion over how to implement the Securing the Cities program does not mean that DHS's discretion is unbounded and unreviewable. On the contrary, "[a] court could never determine that an agency abused its discretion if all matters committed to agency discretion were unreviewable." *Weyerhaeuser*, 586 U.S. at 23.

For these reasons, DHS's reliance on *Lincoln v. Vigil*, 508 U.S. 182 (1993), is misplaced. *Lincoln* involved an agency-created program that "no statute … even mention[ed]," and a congressional lump-sum appropriation that did not "circumscribe agency discretion." *Id.* at 193. By contrast, Securing the Cites is a congressionally-created program mandated by a statute that "specifies funding recipients" (state and local governments), identifies "a narrow and focused purpose" (protecting against terrorist attacks in urban areas), and directs that DHS "shall" use funds for enumerated purposes (including providing resources to detect threats). *Chicago v. DHS*, 815 F. Supp. 3d at 754 (distinguishing *Lincoln*). This Court should thus "give effect to the command that courts set aside agency action that is an abuse of discretion, and ... honor the presumption of judicial review" by rejecting DHS's attempt to fit its arbitrary decision into the narrow exception for actions committed to agency discretion by law. *Dep't of Com.*, 588 U.S. at 772.

**2. Neither Version of the Record Contains a Satisfactory Explanation for the Equipment Freeze.**

DHS's decision to implement the Equipment Freeze—whether assessed based on the certified administrative record alone or a record "supplemented" with Mr. Kuleski's post hoc materials—is arbitrary and capricious because DHS failed to put forward "a satisfactory explanation for its action." Pls.' Mem. at 16 (quoting *Ohio v. EPA*, 603 U.S. 279, 292 (2024)).

***Certified Administrative Record.*** Plaintiffs' opening brief explained that, based on the certified record, DHS failed to meet the "satisfactory explanation" requirement. Pls.' Mem. at 16–18. DHS does not genuinely dispute this point. *See* Defs.' Opp. at 22–23. Rather, DHS must go outside the certified record and draw extensively on the Kuleski Declaration to marshal an argument that it provided the necessary explanation for the Freeze. *See id.* The fact that DHS cannot explain the Freeze without "supplementing" the record after the fact demonstrates that the agency did not provide the necessary explanation at the time. Indeed, DHS's arguments elsewhere in its brief establish that DHS failed to meet the "reasoned explanation requirement." *Dep't of Com.*, 588 U.S. at 785. That requirement is intended "to ensure that agencies offer … reasons [for their actions] that can be scrutinized by courts," *id.*, and yet DHS admits that "'the record *is insufficient for the Court to render a decision*,'" Defs.' Opp. at 6–7 (emphasis added).

***DHS's Post Hoc "Supplemental" Record.*** DHS would fare no better even if the Court were to consider its after-the-fact narrative.

*First*, a number of Mr. Kuleski's explanations about how the agency decided to implement the Equipment Freeze are inconsistent with the evidence. DHS argues that it adopted the Freeze because the CWMD Office recognized a "two-pronged problem": (a) "a lack of funding from Congress" and (b) "unaccountable spending practices enabled by a previous lack of guidance from CWMD." Defs.' Opp. at 23. In support of the first point, Mr. Kuleski emphasizes that the CWMD

Act included a date that the CWMD Office was set to terminate (December 2023). *See* Kuleski Dec. ¶¶ 11, 16; *see also* Defs.' Opp. at 3. But Mr. Kuleski brushes aside the fact that, until May 2026, the Office *was* funded and operational (apart from periodic government shutdowns that were not unique to the Office). *See* Defs.' Opp. at 3 ("Congress continued to authorize [the Office's] operations through a series of appropriations acts …."). As noted, the May *2026* decision to transfer the Office's responsibilities, including administering Securing the Cities, to other parts of DHS logically could not have informed the May *2025* decision to implement the Equipment Freeze. *See* Kuleski Dec. ¶ 3. *See Defs. of Wildlife v. Gutierrez*, 532 F.3d 913, 920 (D.C. Cir. 2008) ("[E]vents occurring after an agency action do 'not inform the agency decision-making which is the subject of review.'").

DHS nevertheless argues that Congress "regularly indicated its *intent* to terminate the Office by declining to fund it," Defs.' Opp. at 22 (emphasis added), a claim that is supposedly supported by Mr. Kuleski's declaration, *see id.* at 3 (citing Kuleski Dec. ¶ 16). Mr. Kuleski, in turn, cites proposed legislation and congressional explanatory statements from June and December 2025—all *after* the Equipment Freeze was implemented in May 2025. Kuleski Dec. ¶ 16 & n.1 (citing Exs. B-1, B-2, B-3). And, while the later congressional statements are ultimately irrelevant, it is telling that Mr. Kuleski omits that both chambers' statements recommended (a) transferring the CWMD Office's core functions to other offices of DHS, not eliminating those functions, and (b) providing continued funding for Securing the Cities. *See* Kuleski Dec., Ex. B-2 at 304, 383; *id.*, Ex. B-3 at 547.

More fundamentally, the assertion that the CWMD Office "was on life support," Defs.' Opp. at 22, ignores the fact that DHS was congressionally mandated to administer Securing the Cities regardless of whether the program was run by the CWMD Office or some other part of DHS.

*See* 6 U.S.C. § 596b(b) (requiring "the Secretary [of Homeland Security]"—not the Assistant Secretary for the CWMD Office—to fulfill enumerated duties as part of the STC program); *id.* §§ 101(16), 590(1) (definitions). *But see* Kuleski Dec. ¶ 16 (claiming that "the CWMD Office," as opposed to other offices within DHS, "was statutorily mandated to administer the STC program").

As to appropriations for Securing the Cities itself, DHS argues that "funding constraints plagued the STC program before, during, and after the equipment pause's implementation," incorrectly stating that Plaintiffs "do not dispute" this point. Defs.' Opp. at 22; *see also* Kuleski Dec. ¶ 10 ("funding remained flat"). Mr. Kuleski's declaration offers no support: Once the program was codified in 2018, Congress funded Securing the Cities every year in amounts that increased over the program's lifetime, including $34 million per year beginning in Fiscal Year 2023. Kuleski Dec. ¶ 10 & table. And in support of his (incorrect) claim that funding for the program was "flat," Mr. Kuleski once again cites facts the agency could not have considered when it implemented the Freeze in May 2025, namely, the passage of the Fiscal Year 2026 DHS appropriations bill nearly a year later, in April 2026. *See* Kuleski Dec. ¶ 10 & tbl.; *id*., Ex. A-1 at 2, 19.

On the second point—that before the Freeze, funds were allegedly being spent irresponsibly due to a lack of guidance from the CWMD Office—Mr. Kuleski presents a Government Accountability Office (GAO) report as an indictment of the program, supposedly supporting the need to freeze equipment purchases. *See* Kuleski Dec. ¶ 12 (citing Ex. D at 63–64); *see also* Defs.' Opp. at 23. Mr. Kuleski omits that the section of the report he cites reached a positive conclusion, namely, that "CWMD Has Strengthened Its Program to Secure Cities and Is Addressing Regional Challenges to Ensure Progress toward Achieving and Sustaining Detection Capabilities." Kuleski Dec., Ex. D at 59. And Mr. Kuleski also omits that, as of the time the

Equipment Freeze was adopted, DHS had implemented four of the GAO's five recommendations and partially addressed the fifth. *See* GAO, Product GAO-24-106922 (Mar. 20, 2024), https://www.gao.gov/products/gao-24-106922.

In short, Mr. Kuleski's post hoc "explanation for [DHS's] decision … runs counter to the evidence [that was] before the agency." *Cook County v. Wolf*, 962 F.3d 208, 229 (7th Cir. 2020) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). As a result, even if the Court were to consider Mr. Kuleski's materials, they could not supply the missing "satisfactory explanation" for the decision to implement the Equipment Freeze. *See Cayuga Nation v. United States*, 594 F. Supp. 3d 64, 71 (D.D.C. 2022) ("'[W]here the record belies the agency's conclusion, [the court] must undo its action.'" (second brackets in original)); *see also Illinois v. FEMA*, 801 F. Supp. 3d 75, 92 (D.R.I. 2025) ("[A]gency action is arbitrary and capricious where the agency '… offered a rationale contradicting the evidence before it ….'").

*Second*, the speed with which Mr. Kuleski allegedly reached his decision to implement the Equipment Freeze supports the conclusion that "there [was] no reasoned decision-making at all." *Am. Pub. Health Assoc. v. Nat'l Insts. of Health*, 791 F. Supp. 3d 119, 139–50, 179 (D. Mass. 2025) (finding agency action arbitrary and capricious where agency identified and batch-terminated grants over the course of a single week); *Drs. for Am. v. Off. of Pers. Mgmt.*, 793 F. Supp. 3d 112, 145 (D.D.C. 2025) (concluding that agency "analyzed almost nothing" where, in relevant part, agency took action within two days). Mr. Kuleski paints a picture of a robust "national-level program management review" that preceded the Freeze. Kuleski Dec. ¶¶ 9, 17; *see also, e.g.*, Defs.' Opp. at 5–6. However, only two days elapsed between when (a) Mr. Kuleski took over as Division Director for Securing the Cities and purportedly began his review and (b) DHS decided to freeze equipment purchases. Kuleski Dec. ¶¶ 9, 17. Worse, some of the work that was supposedly part of

Mr. Kuleski's review could not have reasonably been completed within a two-day window, such as "[m]onitoring and collecting feedback from weekly regional management offices." *Id.* ¶ 9(v). The short timeframe between when Mr. Kuleski began assessing the program and when he issued the Freeze further undermines DHS's claim that it engaged in "'reasoned decisionmaking.'" *Michigan v. EPA*, 576 U.S. 743, 750 (2015).

*Finally*, Plaintiffs explained in their opening brief that the certified administrative record suggested that DHS had relied on considerations other than supposed "funding constraints" when issuing the Equipment Freeze. Pls.' Mem. at 18. In particular, Plaintiffs explained that DHS's decision may have been shaped by its documented hostility to "sanctuary jurisdictions," as reflected in then-Secretary Noem's February 2025 memo directing DHS to "cease providing federal funding to sanctuary jurisdictions." *Id.* (citing AR at 0003–0004). DHS does not dispute that it would have been arbitrary and capricious to rely on Plaintiffs' status as so-called "sanctuary jurisdictions" in issuing the Equipment Freeze. *See* Defs.' Opp. at 21–25. And, whether the Court looks only at the certified record or also at Mr. Kuleski's supplemented version, Secretary Noem's memo remains in the record. *See* AR at 0003–0004. DHS, in its brief, and Mr. Kuleski, in his declaration, both avoid the point that DHS presumably relied upon Plaintiffs' "sanctuary jurisdiction" status, ignoring the memo's presence in the record.

In sum, neither the certified record nor the supplemental materials support the conclusion that DHS provided the necessary "satisfactory explanation" for its decision to implement the Equipment Freeze.

**3. DHS Concedes It Did Not Consider Plaintiffs' Reliance Interests.**

Plaintiffs explained in their opening brief that when DHS "change[d] course" and implemented the Equipment Freeze, it was required to "show that there [we]re good reasons for

the new policy" as well as evaluate any reliance interests engendered by its prior policy. Pls.' Mem. at 18–21 (quotations omitted). DHS did neither.

DHS does not contest that it was required to put forward a "'reasoned explanation for the change' in [its] policy." Pls.' Mem. at 18–19; *see* Defs.' Opp. at 23–24 (not disputing the point). For the same reasons that DHS failed to meet its obligation to put forward a "satisfactory explanation" of the Freeze—whether evaluated on the certified record alone or on Mr. Kuleski's supplemental materials—DHS failed to provide a "reasoned explanation" for changing its equipment purchasing policy. *See supra*, Part III.B.2; Pls.' Mem. at 19.

Moreover, in a fatal blow to its argument that the Equipment Freeze can survive arbitrary and capricious review, DHS does not dispute—and therefore concedes—that (a) it was required "'to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns'" but that (b) it failed to do so. Pls.' Mem. at 19 (quoting *DHS v. Regents*, 591 U.S. at 33); *see* Defs.' Opp. at 23–24 (not disputing the point); *see also Bonte*, 624 F.3d at 466 ("[S]ilence leaves us to conclude … conce[ssion] …."); *Ratcliff*, 684 F. Supp. 3d at 866 (similar); *Nally*, 2023 WL 8236608, at *8 (similar). Neither the certified record nor the supplemental materials reflect an effort on DHS's part to determine if there were any reliance interests, and DHS does not claim otherwise. *See* Defs.' Opp. at 23–24.

Rather, DHS's entire argument is that Plaintiffs did not, as a factual matter, have any reliance interests. Defs.' Opp. at 23–24. DHS is wrong on this point, as explained below, but it is ultimately irrelevant because DHS was required to conduct a threshold assessment of *whether* there were such interests. "[R]easoned agency action … requires 'that consideration [of the strength of any reliance interests] be undertaken by the agency in the first instance.'" *Woonasquatucket*, 186 F.4th at 45–46 (quoting *DHS v. Regents*, 591 U.S. at 31); *see also Illinois*

*v. FEMA*, 801 F. Supp. 3d at 94 (APA requires agencies to determine whether there are reliance interests); *Drs. for Am.*, 793 F. Supp. 3d at 144 ("If the agency failed to … consider … relevant reliance interests[,] then the action … must be set aside."). DHS admits, as it must, that binding law supports this conclusion, stating that *DHS v. Regents* "suggest[s]" that "even if a plaintiff has no legitimate reliance interest in prior agency policy, that does not obviate the need for the agency to assess those interests." Defs.' Opp. at 24 (quoting 591 U.S. at 31). In fact, *DHS v. Regents* did more than just "suggest" that was the case; the Court so held. 591 U.S. at 30–31 (directly rejecting argument that government "did not need to" consider "potential reliance interests" because plaintiffs, in government's view, "ha[d] no 'legally cognizable reliance interests'"). DHS makes no effort to distinguish *DHS v. Regents*.

DHS is wrong on the only argument it makes—that Plaintiffs could not have had reliance interests because program Notices of Funding Opportunity and cooperative agreements stated that DHS provided funding for equipment "[a]t its discretion" or subject to the federal government's "'best interest.'" Defs.' Opp. at 3; *see id.* at 24. But the fact that DHS retained discretion does not mean that Plaintiffs *per se* lacked any reliance interests. *See DHS v. Regents*, 591 U.S. at 30–31 (requiring analysis of reliance interests notwithstanding the fact that government policy included disclaimers, which went to the "strength" of any reliance interests); *Woonasquatucket*, 186 F.4th at 45–46 (requiring analysis of grantees' reliance interests notwithstanding the fact that grants permitted termination by government); *Am. Pub. Health Ass'n*, 791 F. Supp. 3d at 182–85 (similar). The language in Notices of Funding Opportunity and cooperative agreements must also be evaluated in the context of Plaintiffs consistently receiving substantial budgets for equipment purchases, from at least their second year in the Securing the Cities program and continuing onward. *See, e.g.*, Boston Dec., Ex. E at 76, Ex. F at 84, Ex. G at 101, Ex. H at 118 (providing

budgets for equipment each year from 2021 to 2025); *see also Illinois v. FEMA*, 801 F. Supp. 3d at 94 (recognizing reliance interests where plaintiffs had structured their budgets around "consistent federal support" for decades); *Illinois v. Noem*, 813 F. Supp. 3d 282, 308 (D.R.I. 2025) (similar, based on plaintiffs receiving "consistent … funding for emergency preparedness needs"), *appeal filed*, No. 26-1182 (1st Cir.).

DHS's claim that Securing the Cities regions did not have "near-unfettered rights to purchase equipment" is a red herring, as Plaintiffs do not make such a broad claim. Defs.' Opp. at 24. Rather, Plaintiffs assert that they had consistently been able to use Securing the Cities funds to buy equipment (not just "replacements" and "support supplies," *see id.* at 21). Boston Dec. ¶¶ 7, 13, 17(c) (describing equipment purchases); Chicago Dec. 1 ¶¶ 10, 12, 17(c) (same); Denver Dec. ¶¶ 11, 13, 14(c) (same); Seattle Dec. ¶ 18 (same); S.F. Dec. ¶¶ 18, 20–21 (same). DHS itself repeatedly represented that the program provided funding for equipment. Pls.' Mem. at 18–19 (citing sources). Plaintiffs' budget planning relied upon Securing the Cities funds being available to buy radiological and nuclear detection equipment, to the point that in some cases 90% to 100% of their budgets for such equipment came from the program. *Id.* at 20 (citing declarations). Despite this, DHS froze Plaintiffs' ability to purchase equipment and instructed them not to budget for equipment in their funding applications. *See* Boston Dec., Ex. J at 145 (stating that Equipment Freeze Memo "remains in effect … and no R/N Detection Equipment maybe [sic] purchased"); Chicago Dec. 1, Ex. G at 171 (same); Denver Dec., Ex. G at 44 (similar); Seattle Dec., Ex. D at 52 (same); S.F. Dec., Ex. G at 102 (same).

At minimum, before abruptly halting its policy on equipment procurement, DHS should have considered alternatives that would have been less disruptive to Plaintiffs' reliance interests in that policy. *See DHS v. Regents*, 591 U.S. at 30–31. For example, DHS could have considered a

less categorical approach that restricted or tapered new equipment purchases while still affording Plaintiffs some discretion to propose new acquisitions for DHS's review and approval. Instead, "[r]ather than taking a measured approach to identify purportedly wasteful spending," DHS "cut the fuel supply" to the STC program—"seemingly without any consideration for the consequences of that decision." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 763 F. Supp. 3d 36, 55 (D.D.C. 2025). DHS's refusal to even acknowledge any alternatives, either in its initial Equipment Freeze memorandum or after the fact, shows that it has "failed to consider an important aspect of the problem." *Id.*

#### 4. DHS Concedes It Did Not Consider the Equipment Freeze's Impact on Public Safety.

DHS does not dispute that the law required it to consider "important aspect[s] of the problem" before implementing the Equipment Freeze. Pls.' Mem. at 21 (quoting *DHS v. Regents*, 591 U.S. at 30); *see* Defs.' Opp. at 24–25 (not disputing the point). DHS likewise does not dispute that the impact the Freeze could have on public safety was one such issue. Pls.' Mem. at 21–22; *see* Defs.' Opp. at 24–25 (not disputing the point). And DHS does not dispute that it failed to consider this issue before implementing the Freeze, as reflected in both the certified administrative record and Mr. Kuleski's supplemental materials. *See* Pls.' Mem. at 22; Defs.' Opp. at 24–25 (not disputing that certified record lacked any analysis of Freeze's impact on public safety, and not asserting that Mr. Kuleski's materials reflect such an analysis). DHS's failure to dispute these points results in concessions that are fatal to DHS's argument that the Equipment Freeze was not arbitrary and capricious. *See Bonte*, 624 F.3d at 466 ("[S]ilence leaves us to conclude … conce[ssion] …."); *Palmer*, 327 F.3d at 597–98; *Ratcliff*, 684 F. Supp. 3d at 866; *Nally*, 2023 WL 8236608, at *8.

DHS's argument boils down to "no harm, no foul," *i.e.*, that the Freeze has not really impacted public safety because "after the pause went into effect, the STC program remained focused on its mission to protect public safety." Defs.' Opp. at 24. The "after" in DHS's argument is telling; DHS does not claim that it analyzed public safety *before* deciding to freeze equipment purchases. *See Illinois v. FEMA*, 801 F. Supp. 3d at 94 (DHS's "failure to consider public safety … makes it clear that DHS's decision does not comply with the APA"). While Mr. Kuleski describes safety measures carried out after the Freeze went into effect, *see* Kuleski Dec. ¶¶ 17–28, he does not and cannot claim that these efforts somehow bore on his earlier decision to implement the Freeze. *See Gutierrez*, 532 F.3d at 920 (events postdating agency action "do 'not inform'" agency's reasoning in the moment).

Moreover, DHS's claim that the Securing the Cities program "ensur[ed] sustained R[adiological]/N[uclear] detection capabilities at all 13 STC regions" post-Freeze is factually inaccurate. Defs.' Opp. at 24; *see id*. at 4 (similar). DHS claims that the program continued to fund "program administration costs, including salaries for local offices, backfill and overtime for personnel to attend training exercises, equipment repairs, equipment warranties, and other supplies." Defs.' Opp. at 6. None of those expenses are at issue. DHS also states that it approved "certain new equipment purchases" for Chicago, Boston, and Seattle. *Id.* at 5–6 (citing Kuleski Dec. ¶ 18). Mr. Kuleski appears to be referring to Chicago's purchase of personal radiation detectors ("PRDs") in 2025. *See* Kuleski Dec. ¶ 18 (citing, seemingly incorrectly, Ex. F-1, which deals with baselining); *id.*, Ex. F-2 at 101–02 (discussing purchase of PRDs). These detectors were ordered before the Equipment Freeze; they were ultimately received by Chicago after the Freeze because they had already been custom made and could not be repurposed by the manufacturer. *Id.*,

Ex. F-2 at 102. DHS's agreement to procure detectors for Boston and Seattle, meanwhile, came in response to a litigation demand by Plaintiffs. 2d Metcalf Dec. ¶ 2; *see* Kuleski Dec., Exs. H, K, L.

DHS also cannot fill the public safety need by temporarily sending Mobile Detection Deployment Units to Plaintiffs' regions, as DHS suggests. Defs.' Opp. at 24–25; *see id.* at 5 (similar). Mr. Kuleski admits in his declaration that there have been numerous instances in which such units were not available after the Freeze went into effect, including during periodic government shutdowns. Kuleski Dec. ¶¶ 22, 24. In fact, the Mobile Detection Deployment Program "has declined nearly all of Chicago's requests for equipment," including equipment that would have been deployed at a Chicago-area NASCAR race, at Navy Pier as part of the July 4, 2026 celebrations for "America 250," and at the annual St. Patrick's Day Parade. Chicago Dec. 1 ¶ 33. Ultimately, while DHS may wish to highlight how the Mobile Detection Deployment Program has been leveraged after the Equipment Freeze went into effect, this is of no moment. DHS concededly failed to consider the impact of the Freeze on public safety before making its decision. Under the APA, that was arbitrary and capricious. *See* Pls.' Mem. at 21–22 (citing cases).[6]

## IV. DHS Concedes that if the Court Finds the Freezes Unlawful, Plaintiffs Are Entitled to Declaratory Relief, Vacatur, and Injunctive Relief.

DHS does not dispute that, if the Court finds that the Reimbursement Freeze and/or the Equipment Freeze were unlawful, the Court should grant Plaintiffs' requested relief: declaratory judgment, vacatur of the Freeze(s), and a permanent injunction barring DHS from implementing

---

[6] As of mid-2026, STC was issuing "Please Apply" letters to Plaintiffs for fiscal year 2026 stating that the Equipment Freeze remains in effect. On September 21, after submitting its opposition brief, DHS sent some—but not all—Plaintiffs a supplemental funding invitation that DHS indicated was limited to certain preapproved uses, including procuring specific and limited quantities of equipment prescribed by DHS. DHS required applications to be submitted within three days of receiving the offer. DHS did not indicate in this supplemental invitation that the Equipment Freeze has been lifted, nor has it rescinded the May 2025 Equipment Freeze Memo. Accordingly, DHS's recent actions do not affect the analysis of the Equipment Freeze.

the Equipment Freeze. *Compare* Pls.' Mem. at 28–30 (setting out Plaintiffs' request for relief and arguments why the facts and law justify the requests), *with* Defs.' Opp. (not disputing same). DHS does not argue that any of those forms of relief would be unavailable, improper, or otherwise unwarranted should the Court grant summary judgment in Plaintiffs' favor as to either or both Freezes. Nor does DHS argue that Plaintiffs have failed to establish any of the required elements to obtain such relief. DHS has therefore waived any such arguments. *See Nally*, 2023 WL 8236608, at *8 ("'The Seventh Circuit has clearly held that a party who fails to respond to points made upon a motion for summary judgment concedes those points.'"); *Bonte*, 624 F.3d at 466 ("[S]ilence leaves us to conclude … conce[ssion] …."); *Palmer*, 327 F.3d at 597–98; *Ratcliff*, 684 F. Supp. 3d at 866. Accordingly, if the Court finds for Plaintiffs on the merits, it should grant Plaintiffs their requested relief as unopposed.

## CONCLUSION

For the reasons set forth above and in Plaintiffs' opening brief, the Court should grant Plaintiffs' Motion for Partial Summary Judgment, deny Defendants' Cross-Motion for Partial Summary Judgment, and: (1) enter a declaratory judgment; (2) vacate both Freezes; and (3) permanently enjoin Defendants from implementing the Equipment Freeze.

Dated: October 2, 2026

Respectfully submitted,

**Renee Hatcher**
Acting Corporation Counsel of the City of Chicago

By: /s/ *Stephen Kane*
Stephen Kane (IL Bar No. 6272490)
Chelsey Metcalf (IL Bar No. 6447233)
Raphael J. Ginsburg (IL Bar No. 6332724)
John Kauffman (IL Bar No. 6353229)
Nathan Cummings (IL Bar No. 6345560)
City of Chicago Department of Law
121 North LaSalle Street, Room 600
Chicago, Illinois 60602
(312) 744-0458
Stephen.Kane@cityofchicago.org
Chelsey.Metcalf@cityofchicago.org
Raphael.Ginsburg@cityofchicago.org
John.Kauffman@cityofchicago.org
Nathan.Cummings@cityofchicago.org

*Counsel for Plaintiff City of Chicago*

**Michael Firestone**
Corporation Counsel, City of Boston

By: /s/ *Samuel B. Dinning*
Samuel B. Dinning (MA BBO 704304)
Teresa K. Anderson (MA BBO 669985)
City of Boston Law Department
One City Hall Square, Room 615
Boston, MA 02201
(617) 635-4034
samuel.dinning@boston.gov
teresa.anderson@pd.boston.gov

*Counsel for Plaintiff City of Boston*

**Michiko (Miko) Ando Brown**
City Attorney, City and County of Denver

By: /s/ *Matthew J. Mulbarger*
Matthew J. Mulbarger (CO Bar No. 51918)
Denver City Attorney's Office
201 W. Colfax Avenue
Denver, CO 80202
(720) 913-8050
matthew.mulbarger@denvergov.org

*Counsel for Plaintiff City and County of Denver*

**David Chiu**
City Attorney

By: /s/ *Nancy E. Harris*
Nancy E. Harris
Sara J. Eisenberg
San Francisco City Attorney's Office
1390 Market Street, 7th Floor
San Francisco, CA 94102-5408
(415) 355-3308
Nancy.Harris@sfcityatty.org
Sara.Eisenberg@sfcityatty.org

*Counsel for Plaintiff City and County of San Francisco*

**Erika Evans**
Seattle City Attorney

By: /s/ *Rebecca Widen*
Rebecca Widen
Seattle City Attorney's Office
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200
Rebecca.Widen@seattle.gov

*Counsel for Plaintiff City of Seattle*