UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CITY OF CHICAGO, CITY OF BOSTON, CITY AND COUNTY OF DENVER, CITY AND COUNTY OF SAN FRANCISCO, and CITY OF SEATTLE,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY and MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security,<br><br>Defendants. | ) | No. 25 C 5462<br><br>Judge Tharp |

**DEFENDANTS' REPLY IN SUPPORT OF PARTIAL SUMMARY JUDGMENT**

**Introduction**

Plaintiffs challenge two different actions that DHS took related to the Securing the Cities (STC) program. The first is the reimbursement pause, which concerns a four-month period in early 2025 where DHS temporarily stopped reimbursing STC regions for expenses they incurred. As defendants explained in their opening memorandum (Dkt. 64-1), defendants are entitled to summary judgment on plaintiffs' challenge to the reimbursement pause because the reimbursement pause was not a final agency action and because the challenge to the pause is moot.

Plaintiffs also challenge the equipment pause, which began in May 2025 when the administrator of the STC program, Brian Kuleski, told STC regions that new equipment purchases were paused. Defendants attached in support of their partial motion for summary judgment a declaration from Kuleski that further explained why DHS implemented the equipment pause. Dkt. 65. In light of that declaration, DHS's decision to implement the pause was not arbitrary or

capricious. Further, plaintiffs' challenge to the equipment pause is not reviewable in federal court because it challenges a function of the STC program that is left to agency discretion. Defendants are thus entitled to summary judgment on plaintiffs' equipment pause challenge, as well.

Defendants also argued in their opening memorandum that under Tucker Act principles, this court did not have jurisdiction to hear plaintiffs' APA claims. Defendants now withdraw that argument.

## Argument

### I. Defendants Withdraw Their Tucker Act Argument.

Defendants argued in their opening brief in support of partial summary judgment that this court lacked jurisdiction to hear plaintiffs' APA claims under Tucker Act principles. Upon reviewing plaintiffs' response to that argument, defendants withdraw their Tucker Act argument and concede that the Tucker Act does not deprive the court of jurisdiction to hear plaintiffs' APA claims.

### II. The Reimbursement Pause Is Not a Final Agency Action.[1]

The reimbursement pause is not reviewable by this court because it is not a final agency action. An agency action is final where it (1) "mark[s] the 'consummation' of the agency's decisionmaking process" and (2) is one "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

DHS grant officers explained to STC regions in March 2025 that payments were "on pause" while they "await[ed] guidance." Dkt. 56-4 ¶¶ 13, 15. And by June 2025, all payments

[1] As plaintiffs point out, defendants do challenge plaintiffs' reimbursement pause claims on the basis that the reimbursement pause was not arbitrary or capricious.

had resumed. This timeline belies the assertion that the pause reflected a "consummation" of any decisionmaking process.

Plaintiffs correctly note that, in cases challenging funding freezes, courts have found agencies' decisions to halt funds to constitute a final agency action. Dkt. 69 at 15-19. And courts have also held that an agency cannot simply label a funding suspension "temporary" to avoid judicial review. *New Jersey v. U.S. Dep't of Transp.*, 835 F. Supp. 3d 477, 511 (S.D.N.Y. 2026) (noting that a contrary holding would allow an agency to "indefinitely withhold funds without judicial review of its actions so long as it professed an intention to change course, contrary to the APA's presumption of judicial review"). But in each case plaintiffs rely on, either (1) the challenged funding suspension was still ongoing, or (2) the plaintiffs sued to stop a funding freeze before it went into effect. S*ee id.* at 510 (funding freeze ongoing at the time court entered a TRO); *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. U.S. Dep't of Health & Hum. Servs.*, No. 26 C 00759-TLT, 2026 WL 2549267, at *6 (N.D. Cal. June 18, 2026) (plaintiffs received letter stating that funds would be "withheld effective immediately"); *New York v. Trump*, 171 F.4th 1, 12 (1st Cir. 2026) (finding a final agency action where the directive to freeze funding was rescinded "in name only"); *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 186 F.4th 25 (1st Cir. 2026) (challenging an ongoing funding freeze); *Illinois v. Vought*, 825 F. Supp. 3d 721, 725 (N.D. Ill. 2026) (challenging a funding freeze before it went into effect). That is unlike the situation here, where DHS ended the reimbursement pause over a year ago and all owed funds have been paid to plaintiffs.

Indeed, in another case plaintiffs rely on, the court explained that if an agency's funding pause had "truly been temporary," that is, had the funds been restored, "then the Court could consider that" and "might now deem their original action to have been preliminary and temporary."

*State v. U.S. Dep't of Transp.* ("*DOT*"), No. 2:25 C 00848-TL, 2026 WL 183584, at *10 (W.D. Wash. Jan. 23, 2026). On reply, plaintiffs argue that this is a mere "hypothetical" that "does not establish a rule that any funding restriction later rescinded is necessarily nonfinal[.]" Dkt. 69 at 26. That is true enough, but what was only a hypothetical in *DOT* is a reality in this action. DHS temporarily paused reimbursements, and after a few months, restored reimbursements. The court can consider that timeline in finding that the reimbursement pause was not a final agency action.

**III. Plaintiffs' Challenge to the Reimbursement Pause Is Moot.**

For similar reasons, Plaintiffs' challenge to the reimbursement pause is moot. A case is moot where "it is impossible for the court to grant any effectual relief whatever to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012). "[A]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Ellis v. Railway Clerks*, 466 U.S. 435, 442 (1984). And when a party ceases a challenged practice after litigation begins, that "ordinarily does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 169–70 (2000).

But the Seventh Circuit has explained that "when a plaintiff's complaint is focused on a particular statute, regulation, or rule," and the government later repeals that action, the plaintiff's complaint is moot unless "there is a substantial likelihood that the offending policy will be reinstated." *Ozinga v. Price*, 855 F.3d 730, 734 (7th Cir. 2017) (finding plaintiff's 2013 claim moot where relevant regulatory scheme was revised in 2015). Section 3 of Executive Order 14,222 required DHS to establish a centralized technological system to record and justify all payments under covered contracts and grants. Dkt 54-3 at 7. Reimbursements were temporarily paused following that executive order, but they resumed in June 2025 and have continued uninterrupted

ever since. Plaintiffs acknowledge as much, writing that the pause was designed to last only "until DHS complied with the executive order." Dkt 69 at 23. There is no reasonable expectation that DHS will reinstate this temporary payment pause.

Plaintiffs do not dispute that DHS has reimbursed the STC regions for all relevant costs since June 2025, and they do not point to any evidence intimating that DHS has plans to resume the reimbursement pause. If, as plaintiffs argue, the reimbursement pause were a final agency action that reflected the consummation of DHS's decisionmaking, then under *Ozinga*, DHS's repeal of that policy is entitled to a "presum[ption] that government officials have acted in good faith." 855 F.3d at 734. There is no relief that plaintiffs could obtain if they were to prevail on their reimbursement pause claims, so those claims are moot.

## IV. The Court Can Consider the Kuleski Declaration.

### a. The Administrative Record Said Little About the Equipment Pause.

In May 2026, defendants filed an administrative record that contained all "non-privileged documents that were directly or indirectly considered in connection with" the reimbursement pause and equipment pause. Dkt. 64. Both parties acknowledge that, at only twenty-eight pages long, the administrative record is scant. As to the equipment pause specifically, the administrative record says little. In relevant part, it contains an email from Brian Kuleski explaining that the purchase of radiological and nuclear detection equipment purchases is paused due "to current Federal funding constraints[.]" Dkt. 54-3 at 25-26. It also contains an internal action plan concerning how to strengthen the STC program. Although the action plan does not explicitly mandate a pause on new equipment purchases, it demonstrates that a review of the STC program had been underway since February of 2025. Dkt. 54-3 at 20. Specifically, the STC and mobile detection deployment program teams were required to "develop a budget management plan"

within 60 days. *Id.* at 23. The action plan lends credence to Kuleski's declaration that he paused new equipment purchases due to federal funding constraints and the need to conduct a comprehensive program review.

**b. Defendants Attached the Kuleski Declaration to Their Opening Motion.**

Separate from the administrative record, defendants attached to their cross-motion for summary judgment a declaration from Kuleski. *See* Dkt. 65. Defendants argued that the court should consider the declaration because it "provides additional information regarding the history of STC Program, the budgetary constraints it faces, and his decision to implement the equipment pause." Dkt. 64-1 at 6. Kuleski also cited numerous exhibits in his declaration, including appropriations bills that were each several hundreds of pages, and internal documents that demonstrate the administrative complexity of the STC program. *See* Dkt. 65-1, 65-2.[2]

Plaintiffs claim that "the agency never explains why the Kuleski Declaration and its nearly 40 new exhibits are necessary here." Dkt 69, 29-30. Kuleski's declaration and accompanying exhibits help to provide the court with a complete and accurate understanding of the administrative record and the STC program. For example, Kuleski explains in his declaration that the equipment pause was motivated in part by pending termination of the Countering Weapons of Mass Destruction (CWMD) Office. *See* Dkt. 65 ¶ 11. Kuleski attached to his declaration a House Appropriations Committee report from June 6, 2026, which provided:

[2] As plaintiffs explain, the previously designated AUSA in this matter communicated to plaintiffs' counsel that defendants would not seek to supplement the administrative record and verified that the administrative record filed in May 2026 contained the totality of information directly or indirectly considered before implementing either the reimbursement pause or equipment pause. *See* Dkt. 69 at 3-7. The undersigned AUSA was not aware of these communications when defendants filed their cross-motion for summary judgment and the Kuleski Declaration and regrets that plaintiffs were inadvertently misled. If plaintiffs were to seek leave to file a sur-reply to cure any prejudice, defendants would not oppose that request.

> The authorization for the [CWMD] office, which was extended beyond its statutory end date through fiscal year 2024 continuing resolutions, ended on March 22, 2024. Unlike some authorizations that simply lapse, the statutory construction of section 591(e) of title 6, United States Code, terminated the office. As a result, authority for the office continued solely on the basis of the fiscal year 2024 appropriation. The Committee declines to continue, via appropriation, a terminated office and instead chooses to move the critical functions of this office into other components.

Dkt 65-1 at 304. The Kuleski declaration includes the congressionally enacted FY26 appropriations in Exhibit A-1 and its accompanying Joint Explanatory Statement in Exhibit A-2 and congressional markups and reports cumulating in the FY26 appropriations from June and December of 2025, *see* Dkt. 65-1 Exhibits B-1, B-2, and B-3, demonstrating that Congress had been actively considering the termination of the CWMD Office.

Certain exhibits also demonstrate that STC regions had purchased equipment despite not having staff to use that equipment. For example, Kuleski attached a February 2025 memorandum demonstrating that Chicago had purchased 70% of an agreed-upon baseline amount of equipment, but only 51% of Chicago's staff was trained to use that equipment. Kuleski explains in his declaration that he implemented the equipment pause in part to allow each STC region to establish new baselines. Dkt. 65 ¶¶ 17, 27. Other exhibits demonstrate the administrative complexity involved in managing the STC program. *See* Dkt. 65-2, Exhibits G-2, I-2, J-2, M-2, and N-2 (reviewing region-specific program progress); Exhibits G-4, I-4, J-4, M-4, and N-4 (containing region-specific financial outlays).

**c. The Interests of Both Parties and Judicial Economy Favor Consideration of the Kuleski Declaration.**

Plaintiffs' issues with the contents of the declaration and its exhibits aside, the court's consideration of Kuleski's declaration is in the interests of both parties and promotes judicial economy. It "is a well-established maxim" that, if "the record before the agency does not support

the agency action, [or] if the agency has not considered all relevant factors," then "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Calcutt v. Fed. Deposit Ins. Corp.*, 598 U.S. 623, 629 (2023) (citation and internal quotations omitted). Here, if the court were to limit itself to the May 2026 administrative record and set aside the equipment pause because DHS failed to adequately explain the pause, the "proper course" would be to remand back to DHS for a "additional investigation or explanation." *Id*.

But remand on that basis would be unnecessary and inefficient, because DHS has already provided additional explanation in the form of Kuleski's Declaration, in which the administrator of the STC program explains why he implemented the equipment pause. *See* Dkt. 65. And plaintiffs have argued at length that even considering the declaration, the equipment pause was still arbitrary and capricious. Dkt. 69 at 34-55. The court may (or may not) find those arguments persuasive. But there is little reason to avoid evaluating them, when doing so would only delay an eventual adjudication of Kuleski's stated reasoning for the pause. Accordingly, the court should consider Kuleski's declaration.

## V. The Equipment Pause Is Unreviewable Because the Administration of the Program Is Left to Agency Discretion.

DHS's administration of the STC program, and its decisions about which equipment purchases to fund, is committed to agency discretion by law and thus not reviewable. 5 U.S.C. § 701(a)(2). While "narrow," this exception applies where a court "would have no meaningful standard against which to judge the agency's exercise of discretion." *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019).

As described more comprehensively in defendants' opening brief, the relevant statute obligates DHS to "assist" local governments in designing nuclear detection and prevention tools, to "provide resources to enhance detection, analysis, communication, and coordination," and to

provide "augmenting resources, as appropriate, to enable" local governments to "sustain and refresh their capabilities under the STC program." 6 U.S.C. § 596b(b). It also obligates DHS to "monitor expenditures under the STC program and track performance in meeting the goals of the program," and to establish an implementation plan with "measures for achieving and sustaining capabilities under the program." 6 U.S.C. §§ 596b(b)(7), d(1)(A)(iii). But the statute says nothing about equipment, nor does it establish any kind of criteria under which requests to "augment[] resources" should be evaluated.

Kuleski explains in his declaration that although DHS, as a part of the equipment pause, paused "all new purchases" of radiological and nuclear detection equipment, the program continued to fund replacements for equipment that had reached the end of its life, as well as salaries, equipment repairs, and other supplies. Dkt. 65 ¶ 18.[3] Although the statute requires that the program "provide resources" and "augment[] resources, as appropriate," it does not contain any meaningful standard by which a court could assess whether new equipment purchases were necessary to further the statute's aims. 6 U.S.C. § 596b(b).

Plaintiffs contend that this argument is foreclosed by the district court's decision in *Chicago v. Noem*, No. 25 C 12765, 2025 WL 3251222 (N.D. Ill. Nov. 21, 2025). That case involved a separate challenge regarding changes DHS made to the terms and conditions that prospective grantees under multiple programs, including the STC program, were required to agree to before accepting grants. *Id*. at *1-2. Among other things, the terms and conditions purported

[3] Defendants argued in their opening brief that even after the beginning of the equipment pause, DHS continued to fund certain new equipment purchases, including purchases of equipment for Chicago, Boston, and Seattle. Dkt. 64-1 at 5, 27. Plaintiffs point out, and defendants now do not dispute, that those requests for equipment either (1) occurred before the onset of the equipment pause, or (2) were approved by DHS only after plaintiffs' counsel threatened to seek immediate relief with the court if DHS did not approve the purchases. Dkt. 69 at 43-44; Dkt. 69-1 ¶¶ 2.

to require that prospective grantees certify that they would not "operate any programs that advance or promote DEI, DEIA, or discriminator equity ideology in violation of Federal anti-discrimination laws." *Id*. at *2. The *Noem* court held that the terms and conditions functioned to "extract a promise—under express threat of False Claims Act liability—that a grant recipient complied with all anti-discrimination laws on the books, whether related to funding or not." *Id*. at 6. In other words, the terms and conditions at issue in *Noem* concerned whether grants could be awarded at all. *See id.* at *5 (referring to 6 U.S.C. § 596b in a single string cite).

By contrast, the issue with the equipment pause is whether the statute provides a "meaningful standard" against which a court could judge DHS's decision to pause STC regions' purchases of new equipment. It does not. It requires only that DHS provide resources, which DHS has continued to do even after the implementation of the equipment pause. Dkt. 65 ¶ 18. The statute is silent as to which equipment DHS must provide, or how often it must provide, new equipment. Because this function of the program—determining what supplies should be provided to STC regions—is left to agency discretion, plaintiffs' challenge to the equipment pause is unreviewable.

## VI. The Equipment Pause Was Not Arbitrary or Capricious.

When viewed in connection with Kuleski's declaration, the equipment pause was neither arbitrary nor capricious. The arbitrary and capricious standard requires "that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). A court's review of discretionary agency action is "narrow," and courts "determine only whether the [agency] examined 'the relevant data' and articulated a satisfactory explanation' for [its] decision." *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983).

"Even when an agency explains its decision with 'less than ideal clarity,' a reviewing court will not upset the decision on that account 'if the agency's path may reasonably be discerned.'" *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 497 (2004) (quoting *Bowman Transp., Inc. v. Arkansas—Best Freight System, Inc.*, 419 U.S. 281, 286 (1974)).

Here, DHS announced the equipment pause in May 2025, in an email from Kuleski to the STC regions. Kuleski wrote that DHS was pausing purchases of new equipment due to "funding constraints." Dkt. 54-3 at 27. In his declaration, Kuleski provides further illumination, explaining that because of longstanding, publicly documented uncertainty over the availability of federal funding for the STC program and unsustainable program expansion under prior leadership, Kuleski temporarily paused funding for new equipment. *See generally* Dkt. 65.

Plaintiffs deride Kuleski's concerns about the CWMD Office's funding constraints as a mere *post hoc* rationalization, but plaintiffs themselves acknowledged in their complaint that the future of the program was uncertain. Dkt. 10 ¶ 66. And although plaintiffs complain that Kuleski cited documents concerning events that occurred after the equipment pause was implemented, such as the June 2025, December 2025, and April 2026 versions of FY 2026 funding proposals for DHS, their argument misapprehends the reality of the federal appropriations cycle. Dkt. 69 at 36. Draft legislation does not materialize overnight; rather, it is iterative and the culmination of congressional hearings, staff-level deliberations, and consultation with DHS leading up to its formal publications on those dates. Those events nonetheless demonstrate Kuleski was correct to be concerned about the program's future, including the CWMD Office's eventual termination.

More broadly, plaintiffs misunderstand the *post hoc* justification doctrine. The doctrine "is not a time barrier which freezes an agency's exercise of its judgment after an initial decision has been made and bars it from further articulation of its reasoning. It is a rule directed at reviewing

courts which forbids judges to uphold agency action on the basis of rationales offered by anyone *other than* the proper decisionmakers." *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006) (internal quotation marks omitted) (emphasis added). It does not preclude a decisionmaker from offering further after-the-fact explanation of his decision; it exists to prevent later-dated explanations from *others*, like "agency lawyers during litigation." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 67 (2020) (Kavanaugh, J., concurring in part and dissenting in part); *see also State Farm*, 463 U.S. at 50 (providing that "courts may not accept appellate counsel's post hoc rationalizations for agency action"). The doctrine does not preclude DHS from explaining its actions after the actions occurred.

Plaintiffs also take Kuleski to task for relying on a 2024 Government Accountability Office (GAO) report to determine the program had previously been expanded irresponsibly. The GAO found that officials "from several regions reported concerns with how CWMD encourages expansion of STC regional programs," and that "officials from some regions told us their concerns about a lack of guidance and criteria from CWMD on how, when, and where to expand their programs." Dkt. 65-2 at 63-64. Plaintiffs attempt to minimize these concerns by highlighting that the report ultimately concluded that "CWMD Has Strengthened Its Program" and by noting that DHS had implemented others of the GAO's recommendations. Dkt. 69 at 36-37. But the GAO's report that the program had in some ways been strengthened does not negate its finding that regions had complained about a lack of guidance. Nor does it render DHS's decision to pause new equipment purchases in response to that lack of guidance unreasonable.

Plaintiffs further accuse DHS of failing to take into account public safety prior to implementing the equipment pause. Dkt. 69 at 42. Yet plaintiffs acknowledge that DHS continued to deploy mobile detection deployment units in response to STC regions' requests and that DHS

provided funds for other important functions of the STC program, including salaries, equipment replacements, and other supplies. Dkt. 69 at 42-43. And Kuleski explains that DHS took those actions "to ensure sustained [radiological/nuclear] detection capabilities across the 13 STC regions." Dkt. 65 ¶ 19. Plaintiffs' attempt to minimize these expenses as not "at issue" is a *non sequitur*, as they simply demonstrate that DHS continued to ensure public safety even after the pause was implemented. Dkt. 69 at 43.

**VII. Remedy**

If the court were to hold that either pause is arbitrary and capricious, the court should "remand to the agency for additional investigation or explanation." *Calcutt*, 598 U.S. at 629; *Regents*, 591 U.S. at 67 (Kavanaugh, J., concurring in part and dissenting in part) ("the ordinary judicial remedy for an agency's insufficient explanation is to remand for further explanation by the relevant agency personnel").

If the court were to decline to consider Kuleski's declaration, then the court should remand the issue back to DHS so that it can better explain its rationale for implementing the equipment pause. If the were to court consider Kuleski's declaration but nonetheless find that the equipment pause was arbitrary or capricious because DHS failed to consider some important aspect of the pause, or that DHS was required to but failed to consider plaintiffs' reliance interests, the proper remedy would be to remand the case back to DHS to conduct a more fulsome analysis. *See Regents*, 591 U.S. at 36 (remanding where agency failed to comply "with the procedural requirement that it provide a reasoned explanation for its action").

**Conclusion**

For these reasons, this court should deny plaintiffs' partial motion for partial summary judgment and grant defendants' motion for partial summary judgment.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: s/ Michael T. Morrell
MICHAEL T. MORRELL
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 469-6206
michael.morrell@usdoj.gov